UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EPAM SYSTEMS, INC., Plaintiff, v. GOWTHAM RAO, Defendant. | : | Civ. A. No. |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER, A PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY**

Dated: New York, New York
November 4, 2025

SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018
(212) 218-5500

Attorneys for Plaintiff
EPAM Systems, Inc.

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ........ 1

STATEMENT OF FACTS ........ 3

ARGUMENT ........ 7

I. EPAM IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION. ........ 7

A. EPAM Is Likely To Succeed On The Merits Of Its Claims. ........ 7

1. EPAM Is Likely to Succeed on its DTSA and PUTSA Claim. ........ 8

2. EPAM Is Likely to Succeed on its Breach of Contract Claims. ........ 13

3. EPAM Is Likely to Succeed on its Breach of Fiduciary Duty Claim. ........ 16

4. EPAM is Likely to Succeed on its Claim for Conversion. ........ 18

5. EPAM is Likely to Succeed on its Replevin Claim. ........ 19

6. EPAM is Likely to Succeed on its Unjust Enrichment Claim. ........ 19

B. EPAM Will Suffer Irreparable Harm If The Court Does Not Grant It Injunctive Relief. ........ 20

C. A Balance Of The Hardships Weighs In EPAM’s Favor. ........ 22

D. The Public Interest Favors an Injunction. ........ 22

II. EPAM IS ENTITLED TO EXPEDITED DISCOVERY. ........ 23

CONCLUSION ........ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*123 Exteriors, Inc. v. N. Star Exteriors, LLC*,
No. 17-4337, 2018 WL 3642221 (E.D. Pa. Aug. 1, 2018) ....................10

*Air Prods & Chem., Inc. v. Inter-Chemical, Ltd.*,
No. Civ. A. 03-CV-6140, 2003 WL 22917491 (E.D. Pa. Dec. 2, 2003) ....................8, 9, 12

*Alpha Pro Tech, Inc. v. VWR Int'l LLC*,
984 F. Supp. 2d 425 (E.D. Pa. 2013) ....................19

*AmQuip Crane Rental, LLC v. Crane & Rig Servs., LLC*,
2018 Pa. Super 315, 199 A.3d 904 (2018) ....................17

*Bimbo Bakeries USA, Inc. v. Botticella*,
No. 10-0194, 2010 WL 571774 (E.D. Pa. Feb. 9, 2010), *aff'd*, 613 F.3d 102 (3d Cir. 2010) ....................22, 23

*Bohler v. Uddeholm Am., Inc. v. Ellwood Grp., Inc.*,
247 F.3d 79 (3d Cir. 2001) ....................10

*Campbell Soup Co. v. ConAgra, Inc.*,
977 F.2d 86 (3d Cir. 1992) ....................20

*Capstone Logistics Holdings, Inc. v. Navarrete*,
No. 17-cv-4819, 2018 WL 6786338 (S.D.N.Y. Oct. 25, 2018) ....................10, 13

*Cenveo Corp. v. Slater*,
2007 WL 527720 (E.D. Pa. Feb. 12, 2007) ....................18

*Charles Schwab & Co. v. Karpiak*,
No. 06-4010, 2007 WL 136743 (E.D. Pa. Jan. 12, 2007) ....................16

*Chatham Fin. Corp. v. Milhaus, LLC*,
No. 25-cv-00157-SB, 2025 WL 3007405 (D. Del. Oct. 28, 2025) ....................9

*Chicago Title Ins. Co. v. Lexington & Concord Search & Abstract, LLC*,
513 F. Supp. 2d 304 (E.D. Pa. 2007) ....................20

*Clarke Transp. Servs., Inc. v. Haskins*,
No. 06-785, 2006 WL 1620175 (E.D. Pa. June 8, 2006) ....................16

*Consulting Grp., LLC v. Baggot*,
No. 18-cv-00231, 2018 WL 1942762 (D. Colo. Apr. 25, 2018) ....................10

*Coventry First, LLC v. Ingrassia*,
No. Civ.A.05-2802, 2005 WL 1625042 (E.D. Pa. July 11, 2005)....21

*Cutera, Inc. v. Lutronic Aesthetics, Inc.*,
444 F. Supp. 3d 1198 (E.D. Cal. 2020)....13

*Ellsworth Assocs., Inc. v. United States*,
917 F. Supp. 841 (D.D.C. 1996)....24

*Elmagin Cap., LLC v. Chen*,
555 F. Supp. 3d 170 (E.D. Pa. Aug. 17, 2021)....10

*Entertainment Tech. Corp. v. Walt Disney Imagineering*,
No. Civ.A. 03-3546, 2003 WL 22519440 (E.D. Pa. Oct. 2, 2003)....24

*EXL Labs., LLC v. Egolf*,
No. 10-6282, 2011 WL 880453 (E.D. Pa. Mar. 11, 2011)....18

*Fenton v. Balick*,
821 F. Supp. 2d 755 (E.D. Pa. Nov. 3, 2011)....18

*Fisher Bioservices, Inc. v. Bilcare, Inc.*,
No. Civ.A. 06-567, 2006 WL 1517382 (E.D. Pa. May 31, 2006)....21

*Flatiron Crane Operating Co., LLC v. Adkins*,
No. 5:23-cv-02396-JMG, 2023 WL 4565470 (E.D. Pa. July 17, 2023)....23

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.*,
730 F.2d 61 (2d Cir. 1984)....20

*Ford Motor Co. v. Launch Tech. Co.*,
No. 17-12906, 2018 WL 1089276 (E.D. Mich. Feb. 26, 2018)....10

*Ford Motor Credit Co. v. Caiazzo*,
564 A.2d 931 (Pa. Super. Ct. 1989)....19

*Foster Company v. Barnhart*,
No. 14-702, 2014 WL 11395182 (W.D. Pa. Jul. 30, 2014)....13

*Fres-co Sys. USA, Inc. v. Hawkins*,
No. 16-4246, 2016 WL 9306081 (E.D. Pa. Aug. 26, 2016)....21

*Frontier Const. Co. v. Mazzella*,
2009 WL 3806754 (W.D. Pa. Nov. 13, 2009)....17

*Hereas Materials Tech. LLC v. Tung Pham*,
No. 11-2965, 2011 WL 13227724 (E.D. Pa. May 5, 2011)....23

*Hess v. Gebhard Co.*,
570 Pa. 148; 808 A.2d 912 (2002)....................15

*Home Line Furniture Indus., Inc. v. Banner Retail Mktg., LLC*,
630 F. Supp. 2d 527 (E.D. Pa. 2009)....................10

*Hope v. Warden York County Prison*,
956 F.3d 156 (3d Cir. 2020)....................7

*Integrated Solutions, Inc. v. Service Support Specialties, Inc.*,
124 F.3d 487 (3d Cir. 1997)....................19

*Jazz Pharm., Inc. v. Synchrony Group, LLC*,
343 F. Supp. 3d 434 (E.D. Pa. 2018)....................8

