**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EPAM SYSTEMS, INC., | |
| *Plaintiff,* | CIVIL ACTION |
| v. | Case No. 2:25-cv-06260-WB |
| GOWTHAM RAO, | |
| *Defendant.* | |

**JOINT REPORT OF RULE 26(F) MEETING AND PROPOSED DISCOVERY PLAN**

In accordance with Federal Rule of Civil Procedure 26(f), counsel for plaintiff EPAM Systems, Inc. ("Plaintiff" or "EPAM") and defendant Gowtham Rao ("Defendant" or "Rao") conferred on February 24 and 25, 2026, and submit to Chambers the following report of their meeting for the Court's consideration:

**1. Discussion of Claims, Defenses, and Relevant Issues**

**a. Plaintiff's Statement**

Factual Background in Support of Claims: This case involves the alleged theft and misappropriation by Rao, a former employee, of thousands of EPAM's data files including confidential and/or trade-secret information and proprietary source code for various software products developed by EPAM over many years and at significant cost (collectively, "EPAM Confidential Information and IP"). Specifically, EPAM's network activity shows that in the days immediately before his termination for cause on October 15, 2025, Rao downloaded over 44,000 files, along with software source code from EPAM's network – much of which is unrelated to any of Rao's work during his employment with EPAM. Immediately following Rao's termination for various offenses outlined in detail in the Complaint, Rao announced himself as a competitor

of EPAM and, upon information and belief, attempted to solicit at least one EPAM customer in violation of his post-employment non-solicitation covenant in his employment agreement with EPAM. EPAM asserts that Rao's explanations for his various offenses lack credibility and EPAM denies his claim that EPAM wrongfully terminated him in retaliation for whistleblowing. Based on the foregoing and other allegations in the Complaint, EPAM has asserted claims for misappropriation of trade secrets in violation of state and federal law, breach of contract, breach of fiduciary duty, and tortious interference, among other causes of action.

Relevant Issues:

The threshold primary issues in this matter are whether Rao continues to be in possession of the EPAM Confidential Information and IP and what Rao has done with the EPAM Confidential Information and IP after the download. Rao does not deny that he downloaded the files onto a personal computer. He instead claims that he was permitted to have this information on his personal computer as part of the company's BYOD policy – a claim that EPAM unequivocally denies. Rao further asserts that the files were rendered immediately inaccessible and/or wiped from his personal computer once he was terminated. EPAM asserts that this is impossible because EPAM has no control over any data that resides on Rao's personal computer. Regardless of the reasons why Rao downloaded the data, once the EPAM Confidential Information and IP was transmitted to his computer, Rao could have transmitted or uploaded the data onto another device, sent it or sold it to a third party, misused it for his new competing business, or modified the data to avoid detection of any misuse. Indeed, given the conduct that resulted in his termination, the staggering volume of Confidential Information and IP Rao downloaded shortly before his termination, and his immediate announcement thereafter that he was now competing against EPAM, EPAM has reason to believe that Rao intentionally

misappropriated the data for nefarious purposes. The parties are presently engaged in forensic discovery to assist in addressing the disposition of the EPAM Confidential Information and IP.

The second primary issue is the damage that has been caused to EPAM to the extent any EPAM Confidential Information and IP has been compromised (e.g., wrongfully disclosed or misused). Furthermore, any EPAM Confidential Information and IP that is in Rao's possession needs to be properly remediated such that Rao is permanently dispossessed of such information to prevent further misuse and disclosure.

The third primary issue concerns Rao's breach of his post-employment non-solicitation covenant.

Anticipated Discovery:

The parties have already negotiated a Stipulated Consent Injunction, pursuant to which Rao has agreed to submit certain of his personal devices, including the computer that was used for the download, for forensic analysis and inspection. The parties are engaging in forensic discovery for the purpose of providing information concerning the potential location and disposition of the EPAM Confidential Information and IP. Once forensic discovery is complete, if the parties are unable to resolve the case, Plaintiff will require discovery with respect to a number of topics, including: (1) Rao's use and disposition of any EPAM Confidential Information and IP; (2) Rao's or any of his businesses' communications with EPAM's customers both immediately before and after his termination from EPAM; (3) Rao's attempts to destroy EPAM files; and (4) documents relating to his competing business to the extent it has used any EPAM Confidential Information and IP or solicited or conducted business with any EPAM customers.

**b. Defendant's Statement**

Dr. Gowtham Rao is a well-respected physician (MD) and epidemiologist (PhD) with extensive experience in medical informatics and data science. He's a recognized leader in several medical informatics organizations – including OHDSI (Observational Health Data Sciences and Informatics) – and has worked for industry leaders like Johnson & Johnson.

In November 2024, EPAM recruited Dr. Rao to lead their data sciences business line, offering him a position as managing principal. As part of his role, he was responsible for growing EPAM's data science business line, and later, developing EPAM's AI capabilities. In his role, he developed concepts for EPAM using crucially open source information, as well as external AI tools like ChatGPT Pro and Google AI Ultra – all which were expressly authorized by EPAM.

