**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EPAM SYSTEMS, INC.,<br><br>Plaintiff-Counterclaim Defendant,<br><br>-against-<br><br>GOWTHAM A RAO (Pro Se),<br><br>Defendant-Counterclaim Plaintiff . | Civil Action No. 2:25-cv-06260-WB |

**DEFENDANT GOWTHAM A RAO'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT**

Defendant Gowtham A Rao MD, PhD ("Defendant" or "Rao") hereby answers the Complaint of Plaintiff EPAM Systems, Inc. ("Plaintiff" or "EPAM"). Unless expressly admitted herein, Defendant denies each and every allegation contained in the Complaint. Defendant admits only those factual allegations expressly admitted in this Answer and denies any remaining allegations, including any characterizations, conclusions, implications, or inferences drawn by Plaintiff. To the extent the Complaint contains headings, subheadings, introductory statements, background sections, legal argument, or other unnumbered paragraphs, no response is required; however, to the extent any response is deemed required, such allegations are denied. Any statement by Defendant in this Answer that summarizes or characterizes a document or allegation is not intended to admit the accuracy or completeness of Plaintiff's characterization, and the referenced document speaks for itself. To the extent the Complaint characterizes the Agreement or its provisions in any manner inconsistent with its plain terms,

Defendant denies those allegations. Defendant further denies that Plaintiff is entitled to any of the relief requested in the Complaint, whether legal, equitable, or otherwise.

**PRELIMINARY STATEMENT**

This action represents an improper application of the Defend Trade Secrets Act (DTSA) and restrictive employment covenants to retaliate against a protected whistleblower and circumvent explicit contractual limitations. Plaintiff EPAM Systems, Inc. ("EPAM") grounds its Complaint in allegations of intentional data exfiltration, corporate sabotage, and the misappropriation of proprietary intellectual property. The objective evidentiary record, however, demonstrates that these claims are legally and factually deficient.

First, Plaintiff's claims of data exfiltration fundamentally mischaracterize both standard corporate IT architecture and the routine execution of Defendant's job duties. The files at issue were not wrongfully misappropriated; rather, Defendant accessed these materials strictly in the normal course of his authorized employment. To the extent digital artifacts or 'shadows' of these files populated on Defendant's authorized endpoint devices, their presence is the direct result of this lawful, routine access, compounded by the passive Microsoft OneDrive background synchronization mandated by Plaintiff. Consistent with corporate offboarding policies, Defendant engaged in the routine deletion of this incidentally acquired data upon separation, halting this process only to preserve the evidentiary baseline upon receipt of Plaintiff's strict litigation hold.

Second, Plaintiff's misappropriation claims suffer from fatal defects regarding Article III standing and statutory subject matter. Plaintiff lacks standing to assert proprietary rights over the subject files, as exclusive title to that intellectual property vested with a third-party client, Takeda Pharmaceuticals, pursuant to a governing Master Services Agreement. Furthermore, the alleged trade secrets lack statutory protection. These architectures rely on open-source methodologies, were expressly exempted under Section 1(b) of the parties' Employment

Covenants Agreement, and were voluntarily published into the public domain by Plaintiff at an industry symposium and via open-source repositories prior to this litigation.

Third, Plaintiff's breach of contract claims rely upon a post-hoc, pretextual "for cause" termination designed specifically to strip Defendant of his bargained-for contractual rights. Section 5(c) of the Agreement expressly voids post-employment non-competition restrictions in the event of an involuntary termination. After explicitly notifying Defendant that his position was eliminated pursuant to an economically driven Reduction in Force (RIF)—a classification Plaintiff formally affirmed to state administrative agencies—Plaintiff manufactured baseless allegations of technical "sabotage" to reclassify the separation and improperly revive the voided restrictive covenants.

Ultimately, this litigation and the underlying termination are retaliatory. Defendant engaged in protected whistleblowing activity under the New Jersey Conscientious Employee Protection Act (CEPA) and the DTSA Safe Harbor (18 U.S.C. § 1833(b)) by formally objecting to Plaintiff's deceptive geographic staffing practices on federal healthcare accounts—which implicated OFAC and HIPAA compliance—and by refusing executive directives to commercialize Takeda's intellectual property. Defendant submits this Answer, Affirmative Defenses, and Counterclaims to correct the factual record, assert his statutory immunities, and seek redress for Plaintiff's tortious interference and retaliatory conduct.

Defendant responds to the numbered paragraphs of the Complaint as follows:

## <u>NATURE OF THE ACTION</u>

1. Defendant denies the allegations contained in Paragraph 1 of the Complaint.
2. Defendant denies the allegations contained in Paragraph 2 of the Complaint.

3. Defendant denies the allegations contained in Paragraph 3 of the Complaint.
4. Defendant denies the allegations contained in Paragraph 4 of the Complaint.
5. Defendant denies the allegations contained in Paragraph 5 of the Complaint.
6. Defendant denies the allegations contained in Paragraph 6 of the Complaint.
7. Defendant denies the allegations contained in Paragraph 7 of the Complaint.
8. Defendant states that Paragraph 8 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 8 of the Complaint.
9. Defendant states that Paragraph 9 of the Complaint contains statements regarding the relief sought by Plaintiff to which no response is required. To the extent a response is deemed required, Defendant denies that Plaintiff is entitled to any of the relief requested in Paragraph 9 of the Complaint.
10. Defendant states that Paragraph 10 of the Complaint contains legal conclusions and argument regarding alleged irreparable harm and entitlement to injunctive relief to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 10 of the Complaint and denies that Plaintiff is entitled to any relief.

## THE PARTIES

11. Defendant admits the allegations contained in Paragraph 11 of the Complaint.
12. Defendant admits the allegations contained in Paragraph 12 of the Complaint.

## JURISDICTION AND VENUE

13. Defendant admits that Plaintiff purports to invoke the jurisdiction of this Court pursuant to 28 U.S.C. §1332. Defendant further admits that the parties are citizens of different states. Defendant states that the remaining allegations in Paragraph 13 constitute legal

conclusions to which no response is required. To the extent a response is deemed required, Defendant denies those allegations.

14. Defendant states that Paragraph 14 of the Complaint contains legal conclusions regarding the Court's subject matter jurisdiction to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 14 of the Complaint.
15. Defendant states that Paragraph 15 of the Complaint contains legal conclusions regarding personal jurisdiction and venue to which no response is required. Defendant admits that he executed the Agreement referenced in Paragraph 15. The Agreement speaks for itself and is the best evidence of its contents. To the extent the Complaint characterizes the Agreement or its provisions in any manner inconsistent with its plain terms, Defendant denies those allegations. To the extent the Complaint characterizes the Agreement or its provisions in any manner inconsistent with its plain terms, Defendant denies those allegations. To the extent any other response is deemed required, Defendant denies the allegations contained in Paragraph 15 of the Complaint.
16. Defendant states that Paragraph 16 of the Complaint contains legal conclusions regarding personal jurisdiction to which no response is required. To the extent any response is deemed required, Defendant denies the allegations contained in Paragraph 16 of the Complaint.
17. Defendant states that Paragraph 17 of the Complaint contains legal conclusions regarding the interpretation and application of the Agreement to which no response is required. Defendant admits that the Agreement referenced in Paragraph 17 contains an arbitration provision. The Agreement speaks for itself and is the best evidence of its contents. To the extent the Complaint characterizes the Agreement or its provisions in any manner inconsistent with its plain terms, Defendant denies those allegations. To the

extent any further response is deemed required, Defendant denies the allegations contained in Paragraph 17 of the Complaint.

## ALLEGATIONS COMMON TO ALL COUNTS

### I. EPAM'S Confidential Information and IP

18. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18 of the Complaint and therefore denies them.
19. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 19 of the Complaint and therefore denies them.
20. Defendant denies the allegations contained in Paragraph 20 of the Complaint.
21. Defendant denies the allegations contained in Paragraph 21 of the Complaint.
22. Defendant denies the allegations contained in Paragraph 22 of the Complaint.
23. Defendant denies the allegations contained in Paragraph 23 of the Complaint.
24. Defendant denies the allegations contained in Paragraph 24 of the Complaint.
25. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 25 of the Complaint and therefore denies them.
26. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26 of the Complaint and therefore denies them.
27. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27 of the Complaint and therefore denies them.
28. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28 of the Complaint and therefore denies them.
29. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29 of the Complaint and therefore denies them.
30. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 30 of the Complaint and therefore denies them.

31. Defendant denies the allegations contained in Paragraph 31 of the Complaint.
32. Defendant denies the allegations contained in Paragraph 32 of the Complaint to the extent they relate to Defendant. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 32 and therefore denies them.
33. Defendant denies the allegations contained in Paragraph 33 of the Complaint.
34. Defendant denies the allegations contained in Paragraph 34 of the Complaint.
35. Defendant denies the allegations contained in Paragraph 35 of the Complaint.
36. Defendant denies the allegations contained in Paragraph 36 of the Complaint.
37. Defendant denies the allegations contained in Paragraph 37 of the Complaint.
38. Defendant denies the allegations contained in Paragraph 38 of the Complaint.
39. Defendant denies the allegations contained in Paragraph 39 of the Complaint.

II. **Rao's Employment and Agreements with EPAM**

40. Defendant admits that he was employed by EPAM as Managing Principal, Life Sciences Consulting beginning on or about November 18, 2024 and that his employment ended on October 15, 2025. Defendant denies that he was terminated "for cause" and denies any remaining allegations contained in Paragraph 40 of the Complaint.
41. Defendant admits that he held the position of Managing Principal within EPAM's Life Sciences Consulting practice. Defendant denies the remaining allegations contained in Paragraph 41 of the Complaint.
42. Defendant admits that, prior to his employment with EPAM, he had experience working in the pharmaceutical industry. Defendant denies the remaining allegations contained in Paragraph 42 of the Complaint.
43. Defendant admits that his base salary was $250,000 annually. Defendant denies the remaining allegations contained in Paragraph 43 of the Complaint.

44. Defendant admits that he executed the Agreement on or about November 12, 2024. The Agreement speaks for itself and is the best evidence of its contents. To the extent the Complaint characterizes the Agreement or its provisions in any manner inconsistent with its plain terms, Defendant denies those allegations. To the extent any further response is deemed required, Defendant denies the allegations contained in Paragraph 44 of the Complaint.

45. Defendant admits that the Agreement referenced in Paragraph 45 contains provisions regarding confidential information. The Agreement speaks for itself and is the best evidence of its contents. To the extent the Complaint characterizes the Agreement or its provisions in any manner inconsistent with its plain terms, Defendant denies those allegations. To the extent any further response is deemed required, Defendant denies the allegations contained in Paragraph 45 of the Complaint.

46. Defendant admits that the Agreement referenced in Paragraph 46 contains provisions regarding non-solicitation. The Agreement speaks for itself and is the best evidence of its contents. To the extent the Complaint characterizes the Agreement or its provisions in any manner inconsistent with its plain terms, Defendant denies those allegations. To the extent any further response is deemed required, Defendant denies the allegations contained in Paragraph 46 of the Complaint.

47. Defendant admits that the Agreement referenced in Paragraph 47 contains provisions concerning post-employment competitive activities. The Agreement speaks for itself and is the best evidence of its contents. To the extent the Complaint characterizes the Agreement or its provisions in any manner inconsistent with its plain terms, Defendant denies those allegations. To the extent any further response is deemed required, Defendant denies the allegations contained in Paragraph 47 of the Complaint.

48. Defendant admits that the Agreement referenced in Paragraph 48 contains provisions concerning ownership of work product created during employment. The Agreement

speaks for itself and is the best evidence of its contents. To the extent the Complaint characterizes the Agreement or its provisions in any manner inconsistent with its plain terms, Defendant denies those allegations. To the extent any further response is deemed required, Defendant denies the allegations contained in Paragraph 48 of the Complaint.

49. Defendant admits that EPAM maintains a Code of Conduct. The Code of Conduct speaks for itself and is the best evidence of its contents. To the extent the Complaint characterizes the Code of Conduct or its provisions in any manner inconsistent with its plain terms, Defendant denies those allegations. To the extent any further response is deemed required, Defendant denies the allegations contained in Paragraph 49 of the Complaint.

50. Defendant admits that the Code of Conduct referenced in Paragraph 50 contains provisions regarding confidential and proprietary information. The Code of Conduct speaks for itself and is the best evidence of its contents. To the extent the Complaint characterizes the Code of Conduct or its provisions in any manner inconsistent with its plain terms, Defendant denies those allegations. To the extent any further response is deemed required, Defendant denies the allegations contained in Paragraph 50 of the Complaint.

51. Defendant admits that the Code of Conduct referenced in Paragraph 51 contains provisions regarding the handling of confidential information. The Code of Conduct speaks for itself and is the best evidence of its contents. To the extent the Complaint characterizes the Code of Conduct or its provisions in any manner inconsistent with its plain terms, Defendant denies those allegations. To the extent any further response is deemed required, Defendant denies the allegations contained in Paragraph 51 of the Complaint.

52. Defendant admits that the Code of Conduct referenced in Paragraph 52 contains provisions regarding confidential information. The Code of Conduct speaks for itself and is the best evidence of its contents. To the extent the Complaint characterizes the Code of Conduct or its provisions in any manner inconsistent with its plain terms, Defendant denies those allegations. To the extent any further response is deemed required, Defendant denies the allegations contained in Paragraph 52 of the Complaint.
53. Defendant admits that the Code of Conduct referenced in Paragraph 53 contains provisions regarding the acceptable use of technology and the handling of confidential information. The Code of Conduct speaks for itself and is the best evidence of its contents. To the extent the Complaint characterizes the Code of Conduct or its provisions in any manner inconsistent with its plain terms, Defendant denies those allegations. To the extent any further response is deemed required, Defendant denies the allegations contained in Paragraph 53 of the Complaint.
54. Defendant admits that EPAM's records may reflect that he completed certain training modules referenced in Paragraph 54. Defendant denies the remaining allegations contained in Paragraph 54 of the Complaint.
55. Defendant admits that Plaintiff has attached a document identified as the Corporate Governance Policy with respect to Acceptable Use of IT Resources as Exhibit C to the Complaint. The document speaks for itself and is the best evidence of its contents. To the extent the Complaint characterizes the policy or its provisions in any manner inconsistent with its plain terms, Defendant denies those allegations. To the extent any further response is deemed required, Defendant denies the allegations contained in Paragraph 55 of the Complaint.
56. Defendant admits that the IT Resources Policy referenced in Paragraph 56 contains statements regarding the purpose and use of IT resources. The IT Resources Policy speaks for itself and is the best evidence of its contents. To the extent the Complaint

characterizes the IT Resources Policy or its provisions in any manner inconsistent with its plain terms, Defendant denies those allegations. To the extent any further response is deemed required, Defendant denies the allegations contained in Paragraph 56 of the Complaint.

57. Defendant admits that Plaintiff has attached a document identified as the IT Resources Policy as Exhibit C to the Complaint. The IT Resources Policy speaks for itself and is the best evidence of its contents. To the extent the Complaint characterizes the IT Resources Policy or its provisions in any manner inconsistent with its plain terms, Defendant denies those allegations. To the extent any further response is deemed required, Defendant denies the allegations contained in Paragraph 57 of the Complaint.

58. Defendant admits that the IT Resources Policy referenced in Paragraph 58 contains provisions regarding the handling of confidential information. The IT Resources Policy speaks for itself and is the best evidence of its contents. To the extent the Complaint characterizes the IT Resources Policy or its provisions in any manner inconsistent with its plain terms, Defendant denies those allegations. To the extent any further response is deemed required, Defendant denies the allegations contained in Paragraph 58 of the Complaint.

59. Defendant admits that the IT Resources Policy referenced in Paragraph 59 contains provisions regarding the return of company equipment. The IT Resources Policy speaks for itself and is the best evidence of its contents. To the extent the Complaint characterizes the IT Resources Policy or its provisions in any manner inconsistent with its plain terms, Defendant denies those allegations. To the extent any further response is deemed required, Defendant denies the allegations contained in Paragraph 59 of the Complaint.

**III. Rao's Exit from EPAM**

60. Defendant denies the allegations contained in Paragraph 60 of the Complaint.
61. Defendant denies the allegations contained in Paragraph 61 of the Complaint.
62. Defendant denies the allegations contained in Paragraph 62 of the Complaint.
63. Defendant admits that he communicated with EPAM personnel via Microsoft Teams during the course of his employment. Defendant denies the remaining allegations contained in Paragraph 63 of the Complaint.
64. Defendant admits that he shared his personal phone number with certain colleagues during the course of his employment. Defendant denies the remaining allegations contained in Paragraph 64 of the Complaint.
65. Defendant denies the allegations contained in Paragraph 65 of the Complaint.
66. Defendant denies the allegations contained in Paragraph 66 of the Complaint.
67. Defendant admits that he attended an industry conference in New Jersey during the week referenced in Paragraph 67. Defendant denies the remaining allegations contained in Paragraph 67 of the Complaint.
68. Defendant denies the allegations contained in Paragraph 68 of the Complaint.
69. Defendant denies the allegations contained in Paragraph 69 of the Complaint.
70. Defendant denies the allegations contained in Paragraph 70 of the Complaint.
71. Defendant admits that his employment with EPAM ended effective October 15, 2025 and that his access to EPAM systems was suspended on that date. Defendant denies the remaining allegations contained in Paragraph 71 of the Complaint.
72. Defendant denies the allegations contained in Paragraph 72 of the Complaint.
73. Defendant admits that he asked questions regarding the circumstances of his termination and the applicability of the Agreement. Defendant denies the remaining allegations contained in Paragraph 73 of the Complaint.
74. Defendant admits that he returned his company-issued computer to EPAM. Defendant denies the remaining allegations contained in Paragraph 74 of the Complaint.

**IV. Rao's Unauthorized Transmission of EPAM Files and Source Code to His Personal Devices and Other Misconduct**

75. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 75 of the Complaint and therefore denies them.
76. Defendant denies the allegations contained in Paragraph 76 of the Complaint.
77. Defendant denies the allegations contained in Paragraph 77 of the Complaint.
78. Defendant denies the allegations contained in Paragraph 78 of the Complaint.
79. Defendant denies the allegations contained in Paragraph 79 of the Complaint.
80. Defendant denies the allegations contained in Paragraph 80 of the Complaint.
81. Defendant denies the allegations contained in Paragraph 81 of the Complaint.
82. Defendant denies the allegations contained in Paragraph 82 of the Complaint.
83. Defendant denies the allegations contained in Paragraph 83 of the Complaint.
84. Defendant denies the allegations contained in Paragraph 84 of the Complaint.

**V. Rao's Breach of His Post-Employment Restrictive Covenants**

85. Defendant denies the allegations contained in Paragraph 85 of the Complaint.
86. Defendant denies the allegations contained in Paragraph 86 of the Complaint.
87. Defendant denies the allegations contained in Paragraph 87 of the Complaint.
88. Defendant denies the allegations contained in Paragraph 88 of the Complaint.
89. Defendant denies the allegations contained in Paragraph 89 of the Complaint.

**VI. Irreparable Harm to EPAM Without Injunctive Relief**

90. Defendant states that Paragraph 90 of the Complaint contains generalized statements and argument to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 90 of the Complaint.

