Takeda

# MASTER SERVICES AGREEMENT

**THIS MASTER SERVICES AGREEMENT** ("Agreement") is entered into as of June 1, 2019 (the "Effective Date") by and between Millennium Pharmaceuticals, Inc., a wholly owned subsidiary of **Takeda Pharmaceutical Limited Company**, with offices located at 40 Landsdowne Street, Cambridge, MA 02139 ("Takeda") and **Odysseus Data Services, Inc.** with offices located at 245 First Street, Riverview II, 18th Floor, Cambridge MA 02142 ("Company").

**WHEREAS,** Takeda is engaged in the business of developing, marketing and distributing ethical ;pharmaceutical products

**WHEREAS,** Company is engaged in the business of providing Software Engineering and OMOP CDM Data Management and related services and products;

**WHEREAS,** Takeda desires to obtain from Company, and Company desires to provide to Takeda, the Services (as defined below) in accordance with the terms and conditions of this Agreement.

**NOW THEREFORE,** in consideration of the mutual covenants and promises set forth below, and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

**1. SERVICES.**

**A. Generally.** Takeda hereby engages Company on a non-exclusive basis to perform, and Company hereby agrees to perform, certain services from time to time on a project-by-project basis, as more particularly described in this Agreement and in applicable project work orders or purchase orders (the "Services"). Generally, Services may be commenced only after the parties have executed a project work order conforming to the requirements set forth below (each a "PWO") and Takeda has issued a corresponding purchase order (each a "Purchase Order"). However, in certain limited circumstances as determined by Takeda in its sole discretion and communicated to Company, Services may be commenced upon Takeda's issuance of a Purchase Order alone. In such instances: (i) the Purchase Order shall be deemed a PWO for purposes of this Agreement and all references in this Agreement to a PWO shall be deemed references to such Purchase Order where contextually appropriate; and (ii) Company's performance in response to receipt of a Purchase Order shall signify Company's agreement that such Purchase Order shall constitute a PWO under this Agreement.

**B. PWOs.**

(i) Any PWO shall be in the format of Exhibit A, and shall: (a) identify the applicable project and describe the activities and duties for which Company is responsible; (b) include an estimated budget of Company's Fees (as defined in Section 4(A) below) for the project and any Authorized Expenses (as defined in Section 4(B) below) for which Takeda will be responsible as permitted hereunder including any applicable formula for determining such Fees or Authorized Expenses (e.g., hourly rates or otherwise); (c) be signed by both parties prior to commencing work on any project; and (d) be governed by this Agreement and made a part hereof.

(ii) The parties acknowledge and agree that any entity controlling, controlled by or under common control with Takeda (each a "Takeda Affiliate") may engage Company to perform Services pursuant to this Agreement through a PWO that clearly indicates that such Takeda Affiliate is a party thereto. In that event, the Takeda Affiliate that engages Company by initiating and signing the PWO shall be solely responsible to Company for all obligations arising thereunder.

**2. TERM.** This Agreement shall take effect on the Effective Date and shall remain in effect for one (1) year (the "Initial Term") unless terminated as permitted herein. Thereafter, this Agreement shall automatically renew for successive one (1) year terms (each a "Renewal Term") unless and until terminated as permitted herein. The Initial Term and any Renewal Term(s) shall collectively be the "Term."

**3. STANDARD OF PERFORMANCE.** Company shall at all times use its best efforts and all due diligence in performing the Services and shall comply with all applicable laws and regulations. All Services shall be performed in accordance with generally accepted professional standards and to Takeda's reasonable satisfaction. Prior to providing Services, Company shall disclose to Takeda any conflicts of interest it has relating to providing the Services, including whether Company will receive any payments from third parties related to the Services.

**4. COMPENSATION.**

A. **Company's Fees.** In consideration for Company's performance of the Services in accordance with a PWO, Takeda shall pay Company's professional fees as specified in the applicable PWO (the "Fees") and, if applicable, in the manner specified in the applicable PWO.

