Gmail **Gowtham Rao <gowthamrao@gmail.com>**

# E02 - Gowtham and EPAM - Clarification on Defining "Solicitation" of Clients (Section 5(b))

1 message

**Gowtham Rao** <gowtham_rao@epam.com> Thu, Oct 2, 2025 at 3:27 PM
To: Larry McKlaine <Larry_McKlaine@epam.com>
Cc: June Dinitz <June_Dinitz@epam.com>, Gowtham Rao <gowthamrao@gmail.com>

Dear Larry, please have the appropriate authority in EPAM reply with agreement or corrections for documentation. I have CC'd my personal email. This is an email for clarification as a current employee.

Thank you again for the constructive dialogue regarding the Employment Covenants Agreement. I appreciate the clarity you provided during our meeting, and I am writing to formally document our shared understanding of Section 5(b) (Non-Solicitation of Clients).

Ensuring we have a precise interpretation of this provision is vital to prevent future misunderstandings, regardless of how my employment situation evolves. This request is for clarification of the existing terms, not a modification of the agreement. My intent is to fully respect EPAM's legitimate business interests while ensuring my ability to continue my professional activities—particularly those driven by my long-standing reputation in the industry—is not restricted by ambiguity.

**Contractual Context and Shared Interpretation**

We focused our discussion on Section 5(b) of the Agreement, which states that for 12 months following termination (and restricted to relevant clients), I will not: *"...directly or indirectly solicit, contact, or attempt to solicit or contact, using any form of oral, written, or electronic communication, [...] or meet with the EPAM Group's current, former, or prospective clients,* ***for purposes of offering services similar to or competitive with those offered by the EPAM Group****."*

As we clarified, the critical elements defining a violation are the **initiation** of contact by me and the specific **purpose** of that contact (i.e., offering competitive services). The verbs "contact" and "meet with" are strictly governed by the qualifying phrase that follows them.

This aligns with the standard legal interpretation that "solicitation" requires an affirmative act to reach out and entice a client to move their business. It does not impose a blanket ban on all communication or prohibit the passive acceptance of unsolicited business.

You confirmed this interpretation clearly by stating: *"You can't solicit them. We cannot control whether somebody tries to solicit you."*

**The Role of Professional Reputation and Inbound Interest**

As I mentioned, I have cultivated a significant personal brand and deep relationships within the life sciences, healthcare, and pharmaceutical sectors over many years. Due to this visibility and thought leadership, I often function as a "magnet" for inquiries; clients and industry contacts frequently initiate contact with me based on my public work and reputation.

We agreed that responding to these unsolicited, inbound inquiries is fundamentally different from active solicitation and does not violate Section 5(b).

**Clarification Through Scenarios: What Does NOT Constitute Solicitation**
To ensure complete alignment, the following scenarios illustrate activities that, based on our discussion and the contractual language, would **not** constitute a violation of Section 5(b).

<u>1. Responding to Unsolicited Inbound Inquiries</u>

If a client initiates contact with me or a future entity I am associated with—without any prompting from me—to request services, responding to that inquiry is permissible.

- *Scenario*: A Vice President of Clinical Data Sciences at a pharmaceutical company (a restricted EPAM client) independently reaches out to me via email or LinkedIn, requesting a meeting to discuss utilizing my expertise for a new Real-World Evidence (RWE) analysis project.
- *Clarification*: My responding to this request, attending the meeting, and subsequently entering into a business relationship does not violate 5(b) because the contact and the opportunity were initiated by the client.

<u>2. Thought Leadership and Public Engagement</u>

General thought leadership activities directed at the industry at large are not solicitation.

- *Scenario*: I deliver a keynote address at a major industry conference (e.g., Bio-IT World or SCOPE) or publish a white paper on emerging trends in AI for drug discovery. An attendee or reader from a restricted EPAM client approaches me afterward to discuss engaging my services.
- *Clarification*: As you noted in our meeting, engagement resulting from general public presentations or publications is not solicitation. These activities are directed at the industry at large, not targeted specifically at EPAM clients.

<u>3. General, Non-Targeted Marketing and Announcements</u>

General advertising or maintaining a professional online presence that is not targeted specifically at EPAM clients does not constitute solicitation.

