# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EPAM SYSTEMS, INC., Plaintiff, - against - GOWTHAM RAO, Defendant. | Civ. A. No. **2:25-cv-06260** |

## FIRST AMENDED COMPLAINT

Plaintiff EPAM Systems, Inc. ("EPAM" or the "Company"), by and through its undersigned attorneys, Seyfarth Shaw LLP, as and for its **First Amended** Complaint[1] against defendant Gowtham Rao, ("Rao" or "Defendant"), alleges as follows:

## NATURE OF THE ACTION

1. EPAM, a leading provider of technology solutions with a business unit dedicated to the life sciences industry, brings this action for injunctive relief and damages arising from Rao's blatant theft of over 44,000 data files, almost all of which contain confidential and/or trade-secret information relating to EPAM's life sciences business, along with proprietary source code developed by EPAM over time at significant expense throughout several software projects (collectively "EPAM Confidential Information and IP").

---

[1] **Plaintiff files this First Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(1)(2) as it is being filed within 21 days after service of a responsive pleading by Defendant. This First Amended Complaint narrows the claims asserted by Plaintiff in this action, including by withdrawing (without prejudice) certain causes of action originally pleaded. The factual allegations underlying Plaintiff's remaining claims are largely unchanged. For the Court's convenience, a redlined comparison of the original Complaint and this First Amended Complaint is attached hereto as Exhibit D.**

2. Specifically, between September 11 and October 14, 2025, while planning his exit from employment with EPAM, Rao secretly downloaded entire file repositories from EPAM's networks containing source code and other intellectual property, along with EPAM Confidential Information and IP regarding EPAM's clients and ~~their~~ historical account information, RFP information and bid proposals, pricing information, ~~client facing~~ project information (including designs and data models), client contract documents**, strategic proposals**, business pipelines, and P&L and related financial information. Not only were Rao's actions unauthorized and in violation of Company policy, but there can be no business justification for his actions or his personal possession of this information ~~given that~~**. Indeed,** many of the stolen files relate to historical data, clients, or projects about which Rao had no involvement, or are comprised of information that belongs to EPAM's clients **about which EPAM is contractually obligated to these clients to maintain as confidential**.

3. Before discovering the unauthorized downloads, Rao was terminated for cause on October 15, 2025 after the Company learned ~~that he had engaged in a number~~ of ~~other acts of sabotage.~~**several actions.** First, on or about October 12, 2025, ~~he unlawfully attempted to fraudulently assert copyright ownership over~~ **the words "Copyright 2025 Gowtham Rao" appeared in** software code developed by the Company ~~by surreptitiously embedding "Copyright 2025 Gowtham Rao" into the code~~. Second, concerns were raised around the same time that Rao had attempted to permanently delete various files from EPAM's SharePoint site. Third, a week earlier, Rao had fraudulently represented to a longstanding Company client that he was no longer associated with EPAM, and that he was a "free agent" in business for himself.

4. ~~Following~~**Immediately following** Rao's termination, the Company ~~immediately~~ launched an investigation into Rao's activities on its network, during which the unauthorized

download of over 44,000 data files (many of which occurred between October 11 through October 13) came to light. In addition, Rao stole not only the source code to certain software tools owned by EPAM, but also source code to tools comprised of intellectual property owned by EPAM's clients that have been entrusted to EPAM. **and which EPAM is contractually required to maintain as confidential.** The investigation also confirmed that Rao had attempted to permanently delete a large number of EPAM client and project files from EPAM's servers.

5. Upon information and belief, Rao purposefully engineered his termination for cause so that he could compete with EPAM. In the weeks leading up to the discovery of his misconduct, Rao expressed unhappiness with his employment and floated the possibility of voluntarily resigning from the Company. During these discussions with Company leadership, he explored whether EPAM would agree to waive the non-competition covenant in the Employment Covenants Agreement that he executed on November 12, 2024 as a condition of his employment with EPAM (the "Agreement"). When told that the non-compete would not be waived, and because it could only be triggered ~~upon~~**by** a voluntary resignation, upon information and belief, Rao devised and embarked on a campaign to compel his termination in an attempt to circumvent the restriction.

6. Rao's theft of EPAM's data files and intellectual property makes clear that his plan all along was to immediately compete with EPAM after his exit and leverage the stolen information to aid his efforts. Indeed, immediately following his exit, he announced on an industry platform, "I am now a competitor for EPAM."

7. Since his departure from EPAM, the Company has been made aware that Rao is in fact ~~competing with EPAM and soliciting EPAM's customers, notwithstanding the post-termination restrictive covenants – including a client non-solicitation provision that is triggered~~

~~regardless of whether his separation is voluntary or involuntary – in the Agreement.~~**attempting to compete with EPAM.**

8. Rao's actions as described herein are in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1832, *et seq*., the Agreement, the Company's written policies with respect to the use of the Company's computer equipment and the protection of EPAM Confidential Information and IP, and his fiduciary obligations to EPAM, among other legal obligations.

9. By this action, EPAM seeks, among other things, a return and forensic remediation of all EPAM Confidential Information and IP in Rao's possession and control, an injunction prohibiting him from using or disclosing any EPAM Confidential Information and IP, an injunction enforcing his post-termination restrictive covenants, and damages resulting from his willful misconduct.

10. Absent injunctive relief and specific performance of his contractual obligations, EPAM faces irreparable injury, including the loss of proprietary information relating to its business as contained and reflected in the intellectual property and thousands of files purloined by Rao that EPAM developed over the course of many years, at immense cost.

## THE PARTIES

11. EPAM is a Delaware corporation with its principal place of business located in Newtown, Pennsylvania.

12. Upon information and belief, Rao is a citizen of the State of New Jersey and resides in Princeton, New Jersey.

## JURISDICTION AND VENUE

13. This Court has original jurisdiction over this action under 28 U.S.C. § 1332 because the parties are citizens of different states and the matter in controversy exceeds $150,000.00 excluding interest and costs.

14. This Court also has original subject matter jurisdiction under 28 U.S.C. § 1331 because this action involves a claim arising under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1832, *et seq.*, and supplemental jurisdiction under 28 U.S.C. § 1367 because all other claims are so related that they form part of the same case or controversy.

15. This Court has personal jurisdiction over Rao and venue is proper in this District by reason of his execution of the Agreement, a copy of which is attached hereto as Exhibit A, in which he consented to the jurisdiction of the state and federal courts located within the Eastern District of Pennsylvania. *See* Agreement ¶ 9.

16. Moreover, general and specific jurisdiction exists against Rao based on his contacts with the jurisdiction, the fact that he conducts business in Pennsylvania, committed tortious acts against Plaintiff in Pennsylvania, and/or caused harm to Plaintiff in Pennsylvania.

17. Although the Agreement also contains an agreement to arbitrate, specifically excluded from the arbitration provision are any claims seeking injunctive relief in a court of law. *See* Agreement at 7.

