**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EPAM SYSTEMS, INC.,<br><br>Plaintiff/Counterclaim-Defendant<br><br>v.<br><br>GOWTHAM RAO,<br><br>Defendant/Counterclaim-Plaintiff | Civil Action No. 2:25-cv-06260 |

**EPAM SYSTEMS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .......... 1

FACTUAL BACKGROUND .......... 3

I. EPAM's Hiring of Rao .......... 3

II. Takeda "Software Code" Issue .......... 4

III. Gilead Sciences' Staffing Issue .......... 5

IV. EPAM Terminates Rao's Employment .......... 5

V. Rao Denies EPAM's Theft Claims, But Destroys Critical Evidence .......... 6

VI. Rao's Remaining Allegations .......... 7

STANDARD OF REVIEW .......... 8

ARGUMENT .......... 9

I. The CEPA Claim Must Be Dismissed .......... 9

A. Rao Concedes That He Was Terminated For Non-Retaliatory Reasons And Otherwise Pleads Facts Refuting Any Suggestion Of Causation .......... 10

B. Rao Fails To Allege His Purported "Reasonable Belief" Of Wrongful Conduct .......... 11

i. The "Deceptive Staffing" Claim .......... 11

ii. The Takeda "Software Code" Claim .......... 13

C. Rao Fails To Allege Any Protected Whistleblowing .......... 13

II. The Defamation *Per Se* Claim Must Be Dismissed .......... 15

A. Rao does not identify "the defamer and the circumstances of publication" or the "person or persons" to whom he was allegedly defamed .......... 15

B. Rao Fails To Allege Falsity, Much Less Falsity With Negligence Or Actual Malice .......... 16

C. EPAM's alleged communications to Gilead Sciences are protected by New Jersey's common law qualified privilege .......... 18

III. The Tortious Interference Claim Must Be Dismissed .................................................. 19

A. Rao Does Not Have Standing To Bring This Claim ......................................... 19

B. Rao Fails to Plead Tortious Interference......................................................... 20

IV. The Declaratory Judgment Count (Non-Competition Covenant) Is Moot...................... 21

V. The Declaratory Judgment Count (Intellectual Property) Must Be Dismissed as a Redundant Mirror Image of EPAM's Claims ............................................................. 22

VI. The Abuse of Process Claim Must Be Dismissed....................................................... 22

VII. The Breach of the Implied Covenant Claim Must Be Dismissed.................................. 24

VIII. Rao's Fraudulent Inducement Claim Must Be Dismissed ............................................ 25

A. Rao Fails To Allege Any False Statements, About Odysseus Or Otherwise........ 26

CONCLUSION ................................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3G Wireless, Inc. v. Metro PCS Pa. LLC*,
2016 WL 823222 (E.D. Pa. 2016)....................19, 20

*Abella v. Barringer Res., Inc.*,
615 A.2d 288 (N.J. Sup. Ct., Ch. Div. 1992)....................18

*Adair v. Cigna Corp. Servs.*,
LLC, 2026 WL 295744 (E.D. Pa. 2026)....................5, 9

*Aldens, Inc. v. Packel*,
524 F.2d 38 (3d Cir. 1975)....................22

*Ames v. Am. Radio Relay League Inc.*,
2016 WL 7404473 (E.D. Pa. 2016), *aff'd*, 716 F. App'x 115 (3d Cir. 2017)....................17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................10, 14

*Audi of Am., Inc. v. Bronsberg & Hughes Pontiac, Inc.*,
2017 WL 11573271 (M.D. Pa. 2017)....................23

*Avetzuk v. Hertz Corp.*,
2025 WL 559845 (D.N.J. 2025)....................9, 12, 13

*Baldwin v. City of Atl. City*,
2015 WL 5009746 (N.J. App. Div. 2015)....................14

*Bentley v. Merck & Co, Inc.*,
2017 WL 2349708 (E.D. Pa. 2017)....................28

*Brody v. DCiM Sols., LLC*,
2025 WL 1802239 (Del. Ch. 2025)....................26

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
70 F.4th 668 (3d Cir. 2023)....................26, 30

*Cramer v. Cecil Baker & Partners, Inc.*,
2019 WL 2774181 (E.D. Pa. 2019)....................20

*Crescenz v. Penguin Grp. (USA) Inc.*,
2012 WL 6761817 (D.N.J. 2012), *aff'd*, 561 F. App'x 173 (3d Cir. 2014)....................18

*Darakjian v. Hanna*,
366 N.J. Super. 238 (N.J. App. Div. 2004) ............ 19

*Dieckman v. Regency GP LP*,
155 A.3d 358 (Del. 2017) ............ 25

*Feggans v. Billington*,
677 A.2d 771 (N.J. App. Div. 1996) ............ 15, 18

*Figueroa v. Caliber Collision*,
2022 WL 9997786 (D.N.J. 2022) ............ 11

*Fin. Software Sys., Inc. v. First Union Nat. Bank*,
1999 WL 1241088 (E.D. Pa. 1999) ............ 19

*FinClusive Cap., Inc. v. Q2 Software, Inc.*,
2021 WL 5225860 (Del. Super. Ct. 2021) ............ 29

*Fitzgerald v. Little*,
2026 WL 710233 (D.N.J. 2026) ............ 20

*Fouad v. Milton Hershey Sch. & Tr.*,
2020 WL 8254470 (M.D. Pa. 2020) ............ 24

*Fowler v. UPMC Shadyside*,
578 F.3d 203 (3d Cir. 2009) ............ 8

*G.D. v. Kenny*,
205 N.J. 275 (N.J. 2011) ............ 15

*Gen. Refractories Co. v. Fireman's Fund Ins. Co.*,
337 F.3d 297 (3d Cir. 2003) ............ 21, 23

*Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*,
2020 WL 948513 (Del. Ch. 2020) ............ 29

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*,
806 F.3d 162 (3d Cir. 2015) ............ 20, 21

*Henson v. Daimler Truck N. Am. LLC*,
2023 WL 3072532 (D.N.J. 2023) ............ 11

*Ho-Ho-Kus, Inc. v. Sucharski*,
2024 WL 4647964 (D.N.J. 2024) ............ 10

*Ho-Ho-Kus, Inc. v. Sucharski*,
2025 WL 2416937 (D.N.J. 2025) ............ 16

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ........................................ 26, 28, 30

*Kardosh v. McCallin*,
2025 WL 1534976 (E.D. Pa. 2025)........................................ 27, 28

*Landair Transp., Inc. v. Del's Truck & Auto Repair*,
2018 WL 950208 (M.D. Pa. 2018)........................................ 9

*Langman v. Keystone Nat'l Bank & Tr. Co.*,
672 F. Supp. 2d 691 (E.D. Pa. 2009)........................................ 23

*Lapensohn v. Hudson City Sav. Bank*,
2021 WL 1581402 (E.D. Pa. 2021)........................................ 4, 9

*Leang v. Jersey City Bd. of Educ.*,
198 N.J. 557 (N.J. 2009) ........................................ 18

*Lynch v. Long*,
2026 WL 949041 (E.D. Pa. 2026)........................................ 9

*Mangan v. Corp. Synergies Grp., Inc.*,
834 F. Supp. 2d 199 (D.N.J. 2011) ........................................ 15

*Marcone v. Penthouse Int'l Mag. For Men*,
754 F.2d 1072 (3d Cir. 1985) ........................................ 15

*Meade v. Kiddie Acad. Domestic Franchising, LLC*,
501 F. App'x 106 (3d Cir. 2012) ........................................ 20

*Metro. Edison Co. v. Pa. Pub. Util. Comm'n*,
767 F.3d 335 (3d Cir. 2014)........................................ 8

*Mirena v. Exec. Jet Mgmt., Inc.*,
760 F. Supp. 3d 224 (D.N.J. 2024) ........................................ 15

*Post v. Mendel*,
510 Pa. 213 (Pa. 1986) ........................................ 21

*Power v. Lockheed Martin Corp.*,
419 F. Supp. 3d 878 (E.D. Pa. 2020)........................................ 11

*Principal Life Ins. Co. v. Minder*,
2009 WL 1917096 (E.D. Pa. 2009)........................................ 22

*Robnett v. Lithos Indus. Inc.*,
2024 WL 4836704 (Del. Ch. 2024)........................................ 25

*Rosen v. Tabby*,
1997 WL 667147 (E.D. Pa. 1997), *aff'd*, 175 F.3d 1011 (3d Cir. 1999)............................. 23

*Safonof v. DirectSat USA*,
2020 WL 1527946 (D.N.J. 2020) ............................................................................ 12, 13

*Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*,
401 F.3d 123 (3d Cir. 2005)............................................................................................ 20

*Sapp v. Indus. Action Servs., LLC*,
2024 WL 3444633 (D. Del. 2024).............................................................................. 26, 29

*Saqa v. Factory Mut. Ins. Co.*,
2024 WL 939689 (D.N.J. 2024) ..................................................................................... 14

