IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EPAM SYSTEMS, INC.,<br><br>Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>GOWTHAM RAO,<br><br>Defendant/Counterclaim-Plaintiff. | Civil Action No. 2:25-cv-06260 |

**PLAINTIFF/COUNTERCLAIM-DEFENDANT EPAM SYSTEMS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE**

# Table of Contents

**Page**

Preliminary Statement .......... 1

Factual Background .......... 4

Standard of Review .......... 12

Argument .......... 13

I. The Court Should Impose Sanctions Under Rule 37(e) and Its Inherent Authority .......... 13

II. Rao Acted With Bad Faith, Intending to Deprive EPAM of Critical Evidence .......... 14

III. EPAM Has Suffered Severe and Irremediable Prejudice .......... 22

IV. Dispositive, Terminating Sanctions Are Warranted .......... 23

V. The Court Should Award Additional Relief .......... 27

A. Monetary Sanctions and Fees .......... 27

B. Injunctive Relief .......... 28

C. Evidentiary Preclusion .......... 29

VI. Conclusion .......... 30

# Table Of Authorities

**Page(s)**

**Cases**

*Atalian US New England, LLC v. Navarro*,
2022 WL 2681297 (D.R.I. 2022)....24

*Balancecxi, Inc. v. Int'l Consulting*,
2020 WL 6886258 (W.D. Tex. 2020), *R&R adopted* at 2021 WL 2194900 (W.D. Tex. 2021)....16

*Bowman v. Am. Med. Sys., Inc.*,
1998 WL 721079 (E.D. Pa. 1998)....25

*Bull v. United Parcel Serv., Inc.*,
665 F.3d 68 (3d Cir. 2012)....13

*Burris v. JPMorgan Chase & Co.*,
566 F. Supp. 3d 995 (D. Ariz. 2021), *aff'd*, 2024 WL 1672263 (9th Cir. 2024)....19, 24

*In re Chule*,
2026 WL 524023 (Bankr. M.D. Fla. 2026)....15

*Folino v. Hines*,
2018 WL 5982448 (W.D. Pa. 2018).... *passim*

*Gentex Corp. v. Sutter*,
827 F. Supp. 2d 384 (M.D. Pa. 2011)....14, 15

*Gutman v. Klein*,
2008 WL 4682208 (E.D.N.Y. 2008), *R&R adopted* at 2008 WL 5084182 (E.D.N.Y. 2008), *aff'd*, 515 F. App'x 8 (2d Cir. 2013).... *passim*

*Malone v. Weiss*,
2018 WL 3656482 (E.D. Pa. 2018)....14, 15, 24, 25

*Miller v. Thompson-Walk*,
2019 WL 2150660 (W.D. Pa. 2019)....27

*Motown Record Co. v. DePietro*,
2007 WL 1725604 (E.D. Pa. 2007)....29

*Pa. Tr. Co. v. Dorel Juv. Grp., Inc.*,
2011 WL 2789336 (E.D. Pa. 2011)....29

*Pable v. Chi. Transit Auth.*,
2024 WL 3688708 (N.D. Ill. 2024)....22, 25

*Pable v. Chicago Transit Auth.*,
2023 WL 2333414 (N.D. Ill. 2023) ....................22

*Schmid v. Milwaukee Elec. Tool Corp.*,
13 F.3d 76 (3d Cir. 1994)....................13, 14, 22, 23

*Stream Companies, Inc. v. Windward Advert.*,
2013 WL 3761281 (E.D. Pa. 2013) ....................28

*U.S. v. Philip Morris USA, Inc.*,
327 F. Supp. 2d 21 (D.D.C. 2004)....................22

*Williams v. Am. Coll. of Educ., Inc.*,
2019 WL 4412801 (N.D. Ill. 2019) ....................17, 19, 20, 24

**Other Authorities**

Fed. R. Civ. P. 37....................12, 13, 14, 30

https://support.microsoft.com/en-us/accounts-billing/manage/reset-a-forgotten-microsoft-account-password; https://support.microsoft.com/en-us/accounts-billing/manage/reset-a-forgotten-microsoft-account-password (last visited July 28, 2026) ....................2, 16

https://www.coreason.ai/ (last visited July 28, 2026) ....................11, 17, 21

**Preliminary Statement**

It is undisputed that Defendant/Counter-Plaintiff Gowtham Rao spoliated evidence by conducting a system “reset” or “refresh” of his primary desktop computer (the “desktop computer”), which irreparably destroyed critical forensic data. It is also undisputed that Rao did so just fourteen days after receiving a preservation demand from EPAM, *nine days* after receiving a spoliation warning from this Court, *one week* before a scheduled hearing on EPAM’s preliminary injunction motion, and while the parties were negotiating a forensic protocol designed precisely to investigate what Rao did with the roughly 44,960 EPAM files he illicitly downloaded from EPAM’s systems, shortly before his termination, while he was covertly launching a competitive business. Did he copy the files to other devices? Did he upload them to cloud storage accounts? Did he cut-and-paste the information into new files? Did he feed EPAM documents into AI programs to create derivative works? Had Rao not spoliated evidence, the parties’ forensic protocol would have provided invaluable insight into those questions. Now, because of Rao’s intentional destruction of critical information on his desktop computer, EPAM can never fully know the answers. It cannot know where its trade secrets and confidential information went.

The only question is the appropriate sanction. Here, the evidence confirms that the most severe sanction—a default judgment and dismissal of Rao’s counterclaims— is appropriate. The evidence of Rao’s intentional misconduct and bad faith is overwhelming. Further, the excuse that he proffered for his conduct (that he twice forgot his password) is absurd. Rao is a highly sophisticated, technologically savvy individual, who is now the CEO of CoReason, Inc., an artificial intelligence-based software and technology company. He knew that easier, less intrusive ways existed to recover a forgotten password than spoliating evidence through a reset. And if he didn’t know that, a simple web search would have confirmed it. Indeed, Microsoft maintains

websites, easily accessible through a Google search, which provide simple step-by-step instructions to "Reset a forgotten Microsoft account password" and to "Change or reset your local account password in Windows."[1] Those instructions begin with tasks such as selecting the "Forgotten your password" prompt. (*Id.*) They do not suggest reinstalling the computer's operating system, as Rao did. Moreover, even if Rao was somehow ignorant of all this, of if those options somehow were not available, he had many options to solve his alleged issue without spoliating evidence. He could have preceded the reset by imaging his desktop computer to preserve data, informed EPAM of the issue so EPAM could image the device, used one of his *other* computers, bought a new hard drive, or *bought* a new computer—particularly since Rao claims that he meddled with the computer because he needed a computer with no EPAM data on it to perform work for CoReason. At a minimum, Rao could have disclosed the reset, rather than remaining silent until iDS, the parties' forensic neutral, discovered it. He did none of those things.

All of the above would have been bad enough. But Rao then doubled down on his bad faith by making false representations in his Answer, Affirmative Defenses, and Counterclaims ("Answer"), asserting the supposed absence of evidence that he destroyed as the basis for affirmative defenses and counterclaims against EPAM. In other words, not content with destroying evidence, Rao sought to use the alleged *lack* of evidence that he knowingly destroyed *against* EPAM, and was more than willing to lie in his pleadings to accomplish that purpose.

If any doubt existed about the appropriate sanction, EPAM's recent forensic discoveries must end that doubt. Rao spoiled data on the desktop computer he used to download about

---

[1](Greenfield Decl. ¶ 34); https://support.microsoft.com/en-us/accounts-billing/manage/reset-a-forgotten-microsoft-account-password; https://support.microsoft.com/en-us/accounts-billing/manage/reset-a-forgotten-microsoft-account-password (last visited July 28, 2026).

