# EXHIBIT 6

# 20250918

## Introduction

- **Participants:**
  - Gowtham Rao
  - [redacted]
- **Executive Summary:** This conversation captures a critical turning point in Gowtham Rao's career at EPAM. Facing termination due to his manager's lack of revenue, Gowtham outlines a plan to his client, [redacted], to immediately launch an LLC focused on his proprietary "Agentic AI" technology. [redacted], while highly supportive of Gowtham's talent and the venture's potential, advises caution due to a poor job market. He commits to providing future work and helping secure clients for the new company but urges Gowtham not to act rashly, setting up a dynamic between Gowtham's urgent need for a new path and [redacted] more measured, strategic approach.

## Topics

1. Gowtham's Precarious Employment at EPAM
2. Key Stipulations in Gowtham's Employment Contract
3. The Proposal for an "Agentic AI" Startup
4. [redacted] Strategic Counsel and Offer of Support
5. Future Venture Strategy and Next Steps

## Detailed Topic Analysis

### 1. Gowtham's Precarious Employment at EPAM

Gowtham Rao reveals that his position at EPAM is untenable. His manager, Greg Klebanov, "does not have the revenue to justify my involvement," leading to a difficult situation. As a result, EPAM intends to place Gowtham on a formal Performance Improvement Plan (PIP), giving him a three-month window to meet an as-yet-undefined revenue target. Failure to meet this target will result in his termination. Gowtham notes that while he could potentially find another role within EPAM's consulting divisions, those areas are also experiencing instability. This pressure forces him to consider his options outside the company, as he believes he is being managed out. **The immediate risk is that Gowtham will be formally placed on a PIP, starting a countdown to his likely termination if he cannot secure a new revenue stream or internal transfer.**

### 2. Key Stipulations in Gowtham's Employment Contract

A critical factor in Gowtham's planning is the specific wording he negotiated into his employment contract with EPAM. He explains that the terms of his departure are paramount. If EPAM fires him—which he argues is effectively what is happening—he becomes a "free agent," unbound by any non-compete restrictions. This would allow him to "walk with all the intelligence" he has developed. However, if he resigns voluntarily, he is subject to a six-month non-compete clause, which would severely hinder his ability to launch a new enterprise or work for a client like

[redacted]. He also secured clauses ensuring that any work he contributes to open-source communities like OHDSI (referred to as "Odyssey") is not considered EPAM's intellectual property. **The key implication is that the nature of his separation from EPAM will determine whether he can immediately launch a competing venture or be sidelined for six months.**

### 3. The Proposal for an "Agentic AI" Startup

Feeling he has been "practically fired," Gowtham presents an urgent proposal to [redacted]: he will start an LLC immediately and serve as a consultant. He expresses immense confidence in the "Agentic AI" technology he has developed, which [redacted] has seen. Gowtham claims, "This technology that I, that you have seen... is better than open AI." He believes he possesses a unique, best-in-class capability that has massive market potential. He already has a domain name (`coreason.ai`) picked out with a friend and mentions having access to private investors in his Princeton network who are ready to fund a company based on this technology. Gowtham is convinced he can quickly build a powerful, scalable software product using offshore developers, creating a first-mover advantage with a significant competitive moat. **The success of this plan is entirely dependent on securing immediate seed clients and investor buy-in to capitalize on his "free agent" status.**

### 4. [redacted] Strategic Counsel and Offer of Support

[redacted] responds with a blend of strong support and cautious advice. He validates Gowtham's importance, calling him the "linchpin" on their current projects and expresses concern that his departure would leave others in a lurch. However, he repeatedly urges Gowtham, "don't do anything rash yet, okay, till we figure out what is the best option." Citing a weak external job market, he advises Gowtham to "hang in there" at EPAM if possible. To back this up, [redacted] commits to providing at least half a million dollars in work over the next six months. He is highly receptive to the LLC concept, suggesting they could execute it next year or even start it "on the side." [redacted] commits to helping the new venture by securing its first clients to build a revenue stream, clarifying that he would do so indirectly through a trusted representative to avoid a conflict of interest with his role at [redacted]

### 5. Future Venture Strategy and Next Steps

The conversation concludes by outlining a concrete path forward for the potential new company. Gowtham reveals he is meeting with private investors that evening to begin evaluating the idea. [redacted] and Gowtham align on a fundraising strategy: first, secure initial clients to generate "$2 or $3 [million]" in revenue, which would then be leveraged to attract a much larger investment in the "$20 [million]" range. [redacted] affirms his role in this plan, stating, "I can... bring you more clients." They agree to meet in person soon to discuss the details further. [redacted] final piece of advice is to maintain absolute confidentiality about these plans, especially from Greg Klebanov, to avoid jeopardizing Gowtham's current position or future leverage. **The primary risk is a potential breach of confidentiality as Gowtham begins discussions with external investors while still employed by EPAM.**

# Gowtham's Precarious Employment at EPAM

Based on the conversation, here is a detailed account of Gowtham Rao's precarious employment situation at EPAM:

Gowtham's employment at EPAM is at immediate risk due to a lack of revenue within his division to support his role.

