# EXHIBIT 7

20250921

**Participants:**

- **Proposer:** Gowtham Rao
- **Advisor/Potential Partner:** [redacted]

**Executive Summary (~90 words):** Gowtham Rao detailed his career transition after being laid off from Johnson & Johnson and his subsequent success at EPAM developing a sophisticated AI platform for a major pharmaceutical client, [redacted] He pitched a startup idea to [redacted] to productize this system, which accelerates drug launch strategies using multi-agent AI. The conversation centered on the platform's impressive validation and capabilities. [redacted] identified a critical turning point: the unresolved intellectual property (IP) rights, which poses a significant risk. Gowtham's immediate next step is to seek legal counsel.

---

## Topics Discussed

1. Career Transition: From J&J to EPAM
2. The AI Platform for Drug Launch Acceleration
3. [redacted] Project: Validation and Impressive Performance
4. The Startup Pitch and Call for Collaboration
5. Intellectual Property as the Major Hurdle
6. Next Steps and Continued Community Engagement

---

## Detailed Topic Analysis

### 1. Career Transition: From J&J to EPAM

Gowtham Rao began by outlining his career changes over the past year. He was laid off from [redacted] team at Johnson & Johnson in November of the previous year, noting that despite the company's size, OHDSI and real-world data science constituted "a small fraction inside J and J," with most research groups still relying on traditional SAS-based methods. Following the layoff, he joined EPAM, an IT services company that had acquired his friend Greg Klebanov's company, Odysseus. This move marked a significant shift from being an individual contributor in a large pharma company to operating in a fast-paced, business-oriented environment. At EPAM, Gowtham transitioned away from OHDSI-centric work and became the lead for AI projects, gaining critical experience in business operations, including managing profit and loss (P&L), client acquisition, and team management.

### 2. The AI Platform for Drug Launch Acceleration

The core of Gowtham's new venture is an AI platform he designed and deployed for [redacted] The system's primary goal is to accelerate a new drug's "time to peak revenue" by proactively identifying and mitigating potential launch hurdles. The platform is built on a robust knowledge

base created by ingesting and vectorizing three data categories: public sources (PubMed, ClinicalTrials.gov), licensed content ([redacted]), and the client's internal documents (investigator brochures, study protocols, slide decks). The system utilizes a sophisticated multi-agent framework where different AI agents are prompted to adopt specific personas, such as an epidemiologist, a medical affairs doctor, or a market access specialist. Gowtham explained, "this is your role, this is your context. This is what you do, and this is not what you do." These agents then analyze a strategic problem, engage in adversarial and convergent discussions, and ultimately generate a comprehensive analysis.

### 3. [redacted] Project: Validation and Impressive Performance

The platform's output for [redacted] was a detailed list of potential issues that could slow market adoption, followed by concrete, actionable scientific study proposals. These proposals were fully formed, including background, rationale, PICOT framework, and even preliminary cohort size estimates from an OMOP query. Gowtham shared that the system was validated in a blinded test against [redacted] internal strategic planning process. The AI not only identified all the risks the human team had, but also surfaced additional concerns like cardiovascular risks and considerations for rare and older populations. He noted that the client was "floored" by the results, as the system accomplished in a single execution what previously took large teams months to complete. The platform is now fully deployed within [redacted] infrastructure.

### 4. The Startup Pitch and Call for Collaboration

Having proven the concept and learned the business mechanics at EPAM, Gowtham is now at an "inflection point" and wants to start his own company to productize this AI framework. He pitched the idea directly to [redacted] outlining several potential roles for him, including as an advisor, an investor, or a scientific collaborator. Gowtham believes the combination of a validated product concept, his industry connections, and the right partnerships could lead to rapid success. He also suggested leveraging their mutual connection, [redacted] at Stanford, noting his significant influence in the field. Gowtham expressed confidence in his ability to secure clients and deliver on projects, framing the venture as a high-potential opportunity.

### 5. Intellectual Property as the Major Hurdle

[redacted] immediately raised the most significant challenge to Gowtham's plan: intellectual property ownership. Since the platform was developed for [redacted] while Gowtham was employed by EPAM, the IP rights are ambiguous. [redacted] cautioned, "the thing that I see, you know, quickly as not a red flag, but a big question mark, is the IP part." While Gowtham plans to rebuild the system from scratch using his own code, [redacted] suggested that either [redacted] or EPAM could still make a legal claim on the underlying concept and orchestration, especially if the new venture proves successful. Gowtham acknowledged this risk, stating that his employment contract has a favorable clause regarding work done in the public domain (like OHDSI), but the core of this new product is the proprietary orchestration of these components.

- **Risk: EPAM, as the employer, or [redacted] as the client who funded the work-for-hire project, could file a legal challenge claiming ownership of the core IP, potentially sinking the new venture before it starts.**
- **Opportunity:** If the IP issues can be legally cleared, Gowtham possesses a powerful, validated, and high-demand product concept that can be adapted for various use cases across the pharmaceutical and healthcare industries.
- **Next Step:** Gowtham will immediately seek advice from an IP attorney to review his EPAM contract and the [redacted] work agreement to understand his legal standing and options.

