# EXHIBIT 8

20250921

**Participants:**

- Principal: Gowtham Rao
- Advisor: [redacted]

**Executive Summary (~90 words):** Gowtham Rao detailed his precarious situation at EPAM, where his personal success with GenAI contrasts sharply with the underperformance of his direct business unit, forcing a potential role change. He presented a powerful AI platform he developed and is actively considering launching a startup, buoyed by significant external encouragement. [redacted] offered sober counsel, warning of an impending AI hype cycle crash and the risks of underestimating the corporate support structure. Gowtham invited [redacted] to consider a scientific advisor role, which [redacted] agreed to explore post-symposium.

---

## Topics

1. Personal Reflections at a Career Crossroads
2. Performance Dynamics and an Uncertain Future at EPAM
3. The High-Stakes AI Startup Opportunity
4. [redacted] Counsel on Risks and Reputation
5. Evaluating Exit Strategies and Future Collaboration
6. Planning the OHDSI Symposium's Human vs. AI Experiment

---

## Detailed Topic Analysis

### 1. Personal Reflections at a Career Crossroads

The conversation began on a somber note, with Gowtham and [redacted] sharing condolences for recently deceased colleagues, [redacted]. This reflection on loss transitioned into Gowtham's analysis of his own professional life, marking nearly a year since he was laid off from J&J and joined EPAM. He described the past ten months as a period of immense growth and transformation. The initial transition, while born of necessity, has led him to a much stronger position. He noted a significant boost in confidence and reputation, having successfully delivered projects, diversified his skill set beyond OHDSI into GenAI, and gained experience running a P&L. He feels he has moved from a risk-averse mindset at J&J to a more entrepreneurial one, stating, "I am not risk averse anymore." This personal and professional evolution sets the stage for his current dilemma: whether to leverage his newfound momentum for a venture outside the corporate structure.

- **Takeaway:** Gowtham has undergone a significant professional transformation at EPAM, building skills and confidence that now make him seriously consider a high-risk, high-reward entrepreneurial path.

## 2. Performance Dynamics and an Uncertain Future at EPAM

Gowtham provided a candid breakdown of his situation within EPAM. His direct manager, Greg Klebanov, is struggling; his business unit was projected to generate [redacted] from protocol-driven studies and data science but is only tracking towards [redacted]. Gowtham attributes this failure to a combination of unreasonable targets, a limited market for OHDSI-specific protocol studies, and intense competition from larger players like IQVIA. In stark contrast, Gowtham has personally thrived by diversifying into GenAI projects, making himself highly valuable to account managers across the company. This has created a paradoxical situation: EPAM's board has put Greg's unit "in deep red," and Greg can no longer afford Gowtham's cost center. While EPAM wants to retain him, the likely new role would be a broad, cross-functional subject matter expert, which Gowtham fears would stretch him thin and dilute his focus. **The core tension is that his individual success has made him too expensive for his failing home division, forcing him into a potentially less desirable role elsewhere in the company.**

- **Takeaway:** A significant gap between Gowtham's personal performance and his division's financial struggles has created an unsustainable situation, forcing a career decision.

## 3. The High-Stakes AI Startup Opportunity

The central driver of Gowtham's career contemplation is a sophisticated AI platform he developed. He described it as far more than a simple chatbot, calling it an end-to-end workflow built on the world's largest RAG database of public medical data. The system uses multi-agent orchestration to simulate conversations between different functional roles (e.g., epidemiologist, medical affairs) to generate and vet dozens of fully-referenced, 20-page study concepts in about an hour. Though the IP is owned by [redacted] who funded the project, Gowtham has showcased the underlying framework to entrepreneurs and private equity managers in his local Princeton network. The feedback has been overwhelmingly positive, with contacts urging him to leave EPAM immediately. He shared that "they're talking in terms of 50 and 100 million dollars already," viewing his platform as a rare, fully realized application in a sea of generic AI tools. **While multiple business models exist (consulting, on-premise deployment, SaaS), the immediate open question is how to structure a new venture to best capitalize on this perceived value.**

- **Takeaway:** Gowtham has developed a powerful and unique AI platform that has received extraordinary external validation, creating a tangible and potentially lucrative startup opportunity.

