**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EPAM SYSTEMS, INC.,<br><br>Plaintiff/Counter-Defendant,<br><br>- against -<br><br>GOWTHAM RAO,<br><br>Defendant/Counter-Plaintiff. | Civ. A. No. 2:25-cv-06260 |

# DECLARATION OF DMITRII ILIN

I, Dmitrii Ilin, being duly sworn, declare as follows:

1. I am currently employed by Odysseus Data Services s.r.o., an indirect subsidiary of EPAM Systems, Inc. ("EPAM" or the "Company") as a Lead Software Engineer. While my title may have changed, I have held this same substantive position since 2018, when I joined Odysseus, which became part of EPAM in 2024.

2. I submit this declaration in support of EPAM's motion for sanctions. I know the facts testified to in this Declaration to be true based upon my own personal knowledge, discussions with other employees of EPAM, and/or a review of relevant documents. I am over eighteen years old, and am competent to testify in this action. However, as I am based in the Czech Republic, I would request to provide any such testimony remotely, or otherwise will require advance notice for travel.

3. I have a Master's degree in Data Science from Moscow Institute of Physics and Technology (State University) (MIPT). For approximately eighteen years (since 2008), I have worked as a software and data engineer. That work has included extensive experience with coding

computer software. Over the past few years, my work has also, increasingly, involved not only using but building generative artificial intelligence programs ("Generative AI").

4. During the course of my career, I have worked extensively with the development and use of Generative AI platforms and models. As part of that work, I have reviewed many hundreds if not thousands of AI prompts, AI-generated documents or other outputs, as well as countless numbers of documents written by human beings.

5. Documents and outputs generated by AI may contain recurring stylistic patterns or common "tells," which can sometimes make them easier to recognize. For example, Generative AI platforms and models may use an overly consistent "flat" tone, repetitive style, with highly polished grammar, and fewer word choices than are sometimes found in human-authored text. Additionally, Generative AI platforms and models may provide their output in a highly structured format such as enumerated or bulleted lists and sections. Finally, other possible indicators include formulaic responses to Generative AI prompts, such as "Of course." and "Here is a detailed breakdown." Based on my knowledge and extensive experience with Generative AI platforms and models, with a high degree of accuracy, I am able to identify characteristics that may indicate that a document was generated or substantially assisted by AI and to provide an informed assessment of the likelihood of AI involvement.

6. For approximately the past year, a key part of my job has been coding or otherwise designing a software solution for EPAM known at various times as Synapse, although it has gone through other names during the development process (to keep it simple, I will refer to the software as "Synapse" throughout this declaration). At its core, Synapse is a strategic decision support platform that uses artificial intelligence to leverage different "expert perspectives" by aggregating,

transforming, and analyzing information from public and private repositories of medical data to assist in the development and launch of products and services within the life sciences field.

7. During Rao's employment at EPAM, Rao worked on the Synapse project.

8. I have reviewed an unredacted version of the document attached as Exhibit 9 to the Declaration of Jacob Oslick, entitled "Architectural Vision." As the document itself reflects, it provides a "comprehensive, step-by-step plan" (*id.* at 8), that would enable someone with coding expertise to recreate, from scratch, a software solution substantially similar in its foundational architecture, principal components, and core functionality to Synapse as it exists today. The specific version of Synapse depicted in this document incorporates some features that Rao sought to include in Synapse, which we ultimately decided not to include (or, at least, have not yet included) as the development proceeded. Those differences do not alter the document's practical value as a detailed blueprint for building Synapse. The software that could be coded using these instructions would embody the same essential architecture and operating concepts and would therefore provide a substantial foundation for recreating Synapse as it exists today.

9. If someone wanted to design a software solution that was directly competitive with Synapse, this document would provide a "step-by-step plan" for how to do so.

