**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EPAM SYSTEMS, INC.,<br><br>Plaintiff/Counterclaim-Defendant<br><br>v.<br><br>GOWTHAM RAO,<br><br>Defendant/Counterclaim-Plaintiff | Civil Action No. 2:25-cv-06260 |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SEAL**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........ 1

LEGAL STANDARD ........ 3

ARGUMENT ........ 4

- I. Exhibits 9 and 10 Should Be Sealed Because They Contain Highly Sensitive Technical Information Concerning EPAM's Synapse Platform ........ 4
- II. Exhibit 13 Should Be Sealed To Protect Confidential Business Information ........ 6
- III. Limited Sealing Is Appropriate for Exhibits 6-8 to Protect the Privacy Interests of Non-Parties and Avoid Unnecessary Reputational Harm ........ 8
- IV. No Public Interest Factors Outweigh The Need For Sealing ........ 11

CONCLUSION ........ 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alchem USA Inc. v. Cage*,
2022 WL 3043153 (3d Cir. 2022)....................6

*In re All-Clad Metalcrafters, LLC, Cookware Mktg. & Sales Pracs. Litig.*,
2024 WL 1214197 (W.D. Pa. 2024)....................8, 11

*In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*,
924 F.3d 662 (3d Cir. 2019).................... *passim*

*Contour Data Sols., LLC v. Gridforce Energy Mgmt. LLC*,
2024 WL 3994375 (E.D. Pa. 2024)....................8

*Ellis v. CVS Health Corp.*,
2026 WL 1786305 (E.D. Pa. 2026)....................6, 11

*Jorjani v. N.J. Inst. of Tech.*,
2022 WL 1811304 (D.N.J. 2022)....................4, 11

*Nephron Pharms. Corp. v. Jennifer Shelly Hulsey, U.S. Compounding Inc.*,
2020 WL 9596261 (M.D. Fla. 2020)....................6

*Prior v. IntegriChain, Inc.*,
2026 WL 561046 (E.D. Pa. 2026)....................6, 11

*Wickens v. Rite Aid HDQTRS Corp.*,
2021 WL 5876695 (M.D. Pa. 2021)....................4, 11

**Statutes**

18 U.S.C. § 1835....................1, 3, 4, 6

12 Pa. Stat. § 5306....................1, 3, 4, 6

Pennsylvania Uniform Trade Secrets Act....................3

**Other Authorities**

Fed. R. Civ. P. 26(c)....................4

Local Rule 5.1.5....................1, 4

Plaintiff/Counter-Defendant EPAM Systems, Inc. ("EPAM") moves under Local Rule 5.1.5, 18 U.S.C. § 1835, 12 Pa. Stat. § 5306, and/or the Court's inherent authority for an order: (1) permitting it to introduce unredacted versions of Exhibits 9, 10 and 13 to the Declaration of Jacob Oslick ("Oslick Declaration") and less redacted versions of Exhibits 6-8 under seal during the September 16, 2026 hearing on EPAM's Motion for Sanctions for Spoliation of Evidence ("Spoliation Motion"); and (2) closing the courtroom during any testimony during the hearing regarding the sealed information.

## PRELIMINARY STATEMENT

On July 29, 2026, EPAM filed the Spoliation Motion, seeking sanctions against Defendant/Counter-Plaintiff Gowtham Rao. EPAM's motion relied, in part, on Exhibits 6-10, and 13 to the Oslick Declaration. To this end, EPAM publicly filed these documents in redacted form. However, at the upcoming September 16, 2026, evidentiary hearing, EPAM recognizes that the redacted versions of these documents may be insufficient. Accordingly, EPAM moves for an order, seeking the following relief: (a) permission to introduce unredacted and/or less redacted versions of Exhibits 6-10, and 13 under seal during the September 16, 2026 hearing; and (b) closing the courtroom during any testimony during the hearing regarding these exhibits. Defendant/Counter-Plaintiff Gowtham Rao largely opposes this motion, though not entirely.

