**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EPAM SYSTEMS, INC., Plaintiff/Counter-Defendant, - against - GOWTHAM RAO, Defendant/Counter-Plaintiff. | Civ. A. No. 2:25-cv-06260 |

**DECLARATION OF GREGORY KLEBANOV**

I, GREGORY KLEBANOV, being duly sworn, declare as follows:

1. I am the Vice President, Global Head of Real-World Evidence at EPAM Systems, Inc. ("EPAM" or the "Company"). I have held this position since June 12, 2024 when EPAM acquired my prior employer, Odysseus Data Services, Inc. I am providing this declaration in support of EPAM's Motion to Seal.

2. EPAM has spent significant resources to develop the software solution known internally, at certain times, as "Synapse." Through the end of 2025 alone, EPAM recorded over 4,600 employee hours logged to the project that included Synapse. And that figure does not include the time spent by certain high-salaried management personnel on the project, such as Gowtham Rao's time.

3. I have reviewed the document attached as Exhibit 9 to the Declaration of Jacob Oslick. I agree with my colleague Dmitrii Ilin (and as indicated on the face of the document itself), that the document sets forth a "comprehensive, step-by-step plan" (*id.* at 8, Ilin Decl. ¶¶ 8-14), that would enable a competent coder to create a Synapse copycat. Further, precisely because of their value, and the time spent to develop them, I can confirm that EPAM considers the Synapse

source code, and the architecual documents used in Synapse's development, to be not only be highly confidential, but to be trade secrets. I can also confirm that these documents are highly restricted; EPAM does not permit access to these documents to anyone but employees working on the Synapse project or otherwise at a certain level within the organization.

4. EPAM would face a significant, concrete injury if Exhibit 9 became public, and a competitor used it to create a copycat of Synapse. Indeed, EPAM believes that it has *already* suffered an injury for essentially this reason. In particular, Dr. Rao appears to be marketing software that is materially similar to Synapse through his company CoReason. This inhibits EPAM's ability to sell or license Synapse. And the situation would be far worse if the instructions for re-coding Synapse became public, because any competitor could create their own version of Synapse for a tiny fraction of the resources that went into developing it.

5. EPAM is continuing to actively market Synapse and Synapse-derivatives (though it no longer uses the Synapse name). EPAM's prospects for sales materially depend upon Synapse being its own intellectual property—not code that is freely available on the internet.

6. As for Exhibit 10 to the Oslick Declaration, essentially, the document explains *how* Synapse and a related program (MedRag) were designed in order to achieve their functionality, and the internal processes and governance that render Synapse unique. Exhibit 10 contains trade secrets that would provide EPAM's competitors with a huge advantage in understanding what provides Synapse and MedRag with a competitive advantage over its competitors, and how their own competing solutions can be improved to better compete with Synapse. Thus, EPAM would suffer a significant competitive injury if an unredacted version of Exhibit 10 became public, because competitors would gain valuable insight into how to improve their own products to better compete with Synapse.

7. Turning to Exhibit 13 to the Oslick Declaration, this document consists of EPAM's "Sales Battle Card" for Synapse and the related MedRAG program. The document constitutes a confidential sales and marketing resource developed for EPAM's commercial use. Indeed, as can be seen from the document itself, the Sales Battle Card contains EPAM's strategy for how it positions Synapse and MedRage marketplace (*i.e.*, "Business Value & Use Cases"), seeks to differentiate these products from their competitors (*i.e.*, "Why We Win – Key Differentiators" and "Competitive Positioning"), and plans to price its offerings to prospective customers ("Engagement & Pricing Models"). Essentially, the Sales Battle Card contains EPAM's comprehensive sales strategy for Synapse. As suggested by the name, this is EPAM's strategy to go to battle in the marketplace and win sales. It is the blueprint for EPAM's pitch. And, while the Sales Battle Card is roughly one year old by now, EPAM's fundamental strategy for marketing and pricing Synapse, as set forth in this document, has not changed. EPAM would face a significant, concrete injury if its competitors learned the "inside baseball" of EPAM's sales and marketing strategies for Synapse.

I declare, under penalty of perjury, that the foregoing is true and correct.

Dated: August 17, 2026

Gregory Klebanov