**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **EPAM Systems, Inc.,**<br>*Plaintiff/Counterclaim-Defendant,*<br><br>**v.**<br><br>**GOWTHAM RAO, MD, PhD,**<br>*Defendant/Counterclaim-Plaintiff.* | **CIVIL ACTION**<br><br>**NO. 2:25-cv-06260-WB** |

**DEFENDANT/COUNTERCLAIM-PLAINTIFF GOWTHAM RAO'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE (PRO SE)**

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT.................................................................. 1
II. COUNTER-STATEMENT OF FACTS............................................................ 2
III. THE MOTION'S SCOPE.................................................................... 6
IV. LEGAL STANDARD......................................................................... 6
V. ARGUMENT................................................................................ 7
A. EPAM Has Not Identified Electronically Stored Information That Should Have Been Preserved, Was Lost, and Cannot Be Restored or Replaced................ 7
B. EPAM Has Not Shown a Failure to Take Reasonable Steps to Preserve.......... 13
C. EPAM Has Not Shown Prejudice Under Rule 37(e)(1)........................... 16
D. EPAM Has Not Shown Intent to Deprive Under Rule 37(e)(2).................. 18
E. Inherent Authority Supplies No Path Around Rule 37(e)...................... 22
F. EPAM's Additional Requests Fail on Their Own Terms, and Any Measure Must Be the Least Severe............................................................... 23
VI. CONCLUSION.............................................................................. 26
VII. RESERVATION REGARDING THE SEPTEMBER 16 HEARING....................................... 27

# TABLE OF AUTHORITIES

## Cases

*Accurso v. Infra-Red Servs., Inc.*, 169 F. Supp. 3d 612 (E.D. Pa. 2016)
*Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326 (3d Cir. 1995)
*Bull v. United Parcel Serv., Inc.*, 665 F.3d 68 (3d Cir. 2012)
*Burris v. JPMorgan Chase & Co.*, 566 F. Supp. 3d 995 (D. Ariz. 2021)
*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)
*Culler v. Shinseki*, 2011 WL 3795009 (M.D. Pa. Aug. 26, 2011)
*Folino v. Hines*, 2018 WL 5982448 (W.D. Pa. 2018)
*Gentex Corp. v. Sutter*, 827 F. Supp. 2d 384 (M.D. Pa. 2011)
*GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76 (3d Cir. 2019)
*Gutman v. Klein*, 2008 WL 4682208 (E.D.N.Y. 2008)
*In re Chule*, 2026 WL 524023 (Bankr. M.D. Fla. 2026)
*Malone v. Weiss*, 2018 WL 3656482 (E.D. Pa. Aug. 2, 2018)
*Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863 (3d Cir. 1984)
*Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059 (3d Cir. 1984)
*Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76 (3d Cir. 1994)
*Williams v. Am. Coll. of Educ., Inc.*, 2019 WL 4412801 (N.D. Ill. 2019)
*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003)

## Rules

Fed. R. Civ. P. 37(e)
Fed. R. Civ. P. 43(a)
Fed. R. Civ. P. 45
Fed. R. Civ. P. 65
Fed. R. Evid. 403
Fed. R. Evid. 702

## I. PRELIMINARY STATEMENT

Defendant/Counterclaim-Plaintiff Dr. Gowtham Rao, proceeding *pro se*, respectfully submits this Memorandum of Law in Opposition to Plaintiff EPAM Systems, Inc.'s Motion for Sanctions (ECF 58). EPAM asks this Court to end the case — default judgment on its claims, dismissal of my counterclaims with prejudice — over a Windows repair. On November 14, 2025, while attempting to resolve sign-on malfunctions on my personal computer, I used the built-in Microsoft recovery option labeled "Keep my files." EPAM's own expert calls this event a "refresh" and states he performs it personally and professionally. He also states that "this action will reinstall Windows, causing an overwrite and/or rebuild of any and all Windows registry files." (Greenfield Decl. ¶¶ 18–19.) A mechanical consequence of a standard repair is not an intent to destroy evidence. EPAM's counsel described the same option to this Court as one that "allows the user to keep personal files intact." (ECF 42 at 2 n.2.)

Rule 37(e) sets four requirements, and EPAM's motion fails on each independently.

EPAM has not identified information that was lost and cannot be restored or replaced. The artifacts it names either never existed, survived, were restored by synchronization, or remain available from sources already collected (§ V.A).

My conduct was directed at preservation: deletions halted on October 31, I proposed a supervised remediation of the computer on November 4, troubleshooting was attempted on November 13, and the file-preserving repair option was selected on November 14 (§ V.B).

EPAM suffers no prejudice — it holds a vast universe of substitute data, it declined reconciliation of its own logs, and it concedes the alleged spoliation does not impact its defense to my counterclaims for fraudulent inducement and declaratory judgment (§ V.C; ECF 58-2 at 31).

And a file-preserving repair, preceded by documented troubleshooting and followed by my voluntary disclosure, cannot support the intent-to-deprive finding that terminating sanctions require (§ V.D).

Most of EPAM's memorandum argues the merits of its trade-secret claims and of my counterclaims. Those questions are not before the Court on this evidentiary hearing for spoliation. I answer them, assertion by assertion, in the accompanying Scope Appendix. My silence on them in this brief preserves my denials and is not a concession. (§ III.) EPAM has the burden on every element of Rule 37(e). Because EPAM does not meet that burden on any element, the motion should be denied.

## II. COUNTER-STATEMENT OF FACTS

This section states the facts material to Rule 37(e). The full chronology, with supporting exhibits, appears in my declaration ("Rao Decl."). EPAM's motive allegations are outside the elements of this motion and are answered in the accompanying Scope Appendix.

**1.** I joined EPAM in November 2024. I used my personal computer (MSI Codex R2, A0001) for EPAM work under EPAM's Bring Your Own Device policy, with my manager's knowledge. EPAM's OneDrive synchronized EPAM data onto it. EPAM's IT policy provided that when storage of confidential data is "required for productivity/convenience purposes, the data must be automatically synced up to EPAM online storage (SharePoint, OneDrive)." I have acknowledged throughout that EPAM information resided on this computer. (Rao Decl. ¶¶ 5, 7–10; ECF 55 § I(c); ECF 58-6 at 20–22; ECF 37-3 § 3.14.)

**2.** EPAM terminated me effective October 15, 2025 and revoked my access. Over the next two weeks I deleted EPAM files as I found them. That is what EPAM's Offboarding policy instructs: "[p]lace/return Company data into Company storages," and "[r]emove Company/Client

data from all personal devices and personal cloud storages." The policy sets no deadline. (ECF 37-3 § 3.28 at 31; Rao Decl. ¶¶ 28, 30.)

