**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **EPAM Systems, Inc.,**<br>*Plaintiff/Counterclaim-Defendant,*<br><br>**v.**<br><br>**GOWTHAM RAO, MD, PhD,**<br>*Defendant/Counterclaim-Plaintiff.* | **CIVIL ACTION**<br><br><br>**NO. 2:25-cv-06260-WB** |

# APPENDIX TO DEFENDANT/COUNTERCLAIM-PLAINTIFF'S OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS: PRESERVATION OF RECORD AND DEFENSES ON MATTERS OUTSIDE THE SCOPE OF THE SPOLIATION INQUIRY

Defendant/Counterclaim-Plaintiff Dr. Gowtham Rao, MD, PhD, proceeding *pro se*, submits this Scope Appendix pursuant to Section III of the Opposition to preserve his denials of the merits assertions in EPAM's motion papers—allegations of misappropriation, breach, and trade-secret theft that are not before the Court on a Rule 37(e) motion. The absence of merits argument in the Opposition preserves these denials; it concedes nothing. Each entry below identifies EPAM's assertion, states the preserved response with record citations, and confirms that the assertion bears on no Rule 37(e) element. Page citations to ECF 58-2 use the ECF-stamped pagination.

### *1. The 44,960 "Downloaded" Files*

**EPAM's Assertion:** Dr. Rao "illicitly" downloaded approximately 44,960 documents and files containing EPAM Confidential Information between September 11 and October 14, 2025. (ECF 58-2 at 5–6; Sklansky Decl. ¶¶ 9–12.)

**Preserved Response: Denied as characterized.** The count comes from EPAM's logs of activity by a then-current employee with authorized access, working under a BYOD arrangement

in which EPAM's own policy required automatic OneDrive synchronization of EPAM data to his personal computer. (ECF 37-3 § 3.14; Rao Decl. ¶¶ 7–10.) The retrieval of Odysseus financial and contract data followed managing director Killian's September 18, 2025 directive to compile objective financial data regarding Dr. Rao's contributions. (Rao Decl. ¶ 18.) And when EPAM's own search terms were run against Dr. Rao's devices, EPAM's counsel wrote that approximately 93% of the documents then identified from the desktop "were extracted from 'ai-run' and 'codemie' ZIP files" — EPAM product-line repositories distributed on public GitHub under the Apache-2.0 license. (Rao Decl. ¶ 66 & Exs. M, W.) EPAM has declined to identify any specific file as a trade secret. (Rao Decl. ¶¶ 68–69 & Exs. N–O.)

**Rule 37(e) Relevance:** None — bears exclusively on the merits (misappropriation).

***2. Server "Deletion"***

**EPAM's Assertion:** Dr. Rao "attempted to permanently delete files from EPAM's servers," including by "clearing the recovery folder." (ECF 58-2 at 6; Sklansky Decl. ¶ 13; *see also* Ilin Decl. ¶ 21.)

**Preserved Response: Denied as characterized.** Dr. Rao led the unit whose SharePoint content is at issue, and he answered this allegation under oath at the November 5, 2025 TRO hearing: removing duplicative content was "routine maintenance" that was "my responsibility as the leader of the team," performed "throughout my time inside EPAM." (ECF 58-6 (Tr.) at 23:7–24:9.) As he also explained then, an end user cannot make SharePoint content unrecoverable: EPAM's architecture employs a first-stage recycle bin, a second-stage site-collection recycle bin, and management retention policies—"[u]ser level access of removing of files does not cause harm to EPAM. They are there. They are always there." (*Id.*; *see* ECF 33 ¶ 381.)

**Rule 37(e) Relevance:** None — bears on the merits; relates to pre-duty conduct.

***3. "Free Agent" Marketing***

**EPAM's Assertion:** At an October 6–7, 2025 industry conference, Dr. Rao allegedly told a client representative's colleague that he was no longer working at EPAM and was a "free agent." (ECF 58-2 at 6; McDermott Decl. ¶¶ 11–12.)

