**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **EPAM Systems, Inc.,**<br>*Plaintiff/Counterclaim-Defendant,*<br><br>**v.**<br><br>**GOWTHAM RAO, MD, PhD,**<br>*Defendant/Counterclaim-Plaintiff.* | **CIVIL ACTION**<br><br><br>**NO. 2:25-cv-06260-WB** |

**DECLARATION OF DR. GOWTHAM RAO, MD, PhD**
**IN OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS**
**FOR SPOLIATION OF EVIDENCE**

I, Dr. Gowtham Rao, MD, PhD, proceeding *pro se*, declare as follows pursuant to 28 U.S.C. § 1746:

**Background**

**1.** I am the Defendant and Counterclaim-Plaintiff in this action, appearing *pro se*. I submit this declaration in opposition to EPAM's motion for sanctions (ECF 58). I have personal knowledge of the facts stated below, and if called as a witness I could and would testify to them.

**2.** I am a licensed physician (PA, NY, WI, SC) and epidemiologist by training. My professional work concerns real-world evidence, public health, health informatics, and the application of data science and artificial intelligence to those fields. For more than a decade before joining EPAM, I built and maintained open-source scientific software through community and professional organizations.

**3.** I have no training or certification in computer forensics. Before this litigation, I had not heard of forensic artifacts such as "JumpLists," "LNK files," "ShellBags," or "USBSTOR registry hives."

**4.** Each exhibit attached to this declaration and listed in paragraph 75 is a true and correct copy of the document it is described to be.

**Employment and the BYOD Arrangement**

**5.** I signed my Employment Covenants Agreement ("ECA") on November 12, 2024, and began work at EPAM on or about November 18, 2024, as a Managing Principal focused on real-world evidence and AI. (ECF 30-1; ECF 58-3 ¶ 3.)

**6.** My collaboration with EPAM's leadership on open-source scientific software predates my employment by nearly seven years. Between 2018 and my hiring in late 2024, I regularly collaborated with my future manager, Gregory Klebanov, on open-source OHDSI and OMOP tools. Attached as **Exhibit T** are true and correct, unaltered excerpts of my contemporaneous Skype message history with Mr. Klebanov reflecting that collaboration, captured from my personal Skype account archive and preserved prior to Microsoft's retirement of consumer Skype. The messages discuss independently verifiable public open-source artifacts, including GitHub OHDSI/WebAPI Pull Request #358, WebAPI issues #363 and #364, circe-be issue #59, and OHDSI community forum release milestones. EPAM recruited me from Johnson & Johnson (J&J) in substantial part because of this pre-existing expertise and my reputation in the open-source community. Consistent with this background, Section 1(b) of my signed ECA states that "For avoidance of doubt, Confidential Information expressly does not include general industry knowledge, skills, or software developed or acquired by you without reliance on EPAM Group Confidential Information, which is through and for the purpose of community, professional, scientific, or similar groups and settings that are reasonably available through general industry sources." (ECF 30-1 § 1(b).)

**7.** From the start of my employment, I used this personal computer (MSI Codex R2, A0001) for EPAM work. My manager, Gregory Klebanov, knew this. I worked under a Bring

Your Own Device ("BYOD") and Bring Your Own Account ("BYOA") arrangement. (ECF 55 § I(c); ECF 58-6 at 20–22.)

**8.** EPAM's Acceptable Use of IT Resources policy provides that when local storage of confidential data is "required for productivity/convenience purposes, the data must be automatically synced up to EPAM online storage (SharePoint, OneDrive)." (ECF 37-3 § 3.14.) Consistent with that policy, Microsoft OneDrive synchronized EPAM data to my personal desktop throughout my employment.

**9.** The computer at the center of this motion is my personal desktop, an MSI Codex R2, designated A0001 by the neutral examiner. I accessed it through my personal Microsoft account, gowthamrao@hotmail.com.

**10.** I have acknowledged from the outset of this case that EPAM information resided on my personal devices during and after my employment because of this BYOD arrangement.

**The Synapse Proposal and My AI Workflow**

**11.** In June and July 2025, I proposed to EPAM leadership a product concept I called "Synapse," and I served as its designated Product Owner. An internal EPAM steering group was created to evaluate this product idea. It comprised Greg Killian, Sergey Yezkov, Chris Waller, Gregory Klebanov, and myself, and it met weekly to discuss the concept. Subsequently, Jonathan Rioux (EPAM's Vice President of Artificial Intelligence, who served as Managing Principal of AI during my employment) joined to assist me. I worked on these concepts during evenings and weekends, distilling relevant ideas to present to EPAM leadership during our weekly meetings. To my knowledge, EPAM never funded, engineered, or built the proposed EPAM Synapse product during my employment; it remained a hypothetical product concept and internal investment proposal throughout my tenure. EPAM separately delivered a project for its client Takeda under a 2019 Master Services Agreement; that deliverable was at times labeled "takeda-

synapse." (ECF 33-1; ECF 58-20 (EPAM GitLab record showing the "takeda-synapse-infra" repository).) My efforts regarding the EPAM Synapse proposal were overt and ran through official channels. For example, along with Mr. Rioux, I sought to have an EPAM developer, Dmitrii Ilin, allocate hours to the EPAM Synapse proposal through EPAM's time-code system for work delegation. Mr. Ilin is the same individual whose declaration EPAM submitted in support of this motion (ECF 58-25) and for whom EPAM moved for remote testimony (ECF 61). Attached as **Exhibit X** is a true and correct copy of Mr. Rioux's public LinkedIn professional profile documenting his executive role in EPAM's Artificial Intelligence practice. Furthermore, in July 2025, EPAM and Google Cloud sponsored a public thought-leadership campaign on CIO.com (*GCP Foundry CIO Hub Campaign*, coordinated via Google Sheets shared with me by EPAM marketing specialist Naaz Fatima Butt on July 2, 2025, in which the prospective topic was explicitly designated *"EPAM Synapse (TBC)"*—confirming its tentative, unconfirmed status). In that campaign, EPAM publicly published an article—whose byline identified me as an EPAM Life Sciences Consultant—entitled *"Scientists need more than generative AI, they need a co-reasoning partner,"* in which I publicly articulated the concept that AI must evolve from a simple assistant into a "co-reasoning partner" allowing scientists to "co-reason" with platforms through knowledge graphs. Attached as **Exhibit B, Plates B-03 through B-06** are true and correct copies of that public publication, campaign planning sheet, and related transmittal email.

