# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **EPAM SYSTEMS, INC.,**<br>*Plaintiff / Counterclaim-Defendant,*<br><br>*v.*<br><br>**GOWTHAM RAO,**<br>*Defendant / Counterclaim-Plaintiff.* | **Civil Action No. 2:25-cv-06260-WB** |

## DEFENDANT DR. GOWTHAM RAO'S THIRD SET OF REQUESTS FOR ADMISSION TO PLAINTIFF EPAM SYSTEMS, INC. (RFAS 120–147)

**PROPOUNDING PARTY:** Defendant / Counterclaim-Plaintiff Dr. Gowtham Rao, MD, PhD (*Pro Se*)
**RESPONDING PARTY:** Plaintiff / Counterclaim-Defendant EPAM Systems, Inc.
**SET NUMBER:** Three (Set 3: Requests Nos. 120 through 147)

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure and Local Civil Rule 26.1 of the United States District Court for the Eastern District of Pennsylvania, Defendant and Counterclaim-Plaintiff Dr. Gowtham Rao ("Dr. Rao"), proceeding *pro se*, hereby requests that Plaintiff and Counterclaim-Defendant EPAM Systems, Inc. ("EPAM") make the following admissions within thirty (30) days after the date of service of this request.

## I. INSTRUCTIONS

**Addressee and Scope:** This Third Set of Requests for Admission (the "RFAs") is addressed to EPAM Systems, Inc., its subsidiaries, affiliates, divisions, managing agents, officers, directors, employees, forensic investigators, attorneys, or any other persons acting on its behalf.

**Separation and Completeness of Responses:** Each matter of which an admission is requested shall be separately stated. The answer shall specifically deny the matter or set forth in detail the reasons why the answering party cannot truthfully admit or deny the matter, pursuant to Fed. R. Civ. P. 36(a)(4).

**Good-Faith Qualification Standard:** A denial shall fairly meet the substance of the requested admission, and when good faith requires that a party qualify an answer or deny only a part of the matter of which an admission is requested, the party shall specify so much of it as is true and qualify or deny the remainder, pursuant to Fed. R. Civ. P. 36(a)(4).

**Reasonable Inquiry Requirement:** An answering party may not give lack of information or knowledge as a reason for failure to admit or deny unless the party states that the party has made reasonable inquiry

and that the information known or readily obtainable by the party is insufficient to enable the party to admit or deny, pursuant to Fed. R. Civ. P. 36(a)(4).

**Scope of Reasonable Inquiry:** The reasonable inquiry required by Rule 36(a)(4) encompasses an exhaustive search of all records, communications, electronic mail archives, Slack and Microsoft Teams message histories, client pitch presentations, Concur expense records, Bitbucket and Git repositories, CloudTrail and Microsoft 365 Unified Audit Logs, neutral forensic examiner databases, Relativity workspaces, endpoint telemetry logs, public open-source software repositories, and all information in the possession, custody, or control of EPAM, its officers, directors, managing agents, employees, forensic vendors, and outside litigation counsel.

**Restatement of Request:** The full text of the RFA to which the answer is intended to respond is to be restated immediately preceding such answer.

**Conclusiveness of Admissions (Rule 36(b)):** Any matter admitted under Rule 36 is conclusively established in this action unless the Court, on motion, permits the admission to be withdrawn or amended pursuant to Fed. R. Civ. P. 36(b).

**Expense-Shifting Sanctions (Rule 37(c)(2)):** If Plaintiff fails to admit what is requested under Rule 36, and Defendant later proves a document to be genuine or the matter true, Defendant will apply to the Court under Fed. R. Civ. P. 37(c)(2) for an order requiring Plaintiff to pay the reasonable expenses, including reasonable attorney and expert fees and costs, incurred in making that proof.

**Duty to Supplement (Rule 26(e)(1)):** Pursuant to Fed. R. Civ. P. 26(e)(1), Plaintiff is under a continuing duty to supplement or correct its disclosures and responses in a timely manner if Plaintiff learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to Defendant during the discovery process or in writing.