*Kenset Corp. v. Ilanjian*,
600 F. App'x 827 (3d Cir. 2015)....................9

*Kos Pharm., Inc. v. Andrx Corp.*,
369 F.3d 700 (3d Cir. 2004)....................7

*Latuszewski v. VALIC Fin. Advisors, Inc.*,
No. 03-0540, 2007 WL 4462739 (W.D. Pa. Dec. 19, 2007)....................13

*Lux Global Label Co., LLC v. Shacklett, IV, et al.*,
No. 18-5061, 2019 WL 3530424 (E.D. Pa. July 31, 2019)....................10

*Mallet & Co. v. Lacayo*,
No. 19-1409, 2020 WL 6866386 (W.D. Pa. Nov. 23, 2020)....................11, 12

*National Reprographics, Inc. v. Strom*,
621 F. Supp. 2d 204 (D.N.J. 2009)....................7

*O.D. Anderson, Inc. v. Cricks*,
815 A.2d 1063 (Pa. Super. 2003)....................12

*Oakwood Labs. LLC v. Thanoo*,
999 F.3d 892 (3d Cir. 2021)....................20

*Oburn v. Shapp*,
521 F.2d 142 (3d Cir. 1975)....................7

*Pappan Enters, Inc. v. Hardee's Food Sys., Inc.*,
143 F.3d 800 (3d Cir. 1998)....................7, 21

*Philadelphia Newspapers, Inc. v. Gannett Satellite Info. Network, Inc.*,
No. Civ. A. 98-cv-2782, 1998 WL 404820 (E.D. Pa. July 15, 1998)....................24

*PNC Mortg. v. Superior Mortg. Corp.*,
No. 09-5084, 2012 WL 628000 (E.D. Pa. Feb. 27, 2012) ....................17

*Revzip, LLC v. McDonnell*,
No. 3:19-CV-191, 2019 WL 6701835 (W.D. Pa. Dec. 9, 2019) ....................20

*Ritescreen Co., LLC v. White*,
No. 1:23-CV-00778, 2023 WL 5183044 (M.D. Pa. Aug. 11, 2023) ....................14, 21

*Robinson Elec. Supervisory Co. v. Johnson*,
397 Pa. 268, 154 A.2d 494 (1959) ....................11

*Schuylkill Valley Sports, Inc. v. Corp. Images Co.*,
No. 5:20-cv-02332, WL 3167636 (E.D. Pa. June 15, 2020) ....................9

*Signature Fin. LLC v. Shri Vighneshwar LLC*,
No. 23-310, 2024 WL 531257 (E.D. Pa. Feb. 9, 2024) ....................19

*State of N.Y. v. U.S. Metals Ref. Co.*,
771 F.2d 796 (3d Cir. 1985) ....................23

*Stream Cos. v. Windward Advert.*,
No. 12-CV-4549, 2013 WL 12114590 (E.D. Pa. Feb. 8, 2013) ....................20, 22

*Sylvester v. Beck*,
406 Pa. 607, 178 A.2d 755 (1962) ....................16

*Synthes, Inc. v. Emerge Med., Inc.*,
No. 11-1566, 2012 WL 4205476 (E.D. Pa. Sept. 19, 2012) ....................10, 16

*Tantopia Franchising Co., LLC v. W. Coast Tans of PA, LLC*,
918 F. Supp. 2d 407 (E.D. Pa. 2013) ....................20

*United Ins. Co. of Am. v. Dienno*,
248 F.Supp. 553 (E.D. Pa. 1965) ....................17

*Universal Premium Acceptance Corp. v. York Bank & Trust Co.*,
69 F.3d 695 (3d Cir. 1995) ....................18

*Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc.*,
511 F. Supp. 2d 482 (E.D. Pa. 2007) ....................7

*Valley Gypsum Co. v. Pa. State Police*,
581 A.2d 707 (Pa. Commw. Ct. 1990) ....................19

*Viad Corp. v. Cordial*,
299 F. Supp. 2d 466 (W.D. Pa. 2003) ....................15

*Waymo. Uber Techs., Inc.*,
2017 WL 2123560 (N.D. Cal. Mar. 2, 2017)....................13

*West Shore Home, LLC v. Graeser*,
661 F. Supp. 3d 356 (M.D. Pa. 2023)....................13

*Westcode, Inc. v. Daimler Chrysler Rail Sys. (N. Am.) Inc.*,
123 F. Supp. 2d 819 (E.D. Pa. 2000)....................20

**Statutes**

12 Pa. Cons. Stat. Ann. § 5302....................8, 9

12 Pa. Cons. Stat. § 5303....................9

18 U.S.C. § 1832....................2

18 U.S.C. § 1836(b)(3)....................9

18 U.S.C. § 1839(3)....................8

18 U.S.C. § 1839(5)....................9

Defend Trade Secrets Act of 2016.................... *passim*

Pennsylvania Uniform Trade Secrets Act.................... *passim*

**Other Authorities**

Fed. R. Civ. P. 34(b)....................23

Federal Rule of Civil Procedure 26....................23

Federal Rule of Civil Procedure 34....................23

Federal Rules of Civil Procedure Rule 65....................1

Restatement (Third) of Agency, §§ 8.04 & 8.05 (2006)....................17

Plaintiff EPAM Systems, Inc. ("EPAM" or the "Company"), respectfully submits this memorandum of law in support of its motion for a temporary restraining order ("TRO") and a preliminary injunction against Defendant Gowtham Rao, ("Rao" or "Defendant"), pursuant to Rule 65 of the Federal Rules of Civil Procedure. EPAM also seeks expedited discovery in advance of the hearing on this motion for a preliminary injunction.

## PRELIMINARY STATEMENT

EPAM, a leading provider of technology solutions with a business unit dedicated to the life sciences industry, brings this motion for injunctive relief arising from Rao's blatant theft of over 44,000 data files, almost all of which contain confidential and/or trade-secret information relating to EPAM's life sciences business, along with proprietary source code developed by EPAM over time at significant expense throughout several software projects (collectively "EPAM Confidential Information and IP").

Specifically, between September 11 and October 14, 2025, while planning his exit from employment with EPAM, Rao secretly downloaded entire file repositories from EPAM's networks containing source code and other intellectual property, along with Confidential Information and IP regarding EPAM's clients and their historical account information, RFP information and bid proposals, pricing information, client facing project information (including designs and data models), client contract documents, business pipelines, and P&L and related financial information. Not only were Rao's actions unauthorized and in violation of Company policy, but there can be no business justification for his actions or his personal possession of this information given that many of the stolen files relate to historical data, clients, or projects about which Rao had no involvement, or are comprised of information that belongs to EPAM's clients.

Before discovering the unauthorized downloads, Rao was terminated for cause on October 15, 2025 after the Company learned that he had engaged in a number of other acts of

sabotage, including an attempt to fraudulently assert copyright ownership over software code developed by the Company by surreptitiously embedding "Copyright 2025 Gowtham Rao" into the code. The Company then immediately launched an investigation into Rao's activities on its network, during which the unauthorized download of over 44,000 data files (almost all of which occurred between October 11 through October 13) came to light. In addition, Rao stole not only the source code to certain software tools owned by EPAM, but also source code to tools comprised of intellectual property owned by EPAM's clients that have been entrusted to EPAM. The investigation also confirmed that Rao had attempted to permanently delete a large number of EPAM client and project files from EPAM's servers.