During Dr. Rao's tenure, EPAM had a "bring your own device" (BYOD) policy that permitted him to use personal devices for work – which he did.

In or about August of 2025, Dr. Rao became aware of a number of dubious EPAM business practices, which he raised to EPAM leadership around the same time. Rather than take Dr. Rao's comments seriously, EPAM instead retaliated against him by demoting him to an independent contributor position and engaging in a concerted effort to constructively terminate him. Rather than succumb to these pressures, Dr. Rao continued to perform his new duties diligently, which included having access to an EPAM SharePoint site necessary to perform his responsibilities. Where EPAM asserts Dr. Rao improperly downloaded and retained possession of several thousand files from this SharePoint site, in fact, as part of his work duties, Dr. Rao simply synced this site to his BYOD device through Microsoft's standard sync feature – "Always Keep on this Device" – which keeps local copies of files can be accessed offline.

Likewise, where EPAM asserts Dr. Rao purposefully embedded a copyright notice naming him as the copyright owner of various source code, EPAM's system itself automatically configured this notice when Dr. Rao selected "Add License" to code he drafted as part of his role. EPAM terminated Dr. Rao on October 15, 2025. At the time of his departure from EPAM, Dr. Rao thought all such files were removed from his device when his EPAM SharePoint access was cut off. He did not have any intention of accessing these files, or using the information contained within, after his departure.

EPAM also contends that Dr. Rao was improperly soliciting EPAM customers and prospective for his new business, including at an industry conference while still being employed by EPAM. To the contrary, he affirmed publicly at the conference that he was employed by EPAM, and, after his termination, instead of soliciting prior customers, Dr. Rao has actually declined to work with several EPAM customers and prospects who have contacted him for potential work, even though he would be allowed to work with such customers under the terms of the non-solicitation agreement.

In early November, EPAM launched this lawsuit when its brief efforts at amicable resolution did not bear immediate fruit. As the Court may recall, Dr. Rao represented himself *pro se* at the TRO hearing in early November. Thereafter, Dr. Rao retained counsel to assist him in negotiating a Consent Order and forensic protocol, and to engage in the forensic analysis process agreed to by the parties. Dr. Rao has fully cooperated with the forensic process, making available for inspection and remediation not only all of his personal devices, cloud accounts, and GitHub repositories, but also his new company's (CoReason.Ai) GitHub and email account, even though the company is not a party to this dispute.

As a result of his wrongful termination and this lawsuit, Dr. Rao has suffered significant hardship, including financial and reputational damage. Should the case progress, Dr. Rao intends to fully defend himself (likely *pro se*) and will likely assert a number of defenses, including that this litigation was brought in bad faith and not for any proper purpose, as well asserting as Counterclaims against EPAM, including for wrongful demotion and termination, whistleblower retaliation under New Jersey law, tortious interference with prospective economic advantage and/or disparagement and/or defamation.

Issues:

The primary issues in this matter relating to EPAM's claims include: (1) whether or not EPAM has any protectable trade secrets pursuant to the DTSA 8 U.S.C. § 1832 and/or the PUTSA 12 Pa. C.S.A. § 5301, et seq., and if so, to what extent has Dr. Rao misappropriated, benefited, and/or been unjustly enriched by such alleged misappropriation, (2) whether Dr. Rao breached the non-disclosure, confidentiality, and non-solicit provisions of his employment agreement with EPAM, (3) whether the non-competition provision of his employment agreement is enforceable given his termination; (4) whether Dr. Rao has, or has breached purported fiduciary duties allegedly owed to EPAM, (5) whether and to what extent Dr. Rao has tortiously interfered with EPAM's business relationships, (6) whether Dr. Rao's alleged misappropriation of trade secret and/or confidential information constitutes replevin or conversion.

In connection with his anticipated defenses and/or Counterclaims, the primary issues that will need to be decided include the circumstances of Dr. Rao's demotion and termination, including whether Dr. Rao's demotion and termination were wrongful and/or in retaliation for his being a whistleblower about EPAM's improper conduct, and whether EPAM personnel have been improperly defaming or disparaging Dr. Rao in the relevant business community.

The threshold issues currently being addressed include to what extent files belonging to EPAM, if any, remain on Dr. Rao's devices/accounts, and thus require early remediation.

Anticipated Discovery:

Dr. Rao is still evaluating his defenses and claims and thus is unable to provide a full and complete list of his discovery needs at this time; however, at a minimum, Dr. Rao will need discovery into, among other things, the reasons for his demotion and termination, facts related to his whistleblower claims, any communications that EPAM personnel may have been having with customers, prospective customers and/or others in the relevant business community about Dr. Rao, and all allegations asserted in EPAM's complaint regarding his alleged misconduct in this matter.