91. Defendant states that Paragraph 91 of the Complaint contains generalized statements and argument to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 91 of the Complaint.
92. Defendant denies the allegations contained in Paragraph 92 of the Complaint.
93. Defendant denies the allegations contained in Paragraph 93 of the Complaint.
94. Defendant states that Paragraph 94 of the Complaint contains argument and conclusions regarding alleged harm and entitlement to injunctive relief to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 94 of the Complaint.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Actual and/or Threatened Misappropriation of Trade Secrets, 18 U.S.C. § 1832)**

95. Defendant repeats and incorporates by reference his responses to Paragraphs 1 through 95 of the Complaint as if fully set forth herein.
96. Defendant states that Paragraph 96 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 96 of the Complaint.
97. Defendant states that Paragraph 97 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 97 of the Complaint.
98. Defendant states that Paragraph 98 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 98 of the Complaint.
99. Defendant states that Paragraph 99 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 99 of the Complaint.

100. Defendant states that Paragraph 100 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 100 of the Complaint.

101. Defendant states that Paragraph 101 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 101 of the Complaint.

102. Defendant states that Paragraph 102 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 102 of the Complaint.

103. Defendant states that Paragraph 103 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 103 of the Complaint.

104. Defendant states that Paragraph 104 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 104 of the Complaint.

105. Defendant states that Paragraph 105 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 105 of the Complaint.

106. Defendant states that Paragraph 106 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 106 of the Complaint.

107. Defendant states that Paragraph 107 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 107 of the Complaint.

## ***AS AND FOR A SECOND CAUSE OF ACTION***

***(Actual and/or Threatened Misappropriation of Trade Secrets in Violation of the Uniform***

***Pennsylvania Trade Secrets Act, 12 Pa. C.S.A. § 5301, et seq.)***

108. Defendant repeats and incorporates by reference each and every of the preceding paragraphs of the Complaint as if fully set forth herein.

109. Defendant states that Paragraph 109 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 109 of the Complaint.

110. Defendant states that Paragraph 110 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 110 of the Complaint.

111. Defendant states that Paragraph 111 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 111 of the Complaint.

112. Defendant states that Paragraph 112 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 112 of the Complaint.

113. Defendant states that Paragraph 113 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 113 of the Complaint.

114. Defendant states that Paragraph 114 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 114 of the Complaint.

115. Defendant states that Paragraph 115 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 115 of the Complaint.

116. Defendant states that Paragraph 116 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 116 of the Complaint.

117. Defendant states that Paragraph 117 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 117 of the Complaint.

118. Defendant states that Paragraph 118 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 118 of the Complaint.

119. Defendant states that Paragraph 119 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 119 of the Complaint.

120. Defendant states that Paragraph 120 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 120 of the Complaint.

***AS AND FOR A THIRD CAUSE OF ACTION***
***(Breach of Contract: Non-Disclosure of Confidential Information)***

121. Defendant repeats and incorporates by reference each and every of the preceding paragraphs of the Complaint as if fully set forth herein.

122. Defendant states that Paragraph 122 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 122 of the Complaint.

123. Defendant states that Paragraph 123 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 123 of the Complaint.

124. Defendant states that Paragraph 124 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 124 of the Complaint.

125. Defendant states that Paragraph 125 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 125 of the Complaint.

126. Defendant states that Paragraph 126 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 126 of the Complaint.

127. Defendant states that Paragraph 127 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 127 of the Complaint.

128. Defendant states that Paragraph 128 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 128 of the Complaint.

129. Defendant states that Paragraph 129 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 129 of the Complaint.

130. Defendant states that Paragraph 130 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 130 of the Complaint.

131. Defendant states that Paragraph 131 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 131 of the Complaint.

132. Defendant states that Paragraph 132 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 132 of the Complaint.

***AS AND FOR A FOURTH CAUSE OF ACTION***
***(Breach of Contract: Non-Solicitation of Clients)***

133. Defendant repeats and incorporates by reference each and every of the preceding paragraphs of the Complaint as if fully set forth herein.

134. Defendant states that Paragraph 134 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 134 of the Complaint.

135. Defendant states that Paragraph 135 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 135 of the Complaint.

136. Defendant states that Paragraph 136 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 136 of the Complaint.

137. Defendant states that Paragraph 137 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 137 of the Complaint.

138. Defendant states that Paragraph 138 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 138 of the Complaint.

139. Defendant states that Paragraph 139 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 139 of the Complaint.

140. Defendant states that Paragraph 140 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 140 of the Complaint.

## ***AS AND FOR A FIFTH CAUSE OF ACTION***
## ***(Breach of Fiduciary Duty)***

141. Defendant repeats and incorporates by reference each and every of the preceding paragraphs of the Complaint as if fully set forth herein.

142. Defendant states that Paragraph 142 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 142 of the Complaint.

143. Defendant states that Paragraph 143 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 143 of the Complaint.

144. Defendant states that Paragraph 144 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 144 of the Complaint.

145. Defendant states that Paragraph 145 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 145 of the Complaint.

146. Defendant states that Paragraph 146 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 146 of the Complaint.

## ***AS AND FOR A SIXTH CAUSE OF ACTION***
## ***(Tortious Interference)***

147. Defendant repeats and incorporates by reference each and every of the preceding paragraphs of the Complaint as if fully set forth herein.

148. Defendant states that Paragraph 148 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 148 of the Complaint.

149. Defendant states that Paragraph 149 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 149 of the Complaint.

150. Defendant states that Paragraph 150 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 150 of the Complaint.

151. Defendant states that Paragraph 151 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 151 of the Complaint.

152. Defendant states that Paragraph 152 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 152 of the Complaint.

153. Defendant states that Paragraph 153 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 153 of the Complaint.

154. Defendant states that Paragraph 154 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 154 of the Complaint.

155. Defendant states that Paragraph 155 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 155 of the Complaint.

***<u>AS AND FOR A SEVENTH CAUSE OF ACTION</u>***
***(Breach of Contract: Non-Competition)***

156. Defendant repeats and incorporates by reference each and every of the preceding paragraphs of the Complaint as if fully set forth herein.

157. Defendant states that Paragraph 157 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 157 of the Complaint.

158. Defendant states that Paragraph 158 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 158 of the Complaint.

159. Defendant states that Paragraph 159 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 159 of the Complaint.

160. Defendant states that Paragraph 160 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 160 of the Complaint.

161. Defendant states that Paragraph 161 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 161 of the Complaint.

162. Defendant states that Paragraph 162 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 162 of the Complaint.

163. Defendant states that Paragraph 163 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 163 of the Complaint.

164. Defendant states that Paragraph 164 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 164 of the Complaint.

165. Defendant states that Paragraph 165 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 165 of the Complaint.

166. Defendant states that Paragraph 166 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 166 of the Complaint.

167. Defendant states that Paragraph 167 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 167 of the Complaint.

168. Defendant states that Paragraph 168 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 168 of the Complaint.

## ***AS AND FOR AN EIGHTH CAUSE OF ACTION***
## ***(Replevin)***

169. Defendant repeats and incorporates by reference each and every of the preceding paragraphs of the Complaint as if fully set forth herein.

170. Defendant states that Paragraph 170 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 170 of the Complaint.

171. Defendant states that Paragraph 171 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 171 of the Complaint.

172. Defendant states that Paragraph 172 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 172 of the Complaint.

173. Defendant states that Paragraph 173 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 173 of the Complaint.

174. Defendant states that Paragraph 174 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 174 of the Complaint.

175. Defendant states that Paragraph 175 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 175 of the Complaint.

## ***AS AND FOR A NINTH CAUSE OF ACTION***
## ***(Conversion)***

176. Defendant repeats and incorporates by reference each and every of the preceding paragraphs of the Complaint as if fully set forth herein.

177. Defendant states that Paragraph 177 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 177 of the Complaint.

178. Defendant states that Paragraph 178 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 178 of the Complaint.

179. Defendant states that Paragraph 179 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 179 of the Complaint.

180. Defendant states that Paragraph 180 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 180 of the Complaint.

181. Defendant states that Paragraph 181 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 181 of the Complaint.

182. Defendant states that Paragraph 182 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 182 of the Complaint.

## ***AS AND FOR A TENTH CAUSE OF ACTION***
## ***(Unjust Enrichment)***

183. Defendant repeats and incorporates by reference each and every of the preceding paragraphs of the Complaint as if fully set forth herein.

184. Defendant states that Paragraph 184 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 184 of the Complaint.

185. Defendant states that Paragraph 185 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 185 of the Complaint.

186. Defendant states that Paragraph 186 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 186 of the Complaint.

187. Defendant states that Paragraph 187 of the Complaint contains legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations contained in Paragraph 187 of the Complaint.

## RESPONSE TO PRAYER FOR RELIEF

188. Defendant states that the WHEREFORE clause of the Complaint contains requests for relief and legal conclusions to which no response is required. To the extent a response is deemed required, Defendant notes that Plaintiff's requests for forensic inspection and device remediation are moot, as Defendant previously and voluntarily submitted to the mutually agreed December 12, 2025 Forensic Inspection Protocol Agreement. Defendant denies that Plaintiff is entitled to any remaining relief requested in the Complaint, or to any relief whatsoever.

## AFFIRMATIVE DEFENSES

189. Defendant incorporates by reference all factual allegations set forth in the Counterclaims below as if fully set forth herein to support these Affirmative Defenses.

190. Each affirmative defense is asserted as to all claims to the fullest extent applicable. The factual allegations supporting each defense are not limited to the defense under which they appear and are incorporated into every other defense. Defendant reserves the right to assert additional affirmative defenses as discovery progresses.

191. Defendant asserts the following affirmative defenses. By asserting these defenses, Defendant does not assume the burden of proof on matters for which Plaintiff bears the burden.

### First Affirmative Defense (Failure to State a Claim)

192. The Complaint, and each purported cause of action therein, fails to state a claim upon which relief can be granted.

### Second Affirmative Defense (Express and/or Implied Authorization, Lawful Possession, and Ordinary Course of Employment)

193. Plaintiff's claims are barred, in whole or in part, because Defendant did not misappropriate, wrongfully download, or unlawfully retain the proprietary source code or any other information alleged in the Complaint. To the extent any routine data, system artifacts, or open-source libraries were present on Defendant's devices, such presence was expressly and/or impliedly authorized by Plaintiff, occurred in the ordinary course of employment, and was the direct result of Plaintiff's own IT architecture.

194. Plaintiff explicitly permitted and accommodated the use of personal devices for "productivity and convenience," requiring and provisioning Defendant's personal devices

with corporate security compliance software (e.g., OPSWAT) as a mandatory prerequisite for network access. Operating within this expressly authorized framework, Defendant utilized solely his own valid, company-issued credentials to access files to which he was granted authorization. Defendant did not employ stolen credentials, circumvent security barriers, or solicit unauthorized access from third parties, but rather acted entirely within his authorized professional capacity to perform his expected duties.

195. Furthermore, upon information and belief, Plaintiff's centralized IT systems facilitated and configured the use of cloud-synchronization software—including Microsoft OneDrive. This software was configured by Plaintiff to execute the automatic, passive background synchronization of routine data, system artifacts, and open-source libraries to authorized endpoint devices.

196. Consequently, any incidental information accessed, downloaded, retained, or used by Defendant—whether through active, credentialed use in his professional capacity, or through passive system synchronization—was the lawful, foreseeable result of Plaintiff's own IT protocols. Any alleged retention of such files following Defendant's separation from employment was the passive consequence of Plaintiff's system architecture and its own off-boarding procedures, not an affirmative act of misappropriation.

**Third Affirmative Defense (Waiver and Equitable Estoppel)**

197. Plaintiff's claims are barred, in whole or in part, by the equitable doctrines of waiver and equitable estoppel. Plaintiff knowingly designed, configured, and mandated an IT architecture for its own operational benefit that utilized automated, passive background synchronization (e.g., Microsoft OneDrive) of routine data, system artifacts, and open-source libraries to authorized personal endpoint devices.

198. Because Defendant did not exceed his authorized access, and because Plaintiff affirmatively configured this system for its own benefit, Plaintiff knowingly and voluntarily

waived any right to subsequently classify the presence or incidental retention of these routine files on Defendant's devices as unauthorized or unlawful.

199. Plaintiff is therefore equitably estopped from asserting its claims of misappropriation, or seeking equitable and injunctive relief, based upon the foreseeable, authorized, and automated functions of its own mandated IT systems.

**Fourth Affirmative Defense (Failure to Meet Statutory Trade Secret Definition and Public Domain)**

200. Plaintiff’s claims for trade secret misappropriation are barred, in whole or in part, because the information and materials alleged in the Complaint fail to satisfy the statutory definition of a trade secret under the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836 et seq., or applicable state law.

201. Specifically, the materials at issue—including Plaintiff's alleged "ETL Conversion Kit"—are not secret. They comprise open-source methodologies, public domain algorithms, and software architectures that were developed for, and remain freely available to, public scientific communities such as OHDSI. These materials heavily incorporate foundational, openly published community tools (e.g., Rabbit-in-a-Hat, Usagi), Metadata-Driven ETL architectures, and standard mapping algorithms (e.g., CPRD Duration Imputation and Optum formatting logic) published under open-source licenses within the community's ETL-LambdaBuilder repositories.

202. To the extent Plaintiff claims a proprietary interest in the specific configuration, workflow, or compilation connecting these open-source tools, such elements are generally known within the relevant data-science industry and are readily ascertainable through proper means. Consequently, these materials do not derive independent economic value from being kept secret and are wholly ineligible for trade secret protection.

**Fifth Affirmative Defense (Failure to Take Reasonable Measures to Maintain Secrecy)**

203. Plaintiff's claims for trade secret misappropriation are barred, in whole or in part, because Plaintiff failed to take reasonable measures to maintain the secrecy of the alleged materials, as strictly required by the Defend Trade Secrets Act, 18 U.S.C. § 1839(3)(A).

204. Specifically, Plaintiff voluntarily and publicly disclosed the architecture, conceptual design, and capabilities of the alleged trade secrets—including the "AI Cohort Generator" and "AI Accelerator"—at the 2025 OHDSI Global Symposium ("Mind Meets Machine"). This event was a public, industry-wide conference where attendees were not bound by non-disclosure agreements, confidentiality provisions, or any other restrictive covenants.

205. Furthermore, with Plaintiff's explicit authorization and consent, the presentation detailing these exact tools was openly recorded and permanently broadcast to the general public via the video-sharing platform YouTube (https://www.youtube.com/watch?v=7Ek3vF3Pu_E).

206. Plaintiff additionally authorized the publication of the underlying presentation materials and related data to an open-source, publicly accessible GitHub repository (https://github.com/ohdsi-studies/MindMeetsMachines/commits/main). By voluntarily publishing these materials to the open internet and the public scientific community, Plaintiff irrevocably extinguished any purported trade secret protections.

**Sixth Affirmative Defense (Contractual Exemption)**

207. Plaintiff's claims for breach of contract and trade secret misappropriation are barred, in whole or in part, by the express, bargained-for terms of the parties' own Employment Covenants Agreement.

208. Specifically, Section 1(b) of the Agreement contains an explicit carve-out protecting Defendant's scientific and professional contributions. The contractual language, drafted by Plaintiff, expressly excludes from the definition of "Confidential Information" any software, materials, or knowledge acquired or developed "through and for the purpose of community, professional, scientific, or similar groups."

209. The accused materials at issue in this litigation were developed utilizing, and for the express purpose of contributing to, the open OHDSI scientific community. Consequently, these materials fall squarely within the Agreement's explicit contractual exemption and cannot legally form the basis of Plaintiff's claims for misappropriation or breach of confidentiality.

**Seventh Affirmative Defense (Waiver and Equitable Estoppel)**

210. Plaintiff’s claims are barred, in whole or in part, by the equitable doctrines of waiver and equitable estoppel. Plaintiff cannot claim trade secret protection over materials that it explicitly authorized Defendant to disclose to the public.

211. During the 2025 OHDSI Global Symposium, Defendant—acting in his authorized capacity as an EPAM employee—and fellow EPAM employee Darya Zhukova voluntarily presented the architecture and technical capabilities of the disputed tools to the general public. This public disclosure was attended, overseen, and expressly authorized by Plaintiff’s executive leadership, specifically including Gregory Klebanov.

212. With Plaintiff's explicit corporate authorization, this presentation detailed the core technical mechanics of the accused tools, including the use of a containerized Python backend service, REST APIs, relational databases utilizing vector stores for semantic search, and integrations with hosted large language models via AWS Bedrock (specifically Anthropic Claude).

213. By voluntarily disclosing these specific technical architectures in an unrestricted public forum, and by consenting to their ongoing publication, Plaintiff knowingly and intentionally waived any applicable trade secret protections or confidentiality rights. Consequently, Plaintiff is equitably estopped from reversing its position to retroactively weaponize these authorized public disclosures as the basis for a misappropriation lawsuit.

**Eighth Affirmative Defense (Lack of Standing and Ownership)**

214. Plaintiff's claims are barred, in whole or in part, because Plaintiff lacks Article III standing to assert trade secret or intellectual property claims regarding the accused materials, specifically including the "AI Cohort Generator" and "AI Accelerator." Plaintiff lacks standing because it does not possess valid title, proprietary rights, or an exclusive possessory interest in the intellectual property at issue.

215. The Governing MSA: The intellectual property forming the basis of Plaintiff's claims was developed pursuant to a Master Services Agreement (MSA) executed on June 1, 2019, between Millennium Pharmaceuticals, Inc. (Takeda) and Odysseus Data Services, Inc. (an entity subsequently acquired by Plaintiff). Relevant excerpts of the MSA are attached hereto as **Exhibit A**.

216. Exclusive Vesting in Takeda: Under Section 12 of the governing MSA (Ex. A at § 12), all materials prepared in the performance of services "are 'works for hire,' shall be the sole and exclusive property of Takeda and copyright therein shall immediately vest in Takeda." Section 12 further dictates that to the extent any property is not considered a "work for hire," Plaintiff "hereby assigns and agrees to assign to Takeda... all rights including copyright in such property."

217. Preemption of SOW Carve-Outs: Furthermore, Plaintiff cannot rely on any subsequent Project Work Order (PWO) or Statement of Work (SOW) to claim a

retroactive carve-out or license for this intellectual property. Section 25 of the MSA (Ex. A at § 25) expressly dictates that "in the event of any conflict between the provisions of this Agreement and the provisions of any PWO, the terms of this Agreement shall prevail." Because Takeda Pharmaceuticals, and not Plaintiff, is the sole legal owner of the accused code and architectures, Plaintiff has suffered no legally cognizable injury-in-fact regarding their use or retention. Consequently, Plaintiff lacks the requisite legal standing to pursue these claims.

**Ninth Affirmative Defense (Judicial Estoppel and Unclean Hands)**

218. Plaintiff's claims for trade secret misappropriation and injunctive relief are equitable in nature and are therefore barred, in whole or in part, by the doctrine of unclean hands. Plaintiff is equitably barred from asserting proprietary ownership in this litigation because it is prosecuting this action in bad faith, with actual, documented knowledge that it does not own the materials at issue.

219. The Internal Legal Admission: Plaintiff possesses contemporaneous, internal legal determinations confirming that a third party (Takeda Pharmaceuticals) maintains exclusive ownership of the accused intellectual property. Specifically, in September 2025, Plaintiff's own internal legal counsel reviewed the governing Master Services Agreement (MSA) and confirmed this ownership structure in writing.

220. Plaintiff's legal counsel explicitly communicated internally: "the MSA makes no allowance for pre-existing IP—everything we build belongs to Takeda and the MSA controls over the SOW in the event of a conflict between the terms of the two documents." A true and correct copy of this internal communication is attached hereto as **Exhibit B**.