**Authorized Expenses.** In addition, Takeda shall reimburse Company for reasonable pass-through and out-of-pocket expenses actually incurred by Company (at cost and without markup) in connection with the Services for which Takeda has expressly agreed to be responsible in any PWO ("Authorized Expenses") and that follow Takeda's expense policy for its suppliers found at http://takedaoncology.com/content/pdf/Millennium_Policy-Supplier_Business_Travel.pdf. Company shall keep full and accurate records and documentation reasonably satisfactory to Takeda (such as receipts and vendor invoices) supporting any Authorized Expenses.

B. **Commissions.** Company agrees to promptly issue payment to Takeda or credit Takeda's next invoice, as directed by Takeda, the full amount of any commission or other cash credit that Company receives from a third party as a result of Company performing the Services.

**5. BILLING AND PAYMENT.**

A. Invoices.

(i) Company shall submit invoices to Takeda for all Fees and Authorized Expenses incurred in connection with the Services in a format acceptable to Takeda and containing the elements specified herein as well as any elements specified in the applicable PWO. Each such invoice shall: (a) identify the applicable project by name and Purchase Order number; (b) be accompanied by appropriate documentation supporting any Authorized Expenses claimed; (c) include a breakdown of Fees and Authorized Expenses; and (d) include other line item descriptions for applicable charges consistent with those line item descriptions included in the applicable Purchase Order. Takeda shall not be required to pay any

invoice that does not conform to the requirements set forth herein. In no event shall Company submit invoices to Takeda for any project more frequently than monthly. Company's final invoice shall reconcile all payments made against the budget.

(ii) Except as expressly approved by Takeda in a PWO, Takeda will not prepay Company any Fees or Authorized Expenses.

(iii) Company shall e-mail each invoice to Takeda, in pdf format, to apinvoice@tpna.com. Alternatively, if necessary, address hardcopy invoices to the following address, or as otherwise directed by Takeda:

Takeda Pharmaceuticals North America, Inc.
Attn: Accounts Payable
One Takeda Parkway
Deerfield, Illinois 60015

B. Taxes. Takeda shall pay any applicable sales taxes on payments it makes to Company pursuant to this Agreement. All other taxes, such as income tax, gross receipts tax, foreign withholding tax, etc., applicable to payments Takeda makes to Company pursuant to this Agreement shall be the sole responsibility of the Company.

C. Payment. Takeda shall pay each of Company's invoices within ninety (90) days after receipt, provided Company has complied in all material respects with the terms of this Agreement. If any portion of an invoice is disputed, then Takeda shall pay the undisputed amounts as set forth in the preceding sentence and the parties shall use good faith efforts to reconcile the disputed amount as soon as possible. In the event of any overpayment by Takeda, Company shall either promptly refund to Takeda the amount of such overpayment or credit the amount of such overpayment on the next invoice, at Takeda's direction.

D. Payments as Compensation. Takeda's payments to Company under this Agreement are compensation for Company's Services. Takeda and Company hereby acknowledge and agree that if the Services require Company to make any payments to any healthcare professional or any other person or organization that might be in a position to influence the use of Takeda's products, each such payment: (i) constitutes fair market value for the services performed by the healthcare professional, person or organization; (ii) is not being given in exchange for any explicit or implicit agreement by such healthcare professional, person or organization to recommend or provide favorable status for any of Takeda's products or to influence any drug formulary, or prescribing or dispensing decision; and (iii) has not been determined in a manner that takes into account the volume or value of any referrals generated by such health care professional, person or organization.

6. **RIGHT TO AUDIT.** Company shall maintain accurate books and records of all Services performed, Fees charged and Authorized Expenses incurred. During the Term of this Agreement and for two (2) years following its expiration or earlier termination, Takeda shall have the right, at its own expense, to audit such books and records during normal business hours for the purpose of verifying the performance of Services, the accuracy of the invoices submitted by Company and the amounts paid or payable by Takeda or Company hereunder.