- *Scenario*: I update my LinkedIn profile to announce a new professional affiliation or launch a new venture with a public website detailing service offerings.
- *Clarification*: General professional announcements do not constitute solicitation, even if EPAM clients happen to see the announcement and initiate contact.

<u>4. Responding to Formal Requests for Proposal (RFPs)</u>

Responding to a procurement process initiated by the client is not active solicitation.

- *Scenario*: A healthcare payer (a restricted EPAM client) issues a public RFP or an invitation-only RFP. The client independently identifies me or my future firm as a potential vendor and invites participation without my prior involvement in triggering the RFP.
- *Clarification*: Responding to an unsolicited RFP is permissible, as the client is formally initiating the process.

<u>5. Interpretation of the "Meet With" and "Contact" Clauses</u>

The contract restricts the ability to "contact" or "meet with" clients only when the interaction is "for purposes of offering services similar to or competitive with" EPAM.

- ***Scenario 1 (Social/Professional Interaction)***: I maintain friendships with individuals at EPAM clients, many predating my employment, or I participate in industry standards bodies (e.g., OHDSI) alongside them. Contacting them for purely social or academic reasons is permissible. As you confirmed, *"We're not talking about people that you might want to go get something to eat with... We're talking about for business."*
- ***Scenario 2 (Client-Initiated Meeting)***: If a client initiates a meeting to discuss their needs (as in Scenario 1 above), I am permitted to "meet with" them, as the impetus for the meeting came from the client, not me.
- ***Scenario 3 (Incidental Contact):*** If, during a permissible social interaction, a client asks what I am currently doing, providing a factual description of my new role or venture is not solicitation, provided I do not pivot the conversation to proactively suggest they move their business from EPAM.

**Acknowledged Restrictions: What DOES Constitute Solicitation**

For completeness and to demonstrate good faith, I acknowledge that the following actions would be prohibited under Section 5(b):

- Affirmatively initiating contact (e.g., a cold call or targeted email) with a covered EPAM client to introduce my new services which are competitive with EPAM's offerings and suggesting they discuss moving their business.
- Using EPAM confidential client information (pricing, specific project details) to target specific individuals with offers of competitive services.
- Directing a third party, agent, or recruiter to specifically target an EPAM client on my behalf to divert business (indirect solicitation).

I trust these points accurately reflect our shared understanding of the nuances within Section 5(b). Documenting these clarifications provides necessary assurance and a clear framework moving forward. **Please have the appropriate authority in EPAM reply with agreement or corrections for documentation.**

Best regards,

Gowtham Rao

---

**epam contract.pdf**
6038K

Gmail

Gowtham Rao <gowthamrao@gmail.com>

# E01 - Gowtham and EPAM - Documentation of Agreed Position and Employment Status

**Larry McKlaine** <Larry_McKlaine@epam.com> Thu, Oct 2, 2025 at 4:43 PM
To: Gowtham Rao <gowtham_rao@epam.com>
Cc: June Dinitz <June_Dinitz@epam.com>, Gowtham Rao <gowthamrao@gmail.com>

Hello Gowtham,

This is to confirm that I have received your emails (E01 through E04) and will respond accordingly.

Specifically, regarding this email, I acknowledge your request to withdraw your previous request for a mutually agreed separation and your intent to continue your employment with EPAM in the redefined role, as previously communicated by Gregory Klebanov and Greg Killian.

Additionally, I understand that you may wish to revisit the possibility of a mutual separation in the future if the terms and conditions of the current covenants change in a way that would be agreeable to both parties.

**Larry McKlaine**
Senior Manager, People Partner




**Office:** +1 267 759 9000x71531 **Mobile:** [redacted]

Princeton, NJ USA **Office Timezone:** (UTC-04:00)
Working Remotely **Timezone:** (UTC-04:00)

Microsoft Teams

**EPAM.COM**

confidentiality caution and disclaimer
This message is intended only for the use of the individual(s) or entity(ies) to which it is addressed and contains confidential information that may be legally privileged. If you are not the intended recipient, or authorized to read this message on behalf of the intended recipient, do not read, disseminate, distribute or copy this message and please delete this message and destroy any printed copies.