## ALLEGATIONS COMMON TO ALL COUNTS

### I. EPAM's Confidential Information and IP

18. Founded in 1993 as a software engineering company, today EPAM is a leading global provider of digital engineering, cloud and AI-enabled transformation services, and a leading business and experience consulting partner for global enterprises and startups across a broad spectrum of industries. EPAM's clients include businesses engaged in life sciences and healthcare,

financial services, media and entertainment, and insurance, among many others.

19. The Real-World Evidence ("RWE") business unit is positioned within EPAM's life sciences and healthcare group. RWE refers to clinical evidence about the usage and potential benefits or risks of a medical product derived from analysis of real-world data.

20. A core part of EPAM's business is the sale of digital tools and software solutions that EPAM's employees and engineers have continuously developed and refined over many years and via significant investments by the Company. Certain of these products are sold as a commercial license to its pharmaceutical and healthcare clients and are thus considered highly proprietary intellectual property.

21. Among these software tools is what is known as an ETL Conversion Kit. This tool ~~has been developed~~**took 10 years to develop** by EPAM ~~over 10 years~~**and the businesses it acquired** to Extract, Transform and Load ("ETL") data for medical data standardization. This software is focused on medical data management—cleaning, harmonizing, and preparing patient medical history data for healthcare data analytics purposes, including drug safety, disease, and/or cost and quality of care research. EPAM offers this solution as a core part of the Company's services in the RWE market segment, and it makes the Company uniquely competitive by automating tasks which are often done by others manually. The software can be further customized based on a particular client project or a client's specific need.

22. Another software product developed by EPAM is an AI Cohort Generator. This product was developed by EPAM in 2025 utilizing the latest AI technologies. EPAM offers this innovative solution as part of a larger healthcare analytics platform, allowing customers to automatically generate clinical study designs (patient cohorts, medical codes) from free text, thus significantly boosting research team productivity and saving customers significant time and

money.

23. A third software product at issue in this case is an AI Accelerator. This product was also developed by EPAM in 2025 as part of a Company-wide investment and strategy to leverage AI technology. The software is a data and decision support platform that serves as the client's centralized biomedical knowledge layer making it easy for non-technical users.

24. The underlying code to these tools and products are considered confidential and proprietary, accessible only to EPAM employees who work on the development of these products**, are senior executives with broad access needs,** or otherwise have business need for access to such information.

25. The life sciences technology industry, including RWE in particular, is highly competitive. EPAM's competitors in this regard include a range of prominent global IT consulting and technology companies with dedicated life sciences practices.

26. To obtain new business, EPAM invests considerable resources cultivating relationships with pharmaceutical companies, healthcare organizations, and other life science consultants to facilitate consideration for RFP invitations on particular projects.

27. Because competitive pricing is integral to a successful bid, pricing of work or services on a particular project is meticulously calculated based upon a number of factors, including EPAM's use of highly proprietary software solutions and engagement of specialized experts, which are incorporated into EPAM's RFP responses and bid proposals.

28. And because EPAM's business is service oriented, the relationships that EPAM has with its clients are highly dependent on the attention and service, as well as EPAM's development of successful technology solutions and results tailored to each client's specific needs, which EPAM provides to them on an ongoing basis. EPAM's investment in client service enables those who deal

with EPAM to develop confidence in the quality of the services offered, and increased recognition of, and familiarity with, EPAM as a provider of quality and reliable services.

29. Furthermore, because clients also entrust the protection of their businesses and their confidential information to EPAM, an essential aspect of EPAM's business model is to protect its reputation and goodwill. Customer goodwill is particularly critical in this industry because any compromise of a client's own data and/or intellectual property (IP) could seriously damage its business operations and EPAM's reputation.

30. Maintaining client relationships and generating repeat business from clients based on its reputation are critical to EPAM's success because long-term business relationships with established clients allow EPAM to maintain its competitive advantage and strategic position in the industry.

31. To effectively service EPAM's clients, the Company also compiles data pertaining to its clients spanning many years. Such client information includes data reflecting prior work done on behalf of particular clients, pricing arrangements, and the identities of individual points of contact among clients to facilitate the development of new leads and opportunities.

32. EPAM's executives and sales representatives, including Rao, who interface directly with existing and potential clients, not only are the face of the Company, but they benefit directly and indirectly from the goodwill, reputation, and name recognition generated by EPAM's investments in client service and proprietary technology. These individuals consequently are able to forge relationships and cultivate accounts and new business on behalf of EPAM.

33. Given that the Company's success and reputation in the market is a function of all of the foregoing considerations, the Company not only treats its software code and developments in technology as highly proprietary, but also treats its client information, bid proposals, RFP

responses, pricing information, client contracts, project data, P&L analysis, sales and growth strategies, employee compensation data, and other similarly sensitive information as confidential, proprietary, and/or trade-secret information.

34. The foregoing compilation of information and software code is treated as highly confidential and trade secret information by the Company because it would provide a competitor with a "playbook" into how to approach each client, replicate EPAM's life sciences business by offering identical solutions, and usurp business from EPAM. Such information could also be used to undercut pricing, ~~out-bid~~**outbid** competitive proposals, evaluate service opportunities, and target specific clients.

35. In addition, EPAM's client engagements often result in the creation of customized computer code/intellectual property which is delivered to the client. This code **sometimes** becomes the intellectual property of the client~~.~~ **and sometimes is retained as intellectual property of EPAM but is licensed to the client.** EPAM treats ~~client~~**such** code as particularly sensitive and confidential, as it is of significant commercial value to each client **and to EPAM**. Moreover, EPAM has specific contractual obligations to safeguard its clients' intellectual property. EPAM's reputation as a reliable custodian of client confidential information is essential to its business model.

36. EPAM has spent a substantial amount of time and money in developing EPAM Confidential Information and IP to which the Company's trusted senior executives have access to enable them to cultivate client relationships, engage on projects, develop new solutions, and expand the business on the Company's behalf.

37. The foregoing EPAM Confidential Information and IP is not generally known to the public.

38. The foregoing EPAM Confidential Information and IP would give a competitor who acquired it an unfair competitive advantage by, among other things: (a) not having to invest the time and resources to develop the client relationships, software, or information as the Company has done; and (b) allowing the competitor to unfairly compete by, among other things, leveraging their access to or knowledge of such information, including pricing, software source code, and the aforementioned client information.

39. Given the paramount importance of EPAM Confidential Information and IP to EPAM and its business, EPAM utilizes a number of guardrails to maintain the confidentiality of EPAM Confidential Information and IP. These measures include: (i) making all employees subject to a robust set of IT security policies and work instructions, including the Acceptable Use of IT Resources Policy and EPAM's Code of Conduct; (ii) making employees execute agreements that contain confidentiality and non-disclosure obligations as a condition to obtaining access to EPAM Confidential Information and IP, and in certain instances additional restrictive covenants, such as non-competition and non-solicitation provisions; (iii) limiting access to EPAM Confidential Information and IP to employees on a need-to-know basis; (iv) storing information on secure networks and password protected devices; (v) requiring all employees to periodically complete training lessons regarding confidentiality obligations and data privacy compliance; (vi) monitoring employee access and activity on the Company's computer systems to detect questionable conduct; and (viii) requiring employees to return all EPAM Confidential Information and IP upon termination of employment.