*Shaker v. U.S. Dep't of Health and Human Servcs.*,
2026 WL 835577 (W.D. Pa. 2026) .................................................................................. 17

*St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*,
967 F.3d 295 (3d Cir. 2020).............................................................................................. 8

*Step-Saver Data Sys., Inc. v. Wyse Tech.*,
912 F.2d 643 (3d Cir. 1990)............................................................................................ 22

*TherapeuticsMD, Inc. v. Mayne Pharma LLC*,
2026 WL 802333 (D. Del. 2026)................................................................................ 26, 28

*Turnofsky v. electroCore, Inc.*,
2023 WL 4527553 (D.N.J. 2023), *aff'd sub nom.* 2024 WL 4987243 (3d Cir.
2024)............................................................................................................................... 27

*U.S. Claims, Inc. v. Flomenhaft & Cannata, LLC*,
2006 WL 8460176 (E.D. Pa. 2006)..................................................................................... 8

*United States v. Amirnazmi*,
645 F.3d 564 (3d Cir. 2011)............................................................................................ 12

*VIM, Inc. v. Somerset Hotel Ass'n*,
19 F. Supp. 2d 422 (W.D. Pa. 1998)................................................................................ 23

*vMedex, Inc. v. TDS Operating, Inc.*,
2021 WL 1737298 (D. Del. 2021)..................................................................................... 27

*Waiters v. Aviles*,
418 F. App'x 68 (3d Cir. 2011) ........................................................................................ 11

*Whitestone REIT Operating P'ship, L.P. v. Pillarstone Cap. REIT*,
2024 WL 274228 (Del. Ch. 2024) .................................................................................... 24

*Workman v. Astronaut Topco, L.P.*,
2025 WL 2506027 (Del. Super. Ct. 2025) .... 25

*WP Devon Asssociates, L.P. v. Hartstrings, LLC*,
2012 WL 3060513 (Del. Super. Ct. 2012) .... 28, 29

*Yoho v. Bank of New York Mellon Corp.*,
2022 WL 296637 (3d Cir. 2022) .... 21

*Zoneraich v. Overlook Hosp.*,
514 A.2d 53 (N.J. App. Div. 1986) .... 16

**Statutes**

New Jersey's Conscientious Employee Protection Act ("CEPA") .... *passim*

Defend Trade Secrets Act .... 13

HIPAA .... 5, 11, 12

HITECH Act .... 5

Houck Act .... 12

N.J.S.A. 34:19-3(a) .... 14

N.J.S.A. 34:19-3(c) .... 14

**Other Authorities**

Fed. R. Civ. P 26(c) .... 24

Restatement (Second) of Conflict of Laws § 155 (1971) .... 23

Rule 8 .... 26

Rule 9(b) .... 26, 27, 30

Rule 12(b)(1) .... 1

Rule 12(b)(6) .... 1, 8

## PRELIMINARY STATEMENT

In the weeks before his separation from employment, Defendant/Counterclaim-Plaintiff Gowtham Rao downloaded tens of thousands of files belonging to his employer, EPAM Systems, Inc., to his personal computer. He did so without permission, and despite the fact that the files contain EPAM Confidential Information and intellectual property Rao had a duty to safeguard.

To protect its Confidential Information, EPAM sought relief from this Court. At the initial November 5, 2025 hearing, the Court instructed the parties to work on a stipulated order; they did just that, and the Order was entered on December 10. (*See* ECF #20.) The Order required the parties to engage a forensic neutral and implement a review protocol. The Court also instructed Rao to preserve all relevant evidence. He agreed. Yet, just *nine* days after the hearing, on November 14, 2025, Rao deliberately reset the computer he used to download EPAM's files. The reset permanently destroyed critical data and information highly relevant to EPAM's lawsuit, including user activity logs and records of external storage device connections, rendering it impossible to determine when and how certain data was deleted from his computer or if Rao could have transferred this data to an external storage device. Rao kept this reset a secret from EPAM in the months that followed, including as the parties negotiated their stipulated forensic review protocol and as the forensic neutral was expending dozens of hours to collect Rao's sources and generate reports for the parties' review. In fact, Rao's spoliation only came to light because the forensic analysis detected virtually no user activity prior to Rao's intentional actions.

Rather than face the consequences of his gross professional and litigation misconduct, Rao decided to throw muck. To this end, he filed baseless Counterclaims against EPAM. As EPAM's companion letter seeking leave to move for sanctions reflects, these claims should be dismissed outright due to Rao's data spoliation and rank dishonesty in his pleadings. But, independently, these claims fail under Rules 12(b)(1) and 12(b)(6) for the following reasons.

*First*, Rao asserts a whistleblowing retaliation claim under New Jersey's Conscientious Employee Protection Act ("CEPA"). But he alleges no "whistleblowing." To the contrary, he tries to take credit for "whistles" that were supposedly blown by an EPAM client and an EPAM in-house attorney. Moreover, he does not causally connect his purported "whistleblowing" to his termination and, instead, blames his termination on lawful reasons such as cost-cutting.

*Second*, Rao's attempted defamation, tortious interference, and abuse of process claims fail as a matter of law. These claims are premised on EPAM litigating its claims against Rao, conduct that is privileged and protected by the *Noerr-Pennington* doctrine. Moreover, Rao's defamation claim depends upon his dishonest characterization of documents that he incorporated by reference into his Counterclaims, such as the neutral forensic investigator's reports. Contrary to Rao's contentions, these documents are not "exculpatory"; they show that Rao spoliated evidence. Further, Rao lacks Article III standing to pursue his tortious interference claim, which depends upon alleged harms suffered by "commercial entities."

*Third,* Rao purports to assert two declaratory judgment claims. One is moot, because it challenges a non-compete covenant that EPAM no longer seeks to enforce. The other is an improper "mirror-image" counterclaim which seeks a declaration that Rao isn't liable for theft.

*Fourth*, Rao further attempts to assert a breach of the covenant of good faith and fair dealing based on EPAM "stripping" authority from him and threatening to demote him. But an at-will employee like Rao cannot use the implied covenant to challenge these kinds of employment decisions. In any event, Rao pleads no facts plausibly suggesting that he suffered damages from EPAM's purported breaches, a defect that independently dooms any such claim.

Finally, Rao alleges that EPAM fraudulently induced him to join the company. But this claim does not depend on false statements. Instead, it arises from Rao's own confusion. In brief,

he confuses and conflates alleged representations that EPAM made about its *entire* Life Sciences & Health business (the truth of which the Court can confirm through EPAM's SEC filings), with assertions that Rao makes about a subgroup within that unit, called Odysseus. Rao's misunderstanding is no basis for a fraudulent inducement claim.

For these reasons, and as set forth below, the Counterclaims should be dismissed.

## FACTUAL BACKGROUND

### I. EPAM's Hiring of Rao

EPAM is a "leading global provider of digital engineering, cloud and artificial intelligence-enabled transformation services."[1] Rao is a former EPAM employee.

In or about 2024, Rao worked for Johnson & Johnson ("J&J"). (Counterclaims ¶¶ 305-307.) He alleges that EPAM "aggressively" recruited him to leave J&J and join EPAM. (*Id.* ¶ 306.) As part of that recruitment, Rao alleges that EPAM "made highly specific, material representations" to him, including that he would be "entrusted with aggressively scaling EPAM's Health and Life Sciences business unit from $400 million to $1 billion." (*Id.* ¶ 309.) He further contends that these representations were false, and that the "Odysseus business line's actual revenue" was only $500,000, not $400 million. (*Id.* ¶ 316.)

EPAM's public filings and a close reading of Rao's pleading refute his assertions about "misrepresentations." Boiled down, Rao conflates alleged EPAM representations about its *entire* "Health and Life Sciences business,"[2] (*id.* ¶ 309), with allegations Rao makes about "Odysseus" – only a part of that business, which EPAM acquired in 2024. (*Id.* ¶ 306.) As EPAM's public filings

---

[1]EPAM Systems Inc., Form 10-K, for year ended Dec. 31, 2025, dated Feb. 26, 2026 at 2 (publicly available at: https://d18rn0p25nwr6d.cloudfront.net/CIK-0001352010/5229f68c-e204-4165-9d6e-56d445ff5a73.pdf , last visited 5/6/2026).
[2]Identified in EPAM's public filings as the "Life Sciences and Healthcare" unit.

establish,[3] its entire Life Sciences and Healthcare business is, in fact, an over $400 million unit. It earned revenue of about $490 million in 2023, and over $574 million in 2024. (*See* EPAM Systems, Inc. Form 10-K for year ended Dec. 31, 2024, dated Feb. 28, 2025 at 33.[4])

On November 12, 2024, supposedly due to those misrepresentations, Rao and EPAM entered into an "Employment Covenants Agreement" (the "Agreement"). The Agreement, which is governed by Delaware law, contained a non-compete agreement, but stated that this provision was unenforceable if Rao was involuntarily terminated. (*See* ECF #37-1 at § 5(c).)