44,960 EPAM files. But documents that Rao didn't destroy, most of which were found on his *other* devices and accounts (which EPAM did not focus on in its pleadings but since searched via the forensic protocol), evidence that his spoliation was part of a pattern of bad faith and tortious conduct. Documents that EPAM has recently discovered strongly indicate that the competing offering Rao is now selling, on behalf of his company CoReason, is a refactored version of EPAM's Synapse[2] software—which EPAM originally developed, and Rao then rebuilt by feeding Synapse data into generative AI platforms, in order to receive "step-by-step" instructions for how to re-code Synapse anew. Further, while still employed at EPAM, in the midst of beginning to maliciously migrate EPAM information to his own devices and accounts, Rao bragged to multiple third-parties about his scheme to steal Synapse. As Rao explained, he was going to rebuild Synapse from scratch, and then launch his own competing company. With that evidence in hand, Rao's bad faith motive for destroying evidence to cover up his file transfers, copying of information, and theft of EPAM data to make AI-generated derivates becomes even more obvious.

Given the truly egregious circumstances here, litigation integrity demands the strongest possible remedy. Only a default judgment and dismissal of the counterclaims can effectively deter the kind of malfeasance Rao has engaged in. Further, no other remedy would make EPAM whole. By way of example, an adverse inference would be woefully inadequate, because Rao destroyed evidence which likely would have entitled EPAM to summary judgment *months ago*. Enabling Rao to benefit from his misconduct by forcing EPAM to spend many more months, and a fortune in attorneys' fees, engaging in discovery followed by trial, with a mere adverse inference, is no real remedy at all.

[2] "Synapse" is not the final tradename for the software, only an in-development name.

In addition to dispositive sanctions, EPAM further requests an award of the attorneys' fees it incurred seeking to remedy Rao's spoliation, the forensic costs it has already incurred, and the additional forensic costs it now needs to incur (due to Rao's spoliation) to completely investigate his misconduct. Further, given the overwhelming evidence, to prevent further harm to EPAM from Rao's misappropriation, and to enforce the Consent Order already entered, EPAM requests the Court to preliminarily enjoin Rao, pending a hearing on damages and final remedies, from engaging in any business competitive with EPAM, or soliciting EPAM's clients.

If, for some reason, the Court determines that dispositive sanctions are not warranted, then EPAM respectfully requests all of the above additional relief: prior and future forensic costs, attorney's fees, and a preliminary injunction against competition from Rao. Further, EPAM requests an order barring Rao from introducing any testimony or other evidence claiming that the lack of forensic information or documents recovered from his primary desktop computer supports the position that Rao did not misappropriate EPAM Confidential Information by downloading files from EPAM, transferring EPAM files to other devices, cut-and-pasting or otherwise incorporating EPAM Confidential Information into new documents, and/or by feeding EPAM files into generative artificial intelligence ("AI") programs to create derivative works.

## Factual Background

This motion arises from Rao's bad faith attempt to cover his misappropriation of EPAM's trade secrets, confidential information, and intellectual property ("EPAM Confidential Information") by spoliating forensic evidence of his wrongdoing.

EPAM is a leading global provider of digital engineering and cloud and AI-enabled transformation services, including to the life sciences and healthcare industries. (Klebanov Decl. ¶ 5.) A core part of EPAM's business in life sciences and healthcare is the sale of digital tools and software solutions that EPAM's employees and engineers have continuously developed and

refined over many years. (*Id.* ¶ 7.) These software tools include for example: (1) the ETL Conversion Kit, which extracts, transforms and loads ("ETL") data for medical data standardization; (2) the AI Cohort Generator, which enables automatic creation of clinical study designs from free text to enhance research productivity; and (3) Synapse (part of AI Accelerator), an AI-based support platform that serves as a centralized biomedical knowledge layer designed for ease of use by non-technical users. (*Id.* ¶¶ 8-10; Klebanov Suppl. Decl. ¶ 3.)

On November 14, 2024, EPAM entered into an Employee Covenants Agreement (the "Agreement") with Rao, in connection with his employment as a Managing Principal. (*See* Oslick Decl., Ex. 2.) Among other obligations, Rao's Agreement barred him from "disclos[ing]," "access[ing]," "us[ing]," or "copy[ing]" EPAM's "Confidential Information," except in connection with his EPAM employment. (*Id.* § 1(d).) Rao's Agreement also clarified that anything that Rao "made, collected, developed, conceived, discovered, learned, or used by [him] in connection with or in the course of [his] employment," would be "deemed to have been made or discovered by [him] solely for the benefit of [EPAM]," and would be the "sole and exclusive property" of EPAM. (*Id.* § 2.) If Rao designed a work "entirely on [his] own time," and without using any EPAM resources or any work he performed for EPAM, he would still need to provide "advance written notice" to EPAM to ensure that the proposed work was permissible. (*Id.*) Aside from the above, Rao agreed to various post-employment restrictions, including a non-solicit of clients that applied during and after employment, and a non-compete that would apply only if EPAM involuntarily terminated him. (*Id.* § 5(c).)

On October 15, 2025, EPAM terminated Rao's employment. Based on suspicious conduct that formed the basis of the termination decision, EPAM conducted an investigation of Rao's IT activity and discovered that, between September 11, 2025 and October 14, 2025, Rao

downloaded approximately 44,960 documents and data files containing EPAM Confidential Information, most of which occurred between October 11-13, 2025. (Sklansky Decl. ¶ 9-12). These files contained client account information, RFP responses and bid proposals, pricing documentation, client facing project information, including designs and data models, contract documents, CRM data, and P&L data, among other confidential and sensitive information. (*Id.* ¶ 10.) In conjunction with downloading these highly sensitive documents, Rao also accessed and downloaded proprietary source code for EPAM's ETL Conversion Kit, AI Cohort Generator, and Synapse/AI Accelerator, as well as customized software that EPAM created for its clients. (Klebanov Decl. ¶ 40; Klebanov Suppl. Decl. ¶ 3.) Further, not only did Rao illicitly download an enormous amount of EPAM Confidential Information, he also attempted to permanently *delete* files from EPAM's servers, including by attempting to make them unrecoverable by clearing the recovery folder. (Sklansky Decl. ¶ 13.) Meanwhile, and even while still an employee, Rao was publicly marketing himself as a "free agent" and, thus, as an EPAM competitor. (*See* McDermott Decl. ¶¶ 11-12.)

In light of Rao's conduct, EPAM sent Rao a cease-and-desist letter with a document preservation notice (Oslick Decl. Ex. 1), commenced this action, and sought a temporary restraining order ("TRO"). On November 5, 2025, the Court held a hearing on EPAM's TRO motion. During the hearing, the Court instructed Rao that "you are not allowed to – to destroy evidence in any way, hide, destroy it?" and warned him that, if he spoliated evidence, "there's lots of ways I could sanction you. Some of which are small and some of which are very big." (Oslick Decl., Ex. 3, TRO Hearing Tr. at 49.) The Court also set a hearing, to be held on November 21, 2025, on EPAM's motion for a preliminary injunction. (ECF #10.)

In advance of the preliminary injunction hearing, the parties began negotiating a forensic protocol, to govern an agreed-upon inspection of Rao's devices and accounts. (Oslick Decl. ¶ 6.) In broad strokes, the forensic protocol's intended purpose was to identify all EPAM Confidential Information and/or Work that Rao had saved or used in any non-EPAM device or account, determine what Rao did with all such identified EPAM Confidential Information and/or Work (such as whether he copied the information to other devices, or incorporated information from them into derivative works), and remediate all such EPAM Confidential Information and/or Work. (*See Id.* ¶ 7.)