1. **Root Cause:** The core issue stems from his direct manager, Greg Klebanov. Gowtham states explicitly, "Greg Klebanov does not have the revenue to justify my involvement." This financial shortfall is the catalyst for the subsequent actions by the company.

2. **Imminent Company Action:** As a direct result, EPAM plans to place Gowtham on a formal Performance Improvement Plan (PIP). He has received a "verbal notification from Greg Klebanov saying, 'I can't afford you. We have to figure out another place for you.'" The PIP is the formal mechanism for this process.

3. **Terms of the PIP:** The plan will give Gowtham a "three month notice to reach a target." However, the specifics of this target are currently unknown. When asked how much revenue he needs to generate, Gowtham replied, "I don't know all that details that's all supposed to be discussed."

4. **Consequence of Failure:** The outcome of the PIP is unambiguous: "If I don't reach the target, I will be fired." This establishes a clear timeline and a high-stakes scenario for his continued employment.

5. **Alternative Internal Options:** Gowtham has considered transferring to another part of the company as an "alternate option." He believes the consulting divisions might be a possibility, noting, "The consulting areas in EPAM really like me, because I've been supporting, you know, a lot of other areas."

6. **Instability of Alternatives:** Despite his good reputation internally, a transfer is not a secure path. He immediately qualifies this option by stating that the consulting divisions "also are going through some shake ups," making this potential lifeline uncertain.

In summary, Gowtham is being formally managed out of his current role due to his manager's budget constraints. He faces a three-month performance plan with an undefined target, the failure of which will result in termination. His potential escape routes within EPAM are themselves unstable, leaving him in a highly precarious and vulnerable position.

# Key Stipulations in Gowtham's Employment Contract

Of course. Here is a detailed breakdown of the key stipulations Gowtham Rao negotiated into his employment contract with EPAM, based on the conversation.

Gowtham proactively amended his contract with the help of a lawyer upon joining EPAM to include several specific clauses that are now critical to his exit strategy.

1. **Termination vs. Resignation Clause:** This is the most crucial stipulation. The consequences of his departure are entirely dependent on who initiates it.

    - **If Fired (Termination by EPAM):** Gowtham negotiated a clause stating that if EPAM terminates his employment, he is considered a **"free agent."** This means he is not subject to a non-compete agreement and is free to immediately work with whomever he chooses. He believes this allows him to "walk with all the intelligence" he's developed. He considers his current situation, where his manager can no longer afford him, to be a practical termination, stating, "they have practically fired me."
    - **If He Resigns:** In contrast, if Gowtham resigns voluntarily, he is subject to a **"six months non compete"** clause. This would severely restrict his ability to start a new venture or work with a client like [redacted] in the same space.

2. **Intellectual Property (IP) Carve-Out for Open Source:** He ensured his contributions to the open-source community were protected from EPAM's corporate ownership.

    - The contract was amended to state that **"anything that I put in Odyssey [OHDSI] and open source is not EPAM's IP."** This protects his past and future work within that community, allowing him to leverage it independently.

3. **IP Carve-Out for Medical Practice:** He created another boundary around his professional expertise as a physician.

    - The contract specifies that if he does **"anything that is considered medical practice, that is something that is out of [EPAM's] scope."** This clause further limits the company's claim on the full range of his potential work.

In essence, Gowtham's foresight in working with a lawyer to amend his contract created two vital protections: it established a clear, penalty-free exit path if he were to be laid off, and it built a wall around his intellectual property developed in open-source and medical domains, preventing EPAM from claiming ownership. These stipulations are the legal foundation upon which he is building his plan to launch a new, independent venture.

# The Proposal for an "Agentic AI" Startup

Of course. Here is a detailed breakdown of Gowtham Rao's proposal for an "Agentic AI" startup, as described in the conversation.

Facing his imminent departure from EPAM, Gowtham outlines a comprehensive and immediate plan to launch his own company centered around the proprietary "Agentic AI" technology he has developed.

1. **The Immediate Proposal: LLC as a Vehicle:** Gowtham's first move is to formalize a new business entity. He proposes to [redacted] "I will start an LLC right now... and I'll help you as a consultant." This would allow him to seamlessly transition the work he is currently doing for [redacted] from EPAM to his own independent company, ensuring project continuity for [redacted] while establishing his first client.

2. **The Core Technology (The "Moat"):** The venture is built entirely on what Gowtham refers to as "Agentic AI." He expresses supreme confidence in its superiority and market potential:

    - **Uniqueness and Value:** He describes the technology as "out of its world" and "best in class right now." He makes the bold claim that it is "better than open AI."
    - **Ownership:** He asserts sole credit for its creation, stating unequivocally, "It's not EPAM who built it. I built it," which is crucial for his ability to use it in a new venture without IP entanglements.