### 6. Next Steps and Continued Community Engagement

The conversation concluded with a clear path forward. Gowtham committed to investigating the IP situation with a lawyer within the week and following up with [redacted] [redacted] expressed his interest and agreed to consider the opportunity further once the legal risks are clarified. Outside of the startup discussion, they briefly touched on their continued involvement in the OHDSI community. Gowtham invited [redacted] to participate virtually in a phenotyping workshop he is organizing on October 9th. [redacted] accepted, pending another meeting, and offered to connect Gowtham with a former student who is also active in the field and might be interested in contributing.

# Intellectual Property as the Major Hurdle

## Intellectual Property as the Major Hurdle

Upon hearing the details of the platform and the startup proposal, [redacted] immediately identified the most significant and potentially show-stopping challenge: intellectual property ownership. He framed it as the primary obstacle, stating, "the thing that I see, you know, quickly as not a red flag, but a big question mark, is the IP part." The discussion revealed a complex ownership situation, as the original system was developed by Gowtham (an EPAM employee) as a work-for-hire project for [redacted] Gowtham's initial position was that since [redacted] paid for the project, they own the specific code delivered, not EPAM. He argued he could circumvent this by rebuilding the entire system from scratch, telling [redacted] "I'm not going to use the same code. It's the concept. I'm going to write my own code... it's rebuilt."

However, [redacted] pressed on this point, suggesting that the true value lies not in the individual lines of code but in the novel orchestration of the components—the "secret sauce" that makes the system work. He noted that while individual scripts (e.g., loading PubMed data) are trivial, "when you put it together, is when people get finicky." This implies that the conceptual framework itself could be subject to an IP claim. [redacted] warned that even if [redacted] didn't pursue a claim, EPAM might. "Somebody's gonna come out and make a claim to it. And you might even, you know, your employer might even take a crack at it," he cautioned.

Gowtham acknowledged the risk but pointed to a clause in his EPAM contract stating that anything he develops in the public domain, such as for the OHDSI community, is not the company's IP. [redacted] countered that this clause offers little protection here, as the value is in the proprietary assembly of public components, not the public components themselves. To underscore the seriousness of this risk, [redacted] shared his own strategy for avoiding such conflicts: ensuring his startup consulting work is in domains entirely separate from his healthcare work at Stanford to create a "cleaner, you know, clear cut definition." Both concluded that this IP ambiguity is the most critical hurdle that must be cleared before any further steps, like seeking capital or building a demo, can be taken. Gowtham's first and most crucial action item from the conversation is to retain an IP attorney to thoroughly review his contracts and assess the viability of his plan.

# The Startup Pitch and Call for Collaboration

# The Startup Pitch and Call

## The Startup Pitch and Call for Collaboration

With the context of his career transition and the success of the [redacted] project established, Gowtham declared he was at an "inflection point" and ready to "do my own now." He framed his pitch to [redacted] by contrasting the limitations of his current employer with the potential of his idea. He described EPAM as a "body shop company that does not care about products, or IP," whereas he had developed "all the components for a product." His core proposal is to build a new company focused on productizing the AI-driven drug launch acceleration framework he had already validated. He stressed that his time at EPAM was crucial preparation, stating, "back in J&J, I did not know how to run a business, but [at] EPAM... I learned how you know Profit and Loss works... how do you make a deal."

Having laid this foundation, Gowtham made a direct and multi-faceted appeal for [redacted] involvement. He asked pointedly, "Would you be interested in some capacity?" and then outlined three specific ways [redacted] could contribute, leveraging his unique strengths:

1. **As an Advisor and Connector:** Recognizing [redacted] position and network, Gowtham suggested, "You have connections in Stanford, you know people, so you can obviously be part of it in an advisory capacity."
2. **As an Investor:** Acknowledging [redacted] financial resources, he added, "And you also have financial capital, so if you want to invest, you could."
3. **As a Scientific Partner:** Praising his technical skills, Gowtham noted, "And you have science. You're a pretty smart dude," emphasizing that very few people have the necessary combination of skills.

To further entice [redacted] Gowtham strategically invoked their mutual, influential connection, [redacted], suggesting a powerful potential partnership: "you can imagine if [redacted] pad joins together." He envisioned assembling a powerhouse team, mentioning he could also pull in other well-regarded friends from the OHDSI community like [redacted] and [redacted] as scientific advisors. Gowtham projected strong confidence in the venture's viability, asserting that he has "clients that are interested" and that the delivery aspect is "straightforward." He positioned the product as being both first-to-market and best-in-class, making a bold claim: "I think the first is true right now, and the best is also likely true."