## 4. [redacted] Counsel on Risks and Reputation

In response to Gowtham's enthusiasm, [redacted] provided a measured and cautious perspective. He warned that the industry is in a period of "spectacular over investments" in AI and predicted a crash of the hype cycle within the next two years as returns fail to materialize. His primary advice was to focus on creating enduring value that will survive the inevitable market correction.

[redacted] also challenged Gowtham to consider what he might be taking for granted, pointing out that EPAM provides a critical "apparatus" for business development and customer relations. He remarked, “you're probably failing to recognize the apparatus that… has helped you… It wasn't just all you on your own, by yourself.” Furthermore, [redacted] cautioned that leaving EPAM in under a year would be a “yellow flag” on his resume for any future corporate roles, stressing the importance of leaving on good terms and maintaining relationships. **The most significant risk [redacted] highlighted is that Gowtham may be underestimating the non-technical infrastructure and reputational capital required to succeed independently.**

- **Takeaway:** [redacted] advised Gowtham to be realistic about the impending AI market correction and to not underestimate the value of the corporate infrastructure or the reputational risks of a short tenure at EPAM.

### 5. Evaluating Exit Strategies and Future Collaboration

Gowtham outlined his preferred path forward: remain on the EPAM payroll while quietly laying the groundwork for his startup—building relationships and preparing to raise capital. He described a scenario of slowly becoming less responsive until EPAM puts him on a performance improvement plan, triggering an exit. [redacted] strongly advised against this approach, emphasizing that burning bridges is a mistake. “If you want to move in a direction where relationships are going to matter,” [redacted] said, “you don't want stuff attached to you... having people with bad days in their mouth.” A better approach would be an amicable departure where his manager would still act as a positive reference. The conversation then pivoted to the OHDSI ecosystem, with Gowtham identifying potential partners like [redacted]. He noted [redacted] is already concerned about his organization being distracted by the “LLM shiny novel.” The discussion culminated in Gowtham formally asking if [redacted] would be interested in serving as a scientific advisor to his potential new company. [redacted] confirmed his interest in helping and agreed to discuss the possibility in more detail after the OHDSI symposium.

- **Takeaway:** Gowtham is planning his exit from EPAM to pursue a startup and has secured [redacted] interest in a potential scientific advisory role, contingent on future discussions.

### 6. Planning the OHDSI Symposium's Human vs. AI Experiment

The final segment of the meeting was a detailed planning session for an ambitious workshop Gowtham is organizing for the OHDSI Symposium. The session will be a blinded study comparing concept sets created by human teams versus those generated by AI tools. Gowtham has already assembled a 15-person team to manage the logistics, which include setting up a dedicated, time-locked Atlas instance for the human participants and developing a Python-based adjudication tool. He aims to recruit clinical leads for various specialties (e.g., rheumatology, critical care) who will guide teams in building the concept sets within a one-hour timeframe. [redacted] lauded the plan but raised a critical concern about the time constraint, warning that the experiment’s validity depends on the human teams producing their best possible work. He cautioned, "if it's instead, like a half completed draft, then the kind of, the kind of unravel for anything." He suggested giving the teams the clinical descriptions and homework

well in advance to ensure they arrive prepared for a consensus-building session rather than starting from scratch.

- **Takeaway:** Gowtham is planning a complex, high-visibility workshop to benchmark human vs. AI performance in phenotyping. **The primary risk is ensuring human participants have sufficient time and preparation to produce high-quality work for a valid comparison.**

# Personal Reflections at a Career Crossroads

Based on the conversation, here is a detailed account of the topic "Personal Reflections at a Career Crossroads":

The discussion began on a somber and reflective note as Gowtham Rao and [redacted] exchanged condolences regarding the recent deaths of professional acquaintances, [redacted]. This prompted Gowtham to contemplate his own stage in life, remarking, "I don't know if it's a stage in our life where we reach 40s and we start seeing death of people... that's a conversation that my father has, but now I'm having it."

This reflective mood served as a direct bridge to a broader career assessment. Gowtham contrasted his vulnerable position just ten months prior, after being laid off from J&J, with his current state. He described the initial job search as an unpleasant experience of "being screened and pre screened" by a "black box" process where he felt he lacked sufficient connections.