10. In my opinion, it would be impossible to draft the "Architectural Vision" without access to extremely sensitive, confidential, and propriety EPAM data relating to Synapse. Drafting this document likely required access to the Synapse source code itself and/or highly sensitive architecture documents used in the development of Synapse, which EPAM considers to be a trade secret. Indeed, the document identifies numerous file and folder names (such as the over 100 references to specific Synapse components, such as "epam-synapse-backend", "synapse-

core", and "synapse-connectors"). These names repeatedly and directly identify EPAM and Synapse and clearly relate the proposed architecture to the Synapse platform.

11. Based upon my review, the document appears likely to have been drafted with substantial assistance from a Generative AI platform or model. It contains many of the "tells" typically found in AI writing, including repetitive section structures, standardized phrasing, consistent formatting across a lengthy document, and limited variation in grammar and word choice. The document also contains an "AI-Assisted Build Guide" with prompts for generating portions of the proposed software. Taken together, these features strongly suggest that Generative AI was used to draft at least a substantial part of the document.

12. My best assessment is that it is highly likely that this document was created by providing a Generative AI program with detailed, confidential, and proprietary information about Synapse, and then prompting the AI to create a "step-by-step plan" for rebuilding the Synapse platform from scratch. The document's repeated references to Synapse, together with the specificity of its architecture, components, and development instructions, strongly indicate that internal Synapse information was used in its preparation. In my assessment it is highly likely that the information used to generate this document included the Synapse source code directly and/or highly sensitive architecture documents used in the development of Synapse.

13. This is not a document that EPAM created for any business purpose. EPAM would have no legitimate business use for any such document. We already had Synapse; we did not need assistance from an AI program on how to rebuild what we already had.

14. Based on my knowledge and experience in coding, this kind of document would be highly valuable to a competitor who was seeking to create a Synapse competitor. Using this document, a competent coder could draft new code that would result in a program with

functionality and capabilities similar to the version of Synapse described in this document, without spending the same time and resources needed to develop the specific workflows from scratch. Essentially, this document would give a competitor a major head start.

15. At one point, I had a discussion in which Rao mentioned that he had started "refactoring" the Synapse code (i.e., reorganizing and improving the code without changing what it does). I asked Rao to see the code that he was drafting for the Synapse project, but he never shared it with me. To the best of my knowledge, he did not store this code, or any other work product associated with this "refactoring" on any EPAM system, device, or account.

16. I have also reviewed an unredacted version of the document attached as Exhibit 10 to the Declaration of Jacob Oslick, entitled "Perplexity AI." This is not a document that I ever recall seeing at EPAM, and I do not believe it was generated for any EPAM business purpose. I have been informed that the "modified" date of the document, in the Metadata, is November 2, 2025—which would be after Rao's EPAM employment ended, and just a few days after EPAM filed this lawsuit.

17. As the document itself reflects, it "provides a detailed comparison" of EPAM's Synapse (or, at least a version of EPAM's Synapse) to a Generative AI service known as "Perplexity AI." (*Id.* at 13.)

18. The level of detail in this document about Synapse is astonishing. It strongly indicates that detailed, proprietary, and sensitive EPAM information about Synapse was used to prepare the document. The document itself states that its analysis of Synapse was "based on the provided documentation." In my assessment it is highly likely the "provided documentation" used to generate this document included the Synapse source code directly and/or highly sensitive

architecture documents used in the development of Synapse. Conversely, the level of information about Perplexity AI is more general, perhaps reflecting sources that are public information.

19. My best assessment is that this document was generated with substantial assistance from a Generative AI program that was provided with detailed, proprietary, and sensitive EPAM information about Synapse, including the Synapse source code and/or highly sensitive architecture documents used in the development of Synapse.

20. EPAM would have no legitimate business purpose in creating such a document; Perplexity AI is not a competitor to Synapse.

21. Rao's employment ended on October 15, 2026. After his employment ended, I noticed that several critical documents regarding Synapse's architecture, including different plans and proposals that we considered during Synapse's development, had been deleted from the cloud storage accounts used by our team. I learned that Rao had deleted these documents, shortly before the end of his employment.

I declare, under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Dated: July 29, 2026.

Dmitrii Ilin