EPAM recognizes that judicial records are subject to a strong presumption of public access. A party seeking sealing bears the burden of establishing, on a document-by-document basis, that disclosure would cause a clearly defined and serious injury sufficient to overcome that presumption. *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672-73 (3d Cir. 2019). That standard is satisfied here.

Exhibits 6-10 and 13 do not merely contain routine business communications. Rather, they contain: (1) a "comprehensive, step-by-step plan" that would enable an EPAM competitor

to recreate, from scratch, a competing software solution substantially similar to EPAM's artificial-intelligence platform known internally as Synapse; (2) other highly technical, highly confidential architectural information about Synapse; (iii) confidential strategic and business information concerning EPAM's sales and marketing strategy for Synapse and a related software solution known as MedRag; and (iv) the identification of non-party individuals, who could potentially suffer significant reputational harm.

Under *Avandia*, disclosure of genuine trade-secrets, competitively sensitive technical material, and confidential strategic business information constitutes precisely the sort of clearly defined and serious injury that justifies sealing. *Id.* at 924 F.3d at 679 n.14. That warrants sealing Exhibits 9-10, and 13.

The issue with Exhibits 6-8 is different. These documents appear to be summaries of conversations that Rao had with non-parties, whom the Sanctions Motion identifies as Executives #1-3. EPAM redacted these documents primarily to protect the reputations of Executives #1-3, as the documents appear to depict certain of the non-parties engaging in ethically questionable behavior, and because EPAM has not yet validated that the documents are completely accurate in the recitation of all statements attributed to these non-parties. If it turns out that the summaries do not completely accurately depict Executive #1-3's conduct, they could suffer significant and unwarranted reputational injury if their identities became public. That concern warrants accepting less redacted versions[1] of Exhibits 6-8 under seal, at this stage.

---

[1] Aside from information that identifies Executives #1-3, EPAM also redacted a small amount of confidential business information, as well as the names of non-parties that are mentioned in passing in the document. That information is not germane to EPAM's Sanctions Motion, and there is no realistic need to discuss it during the September 16, 2026 hearing. In lieu of attempting to establish the high standard for sealing this information, EPAM instead intends to rely on less redacted versions at the September 16 hearing that continues to keep this information redacted.

Defendant/Counter-Plaintiff Gowtham Rao consents to omitting the names of these Executives in the September 16 hearing and relying on the Executives #1-3 nomenclature versus inclusion of names on the record at this stage.

The requested relief is narrowly tailored. EPAM seeks sealing only of the identified exhibits, not wholesale sealing of the underlying motion papers, which, together with redacted versions of Exhibits 6-10, 13, remain publicly available. Further, while EPAM's proposed relief would require closing the courtroom during portions of the September 16, 2026 hearing, a lightly redacted transcript of the hearing could be made publicly available. There would be nothing meaningfully lost in the public's ability to understand the litigation by protecting just this narrow information from disclosure.

For these reasons, and as set forth below, EPAM requests this motion to be granted.

## **LEGAL STANDARD**

Because Exhibits 6-10 and 13 were filed in connection with a motion before the Court, they are judicial records subject to the common-law right of access. *Avandia*, 924 F.3d at 672-73.

The presumption of access may nevertheless be overcome when the moving party demonstrates that disclosure would cause a "clearly defined and serious injury." *Id.* The Court must conduct a document-by-document analysis and identify the specific interests supporting continued sealing. *Id.* at 677-78. Trade-secret information and confidential business information that would cause competitive harm are among the categories of information courts may protect. *Id.* at 673, 679. Indeed, the Defend Trade Secrets Act and the Pennsylvania Uniform Trade Secrets Act, both of which EPAM seeks relief under, specifically authorize the Court to "enter such orders and take such other action as may be necessary and appropriate to preserve the confidentiality of trade secrets" (18 U.S.C. § 1835), and to otherwise "hold[] *in camera* hearings, sealing the records of the action (12 Pa. Stat. § 5306).