**3.** I stopped those deletions when EPAM's cease-and-desist letter arrived on Friday evening, October 31. The letter carried a "Notice of Duty to Preserve" and announced that EPAM would ask the Court to order my devices turned over for imaging. The parties agree the duty attached on or about that date. (ECF 58-4; ECF 44 at 2; Rao Decl. ¶¶ 31–32.)

**4.** On November 4, through counsel, I proposed a supervised remediation of this computer — a targeted file-name search and list, then a factory reset and clean OS installation under attorney or vendor supervision. EPAM did not accept. (Rao Decl. ¶ 33 & Ex. J; ECF 44 at 2.) The next day the Court denied the TRO, declined a preservation order, and declined the forensic examination EPAM requested. I testified that day about my device use, my routine deletions, and the likely presence of residual EPAM files. When the Court cautioned me about preserving evidence, I answered "Of course." (ECF 58-6 at 47–53; Rao Decl. ¶ 34.)

**5.** On November 11, Microsoft notified me that my personal subscription would expire in a week. I decided to use my company profile to save costs. (Rao Decl. ¶ 36 & Ex. G.) Because EPAM data sat in my personal profile under the BYOD arrangement, I decided to leave that profile intact and untouched and to create a separate profile dedicated to company work. The attempt failed. The company account would not attach as a login. I created local accounts and lost passwords I had just set. I regained access by signing in through my hotmail account and changing settings. Those efforts disrupted the user-profile configuration. The sign-on screen stopped displaying all of my accounts — a condition EPAM's memorandum acknowledges I reported. The problem EPAM reduces to a twice-forgotten password (ECF 58-2 at 5) was that and more: I had lost passwords I had just set, the sign-on screen no longer listed all of my

accounts, and I retained use of the computer and its browser without achieving the separation of the accounts and their data. (Rao Decl. ¶¶ 37–40; ECF 44-3 at 1; ECF 58-2 at 5–6, 21.)

**6.** On the morning of November 13 I searched for repair guidance and, as I recall, ran Microsoft's System File Checker. One search, at about 10:11 AM, was "my microsoft windows appears corruptded how to reset" [sic]. The System File Checker did not resolve the problem, and I took no further step that day. The next morning at 6:02 AM I ran the built-in recovery and chose "Keep my files" over "Remove everything." Microsoft describes that option as one that "reinstalls Windows while keeping your personal files intact." (ECF 58-17 at 4, 6; Rao Decl. ¶¶ 41–42 & Ex. H.)

**7.** I did not format the disk, delete any partition, or run disk-wiping software. The Protocol required the neutral to report any "software whose primary purpose is to forensically delete or render unrecoverable" ESI. The neutral reported the OS reset under this paragraph to add clarity, but identified no such third-party wiping software. (Rao Decl. ¶ 43; ECF 55 § III(a)(i)(12); ECF 58-7 at 2.)

**8.** The files survived with their metadata. When asked whether files remained in custom root directories (such as `C:\files\`) with creation dates prior to November 14, the neutral answered "Confirmed," and verified that the Master File Table also retained records predating the repair. Signing back into my accounts reconnected cloud synchronization and restored browsing history. This includes the November 13 repair searches EPAM now cites — Chrome activity from November 4 forward, Edge from November 3 forward. (ECF 58-8 at 5; ECF 58-17 at 5–7; Rao Decl. ¶¶ 46–47.)

**9.** On November 26, a medical professional diagnosed a recurrent depressive episode with anxiety, precipitated by "job loss and ongoing legal issues." The provider documented

early-morning awakenings and rumination about this lawsuit. (Rao Decl. ¶¶ 48–49 & Ex. I (under seal).)

**10.** On December 10 the Court entered the parties' Consent Order. That Order placed the costs of the forensic examination on EPAM, named iDS as the neutral examiner, and denied EPAM's preliminary-injunction motion as moot. Two days later the neutral imaged five devices at my home and collected eleven cloud sources using credentials I surrendered. (ECF 20 ¶ 4 & at 7; ECF 55 § I, § III(a); Rao Decl. ¶¶ 50–52.)

**11.** On January 6, 2026, the neutral reported that the operating system "appears to have been reset on or about November 14, 2025." It declined to opine on the basis for the events, and later declined to draw "a 100% conclusion on whether this particular computer was reset." On January 13 I directed my counsel to release the neutral's analysis to EPAM. On January 27 I sent EPAM a written explanation composed from memory, including the account names I had created. EPAM continued the forensic process and moved for sanctions on July 29, 2026 — approximately six months after the neutral's January 6 report, and after I filed counterclaims on April 1, 2026. (ECF 58-7 at 2, 6; ECF 58-8 at 5; ECF 44-3; ECF 33; ECF 58; Rao Decl. ¶¶ 54–59 & Exs. K–L.)

**12.** By July 2026 I had released approximately 84,000 of the roughly 85,000 files EPAM's search terms captured, withholding about one percent on privilege and privacy grounds. EPAM has designated about 6,700. Its counsel wrote on April 22, 2026 that approximately 93% of the documents then identified from this computer "were extracted from 'ai-run' and 'codemie' ZIP files," and added on July 20, 2026 that "certain aspects of the Codemie code base were released publicly." AI/Run and CodeMie are EPAM product lines with public GitHub repositories — several under the Apache-2.0 open-source license — including four whose

creation dates, April 2 through October 18, 2025, precede EPAM's preservation letter. (Rao Decl. ¶¶ 65–67 & Exs. M, W.)

**13.** On May 27, 2026, I proposed reconciling EPAM's download logs against the neutral's extraction list. EPAM rejected it the next day as "far too narrow." When I asked for the findings of EPAM's internal review and requested compliance with Protocol § III(b)(ii)'s 5-day designation timeline, EPAM refused and called the request "a bad faith and obstructive action." It admitted in writing that it has not reviewed the contents of approximately 79,000 extracted files, asserted that reviewing them "would take over 1,300 hours," declined to state whether it reasonably believes they contain confidential information, and stated that it indefinitely reserves rights to assert claims on them later in discovery. I then offered to personally fund a supplemental analysis by the neutral. EPAM authorized that engagement on July 24, 2026 and filed this motion five days later. (Rao Decl. ¶¶ 68–70 & Exs. N–P.)

## III. THE MOTION'S SCOPE

The Court should confine its ruling to the elements of Rule 37(e). Most of EPAM's memorandum addresses matters outside those elements. Five of the six "Steps" in EPAM's narrative (ECF 58-2 at 18–26), and the whole of its Section IV (*id.* at 27–31), argue the merits of EPAM's unproven claims and of my counterclaims. Those matters are outside the scope of this motion and of the September 16 evidentiary hearing. Because EPAM has presented them, I have provided line-by-line responses in the accompanying Scope Appendix. The absence of merits argument in this brief preserves my denials; it concedes nothing but focuses on the topic of spoliation. I do not consent to resolution of any merits issue on this motion. The Rule 37(e) analysis should begin at page 11 of ECF 58-2, where the description of the November 14 event first appears.