**Preserved Response: Denied as characterized.** EPAM offers no first-hand account: Ms. McDermott recounts what a client representative told her about what Dr. Rao allegedly told the representative's colleague. (McDermott Decl. ¶ 12.) The sworn record shows this: on September 17, 2025, management informed Dr. Rao that his role was being eliminated (Rao Decl. ¶ 18); he thereafter spoke with professional contacts about his transition (Rao Decl. ¶ 21); and he disclosed his post-separation plans to EPAM Human Resources in writing, which knew of and discussed his transition efforts with him (Rao Decl. ¶¶ 20, 23). Speaking with professional contacts about a transition after notice of role elimination is planning, not disloyalty.

**Rule 37(e) Relevance:** None — bears on the merits (duty of loyalty).

***4. The "Step-by-Step Plan" (Oslick Ex. 9)***

**EPAM's Assertion:** Dr. Rao fed EPAM's Synapse source code into a generative-AI program to obtain "step-by-step" instructions for re-coding Synapse, as a roadmap for a competing product. (ECF 58-2 at 7–8, 19; Ilin Decl. ¶¶ 8–14.)

**Preserved Response: Denied.** EPAM's memorandum states this inference in qualified terms—"very likely generated by providing" the AI with confidential information, "likely the source code" (ECF 58-2 at 13)—and its declarant likewise hedges ("highly likely"; "and/or"). (Ilin Decl. ¶¶ 10, 12.) The record facts: EPAM's counsel dates the document to August 10, 2025, before the September 11–October 14, 2025 download window EPAM alleges (Oslick Decl. ¶ 16; Sklansky Decl. ¶ 9); Dr. Rao's recollection is that he generated it by prompting with his own ideas for an unbuilt product EPAM should build (Rao Decl. ¶ 13); the version history shows AI

output imported into Google Docs that evening (Rao Decl. ¶ 14 & Ex. C); the AI subscription that produced it was approved and paid for by EPAM's corporate card (Rao Decl. ¶ 12 & Ex. A); and EPAM's engineer concedes the document incorporates features EPAM "ultimately decided not to include (or, at least, have not yet included)." (Ilin Decl. ¶ 8.) Whatever its inputs, AI-assisted work in July–August 2025 by the Synapse Product Owner, on EPAM-funded tools, toward a proposed, unbuilt EPAM product concept, was authorized employment activity and self-directed observational scientific inquiry on public concepts. (Rao Decl. ¶ 13.)

**Rule 37(e) Relevance:** None — bears on the merits (trade secret).

***5. The "Covert" AI Workflow***

**EPAM's Assertion:** Dr. Rao's use of personal generative-AI accounts was part of a covert scheme. (ECF 58-2 at 19–20.)

**Preserved Response: Denied.** EPAM's internal generative-AI tooling did not, in Dr. Rao's experience, support the complexity of the workflows his product-development work required; consistent with the BYOA arrangement, he used personal accounts on public AI tools for that work, and EPAM approved and paid for the premium Google AI subscription on its corporate card ending 4760. (Rao Decl. ¶¶ 7, 12 & Ex. A.) A workflow the employer funds is not covert.

**Rule 37(e) Relevance:** None — bears on the merits (misappropriation).

***6. The Two Synapses***

**EPAM's Assertion:** Dr. Rao stole EPAM's proprietary "Synapse" tool. (ECF 58-2 at 5, 19–21; Klebanov Decl. ¶¶ 8–10.)

**Preserved Response: Denied.** EPAM conflates two different things. "EPAM Synapse" was purely a hypothetical, unbuilt product concept that Dr. Rao proposed and championed in an attempt to secure corporate investment; it was never built, never engineered into software, and

never existed as an operational tool during his employment. "Takeda-synapse" was a bespoke client deliverable under a 2019 Master Services Agreement—and EPAM's own Legal function concluded in writing on September 22, 2025: "legal said nope. You were right. . . . everything we build belongs to Takeda and the MSA controls over the SOW." (ECF 33-2; Rao Decl. ¶¶ 11, 15–17 & Ex. D.) EPAM cannot assert trade-secret rights in a third party's deliverable, nor can it claim spoliation or theft of an unbuilt, hypothetical concept.

**Rule 37(e) Relevance:** None — bears on the merits (DTSA ownership).

***7. The "CoReason" Name***

**EPAM's Assertion:** The name "CoReason" "originated with Synapse," which EPAM's July 2025 materials described as "Your AI Co-Reasoning Partner." (ECF 58-2 at 11; McDermott Suppl. Decl. ¶ 4.)