**12.** During my employment, EPAM provided internal generative-AI tooling, but in my experience it did not support the complexity of the AI workflows my product-development work required. Consistent with the BYOA arrangement described above, I used personal accounts on public AI tools to perform that work. EPAM approved and paid for the premium Google AI (Gemini) subscription I used, charging it to an EPAM corporate credit card ending 4760. The

subscription account associated with those payments is subscriptionrao@gmail.com. Attached as **Exhibit A** are true and correct copies of records of those payments.

**13.** From June through August 2025, I generated multiple working documents, whitepapers, and conceptual proposals using my personal AI accounts. I conducted this work in two complementary capacities: first, as an EPAM employee and designated Product Owner championing the unbuilt Synapse product concept for EPAM; and second, as an independent researcher pursuing self-directed scientific study and personal learning on my own time during evenings and weekends. Attached as **Exhibit B** are true and correct copies of document-creation logs, Google Docs version-history captures, public campaign materials, and Google NotebookLM workspace records reflecting this continuous initiative (comprising Plates B-01 through B-24). Specifically:

**Plates B-01 & B-02 (June 23, 2025 at 10:15 PM — AI System Flaws Analysis / Architectural Red-Team Review):** I prompted Google Gemini to adopt an adversarial "red-team" persona to stress-test the conceptual architecture and expose system brittleness (*"AI System Flaws Analysis"* / *"A Critical Architectural and Methodological Review of the EPAM Synapse System"*), explicitly articulating the platform's vision as an AI *"co-reasoning partner"* for pharmaceutical strategy teams (Exhibit B, Plates B-01–B-02).

**Plates B-03 to B-06 (July 2, 2025 — GCP Foundry CIO Hub Campaign & CIO.com Publication):** EPAM marketing (Naaz Fatima Butt) and Google Cloud engaged me to collaborate on a public marketing initiative on CIO.com, in which the prospective topic was explicitly tracked as *"EPAM Synapse (TBC)"* (To Be Confirmed) in official campaign planning sheets, and EPAM publicly published an article quoting me defining an AI "co-reasoning partner" (Exhibit B, Plates B-03–B-06; described in ¶ 11).

**Plates B-07 & B-08 (July 11, 2025 at 7:59 PM — Stakeholder Analysis: Strategic Clarity Guide):** I prompted Google Gemini to analyze organizational matrix dynamics in *"Navigating the Corporate Landscape: A Strategic Guide to Stakeholder Analysis and Mapping for Project Success"*, in which the AI output coached me to *"ring the bell as loud as he can"* across EPAM leadership to build consensus and secure corporate funding for the Synapse proposal (Exhibit B, Plates B-07–B-08).

**Plates B-09 & B-10 (July 11, 2025 at 8:01 PM — B2B PLG Strategy Playbook):** In response to EPAM Sales Lead James Gatch's request to propose how EPAM could transform the initial Takeda client success into a repeatable, scalable business for EPAM, I prompted Google Gemini to simulate a venture-capital General Partner persona in *"The Synapse Playbook: A General Partner's Guide to Implementing a Product-Led Growth Strategy"* (Exhibit B, Plates B-09–B-10).

**Plates B-11 & B-12 (July 11, 2025 at 8:01 PM — Pilot-to-Product Playbook):** I generated *"The Pilot-to-Product Playbook: A Guide to Scalable Growth"*, explicitly analyzing the operational divide between delivering a bespoke client project (Takeda) and building a scalable software product for EPAM, emphasizing that *"a fundamental distinction must be drawn between delivering a successful project and selling a successful product"* (Exhibit B, Plates B-11–B-12).

**Plates B-13 & B-14 (July 14, 2025 at 9:33 AM — Product Naming Exploration):** I authored *"New name for EPAM synapse"*, exploring naming concepts and originating the themes of *"Collaborative Reasoning"* and a *"structured, co-reasoning experience"* openly for EPAM (Exhibit B, Plates B-13–B-14).

**Plates B-15 & B-16 (July 17, 2025 at 6:27 AM — Multi-Tab Interface & Workflow Framework):** I generated a multi-tabbed interaction structure titled *"Synapse new name"* exploring hypothetical user journeys and strategic advisory workflows (WYSIWYG, Group, Mind Maps, Names 1–3) for the weekly EPAM executive steering committee (Exhibit B, Plates B-15–B-16).

**Plates B-17 & B-18 (July 20, 2025 at 3:07 PM — Competitive Analysis vs. Big 5 Life Sciences):** I authored *"Competitive Analysis: EPAM Synapse vs. Big 5 Life Sciences"*, formulating the express business-case hypothesis that *"Medically qualified EPAM employees, using advanced AI workflows like Synapse, can compete with Big 5 consulting firms in life sciences"* (McKinsey, BCG, Bain, Deloitte, PwC), detailing a hypothetical "EPAM Synapse Model" as an AI-native co-reasoning platform governed by human experts to justify product investment for EPAM (Exhibit B, Plates B-17–B-18).

**Plate B-19 (July 21, 2025 at 7:28 AM — Sales Battle Card: MedRAG + Synapse):** I generated an initial, preliminary sales enablement draft titled *"Sales Battle Card: EPAM's Unified AI Platform (MedRAG + Synapse)"* via Google Gemini prompting to explore commercial positioning and equip sales leadership (Jim Gatch) with pitch messaging (Exhibit B, Plate B-19; the initial AI draft preceding the refined September 21 iteration in Exhibit E, described in ¶ 25).

**Plates B-20 & B-21 (July 31 – August 8, 2025 — xMedRag Thought-Leadership & Marketing Ideas):** I prompted the AI to explore high-level educational and marketing concepts in *"xMedRag Synapse Blog or Video ideas - original content"*, generating academic concepts regarding clinical trial analysis and protocol amendments (such as outcome switching in Phase

III RCTs) to explore hypothetical capabilities for EPAM thought-leadership (Exhibit B, Plates B-20–B-21).

**August 10, 2025 — Conceptual Architecture Build Guide (Oslick Decl. Ex. 9; Exhibit C):** I prompted Google Gemini with my own product ideas to generate the conceptual architecture document EPAM now characterizes as a "step-by-step plan" (assembled tab by tab in 29 minutes).