**Sufficiency of Answers or Objections (Rule 36(a)(6)):** Pursuant to Fed. R. Civ. P. 36(a)(6), Defendant reserves the right to move the Court to determine the sufficiency of an answer or objection. Unless the Court determines that an objection is justified, it will order that an answer be served. On finding that an answer does not comply with Rule 36, the Court may order either that the matter is admitted or that an amended answer be served.

## II. DEFINITIONS

The following definitions apply to each Request for Admission herein:

**"EPAM"**, **"Plaintiff"**, or **"Company"** means Plaintiff EPAM Systems, Inc., including its subsidiaries, affiliates, predecessors, successors, parents, divisions, and its current and former officers, directors, employees, agents, representatives, and attorneys.

**"Dr. Rao"** or **"Defendant"** means Defendant Dr. Gowtham Rao, MD, PhD.

**"Employment Covenants Agreement"** or **"ECA"** means the Employment Covenants Agreement dated November 12, 2024, attached as Exhibit A to EPAM's Complaint (ECF No. 1-1) and First Amended Complaint (ECF No. 30-1).

**"Forensic Inspection Protocol"** or **"Protocol"** means the Stipulated Forensic Inspection Protocol Agreement executed by the parties on December 12, 2025.

**"Neutral Forensic Examiner"** or **"iDS"** means iDiscovery Solutions, Inc., the neutral digital forensics expert appointed under the Forensic Inspection Protocol.

**"Workstation A0001"** or **"MSI Desktop Workstation"** means Dr. Rao's personally owned desktop computer designated by neutral forensic examiner iDS as Device A0001 (Make: MSI, Serial Number: MSB0Y2O7S0104130).

**"Relativity Database"** or **"Relativity Workspace"** means the shared, neutral electronic discovery database hosted by iDS at `idsinc.myrelativity.com` containing all images and extractions collected under the Forensic Protocol.

**"NIST NSRL"** means the National Institute of Standards and Technology National Software Reference Library database of known, non-probative operating system and commercial software cryptographic file hashes.

**"Software Heritage"** means the universal open-source software archive and dataset maintained at `softwareheritage.org`.

**"Corporate User Account"** means any EPAM-issued digital credential, user account, or email address assigned to Dr. Rao, including but not limited to `gowtham_rao@epam.com`, Git handle `grao`, and associated Active Directory domain accounts.

**"Synapse"** means the healthcare technology initiative, product roadmap, slide decks, and multi-agent simulation workflows variously known within EPAM as 'EPAM Synapse,' 'Synapse,' or 'Takeda-Synapse.'

**"Takeda Master Services Agreement"** or **"Takeda MSA"** means Master Services Agreement CW2719230, effective June 1, 2019, entered into between Millennium Pharmaceuticals, Inc., a wholly owned subsidiary of Takeda Pharmaceutical Limited Company ("Takeda"), and Odysseus Data Services, Inc. (subsequently acquired by EPAM), filed at ECF No. 33-1.

**"First Amended Complaint"** or **"FAC"** means Plaintiff's First Amended Complaint filed on the docket on March 27, 2026 (ECF No. 30).

**"Motion to Dismiss"** means Defendant's Motion to Dismiss Plaintiff's First Amended Complaint filed on the docket on May 18, 2026 (ECF Nos. 46, 46-1).

**"Odysseus Acquisition"** means EPAM's corporate acquisition of Odysseus Data Services, Inc. in 2024.

## III. REQUESTS FOR ADMISSION

**Request for Admission No. 120:**

Admit that:

**(a)** on May 9 and May 22, 2025, Dr. Rao presented demonstrations to Sergey Yezhkov;

**(b)** said demonstrations consisted of prompt engineering experiments conducted on the public consumer-grade Google Gemini web chat interface (utilizing zero backend API integrations, zero dedicated software developers, and zero proprietary EPAM source code);

**(c)** Dr. Rao presented said experiments for the purpose of seeking internal corporate R&D investment budget to build the AI Accelerator (including developments variously known within EPAM as 'EPAM Synapse,' 'Synapse,' or 'Takeda-Synapse'); and

**(d)** Dr. Rao presented said demonstrations in scheduled meetings with EPAM senior leadership, and no EPAM supervisor directed Dr. Rao to cease said demonstrations or prompt engineering experiments.