Rao's theft of EPAM's data files and intellectual property makes clear that his nefarious plan all along was to immediately compete with EPAM after his exit and leverage the stolen information to aid his efforts. Indeed, immediately after his exit, he announced on an industry platform, "I am now a competitor for EPAM." Since his departure from EPAM, the Company has been made aware that Rao has in fact been competing with EPAM and soliciting EPAM's customers, notwithstanding the post-termination restrictive covenants—including a client non-solicitation provision that is triggered regardless of whether his separation is voluntary or involuntary—in the Agreement.

Rao's actions as described herein are in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1832, the Pennsylvania Uniform Trade Secrets Act, the Employment Covenants Agreement that Rao executed on November 12, 2024 as a condition of his employment with EPAM (the "Agreement"), the Company's written policies with respect to the use of the Company's computer equipment and the protection of EPAM Confidential Information and IP, and his fiduciary obligations to EPAM, among other legal obligations. EPAM seeks, among

other things, a return and forensic remediation of all EPAM Confidential Information and IP in Rao's possession and control, an injunction prohibiting him from using or disclosing any EPAM Confidential Information and IP, an injunction enforcing his post-termination non-solicitation covenants, and damages resulting from his willful misconduct.

Absent injunctive relief and specific performance of his contractual obligations, EPAM faces irreparable injury, including the loss of proprietary information relating to its business as contained and reflected in the thousands of files and intellectual property purloined by Rao that EPAM developed over the course of many years, at immense in cost.

## STATEMENT OF FACTS

For a full recitation of the relevant facts, Plaintiff incorporates by reference the factual statements made in the accompanying Declarations of Gregory Klebanov ("Klebanov Decl."), Miroslav Sklansky ("Sklansky Decl."), Larry McClaine ("McClaine Decl."), Lucy McDermott ("McDermott Decl."), June Dinitz ("Dinitz Decl."), and James Yu ("Yu Decl."), and all exhibits thereto. A summary of the salient facts is stated below.

EPAM is a leading global provider of digital engineering, cloud and AI-enabled transformation services, and a leading business and experience consulting partner for global enterprises and startups across a broad spectrum of industries, including life sciences and healthcare. The life sciences group, and the Real-World Evidence ("RWE") business unit in which Rao worked, provide technology solutions and data analytic services to pharmaceutical companies and healthcare organizations around the world. (Klebanov Decl. ¶¶ 2, 5-6).

A core part of EPAM's business is the sale of digital tools and software solutions that EPAM's employees and engineers have continuously developed and refined over many years. Certain of these products are sold as a commercial license to EPAM's pharmaceutical and healthcare clients and are thus considered highly proprietary intellectual property. (*Id.* ¶ 7).

These software tools include an ETL Conversion Kit, which was developed by EPAM over 10 years to Extract, Transform and Load ("ETL") data for medical data standardization and which makes the Company uniquely competitive by automating tasks which are often done by others manually. (*Id.* ¶ 8). In addition, in 2025 EPAM also developed an AI Cohort Generator, which enables automatic creation of clinical study designs from free text to enhance research productivity, and an AI Accelerator, a data and decision support platform that serves as a centralized biomedical knowledge layer designed for ease of use by non-technical users. These assets are licensed to clients and are critical to EPAM's market positioning. (*Id.* ¶¶ 8-10). The underlying code to these tools and products are considered confidential and proprietary, accessible only to EPAM employees who work on the development of those products or otherwise have a business need for access to such information. (*Id.* ¶ 11).

EPAM's success in this competitive industry is not only highly dependent upon its ongoing investment in proprietary technology solutions, but also continuous cultivation of client relationships in order to develop recognition, goodwill and successful partnerships with clients. (*Id.* ¶¶ 7-14). Accordingly, EPAM's compilation of client information, pricing arrangements, identities of individual points of contact, contract documents, project data, and bid proposals, among others, are also considered highly confidential trade-secret information. (*Id.* ¶ 20).

In addition, EPAM's client engagements often result in the creation of customized code which is delivered to the client and becomes the client's intellectual property. EPAM treats client code as particularly sensitive and confidential, as it is of significant commercial value to each client. Moreover, EPAM has specific contractual obligations to safeguard its clients' intellectual property. (*Id.* ¶ 22.)

Rao was, until October 15, 2025, Managing Principal, Life Sciences Consulting at EPAM. In that role, he was responsible for heading the data science business unit within EPAM's life sciences division, including business development, revenue generation, portfolio management, and managing the members of the data science team. (*Id.* ¶¶ 27-28). In consideration for his employment, Rao signed the Agreement which includes confidentiality and non-disclosure obligations, as well as non-competition and non-solicitation restrictive covenants befitting his position in the Company and access to EPAM Confidential Information and IP. (Dinitz Decl. ¶ 6, Ex. A). During his employment, Rao had broad access to a wide range of EPAM Confidential Information and IP. (Klebanov Decl. ¶ 20-23, 30).

Following a number of issues concerning his performance and complaints from his team about Rao's leadership, in September 2025, Rao's role was redefined to focus on developing EPAM's AI capabilities with regard to certain solutions for specific clients. (McClaine Decl., ¶ 9). Unhappy with this change, Rao began to explore a separation from the Company. (Klebanov Decl. ¶ 33.)

In the midst of these discussions, Rao engaged in a number of acts of misconduct. First, on or about October 12, 2025, he unlawfully attempted to fraudulently assert copyright ownership over software code developed by the Company by surreptitiously embedding the phrase "Copyright 2025 Gowtham Rao" in connection with the software code for one of EPAM's tools it had been developing and to which Rao had access via GitLab (a software code repository). (McDermott Decl. ¶ 13.) Second, concerns were raised around the same time that Rao had attempted to permanently delete various files from EPAM's SharePoint site. (*Id.* ¶ 14.) Third, a week earlier, Rao had fraudulently represented to a longstanding Company client that he

was no longer associated with EPAM, and that he was a “free agent” in business for himself. (*Id.* ¶¶ 11-12).

Following his termination on October 15, 2025, EPAM learned that between September 11, 2025 and October 14, 2025 (with a significant tranche between October 11 and 13), Rao also downloaded approximately 44,960 documents and data files containing EPAM Confidential Information and IP to one or more external devices, without the Company’s authorization. (Sklansky Decl. ¶ 9-12). Among the downloads, Rao purloined code bases to a number of EPAM software tools, including the source code to EPAM’s ETL Conversion Kit, AI Cohort Generator, and AI Accelerator, and customized software owned by EPAM’s clients. (Klebanov Decl. ¶ 40). The Company’s security team also confirmed that Rao had in fact attempted to permanently delete a large number of data files from EPAM’s servers. (Sklansky Decl. ¶ 13). Not only were Rao’s actions unauthorized and in violation of Company policy, but there could be no business justification for his personal possession of this information given that many of the stolen files relate to historical data, clients, or projects about which Rao was not involved or had no need for his work with EPAM, or are comprised of information that belong to EPAM’s clients. (Klebanov Decl. ¶ 42).