**2. Initial and Informal Disclosures**

Since the TRO hearing in this matter, the parties have been diligently cooperating on a forensic examination and analysis process, commencing with negotiating and entering into a Consent Order (Dkt. 20) and associated forensic protocol. Immediately upon finalizing the forensic protocol, on December 15, 2025, the agreed-upon forensic neutral, iDiscovery Solutions, Inc. ("IDS"), was provided access to and imaged 5 devices belonging to Dr. Rao, and collected data from multiple cloud accounts belonging to Dr. Rao and a GitHub and email account belonging to his company, CoReason.ai.

On January 6, 2026, IDS began issuing reports on a rolling basis under the forensic protocol. To date over two dozen reports have been received and reviewed by the parties, which is still ongoing. The process is now moving onto the next stage, which includes a document-by-document review in Relativity of certain files EPAM asserts require remediation. At this time,

the parties believe that this process will be completed by the end of March, and any required remediation also should be by that date.

Throughout this time, the parties' counsel have been in frequent communication with each other and with IDS, typically several times a week, including not only via email but also conference calls to review the progress and discuss the necessary next steps.

The parties are hopeful that completion of this process will significantly advance a potential resolution resulting in a dismissal of this action without prejudice. Otherwise, the parties believe that this process will substantially narrow and focus EPAM's need for additional discovery in this matter. Thus, the parties have concentrated all of their efforts on expeditious completion of this process to date Dr. Rao in particular has asked to take into account his financial circumstances and need to dedicate his limited financial resources towards this process, as opposed to the remainder of the litigation which he asserts would need to handle *pro se*.

Pursuant to the Court's Order and Federal Rule of Civil Procedure 26(a)(1) the parties will exchange Initial Disclosures on **February 27, 2026**; however, the parties note these will require supplementation once Dr. Rao has answered, moved, or otherwise responded to the Complaint (currently due on April 3, 2026).

**3. Formal Discovery**

The parties agree that a Protective Order is necessary in this case and will submit a proposed order by May 1, 2026 if the case continues after completion of forensic discovery. Based upon the information known and disclosures to date, the parties do not anticipate that any party will need to exceed the standard number of interrogatories or depositions provided for under the Federal Rules of Civil Procedure.

The parties have conferred and agreed on the following proposed schedule for fact discovery:

| DATE | EVENT |
|---|---|
| February 27, 2026 | Exchange Initial Disclosures |
| September 30, 2026 | Fact Discovery Cutoff |

**4. Electronic Discovery**

The parties consent to entry of the Court's default order regarding electronic discovery. The parties agree that electronic discovery will be necessary and that, to the extent not already completed during the forensic process, reasonable steps shall be taken by each party to preserve all documents and files that are relevant or potentially relevant to this dispute. The parties anticipate electronic discovery will include, but is not limited to, electronically stored documents, records, emails and/or other communications and other cloud accounts such as GitHub.

**5. Expert Witness Disclosures**

The parties propose the following schedule related to experts:

| DATE | EVENT |
|---|---|
| October 30, 2026 | Opening Expert Reports |
| November 30, 2026 | Rebuttal Expert Reports |
| January 15, 2027 | Expert Depositions completed |

**6. Early Settlement or Resolution**

The parties have engaged in ongoing discussions about a potential resolution upon completion of the forensic process; however, if that is not the case, the parties remain open to discussing a resolution at other points in time, such as after additional documentary discovery and/or depositions are completed.

The parties do not presently anticipate needing the assistance of a magistrate judge or other neutral in connection with settlement discussions, but are open to working with a

magistrate judge or other neutral after the completion of the forensic process if the case remains ongoing and if it seems helpful

**7. Trial Date**

The parties agree that they can be ready for trial within thirty days of the Court's ruling on any motions for summary judgment. In the alternative, the parties agree that they can be ready for trial by May 26, 2027, *i.e.*, approximately sixty (60) days after summary judgment motions are fully briefed.

The parties request a jury trial, and the parties presently anticipate at least five days will be needed for trial.

**8. Other**

The parties do not consent to the jurisdiction of a Magistrate Judge. The parties also suggest the following proposed schedule for summary judgment and *Daubert* motions:

| DATE | EVENT |
|---|---|
| February 12, 2027 | Dispositive Motions and Challenges to Experts (*Daubert* Motions) |
| March 12, 2027 | Oppositions to Dispositive and *Daubert* Motions |
| March 26, 2027 | Replies on Dispositive and *Daubert* Motions |

Respectfully submitted,

SEYFARTH SHAW LLP

By: */s/ James Yu*

Jacob Oslick
James S. Yu (*pro hac vice*)
Brooke Gary (*pro hac vice*)
620 Eighth Avenue
New York, NY 10018-1405
(212) 218-5500
joslick@seyfarth.com

ND GALLI LAW LLC

By: */s/ Nicole D. Galli*

Nicole D. Galli
Andrew J. Costa
One Liberty Place
1650 Market Street
Suite 3600
Philadelphia, PA 19103
T: (215) 525-9580

jyu@seyfarth.com
brgary@seyfarth.com

*Attorneys for Plaintiff*

Fax: (215) 525-9585
ndgalli@ndgallilaw.com
ajcosta@ndgallilaw.com

*Attorneys for Defendant*

Dated: February 25, 2026