221. Bad-Faith Prosecution: Despite possessing this explicit internal legal determination confirming Takeda's exclusive ownership, Plaintiff willfully concealed this fact from the

Court and prosecuted this action anyway. By falsely asserting proprietary ownership over these materials to manufacture a federal lawsuit against Defendant, Plaintiff has acted in bad faith, severely abused the judicial process, and sullied its hands, thereby barring its claims under the principles of equity.

**Tenth Affirmative Defense (Absolute Immunity under the DTSA Whistleblower Safe Harbor)**

222. Plaintiff's claims for trade secret misappropriation under the Defend Trade Secrets Act (DTSA) and applicable state law are barred, in their entirety, because Defendant is entitled to absolute statutory immunity pursuant to the federal whistleblower safe harbor provision, 18 U.S.C. § 1833(b).

223. Protected Whistleblowing Activity: Prior to his retaliatory termination, Defendant engaged in protected whistleblowing activity by formally objecting to Plaintiff's illicit corporate practices. Specifically, Defendant objected to Plaintiff's deceptive geographic staffing practices on the Gilead Sciences account—which Defendant reasonably believed violated OFAC sanctions, Export Administration Regulations (EAR), and HIPAA mandates—as well as Plaintiff's explicit directives to misappropriate third-party intellectual property belonging to Takeda Pharmaceuticals.

224. Lawful Retention of Evidence: Under 18 U.S.C. § 1833(b), an individual cannot be held civilly or criminally liable for the acquisition or disclosure of a trade secret if it is made in confidence to an attorney or government official solely for the purpose of reporting or investigating a suspected violation of law. To the extent Defendant retained, accessed, or transmitted any internal documents or files relating to the Gilead or Takeda accounts, such actions were conducted in strict confidence for the exclusive purpose of preserving evidence to report these suspected federal and regulatory violations to legal counsel and relevant government authorities.

225. Absolute Immunity: Consequently, Defendant's actions fall squarely within the statutory protections of 18 U.S.C. § 1833(b), rendering him absolutely immune from any civil or criminal liability under state or federal trade secret law, and legally precluding Plaintiff from maintaining this action.

**Eleventh Affirmative Defense (Mootness)**

226. Plaintiff's claims are barred, in whole or in part—specifically including but not limited to its demands for preliminary and permanent injunctive relief—by the doctrine of mootness. There is no live, ongoing controversy requiring further equitable intervention by this Court because the alleged risk of harm has been fully addressed, secured, and superseded by binding agreements and Court Orders.

227. The Superseding Orders: Specifically, the status quo is already preserved by the December 10, 2025 Stipulated Consent Order—an active Order of this Court that strictly governs Defendant's conduct—and the mutually executed December 12, 2025 Stipulated Forensic Inspection Protocol Agreement (the "Protocol").

228. Absence of Ongoing Risk: While Defendant retains lawful physical possession of his personal devices, his actions regarding the data on those devices remain strictly subject to the Court's existing Consent Order and the active remediation framework of the Protocol.

229. Because the legal status quo is already secured and actively governed by this Court's existing directives, Plaintiff faces no ongoing threat of irreparable harm. Consequently, Plaintiff's demands for redundant or further injunctive relief present no justiciable controversy, are legally moot, and must be dismissed to preserve judicial resources.

**Twelfth Affirmative Defense (Lack of Irreparable Harm and Adequate Remedy at Law)**

230. Plaintiff's claims are barred, in whole or in part—specifically including but not limited to its demands for equitable and extraordinary injunctive relief—because Plaintiff cannot demonstrate an actual, imminent threat of irreparable harm, and because Plaintiff possesses an adequate remedy at law.

231. Secured Evidentiary Baseline: Pursuant to this Court's Consent Order and the mutually executed Forensic Inspection Protocol, a neutral third-party vendor (iDS) has already forensically imaged and secured Defendant's relevant devices and accounts. The evidentiary baseline is completely preserved, documented, and actively governed by a neutral custodian.

232. Absence of Imminent Harm: Furthermore, the parties are currently engaged in the Protocol's secure "Relativity" review process to systematically identify and remediate any disputed files. Because the data is effectively frozen, secured, and subject to an active remediation framework, Plaintiff cannot establish the imminent, irreparable harm required to justify extraordinary equitable intervention by this Court.

233. Adequate Remedy at Law: Finally, to the extent Plaintiff has suffered any legally cognizable injury—which Defendant expressly denies—such alleged injuries are purely economic and fully compensable through a standard award of monetary damages. Because Plaintiff possesses an adequate remedy at law, its demands for extraordinary injunctive relief are legally barred.

**Thirteenth Affirmative Defense (Inapplicability of the non-compete Restrictive Covenants)**

234. Plaintiff's claims are barred, in whole or in part—specifically including but not limited to any claims seeking to enforce post-employment non-competition provisions—by the express and unambiguous terms of the parties' own Employment Covenants Agreement.

235. The Contractual Exemption: Section 5(c) of the Agreement, drafted by Plaintiff, explicitly limits the enforceability of the non-competition provisions. The plain language of the contract dictates that the restrictions are triggered only "in the event you voluntarily resign employment," and unequivocally guarantees that the restrictions "shall not apply in case of an involuntary termination."

236. The Involuntary Termination (RIF): The circumstances surrounding Defendant's separation do not trigger the non-competition restrictions because Defendant did not voluntarily resign. Defendant's separation was an involuntary termination resulting directly from a corporate Reduction in Force (RIF). In or around September 2025, Plaintiff's executive leadership, specifically Gregory Klebanov, expressly informed Defendant that his business unit was mandated to reduce costs and that Defendant's position was being eliminated.

237. Because Defendant's separation was an involuntary termination, the explicit contractual conditions precedent required to enforce the non-competition provisions were never met. Consequently, the non-competition covenants are entirely inapplicable to Defendant by the express terms of the contract, and cannot legally form the basis for any claim or injunctive relief.

**Fourteenth Affirmative Defense (Judicial and Equitable Estoppel)**

238. Plaintiff's claims are barred, in whole or in part—specifically including but not limited to any claims seeking to enforce non-competition provisions or alleging a "for-cause" termination—by the doctrines of judicial and equitable estoppel. Plaintiff is legally estopped from manufacturing these claims because it has already made explicit, binding,

and contradictory representations to both state and federal authorities regarding the nature of Defendant's separation.

239. The State Administrative Admission: First, Plaintiff explicitly represented to the State of New Jersey Department of Labor and Workforce Development that Defendant's separation was a corporate Reduction in Force (RIF). Plaintiff deliberately did not classify the termination as being for misconduct or "for cause." Based upon Plaintiff's official, documented representations, the State awarded Defendant unemployment benefits. A true and correct copy of Defendant's official New Jersey Department of Labor benefits record, confirming this award, is attached hereto as **Exhibit D**.

240. The Federal Judicial Admission: Second, Plaintiff explicitly conceded this exact point before this very Court. In the mutually executed Stipulated Consent Order entered on December 10, 2025, Plaintiff agreed and stipulated that because *"Defendant's employment was involuntarily terminated, Section 5(c) of the Employee Covenants Agreement... regarding Noncompetition is not at issue."*

241. Application of Estoppel: Plaintiff is legally bound by its prior stipulations and official representations. Plaintiff cannot tell the State of New Jersey and a federal judge that Defendant was involuntarily terminated without cause, and subsequently reverse its position to allege a "for-cause" termination in an attempt to resurrect a voided non-compete agreement. Because Plaintiff is attempting to adopt a contradictory, bad-faith legal posture to manufacture a claim, its claims are barred by estoppel.

**Fifteenth Affirmative Defense (Prior Material Breach and Breach of Implied Covenant)**

242. Plaintiff's claims are barred, in whole or in part—specifically including but not limited to any claims seeking to enforce post-employment restrictive covenants—by the doctrine of prior material breach and Plaintiff's own violation of the implied covenant of good faith and fair dealing.

243. The Implied Covenant: Every contract subject to New Jersey law contains an implied covenant of good faith and fair dealing. This covenant strictly prohibits either party from acting maliciously to destroy or injure the right of the other party to receive the bargained-for fruits of the contract—which, in this case, includes Defendant's express right to be freed from non-competition restrictions under Section 5(c) following an involuntary termination.

244. The Bad-Faith Fabrication: Following Plaintiff's initial September 2025 Reduction in Force (RIF) notification to Defendant, Plaintiff engaged in a series of pretextual proposals to reassign or demote Defendant, which ultimately culminated in his involuntary termination. Plaintiff's subsequent, retroactive reclassification of this separation as a "for-cause" termination within the context of this litigation is a bad-faith fabrication.

245. Material Breach and Preclusion: Plaintiff manufactured this pretextual "for-cause" narrative for the sole, improper purpose of depriving Defendant of his explicit contractual waiver under Section 5(c). This bad-faith conduct constitutes a prior material breach of the Employment Covenants Agreement. Because Plaintiff materially breached the agreement first by violating the implied covenant of good faith and fair dealing, Plaintiff is legally precluded from seeking this Court's assistance to enforce any restrictive covenants against Defendant.

**Sixteenth Affirmative Defense (Unclean Hands regarding Intellectual Property)**

246. Plaintiff's claims are barred, in whole or in part—specifically including but not limited to its claims of trade secret misappropriation and demands for equitable relief—by the equitable doctrine of unclean hands. Plaintiff is barred from seeking equitable relief because it engaged in bad-faith, inequitable conduct directly involving the specific intellectual property at issue in this litigation.

247. The Illicit Directive: During Defendant's employment, Plaintiff explicitly directed Defendant to commercialize and resell specific technical assets, including the "AI Cohort Generator" and "AI Accelerator." Plaintiff issued this directive with actual, documented knowledge—confirmed by its own internal legal counsel—that it did not own these assets, and that they were the exclusive property of a third-party client, Takeda Pharmaceuticals.

248. Defendant's Refusal: Defendant expressly refused Plaintiff's directive to misappropriate and commercialize Takeda's intellectual property, recognizing that doing so would violate third-party contractual rights and federal law.

249. The Bad-Faith Litigation: Following Defendant's refusal to participate in this illicit scheme, Plaintiff initiated the instant litigation. Plaintiff has compounded its bad faith by affirmatively, and falsely, claiming proprietary ownership before this Court over the exact same assets it previously directed Defendant to misappropriate from Takeda. Because Plaintiff's hands are deeply sullied by its own inequitable conduct regarding this specific intellectual property, it is legally and equitably barred from seeking this Court's protection over it.

**Seventeenth Affirmative Defense (Unclean Hands and Bad Faith regarding Employment Covenants)**

250. Plaintiff's claims are barred, in whole or in part—specifically including but not limited to any claims seeking to enforce post-employment non-competition and non-solicitation provisions—by the equitable doctrines of unclean hands and bad faith. Plaintiff is legally barred from seeking equitable relief because its conduct regarding the termination of Defendant's employment was executed in bad faith to intentionally circumvent its own contractual obligations.

251. The Circumvention Scheme: Under the explicit terms of Section 5(c) of the Employment Covenants Agreement, non-competition restrictions are inapplicable in the event of an involuntary termination. After expressly notifying Defendant that his position was being eliminated due to an economically driven corporate Reduction in Force (RIF), Plaintiff pressured Defendant to voluntarily resign. Plaintiff executed this pressure campaign with the specific, bad-faith intent to artificially trigger the non-competition provisions that would otherwise be voided by the RIF.

252. The Manufactured Pretext: When Defendant rightfully refused to voluntarily resign and forfeit his contractual waiver, Plaintiff involuntarily terminated his employment. Subsequently, in a bad-faith attempt to resurrect and enforce these otherwise invalid restrictive covenants before this Court, Plaintiff manufactured a pretextual "for-cause" classification for the termination.

253. Because Plaintiff’s hands are sullied by its own orchestrated scheme to manipulate Defendant's employment status, strip him of his contractual rights, and mislead the Court regarding the true nature of his separation, Plaintiff is equitably barred from enforcing the resulting restrictive covenants.

**Eighteenth Affirmative Defense (Bad-Faith Prosecution and Ignored Forensic Data)**

254. Plaintiff’s claims are barred, in whole or in part, by the doctrine of unclean hands. Plaintiff has engaged in inequitable and bad-faith litigation conduct by aggressively prosecuting claims that are contradicted by the emerging forensic record.

255. The Preliminary Forensic Findings: Following the initiation of this lawsuit, Plaintiff and Defendant mutually executed the December 12, 2025 Stipulated Forensic Inspection Protocol. The preliminary data generated from this independent protocol—specifically the forensic search term results—yielded no evidence supporting Plaintiff's core

allegations that Defendant exfiltrated, misappropriated, or possessed the accused source code (including the ETL Conversion Kit and AI Cohort Generator).

256. The Premature and Bad-Faith Filing: Despite possessing this exculpatory preliminary forensic data, and before the review process could even be concluded, Plaintiff proceeded to escalate this litigation in bad faith. Specifically, on March 27, 2026, Plaintiff attempted to file a First Amended Complaint (ECF No. 30) that intentionally republished the very allegations of "theft" that their own forensic search protocol had thus far completely failed to substantiate. This Court subsequently struck Plaintiff's improper filing by formal Order (ECF No. 32).

257. The Equitable Bar: Because Plaintiff has engaged in willful, inequitable conduct by prematurely prosecuting severe allegations that it knows are unsupported by the active forensic data, Plaintiff’s hands are unclean. Consequently, Plaintiff is barred from seeking equitable or legal relief from this Court.

**Nineteenth Affirmative Defense (Statutory Bar and Unlawful Retaliation under NJ CEPA)**

258. Plaintiff’s claims are barred, in whole or in part—specifically including but not limited to its claims of trade secret misappropriation and breach of contract—because the initiation and prosecution of this lawsuit, as well as the underlying termination of Defendant, constitute unlawful retaliation in violation of the New Jersey Conscientious Employee Protection Act (NJ CEPA), N.J.S.A. 34:19-1 et seq.

259. Protected Whistleblowing Activity: During his employment, Defendant engaged in legally protected activity under CEPA. Specifically, beginning on or about September 9, 2025, Defendant objected to the explicit directives to commercialize intellectual property exclusively owned by Plaintiff's client, Takeda Pharmaceuticals. Defendant escalated

these protected concerns to Plaintiff’s legal department via an internal colleague, Katie Barista, who acted as a conduit to secure Legal's confirmation that the conduct was prohibited. Furthermore, Defendant raised protected internal objections directly to Plaintiff's management regarding deceptive geographic staffing practices concerning the Gilead Sciences account, reasonably believing such practices violated established legal, compliance, and public policy mandates.

260. The Retaliatory Campaign: In direct retaliation for, and in highly suspicious temporal proximity to, these protected disclosures, Plaintiff initiated a campaign of adverse employment actions against Defendant. Just days after Defendant's formal objections, in mid-September 2025, Plaintiff notified Defendant that his position was being eliminated. When Defendant rightfully refused to voluntarily resign and forfeit his contractual rights, Plaintiff terminated his employment.

261. The Lawsuit as Retaliation: Following the retaliatory termination, Plaintiff manufactured a pretextual "for-cause" classification based on objectively disproven allegations of data theft. Plaintiff's allegations of misappropriation and the subsequent weaponization of the federal judicial system through this lawsuit constitute ongoing, retaliatory actions designed to penalize, silence, and financially ruin Defendant for his protected whistleblowing disclosures. Because Plaintiff's claims are fundamentally retaliatory in nature, they are legally barred by statute.

**Twentieth Affirmative Defense (Public Policy and Legal Justification)**

262. Plaintiff’s claims are barred, in whole or in part—specifically including but not limited to its claims of misappropriation and demands for equitable relief—by the doctrines of legal justification and fundamental public policy.

263. Legal Justification and Privilege: Defendant’s actions, specifically including any alleged access to or incidental retention of the documents at issue, were legally justified and privileged. These actions were undertaken as part of Defendant's protected efforts to document, preserve evidence of, and formally object to Plaintiff's unlawful conduct, compliance violations, and explicit directives to improperly commercialize third-party intellectual property.

264. The Chilling Effect: Plaintiff is actively weaponizing this litigation to retaliate against Defendant for his protected disclosures regarding the Takeda Pharmaceuticals and Gilead Sciences accounts. Furthermore, Plaintiff's prosecution of this action is designed to improperly chill Defendant, and other similarly situated employees, from further reporting Plaintiff's illicit business practices to the relevant legal and regulatory authorities.

265. The Public Policy Bar: The courts cannot be utilized as an instrument of corporate retaliation. Because the judicial enforcement of Plaintiff's claims or the granting of its requested equitable relief would actively facilitate retaliation, suppress the lawful reporting of corporate misconduct, and protect illicit business practices, Plaintiff's claims are fundamentally repugnant to established mandates of public policy and must be barred.

**Twenty First Affirmative Defense (Lawful Competition and Reverse Solicitation)**

266. Plaintiff’s claims are barred, in whole or in part—specifically including but not limited to any claims alleging unlawful solicitation or the breach of non-solicitation restrictive covenants—because Defendant did not affirmatively solicit, induce, or recruit any of Plaintiff’s clients, employees, or business opportunities.

267. Independent Inbound Inquiries: To the extent any non-solicitation covenants are deemed legally enforceable—which Defendant expressly and vehemently denies—any

post-termination communications between Defendant and Plaintiff’s employees, clients, or associated third parties were independently initiated by those individuals, and not by Defendant.

268. Reverse Solicitation and Lawful Competition: Defendant's actions constitute lawful competition. It is a well-established legal principle that mere responses to unsolicited, inbound inquiries (commonly referred to as "reverse solicitation") do not constitute actionable solicitation, nor do they constitute a breach of any non-solicitation agreement.

269. Documentary Evidence: As a representative example of this dynamic, an EPAM employee independently initiated contact with Defendant on October 16, 2025. Defendant merely provided a lawful response to this unsolicited outreach. A true and correct copy of this transcript, demonstrating the inbound nature of the communication, is attached hereto as **Exhibit E**. Because Defendant's conduct constitutes lawful reverse solicitation, Plaintiff's claims are legally barred.

**Twenty Second Affirmative Defense (Contractual Exemption of Subject Matter and Lack of Protectable Interest)**

270. Plaintiff’s claims are barred, in whole or in part—specifically including but not limited to any claims alleging unlawful solicitation or the breach of restrictive covenants—because the subject matter of any alleged post-termination communications falls entirely outside the scope of Plaintiff's legitimate protectable business interests and is explicitly exempted by contract.

271. The Contractual Exemption: Under the explicit terms of Section 1(b) of the parties' Employment Covenants Agreement, Plaintiff expressly excluded software, materials, and knowledge acquired or developed "through and for the purpose of community, professional, scientific, or similar groups" from the scope of its restrictive covenants.

272. Exempted Subject Matter: The subject matter of the post-termination communications at issue pertained strictly to the open-source OHDSI scientific community and related public-domain tools. These topics fall squarely within the Agreement's explicit carve-out for scientific and professional community contributions.

273. Lack of Protectable Interest: Because Defendant's communications were strictly limited to these explicitly exempted, public-domain topics, Plaintiff possesses no legitimate, legally protectable business interest in suppressing them. Consequently, Defendant's communications constitute lawful, contractually permitted activity that cannot legally form the basis of a breach of contract or solicitation claim.

**Twenty Third Affirmative Defense (Failure to Mitigate Damages)**

274. Plaintiff's claims are barred, in whole or in part, or must be substantially reduced—specifically including but not limited to its claims for monetary damages, attorneys' fees, and investigative costs—because Plaintiff failed to exercise its affirmative legal duty to mitigate its alleged damages.