**7. CONFIDENTIALITY AND INJUNCTIVE RELIEF.**

A. During the term of this Agreement, each party, its respective employees, agents and permitted subcontractors (collectively, the "Receiving Party") may receive or have access to confidential materials and information of the other party, including its affiliates and/or business partners (the "Disclosing Party"). All such materials and information in written, electronic and oral form (including, without limitation, proposals, client or physician lists, pricing and financial information, business plans and strategies, marketing plans and strategies, employee information, customer and business partner information, technical, scientific and research and development information, and/or data relating to the approval, administration, use or experience of the Disclosing Party's products (whether marketed or in development), intellectual property and company policies and procedures), are collectively referred to herein as "Confidential Information" and constitute the exclusive property of the Disclosing Party. The Receiving Party shall hold in confidence, and shall not disclose to any third party (other than its employees, agents and permitted subcontractors hereunder) any Confidential Information of the Disclosing Party without the prior written consent of the Disclosing Party. Confidential Information of Takeda shall be deemed to include any materials prepared by Company in connection with the Services performed hereunder and any Confidential Information of Takeda's affiliates and business partners. The Receiving Party shall use such Confidential Information only for the purpose for which it was disclosed, and shall disclose Confidential Information received by it under this Agreement only to those employees, agents and permitted subcontractors who have a need to know such Confidential Information in the course of performing their duties for the Receiving Party hereunder, and who are bound by written obligations of confidentiality and non-use at least as restrictive as the provisions in this Agreement. Notwithstanding the foregoing, the Receiving Party shall be liable to the Disclosing Party for any breach of this Section 8 by any of its employees, agents and permitted subcontractors, and agrees, at its sole expense, to use its best efforts to restrain its employees, agents and subcontractors from prohibited or unauthorized disclosure or use of the Confidential Information.

B. Section 7(A) shall not apply to Confidential Information which:

(i) was in the possession of the Receiving Party as evidenced by written records pre-dating disclosure under or in connection with this Agreement;

(ii) was or becomes generally available to the public other than through the willful or negligent act or omission of the Receiving Party or any of its employees, agents or permitted subcontractors;

(iii) was disclosed to the Receiving Party by a third party who had the legal right to make such disclosure, was not obligated by confidentiality and nonuse obligations and did not bind the Receiving Party to such obligations; or

(iv) was required to be disclosed by the Receiving Party to comply with applicable laws or government regulations; provided, however, that the Receiving Party immediately notified the Disclosing Party in writing of such requested disclosure, gave the Disclosing Party the opportunity to prevent or limit the disclosure through

appropriate legal means and used its best efforts to maintain the confidentiality of the Confidential Information being disclosed to the greatest extent possible.

C. Without limiting either party's remedies in any way, the parties acknowledge and agree that any actual or threatened breach of the confidentiality and non-use obligations in this Agreement relating to the Confidential Information would cause irreparable harm for which remedies at law would not be adequate. Therefore, in the event of any breach or anticipatory breach of this Section 8, each party shall be entitled to specific performance and other injunctive and equitable relief without limiting any of its other available rights and remedies.

D. The confidentiality obligations of this Section 7 shall survive the expiration or termination of this Agreement for a period of ten (10) years thereafter.

**8. INDEMNITY.**

A. Company shall indemnify, defend and hold Takeda harmless from any liability, loss, claim, injury, damage or expense (including reasonable attorneys' fees and costs) incurred by Takeda as a result of and to the extent of: (i) any negligent or willful act or omission by Company or its employees, agents or subcontractors in the performance of the Services; (ii) any breach of this Agreement by Company including, without limitation, paying appropriate third parties hereunder; (iii) any copyright infringement, trademark infringement, title claim or misappropriation claim resulting from Takeda's possession or use of materials or Deliverables provided by Company hereunder except to the extent such claim arises from and as a result of materials provided to Company by Takeda; or (iv) any claim by third parties for payment for goods or services ordered by Company on behalf of Takeda and without Takeda's prior written approval or for which Takeda has previously reimbursed Company.

B. Takeda shall indemnify, defend and hold Company harmless from any liability, loss, claim, injury, damage or expense (including reasonable attorneys' fees and costs) incurred by Company as a result of and to the extent of: (i) any negligent or willful act or omission by Takeda or its employees, agents or subcontractors; (ii) any breach of this Agreement by Takeda; or (iii) any copyright infringement, trademark infringement, title claim or misappropriation claim resulting from Takeda's possession or use of materials or Deliverables provided by Company hereunder to the extent such claim arises from and as a result of materials provided to Company by Takeda.