---

**From:** Gowtham Rao <gowtham_rao@epam.com>
**Sent:** Thursday, October 2, 2025 2:35 PM
**To:** Larry McKlaine <Larry_McKlaine@epam.com>

**Cc:** June Dinitz <June_Dinitz@epam.com>; Gowtham Rao <gowthamrao@gmail.com>
**Subject:** E01 - Gowtham and EPAM - Documentation of Agreed Position and Employment Status

Dear Larry, I have formally withdrawn my request for mutually agreed separation (justification below). Please reply with agreement for documentation. I have CC'd my personal email.

Thank you again for the collaborative discussion yesterday. I appreciate the professionalism and candor as we navigate this complex situation.

I am writing to formally document the shared understanding we reached concerning my request for a Mutually Agreed Separation, the impasse we identified, and my resulting employment status.

**The Section 5(c)**

During our meeting, we centered on the application of the non-competition clause in my Employment Covenants Agreement. We acknowledge EPAM's position, as you articulated, that a Mutually Agreed Separation is interpreted by EPAM as a voluntary resignation (stating, "You are choosing to leave. So that is a resignation.").

This distinction is critical due to the specific language in the Agreement. Section 5(c) is triggered explicitly "In the event you voluntarily resign employment." Crucially, both subsections 5(c)(1) and 5(c)(2) expressly state that "The restrictions in this subsection shall not apply in case of an involuntary termination."

My objective in seeking a mutual separation is to facilitate a clean, good-faith transition, not to voluntarily accept restrictions that the contract explicitly waives in the event of an involuntary termination.

**Clarification of Employment Status and Withdrawal of Request**

It is crucial to reiterate and formally document that **I am not resigning, nor is it my intention to be considered as having voluntarily resigned.**

Given EPAM's current position that Section 5(c) would remain enforceable under a Mutually Agreed Separation—a condition I cannot accept—I have formally withdrawn my request for separation.

**Path Forward**

I remain open to pursuing a Mutually Agreed Separation only on the condition that EPAM agrees to explicitly nullify and waive all restrictions under Section 5(c), ensuring the outcome is consistent with the contractual provisions regarding involuntary termination.

In the absence of such an agreement, I am confirming my status as a continuing employee. As we agreed in our discussion, I intend to execute my duties diligently and professionally unless EPAM chooses to initiate an involuntary termination or agrees to the waiver of Section 5(c) as outlined above.

I trust this accurately reflects our discussion and the conditions required to move forward. I look forward to hearing from you after your discussions with the leadership and legal teams.

Best regards,

Gowtham Rao

Gmail

Gowtham Rao <gowthamrao@gmail.com>

# E03 - Gowtham and EPAM - Clarification and Shared Understanding: Section 5(a) (Non-Solicitation of Employees)

1 message

**Gowtham Rao** <gowtham_rao@epam.com> Thu, Oct 2, 2025 at 3:44 PM
To: Larry McKlaine <Larry_McKlaine@epam.com>
Cc: June Dinitz <June_Dinitz@epam.com>, Gowtham Rao <gowthamrao@gmail.com>

Dear Larry, please have the appropriate authority in EPAM reply with agreement or corrections for documentation. I have CC'd my personal email. This is an email for clarification as a current employee.

Thank you for the continued open and constructive dialogue regarding the Employment Covenants Agreement. I am writing to formally document our shared understanding of Section 5(a) (Non-Solicitation of Employees).

As we discussed, my intent is to fully honor my commitments and respect EPAM's legitimate interest in retaining its talent, while ensuring there is no ambiguity about what constitutes "solicitation." This request is for clarification of the existing terms as a current employee, not a modification of the agreement.

**Contractual Context and Shared Interpretation**

We focused our discussion on Section 5(a) of the Agreement, which states that for 12 months following termination, I will not: *"...directly or indirectly solicit, hire, engage, recruit, or attempt such acts, with respect to any employee or contractor of the EPAM Group who is or has been employed/engaged by the EPAM Group in the 3 months preceding your termination of employment (collectively, "Covered Employee/Contractor"), or induce the termination of employment or services of any Covered Employee/Contractor."*

As we clarified, the defining element of "solicitation," "recruitment," or "inducement" under this provision is the *affirmative act* of targeting and enticing an EPAM employee to leave their position. The provision is intended to prevent the active poaching of EPAM staff. This aligns with the standard interpretation that "solicitation" requires an initiation of contact to induce an employee to leave. It does not prohibit the passive receipt of unsolicited applications or general, non-targeted hiring activities.