## II. Rao's Employment and Agreements with EPAM

40. Rao was employed by EPAM as Managing Principal, Life Sciences Consulting starting on or about November 18, 2024 until he was terminated for cause on October 15, 2025.

41. In the role for which he was hired, Rao was responsible for heading the data science business unit within EPAM's life sciences group and RWE business unit, including business development, revenue generation, portfolio management, and managing the members of the data science team.

42. Prior to his employment with EPAM, Rao **purportedly** had significant experience working in the pharmaceutical industry, with an expertise in epidemiology. The Company had believed his connections in the industry might be well-suited for the role.

43. Rao was highly compensated for this position, earning a base salary of $250,000 annually.

44. In consideration for his employment, Rao executed the Agreement on November 12, 2024. The Agreement contains various provisions with respect to the protection of EPAM's confidential information and business interests, such as a provision prohibiting the misuse and disclosure of confidential information and restrictive covenants prohibiting the solicitation of certain employees and clients of the Company for a period of 12 months following termination of employment.

45. With regard to non-disclosure and use restrictions, Section 1(d) of the Agreement expressly provides, in relevant part, as follows:

> You agree you will: (i) treat all Confidential Information[2] as strictly confidential; (ii) not directly or indirectly disclose Confidential Information, or

[2] Confidential Information is defined in the Agreement to include, "without limitation, all information not generally known to the public, in spoken, printed, electronic, or any other form, relating to the EPAM Group's business processes, practices, policies, plans, publications, research, operations, services, strategies, techniques, contracts, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, software, applications, design, databases, records, systems, supplier and vendor information, financial information, accounting information, legal information, marketing, pricing, payroll, staffing personnel, internal controls, security, formula, algorithms, ideas, inventions, patent applications, original works of authorship, discoveries, experimental processes/results, specifications, ***and***

> allow it to be disclosed in whole or in part, to any entity or person whatsoever outside of the direct employ of the EPAM Group[3] except as required in the performance of your authorized duties (and then, only within the limits and to the extent of such duties); and (iii) not access, use, or copy Confidential Information or any documents, records, files, media, or other resources containing any Confidential Information, or remove any such items from the premises or control of the EPAM Group, except as required in the performance of your authorized employment (and then, only within the limits and to the extent of such duties or consent).
>
> …
>
> You understand and acknowledge these obligations regarding Confidential Information continue during and after your employment until such time as such Confidential Information becomes public knowledge, except as a result of your breach of this Agreement, or by those acting in concert with you.
>
> If/when your employment terminates, you shall immediately return any and all Confidential Information and other EPAM Group equipment or information in your possession.

~~46. With regard to non-solicitation of employees and clients, paragraphs 5(a) and 5(b) of the Agreement expressly state as follows:~~

> ~~(a) Non-Solicitation of Employees. You agree that the term of your employment plus 12 months following termination of employment, you will not directly or indirectly, solicit, hire, engage, recruit, or attempt such acts, with respect to any employee or contractor of the EPAM Group who is or has been employed/engaged by the EPAM Group in the 3 months preceding your termination of employment (collectively, "Covered Employee/Contractor"), or induce the termination of employment or services of any Covered Employee/Contractor.~~
>
> ~~(b) Non-Solicitation of Clients. You understand and acknowledge that because of your relationship to the EPAM Group, you will have access to and learn about the EPAM Group's client information, such as for example: names, phone numbers, addresses, email addresses, service history, structure, pricing, and other information specific to the client and relevant to the provision of services by EPAM Group. You further understand and acknowledge that loss of any~~

***client information of the EPAM Group or any existing or prospective client, supplier, investor, or other person or entity that has entrusted information to the EPAM Group in confidence~~.~~."*** **(emphasis added)**

[3] "EPAM Group" is defined in the Agreement to include EPAM's owned affiliates, and successors and assigns.

> ~~client relationship or goodwill will cause significant and irreparable harm to the EPAM Group.~~
>
> ~~You agree that for the term of your employment plus 12 months following termination of employment, you will not directly or indirectly solicit, contact, or attempt to solicit or contact, using any form of oral, written, or electronic communication, including, but not limited to, electronic or other mail, phone, fax, instant message, or social media, or meet with the EPAM Group's current, former, or prospective clients, for purposes of offering services similar to or competitive with those offered by the EPAM Group. Following termination of employment, this restriction shall only apply to: (i) any clients or prospective clients you had any contact with during the 12 months preceding termination of employment; and separately, (ii) any clients about whom you possess trade secret or confidential information gained during the 12 months preceding termination of your employment. The restriction applies broadly, without the limitations in (i) and (ii), while you remain employed.~~

~~47. The Agreement also contains a non-competition provision applicable in the event of a voluntary resignation of employment, which prohibits, for a period of 12 months following termination of employment, engagement in certain competitive work or employment.~~

~~48.~~**46.** Separately, the Agreement makes clear that any work made by Rao in connection with his employment with the Company is owned by EPAM. Specifically, Section 2 of the Agreement provides, in relevant part:

> <u>Ownership of Work Product</u>. Any Confidential Information, design, program, product, invention, package, prototype, model, innovation, data, improvement, new technique, process, discovery, concept, know how, trade secret, work product and original work of authorship, whether or not patentable, copyrightable or otherwise legally protectable (individually and collectively, "Work") made, collected, developed, conceived, discovered, learned, or used by you in connection with or in the course of your employment, whether during or after normal business hours, shall constitute "work made for hire" as that term is defined by the Copyright Act of 1978, as amended from time to time, and shall be deemed to have been made or developed by you solely for the benefit of your employer within the EPAM Group ("Employer") and shall be the sole and exclusive property of Employer. In order to effectuate the terms of this Agreement and in the event any Work created by or on behalf of you would not be deemed to be the sole and exclusive property of Employer, you assign and agree to assign to Employer all your rights in and to the Work including, without limitation, any trademarks, copyrights, patents, moral rights, and all other proprietary interest that you may have in any such Work without additional compensation. You shall not during the course of employment or any

> time after, use or (to the extent that the Work constitutes Confidential Information) disclose to any other person any such Work, except as expressly authorized in writing by Employer.

~~49.~~**47.** As an employee of EPAM, Rao was also subject to the Company's Code of Conduct, which contains express policies regarding EPAM's culture of confidentiality and treatment of confidential information both with respect to EPAM information and third-party information. A copy of the Code of Conduct is attached hereto as Exhibit B.