## II. <u>Takeda "Software Code" Issue</u>

Rao alleges that, at some unstated time after joining EPAM, he "discovered" that Takeda Pharmaceutical Company supposedly "own[ed]" the rights for certain code EPAM developed. (Counterclaims ¶ 318.) Rao also contends that, in September 2025, he reviewed privileged legal advice supporting this view. (*Id.* ¶ 319.) Rao claims that, despite the "legal directive," EPAM's Gregory Klebanov directed him to market this code to J&J, but he refused. (*Id.* ¶ 321.)

Rao's allegations about the "software code" issue are contradicted by his Exhibit B. In that document, Rao attests that what EPAM sought to market to J&J was *not* the "product" owned by Takeda, but a service: "what we are selling is we built this for Takeda and we can build something like this for you." (Counterclaims Ex. B at 1, 3.) Takeda's software would be used only as a "demo." (*Id.* at 3.) Further, Rao represented that he had "friends" at Takeda that would grant EPAM permission to use the software (*id.*), then obtained clearance from EPAM's legal department that he could proceed if "Takeda gives expression permission." (*Id.*)

---

[3]The Court can take judicial notice of filings with the Securities and Exchange Commission. *Lapensohn v. Hudson City Sav. Bank*, 2021 WL 1581402, at *3 n.5 (E.D. Pa. 2021).
[4]Publicly available at: <u>https://d18rn0p25nwr6d.cloudfront.net/CIK-0001352010/d0d36071-97a0-401d-b6ae-bcefc3056131.pdf</u> (last visited 5/6/2026).

## III. Gilead Sciences' Staffing Issue

Rao also alleges that EPAM engaged in "alarming staffing practices" on the Gilead Sciences Account. (*Id.* ¶ 322.) Specifically, Rao contends that EPAM used staff in supposedly "restricted" foreign jurisdictions such as Belarus, Russia, and Serbia to work on the account, and "misrepresented the physical locations" of these employees to Gilead. (*Id.* ¶¶ 322, 323.) Rao claims that, after a "Gilead representative explicitly raised these alarming geographic discrepancies," he "escalated" Gilead's concern to Klebanov. (*Id.* ¶¶ 325-326.) Rao further proffers that he "reasonably believed" that EPAM's staffing practices "violated federal data privacy laws (including HIPAA and the HITECH Act)," and "unlawfully circumvent States export controls and Office of Foreign Assets Control (OFAC) sanctions." (*Id.*)

Rao does not, however, identify any facts to explain why he "reasonably believed" that EPAM's staffing raised HIPAA or HITECH issues; nor does he specify what "export controls" and OFAC "sanctions" he reasonably believed were at issue. Notably, as to OFAC, Rao's only specific factual examples concerned employees in Serbia and Belarus. (*Id.* ¶¶ 323-324.) But Serbia is *not* on the OFAC sanctions list, while OFAC sanctions against Belarus are limited to specific individuals.[5] Rao does not allege that he reasonably believed the purported Belarus-based employee, Alexander Alexeuk, to be a sanctioned individual. (*See* Counterclaims ¶ 324.)

## IV. EPAM Terminates Rao's Employment

On September 17, 2025, Klebanov "notified Rao of his impending separation" because his role was eliminated as part of a cost-cutting measure. (Counterclaims ¶¶ 352, 361.) Rao does not

[5](*See* https://ofac.treasury.gov/sanctions-programs-and-country-information; see generally https://ofac.treasury.gov/sanctions-programs-and-country-information/belarus-sanctions, both last visited 5/6/2026; see also Executive Order 13405 (June 16, 2006), 71 Fed. Reg. 35485-35487. The Court can take judicial notice of "publicly available documents on government websites." *Adair v. Cigna Corp. Servs.*, LLC, 2026 WL 295744, at *4-5 (E.D. Pa. 2026).

attribute Klebanov's termination decision to purported whistleblowing. Rather, Rao alleges that Klebanov "acknowledged" and "confessed" that the pipeline was "close to zero," resulting in EPAM's Board of Directors placing him under a "direct, strict mandate" to "immediately reduce costs." (*Id.* ¶ 361.) Additionally, Rao asserts that Klebanov was "further motivate[ed]" to cut Rao's position because, although Rao earned "substantial revenue" for EPAM, the kind of revenue he generated "did not legally credit toward Mr. Klebanov's legacy acquisition earn-out targets." (*Id.* ¶¶ 351, 362.) In other words, Rao alleges that Klebanov terminated him *not* because of any purported whistleblowing, but rather because of cost-cutting and because Rao failed to generate the types of revenue that personally enriched Klebanov.

On September 26, 2025, nine days after Klebanov informed Rao that he was being terminated, Rao alleges that Klebanov instead proposed demoting him and issuing him a Performance Improvement Plan ("PIP"). (*Id.* ¶ 355.) Rao alleges that EPAM made these threats, only to later "abandon[]" them, to "force a voluntary resignation," because an "involuntary termination" would free him from the Agreement's non-compete. (*Id.* ¶¶ 363, 366.)

## V. <u>Rao Denies EPAM's Theft Claims, But Destroys Critical Evidence</u>

Rao alleges that, on October 15, 2025, EPAM terminated him "for-cause[,]" *viz.*, his "data exfiltration and sabotage." (*Id.* ¶ 369.) Rao alleges that these grounds for his termination are false. (*Id.* ¶¶ 360-370.) He proffers that the "activities" that EPAM accused him of were, in reality, "routine operational procedures," authorized business functions, "standard version-control synchronization," or did not accurately depict his conduct. (*Id.* ¶¶ 374-383.)

Rao further contends that the "independent forensic export" conducted in this matter under the parties' forensic investigation protocol proved "[e]xculpatory," and "conclusively demonstrated" that the "vast majority" of the files on his system were "merely technical artifacts and standard hash matches," not stolen data. (*Id.* ¶¶ 386-387.) Rao further alleges that the "data

exported pursuant to the independent forensic protocol yielded no evidence" to support EPAM's theft claims, and that EPAM continued to pursue these claims in "bad faith." (*Id.* ¶¶ 387-389.)

Unfortunately for Rao, the forensic records – which he incorporated by reference into his Counterclaims – say no such thing. Quite the contrary, these records show that Rao *spoliated and destroyed* data by conducting a system "reset" on November 14, 2025. (*See* Declaration of James Yu ("Yu. Decl."), Ex. 2 at 6.) This was roughly two weeks *after* litigation commenced, and after the Court warned Rao about spoliating evidence. (Yu Decl. Ex. 1, TRO Hearing Tr. at 48–49.) Because Rao destroyed data by resetting his computer, it is now impossible to tell when EPAM files were removed from his computer and whether Rao connected an external storage device to his computer where he could have transferred those files prior to removal. (*See* Yu, Decl. Ex. 2 at 1, 6) (noting that Rao's computer "appears to have been reset on or about" 11/14/15, which "affected several forensically relevant items," including "log events," "file/folder interaction," and "browsing activity"); (Yu Decl. Ex. 4, showing zero USB activity before 11/14/15). In other words, because of Rao's reset, he could have copied all files that EPAM alleges he stole, transferred those files to a separate device, resetting his computer, and there is now no way to tell.

## VI. Rao's Remaining Allegations

At some point after his termination, Rao alleges, "[u]pon information and belief," that "EPAM executives maliciously engaged in extra-judicial communications, actively publishing false accusations of trade secret theft and professional misconduct to third parties." (Counterclaims ¶ 395.) Rao "specifically" claims that "EPAM targeted representatives at Gilead Sciences with these defamatory claims," damaging his reputation and causing him to lose a speaking engagement. (*Id.*) On this point, he claims that "in or around late October 2025, and again in or around January and February 2026, EPAM executive Gregory Klebanov directly communicated to authorized representatives of EPAM clients and industry participants—including Gilead

Sciences —that Dr. Rao had engaged in the criminal 'theft' of tens of thousands of confidential files, misappropriated trade secrets, and committed professional 'sabotage.'" (*Id.* ¶ 414.)

Rao also alleges that, on November 3, 2025, J&J "suspended" a "Statement of Work" contract with Rao's "newly formed commercial entity, CoReason Inc." (*Id.* ¶¶ 396, 397.) Rao believes that J&J did so "[b]ecause" EPAM filed this "highly publicized federal lawsuit." (*Id.* ¶ 397.) Rao additionally alleges that, due to this "litigation," CoReason has "suspend[ed] further business operations." (*Id.* ¶ 398.) Absent the lawsuit, Rao speculates that CoReason was "projected" to secure contracts with unspecified businesses that would exceed more than $10 million in revenue and achieve a total $1 billion valuation. (*Id.* ¶ 399.) Notably, on this point, Rao's allegations concern purported harms suffered by CoReason (a non-party to this case), not injuries he personally incurred. (*See generally* ¶¶ 396-399, 421-429.)

Finally, Rao contends that EPAM asserts trade secret protection over materials that, Rao posits, are "open-source" and in the public domain. (*Id.* ¶¶ 332, 339, 340.)

## STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, 967 F.3d 295, 300 (3d Cir. 2020). "[C]onclusory or 'bare-bones' allegations" and "threadbare recitals of the elements of a cause of action" do not suffice. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). In addition to a pleading and its exhibits, the Court can consider "documents incorporated by reference" into a complaint. *See Metro. Edison Co. v. Pa. Pub. Util. Comm'n*, 767 F.3d 335, 341 n.1 (3d Cir. 2014). When doing so, the Court need not "accept as true conclusory allegations contradicted by documents underlying the complaint." *U.S. Claims, Inc. v. Flomenhaft & Cannata, LLC*, 2006 WL 8460176, at *2 (E.D. Pa. 2006). This doctrine "prevent[s]" plaintiffs from "maintaining a claim based on an extrinsic

document that they selectively quote." *Adair,* 2026 WL 295744, at *3–4 (citation and quotation omitted). Additionally, the Court can take judicial notice of information on "publicly available documents on government websites," public filings with the Securities and Exchange Commission, and other "sources not reasonably subject to dispute." *Adair*, 2026 WL 295744, at *4-5; *Lapensohn*, 2021 WL 1581402, at *3; *Landair Transp., Inc. v. Del's Truck & Auto Repair*, 2018 WL 950208, at *2 n.1 (M.D. Pa. 2018). As with documents incorporated by reference, the Court is "not required to credit factual allegations contradicted" by "matters of public record of which we may take judicial notice." *Lynch v. Long*, 2026 WL 949041, at *17 (E.D. Pa. 2026).

## ARGUMENT

### I. The CEPA Claim Must Be Dismissed

Rao's first counterclaim asserts whistleblowing retaliation under New Jersey's Conscientious Employee Protection Act ("CEPA"). Specifically, Rao contends that he blew the whistle regarding: (1) alleged "deceptive staffing practices" on EPAM's Gilead Sciences account; and, (2) EPAM's commercialization of software code that Rao contends belongs to an EPAM client, Takeda. Rao further contends that, in response to his alleged protected conduct, EPAM "constructively demoted him, imposed a punitive and structurally unachievable [PIP], and ultimately executed his involuntary termination." (Counterclaims ¶ 408.)

To plead a CEPA retaliation claim, Rao must sufficiently allege: (1) a reasonable belief the conduct complained of "violated a law, rule, regulation, or public policy, or is fraudulent or criminal"; (2) whistleblowing; (3) an adverse employment action; and (4) a causal connection between the whistleblowing and the adverse employment action. *See Avetzuk v. Hertz Corp.*, 2025 WL 559845, at *3 (D.N.J. 2025). Here, Rao alleges an adverse employment action – his termination. But he fails to plead facts supporting the other three *prima facie* prongs.

### A. Rao Concedes That He Was Terminated For Non-Retaliatory Reasons And Otherwise Pleads Facts Refuting Any Suggestion Of Causation

Although Rao fails to plead any of the remaining elements of his *prima facie* case, his most flagrant failure concerns the fourth prong: his failure to allege a causal connection between his alleged protected activity and any alleged adverse employment actions. Here, Rao does not merely fail to plead facts. Rather, the facts he does plead utterly refute his conclusory claims.

Put simply, the facts that Rao pleads, which must be accepted as true for this motion, reflect that Rao was terminated for lawful reasons unrelated to alleged CEPA whistleblowing. Specifically, Rao alleges that: (1) as Klebanov "confessed," EPAM's Board had "mandate[d]" that Klebanov "immediately reduce costs"; and (2) while Rao generated "substantial revenue" for EPAM, this revenue did not enrich Klebanov, as it "did not legally credit toward" Klebanov's "earn-out targets." (Counterclaims ¶¶ 351, 361-362.) In fact, Rao identifies this second reason as the specific basis for why "Klebanov moved to eliminate [his] position." (*Id.* ¶ 351.)

Similarly, while Rao also complains about the "threat of a PIP and demotion" (which ultimately never happened), *id.* ¶¶ 356, 366, he expressly attributes non-retaliatory motives to these threats: he alleges that EPAM wanted to "force a voluntary resignation" by making his work experience unpleasant, so EPAM could enforce his non-compete. (*Id.* ¶ 363.) Had EPAM merely "eliminat[ed] Dr. Rao's role," for cost-cutting reasons, that would "free him to compete." (*Id.*)

In sum, because Rao expressly attributes the adverse employment actions he supposedly suffered to non-retaliatory reasons, his CEPA claim must be dismissed with prejudice. *See Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) (where allegations are merely "consistent with" discrimination but present an "obvious alternative explanation" for the alleged conduct, "discrimination is not a plausible conclusion"); *Ho-Ho-Kus, Inc. v. Sucharski*, 2024 WL 4647964, at *14 (D.N.J. 2024) (dismissing CEPA claim where factual allegations supported the "alternative, and entirely lawful,

theory" that plaintiff was terminated due to a "difference of opinion"); *Henson v. Daimler Truck N. Am. LLC*, 2023 WL 3072532, at *8 (D.N.J. 2023) (dismissing CEPA "[b]ecause the allegations here support a non-retaliatory explanation for the adverse action"); *Figueroa v. Caliber Collision*, 2022 WL 9997786, at *3 (D.N.J. 2022) (allegations did not show "causal link between [employee's] claimed reporting" and his "firing").

Furthermore, at least as to the Takeda "software code" issue, Rao's purported protected activity happened *after* EPAM informed him that he was being terminated. Rao alleges that he learned of his "impending separation" on September 17, 2025. (Counterclaims ¶ 352.) It was not until six days *later*, on September 23, when Rao received the opinion from "internal legal counsel" that supposedly caused him to "object[]" and "refus[e]" to "commercializ[ing]" the software code. (*Id.* ¶¶ 319, 406 & Ex. B; Yu Decl. Ex. 5.) EPAM could not have "retaliated" against Rao based on protected activity which had not yet happened. *See Waiters v. Aviles*, 418 F. App'x 68, 72 (3d Cir. 2011) (no causation where adverse actions happened before protected activity); *Power v. Lockheed Martin Corp.*, 419 F. Supp. 3d 878, 898 (E.D. Pa. 2020) ("Because [plaintiff] had not yet engaged in protected activity at the time that [managers] discussed placing him on the PIP, their resulting decision to do so could not have been motivated by retaliatory animus").

**B. Rao Fails To Allege His Purported "Reasonable Belief" Of Wrongful Conduct**

The CEPA claim must also be dismissed because Rao pleads no facts – as opposed to conclusory allegations – to support that he held a reasonable belief that EPAM "violated a law, rule, regulation, or public policy, or [was] fraudulent or criminal." As explained below, this failure dooms both Rao's "deceptive staffing" and Takeda "software code" claims.

***i. The "Deceptive Staffing" Claim***

As to the "deceptive staffing" claim, Rao throws out the names of numerous laws and regulations – such as HIPAA, HITECH, and OFAC. But Rao doesn't explain why he reasonably

believed that EPAM's alleged use of employees in foreign jurisdictions such as Serbia and Belarus would violate any of these rules. He doesn't, for instance, point to anything in HIPAA or in HITECH which would prohibit an employer from assigning work or sharing data with employees located in foreign jurisdictions. Similarly, while the United States government, through OFAC, imposes sanctions on certain foreign countries and individuals, the scope of the sanctions is publicly available. Serbia is not a sanctioned country, and sanctions to Belarus only apply to specific individuals. (*See generally* https://ofac.treasury.gov/sanctions-programs-and-country-information). Even as to Russia, where sanctions are broader and Rao asserts only a vague allegation (failing to identify a single EPAM employee based in Russia, or any supposedly unlawful conduct as to that employee), there is no blanket ban on U.S. companies employing persons in Russia. (*See* https://ofac.treasury.gov/faqs/topic/6626). Indeed, that is not how U.S. sanctions rules work.[6] Nowhere does Rao identify specific sanctions against any country that would preclude EPAM from providing data access or assigning unspecified work to employees in Serbia or Belarus (Counterclaims ¶¶ 323-324), or that would bar EPAM from employing someone in Russia to perform some unidentified task. (*Id.* ¶ 322.)

This kind of pleading does not suffice to plead CEPA's "reasonable belief" prong. To overcome a motion to dismiss, Rao must do more than merely recite the names of laws and claim they were violated. *See Avetzuk*, 2025 WL 559845, at *5 (allegation that employer "violated the Houck Act" insufficient); *Safonof v. DirectSat USA*, 2020 WL 1527946, at *4 (D.N.J. 2020)

---

[6]U.S. sanctions regulate specified transactions and dealings with blocked persons or prohibited sectors, not employment of foreign nationals writ large (whether domestically or remotely). *See*, *e.g.*, *United States v. Amirnazmi*, 645 F.3d 564, 573 (3d Cir. 2011) (*quoting* 50 U.S.C. § 1702(a)(1)). OFAC's Russia sanctions target specified transactions involving particular persons or categories of persons. *See*, *e.g.*, Executive Order 14024, *Blocking Property With Respect to Harmful Foreign Activities of the Government of the Russian Federation*, 86 Fed. Reg. 20249 (Apr. 15, 2021). They do not impose a blanket ban on employing Russian nationals.