On November 14, 2025, *fourteen days after* receiving notice of the imminent lawsuit and a preservation notice, *nine days after* the TRO hearing and *seven days before* the scheduled preliminary injunction hearing, and *while* the parties were negotiating a forensic inspection protocol, Rao conducted a form of system "reset," known as a "refresh" on his desktop computer, by reinstalling the Windows operating system. (Oslick Decl. Ex. 4 at 5; ECF #44-2.) This reset permanently destroyed significant forensic data (*id.*; Greenfield Decl. ¶¶ 17-37), including the following:

1. **<u>USB Connections</u>**: The reset appears to have permanently destroyed all forensic evidence of USB devices that had previously been attached to his computer. (Oslick Decl. Ex. 4 at 5; Oslick Decl. Ex. 15; Greenfield Decl. ¶ 26-27.) That evidence, together with other forensic artifacts that Rao's reset also permanently destroyed (JumpLists and LNK files), could have been used to determine if files were copied to a USB device, such as a flash drive or external hard drive. (Greenfield Decl. ¶¶ 23-27.) Now, if Rao copied EPAM files to a USB device before the reset, there would be no way to tell, much less to identify the specific device that now holds EPAM's files. (*Id.* ¶ 27.)

2. **<u>Browsing Activity</u>**: The reset also appears to have permanently destroyed significant forensic evidence of Rao's pre-reset web browsing activity. (Oslick Decl. Ex. 4 at 1; Oslick Decl. Ex. 14 at 5-6; Greenfield Decl. ¶¶ 17, 29.) While limited browsing data remains, it is impossible to know the extent of data that was deleted and is now unrecoverable. (Greenfield Decl. ¶ 29.) That evidence, together with other forensic artifacts that Rao's reset also permanently destroyed, could have been used to determine if Rao copied EPAM files to a cloud storage website (such as a Dropbox account) or transferred EPAM files to a generative AI platform (such as ChatGPT, Co-Pilot, or Claude), to create derivative works. (Greenfield Declaration ¶ 30.) Now, due to the reset, it is impossible to determine through forensic artifacts if Rao copied EPAM files to cloud storage accounts, or fed EPAM files into generative AI platforms. (*Id*.)

3. **<u>User Activity</u>**: The reset additionally permanently destroyed significant forensic evidence of user activity, such as file and folder activity. (Oslick Decl. Ex. 4 at 1; Greenfield Decl. ¶ 31.) This data would have been critical in assessing whether Rao used EPAM Confidential Information to create derivative works. (Greenfield Decl. ¶ 32.) For example, if the forensic data showed that Rao opened a file he downloaded from EPAM and then, shortly thereafter, created a new file (or fed an EPAM file into a generative AI program, then saved a new file), EPAM would know what files to review and investigate to determine if Rao cut-and-pasted or otherwise incorporated EPAM Confidential Information into "new" files. (*Id.* ¶ 32.) Now, it is impossible to determine through forensic artifacts which files might contain copies of EPAM information, or EPAM information in a derivative form. (*Id.* ¶ 37.)

4. **<u>Deleted Files</u>**: The reset also impacted the forensic evidence of what files Rao deleted. (Oslick Decl. Ex. 5 at 1.) While certain deleted files were able to be recovered, there is

no way to tell what files once existed and were *not* able to be recovered. (*Id.*; *see also* Greenfield Decl. ¶ 33.) This is also important. Rao *admits* to deleting files before receiving EPAM's October 31, 2025 preservation notice. (*See* ECF #44 at 2.) And Rao's reset means that it is now impossible to tell what files Rao once possessed on his desktop computer (and may have copied to USB devices or cloud storage accounts), but no longer possesses on that specific device (though he may have copies on other sources), or the dates of any deletions. For example, if Rao cut-and-pasted EPAM's Confidential Information into a new document, copied the new document to a cloud storage account or USB device, and then deleted the new document from his desktop computer, his spoliation may have eradicated any trace that the new document once existed on his desktop, not to mention where it resides today. (Greenfield Decl. ¶ 33.)

This is not the end of the story. The facts that EPAM learned through the forensic protocol and additional investigation to date reflect that Rao's spoliation attempted to cover-up a purposeful scheme to intentionally misappropriate EPAM Confidential Information in order to wrongfully compete against EPAM. By way of inexhaustive examples, documents that Rao did *not* destroy (primarily from his other, non-"reset" devices and accounts, such as his personal Google Drive, which he may not have realized would be searched) indicate the following:

1. On or about August 10, 2025 (based on the metadata), Rao apparently created a document which set forth an incredibly detailed, meticulous "step-by-step plan" for rebuilding the Synapse platform using new computer code. (*See* Oslick Decl., Ex 9 at 8-56; Ilin Decl. ¶¶ 8-14.) The document was very likely generated by providing a generative AI program with highly confidential and proprietary information about Synapse, likely the source code and/or highly sensitive architectural documents used in Synapse's development. (Ilin Decl. ¶ 10.) Rao had no

legitimate business reason for creating such a document—EPAM had the Synapse source code; it did not need AI-generated instructions for recoding what it already had. (*Id.* ¶ 13.)

2. On or about September 18, 2025, about a month before the end of his EPAM employment, Rao spoke with Executive #1[3] (a senior executive at a key EPAM customer), and apparently retained a summary of the conversation in a memorandum. (Oslick Decl. Ex. 6.) As depicted in this memorandum, Rao proposed raising millions of dollars to start a new business, in order to market an "Agentic AI" technology that he supposedly "developed," (*Id.* at 2.) Rao further claimed the technology was "out of its world," and that he "built it" himself. (*Id.* at 9.) Rao also suggested marketing the technology using the internet domain name, "coreason.ai" that he already purchased. (*Id.* at 3.) And, in fact, the public WHOIS database indicates that "coreason.ai" was purchased on September 18, 2025, the same day as this conversation. (Oslick Decl. Ex. 11.) The next day, Rao and Executive #1 spoke again, and "finalized a plan to spin out an AI project, currently at EPAM, into a new independent venture," while keeping Executive #1's involvement "completely hidden." (Oslick Decl. Ex. 6 at 18, 19.)

3. On or about September 21, 2025, per another memorandum discovered on Rao's devices, Rao spoke with a different individual, Executive #2. In this memorandum, Rao explained his plan to take intellectual property he developed as an EPAM employee, and "rebuild the system from scratch using his own code." (Oslick Decl. Ex. 7 at 3, 6.) ***In other words, Rao essentially told a third-party how he intended to misappropriate Synapse by creating copycat software, using ostensibly new code. This makes Rao's reason for generating the "step-by-step***

[3] In an abundance of caution, EPAM has redacted the names of the non-parties identified in the documents. While the only credible explanation is that these documents are summaries of Rao's conversations with non-parties, EPAM cannot know without further discovery if every word in the summaries are accurate—and it does not want to damage the reputation of non-parties absent such certainty. EPAM will agree to provide unredacted copies to the Court for *in camera* review.

***plan" for recoding Synapse even more apparent, and also amply explains Rao's motivation to spoliate forensic evidence of him creating such a document.***

4. Also on September 21, 2025, per yet another memorandum, Rao spoke with a third individual, Executive #3. (*See* Oslick Decl. Ex. 8.) Per this memorandum, Rao explained to Executive #3 that, to evade his non-compete obligations to EPAM, he intended to purposefully underperform until EPAM involuntarily terminated him. (*Id.* at 18.) Rao could then use the "sophisticated AI platform" that he purportedly developed to launch a business. (*Id.* at 3.) Rao represented that he had already "showcased the underlying framework to entrepreneurs and private equity managers," who are "talking in terms of 50 and 100 million dollars." (*Id*.) That same day, Rao, using his personal Google account, sent EPAM's "Sales Battle Card" for Synapse (and the related MedRag program) to a nondescript personal email address—subscriptionrao@gmail.com. (Oslick Decl. Ex. 13.) The "Sales Battle Card" set forth a marketing strategy for Synapse. (*Id.*)

5. On October 16, 2025, the *day* after Rao's EPAM employment ended, he incorporated CoReason. (Oslick Decl. Ex. 12.) He launched this enterprise, using the same www.coreason.ai domain name that he procured back on September 18. The website reflected, an still reflects, an incredibly sophisticated, well-funded venture. (McDermott Suppl. Decl. Ex. 1); www.coreason.ai (last visited July 28, 2026).