3. **Funding and Business Strategy:** Gowtham outlines a clear, two-phase strategy to finance and scale the company:

    - **Phase 1 - Secure Seed Clients:** He needs an initial "consulting gig" to serve as proof of concept and generate early revenue. This initial client work is the key to unlocking the next phase.
    - **Phase 2 - Attract Venture Capital:** He states he has "private investors who will... invest in a company that will make this 10, $15 million in no time." He specifies these are friends and neighbors in his Princeton network. The strategy, refined with [redacted] is to use the initial client contracts to show a revenue of "$2 or $3 [million]" to justify a much larger investment in the range of "$20 [million]."

4. **Execution and Development Plan:** He is confident in his ability to build out the technology quickly and efficiently.

    - **Architecture:** "I know the whole architect. We can build this."
    - **Team:** He plans to use offshore developers, stating, "I have these developers are offshore... in India, maybe we can get so many people to build this out in like no time."
    - **Speed:** He emphasizes that modern software development is easy and that a "version that is so powerful" can be built "in no time."

5. **Go-to-Market Vision:** His plan is to quickly establish market dominance. He intends to build a product so compelling that he can "do demos to every, every pharma company, and they blow their mind." He also mentions the possibility of putting some components "in the public domain" to build a community and increase its power and reach.

6. **Immediate Steps Already Taken:** The proposal is not just an idea; Gowtham has already initiated action. He shared the concept with a close friend who immediately registered a website for the potential company: **coreason.ai**. Furthermore, he states his intention to formally "be talking with some private investors" that very night to evaluate the idea.

# [redacted] Strategic Counsel and Offer of Support

Of course. Here is a detailed account of [redacted] strategic counsel and his specific offers of support for Gowtham Rao.

[redacted] response to Gowtham's situation is multi-layered, combining immediate, cautious advice with significant, tangible offers of long-term support for his proposed venture.

## Part 1: Strategic Counsel

[redacted] primary goal is to prevent Gowtham from making a hasty decision while validating his long-term plans.

1. **Exercise Patience and Avoid Rash Actions:** This is [redacted] most consistent message throughout the conversation.
    - He advises Gowtham to "just hang in there," justifying this by stating, "the market is not that good outside."
    - He repeatedly urges caution, saying, "don't, don't do anything rash yet, okay, till we figure out what is the best option," and later reiterating, "don't take action yet."
    - He suggests that if EPAM is willing to keep Gowtham for a "little bit," he should accept it to buy time.
2. **Maintain Strict Confidentiality:** [redacted] stresses the need for discretion to protect both of their positions.
    - He prefaces his advice with, "Don't say this out loud," and later gives a direct instruction regarding Gowtham's situation: "keep this between us. Confidential."
    - He warns Gowtham about sharing his plans too widely, advising him to keep them "closer."
3. **Endorse the LLC Concept, but on a Slower Timeline:** While Gowtham proposes immediate action, [redacted] frames the startup as a near-future plan rather than an emergency exit.
    - He validates the idea, saying, "this LLC concept, don't give up on that."
    - However, he suggests a more measured timeline: "Okay, maybe next year we will execute on it." He also proposes it as a parallel activity, something they "can do it on the side" while Gowtham potentially remains at EPAM.

## Part 2: Offer of Support

[redacted] backs up his advice with concrete commitments to ensure Gowtham's success, demonstrating his belief in his abilities and the new venture.

1. **Commitment of Future Work:** [redacted] provides a crucial financial bridge by guaranteeing a pipeline of work from his company, [redacted].

- He makes a specific financial commitment: "I am going to give... at least half a million over the next, you know, five, six months. But it could be more." This provides the foundational revenue Gowtham's new LLC would need.

2. **Validation of Gowtham's Role:** [redacted] makes it clear that his support is based on Gowtham's unique value.

    - He calls Gowtham "the linchpin" on their current project, stating, "If you go, then nobody else can communicate." This affirms Gowtham's irreplaceability and justifies [redacted] efforts to help him.

3. **Active Role in Business Development:** Beyond his own company's work, [redacted] offers to be a key player in building the new venture's client base.

    - He makes a direct promise: "I can... bring you more clients" and clarifies, "I'll help with getting, getting revenue for you." This is a vital offer that goes beyond a simple client relationship and positions [redacted] as a strategic partner.

4. **A Structured, Indirect Partnership:** [redacted] carefully defines the nature of his involvement to avoid any conflict of interest with his position at [redacted]

    - He states he cannot be "in the equation" directly or be rewarded "legally."
    - He proposes a proxy structure for his involvement: "we'll have someone... somebody I know will be represented on that [the new company's board or cap table]." This allows him to provide strategic oversight and protect his interests without a direct, formal connection.

# Future Venture Strategy and Next Steps

Of course. Here is a detailed breakdown of the future venture strategy and the immediate next steps that Gowtham Rao and [redacted] agreed upon during their conversation.

## Part 1: Future Venture Strategy

They aligned on a clear, revenue-first strategy designed to de-risk the new venture and position it for significant future investment.