# [redacted] Project: Validation and Impressive

## [redacted] Project: Validation and Impressive Performance

Gowtham explained that the AI platform he developed was not merely a theoretical concept but a fully deployed system that had undergone a rigorous validation process at [redacted] yielding results that "floored" the client. The performance was assessed during a Proof of Concept (POC) phase through a blinded comparison. The output from Gowtham's AI system was benchmarked against the findings from [redacted] own internal strategic planning process, which he referred to as their [redacted]. A crucial element of this test was that the AI system was only given access to public data and was not privy to any of [redacted] internal analyses or proprietary documents, ensuring an unbiased evaluation.

The results of the comparison were definitive: the AI system's analysis was superior to that produced by the human teams. Gowtham reported that his system successfully identified all the priority risk areas the [redacted] team had flagged for a specific drug, including the risk of insomnia, hepatic failure, and physician hesitancy. Critically, the AI went further, identifying "a few more" significant risks that the internal team had missed, such as potential cardiovascular risks and specific strategic considerations for use in rare and older patient populations. The output was also praised for being "very well structured."

Beyond the superior depth of the analysis, the platform demonstrated a massive leap in efficiency. It was able to generate this comprehensive strategic analysis, along with a complete scientific study protocol—including background, rationale, PICOT framework, and preliminary OMOP queries—in a single execution lasting about 40 to 50 minutes. Gowtham emphasized the impact of this, stating, "what takes months, takes one one execution" for large teams of scientists. The success of the POC led to the platform being fully deployed, and it is now an operational tool running within [redacted] own systems.

[redacted] details

Based on the conversation, here is a detailed analysis of [redacted] reactions, impressions, and stance regarding Gowtham's proposal.

## Detailed Analysis of [redacted] Reactions

[redacted] role in the conversation evolved from a friend catching up to a pragmatic, cautious, and analytical potential advisor. His reactions were not driven by emotion but by a methodical, experience-based assessment of the business, scientific, and legal merits of the pitch.

### 1. Gut Reactions and Initial Impressions

[redacted] gut reactions served as critical guideposts throughout the conversation, immediately focusing on the most practical and high-risk aspects of the proposal.

- **Pragmatism on the Business Model:** His first significant question was, "What exactly are you planning on doing of offering services like another consulting shop, or do you have a product in mind?" This immediate, clarifying question reveals a practical, business-oriented mindset. He instantly cut through Gowtham's narrative to get to the core of the business model, seeking to understand if the venture was a scalable product or a less-scalable services company like the "body shop" Gowtham was trying to leave.
- **Scrutiny of the Science:** After Gowtham detailed the platform's impressive capabilities, [redacted] next immediate question was a simple but sharp, "Have you validated it?" This is the reaction of an experienced data scientist who is not easily swayed by a good story. He needed to see proof and understand the rigor behind the claims before considering the idea credible.
- **Alarm at the Legal Risk:** [redacted] strongest and most definitive gut reaction was to the intellectual property situation. He immediately identified it as the venture's primary vulnerability, calling it "not a red flag, but a big question mark." His tone shifted from curious to cautionary, and he gently pushed back on Gowtham's initial confidence that rewriting the code would solve the problem, stating, "I don't think that, you know, it's... as trivial as you mentioned it." This reaction demonstrated his awareness of the severe complexities of IP law in a corporate work-for-hire context.

### 2. Level of Interest

[redacted] interest level was clearly piqued but remained conditional throughout the conversation.

- **Initial Curiosity:** At the start, he was simply engaged in a friendly chat.
- **Piqued by the Technology:** His interest grew significantly as Gowtham described the multi-agent AI platform and its successful, blinded validation against [redacted] internal teams. Phrases like "sounds interesting" and his engaged questioning show he was impressed by the technical achievement and the market application.
- **Conditional on IP Resolution:** His interest became heavily qualified once the IP issue was raised. While he didn't dismiss the idea, he effectively tabled the discussion pending a legal resolution. His stance became: the technology is compelling, but the business

foundation is too risky to engage with at this stage. He left the door open, but only if Gowtham could clear this fundamental hurdle.

### 3. Next Steps and Action Items

[redacted] assigned no immediate action items to himself, positioning himself in a reactive, wait-and-see role. His next steps were entirely dependent on Gowtham's actions.

- **Primary Action Item (for Gowtham):** [redacted] main contribution was to define Gowtham's critical next step: get a professional legal opinion on the IP.
- [redacted] **Stance:** His commitment was to re-engage *after* Gowtham had answers. He stated this clearly: "Yeah, no severe that part out, you know, let me know what they tell you. And, I mean, you know, and I can let you know, know my, my other thoughts on it." This is a cautious offer to continue the conversation, contingent on the removal of the primary risk.
- **Passive Consideration:** He did agree to "start thinking about stuff as well," indicating that the idea was compelling enough for him to mull over in the background.

In summary, [redacted] acted as a crucial "first-pitch" filter. He was impressed by the technology and the validation but immediately identified the critical non-technical flaw that could doom the entire venture. His interest is genuine but pragmatic; he is unwilling to invest his time or resources until the foundational legal risks are properly assessed and mitigated.