He then emphatically described the dramatic change since joining EPAM: "It's been 10 months, and it has flipped. It's flipped a lot for me." He detailed the key aspects of this transformation:

- **Renewed Confidence and Connections:** He stated, "I'm in a much more different spot than I used to be... I've got connections. I've got more confidence."
- **Proven Track Record:** He emphasized his performance, saying, "I have delivered, and I have built a new reputation."
- **Skill Diversification:** He has expanded his expertise significantly, most notably by gaining experience running a P&L and successfully venturing into GenAI.
- **Shift in Mindset:** Most critically, he identified a fundamental change in his personality and professional outlook. He confessed, "I was very risk averse when I was in J and J," but now declared, "I am not risk averse anymore."

Gowtham acknowledged the fortuitous nature of his transition to EPAM, calling the timing "incredible" as it spared him a prolonged and difficult job search. This entire period of growth and success has crystallized his thinking about the future, reinforcing that EPAM was a crucial stepping stone rather than a final destination. This newfound confidence and appetite for risk are the direct drivers of his current contemplation to leave the corporate structure and pursue his own entrepreneurial venture.

# Performance Dynamics and an Uncertain

Of course. Here is a detailed account of the topic "Performance Dynamics and an Uncertain Future at EPAM":

Gowtham Rao provided a detailed and candid assessment of the complex business dynamics that have defined his year at EPAM and created his current career dilemma. He explained that he was brought into Greg Klebanov's business unit with a specific mandate to grow its data science and protocol-driven study offerings. Greg had made a significant commitment to EPAM leadership, projecting that this sub-unit would generate [redacted] in annual revenue.

However, the reality fell drastically short. The unit's historical performance was only around [redacted], and despite Gowtham's efforts, it failed to grow, remaining stagnant at approximately [redacted]. Gowtham attributed this failure to a confluence of three major factors:

1. **An Unreasonable Target:** The goal of quintupling revenue to [redacted] was fundamentally unrealistic from the outset.
2. **A Limited and Contracting Market:** The unit's business development connections were confined almost exclusively to the OHDSI/OMOP community, which is a small niche for protocol-driven studies. This was compounded by broad market uncertainty and major layoffs at key pharmaceutical companies like Amgen and Pfizer, which dried up opportunities.
3. **Intense Competition:** The unit faced stiff competition from larger entities like IQVIA, which could leverage their existing, large-scale clinical trial contracts to "piggyback" and win the smaller staff augmentation and R&D projects that EPAM was targeting, leading to lost contracts at clients like [redacted].

In stark contrast to his unit's financial struggles, Gowtham's personal performance was a resounding success. He "extremely diversified inside EPAM," particularly by leveraging the GenAI hype. He successfully sold and delivered innovative AI projects, which brought him significant positive attention, or "limelight." As a result, "all the account managers love me," and he became the go-to subject matter expert and trusted partner on numerous client engagements.

This divergence created a paradox. Following an annual review where EPAM's board informed Greg Klebanov that his unit was "in deep shit" and needed to cut costs, the direct consequence was that "Greg Klebanov cannot afford me anymore." Gowtham made a crucial distinction: "EPAM can afford me. Greg Klebanov cannot afford me."

This has led to an uncertain future. While EPAM values Gowtham and wants to retain him, the proposed solution is to move him out of Greg's cost center and into a broader, cross-functional role. Gowtham fears this would turn him into a "Jack of all trades," pulled in many directions. Unlike the "ring-fenced" structure of his current role, he would be accessible to every account manager, forcing him to travel constantly and engage in topics outside his core expertise, often just for the credential of having an MD/PhD in the room. This potential for dilution and loss of

focus is a major concern, as it would rob him of the "mental bandwidth to think about what I want to do."

# The High-Stakes AI Startup Opportunity

Of course. Here is a detailed account of the topic "The High-Stakes AI Startup Opportunity":

The primary driver behind Gowtham Rao's consideration of leaving EPAM is a "phenomenal" and powerful AI platform he developed, which has generated extraordinary external interest. He describes this system as a significant leap beyond typical AI applications, representing a tangible and potentially massive commercial opportunity.