Likewise, courts may also seal information to protect the privacy and reputational interests of non-parties. *See Jorjani v. N.J. Inst. of Tech.*, 2022 WL 1811304, at *6 (D.N.J. 2022) (sealing information about non-parties to protect them from "potential embarrassment and harm to their reputation"); *Wickens v. Rite Aid HDQTRS Corp.*, 2021 WL 5876695, at *2 (M.D. Pa. 2021) (granting sealing because "disclosure of financial information and information regarding workplace investigations into the conduct of non-parties who have not consented to their personal information being made public would harm the reputation and privacy interests of those non-parties").

While some courts have sealed documents using the rubric of a protective order under Fed. R. Civ. P. 26(c), that rule and its applicable standards concerns discovery, not the common law right of access. *See Avandia*, 924 F.3d at 676. Accordingly, EPAM seeks relief under Local Rule 5.1.5 (permitting courts to authorize sealing), 18 U.S.C. § 1835, 53 Pa. Stat. § 5306, and/or the Court's inherent authority.

## ARGUMENT

### I. Exhibits 9 and 10 Should Be Sealed Because They Contain Highly Sensitive Technical Information Concerning EPAM's Synapse Platform

The evidentiary record demonstrates that Exhibits 9 and 10 contain trade secrets and/or other incredibly sensitive information concerning EPAM's Synapse platform, and that EPAM would suffer a serious injury if this information became public.

As explained by Dmitrii Ilin, Exhibit 9 contains what *the document itself* describes as a "comprehensive, step-by-step plan" for recreating Synapse from scratch. (ECF #58-25 ¶ 8; ECF #58-12 at 8.) In Ilin's professional opinion, the document "would enable someone with coding expertise to recreate, from scratch, a software solution substantially similar in its foundational architecture, principal components, and core functionality to Synapse as it exists today." (ECF

#58-25 ¶ 8.) Further, as Ilin concluded, Exhibit 9 “would be highly valuable to a competitor who was seeking to create a Synapse competitor. Using this document, a competent coder could draft new code that would result in a program with the functionality and capabilities similar to the version of Synapse described in this document, without spending the same time and resources needed to develop the specific workflows from scratch.” (ECF #58-25 ¶ 14.) Indeed, EPAM has spent significant resources to develop Synapse, is still seeking to sell Synapse and Synapse-derivatives and EPAM considers the information contained in Exhibit 9 to be a trade secret. (*See* Klebanov Decl. ¶¶ 2-5.) Needless to say, EPAM would face significant injury if a competitor used an unredacted version of Exhibit 9 to create a copycat of Synapse. (*Id.* ¶ 4.)

As for Exhibit 10, Ilin explains that this document reflects an “astonishing” level of detail concerning Synapse, which strongly indicates that it was created using the Synapse source code and/or other information and highly sensitive architecture materials. (ECF #58-25 ¶¶ 18-19; ECF #58-13.) Essentially, the document explains *how* Synapse and a related program (MedRag) were designed in order to achieve their functionality, and the internal processes and governance that render Synapse unique. (Klebanov Decl. ¶ 6.) Exhibit 10 contains trade secrets that would provide EPAM’s competitors with a huge advantage in understanding what provides Synapse and MedRag with a competitive advantage over its competitors, and how their own competing solutions can be improved to better compete with Synapse. (*Id*.) Thus, EPAM would suffer a significant competitive injury if an unredacted version of Exhibit 10 became public. (*Id*.)

Disclosure of materials that reveals trade secrets and/or incredibly sensitive, confidential details about Syanpse’s internal architecture, to the point of providing a “step-by-step plan” on how to recreate the software from scratch, and/or setting forth details which explain *how* Synapse achieves its competitive advantage, would plainly cause EPAM a well-defined