## IV. LEGAL STANDARD

The burden of proof rests on the party asserting spoliation. *Malone v. Weiss*, 2018 WL 3656482, at \3 *(E.D. Pa. Aug. 2, 2018) (Beetlestone, J.) (citing* Culler v. Shinseki*, 2011 WL 3795009, at* \3 (M.D. Pa. Aug. 26, 2011)). EPAM must carry that burden on each element of Rule 37(e). EPAM's statement of the standard recites the rule but omits the burden of proof. (ECF 58-2 at 16–17.)

Rule 37(e) opens with conjunctive gateway conditions: there must be ESI "that should have been preserved," that "is lost because a party failed to take reasonable steps to preserve it," and that "cannot be restored or replaced through additional discovery." Only after all are met may the Court act under the rule's subdivisions. Subdivision (e)(1) requires a finding of prejudice and caps any measure at "no greater than necessary to cure" it. Subdivision (e)(2) governs the severest measures — adverse inferences, dismissal, and default. Those are available "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation." The 2015 amendment "rejects cases … that authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence." Fed. R. Civ. P. 37(e) advisory committee's note (2015). This district enforces that limit. *Accurso v. Infra-Red Servs., Inc.*, 169 F. Supp. 3d 612, 618 (E.D. Pa. 2016).

In this Circuit, spoliation requires control, relevance, "actual suppression or withholding of the evidence," and a reasonably foreseeable duty to preserve. *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012); *accord GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76, 82 (3d Cir. 2019). *Bull* holds that "[w]ithholding requires intent." 665 F.3d at 79. *Bull* also holds that a bad-faith finding is error where the record is consistent with inadvertence — that is, with an unintended result. *Id.* at 77–79. No unfavorable inference arises when a loss is "a matter of

routine with no fraudulent intent" or is "otherwise properly accounted for." *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995).

## V. ARGUMENT

### *A. EPAM Has Not Identified Electronically Stored Information That Should Have Been Preserved, Was Lost, and Cannot Be Restored or Replaced.*

Every item EPAM names as being lost falls into one of these categories: it never existed, it was restored, it survived, or it remains available from sources already collected. I apply them below to the four kinds of forensic data EPAM says the November 14, 2025 repair destroyed: "USB Connections," "Browsing Activity," "User Activity," and "Deleted Files." (ECF 58-2 at 11–12.) EPAM's theory is that these four kinds of forensic data would have shown whether its files were copied to a USB device or uploaded to cloud accounts. (ECF 58-2 at 11–12, 26; Greenfield Decl. ¶¶ 23–27.)

EPAM bears the burden of proof.

**1. Records of USB file transfers cannot be lost because Windows does not create them.**

Logs of copying files into USB drive: On personal computers like mine, Windows does not record the copying of files to a USB drive. Even if the repair had never happened, this computer would not have those logs. EPAM's own expert confirms this. He states that *"there does not exist a log of copy actions to a USB device on a Windows system."* (Greenfield Decl. ¶ 23.) The *"independent forensic artifacts"* the rest of that sentence describes are the connection and access records, not copy records. (Greenfield Decl. ¶¶ 23–24.) As the neutral puts it, the USBSTOR registry keys *"do not contain audit of actual data transfers, but rather evidence of device connections."* (ECF 58-8 at 5–6.) On my computer, the neutral *"did not identify detailed*

*entries for Event ID 4663."* (ECF 58-8 at 5.) Windows audit policy is off by default on consumer computers. (Rao Decl. ¶ 74 & Ex. Q.)

Logs of USB connections: EPAM's expert says there is now "no way to ascertain … even which USB devices he connected to his computer before the reset." (Greenfield Decl. ¶ 27.) Assume those connection records existed and the repair is why they are gone. But a connection record is not a transfer record. The neutral stated: the USBSTOR keys hold "evidence of device connections," not an "audit of actual data transfers." (ECF 58-8 at 5–6.) Connection alone says nothing about whether a file was copied to the device. And EPAM's own Exhibit 15 — the neutral's removable-device report for this computer — lists no third-party removable device at all: its two entries are the computer's internal drive and the neutral examiner's imaging drive. (ECF 58-18; ECF 58-7 at 6; Rao Decl. ¶ 45.)

Forensic artifacts: EPAM lists JumpLists, LNK files, ShellBags, and Windows Explorer history as additional forensic artifacts. EPAM's expert does not claim any of these records is a copy log. He says examiners use them together, in a timeline, to judge whether copying is *"likely."* (Greenfield Decl. ¶ 23.)

What EPAM does not say is that these artifacts record access, not copying. The file-referencing entries EPAM describes arise in one narrow sequence: connect a USB drive, copy a file to it, and then *open* that file from within the drive while it is still connected. The ordinary sequence — copy a file and disconnect — does not create the file-opening records EPAM describes. (Rao Decl. ¶¶ 44, 74 & Exs. R–S; Greenfield Decl. ¶¶ 23–24.) I did not copy EPAM files to a removable drive, and I did not open EPAM files from one. (Rao Decl. ¶ 44.) The artifacts EPAM describes would not exist.

No record of file copying ever existed on this computer. What may have been lost shows connection, not copying. This category cannot satisfy Rule 37(e).

**2. The browsing history EPAM relies on was restored through cloud synchronization.**

EPAM's second claim is loss of my browsing activity from before the repair.

EPAM says the reset *"appears to have permanently destroyed significant forensic evidence of [my] pre-reset web browsing activity."* It says that without that evidence it *"cannot determine what files may have been uploaded to cloud storage accounts or AI platforms."* (ECF 58-2 at 12, 26; Greenfield Decl. ¶ 29.) But the same memorandum concedes that *"limited browsing data remains."* Its Exhibit 14 describes my browsing history from before the November 14 repair. (ECF 58-2 at 12; ECF 58-17.)

The neutral reported my online browsing on the computer from before the November 14 repair. The reason the neutral found it is online account synchronization. The neutral states: *"browsing activity previously synchronized with a Google account was available,"* restoring Chrome activity from November 4 forward and Edge activity from November 3 forward. (ECF 58-17 at 4–7; Rao Decl. ¶¶ 46–47.) This covers the November 13 repair searches EPAM relies on in its motion, defeating any claim that those records are unrecoverable. It does not cover the September–October window EPAM alleges for data exfiltration.

Information recovered from other sources is not lost. The advisory committee treats loss from one source as often harmless where substitute information can be found elsewhere. Fed. R. Civ. P. 37(e) advisory committee's note (2015); *see* § V.A.5. EPAM has not identified a single search, a single site, or a single upload that it says is missing. For the September–October window it does allege, activity tied to my Google accounts sits on Google's servers, not on this

computer. The Protocol designates those accounts as Cloud Sources and reaches "other Google service data." (ECF 55 § I(e)(iii).) The neutral collected email and Google Drive from each of them. (ECF 58-7 at 5–6.) Information obtainable through additional discovery is not information that "cannot be restored or replaced." Fed. R. Civ. P. 37(e).