**Preserved Response: Denied.** Contemporaneous Google Docs records show that Dr. Rao himself formulated and explored the concept of a "co-reasoning partner" as early as June 23, 2025, in an AI-prompted architectural stress-test titled *"AI System Flaws Analysis"* (*"The EPAM Synapse design document outlines a highly ambitious, multi-agent AI system intended to serve as a 'co-reasoning partner' for pharmaceutical strategy teams"*). (Rao Decl. ¶ 13 & Ex. B, Plates B-01–B-02.) In July 2025, EPAM and Google Cloud sponsored a public marketing campaign on CIO.com (*GCP Foundry CIO Hub Campaign*, coordinated via Google Sheets shared with Dr. Rao on July 2, 2025, explicitly designating the proposed topic as *"EPAM Synapse (TBC)"*) featuring an article quoting Dr. Rao entitled *"Scientists need more than generative AI, they need a co-reasoning partner."* (Rao Decl. ¶ 11 & Ex. B, Plates B-03–B-06.) That public publication broadcast the descriptive paradigm of an "AI co-reasoning partner" into the public domain. Moreover, contemporaneous records show that Dr. Rao continued exploring naming concepts (*"Collaborative Reasoning"* and a *"structured, co-reasoning experience"*) in a July 14, 2025

brainstorming document titled *"New name for EPAM synapse"* for an unbuilt offering. (Rao Decl. ¶ 13 & Ex. B, Plates B-13–B-14.) A publicly published descriptive concept in public marketing copy is not a trade secret under DTSA (18 U.S.C. § 1839(3)) or PUTSA (12 Pa.C.S. § 5302), and EPAM holds no proprietary mark or exclusive ownership over generic co-reasoning terminology.

**Rule 37(e) Relevance:** None — bears on the merits (trade secret).

***8. The Executive Conversations (Oslick Exs. 6–8)***

**EPAM's Assertion:** Dr. Rao conducted "covert operations," told third parties he would "rebuild the system from scratch," and schemed to misappropriate EPAM IP. (ECF 58 ¶ 3; ECF 58-2 at 10–11, 19–20.)

**Preserved Response: Denied.** The exhibits are machine-generated summaries produced by a passive listening application during transition conversations held after EPAM announced the elimination of Dr. Rao's role; he did not edit, correct, or delete them, and they remained in his accounts, unaltered, until the neutral collected them. (Rao Decl. ¶¶ 21–23.) They contain no statement of intent to take EPAM property; they record a plan to consult an intellectual-property attorney to ensure legal compliance; and EPAM HR knew of the transition efforts. (Rao Decl. ¶ 23.) Mr. Shallal registered the coreason.ai domain on September 18, 2025; Dr. Rao did not ask him to do so and learned of the registration afterward. CoReason, Inc. was incorporated on October 16, 2025. (Rao Decl. ¶ 24.) EPAM's own papers are consistent: its domain exhibit is a privacy-proxy registration record identifying no registrant (Oslick Decl. Ex. 11), and its memorandum attributes CoReason's incorporation to Mr. Shallal (ECF 58-2 at 21 n.7). As to Exhibit 8 specifically: the page EPAM cites records that the other participant "immediately and strongly advised against" the exit scenario EPAM attributes to Dr. Rao as a plan, and that Dr. Rao "acknowledged this point, referencing his professional and drama-free exit from J&J"