**Plate B-22 (August 14, 2025 at 7:17 AM — Life Sciences Advisory Framework Whitepaper):** I generated a detailed whitepaper entitled *"EPAM Synapse: A Computational Framework for Augmented Pharmaceutical Advisory Services"*, formalizing a multi-agent architecture and deployment model for an unbuilt platform for EPAM's consulting practice (Exhibit B, Plate B-22).

**Plates B-23 & B-24 (August 16, 2025 — Google NotebookLM Self-Directed Study):** In response to an inquiry and to improve my own conceptual understanding for pitching the unbuilt concept as an EPAM employee, I used Google NotebookLM to study and compare my hypothetical concept against an established commercial product, Perplexity AI (Oslick Decl. Ex. 10; ECF 58-13), uploading an input source explicitly titled *"Perplexity AI vs Gowthams Ideas"* and synthesizing comparison data drawn from public internet sources (imported into Google Docs at 7:42 AM on August 16, 2025 and edited through 8:45 AM) (Exhibit B, Plates B-23–B-24).

I generated these documents using Google Gemini's native "export to Docs" functionality, which automatically creates an imported HTML file in Google Docs (as shown across all version-history logs). These documents are raw or lightly curated AI model outputs based on public internet knowledge, created during evenings and weekends for self-learning,

scientific exploration, and internal EPAM presentations. None of these documents underwent substantial human editing. I do not assert copyright over these AI-generated outputs. I never considered or treated these exploratory AI outputs as trade secrets or confidential information; they consist of public concepts, generalized software architectures, and machine-generated exploratory text.

This AI-assisted work served both purposes at once: authorized product planning for EPAM in my role as Product Owner, and general scientific self-study. Section 1(b) of my Employment Covenants Agreement contemplates exactly that overlap; it excludes from "Confidential Information" general industry knowledge, skills, or software developed or acquired without reliance on EPAM confidential information "through and for the purpose of community, professional, scientific, or similar groups." All of it was conducted on the Google subscription EPAM approved and funded on its corporate credit card (Exhibit A).

**14.** The Google Docs version history of the document EPAM filed as Oslick Exhibit 9 shows that its text entered Google Docs as an imported HTML file at 7:50 PM Eastern on August 10, 2025, and was assembled tab by tab over approximately twenty-nine minutes. The twenty-nine minutes reflects the assembly in Google Docs of Gemini-exported HTML tabs; Exhibit B reflects the related prompting activity from June through August 2025. Attached as **Exhibit C** are true and correct copies of screen captures of that version history taken from my Google account.

**The September 2025 Intellectual-Property Review**

**15.** On September 9, 2025, I emailed EPAM's enterprise product manager, Katie Barista—copying my manager and others—asking for legal review of whether the Takeda Statement of Work permitted demonstrating the Takeda deliverable to another client.

**16.** On September 20, 2025, I escalated the concern in writing: "we do not have any pre-existing IP in this solution – everything was built on Takeda's dime." Attached as **Exhibit D** is a true and correct copy of this email chain.

**17.** On September 22, 2025, EPAM's product manager relayed EPAM Legal's conclusion in writing: "legal said nope. You were right. SOW said cool but MSA is not… everything we build belongs to Takeda and the MSA controls over the SOW." (ECF 33-2.)

**The September–October 2025 Separation Events**

**18.** On September 17, 2025, my manager, Gregory Klebanov, told me verbally that my role was being eliminated for cost reasons. On September 18, 2025, Managing Director Gregory Killian confirmed, in substance, that the action was not conduct-based, and directed me to compile objective financial data regarding my contributions to EPAM. That directive is why, in the weeks that followed, I retrieved Odysseus financial and contract data to which I had authorized access as an employee of that division; measuring my contributions against the division's performance required the division's baseline revenue and contract data.

In my view, projecting Odysseus's historical revenue forward did not justify the performance-improvement plan ("PIP") management proposed. Based on my review of the division's actual financial records, Odysseus Data Science's historical annual revenue was at best approximately $800,000 at its upper limit, and closer to $300,000 for the year—far lower than the $2,000,000 figure Mr. Klebanov had represented to me during recruitment. Imposing a PIP revenue target of $2,500,000 was, in my opinion, wholly unrealistic and unachievable.

I used the retrieved data to build revenue analyses comparing my performance against that baseline and responding to management's financial assumptions. I had also accepted a transition plan by email to Larry McKlaine, though EPAM had not yet formally implemented it.

**19.** On September 25, 2025, management stated there would be no performance-improvement plan. On September 26, 2025, I received an email offering a revised individual-contributor role accompanied by an immediate performance-improvement plan. (ECF 33-3.)

**20.** On or about October 2, 2025, I sent four written recap emails to EPAM Human Resources describing the September meetings and my post-separation plans, including my intent to work independently in my field. I copied those emails to my personal email address, openly, to document the dispute and to seek legal counsel. HR acknowledged receipt in writing. In that written response, rather than answering my direct question regarding whether refusing the demotion would result in termination, HR stated only that my continued employment would be "in the redefined role" mandated by management. (ECF 33-3; ECF 33-7.)

**The Conversations EPAM Filed as Exhibits 6, 7, and 8**

**21.** After receiving notice on September 17, 2025 that my role was being eliminated, I spoke with professional contacts about my transition. These include the conversations of September 18–21, 2025 that EPAM filed provisionally under seal and moved to seal as Oslick Exhibits 6, 7, and 8 (ECF 58-9, ECF 58-10, ECF 58-11; ECF 60), to which I have formally objected.

**22.** The documents EPAM filed are machine-generated summaries produced by a passive listening application. I did not edit, correct, or delete them. While I may have briefly skimmed portions of them at the time, they remained in my accounts, unaltered, until the neutral examiner collected them.

**23.** In my September 18–21, 2025 transition discussions with professional contacts (reflected in Exhibits 6, 7, and 8), I discussed general transition planning, prospective venture ideas, and fundraising. I did not state in any of those discussions an intent to take, copy, or use EPAM property, and I had no such intent. Rather, as the AI summaries themselves record, I

repeatedly stated the necessity of consulting an intellectual-property attorney to thoroughly review my employment agreements and ensure that anything I might build in the future would be fully legally compliant. Following through on that stated plan, on September 29, 2025, I retained legal counsel whose engagement included reviewing my EPAM contracts before taking any further steps. Throughout this period, EPAM Human Resources knew of and discussed my transition efforts with me.