**Request for Admission No. 121:**

Admit that:

**(a)** EPAM assigned internal non-billable corporate investment project codes (including, but not limited to, 'EPMC-SYNP') to fund and supplement client-billable project budgets (including, but not limited to, 'TKDA-DSFX' for Takeda Synapse development) under Dr. Rao;

**(b)** hours logged by personnel under internal 'EPMC' investment codes were funded by EPAM corporate overhead rather than client billings;

**(c)** hours logged under said internal investment codes did not count toward the commercial revenue or margin targets of the Odysseus Data Services acquisition overseen by Gregory Klebanov; and

**(d)** EPAM's project-accounting systems accepted and recorded time entries logged by Dr. Rao and assigned technical personnel (including Dmitrii Ilin) against said corporate investment codes.

**Request for Admission No. 122:**

Admit that:

**(a)** during 2025, Dr. Rao collaborated with members of EPAM's Synapse commercialization team (including Sergey Yezhkov, Greg Killian, Chris Waller, Anastasia Christianson, Jonathan Rioux, and James Gatch);

**(b)** members of said commercialization team engaged in strategy meetings and internal EPAM Microsoft Teams chats evaluating commercial billing models and a 3-tier pricing framework (ranging from [redacted] pilots to [redacted] enterprise programs) for the AI Accelerator (including developments variously known within EPAM as 'EPAM Synapse,' 'Synapse,' or 'Takeda-Synapse'); and

**(c)** said commercialization team projected a [redacted] to [redacted] recurring annual revenue opportunity for EPAM Life Sciences resulting from the deployment and commercialization of said tool.

**Request for Admission No. 123:**

Admit that:

**(a)** during Dr. Rao's employment, technical architectures, step-by-step brand launch workflows, pilot Statement of Work (SOW) templates, and knowledge graph blueprints for the AI Accelerator (including developments variously known within EPAM as 'EPAM Synapse,' 'Synapse,' or 'Takeda-Synapse') were created collaboratively for EPAM;

**(b)** Jonathan Rioux created architectural wire diagrams on enterprise collaborative diagramming platforms using conceptual prompts provided by Dr. Rao;

**(c)** EPAM maintained custody of said architectural wire diagrams on its corporate enterprise systems; and

**(d)** from the forensic search hit reports generated by neutral examiner iDS across Dr. Rao's inspected devices, EPAM has identified zero files, records, or instances showing that Dr. Rao downloaded, synced, or retained copies of said architectural wire diagrams created by Jonathan Rioux onto any personal device.

**Request for Admission No. 124:**

Admit that:

**(a)** in collaboration with Jim Gatch and Santanu Sen, and with the approval of Sergey Yezhkov, Dr. Rao led strategic funding initiatives for the AI Accelerator (including developments variously known within EPAM as 'EPAM Synapse,' 'Synapse,' or 'Takeda-Synapse') and MedRAG;

**(b)** said initiatives included pitching a [redacted] to [redacted] AWS compute sponsorship to Amazon Web Services; and

**(c)** said initiatives included structuring a joint AWS-EPAM go-to-market proposal to [redacted] for a [redacted] engagement to retain [redacted] on AWS infrastructure.

**Request for Admission No. 125:**

Admit that the concepts, data models, source-to-target mapping rules, transformation algorithms, and functional architectures for converting healthcare data into the OMOP Common Data Model (such as those embodied in OMOP ETL conversions):

**(a)** have been published, discussed, and demonstrated across public technical workshops, client training sessions, academic symposia, and European regulatory training programs (including EHDEN Academy);

**(b)** are available in public open-source repositories and toolchains (including OHDSI/ETL-LambdaBuilder, OHDSI/WhiteRabbit, OHDSI/Usagi, OHDSI/DataQualityDashboard, and Johnson & Johnson's public ETL-Lambda repository);

**(c)** can be implemented in a functional, working OMOP ETL conversion solution using only publicly available open-source software tools and published informatics methodologies, without access to any EPAM source code.