Confirming the Company’s suspicion that Rao intends to misuse the stolen data to compete with EPAM, since his termination, EPAM has obtained evidence that Rao is competing with EPAM and has breached the non-solicitation covenant in his employment agreement with EPAM. Indeed, within hours of his termination, Rao attempted to schedule a meeting with a longstanding EPAM client on an external industry Teams platform, announcing “In full disclosure I am now a competitor for EPAM.” (McDermott Decl. ¶ 16). The Company has continued to receive reports from its clients that Rao has been soliciting them for business. (*Id.*).

# ARGUMENT

## I. EPAM IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION.

One of the primary purposes of an emergency injunction is to maintain the status quo until a hearing can be held on the application for a preliminary injunction. *Hope v. Warden York County Prison*, 956 F.3d 156, 160 (3d Cir. 2020). In this case, preserving the status quo means preventing further irreparable harm to EPAM's business caused by Rao's continued access to and misuse of EPAM Confidential Information and IP, his solicitation of EPAM's clients, and his continued interference with EPAM's business relationships.

Under the well-established standard in this Circuit, EPAM is entitled to a preliminary injunction if it can demonstrate: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004); *Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc.*, 511 F. Supp. 2d 482, 489 (E.D. Pa. 2007).

### A. EPAM Is Likely To Succeed On The Merits Of Its Claims.

A party seeking injunctive relief must demonstrate a "likelihood that plaintiff will prevail on the merits at final hearing." *Pappan Enters, Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 803 (3d Cir. 1998). In evaluating whether a movant has satisfied this standard, "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a prima facie case showing a reasonable probability that it will prevail on the merits." *National Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 222 (D.N.J. 2009) (quoting *Oburn v. Shapp*, 521 F.2d 142, 148 (3d Cir. 1975)).

### 1. EPAM Is Likely to Succeed on its DTSA and PUTSA Claim.

EPAM will succeed on its claims of misappropriation of trade secrets because the record evidence irrefutably demonstrates that Rao has wrongfully accessed, stolen and misused EPAM's trade secrets in violation of the Defend Trade Secrets Act of 2016 ("DTSA") and the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), and continues to threaten to misuse such information.

The DTSA defines a "trade secret" as:

> All forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if --
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C. § 1839(3); *see also Jazz Pharm., Inc. v. Synchrony Group, LLC*, 343 F. Supp. 3d 434, 444 (E.D. Pa. 2018) ("Although the DTSA and the PUTSA use different wording, both statutes define a 'trade secret' as information that: (1) the owner has taken reasonable means to keep secret; (2) derives independent economic value, actual or potential, from being kept secret; (3) is not readily ascertainable by proper means; and (4) others who cannot readily access it would obtain economic value from its disclosure or use.") (citing 12 Pa. Cons. Stat. Ann. § 5302); *Air Prods & Chem., Inc. v. Inter-Chemical, Ltd.*, No. Civ. A. 03-CV-6140, 2003 WL 22917491, at *9 (E.D. Pa. Dec. 2, 2003) (holding that the "crucial indicia" in determining if information is a trade secret are "substantial secrecy and competitive value …").

Both the DTSA and PUTSA expressly permit injunctions to prevent actual *or threatened* misappropriation of trade secrets. 18 U.S.C. § 1836(b)(3); 12 Pa. Cons. Stat. § 5303; *Kenset Corp. v. Ilanjian*, 600 F. App'x 827, 831 (3d Cir. 2015). The DTSA defines misappropriation as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or disclosure or use of a trade secret of another without express or implied consent." 18 U.S.C. § 1839(5). The PUTSA adopts a similar definition of misappropriation. 12 Pa. Cons. Stat. Ann. § 5302; *Schuylkill Valley Sports, Inc. v. Corp. Images Co.*, No. 5:20-cv-02332, WL 3167636, at *11 (E.D. Pa. June 15, 2020).

EPAM easily meets these standards. First, EPAM Confidential Information and IP qualifies as a "trade secret" under the DTSA and PUTSA. EPAM seeks protection of, among other things, not only the proprietary software code of its ETL Conversion Kit, AI Cohort Generator, and AI Accelerator, among other intellectual property, but also data relating to EPAM's clients, client account information, RFP responses and bid proposals, pricing documentation, client facing project information (including designs and data models), contract documents, CRM data, and P&L data, among other highly confidential and sensitive information, all of which have been unlawfully stolen by Rao. (*See generally* Klebanov Decl. ¶¶ 36-37; McClaine Decl. ¶¶ 20-21). Since EPAM developed this information at substantial time and expense, EPAM is entitled to reap the benefits of its significant investments. *Air Prods. & Chem.*, 2003 WL 22917491 at *10 (affording trade secret status to customer list based upon plaintiff's investment of significant time and money compiling the information).

Proprietary source code and digital intellectual property in particular are routinely protected as trade secrets. *See Chatham Fin. Corp. v. Milhaus, LLC*, No. 25-cv-00157-SB, 2025 WL 3007405, at *4 (D. Del. Oct. 28, 2025) (citing cases finding software, source code, scripts

and algorithms to all constitute trade secrets); *Elmagin Cap., LLC v. Chen*, 555 F. Supp. 3d 170, 180 (E.D. Pa. Aug. 17, 2021) (holding that similarity of trading strategy algorithms derived from software code sufficiently stated a claim for misappropriation of trade secrets); *Home Line Furniture Indus., Inc. v. Banner Retail Mktg., LLC*, 630 F. Supp. 2d 527 (E.D. Pa. 2009) (granting preliminary injunction under PUTSA where marketing firm accessed proprietary web-based sales platform under confidentiality agreement and marketed to competitors); *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-cv-4819, 2018 WL 6786338, at *3 (S.D.N.Y. Oct. 25, 2018) (finding that plaintiffs were likely to succeed on its misappropriation claim under the DTSA, based upon evidence that defendants copied and misused source code to proprietary software platform developed by plaintiffs); *Consulting Grp., LLC v. Baggot*, No. 18-cv-00231, 2018 WL 1942762, at *9 (D. Colo. Apr. 25, 2018) (enjoining defendant from using or sharing plaintiff's trade secret information, including "software or computer programs"); *Ford Motor Co. v. Launch Tech. Co.*, No. 17-12906, 2018 WL 1089276, at *17 (E.D. Mich. Feb. 26, 2018) (integrated diagnostic software constitutes a trade secret under DTSA).