275. The Offer of Immediate Remediation: Prior to Plaintiff initiating this litigation or seeking equitable relief, Defendant explicitly offered to conduct a prompt, verifiable remediation and deletion of any allegedly remaining files on his personal devices to resolve the dispute privately. Specifically, on or about November 4, 2025, Defendant unconditionally offered to execute a complete "hard reset" and wipe of his computer to definitively eliminate any purported risk to Plaintiff's data.

276. The Unreasonable Rejection: Plaintiff unreasonably rejected this commercially standard offer of immediate remediation. Instead of accepting a free and definitive resolution to secure its data, Plaintiff demanded that Defendant personally bear the financial burden of a third-party forensic examination, which Plaintiff's own legal counsel explicitly estimated would cost Defendant $8,000 per device.

277. Self-Inflicted Damages: Plaintiff's unreasonable, bad-faith refusal to accept Defendant's immediate and effective mitigation offer directly caused the financial damages Plaintiff now claims to have suffered. Because Plaintiff affirmatively chose to incur escalating investigative and litigation costs rather than accept a commercially reasonable resolution, its recovery for such self-inflicted damages is barred by the doctrine of mitigation.

**Twenty Fourth Affirmative Defense (Intervening Cause and Lack of Proximate Cause)**

278. Plaintiff's claims are barred, in whole or in part—specifically including but not limited to its claims for monetary damages, investigative costs, and ongoing equitable relief—because any alleged financial injuries or risks currently claimed by Plaintiff were not proximately caused by Defendant.

279. The Intervening and Superseding Cause: Plaintiff's deliberate decision to reject Defendant's offer of immediate, free remediation in favor of initiating federal litigation and demanding expensive third-party forensic examinations constitutes an independent, intervening, and superseding cause of Plaintiff's alleged injuries.

280. Severance of Proximate Cause: It is a fundamental legal principle that a plaintiff cannot recover damages that are the direct result of its own independent actions. The escalating forensic costs, legal fees, and purported ongoing security risks alleged in the Complaint completely broke the chain of causation.

281. Consequently, these alleged injuries and ongoing costs are the direct, proximate result of Plaintiff's own strategic litigation choices. Because Plaintiff actively manufactured its own damages through its intervening actions, those damages cannot be legally attributed to Defendant.

**Twenty Fifth Affirmative Defense (Impossibility of Performance and Compliance with Legal Process)**

282. Plaintiff's claims are barred, in whole or in part—specifically including but not limited to any claims alleging wrongful retention, conversion, replevin, or breach of contract for the failure to return or destroy property—by the doctrines of impossibility of performance and compliance with legal process.

283. Initial Compliance with Offboarding Policy: Any routine data, system artifacts, or files residing on Defendant's personal devices following his termination were lawfully acquired in the ordinary course of employment. Following his separation, and prior to receiving any notice of anticipated litigation, Defendant engaged in the routine, good-faith deletion of incidental files. This action was taken in direct compliance with Section 3.28 ("Offboarding") of Plaintiff's "Acceptable Use of IT Resources" policy, which directs departing employees to "Remove Company/Client data from all personal devices and personal cloud storages."

284. The Intervening Litigation Hold: On October 31, 2025, Plaintiff served Defendant with a formal Cease and Desist letter containing a strict litigation preservation demand. This formal legal notice explicitly prohibited Defendant from deleting, modifying, transferring, or otherwise altering any data on his personal devices, under the explicit threat of judicial sanctions for the spoliation of evidence.

285. Impossibility of Performance: Upon receipt of this legal demand, Defendant lawfully and immediately complied, halting his policy-mandated device cleanup to strictly preserve the evidentiary baseline and freeze the legal status quo. Because Plaintiff's own legal counsel affirmatively demanded the absolute preservation of this data in its current state, Defendant's continued compliance with the corporate offboarding deletion policy was rendered legally impossible. Plaintiff cannot now manufacture a claim for

"wrongful retention" based entirely upon Defendant's strict compliance with Plaintiff's own litigation hold.

**Twenty Sixth Affirmative Defense (Waiver of Return-or-Destroy Provisions)**

286. Plaintiff's claims are barred, in whole or in part—specifically including but not limited to any claims alleging breach of contract, conversion, or wrongful retention based on a failure to return or destroy property—by the doctrine of waiver.

287. Superseding Preservation Obligations: On October 31, 2025, Plaintiff formally issued a strict litigation preservation demand explicitly mandating the absolute preservation of all data on Defendant's personal devices. This formal directive practically and legally superseded standard corporate offboarding policies and contractual "return-or-destroy" provisions. Following the receipt of this demand, any unilateral deletion, alteration, or unmonitored transfer of the files by Defendant would have risked severe sanctions for spoliation of evidence. Consequently, Defendant's retention of the inactive files on his device after this date was strict, good-faith compliance with Plaintiff's own legal preservation instructions pending a mutually agreed-upon forensic protocol, and cannot be construed as willful misappropriation, retention, or breach of contract.

288. The Contradictory Posture: Plaintiff cannot legally or equitably maintain two entirely contradictory positions. Plaintiff cannot simultaneously demand that Defendant freeze all data in place under the explicit threat of judicial sanctions for spoliation of evidence, and subsequently manufacture a lawsuit seeking to penalize Defendant for his strict compliance with that exact preservation demand.

289. Because Plaintiff affirmatively demanded the ongoing retention of the data to serve its own litigation strategy, it has irrevocably waived its right to pursue legal or equitable claims based on Defendant's failure to destroy it.

**Twenty Seventh Affirmative Defense (Unclean Hands and Bad Faith Regarding Emergency Injunctive Relief)**

290. Plaintiff's claims are barred, in whole or in part—specifically including but not limited to its demands for preliminary, permanent, and emergency injunctive relief—by the equitable doctrines of unclean hands and bad faith. Plaintiff is legally barred from seeking equitable relief because it willfully breached its duty of candor to this Court during emergency proceedings.

291. Concealment of Material Evidence: In seeking an emergency Temporary Restraining Order (TRO) from this Court, Plaintiff and its sworn declarants—specifically Human Resources personnel Larry McKlaine and June Dinitz—intentionally withheld material, exculpatory documentary evidence from the tribunal.

292. The Exculpatory Record: As reflected in **Exhibit C**, just weeks prior to executing their sworn declarations for the Court, McKlaine and Dinitz explicitly reviewed and acknowledged in writing Defendant's stated understanding of his post-employment obligations. Furthermore, they explicitly acknowledged Defendant's formal withdrawal of his separation request and his documented commitment to remain employed.

293. Breach of Candor and Manufactured Narrative: Plaintiff purposefully concealed these contemporaneous written communications—and Defendant's formal withdrawal—from the Court in a deliberate attempt to manufacture a false, bad-faith narrative of an "orchestrated" termination. By intentionally omitting this exculpatory evidence to secure extraordinary emergency relief, Plaintiff severely abused the equitable judicial process. Because Plaintiff comes to this Court with unclean hands and a demonstrated willingness to mislead the tribunal, it is absolutely precluded from receiving any equitable relief.

**Twenty Eighth Affirmative Defense (Reservation of Rights)**

294. Defendant expressly reserves the right to amend, supplement, or modify this Answer to assert any additional affirmative defenses, counterclaims, or third-party claims that may become apparent or available during the course of discovery, further factual investigation, or as the litigation progresses, in accordance with the Federal Rules of Civil Procedure.

## COUNTERCLAIMS

Defendant/Counterclaim-Plaintiff Gowtham Rao ("Dr. Rao" or "Counterclaim-Plaintiff"), representing himself pro se, pursuant to Rule 13 of the Federal Rules of Civil Procedure, asserts the following Counterclaims against Plaintiff/Counterclaim-Defendant EPAM Systems, Inc. ("EPAM" or "Counterclaim-Defendant"), and alleges upon knowledge as to his own acts and upon information and belief as to all other matters, except as otherwise noted below, as follows:

## THE PARTIES

295. Defendant/Counterclaim-Plaintiff Gowtham Rao is an individual residing in Princeton, New Jersey, and a naturalized citizen of the United States. Dr. Rao immigrated to the United States under the EB-1 visa classification for foreign nationals of "extraordinary ability" in the sciences.

296. Dr. Rao is a physician-scientist maintaining active medical licenses in New York, Pennsylvania, South Carolina, and Wisconsin. He is double board-certified by the American Board of Preventive Medicine and the American Board of Clinical Informatics. He is also an Epidemiologist and Biostatistician.

297. Throughout his career, including senior roles at Johnson & Johnson and BlueCross BlueShield of South Carolina (BCBSSC), Dr. Rao has managed the secure handling and privacy compliance of personally identifiable healthcare data records. His contributions to healthcare analytics include the development of the "Rao Score," a proprietary metric utilized by BCBSSC to identify and manage care for specific patient populations.

298. In addition to his corporate and clinical roles, Dr. Rao is an active contributor to the open-source medical information ecosystem. Within the Observational Health Data

Sciences and Informatics (OHDSI) collaborative, he leads major initiatives, including the Phenotype Development and Evaluation workgroup and Phenotype Phebruary.

299. Dr. Rao is a primary author and architect of foundational free open-source software utilized in the health informatics industry. Dr. Rao wrote, published, and distributed analytical code—specifically including the OMOP Common Data Model (CDM), Atlas, WebAPI, and CohortDiagnostics—prior to his employment with EPAM. Dr. Rao's open-science research and software methodologies are utilized by pharmaceutical companies, life science organizations, and health insurance networks.

300. Counterclaim-Defendant EPAM Systems, Inc. ("EPAM") is a corporation organized under the laws of the State of Delaware, with its principal place of business in Newtown, Pennsylvania.

## JURISDICTION

301. This Court has subject matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. § 1367 because they arise out of the same transaction or occurrence that is the subject matter of EPAM Systems, Inc.'s original Complaint, and therefore form part of the same case or controversy under Article III of the United States Constitution.

302. Alternatively, this Court has original jurisdiction pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

303. To the extent any Counterclaims are compulsory under Federal Rule of Civil Procedure 13(a), this Court possesses jurisdiction over such Counterclaims, as they derive from the same case or controversy as EPAM's claims—specifically, the employment relationship, termination event, and subsequent litigation activities placed at issue by EPAM's Complaint.

## VENUE

304. Venue is proper in this District because EPAM commenced this action in this Court and because the events and allegations underlying these Counterclaims arise out of the same conduct, transactions, and occurrences alleged in the Complaint.

## FACTUAL ALLEGATIONS

### A. EPAM's Solicitation and Inducement of Dr. Rao

305. Prior to joining EPAM, Dr. Rao was employed in a senior capacity at Johnson & Johnson (J&J). Dr. Rao possessed a longstanding professional relationship with Gregory Klebanov dating back to approximately 2016. At that time, Dr. Rao was serving as the Chief Medical Informatics Officer at BlueCross BlueShield of South Carolina (BCBSSC) and, in his capacity as an executive decision-maker, awarded a lucrative contract to Mr. Klebanov's then-independent company, Odysseus Data Services, Inc.

306. In or around 2024, EPAM acquired Odysseus Data Services. Following this corporate acquisition, and the subsequent attrition of critical clinical data science personnel, Mr. Klebanov affirmatively targeted and solicited Dr. Rao for employment. Upon information and belief, Mr. Klebanov's aggressive recruitment efforts were directly motivated by his personal financial need to achieve specific, acquisition-related revenue "earn-out" targets, which required Dr. Rao's caliber of industry expertise to fulfill.

307. At the time of this targeted solicitation, Dr. Rao was actively employed by J&J. Upon information and belief, EPAM's affirmative recruitment of Dr. Rao constituted a direct violation of the strict non-solicitation provisions contained within EPAM's own Master Services Agreement (MSA) with J&J. In an early display of bad faith, EPAM and Mr. Klebanov deliberately concealed this MSA restriction from Dr. Rao during the recruitment

process, inducing him to unknowingly participate in EPAM's breach of its client obligations.

308. To ensure Dr. Rao trusted the employment offers being made, Mr. Klebanov represented that he wielded broad, exceptional authority within EPAM. Mr. Klebanov explicitly attributed this authority to his longstanding, intimate personal relationship with EPAM’s Founder, CEO, and Chairman, Arkadiy Dobkin, emphasizing to Dr. Rao that their relationship traced back to their shared youth in Belarus.

309. To successfully induce Dr. Rao to abandon his secure position at J&J, Mr. Klebanov and EPAM Senior Vice President Greg Killian made highly specific, material representations regarding the scope and trajectory of the offered role. During recruitment meetings spanning October and November 2024, these EPAM executives explicitly promised Dr. Rao that he would be positioned on a direct trajectory to the Chief Medical Officer (CMO) role, would be granted full Profit and Loss (P&L) leadership, and would be entrusted with aggressively scaling EPAM’s Health and Life Sciences business unit from $400 million to $1 billion.

310. In reasonable, good-faith reliance upon these explicit executive representations, as well as his established prior professional relationship with Mr. Klebanov, Dr. Rao engaged in detrimental reliance. He actively declined to pursue competing, highly lucrative employment opportunities within the pharmaceutical industry and formally accepted the position of Managing Principal at EPAM in November 2024.

**B. Negotiation of the Employment Covenants Agreement**

311. Between approximately November 1 and November 12, 2024, Dr. Rao and EPAM engaged in documented, substantive negotiations regarding the material terms of his Employment Covenants Agreement (the "Agreement").

312. The Open-Source Carve-Out: During these negotiations, Dr. Rao successfully demanded and secured highly specific, material revisions to the definition of "Confidential Information" under Section 1(b) of the Agreement. The finalized, mutually executed clause expressly excluded "general industry knowledge, skills, or software... [developed] for the purpose of community, professional, scientific, or similar groups." This express contractual carve-out was specifically negotiated to protect and permanently exempt Dr. Rao's pre-existing intellectual property and ongoing contributions to the open-source OHDSI scientific community from any proprietary claims by EPAM.

313. The Involuntary Termination Exemption: Furthermore, Dr. Rao explicitly negotiated a hard limitation to the Non-Competition restrictions contained within Section 5(c) of the Agreement. The finalized, executed Agreement unambiguously dictates that the non-competition restrictions are triggered exclusively in the event of a voluntary resignation. By the express drafted terms of the contract, these restrictive covenants are rendered entirely void and inapplicable in the event of an involuntary termination.

314. Binding Legal Admissions by EPAM Counsel: On November 12, 2024, directly prior to the execution of the Agreement, EPAM's Director and Associate General Counsel, Sarah Lugar, provided Dr. Rao with a written interpretation of the modified non-competition terms. In this communication, acting in her official capacity as EPAM's legal counsel, Ms. Lugar explicitly conceded and confirmed in writing that health systems, payors, and pharmaceutical businesses "are not likely to be competitors of EPAM."

315. Execution and Reliance: Operating in reasonable, detrimental reliance upon the expressly negotiated textual carve-outs within the finalized Agreement, as well as the authoritative written legal interpretations provided directly by EPAM's own Associate

General Counsel, Dr. Rao executed the contract. He officially commenced his employment as Managing Principal on November 18, 2024.

**C. Discovery of Financial Discrepancies and Protected Whistleblowing Activity**

316. Discovery of Fraudulent Inducement: Upon commencing his employment, Dr. Rao quickly discovered that the pre-employment representations made by Mr. Klebanov and EPAM leadership were materially false. Dr. Rao discovered that the Odysseus business line's actual revenue was approximately $500,000—a staggering contradiction to the explicit representations that he was being hired to lead and scale a $400 million business unit to $1 billion. Furthermore, Mr. Klebanov concealed the acquisition-related financial metrics, and the highly touted "distributed data network" represented to Dr. Rao during recruitment did not actually exist in any fully operational capacity.

317. Breach of Contract Regarding Open-Source Work: In direct contravention of the explicitly negotiated protections in Section 1(b) of the Agreement, EPAM leadership improperly directed Dr. Rao to cease his volunteer contributions to the open-source OHDSI community. Instead, Mr. Klebanov directed Dr. Rao to market and sell an EPAM software product internally dubbed "Prometheus." Upon technical evaluation, Dr. Rao determined that "Prometheus" was largely derivative of the free, publicly available OHDSI Atlas and WebAPI platforms—foundational open-source architectures that Dr. Rao himself had previously co-authored.

318. Misappropriation of Takeda Intellectual Property: Dr. Rao further discovered that the underlying code for the software EPAM was aggressively attempting to commercialize—specifically including the "Prometheus" platform, the "AI Cohort Generator," and the "AI Accelerator"—was developed pursuant to specific client work orders funded by Takeda Pharmaceutical Company. Under the express terms of the governing Master Services Agreement (MSA) between EPAM and Takeda, relevant

excerpts of which are attached hereto as **Exhibit A**, intellectual property rights for that work vested exclusively with Takeda, not EPAM.

319. Protected Whistleblowing (The Takeda Objection): Deeply concerned that EPAM was actively misappropriating a client's intellectual property, Dr. Rao engaged in protected whistleblower activity. In September 2025, Dr. Rao escalated the issue to EPAM's internal legal department via an EPAM colleague, Katie Barista. Dr. Rao subsequently reviewed the written communication generated by EPAM's legal department, a true and correct copy of which is attached hereto as **Exhibit B**. In this communication, EPAM's own legal counsel explicitly confirmed: "the MSA makes no allowance for pre-existing IP—everything we build belongs to Takeda." The legal department strictly warned against commercializing the Takeda software, referencing prior disputes with other pharmaceutical clients (specifically noting that EPAM lost all business and was banned by Roche/Genentech for a generation) over similar IP misappropriation issues.

320. Culture of Retaliation and the "Chilling Effect": EPAM executive leadership actively cultivated a corporate environment of fear and retaliation to suppress objections to its illicit IP practices. Specifically, Senior Vice President Greg Killian had previously recounted to Dr. Rao a "cautionary tale" regarding the aforementioned Roche/Genentech intellectual property dispute. SVP Killian explicitly informed Dr. Rao that the EPAM employee who discovered the Roche IP theft and ethically reported it to the client was swiftly terminated by EPAM. SVP Killian chillingly justified the retaliatory firing to Dr. Rao by claiming the whistleblower failed to follow "proper process" by not coming to EPAM leadership first. This explicit, executive-level threat of termination for whistleblowing established a profound chilling effect, directly influencing Dr. Rao's reasonable fear of extreme retaliation when he subsequently discovered Mr. Klebanov attempting to misappropriate Takeda's intellectual property.

321. Despite this explicit, documented mandate from EPAM's internal legal counsel, Gregory Klebanov unilaterally dismissed the legal directive, claimed a baseless "exception," and explicitly ordered Dr. Rao to market the Takeda-owned software to Johnson & Johnson. Acting in good faith and in compliance with the law, Dr. Rao explicitly objected to and refused Mr. Klebanov's directive to participate in the unauthorized commercialization of third-party intellectual property.

322. Discovery of Federal Compliance and Regulatory Violations: Concurrently, Dr. Rao discovered highly alarming staffing practices regarding the Gilead Sciences account. EPAM was assigning personnel physically located in restricted foreign jurisdictions—including Belarus, Russia, and Serbia—to highly sensitive client accounts. This practice directly violated Gilead's expressed compliance requirements, which mandated that personnel accessing sensitive United States healthcare datasets (including protected Medicare and Medicaid data subject to HIPAA and HITECH regulations) must not operate from high-risk foreign jurisdictions.

323. To actively circumvent these strict security mandates, EPAM deliberately misrepresented the physical locations of its workforce to the client. For example, EPAM affirmatively represented to Gilead that an employee, Anna Tauetekova, was operating from within the United States, when she was actually located and working in Serbia.