**9. INSURANCE.** As an independent contractor, Company will carry policies of insurance sufficient to meet its obligations under this Agreement.

**10. SUBCONTRACTING.** Company may not subcontract the performance of any of the Services to third parties without Takeda's prior written consent. Company shall at all times remain primarily liable for the full and proper performance of all of its obligations under this Agreement and shall be solely responsible for the oversight of all subcontractors. If the Services require Company to pay any permitted third parties, Company agrees that it shall disburse promptly funds received from Takeda to the appropriate third parties.

**11. TERMINATION.**

A. Either party may terminate this Agreement for convenience and without cause by providing written notice to the other party at least thirty (30) days in advance of the intended termination date. Any such termination shall automatically terminate all PWOs then in effect. However, unless otherwise agreed by the parties in writing, termination of this Agreement by Company shall take effect only upon Company's completion and Takeda's acceptance of all Services to be performed pursuant to any PWO in effect as of the date of Company's notice of termination.

B. Takeda may terminate any PWO for convenience and without cause by providing written notice to Company at least thirty (30) days in advance of the intended termination date, which notice must expressly state to which specific PWO such termination relates. Any such termination shall be effective only with respect to such specific PWO. A termination of all outstanding PWOs shall operate as a termination of this Agreement.

C. Either party may terminate this Agreement or any PWO immediately upon any breach of this Agreement or the PWO, as the case may be, by the other party and the failure of the breaching party to cure such breach within thirty (30) days of receipt of written notice of such breach from the non-breaching party. Any such termination of this Agreement shall automatically terminate all PWOs then in effect.

D. Upon receiving any notice of termination from Takeda, Company shall use its best efforts to: (i) promptly wind down its work on the Services to be performed pursuant to any PWO being terminated; (ii) refrain from entering into any non-cancelable commitments with respect to any PWO being terminated; and (iii) mitigate any further Fees or Authorized Expenses associated with the PWO being terminated.

E. Takeda's liability for any PWO terminated prior to completion of all Services to be performed pursuant to the PWO shall be limited to the pro rata portion of Company's compensation under this Agreement or the applicable PWO, as the case may be, based on Services performed prior to termination and for any non-cancelable commitments entered into by Company prior to notice of termination. Notwithstanding the foregoing, in the event that Takeda terminates this Agreement or a PWO as a result of a breach of this Agreement by Company, Takeda will be liable for the pro rata portion of Company's compensation under this Agreement or the applicable PWO, as the case may be, based on Services performed prior to the date of the notice of breach by Takeda and for any non-cancelable commitments entered into by Company prior to such notice of breach. Upon receiving payment from Takeda, Company shall promptly provide to Takeda all work product in process and/or completed through the date of termination. Payment for Services shall be Company's sole and exclusive remedy upon any early termination of a PWO by Takeda.

F. Unless terminated earlier pursuant to Section 11(A), 11(B) or 11(C) above, each PWO shall terminate upon expiration of its stated term or, if no term is stated or the completion date is only an estimate, upon Company's completion and Takeda's acceptance of all Services to be performed pursuant to the PWO.

**12. INTELLECTUAL PROPERTY AND RESTRICTIONS ON PUBLICATIONS.** Any information, data, concepts, reports, discoveries, inventions, innovations or other intellectual property that is conceived, discovered, reduced to practice, made or developed by Company in the course of performing the Services shall be promptly disclosed to Takeda, and title thereto shall immediately vest in Takeda. Company further agrees that all information and materials prepared in the

performance of Services (collectively, the "Deliverable(s)") are "works for hire," shall be the sole and exclusive property of Takeda and copyright therein shall immediately vest in Takeda. To the extent that any such property, ideas, and materials are not "work for hire," Company hereby assigns and agrees to assign to Takeda, and shall require anyone working for Company to assign to Takeda, all rights including copyright in such property, ideas and materials. Company agrees to execute and obtain execution of any documents (including assignments) necessary to accomplish the intent of this paragraph with no obligation for additional payment by Takeda beyond that identified in the purchase order and specific work requests. During the term of this Agreement and thereafter Company shall fully cooperate with, and assist Takeda in filing and prosecuting patent, trademark and copyright applications and otherwise protecting its rights to the Deliverable(s) and other intellectual property described in this Section. In this regard, Company shall execute such assignments and other documents as Takeda deems necessary to protect its right, title and interest in and to any such Deliverable(s) or other intellectual property.