You confirmed this interpretation clearly when discussing the scenario of public job postings, stating: **"As long as you are not trying to recruit that employee from our company... that's not solicitation."**

**Clarification Through Scenarios: What Does NOT Constitute Solicitation**

To ensure complete alignment, the following scenarios illustrate activities that, based on our discussion and the contractual language, would **not** constitute a violation of Section 5(a).

**1. General, Non-Targeted Job Postings and Passive Hiring**

Advertising job openings to the general public or the industry at large, without targeting EPAM employees specifically, does not constitute solicitation.

- **Scenario:** I (or a future entity I am associated with) make a general job posting and advertise it publicly on LinkedIn, a company website, or other public media. An EPAM employee sees the public posting, independently decides to apply, and submits an application through the standard process.
- **Clarification:** Reviewing this application, interviewing the candidate, and subsequently hiring them does not violate 5(a) because I did not initiate the contact or recruit the individual away from EPAM. As you noted, if the employee sees a posting they are interested in and applies of their own volition, it is permissible.

**2. Responding to Unsolicited Inbound Inquiries**

If an EPAM employee initiates contact with me—without any prompting or targeting from me—to inquire about opportunities, responding to that inquiry is permissible.

- **Scenario:** An EPAM employee independently reaches out to me after hearing I may be involved in a new venture, asking if the company is hiring.
- **Clarification:** My responding to this inquiry and processing a subsequent application does not violate 5(a) because the contact and interest were initiated by the employee.

**3. Maintaining Informal and Personal Relationships**

The contract restricts the solicitation or recruitment of employees; it does not impose a blanket ban on communication or prohibit the maintenance of normal professional and personal relationships.

- **Scenario 1 (Informal Contact):** I intend to maintain friendships and professional connections with colleagues. We may keep in touch via WhatsApp, text message, LinkedIn messenger, or personal email regarding informal relationships, shared industry interests, or purely social matters.
- **Clarification:** This type of communication is permissible as it does not involve recruiting the employee or inducing them to terminate their employment with EPAM.
- **Scenario 2 (Factual Updates):** During a permissible social interaction, a colleague asks what I am currently doing or if my new company is hiring. Providing a factual description of my new role or stating that the company has public job postings is not solicitation, provided I do not pivot the conversation to proactively suggest they leave EPAM to join me.

**Acknowledged Restrictions: What DOES Constitute Solicitation**

For completeness and to demonstrate good faith, I acknowledge that the following actions *would* be prohibited under Section 5(a):

- Affirmatively initiating contact (e.g., a targeted email, direct message, or phone call) with an EPAM employee specifically to discuss an employment opportunity and encouraging them to leave EPAM.
- Actively persuading or offering specific incentives to an EPAM employee with the express purpose of inducing them to terminate their employment.
- Directing a third-party recruiter or agency to specifically target EPAM employees for recruitment (indirect solicitation). As you noted, telling a recruiting company, *" recruit Peter from EPAM"* would be a violation.
- Using EPAM confidential information (e.g., internal organization charts, performance data, or salary information) to identify and target specific individuals for recruitment.

I trust these points accurately reflect our shared understanding of the nuances within Section 5(a). Documenting these clarifications provides a clear framework for the future. Please have the appropriate authority in EPAM reply with agreement or corrections for documentation.

Best regards,

Gowtham Rao

Gmail **Gowtham Rao <gowthamrao@gmail.com>**

# E04 - Gowtham and EPAM - Clarification and Shared Understanding: Intellectual Property Ownership (Sections 1b and 2a)

**Gowtham Rao** <gowtham_rao@epam.com> Fri, Oct 3, 2025 at 4:28 PM
To: June Dinitz <June_Dinitz@epam.com>
Cc: Larry McKlaine <Larry_McKlaine@epam.com>, Gowtham Rao <gowthamrao@gmail.com>

Thank you, June, – and I apologized profusely and at the same time thanked Larry for his time. He gave me more time than any employee would reasonably expect – and I truly am in his debt. I know, what I have asked for borders being unreasonable (almost paranoia).