~~50.~~**48.** For example, the Code of Conduct emphasizes "Our confidential and proprietary information is a special kind of company asset. It is the non-public information that brings EPAM value. If such information is disclosed, it might harm our business or benefit our competitors. We protect our customers' and business partners' confidential information the same way." *See* Code of Conduct at 29.

~~51.~~**49.** Employees are instructed in the Code of Conduct to use Confidential Information only if and as authorized, follow non-disclosure agreements, share it securely with permitted recipients, and to not obtain information that is not needed or that the employee shouldn't have. *Id.*

~~52.~~**50.** The Code of Conduct further provides examples of EPAM Confidential Information, which includes, among other types of information, business operating strategies and plans, technical information, pricing information, Company financial data, customer and client lists, and research and development activities, among others. *Id.* at 30.

~~53.~~**51.** The Code of Conduct also instructs employees regarding the acceptable use of technology, and to not use technology to violate non-disclosure agreements, intellectual property rights, or disclose client names or confidential information. *Id.* at 32.

~~54.~~**52.** Rao's HR Records show that he completed the Code of Conduct training module on November 18, 2024, and was thus aware of the policies contained therein. He also completed

the Company's Confidentiality and Social Media course. Rao was thus well-aware of the Company's policies with respect to the need to safeguard EPAM Confidential Information and IP from misuse.

~~55.~~**53.** As an employee of EPAM, Rao was also subject to the Corporate Governance Policy with respect to Acceptable Use of IT Resources (the "IT Resources Policy"). A copy of the IT Policy is attached hereto as Exhibit C.

~~56.~~**54.** As stated therein, the purpose of the IT Resources Policy is to establish standards and obligations for proper use of IT Resources (including, for example, computers, devices, network communications and information systems) in EPAM's business activities. *See* IT Resources Policy at 5.

~~57.~~**55.** The IT Resources Policy repeats the same confidentiality policies set forth in the Code of Conduct. *Id.* at 7.

~~58.~~**56.** The IT Resources Policy also provides rules for managing confidential information, including a prohibition against storing confidential data on local workstations or mobile devices. *Id.* at 15.

~~59.~~**57.** The IT Resources Policy also requires employees to return all work equipment when departing the Company, including any Company-issued laptops. *Id.* at 30.

**III. Rao's Exit from EPAM**

~~60.~~**58.** During his tenure with EPAM, Rao failed to consistently fulfill the expectations of his position. In particular, he failed to build revenue and exhibited poor managerial capabilities; team members cited his lack of leadership and unwillingness to engage in their professional development.

~~61.~~**59.** In light of these performance issues, in September 2025, the Company made the decision to transition Rao to a different role in which he would be responsible for developing EPAM's AI capabilities with regard to certain solutions for specific clients. No decision had been made to exit Rao from EPAM employment, and EPAM leadership made this quite clear to him on several occasions.

~~62.~~**60.** Rao appeared to take offense to both the negative performance evaluations and the change to his role.

~~63.~~**61.** Despite being assured that there was no intention to terminate him, Rao sent a number of messages on Microsoft Teams expressing concern about the state of his employment with EPAM and his continued ability to access messages as if he were about to be terminated.

~~64.~~**62.** On Monday, September 29, 2025, Rao shared his personal number and encouraged team members to communicate directly with him via WhatsApp and thereafter set his status as "offline" on EPAM's internal Microsoft Teams platform indicating to EPAM employees that he was unavailable. However, he continued to communicate with some EPAM employees through an external Microsoft Teams platform referred to as "OHDSI's Teams Tenant."

~~65.~~**63.** In late September, Rao also began exploring with EPAM his resignation via a mutually agreeable separation. As part of those discussions, Rao asked EPAM leadership whether EPAM would agree to waive the post-employment non-solicitation and non-competition restrictions in the Agreement.

~~66.~~**64.** EPAM responded that it would not waive the restrictive covenants and again reiterated that EPAM was not terminating him, and that his decision to leave was entirely his choice. Rao then appeared to abandon discussions about a resignation.

~~67.~~**65.** During the week of October 6 through October 9**, 2025**, Rao attended a professional industry conference in New Jersey as a representative of EPAM. At the conference, an EPAM RWE employee learned that Rao had approached at least one major EPAM client and falsely conveyed that he was no longer working at EPAM. Rao stated that he was a "free agent," suggesting that he was in business for himself.

~~68.~~**66.** Rao's statements to the client were patently untrue; he was still employed with EPAM and the Company had no plans at that time to terminate his employment.

~~69.~~**67.** On or about October 14, 2025, the Company ~~learned that Rao engaged in far more nefarious conduct. Specifically, the RWE team discovered that Rao embedded~~ **found** the phrase "Copyright 2025 Gowtham Rao" **embedded** in ~~connection with~~ the software code for one of EPAM's tools it had been developing and to which Rao had access via GitLab (a software code repository~~) in an apparent attempt to fraudulently assert ownership over the code.~~**).**

~~70.~~**68.** The project team also raised concerns that Rao had attempted to delete various files from an EPAM SharePoint site (including by attempting to make them permanently unavailable by clearing the recovery folder).

~~71.~~**69.** ~~Rao's aforementioned misconduct~~**The sum total of Rao's conduct and the attendant circumstances** compelled EPAM to terminate his employment, effective October 15, 2025. Rao's access to his EPAM email account and the Company's networks were also suspended that same day.

~~72.~~**70.** Upon information and belief, Rao purposefully orchestrated a for cause termination from the Company in an effort to evade the non-competition restriction in the Agreement.

~~73.~~**71.** In fact, when he was advised of his termination, Rao specifically questioned whether the termination was for cause and whether the non-competition provision would be enforced.

~~74.~~**72.** During that same discussion, Rao was advised to return his Company-issued computer, but the Company did not receive it until October 31, 2025.

**IV. Rao's Unauthorized Transmission of EPAM Files and Source Code to His Personal Devices and Other Misconduct**

~~75.~~**73.** Given Rao's misconduct and unethical actions resulting in his termination, the Company took immediate steps to investigate its computer network for evidence of any further misconduct, including other instances of data alteration or exfiltration by Rao.

~~76.~~**74.** The Company's information security team (the "InfoSec Team") discovered that between September 11, 2025 (around the same time when EPAM advised Rao of a change to his role) through October 14, 2025, Rao downloaded approximately 44,960 documents and data files from the Company's networks to one or more personal external devices, without the Company's authorization.

~~77.~~**75.** A large volume of these downloads occurred between October 11 and October 13, 2025, just days before his termination.

~~78.~~**76.** Among the documents accessed and downloaded by Rao were software code bases for a number of EPAM's digital tools and products, including proprietary source code to EPAM's ETL Conversion Kit, AI Cohort Generator, and AI Accelerator. Some of the downloaded source code also included custom built or customized software ~~owned~~**built** by ~~EPAM's~~**EPAM for** clients.

~~79.~~**77.** In addition to purloining EPAM's proprietary intellectual property, Rao also downloaded entire data folders relating to EPAM's clients, client account information, RFP responses and bid proposals, pricing documentation, client facing project information, including

designs and data models, contract documents, CRM data, and P&L data, among other highly confidential and sensitive information.