(conclusory allegation that employer violated "laundry list" of nine statutes insufficient). He must "plainly specify the ways" in which he believed the laws were violated, and establish "a substantial nexus between the alleged conduct and the supposed violations." *Safonof*, 2020 WL 1527946, at *4. Because Rao fails to meet that standard, his "deceptive staffing"-based CEPA claim must be dismissed.

#### *ii. The Takeda "Software Code" Claim*

Rao also fails to allege that he held reasonable belief that EPAM's conduct as to alleged Takeda "software code" issue violated a "law, rule, regulation, or public policy, or is fraudulent or criminal." *Avetzuk*, 2025 WL 559845, at *3. As to this issue, Rao cites the Defend Trade Secrets Act ("DTSA"). (Counterclaims ¶ 406.) But Rao does not explain why or how he reasonably believed that the conduct at issue violated the DTSA.

In fact, while Rao vaguely alleges that EPAM schemed to "commercialize and resell" Takeda's software to J&J (*id.*), his own Exhibit B paints a vastly different picture. As Exhibit B reflects, EPAM, with Rao leading the charge, only wished to use Takeda's software as a "demo." (*Id.* at 3.) As Rao explained, what EPAM was "selling" was not the "product," but the service: "we built this for Takeda and we can build something like this for you." (*Id.* at 1.) And Rao sought to act with Takeda's permission, which he thought he could get. (*Id.* at 1, 3.) Nowhere in Rao's Counterclaims does he "plainly specify the ways" he believed using Takeda's software as a "demo," with Takeda's permission, would violate the DTSA. *Safonof*, 2020 WL 1527946, at *4. Thus, Rao also fails to plead the reasonable belief prong as to the Takeda software code issue.

### **C. Rao Fails To Allege Any Protected Whistleblowing**

Rao also fails to sufficiently allege that he engaged in protected whistleblowing activities. As to the purported "deceptive staffing" scheme, Rao alleges that a "Gilead representative" first "raised" the "alarming" issue of purported "geographic discrepancies" in the project's staffing.

(Counterclaims ¶ 325.) Only *afterwards* did Rao "escalate[]" *Gilead's* concerns to Klebanov. (*Id.* ¶ 326.) In other words, it was Gilead, not Rao, that "blew the whistle." Rao merely passed along Gilead's concerns about its own account. That is not CEPA-protected whistleblowing. *See* N.J.S.A. § 34:19-3(a) (protecting employee who "[d]iscloses, or threatens to disclose" illegal acts).

As to the Takeda software code issue, Rao's purported "whistleblowing" principally consisted of him seeking *legal advice* from EPAM's in-house legal department. (Counterclaims ¶ 319.) But seeking legal advice is not a disclosure to a "supervisor or public body," and thus doesn't qualify as CEPA-protected whistleblowing. N.J.S.A. 34:19-3(a). Moreover, even if Rao then conveyed this legal advice to his superior, who disagreed with in-house counsel's opinion, a company's internal "legal disagreement" does not constitute CEPA-protected activity. *Saqa v. Factory Mut. Ins. Co.*, 2024 WL 939689, at *6 (D.N.J. 2024); *see generally Baldwin v. City of Atl. City*, 2015 WL 5009746, at *6-7 (N.J. App. Div. 2015) (appearing to agree that CEPA claim cannot be premised on privileged legal advice).

Aside from the above, Rao vaguely proffers that he "objected" or "refused" to participate in the above practices. (Counterclaims ¶¶ 321, 327, 404, 405, 406.) But these allegations merely parrot CEPA's language. *See* N.J.S.A. 34:19-3(c) (prohibiting retaliation against employee who "[o]bjects to, or refuses to participate in any activity, policy or practice" protected by CEPA). And the "threadbare recital[]" of a cause of action does not state a claim. *Ashcroft*, 556 U.S. at 678. Missing are facts, beyond vague generalities, explaining what Rao did to "object" and "refuse." Perhaps most basically, Rao pleads no facts about whether he informed EPAM that his alleged "objections" and "refusals" were because of his purported belief that EPAM was breaking the law. If anything, Rao's factual allegations reflect he never gave EPAM such notice, believing he was "legally excused" from doing so. (Counterclaims ¶ 407.) But, if EPAM did not know *why* Rao

objected and refused to perform work, then it had no reason to know that Rao was engaging in CEPA-protected activity, instead of mere insubordination. Rao's CEPA claim fails for that additional reason. *See Mirena v. Exec. Jet Mgmt., Inc.*, 760 F. Supp. 3d 224, 252 (D.N.J. 2024) (under CEPA, employer "cannot retaliate based on something it does not know about").

## II. <u>The Defamation *Per Se* Claim Must Be Dismissed</u>

In his second counterclaim, Rao asserts defamation *per se*. Under Pennsylvania's choice-of-law rules, New Jersey law applies. *See Marcone v. Penthouse Int'l Mag. For Men*, 754 F.2d 1072, 1077 (3d Cir. 1985) (law of the aggrieved party's domicile applies to a defamation claim).

To assert a defamation under New Jersey law, Rao must show that EPAM: (1) made a false and defamatory statement concerning Rao; (2) that the statement was communicated to another person and not privileged; and (3) that EPAM "acted negligently or with actual malice." *G.D. v. Kenny*, 205 N.J. 275, 292–93 (N.J. 2011). "To satisfy the communication element of a defamation claim, the complaint must 'plead facts sufficient to identify the defamer and the circumstances of publication'." *Mangan v. Corp. Synergies Grp., Inc.*, 834 F. Supp. 2d 199, 206 (D.N.J. 2011). Rao must also allege that the statement "was communicated to a person or persons" other than him. *Feggans v. Billington*, 677 A.2d 771, 775 (N.J. App. Div. 1996).

Here, Rao's defamation claim must be dismissed because: (A) he fails to identify the "defamer," "circumstances of publication," or the recipient on the statement; (B) he fails to plead facts to show that EPAM made a false statement, much less that it did so negligently or with malice; and (C) EPAM's alleged conduct is protected by a qualified privilege.

### A. Rao does not identify "the defamer and the circumstances of publication" or the "person or persons" to whom he was allegedly defamed

Rao fails to allege facts sufficient to satisfy the communication element of a defamation claim. He alleges vaguely that "EPAM executives" defamed him "to third parties." While he

identifies one alleged defamer by name (Klebanov), he does not identify to whom Klebanov allegedly defamed him apart from "industry participants—including Gilead Sciences." Rao fails to identify a single person at Gilead Sciences whom Klebanov spoke to, and similarly fails to describe the circumstances or means of that alleged correspondence except to quote allegations that EPAM made against Rao in its federal court complaint. That is not sufficient to state a defamation claim, so his claim must be dismissed. *See Zoneraich v. Overlook Hosp.*, 514 A.2d 53, 63 (N.J. App. Div. 1986) (dismissing defamation claim that did not "plead facts sufficient to identify the defamatory words, their utterer and the fact of their publication."); *Ho-Ho-Kus, Inc. v. Sucharski*, 2025 WL 2416937, at *12 (D.N.J. 2025) ("allegedly defamatory statements" made to "anonymous aerospace customers and without any information regarding the date, time, or circumstances of the alleged publication," such as "to whom" within a company a defamatory statement was made "lacks the specificity and particularity required to survive dismissal").

### B. Rao Fails To Allege Falsity, Much Less Falsity With Negligence Or Actual Malice

Rao's defamation claims are defective for another reason. When considering the materials that Rao incorporates by reference into his Counterclaims, it is also clear that Rao fails to allege that EPAM made a false statement, much less that it did so negligently or with actual malice.

Rao attempts to meet the falsity and intent prongs of a defamation claim by claiming that EPAM's data theft claims were refuted by materials such as "EPAM's own IT logs demonstrating that the file transfers were passive, automated OneDrive synchronizations, as well as contemporaneous written communications from EPAM's Human Resources department authorizing Dr. Rao's actions." (Counterclaims ¶ 415.) And Rao further references the "comprehensive examination" done by the parties' "neutral, third-party forensic vendor," which Rao describes as "exculpatory." (*Id.* ¶¶ 386-389.)