6. CoReason's own description on its website indicates that CoReason is or was marketing a software solution that is substantively similar to Synapse, and directly competitive with Synapse. (*See* McDermott Suppl. Decl. ¶¶ 3-4 & Ex. 1.) Even the name "CoREason" appears to have originated with Synapse, as EPAM described Synapse in July 2025 materials as "Your AI Co-Reasoning Partner." (*Id.* ¶ 4 & Ex. 2.)

7. Just five days after his termination from EPAM, Rao secured an approved Statement of Work through CoReason from J&J. (ECF #33 ¶ 396). J&J is an EPAM client. (Klebanov Suppl. Decl. ¶ 5.)

In other words, EPAM's investigation indicates that, through CoReason, Rao is now marketing—including to EPAM clients—a modified or rebuilt version of EPAM's Synapse, which he, *while employed at EPAM*: (1) appears to have designed after generating (likely through AI) detailed instructions for coding a duplicate of Synapse from scratch; and (2) pitched to investors and EPAM client contacts to obtain funding for his competing company. (*See* Oslick Decl. Exs. 6-9.[4]) Then, after EPAM filed this case, Rao spoliated the forensic evidence which would have enabled EPAM to directly trace the file transfers, file and folder activity, and use of AI platforms evidencing his misappropriation of EPAM data to aid his new venture.

On April 1, 2026, Rao filed his Answer, Affirmative Defense, and Counterclaims to Plaintiff's Complaint (the "Answer," ECF #33). In the Answer, Rao asserted allegations, affirmative defenses, and counterclaims based on the supposedly "exculpatory" forensics. (*See* Answer ¶¶ 254-257, 386, 388-389, 415.) Among other assertions, Rao misrepresented that the "evidentiary baseline is completely preserved" (*id.* ¶ 231), and that the "independent" forensic analysis not only "yielded no evidence" of his wrongdoing but provided "definitive forensic clearance" of his conduct, and/or was "exculpatory." (*id.* ¶¶ 386, 389, 453, 454; *see also* ¶ 255.)

**<u>Standard of Review</u>**

Federal Rule of Civil Procedure 37(e) governs sanctions for the loss of electronically stored information ("ESI"). Where ESI "that should have been preserved in the anticipation or

[4] The content cited in this Motion is just a fraction of the compelling evidence of misappropriation discovered thus far through the forensic searches of the non-primary computer and devices, but which is specifically cited as evidence of Rao's intentional bad faith conduct.

conduct of litigation is lost" and "cannot be restored or replaced," the Court may impose severe sanctions if the spoliating party acted "with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). Sanctions can include "dismiss[al] [of] the action or enter[ing] a default judgment." Fed. R. Civ. P. 37(e)(2)(C).

This Court can also impose spoliation sanctions under its inherent authority. When considering such an appropriate sanction, the Court must weigh: (1) the degree of fault of the party who "altered or destroyed" evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether a lesser sanction will "avoid substantial unfairness" and, "where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994).

## Argument

### I. The Court Should Impose Sanctions Under Rule 37(e) and Its Inherent Authority

Spoliation exists where the evidence was within the party's control, relevant, suppressed or destroyed, and a preservation duty was "reasonably foreseeable." *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012).

Those elements are satisfied. Rao had exclusive control over his desktop computer. The forensic artifacts on that computer—including the USB history, browsing activity, and file activity logs—are directly and critically relevant to EPAM's claims. Rao destroyed that information when he "reset" his computer. And he did so fourteen days after receiving a preservation notice, and nine days after the Court warned him not to destroy evidence. Thus, sanctions are appropriate.

In imposing sanctions, the Court can utilize either Fed. R. Civ. P. 37(e) or its own inherent authority. Under Fed. R. Civ. P. 37(e)(1), upon finding prejudice, the Court can award sanctions when a party "failed to take reasonable steps to preserve" evidence. And, if the

spoliating party "acted with the intent to deprive another party of the information's use," the Court can impose sanctions up to dismissal and a default judgment. Fed. R. Civ. P. 37(e)(2). Alternatively, when a party's conduct is "much more serious" than a mere failure to preserve evidence, the Court's "inherent power to sanction is a more appropriate rubric," and permits sanctions up to dismissal and/or a default judgment. *Malone v. Weiss*, 2018 WL 3656482, at *7 (E.D. Pa. 2018) (Beetlestone, J.)

Under either Fed. R. Civ. P. 37(e)(1) or the Court's inherent authority, to determine the appropriate sanction, the Court must consider: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Schmid.*, 13 F.3d at 79); *Malone*, 2018 WL 3656482, at *7. Where, as here, a party intentionally destroys critical evidence in bad faith, courts routinely impose dispositive sanctions, including dismissal or a default judgment. *See Malone*, 2018 WL 3656482, at *7; *Folino v. Hines*, 2018 WL 5982448, at *3 (W.D. Pa. 2018). The *Schmid* factors overwhelmingly support that result.

## II. Rao Acted With Bad Faith, Intending to Deprive EPAM of Critical Evidence

The first *Schmid* factor—the degree of fault—weighs heavily in favor of the most severe sanction. A party's fault is "high" where there has been "actual suppression or withholding of evidence." *Gentex Corp. v. Sutter*, 827 F. Supp. 2d 384, 391 (M.D. Pa. 2011) (internal quotations and citation omitted).

There can be no serious dispute that Rao's actions were intentional. He performed a system "reset" or "refresh" that wiped the forensic record from the personal desktop computer he used to perform EPAM work, which is the device EPAM referenced in its original Complaint and

that Rao talked about during the November 5th TRO hearing. (*See* Compl. ¶ 171, Oslick Decl. Ex. 3 at 19.) Courts uniformly recognize that such conduct—resetting or refreshing a device—requires deliberate action and supports a finding of intent to deprive. In *Folino*, for example, the court found intent where a party reset devices and wiped data while aware of its evidentiary significance. *Folino*, 2018 WL 5982448, at *3 ("only an intentional action could have reset the iPads and wiped the computer, and the destruction of the data occurred at a point in time where she was acutely aware of its importance to Plaintiff").

But beyond merely being intentional, the evidence confirms that Rao's conduct was willful, in bad faith, and part and parcel of a pattern of bad faith and potentially criminal conduct. This is for at least six reasons:

***First,*** the timing of Rao's spoliation demonstrates intent and bad faith. He reset his desktop computer fourteen days after receiving a document preservation notice; nine days after the Court warned him about spoliation; seven days before a scheduled preliminary injunction hearing; and while the parties were actively negotiating a forensic protocol specifically intended to examine his conduct. Courts have repeatedly inferred bad faith warranting a default judgment or dismissal when the destruction occurs after a duty to preserve arises, at a moment when the evidence is critically important—such as after a spoliation warning has been sent, or while the parties are negotiating an agreement for a forensic examination.[5]

---

[5] *See Folino*, 2018 WL 5982448, at *2 ("the timing of the destruction of the data on the Devices—at the conclusion of the parties' negotiation of an offer to settle by Plaintiff contingent on Defendant Ly's willingness to have a forensic examination performed on those same Devices—evinces bad faith"); *Malone*, 2018 WL 3656482, at *8 (dismissing claims where party "continued to delete pertinent files . . . after the deposition when he was presented with the fabricated emails"); *Gentex Corp. v. Sutter*, 827 F. Supp. 2d 384, 387-390 (M.D. Pa. 2011) (in case arising from misappropriation of former employer's confidential information, awarding default judgment against employees who deleted ESI evidence after being informed of litigation hold); *In re Chule*, 2026 WL 524023, at *7-8 (Bankr. M.D. Fla. 2026) (granting default judgment

***Second***, Rao's proffered explanations—that he reset his desktop computer because he forgot his passwords *twice*—is absurd. (*See* ECF #44-3, where Rao claims that he "misplaced the password," then "added a password," but "lost that password too"). As a simple Google search would confirm, simple password recovery methods exist that do not require resetting or refreshing a machine. (*See* Greenfield Decl. ¶ 34.) Instead, they require basic steps such as following a "Forgotten your password?" prompt, or clicking on an arrow. (*Id.*; *see* Change or reset your Microsoft account password in Windows | Microsoft Support; *see also* Reset a forgotten Microsoft account password | Microsoft Support (both last visited July 28, 2026.)