1. **A Phased Funding Model:** The core of the strategy is to use initial, client-funded work to justify a much larger round of venture capital.
    - **Phase 1: Achieve Foundational Revenue:** The first goal is to prove the business model by securing initial clients and generating revenue. [redacted] explicitly states the target: "we had to try and scale it to **two mil** within, within a year or a year and a half."
    - **Phase 2: Leverage Revenue for Major Investment:** This initial revenue is not the end goal, but the key to unlocking major funding. [redacted] clarifies the dynamic: "**you have to show a revenue of two or three to get the investment of 20.**" Gowtham confirms this is his understanding, showing their alignment on using a `$2-3 million` revenue run rate to secure a large investment in the range of **`$20 million`**.
2. [redacted] **Strategic Role:** [redacted] defines his role within this strategy as that of a key business development partner.
    - He commits to being the primary source for the initial clients needed to execute Phase 1 of the plan. His direct promise is, "**I can... bring you more clients**" and "**I'll help with getting, getting revenue for you.**" This makes him an active participant in the venture's early success rather than a passive supporter.

## Part 2: Immediate Next Steps

To put this strategy into motion, they agreed on several concrete actions and principles to follow in the immediate future.

1. **Gowtham's Investor Discussions (Immediate):** Gowtham has an urgent, independent action item. He informs [redacted] that he will be moving forward that very evening: "**tonight, I'm going to be talking with some private investors and to evaluate this idea.**" This is the first step in testing the venture's viability with the capital market.
2. **Joint In-Person Strategy Meeting:** Both agree that a face-to-face meeting is essential to discuss the plan in greater detail.
    - Gowtham initiates, "I would love to come meet with you in person, and we can talk about this."

- [redacted] enthusiastically agrees, "And we should, we should, we should."
- They conclude the call by solidifying this plan, with Gowtham asking [redacted] to let him know when they can "have lunch together and talk about it," to which [redacted] agrees.

3. **Maintain Communication and Patience:** The most critical overarching next step, dictated by [redacted] is for Gowtham to hold his position and not make any sudden moves at EPAM.

    - [redacted] consistent advice is to "keep in touch" and "don't do anything harsh" until they can finalize the best path forward together. This acts as a temporary holding pattern to ensure Gowtham's departure is handled strategically.

# 20250919

**Participants:**

- [redacted] Lead: [redacted]
- EPAM Product Lead: Gowtham Rao

**Executive Summary:** Gowtham Rao and [redacted] finalized a plan to spin out an AI project, currently at EPAM, into a new independent venture. Gowtham confirmed a contractual loophole that assigns all intellectual property (IP) to [redacted], enabling them to transfer the code base. [redacted] advised Gowtham to execute a managed, temporary exit from EPAM to ensure financial stability while he works to onboard the new company as a [redacted] vendor. [redacted] will act as a silent, unofficial partner, using his position to secure [redacted] as the anchor client and attract VC funding, while Gowtham leads the new entity.

## Topics

1. Intellectual Property (IP) Control Strategy
2. Gowtham's Managed Exit from EPAM
3. New Venture Formation and Funding
4. Clandestine Partnership Structure
5. Go-to-Market and Long-Term Vision

## Detailed Topic Analysis

### 1. Intellectual Property (IP) Control Strategy

Gowtham initiated the conversation by clarifying the intellectual property ownership of the AI code developed under the EPAM-[redacted] contract. He revealed a strategic clause he had previously inserted, which stated that EPAM would provide [redacted] a license for "pre-existing intellectual property." However, Gowtham confirmed that the software was built entirely after the contract was signed, meaning no pre-existing IP was ever brought by EPAM. He stated, "this software was never built, so there is no pre-existing IP. It was built after the sign of contract." This legal distinction effectively makes all code the property of [redacted], not EPAM. [redacted] expressed complete agreement with this strategy, dismissing any potential challenges and confirming he could easily manage the transfer internally. He noted that since they could simply export the code and start fresh with a new vendor, "nobody can question me as to what I'm doing." This gives them the freedom to move the entire project to a new entity without legal encumbrance from EPAM.

**Risks / Implications: While both parties are confident in this interpretation, a formal legal review might be necessary to ensure EPAM cannot later challenge the IP transfer, especially once the new venture becomes successful.**

### 2. Gowtham's Managed Exit from EPAM

With the IP path cleared, the discussion turned to Gowtham's impending departure from EPAM. Gowtham confirmed his decision to leave has been made. However, [redacted] strongly advised

against an abrupt resignation. Instead, he recommended a transitional period to ensure continuity of income and benefits while they establish the new company. He advised Gowtham to "Park yourself a bird in the hand is worth two in a bush while we figure out the logistics of, you know, the LLC." [redacted] committed to facilitating this by extending the current [redacted] contract with EPAM or creating a new, smaller project to keep Gowtham engaged for a few more months. Gowtham estimated he could likely secure a three-month buffer. This "soft exit" strategy provides a crucial financial bridge and maintains project momentum during the sensitive setup phase of the new venture.