**The Technology and Its Capabilities:** Gowtham detailed a sophisticated, end-to-end workflow for generating scientific study concepts. Its key components include:

- **A Massive RAG Database:** He claims to have built one of the world's largest Retrieval-Augmented Generation (RAG) databases, which includes "pretty much every public medically related data" such as PubMed articles, conference proceedings, FDA and EU clinical trial documents, and UMLS ontologies, all processed into vector embeddings and knowledge graphs.
- **A Multi-Agent System:** The platform's core logic relies on "multi agents, orchestrating, writing, thinking." These agents are programmed with specific personas—such as an epidemiologist, a medical affairs lead, a compound development team leader, and a global value expert.
- **Sophisticated, Human-like Reasoning:** The agents engage in complex interactions to vet ideas. Gowtham described them performing "adversarial conversations, divergent conversations, [and analyzing] different types of emotional, scientific rationale," before synthesizing the outputs into a convergent recommendation.
- **An Automated End-to-End Workflow:** The system takes an indication and a drug as inputs, searches all relevant content, and orchestrates the agent conversations. It then generates a long list of potential commercial challenges for the product, proposes scientific studies to mitigate those risks, writes a draft protocol for each, and even runs preliminary feasibility queries.
- **High-Volume, High-Quality Output:** The platform can produce "15 to 20 study ideas in about one hour," with each concept detailed in a 20-page document where every line is referenced to a source article. He emphasized that it operates within "highly constrained, lots of guardrails."

**IP and Business Model:** A critical detail is that while the project was funded by [redacted] making them the owner of that specific IP, EPAM has no claim as they were purely a "work for hire" vendor. This leaves Gowtham with the architectural knowledge and the underlying modular, "Lego"-like Python framework to rebuild and adapt. He is exploring multiple commercialization strategies, including deploying it as an on-premise accelerator for clients, offering it as a service partnered with human-in-the-loop scientists, or acting as a technology partner for boutique consulting firms.

**External Validation and Valuation:** The "high-stakes" nature of the opportunity comes from the powerful validation he has received from his personal network in Princeton, which includes successful entrepreneurs, private equity managers, and senior pharma employees. After seeing

demonstrations, their reaction has been unanimous and forceful: "They are like you leave EPAM today." They see his platform as fundamentally different from the glut of simple AI tools on the market, with one person remarking, "99% of all AI things are just chat bots... What you have shown us is a full workflow, end to end." This enthusiasm is backed by significant financial speculation, with Gowtham noting, "they’re talking in terms of 50 and 100 million dollars already."

# [redacted] Counsel on Risks and Reputation

Of course. Here is a detailed account of the topic "[redacted] Counsel on Risks and Reputation":

Responding to Gowtham Rao's enthusiasm for a startup, [redacted] adopted a measured, advisory tone, providing sober counsel focused on mitigating risks and preserving long-term reputation. His advice covered four distinct areas: the macro-economic environment, personal blind spots, exit strategy, and professional reputation.

**1. The Macro Risk: The Coming AI Hype Cycle Crash** [redacted] began with a market-level warning, predicting that the current frenzy of "unbridled on constrained money" being poured into AI would not last. He forecast a "crash of that hype cycle" within the next two to three years. He argued this correction is inevitable because companies are underestimating the true costs of AI implementation while overestimating the returns, particularly those based on optimistic assumptions like reducing staff. He advised Gowtham to pursue a dual strategy: while it's viable to "grab money now, while it's available," the more critical goal should be to "set yourself up for the value for when the... cycle crashes." The key to survival, in his view, is to build a solution with proven utility and "enduring value" that will remain relevant after the hype dissipates.

**2. The Personal Risk: Underestimating the "Apparatus"** [redacted] offered a direct and personal critique, challenging Gowtham's perception that his success was solely his own. He recalled a previous exchange where Gowtham had asserted his success "had nothing to do with EPAM. It was all you and your hard work." [redacted] gently corrected this view: "I think that you're probably failing to recognize the apparatus... the EPAM apparatus has helped you... It wasn't just all you on your own, by yourself." He urged Gowtham to take stock of the invisible support structures he benefited from, such as EPAM's established customer relations, management systems, and the "business development people that open doors for you," calling them non-trivial assets he would lack if he went solo. He suggested Gowtham reframe his remaining time at EPAM as a strategic opportunity to consciously learn these aspects of the business.