competitive injury. Such information falls squarely within the type of commercially sensitive information that courts may protect under *Avandia*. *See e.g.*, *Alchem USA Inc. v. Cage*, 2022 WL 3043153, at *3–4 (3d Cir. 2022) ("Documents containing trade secrets or other confidential business information may be protected from disclosure") (cleaned up); *Prior v. IntegriChain, Inc.*, 2026 WL 561046, at *4 (E.D. Pa. 2026) (sealing documents that contain "trade secrets and confidential information," which "if released, could put [IntegriChain] at a competitive disadvantage" (citation omitted)); *Ellis v. CVS Health Corp.*, 2026 WL 1786305, at *1 (E.D. Pa. 2026) (appropriate to seal "business information that might harm a litigant's competitive standing," (quoting *Avandia*, 924 F.3d at 679)). Indeed, disclosure of this highly confidential information is the very same injury that EPAM seeks to redress through the present litigation. Making this highly confidential information public would exponentially exacerbate the material harm already suffered by EPAM in this case. Further, the Court has the express statutory authority to order sealing and *in camera* hearings under 18 U.S.C. § 1835, which permits the court to "enter such orders and take such other action as may be necessary and appropriate to preserve the confidentiality of trade secrets," and 12 Pa. Stat. § 5306, which explicitly authorizes "*in camera* hearings" and "sealing." *See Nephron Pharms. Corp. v. Jennifer Shelly Hulsey, U.S. Compounding Inc.*, 2020 WL 9596261, at *2 (M.D. Fla. 2020) (granting sealing under DTSA and Florida trade secret statute).

## II. Exhibit 13 Should Be Sealed To Protect Confidential Business Information

Exhibit 13 contains highly confidential information about EPAM's business, marketing and sales strategy for Synapse. (*See* ECF #58-16.)

As EPAM's sanctions memorandum explains, Exhibit 13 consists of EPAM's "Sales Battle Card" for Synapse and the related MedRAG program, which Rao improperly transmitted from his personal Google account to another non-descript personal account while he remained

employed by EPAM. This was done on the same day that Exhibit 7 records Rao speaking with Executive #2 about creating his own company based on intellectual property that he developed at EPAM, with him "rebuilding the entire system from scratch" to sell it for a competitor. (ECF #58-2 at 10-11; Oslick Decl. ¶ 20; ECF #58-10 at 6.) The Sales Battle Card constitutes a confidential sales and marketing resource developed for EPAM's commercial use. (Klebanov Decl. ¶ 7.) Indeed, as can be seen from the document itself, the Sales Battle Card contains EPAM's strategy for how it positions Synapse and MedRage in the marketplace (*i.e.*, "Business Value & Use Cases"), seeks to differentiate these products from their competitors (*i.e.*, "Why We Win – Key Differentiators" and "Competitive Positioning"), and plans to price its offerings to prospective customers ("Engagement & Pricing Models"). (ECF #58-16; Klebanov Decl. ¶ 7.) Essentially, the Sales Battle Card contains EPAM's comprehensive sales strategy for Synapse. (Klebanov Decl. ¶ 7.) As suggested by the name, this is EPAM's strategy to go to battle in the marketplace and win sales. (*Id.*) It is the blueprint to EPAM's sales pitch. (*Id.*) And, while the Sales Battle Card is roughly one year old by now, EPAM's fundamental strategy for marketing and pricing Synapse as set forth in this document has not changed. (*Id.*) EPAM would face a significant, concrete injury if its competitors learned the "inside baseball" of EPAM's sales and marketing strategies for Synapse. (*Id.*) Moreover, permitting the Sales Battle Strategy to become public would result in doubly-punishing EPAM—which has *already* been victimized by Rao pilfering the Sales Battle Card, seemingly to use it for his own competing venture, CoReason. (*See generally* ECF #58-2.) It should not be damaged even further by letting its *other* competitors have access to the same information.