EPAM cannot show the loss of browsing history it quotes in its own exhibit. This category cannot satisfy Rule 37(e).

**3. The files themselves and their metadata survived the repair.**

EPAM's third category is *"user activity."* It claims the repair destroyed *"significant forensic evidence of user activity, such as file and folder activity."* It says that data *"would have been critical in assessing whether Rao used EPAM Confidential Information to create derivative works."*

Its example is forensic data showing that I opened a file downloaded from EPAM and then, shortly afterward, worked on a file of my own. (ECF 58-2 at 11–12; Greenfield Decl. ¶¶ 31–32.) The inference EPAM wants is that two timestamps close together, one file traceable to EPAM and one not, would show a derivative work. EPAM says the repair took away the ESI that would let it draw that inference.

But the repair preserved the files and their native metadata. Both sides of EPAM's hypothetical — any EPAM file, and any file said to be derived from it — remain on this computer with their creation and modification timestamps.

These artifacts were never the best proof of what EPAM wants to prove. An artifact records that a file was opened. It does not record what, if anything, was made from it. Opening is not deriving. If one document was built from another, the two documents show it — their content does, side by side. That is direct evidence. Two timestamps near each other is an inference about

it. EPAM holds both documents: the master file table is intact, and the neutral extracted 81,696 keyword-responsive records, about 41 gigabytes, from this drive. EPAM has not compared them. EPAM admitted in writing that it has not reviewed the contents of approximately 79,000 extracted files, claimed reviewing them "would take over 1,300 hours," and refused to state whether it reasonably believes they contain confidential information while indefinitely reserving rights to sue on them. (Rao Decl. ¶ 69 & Ex. O.) And in its thirty-six-page memorandum it does not name one derivative work it says it cannot prove without these artifacts.

This category cannot satisfy Rule 37(e). EPAM holds the better evidence and has not reviewed it.

**4. The deleted files were deleted before the duty to preserve arose, and their dates are unknowable for reasons unrelated to the repair.**

I have acknowledged throughout this case that I deleted EPAM files, as I was required to do by EPAM's Offboarding policy. (ECF 37-3 § 3.28; Rao Decl. ¶¶ 30–32.) The EPAM-file deletions I made stopped when the preservation notice arrived on Friday night, October 31. (Rao Decl. ¶¶ 31–32.) The committee note is explicit: "[t]he rule does not apply when information is lost before a duty to preserve arises." Fed. R. Civ. P. 37(e) advisory committee's note (2015).

As EPAM's expert states, a solid-state drive (SSD) has housekeeping mechanisms that make deleted data unrecoverable. This is an attribute of the SSD, and it would occur whether or not the November 14th repair had occurred. (Greenfield Decl. ¶¶ 21–22, 33.) As for the more than 13,000 names in the deleted-files table, the neutral could not determine the deletion dates. That limitation is not a product of the repair either. Asked in writing when these documents were deleted, the neutral answered that the items "are marked as deleted on the computer. iDS cannot determine the method by which they are deleted, or an exact date of deletion." (ECF 58-8 at 2.)

There is a second consequence to that answer. If the forensic neutral expert cannot establish when these files were deleted, then EPAM cannot establish that any of them were deleted after its letter arrived. I have said under oath that my deletions of EPAM files stopped when that letter came in on the night of Friday, October 31, and that after October 31, 2025, I did not delete any EPAM files from any device. (Rao Decl. ¶¶ 30–32.)

The burden is EPAM's. EPAM cannot prove that the files were deleted after the duty to preserve was established. Rule 37(e) does not reach these deletions.

**5. EPAM's demand for additional discovery to prove its case is an admission that it believes the lost ESI is replaceable.**

Replaceability is part of the rule's own threshold: Rule 37(e) reaches only ESI that *"cannot be restored or replaced through additional discovery."* Fed. R. Civ. P. 37(e). The Advisory Committee warns that *"[b]ecause electronically stored information often exists in multiple locations, loss from one source may often be harmless when substitute information can be found elsewhere."* Fed. R. Civ. P. 37(e) advisory committee's note (2015).

The neutral holds images of five of my devices and collections from eleven cloud sources. (ECF 55 § I; Rao Decl. ¶¶ 51–52.) EPAM holds its own ledger of the files it says I downloaded. (Sklansky Decl. ¶ 9.) It has admitted in writing that it has not reviewed the contents of approximately 79,000 extracted files. (Rao Decl. ¶ 69 & Ex. O.) EPAM now asks this Court to authorize additional forensic examinations of my devices. (ECF 58-2 at 32.)

A party that asks for more discovery to find the evidence is telling the Court the evidence can be found. EPAM has not proven that additional discovery cannot restore or replace what it says it lost. It fails the threshold of Rule 37(e).

***B. EPAM Has Not Shown a Failure to Take Reasonable Steps to Preserve.***

Rule 37(e) demands reasonable steps, not perfect ones. The advisory committee acknowledges that "perfection in preserving all relevant electronically stored information is often impossible." Fed. R. Civ. P. 37(e) advisory committee's note (2015). The record shows the steps I took.

**1. The preservation notice did not identify the artifacts EPAM's motion is built on.**

The scope of the duty matters as much as the steps. EPAM's letter demanded preservation of "all documents, tangible things, and electronically stored information potentially relevant" to the dispute, and it enumerated a long list of categories — among them spreadsheets, databases, calendars, system usage logs, phone records, internet usage files, archives, and backup tapes. (ECF 58-4 at 3.) It named no registry hives, no JumpLists, and no LNK files. Nothing in that enumeration told an individual reading it on a Friday night that such artifacts existed, or that repairing a malfunctioning operating system could alter them. The one enumerated category EPAM's motion now invokes that a lay reader would recognize — browsing activity, as "internet usage files" — was restored by account synchronization. (§ V.A.2.) The committee note speaks to this directly: "The court should be sensitive to the party's sophistication with regard to litigation in evaluating preservation efforts; some litigants, particularly individual litigants, may be less familiar with preservation obligations than others who have considerable experience in litigation." Fed. R. Civ. P. 37(e) advisory committee's note (2015).

EPAM is a public company with in-house counsel and a national law firm. When its letter arrived on a Friday night, I had no lawyer. I am the individual litigant the note describes. EPAM's letter announced that EPAM would ask the Court to order my devices turned over "for imaging and inspection." (ECF 58-4 at 3.) On November 5 it asked. The Court declined: "You don't need it. You may want it. You may get it. You don't need it. And certainly there is nothing

to suggest that I should enter an order requiring a forensic examination of his personal device." (ECF 58-6 at 51–52.) No one directed me to image the computer before November 14. I preserved exactly what the notice communicated: the files, the accounts, and the computer itself. (Rao Decl. ¶¶ 3, 31–33.)