(Oslick Decl. Ex. 8 at 18); and the page-3 sentence EPAM quotes for investor interest opens, "Though the IP is owned by Takeda, who funded the project"—matching EPAM Legal's own written conclusion of September 22, 2025. (*Id.* at 3; ECF 33-2.) As to Exhibit 7: the page EPAM cites for the "rebuild" plan records the statement in full—"I'm not going to use the same code. It's the concept. I'm going to write my own code"—the other participant's caution that "your employer might even take a crack at it," the shared conclusion that the IP question had to be cleared "before any further steps," and the conversation's "first and most crucial action item": "retain an IP attorney to thoroughly review his contracts." (Oslick Decl. Ex. 7 at 6; *see id.* at 2, 4, 15.) Dr. Rao retained counsel on September 29, 2025, and the engagement included review of his EPAM contracts. (Rao Decl. ¶ 23.) As to Exhibit 6: the pages EPAM cites for "completely hidden" attribute the secrecy demand to the other participant—a senior executive at EPAM's customer—for his own stated reasons ("I'm still a Takeda leader"; his name should "never be in the picture"). (Oslick Decl. Ex. 6 at 19, 32.) What was to be concealed was that executive's prospective role, not the venture, which Dr. Rao disclosed to EPAM HR in writing on October 2, 2025 (Rao Decl. ¶ 20)—and EPAM does not allege that the arrangement described ever occurred. The summaries EPAM relies on exist because Dr. Rao preserved them in his accounts until the neutral collected them. (Rao Decl. ¶ 22.)

**Rule 37(e) Relevance:** None — bears on the merits (misappropriation).

***9. The Sales Battle Card (Oslick Ex. 13)***

**EPAM's Assertion:** Dr. Rao sent EPAM's "Sales Battle Card" to a "nondescript personal email address" as part of a misappropriation scheme. (ECF 58-2 at 11.)

**Preserved Response: Denied.** The Sales Battle Card was marketing and sales enablement content generated via AI prompting to support EPAM's sales pipeline—work squarely within Dr. Rao's role as Product Owner. Dr. Rao generated the initial draft via Google

Gemini prompting on July 21, 2025 (Exhibit B, Plate B-19). Following subsequent sales enablement meetings with EPAM Senior Sales Director Jim Gatch and marketing lead Gabby Semon, who provided existing EPAM battle cards as templates for Q4 client pitches, Dr. Rao generated an updated, more refined AI iteration on September 21, 2025 (ECF 58-16; Exhibit E). Both drafts are AI-generated marketing outlines rather than proprietary trade secrets. Dr. Rao routed the document to subscriptionrao@gmail.com as part of his practical workaround of using multiple Google accounts to manage consumer AI usage limits; subscriptionrao@gmail.com was the dedicated account holding the additional AI subscription approved and paid for by EPAM on its corporate credit card ending 4760 (Rao Decl. ¶¶ 12, 26 & Ex. A). Dr. Rao discussed this collateral openly with Mr. Gatch on Microsoft Teams (Rao Decl. ¶¶ 25–27 & Ex. E).

**Rule 37(e) Relevance:** None — bears on the merits (misappropriation).

***10. The J&J Statement of Work***

**EPAM's Assertion:** Dr. Rao improperly solicited EPAM client J&J, securing a Statement of Work five days after termination. (ECF 58-2 at 12.)

**Preserved Response: Denied as characterized.** Dr. Rao was recruited to EPAM *from* Johnson & Johnson; his professional relationships there predate his EPAM employment. (Rao Decl. ¶ 6.) Independent post-termination work grounded in pre-existing relationships is not unlawful solicitation. The covenant claims this assertion would support are no longer asserted in this action. (*Compare* ECF 1 (Compl.), *with* ECF 30 (Am. Compl.).)

**Rule 37(e) Relevance:** None — bears on the merits (covenants).

***11. The "Offline" Teams Status***

**EPAM's Assertion:** Dr. Rao appeared "offline" on Teams during work hours, evidencing covert downloading. (McDermott Decl. ¶ 10.)

**Preserved Response: Denied as characterized.** A presence indicator is not evidence of anything: Teams status does not reliably reflect activity across a BYOD environment with multiple devices, no EPAM policy required a particular status, and by this period management had already told Dr. Rao his role was being eliminated. (Rao Decl. ¶ 18.) The contemporaneous medical record additionally documents social withdrawal in this window. (Rao Decl. ¶¶ 48–49 & Ex. I (under seal).)

**Rule 37(e) Relevance:** None — bears on the merits (intent).

***12. The "False Pleading" Accusation***

**EPAM's Assertion:** Dr. Rao "knowingly falsely" pleaded that the neutral forensic examination was "exculpatory" and that the evidentiary baseline was preserved. (ECF 58-2 at 6–8, 22–23.)