**24.** In my September 2025 transition discussions, my colleague and eventual CoReason co-founder Ammar Shallal and I brainstormed loosely about a possible future venture. Those discussions included the "co-reasoning" concept I had publicly articulated in EPAM's July 2025 CIO.com campaign (¶ 11), and "CoReason" as a possible name for a future company. We reached no decision to form a company and set no timing. On September 18, 2025, Mr. Shallal registered the domain "coreason.ai"; I did not ask him to register it, and I learned of the registration afterward. CoReason, Inc. was incorporated on October 16, 2025, the day after my termination.

**The Sales Battle Card**

**25.** On July 21, 2025 at 7:28 AM, I generated an initial, preliminary draft of a sales enablement document titled *"Sales Battle Card: EPAM's Unified AI Platform (MedRAG + Synapse)"* via Google Gemini prompting and imported it into Google Docs (Exhibit B, Plate B-19). Following subsequent internal sales enablement discussions with EPAM Senior Sales Director Jim Gatch and marketing lead Gabby Semon regarding Q4 sales collateral (in which Ms. Semon provided existing EPAM battle cards as templates and requested refined drafts for client pitches), on September 21, 2025, I prompted Google Gemini to produce an updated, more refined iteration of the July 21 draft. EPAM filed this September 21 refined version as Oslick Exhibit 13 (ECF 58-16). Both versions are raw or lightly curated AI-generated working drafts

created to support EPAM's sales pipeline—work squarely within my authorized role as Product Owner.

**26.** On September 21, 2025, I routed the refined draft between my personal Google accounts (gowthamrao@gmail.com to subscriptionrao@gmail.com). Because consumer AI accounts enforce strict rate and usage limits, I used multiple Google accounts as a practical workaround to manage these quotas, frequently sharing drafts and working materials across my own accounts to continue uninterrupted work. The recipient account, subscriptionrao@gmail.com, was the dedicated account holding the additional Google AI subscription approved and paid for by EPAM on its corporate credit card ending 4760 (Exhibit A). Sharing the document with that account allowed me to switch accounts and continue iterative AI prompting for EPAM work.

**27.** The Battle Card was not covert. I shared and discussed it openly with Jim Gatch of EPAM's sales team over Microsoft Teams. Attached as **Exhibit E** are true and correct copies of the contemporaneous sales enablement discussion with Mr. Gatch and Ms. Semon, together with the September 21, 2025 refined Sales Battle Card. Attached as **Exhibit Y** is a true and correct copy of Mr. Gatch's public LinkedIn professional profile documenting his executive role as Senior Director of Life Science/Healthcare Solutions at EPAM Systems in Philadelphia.

**Termination and Offboarding**

**28.** My termination became effective October 15, 2025. EPAM revoked my system access, and the OneDrive folders that had synchronized EPAM data to my desktop emptied. (ECF 58-6 at 21–22.)

**29.** Consistent with my September 17, 2025 conversation with Gregory Klebanov—in which he gave me verbal notice of role elimination and stated that my former responsibilities would be transitioned to Sarah Seager as a lower-cost resource—EPAM reported my separation

to the New Jersey Department of Labor in terms consistent with a layoff. My unemployment benefits were approved and continue. Attached as **Exhibit F** are true and correct copies of those records.

**30.** Between October 15 and October 31, 2025, I deleted EPAM files from my personal devices as I found them. EPAM's Offboarding policy instructs departing employees to "[r]emove Company/Client data from all personal devices and personal cloud storages (iCloud/Google Drive, etc.)," and sets no deadline. (ECF 37-3 § 3.28 at 31; ECF 44 at 2; ECF 33 ¶ 284.)

**31.** On Friday evening, October 31, 2025, I received EPAM's cease-and-desist letter containing a "Notice of Duty to Preserve." The letter did not request imaging of my devices. (ECF 58-4.)

**32.** Upon receiving that letter, I stopped the offboarding deletions. After October 31, 2025, I did not delete any EPAM files from any device.

**The November 4 Offer and the TRO Hearing**

**33.** On November 4, 2025, EPAM transmitted a settlement term sheet demanding a court-ordered consent injunction, including an EPAM-approved forensic examination of my devices and accounts at my expense. Through my then-counsel, Andrew Avorn, I responded the same day with a remediation counter-proposal for this computer: I would identify under penalty of perjury the devices and accounts used for EPAM work; search the desktop and provide EPAM a list of file names and paths reasonably likely to contain EPAM materials; and then perform "a complete factory reset and clean OS installation under the supervision of a New Jersey attorney or cybersecurity vendor, with serial-number capture, contemporaneous screen recording, and a supervision certificate," bearing the cost of supervision myself, upon EPAM's written waiver and release of its trade secret theft and DTSA claims as to the device. That proposal contemplated a destructive sanitization of the device — which is why I proposed supervision, recording, and

certification — and I conditioned it on EPAM's release. I also proposed that EPAM participate commercially in my new venture. EPAM did not accept these proposals; it filed this action the same day. Attached as **Exhibit J** is a true and correct copy of that correspondence. (See also ECF 44 at 2.)

**34.** At the November 5, 2025 TRO hearing, I testified about my use of personal devices for EPAM work, my routine deletion of files, and the likely presence of residual EPAM files. When the Court cautioned me about preserving evidence, I answered, "Of course." (ECF 58-6 at 47–53.)

**35.** During that hearing, EPAM's counsel told the Court that EPAM "do[es] need a forensic examination in advance of a preliminary injunction." The Court responded: "You don't need it. You may want it. You may get it. You don't need it. And certainly there is nothing to suggest that I should enter an order requiring a forensic examination of his personal device." (ECF 58-6 at 51–52.) The Court denied the temporary restraining order without prejudice, entered no preservation order, and ordered no forensic examination. (ECF 58-6 at 48, 51–52.) The Court suggested instead that the parties negotiate a stipulation with the assistance of the attorney who had been advising me. (ECF 58-6 at 53–54.) I then retained counsel at my own personal expense, and the parties negotiated the forensic protocol privately.

**The November 2025 Computer Events**

**36.** On November 11, 2025, Microsoft notified me that the Microsoft 365 Family subscription associated with gowthamrao@hotmail.com would expire on November 18, 2025. Attached as **Exhibit G** is a true and correct copy of that notice.

**37.** Following my October 15, 2025 separation, CoReason, Inc. was incorporated on October 16, 2025 as a Delaware corporation (ECF 58-15). By November 2025, the company had acquired its own enterprise Microsoft licenses. As I was unemployed and had transitioned to

using the company's dedicated infrastructure, I did not want to continue paying personal funds for duplicate software subscriptions.