**Request for Admission No. 126:**

Admit that:

**(a)** during October and November 2024, Gregory Klebanov engaged in recruitment communications (including Skype messaging and virtual meetings) with Dr. Rao to induce Dr. Rao to resign from Johnson & Johnson and execute the Employment Covenants Agreement (ECA);

**(b)** during said communications, Gregory Klebanov represented that Dr. Rao would lead an autonomous life sciences practice with full Profit and Loss (P&L) authority, dedicated engineering resources, and a multi-million-dollar growth mandate; and

**(c)** upon commencing employment, EPAM did not provide Dr. Rao with autonomous P&L authority or dedicated engineering headcount.

**Request for Admission No. 127:**

Admit that:

**(a)** on October 12, 2025, Dr. Rao committed an open-source license file to the internal GitLab repository 'takeda-synapse-infra' (Commit 3d8b15ac, ECF No. 3-6) with the commit message 'Was missing license';

**(b)** the phrase 'Copyright 2025 Gowtham Rao' was inserted into the license header by GitLab's default template automatically populating the authenticated user's profile name;

**(c)** Plaintiff acknowledged in writing in its proposed amended pleading transmitted to Defendant that the attachment of said phrase 'may not have been intentional' but was nevertheless 'one of the reasons for Rao's termination' on October 15, 2025; and

**(d)** the text of the MIT-0 license committed in Exhibit A to the McDermott Declaration (ECF No. 3-6) expressly grants permission 'to deal in the Software without restriction, including without limitation the rights to use, copy, modify, merge, publish, distribute, sublicense, and/or sell copies of the Software.'

**Request for Admission No. 128:**

Admit that:

**(a)** in Paragraphs 1 and 33 of Plaintiff's First Amended Complaint (ECF No. 30), Plaintiff defined 'EPAM Confidential Information and IP' as an aggregated category encompassing source code, RFP information, bid proposals, pricing information, client contracts, project data, P&L analysis, and employee compensation data;

**(b)** in Paragraph 74 of the First Amended Complaint, Plaintiff alleged that Dr. Rao downloaded approximately 44,960 documents and data files and designated the entirety of said files under the collective defined term 'EPAM Confidential Information and IP'; and

**(c)** the First Amended Complaint contains no itemized schedule, file manifest, or paragraph specifying which individual files among the 44,960 downloaded files constitute statutory trade secrets under 18 U.S.C. § 1839(3) as distinguished from non-trade-secret confidential information.

**Request for Admission No. 129:**

Admit that:

**(a)** in Paragraphs 24, 32, and 41 of Plaintiff's First Amended Complaint (ECF No. 30), Plaintiff affirmatively pleaded that by virtue of his employment with EPAM, Dr. Rao was granted authorized access to EPAM's files, software tools, P&L data, and client materials; and

**(b)** Section 1(d) of the Employment Covenants Agreement (ECF No. 30-1, Exhibit A at p. 3, quoted at ECF No. 30 ¶ 45) expressly provides that employees are permitted to access, use, and copy confidential information 'as required in the performance of your authorized employment duties.'

**Request for Admission No. 130:**

Admit that:

**(a)** in Paragraphs 21, 22, and 23 of Plaintiff's First Amended Complaint (ECF No. 30), Plaintiff describes the 'ETL Conversion Kit,' 'AI Cohort Generator,' and 'AI Accelerator' by their general operational functions;

**(b)** the First Amended Complaint contains no factual allegation identifying any specific proprietary algorithm, mathematical formula, source code architecture, or data structure claimed as a trade secret within said tools; and

**(c)** Counts I and II of the First Amended Complaint assert trade secret misappropriation over the collective defined term 'EPAM Confidential Information and IP' without identifying any individual algorithm, formula, code module, or data structure as a distinct statutory trade secret.

**Request for Admission No. 131:**

Admit that:

**(a)** Plaintiff included 'client contract documents' and 'client contracts' within its defined term 'EPAM Confidential Information and IP' (ECF No. 30 ¶¶ 1, 33), which documents were shared with third-party commercial clients upon execution;

**(b)** Plaintiff included 'employee compensation data' within said defined term (ECF No. 30 ¶ 33), which data constitutes internal personnel administrative records; and

**(c)** Plaintiff did not separate or distinguish said commercial contracts and personnel records from statutory trade secrets in Counts I and II of the First Amended Complaint.