Likewise, "Pennsylvania courts have universally found client/customer lists and profiles, and pricing information to be trade secrets when confidently maintained." *123 Exteriors, Inc. v. N. Star Exteriors, LLC*, No. 17-4337, 2018 WL 3642221, at *7 (E.D. Pa. Aug. 1, 2018) (citing *Bohler v. Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 107 (3d Cir. 2001)); *see also Lux Global Label Co., LLC v. Shacklett, IV, et al.*, No. 18-5061, 2019 WL 3530424, at *1 (E.D. Pa. July 31, 2019) (holding that defendant's authorized download of files onto thumb drive containing pricing lists, customer analysis, key contact information, customer needs and demands, marketing strategies, and data comparisons sufficiently identified trade secrets at issue to state a claim for violation of the DTSA); *Synthes, Inc. v. Emerge Med., Inc.*, No. 11-1566,

2012 WL 4205476, at *24-25 (E.D. Pa. Sept. 19, 2012) (holding that a claim is sufficiently pled under PUTSA when the trade secret included information pertaining to the plaintiff's customers, business activities, strategies, and product development plans); *Mallet & Co. v. Lacayo*, No. 19-1409, 2020 WL 6866386, *7 (W.D. Pa. Nov. 23, 2020) ("Customer information obtained by an employee that is not readily available or has been generated through expense, time and effort may qualify as a trade secret"); *Robinson Elec. Supervisory Co. v. Johnson*, 397 Pa. 268, 154 A.2d 494, 496 (1959) ("[C]ustomer lists and customer information ... [are] highly confidential and constitute[ ] a valuable asset. Such data has been held to be property in the nature of a 'trade secret' for which an employer is entitled to protection, independent of a non-disclosure contract.").

Second, EPAM derives independent economic value from its proprietary codebases and aforementioned confidential information, which form the backbone of its commercial offerings and strategic operations. If a competitor were to gain access to EPAM Confidential Information and IP, they would obtain an unfair advantage by avoiding the substantial time, cost, and expertise required to develop these resources, enabling them to replicate EPAM's solutions, target its clients, and interfere with business opportunities cultivated over a decade of research and development. (Klebanov Decl. ¶ 25).

Third, EPAM rigorously protects the secrecy of EPAM Confidential Information and IP, including by (i) making all employees subject to the confidentiality provisions of EPAM's Employee Code of Conduct; (ii) making employees execute agreements that contain confidentiality and non-disclosure obligations as a condition to obtaining access to EPAM Confidential Information and IP, and in certain instances additional restrictive covenants, such as non-competition and non-solicitation provisions; (iii) limiting access to EPAM Confidential

Information on a need-to-know basis; (iv) storing information on secure networks and password protected devices; (v) requiring all employees to periodically complete training lessons regarding confidentiality obligations and data privacy compliance; (vi) monitoring employee access and activity on the Company's computer systems to detect questionable conduct; and (viii) requiring employees to return all EPAM Confidential Information and IP upon termination of employment. (Klebanov Decl. ¶ 26). Such measures are sufficient to demonstrate trade secret status under both federal and Pennsylvania law. *See, e.g.*, *Air Prods.*, 2003 WL 22917491 at *9 ("confidentiality agreements [are] evidence of the secret nature of the subject information"); *Mallet*, 2020 WL 6866386 at *8 ("Mallet need not undertake every available option to have acted reasonably"); *O.D. Anderson, Inc. v. Cricks*, 815 A.2d 1063, 1071 (Pa. Super. 2003) (maintaining customer lists on a restricted database and instructing employees about its confidential nature were reasonable protective measures).

Fourth, Rao acquired the EPAM Confidential Information and IP through improper means when he secretly downloaded over 44,000 documents and data files from the Company's networks to one or more external devices, knowing he was about to leave the Company. (Klebanov Decl. ¶ 39). Moreover, both before and after his termination, Rao has manifested an intent to misuse such information by engaging in other unethical acts that violated Company policy, including his admitted engagement in competition with EPAM and solicitation of EPAM clients, all while in unlawful possession of EPAM Confidential Information and IP.

Rao must be enjoined from not only accessing and using the stolen information, but he cannot be trusted to engage in unrestricted competitive employment with EPAM following such blatant theft. Where, as here, evidence of theft of trade secrets by a rogue employee is present, courts in Pennsylvania and across the country routinely grant injunctive relief under the DTSA

and PUTSA placing restrictions on employment, competition and/or the solicitation of customers, even if the employee is not subject to any contractual restrictive covenants, to maintain the sanctity of trade secrets. *Foster Company v. Barnhart*, No. 14-702, 2014 WL 11395182, *3 (W.D. Pa. Jul. 30, 2014) (issuing a preliminary injunction order where former employee retained confidential documents and attempted to solicit clients in violation of restrictive covenants and enjoining former employee from "sharing confidential and proprietary information with [his new employer]"); *Latuszewski v. VALIC Fin. Advisors, Inc.*, No. 03-0540, 2007 WL 4462739, at *18 (W.D. Pa. Dec. 19, 2007) (granting injunctive relief where former employees used the plaintiff company's trade secrets to target its customers at their new company); *see also Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1212 (E.D. Cal. 2020) (ordering TRO in the absence of a restrictive covenant); *Capstone*, 2018 WL 6786338, at *32 (holding that, irrespective of any restrictive covenants, the DTSA enables Courts to fashion equitable remedies based on violation of DTSA, including restricting employment); No. C 17-00939, *Waymo. Uber Techs., Inc.*, 2017 WL 2123560, at *13 (N.D. Cal. Mar. 2, 2017) (enjoining defendant who downloaded 14,000 confidential files from former employer from working on certain technology for Uber).

Under these circumstances, EPAM is not merely likely, but is all but certain, to succeed on its claims under the DTSA and PUSTA.

**2. <u>EPAM Is Likely to Succeed on its Breach of Contract Claims.</u>**

EPAM is likely to succeed on its claims that Rao breached his confidentiality obligations and the non-solicitation covenant. As there can be no reasonable dispute that the Agreement is a valid and enforceable contract and that Rao breached the contract causing damage to EPAM, all of the elements of a breach of contract claim have been met. *West Shore Home, LLC v. Graeser*, 661 F. Supp. 3d 356, 368 (M.D. Pa. 2023) (reciting elements of breach of contract).

(a) Rao Breached the Confidentiality Obligations in the Agreement.

Rao unquestionably breached the confidentiality and non-disclosure obligations in the Agreement. The Agreement specifically requires Rao to preserve the confidentiality of EPAM Confidential Information and IP, and to not access, use, or copy EPAM Confidential Information and IP, or remove any such items from the premises or control of EPAM, without authorization. (Dinitz Decl. ¶ 7, Ex. A). Both the Agreement and the Company's Code of Conduct and other policies make clear that any EPAM Confidential Information and IP will be used only for EPAM's benefit. (*Id.* ¶ 7-9, Ex. A-C). And both make clear that upon termination, Rao must return all EPAM Confidential Information and IP. These obligations apply equally to the confidential information and intellectual property of EPAM's clients that have been entrusted to EPAM's care.