324. Furthermore, Dr. Rao discovered that Gregory Klebanov explicitly directed a Belarus-based, uncleared employee, Alexander Alexeuk, to actively bypass federal and client security protocols. Mr. Klebanov directed Mr. Alexeuk to view the screen of a cleared employee and utilize shared passwords to execute unauthorized work on the Gilead account.

325. Protected Whistleblowing (The Gilead Objection): This severe compliance violation was not merely suspected; it was independently discovered and directly corroborated by a representative of Gilead Sciences. When this Gilead representative explicitly raised

these alarming geographic discrepancies in direct communications with Dr. Rao, Dr. Rao reasonably believed that EPAM's systemic conduct violated federal data privacy laws (including HIPAA and the HITECH Act) and exposed the client to severe legal liability.

326. Acting in good faith, Dr. Rao immediately escalated this severe compliance breach to Gregory Klebanov in or around September 2025, and explicitly refused to place restricted personnel onto the Gilead account. Rather than investigate the breach, Mr. Klebanov dismissed Dr. Rao's protected concerns, stating regarding the deceptive geographic staffing practices, "We do it all the time," and "I will take care of it," explicitly directing Dr. Rao to drop the issue. Based on these admissions, Dr. Rao reasonably believed this was a systemic corporate practice designed to unlawfully circumvent United States export controls and Office of Foreign Assets Control (OFAC) sanctions.

327. The Retaliatory Trigger: Shortly after Dr. Rao engaged in these protected whistleblower activities—formally objecting to the misappropriation of Takeda's intellectual property and the unauthorized, deceptive staffing practices on the Gilead account—EPAM leadership unlawfully retaliated by subjecting Dr. Rao to a swift and escalating series of adverse employment actions.

**D. Authorized Workflows, Public Domain Utilization, and Personal Account Usage**

328. Authorized Open-Science Workflow: Throughout his employment, Dr. Rao openly operated an "Open Science" workflow that relied heavily upon his pre-existing, public-facing scientific network. Dr. Rao's designated role fundamentally involved bridging advanced, public-domain methodologies with EPAM's client needs. In executing this role, Dr. Rao routinely ideated and developed scientific innovations in public, collaborative settings, utilizing external platforms including OHDSI Microsoft Teams, Skype, LinkedIn, and public OHDSI forums. Because Dr. Rao was not assigned to any internal EPAM unit dedicated to the creation of proprietary corporate code, his

independent scientific innovations remained fully protected under the pre-negotiated "Confidential Information" carve-out in Section 1(b) of his Agreement.

329. Corporate Funding of Personal Accounts: To inform client deliverables, Dr. Rao regularly utilized publicly available Generative AI platforms (such as Google Gemini and OpenAI's ChatGPT). EPAM management, specifically including Gregory Klebanov, expressly authorized Dr. Rao to utilize these external AI platforms for corporate work. Critically, Mr. Klebanov explicitly directed Dr. Rao to submit corporate expense reports for these AI subscriptions, despite possessing actual knowledge that the accounts were registered to Dr. Rao's personal email addresses (including gowthamrao@gmail.com).

330. Dr. Rao subsequently submitted formal, written corporate expense reports exceeding $200 per month for these external tools, explicitly tagging them to specific client billing codes, including the Takeda project. EPAM management formally reviewed, approved, and funded these expense reports, thereby officially and financially authorizing Dr. Rao's use of personal accounts for corporate workflows. The documentary records of these approved expense reports are currently in EPAM's exclusive possession and control.

331. Pre-Existing and Open-Source Tools: Dr. Rao's day-to-day responsibilities in Real-World Evidence (RWE) data science involved reviewing client research protocols and providing methodological guidance. The substantive scientific methodologies Dr. Rao applied to execute this consulting work were sourced directly from the public domain, predominantly utilizing public algorithms from the OHDSI Phenotype Library.

332. Regarding the specific technical assets placed at issue in this litigation, EPAM's claim of "trade secret" protection over materials such as the "ETL Conversion Kit" is fundamentally defective, as it encompasses widely known, open-source community tools. The "ETL Conversion Kit" merely functions as an orchestration mechanism for standard, open-source scientific tools (such as WhiteRabbit and Usagi) that are freely available in the public domain under Apache 2.0 licenses.

333. Furthermore, Dr. Rao personally authored foundational open-source tools (including CohortDiagnostics and CohortAlgebra) between 2016 and 2024, long prior to his employment with EPAM. Any utilization of these pre-existing, public methodologies by Dr. Rao during his employment was explicitly excluded from EPAM's definition of "Confidential Information" under Section 1(b) of his Agreement.

334. Systemic Corporate Practice of Personal Device Usage: Due to internal EPAM firewall restrictions, the authorized transfer of public-domain knowledge into EPAM systems required a collaborative, external-to-internal workflow. Dr. Rao routinely generated concepts externally and shared them with internal EPAM employees, who would then port the content into internal EPAM slides, SharePoint files, and client deliverables.

335. The utilization of personal devices and personal accounts (such as Google Docs and personal email addresses) was not an isolated incident; it was a standard, systemic corporate practice at EPAM. This exact practice was explicitly supported by Section 3.14 of EPAM's "Acceptable Use of IT Resources" policy, which formally permits the storage of data on personal devices for *"productivity/convenience purposes."*

336. Operating strictly under this established corporate practice, EPAM employees routinely initiated the inbound sharing of EPAM materials directly to personal accounts. By way of example, on July 2, 2025, EPAM employee Naaz Fatima Butt shared an EPAM spreadsheet titled "GCP Foundry CIO Hub Campaign" directly to Dr. Rao's personal email. Similarly, on September 24, 2025, EPAM employee Konstantin Iaroshovets shared an EPAM document titled "MedRAG - AWS Estimates" directly to Dr. Rao's personal email, simultaneously copying the personal email of Santanu Sen, another EPAM employee. True and correct copies of these system-generated sharing notifications, demonstrating EPAM's active utilization of personal accounts, are attached collectively hereto as Exhibit J.

337. The Takeda Proof-of-Concept: Utilizing this authorized workflow, Dr. Rao designed a Generative AI proof-of-concept (POC) for Takeda Pharmaceutical, successfully securing an approximately $80,000 engagement for EPAM. This POC was strictly an evaluation exercise regarding advanced prompt engineering and did not involve the development of custom proprietary software or the ingestion of any of Takeda's internal confidential data.

338. To efficiently execute the Takeda POC, Dr. Rao developed the deliverables externally using Google Docs via his personal account. This external workflow was expressly known, approved, and authorized by Takeda's client representative, Saurin Jani. Furthermore, pursuant to the explicit terms of the Master Services Agreement (MSA) between EPAM and Takeda governing this exact engagement, all intellectual property and work product generated during the POC vested exclusively with Takeda, not EPAM.

339. Prior Publication of the "AI Accelerator": Concurrently, and entirely separate from the Takeda POC, Dr. Rao engaged in an independent open-science initiative to build specific Generative AI prompt architectures. Dr. Rao independently authored and published this underlying codebase to the public OHDSI open-source GitHub repository under the package name `llmpromptbuilders`. The genesis commit for this public repository was executed on May 8, 2025, openly sharing the work with the global scientific community under an Apache 2.0 open-source license.

340. The specific prompt engineering code that EPAM now alleges Dr. Rao misappropriated as a proprietary "trade secret" had, in fact, been globally accessible and freely downloadable on the open internet for over five months prior to Dr. Rao's termination. Upon information and belief, the purportedly proprietary "EPAM AI Accelerator" software that EPAM falsely claims to own in this litigation is actually a derivative work built directly upon Dr. Rao's pre-existing, open-source `llmpromptbuilders` package.

341. Human Resources Validation: The non-proprietary nature of Dr. Rao's independent development was explicitly communicated to, and validated by, EPAM's Human Resources leadership. On October 2, 2025, Dr. Rao sent a formal communication (designated "E04") to EPAM Senior Manager Larry McKlaine and Senior Director of HR June Dinitz. In this document, Dr. Rao explicitly stated: *"I have not used any EPAM Confidential Information in the development of my personal projects or my public scientific contributions."* EPAM leadership received and retained this communication without objecting to Dr. Rao's declared intellectual property boundary. Furthermore, on October 3, 2025, Ms. Dinitz responded in writing, actively validating the open-science carve-out described in Dr. Rao's communication. A true and correct copy of this entire, exculpatory email thread is attached hereto as **Exhibit C**.

**E. Corporate Endorsement and the "Star Magnet" Marketing Initiative**

342. Executive Endorsement and Revenue Generation: Utilizing his independent, Generative AI-driven methodologies, Dr. Rao successfully and consistently generated revenue for the Odysseus business unit. Subsequently, Dr. Rao openly detailed these exact Generative AI workflows during a company-wide presentation. During this presentation, EPAM CEO Balázs Fejes publicly and unequivocally endorsed Dr. Rao's work, stating to the entire company that Dr. Rao's AI approach represented "the future of EPAM."

343. Remediation of At-Risk Client Accounts: Following this explicit endorsement from EPAM executive leadership, account managers, scientific leads, and sales executives across the enterprise routinely relied upon Dr. Rao to assist with complex technical sales and to personally intervene to salvage at-risk client projects (internally designated by

EPAM as "turning red"). Dr. Rao's methodologies were highly valued, openly utilized, and critical to stabilizing EPAM's client relationships. The extensive internal reliance on Dr. Rao's expertise is directly corroborated by the operational history of numerous EPAM executives and senior personnel, specifically including Alvin Ow, David Psaris, Jim Gatch, Thomas Célérier, Vojtech Heuser, Ted Slater, George Litos, Jesal Panchal, Chris Waller, Anastasia Christianson, Rafal Strzelczyk, Troy Rask, and Santanu Sen.

344. The "Star Magnet" Marketing Initiative: To further capitalize upon Dr. Rao’s prominent public scientific profile and attract high-value enterprise clients, EPAM executive leadership officially authorized, funded, and launched an internal marketing initiative designated as the "Star Magnet" program. This program was actively sponsored and explicitly supported by top-level EPAM leadership, specifically including Head of Marketing Jim Gatch, Senior Vice President Greg Killian, and Gregory Klebanov.

345. Affirmative Public Disclosure (The CIO.com Article): As the explicit, public-facing execution of this "Star Magnet" initiative, EPAM sponsored, funded, and published a commercial article on the public website CIO.com prominently featuring Dr. Rao.

346. This EPAM-authorized, publicly accessible article explicitly quoted and detailed Dr. Rao’s specific AI methodologies, specifically including the synthesis of scientific content via "smart prompting" and "co-reasoning." By affirmatively legally authorizing, funding, and publishing this article on the open internet, EPAM intentionally disclosed Dr. Rao’s AI workflows into the public domain. Consequently, EPAM legally extinguished any right to subsequently claim trade secret protection or proprietary ownership over these exact methodologies in this litigation.

**F. Financial Performance, Protected Escalations, and Shifting Employment Metrics**

347. Financial Pressures and Unethical Directives: During Dr. Rao's tenure, the traditional data science staffing services within the Odysseus unit experienced a severe decline in

revenue. Upon information and belief, the unit's rolling six-month revenue fell to approximately $200,000, which directly threatened the specific, acquisition-related financial "earn-out" targets of Gregory Klebanov. In desperate response to this revenue decline, Mr. Klebanov explicitly directed Dr. Rao to propose scientifically unsupported "drug repurposing" studies to clients, aggressively stating to Dr. Rao, "we need to make revenue man." Operating strictly within his ethical and scientific obligations, Dr. Rao outright refused these improper directives.

348. The IQVIA Contract Escalation and Scapegoating: Subsequently, Mr. Klebanov unilaterally sold a complex subcontracting engagement to IQVIA for a mere $25,000. Dr. Rao had previously evaluated this exact contract and estimated that fulfilling its complex data science requirements would safely require approximately $500,000 in resourcing. Because of the severe, artificial budget constraints imposed by Mr. Klebanov, an offshore EPAM employee assigned to the project experienced documented, severe burnout.

349. Exercising his managerial duties, Dr. Rao formally escalated the severe underpricing of the IQVIA contract and the resulting dangerous staffing conditions directly to Mr. Klebanov, and subsequently to EPAM Senior Vice President Greg Killian. While SVP Killian acknowledged the compromised profit margins, EPAM leadership refused to remediate the working conditions.

350. Following Dr. Rao's protected escalation of these financial and staffing failures to executive leadership, Mr. Klebanov retaliated by falsely attributing the project's structural collapse and staff burnout directly to Dr. Rao. This bad-faith scapegoating is currently reflected in the sworn Declaration of EPAM Senior Program Manager Lucy McDermott filed in this litigation, which confirms the project resulted in "one team member voluntarily resigning and another threatening to leave," but relies entirely on Mr. Klebanov's

manufactured internal reporting to blame Dr. Rao, rather than the project's deliberate, $475,000 underpricing.

351. Shifting Justifications for Separation: Despite the Odysseus unit possessing a severely limited active pipeline for traditional pharmaceutical studies upon Dr. Rao's arrival, Dr. Rao originated and delivered a $150,000 contract with Bayer within his first four months. However, because the substantial revenue generated by Dr. Rao’s separate Generative AI initiatives did not legally credit toward Mr. Klebanov’s legacy acquisition earn-out targets, Mr. Klebanov moved to eliminate Dr. Rao's position.

352. On September 17, 2025, Mr. Klebanov formally notified Dr. Rao of his impending separation from the company. During this communication, Mr. Klebanov explicitly cited corporate budgetary constraints and a "flat pipeline" as the sole reasons for the separation, informing Dr. Rao that his role would be backfilled by a lower-cost resource (Sarah Seager). Tellingly, just one day later, on September 18, 2025, EPAM leadership abruptly altered the stated justification for Dr. Rao's separation, shifting the narrative from an economically driven Reduction in Force to alleged "performance deficiencies."

353. Documentary Evidence Contradicting Performance Allegations: Prior to September 18, 2025, EPAM had never established, communicated, or documented any specific revenue targets for Dr. Rao’s role. Under EPAM’s official "Performance Management Process," goals and managerial feedback are strictly required to be recorded in an internal human resources system called "Telescope."

354. Dr. Rao’s official Telescope performance profile contained absolutely no documented goals, no revenue metrics, and zero negative managerial feedback. In fact, as objectively reflected in the Telescope records attached hereto as **Exhibit F**, the system explicitly stated: "No expectations found." Furthermore, the system formally documented Dr. Rao's active, highly billable assignments to over a half-dozen major enterprise client

projects (including Bayer, Pfizer, Merck, and AstraZeneca), directly and fatally contradicting EPAM's post-hoc litigation narrative of poor performance.

355. The Pretextual PIP and Fabricated Metrics: On September 26, 2025, Gregory Klebanov abruptly proposed demoting Dr. Rao to an individual contributor role, threatening in writing that if Dr. Rao accepted the demotion, a punitive Performance Improvement Plan (PIP) would be implemented. A true and correct copy of this communication is attached hereto as **Exhibit G**.

356. In this communication, Mr. Klebanov falsely alleged that Dr. Rao failed to achieve "target revenue" and "profit margins"—targets which EPAM's own internal records prove never existed. To manufacture cause for termination, EPAM subsequently demanded Dr. Rao achieve $2.5 million in immediate revenue targets (annualizing to $10 million), a completely fabricated metric that deviated absurdly from the historical financial realities of a business unit that had previously generated only $500,000 annually. This sudden threat of a PIP and demotion, based entirely on fabricated, mathematically impossible metrics, was a textbook, pretextual act of retaliation following Dr. Rao's protected whistleblowing escalations.

357. Internal Recognition of Retaliatory Abuse: The bad-faith, pretextual nature of this PIP was so glaringly obvious that it generated immediate alarm among EPAM's own senior personnel. During the exact period Dr. Rao was being subjected to these fabricated performance threats, EPAM executive Alvin Ow explicitly warned that EPAM was actively "abusing" Dr. Rao. Mr. Ow internally recognized that this targeted abuse would severely damage EPAM’s credibility across the entire pharmaceutical industry, explicitly noting the catastrophic business consequences for EPAM if Dr. Rao were to assume a senior role at a prospective pharmaceutical client following such mistreatment. This internal, contemporaneous admission by EPAM personnel conclusively demonstrates that the

PIP was widely recognized not as a legitimate performance tool, but as a destructive, retaliatory weapon.

358. Motive for the Post-Termination Smear Campaign: Mr. Ow's internal warning explicitly exposed Plaintiff's motive for its subsequent bad-faith litigation and defamatory conduct. Recognizing the severe business risk if Defendant—a highly regarded industry expert—were to assume a senior leadership role at a prospective pharmaceutical client following this documented mistreatment, Plaintiff manufactured a preemptive smear campaign. By fabricating and publicizing severe, unfounded allegations of corporate sabotage and data exfiltration, Plaintiff acted with malicious intent to systematically destroy Defendant's professional reputation. The calculated objective of this defamatory campaign was to render Defendant unemployable in senior pharmaceutical roles, thereby neutralizing the exact business risk identified by Plaintiff's own executive leadership.

359. Contemporaneous Praise and Corporate Awards: The fabricated allegations of poor performance in the September PIP are thoroughly dismantled by EPAM's own contemporaneous documentary records. Dr. Rao's Telescope system contained exclusively positive project-level reviews, including a March 31, 2025 "2.2 Meets" rating, and a February 10, 2025 assessment from Project Manager Raman Loseu rating Dr. Rao's impact as "High" and his contributions as "highly appreciated." During this exact same period of alleged "poor performance," Dr. Rao was also awarded the corporate "EPAM HEROES 2025" award.

360. Finally, during direct verbal conversations on September 17 and September 22, 2025—the very days EPAM was orchestrating his termination—both Gregory Klebanov and SVP Greg Killian explicitly characterized Dr. Rao's subjective performance to him as "wonderful," "stellar," and "solid."

**G. The Initial RIF, the Bad-Faith Pressure Campaign, and the Manufactured Termination**

361. The Initial Reduction in Force (RIF) Notification: In or around mid-September 2025, Gregory Klebanov formally notified Dr. Rao that his role as the lead of the Data Science unit was being eliminated, thereby triggering the framework for a corporate Reduction in Force (RIF). During this communication, Mr. Klebanov explicitly acknowledged that the legacy data science pipeline was "close to zero" and confessed that he was under a direct, strict mandate from the EPAM Board of Directors to immediately reduce costs on his Profit & Loss (P&L) ledger.

362. The "Earn-Out" Motive: During these separation communications, Mr. Klebanov actively validated Dr. Rao’s strong performance, acknowledging that Dr. Rao had successfully generated new, substantial revenue through his advanced AI initiatives. However, Mr. Klebanov expressed frustration that EPAM board leadership categorized this specific revenue as "engineering" rather than Real World Data (RWD) revenue. Consequently, Dr. Rao's AI-generated revenue did not credit toward Mr. Klebanov’s specific, personal legacy M&A acquisition targets, further motivating Mr. Klebanov's decision to eliminate Dr. Rao's position to cut costs.

363. The Contractual Trap and the Shift to "Performance": Pursuant to the express, drafted terms of Section 5(c) of Dr. Rao’s Employment Covenants Agreement, any involuntary termination (such as a RIF) automatically renders his post-employment non-competition restrictions inapplicable. Upon realizing that eliminating Dr. Rao's role would contractually free him to compete in the open market, EPAM management abruptly altered its separation strategy. EPAM maliciously removed Dr. Rao's P&L and people management responsibilities and suddenly introduced the threat of the aforementioned, fabricated Performance Improvement Plan (PIP) to force a voluntary resignation.