**13. PUBLICATIONS.** Company shall not publish any articles or papers or make any presentations or communications (nor assist any other person in publishing any articles or papers or in making any presentations or communications) relating or referring to any of the Services, Deliverable(s) or any data, information or materials obtained or generated in the performance of Company's obligations hereunder, in whole or in part, without the prior written consent of Takeda, which consent may be granted or withheld in Takeda's sole discretion.

**14. BUSINESS IDENTIFIERS.** Neither party shall use the trade name, logos or trademarks of the other party and/or its products or services without the other party's prior written consent.

**15. RETURN OF MATERIALS.** Upon the expiration or termination of this Agreement, or at any other time upon either party's written request, each party shall promptly deliver to the other party all Confidential Information of the other party. Company, upon expiration or termination of the Agreement, or upon Takeda's written request, shall promptly deliver to Takeda any and all Deliverable(s) and materials (including preliminary outlines, notes, sketches, plans, unpublished memoranda and other documents) provided by, or prepared for Takeda hereunder. Return of all such materials to Takeda shall be a condition to Company receiving any final payment due hereunder. Company shall have the right to retain one (1) copy of any such items in a secure location for the sole purpose of confirming its compliance with its obligations hereunder.

**16. INDEPENDENT CONTRACTOR.** Company's status hereunder shall be that of an independent contractor and not an agent or employee of Takeda. In no event shall Company have any authority to enter into any contract or commitment in the name of or on behalf of Takeda, and Company shall not hold itself out as having authority to do so without Takeda's prior written authorization.

**17. NO DEBARMENT.** Company hereby represents and warrants to Takeda that:

A. Company is not, has never been, and will not employ or use in any capacity to perform Services, a person or entity sanctioned by the Office of Inspector General ("OIG") of the Department of Health and Human Services, barred from participating in government health care programs, or convicted of a criminal offense with respect to health care reimbursement, nor is Company employed by, in partnership with, a stockholder in, or otherwise affiliated with, a person or entity who has been so sanctioned, barred, or convicted; and

B. Company is not, has never been and will not employ, or use in any capacity to perform Services, a person or entity debarred under Section 306(a) or (b) of the Federal Food, Drug, and Cosmetic Act, nor is Company employed by, in partnership with, a stockholder in, or otherwise affiliated with, a person or entity who has been so debarred; and

C. Company shall immediately notify Takeda in writing in the event that any of the foregoing representations and warranties should become untrue or if Company becomes aware of any fact or circumstance which is reasonably expected to make any such representation or warranty to become untrue.

**18. PRODUCT INFORMATION/ADVERSE EVENT REPORTING.**

A. For purposes of this Section, the following terms shall have the following meanings:

(i) "Adverse Event" means any undesirable event or experience associated with the use of any Product in humans, whether or not expected, and whether or not considered related to or caused by the Product, including, but not limited to, an event or experience that occurs in the course of the use of the Product in professional medical practice, including without limitation, from overdose whether accidental or intentional, from abuse, from withdrawal, from a failure of expected pharmacological or biological therapeutic action of the Product.

(ii) "Medication Error" means any preventable event that may cause or lead to inappropriate medication use or patient harm while the medication is in the control of the health care professional, patient, or consumer (whether related to professional medical practice, health care products, procedures, and systems including: prescribing, order communication, product labeling, packaging, and nomenclature, compounding, dispensing, distribution, administration, education, monitoring; and use of Product(s) or otherwise).