As a response to your todays email - Thank you! Thank you for confirming that the guidelines that Larry has reviewed with me are accurate in terms of EPAM expectations thus confirming his authority to represent EPAM – he did it fantastically and clearly.

In my multiple emails, I think I have captured them as honestly as possible – I know they are long, it will take time. Please put them to a backlog – please, when you all have time do a quick high level review of the multiple emails – and even if you agree that directionally they are accurate that is sufficient for me. I understand very well that validating every individual scenario is not a reasonable expectation.

Thank you so much for the support you give to the family of EPAM.

Gowtham

---

**From:** June Dinitz <June_Dinitz@epam.com>
**Sent:** Friday, October 3, 2025 4:19 PM
**To:** Gowtham Rao <gowtham_rao@epam.com>
**Cc:** Larry McKlaine <Larry_McKlaine@epam.com>; Gowtham Rao <gowthamrao@gmail.com>
**Subject:** RE: E04 - Gowtham and EPAM - Clarification and Shared Understanding: Intellectual Property Ownership (Sections 1b and 2a)

Hi Gowtham,

To address your multiple emails, we cannot respond to your various, individual scenarios, as life is rarely as defined as the examples you have provided. The guiding principles Larry has reviewed with you are accurate in terms of our expectations.

As per Larry's response to email E01, regarding your interest to revisit the possibility of a mutual separation in the future if the terms and conditions of the current covenants change in a way that would be agreeable to both parties, this is something we will review with leadership and revert back to you accordingly. Please note that due to travel schedules, this response may take some additional time. Thank you for your patience.

Kind Regards,

June

**June Dinitz**

Senior Director, Head of People, USA and Canada

**Office:** +1 267 759 9000x59223 **Mobile:** [redacted]

---

**From:** Gowtham Rao <gowtham_rao@epam.com>
**Sent:** Thursday, October 2, 2025 4:15 PM
**To:** Larry McKlaine <Larry_McKlaine@epam.com>
**Cc:** June Dinitz <June_Dinitz@epam.com>; Gowtham Rao <gowthamrao@gmail.com>
**Subject:** E04 - Gowtham and EPAM - Clarification and Shared Understanding: Intellectual Property Ownership (Sections 1b and 2a)

Dear Larry, please have the appropriate authority in EPAM reply with agreement or corrections for documentation. I have CC'd my personal email. This is an email for clarification as a current employee.

I appreciate the opportunity to continue our constructive dialogue regarding the Employment Covenants Agreement. In this email, I wish to formally document our shared understanding of the clauses related to Intellectual Property (IP) ownership, specifically focusing on the exceptions clearly defined within the agreement.

Ensuring we have a precise interpretation of these provisions is crucial for preventing future misunderstandings. This is particularly important given my active involvement in the scientific and open-source communities within life sciences, healthcare, and AI. My intent is to fully respect EPAM's proprietary interests while ensuring that my ability to continue participating in, and contributing to, public-domain scientific advancement—and developing independent projects—is not restricted by ambiguity. This request is for clarification of the existing terms as a current employee, not a modification of the agreement. These terms were also verbally agreed with EPAM and my current manager Gregory Klebanov (CC'd).

**Contractual Context**

We focused our discussion on two critical sections of the Agreement that delineate what is and is not considered EPAM property.

**Section 1(b)** provides a crucial exclusion from the definition of Confidential Information:

> *"For avoidance of doubt, Confidential Information expressly does not include general industry knowledge, skills, or software developed or acquired by you without reliance on EPAM Group Confidential Information, which is through and for the purpose of community, professional,*

*scientific, or similar groups and settings that are reasonably available through general industry sources."*

Furthermore, **Section 2(a)**, which applies as my primary work location is New Jersey, supplements the standard "Ownership of Work Product" (Section 2) by recognizing employee ownership of independent developments:

> *"...you understand and acknowledge that the provisions in this Agreement requiring you to assign (or otherwise providing for ownership by Employer of) rights to Work does not apply to, any invention that you develop entirely on your own time without using EPAM Groups' equipment, supplies, facilities, or trade secret information, except for those inventions that either (i) relate at the time of conception or reduction to practice of the invention directly to Employer's business or actual or demonstrably anticipated research or development of Employer; or (ii) result from any work performed by you for Employer."*

**Shared Interpretation and Industry Context**

Our shared understanding is that these two sections work together to protect an employee's right to utilize public knowledge and develop intellectual property independently, provided specific conditions are met.