~~80.~~**78.** Not only were Rao's actions unauthorized and in violation of Company policy, but there could be no business justification for his personal possession of this information **or use of this information on a personal device** given that many of the stolen files relate to historical data, clients, or projects about which Rao was not involved or had no need for his work with EPAM, or are comprised of information that belong to EPAM's clients.

~~81.~~**79.** Upon information and belief, Rao intends to leverage the information contained in all of the foregoing purloined documents and other EPAM Confidential Information and IP to compete with EPAM.

**80. Indeed, Rao began competing with EPAM immediately after his separation from EPAM. On October 16, 2025, the day after his termination, Rao declared on an external Teams environment, "In full disclosure I am now a competitor for EPAM."**

~~82.~~**81.** Separate from the data exfiltration, the InfoSec team also confirmed earlier reports from the relevant project team that on October 13, 2025, Rao had attempted to permanently delete files in over 60 EPAM client and project folders from EPAM's SharePoint network.

~~83.~~**82.** The InfoSec team also identified over a dozen outbound emails from Rao's EPAM email account to a personal email account between September 20, 2025 through October 3, 2025, either forwarding or attaching various documents that appear to be related to Rao's obligations to the Company.

~~84.~~**83.** In addition to investigating its computer networks, the Company also investigated Rao's misuse of resources during his employment at EPAM. For example, Rao had improperly

staffed an employee to work on a personal website for Rao and had requested that another employee ghost write a blog for Rao's personal website on Rao's behalf.

## ~~V. Rao's Breach of His Post-Employment Restrictive Covenants~~

~~85. Since his termination, EPAM has obtained evidence that Rao has continued to breach the non-solicitation covenant in the Agreement.~~

~~86. Specifically on October 16, 2025, in an external Teams message outside of the EPAM Teams environment, an employee of EPAM, unaware that Rao had been terminated, reached out with an inquiry concerning work for an EPAM client. Rao responded to that message, suggesting a meeting with the client, noting his new work email as Gowtham.rao@coreaaon.ai. He further wrote, "In full disclosure I am now a competitor for EPAM."~~

~~87. Upon information and belief, Rao also sent text messages to a number of EPAM clients on the day of his termination.~~

~~88. The Company has also continued to obtain additional information through discussions with their clients that Rao has been reaching out to EPAM clients directly after his termination for purposes of doing business with those clients.~~

~~89. Upon information and belief, Rao purposefully orchestrated his termination from EPAM in an attempt to circumvent the non-compete restriction in the Agreement in order to compete with EPAM. This is corroborated by: (1) Rao's mass downloading of data files and software code, as set forth above; (2) Rao's refusal to communicate with EPAM team members on its dedicated internal Teams platform in the days prior to his separation from the Company; (3) Rao's forwarding of documents relating to his post-employment obligations to the Company to his personal email account during the same time period; and (4) Rao's immediate announcement that he is a competitor of EPAM hours after his exit from the Company.~~

**~~VI.~~V. Irreparable Harm to EPAM Without Injunctive Relief**

~~90.~~**84.** EPAM Confidential Information and IP is the lifeblood of EPAM's business.

~~91.~~**85.** Anyone with unauthorized access to EPAM Confidential Information and IP could exploit such information to replicate EPAM's business and intellectual property, usurp business opportunities, or leverage such information to destroy EPAM's competitive advantage or reputation in the marketplace.

~~92.~~**86.** Due to Rao's misconduct, EPAM stands to lose an incalculable amount of dollars in business and the loss of value of its trade secrets, and confidential and proprietary information, as well as its reputation with its clients.

~~93.~~**87.** Rao's misconduct is particularly willful and egregious in that he was a senior employee of EPAM's life science business who understands the importance of protecting Company property and its data.

~~94.~~**88.** All told, Rao is causing, threatening, and/or will continue to cause or threaten significant irreparable harm to EPAM, including the loss of value of confidential and/or trade secret information, the loss of long-standing client relationships, damage to reputation, and loss of goodwill, unless injunctive relief is obtained.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Actual and/or Threatened Misappropriation of Trade Secrets, 18 U.S.C. § 1832)**

~~95.~~**89.** EPAM repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

~~96.~~**90.** By virtue of his employment at EPAM and performance of responsibilities for EPAM, Rao was given access to and possessed trade secrets and confidential and proprietary information of EPAM, to wit, the EPAM Confidential Information and IP.

~~97.~~**91.** The EPAM Confidential Information and IP was developed by EPAM at great time and expense to EPAM, and is maintained on password-protected computer networks accessible only by EPAM authorized personnel **at an executive level, or otherwise** with need to use information on EPAM's behalf or in furtherance of EPAM's business interests.

~~98.~~**92.** EPAM derives independent economic value from the EPAM Confidential Information and IP entrusted to Rao by EPAM; such information is not generally known or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure and use, and the information is the subject of significant efforts to maintain its secrecy.

~~99.~~**93.** Such information is considered a trade secret under the federal Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1832 et seq., because EPAM derives independent economic value from this information not being generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy. 18 U.S.C. § 1839.

~~100.~~**94.** Rao acquired EPAM's trade secrets by improper means, including by surreptitiously downloading without authorization thousands of data files—including the software code to its ETL Conversion Kit, AI Cohort Generator, and AI Accelerator and other EPAM Confidential Information and IP—to a personal external device outside of EPAM's network and control, in the days leading up to his planned termination from EPAM**, and furthermore by not returning or disclosing to EPAM his possession of the Confidential Information and IP after his termination**.

~~101.~~**95.** At the time Rao transmitted EPAM Confidential Information and IP to his personal device, Rao knew, or had reason to know, that he had a duty to maintain its secrecy or limit its use.

~~102.~~**96.** By his actions, Rao has used and disclosed, intends to use and disclose and/or threatens to use or disclose EPAM's trade secrets without express or implied consent.

~~103.~~**97.** Rao knew or should have known that such information, including the EPAM Confidential Information and IP: (1) is confidential; (2) was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) was developed or acquired by EPAM at great expense and effort; (4) was maintained as confidential and is not generally available to the public and EPAM's competitors; (5) would provide significant benefit to a competitor competing or seeking to compete with EPAM; and (6) is critical to EPAM's ability to conduct its business successfully.

~~104.~~**98.** Rao has misappropriated, exploited, misused, and/or disclosed or threatened to disclose EPAM's trade secrets for his own self-interest and benefit, and without EPAM's express or implied consent.

~~105.~~**99.** Rao will be or is being unjustly enriched by the misappropriation of EPAM Confidential Information and IP and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate EPAM Confidential Information and IP.

~~106.~~**100.** As a result of Rao's wrongdoing, EPAM has suffered and continues to suffer the substantial and irreparable loss of its trade secrets, goodwill, and business expectancies in amounts which may be impossible to determine unless Rao is enjoined and restrained by order of the Court.