These documents, which Rao incorporates by reference, do not support his defamation claims. The Microsoft 365 audit logs generated by EPAM and incorporated into the forensic protocol as Exhibit B identified over 10,000 "File downloaded" events and approximately 45,000 "FileSyncDownloadedFull" events. (*See* Yu Decl. ¶¶ 5 - 6). This transfer of tens of thousands of documents to Rao's devices occurred two weeks after Rao alleges he was notified of his impending termination. (*Compare id. with* Counterclaims ¶ 352.) As for the independent forensic examination, the forensic neutral's analysis clearly showed that ***shortly after the commencement of this litigation***, ***the computer reset resulted in the lack of several forensic artifacts that could have established the existence of extensive EPAM Confidential Information, including additional evidence indicating that data could have been transferred or retained elsewhere***.(*See* Yu Decl, Exs. 2, 3). These documents, in short, do not back up Rao's conclusory assertions that EPAM made false statements, much less that it did so negligently. *See Ames v. Am. Radio Relay League Inc.*, 2016 WL 7404473, at *4 (E.D. Pa. 2016) (dismissing defamation claim where documents established that challenged statements were true), *aff'd*, 716 F. App'x 115 (3d Cir. 2017); *see also Shaker v. U.S. Dep't of Health and Human Servcs.*, 2026 WL 835577, at *6 (W.D. Pa. 2026) ("Having considered the public documents cited in the footnotes . . . it is clear that Plaintiff has interpreted those documents to say things that they do not.").

Even putting aside that the documents Rao invokes to allege falsity actually *support* EPAM's misappropriation claims, his defamation claim would still fail. At bottom, Rao's defamation claim is premised on his own subjective disagreement with EPAM's allegations against him. That is not enough. The Microsoft 365 audit logs generated by EPAM and incorporated into the forensic protocol as Exhibit B leave no doubt that, prior to his exit from EPAM, Rao downloaded tens of thousands of documents from EPAM's network—many of which contain

filenames or file paths referencing confidential information of EPAM or of its clients. (*See* Yu Decl. ¶¶ 5 - 6). Whatever Rao's justifications for that unauthorized conduct may be (*e.g.*, Counterclaims ¶ 374), his excuses do not plausibly suggest that EPAM's alleged statements to third parties regarding Rao's conduct were made even negligently. *See Crescenz v. Penguin Grp. (USA) Inc.*, 2012 WL 6761817, at *4 (D.N.J. 2012) (defamation claim failed because negligence requires more than "truth/falsity," and "[i]t is not negligence simply because some evidence contrary to a believed fact exists"), *aff'd*, 561 F. App'x 173 (3d Cir. 2014); *Abella v. Barringer Res., Inc.*, 615 A.2d 288, 292 (N.J. Sup. Ct., Ch. Div. 1992) (even if statements were false, independent auditor was not negligent).

### C. EPAM's alleged communications to Gilead Sciences are protected by New Jersey's common law qualified privilege

Rao also fails to allege that EPAM's statement was "unprivileged." *Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 585 (N.J. 2009) ("unprivileged publication" is element of defamation claim). Here, EPAM's alleged statement, if it occurred at all, was protected by a common law "qualified privilege," which protects individuals from legal liability for statements made to protect their "own interest." *Feggans*, 677 A.2d at 776 (internal quotations and citations omitted). "The public policy underlying this qualified privilege is 'that it is essential that true information be given whenever it is reasonably necessary for the protection of one's own interests.'" *Id*. When the privilege applies, "it is irrelevant whether the statement at issue was defamatory." *Id.* (statements made by coworkers to manager and union representative were privileged due to the "interest that each employee has in the condition of his or her work environment").

This privilege applies here. Rao alleges that EPAM made statements "to authorized representatives of EPAM clients and industry participants," in order to protect EPAM's interests, given Rao's "criminal 'theft' of tens of thousands of confidential files, misappropriate[ion of] trade

secrets, and commi[ssion of] professional 'sabotage'." (Counterclaim ¶ 414.) To overcome that qualified privilege, Rao must allege facts demonstrating malice. *See Darakjian v. Hanna*, 366 N.J. Super. 238, 251 (N.J. App. Div. 2004). Yet, as noted above, Rao's allegations do not suffice even to allege negligence. His defamation claim must be dismissed for this additional reason.

## III. <u>The Tortious Interference Claim Must Be Dismissed</u>

In his third counterclaim, Rao accuses EPAM of interfering in the business opportunities of "his commercial entities," CoReason Inc. and Scientific Infomatics, LLC. (Counterclaims ¶ 421, collectively "CoReason").[7] Rao alleges first that EPAM tortiously interfered with CoReason's potential business opportunities when "senior personnel" at EPAM, including Klebanov, "directly communicated false statements to authorized representatives at Gilead Sciences and other industry participants." (Counterclaim ¶ 424.) Second, he alleges that EPAM tortiously interfered with CoReason's potential business opportunities by filing a lawsuit against him, alleging in a conclusory manner that EPAM's lawsuit is a "sham litigation." (*Id.* ¶ 425.)

Rao's tortious interference claim must be dismissed because he does not have standing to bring the claim, and because EPAM's alleged conduct is protected by the absolute litigation privilege and the *Noerr-Pennington* Doctrine.

### A. Rao Does Not Have Standing To Bring This Claim

As a threshold matter, Rao does not have standing to bring a tortious interference claim on CoReason's behalf. For that reason alone, this counterclaim must be dismissed.

"Standing is a fundamental threshold issue." *3G Wireless, Inc. v. Metro PCS Pa. LLC*, 2016 WL 823222, at *4 (E.D. Pa. 2016) (citations and quotations omitted). To establish standing, a

[7] Because this counterclaim stems from EPAM's conduct in Pennsylvania, the relationship between Gao and EPAM centered in Pennsylvania, and no true conflict of law exists, Pennsylvania law governs the tortious interference with prospective economic advantage claim. *Fin. Software Sys., Inc. v. First Union Nat. Bank*, 1999 WL 1241088, at *6 (E.D. Pa. 1999).

litigant must "assert his or her own legal rights rather than those of third parties." *Id.* "It is well established that, absent a direct individual injury, the president and principal shareholder of a corporation lacks standing to sue for an injury to the corporation." *Meade v. Kiddie Acad. Domestic Franchising, LLC*, 501 F. App'x 106, 108 (3d Cir. 2012) (affirming motion to dismiss).

Here, the alleged business opportunities that EPAM purportedly interfered with belonged to his "commercial entities," *i.e.*, CoReason, not to Rao personally. (Counterclaims ¶¶ 421, 423.) Because Rao lacks standing to sustain legal claims on CoReason's behalf, this counterclaim must be dismissed. *Meade*, 501 F. App'x at 108; *Cramer v. Cecil Baker & Partners, Inc.*, 2019 WL 2774181, at *3 (E.D. Pa. 2019) (company president not entitled to sue "in his individual capacity" based on harms to company); *Fitzgerald v. Little*, 2026 WL 710233, at *8 (D.N.J. 2026) ("[I]ndividuals lack standing to sue on behalf of a corporation or company for losses sustained by the business entity"). For this threshold reason, Rao lacks standing to pursue the tortious inference claim. Thus, the Court should dismiss this claim for lack of subject matter jurisdiction.

**B. Rao Fails to Plead Tortious Interference**

Even if Rao could somehow establish his standing to purse this claim (he cannot), EPAM's alleged "interference" was not tortious. It was protected under both the United States Constitution and common law, and otherwise must be dismissed as duplicative of the defamation claim.

In short, Rao alleges that EPAM tortiously interfered with CoReason's business opportunities by "weaponiz[ing] the federal judicial system" through this lawsuit and related communications. (Counterclaim ¶ 425.) Yet the *Noerr-Pennington* doctrine, predicated on the First Amendment's right to petition, "provides broad immunity from liability to those who petition the government, including [] courts," through the filing of lawsuits, "for redress of their grievances." *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 178 (3d Cir. 2015). That includes barring tortious inference claims. *Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*,

401 F.3d 123, 140 (3d Cir. 2005) ("[T]he *Noerr/Pennington* doctrine shields petitioning activity from liability for claims of tortious interference"). Rao must overcome a high bar to establish the "sham litigation" exception to the doctrine, and his pleading does not come close to doing so. *Hanover 3201 Realty*, 806 F.3d at 180.

As Rao is litigating these claims in Pennsylvania, EPAM is additionally protected by Pennsylvania's absolute litigation privilege, also known as "judicial immunity." *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 311 (3d Cir. 2003). The privilege protects "statements made in court filings," like those Rao identifies in his counterclaim. *Id.* at 312. While the same result should enter here regardless, unlike the *Noerr-Pennington* Doctrine, there is no "sham lawsuit" exception to the absolute judicial privilege. *Post v. Mendel*, 510 Pa. 213, 220 (Pa. 1986) (privilege protects right to "to present whatever claims, true or false, real or fictitious"). In sum, both *Noerr-Pennington* and the common law litigation privilege bar Rao's tortious interference counterclaim premised on EPAM's filing of this lawsuit.

Further, if Rao bases this claim on the alleged defamatory statements made to third parties, this claim is "duplicative" of his defamation claim, and must be dismissed on that basis as well. *See Yoho v. Bank of New York Mellon Corp.*, 2022 WL 296637, at *3 (3d Cir. 2022).

## IV. <u>The Declaratory Judgment Count (Non-Competition Covenant) Is Moot</u>

In his fourth counterclaim, Rao seeks a declaratory judgment stating that he "is not bound by the non-competition provisions of Section 5(c) of the Agreement." (Counterclaim ¶ 437.) While Count VII of EPAM's original Complaint contained a breach of contract claim related to the non-competition provision of the Employment Covenants Agreement (ECF No. 1 at ¶¶ 156-168), EPAM withdrew that claim in its Amended Complaint (*see* ECF No. 37 (Amended Complaint) and ECF No. 37-4 at p. 31 (Redline Comparison of Original and Amended Complaint)).