Rao cannot plead ignorance. He is extremely savvy with computers, technology, and AI programs. In fact, he is the founder of an AI-focused company that seeks to *directly compete* with EPAM. And he admits that he sought to use the computer at issue to perform "AI-related work." (ECF #44-3.) More to the point, the web search that Rao points to as exculpatory makes no sense in light of his "forgotten passwords" excuse. Rao did not search the web, or consult the AI programs he uses, for advice about recovering a lost password. Instead, he sought guidance about "how to reset" his computer in light of purported "corrupted" files. (*See* ECF #44 at 1)

Further, even Rao's stated purpose of needing to use the computer for his "new company" (ECF #44 at 1), CoReason, makes no sense. Rao should not have been using this computer at all. He "used [it] for EPAM's work," knew it contained enormous amounts of EPAM's data, and knew it was the subject of a lawsuit. (*Id.*) If Rao needed to use a computer for CoReason, he

---

where party destroyed forensic data "in the days immediately preceding the May 23, 2025 forensic imaging of the Computer"); *Gutman v. Klein*, 2008 WL 4682208, at *7-8 (E.D.N.Y. 2008), *R&R adopted* at 2008 WL 5084182 (E.D.N.Y. 2008), *aff'd*, 515 F. App'x 8 (2d Cir. 2013) (default judgment warranted where laptop was spoliated after commencement of litigation); *Balancecxi, Inc. v. Int'l Consulting*, 2020 WL 6886258, at *13-14 (W.D. Tex. 2020) *R&R adopted* at 2021 WL 2194900 (W.D. Tex. 2021) (in theft of trade secrets case, awarding default judgment due to repeated spoliation despite knowing of duty to preserve evidence).

could have used one of the at least three *other* computers he owned. (*See* ECF #55 §I(c).) Or Rao, who earned $250,000 a year at EPAM,[6] and who had *already* seemingly secured a "Founding Investor" for CoReason,[7] could have *bought* a new computer to use exclusively for his new venture. At a minimum, and for only about $200, he could swapped the computer's storage drive for a new one that did not have EPAM information on it. (Greenfield Decl. ¶ 36.)

Courts treat implausible explanations as evidence of bad faith. Indeed, Rao's purported justification for his spoliation is strikingly similar, if even less believable, than the "incredible explanations" the *Gutman* court found inferred a finding of bad faith, and justified a default judgment. Indeed, whereas the *Gutman* defendant claimed that he spoliated computer data by reinstalling an operating system to "enhance the computer's performance," Rao insists that he "refreshed" his computer (*i.e.*, reinstalled the Windows operating system) because he lost the passwords, and/or because Microsoft Windows would "not bring up all the accounts on the sign-on page." (ECF #44 at 1, 44-3 at 1*); Gutman*, 2008 WL 4682208, at *9-10. As *Gutman* recognized, "[e]ven a novice computer user" would not reinstall an operating system before first taking "less aggressive procedure[s]." *Id.* And, once again, Rao is not a "novice computer user"; he is a sophisticated software technology executive, who is now the CEO and Founder of an artificial intelligence company. *See* https://www.coreason.ai/ (last visited July 28, 2026). Rao's nonsensical justification of his conduct requires a bad faith finding. *See Gutman*, 2008 WL 4682208, at *9-10; *Williams v. Am. Coll. of Educ., Inc.*, 2019 WL 4412801, at *14 (N.D. Ill. 2019) ("Given Williams's experience as an IT professional, he must have known that reinstalling

[6] (*See* Klebanov Suppl. Decl. ¶ 4.)
[7] CoReason was incorporated on October 16, 2025, before the spoliation, by Ammar Shallal. (Oslick Decl. Ex. 12 at 3.) The CoReason website identifies Mr. Shallal as its "Founding Investor." (*See* https://www.coreason.ai/#team, last visited July 28, 2026.)

the operating system had the potential" to spoliate evidence, warranting bad faith finding and dismissal of action); *see also Folino*, 2018 WL 5982448, at *4 (plaintiff's failure to offer explanation for spoliation "convinces the Court that no such good faith explanation exists").

***Third***, and relatedly, even if Rao needed to reset his desktop computer (and he didn't), it still wouldn't excuse his spoliation. Before conducting the "reset" or "refresh," Rao could have first preserved all forensic data by having his computer imaged, or, for about $200, he could have swapped out the computer's storage drive. (Greenfield Decl. ¶ 36.) The cost would have been reasonable, particularly in light of Rao's computer holding critical evidence. (*See id.*)

***Fourth***, Rao showed consciousness of guilt by hiding his spoliation. If, as Rao claims, he conducted the reset for a legitimate purpose, he should have promptly disclosed it to EPAM. He did not. EPAM learned of it only after iDS, the parties' forensic neutral, discovered it. (*See* Oslick Decl. ¶ 10 & Ex. 4.) In short, his "destruction of evidence was of the worst sort: intentional, thoroughgoing, and (unsuccessfully) concealed." *Gutman*, 2008 WL 4682208, at *12.

***Fifth***, Rao didn't just spoliate evidence. He *misrepresented* the forensic record to affirmatively use his spoliation *against* EPAM, by asserting affirmative defenses, factual allegations, and counterclaims based upon the supposed lack of evidence that he destroyed—even accusing EPAM of litigating in "bad faith" by continuing to press this matter, despite the supposedly "exculpatory" forensics. (*See* Answer at ¶¶ 254-257, 386, 388-389, 415). Rao even outright misrepresented to the Court that the "evidentiary baseline is completely preserved" (*id.* ¶ 231), and that the "independent" forensic analysis not only "yielded no evidence" of his wrongdoing but provided "definitive forensic clearance" of his conduct, and/or was "exculpatory." (*Id.* ¶¶ 386, 389, 453, 454; *see also* ¶ 255.)

Rao's attempt to use his spoliation of evidence affirmatively *against* EPAM, and his reliance on blatantly false statements in his pleadings to back up his spoliation-based affirmative defenses and counterclaims, further supports a finding of bad faith. *Burris v. JPMorgan Chase & Co.*, 566 F. Supp. 3d 995, 1017 (D. Ariz. 2021), *aff'd*, 2024 WL 1672263 (9th Cir. 2024) (plaintiff's "lies and acts of deception" provided "perhaps the most compelling evidence" of bad faith spoliation, warranting dismissal of claims); *Williams*, 2019 WL 4412801, at *14-16 (party's "false testimony" relating to spoliation, as well has having "the gall to request" a default judgment against victimized party, warranted finding of intent and sanction of dismissal).