**Risks / Implications: Gowtham must navigate his remaining time at EPAM without revealing his plans to form a competing company, which could create a conflict of interest or lead to his premature termination.**

### 3. New Venture Formation and Funding

A significant portion of the meeting focused on the logistics of creating and funding the new company. [redacted] acknowledged that the process for onboarding a new supplier at [redacted] is slow and bureaucratic, involving third-party risk management (TPR) assessments that will take time. The immediate goal is to establish an LLC and begin this onboarding process. Concurrently, they plan to pursue seed funding. [redacted] committed to leveraging his network, stating, "I know many VCs... we just have to make sure we show the value proposition to them." Gowtham mentioned he also has friends in the venture capital space who are providing guidance. The initial funding would be used to build out a small team, including bringing on an individual named [redacted] from India. The overarching goal is to secure a substantial contract from [redacted] to anchor the new company's valuation and attract further investment.

**Risks / Implications: The success of the venture is heavily dependent on successfully navigating [redacted] procurement process and securing seed funding in a timely manner. Delays in either could jeopardize the company's launch.**

### 4. Clandestine Partnership Structure

Given [redacted] senior role at [redacted], his direct involvement in the new venture presents a major conflict of interest. They agreed his participation must be completely hidden. [redacted] was explicit about this, stating his name should "never be in the picture" for two reasons: his ongoing employment at [redacted] and the need to protect [redacted] who also appears to work at [redacted] Despite this, [redacted] affirmed his commitment to being a full partner, saying, "I want to be, but I want to make sure I'm in it with you." To solve the legal and ethical dilemma, he suggested structuring his ownership stake through a proxy, such as his wife. This arrangement allows him to contribute his strategic influence, secure [redacted] as the foundational client, and open doors to investors without formally appearing on any company documents.

**Risks / Implications: This clandestine arrangement is a significant risk. If [redacted] involvement were discovered, it could have severe career repercussions for him and [redacted], and [redacted] could immediately terminate its relationship with the new venture.**

### 5. Go-to-Market and Long-Term Vision

The immediate business development priority is securing a large contract from [redacted]. [redacted] set an ambitious target: "we need to get you know, over the next year... at least a million dollars from here." To facilitate this, he requested that Gowtham prepare presentation slides for an upcoming summit in Cambridge, where he intends to pitch the project to senior [redacted] leadership. Beyond [redacted], they identified a clear expansion strategy targeting other major pharmaceutical companies, including Boehringer Ingelheim (with a contact named "Paw Patrol"), Gilead, and Eli Lilly. Their long-term vision is highly disruptive; they believe their agent-based AI approach can be developed into a foundational model for real-world data analysis, potentially making existing industry standards like the OHDSI/OMOP model "obsolete."

**Risks / Implications: The initial million-dollar target from [redacted] is critical. Failure to secure this anchor contract would drastically undermine their valuation and ability to attract both VC funding and other pharmaceutical clients.**

## Decision Archaeology

| Decision | Proposal | Objection | Revision | Outcome |
|---|---|---|---|---|
| **Transfer Project IP** | Gowtham explained that the IP belongs to [redacted] not EPAM, because all code was developed after the contract was signed, invalidating the "pre-existing IP" clause. | None. [redacted] confirmed this was a non-issue and he could manage it. | None. | **Agreed.** They will proceed with transferring the code base from the EPAM project to the new venture. |
| **Gowtham's Exit Strategy** | Gowtham stated his decision to leave EPAM was finalized. | [redacted] advised against a sudden departure, citing the need for income continuity. | Gowtham will pursue a "soft exit," remaining at EPAM for a transitional period (approx. 3 months) supported by a contract extension that [redacted] will arrange. | **Agreed.** Gowtham will not resign immediately but will coordinate a managed transition. |

| Decision | Proposal | Objection | Revision | Outcome |
|---|---|---|---|---|
| **[redacted] Partnership Role** | Both parties agreed to form a new company to commercialize the project. | [redacted] noted his [redacted] employment creates a conflict of interest, preventing him from being officially involved. | [redacted] will be a silent, unofficial partner. His ownership will be registered under his wife's name to maintain secrecy. | **Agreed.** They will form a new venture with [redacted] as a clandestine strategic partner. |

# Intellectual Property (IP) Control Strategy

Of course. Here is a full, detailed breakdown of the Intellectual Property (IP) Control Strategy discussed by Gowtham Rao and [redacted]

## Detailed Analysis: Intellectual Property Control Strategy

The core of the strategy hinges on a deliberate and forward-thinking contractual maneuver executed by Gowtham Rao during the initial agreement between EPAM and [redacted] The plan was designed to ensure that [redacted], not EPAM, would have unambiguous and total control over the code developed, thereby enabling its future transfer to a new entity.

The strategy unfolds in three distinct parts:

**1. The Foundation: "Work for Hire" Agreement** The baseline for the project was a standard "work for hire" contract. As Gowtham notes, "E palm is obviously work for hire. So by default, the [redacted] owns the IP, not E palm." This establishes the initial legal premise that any work product created by EPAM for [redacted] belongs to [redacted]

**2. The Strategic Clause: A "Play of Words"** Gowtham revealed that he proactively inserted a specific clause into the contract to preempt any future IP disputes. He described this as a "play of words for to make sure that there is no problems in any future plans."

The specific wording of the clause was:

> "Odysseus will provide [redacted] with non-exclusive, non-transferable license of AI enabled accelerated code, which is **pre-existing intellectual property**, and will preserve intellectual property rights to the software and any modification required to integrate into [redacted] environment."