**3. The Strategic Risk: How You Exit Matters** When Gowtham floated the idea of a slow, disengaged exit where his performance would gradually decline, [redacted] was unequivocally against it. "I would not advise a situation where you're trying to take advantage of EPAM and not delivering on your responsibilities," he stated firmly. He emphasized the long-term importance of relationships, warning, "you don't want stuff attached to you... having people with bad days in their mouth." The goal, he advised, should be an amicable departure where former managers become allies who, despite being sad to lose him, would gladly act as positive references. The ideal outcome is for them to say, "it sucks to lose them, but I'm glad for them that they're doing that thing."

**4. The Reputational Risk: The CV "Yellow Flag"** Finally, [redacted] highlighted a practical, long-term career risk. Should the startup not succeed, leaving EPAM in under a year would be a significant red flag for future corporate employers. "Leaving... in under a year is like a yellow flag," he explained. From a hiring manager's perspective, such a short tenure "raises a question" and creates "concerns about commitments," making a candidate less attractive. This

grounds the importance of a thoughtful and well-managed career move in tangible future consequences.

# Evaluating Exit Strategies and Future

Of course. Here is a detailed account of the topic "Evaluating Exit Strategies and Future Collaboration":

This part of the conversation focused on the practicalities of how Gowtham Rao could transition out of EPAM and who he might partner with in a new venture, culminating in a direct request for [redacted] involvement.

**Gowtham's Proposed Exit Strategy** Gowtham outlined what he called his "third option," a deliberate plan to facilitate his departure. He proposed continuing on the EPAM payroll while working "in the shadows" to lay the groundwork for his startup—raising capital and building relationships. The mechanics of this exit would involve "slowly weaning, being less responsive, because I have to focus on something else." He anticipated this would eventually lead management to put him on a "performance improvement plan, or some crap like that," which would then serve as a trigger to negotiate a formal exit. Gowtham believed this method would be advantageous because, due to the way his contract was written, such a departure might nullify his non-compete clause.

**[redacted] Counsel on a Clean Exit** [redacted] immediately and strongly advised against this strategy. He argued that intentionally engineering a performance-based exit to gain a contractual advantage was a short-sighted approach that would cause significant reputational damage. He stressed the long-term value of professional relationships, stating, "If you want to move in a direction where relationships are going to matter, you don't want stuff attached to you... having people with bad days in their mouth." Instead, he advocated for a transparent and amicable departure that would preserve his connections and ensure former managers would remain allies and positive references. Gowtham acknowledged this point, referencing his professional and drama-free exit from J&J as evidence that he understood the importance of maintaining good relationships.

**Exploring Future Collaborations** The discussion then shifted to the future. Gowtham recognized that any new venture in the OMOP space would require partnerships, as he does not intend to handle all aspects of the business, stating, "I am not going to do ETL, for example." He identified key players in the OHDSI vendor community as potential collaborators:

- [redacted]**:** He mentioned that "partnering with somebody like [redacted] sounds like a great idea."
- [redacted]**:** He expressed high regard for [redacted], calling him "awesome." [redacted] added valuable context, noting he had spoken with [redacted] the previous day and confirmed that [redacted] organization is actively trying to develop an LLM strategy because their clients are "distracted by the LLM shiny novel." This insight positioned [redacted] as a highly relevant and potentially receptive partner.

**The Direct Ask for [redacted] Involvement** This exploration of collaboration led Gowtham to make a direct request to [redacted] first asking procedurally, "Are you allowed to become a

scientific advisor to a small company?" and then personally, "is that something you are interested in pursuing?"

[redacted] response was positive but carefully framed:

- **He confirmed it was possible:** He stated there is a formal process at his company to do so, which requires HR disclosure.
- **He expressed personal commitment:** "I am very committed to helping you... I'm open to whatever that would be."
- **He defined his potential role:** He clarified that his interest was "purely from the scientific side, not the business side," and noted that while he could contribute, the business positioning aspect of Gowtham's tool was not his core expertise.