Under *Avandia*, courts may protect confidential commercial information where disclosure would result in a clearly defined and serious competitive injury. *See* 924 F.3d at 673, 679. That

standard is satisfied here, because public disclosure of the Sales Battle Card would provide EPAM's competitors with access to EPAM's own internal sales and marketing playbook, which reveals EPAM's strategic positioning, messaging, and commercialization efforts. (*See* Klebanov Decl. ¶ 7.); *Contour Data Sols., LLC v. Gridforce Energy Mgmt. LLC*, 2024 WL 3994375, at *3 (E.D. Pa. 2024) ("Confidential pricing and strategy information is commonly redacted by courts because this information could cause real and serious harm"); *In re All-Clad Metalcrafters, LLC, Cookware Mktg. & Sales Pracs. Litig.*, 2024 WL 1214197, at *2 (W.D. Pa. 2024) ("credible representation" of commercial harm to party's "competitive market position" if pricing information was publicly disclosed sufficed to warrant sealing).

## III. Limited Sealing Is Appropriate for Exhibits 6-8 to Protect the Privacy Interests of Non-Parties and Avoid Unnecessary Reputational Harm

Unlike Exhibits 9-10 and 13, EPAM only very lightly redacted the publicly-filed versions of Exhibits 6-8. Its primary concern was not protection of trade secrets or confidential business information, but rather to prevent public identification of the three non-parties that EPAM's Sanctions Motion refers to as Executive #1, Executive #2, and Executive #3. The relief EPAM seeks in this Motion, in connection with the September 16 hearing, is the Court accepting under seal less redacted versions of these documents, which will disclose, *in camera*, the identities of these individuals, as well as closing the courtroom during testimony that could reveal their identities (or information that would make it easy to determine their names and identities).[2]

These individuals are not parties to this litigation. Their identities are not necessary for the public to understand the issues before the Court, EPAM's sanctions motion, or the evidence

[2] As noted earlier, EPAM also redacted a limited amount of confidential business information in these documents, as well as the names of non-parties who are mentioning in passing in these documents. EPAM does not seek to court approval to seal this information. Instead, EPAM seeks to introduce at hearings lightly redacted versions of Exhibits 6-8, that continues to redact the business information references to non-parties are not germane to the Sanctions Motion.

relevant to that motion. EPAM requests that after the hearing, the hearing transcript can be publicly disclosed with only redactions to protect the identities of these individuals. Accordingly, the proposed sealing and court closure is narrowly tailored to protect substantial privacy and reputational interests while preserving public access to the core issues in dispute.

Moreover, the need for caution is heightened because while Exhibits 6-8 appear to be AI-generated summaries of conversations that Rao had with the non-parties, EPAM cannot affirm that every statement attributed to Executives #1-3 reflected in these summaries is completely accurate.

That concern is particularly acute with respect to Executive #1. Exhibit 6 portrays Executive #1 as participating in a covert effort to assist Rao in launching a competing venture, while scheming to keep his involvement a secret. As Exhibit 6 records Executive #1 stating, "everything has to be a secret," "my name should never be in the picture." (ECF #58-9 at 32.) Indeed, Exhibit 6 indicates that Rao and Executive #1 conspired to keep their partnership "deliberately structured to be hidden from public and corporate view," because Executive #1 has a "significant conflict of interest," given his "senior role" at an EPAM client. (*Id.* at 32.) Exhibit 6 further indicates that Rao and Executive #1 discussed "structuring his ownership stake through a proxy, such as his wife." (*Id.* at 19.) If these descriptions are accurate, they depict Executive #1 as knowingly participating in a deceptive arrangement implicating conflicts of interest, breaches of fiduciary duties to his employer, and potentially criminal conduct relating to the hiding of assets. Needless to say, the reputational harm to Executive #1 if his name was revealed (or if his identity could be discovered, such as by identifying his employer) would be immense and irreparable.

Exhibits 7 and 8 similarly contain information that could cause substantial embarrassment and reputational injury, if Executive #2 and #3's identities were publicly disclosed. The documents depict Executive #2 and #3 as engaging in an extended discussion concerning a proposed venture built upon Rao's misappropriation of technology that Rao claims to have developed through work that he performed at EPAM. (*See* ECF #58-10, #58-11.) The documents portray Executive #2 and #3 as individuals that Rao pitches to solicit collaboration in his unlawful scheme.