EPAM cannot fault me for failing to preserve artifacts its own notice never named.

**2. A file-preserving repair is a reasonable step for a _pro se_ litigant facing a computer malfunction.**

I stopped deletions when the preservation notice arrived on Friday night, October 31. Four days later, in lieu of the TRO hearing, I proposed a supervised remediation of the computer. (Rao Decl. ¶¶ 31–33 & Ex. J; ECF 44 at 2.) The computer malfunction arose from an attempt to separate my new company's work from EPAM's files. I was trying to keep EPAM's data intact and apart, to preserve it. It stayed intact — the file table survived, and the neutral pulled 81,696 records off that drive. (ECF 58-8 at 5; ECF 58-7 at 3.)

When the malfunction prevented reliable sign-on, I searched for repair guidance and ran Microsoft's System File Checker. When that failed, I waited overnight and then ran the Windows recovery tool, affirmatively selecting "Keep my files" over "Remove everything." (Rao Decl. ¶¶ 39–43; ECF 58-17 at 4, 6.)

A person who stops deletions, proposes remediation to the adversary, runs diagnostics, sleeps on it, and picks "Keep my files" has taken reasonable steps.

**3. The repair achieved the preservation objectives of EPAM's own proposed alternatives.**

EPAM's own list of alternatives validates the objective I was pursuing. EPAM says I "could have" imaged the drive, told EPAM so it could image the device, used another computer,

bought a new hard drive, or bought a new computer. (ECF 58-2 at 6.) Three of those five share the goal I was already pursuing: keeping EPAM's data separate from my new company's work. EPAM cannot fault the action for an objective it endorses.

I had already approached EPAM about this computer. On November 4, in lieu of the TRO hearing, I proposed a supervised remediation: a targeted search and file-name list, then a factory reset and clean OS installation under attorney or vendor supervision, at my cost. EPAM did not accept. (Rao Decl. ¶ 33 & Ex. J; ECF 44 at 2.) EPAM could have resolved its concerns about this computer ten days before the repair, for far less than the cost of this litigation. As for the rest: imaging a drive to evidentiary standards is a job for a forensic vendor. Buying replacement hardware is an expense that would not occur to someone who had just lost his job.

EPAM's remaining suggestion — Microsoft's password-recovery pages — assumes a working sign-on screen that reliably displays the account. Mine did not, as EPAM's own memorandum records. (ECF 58-2 at 6, 20–21; ECF 44-3 at 1; Rao Decl. ¶ 40.)

EPAM calls unreasonable the very step it told the Court I could have taken.

***C. EPAM Has Not Shown Prejudice Under Rule 37(e)(1).***

Rule 37(e)(1) permits a remedy only "upon finding prejudice to another party from loss of the information," and caps any cure at measures "no greater than necessary." Fed. R. Civ. P. 37(e)(1). The burden to prove prejudice belongs entirely to EPAM. To satisfy this burden, a party must show that the loss of specific information materially impairs its ability to prove its claims or defenses. An evaluation of prejudice "necessarily includes an evaluation of the information's importance in the litigation." Fed. R. Civ. P. 37(e) advisory committee's note (2015). EPAM must particularize that importance in this litigation. It cannot substitute a generalized claim for the concrete prejudice the rule demands.

**1. EPAM has not particularized the importance of the evidence it says was lost.**

EPAM demands sanctions for the loss of theoretical evidence without ever proving that such evidence existed in the first place. As established above (§ V.A.1), EPAM's USB theory asks the Court to assume a highly narrow scenario that produces artifacts of a file being *opened*. EPAM then asks the Court to interpret those artifacts as evidence of *copying*. A party cannot prove the "importance" of evidence it has not even shown existed.

Nor has EPAM said what this evidence would have proved. It does not identify one file it says went to a USB device, one document it says was derived from another, or one issue it says it can no longer reach. The rule asks how important the lost information was to this case. EPAM answers that question nowhere.

EPAM does not satisfy Rule 37(e)(1) when it cannot particularize the importance of evidence it has not even shown existed.

**2. EPAM has not shown that the evidence it already holds is insufficient.**

EPAM holds its own download ledger, the neutral's extractions, eleven cloud collections, and the preserved file table. (Rao Decl. ¶¶ 51–52, 65; Oslick Decl. ¶¶ 13–17.) Every motive exhibit it filed came intact from those sources. EPAM has not explained why that record cannot prove its case. It has never claimed that the background artifacts on my computer were the only place its proof could be found.

It has also declined the means to find out. It rejected in one day my proposal to reconcile its own download ledger against the neutral's extraction list. (§ V.A.5.) Under Protocol § III(b)(ii), EPAM had five business days to designate files it reasonably believed contained confidential information. Months past that deadline, EPAM admitted in writing that it has not reviewed the contents of approximately 79,000 extracted files, claimed reviewing them "would take over 1,300 hours," and declined to state whether it reasonably believes they contain

confidential information while indefinitely reserving rights to assert claims later. (Rao Decl. ¶ 69 & Ex. O.) I then offered to pay for a supplemental analysis by the neutral. EPAM authorized that engagement on July 24, 2026, and filed this motion five days later. (Rao Decl. ¶ 70 & Ex. P.)

A party that authorizes a curative analysis five days before calling the loss incurable, and will not read what it already holds, has not shown that its case is impaired.

EPAM's own memorandum states that "the files that Rao did *not* destroy paint a compelling picture of his misconduct," and frames its complaint as my having failed to "spoliate *enough*." (ECF 58-2 at 25, 27.) A party that describes the surviving record as a compelling picture has not shown that any loss impaired its case.

**3. EPAM concedes the loss does not impair its defense to two of my counterclaims.**

EPAM asks the Court to dismiss my counterclaims. As to two of them — fraudulent inducement and declaratory judgment — it concedes that the alleged spoliation "does not directly impact EPAM's defense of these claims." (ECF 58-2 at 31.) Deterrence belongs to Rule 37(e)(2) and requires the intent finding EPAM cannot make. Under (e)(1), a conceded absence of prejudice ends the analysis.

As to those two counterclaims, EPAM concedes there is no prejudice, and asks for dismissal anyway.

***D. EPAM Has Not Shown Intent to Deprive Under Rule 37(e)(2).***

Every severe sanction EPAM requests requires the Court to act "only upon finding" that I "acted with the intent to deprive" EPAM of information for use in this litigation. Fed. R. Civ. P. 37(e)(2). "[A] finding of bad faith is pivotal," and the inference is impermissible where the record is consistent with routine conduct. *Bull*, 665 F.3d at 79; *Brewer*, 72 F.3d at 334. The objective record forecloses that inference here.