**Preserved Response: Denied.** The Answer's characterization has a documented basis: no report of the neutral identifies any forensic-deletion software; the neutral reported that USB registry data records device connections, not transfers; the neutral declined to opine on the basis for the November 14 events and declined to draw "a 100% conclusion on whether this particular computer was reset"; and EPAM's counsel wrote that approximately 93% of the documents then identified from the desktop were extracted from ZIP files of EPAM product lines distributed on public GitHub under the Apache-2.0 license, while declining to identify any file as a trade secret. (ECF 58-7 at 2, 6; ECF 58-8 at 2, 5–6; Rao Decl. ¶¶ 43, 55, 63–64, 66, 69 & Exs. M–O.) Characterizing that record favorably is advocacy grounded in evidence, not falsity. The Answer's own qualifiers — "preliminary," "forensic search term results," and the three named software assets — are set out in the Memorandum. (Mem. § V.D.9.)

**Rule 37(e) Relevance:** Addressed in Memorandum § V.D.9; bears on no Rule 37(e) element.

*13. "Engineered Termination"*

**EPAM's Assertion:** Dr. Rao purposefully underperformed to engineer his own firing and escape his non-compete. (ECF 58-2 at 15, 31.)

**Preserved Response: Denied.** Management informed Dr. Rao of a cost-driven role elimination on September 17, 2025—before the conversations EPAM cites—and EPAM reported the separation to the New Jersey Department of Labor in terms consistent with a layoff; unemployment benefits were approved and continue. (Rao Decl. ¶¶ 18, 29 & Ex. F.) The exhibit EPAM cites records the opposite of a plan adopted: the other participant "immediately and strongly advised against this strategy," and Dr. Rao "acknowledged this point." (Oslick Decl. Ex. 8 at 18.) The performance-improvement plan that materialized was EPAM's own: management stated on September 25, 2025 that there would be no such plan, then delivered one on September 26 attached to a demotion offer. (Rao Decl. ¶ 19; ECF 33-3.) As for the covenant, the Agreement EPAM drafted lifts its non-competition restrictions upon involuntary termination—"[t]he restrictions in this subsection shall not apply in case of an involuntary termination" (ECF 30-1 § 5(c))—and EPAM's own memorandum describes the covenant in irreconcilable ways (*compare* ECF 58-2 at 5, *with id.* at 20). An employee's awareness of the terms of the contract his employer wrote is not a scheme. The substance of Dr. Rao's CEPA counterclaim is addressed in his pleading (ECF 33) and belongs to the merits.

**Rule 37(e) Relevance:** None — bears on the merits (CEPA counterclaim).

*14. Retention as "Use"*

**EPAM's Assertion:** Dr. Rao's possession of EPAM files establishes misappropriation. (*E.g.*, ECF 58-2 at 27–29.)

**Preserved Response: Denied.** Dr. Rao's possession of EPAM information on his personal devices was the designed consequence of EPAM's BYOD arrangement and mandatory

OneDrive synchronization policy. (ECF 37-3 § 3.14; Rao Decl. ¶¶ 7–10.) He denies any commercial use or disclosure of any EPAM trade secret, and EPAM has identified none.

**Rule 37(e) Relevance:** None — bears on the merits (DTSA liability).

***15. The Website "Redesign"***

**EPAM's Assertion:** CoReason's website changes are "potentially another act of spoliation." (ECF 58-2 at 25.)

**Preserved Response: Denied.** Revising marketing copy on a start-up's public website is ordinary business conduct; EPAM identifies no preservation duty attaching to it, and by its own account EPAM captured the prior version before the change. (McDermott Suppl. Decl. Ex. 1.) Nothing was lost, by EPAM's own exhibit.

**Rule 37(e) Relevance:** None — not ESI loss from which EPAM claims prejudice.

**Reservation.** These responses preserve Dr. Rao's denials for adjudication on a full record under the standards that govern the merits—including Rule 12, Rule 56, and trial—and are not a waiver of any defense, objection, or counterclaim. Dr. Rao does not consent to resolution of any merits issue on this motion.

Respectfully submitted,
/s/ *Gowtham A. Rao*
**Gowtham A. Rao, MD, PhD**
Defendant and Counterclaim-Plaintiff, *pro se*
184 Mansgrove Rd., Princeton, NJ 08540
gowthamrao@gmail.com
August 19, 2026