**38.** Using CoReason's licenses on this computer required signing in with the company account. Because EPAM data resided in my personal hotmail profile pursuant to EPAM's BYOD policy, I decided to leave that profile intact and untouched, and to create a new, separate profile dedicated to company work.

**39.** My attempt to separate the accounts did not go as planned, and I do not recall every step in exact order. The CoReason work online account would not attach as a login. In response, I created local accounts for the company work, and I may have created and removed one or more in quick succession as I tried to get the setup right. I set passwords in haste and lost track of passwords I had just set. At one point I found an administrator account that appeared to have no password; concerned that the computer was exposed, I set a password for it, and lost that one as well. I ultimately regained access by signing in through my gowthamrao@hotmail.com account and changing settings to regain access to the administrator accounts. I believe these efforts, together, disrupted the computer's user-profile configuration. (ECF 44-3; Ex. L (described in ¶ 57).)

**40.** During this process the Windows sign-on screen stopped bringing up all of my accounts. I had lost the passwords to accounts I had just created, and beyond that, the sign-on screen no longer listed all of the accounts. I retained access to the computer and its browser, but I could not reach the profiles I had set up, and I had not achieved the goal of separating the accounts and their data. I reported this condition contemporaneously, and EPAM's memorandum acknowledges it, quoting my statement that Windows would "not bring up all the accounts on the sign-on page." (Ex. L at 1; ECF 58-2 at 21.)

**41.** On the morning of November 13, 2025, I set out to repair the computer. At approximately 10:11 a.m. local Eastern time, I searched Google for "my microsoft windows appears corruptded how to reset" [sic]. About an hour and a half later, at approximately 11:42 a.m. local time, I opened Microsoft's support page titled "Use the System File Checker tool to repair missing or corrupted system files," and, as I recall, I ran the System File Checker tool it describes. The forensic report records these two events in UTC—3:11 PM and 4:42 PM—which is five hours ahead of the Eastern Standard Time then in effect in New Jersey. (ECF 58-17 at 6.) The System File Checker did not resolve the problem. I took no further drastic step that day and left the computer overnight.

**42.** I routinely begin work in the early morning, typically between 4:00 and 5:00 a.m., as I did regularly throughout my employment at EPAM. The next morning, November 14, 2025, I used Windows' built-in recovery. The recovery screen presented two options—"Keep my files" and "Remove everything"—and I selected "Keep my files." I did not select "Remove everything"; a complete wipe of this computer was what I had offered on November 4 only under supervision and only upon EPAM's release (¶ 33), and I did not perform one on November 14. Microsoft's documentation describes that option as one that "reinstalls Windows while keeping your personal files intact." The forensic report records the recovery as beginning at 11:02 AM UTC, which is 6:02 a.m. local Eastern time. (ECF 58-17 at 4.) Attached as **Exhibit H** are true and correct copies of the Microsoft support pages for this recovery procedure and for the System File Checker, together with the corresponding record excerpts previously filed at ECF 44-1 and ECF 44-2.

**43.** During this repair, I did not format the drive, I did not delete any partition, and I did not run any third-party deletion or disk-wiping software. My purpose on November 14 was to

regain access to my computer while keeping its files. The Forensic Protocol required the neutral examiner to report, for each device source, "whether there is any evidence of the use of software whose primary purpose is to forensically delete or render unrecoverable electronically stored information, and if so, the name of the software, the date the software was used, and any additional evidence of its usage." (ECF 55 § III(a)(i)(12).) No report the neutral examiner has issued in this matter identifies any such software on this computer. (ECF 58-7; ECF 58-8; ECF 58-17.)

**Removable Storage Devices**

**44.** I did not copy EPAM files or EPAM information from this computer to a USB drive or to any other removable storage device, at any time, either during or after my employment. I also did not open EPAM files from a removable storage device while it was connected to this computer. The published documentation attached as **Exhibits R and S** describes the artifacts EPAM relies on — JumpLists, LNK files, and ShellBags — as records of user file-and-folder activity that can reference removable devices; references to a removable device arise when a user opens files or folders on a connected device. EPAM's own retained expert acknowledges that "there does not exist a log of copy actions to a USB device on a Windows system." (Greenfield Decl. ¶ 23, ECF 58-26.) Because I did not take those steps with EPAM files, I do not believe such records concerning EPAM files ever existed on this computer.

**45.** EPAM filed as its Exhibit 15 a two-row extract of the neutral examiner's USB report for this computer. (ECF 58-18 at 2.) The extract lists a "SanDisk Portable SSD SCSI Disk Device," first connected December 12, 2025 at 14:09 UTC and last connected the same day at 14:20 UTC, and a "KINGSTON SNV2S1000G," first connected November 14, 2025 at 11:37 UTC. The neutral examiner identified both devices in the Notes accompanying its January 6, 2026 transmittal. Describing the two USB devices "that show up in the report as being connected

after 9/1/2025," the neutral wrote that these are: "Kingston SNV2S1000G - The computer's own hard drive" and "SanDisk Portable SSD – iDS hard drive used to image the computer." (ECF 58-7 at 6.) One is the computer's internal hard drive, and the other is the neutral examiner's own imaging drive; on the neutral's own account, neither is a removable storage device that I connected to this computer.

**46.** After the refresh completed on the morning of November 14, I was able to sign into the local user account designated "CoReasonAdmin"—a local profile I created for CoReason work on this desktop computer, which is my personal property and is not owned by CoReason, Inc.—and began setting it up. Prior to the refresh, the profile and sign-on configuration issues described above had prevented access to that account. I did not sign into the gowthamrao@hotmail.com profile that day—leaving that profile untouched was the purpose of the separation effort. Early the next morning, November 15, 2025, starting work early as was my normal custom, I checked the computer's accounts and signed into the gowthamrao@hotmail.com account to confirm that it and its data were intact; the forensic report records that profile's re-creation at 9:27 AM UTC, which is 4:27 a.m. local Eastern time. (ECF 58-17 at 5.) My personal directories, including C:\files\, were present with their contents. Signing into my accounts also reconnected their cloud synchronization. I did not report the November 14 recovery to anyone at the time; I did not understand it to be forensically significant, and I have no forensic training (¶ 3). I also took no step to obscure it: the recovery's own records—the $SysReset folder, the account-creation dates, and my November 13 repair searches, which my signed-in accounts restored to the computer—remained on the computer, and I produced the computer in that state for imaging on December 12, 2025. When the neutral examiner raised the November 14 events on January 6, 2026, I directed the release of the

operating-system analysis to EPAM on January 13, 2026, and provided a written explanation on January 27, 2026 (¶¶ 56–57; Exhibits K, L).