**Request for Admission No. 132:**

Admit that:

**(a)** the First Amended Complaint (ECF No. 30) alleges no specific instance where Dr. Rao disclosed any EPAM document or data file to any third party following his October 15, 2025 termination; and

**(b)** the First Amended Complaint alleges no specific instance where Dr. Rao incorporated, deployed, or commercialized any EPAM trade secret into any product, service, or commercial deliverable.

**Request for Admission No. 133:**

Admit that:

**(a)** in Paragraphs 2, 4, 35, 76, and 77 of Plaintiff's First Amended Complaint (ECF No. 30), Plaintiff affirmatively pleaded that software code, clinical project data, and deliverables at issue were developed for commercial clients;

**(b)** the First Amended Complaint does not differentiate between property allegedly owned by EPAM and property owned by said commercial clients within its trade secret claims in Counts I and II;

**(c)** the First Amended Complaint does not plead the terms of any client agreement assigning title, granting an exclusive license, or conferring legal authority to EPAM to assert statutory trade secret claims over client-owned property; and

**(d)** the First Amended Complaint alleges zero facts regarding reasonable measures taken by EPAM's commercial clients to maintain the secrecy of client-owned materials.

**Request for Admission No. 134:**

Admit that:

**(a)** in Paragraphs 126, 132, 139, and 146 of the First Amended Complaint (ECF No. 30), Plaintiff realleged and incorporated by reference the identical factual allegations that support its trade secret claims in Counts I and II;

**(b)** in each of Counts IV (Breach of Fiduciary Duty), Count V (Replevin), Count VI (Conversion), and Count VII (Unjust Enrichment), Plaintiff identified the property allegedly taken, retained, or converted as 'EPAM Confidential Information and IP'; and

**(c)** the First Amended Complaint alleges no taking, detention, or conversion of any physical property or non-confidential asset separate from the digital files and data encompassed within the defined term 'EPAM Confidential Information and IP'.

**Request for Admission No. 135:**

Admit that:

**(a)** in Count III (Breach of Contract, Paragraphs 118–125) of the First Amended Complaint (ECF No. 30), Plaintiff does not identify by name any commercial client that terminated, reduced, or failed to renew a contract with EPAM as a result of Dr. Rao's alleged conduct;

**(b)** in Count III, Plaintiff does not set forth any specific dollar amount of lost profits or historical revenue incurred by EPAM prior to the filing of the complaint; and

**(c)** prior to initiating this action on November 4, 2025 (including in Plaintiff's October 31, 2025 cease-and-desist letter, ECF No. 3-13), Plaintiff sent no written communication to Dr. Rao identifying specific documents or data files by name or file path and demanding their return.

**Request for Admission No. 136:**

Admit that:

**(a)** neutral forensic examiner iDS reported to Plaintiff that on December 12, 2025, Defendant physically surrendered five (5) computing and storage devices (including Device A0001 [MSI Desktop Workstation, S/N: MSB0Y2O7S0104130], HP Laptop, two legacy laptops, and Samsung S23 mobile device) pursuant to the Court's Consent Order (ECF No. 20) and the Forensic Inspection Protocol (ECF No. 55);

**(b)** iDS reported to Plaintiff that in or about mid-December 2025, iDS completed forensic bit-stream imaging of said devices and forensically sound collections of Defendant's email and cloud accounts (including Defendant's Microsoft OneDrive, personal and CoReason GitHub repositories, and CoReason email account `gowtham.rao@coreason.ai`); and

**(c)** iDS reported to Plaintiff that Defendant provided all requested administrative credentials, volume passcodes, and multi-factor authentication tokens required to complete imaging.

**Request for Admission No. 137:**

Admit that:

**(a)** pursuant to Sections I(f) and II(a) of the Forensic Inspection Protocol (ECF No. 55), neutral examiner iDS was mandated to create a 'Forensic Image' (contractually defined in Protocol § I(f) as 'a full forensic bitstream image of a device') of Defendant's surrendered computing devices and forensically sound collections of associated email and cloud repositories; and

**(b)** Plaintiff has identified zero instances where any responsive file, document, or communication was deleted, purged, or destroyed following the transmission of Plaintiff's October 31, 2025 cease-and-desist letter.