Rao's willful breach of the confidentiality provision entitles EPAM to injunctive relief, including restricting competition with EPAM. *Ritescreen Co., LLC v. White*, No. 1:23-CV-00778, 2023 WL 5183044, at *8 (M.D. Pa. Aug. 11, 2023) (enjoining former employee who transferred thousands of files to USB device from working for competitor for a limited period of time even in absence of enforceable non-compete).

(b) Rao Breached the Non-Solicitation Covenant in the Agreement

The record evidence shows that Rao also breached the client non-solicitation restriction in his Agreement. During his employment with EPAM, Rao solicited a longstanding client of EPAM at an industry conference that took place between October 6 through 9, fraudulently representing at the time that he was no longer associated with EPAM. (McDermott Decl. ¶ 12). After he was terminated, Rao announced on an external industry Teams platform that he was now a competitor of EPAM and attempted to schedule a meeting with an EPAM client. (*Id.*

¶ 16.) EPAM has also received credible information from contacts in the industry that its clients have been approached by Rao since his termination. (*Id.*)

The non-solicitation covenant in the Agreement expressly states as follows:

> You agree that for the term of your employment plus 12 months following termination of employment, you will not directly or indirectly solicit, contact, or attempt to solicit or contact, using any form of oral, written, or electronic communication, including, but not limited to, electronic or other mail, phone, fax, instant message, or social media, or meet with the EPAM Group's current, former, or prospective clients, for purposes of offering services similar to or competitive with those offered by the EPAM Group. Following termination of employment, this restriction shall only apply to: (i) any clients or prospective clients you had any contact with during the 12 months preceding termination of employment; and separately, (ii) any clients about whom you possess trade secret or confidential information gained during the 12 months preceding termination of your employment. The restriction applies broadly, without the limitations in (i) and (ii), while you remain employed.

Under Pennsylvania law, restrictive covenants are enforceable if they are: (1) ancillary to the employment relationship and supported by valid consideration; (2) necessary to protect a legitimate business interest; and (3) reasonably limited in duration and geographic scope. *See, e.g., Hess v. Gebhard Co.*, 570 Pa. 148, 157; 808 A.2d 912, 917 (2002). Moreover, a defendant-employee has the burden to prove that the covenant is unreasonable. *Viad Corp. v. Cordial*, 299 F. Supp. 2d 466, 477 (W.D. Pa. 2003). Each element is met here.

First, as made clear in the preamble to the Agreement, Rao entered into the Agreement as a condition of his employment with EPAM, and it is thus supported by valid consideration.

Second, the terms of the Agreement are necessary to protect EPAM's legitimate business interests in protecting its confidential information, trade secrets and customer goodwill. Pennsylvania law recognizes that trade secrets of an employer, customer goodwill, and specialized training and skills acquired from the employer are all legitimate interests protectable through a general restrictive covenant. *Id.* at 478. Rao cannot deny that in his role, which entailed cultivating client relationships, developing business on behalf of EPAM, and development of AI-

empowered solutions, he was entrusted with access to EPAM Confidential Information and IP, including proprietary source code to a number of its product offerings, as well as source code customized for EPAM's clients. Now that Rao is competing with EPAM, Rao is poised to leverage all of the foregoing information to usurp business from EPAM's clients and other business opportunities unless the non-solicitation provision is enforced.

Third, the non-solicitation provision is reasonably limited in duration and scope. It lasts only 12 months from separation of employment and prohibits only the solicitation of clients with whom he had any contact during the year prior to his termination, or about whom he possessed confidential or trade secret information during the year prior to his termination. Courts in Pennsylvania routinely uphold non-solicitation covenants at or beyond one year. *Clarke Transp. Servs., Inc. v. Haskins*, No. 06-785, 2006 WL 1620175, at *4 (E.D. Pa. June 8, 2006) (finding that a three-year reach for the non-competition and customer non-solicitation provisions and one-year reach for the employee non-solicitation are reasonable in duration); *Charles Schwab & Co. v. Karpiak*, No. 06-4010, 2007 WL 136743, at *13 (E.D. Pa. Jan. 12, 2007) (holding that the eighteen month time frame for non-solicitation is reasonable in duration).

Accordingly, EPAM is likely to succeed on the merits of its breach of the client non-solicitation provision in the Agreement.

**3. <u>EPAM Is Likely to Succeed on its Breach of Fiduciary Duty Claim.</u>**

EPAM is likely to succeed on its claim that Rao breached his fiduciary duties of loyalty and honesty. It is a firmly established principle in the law of Pennsylvania "that an agent owes a duty of loyalty to his principal and in all matters, affecting the subject of his agency, he must act with the utmost good faith in the furtherance and advancement of the interests of his principal." *Synthes*, 25 F. Supp. 3d at 667; *Sylvester v. Beck*, 406 Pa. 607, 610, 178 A.2d 755, 757 (1962).

The duty of good faith and loyalty to EPAM requiring Rao to refrain from improperly using EPAM Confidential Information and IP obtained while employed at EPAM includes a "duty to refrain from competing with the [employer]… as well as a duty not to use property or confidential information of the [employer] for the [employee's] own purpose or those of a third party." *Frontier Const. Co. v. Mazzella*, 2009 WL 3806754, at *4 (W.D. Pa. Nov. 13, 2009) (quoting Restatement (Third) of Agency, §§ 8.04 & 8.05 (2006)). *See also PNC Mortg. v. Superior Mortg. Corp.*, No. 09-5084, 2012 WL 628000, at * 26 (E.D. Pa. Feb. 27, 2012); *United Ins. Co. of Am. v. Dienno*, 248 F.Supp. 553, 557 (E.D. Pa. 1965) (stating party who develops or possesses confidential information or trade secrets belonging to his employer should not be allowed to terminate his association and then use information to undercut former employer). Furthermore, a former employee's conduct can still constitute a breach of their common law duty of loyalty to their employer even if they never entered into a restrictive covenant. *See AmQuip Crane Rental, LLC v. Crane & Rig Servs., LLC*, 2018 Pa. Super 315, 199 A.3d 904, 913 (2018).

Simply put, Rao is bound by the common-law duties of good faith and loyalty not to steal EPAM's intellectual property, damage EPAM's relationships with its clients, act unethically and dishonestly, or otherwise compete with EPAM during his employment. Rao, however, knowingly chose to be disloyal in a number of ways. First, he tampered with the source code to one of EPAM's software tools in an attempt to fraudulent assert copyright ownership over the code. Second, during an industry conference in which was being paid to represent EPAM's interests, he fraudulently represented to a longstanding EPAM client that he was no longer associated with EPAM. Third, he attempted to permanently destroy Company files from an EPAM SharePoint site, including by attempting to make them permanently unavailable by clearing the recovery folder. Fourth, he misused Company resources to develop a personal

website. Fifth, he purloined EPAM Confidential Information and IP with the intent to misuse such information. Sixth, he orchestrated a for cause termination in an effort to evade his post-termination non-compete obligations.