364. The Demotion Attempt and HR's Admission: Concurrently, Mr. Klebanov attempted to unilaterally transfer Dr. Rao to a different consulting unit managed by Chris Waller, which would have stripped Dr. Rao of his delivery team and relegated him from a senior-level (B5) manager of 15 employees to an individual contributor reporting to a junior peer. Dr. Rao rightfully refused this punitive demotion.

365. On September 20, 2025, Dr. Rao escalated these conflicting, bad-faith management directives to EPAM Human Resources representative Larry McKlaine. During this meeting, Mr. McKlaine explicitly validated Dr. Rao’s concerns regarding the lack of objective goals. Astoundingly, Mr. McKlaine acknowledged on behalf of EPAM HR that the abrupt introduction of a PIP without clear, preexisting, and achievable metrics operates as a "setup for failure."

366. Refusal to Resign and the Abandoned PIP: On September 23, 2025, during a follow-up meeting, Dr. Rao explicitly informed HR that he would only accept a formal PIP if EPAM could produce objective, pre-existing, documented goals. Dr. Rao highlighted to Mr. McKlaine that the sudden $2.5 million PIP revenue demand was mathematically disconnected from the unit's historical peak revenue of approximately $700,000. Recognizing the legal indefensibility of the PIP, SVP Greg Killian formally abandoned the attempted demotion during a September 25 meeting, agreeing Dr. Rao would remain in his strategic role under a collaborative "focus plan" for the Takeda and Boehringer Ingelheim accounts.

367. The Offer of Mutual Separation: On September 30, 2025, during another meeting with EPAM HR, Dr. Rao formally declined to voluntarily resign. Instead, to resolve the escalating hostility, Dr. Rao offered a mutually agreed separation, explicitly offering to forfeit any financial severance in exchange for the mutual waiver of his post-employment restrictive covenants. During this exact meeting, Mr. McKlaine explicitly acknowledged on the record that Dr. Rao was not resigning, stating: "I understand you have not

submitted a resignation. You have not said you wanted to resign." A true and correct copy of this written separation offer, and the surrounding email thread regarding the proposed demotion, is attached hereto as **Exhibit G**.

368. Written Recommitment and the Retaliatory Termination: When EPAM rejected the mutual separation, Dr. Rao memorialized his employment status in an October 2, 2025 email to HR. Dr. Rao formally withdrew his separation request and stated unequivocally in writing: "I am not resigning, nor is it my intention to be considered as having voluntarily resigned." That same afternoon, Mr. McKlaine replied in writing: "I acknowledge your request to withdraw your previous request for a mutually agreed separation and your intent to continue your employment with EPAM in the redefined role." A complete copy of this highly exculpatory email thread is attached hereto as **Exhibit C**.

369. Despite possessing Dr. Rao's explicit, written commitment to remain employed, and HR's written acceptance of that commitment, EPAM terminated Dr. Rao just 13 days later on October 15, 2025. In a final, bad-faith effort to circumvent the Section 5(c) non-compete waiver and punish Dr. Rao for his whistleblowing, EPAM falsely alleged that the separation was a "for-cause" termination based on entirely manufactured claims of data exfiltration and sabotage.

### H. EPAM’s Post-Hoc Fabrication of "For Cause" Misconduct and Manipulation of Evidence

370. The Post-Hoc Fabrication: EPAM’s current litigation narrative—that Dr. Rao was terminated "for cause" due to malicious data exfiltration, corporate sabotage, and unlawful solicitation—is a demonstrably false, post-hoc fabrication. The objective documentary record conclusively establishes that EPAM manufactured these severe allegations only after Dr. Rao was separated from the company, in a desperate attempt to void his contractual non-compete waiver and punish his whistleblowing.

371. The State Administrative Admission: At the time of Dr. Rao's termination on October 15, 2025, EPAM did not provide him with any written notice indicating that his separation was a "for-cause" termination based upon misconduct. Following his separation, Dr. Rao applied for New Jersey unemployment benefits. During the State's mandatory fact-finding investigation, the New Jersey Department of Labor directly contacted EPAM to ascertain the official reason for separation.

372. Critically, EPAM did not claim misconduct, sabotage, or data exfiltration to the State. Instead, EPAM officially and formally reported to the government that Dr. Rao's termination was due to a corporate "Reduction in Force" (RIF). Based entirely on EPAM's own official reporting, the State found no misconduct and awarded Dr. Rao unemployment benefits. A true and correct screenshot of the official State of New Jersey benefits portal confirming this award is attached hereto as Exhibit D.

373. Sworn Admissions of a Retroactive Investigation: Furthermore, EPAM's own federal declarations confirm the pretextual timeline of this fabrication. In the Declaration of Lucy McDermott (ECF No. 3-5, 15), submitted by EPAM to this Court in support of emergency injunctive relief, Ms. McDermott explicitly admits: "After Rao was terminated on October 15, 2025, I understand that the Company conducted an investigation..." Ms. McDermott's sworn admission conclusively proves that EPAM did not investigate or confirm any alleged data anomalies until after Dr. Rao had already been terminated, exposing the "for-cause" justification as a retroactive legal fiction.

374. The "Data Exfiltration" Allegations: Plaintiff's allegations regarding "data exfiltration" rely on an internal IT security investigation (ECF No. 3-4) that mischaracterizes Dr. Rao's standard technical workflows for EPAM. The activities cited in the Complaint were routine operational procedures necessary to fulfill executive directives and perform advanced business development functions, rather than unauthorized data export.

375. Local Caching for Generative AI (LLM) Development: Plaintiff cites the utilization of Microsoft SharePoint and OneDrive’s standard "Make files available offline" feature as evidence of exfiltration. However, Dr. Rao utilized this enterprise-provided feature in direct preparation for executing local Generative AI (LLM) workflows. Specifically, in response to the $2.5 million revenue generation target mandated by the September 26, 2025 Performance Improvement Plan (PIP), Dr. Rao initiated a strategic effort to deploy a local LLM to identify patterns across historical projects and synthesize new AI service offerings. Developing this local LLM required caching historical project contexts to a local directory to serve as inputs. Although Dr. Rao was terminated before the LLM analysis could be completed, the initial caching of these files was an authorized, preparatory business function directly responsive to EPAM management's PIP demands.

376. Downloads to Satisfy Executive Directives: Furthermore, during this exact period, Senior Vice President Greg Killian directly instructed Dr. Rao to produce evidence of his historical project contributions and demonstrate his value to the company. To comply with this executive directive and respond to the performance allegations raised by management, Dr. Rao was directed and required to access, synchronize, and compile his historical work product and project files from internal systems to a local directory for review.

377. GitLab Synchronization and the 44,000 File Count: Plaintiff alleges that Dr. Rao downloaded over 44,000 files, framing the volume as a massive data breach. This file count is a technical artifact of standard version-control synchronization, not the targeted downloading of 44,000 individual proprietary documents. Dr. Rao's duties required him to interact with software repositories via EPAM's GitLab. In modern software engineering, executing standard Git commands (such as cloning or syncing a repository) automatically downloads an entire project’s infrastructure. This inherently includes tens

of thousands of microscopic, non-proprietary open-source dependency files (e.g., LICENSE, README, standard Python packages) and hidden version-control histories.

378. Administrative Control over Synced Containers: Executing routine local synchronizations to a corporate-approved "Bring Your Own Device" (BYOD) workstation does not constitute "exfiltration." The locally cached files remained subject to EPAM's enterprise administrative purview at all times. Furthermore, the IT Security Head admitted under oath that he did not personally review the contents of these files, but instead relied entirely on hearsay regarding what business personnel "advised" him (ECF No. 3-4, ¶¶ 10-11). The files in question were placed on the device via Plaintiff's own authorized sync utilities, not via unauthorized export to third-party media. Ultimately, upon Dr. Rao's termination on October 15, 2025, EPAM successfully utilized its enterprise administrative controls to remotely revoke his access, demonstrating the synced containers remained within EPAM's enterprise reach and administrative control..

379. Authorized HR Communications: Similarly, EPAM falsely alleges that Dr. Rao engaged in unauthorized data transfers via outbound emails to his personal account between September 20 and October 3, 2025. As proven by Exhibit C, these transmissions were, in fact, direct, transparent communications with EPAM's own Human Resources department regarding his employment boundaries and exit negotiations. Dr. Rao explicitly informed EPAM HR in writing within those very emails that he was copying his personal email address to maintain a record of the negotiations, and EPAM HR raised no objections.

380. The "Sabotage" and Copyright Fabrication: EPAM further attempts to recharacterize routine technical artifacts and basic version-control maintenance as malicious "sabotage." EPAM falsely alleges Dr. Rao fraudulently asserted ownership over EPAM intellectual property by inserting "Copyright 2025 Gowtham Rao" into EPAM code. In reality, this text was not manually typed by Dr. Rao. When performing the routine

administrative task of repository initialization, EPAM's default GitLab 'Add License (MIT)' template was improperly configured to automatically populate the authenticated user's full name into the copyright field, rather than the correct corporate entity. Dr. Rao unequivocally acknowledges EPAM owns this specific software; the text was a reversible, automated system error, not an assertion of ownership. Original screenshots of this GitLab initialization process are attached hereto as Exhibit H.

381. The Technical Impossibility of SharePoint Deletion: Furthermore, the alleged SharePoint "deletions" referenced in the Complaint were simply routine local version-control maintenance actions utilized to resolve synchronization errors on Dr. Rao's synced personal drive. EPAM's inflammatory allegation that Dr. Rao attempted to "permanently delete" corporate files is technically impossible. As an enterprise-grade system bound by ISO 27001 compliance standards, EPAM's Microsoft SharePoint architecture utilizes robust First-Stage and Second-Stage (Site Collection) Recycle Bins. The files were never permanently deleted and remained continuously, easily recoverable on EPAM's own servers.

382. Deceptive Manipulation of Evidence (The Teams Chat): Finally, EPAM's allegations of client and employee solicitation are directly contradicted by the documentary record. During a public industry conference between October 6 and October 9, 2025, Dr. Rao explicitly stated to the audience: "I work for a company called EPAM." Most egregiously, and in a severe breach of candor to this Court, EPAM submitted a deceptively cropped and manipulated version of an October 16, 2025 Microsoft Teams chat (ECF No. 3-7) to falsely accuse Dr. Rao of unlawful solicitation. EPAM deliberately concealed the initial 10:49 AM message from EPAM employee Gaurav Dravida.

383. As reflected in the true, unredacted, and complete chat transcript attached hereto as Exhibit E, Dr. Rao did not initiate this communication. It was a direct response to an unsolicited, inbound message from Mr. Dravida seeking technical assistance. By

intentionally cropping out the inbound request, EPAM manufactured a false narrative of active solicitation. Dr. Rao's subsequent statement in that chat—"In full disclosure I am now a competitor for EPAM"—was the ethical establishment of a professional boundary to prevent improper communications, not an outbound solicitation. Once the EPAM employee determined his question pertained to proprietary EPAM work, the employee canceled the meeting, and Dr. Rao immediately respected that boundary. EPAM's deliberate manipulation of this exhibit constitutes bad-faith litigation conduct.

**I. Bad-Faith Litigation, Forensic Exoneration, and Public Disclosures**

384. Rejection of Immediate Remediation: Prior to EPAM initiating its aggressive motion for a Temporary Restraining Order (TRO), Dr. Rao engaged in good-faith settlement communications to resolve the dispute privately and protect his reputation. On November 4, 2025, Dr. Rao explicitly offered to unconditionally wipe and permanently delete all data from his personal computer to definitively alleviate EPAM's stated security concerns. Demonstrating that its true motive was retaliation and financial ruin rather than data security, EPAM unreasonably rejected this free, immediate remediation and proceeded to drag Dr. Rao through the TRO and Preliminary Injunction process.

385. Judicial Rejection of Third-Party Claims: During the November 5, 2025 TRO hearing, the Honorable Judge Beetlestone directly addressed EPAM's lack of standing to represent its clients' (e.g., Takeda's) intellectual property. Addressing EPAM's overreach on the record, the Court explicitly stated: "To the extent that you're asking for a TRO with respect to those documents or those issues, you're not getting one."

386. The Exculpatory Forensic Inspection: Despite the Court’s refusal to grant EPAM its requested injunctive relief over these materials, Dr. Rao voluntarily agreed to a highly intrusive Stipulated Forensic Inspection Protocol on December 12, 2025. Dr. Rao granted a neutral, third-party forensic vendor complete access to his personal desktop,

laptops, mobile phone, distinct personal Google accounts, Microsoft OneDrive, personal GitHub/GitLab repositories, and the corporate accounts of his new business venture, CoReason Inc.

387. EPAM's Complaint alleges that Dr. Rao actively downloaded over 44,000 proprietary files. However, Dr. Rao's review of the independent forensic export conclusively demonstrated that the vast majority of these files were merely technical artifacts and standard hash matches for third-party, public-domain open-source software dependencies (such as public LICENSE text files, standard .gitignore files, and generic .py packages). These files were generated entirely by passive Microsoft OneDrive background synchronization, not by active human exfiltration.

388. Crucially, the data exported pursuant to the independent forensic protocol yielded no evidence that any of the remaining user-generated files contained the source code for the "AI Cohort Generator," the "AI Accelerator," or the "ETL Conversion Kit"—the exact proprietary software assets that EPAM explicitly accused Dr. Rao of misappropriating. Furthermore, the forensic record demonstrates that Dr. Rao's system access was performed lawfully, utilizing EPAM-issued, authenticated credentials on an EPAM-approved Bring Your Own Device (BYOD) computer.

389. Bad-Faith Federal Filings (ECF No. 30): Despite possessing this independent, exculpatory forensic data confirming Dr. Rao did not possess the accused files, Plaintiff continued to prosecute its false narrative. On March 27, 2026, Plaintiff filed a First Amended Complaint (ECF No. 30), which in bad faith intentionally republished the objectively disproven allegations of theft regarding the ETL Conversion Kit and AI Cohort Generator. This Court subsequently struck Plaintiff's improper filing by formal Order (ECF No. 32).

390. The Spoliation Trap and Manufactured Liability: Regarding the retention of any remaining incidental files, Dr. Rao's actions were strictly governed by EPAM's own

corporate mandates. Under Section 3.28 ("Offboarding") of EPAM's "Acceptable Use of IT Resources" policy, departing employees are commanded to "Remove Company/Client data from all personal devices and personal cloud storages." Prior to receiving any notice of litigation, Dr. Rao engaged in routine maintenance to delete incidental files from his local directories in direct compliance with this policy.

391. However, on October 31, 2025, EPAM served Dr. Rao with a formal Cease and Desist and litigation preservation notice, commanding him to freeze his devices and immediately halt all file deletion under the explicit threat of judicial sanctions for spoliation of evidence. Dr. Rao lawfully complied, immediately halting his policy-mandated device cleanup. In an absurd and malicious display of bad faith, EPAM is now prosecuting claims of "wrongful retention" against Dr. Rao regarding the exact incidental files that Dr. Rao preserved in strict compliance with EPAM's own October 31 legal demand.

392. Abuse of the Discovery Process: Following the forensic collection, a subset of user files remained for review. These files contained Dr. Rao's proprietary intellectual property, private business contacts, and highly sensitive strategic dealings related to his commercial venture, CoReason Inc. To protect his business while complying with discovery, Dr. Rao requested these remaining files be designated "Attorneys' Eyes Only" (AEO)—a standard legal protection allowing EPAM's outside counsel to verify the files while shielding CoReason’s proprietary data from EPAM executives. Revealing its true anti-competitive motives, EPAM explicitly rejected the standard AEO designation and demanded that EPAM business personnel be granted direct access to a competitor's strategic files.

393. Public Domain Disclosure by EPAM: Finally, regarding the specific software tools placed at issue in this litigation, Dr. Rao assessed the "AI Cohort Generator" during his

tenure, determined it lacked scientific validity, and declined to be involved with its development or deployment.

394. Regardless of Dr. Rao's involvement, EPAM cannot claim trade secret protection over these tools because EPAM itself intentionally released them into the public domain. At the public OHDSI Global Symposium 2025 ("Mind Meets Machine"), EPAM employee Darya Zhukova presented the architecture, design, and capabilities of both the "AI Accelerator" and the "AI Cohort Generator" to the global public. Executive Gregory Klebanov attended the symposium in person and affirmatively authorized the release of this content. This presentation was subsequently published globally on YouTube, and the associated architecture and materials were published to a public, open-source GitHub repository, affirmatively extinguishing any claim to proprietary secrecy.

**J. Extra-Judicial Defamation, Tortious Interference, and Resulting Damages**

395. Extra-Judicial Defamation (Gilead Sciences): Following Dr. Rao's retaliatory termination, EPAM leadership did not confine its grievances to the judicial process. Upon information and belief, EPAM executives maliciously engaged in extra-judicial communications, actively publishing false accusations of trade secret theft and professional misconduct to third parties in the industry. Specifically, EPAM targeted representatives at Gilead Sciences with these defamatory claims. As a direct and proximate result of this extra-judicial smear campaign, Dr. Rao's professional reputation was severely damaged, and he was forced to forfeit a highly prestigious, scheduled keynote speaking engagement at Gilead Sciences.

396. Tortious Interference with Prospective Business (Johnson & Johnson): Furthermore, the bad-faith filing of this litigation and EPAM's concurrent extra-judicial communications intentionally and maliciously interfered with Dr. Rao's prospective business engagements through his newly formed commercial entity, CoReason Inc. Immediately following his

separation from EPAM, Dr. Rao successfully negotiated a Proof of Concept (POC) engagement with Johnson & Johnson (J&J). On October 20, 2025, J&J leadership officially approved the CoReason Statement of Work (SOW) and formally directed its internal procurement team to proceed with contracting. A true and correct copy of the communications documenting J&J's explicit approval and subsequent abrupt suspension of the Statement of Work is attached hereto as Exhibit I.

397. However, on November 3, 2025—in direct, suspicious temporal proximity to EPAM's filing of this highly publicized federal lawsuit—J&J abruptly halted the procurement process and suspended the engagement. Because EPAM engineered an active federal lawsuit falsely alleging trade secret misappropriation, Dr. Rao was unlawfully prevented from successfully passing J&J's standard corporate vendor vetting and compliance reviews, resulting in the direct, proximate loss of the lucrative J&J contract.

398. The "Chilling Effect" and Forced Suspension of Operations: Due to the aggressively disputed contractual status manufactured by EPAM, and EPAM's highly vindictive litigation posture, Dr. Rao was forced into a legally induced paralysis. To responsibly mitigate further legal and financial exposure for himself and prospective partners, Dr. Rao was forced to suspend further business operations. By way of example, on December 4, 2025, Dr. Rao had to explicitly inform a prospective client at Boehringer Ingelheim (BI) in writing that CoReason was "holding off on discussing a business relationship" until EPAM's bad-faith legal onslaught was resolved.

399. Destruction of a "Unicorn" Enterprise and Quantifiable Economic Damages: As a direct, foreseeable, and proximate result of EPAM's retaliatory termination, defamatory extra-judicial communications, and bad-faith litigation tactics, Dr. Rao has suffered severe, quantifiable economic damages. Based on the finalized J&J POC, the advanced negotiations with other Life Sciences companies, and the massive market demand for CoReason's proprietary generative AI architecture, CoReason was aggressively

projected to secure long-term enterprise contracts exceeding $10,000,000.00 ($10 Million) in annual recurring revenue. Furthermore, fueled by its early-mover market advantage in the life sciences sector, CoReason Inc.'s enterprise valuation was reasonably projected by Dr. Rao to achieve "unicorn" status, exceeding a $1,000,000,000.00 ($1 Billion) valuation. EPAM’s malicious conduct effectively prevented Dr. Rao from realizing this massive commercial valuation. These damages specifically include the complete inability to commercially launch CoReason Inc., the destruction of his professional reputation, and the loss of both finalized and highly probable prospective income streams.