(iii) "Pregnancy Information" means any information pertaining to a patient's experience with any Product during or affecting pregnancy.

(iv) "Product" means any of Takeda's medicinal or biological products or medical devices.

(v) "Product Complaint" means any written, electronic or oral communication involving dissatisfaction with the physical characteristics, packaging, labeling, potency, reliability or design of a Product.

(vi) "Reportable Information" means a Medication Error, Adverse Event, Product Complaint, and/or Pregnancy Information.

B. To the extent any Services performed by Company pursuant to this Agreement result in Company's collection, receipt or other form of knowledge of any Reportable Information about any Product, from any source, in any form, Company represents and warrants that it shall cooperate with Takeda as set forth in this provision. Company shall preserve the original record of such Reportable Information and within one (1) business day of the day on which such Reportable Information was received or otherwise became known to

Company, submit a copy of such records and information to Takeda: (i) identifying and providing full contact information for both the person receiving the Reportable Information and the Company personnel submitting it to Takeda; (ii) stating the date on which the Reportable Information was received by Company, and (iii) describing the Product(s) in question and the event underlying the Reportable Information, including identifying the subject thereof. Company may submit Reportable Information to Takeda at medicalinformation@tpna.com. Alternatively, Company may submit Reportable Information to Takeda's Call Center by calling 1-877-TAKEDA7.

19. **NOTICES.** Any notices or other communications required or permitted hereunder shall be made in writing and delivered by facsimile, a nationally-recognized overnight express delivery company (postage pre-paid), certified mail (postage pre-paid with return receipt requested), addressed to the applicable party as follows or as otherwise directed by such party in accordance with the terms of this Section:

To Takeda:

Millennium Pharmaceuticals, Inc.
Attn: General Counsel
40 Landsdowne Street
Cambridge, MA 02139
Telephone: 617-679-7000
Fax: 617-374-0074

To Company:

Odysseus Data Services, Inc
Attn: CEO / CTO
245 First Street, Riverview II, 18th Floor
Cambridge MA 02142
Phone: +1 (888) 550-9968
Fax: +1 (339) 204-4044

Unless otherwise specified herein, such notices or other communications shall be deemed received: (A) on the date delivered, if delivered by facsimile transmission between the hours of 9 AM and 5 PM local time at the recipient’s location; provided, however, that the sender has also effected delivery that same day by one (1) of the additional means outlined herein; (B) on the next business day after mailing with a nationally-recognized overnight express delivery company; or (C) on the third business day after mailing, if sent by certified mail return receipt requested.

20. **ASSIGNMENT AND DELEGATION.** Neither party may assign this Agreement or delegate any right or obligation (except as provided in Section 10 hereof) without the other party’s prior written consent; provided, however, that Takeda shall have the right to assign this Agreement to any corporate affiliate or successor of all or substantially all of its business.

**21.** **CONTROLLING LAW.** The validity, interpretation and performance of this Agreement and any dispute connected herewith shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard to its conflict of laws principles.

**22.** **AMENDMENT; NO WAIVER.** Any amendments or modifications to this Agreement shall be done in writing and signed by authorized representatives of both parties. Either party's failure to insist on compliance or enforcement of any provision of this Agreement shall not affect its validity or enforceability or constitute a waiver of future enforcement of that provision or of any other provision of this Agreement.

**23.** **SURVIVAL**. The provisions of Sections 4, 5, 6, 7, 8, 11(E), 12, 13, 14, 15, 18, 21, 23, and 24 contained herein shall survive the expiration or other termination of this Agreement.

**24.** **PUBLICITY.** Neither party shall identify the other party as a prospective, current or former client in any press release, publicity, advertising, or other disclosure without prior written consent of the other party.

**25.** **ENTIRE AGREEMENT.** This Agreement (including any Exhibits, Schedules or Addenda attached hereto) and any PWOs incorporated herein contain the entire agreement of the parties with respect to the subject matter hereof and supersede any prior written or oral agreements or understandings. No representations were made or relied upon by either party other than those that are expressly set forth in this Agreement. In the event of any conflict between the provisions of this Agreement and the provisions of any PWO, the terms of this Agreement shall prevail. No term, condition, proposal or other document provided or generated by Company shall have any force and effect with respect to the subject matter hereof unless Takeda has expressly and specifically agreed to that term, condition, proposal or document in writing.