**1. The Public Domain and Scientific Community Exception (Sec. 1(b))** Section 1(b) explicitly acknowledges that general industry knowledge and skills are not confidential. Crucially, it also states that software developed for community, professional, or scientific purposes, derived from general industry sources and *without reliance on EPAM Confidential Information*, is expressly excluded from EPAM's claim.

This interpretation is vital in the fields of life sciences, healthcare, and Artificial Intelligence. These fields prioritize scientific discussion, community validation, public ideation with public release, as transparency is often required for trust and adoption.

Much of my work involves participation in groups like OHDSI (Observational Health Data Sciences and Informatics), an open-source, multi-stakeholder collaborative that develops and relies on public-domain standards and tools. Similarly, the broader AI and software communities function through the exchange of open-source code and public research.

We agree that knowledge, skills, and methodologies acquired from these public sources constitute "general industry knowledge" and are "reasonably available through general industry sources."

**2. The Independent Development Exception (Sec. 2(a))** Section 2(a) establishes that EPAM does not own work developed entirely on my own time, using my own resources, and without using EPAM trade secrets.

**Clarification of Ownership: What Does NOT Constitute EPAM IP**

To ensure complete alignment, the following illustrates activities and work products that, based on the contractual language, are not owned by EPAM.

**1. Utilization of General Industry Knowledge and Community Contributions** Learning and applying concepts, algorithms, or methodologies published in scientific papers, open-source documentation (e.g., OHDSI standards, public AI frameworks), or presented at public conferences. This also includes developing software or methodologies for projects, provided the development does not rely on EPAM Confidential Information.

**2. Independent Personal Projects (Past, Present, and Future)** Any code, software, or invention I have developed, or will develop, that meets the criteria of being created:

- Entirely on my personal time.
- Using my personal computer and equipment.
- Using personal infrastructure (e.g., personal GitHub account, personal cloud services);
- At my personal expense, AND
- Without incorporating EPAM trade secrets.

**Specific Example: The Code Evaluation Adjudication Engine**

As a concrete example of independent development for learning and potential future ventures, I maintain a project in my personal GitHub repository: The Code Evaluation Adjudication Engine (https://github.com/gowthamrao/codeeval_adjudication_engine/tree/develop

). This is a project I am developing for the OHDSI Symposium workshop on October 9th 2025 as announced here https://forums.ohdsi.org/t/confirmed-hyrbid-and-in-person-ohdsi-symposium-2025-phenotype-development-and-evaluation-work-group-call-for-collaboration-collaborative-intelligence-humans-and-ai-in-concept-set-development-in-phenotyping/24349

I assert that this project, and others like it, fall squarely within the exceptions of Sections 1(b) and 2(a). It was developed entirely on my personal computer, on my personal time, and at my personal expense. It does not utilize or rely upon any EPAM Confidential Information, nor does it result from work performed for EPAM. It references my OHDSI affiliation as rao@ohdsi.org.

Therefore, it is our shared understanding that I solely own this code, I am free to declare my ownership publicly, and I retain the right to assign any license of my choice (e.g., MIT, Apache 2.0, proprietary) to this work product.

**Acknowledged Restrictions: What DOES Constitute EPAM IP**

For completeness and to demonstrate good faith, I acknowledge that the following would be owned by EPAM under Section 2 (Ownership of Work Product):

- Work developed using EPAM equipment, infrastructure, or resources. E.g. EPAM gitlab account, EPAM computer, EPAM servers.

- Work developed as part of assigned duties for EPAM business ("in the course of your employment"). This excluded work that was done for self-learning or self-improvement in preparation for EPAM business but not paid directly by EPAM, as this would be covered under general independent work.
- Work that specifically incorporates or relies upon EPAM Confidential Information or trade secrets.

To the best of my knowledge and recollection, I have not used any EPAM Confidential Information in the development of my personal projects or my public scientific contributions.

I trust these points accurately reflect the clear language of the agreement and our shared understanding of intellectual property ownership. Documenting these clarifications provides necessary assurance and a clear framework moving forward. Please have the appropriate authority in EPAM reply with agreement or corrections for documentation.

Best regards,

Gowtham Rao