~~107.~~**101.** In addition, EPAM seeks actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Actual and/or Threatened Misappropriation of Trade Secrets in Violation of the Uniform Pennsylvania Trade Secrets Act, 12 Pa. C.S.A. § 5301, *et seq.*)**

~~108.~~**102.** EPAM repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

~~109.~~**103.** By virtue of his employment at EPAM and performance of responsibilities for EPAM, Rao was given access to and possessed trade secrets and confidential and proprietary information of EPAM, to wit, the EPAM Confidential Information and IP.

~~110.~~**104.** The EPAM Confidential Information and IP was developed by EPAM at great time, cost, and expense to EPAM, and is maintained on password protected computer networks accessible only by EPAM authorized personnel with need to use information on EPAM's behalf.

~~111.~~**105.** EPAM derives independent economic value from the EPAM Confidential Information and IP entrusted to Rao by EPAM; such information is not generally known or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure and use, and the information is the subject of significant efforts to maintain its secrecy.

~~112.~~**106.** Such information is considered a trade secret under the Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S.A. §§ 5301-5308 (the "PUTSA"), because EPAM derives independent economic value from this information not being generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain economic

value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy. 12 Pa. C.S.A. § 5302.

~~113.~~**107.** Rao acquired EPAM's trade secrets by improper means, including by surreptitiously downloading without authorization thousands of data files—including the software code to its ETL Conversion Kit, AI Cohort Generator, and AI Accelerator and other EPAM Confidential Information and IP—to a personal external device outside of EPAM's network and control, in the days leading up to his ~~planned~~ **anticipated** termination from EPAM.

~~114.~~**108.** At the time Rao transmitted EPAM Confidential Information and IP to his personal device, Rao knew, or had reason to know, that he had a duty to maintain its secrecy or limit its use~~.~~**, and furthermore to return the Confidential Information and IP after his termination.**

~~115.~~**109.** By his actions, Rao has used and disclosed, intends to use and disclose and/or threatens to use or disclose EPAM's trade secrets without express or implied consent.

~~116.~~**110.** Rao knew or should have known that such information, including the EPAM Confidential Information and IP: (1) is confidential; (2) was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) was developed or acquired by EPAM at great expense and effort; (4) was maintained as confidential and is not generally available to the public and EPAM's competitors; (5) would provide significant benefit to a competitor competing or seeking to compete with EPAM; and (6) is critical to EPAM's ability to conduct its business successfully.

~~117.~~**111.** Rao has misappropriated, exploited, misused, and/or disclosed or threatened to disclose EPAM's trade secrets for his own self-interest and benefit, and without EPAM's express or implied consent.

~~118.~~**112.** Rao will be or is being unjustly enriched by the misappropriation of EPAM Confidential Information and IP and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate EPAM Confidential Information and IP.

~~119.~~**113.** As a result of Rao's wrongdoing, EPAM has suffered and continues to suffer the substantial and irreparable loss of its trade secrets, goodwill, and business expectancies in amounts which may be impossible to determine unless Rao is enjoined and restrained by order of the Court.

~~120.~~**114.** In addition, EPAM seeks actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

**AS AND FOR A THIRD CAUSE OF ACTION**
**(Breach of Contract: Non-Disclosure of Confidential Information)**

~~121.~~**115.** EPAM repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

~~122.~~**116.** On or about November 12, 2024, Rao entered into the Agreement in connection with his employment with EPAM.

~~123.~~**117.** The Agreement explicitly prohibits him from, *inter alia*, accessing, using, disclosing or copying any EPAM Confidential Information and IP, or removing any EPAM Confidential Information and IP from the premises or control EPAM, other than in the performance of duties for and authorized by EPAM.

~~124.~~**118.** The Agreement also explicitly obligates Rao to return any and all EPAM Confidential Information and IP and EPAM equipment or information in his possession, upon termination of employment.

~~125.~~**119.** The Agreement is a duly executed and enforceable contract.

~~126.~~**120.** The confidentiality and non-disclosure obligations contained in the Agreement remain in full force and effect, and Rao, for good and valuable consideration, remains obligated to comply with those provisions.

~~127.~~**121.** Rao breached the Agreement by secretly accessing, transmitting, copying or downloading, without the Company's knowledge or authorization, thousands of data files—including the software code to its ETL Conversion Kit, AI Cohort Generator, and AI Accelerator and other EPAM Confidential Information and IP—to a personal external device outside of EPAM's network and control, in the days leading up to his ~~planned~~**anticipated** termination from EPAM.

~~128.~~**122.** Rao also breached the Agreement by continuing to maintain possession of and failing to return EPAM Confidential Information and IP.

~~129. Rao also breached the Agreement by unlawfully asserting ownership over Company work product, including the source code to the Company's software tools, which is the intellectual property of the Company or its clients.~~

~~130.~~**123.** Rao's actions have damaged EPAM's legitimate business interests, and have denied EPAM the benefit of its bargain in respect to the Agreement.

~~131.~~**124.** As a result of Rao's breach, EPAM has suffered and continues to suffer irreparable injury, including loss of its confidential and trade secret information, and damage to its business, for which a remedy at law is inadequate. Accordingly, EPAM is entitled to injunctive and equitable relief.

~~132.~~**125.** In addition, EPAM seeks actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

**AS AND FOR A FOURTH CAUSE OF ACTION**
~~**(Breach of Contract: Non-Solicitation of Clients)**~~

~~133. EPAM repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.~~

~~134. The Agreement is a duly executed and enforceable contract giving rise to legal obligations between EPAM and Rao, including the non-solicitation and non-competition covenants contained in Section 6.~~

~~135. The non-solicitation covenant remains in full force and effect and is supported by good consideration.~~

~~136. The non-solicitation covenant is necessary and tailored to protect EPAM's legitimate business interests, including but not limited to EPAM Confidential Information and IP, goodwill and business relationships.~~

~~137. Rao breached the non-solicitation covenant by soliciting and/or contacting EPAM clients on behalf of himself for the purpose of offering services similar or competitive to those offered by EPAM both during and within the 12-month period following the termination of his employment.~~

~~138. Upon information and belief, Rao's breach of the non-solicitation covenant will continue unless and until he is ordered to abide by the obligations to which he agreed when he executed the Agreement.~~

~~139. As a direct result of EPAM's breach of the non-solicitation covenant, EPAM has suffered and continues to suffer irreparable injury, including loss of its confidential and trade secret~~

~~information, and damage to its business, for which a remedy at law is inadequate. Accordingly, EPAM is entitled to injunctive and equitable relief.~~

~~140. In addition, EPAM seeks actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.~~

~~**AS AND FOR A FIFTH CAUSE OF ACTION**~~

**(Breach of Fiduciary Duty)**

~~141.~~**126.** EPAM repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

~~142.~~**127.** In his role as Managing Principal, Life Sciences Consulting, Rao was placed in a position of trust and confidence, and was expected to devote his full time to the management and promotion of the company's business interests.