Because EPAM does not seek to enforce the non-competition provisions of Rao's Agreement, there is no justiciable controversy for this Court to consider, so the counterclaim seeking a declaratory judgment regarding the enforceability of those provisions must be dismissed as moot. *See Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 647 (3d Cir. 1990).

## V. <u>The Declaratory Judgment Count (Intellectual Property) Must Be Dismissed as a Redundant Mirror Image of EPAM's Claims</u>

In his fifth counterclaim, Rao asks the Court to enter a declaratory judgment holding that EPAM does not own the intellectual property at the center of its lawsuit against Rao—and that EPAM does not have standing to bring its lawsuit. (Counterclaim ¶¶ 439-445.) Specifically, Rao asks the Court to "enter judgment in his favor" that he is not liable for misappropriation because "EPAM lacks proprietary ownership and legally enforceable trade secret rights" over the "AI Cohort Generator," "AI Accelerator," and "ETL Conversion Kit." (Counterclaim ¶ 445.)

Those are the exact "materials" that form the basis of EPAM's lawsuit against Rao. (*See* ECF No. 1 at ¶¶ 100, 113, 127.) Put another way, with his fifth counterclaim, Rao asks the Court to enter judgment for him in EPAM's lawsuit. That is not an appropriate counterclaim because it is a redundant, mirror-image of EPAM's Complaint. *Aldens, Inc. v. Packel*, 524 F.2d 38, 51 (3d Cir. 1975) (where "there is a complete identity of factual and legal issues between the complaint and the counterclaim," dismissal is appropriate); *see also Principal Life Ins. Co. v. Minder*, 2009 WL 1917096, at *2 (E.D. Pa. 2009) (dismissing counterclaim as a 'mirror image' plaintiff's claim against defendant, holding that the "counterclaim is redundant of the issues that will necessarily be adjudicated" in resolving the plaintiff's claim). This claim must be dismissed.

## VI. <u>The Abuse of Process Claim Must Be Dismissed</u>

In his sixth counterclaim, Rao alleges "abuse of process" by EPAM, specifically alleging that "EPAM initiated, and continues to pursue, this action against Dr. Rao for an ulterior, anti-

competitive motive." (Counterclaim ¶ 447.) Because Rao "explicitly bases alleged liability on [EPAM's] actions undertaken pursuant to this litigation," the *Noerr-Pennington* doctrine bars this claim as well. *See Audi of Am., Inc. v. Bronsberg & Hughes Pontiac, Inc.*, 2017 WL 11573271, at *5 (M.D. Pa. 2017); *VIM, Inc. v. Somerset Hotel Ass'n*, 19 F. Supp. 2d 422, 430 (W.D. Pa. 1998) (dismissing "malicious use of process" claim under *Noerr-Pennington* doctrine).

Even if Rao could somehow overcome the *Noerr-Pennington* bar, he fails to state a claim. To establish abuse of process,[8] Rao must allege facts showing that EPAM: "(1) used a legal process against [him], (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to [him]." *Langman v. Keystone Nat'l Bank & Tr. Co.*, 672 F. Supp. 2d 691, 700 (E.D. Pa. 2009). "[T]he word 'primarily'" means "that there is no action for abuse of process when the process is used for the purpose for which it is intended." *Gen. Refractories Co.*, 337 F.3d at 305 n.2. Phrased differently, an action exists only if process is "somehow perverted so as to achieve an unrelated result." *Rosen v. Tabby*, 1997 WL 667147, at *8 (E.D. Pa. 1997), *aff'd*, 175 F.3d 1011 (3d Cir. 1999) (quotations and citations omitted). With that framework, Rao does not allege anything close to abuse of process by EPAM.

*First*, Rao's claim that EPAM "manufacture[d] an emergency" to obtain a TRO (Counterclaim ¶¶ 449-50) is not a "perversion" of process. EPAM used the TRO process to try to obtain a TRO (with Rao ultimately consenting to a preliminary injunction)—the exact purpose for which the process was intended.

---

[8]Because this case is being litigated in Pennsylvania, Pennsylvania law applies to this claim. *See* Restatement (Second) of Conflict of Laws § 155 (1971).

*Second*, Rao's claim that "EPAM submitted incomplete documentary evidence" is similarly insufficient because Rao merely challenges EPAM's evidence. (*Id.* ¶ 451.) That is a mundane litigation dispute, not a tort, and Rao's remedy, if any, is to present additional evidence.

*Third,* Rao's claim that "EPAM abused the discovery process" again wrongly attempts to transform an ordinary litigation dispute into a tort. (*Id.* ¶ 452.) Rao's remedy, if any, would be to seek a Protective Order under Fed. R. Civ. P 26(c), not to assert a counterclaim. Meanwhile, the forensic process was specifically agreed to by Rao, further discrediting this claim.

*Finally,* Rao's claim that EPAM's "ongoing prosecution" of its lawsuit is in bad faith because a "neutral forensic vendor" conducted a search that "yielded no evidence that Defendant exfiltrated, transferred, or misappropriated Plaintiff's alleged trade secrets" (Counterclaim ¶¶ 453-54), is both flatly contradicted by the documents he incorporates by record (as discussed herein) and, in any event, does not constitute abuse of process as a matter of law. "There is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even [] with bad intentions." *Fouad v. Milton Hershey Sch. & Tr.*, 2020 WL 8254470, at *20 (M.D. Pa. 2020). Rao's abuse of process counterclaim consequently fails as a matter of law.

## VII. <u>The Breach of the Implied Covenant Claim Must Be Dismissed</u>

In his seventh counterclaim, Rao alleges that "EPAM breached the implied covenant of good faith and fair dealing by exercising its managerial discretion maliciously to deprive Dr. Rao" of the "contractual benefit" of Section 5(c) of the Agreement. Delaware law applies because the Agreement is governed by Delaware law. (*See* ECF No. 30-1, ¶ 9.)

The elements of breach of the implied covenant of good faith and fair dealing are those of a breach of contract: contract, breach, damages. *See Whitestone REIT Operating P'ship, L.P. v. Pillarstone Cap. REIT*, 2024 WL 274228, at *7 (Del. Ch. 2024). "The implied covenant" serves "to infer contract terms to handle developments or contractual gaps that the asserting party pleads

neither party anticipate." *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (internal quotations and citations omitted). This claim fails on two independent grounds.

*First*, because Rao was an at-will employee, he cannot assert a breach of the covenant of good faith and fair dealing. Delaware law permits at-will employees to bring implied covenant claims only in limited situations, none of which apply here. *See Workman v. Astronaut Topco, L.P.*, 2025 WL 2506027, at *11 (Del. Super. Ct. 2025); *Robnett v. Lithos Indus. Inc.*, 2024 WL 4836704, at *7 (Del. Ch. 2024). Nothing in Rao's employment contract barred EPAM from "stripping Profit & Loss (P&L) authority" from him, "attempt[ing] to demote him," or otherwise managing the employment relationship, and the Court cannot, under the guise of the implied covenant, read terms into his agreement that do not exist. *Workman*, 2025 WL 2506027 at *11.

*Second*, the Counterclaims fail to plausibly suggest that the alleged "breach" here caused Rao damages. Put simply, Rao alleges that EPAM engaged in a "bad faith" campaign to force a "voluntary" resignation in order to vitiate his non-compete. (Counterclaims ¶¶ 458-466.) But Rao *did not* voluntarily resign. And, while Rao makes a conclusory assertion of having suffered damages such as the "loss of his salary and benefits," he fails to plausibly explain how an *unsuccessful* scheme to force him to resign cost him a penny. (Counterclaims ¶ 466.)

## VIII. Rao's Fraudulent Inducement Claim Must Be Dismissed

Count VIII alleges fraudulent inducement in connection with the Agreement. Because the Agreement's choice of law provision applies to "all matters arising out of or relating to this Agreement," even those in "tort," Delaware law governs this claim. (*See* Am. Compl. Ex. A § 9.)

Under Delaware law, to plead fraudulent inducement, Rao must allege: (1) a false representation; (2) the defendant's knowledge or reckless indifference that the representation was false; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance; and (5) damage to the plaintiff due to such reliance. *See*

*TherapeuticsMD, Inc. v. Mayne Pharma LLC*, 2026 WL 802333, at *10 (D. Del. 2026). Additionally, the fraud must be "material" and "concern an essential part of the transaction." *Brody v. DCiM Sols., LLC*, 2025 WL 1802239, at *7 (Del. Ch. 2025) (collecting cases). Those basic elements aside, to comply with Rule 9(b), Rao must plead fraud with particularity. That means Rao "must describe the time, place, and contents of the false representations or omissions, as well as the identity of the person making the statement and the basis for the statement's falsity." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 680 (3d Cir. 2023). In other words, Rao must plead the "who, what, when, where and how." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009). Here, Rao's allegations do not assert a plausible claim under Rule 8—let alone satisfy Rule 9(b)'s heightened standards.