***Sixth***, documents discovered to date through the forensics process support the strong inference that Rao spoliated evidence to cover up his on-going scheme to copy or otherwise misappropriate EPAM's Confidential Information, in order to repurpose it for CoReason, Rao's competing venture. Rao's own documents are simply damming. In brief:

**<u>Step 1: Using Generative AI to Duplicate EPAM's Synapse</u>:** The evidence reflects that, on or about August 10, 2025, Rao took incredibly sensitive EPAM Confidential Information about Synapse, including likely the source code itself, and fed it into an generative AI program—in order to obtain "comprehensive, step-by-step" instructions about how to rebuild Synapse from scratch. (*See* Oslick Decl. Ex. 9 at 8; *see also* Ilin Decl. ¶¶ 8-14.) Now, Rao had an easy roadmap for how to code a Synapse competitor, based off of stolen EPAM intellectual property.

**<u>Step 2: Plotting The Venture:</u>** A little more than a month later, on or about September 18-19, 2025, Rao hatched a scheme with Executive #1, a senior leader at an EPAM client, to covertly start a new "Agentic AI" business using the domain name "coreason.ai," which would directly compete with EPAM (Oslick Decl. Ex. 6 at 2-3.) Together, they "finalized a plan to spin

out an AI project, currently at EPAM, into a new independent venture," while conspiring to keep Executive #1's involvement "completely hidden." (*Id.* at 18-19, 32.)

A few days later, on or about September 21, 2025, during conversations with two different individuals (Executive #2 and Executive #3), Rao explained that he planned to take technology that EPAM developed, rebuild it from "scratch" using new code to circumvent intellectual property claims (Oslick Decl. Ex. 7 at 3, 6.), and then leverage this technology into a new business, already purportedly valued by potential investors at $50-$100 million. (Oslick Ex. 8 at 3.) ***In short, Rao admitted that he planned to create a copycat of EPAM software (i.e., Synapse), using purportedly new code, and then launch a competing business. And, as noted above, Rao had already secured, presumably via an AI program, "step-by-step" instructions for how he could recreate Synapse***. (*See* Oslick Decl., Exs. 6-9; *see also* Ilin Decl. ¶¶ 8-14.)

**Step 3: Evading the Non-Compete:** Rao recognized there was an impediment to his plan to compete with EPAM – his Agreement contained a non-compete that would activate if he simply resigned. So, as he explained to Executive #3, he planned to underperform until EPAM fired him. (Oslick Decl. Ex. 8 at 18.)

**Step 4: Stealing EPAM's Confidential Information:** Rao, in the waning days of his EPAM employment, downloaded roughly 44,960 EPAM files, including the source code for the ETL Conversation Kit, AL Cohort Generator, and Synapse/AI Accelerator. (Klebanov Decl. ¶ 40; Klebanov Suppl. Decl. ¶ 3.) Rao also downloaded legions of other confidential materials, such as EPAM pricing documentation and bid proposals. (Klebanov Decl. ¶ 41). Meanwhile, Rao attempted to also permanently *delete* many documents from EPAM's own systems, including critical documents regarding Synapse's design. (Sklansky Decl. ¶ 13; Ilin Decl. ¶ 21.).

**Step 5: Launching CoReason**: Armed with technology lifted from EPAM, likely rebuilt using AI help, and believing himself freed from his non-compete by his own faithless service, Rao launched CoReason. Rao registered CoReason's website September 18, while still employed by EPAM (on the *same day* he spoke with Executive #1), and incorporated the company on October 16, 2025, the *next day* after his termination. (Oslick Decl. Exs. 11, 12.)

Consistent with Rao's prior conversations with Executive #1, #2, and #3, the website depicts CoReason as an incredibly sophisticated, fully-formed, and well-funded start-up entity. *See* www.coreason.ai. CoReason's website reflects that its technology is substantively similar to Synapse. (*See* McDermott Suppl. Decl. ¶¶ 3-4 & Ex. 1.) [In what is potentially another act of spoliation, CoReason recently redesigned and simplified its website, but screenshots of its prior website are available at McDermott Suppl. Decl. Ex. 1.]

**Step 6: Spoliating Evidence to Cover His Tracks**: Rao knew that damning evidence rested on the desktop computer; the very computer at issue in this litigation, which he discussed during the TRO hearing nine days before the reset. (*See* Compl. ¶ 171; Oslick Decl. Ex. 3 at 19.) That evidence would provide critical evidence of exactly what Rao did with EPAM's files—such as which ones he copied to other devices, uploaded to cloud storage accounts, cut-and-pasted into new documents, or fed into AI programs to create derivative works. (*See* Greenfield Decl. ¶¶ 23-37.) It would also help EPAM establish which files on his devices contained copies or derivatives of EPAM information. (*Id.* ¶ 33, 37.) Now, all that evidence is irreparably lost. (*Id.*) Rao's scheme failed only because he didn't spoliate *enough* – limiting his spoliation to the desktop computer that EPAM believed was the source of the illicit downloads and which he discussed at the TRO hearing. Meanwhile, EPAM discovered other evidence on other devices and accounts (which Rao may not have realized would be searched), which drew a clear picture

of Rao's overall conduct, even if that conduct cannot be forensically traced due to Rao's spoliation.

In short, the evidence establishes that Rao spoliated evidence with egregious bad faith following repeated express preservation instructions, that his excuses offered are not credible, and that the spoliation was committed as part of his scheme to misappropriate EPAM's Confidential Information and to cover up his conduct squarely at issue in this litigation..

## III. EPAM Has Suffered Severe and Irremediable Prejudice

The second *Schmid* factor—prejudice—also strongly favors dispositive sanctions. The most severe prejudice arises where destroyed evidence makes it "impossible to identify which files [were relevant] and how they might have been used." *Gutman*, 2008 WL 4682208, at 12 (citations and quotations omitted); *Pable v. Chicago Transit Auth.*, 2023 WL 2333414, at *2, *35 (N.D. Ill. 2023) (due to spoliation of forensic evidence, "it is impossible to know the scope and quality of the now non-recoverable discovery," resulting in prejudice) *R&R adopted* at 2024 WL 3688708 (N.D. Ill. 2024), *aff'd*, 145 F.4th 712 (7th Cir. 2025).

That is precisely the situation here. Because Rao destroyed forensic artifacts:

- EPAM cannot determine what files may have been transferred to USB devices or what devices they might have been transferred to;
- EPAM cannot determine what files may have been uploaded to cloud storage accounts or AI platforms; and
- EPAM cannot identify derivative works or the locations of derivative works by analyzing forensic artifacts.

EPAM "cannot recreate what has been destroyed." *U.S. v. Philip Morris USA, Inc.*, 327 F. Supp. 2d 21, 25 (D.D.C. 2004). Further, the destroyed evidence is "central"—not peripheral—to liability. *See Folino*, 2018 WL 5982448, at *4 (when spoliated evidence is "central to the case, the harsh sanction of default judgment may be warranted").

At his relative strongest, Rao may argue that EPAM's prejudice is reduced because he didn't spoliate enough. Indeed, the files that Rao did *not* destroy paint a compelling picture of his misconduct. Notwithstanding, any such attempt to minimalize EPAM's prejudice would be misplaced. The destroyed forensic evidence would have provided *clear* evidence of *how* Rao used EPAM's Confidential Information, *where* it resides today, and the degree he incorporated it into competing products. For example, while other evidence discovered to date strongly suggests that CoReason's core product was created using stolen Synapse code (likely with assistance from generative AI), the destroyed evidence may have provided direct evidence of that theft—and without EPAM spending a fortune in attorneys' fees and forensic consultants going file-by-file across tens of thousands of Rao's files, and or having to retain testifying experts to explain how CoReason's product derived from stolen Synapse code. Further, EPAM can never know what it does not know. EPAM does not, for instance, know what other sensitive EPAM data Rao may have processed using AI to create products that CoReason is not yet marketing.