The key to this clause is the term "pre-existing intellectual property." It sets up a legal distinction between code that EPAM already owned before the project began and code that would be developed during the project.

**3. The Crucial Fact: No Pre-existing IP Existed** This is the linchpin of the entire strategy. Gowtham confirmed that EPAM brought no proprietary code to the project. The entire software solution was built from scratch after the contract was signed.

- **Gowtham's Confirmation:** "Now the remember, this software was never built, so there is no pre-existing IP. It was built after the sign of contract. So [redacted] epump did not bring pre-existing IP to the so [redacted] can technically and legally claim all of the IP and not EPAM."
- **Verifiable Evidence:** Gowtham, as the product lead, can substantiate this claim with a clear and immutable audit trail. He stated, "The GitLab all the commits, everything is after this contract was signed."

**Conclusion and Outcome:**

Because EPAM provided no "pre-existing intellectual property," the clause that grants [redacted] a license to it is effectively null and void. The contract defaults back to the simple "work for hire" principle, granting [redacted] full and undisputed ownership of 100% of the developed code.

This gives [redacted] as the [redacted] lead, the complete authority to transfer this IP to another vendor of his choosing—which will be Gowtham's new company. [redacted] confirmed he sees no obstacle to this, stating he could simply have Gowtham "export and send it to me... nobody can question me as to what I'm doing." This maneuver effectively de-risks the spin-out of the project, ensuring the core asset—the software itself—can be legally moved from EPAM to the new venture without challenge.

# Gowtham's Managed Exit from EPAM

Of course. Here is a full, detailed breakdown of the plan for "Gowtham's Managed Exit from EPAM," as discussed in the meeting.

## Detailed Analysis: Gowtham's Managed Exit from EPAM

The strategy for Gowtham's departure from EPAM is not an abrupt resignation but a carefully orchestrated transitional phase. The plan was proposed by [redacted] as a pragmatic solution to bridge the gap between Gowtham's current employment and the operational launch of their new venture.

The plan is composed of four key elements:

**1. The Firm Decision to Leave** Gowtham makes it clear at the outset that his departure from EPAM is a foregone conclusion. He unequivocally states, **"Yes, the decision has been made."** This sets the context for the discussion: they are not debating *if* he should leave, but *how* and *when*.

**2. [redacted] Counsel for a Cautious "Soft Exit"** [redacted] immediately advises against a hasty departure. His primary concern is ensuring Gowtham's financial and logistical stability during the vulnerable start-up period.

- **The "Park Yourself" Strategy:** [redacted] core advice is for Gowtham to temporarily remain at EPAM. He frames it as a holding pattern: "I'm saying, park there for the time being, till we can figure out what we can do, you know, contractually... Don't, don't, just exit."
- **The Rationale:** [redacted] reasoning is twofold:
    - **Financial Security:** He wants to prevent any interruption to Gowtham's income and benefits. He emphasizes this with the idiom, **"a bird in the hand is worth two in a bush,"** and explicitly states, "I want to make sure you are not losing continuity in terms of pay and insurance and all that."
    - **Bureaucratic Delays:** He anticipates that establishing the new company as an official [redacted] vendor will be a slow process. He cites "vendor onboarding, supplier onboarding," and "TPRM [Third-Party Risk Management]" as necessary but time-consuming hurdles. The managed exit provides the necessary time to navigate this bureaucracy.

**3. The Mechanism for the Transition** To make the "soft exit" viable, [redacted] commits to creating a business justification for EPAM to keep Gowtham employed for a short period. He proposes two concrete options he can execute from the [redacted] side:

1. **Extend the Existing Contract:** [redacted] reveals he has already laid the groundwork for this, telling Gowtham, "I told Greg that, you know, I'm willing to extend the sign another, you know, contract." This would provide a natural reason for EPAM to retain Gowtham on the project.

2. **Initiate a New, Smaller Project:** As an alternative, [redacted] offers to commission a new, short-term project specifically to cover Gowtham's transition, stating, **"I can give, you know, a small project... to continue so you are okay for three months."**

**4. The Agreed-Upon Timeline** Gowtham accepts this strategy and provides a realistic timeline. He estimates that under these conditions, he can likely remain at EPAM for approximately three months. This timeframe aligns perfectly with [redacted] proposal to secure him for that duration, creating a clear and agreed-upon plan to bridge the gap before they "continue separately."

In summary, the "Managed Exit" is a tactical decision to use Gowtham's existing employment at EPAM as a financial and operational bridge. It allows [redacted] the time to handle the administrative setup of the new venture within [redacted] while ensuring Gowtham remains financially secure, thereby de-risking the entire launch process.

# New Venture Formation and Funding

Of course. Here is a full, detailed breakdown of the discussion around the "New Venture Formation and Funding" strategy.

## Detailed Analysis: New Venture Formation and Funding

The plan to create and finance the new company is a multi-stage strategy that leverages both internal corporate processes and external venture capital. It is designed to methodically de-risk the venture by first securing a foundational client before seeking outside investment.