They concluded with a mutual understanding. Gowtham was pleased to have secured [redacted] interest, and they agreed to postpone a more detailed discussion about the nature of the advisory role until after the upcoming OHDSI symposium.

# Planning the OHDSI Symposium's Human

Of course. Here is a detailed account of the topic "Planning the OHDSI Symposium's Human vs. AI Experiment":

The final portion of the conversation was an in-depth planning session for a highly ambitious and methodologically complex workshop Gowtham Rao is organizing for the upcoming OHDSI Symposium. The goal is to conduct a formal, blinded study comparing the quality of phenotype concept sets created by human experts versus those generated by various AI tools.

**Experimental Design and Logistics:** Gowtham has constructed a rigorous plan, supported by a 15-person team, to ensure the experiment is controlled and the results are credible.

- **Controlled Environment:** He has arranged with OHDSI's technical team to set up a dedicated, temporary Atlas instance. This instance will be made available via IP address for a strict one-hour "pencils down" period, after which it will be locked to read-only access.
- **Custom Adjudication Tool:** A custom Python application is being built to manage the evaluation phase. This tool will display blinded, pairwise comparisons of the generated concept sets to participants for scoring.
- **Standardized Evaluation:** A formal scoring rubric and scale are being designed by Jack Murphy to ensure all adjudicators use the same criteria. Gowtham requested [redacted] input on this methodology.
- **A "Gold Standard" Target:** Before the workshop, a "target quality concept set" for each clinical idea will be created and agreed upon by a small expert panel including Gowtham, [redacted] and [redacted], to serve as a benchmark.

**Step-by-Step Workshop Workflow:**

1. **Pre-Workshop Preparation:** The clinical descriptions for the concepts will be sent to all human participants 10 days in advance. Simultaneously, developers of AI tools (Gowtham has invited all known players in the space) will receive the same descriptions and must submit their fully AI-generated concept sets as resolved code lists beforehand.
2. **Introduction (40 mins):** The session will begin with an overview of the experimental design and instructions.
3. **Human Creation (1 hour):** Participants will break into tables, each led by a clinical expert for a specific domain (e.g., rheumatology, ophthalmology). These teams will collaborate to build their concept sets within the time-locked Atlas instance. Gowtham also plans to record the discussions at each table for qualitative analysis.
4. **AI Presentations & Backend Processing (45 mins):** While the AI developers present their methodologies, Gowtham's backend team will extract the human-created concept sets, resolve them, and load them into the adjudication app alongside the blinded AI and "gold standard" sets.
5. **Blinded Adjudication:** Participants will then use the app to score a series of pairwise comparisons (e.g., Human Team A vs. AI Tool B; AI Tool C vs. Gold Standard). The source of each concept set will be completely blinded to the adjudicators.

6. **Results Reveal:** Once the adjudication is complete, the system will unblind the results and display real-time analysis, ranking all submissions relative to the "gold standard."

[redacted] **Critical Feedback and Refinements:** [redacted] praised the overall plan but offered two crucial pieces of advice to mitigate risk:

- **Focus on Quality, Not Quantity, of Participants:** When Gowtham mentioned a goal of over 100 participants, [redacted] strongly advised against it, warning that large crowds can dilute the focus and quality of a hands-on workshop. He recommended focusing on recruiting the *right* experts rather than maximizing attendance.
- **The Biggest Risk is Time and Preparation:** [redacted] primary concern was the one-hour time limit for human creation. He warned, "we always, always underestimate the time it takes people to perform that task." He stressed that the entire experiment's validity would be compromised if the human output was just a "half completed draft." To address this, he strongly recommended using the 10-day pre-work period to ensure participants arrive fully prepared. The one-hour session should not be for starting from scratch, but rather for prepared experts to "reach consensus on their work." Gowtham agreed this was a critical refinement to the plan.

# Advise

Of course. Here is a detailed capture of [redacted] counsel to Gowtham Rao, including his impressions, cautions, and commitments, using verbatim quotes from the conversation.