Of note, while Rao opposes EPAM's motion, he recognizes that Exhibits 6-8 raise concerns regarding the privacy of the non-party individuals named in the exhibits and Rao consents to continued use of the Executive #1, 2, and 3 nomenclature and exclusion of the individuals' names from the record. Rao's proposed solution, in correspondence with EPAM, was to "continu[e] the 'Executive 1/2/3' convention in open-court testimony and in any exhibit displayed publicly," in lieu of closing the courtroom or providing the Court *in camera* copies of unredacted documents. (*See* Ex. A.) The problem with Rao's suggested approach is twofold: (a) it would limit EPAM's ability to question Rao regarding these exhibits, such as by identifying Executive #1's employer (a key EPAM client) during EPAM's questioning of him; and (b) it depends upon Rao's ability to testify perfectly using this phrasing (*e.g.*, "Executive #1"), when his natural inclination may be to refer to these individual's names and/or to disclose information that would reveal their identities. And, if Rao "slips up," even inadvertently, and publicly identifies these persons, there may be no way to cure that disclosure later on. Conversely, EPAM's proposed solution of closing the courtroom but only lightly redacting the transcript ensures both the anonymity of these individuals as well as public access to the substance of Rao's testimony,

For those reasons, sealing limited to information that would reveal the identities of Executive #1, Executive #2, and Executive #3, including the identity of Executive #1's employer, is narrowly tailored and appropriate under *Avandia*. *See Jorjani*, 2022 WL 1811304, at *6 (sealing information to protect non-parties from "potential embarrassment and harm to their reputation"); *Wickens*, 2021 WL 5876695, at *2 (sealing information that would "harm the reputation and privacy interests" of non-parties).

## IV. No Public Interest Factors Outweigh The Need For Sealing

EPAM's requested relief is further appropriate because no public interest factors outweigh the concrete risks to EPAM of commercial injury, or the risks of reputational harm to non-parties. For instance, the Synapse architecture and marketing strategies "implicate[] no public official or institution," and there is no "public interest in revealing" how to create a Synapse duplicate or how EPAM is marketing Synapse. *Ellis*, 2026 WL 1786305, at *1. There are also no third parties who have a plausible interest in this narrow material becoming public. *See In re All-Clad Metalcrafters, LLC, Cookware Mktg. & Sales Pracs. Litig.*, 2024 WL 1214197, at *2. And the same is true for identities of Executives #1-3, particularly, if Exhibits 6-8 are not wholly accurate in their depictions of statements attributed to these non-parties. Further, EPAM has already publicly filed a redacted version of Exhibits 6-10, and 13, which provides the public with sufficient information about what these exhibits contain, but without the critical details that would threaten EPAM's competitive advantage. And, after the hearing, the transcript can become publicly available, with only very light redactions to protect the interests set forth herein. Thus, EPAM's proposed relief "represent[s] the least restrictive means available to protect the interests at stake." *Prior*, 2026 WL 561046, at *4.

**CONCLUSION**

For the foregoing reasons, EPAM respectfully requests that the Court enter an order permitting EPAM to: (a) introduce, as exhibits, unredacted versions of Exhibits 9-10, and 13 and less redacted versions of Exhibits 6-8 under seal during the September 16, 2026 hearing; and (b) closing the courtroom during testimony regarding the sealed information.

Dated: August 17, 2026

Respectfully submitted,

*/s/ Jacob Oslick*

Jacob Oslick (Pa. Bar No. 311028)
joslick@seyfarth.com
James S. Yu (admitted *pro hac vice*)
jyu@seyfarth.com
Brooke K. Gary (admitted *pro hac vice*)
brgary@seyfarth.com
SEYFARTH SHAW LLP
620 Eighth Avenue,
New York, New York 10018
(212) 218-5500

Matthew Christoff (admitted *pro hac vice*)
mchristoff@seyfarth.com
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, IL 60606
(312) 460-5000

*Attorneys for Plaintiff/Counterclaim-Defendant EPAM Systems, Inc.*