**1. EPAM's own exhibit documents troubleshooting, not an impulsive act.**

Exhibit 14 records the November 13 sequence as I have explained it: a troubleshooting search, misspelling included, then the Microsoft support page for the System File Checker repair tool. The repair EPAM calls spoliation came the next morning, twenty hours after that search. (ECF 58-17 at 4, 6; Rao Decl. ¶¶ 41–42.) That is measured, escalating diagnosis. I slept on it.

**2. I chose the option that preserves files.**

The recovery screen offered "Remove everything" — the complete wipe I had offered on November 4 only under supervision and only upon EPAM's release. I selected "Keep my files." (Rao Decl. ¶¶ 33, 42.) The neutral's report identifies no wiping software. (Rao Decl. ¶¶ 42–43; ECF 55 § III(a)(i)(12); ECF 58-7.) A formatted or wiped disk does not yield an intact file table and 81,696 recoverable files. This one did. (ECF 58-8 at 5; ECF 58-7 at 3.) The C:\Windows folder itself retains its original creation date of April 1, 2024. (ECF 58-17 at 4.) A party intending to deprive an adversary of data does not choose the option engineered to keep it.

**3. The absence of advance notice reflects what the option is called, not consciousness of guilt.**

EPAM says I showed "consciousness of guilt" by not telling it about the repair. (ECF 58-2 at 22.) The question is why I did not write to EPAM before running it. The answer is that I did not think I was doing anything to the evidence. (Rao Decl. ¶ 46.) The option I chose is called "Keep my files." Microsoft's page says it keeps personal files. EPAM's counsel told this Court it "allows the user to keep personal files intact." (ECF 42 at 2 n.2.) EPAM's own expert quotes that same language from my exhibit. He adds: "I have performed this type of reset on both examination systems and personal systems." (Greenfield Decl. ¶¶ 18–19; Rao Decl. Ex. H.) Someone who believes he is keeping his files does not think he needs permission to keep them. And nothing was hidden: the recovery wrote its own C:\$SysReset marker, the new account-

creation dates sat in plain view, my signed-in accounts restored the very November 13 repair searches EPAM now quotes, and I produced the computer in that state for imaging on December 12. (Rao Decl. ¶ 46; ECF 58-17 at 4–6.)

I had already proposed a supervised remediation of this computer. EPAM did not accept. I had no reason to think a further request would be answered differently.

**4. My conduct before and after the repair points away from concealment.**

Before the repair, I disclosed my post-employment plans to EPAM HR in writing, proposed a supervised remediation of my computer after its cease-and-desist letter, and testified openly on November 5. (Rao Decl. ¶¶ 20, 33–34.) After the repair, I authorized release of the neutral's analysis and volunteered a written explanation composed from memory. That explanation named the accounts imperfectly — it lists CoReasonLocal, CoReasonAdmin, SuperAdmin, and Admin, where the machine's actual list reads SuperAdmin, CoReasonUser, and CoReasonAdmin. (Rao Decl. ¶¶ 56–57 & Exs. K–L; ECF 44-3; ECF 58-17 at 4–5.) A person copying the neutral's report does not misname the accounts. A person recalling them from memory does.

EPAM has held that explanation since January and has identified no inconsistency between it and the forensic record. It then continued the forensic process and moved for sanctions on July 29, 2026 — six months after the neutral's report, and after I filed counterclaims. (Rao Decl. ¶ 59.) That sequence describes disclosure followed by a delayed accusation.

**5. EPAM's theory contradicts itself.**

EPAM asks the Court to believe that a physician with no forensic training (Rao Decl. ¶ 3) set out to destroy artifacts that forensic professionals study. It paints me as a savvy expert acting

with malicious intent. In the same breath it says I selected the one method that preserves the user's files and announces itself by writing a `C:\$SysReset` folder for any examiner to find. (ECF 58-17 at 4.) The theory demands sophistication and incompetence from the same actor in the same act.

**6. The motive documents record EPAM-funded work, and EPAM's own exhibits answer the inference it draws from them.**

EPAM's inference that the August 10 document was built from source code arrives doubly qualified by its own counsel. EPAM's brief says it was "very likely generated by providing" the AI with confidential information, "likely the source code." (ECF 58-2 at 13.) The unqualified facts are these: EPAM's counsel dates the document to August 10, 2025, before the September 11–October 14 download window EPAM alleges; the AI subscription that produced it was approved and paid for on EPAM's corporate card; and EPAM's own engineer concedes the document "incorporates some features that Rao sought to include in Synapse, which we ultimately decided not to include (or, at least, have not yet included)." (Oslick Decl. ¶ 16; Sklansky Decl. ¶ 9; Ilin Decl. ¶ 8; Rao Decl. ¶¶ 12–14 & Exs. A–C.) Work performed from June through August 2025 by the designated Product Owner advocating for an unbuilt, hypothetical product proposal ("EPAM Synapse"), on EPAM-funded tools, toward an internal corporate concept that EPAM never engineered or built, is authorized employment activity. Work performed for EPAM does not supply a motive to destroy evidence.

The three conversation exhibits follow one pattern: on the pages EPAM cites, the material that answers EPAM's inference sits beside the material EPAM quotes. EPAM cites Exhibit 8 at page 18 for a plan to "purposefully underperform." The same page records that the other participant advised "immediately and strongly … against this strategy," and that I accepted

the advice. (ECF 58-2 at 15, 24; Oslick Decl. Ex. 8 at 18.) The same-page answers for Exhibits 6 and 7 are set out in the Scope Appendix. EPAM itself certifies that it "cannot know without further discovery if every word in the summaries [is] accurate." (ECF 58-2 at 14 n.3.) These summaries exist because I preserved them; they sat in my accounts until the neutral collected them. (Rao Decl. ¶ 22.) A party bent on depriving an adversary of evidence does not preserve the records now offered as the centerpiece of the adversary's motion, waive confidentiality over them, and ask that they be read in open court.

**7. The medical record bears on state of mind.**

In the window at issue, a medical professional diagnosed a recurrent depressive episode precipitated by job loss and this litigation. The provider documented 2:00 AM awakenings and rumination about the lawsuit. A sleep disorder documented at Penn Medicine since 2021 corroborates the early-morning timing of the repair, which ran at 6:02 AM local time. (Rao Decl. ¶¶ 41–42, 48–49 & Ex. I (under seal); ECF 58-17 at 4.)

**8. EPAM's authorities describe different conduct.**

Every intent case EPAM cites involved destruction of identified material after a direct demand, together with concealment or false testimony: *Folino*, 2018 WL 5982448, at *2–3 (devices wiped during negotiations over their own examination);* Malone*, 2018 WL 3656482, at* \8 (deletions after confrontation with fabricated emails); *Gentex*, 827 F. Supp. 2d at 387–90 (deletions after a litigation hold); *In re Chule*, 2026 WL 524023, at *7–8 (active wiping and OS reinstallation days after court hearing);* Gutman*, 2008 WL 4682208, at* \12 (destruction "intentional, thoroughgoing, and (unsuccessfully) concealed"); *Burris*, 566 F. Supp. 3d at 1017 ("lies and acts of deception"); *Williams*, 2019 WL 4412801, at *14–16 ("false testimony"). This

record contains a file-preserving repair, preceded by a remediation proposal and followed by authorized disclosure.