**47.** The neutral examiner's January 12, 2026 report, which EPAM filed as its Exhibit 14, states that "[s]ynchronized Google Chrome activity is available on this computer from November 4, 2025 forward," meaning that "browsing activity previously synchronized with a Google account was available as of that date"; that "[s]ynchronized Microsoft Edge activity is available on this computer from November 3, 2025 (1:59:04 AM) forward"; and that "[t]he earliest available 'carved' internet activity is as of November 3, 2025 at 2:17:36 AM." (ECF 58-17 at 6–7.) The same report states that "[t]he first recorded Google Chrome browsing activity using this computer" is November 15, 2025 at 12:42:40 PM UTC, and identifies the sources of the November 13 repair searches as history files inside the CoReasonAdmin profile (Google Chrome) and the gowth profile (Microsoft Edge)—profiles created or re-created after the repair. (ECF 58-17 at 6.) The November 13 repair searches EPAM cites in this motion are among the history restored to the computer in this way.

**The Medical Evaluation**

**48.** On November 26, 2025, at my wife's urging, I underwent evaluation at a medical clinic. The examining medical professional diagnosed recurrent major depressive disorder (moderate) and generalized anxiety disorder, and prescribed medication—my first such treatment since 2023. Separately, I have a sleep disorder diagnosed at Penn Medicine years before this litigation (evaluations from 2021–2023 documenting obstructive sleep apnea and sleep-maintenance insomnia), for which I have used prescribed positive-airway-pressure therapy since 2022. True and correct copies of these Penn Medicine sleep-medicine records (2021–2023) are included in Exhibit I (filed under seal).

**49.** The examining medical provider recorded that my symptoms began "in the last one-two months" and were "precipitated or exacerbated by recent psychosocial stressors, including job loss and ongoing legal issues," and documented early-morning awakenings "often at 2:00 AM"; "ruminative thoughts about the lawsuit and potential financial instability, including fears of losing his home"; social withdrawal; and a "perceived inability to provide for his family." Attached as **Exhibit I** is a true and correct copy of that November 26, 2025 clinical record. Exhibit I will be filed under seal; a motion for leave to file under seal accompanies this filing.

**The Consent Order, the Protocol, and My Cooperation**

**50.** On December 10, 2025, the Court entered the parties' stipulated Consent Order. I signed the certification attached to it. The Consent Order places the costs of the forensic examination on EPAM. (ECF 20 ¶ 4 & at 7.)

**51.** The parties executed the Forensic Protocol on December 12, 2025. (ECF 55.) On December 12, 2025, the neutral examiner, iDS, imaged five physical devices in person at my home and collected data from eleven separate cloud sources. EPAM's own filings show that EPAM employees—not only its outside counsel—later reviewed and discussed materials collected from my personal accounts. (See Ilin Decl. ¶¶ 8–14 (58-25); McDermott Suppl. Decl.; Klebanov Suppl. Decl.)

**52.** To facilitate that collection, I surrendered my private credentials for five email accounts, my Google Drive accounts (including Google Gemini AI data), my personal photo and video storage, OneDrive, and GitHub—spanning both my personal accounts and CoReason's accounts. (ECF 55 § I, § III(a).)

**53.** On January 6, 2026 at 4:44 PM, the neutral examiner transmitted to counsel "an initial set of reports pursuant to the protocol," together with a table mapping each device and account to an iDS evidence identifier and a set of Notes. In those Notes the neutral stated: "The

operating system on this computer appears to have been reset on or about November 14, 2025." The same Notes contain the two USB-device identifications quoted in paragraph 45 above. (ECF 58-7 at 6.)

**54.** On January 12, 2026 at 2:11 PM, the neutral transmitted a further report titled "EPAMR-06448.A0001_Forensic_Investigation_Report-20260112.pdf," which EPAM filed as its Exhibit 14. (ECF 58-17.) In the transmitting email the neutral wrote that, "[b]ased on further analysis," it was "reporting the following events to add clarity to the analysis related to protocol paragraph III-a-i-12": that "[o]n or about November 14, 2025 events occurred on this computer which affected several forensically relevant items," including a "lack of Windows Event log events prior to November 14, 2025"; user-account creation dates "listed as being on or after November 14, 2025, including the creation date of account 'gowth' being on November 15, 2025"; "the creation of a folder named '$SysReset' on November 14, 2025"; "limited file / folder interaction activity prior to November 14, 2025, including no LNK files created in the c:\Users\gowth profile before November 15, 2025"; and "[l]imited browsing activity prior to November 14, 2025."

**55.** In the same transmitting email of January 12, 2026, the neutral examiner expressly declined to draw conclusions regarding why or how the potential reset occurred, writing: "As to your inquiry to the basis for the potential reset of the computer, at this stage I am not forming an opinion or drawing a 100% conclusion on this issue." (ECF 58-7 at 2.)

**56.** On January 13, 2026, I instructed my then-counsel to direct iDS to release its operating-system analysis to EPAM. Attached as **Exhibit K** is a true and correct copy of that transmittal correspondence.

**57.** On January 27, 2026, my counsel transmitted to EPAM my written explanation of the November events. Attached as **Exhibit L** is a true and correct copy. I composed it from my own memory; at the time I was in India and did not have physical access to the computer (A0001), which was in the United States. Writing from memory, I named the accounts imperfectly: my explanation lists CoReasonLocal, CoReasonAdmin, SuperAdmin, and Admin, while the neutral's analysis of the machine lists SuperAdmin, CoReasonUser, and CoReasonAdmin. (ECF 44-3; ECF 58-17 at 4–5.)

**58.** On February 26 and March 6, 2026, counsel for both parties submitted written follow-up questions to the neutral examiner. The neutral answered them in emails dated March 5, 2026 at 6:34 PM and March 6, 2026 at 1:02 PM. EPAM filed that exchange as its Exhibit 5. (ECF 58-8.) I set out the neutral's answers in paragraphs 60 through 64 below.