**Request for Admission No. 138:**

Admit that:

**(a)** on or about October 15, 2025, when Plaintiff decided to terminate Dr. Rao's employment and initiated steps leading to the filing of this lawsuit, Plaintiff reasonably anticipated litigation against Dr. Rao;

**(b)** as a sophisticated corporate enterprise, Plaintiff's legal duty to preserve all relevant electronically stored information (ESI)—including server-side GitLab clone and audit logs, Entra ID telemetry, internal Teams and email communications regarding Dr. Rao's termination, and SharePoint administrative logs—attached on or about October 15, 2025; and

**(c)** Plaintiff's legal duty to preserve relevant ESI attached irrespective of whether Dr. Rao served a formal litigation hold notice or cease-and-desist letter on Plaintiff.

**Request for Admission No. 139:**

Admit that:

**(a)** in April 2026, Defendant formally proposed in writing that the parties instruct neutral examiner iDS to de-NIST the file listings against the National Software Reference Library (NSRL) and exclude standard operating-system files, virtual environments, Git infrastructure files, and public open-source software libraries;

**(b)** Plaintiff did not agree to de-NISTing or the algorithmic exclusion of public open-source software files from the review sets; and

**(c)** Plaintiff designated keyword search strings in Exhibit A of the Forensic Protocol that included open-source packages ('uvicorn', 'beego', 'quarto', 'picard', 'Arachne', 'cyclops'), public OMOP database columns ('concept_id', 'cohort_definition_id', 'covariateid'), public medical vocabulary ('rxnorm'), clinical condition terms ('afib', 'Thrombosis', 'LUPUS'), and third-party entity names ('epic', 'cerner', 'j&j', 'Cloudera'), to evaluate file retention under the Forensic Protocol.

**Request for Admission No. 140:**

Admit that:

**(a)** Plaintiff maintains custody and control over internal server-side Git clone logs, GitLab access audit trails, and Entra ID authentication telemetry associated with corporate user accounts or credentials assigned to Dr. Rao (including, but not limited to, `gowtham_rao@epam.com`);

**(b)** Plaintiff produced spreadsheets reflecting automated SharePoint download log rows in this litigation; and

**(c)** as of the date of this Request, Plaintiff has produced no raw server-side Git clone logs, GitLab access audit trails, or repository cloning telemetry associated with Dr. Rao's corporate user accounts or credentials in this litigation.

**Request for Admission No. 141:**

Admit that:

**(a)** Plaintiff provided unredacted copies of forensic search extractions and documents obtained under the Forensic Inspection Protocol (including exhibits filed as ECF Nos. 58-12 and 58-13) to Dmitrii Ilin;

**(b)** Dmitrii Ilin is employed by Odysseus Data Services s.r.o. in Prague, Czech Republic, is an active commercial software developer, is not an attorney of record, and resides outside the territorial jurisdiction of the United States District Court for the Eastern District of Pennsylvania;

**(c)** Defendant communicated written objections to Plaintiff regarding non-attorney employees (including Dmitrii Ilin) receiving access to unredacted forensic extractions under the Forensic Protocol; and

**(d)** the forensic search extractions provided to Dmitrii Ilin included personal records of Defendant and materials associated with the email account `gowtham.rao@coreason.ai`.

**Request for Admission No. 142:**

Admit that:

**(a)** Miroslav Sklansky, who executed the declaration filed as ECF No. 3-4 in support of Plaintiff's ex parte motion for temporary restraining order, is an employee of Plaintiff, and neither the declaration nor Plaintiff's Rule 26 disclosures identify any professional digital forensic certification (such as EnCE, CFCE, CCE, GCFA, or GCFE) held by Miroslav Sklansky;

**(b)** the 44,960 download figure asserted in the declaration of Miroslav Sklansky (ECF No. 3-4 ¶ 9) was calculated from automated SharePoint and OneDrive log rows; and

**(c)** prior to executing the declaration on November 4, 2025 (ECF No. 3-4), Miroslav Sklansky did not examine the contents of the 44,960 files, cross-reference the file paths against public open-source software repositories, or determine that each individual file contained proprietary trade secrets of Plaintiff as opposed to third-party or open-source software.