### 4. EPAM is Likely to Succeed on its Claim for Conversion.

By unlawfully retaining EPAM Confidential Information and IP, Rao is liable for conversion. In Pennsylvania, conversion is "the deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification." *Universal Premium Acceptance Corp. v. York Bank & Trust Co.*, 69 F.3d 695, 704 (3d Cir. 1995). "A conversion can occur in several ways: 1) acquiring possession of property with the intent to assert a right to it adverse to the owner; 2) transferring the property and therefore depriving the owner of control; 3) unreasonably withholding possession of the property from the one who has the right to it; and 4) misusing or seriously damaging the property in defiance of the owner's rights." *Fenton v. Balick*, 821 F. Supp. 2d 755, 760 (E.D. Pa. Nov. 3, 2011).

Pennsylvania courts have held that an employee's wrongful misappropriation of confidential information can give rise to a conversion. *See Cenveo Corp. v. Slater*, 2007 WL 527720, at * 4 (E.D. Pa. Feb. 12, 2007) (denying motion to dismiss conversion claim where employee took confidential business documents, including artwork, confidential pricing information, confidential business proposals, confidential quality control procedure documents, and a laptop). *See also EXL Labs., LLC v. Egolf*, No. 10-6282, 2011 WL 880453, at *8 (E.D. Pa. Mar. 11, 2011) (denying motion to dismiss conversion claim where claim premised on misappropriation of both trade secrets and confidential information, including confidential pricing data and business plans).

All of the elements of conversion have been met here. By retaining EPAM's property, *i.e.*, EPAM Confidential Information and IP, and refusing to return it to EPAM, Rao has exercised unauthorized dominion and control over those files and documents. EPAM is therefore likely to succeed on its claim for conversion.

**5. <u>EPAM is Likely to Succeed on its Replevin Claim.</u>**

EPAM is also likely to succeed on its replevin claim. "The action of replevin is founded upon the wrongful taking and detention of property and seeks to recover property in the possession of another." *Signature Fin. LLC v. Shri Vighneshwar LLC*, No. 23-310, 2024 WL 531257, at *3 (E.D. Pa. Feb. 9, 2024) (quoting *Valley Gypsum Co. v. Pa. State Police*, 581 A.2d 707, 710 (Pa. Commw. Ct. 1990)). To prevail, "the plaintiff must show not only title, but also the exclusive right of immediate possession of the property in question." *Ford Motor Credit Co. v. Caiazzo*, 564 A.2d 931, 933 (Pa. Super. Ct. 1989). *See also Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487, 489 n.1 (3d Cir. 1997) (noting that employer stated a claim for replevin against employees who took proprietary information from the employer). Here, it cannot be disputed that EPAM has a superior possessory right to its Confidential Information and IP.

**6. <u>EPAM is Likely to Succeed on its Unjust Enrichment Claim.</u>**

EPAM is also likely to succeed on its unjust enrichment claim. In *Alpha Pro Tech, Inc. v. VWR Int'l LLC*, 984 F. Supp. 2d 425 (E.D. Pa. 2013), an employer asserted an unjust enrichment claim against a company who, among other things, misappropriated and shared the employer's proprietary manufacturing methods and trade secrets to produce similar products. The court held that these facts make it unjust for the defendant to "unjustly [retain]" the trade secrets and benefit through the use of the proprietary manufacturing methods. *Id.*

**B. EPAM Will Suffer Irreparable Harm If The Court Does Not Grant It Injunctive Relief.**

EPAM will suffer irreparable harm if this Court does not grant injunctive relief. "To obtain injunctive relief, the plaintiff must make a clear showing of 'immediate irreparable injury' or a 'presently existing actual threat.'" *Chicago Title Ins. Co. v. Lexington & Concord Search & Abstract, LLC*, 513 F. Supp. 2d 304, 319 (E.D. Pa. 2007). Irreparable harm is that for which money damages are not adequate compensation. *See Tantopia Franchising Co., LLC v. W. Coast Tans of PA, LLC,* 918 F. Supp. 2d 407, 417 (E.D. Pa. 2013).

EPAM's loss of the EPAM Confidential Information and IP, and the possibility that Rao intends to misuse such information or disclose that information to a competitor, cannot be measured in money damages, because "'[a] trade secret once lost is, of course, lost forever.'" *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 914 n.20 (3d Cir. 2021) (quoting *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984)). Moreover, with every day Rao wrongfully retains the EPAM Confidential Information and IP, EPAM is exposed to and threatened with further loss of its trade secrets and irreparable harm. *See Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92–93 (3d Cir. 1992) ("an intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost certainly show immediate irreparable harm."); *Stream Cos. v. Windward Advert.*, No. 12-CV-4549, 2013 WL 12114590, at *18 (E.D. Pa. Feb. 8, 2013) ("Because [d]efendants took confidential, as well as trade secreted, information for use in their new agency and because they have displayed an intention to make imminent and continued use of this information, [plaintiff] has demonstrated that they will suffer irreparable harm absent an injunction."); *Revzip, LLC v. McDonnell*, No. 3:19-CV-191, 2019 WL 6701835, at *8 (W.D. Pa. Dec. 9, 2019) ("The use or disclosure of a trade secret almost always constitutes irreparable harm for purposes of issuing an injunction."); *Westcode, Inc. v. Daimler*

*Chrysler Rail Sys. (N. Am.) Inc.*, 123 F. Supp. 2d 819, 825 (E.D. Pa. 2000) (finding that "[g]rounds for finding irreparable injury include loss of control of reputation, loss of trade, ... loss of good will, and likelihood of confusion."). Furthermore, confidential information need not rise to the level of a trade secret in order for a plaintiff facing the loss of such information to be entitled to injunctive relief. *Ritescreen*, 2023 WL 5183044, at *8.

It is also well-established in the Third Circuit that the loss of client relationships and goodwill also generally constitutes irreparable harm. Similarly, allowing Rao to use the stolen information in any way, whether on his own behalf or for another, will cause serious damage to EPAM's reputation and goodwill with its clients. *See Coventry First, LLC v. Ingrassia*, No. Civ.A.05-2802, 2005 WL 1625042, at *11 (E.D. Pa. July 11, 2005) ("Pennsylvania courts have indicated that interference with customer relationships satisfies the irreparable harm requirement."); *Fres-co Sys. USA, Inc. v. Hawkins*, No. 16-4246, 2016 WL 9306081, at *2 (E.D. Pa. Aug. 26, 2016) ("Interference with customer relationships is similarly recognized to cause harm that is unascertainable and not capable of being fully compensated by money damages."); *Fisher Bioservices, Inc. v. Bilcare, Inc.*, No. Civ.A. 06-567, 2006 WL 1517382, at *12 (E.D. Pa. May 31, 2006) ("injury to goodwill and the use of a company's confidential information are the types of injuries which would constitute irreparable harm that cannot be compensated with monetary damages."); *Pappan Enters.*, 143 F.3d at 805 ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill.")