400. Severe Emotional Distress and Medical Injury: Beyond the financial devastation, EPAM’s malicious and sustained campaign of corporate retaliation has inflicted severe, documented medical and psychiatric injury upon Dr. Rao. The extreme stress of EPAM's fabricated criminal accusations, the threat of financial ruin, and the intentional destruction of his life's work in the open-source community has caused Dr. Rao to suffer severe emotional distress. This distress has manifested in formal, clinical medical diagnoses of Major Depressive Disorder, Generalized Anxiety Disorder, and severe Insomnia. These conditions have required escalating pharmacological intervention, with new, targeted medical prescriptions actively issued by his treating physicians on November 26, 2025. Contemporaneous medical records confirming these clinical diagnoses and treatments are in Dr. Rao's possession and will be produced during the discovery phase pursuant to an appropriate Confidentiality and Protective Order.

## CAUSES OF ACTION

## COUNT I - VIOLATION OF THE NEW JERSEY CONSCIENTIOUS EMPLOYEE PROTECTION ACT (N.J.S.A. 34:19-1 ET SEQ.)

401. Counterclaim-Plaintiff Rao repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

402. At all relevant times, Dr. Rao was an covered "employee" and EPAM was an "employer" within the meaning of the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-2. EPAM explicitly designated Dr. Rao's primary work location as Princeton, New Jersey, in the Employment Covenants Agreement, thereby expressly subjecting his employment to New Jersey law and bringing him squarely within the statutory protections of CEPA.

403. Under CEPA, it is strictly prohibited for an employer to take retaliatory action against an employee who discloses, objects to, or refuses to participate in any activity, policy, or practice that the employee reasonably believes violates a law, rule, or clear mandate of public policy.

404. Protected Activity 1 (Gilead Sciences Account): Dr. Rao engaged in protected whistleblowing activity when he objected to and refused to participate in EPAM's deceptive staffing practices on the Gilead Sciences account. After receiving a direct complaint from an employee of Gilead Sciences, Dr. Rao discovered that EPAM personnel were masking their physical geographic locations—operating out of restricted jurisdictions including Russia, Belarus, and Serbia—while falsely reporting as working within the United States.

405. Dr. Rao immediately escalated this issue to his supervisor, Gregory Klebanov, and Senior Program Manager Lucy McDermott, explicitly objecting to the practice. Dr. Rao reasonably believed that geographic "spoofing" of personnel in restricted jurisdictions violated Office of Foreign Assets Control (OFAC) sanctions, Export Administration Regulations (EAR), and federal healthcare privacy mandates (HIPAA/HITECH), particularly given the account's processing of protected U.S. Medicare and Medicaid data.

406. Protected Activity 2 (Takeda IP Misappropriation): Dr. Rao further engaged in protected activity by refusing to execute direct orders from Mr. Klebanov to commercialize and resell specific software code to other EPAM clients, including Johnson & Johnson. Dr. Rao explicitly objected because EPAM's own internal legal counsel had previously circulated an opinion confirming this specific code was exclusively owned by a third-party client, Takeda Pharmaceuticals. Dr. Rao reasonably believed that misappropriating and reselling this code violated the federal Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, contractual obligations, and clear mandates of public policy.

407. The Futility/Actual Knowledge Exception: Pursuant to N.J.S.A. 34:19-4, Dr. Rao was legally excused from providing formal written notice of these violations to EPAM. EPAM’s executive leadership already possessed actual, firsthand knowledge of the illicit practices. Mr. Klebanov explicitly admitted to the geographic spoofing, stating "we do it all the time," and was the executive directly ordering the misappropriation of the Takeda IP. Consequently, formal written notice would have been futile.

408. Retaliatory Action & Causation: In direct retaliation for Dr. Rao’s protected objections and refusals, EPAM subjected him to a swift and severe campaign of adverse employment actions. Shortly after Dr. Rao escalated these legal and regulatory concerns to Mr. Klebanov and SVP Greg Killian, EPAM constructively demoted him, imposed a punitive and structurally unachievable Performance Improvement Plan (PIP), and ultimately executed his involuntary termination on October 15, 2025.

409. Damages: As a direct and proximate result of EPAM’s retaliatory conduct, Dr. Rao suffered significant economic and non-economic damages. These include lost wages and benefits, the forfeiture of a scheduled keynote address at Gilead Sciences, the destruction of a finalized Proof of Concept Statement of Work with Johnson & Johnson, the derailment of his new commercial venture (CoReason Inc.), severe reputational

harm, and clinically documented psychiatric injuries requiring pharmacological intervention.

410. As explicitly demonstrated by SVP Greg Killian's prior admission regarding the retaliatory termination of the Roche/Genentech whistleblower, EPAM operates with a systemic, top-down culture of destroying the careers of employees who object to the company's misappropriation of client intellectual property. EPAM's retaliatory actions were willful, malicious, and executed with reckless disregard for Dr. Rao's clearly established rights under CEPA, warranting an award of punitive damages.

411. **WHEREFORE**, Counterclaim-Plaintiff Rao respectfully requests judgment in his favor and against EPAM, including:

a. Compensatory damages for all past and future lost wages, bonuses, benefits, and front pay in lieu of reinstatement;

b. Compensatory damages for emotional distress, reputational harm, and clinically documented psychiatric injury;

c. Punitive damages for EPAM's willful, malicious, and egregious conduct;

d. Equitable relief ordering EPAM to expunge all references to a "for cause" termination or alleged misconduct from Dr. Rao's personnel file and employment records;

e. Attorneys' fees, costs of suit, and out-of-pocket forensic compliance expenses as explicitly permitted under CEPA (N.J.S.A. 34:19-5);

f. Pre-judgment and post-judgment interest at the maximum rate permitted by law; and

g. Such other and further relief as the Court deems just, equitable, and proper.

**<u>COUNT II - Defamation (Defamation Per Se)</u>**

412. Counterclaim-Plaintiff Rao repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

413. Following Dr. Rao's involuntary termination, EPAM, acting through its executive leadership, intentionally published false and defamatory statements of fact regarding Dr. Rao to third parties within his professional network and the pharmaceutical industry.

414. Unprivileged Publication: These defamatory statements were made extra-judicially and entirely outside the scope of any protected litigation or judicial privilege. Specifically, in or around late October 2025, and again in or around January and February 2026, EPAM executive Gregory Klebanov directly communicated to authorized representatives of EPAM clients and industry participants—including Gilead Sciences —that Dr. Rao had engaged in the criminal "theft" of tens of thousands of confidential files, misappropriated trade secrets, and committed professional "sabotage."

415. Falsity and Actual Malice: EPAM's statements were objectively false. Furthermore, EPAM published these statements with actual malice, acting with either actual knowledge of their falsity or reckless disregard for the truth. At the time Mr. Klebanov published these extra-judicial accusations, EPAM was already in possession of internal documentary evidence completely contradicting the claims of "theft" and "sabotage." This exculpatory evidence included EPAM's own IT logs demonstrating that the file transfers were passive, automated OneDrive synchronizations, as well as contemporaneous written communications from EPAM's Human Resources department authorizing Dr. Rao's actions.

416. Defamation Per Se: By falsely accusing a licensed, double board-certified physician-scientist and epidemiologist of criminal theft, sabotage, and dishonesty in his trade and profession, EPAM's statements constitute defamation per se. These accusations fundamentally strike at Dr. Rao's professional fitness, directly threaten his medical licenses, subject him to unwarranted scrutiny from state medical boards, and

irreparably damage his reputation among prospective healthcare partners. Because the statements constitute defamation per se, damages are presumed as a matter of law.

417. Special and Economic Damages: In addition to presumed damages, EPAM’s unprivileged defamatory statements directly and proximately caused Dr. Rao substantial, quantifiable special damages. In the highly specialized sector of artificial intelligence and real-world evidence (RWE), enterprise software procurement requires rigorous vendor compliance vetting. EPAM's defamatory accusations caused prospective clients to fail Dr. Rao during this vetting process. Specifically, EPAM's tortious interference directly caused the termination of an active $50,000 Proof of Concept (POC) Statement of Work between CoReason Inc. and Johnson & Johnson (See **Exhibit I**). The destruction of this POC directly extinguished the customary and expected progression to long-term enterprise licensing renewals and contracts with J&J and Gilead Sciences exceeding $10,000,000 in annual recurring revenue. Furthermore, EPAM's conduct precluded Dr. Rao from capitalizing on a time-sensitive market window, destroying his early-mover market positioning and completely preventing CoReason Inc. from achieving its reasonably projected $1,000,000,000.00 ($1 Billion) "unicorn" valuation, resulting in catastrophic economic loss.

418. EPAM’s defamatory conduct was willful, malicious, and executed with the specific intent to destroy Dr. Rao’s professional livelihood and unlawfully suppress legitimate competition, thereby entitling Dr. Rao to an award of punitive damages.

419. **WHEREFORE**, Counterclaim-Plaintiff Rao respectfully requests judgment in his favor and against EPAM for:

a. Compensatory and special damages, including but not limited to the destruction of Dr. Rao's early-mover market positioning, the loss of customary recurring enterprise revenue pipelines, and quantifiable economic losses related to Gilead Sciences, Johnson & Johnson, and other prospective enterprise clients within the

pharmaceutical sector, as well as damages for the severe harm to Dr. Rao's professional reputation;

b. Punitive damages in an amount sufficient to punish and deter EPAM's actual malice and willful misconduct;

c. Preliminary and permanent injunctive relief enjoining EPAM, its officers, employees, and agents from publishing further false and defamatory statements regarding Dr. Rao to any third parties;

d. An equitable Order compelling EPAM to issue a formal, written retraction of its false statements regarding Dr. Rao to Gilead Sciences and any other third parties to whom such statements were published;

e. Attorneys' fees and costs of suit where permitted by law;

f. Pre-judgment and post-judgment interest at the maximum rate permitted by law; and

g. Such other and further relief as the Court deems just, equitable, and proper.

**COUNT III - TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

420. Counterclaim-Plaintiff Rao repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

421. Prospective Economic Advantage: At all relevant times, Dr. Rao had a reasonable, legally protectable expectation of entering into valid business relationships and professional engagements within the life sciences sector through his commercial entities, CoReason Inc. and Scientific Informatics, LLC. Specifically, Dr. Rao possessed advanced, formalized prospective economic advantages with major industry participants. On October 20, 2025, Johnson & Johnson leadership explicitly approved a Statement of

Work (SOW) and formally directed its procurement team to proceed with contracting. Dr. Rao was also in advanced negotiations with Boehringer Ingelheim and scheduled to deliver a keynote address for Gilead Sciences.

422. Knowledge: EPAM, through its executive leadership, was fully aware of Dr. Rao's industry standing, his post-termination commercial ventures, and his prospective economic advantages.

423. Intentional and Malicious Interference: Following Dr. Rao's termination, EPAM intentionally, maliciously, and without legal justification interfered with CoReason Inc.'s ability to pursue and finalize these opportunities. EPAM executed this tortious interference through a two-pronged campaign of extra-judicial defamation and sham litigation.

424. Prong One (Extra-Judicial Interference): First, EPAM interfered extra-judicially when senior personnel—specifically including executive Gregory Klebanov—directly communicated false statements to authorized representatives at Gilead Sciences and other industry participants. These unprivileged communications falsely asserted that Dr. Rao had engaged in criminal misconduct and the theft of intellectual property. EPAM made these statements with actual malice, knowing they were entirely contradicted by EPAM's own internal IT logs and Human Resources authorizations.

425. Prong Two (Sham Litigation): Second, EPAM intentionally weaponized the federal judicial system to execute a de facto commercial block against Dr. Rao. EPAM's interference via the filing of this lawsuit is not shielded by the litigation privilege or the Noerr-Pennington doctrine because the action constitutes sham litigation. EPAM's objective was not to genuinely protect trade secrets, but to intentionally trigger standard corporate vendor compliance failures for Dr. Rao's new enterprise.

426. EPAM's bad-faith, anti-competitive intent is evidenced by its strategic concealment of exculpatory evidence. In seeking emergency injunctive relief, EPAM intentionally

withheld contemporaneous written authorizations from its own Human Resources department (**Exhibit C**) that expressly contradicted its claims of "secret theft" and an "orchestrated" exit. By filing an objectively baseless lawsuit built upon the deliberate omission of exculpatory documents, EPAM utilized the litigation process itself as an anti-competitive weapon.

427. Causation and Damages: As a direct and proximate result of EPAM's two-pronged tortious interference, Dr. Rao suffered substantial and quantifiable economic damages. Enterprise software procurement in the pharmaceutical sector requires strict vendor compliance vetting; the existence of EPAM's highly publicized, albeit baseless, federal trade secret lawsuit caused Dr. Rao to immediately fail this vetting.

428. Specifically, on November 3, 2025, in direct temporal proximity to EPAM's escalation of this litigation, Johnson & Johnson halted the procurement process and suspended the approved SOW (See **Exhibit I**). Similarly, on December 4, 2025, Dr. Rao was forced to suspend advanced business negotiations with Boehringer Ingelheim due directly to EPAM's legal filings. Furthermore, Dr. Rao forfeited his scheduled keynote engagement at Gilead Sciences, lost prospective venture capital investment, and suffered the complete cessation of operations for his new business venture. By maliciously interfering with Dr. Rao's finalized POCs and advanced industry negotiations, EPAM actively destroyed long-term enterprise contracts projected to exceed $10,000,000 annually, and fundamentally prevented Dr. Rao from realizing CoReason Inc.'s anticipated $1,000,000,000.00 ($1 Billion) "unicorn" enterprise valuation.

429. EPAM's interference was willful, malicious, and executed with reckless disregard for Dr. Rao's commercial rights, thereby entitling Dr. Rao to an award of punitive damages.

430. **WHEREFORE**, Counterclaim-Plaintiff Rao respectfully requests judgment in his favor and against EPAM for:

a. Compensatory, consequential, and special damages, including but not limited to the destruction of CoReason Inc., the loss of prospective venture capital investment, and the loss of lucrative, formalized business engagements with Johnson & Johnson, Boehringer Ingelheim, Gilead Sciences, and other prospective clients;

b. Punitive damages in an amount sufficient to punish and deter EPAM's actual malice, anti-competitive intent, and willful misconduct;

c. Preliminary and permanent injunctive relief enjoining EPAM, its officers, employees, and agents from continuing their tortious interference with Dr. Rao's and CoReason Inc.'s prospective economic advantages, specifically including an Order enjoining EPAM from utilizing this sham litigation or unprivileged communications as a *de facto* commercial block;

d. Attorneys' fees and costs of suit where permitted by law or equity;

e. Pre-judgment and post-judgment interest at the maximum rate permitted by law; and

f. Such other and further relief as the Court deems just, equitable, and proper.

**COUNT IV - DECLARATORY JUDGMENT (NON-COMPETITION COVENANT UNENFORCEABLE) (28 U.S.C. § 2201)**

431. Counterclaim-Plaintiff Rao repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

432. The Actual Controversy: Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, an actual, present, and justiciable controversy exists between Dr. Rao and EPAM

concerning the enforceability of the post-employment non-competition provisions contained in Dr. Rao’s Employment Covenants Agreement ("the Agreement").

433. The Contractual Involuntary Carve-Out: Section 5(c) of the Agreement expressly and unambiguously limits the enforceability of the non-competition provisions. Under the plain language drafted by EPAM, the non-competition restrictions are triggered only "[i]n the event you voluntarily resign employment." The Agreement dictates unequivocally: "The restrictions in this subsection shall not apply in case of an involuntary termination."

434. The Factual Trigger (Involuntary RIF): Dr. Rao did not voluntarily resign; he was involuntarily terminated by EPAM on October 15, 2025. This involuntary status is an indisputable matter of public record. Following his termination, EPAM officially represented to the State of New Jersey Department of Labor that Dr. Rao's separation was due to a corporate "Reduction in Force" (RIF) (**Exhibit D**). Because Dr. Rao did not voluntarily resign, the explicit contractual conditions required to enforce the non-competition provisions under Section 5(c) were never met.

435. The Need for Judicial Resolution: EPAM’s underlying Complaint explicitly seeks injunctive relief to enforce these post-employment restrictions and enjoin Dr. Rao from operating CoReason Inc. within the life sciences sector. Subsequently, in the Stipulated Consent Order entered by this Court (ECF No. 20), EPAM conceded that Dr. Rao’s employment was involuntarily terminated, ostensibly rendering the non-compete moot for the purposes of emergency relief.

436. However, because EPAM has not formally amended or withdrawn the underlying claims in its Complaint, an active, unresolved contradiction remains on the federal docket. This contradiction creates a permanent commercial "cloud" over Dr. Rao’s legal rights and his ability to engage in lawful commerce, as prospective clients and investors require absolute legal certainty regarding his freedom to operate.

437. Relief Requested: A final Declaratory Judgment is therefore necessary and appropriate to permanently resolve this inconsistency, pierce the commercial cloud over CoReason Inc., and formally declare that Dr. Rao is not bound by the non-competition provisions of Section 5(c) of the Agreement.

438. **WHEREFORE**, Counterclaim-Plaintiff Rao respectfully requests that this Court, pursuant to 28 U.S.C. § 2201, enter judgment in his favor and against EPAM, including:

a. A Declaratory Judgment that the post-employment non-competition restrictions contained within Dr. Rao's Employment Covenants Agreement are permanently unenforceable and do not bind Dr. Rao or CoReason Inc. or other entities associated with Dr. Rao;

b. A Declaratory Judgment that Dr. Rao's separation from EPAM constituted an involuntary termination and Reduction in Force (RIF), thereby satisfying the contractual conditions required to waive the non-competition provisions;

c. A Declaratory Judgment that Dr. Rao and CoReason Inc. are legally free to pursue lawful employment, investment, and enterprise business opportunities within the life sciences and healthcare technology industries without restriction by EPAM;

d. Preliminary and permanent injunctive relief enjoining EPAM, its officers, employees, and agents from asserting, threatening, or attempting to enforce these unenforceable non-competition provisions against Dr. Rao, CoReason Inc., or any of their prospective clients, partners, or investors;

e. Attorneys' fees and costs of suit where permitted by law or equity; and

f. Such other and further relief as the Court deems just, equitable, and proper.

## COUNT V - DECLARATORY JUDGMENT (EPAM LACKS OWNERSHIP AND STANDING REGARDING ALLEGED IP) (28 U.S.C. § 2201)

439. Counterclaim-Plaintiff Rao repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

440. The Actual Controversy: Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, an actual, present, and justiciable controversy exists between Dr. Rao and EPAM regarding the legal ownership of, and proprietary rights to, the artificial intelligence and data-science architectures referenced in Plaintiff's Complaint. EPAM baselessly alleges that these assets constitute its proprietary corporate trade secrets. Dr. Rao disputes these allegations on the grounds that EPAM holds no lawful ownership interest in these materials.

441. Public Domain Assets ("AI Cohort Generator" and "AI Accelerator"): EPAM lacks a legally cognizable proprietary interest in the "AI Cohort Generator" and "AI Accelerator" architectures. EPAM previously disclosed and published these materials into the public domain via publicly accessible platforms, including YouTube and open-source repositories presented at the OHDSI Symposium. Consequently, these materials have been stripped of any purported trade secret status, and EPAM cannot claim proprietary protection or ownership over broad, public-domain disclosures.