**26.** **HEADINGS.** The captions to the Sections hereof are not a part of this Agreement, but are included merely for convenience of reference only and shall not affect its meaning or interpretation.

**27.** **COUNTERPARTS.** This Agreement may be executed in one (1) or more duplicate originals, all of which together shall be deemed one and the same instrument.

**28.** **GOVERNMENT SUBCONTRACTS.** Pursuant to the Federal Acquisitions Regulation (FAR), Title 48, Code of Federal Regulations, Chapter 1, Takeda is required to notify its vendors that certain federal contract clauses may be applicable to such vendors, including Company. These clauses set forth requirements including, but not limited to affirmative action programs and subcontracting with small businesses, small disadvantaged businesses, women-owned businesses, veteran-owned small businesses, service-disabled veteran-owned small businesses, and HUB Zone small businesses. To the extent applicable, all such clauses that are in effect during the term of this Agreement are hereby incorporated into this Agreement with the same force and effect as though they had been set forth herein. BY ACCEPTANCE OF THIS AGREEMENT, COMPANY HEREBY CERTIFIES THAT NEITHER COMPANY NOR ANY OF COMPANY'S PRINCIPALS IS PRESENTLY DEBARRED, SUSPENDED, PROPOSED FOR DEBARMENT, OR DECLARED INELIGIBLE FOR THE AWARD OF CONTRACTS BY ANY FEDERAL AGENCY.

**29.** **SUPPLIER DIVERSITY.** Company acknowledges Takeda's commitment to diversity, both for its own workforce, and within its supplier base through Takeda's Supplier Diversity Program. Takeda's Supplier Diversity Program seeks to increase opportunities for small businesses and diverse businesses (businesses owned or operated by historically underutilized population groups, such as women, minorities, veterans, persons with disabilities , persons representing a variety of sexual

orientation or identity and others) to participate in Takeda's contracts and subcontracts. To that end, for any permitted subcontract under this Agreement, Company agrees to seek out and provide commercially reasonable opportunities for small and diverse businesses as described above to participate in such subcontracts to the extent consistent with the efficient performance of the Services. Takeda invites and encourages small and diverse suppliers to identify themselves as part of the contracting process. Company agrees, upon the request of Takeda, to report spend with small and diverse businesses subcontracted under this Agreement.

**30.** **SUPPLIER CODE OF CONDUCT**. Takeda is a signatory of the United Nations Global Compact (www.unglobalcompact.org). Takeda is committed to upholding the UN Global Compact's 10 universally accepted principles in the areas of human rights, labor, environment and anticorruption, as applied to Takeda's supplier community. Takeda intends to evaluate its supplier's fulfillment of the principles set forth in the Supplier Code of Conduct in connection with awarding business to and maintaining business with its suppliers. Takeda expects Laboratory to engage in good faith discussions regarding any areas in which the principles set forth in the Supplier Code of Conduct are not fulfilled, and actions Laboratory will take to better fulfill the expectations set forth in the Supplier Code of Conduct. Failure of Laboratory to meet the expectations in the Supplier Code may affect Takeda's willingness to continue to award business to or maintain business with Laboratory.

**31.** **EQUAL OPPORTUNITY AND COMPLIANCE WITH EMPLOYMENT LAWS.** If applicable to Company's Services hereunder, Company warrants that in providing the goods and/or Services specified herein, Company will comply with the following laws, executive order, and the regulations promulgated thereunder, as the same may be amended, when applicable: (i) the Vietnam Era Veterans Readjustment Assistance Act of 1974, (ii) Executive Order 11246, and (iii) the Rehabilitation Act of 1973. Any clause required to be set forth in a document of this type by such laws, administrative regulations or executive orders shall be deemed to be incorporated herein by this reference. Company shall not discriminate against any employee or applicant for employment because of race, color, religion, sex, national origin, disability, or covered veteran status.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the first above written date.