~~143.~~**128.** As a result of this special relationship, Rao owed certain fiduciary duties to EPAM, including a duty of loyalty and honesty, and a duty not to act in any way contrary to the interests of EPAM, including, but not limited to, a duty, while still employed with EPAM and being compensated by the Company: (a) not to make fraudulent representations to EPAM clients with respect to the status of his employment with EPAM; (b) not to ~~fraudulently assert ownership over EPAM intellectual property; (c) not to~~ misuse or misappropriate the Company's confidential or trade secret information, including EPAM Confidential Information and IP; (~~d~~**c**) not to attempt to destroy Company property, including data files on its networks; (~~e~~**d**) not to engage in conduct for the purpose of compelling a termination for cause; and (~~f~~**e**) not to be deceitful to the Company.

~~144.~~**129.** Notwithstanding these obligations and duties, and in violation thereof, Rao breached his fiduciary duty of loyalty and honesty to EPAM by, among other willful acts of misconduct during his employment, (a) fraudulently representing to third persons, including at

least one EPAM client, that he is no longer associated with the Company; (b) ~~embedding the term "Copyright 2025 Gowtham Rao" into the software code in an apparent attempt to fraudulently assert ownership over source code owned by the Company; (c)~~ stealing data belonging to EPAM, including EPAM Confidential Information and IP, out of EPAM's control and into his own possession for his own personal benefit; (~~d~~**c**) attempting to permanently delete data files on the Company network; and (~~e~~**d**) intentionally engineering a termination for cause for the purpose of evading the non-competition restrictive covenant in the Agreement.

~~145.~~**130.** As a consequence of Rao's breach of his fiduciary duty of loyalty to EPAM, EPAM has been injured and face**s** irreparable injury. EPAM is threatened with loss and misuse of its confidential and trade secret information, including the EPAM Confidential Information and IP in amounts which may be impossible to determine, unless Rao is enjoined and restrained by order of this court.

~~146.~~**131.** In addition, as a consequence of Rao's breach of his fiduciary duty, EPAM seeks actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

~~**AS AND FOR A SIXTH CAUSE OF ACTION**~~
~~**(Tortious Interference)**~~

~~147. EPAM repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.~~

~~148. As set forth above, EPAM maintains valid business relationships, or the expectancy of business relationships with its customers and clients.~~

~~149. EPAM further has contractual and other legal obligations to certain clients to protect their information and intellectual property entrusted to EPAM from wrongful disclosure or misuse.~~

~~150. EPAM further has the reasonable expectation that these client relationships would continue and would not be unjustifiably disrupted.~~

~~151. Rao was and remains aware of EPAM's client relationships, business expectancies, and EPAM's contractual obligations to its clients to safeguard and protect client confidential information and intellectual property from wrongful disclosure or misuse.~~

~~152. Notwithstanding his knowledge of the existence of these relationships, obligations, and expectancies, Rao intentionally and unjustifiably interfered with EPAM's business and contractual relationships with its customers by misappropriating their confidential information and intellectual property, including proprietary software code entrusted to EPAM's care, for his own personal use.~~

~~153. EPAM's intentional interference with these relationships was willful, malicious, unjustified and accomplished through wrongful means, and was accomplished for an improper purpose, including to cause damage to EPAM and its lawful business.~~

~~154. As a result of Rao's intentional interference, EPAM has suffered monetary damages and has suffered substantial and irreparable harm and is threatened with further substantial and irreparable harm due to the loss of trade secrets, confidential information, and customer goodwill, for which there is no adequate remedy at law to compensate.~~

~~155. In addition, EPAM seeks actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.~~

**~~AS AND FOR A SEVENTH CAUSE OF ACTION~~**
**~~(Breach of Contract: Non-Competition)~~**

~~156. EPAM repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.~~

157. The Agreement contains a non-competition provision, which provides in pertinent part as follows:

> In the event you voluntarily resign employment, then you agree that for 12 months following termination of your employment, not to engage in activity in which you contribute directly or indirectly in a senior management role as an employee, employer, owner, contractor, fiduciary, or in any other capacity, to a direct competitor of the EPAM Group for purposes of performing similar duties as compared to your EPAM position during the last 12 months preceding your termination. A direct competitor for purpose of this provision is an individual or entity that sells (or seeks to sell) any of the same or similar nature services as compared to the services you were involved with by providing support for, having management oversight over, or possessing confidential information about, during your last 12 months of employment. A senior management role is defined for purpose of this provision as any role that: is involved in setting strategic direction, oversees a functional area that performs any activities competitive with the EPAM Group, supports mergers and acquisition activity, manages client accounts or relationships for a business or delivery perspective, or is involved in new business or new client generation. This prohibition also includes any activity that requires or inevitably requires disclosure of trade secrets, proprietary information, or Confidential Information. The geographic scope of the restriction applies to any country in which you had any contact with clients or potential clients of the EPAM Group or performed any services for the EPAM Group within the last 12 months preceding your termination. The restrictions in this subsection shall not apply in case of an involuntary termination.

158. The non-competition covenant is reasonably necessary and narrowly tailored to protect EPAM's legitimate business interests, including but not limited to EPAM Confidential Information and IP and goodwill, all of which Rao had access to while employed by EPAM.

159. Furthermore, implicit in every contract, including the Agreement, is an implied covenant of good faith and fair dealing.

160. The implied covenant of good faith and fair dealing compels any party to a contract not to do that which, even if not proscribed by contract, of frustrating the very purpose of the contract.

161. Where a contract requires that a party exercise discretion, there is also an implied covenant of good faith and fair dealing requiring that such exercise of discretion may not be exercised arbitrarily or irrationally, nor maliciously or in bad faith.

162. Acknowledging that a voluntary resignation would trigger enforcement of the non-compete covenant in the Agreement, Rao abandoned discussions about a possible resignation from the Company in late September 2025.

163. Rao then purposefully and intentionally engaged in misconduct in violation of Company policies, as set forth above, in order to compel an involuntary termination of his employment by EPAM and circumvent the non-competition restriction.

164. Rao's intent was to immediately compete following his termination, as evidenced by his attempts to assert ownership over EPAM's software code, unauthorized download of EPAM Confidential Information and IP, solicitation of clients while employed by EPAM, and his immediate announcement as a competitor of EPAM after his termination.

165. Rao's conduct, as set forth above, is in breach of the covenant of good faith and fair dealing and by being allowed to compete has deprived EPAM of the benefit of the bargain under the Agreement.

166. After his exit, Rao announced himself as a competitor of EPAM and, as set forth above, has been contacting EPAM's clients for purposes of soliciting their business and engaging in competitive business activities. Rao is accordingly in breach of the non-competition covenant in the Agreement.