### A. Rao Fails To Allege Any False Statements, About Odysseus Or Otherwise

At the outset, Rao fails to allege the most basic element of a fraudulent inducement claim – a false representation. Principally, Rao alleges that EPAM made a misrepresentation by stating that its "Health and Life Sciences business unit" was a $400 million business, which it hoped to "aggressively scal[e]" to $1 billion. (Counterclaims ¶ 309.) Yet the first part of this statement – that EPAM's "Health and Life Sciences business unit" was a $400 million business – was not only true, but an understatement. As EPAM's public filings confirm, this unit earned about $490 million in revenue in 2023, and over $574 million in revenue in 2024. (*See* EPAM Systems, Inc. Form 10-K for the year ended Dec. 31, 2024, dated Feb. 28, 2025 at 33.)

And the second part of the statement – that EPAM hoped to scale the unit to $1 billion in revenue – is not a factual representation at all, but a statement of future intent, which generally cannot support a fraudulent inducement claim. *Sapp v. Indus. Action Servs., LLC*, 2024 WL 3444633, at *4 (D. Del. 2024) ("Generally, prior oral promises or statements of future intent do not constitute false representations of fact that would satisfy the first element of fraudulent

misrepresentation") (citation and quotation omitted). Further, Rao pleads no facts to suggest that EPAM lacked this intent.[9] If anything, the rapid year-on-year grown in EPAM's Life Sciences and Healthcare business from $490 million in revenue in 2023 to $574 million in revenue in 2024 amply demonstrates that EPAM genuinely expressed its desire to grow the business. (*See* EPAM Systems, Inc. Form 10-K for the year ended Dec. 31, 2024, dated Feb. 28, 2025 at 33.)

So where does Rao's fraud claim come from? As far as EPAM can figure, from his own confusion. Despite EPAM's alleged representation being about the *entire* "Health and Life Sciences business unit," Rao complains that the "Odysseus business line's actual revenue" was only $500,000. (Counterclaims ¶¶ 310, 316.) But EPAM's "Odysseus" business unit is *not* EPAM's entire "Health and Life Sciences business unit," only a subset of it. And Rao does not allege that EPAM ever represented otherwise. To the contrary, Rao acknowledges that EPAM acquired Odysseus only in 2024 (*id.* ¶ 306), adding the unit to a division that *already* earned over $490 million in revenue the prior year. (*See* EPAM Systems, Inc. Form 10-K for the year ended Dec. 31, 2024, dated Feb. 28, 2025 at 33.) Rao's mistaken conflation of Odysseus with EPAM's entire Life Sciences and Healthcare business does not transform a true statement into a misrepresentation, dooming the fraud claim. *See generally, Turnofsky v. electroCore, Inc.*, 2023 WL 4527553, at *8 (D.N.J. 2023) ("conflating the term 'commercial payor' with the terms 'insurers' or 'insurance payors'" did not state a fraud claim), *aff'd sub nom.* 2024 WL 4987243 (3d Cir. 2024); *Kardosh v. McCallin*, 2025 WL 1534976, at *7 (E.D. Pa. 2025) (a "mistake or misunderstanding" insufficient

[9] If Rao also asserts a fraud claim about purported promises regarding a potential career trajectory to "Chief Medical Officer" (Counterclaims ¶ 470), this claim must be dismissed for a similar reason. Rao alleges no facts, or even conclusory allegations, to support that EPAM lacked the intent for him to have a successful EPAM career. *See vMedex, Inc. v. TDS Operating, Inc.*, 2021 WL 1737298, at *5 (D. Del. 2021) (to allege fraudulent promises of future performance, "a plaintiff must plead specific facts that . . . the promisor had no intention of performing"). Further, such a claim does not satisfy Rule 9(b)'s requirements.

to plead fraudulent concealment). Further, as the statement was not false, Rao cannot claim that it was knowingly or recklessly false.

Nor does Rao plead fraud with particularly. He does not allege who made the statement, leaving one to guess if it was Klebanov or Killian. (Counterclaims ¶ 309.) Nor does he allege the "what" – *i.e.*, what specifically was said, instead relying on a paraphrase. (*Id.* ¶ 309.) And, Rao's confusion between EPAM's entire Life Sciences and Healthcare unit and the Odysseus subunit renders this defect particularly problematic. Further, Rao does not allege the "when," "where," and "how," other than saying it happened while negotiating the Agreement. (*Id.*); *Bentley v. Merck & Co, Inc.*, 2017 WL 2349708, at *2 (E.D. Pa. 2017) ("bald assert[ions]" to "unnamed individuals, on unspecified dates" did not plead a fraud claim). Thus, Rao does not plead the "who, what, when, where and how" of the alleged fraud. *Inst'l Invs. Grp.*, 564 F.3d at 253.

Aside from Rao's conflation of Odysseus with EPAM's entire Life Sciences and Health care business, Rao also alleges that "Klebanov concealed the acquisition-related financial metrics," which Rao asserts led Klebanov to pursue only certain revenue. (Counterclaim ¶ 316.) But this allegation again fails the most basic test of a fraud claim – it does not allege that Klebanov made a "false representation." *TherapeuticsMD, Inc.*, 2026 WL 802333, at *10. Further, Rao pleads no facts suggesting that EPAM had a duty to disclose the specifics of Klebanov's compensation arrangements (*see* Counterclaims ¶ 472), or that the omission was material, or that EPAM purposefully "omitted" how it compensated Klebanov to induce Rao to join EPAM, or that Rao justifiably relied on his lack of knowledge about how Klebanov got paid. *TherapeuticsMD, Inc.*, 2026 WL 802333, at *10; *WP Devon Asssociates, L.P. v. Hartstrings, LLC*, 2012 WL 3060513, at *4 (Del. Super. Ct. 2012) ("absent a fiduciary relationship, there is no duty to speak, and an alleged omission does not constitute fraud"). Similar defects doom Rao's claim that EPAM concealed that

his hiring allegedly "violated" a "non-solicitation covenant[]" with J&J. (Counterclaims ¶ 473.) Once again, Rao fails to allege facts supporting that EPAM owed him a duty to disclose alleged contractual obligations EPAM supposedly owed to a third-party. *WP Devon Asssociates, L.P.*, 2012 WL 3060513, at *4. And, once again, Rao fails to provide facts supporting that the alleged omission was material, or that he justifiably relied on the omission.

Finally, Rao alleges that EPAM represented that it had a "fully operational . . . distributed data network" ready to support his work when, in fact, the "distributed data network" was not "fully operational." (Counterclaims ¶ 316) But, yet again, this allegation fails to plead fraud's common law elements, much less with the requisite particularity.

As to the common law elements, Rao fails to plead facts, or even conclusory allegations, to support that this alleged misrepresentation was "material," meaning that "a reasonable person would attach importance to and be induced to act." *FinClusive Cap., Inc. v. Q2 Software, Inc.*, 2021 WL 5225860, at *11 (Del. Super. Ct. 2021) (fraud claim failed to allege material misrepresentation); *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 948513, at *4 (Del. Ch. 2020) (false but immaterial statement did not support fraud claim). Indeed, Rao pleads no facts to explain what a "distributed data network" is, why it would have been important to him, and what kind of data network EPAM actually had. *See Sapp v. Indus. Action Servs., LLC*, 2024 WL 3444633, at *4 (D. Del. 2024) ("boilerplate" allegations about a "promise to integrate [] subsidiaries" did not state a fraud claim, where allegations lacked "the essential factual background" of promise). While it appears that a distributed data network stores

data in multiple physical locations instead of on a central server,[10] Rao pleads no facts to support that he joined EPAM because of representations about where or how it stored data.

Finally, Rao also does not satisfy the Rule 9(b) requirements. He does not identify the "identity of the person making the statement," merely alleging that "EPAM" did so. *City of Warren Police & Fire Ret. Sys.*, 70 F.4th at 680. And he does not allege "when," "how" or "where" the statement was made. *Institutional Invs. Grp.*, 564 F.3d at 253. For these additional reasons, his fraudulent inducement claim must be dismissed.

**CONCLUSION**

For all of the foregoing reasons, EPAM respectfully requests that this Court grant its Motion to Dismiss and dismiss the Counterclaims in their entirety with prejudice.

Dated: May 6, 2026

Respectfully submitted,

EPAM SYSTEMS, INC.,

By its attorneys,

By: */s/ James Yu*

Jacob Oslick (Pa. Bar No. 311028)
joslick@seyfarth.com
James S. Yu (*pro hac vice* admitted)
jyu@seyfarth.com
Brooke Gary (admitted *pro hac vice*)
brgary@seyfarth.com
620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5500

[10] *See* https://nvlpubs.nist.gov/nistpubs/Legacy/SP/nbsspecialpublication500-154.pdf at p. 8 (last visited May 1, 2026.)