## IV. Dispositive, Terminating Sanctions Are Warranted

The third *Schmid* factor—whether lesser sanctions suffice—also compels granting EPAM the strongest relief possible: a default judgment on its claims, as well as dismissal of Rao's counterclaims. This is for two reasons.

***First***, only a default judgment and dismissal of Rao's counterclaims would provide an effective deterrent to the kinds of misconduct that Rao engaged in, and ameliorate the harms his actions posed to litigation integrity. Indeed, Rao's conduct, in its totality, does not just reflect an attempt to impede EPAM's factual investigation. It represents a scathing affront to the Court's authority and to the honesty expected of litigants. To recap: (1) he conducted the reset *nine days* after the Court warned him against spoliating evidence, just *seven days* before a scheduled hearing on EPAM's preliminary injunction motion, and while the parties were negotiating a

forensic protocol; (2) he failed to disclose the reset; (3) he then falsely represented, in his pleadings, that the "evidentiary baseline is completely preserved" (Answer ¶ 231), and that the "exculpatory" forensics established that *EPAM* was litigating in "bad faith," and asserted defenses and counterclaims based on those misrepresentations (*id*. ¶¶ 386, 389, 453, 454; *see also* ¶ 255); (4) he proffered a preposterous explanation for his conduct (forgetting his passwords twice), that would not make sense for a "novice computer user," much less the CEO and Founder of a computer software company; and (5) he did all this *after* downloading 44,960 EPAM files and *while* he was scheming to repurpose EPAM's confidential information to use for his new competing company. (ECF #20 at p. 2.) By itself, "the interests of justice and upholding the credibility of our civil litigation system dictate the entry of default judgment" and dismissal of Rao's counterclaims "as the only reasonable sanction." *Atalian US New England, LLC v. Navarro*, 2022 WL 2681297, at *4 (D.R.I. 2022); *Malone*, 2018 WL 3656482, at *9 (dismissing case where lesser sanction "would not deter this kind of behavior").

***Second,*** the prejudice to EPAM cannot be remediated by anything less than terminating sanctions.[8] Lesser sanctions "such as jury instructions and presumptions that the deleted information was unfavorable . . . cannot cure the prejudice." *Williams*, 2019 WL 4412801, at *15; *Gutman*, 2008 WL 4682208, at *12 (adverse inferences are "ill-suited" where a party has irretrievably deleted critical files in bad faith). To the contrary, they would amplify the prejudice that EPAM has incurred, by forcing it to continue to incur costs for discovery, motion practice,

[8] *See Folino*, 2018 WL 5982448, at *4 (awarding default judgment where "the evidence cannot be recovered and no other evidence can stand in its place"); *Gutman*, 2008 WL 4682208, at *12 ("lesser sanctions such as adverse inferences are ill-suited to a case like this, where the spoliator has, in bad faith, irretrievably deleted computer files that likely contained important discovery information"); *Burris*, 566 F. Supp. 3d at 1019 (terminating sanctions warranted because "it is impossible to have confidence that Defendants will ever have access to the true facts").

and trial—all while Rao profits from these delays through unfair competition—while EPAM might have already obtained summary judgment through the evidence that Rao destroyed. *See Malon*e, 2018 WL 3656482, at *8 (dismissing claim, where adverse inference "would not remedy the prejudice that Defendants experienced in litigating the present motion" and where conduct resulted in added "time, effort and costs" litigating); *Pable v. Chi. Transit Auth.*, 2024 WL 3688708, at *9 (N.D. Ill. 2024) (terminating sanctions appropriate where adverse inference would not "eliminate—or even substantially mitigate—the prejudice") (internal quotations and citation omitted). No sanction other than a default judgment and dismissal of Rao's counterclaims "is effective or is fair" to EPAM.[9]

To be clear, while EPAM has primarily focused on the damage that Rao's spoliation has caused to EPAM's prosecution of its own claim (*e.g.*, misappropriation of trade secrets, breach of fiduciary duty), it also significantly impacts EPAM's defense of Rao's Counterclaims. In brief:

a. <u>Defamation and Tortious Interference (Counterclaims II and III)</u>: Rao's defamation and tortious interference counterclaims are based on a similar theory—that EPAM falsely reported to third-parties that Rao misappropriated EPAM's Confidential Information. (Answer ¶¶ 412-430.) Because truth is a defense to defamation, and justification is a defense to tortious inference, EPAM's ability to defend those claims has been irreparably damaged by Rao's destruction of evidence that likely would have cemented EPAM's alleged statements as true and justified. Additionally, Rao's defamation claim appears to rely, in part, upon the "comprehensive

[9] *Folino*, 2018 WL 5982448, at *4; *Gutman*, 2008 WL 4682208, at *12 (default judgment appropriate because "it is impossible to know what [plaintiffs] would have found if [defendants] and [their] counsel had complied with their discovery obligations") (quoting *Metro. Opera Ass'n v. Local 100, Hotel Employees & Rest. Employees Int'l Union*, 212 F.R.D. 178, 230 (S.D.N.Y. 2003).); *Bowman v. Am. Med. Sys., Inc.*, 1998 WL 721079, at *5-6 (E.D. Pa. 1998) (awarding dismissal where lesser sanctions such as adverse inference would not cure prejudice).

examination" done by the parties' "neutral, third-party forensic vendor," which Rao knowingly falsely contends was "exculpatory." *(Id.* ¶¶ 386-389.) Meanwhile, his tortious interference claim depends upon EPAM's supposed bad faith in bringing this alleged "sham litigation." (*Id.* ¶ 425.) Rao cannot be permitted to prosecute claims based on a combination of proven lies and his own spoliation of evidence. Those claims should be dismissed for this independent reason.

b. <u>Abuse of Process (Counterclaim VI)</u>: Similar to his defamation and tortious inference counterclaims, Rao's abuse of process counterclaims depends upon a mix of his own false statements and destruction of evidence. (Answer ¶¶ 446-457.) Indeed, Rao's purported evidence for EPAM engaging in an "abuse of process" is that EPAM supposedly prosected this case in bad faith because a "neutral forensic vendor" conducted a search that "yielded no evidence that Defendant exfiltrated, transferred, or misappropriated Plaintiff's alleged trade secrets." (Counterclaim ¶¶ 453-54.) The Court cannot permit Rao to maintain claims predicated upon his own misconduct and false statements in pleadings. This claim should be dismissed.

c. <u>CEPA, Declaratory Judgment (Non-Compete), and Breach of the Covenant of Good Faith and Fair Dealing (Counterclaims I, IV, VII)</u>: These counterclaims center on the end of Rao's employment. Essentially, Rao argues that EPAM took adverse employment actions against him based on protected activity (CEPA), or to convince him to resign so as to subject him to a non-compete (Good Faith and Fair Dealing), or posits that his non-compete is unenforceable because EPAM involuntarily terminated his employment. (Answer ¶¶ 401-411, 431-438, 458-467) Yet the evidence that Rao didn't manage to destroy impeaches all of those claims—it strongly suggests that Rao purposefully engineered his own termination, in bad faith, in order to vitiate his non-compete and immediately compete against EPAM using stolen EPAM technology to fuel his new venture, which he was ready to incorporate the very next day after his termination. *See supra* at

19-21. That makes the forensic evidence that Rao spoliated even more important—this evidence (through forensics supporting file transfers, AI usage, and creation of files likely to be derivative works) may have provided information about dates, times, and degree of Rao's misappropriation, further supporting that Rao was acting as a faithless servant, in bad faith, with the aim of getting fired so that he could immediately (unfairly) compete against EPAM.

d. Fraudulent Inducement (Counterclaim VIII) and Declaratory Judgment (Counterclaim V): While Rao's fraudulent inducement counterclaim and second declaratory judgment counterclaim—which seeks a declaratory judgment that EPAM does not own its intellectual property at all—are factually baseless, Rao's spoliation does not directly impact EPAM's defense of these claims. Nevertheless, given Rao's repeated acts of bad litigation conduct, including his misrepresentations in pleadings, EPAM submits that the Court should still dismiss these claims to provide an effective deterrent and reaffirm the principle of litigation integrity.