The strategy can be broken down into four key components:

**1. Legal Formation and Vendor Onboarding** The immediate first step is the creation of a formal legal entity, which they refer to as "the LLC." However, [redacted] identifies the primary administrative hurdle: getting this new LLC approved as a supplier for [redacted]

- **The Challenge:** [redacted] emphasizes that this is a slow and difficult process. He states, "**vendor onboarding, supplier onboarding, is not easy, it's gonna take a little bit of time.**" He specifically mentions the need to pass a **"TPR" (Third-Party Risk Management)** review, a standard but rigorous corporate compliance step.
- [redacted] **Commitment:** [redacted] takes personal responsibility for navigating this internal bureaucracy. He assures Gowtham, "**I will push through the supplier and all that. Okay, so that's on me.**" This is one of his most critical contributions, as his internal influence is required to expedite the approval.

**2. Securing [redacted] as the Anchor Client** The cornerstone of their entire financial strategy is to secure a significant contract from [redacted] *before* approaching external investors. This initial contract serves as both revenue and, more importantly, market validation.

- **The Financial Target:** [redacted] sets a clear and ambitious goal for the first year of business: "**we need to get you know, over the next year... at least a million dollars from here [redacted].**"
- **Strategic Value:** This contract is positioned as the ultimate proof point for their business model. Having a major pharmaceutical company like [redacted] as a committed, paying customer dramatically increases the new venture's valuation and attractiveness to VCs. It transforms the company from a speculative idea into a validated business with a satisfied flagship client.

**3. Raising External Capital from Venture Capitalists** With the [redacted] contract as their foundation, they plan to raise a formal seed round of funding. Both partners will leverage their respective networks to accomplish this.

- **Gowtham's Network:** Gowtham is already exploring investment from his personal contacts, including friends and neighbors. He also mentioned receiving direct mentorship from "**a friend of mine who is in this venture capital SIP space... he taught me all the details about how these things work... Series A, Series B.**"

- [redacted] **Network:** [redacted] brings high-level connections to the table, stating confidently, "**I know many VCs.**" His role will be to make strategic introductions once their value proposition is solidified.
- **The Pitch:** [redacted] stresses that their pitch must be exceptionally strong to stand out in a crowded market of AI startups. It has to be "**so compelling that they say, 'Yes, you know, here you go, here you see, go, you know?'**" The signed [redacted] contract will be the centerpiece of this compelling narrative.

**4. Use of Funds: Building the Team** The plan for the initial seed funding is clearly defined: to hire a core technical and operational team.

- **Key Hires:** The first priority is to bring on a colleague named [redacted]
- **Offshore Strategy:** Their team-building strategy is centered on leveraging talent in India. [redacted] outlines the goal: "**we want to make sure we get enough seed funding... so we can fund him and a few more people in India. That's how it should be.**" This approach allows them to build a larger team with the initial capital raised.

In summary, the venture formation and funding plan is a sequential and strategic process. It begins with the difficult but necessary step of corporate onboarding, uses [redacted] influence to secure a million-dollar anchor contract from [redacted] and then leverages that success to attract external VC funding to scale the team.

# Clandestine Partnership Structure

Of course. Here is a full, detailed breakdown of the "Clandestine Partnership Structure" that [redacted] and Gowtham Rao agreed upon.

## Detailed Analysis: Clandestine Partnership Structure

The partnership between [redacted] and Gowtham is foundational to the new venture, but it is deliberately structured to be hidden from public and corporate view. This secrecy is a non-negotiable condition driven by [redacted] significant conflict of interest. The structure they discussed covers the reasons for the secrecy, the method for concealing [redacted] involvement, and the nature of his role as a silent partner.

**1. The Mandate for Absolute Secrecy** [redacted] is explicit that his involvement must be completely confidential. He sets this as a ground rule for the partnership.

- **Direct Instruction:** [redacted] states unequivocally, "**But obviously everything has to be secret... my name should never be in the picture.**"
- **The "Two Reasons":** He provides two clear justifications for this requirement:
    1. **His Position at** [redacted] As a senior leader ("I'm still a [redacted] leader"), his official association with a startup that he is also onboarding as a vendor would represent a major violation of corporate ethics and create an untenable conflict of interest.
    2. **Protecting His Colleague,** [redacted] is also protecting another [redacted] employee, [redacted] whom they plan to hire into the new venture. He explains, "I don't want them [redacted] to look at [redacted] in a negative way for any reason." Any premature discovery of [redacted] side venture could jeopardize [redacted] current employment and future transition.

**2. The Mechanism: Ownership by Proxy** To maintain secrecy while ensuring [redacted] has an equity stake, they agree on a legal workaround where [redacted] ownership is held through a trusted third party.

- **The Legal Separation:** The goal is to function as partners while ensuring [redacted] name is not on any official paperwork. As [redacted] puts it, he will help "without my name being legally, you know, understood."
- **The Proposed Solution:** [redacted] offers a specific method to achieve this: "**Maybe I'll add my wife's name.**" This proxy structure is the chosen mechanism to hold his equity. His wife would be the legal shareholder on paper, while he would act as the de facto partner.
- **Mutual Agreement:** Gowtham immediately signals his complete understanding and acceptance of this arrangement, responding, "**I got it. I understand it. I understand completely.**"

**3. The Role: An Active, Silent Partner** Despite being hidden, [redacted] role is not passive. He affirms his deep commitment to the venture's success and outlines his active contributions.