## Impression on the Startup and the AI Market

[redacted] views the opportunity through the lens of a maturing and volatile market. He sees a short-term window driven by hype but advises focusing on long-term, durable value.

- **On the Current Market Frenzy:** He acknowledges the massive investment, stating, "lots of companies are are pouring money into AI, hoping to see a return on investment."
- **On the Inevitable Correction:** He predicts a downturn, cautioning, "we feel in the next three years, absolutely be a crash of that hype cycle... not because that [LLMs] don't have value, but because the level of investment and the expectation on the return on this will not be [met]."
- **Counsel on Strategy:** He advises Gowtham to build something that can outlast the hype. The goal should be to "set yourself up for the value for when the... cycle crashes, so people actually just need to see something that can actually prove utility... something that, like, really realizes enduring value."

## On Gowtham's Potential Mistake and Lack of Awareness

[redacted] most direct critique was aimed at what he perceived as Gowtham's potential blind spot: underestimating the corporate support system that enabled his success.

- **Identifying the Blind Spot:** He recalled a previous conversation, noting, "you reply back like it had nothing to do with EPAM. It was all you and your hard work."
- **The Core Caution:** He corrected this perception directly: "And I think that you're probably failing to recognize the apparatus that... the EPAM apparatus has helped you... **It wasn't just all you on your own, by yourself.**"
- **The Reality of Going Solo:** He emphasized what would be lost, stating, "If you were to start something, you are truly without apparatus... like, their, like, pretty strong, like, customer relations and management systems, right? And like their business development people that open doors for you... those are not trivial."

## On Gowtham's Fit and How to Improve

[redacted] affirms Gowtham's growth but suggests he is not yet fully prepared to run a company independently, advising him to use his remaining time at EPAM strategically.

- **Acknowledging Growth but Seeing Gaps:** "I think that you have gotten good exposure over the last 10 months... but I think that you also still probably have quite a bit of a runway to continue to learn... **There's no way that you've learned all of the operation, because you can't do that in 10 months.**"
- **Actionable Advice for Improvement:** He proposed a new mindset for the near future: "if you were to set in your own mind... 'I want to start my own company. I want to do it in

a year.' Then it's like, **what do I need to do inside of a year as [at EPAM] to learn and grow and position myself for the best success?**"

## Advice and Caution on Exit Strategy and Reputation

[redacted] was unequivocal in his rejection of Gowtham's proposed "slow exit" plan, framing it as a major reputational and relational risk.

- **On a Disengaged Exit:** His advice was blunt: "**So I would not advise a situation where you're trying to take advantage of EPAM and not delivering on your responsibilities.**"
- **On Burning Bridges:** He stressed the long-term consequences: "If you want to move in a direction where relationships are going to matter, you don't want stuff attached to you... **having people with bad days in their mouth.**"
- **On the Reputational Risk of a Short Tenure:** He pointed out the practical career impact: "leaving... in under a year is like a yellow flag... When somebody [is] hiring a person, they're looking for, someone who they don't want to... have concerns about commitments."
- **On the Right Way to Leave:** The goal should be to create allies, not adversaries. "You want [your manager] to be on your side... When you want those allies, you're going to want them from EPAM... to be in a situation if that was possible."

## On Partnership, Mentorship, and Personal Commitment

When asked directly about a formal role, [redacted] was open and supportive, clearly defining the nature and boundaries of his potential involvement.

- **On Partnerships:** He validated Gowtham's idea of partnering with [redacted] by providing timely market intelligence, noting that LLM innovation is "a high on [redacted] mind," making it a strategically sound approach.
- **On His Personal Commitment:** In response to the ask to be a scientific advisor, [redacted] commitment was clear and personal: "**So I am very committed to helping you. Yes, whatever the capacity that makes sense for you, I'm kind of like, I'm open to whatever that would be.**"
- **Defining the Mentorship Role:** He set clear boundaries on his expertise and involvement: "I'm thinking about it purely from the scientific side, not the business side... I don't know how much science I conveniently contribute into such a solution like that, but I think that there could be some."
- **Next Steps:** They agreed to continue the conversation later, with Gowtham concluding, "the question is, first, is interest? And you have said, You have said yes, and that's great."