**9. The Answer is qualified; EPAM's rendition is not.**

EPAM compares me to the parties in *Burris* and *Williams*. That comparison requires falsity in my pleading. (ECF 58-2 at 16, 22, 28.) Paragraph 255 is captioned "The Preliminary Forensic Findings." It states: "The preliminary data generated from this independent protocol—specifically the forensic search term results—yielded no evidence supporting Plaintiff's core allegations that Defendant exfiltrated, misappropriated, or possessed the accused source code (including the ETL Conversion Kit and AI Cohort Generator)." (ECF 33 ¶ 255; *accord id.* ¶¶ 256, 388, 453.) EPAM reports that as "definitive forensic clearance" of "his conduct." (ECF 58-2 at 22.) Paragraph 231 is the Twelfth Affirmative Defense, captioned "Lack of Irreparable Harm and Adequate Remedy at Law." It opposes an injunction on the ground that the neutral already holds the material. (ECF 33 ¶¶ 230–232.) *Burris* and *Williams* rested on falsity already established. Here falsity is the predicate EPAM must prove.

***E. Inherent Authority Supplies No Path Around Rule 37(e).***

The 2015 amendment "forecloses reliance on inherent authority" to sanction the loss of ESI that Rule 37(e) governs. Fed. R. Civ. P. 37(e) advisory committee's note (2015). *Malone* confirms the boundary rather than crossing it: this Court reached inherent authority there because the conduct — "intentional manipulation of emails and contracts" — was "much more serious" than a preservation failure. 2018 WL 3656482, at \7. *That conduct therefore fell outside the rule. Fabricating a document is not the same as characterizing one. (§ V.D.9.) An operating-system repair that allegedly cost transient artifacts is the paradigm Rule 37(e) dispute. It sits inside the rule. Inherent authority would independently require bad faith in any event.* Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991).

The composition of EPAM's authority is also instructive. Of the terminating-sanctions authorities EPAM cites, only *Bull* and *Schmid* bind this Court, and each set aside the sanction imposed below. *Bull*, 665 F.3d at 79–85; *Schmid*, 13 F.3d at 79–81. EPAM omits the leading precedential Third Circuit decision applying amended Rule 37(e): *GN Netcom*. There the district court refused default even after finding an actual intent to deprive, and the Third Circuit affirmed the sanctions ruling. 930 F.3d at 82–85. No binding decision has upheld a terminating sanction on facts resembling this record.

***F. EPAM's Additional Requests Fail on Their Own Terms, and Any Measure Must Be the Least Severe.***

*Fees and costs.* The Consent Order places forensic-examination costs on EPAM. (ECF 20 ¶ 4.) EPAM's request for the costs of future examinations describes a discovery program rather than a cure. It also presupposes that the information is replaceable, which negates the gateway. (§ V.A.5.)

*The injunction.* EPAM asks the Court to "deem" the sanctions hearing to cover a revived preliminary-injunction application. (ECF 58-2 at 33.) That is a scheduling request inside a sanctions brief, not a noticed Rule 65 motion. I address it in § VII and do not consent to consolidation under Rule 65(a)(2).

*Preclusion.* EPAM seeks orders precluding me from contesting USB transfers, derivative works, and my company's product — the core of its case and of its defense to my counterclaims. Such an order would not cure prejudice; it would decide the merits.

Solely to assist the Court, the measures legally available, in descending order, are these: (1) **no measure**, because the gateway is unmet (§ V.A); (2) **completion of the parties' supplemental-analysis mechanism** (Rao Decl. ¶¶ 70–71), with costs per ECF 20 ¶ 4 and with EPAM required to particularize the files it claims were lost; (3) **a narrow permissive**

**instruction**, available only on findings this record does not support — *GN Netcom* imposed a permissive inference *in lieu of* default even after intent was found, 930 F.3d at 82–85; *Bull* calls an adverse inference "itself a severe sanction," 665 F.3d at 82; and *Culler*, the decision this Court cited in *Malone*, denied the instruction outright, quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003) ("an extreme sanction" that "should not be given lightly"); and (4) **targeted cost-shifting**, only on affirmative findings of fault and prejudice. Under the *Schmid* factors the analysis ends the same way: the fault shown is at most imperfect preservation incident to a documented repair, the prejudice shown is speculative, and lesser measures stand available. 13 F.3d at 79.

*The* Poulis *factors.* The factors that govern a dispositive sanction do not support one here. Before a district court dismisses a claim or enters a default, it balances the six factors of *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863, 868 (3d Cir. 1984). *Bull* balanced them in a spoliation case, on a dismissal with prejudice. 665 F.3d at 80. That dismissal rested on the court's inherent power — the same alternative EPAM invokes. (§ V.E.) Two of the six factors there favored dismissal — personal responsibility and prejudice. The remaining four weighed against it: dilatoriness, bad faith, lesser sanctions, and the merits. The Third Circuit reversed the dismissal as an abuse of discretion. 665 F.3d at 83. EPAM's memorandum does not reach this step.

The same division appears here. The first factor asks whether the party or counsel bears responsibility for the conduct at issue. I performed the November 14 repair myself. That factor therefore weighs against me. It weighed against the plaintiff in *Bull* too, for the duty she had under Rule 1002. The Court there still held that it "cannot be given great weight because there is neither evidence of, nor a finding that she intended to withhold the documents." 665 F.3d at 80.

Nothing in this record shows a history of dilatoriness. I signed the Protocol, surrendered five devices and eleven cloud sources, and released approximately 84,000 of roughly 85,000 responsive files. Willfulness and bad faith fail on this record for the reasons stated in § V.D. Lesser measures remain available, including the supplemental analysis I offered to fund and EPAM authorized on July 24, 2026. The merits remain unadjudicated on both sides. *Poulis* asks whether the pleadings, if established at trial, would support recovery or a complete defense; it does not "use summary judgment standards." 747 F.2d at 869–70. "Dismissal must be a sanction of last, not first, resort." *Poulis*, 747 F.2d at 869.

**EPAM's own handling of the court-ordered forensic process weighs against the relief it seeks.** First, under Protocol § III(b)(ii), EPAM was obligated to provide, within five business days of receiving the Initial Reports, a list of records it reasonably believes contain EPAM Confidential Information. For approximately 79,000 released files, EPAM refused to promote them into Relativity for substantive review, stating that reviewing them "would take over 1,300 hours" and be a "ridiculous and disproportionate burden." (Rao Decl. ¶ 69 & Ex. O.) Months past the deadline, EPAM declined to state whether it reasonably believes they contain confidential information, yet asserted that it indefinitely reserves rights to review them and assert claims later in discovery or litigation. (Id.) By refusing to review or classify these files under the Protocol's deadlines while threatening future claims, EPAM kept tens of thousands of files in permanent uncertainty and refused to bring the remediation process to a close.