**59.** EPAM then proceeded with the forensic review process. EPAM moved for sanctions based on the November 14 event on July 29, 2026—approximately six months after the neutral examiner first reported that event on January 6, 2026, and after I filed my counterclaims on April 1, 2026. (ECF 33; ECF 58.)

**What the Neutral Examiner's Reports State**

**60.** I have reviewed the neutral examiner's reports and correspondence that EPAM filed with its motion as Exhibits 4, 5, and 14 (ECF 58-7, ECF 58-8, ECF 58-17). The paragraphs that follow describe what those documents state, so that the Court has the neutral's own words in one place (the legal significance of these statements is addressed in the accompanying memorandum of law). Regarding the *volume of material extracted from this computer*, on January 10, 2026, the neutral provided "a breakdown by device of hash hits (Hashes) and other hits (non-hashes)." For device A0001—this computer—the table reports 1,265 hash-matching files totaling 2,792,554,719 bytes, and 81,696 non-hash files totaling 41,145,397,868 bytes, or approximately

41 gigabytes. Across all ten device sources the table reports 4,406 hash-matching files totaling 2.61 gigabytes and 93,859 non-hash files totaling 45 gigabytes. (ECF 58-7 at 3.)

**61.** *Custom directories and the Master File Table.* Asked whether files remained "located in custom root directories (such as C:\files\) with creation dates prior to Nov. 14, 2025," the neutral answered: "Confirmed." Asked about the Master File Table, the neutral answered that "we can confirm that there are Master File Table records for files in 'C:\files' which pre-date November 14, 2025." The neutral further stated that "the MFT, by design, can contain information about both active and deleted files," that "[r]ecords about files that were deleted can be overwritten when an entry in the MFT is needed," and that it "would not expect the MFT to contain information about all deleted files." (ECF 58-8 at 5.)

**62.** *Deleted files.* EPAM's counsel noted that the neutral's report "EPAMR-06448.A0001-III-a-i-2-FileKnowledge-LostFiles-KWResponsive.xlsx" "contains over 13,000 files that were identified as deleted from the workstation," and asked the neutral to confirm when those documents were deleted. The neutral answered: "The items in the 'EPAMR-06448.A0001-III-a-i-2-FileKnowledge-LostFilesKWResponsive.xlsx' report are marked as deleted on the computer. iDS cannot determine the method by which they are deleted, or an exact date of deletion." Asked about the effect of a Windows refresh on recovery, the neutral answered that it "has recovered, searched, and/or reported on what is available from the deleted category, or, as applicable, on file names where the content itself may have been overwritten," and that the "[a]bility to recover deleted and/or overwritten files on a computer depends on many factors," one of which "is whether the space previously held by a deleted file is now used by another file. If a 'refresh', in this context, means the install or update of many operating system files, then if those new or updated files overwrote the space previously held by other deleted files, recovery would be

minimized." (ECF 58-8 at 2–3.) As noted in paragraph 61 above, the neutral separately confirmed that the Master File Table did retain pre-November 14 records for my files.

**63.** *Audit logging and USB records.* Asked whether the computer's Group Policy enabled "Object Access Auditing' (Event ID 4663) or detailed file transfer logging," the neutral answered that the question "sounds like a request for an opinion, which unless the parties agree iDS should undertake this testing, validation, and reporting, is considered out of scope," and added: "However, on this particular computer, iDS did not identify detailed entries for Event ID 4663." Asked about registry evidence of whether a physical device was connected, the neutral answered: "in our experience, the USBSTOR keys do not contain audit of actual data transfers, but rather evidence of device connections." (ECF 58-8 at 5–6.)

**64.** *The limits the neutral placed on its conclusions.* On two occasions the neutral declined to draw a conclusion about the November 14 events. On January 12, 2026, asked about the basis for the potential reset, it wrote that "at this stage I am not forming an opinion or drawing a 100% conclusion on this issue." (ECF 58-7 at 2.) On March 5, 2026 it wrote: "iDS is not forming an opinion or drawing a 100% conclusion on whether this particular computer was reset. Hypothetically speaking, if a reset took place, system files may appear in 'Lost Files.' On this specific computer, there are what appear to be system files in the Lost Files area." (ECF 58-8 at 5.) To my knowledge, the neutral examiner has never withdrawn or qualified either statement.

**Document Review, Releases, and the Reconciliation Effort**

**65.** Beginning in late March 2026, I participated in a rolling review of the collected materials. In response to successive meet-and-confer demands, by July 2026 I had released approximately 84,000 of the roughly 85,000 files captured by EPAM's search terms, including many purely personal files.

**66.** Of that production, EPAM designated approximately 6,700 documents as containing its information. On April 22, 2026, EPAM's counsel wrote that "approximately 93% of the recently identified documents from A0001"—this computer—"were extracted from 'ai-run' and 'codemie' ZIP files located within an 'ss' subfolder from your 'Documents' folder." On July 20, 2026, EPAM's counsel added that the April 22 figure described the documents identified from this computer as of that date rather than its full remediation set; that more than 2,200 of the 6,693 designated documents were not associated with Codemie ZIP files or repositories; and that "certain aspects of the Codemie code base were released publicly" in March 2026. AI/Run and CodeMie are EPAM product lines: the codemie.ai website is branded "EPAM AI/RUN CodeMie" and "Powered by EPAM." Public GitHub repository records show that EPAM's "EPAM-AI-RUN-Marketplace" repository, distributed under the Apache-2.0 open-source license, was created on June 16, 2025, and that the "codemie-ai" organization's public repositories, also under the Apache-2.0 license, begin with "codemie-code," created November 1, 2025, followed by the core "codemie" and "codemie-ui" repositories on March 11, 2026. Repository records further show four AI/Run and CodeMie repositories published through the "epam-gen-ai-run" GitHub account with creation dates before EPAM's October 31, 2025 preservation letter: "ai-run-community-tools" (April 2, 2025), "ai-run-demo-agents" (May 12, 2025), "ai-run-swebench" (August 26, 2025), and "codemie-tools" (October 18, 2025). Attached as **Exhibit M** are true and correct copies of the April 22 and July 20, 2026 correspondence and related production records; attached as **Exhibit W** are true and correct copies of records of these public repositories and the codemie.ai website. Regarding the approximately 79,000 files EPAM did not promote for review, EPAM declined to state whether they contain EPAM information, as described in paragraph 69 below.