**Request for Admission No. 143:**

Admit that:

**(a)** during the November 5, 2025 preliminary injunction hearing before Chief Judge Beetlestone, Plaintiff's counsel of record James S. Yu stated on the record: 'Did we actually open up every single document of the 44,000 files? No.' (ECF No. 43-3 at 8:17–18);

**(b)** Section III(b)(ii) of the Forensic Inspection Protocol (ECF No. 55) required Plaintiff, within five (5) business days of receiving Initial Reports from neutral examiner iDS, to provide a listing of records by unique identifier that Plaintiff reasonably believes contain Confidential Information and/or Work;

**(c)** Plaintiff did not designate or promote approximately 79,000 files identified in said Initial Reports within said five-day period, and Plaintiff's counsel of record Jacob Oslick confirmed in writing that 'the 79,000 documents that were not promoted for review were, unsurprisingly, not reviewed' and that Plaintiff's promotion decisions were based on metadata 'and not review of the content of every single file' (ECF No. 54-6 at p. 3);

**(d)** with respect to the subset of 6,693 files Plaintiff promoted for review, Plaintiff's counsel of record Matthew Christoff stated in written correspondence dated July 20, 2026 that under the Forensic Protocol a document 'must be remediated' if it contains EPAM's Confidential Information and/or Work 'even if it does not contain a trade secret under the DTSA'; and

**(e)** as of the date of this Request, Plaintiff has not served or produced an individualized trade secret identification list specifying which specific files among either said 79,000 unpromoted files or said 6,693 promoted files constitute protectable trade secrets of Plaintiff.

**Request for Admission No. 144:**

Admit that:

**(a)** Exhibit B of the Forensic Protocol mandated targeted searches across Defendant's devices for over 100 specific source code filenames for Plaintiff's AI Cohort Generator (including developments variously known within EPAM as 'Prometheus,' 'Prometheus Platform,' or 'Prometheus Federated Data Analytics Platform') and eight (8) specific Python packages and wheels for Plaintiff's 'ETL Kit' (including `cdmkit` and `cdmkit-1.7.8-py2.py3-none-any.whl`);

**(b)** the neutral forensic scan conducted by neutral examiner iDS across Defendant's personally owned desktop workstation (designated by iDS as Device A0001, Make: MSI, S/N: MSB0Y2O7S0104130) returned zero (0) hits for the targeted Cohort Generator source code and zero (0) hits for the targeted `cdmkit` Python wheels; and

**(c)** the neutral forensic scan conducted by neutral examiner iDS across all ten (10) collected computing devices returned zero (0) matching source code files for Plaintiff's AI Cohort Generator, ETL Kit (`cdmkit`), or AI Accelerator (including developments variously known within EPAM as 'EPAM Synapse,' 'Synapse,' or 'Takeda-Synapse').

**Request for Admission No. 145:**

Admit that:

**(a)** 'de-NISTing' (filtering candidate and collected file hashes against public reference databases such as the NIST National Software Reference Library (NSRL) pursuant to NIST SP 800-86 and the CIRCL HashLookup database) is an established digital forensic practice to exclude known benign operating system and public third-party software;

**(b)** the candidate hash list Plaintiff submitted as Exhibit C of the Forensic Protocol included cryptographic hashes representing empty or 0-byte files (including standard empty-file hashes MD5 `d41d8cd98f00b204e9800998ecf8427e` and SHA-256 `e3b0c44298fc1c149afbf4c8996fb92427ae41e4649b934ca495991b7852b855`) and generic Git repository templates (such as `.git/info/exclude` and `applypatch-msg.sample`) on Defendant's personally owned desktop workstation (designated by neutral forensic examiner iDS as Device A0001, Make: MSI, S/N: MSB0Y2O7S0104130);

**(c)** Plaintiff rejected Defendant's formal written demand in April 2026 to instruct neutral examiner iDS to perform automated de-NISTing, with the result that known benign operating-system files, empty-file hash collisions, and Git-template artifacts remained throughout Plaintiff's discovery review spreadsheet `EPAMR-06448.A0001-III-a-i-KWResponsive.xlsx`; and

**(d)** at least 755 of the cryptographic hashes Plaintiff designated for searching are verified in the public CIRCL HashLookup database as corresponding directly to publicly available, benign open-source software files (including Ubuntu dependencies and Boost C++ libraries).