If Rao is permitted to capitalize on his wrongful conduct, EPAM will be faced with the permanent and irretrievable loss of its Confidential Information and IP. It is exceedingly difficult, if not impossible, to predict EPAM's losses if Rao is permitted to exploit such information. If Rao is allowed to capitalize on his unlawful misconduct, the result for him,

however, is clear: Rao and/or any competitor of EPAM who obtains such information may succeed in undermining EPAM's business and goodwill, and EPAM's business will be substantially, irreparably and incalculably harmed. Therefore, only an immediate injunction enjoining Rao from misusing, disclosing or exploiting EPAM Confidential Information and IP will ensure that he will not cause any more irreparable damage to EPAM's business.

**C. A Balance Of The Hardships Weighs In EPAM's Favor.**

In addition to EPAM's strong showing of a likelihood of success on the merits and irreparable harm, it is also evident that the balance of hardships weighs decidedly in EPAM's favor. EPAM is not seeking to prevent Rao from earning a livelihood or being employed elsewhere, so long as he is not in a position to misuse the stolen EPAM Confidential Information and IP, unfairly compete with EPAM, or solicit EPAM's clients. Given that Rao is not entitled to such property to begin with, there is no harm to Rao by enjoining him from using such information, and requiring him to return such information, which he contractually agreed not to possess. On the other hand, if EPAM Confidential Information and IP or its clients' intellectual property is disclosed, the hardship to EPAM is obvious. *See Stream Co.*, 2013 WL 12114590, at *16 (the harm of plaintiff's trade secrets being used in direct competition outweighs the harm to defendants from not being able to solicit clients using plaintiff's confidential information); *Bimbo Bakeries USA, Inc. v. Botticella*, No. 10-0194, 2010 WL 571774, at *16 (E.D. Pa. Feb. 9, 2010), *aff'd*, 613 F.3d 102 (3d Cir. 2010) (the irreparable harm to plaintiff from the disclosure of its trade secrets outweighs the harm to defendant from not being able to commence employment at competitor pending a final determination in this matter).

**D. The Public Interest Favors an Injunction.**

The public interest favors an injunction because the protection of trade secrets is in the public interest, and there is no public interest in Rao's theft of EPAM Confidential Information

and IP. The Third Circuit Court of Appeals and Pennsylvania law have held that "there is a generalized public interest in upholding the inviolability of trade secrets and enforceability of confidentiality agreements." *Bimbo Bakeries*, 613 F.3d 102, at 119. *See also Hereas Materials Tech. LLC v. Tung Pham*, No. 11-2965, 2011 WL 13227724, at *2 (E.D. Pa. May 5, 2011) ("[t]he public also has a strong interest in recognizing and enforcing employment agreements designed to protect company secrets.").

## II. EPAM IS ENTITLED TO EXPEDITED DISCOVERY.

In order to present the facts of this case to the Court as completely as possible for purposes of presenting EPAM's motion for a preliminary injunction, and to discover the full extent of Rao's unlawful activities and the corresponding damage being done or already done to EPAM, it must be allowed to conduct certain expedited discovery.

While Federal Rule of Civil Procedure 34 generally provides that a party upon whom a document request is served must respond within thirty days, the rule specifically permits that "[a] shorter . . . time may be directed by the court." Fed. R. Civ. P. 34(b). In addition, Federal Rule of Civil Procedure 26 "provides very broad discovery and gives the trial court wide discretion to manage the process." *State of N.Y. v. U.S. Metals Ref. Co.*, 771 F.2d 796, 805 (3d Cir. 1985). The "prevailing approach" in the Third Circuit is to apply the "good cause" or "reasonableness standard" when deciding a motion to expedite discovery. *Flatiron Crane Operating Co., LLC v. Adkins*, No. 5:23-cv-02396-JMG, 2023 WL 4565470, at *3 (E.D. Pa. July 17, 2023). In evaluating a motion for expedited discovery, courts consider the following non-exhaustive factors: "(1) the timing and context of the discovery requests, including whether a preliminary injunction hearing has been scheduled; (2) the scope and purpose of the requests; and (3) the nature of the burden to the respondent." *Id.*

Courts have interpreted these provisions and factors to permit expedited discovery when, as here, the movant shows: (1) irreparable injury; (2) some probability of success on the merits; (3) some connection between the expedited discovery and the avoidance of the irreparable injury; and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted. *See Entertainment Tech. Corp. v. Walt Disney Imagineering*, No. Civ.A. 03-3546, 2003 WL 22519440, at *3 (E.D. Pa. Oct. 2, 2003). "Expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of the proceedings." *Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841, 844 (D.D.C. 1996). Expedited discovery is also warranted where it is alleged that the defendant stole trade secrets. "Expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." *Philadelphia Newspapers, Inc. v. Gannett Satellite Info. Network, Inc.*, No. Civ. A. 98-cv-2782, 1998 WL 404820, at *2 (E.D. Pa. July 15, 1998) (noting that expedited discovery has been ordered where it would "better enable the court to judge the parties' interests and respective chances for success on the merits" at a preliminary injunction hearing.).

Expedited discovery is needed here to allow EPAM to provide a full evidentiary case at the preliminary injunction hearing. At present, EPAM knows that Rao has stolen the proprietary EPAM Confidential Information and IP. However, EPAM does not know the full extent to which Rao is misusing such information, how many copies he has made, or where he has stored those copies. The need for discovery is great; to be sure, if EPAM must wait to take discovery in the normal course, it will be forced to present its case on an incomplete record, and it will continue to suffer irreparable injury in the process. There is no prejudice resulting to Rao if expedited

discovery is granted, particularly given the uncontroverted proof that he has taken wrongful possession of a mass amount of EPAM Confidential Information and IP.

Furthermore, in order to allow the Court to effectively and completely evaluate the evidence in this matter, Rao must be ordered to immediately preserve and not alter, and EPAM must be permitted to inspect and image, all computers, email accounts, cloud accounts, sharefile accounts and other electronic devices, including, but not limited to, computers, hard disk drives, floppy disk drives, removable storage devices (e.g., thumb drives), CDs, smart phones, iPads, tablets and/or all other similar electronic storage devices belonging to, under the control of, accessible to, or operated by Rao on which EPAM information of any kind resides or may have resided. Given the severity of Rao's lack of ethical conduct, coupled with his prior attempts to permanently destroy files, EPAM is further entitled to an order permitting forensic imaging and inspection of these devices so that EPAM can understand the full extent of Rao's misappropriation of, and dissemination of, EPAM Confidential Information and IP. This also includes preservation and inspection of all electronic storage devices and accounts, which Rao may have used to transmit documents containing EPAM Confidential Information and IP.

## CONCLUSION

For the foregoing reasons, EPAM respectfully requests that this Court issue a temporary restraining order, an order permitting discovery to proceed by EPAM on an expedited basis, and a preliminary injunction.

Dated: November 4, 2025

Respectfully submitted,

EPAM SYSTEMS, INC.

By its attorneys,

*/s/ Jacob Oslick*

Jacob Oslick
joslick@seyfarth.com
James S. Yu (*pro hac vice* pending)
jyu@seyfarth.com
Brooke Gary (*pro hac vice* pending)
brgary@seyfarth.com
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, NY 10018-1405
(212) 218-5500