442. Third-Party Client Assets ("ETL Conversion Kit"): EPAM similarly lacks proprietary ownership over the software, codebases, and related deliverables comprising the "ETL Conversion Kit." These materials were developed in connection with billable work performed for EPAM's client, Takeda Pharmaceuticals. Under the explicit terms of the governing Master Services Agreement (MSA) between EPAM and Takeda, intellectual property created in connection with this work constitutes a client-owned deliverable.

Legal ownership of that intellectual property vested exclusively with Takeda Pharmaceuticals, not EPAM.

443. Lack of Standing: Because the referenced technical assets are either irrevocably in the public domain or owned exclusively by a third-party client, EPAM possesses no proprietary interest in them. Consequently, EPAM has suffered no legally cognizable injury-in-fact regarding their use and lacks Article III standing to sue Dr. Rao for their alleged misappropriation.

444. Freedom to Operate and Relief Requested: EPAM's continued, bad-faith assertion of ownership over these assets in this litigation creates an active, commercial cloud over Dr. Rao's professional livelihood. A Declaratory Judgment is necessary to establish Dr. Rao's prospective "freedom to operate" and to permanently enjoin EPAM from unlawfully interfering with Dr. Rao's future business engagements by threatening litigation over open-source and third-party intellectual property that EPAM does not own.

445. **WHEREFORE**, Counterclaim-Plaintiff Rao respectfully requests that this Court, pursuant to 28 U.S.C. § 2201, enter judgment in his favor and against EPAM, including:

a. A Declaratory Judgment that EPAM lacks proprietary ownership and legally enforceable trade secret rights over the "AI Cohort Generator" and "AI Accelerator" architectures, as said materials have been disclosed into the public domain;

b. A Declaratory Judgment that EPAM lacks exclusive ownership and legally enforceable trade secret rights over the "ETL Conversion Kit," as said intellectual property is owned by Takeda Pharmaceuticals pursuant to the governing Master Services Agreement;

c. A Declaratory Judgment that, lacking legally cognizable ownership or trade secret rights in the referenced materials, EPAM lacks Article III standing to assert claims of trade secret misappropriation against Dr. Rao regarding these assets;

d. An award of attorneys' fees and costs of suit where permitted by law or equity; and

e. Such other and further relief as the Court deems just, equitable, and proper.

## COUNT VI - ABUSE OF PROCESS

446. Counterclaim-Plaintiff Rao repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

447. The Ulterior Motive: EPAM initiated, and continues to pursue, this action against Dr. Rao for an ulterior, anti-competitive motive. EPAM's primary purpose is not to secure legitimate legal redress or protect actual trade secrets, but rather to weaponize the federal litigation process as a de facto commercial block to inflict exorbitant costs, paralyze Defendant’s lawful activities, and destroy his new venture, CoReason Inc.

448. To achieve this illegitimate, anti-competitive end, EPAM committed a series of willful, improper acts in the regular conduct of these legal proceedings:

449. Improper Act 1 (The TRO Ambush & Evidence Concealment): EPAM wrongfully obtained emergency injunctive relief by intentionally mischaracterizing Defendant's routine corporate communications as a malicious "cybersecurity incident." In support of its TRO application, EPAM submitted a sworn declaration from its Global Head of IT Security, Miroslav Sklansky (ECF No. 3-4, 14), who testified that Defendant engaged in suspicious data exfiltration by sending "over a dozen outbound emails" to a personal account.

450. This presentation to the Court was a deliberate distortion of the factual record. EPAM intentionally concealed from the Court that these specific emails (**Exhibit C**) were transparent, good-faith contract negotiations regarding Defendant's employment

boundaries directed explicitly to EPAM's own Human Resources executives (Larry McKlaine and June Dinitz). Instructing an IT department to present authorized HR correspondence to a federal judge as "stolen data" to manufacture an emergency constitutes a severe abuse of process.

451. Improper Act 2 (Submission of Incomplete Evidence): In further abuse of the judicial process, EPAM submitted incomplete documentary evidence to this Court (ECF No. 3-7). EPAM deliberately omitted exculpatory timestamps and an initiating message to manufacture a false claim of unlawful client solicitation against Dr. Rao.

452. Improper Act 3 (Weaponization of Discovery): EPAM has utilized the discovery process for purposes entirely outside its legitimate scope. Following the initial forensic scan, a subset of personal files remained for review. To protect his proprietary business data from a direct competitor, Dr. Rao requested these remaining files be designated "Attorneys' Eyes Only" (AEO). EPAM explicitly refused this standard protective designation. By seeking direct access for EPAM business personnel to Dr. Rao's new commercial information, client contacts, and intellectual property, EPAM abused the discovery process to obtain competitive intelligence rather than advance legitimate legal claims.

453. Improper Act 4 (Prosecution Contrary to Forensic Evidence): Plaintiff's ongoing prosecution constitutes a bad-faith abuse of process because its core allegations of data exfiltration have been definitively disproven. Pursuant to the Stipulated Forensic Inspection Protocol, a neutral forensic vendor conducted a comprehensive examination of Defendant's devices. This independent analysis yielded no evidence that Defendant exfiltrated, transferred, or misappropriated Plaintiff's alleged trade secrets.

454. Despite possessing this definitive forensic clearance, EPAM maintained its action. Furthermore, even after the Court provided guidance regarding EPAM's lack of standing to seek injunctive relief for third-party intellectual property, EPAM filed a First Amended

Complaint (ECF No. 30, subsequently struck by Order of this Court, ECF No. 32) that republished the disproven claims of "blatant theft."

455. Damages: As a direct and proximate result of EPAM's systematic abuse of the judicial process, Dr. Rao has suffered substantial and quantifiable economic and non-economic damages. These damages include the destruction of the approved Johnson & Johnson Proof of Concept contract, highly burdensome forensic compliance costs, significant legal defense fees, severe reputational harm, and emotional distress.

456. EPAM's bad-faith weaponization of the judicial process was willful, malicious, and executed with reckless disregard for Dr. Rao's rights, thereby entitling Dr. Rao to an award of punitive damages.

457. **WHEREFORE**, Counterclaim-Plaintiff Rao respectfully requests judgment in his favor and against EPAM, including:

a. .Compensatory, consequential, and special damages, including but not limited to the loss of the Johnson & Johnson Proof of Concept contract, forensic compliance costs, and financial harm incurred as a direct result of EPAM's improper use of the legal process;

b. Punitive damages in an amount sufficient to punish and deter EPAM's willful, malicious, and anti-competitive abuse of the judicial system;

c. Injunctive or protective relief enjoining EPAM, its officers, and its business personnel from accessing, reviewing, or utilizing Dr. Rao's personal or business data and client communications obtained during discovery;

d. An award of reasonable attorneys' fees and costs incurred by Dr. Rao, awarded as sanctions for EPAM's bad-faith litigation tactics and improper use of the judicial process;

e. Pre-judgment and post-judgment interest at the maximum rate permitted by law; and

f. Such other and further relief as the Court deems just, equitable, and proper.

**COUNT VII - BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

458. Counterclaim-Plaintiff Rao repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

459. The Implied Covenant: Every contract subject to New Jersey law, including Dr. Rao's Employment Covenants Agreement, contains an implied covenant of good faith and fair dealing. This covenant dictates that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Furthermore, where a contract affords an employer discretion—such as the discretion to evaluate performance, assign duties, or implement performance plans—that discretion must be exercised in good faith and not arbitrarily, maliciously, or unreasonably.

460. The Bargained-For Benefit: A central, bargained-for benefit of Dr. Rao's Agreement was the explicit protection contained in Section 5(c). This section dictates that post-employment non-competition restrictions are enforceable only in the event of a voluntary resignation, expressly guaranteeing that the restrictions "shall not apply in case of an involuntary termination."

461. Bad-Faith Abuse of Discretion: EPAM breached the implied covenant of good faith and fair dealing by exercising its managerial discretion maliciously to deprive Dr. Rao of this specific contractual benefit. Recognizing that an outright termination would instantly void Dr. Rao's non-compete, EPAM leadership engaged in a bad-faith campaign of constructive discharge designed to force Dr. Rao into a "voluntary" resignation.

462. In executing this scheme, EPAM utilized its corporate discretion arbitrarily and unreasonably. Without legitimate business justification, EPAM abruptly altered Dr. Rao's duties, stripped his Profit & Loss (P&L) authority, and attempted to demote him from a Vice President-level Physician-Scientist to an individual contributor coding role reporting to a junior peer.

463. The Pretextual PIP: When Dr. Rao refused to voluntarily resign and forfeit his contractual rights, EPAM escalated its bad-faith conduct by weaponizing its Human Resources apparatus. EPAM presented Dr. Rao with a punitive Performance Improvement Plan (PIP) containing structurally unattainable $2.5 million revenue targets.

464. The imposition of this PIP was an arbitrary, bad-faith deviation from EPAM's own standard performance management policies. Dr. Rao's official internal "Telescope" performance profile contained zero documented goals, zero revenue targets, and zero negative feedback. EPAM abused its discretionary authority to impose this baseless PIP not to improve performance, but to manufacture pretextual grounds for his exit while attempting to preserve the enforceability of the non-competition covenants.

465. Damages: By maliciously exercising managerial discretion to impose unsupported performance metrics and fundamentally alter Dr. Rao's employment conditions, EPAM actively destroyed Dr. Rao's right to receive the fruits of his contract—specifically, his right to be free from restrictive covenants following an involuntary separation.

466. As a direct and proximate result of EPAM's breach of the implied covenant of good faith and fair dealing, Dr. Rao has suffered substantial and quantifiable economic harm. These damages include the loss of his salary and benefits, the destruction of prospective commercial contracts for his new ventures, forensic compliance costs, and severe emotional distress.

467. **WHEREFORE**, Counterclaim-Plaintiff Rao respectfully requests that this Court enter judgment in his favor and against EPAM, including:

a. Compensatory, consequential, and special damages, including but not limited to the loss of past and future salary and benefits, the deprivation of prospective business advantages for his commercial ventures, and forensic compliance costs incurred as a direct result of EPAM's breach;

b. Punitive damages in an amount sufficient to punish and deter EPAM's willful breach of the implied covenant of good faith and fair dealing;

c. An equitable Order declaring that EPAM's material breach of the implied covenant of good faith and fair dealing renders permanently unenforceable any post-employment restrictive covenants contained within the Agreement;

d. An award of reasonable attorneys' fees and costs of suit where permitted by law or equity;

e. Pre-judgment and post-judgment interest at the maximum rate permitted by law; and

f. Such other and further relief as the Court deems just, equitable, and proper.

**COUNT VIII - FRAUDULENT INDUCEMENT**

468. Counterclaim-Plaintiff Rao repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

469. The Material Misrepresentations: In or around October and November 2024, EPAM executives—specifically including Gregory Klebanov and Senior Vice President Greg Killian—initiated a targeted recruitment campaign to induce Dr. Rao to resign from his secure position at Johnson & Johnson and join EPAM. During a series of virtual conferences and meetings, Klebanov and Killian made specific, material representations of fact regarding the financial health, technological infrastructure, and strategic mandate of EPAM's "Odysseus" business unit.

470. Specifically, to secure Dr. Rao's signature on the Employment Covenants Agreement, EPAM executives explicitly represented that Dr. Rao would be granted full Profit and Loss (P&L) authority, a direct trajectory to Chief Medical Officer, and a mandate to scale the unit from "$400 million to $1 billion." Furthermore, EPAM represented that it possessed a fully operational, enterprise-grade "distributed data network" ready to immediately support Dr. Rao's scientific initiatives.

471. Scienter and Active Concealment: At the time these representations were made, EPAM, Killian, and Klebanov knew them to be objectively false. In reality, the Odysseus unit was failing; its rolling six-month revenue was approximately $200,000, not the hundreds of millions represented. Furthermore, the touted "distributed data network" was materially non-operational vaporware.

472. EPAM intentionally concealed these grim financial and technological realities. Moreover, EPAM actively concealed its true motive for the recruitment: Dr. Rao was not hired to lead a $1 billion tech expansion, but rather to lend his prestigious public standing within the OHDSI scientific community to a failing business unit so that Mr. Klebanov could achieve undisclosed, lucrative acquisition "earn-out" targets.

473. Concealment of Third-Party Breach: Upon information and belief, EPAM further concealed the material fact that its aggressive recruitment of Dr. Rao directly violated the non-solicitation covenants contained within EPAM's own Master Services Agreement with Dr. Rao's then-employer, Johnson & Johnson.

474. Intent to Induce and Reasonable Reliance: EPAM made these material misrepresentations and omissions with the specific intent that Dr. Rao rely upon them. Dr. Rao justifiably and reasonably relied upon EPAM's executive representations when deciding to resign from Johnson & Johnson and execute the Agreement. Because the actual revenue metrics, operational capabilities, and executive earn-out targets were highly confidential internal corporate data, Dr. Rao, as an external candidate, suffered

from a severe information asymmetry. He had no independent means to audit EPAM's internal financial records and reasonably trusted the representations of EPAM leadership, relying heavily on a decade of prior professional association with Mr. Klebanov.

475. Causation and Voidability: Had EPAM disclosed the actual, distressed financial state of the Odysseus unit, the lack of operational scientific infrastructure, and the self-serving earn-out targets, Dr. Rao never would have resigned from Johnson & Johnson, accepted the position, or signed the Agreement. Because Dr. Rao's assent was procured through fraud, the Employment Covenants Agreement—and every post-employment restrictive covenant and intellectual property assignment contained therein—is voidable and legally unenforceable.

476. Damages: As a direct and proximate result of EPAM's fraudulent inducement, Dr. Rao has suffered substantial and quantifiable economic damages. These include severe opportunity costs, the forfeiture of alternative lucrative employment prospects within the pharmaceutical industry, the loss of his established career trajectory at Johnson & Johnson, and profound reputational harm.

477. **WHEREFORE**, Counterclaim-Plaintiff Rao respectfully requests that this Court enter judgment in his favor and against EPAM, including:

a. A Declaratory Judgment that the Employment Covenants Agreement—specifically including all post-employment restrictive covenants and intellectual property assignment provisions contained therein—is void ab initio and legally unenforceable due to fraudulent inducement;

b. Compensatory, consequential, and special damages, including but not limited to severe opportunity costs, the forfeiture of alternative lucrative employment prospects, career disruption, and financial harm incurred as a direct result of EPAM's fraudulent conduct;

c. Punitive damages in an amount sufficient to punish and deter EPAM's willful and intentional fraudulent inducement;

d. An award of reasonable attorneys' fees and costs of suit where permitted by law or equity;

e. Pre-judgment and post-judgment interest at the maximum rate permitted by law; and

f. Such other and further relief as the Court deems just, equitable, and proper.

## PRAYER FOR RELIEF

478. **WHEREFORE**, Defendant and Counterclaim-Plaintiff Dr. Gowtham A. Rao respectfully requests that this Court enter judgment in his favor and against Plaintiff and Counterclaim-Defendant EPAM Systems, Inc., and grant the following relief:

a. Compensatory and consequential damages in an amount to be determined at trial for all economic harm, including but not limited to lost prospective income, the loss of finalized business contracts, lost venture capital, and reputational harm;

b. Special damages for emotional distress, documented medical and psychiatric injuries, and related healthcare costs incurred as a direct and proximate result of EPAM's conduct;

c. Punitive and exemplary damages in an amount sufficient to punish and deter EPAM's willful and intentional misconduct, as permitted by applicable law;

d. A Declaratory Judgment that the Employment Covenants Agreement is void ab initio due to fraudulent inducement, or in the alternative, that the post-employment restrictive covenants asserted by EPAM are void, unenforceable, and do not restrict Dr. Rao;

e. A Declaratory Judgment that Dr. Rao’s retention of documents constitutes protected whistleblower activity under the Defend Trade Secrets Act Safe Harbor, 18 U.S.C. § 1833(b), granting him absolute immunity from civil and criminal liability, and that he did not misappropriate EPAM trade secrets or confidential information;

f. A Declaratory Judgment that EPAM lacks ownership rights and legal standing to assert trade secret claims over the open-source, client-owned, or public-domain intellectual property referenced in the Complaint;

g. Preliminary and permanent injunctive relief enjoining EPAM, its officers, and its agents from interfering with Dr. Rao’s prospective business relationships, enjoining them from publishing further defamatory statements to third parties, and enjoining them from attempting to enforce the voided restrictive covenants;

h. An award of reasonable attorneys’ fees, out-of-pocket forensic vendor compliance costs, and all related litigation expenses as permitted by law, specifically including awards pursuant to the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-5, and for EPAM's bad-faith claim of misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(D);

i. Pre-judgment and post-judgment interest at the maximum rate permitted by law; and

j. Such other and further relief as the Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

479. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Defendant and Counterclaim-Plaintiff Dr. Gowtham A. Rao hereby demands a trial by jury on all issues so triable.

Dated: March 31, 2026

Respectfully submitted,

**/s/ Gowtham A. Rao**

---

Gowtham A. Rao, MD, PhD
Defendant and Counterclaim-Plaintiff, Pro Se
184 Mansgrove Rd.
Princeton, NJ 08540
Email: gowthamrao.litigation@gmail.com
Email: gowthamrao@gmail.com

## INDEX OF EXHIBITS

- **Exhibit A:** Excerpts of Master Services Agreement between Millennium Pharmaceuticals, Inc. (Takeda) and Odysseus Data Services, Inc.
- **Exhibit B:** Internal EPAM Legal Communication regarding Takeda Intellectual Property Ownership
- **Exhibit C:** October 2-3, 2025 Email Thread between Dr. Rao and EPAM Human Resources (Communications E01-E04)
- **Exhibit D:** Screenshot of Official State of New Jersey Department of Labor Unemployment Benefits Portal
- **Exhibit E:** October 16, 2025 Microsoft Teams Chat Transcript with Gaurav Dravida
- **Exhibit F:** EPAM Telescope Performance Profile and HEROES 2025 Award Notification
- **Exhibit G:** September 25-30, 2025 Email Thread Regarding Proposed Demotion and Performance Improvement Plan
- **Exhibit H:** Original Screenshots of EPAM GitLab Repository Initialization and License Configuration
- **Exhibit I:** October - November 2025 Email Thread between CoReason Inc. and Johnson & Johnson Demonstrating SOW Approval and Abrupt Suspension
- **Exhibit J:** Composite Exhibit Demonstrating Inbound Sharing of EPAM Corporate Documents to Personal Accounts by EPAM Employees

**CERTIFICATE OF SERVICE**

I, Gowtham A. Rao, Defendant and Counterclaim-Plaintiff Pro Se, hereby certify that on March 31, 2026, a true and correct copy of the foregoing Defendant's Answer, Affirmative Defenses, and Counterclaims was electronically filed with the Clerk of the Court using the CM/ECF system, which will automatically send notification of such filing to the following attorneys of record:

Jacob Oslick, Esq. (joslick@seyfarth.com)
James S. Yu, Esq. (jyu@seyfarth.com)
Brooke Gary, Esq. (brgary@seyfarth.com)

Seyfarth Shaw LLP
620 Eighth Avenue
New York, NY 10018-1405
Attorneys for Plaintiff EPAM Systems, Inc.

Dated: March 31, 2026

Respectfully submitted,

**/s/ Gowtham A. Rao**

---

Gowtham A. Rao, MD, PhD
Defendant and Counterclaim-Plaintiff, Pro Se
184 Mansgrove Rd.
Princeton, NJ 08540
Email: gowthamrao.litigation@gmail.com
Email: gowthamrao@gmail.com