**MILLENNIUM PHARMACEUTICALS, INC.**

DocuSigned by:
By Yan Ge
2087DA1D9C8042A...
duly authorized

Print Name Yan Ge

Title Director of Data Analytics

Date 23-Jun-2020 | 23:37 JST

**ODYSSEUS DATA SERVICES, INC.**

By [signature]
duly authorized

Print Name Gregory Klebanov

Title CTO / Vice President

Date May 31, 2019

**EXHIBIT A**

**PROJECT WORK ORDER**

**THIS PROJECT WORK ORDER** (the "PWO")is incorporated into and shall be governed by the Master Services Agreement by and between Millennium Pharmaceuticals, Inc. and _________ ("Company") dated _________ (the "Agreement"). For the purposes of this PWO, "Takeda" shall mean Millennium Pharmaceuticals, Inc. or the Takeda Affiliate that signs this PWO. Capitalized but undefined terms shall have the meanings first ascribed to them in the Agreement.

**1.** **TAKEDA PROJECT NUMBER:** SC #[fill in shopping cart number]

**2.** **PROJECT NAME:**

**3.** **PROJECT INITIATION DATE:**

**4.** **PROJECT COMPLETION DATE:**

**5.** **DESCRIPTION OF SERVICES & DELIVERABLES:**

**[INCLUDE ONE OF THE FOLLOWING:]**

Company shall **[fully describe services and Deliverables that were agreed to in the proposal in sentence form in sentence form including benchmark dates and obligations of Takeda]** (the "Services").

**OR if the services and Deliverables are very complex and can't be succinctly summarized in a PWO, prepare a set of work instructions from the proposal, and include the following text in this PWO:**

Company shall **[describe services briefly]** (the "Services"). All specifics pertaining to the Services shall conform to the specifications, and achieve the objectives more particularly described in the Proposal attached hereto and incorporated herein as Exhibit A.

**6.** **MAXIMUM PROJECT BUDGET:** [NUMBER SHOULD EQUAL FEES + AUTHORIZED EXPENSES]

**A.** **Fees.** In consideration for the Services that Company performs pursuant to this PWO, Takeda shall pay Company's fees of $[AMOUNT] (the "Fees").

**B.** **Expenses.** Takeda shall reimburse Company for reasonable, pre-approved pass-through and out-of-pocket expenses for the following that are actually incurred by Company in connection with the Services not to exceed $[AMOUNT] [(NUMBER SHOULD = ANTICIPATED EXPENSES]: [describe pass-through /OOP expenses (e.g., travel, delivery services, etc.)] (the "Authorized Expenses"). Takeda shall be responsible for any additional expenses incurred by Company in connection with the Services only if such expenses are approved by Takeda in writing in advance of the date they are incurred.

**C.** **Payment Terms and Invoicing Schedule.** Company may invoice Takeda for the Fees under the agreed upon schedule and any Authorized Expenses as they are incurred but no more

frequently than monthly. All invoices shall be directed to the attention of Accounts Payable at apinvoice@tpna.com. Takeda shall pay each invoice it receives from Company in accordance with the terms of the Agreement.

<Invoicing Schedule – Insert Deliverable(s)/milestone(s) and amounts associated with each>

**D.** **Additional Work.** Takeda may incur additional fees and expenses if it requests Company to perform services that are materially different than, or in addition to, those described in this PWO (the "Additional Work"). Prior to commencing any such Additional Work or incurring any expenses in connection with the Additional Work, Company will notify Takeda that the requested services are outside of the scope of this PWO, will provide a fee estimate to Takeda, and will obtain Takeda's written approval.

**AGREED AND ACKNOWLEDGED:**

| | |
|---|---|
| **MILLENNIUM PHARMACEUTICALS, INC.** | ***COMPANY NAME*** |
| By____________SAMPLE do not sign_____<br>duly authorized | By________SAMPLE do not sign___________<br>duly authorized |
| Print Name_______________________________ | Print Name___________________________________ |
| Title_______________________________________ | Title_________________________________________ |
| Date_______________________________________ | Date_________________________________________ |