167. As a direct result of EPAM's breach of the covenant of good faith and fair dealing, EPAM has suffered and continues to suffer irreparable injury, including loss of its confidential and

~~trade secret information, and damage to its business, for which a remedy at law is inadequate. Accordingly, EPAM is entitled to injunctive and equitable relief.~~

~~168. In addition, EPAM seeks actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.~~

**AS AND FOR AN ~~E~~FI~~GH~~FTH CAUSE OF ACTION**
**(Replevin)**

~~169.~~**132.** EPAM repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

~~170.~~**133.** As set forth above, Rao is currently in possession **or control** of EPAM property, including EPAM Confidential Information.

~~171.~~**134.** Upon information and belief, the EPAM Confidential Information and IP currently resides on a personal computer device owned by Rao~~, located in Rao's home in Princeton, New Jersey.~~**.**

~~172.~~**135.** Despite his duties and obligations under the Agreement and the IT Resources Policy to return all Confidential Information and other EPAM equipment or information in his possession, Rao has not returned and continues to remain in possession of the stolen EPAM Confidential Information and IP.

~~173.~~**136.** Rao has no right to possession of EPAM Confidential Information and IP, and, accordingly, EPAM has a possessory right superior to that of Rao.

~~174.~~**137.** Given that Rao is no longer employed by EPAM, EPAM is entitled to immediate possession of the EPAM Confidential Information and IP.

~~175.~~**138.** In addition, ~~Rao~~**EPAM** is entitled to recover its attorneys' fees and expenses incurred as a result of Rao's theft and wrongful detention of EPAM Confidential Information and IP.

**AS AND FOR A ~~N~~SI~~N~~XTH CAUSE OF ACTION**
**(Conversion)**

~~176.~~**139.** EPAM repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

~~177.~~**140.** Rao has intentionally and wrongfully misappropriated EPAM's property, including, among other things, EPAM Confidential Information and IP.

~~178.~~**141.** Rao downloaded the EPAM Confidential Information and IP onto his personal device without EPAM's consent and without legal justification.

~~179.~~**142.** Rao continues to be in possession of ~~such property~~**EPAM Confidential Information and IP** despite his obligation to return such property upon the cessation of his employment~~.~~.

~~180.~~**143.** By engaging in the conduct set forth above, Rao acted with the intent to exercise dominion and control over EPAM Confidential Information and IP, thus depriving EPAM's exclusive rights to such property and which will result in the dilution of its value to EPAM.

~~181.~~**144.** As a result of Rao's intentional and wrongful conduct, EPAM has been and will continue to be injured, for which it is entitled to recover actual, incidental, compensatory, punitive and consequential damages in an amount to be determined at trial.

~~182.~~**145.** EPAM is further entitled to recover all monies expended to recover converted property as special damages, including attorneys' fees.

**AS AND FOR A ~~T~~SEVENTH CAUSE OF ACTION**

**(Unjust Enrichment)**

~~183.~~**146.** EPAM repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein~~.~~.

~~184.~~**147.** Rao obtained the EPAM Confidential Information and IP that in equity and good conscience he should not have obtained.

~~185.~~**148.** Rao's theft of EPAM Confidential Information and IP has unjustly enriched Rao at EPAM's expense.

~~186.~~**149.** Rao was further unjustly enriched with compensation and other benefits while engaging in acts of disloyalty during his employment with EPAM.

~~187.~~**150.** As a consequence of Rao's unjust enrichment, EPAM has been and will continue to be injured, for which it is entitled to recover actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

**WHEREFORE**, EPAM seeks judgment in its favor and an Order against Rao that grants the following relief:

1. A preliminary injunction and after trial, a permanent injunction that:

(a) Preliminarily and permanently enjoins Rao from breaching his confidentiality and non-disclosure obligations to EPAM;

(b) Preliminarily and permanently enjoins Rao, and all persons and/or entities acting on his behalf, for his benefit, or in active concert or participation with him, from directly or indirectly accessing, disclosing, reproducing, transmitting or using any confidential, proprietary, or trade secret information of any kind, nature or description belonging to EPAM, including EPAM Confidential Information and IP;

~~(c)~~**(a)** Preliminarily and permanently enjoins Rao, and all persons and/or entities acting on his behalf, for his benefit, or in active concert or participation with him, from directly or indirectly accessing disclosing, reproducing, transmitting or using any intellectual property of any kind belonging to EPAM or any EPAM client, including software code;

~~(d)~~**(b)** Preliminarily and prospectively enjoins Rao from directly or indirectly soliciting, contacting, or attempting to solicit or contact, or meet ~~withany~~**with any** EPAM client, former, or prospective client, for purposes of offering services similar to or competitive with those offered by EPAM;

~~(e) Preliminarily and prospectively enjoins Rao from engaging in activity in which he contributes directly or indirectly in a senior management role as an employee, employer, owner, contractor, fiduciary, or in any other capacity, to a direct competitor of EPAM for purposes of performing similar duties as compared to his EPAM position during the last 12 months preceding his termination, in any country in which he had any contact with clients or potential clients of EPAM or performed any services for EPAM within the last 12 months preceding his termination; and~~

~~(f)~~**(c)** Preliminarily and prospectively enjoins Rao from breaching his contractual obligations to EPAM;

2. An Order that Rao, and all parties in active concert or participation with him, to return to EPAM all EPAM property, including all originals and copies of all files, devices and/or documents that contain or relate to EPAM's proprietary software source code, confidential, proprietary and trade secret information, including EPAM Confidential Information and IP;

3. An Order that Rao, and all parties in active concert or participation with him, to return to EPAM all intellectual property belonging to EPAM or its clients, including any and all source code and data relating to software tools owned by EPAM or any EPAM client;

4. An Order that Rao produce for inspection, imaging, and remediation all computers and other electronic storage devices or storage accounts, including any cloud accounts, sharefile accounts, USB devices, email accounts, and smartphones belonging to, under the control of, accessible to, or operated by Rao, at Rao's expense;

5. Actual, incidental, compensatory, and consequential damages in excess of $150,000, in an amount to be proven at trial;

6. Exemplary damages pursuant to the DTSA and PUTSA, in an amount to be proven at trial;

7. Punitive damages in an amount to be proven at trial due to Rao's willful and malicious conduct;

8. Costs and expenses incurred herein, including reasonable attorneys' fees and interest, including pursuant to the Agreement;

9. Pre-judgment interest; and

10. All other relief as the Court may deem just, equitable and proper.

Dated: ~~November 4, 2025~~**April 20, 2026**

Respectfully submitted,

EPAM SYSTEMS, INC.,

By its attorneys,

*/s/ Jacob Oslick*
Jacob Oslick **(Pa. Attorney No. 311028)**
joslick@seyfarth.com
James S. Yu (**admitted** *pro hac vice* ~~pending~~)
jyu@seyfarth.com
Brooke Gary (**admitted** *pro hac vice* ~~pending~~)
brgary@seyfarth.com
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, NY 10018-1405
(212) 218-5500