## V. The Court Should Award Additional Relief

### A. Monetary Sanctions and Fees

Even when imposing a terminating sanction, such as a default judgment, courts routinely award attorneys' fees and costs incurred due to spoliation, including forensic investigation expenses and attorneys' fees. *Folino*, 2018 WL 5982448 , at *5 (in addition to default judgment, awarding "costs and fees incurred to file the instant motion and for the futile forensic examination"); *Gutman*, 2008 WL 4682208, at *13 (awarding attorneys' fees plus a default judgment). These kinds of sanctions are also imposed even when dismissal or a default judgment is not awarded. *See, e.g.*, *Miller v. Thompson-Walk*, 2019 WL 2150660, at *13 (W.D. Pa. 2019) ("Thompson caused Miller to incur unnecessary costs, for which she must reimburse him").

An award of forensic costs and attorneys' fees is appropriate here. EPAM originally agreed to pay all forensic examination costs (*see* ECF #20 ¶ 4), with the intent of obtaining

forensic reports that would provide clarity about what Rao did with the 44,960 EPAM files he downloaded. Rao's spoliation negated the very reason why EPAM agreed to pay these costs. Further, EPAM has incurred considerable attorneys' fees and costs (including retention of a separate expert) in order to investigate the scope and effects of Rao's spoliation, and to seek relief from the Court. Requiring Rao to pay the forensic costs, as well as the attorneys' fees arising from his spoliation, would at least partially remedy these harms to EPAM.

Additionally, because Rao destroyed critical information regarding whether he copied, transferred, or created derivates of EPAM information—and where that EPAM information has gone—EPAM will now need to conduct additional forensic examinations, including by serving subpoenas on Rao's companies, CoReason and Scientific Informatics, LLC, in order to obtain forensic evidence of their systems and accounts. Had Rao not spoliated evidence, this additional discovery may not have been necessary. Now, it's essential, in order to understand to what degree EPAM's Confidential Information has migrated to Rao's companies. Rao should be required to pay the additional forensic costs and attorneys' fees associated with those future examinations. *See Stream Companies, Inc. v. Windward Advert.*, 2013 WL 3761281, at *9 (E.D. Pa. 2013) (awarding costs associated with "future forensic imaging" due to evidence spoliation).

**B. Injunctive Relief**

In the Consent Order, Rao "voluntarily reaffirm[ed]" that he would "comply with and thus is preliminary enjoined and restrained" from violating Sections 1, 2, 5(b), and 6 of his Agreement. (ECF #20 at p. 2.) Among other prohibitions, those sections barred Rao from disclosing EPAM Confidential Information, or "access[ing], us[ing], or cop[ying]" EPAM Confidential Information. (*See* Oslick Decl. Ex. 2 § 1(d).) Here, as explained above, the evidence strongly reflects that Rao incorporated EPAM's Confidential Information into a Synapse-like software solution—yet Rao's evidence spoliation has destroyed proof of the traceable conduct.

Consistent with the Court's Consent Order, and in light of the evidence before the Court, and the spoliation sanction of a default judgment, the Court is requested to conclude that Rao is enjoined from competing against EPAM, pending a hearing on damages and remedies. If dispositive sanctions are not imposed, the Court is requested to revive EPAM's motion for a preliminary injunction (denied in the Consent Order is "MOOT"), deem the upcoming evidentiary hearing as also covering this motion, and then preliminarily enjoin Rao from competing against EPAM.

**C. Evidentiary Preclusion**

Courts can also impose evidentiary preclusion where spoliation deprives the opposing party of the ability to test evidence. For example, in *Motown Record Co. v. DePietro*, 2007 WL 1725604, at *1 (E.D. Pa. 2007), the Court barred the spoliating party from "offering any testimony-whether lay or expert-or making any argument that Plaintiffs would be able to sufficiently rebut only if they had the opportunity to examine the spoliated computer and modem," such as testimony that the computer was "hacked." *See also Pa. Tr. Co. v. Dorel Juv. Grp., Inc.*, 2011 WL 2789336, at *6-7 (E.D. Pa. 2011) (where booster seat was spoliated, excluding testimony booster seat was being used at the time of the accident).

Here, terminating sanctions are appropriate. But if the Court does not grant EPAM such relief, then EPAM requests, at a minimum, that Rao be precluded from introducing evidence or testimony that EPAM could have rebutted through the spoliated evidence. By way of examples, EPAM requests that the Court bar Rao from introducing any lay or expert testimony, or documentary evidence, contradicting that: (1) he copied or transferred EPAM files from his desktop onto other devices, and/or uploaded these files to cloud storage accounts; (2) he incorporated EPAM information into derivative works, such as by copying information into new documents, and by uploading EPAM files into generative AI platforms; and (3) the Synapse-like software solution that he is currently marketing through CoReason was derived from EPAM files

and information. This form of sanction would still permit Rao to defend against EPAM's claims on evidentiary grounds not affected by his spoliation, such as his (false) claim that EPAM did not own the intellectual property at issue. Further, the Court is requested to permit the jury to hear about Rao's spoliation and other misconduct.

## VI. Conclusion

Rao deliberately destroyed critical forensic evidence after being warned by EPAM and then by the Court, offered implausible explanations, concealed his actions, and misled the Court.

Under Rule 37(e), the Court's inherent authority, and controlling precedent, the only sanction that fully addresses Rao's fault, cures the prejudice, and deters future misconduct is a default judgment in EPAM's favor, with an inquest for damages and other remedies, and dismissal of Rao's counterclaims. Pending that inquest, Rao should be enjoined from competing with EPAM. EPAM also requests the imposition of substantial monetary sanctions, to make EPAM whole for the forensic costs and attorneys' fees it has incurred, and will incur, relating to the forensic examination of the spoliated device, the additional forensic discovery EPAM now requires, and the costs of seeking relief from the Court.

At a minimum, the Court is requested to impose the aforementioned monetary sanctions, issue an evidentiary preclusion order, and consider this motion and the upcoming evidentiary hearing as a revival of EPAM's prior preliminary injunction motion.

DATED: July 29, 2026

Respectfully submitted,

SEYFARTH SHAW LLP

By: */s/ Jacob Oslick*

Jacob Oslick (Pa. Bar No. 311028)
joslick@seyfarth.com
James S. Yu (admitted *pro hac vice*)
jyu@seyfarth.com
Brooke K. Gary (admitted *pro hac vice*)
brgary@seyfarth.com
620 Eighth Avenue,
New York, New York 10018
(212) 218-5500

Matthew Christoff (admitted *pro hac vice*)
mchristoff@seyfarth.com
233 South Wacker Drive, Suite 8000
Chicago, IL 60606
(312) 460-5000

*Attorneys for Plaintiff/Counterclaim-Defendant EPAM Systems, Inc.*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EPAM SYSTEMS, INC., Plaintiff, - against - GOWTHAM RAO, Defendant. | : | Civ. A. No. 2:25-cv-06260 |

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2026, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which sends notification of the filing to all counsel of record, and a copy was also served via electronic mail and FedEx upon the following:

GOWTHAM ADAMANE ROA
184 Mansgrove Rd
Princeton, NJ 08540
gowthamrao@gmail.com
gowthamrao.litigation@gmail.com

*/s/ Jacob Oslick*
Jacob Oslick
*Attorney For Plaintiff*
*EPAM Systems, Inc.*