- **Personal Commitment:** [redacted] makes it clear that this is a true partnership. He tells Gowtham, "**I want to make sure I'm in it with you,**" emphasizing his personal and strategic investment in the outcome.
- **Strategic Contributions:** As a silent partner, [redacted] responsibilities are critical to the company's launch and growth. He will leverage his position and network to:
  - **Secure the Anchor Client:** Personally push through the million-dollar [redacted] contract.
  - **Navigate Bureaucracy:** Shepherd the new LLC through [redacted] vendor onboarding and risk management processes.
  - **Facilitate Fundraising:** Open doors to his network of venture capitalists.
  - **Guide Strategy:** Provide high-level guidance on product and market strategy.

In summary, the clandestine partnership is a carefully constructed arrangement where [redacted] operates as a full strategic partner behind the scenes. His official identity is masked through a proxy (his wife) to navigate a clear conflict of interest, allowing him to use his corporate influence and network to build the company from the inside while Gowtham leads it from the front.

# Go-to-Market and Long-Term Vision

Of course. Here is a full, detailed breakdown of the "Go-to-Market and Long-Term Vision" as discussed by [redacted] and Gowtham Rao.

## Detailed Analysis: Go-to-Market Strategy and Long-Term Vision

The discussion outlined a clear, two-phase go-to-market strategy focused on securing an anchor client before expanding, as well as a highly ambitious long-term vision to fundamentally disrupt data analysis in the life sciences industry.

---

### Part 1: Go-to-Market (GTM) Strategy

The immediate commercial plan is sequenced to maximize the chances of success by leveraging [redacted] internal position at [redacted]

**Phase A: Secure [redacted] as the Anchor Client**

This is the absolute top priority and the cornerstone of their entire business plan.

- **The Immediate Action Item:** [redacted] needs materials for an upcoming summit in Cambridge. His immediate task for Gowtham is to prepare a compelling pitch: "**send me the slides, because next week... I need to at least be able to get their attention for five minutes.**" Gowtham confirmed this is his "**100% focus**" and he will provide ample "talking points like ideas."
- **The Financial Goal:** The objective is to secure a substantial contract from [redacted] within the first year. [redacted] sets a specific target: "**we need to get you know, over the next year... at least a million dollars from here.**"
- **The Strategic Importance:** This initial contract is not just about revenue; it serves as crucial validation for the new venture. It provides a powerful case study and proof of a satisfied, high-profile customer, which is essential for attracting future clients and venture capital.

**Phase B: Expansion to the Broader Pharma Market**

Once the [redacted] contract is secured, they have a clear roadmap for customer acquisition that relies heavily on Gowtham's existing network.

- **Named Target List:** Gowtham identifies a specific list of high-value pharmaceutical companies to approach next, leveraging his personal contacts:
  - **Boehringer Ingelheim:** Through a contact he refers to as "Paw Patrol."
  - **Gilead Sciences**
  - **Eli Lilly**

- **Wider Market Segment:** Beyond these large players, Gowtham sees a significant opportunity with smaller companies, noting that "**lots of lot of small pharmas can get... benefit from it.**"
- **Bringing Key Partnerships:** Gowtham plans to transfer valuable ecosystem relationships he developed at his previous role. He highlights his work "**building the connections for** [redacted]" a critical provider of scientific data. [redacted] agrees that the new venture will fund necessary subscriptions, ensuring operational continuity.

---

## Part 2: Long-Term Vision

Their ultimate goal extends far beyond providing a service or a simple software tool. They envision creating a new technological paradigm for real-world data analysis that makes current industry standards obsolete.

- **The Core Concept: A Foundational Model:** The central idea is to build a "**foundational model**" specifically for health data. This model would be capable of understanding complex research questions and providing answers directly, without the need for the extensive manual data processing and programming currently required.
- **Disrupting Industry Standards:** Gowtham makes several bold predictions about the disruptive power of their technology:
    - **Obsolescence of Custom Data Conversion:** He states that the need for custom data transformation pipelines, a time-consuming and expensive part of data analysis, "**is going to be obsolete.**"
    - **Superseding OHDSI/OMOP:** Most significantly, he predicts that their approach will eventually render the entire OHDSI (Observational Health Data Sciences and Informatics) ecosystem obsolete. He claims, "**honestly, even the whole Odyssey idea is going to go obsolete.**" This is a profound statement, as OHDSI and its OMOP Common Data Model are a global standard in the industry.
- **The New Paradigm:** The vision is to shift from a world of complex coding and data mapping to one where researchers can directly query data for "characterization, risk questions." This would dramatically accelerate the pace of research in pharmacoepidemiology and health economics. [redacted] echoes this sentiment, noting that even with the current project, they are only "**scratching the surface**" of its potential applications.