Second, the Forensic Protocol routes every release of extracted material through counsel. Redacted and unredacted Initial Reports go "to counsel for EPAM." (ECF 55 § III(b)(i).) Non-Withheld Inspection Documents are "provided to counsel for EPAM for review." (Id. § III(b)(iv).) The Protocol further provides that all Protocol materials "shall be used for the

purposes of this Litigation only and for no other purpose" (id. § VI(c)), and requires the parties to meet and confer on the purpose and content of any "additional reports or analysis beyond that which is specifically authorized" (id. § VI(b)). The Protocol operates under this Court's Consent Order. (ECF 20 ¶ 3.) The collection also includes material from non-party CoReason's repository and email account, which the Consent Order permits the neutral to inspect for a single stated purpose: "to recover and remediate any and all EPAM Protected Material." (Id.; ECF 25.)

On July 17, EPAM asked the Court to direct that its employees receive access to the Relativity review platform. (ECF 53.) No such order issued. On July 22, I asked the neutral in writing to issue no access "until both parties have met," copying EPAM's counsel. The neutral replied in writing: "Acknowledged." (Rao Decl. ¶ 72 & Ex. U.) On July 24, EPAM's counsel transmitted confidentiality acknowledgments signed by three EPAM employees, including Mr. Ilin, and wrote that absent my agreement to direct access EPAM would "provide access to any critical documents to Mr. Ilin without him requiring Relativity access, such as via screen share for example." I replied the same day that I did not agree with EPAM's interpretation or its proposed next steps, that any access would be without my consent, and that viewing files by screen share would circumvent the neutral inspection process and likely violate the terms of the parties' private contract (the Forensic Protocol), the vendor iDS's terms, and the Relativity platform licensing terms. The neutral then confirmed in writing that it "will not do anything unless both parties agree, or unless ordered by the court." (Rao Decl. ¶ 73 & Ex. V.)

Five days later, EPAM filed the declaration of Mr. Ilin — a Lead Software Engineer of an EPAM subsidiary who EPAM asserts worked on the Synapse initiative. (ECF 58-25 ¶¶ 1, 6.) Mr. Ilin states that he "reviewed an unredacted version" of Exhibits 9 and 10 to the Oslick Declaration, documents extracted from my personal accounts under the Protocol, and he presents

his own analysis of them in support of this motion. (Id. ¶¶ 8, 11, 16.) The neutral had committed in writing not to act absent agreement or court order. No order issued. What remains is the route EPAM announced and I rejected in writing: EPAM itself providing the documents to Mr. Ilin outside the counsel-only chain the Protocol prescribes — for an analysis on which the parties never met and conferred.

EPAM asks the Court to end the case over my handling of a court-supervised process. Its motion rests in part on a declaration produced through its own departure from that same process. The Court can weigh Mr. Ilin's declaration accordingly, and this sequence weighs against any measure beyond the least severe. I have raised the matter with EPAM's counsel and reserve all remedies.

## VI. CONCLUSION

EPAM has not identified lost, irreplaceable ESI. It has not shown unreasonable preservation conduct, it has not shown intent to deprive, and it has not shown prejudice. I respectfully request that the Court deny the motion in its entirety. A proposed order accompanies this filing.

## VII. RESERVATION REGARDING THE SEPTEMBER 16 HEARING

**(a) Forensic opinions.** I will test the Greenfield declaration on cross-examination and reserve all objections under Federal Rules of Evidence 702 and 403, including by motion *in limine*.

**(b) The neutral examiner.** I respectfully request that the Court direct the neutral's appearance at the hearing, with costs allocated per ECF 20 ¶ 4. In-person appearance is practicable: the neutral appeared and testified in person at the May 20, 2026 status conference on one day's notice, with iDS's consent. (See ECF 48 (minute entry).)

**(c) Proposed findings.** Section II is numbered to facilitate review; I offer to submit proposed findings of fact and conclusions of law on the Court's preferred schedule.

**(d) Scope.** The Court noticed this hearing on the spoliation motion, and no preliminary-injunction motion is pending. If the Court entertains a revived application, I request a separate briefing schedule and reserve all objections; I do not consent to consolidation under Rule 65(a)(2).

**(e) Sealing and courtroom closure.** EPAM has moved to introduce unredacted versions of its Exhibits 9, 10, and 13 and less-redacted versions of Exhibits 6–8 under seal at the September 16 hearing, and to close the courtroom for related testimony. (ECF 60.) I object, and I am opposing that motion by separate filing. These exhibits are records of my own conversations from my own accounts. I have waived any confidentiality in them. Civil hearings in this Circuit are presumptively open. *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1070–71 (3d Cir. 1984). I will consent to one narrow measure serving the only interest EPAM's papers identify: continuing the Executive 1/2/3 convention for the non-party individuals named. My own sealing request is limited to a single exhibit of personal medical records.

**(f) Remote testimony.** I do not consent to remote appearances by EPAM's witnesses (Mr. Ilin and Dr. Greenfield). Rule 43(a) permits remote testimony only "[f]or good cause in compelling circumstances." Credibility is central to a motion seeking case-ending sanctions. I intend to cross-examine both declarants with documents. EPAM has moved under Rule 43(a) for Mr. Ilin to testify remotely from the Czech Republic (ECF 61); I am opposing that motion by separate filing.

**(g) The Ilin declaration.** I rely here on statements in the Ilin declaration that are admissions of EPAM, my party-opponent. Those include its declarant's statement that the August

10 document "incorporates some features that Rao sought to include in Synapse, which we ultimately decided not to include (or, at least, have not yet included)." (Ilin Decl. ¶ 8.) To the extent EPAM offers Mr. Ilin's opinions as affirmative proof of misappropriation, those opinions are untested. He is a foreign EPAM employee in the Czech Republic, beyond this Court's subpoena power under Rule 45. I objected to his participation before this motion was filed (ECF 54) and I intend to cross-examine him. If EPAM does not produce him, I reserve the right to move to strike his affirmative opinions, without prejudice to my reliance on EPAM's own admissions in the same declaration. Mr. Ilin's declaration also carries the provenance problem addressed at the close of § V.F: it rests on an unredacted review of Protocol-extracted materials that no order and no agreement authorized him to receive, circumventing the Relativity platform controls and the Forensic Protocol. (Rao Decl. ¶¶ 72–73 & Exs. U–V.)

Respectfully submitted,
/s/ *Gowtham A. Rao*
**Gowtham A. Rao, MD, PhD**
Defendant and Counterclaim-Plaintiff, *pro se*
184 Mansgrove Rd., Princeton, NJ 08540
gowthamrao@gmail.com
August 19, 2026