**67.** I continue to withhold approximately one percent of the collection on grounds of privilege and personal privacy.

**68.** On May 27, 2026, I proposed a reconciliation: compare EPAM's ledger of the files it alleges I downloaded against the neutral examiner's extraction list, and produce the intersection. On May 28, 2026, EPAM rejected the proposal as "far too narrow," stating that it would not capture "derivative works, renamed files, or documents summarizing, analyzing, or disclosing EPAM information." Attached as **Exhibit N** is a true and correct copy of this exchange.

**69.** I then asked EPAM for the findings of its internal review of my released files, to focus any further analysis. EPAM's counsel refused, invoking the work-product doctrine and the attorney-client privilege, describing my request as "a bad faith and obstructive action." When I pressed the issue and requested compliance with Protocol § III(b)(ii)—which required EPAM within five business days to state whether it reasonably believes files contain EPAM Confidential Information—EPAM's counsel explicitly admitted in writing on July 9 and July 17, 2026 that EPAM had not reviewed the contents of approximately 79,000 extracted files, that reviewing them "would take over 1,300 hours" and be a "ridiculous and disproportionate burden," and that EPAM refused to make any affirmative representation regarding whether the 79,000 files contained its confidential information. In that same correspondence, EPAM stated that it indefinitely reserved the right to review those 79,000 files and assert claims on them later in discovery or litigation. Attached as **Exhibit O** are true and correct copies of this correspondence.

**70.** To break the impasse, I offered to personally fund a supplemental analysis by the neutral examiner. On July 24, 2026, EPAM's counsel authorized iDS to transmit the engagement

letter to me. On July 29, 2026, EPAM filed this motion. On July 31, 2026, I executed the iDS engagement. Attached as **Exhibit P** is a true and correct copy of the executed engagement.

**71.** As of the date of this declaration, EPAM has not consented to any specific request under that supplemental-analysis mechanism.

**The July 2026 Platform-Access Events**

**72.** On July 22, 2026, I wrote to the neutral examiner, copying EPAM's counsel, asking that no access to the Relativity review platform be issued "until both parties have met." The neutral's Senior Managing Director, James Vaughn, replied in writing: "Acknowledged." Attached as **Exhibit U** is a true and correct copy of that exchange.

**73.** On July 24, 2026, EPAM's counsel transmitted confidentiality acknowledgments signed by three EPAM employees, including Dmitrii Ilin, and wrote that if I would not agree to direct access, EPAM would "provide access to any critical documents to Mr. Ilin without him requiring Relativity access, such as via screen share for example." I responded the same day that I did not agree with EPAM's interpretation or proposed next steps, that any access would be without my consent, and that viewing files via screen share would circumvent the neutral inspection process and likely violate the terms of the parties' private contract (the Forensic Protocol), the vendor iDS's terms, and the Relativity platform licensing terms. Mr. Vaughn wrote the same day that iDS "will not do anything unless both parties agree, or unless ordered by the court." Attached as **Exhibit V** are true and correct copies of these communications.

**Technical Reference Exhibits**

**74.** Attached as **Exhibits Q, R, and S** are true and correct copies of published technical documentation that I obtained from public sources concerning, respectively: Windows advanced security audit-policy settings (including the default state of object-access auditing); USB device artifacts on Windows systems; and Windows link-file (LNK) and JumpList artifacts. I attach

them for the Court's reference. The substantive points they support are addressed in the accompanying memorandum of law, not in this declaration.

**Index of Exhibits**

**75.** The exhibits attached to this declaration are:

| Exhibit | Description |
|---|---|
| **A** | EPAM corporate credit card payment records (card ending 4760) for Google AI subscription (subscriptionrao@gmail.com) |
| **B** | Document-creation logs, Google Docs version histories, public campaign materials, and AI workflow records for proposed EPAM Synapse concept (Plates B-01–B-24; June–August 2025) |
| **C** | Google Docs version-history screen captures for August 10, 2025 document (Oslick Ex. 9) |
| **D** | September 9–20, 2025 email chain seeking legal review of Takeda IP ownership |
| **E** | Synapse Sales Battle Card and contemporaneous sales discussion with Jim Gatch and Gabby Semon |
| **F** | New Jersey Department of Labor separation and unemployment insurance records |
| **G** | Microsoft subscription expiration notice (November 11, 2025) |
| **H** | Microsoft support documentation: "Keep my files" recovery option and System File Checker; related record excerpts (ECF 44-1, 44-2) |
| **I** | Medical records: November 26, 2025 clinical evaluation; Penn Medicine records, 2021–2023 (**TO BE FILED UNDER SEAL**) |
| **J** | November 4, 2025 settlement correspondence: Dr. Rao's supervised-remediation counter-proposal (Avorn transmittal) |
| **K** | January 12–13, 2026 iDS operating-system analysis transmittal and release correspondence |
| **L** | January 27, 2026 written explanation of November 2025 operating-system repair |
| **M** | April 22 and July 20, 2026 correspondence and related production records (Matthew Christoff) |
| **N** | May 27–28, 2026 reconciliation proposal and rejection correspondence |
| **O** | July 7–17, 2026 meet-and-confer correspondence (79,000 unreviewed documents admission and protocol non-compliance) |
| **P** | Executed iDS supplemental-analysis engagement and Seyfarth authorization (July 24–31, 2026) |
| **Q** | Published documentation: Windows advanced security audit-policy settings |
| **R** | Published documentation: USB device artifacts on Windows systems |
| **S** | Published documentation: Windows LNK and JumpList technical artifacts |
| **T** | Contemporaneous Skype message history excerpts with Gregory Klebanov (2018–2020) |
| **U** | July 22, 2026 Relativity platform access email exchange with neutral examiner James Vaughn |
| **V** | July 24, 2026 correspondence: EPAM employee confidentiality acknowledgments; non-consent; iDS position |
| **W** | Public repository and website records: codemie.ai homepage; GitHub records for EPAM open-source distributions |
| **X** | Public professional profile (LinkedIn) for Jonathan Rioux (EPAM Vice President, Artificial Intelligence) |
| **Y** | Public professional profile (LinkedIn) for Jim Gatch (EPAM Senior Director, Life Science/Healthcare Solutions) |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 19, 2026, at Princeton, New Jersey.

/s/ *Gowtham A. Rao*

**Gowtham A. Rao, MD, PhD**

Defendant and Counterclaim-Plaintiff, *pro se*

184 Mansgrove Rd., Princeton, NJ 08540

gowthamrao@gmail.com