**Request for Admission No. 146:**

Admit that:

**(a)** in the global forensic review listings produced by neutral examiner iDS across all ten (10) collected computing devices pursuant to Section III(a) of the Forensic Protocol (ECF No. 55), the overwhelming majority of all entries flagged as matching Plaintiff's search criteria were identified by textual keyword strings or filenames (Protocol Exhibits A, B, and BC) rather than exact cryptographic file hashes (Protocol Exhibit C);

**(b)** entries attributable to exact cryptographic file hashes from Protocol Exhibit C constituted only a small fraction of all matching entries globally across said collected devices, and included hash collisions mapping to empty files and standard Git repository templates (including `.git/info/exclude` and `applypatch-msg.sample`); and

**(c)** the most frequent criteria matches reflected in said listings across Defendant's devices consisted of generic software licensing, graphical, and developer boilerplate terms — including 'LICENSE', '1.svg', 'Core', 'index', 'Threads', 'BUILD', and the standard Python package initializer '`__init__.py`' — each of which generated thousands of matching entries in said listings.

**Request for Admission No. 147:**

Admit that:

**(a)** during recruitment discussions in October and November 2024, Gregory Klebanov represented to Dr. Rao that EPAM's Life Sciences Data Science practice had an existing baseline annual revenue of approximately $2,000,000, that Dr. Rao would manage a dedicated team of 8 to 10 data scientists upon joining EPAM, and that the acquired Odysseus Data Services business line possessed an operational enterprise data network generating stable commercial margins;

**(b)** Gregory Klebanov made said financial, team, and infrastructure representations to induce Dr. Rao to accept EPAM's offer of employment and execute the Employment Covenants Agreement on November 12, 2024 (Amended Complaint, ECF No. 30-1, Exhibit A);

**(c)** following Dr. Rao's commencement of employment on November 18, 2024, the actual baseline annual revenue of the practice, the dedicated billable data science staffing, and the funded Odysseus client pipeline were materially below the figures and resources Gregory Klebanov had described during recruitment; and

**(d)** EPAM's internal financial records reflect that the Life Sciences Data Science practice's actual annual revenue baseline at the time of Dr. Rao's recruitment was materially below the approximately $2,000,000 figure represented by Gregory Klebanov.

Dated: August 16, 2026

Respectfully submitted,

/s/ Dr. Gowtham A. Rao
**Dr. Gowtham A. Rao, MD, PhD**
*Defendant and Counterclaim-Plaintiff Pro Se*
184 Mansgrove Rd
Princeton, NJ 08540
Phone: (803) 386-7890
Email: `gowthamrao.litigation@gmail.com`

---

## CERTIFICATE OF SERVICE

I hereby certify that on **August 16, 2026**, a true and correct copy of the foregoing **Defendant Dr. Gowtham Rao's Third Set of Requests for Admission to Plaintiff EPAM Systems, Inc. (RFAs 120–147)** was served via electronic mail pursuant to Fed. R. Civ. P. 5(b)(2)(E) and the parties' established course of electronic service upon Plaintiff's counsel of record:

- **Jacob Oslick, Esq.** (`joslick@seyfarth.com`)
- **James S. Yu, Esq.** (`jyu@seyfarth.com`)
- **Matthew Christoff, Esq.** (`MChristoff@seyfarth.com`)
- **Brooke Gary, Esq.** (`brgary@seyfarth.com`)

*Seyfarth Shaw LLP*

620 Eighth Avenue

New York, NY 10018

/s/ Dr. Gowtham A. Rao

**Dr. Gowtham A. Rao, MD, PhD** (*Defendant Pro Se*)

Email: `gowthamrao.litigation@gmail.com`