# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

--------------------------------------------------------- x

| | | |
|---|---|---|
| **EPAM SYSTEMS, INC.,**<br>*Plaintiff / Counterclaim-Defendant,*<br><br>*v.*<br><br>**GOWTHAM RAO,**<br>*Defendant / Counterclaim-Plaintiff.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Civil Action No. 2:25-cv-06260-WB**<br>*Hon. Wendy Beetlestone, C.J.* |

--------------------------------------------------------- x

## DEFENDANT DR. GOWTHAM RAO'S FOURTH SET OF REQUESTS FOR ADMISSION TO PLAINTIFF EPAM SYSTEMS, INC. (RFAS 148–186)

***Whistleblower Retaliation, Takeda Intellectual Property Ownership, Pretextual PIP & Post-Termination Commercial Interference***

**PROPOUNDING PARTY:** Defendant / Counterclaim-Plaintiff Dr. Gowtham Rao, MD, PhD (*Pro Se*)
**RESPONDING PARTY:** Plaintiff / Counterclaim-Defendant EPAM Systems, Inc.
**SET NUMBER:** Four (Set 4: Requests Nos. 148 through 186)

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure and Local Civil Rule 26.1 of the United States District Court for the Eastern District of Pennsylvania, Defendant and Counterclaim-Plaintiff Dr. Gowtham Rao ("Dr. Rao"), proceeding *pro se*, hereby requests that Plaintiff and Counterclaim-Defendant EPAM Systems, Inc. ("EPAM") make the following admissions within thirty (30) days after the date of service of this request.

## I. INSTRUCTIONS

1. **Addressee and Scope:** This Fourth Set of Requests for Admission (the "RFAs") is addressed to EPAM Systems, Inc., its subsidiaries, affiliates, divisions, managing agents, officers, directors, employees, forensic investigators, attorneys, or any other persons acting on its behalf.

2. **Separation and Completeness of Responses (Rule 36(a)(4)):** Each matter of which an admission is requested shall be separately stated. Where a numbered request contains lettered subparts (e.g., (a), (b), (c), (d)), each subpart constitutes a separate, independently answerable factual proposition, and the responding party may, and is requested to, admit, qualify, or deny each lettered subpart separately. Consistent with Fed. R. Civ. P. 36(a)(4) and 36(a)(5), the grounds for any objection must be stated with specificity, and where good faith permits admission of part of a request, the responding party shall

specify so much of it as is true and qualify or deny the remainder; the lettered subparts are independently answerable for this purpose.

3. **Good-Faith Qualification Standard:** A denial shall fairly meet the substance of the requested admission, and when good faith requires that a party qualify an answer or deny only a part of the matter of which an admission is requested, the party shall specify so much of it as is true and qualify or deny the remainder, pursuant to Fed. R. Civ. P. 36(a)(4).

4. **Reasonable Inquiry Requirement:** An answering party may not give lack of information or knowledge as a reason for failure to admit or deny unless the party states that the party has made reasonable inquiry and that the information known or readily obtainable by the party is insufficient to enable the party to admit or deny, pursuant to Fed. R. Civ. P. 36(a)(4).

5. **Scope of Reasonable Inquiry:** The reasonable inquiry required by Rule 36(a)(4) encompasses an exhaustive search of all records, communications, electronic mail archives, Slack and Microsoft Teams message histories, Barista and internal chat logs, client pitch presentations, Concur expense records, Bitbucket and Git repositories, CloudTrail and Microsoft 365 Unified Audit Logs, Telescope HR and staffing systems, neutral forensic examiner databases, Relativity workspaces, endpoint telemetry logs, public open-source software repositories, and all information in the possession, custody, or control of EPAM, its officers, directors, managing agents, employees, forensic vendors, and outside litigation counsel.

6. **Restatement of Request:** The full text of the RFA to which the answer is intended to respond is to be restated immediately preceding such answer.

7. **Conclusiveness of Admissions (Rule 36(b)):** Any matter admitted under Rule 36 is conclusively established in this action unless the Court, on motion, permits the admission to be withdrawn or amended pursuant to Fed. R. Civ. P. 36(b).

8. **Expense-Shifting Sanctions (Rule 37(c)(2)):** If Plaintiff fails to admit what is requested under Rule 36, and Defendant later proves a document to be genuine or the matter true, Defendant will apply to the Court under Fed. R. Civ. P. 37(c)(2) for an order requiring Plaintiff to pay the reasonable expenses, including reasonable expert fees and costs, incurred in making that proof.

9. **Duty to Supplement (Rule 26(e)(1)):** Pursuant to Fed. R. Civ. P. 26(e)(1), Plaintiff is under a continuing duty to supplement or correct its disclosures and responses in a timely manner if Plaintiff learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to Defendant during the discovery process or in writing.

10. **Sufficiency of Answers or Objections (Rule 36(a)(6)):** Pursuant to Fed. R. Civ. P. 36(a)(6), Defendant reserves the right to move the Court to determine the sufficiency of an answer or objection. Unless the Court determines that an objection is justified, it will order that an answer be served. On finding that an answer does not comply with Rule 36, the Court may order either that the matter is admitted or that an amended answer be served.

## II. DEFINITIONS

The following definitions apply to each Request for Admission herein:

1. **"EPAM"**, **"Plaintiff"**, or **"Company"** means Plaintiff EPAM Systems, Inc., including its subsidiaries, affiliates, predecessors, successors, parents, divisions, and its current and former officers, directors, employees, agents, representatives, and attorneys.

2. **"Dr. Rao"** or **"Defendant"** means Defendant Dr. Gowtham Rao, MD, PhD, in his individual and professional capacity as a physician, biomedical researcher, data scientist, author, keynote speaker, and independent consultant, as well as in his capacity as a founder, officer, or contractor of CoReason, Inc. or Scientific Informatics, LLC.

3. **"Employment Covenants Agreement"** or **"ECA"** means the Employment Covenants Agreement dated November 12, 2024, attached as Exhibit A to EPAM's Complaint (ECF No. 1-1) and First Amended Complaint (ECF No. 30-1).

4. **"Takeda Master Services Agreement"** or **"Takeda MSA"** means the Master Services Agreement entered into as of June 1, 2019 by and between Millennium Pharmaceuticals, Inc., a wholly owned subsidiary of Takeda Pharmaceutical Company Limited ("Takeda"), and Odysseus Data Services, Inc. (subsequently acquired by EPAM), filed at ECF No. 33-1.

5. **"Takeda"** means Millennium Pharmaceuticals, Inc., Takeda Pharmaceutical Company Limited, and their corporate affiliates and subsidiaries.

6. **"Gilead"** or **"Gilead Sciences"** means Gilead Sciences, Inc. and its corporate affiliates.

7. **"[redacted]"** or **"[redacted]"** means [redacted], and their corporate affiliates.

8. **"Sanofi"** means Sanofi S.A. and its corporate affiliates.

9. **"Johnson & Johnson"** or **"J&J"** means Johnson & Johnson Services, Inc., Janssen Pharmaceuticals, and their corporate affiliates.

10. **"CoReason"** or **"CoReason, Inc."** means CoReason, Inc., a Delaware corporation incorporated on or about October 16, 2025, and any business, consulting, or technical activities conducted by or through Dr. Rao under that name.

11. **"Odysseus Acquisition"** means EPAM's corporate acquisition of Odysseus Data Services, Inc. in or around 2024.

12. **"Prometheus"** or **"Prometheus Platform"** means the software referred to in EPAM's pleadings and filings in this action as the "Prometheus" platform, including developments variously known within EPAM as "Prometheus," "Prometheus Platform," or "Prometheus Federated Data Analytics Platform."

13. **"Synapse"** means the software referred to in EPAM's pleadings and filings in this action variously as "EPAM Synapse," "Synapse," or "Takeda-Synapse," including the repository and infrastructure namespaces reflected in EPAM's own exhibit at ECF No. 3-6 (including `takeda-synapse-infra`).

14. **"MedRAG"** means the software development identified as "MedRag (another EPAM development)" in the Supplemental Declaration of Gregory Klebanov (ECF No. 58-28 ¶ 3), which together with Synapse is there described as comprising "AI Accelerator."

15. **"ETL Conversion Kit"** means the toolset referred to in EPAM's pleadings and filings in this action as the "ETL Conversion Kit" (see, e.g., ECF No. 58-2).

16. **"Telescope"** or **"Telescope HR"** means EPAM's enterprise human resources, staffing, and project performance tracking system.

17. **"Performance Improvement Plan"** or **"PIP"** means the 30-day performance conditions, including a revenue target of approximately $2.5 million, proposed or communicated to Dr. Rao on or about September 26, 2025.

18. **"Workstation A0001"** or **"MSI Desktop Workstation"** means Dr. Rao's personally owned desktop computer designated by neutral forensic examiner iDS as Device A0001 (Make: MSI, Serial Number: MSB0Y2O7S0104130).

19. **"Forensic Inspection Protocol"** or **"Protocol"** means the Stipulated Forensic Inspection Protocol Agreement executed by the parties on December 12, 2025.

20. **"First Amended Complaint"** or **"FAC"** means Plaintiff's First Amended Complaint filed on the docket on March 27, 2026 (ECF No. 30).

## III. REQUESTS FOR ADMISSION

**Request for Admission No. 148:**

Admit that:

**(a)** prior to September 23, 2025, EPAM or Odysseus Data Services, Inc. lost business of [redacted], Genentech, or an affiliated [redacted] entity in connection with a dispute concerning deliverables or intellectual property developed for that client;

**(b)** in the internal chat filed by Dr. Rao as Exhibit B to his Answer and Counterclaims (ECF No. 33-2 at p. 2) and separately filed by EPAM (ECF No. 43-7), EPAM employee Katie Barista transmitted to Dr. Rao a written message relaying EPAM In-House Legal's advice that Odysseus 'should not demo this for anyone else unless the MSA has been amended' to provide for background intellectual property ownership 'or Takeda gives express permission to share it';

**(c)** the same relayed written legal advice stated, in substance, that EPAM 'lost all of [redacted] business,' would not 'get it back for a generation,' and 'barely avoided lawsuit with [redacted]'; and

**(d)** between September 23, 2025 and October 15, 2025, no EPAM officer, manager, or in-house counsel transmitted any written communication to Dr. Rao stating that the statements described in subparts (b) and (c) were inaccurate or incorrect.

**Request for Admission No. 149:**

Admit that:

**(a)** the Microsoft Teams chat filed at ECF No. 43-7 is a true and correct copy of a September 23, 2025 written exchange between Dr. Rao and EPAM employee Katie Barista conducted on EPAM's corporate messaging systems;

**(b)** in that exchange, at approximately 3:59 PM, Dr. Rao transmitted a written message stating, in substance, that he needed to do a demo but could not demo 'what we built for takeda to another potential client';

**(c)** in that exchange, Katie Barista transmitted written replies stating 'legal confirmed this yesterday' and identifying the subject of that confirmation as 'the roche/sanofi problem'; and

**(d)** no EPAM manager, executive, or in-house counsel transmitted any written response to Dr. Rao on or before October 15, 2025 disputing the statements described in subpart (b).

**Request for Admission No. 150:**

Admit that:

**(a)** in or around 2024, EPAM acquired Odysseus Data Services, Inc., and following the acquisition Gregory Klebanov served as a Vice President with profit-and-loss responsibility for the Odysseus / life sciences data science practice;

**(b)** Gregory Klebanov's compensation or acquisition consideration included earn-out or performance-linked targets tied to the post-acquisition financial performance of that practice;

**(c)** during 2025, the revenue generated by that practice declined below its historical pre-acquisition levels and fell in the lower thresholds of the financial performance targets or benchmarks established for Gregory Klebanov's post-acquisition earn-out compensation;

**(d)** prior to EPAM's 2024 corporate acquisition of Odysseus Data Services, Inc., Gregory Klebanov and EPAM Founder, CEO, and Chairman Arkadiy Dobkin maintained a pre-existing direct or indirect relationship, acquaintance, or commercial connection; and

**(e)** during Dr. Rao's recruitment, Gregory Klebanov represented to Dr. Rao that his pre-existing relationship with Arkadiy Dobkin afforded him direct executive access and operational autonomy within EPAM.

**Request for Admission No. 151:**

Admit that:

**(a)** during Dr. Rao's 2024 recruitment, EPAM personnel (including Gregory Klebanov or SVP Greg Killian) represented to Dr. Rao that he would receive full Profit and Loss (P&L) authority, a trajectory toward a Chief Medical Officer role, and a mandate to scale the life sciences unit from approximately $400 million toward $1 billion;

**(b)** during the same recruitment, EPAM personnel represented to Dr. Rao that EPAM possessed an operational, enterprise-grade 'distributed data network';

**(c)** as of November 12, 2024 — the date Dr. Rao executed the Employment Covenants Agreement — the 'distributed data network' described in subpart (b) was not deployed in production for any paying client; and

**(d)** prior to Dr. Rao's execution of the Employment Covenants Agreement, no EPAM representative disclosed to him in writing that Gregory Klebanov held acquisition-related earn-out targets tied to the financial performance of the unit Dr. Rao was being recruited to lead.

**Request for Admission No. 152:**

Admit that:

**(a)** EPAM executive leadership authorized and launched an internal marketing initiative designated the 'Star Magnet' program built around Dr. Rao's public scientific profile, with sponsorship that included Head of Marketing Jim Gatch, SVP Greg Killian, and Gregory Klebanov;

**(b)** as of September 17, 2025, Dr. Rao's records in EPAM's Telescope human-resources system contained no written reprimand, no disciplinary notice, and no documented performance deficiency, and included a March 31, 2025 '2.2 Meets' project rating and a February 10, 2025 assessment by Project Manager Raman Loseu rating Dr. Rao's impact as 'High';

**(c)** EPAM's corporate records (including Outlook calendar entries, Microsoft Teams meeting logs, ad-hoc call records, and chat communications) reflect recurring scheduled and ad-hoc meetings, calls, and written discussions between Dr. Rao and SVP Greg Killian or VP Troy Rask concerning Life Sciences and Real-World Data practice strategy during the period February 3, 2025 through August 11, 2025; and

**(d)** on or about September 17 and September 22, 2025, Gregory Klebanov and SVP Greg Killian each verbally characterized Dr. Rao's performance to him in positive terms, including as 'wonderful,' 'stellar,' or 'solid.'

**Request for Admission No. 153:**

Admit that:

**(a)** during 2022 through 2025, EPAM maintained human-resources systems of record (including the system known within EPAM as 'Telescope') that recorded each employee's assigned work country or work location;

**(b)** during the same period, EPAM required corporate network access to occur through managed security tooling — including GlobalProtect VPN and the OPSWAT posture-checking agent referenced in EPAM's Acceptable Use of IT Resources Policy — that generated log records reflecting the connecting device and connection origin;

**(c)** EPAM's Acceptable Use of IT Resources Policy (filed with EPAM's own moving papers, ECF No. 30-3) stated that it is 'forbidden to allow the computer device accessing the Company's network to act as a gateway between the Company's network and another network'; and

**(d)** during 2022 through 2025, EPAM operated a formal relocation program through which employees' assigned work countries were updated in its human-resources systems upon approved relocation.

**Request for Admission No. 154:**

Admit that:

**(a)** during 2024 and 2025, EPAM or Odysseus Data Services, Inc. performed data science, analytics, or software services for Gilead Sciences, Inc. under one or more Master Services Agreements, Statements of Work, or work orders;

**(b)** the work performed for Gilead included processing or analyzing longitudinal patient-level healthcare claims datasets licensed by Gilead from one or more third-party data vendors;

**(c)** one or more instruments governing that work — including client data-security requirements or data-vendor license terms applicable to U.S. Medicare or Medicaid data — restricted or prohibited access to the licensed data by personnel located in one or more designated foreign jurisdictions; and

**(d)** EPAM was contractually obligated to Gilead to comply with the data-access restrictions described in subpart (c).

**Request for Admission No. 155:**

Admit that:

**(a)** during 2024 or 2025, one or more individuals performing work on the Gilead Sciences account were physically located in Belarus, Russia, or Serbia while performing that work;

**(b)** EPAM represented to Gilead Sciences that an individual performing work on the account, Anna Tauetekova, was operating from within the United States;

**(c)** at one or more times when the representation described in subpart (b) was outstanding, Anna Tauetekova was physically located in and working from Serbia; and

**(d)** EPAM's own human-resources or telemetry records (including Telescope work-location entries, GlobalProtect connection logs, or Entra ID sign-in logs) reflected, at the relevant times, the actual physical locations of one or more personnel described in subpart (a).

**Request for Admission No. 156:**

Admit that:

**(a)** Gregory Klebanov directed a Belarus-based employee, Alexander Alexeuk, to perform work in a manner that bypassed one or more federal or client security protocols applicable to the account;

**(b)** one or more personnel located in Belarus, Russia, or another restricted jurisdiction participated in Gilead account work through screen-sharing sessions or through access under another individual's session or credentials;

**(c)** network connections for one or more such personnel were routed through intermediate VPN gateways, proxy nodes, or egress points located outside the personnel's actual physical jurisdiction (including, but not limited to, gateway infrastructure in the Republic of Serbia); and

**(d)** no written authorization from Gilead Sciences approved the practices described in subparts (a) through (c).

**Request for Admission No. 157:**

Admit that:

**(a)** in or before September 2025, an employee of Gilead Sciences communicated to Dr. Rao a concern regarding the physical locations of EPAM personnel performing work on the Gilead account;

**(b)** in or around September 2025, Dr. Rao escalated concerns regarding the staffing and location practices on the Gilead account to his supervisor Gregory Klebanov and to Senior Program Manager Lucy McDermott, and objected to those practices;

**(c)** Dr. Rao declined to participate in staffing or location-reporting practices on the Gilead account that he identified as inconsistent with client or legal requirements; and

**(d)** the escalation and objection described in subparts (b) and (c) occurred before September 17, 2025, the date on which Gregory Klebanov first communicated to Dr. Rao that his position was being eliminated.

**Request for Admission No. 158:**

Admit that:

**(a)** between September 1, 2025 and October 15, 2025, EPAM did not open a documented internal compliance investigation into the Gilead staffing and location practices described in Dr. Rao's escalation;

**(b)** during the same period, EPAM did not engage any outside counsel, auditor, or consultant to investigate those practices;

**(c)** during the same period, EPAM did not report the escalated concerns to Gilead Sciences or to any governmental authority; and

**(d)** prior to October 15, 2025, no EPAM compliance, legal, or HR function interviewed Dr. Rao regarding the substance of his Gilead escalation.

**Request for Admission No. 159:**

Admit that:

**(a)** the Master Services Agreement filed as Exhibit A to Dr. Rao's Answer and Counterclaims (ECF No. 33-1) was entered into as of June 1, 2019 by and between Millennium Pharmaceuticals, Inc., a wholly owned subsidiary of Takeda Pharmaceutical Company Limited, and Odysseus Data Services, Inc.;

**(b)** Section 12 of that Agreement provides that materials prepared in the performance of services 'are "works for hire," shall be the sole and exclusive property of Takeda and copyright therein shall immediately vest in Takeda';

**(c)** Section 12 further provides that, to the extent any such property is not a work for hire, the company 'hereby assigns and agrees to assign to Takeda... all rights including copyright in such property, ideas and materials'; and

**(d)** Section 25 of that Agreement provides that '[i]n the event of any conflict between the provisions of this Agreement and the provisions of any PWO, the terms of this Agreement shall prevail.'

**Request for Admission No. 160:**

Admit that:

**(a)** software functionality that EPAM's pleadings describe as the 'AI Cohort Generator' and as the Prometheus platform (including developments variously known within EPAM as 'Prometheus,' 'Prometheus Platform,' or 'Prometheus Federated Data Analytics Platform') was developed in whole or in part pursuant to work orders or Statements of Work funded by Takeda;

**(b)** developer time for that work was billed or allocated to Takeda-related project, client, or corporate investment billing codes (including, but not limited to, codes containing 'TKDA', 'TKDA-DSFX', 'TKDA-ESFX', 'TKDA-OSFX', 'TKDA-SYNPS', 'TAKEDA', 'TAKEDA-SYNAPSE', 'SYNP', or 'EPMC-SYNP');

**(c)** during that development, Dr. Rao served in a technical leadership role on the Takeda engagement pursuant to his assigned EPAM duties; and

**(d)** the source code repositories containing that work were not segregated into a repository designated as EPAM-proprietary and separate from the Takeda deliverable repositories.

**Request for Admission No. 161:**

Admit that:

**(a)** data loading or ETL scripts associated with the toolset EPAM's pleadings describe as the 'ETL Conversion Kit' were revised, rewritten, or further developed during the Takeda engagement;

**(b)** on September 20, 2025, Dr. Rao transmitted a written communication to EPAM employee Katie Barista via corporate email (filed within ECF No. 33-2 at p. 3) stating, among other things, that 'we do not have any pre-existing IP in this solution' and that the prior data loading scripts 'were all sphagetti and incomplete before and we re-did all of those for Takeda';

**(c)** EPAM received the September 20, 2025 communication described in subpart (b) on its corporate email, Microsoft Teams, or other corporate messaging systems; and

**(d)** no EPAM manager, executive, or in-house counsel transmitted a written response to Dr. Rao via email, Microsoft Teams, or other corporate messaging systems on or before October 15, 2025 disputing the statements quoted in subpart (b).

**Request for Admission No. 162:**

Admit that:

**(a)** EPAM source-code repository or infrastructure paths associated with the software variously known within EPAM as 'EPAM Synapse,' 'Synapse,' or 'Takeda-Synapse' included a repository or namespace designated `takeda-synapse-infra`, as reflected in EPAM's own exhibit filed at ECF No. 3-6;

**(b)** as EPAM stated at ECF No. 58-2 at 3 n.2, "Synapse' is not the final tradename for the software, only an in-development name';

**(c)** as EPAM's declarant Gregory Klebanov stated at ECF No. 58-28 ¶ 3, 'Synapse and MedRag (another EPAM development) together are referred to as AI Accelerator'; and

**(d)** prior to October 15, 2025, EPAM had not released or licensed any product under the name 'Synapse' to any client other than in connection with the Takeda engagement.

**Request for Admission No. 163:**

Admit that:

**(a)** on or about September 9, 2025 and September 20, 2025, Dr. Rao transmitted written communications via EPAM's corporate email, Microsoft Teams, or other corporate messaging systems (filed within ECF No. 33-2 at pp. 3–4) requesting legal review of whether work built under the Takeda engagement could be demonstrated to a third party;

**(b)** the September 20, 2025 written communication stated, among other things, 'There is a request to do a demo from J&J, but is it something we truly can demo?' and 'We need absolute clarity from Legal on this before we schedule anything';

**(c)** EPAM received the written communications described in subpart (a) on its corporate email, Microsoft Teams, or other corporate messaging systems before October 15, 2025; and

**(d)** Dr. Rao declined to conduct a demonstration of Takeda-funded work for Johnson & Johnson unless and until such legal clarity was obtained.

**Request for Admission No. 164:**

Admit that:

**(a)** in September 2025, EPAM employee Katie Barista consulted EPAM In-House Legal regarding ownership of work built under the Takeda engagement and relayed Legal's responses to Dr. Rao in writing;

**(b)** one such relayed written response stated, in substance, that the SOW identified the accelerator code as pre-existing IP that Odysseus presumably owns, but that 'the MSA makes no allowance for pre-existing IP,' that 'everything we build belongs to Takeda,' and that 'the MSA controls over the SOW in the event of conflict between the terms of the two documents';

**(c)** one such relayed written message stated 'legal said nope. You were right SOW said cool but MSA is not'; and

**(d)** EPAM has not produced or identified in this litigation any written legal opinion dated prior to October 15, 2025 concluding that EPAM or Odysseus, rather than Takeda, owned the work built under the Takeda engagement.

**Request for Admission No. 165:**

Admit that:

**(a)** on September 17, 2025, Gregory Klebanov communicated to Dr. Rao that his position was being eliminated or that he was being separated from his role;

**(b)** in that communication, Mr. Klebanov cited corporate budgetary constraints and a flat or declining Real-World Data pipeline as the reason;

**(c)** in or around the same communication, a transfer of Dr. Rao to the consulting group led by Dr. Chris Waller was proposed or discussed as an alternative; and

**(d)** in that September 17, 2025 communication, Mr. Klebanov did not state that Dr. Rao was being separated for poor performance or for cause.

**Request for Admission No. 166:**

Admit that:

**(a)** on or about September 18, 2025, SVP Greg Killian met with Dr. Rao following Gregory Klebanov's September 17, 2025 layoff notice;

**(b)** in that meeting, transfer or redeployment options within EPAM for Dr. Rao were discussed;

**(c)** in that meeting, Mr. Killian did not state that Dr. Rao was being separated for poor performance or misconduct; and

**(d)** on or about September 22, 2025, Mr. Killian characterized Dr. Rao's performance to him in positive terms.

**Request for Admission No. 167:**

Admit that:

**(a)** on or about September 22, 2025, Dr. Rao met with EPAM HR leader Larry McKlaine concerning his separation;

**(b)** on or about September 23, 2025, Dr. Rao communicated to HR that he would not resign voluntarily and would accept a performance plan only if EPAM produced objective, pre-existing, documented goals;

**(c)** on or about September 30, 2025, Dr. Rao transmitted a written email on EPAM's corporate systems under the subject 'Gowtham and EPAM - concrete (documented) next steps' (filed at ECF No. 33-7) memorializing his requests for documented terms; and

**(d)** EPAM received the September 30, 2025 email described in subpart (c), and no EPAM representative responded in writing disputing Dr. Rao's account of the September meetings.

**Request for Admission No. 168:**

Admit that:

**(a)** on or about September 26, 2025, Gregory Klebanov communicated to Dr. Rao a performance improvement plan or proposed performance conditions that included a revenue target of approximately $2.5 million;

**(b)** the September 2025 communication alleged that Dr. Rao had failed to achieve 'target revenue' and 'profit margins';

**(c)** prior to September 18, 2025, EPAM had not established, communicated, or documented any specific revenue targets for Dr. Rao's role in its performance-management systems; and

**(d)** the practice unit's historical peak revenue was approximately [redacted]

**Request for Admission No. 169:**

Admit that:

**(a)** EPAM terminated Dr. Rao's employment on October 15, 2025, and Dr. Rao did not resign;

**(b)** in submissions or responses to the State of New Jersey Department of Labor and Workforce Development concerning Dr. Rao's unemployment claim, EPAM did not classify the separation as a termination for misconduct, and the State thereafter awarded Dr. Rao unemployment benefits;

**(c)** in the Stipulated Consent Order entered December 10, 2025 (ECF No. 20), EPAM agreed that 'because Defendant's employment was involuntarily terminated, Section 5(c) of the Employee Covenants Agreement... regarding Noncompetition is not at issue'; and

**(d)** EPAM did not contest or appeal the State of New Jersey's award of unemployment benefits to Dr. Rao.

**Request for Admission No. 170:**

Admit that:

**(a)** on September 17, 2025, the reason communicated to Dr. Rao for his separation was budgetary (as described in RFA No. 165);

**(b)** on or about September 26, 2025, the reason communicated shifted to performance, in the form of the PIP conditions described in RFA No. 168;

**(c)** in its Amended Complaint, EPAM alleged that Dr. Rao 'was terminated for cause on October 15, 2025' (ECF No. 30 ¶ 3); and

**(d)** prior to October 12, 2025, EPAM had not communicated to Dr. Rao any of the conduct grounds recited in ECF No. 30 ¶ 3 as a basis for his separation.

**Request for Admission No. 171:**

Admit that:

**(a)** on October 16, 2025, EPAM employee Gaurav Dravida initiated contact with Dr. Rao via Microsoft Teams;

**(b)** the Microsoft Teams exchange filed by EPAM in support of its emergency application (ECF No. 3-7) is an excerpt of the same exchange filed unredacted as Exhibit E to Dr. Rao's Answer and Counterclaims (ECF No. 33-5);

**(c)** in the version filed at ECF No. 3-7, the name and identity of the EPAM employee counterparty were redacted or not disclosed; and

**(d)** EPAM's emergency application did not disclose to the Court that the exchange was initiated by a current EPAM employee.

**Request for Admission No. 172:**

Admit that:

**(a)** on or about October 2, 2025, Dr. Rao transmitted to EPAM Senior Manager Larry McKlaine, with copy to June Dinitz, a series of written emails designated E01 through E04, including E01 titled 'Documentation of Agreed Position and Employment Status' and E04 concerning his independent, non-proprietary development work;

**(b)** on October 2, 2025, Larry McKlaine transmitted a written reply stating 'This is to confirm that I have received your emails (E01 through E04) and will respond accordingly,' and acknowledging Dr. Rao's 'request to withdraw your previous request for a mutually agreed separation';

**(c)** Larry McKlaine and June Dinitz each executed declarations submitted in support of EPAM's emergency application in this action; and

**(d)** the declarations described in subpart (c) did not disclose to the Court the E01–E04 communications or McKlaine's October 2, 2025 written acknowledgment.

**Request for Admission No. 173:**

Admit that:

**(a)** on October 31, 2025, EPAM's counsel James Yu transmitted to Dr. Rao a letter titled 'Cease and Desist and Notice Pursuant to Fed. R. Civ. P. 65 on Behalf of EPAM Systems, Inc.';

**(b)** on November 4, 2025, EPAM filed its Complaint and an application for emergency injunctive relief in this Court;

**(c)** by Order dated November 7, 2025 (ECF No. 10), the Court denied EPAM's Motion for a Temporary Restraining Order and Expedited Discovery and scheduled a preliminary-injunction hearing; and

**(d)** as of November 4, 2025, EPAM had not completed any documented internal investigation into the Gilead staffing escalation or the Takeda IP escalation described in RFAs 157 and 163.

**Request for Admission No. 174:**

Admit that:

**(a)** the software tools EPAM identifies in this litigation as trade secrets include the ETL Conversion Kit, the AI Cohort Generator, and the software variously known within EPAM as 'EPAM Synapse,' 'Synapse,' or 'Takeda-Synapse' (ECF No. 58-2);

**(b)** prior to October 15, 2025, source code for one or more of those tools resided in repositories that also contained code authored, funded, or deliverable under the Takeda engagement;

**(c)** prior to October 15, 2025, EPAM did not maintain a separate repository, designated as containing only EPAM-proprietary code and no client-deliverable code, for the tools described in subpart (a); and

**(d)** prior to October 15, 2025, Takeda and EPAM (or Odysseus) had not executed any written amendment to the governing Master Services Agreement (ECF No. 33-1) granting EPAM or Odysseus a license, assignment, or carve-out to commercialize or demonstrate for other clients work product developed under the Takeda engagement.

**Request for Admission No. 175:**

Admit that:

**(a)** prior to October 15, 2025, EPAM did not develop, maintain, or possess a separate, standalone software product named 'EPAM Synapse' that was independently built without incorporating source code, architecture, or deliverables created under the Takeda engagement;

**(b)** prior to October 15, 2025, EPAM maintained no internal budget line, capitalized development project, or funded R&D workstream for a 'Synapse' software product independent of client-funded engagements;

**(c)** prior to October 15, 2025, EPAM had not sold, licensed, or deployed 'Synapse' (variously labeled in EPAM's pleadings as 'EPAM Synapse,' 'AI Cohort Generator,' or 'AI Accelerator') to any client other than in connection with the Takeda engagement;

**(d)** the software functionality that EPAM claims as proprietary trade secrets in this action embodies the same essential architecture and components developed during the Takeda engagement period; and

**(e)** EPAM's declarant stated at ECF No. 58-25 ¶ 8 that the 'Architectural Vision' document 'would provide a substantial foundation for recreating Synapse as it exists today.'

**Request for Admission No. 176:**

Admit that:

**(a)** the OMOP Common Data Model and associated OHDSI vocabularies and tooling were publicly available prior to June 1, 2019, the effective date of the Takeda MSA;

**(b)** the ETL Conversion Kit identified in EPAM's filings performs extraction, transformation, and loading of data into OMOP-based structures;

**(c)** EPAM managers or executives had contemporaneous knowledge, during Dr. Rao's employment, of his public open-source releases through OHDSI GitHub repositories (including the LlmPromptBuilders package); and

**(d)** EPAM did not instruct Dr. Rao to cease his OHDSI open-source activities at any time prior to October 15, 2025.

**Request for Admission No. 177:**

Admit that:

**(a)** as stated in the Klebanov Supplemental Declaration (ECF No. 58-28 ¶ 3), 'Synapse and MedRag (another EPAM development) together are referred to as AI Accelerator';

**(b)** MedRAG and Synapse are separate software developments with distinct codebases and distinct primary functions;

**(c)** MedRAG's primary function concerns biomedical literature retrieval or retrieval-augmented generation, and it is not a cohort-analytics platform; and

**(d)** EPAM's allegation that Dr. Rao downloaded 'AI Accelerator' source code (Klebanov Decl. ¶ 40, as glossed by ECF No. 58-28 ¶ 3) does not identify which of the two components — Synapse or MedRAG — any particular file belonged to.

**Request for Admission No. 178:**

Admit that:

**(a)** during Dr. Rao's employment, Workstation A0001 accessed EPAM systems while the OPSWAT MetaAccess agent reported the device as compliant with EPAM's security policy;

**(b)** EPAM's identity and endpoint management tenant records (including Microsoft Entra ID sign-in logs) reflect authenticated sessions originating from Workstation A0001 during Dr. Rao's employment;

**(c)** the personally owned desktop workstation designated by neutral forensic examiner iDS as Device A0001 (Make: MSI, S/N: MSB0Y2O7S0104130) was surrendered for inspection and examined by iDS pursuant to the parties' stipulated Forensic Inspection Protocol; and

**(d)** iDS transmitted its forensic investigation report concerning Device A0001 to counsel for both parties on or about January 12, 2026.

**Request for Admission No. 179:**

Admit that:

**(a)** during Dr. Rao's employment, EPAM assigned to him or utilized for his work one or more internal employee project codes, corporate investment codes, or client billing codes (including, but not limited to, codes containing 'TKDA', 'TKDA-DSFX', 'TKDA-ESFX', 'TKDA-OSFX', 'TKDA-SYNPS', 'ODUS-TKDA', 'TAKEDA', 'TAKEDA-SYNAPSE', 'SYNP', 'EPMC-SYNP', 'AMNA-ODYS', 'AMNA', 'AMNA-AIRN', 'CCC-ARCH', 'CCC', or 'ODYS');

**(b)** developer time recorded by or for Dr. Rao was allocated in EPAM's timekeeping systems against one or more of the codes described in subpart (a);

**(c)** repository or directory paths inventoried by neutral forensic examiner iDS from the examined devices and accounts (including, but not limited to, paths containing 'amna-airn', 'amna-odys', 'takeda-synapse', or 'synapse') correspond to client engagements or corporate projects associated with the codes described in subpart (a); and

**(d)** EPAM's records do not reflect any written revocation, during Dr. Rao's employment, of his authorization to access repositories or directory paths associated with the codes described in subpart (a).

**Request for Admission No. 180:**

Admit that:

**(a)** on or about September 23, 2025, EPAM (through or at the direction of Gregory Klebanov) withdrew or reduced its support for Dr. Rao's activities in the OHDSI open-science community, as communicated through EPAM employee Lana Shubinsky;

**(b)** after October 15, 2025 – including in or around late October 2025 and in or around January and February 2026 – one or more EPAM executives or managers (including Gregory Klebanov) communicated with personnel of Gilead Sciences (including Alex Cash, also known as Alex Asiimwe, or Ram Varma) regarding Dr. Rao;

**(c)** one or more of the communications described in subpart (b) referenced this lawsuit, alleged data taking, or alleged misconduct by Dr. Rao, and concerned Dr. Rao in his individual professional capacity; and

**(d)** EPAM has never transmitted to Gilead Sciences any correction or retraction of the statements described in subpart (c).

**Request for Admission No. 181:**

Admit that:

**(a)** CoReason, Inc. was incorporated in Delaware on or about October 16, 2025 – after Dr. Rao's October 15, 2025 termination – and EPAM has no documents showing CoReason conducted commercial operations before that date;

**(b)** the email correspondence filed at ECF No. 33-9 reflects that on November 3, 2025, a Johnson & Johnson representative corresponded regarding a draft Statement of Work and terms for a proof-of-concept engagement for technical and scientific services to be performed by Dr. Rao (whether individually or through CoReason, Inc.);

**(c)** as stated in the Klebanov Supplemental Declaration, 'Johnson & Johnson ("J&J") is an EPAM client' (ECF No. 58-28 ¶ 5); and

**(d)** after October 15, 2025, one or more EPAM personnel communicated with Johnson & Johnson personnel regarding Dr. Rao personally, CoReason, Inc., or this lawsuit.

**Request for Admission No. 182:**

Admit that:

**(a)** the email filed at ECF No. 33-9 reflects that on November 3, 2025, a Johnson & Johnson representative wrote regarding prospective technical services by Dr. Rao and CoReason: 'We had a change in business priorities and have decided to not pursue the... activities. I have asked the team to pause the contracting activities';

**(b)** as of November 3, 2025, the proof-of-concept Statement of Work involving Dr. Rao referenced in that thread had been under active negotiation since at least October 21, 2025;

**(c)** EPAM filed its Complaint and emergency application in this Court on November 4, 2025, the day after the communication described in subpart (a); and

**(d)** EPAM does not contend that the proof-of-concept engagement involving Dr. Rao or CoReason described in ECF No. 33-9 would have used or disclosed any EPAM trade secret.

**Request for Admission No. 183:**

Admit that:

**(a)** Count VII of EPAM's original Complaint asserted a breach of contract claim related to the noncompetition provision, and EPAM withdrew that claim in its Amended Complaint (ECF No. 37; redline at ECF No. 37-4 p. 31);

**(b)** EPAM stated in its motion papers that '[b]ecause EPAM does not seek to enforce the non-competition provisions of Rao's Agreement, there is no justiciable controversy' (ECF No. 43-1 at p. 30);

**(c)** Section 5(c) of the Employment Covenants Agreement (ECF No. 37-1) imposes its post-employment restriction '[i]n the event you voluntarily resign employment'; and

**(d)** since the entry of the Stipulated Consent Order (ECF No. 20), EPAM has not sought any judicial relief enforcing a non-competition restriction against Dr. Rao.

**Request for Admission No. 184:**

Admit that:

**(a)** EPAM's motion papers describe its Life Sciences and Healthcare business as earning revenue of approximately $490 million in 2023 and over $574 million in 2024 (ECF No. 43-1 at p. 12, citing EPAM's Form 10-K for the year ended December 31, 2024);

**(b)** no client of EPAM has terminated, cancelled, or reduced any engagement with EPAM as a result of conduct by Dr. Rao alleged in this action;

**(c)** EPAM has not lost any specific, identified sale or license of the software described in its pleadings as a result of conduct by Dr. Rao alleged in this action; and

**(d)** EPAM has not identified any customer, contract, license, or revenue stream lost to Dr. Rao individually, to CoReason, Inc., or to Scientific Informatics, LLC.

**Request for Admission No. 185:**

Admit that:

**(a)** EPAM's initial disclosures served under Fed. R. Civ. P. 26(a)(1) in this action did not state a computation of any category of damages;

**(b)** as of the date of these responses, EPAM has not served a supplemental disclosure stating a computation of any category of damages;

**(c)** as of the date of these responses, EPAM has not disclosed any expert witness on the subject of damages; and

**(d)** as of the date of these responses, EPAM has not produced documents quantifying any claimed monetary loss caused by Dr. Rao.

**Request for Admission No. 186:**

Admit that:

**(a)** on July 8, 2026, Dr. Rao transmitted a written meet-and-confer email to EPAM's counsel of record stating, among other things, that EPAM's litigation conduct was 'actively causing me documented physical and mental health harm';

**(b)** EPAM's counsel received the July 8, 2026 email and transmitted a written response in the same thread on or about July 9, 2026;

**(c)** after receiving the July 8, 2026 notice, EPAM did not withdraw or modify the discovery demands addressed in that meet-and-confer thread; and

**(d)** as of July 8, 2026, Dr. Rao was appearing pro se in this action and personally conducting his own defense.

Dated: August 17, 2026

Respectfully submitted,

/s/ Dr. Gowtham A. Rao
**Dr. Gowtham A. Rao, MD, PhD**
*Defendant and Counterclaim-Plaintiff Pro Se*
184 Mansgrove Rd
Princeton, NJ 08540
Phone: (803) 386-7890
Email: `gowthamrao.litigation@gmail.com`

## CERTIFICATE OF SERVICE

I hereby certify that on **August 17, 2026**, a true and correct copy of the foregoing **Defendant Dr. Gowtham Rao's Fourth Set of Requests for Admission to Plaintiff EPAM Systems, Inc. (RFAs 148–186)** was served via electronic mail pursuant to Fed. R. Civ. P. 5(b)(2)(E) and the parties' established course of electronic service upon Plaintiff's counsel of record:

- **Jacob Oslick, Esq.** (`joslick@seyfarth.com`)
- **James S. Yu, Esq.** (`jyu@seyfarth.com`)
- **Matthew Christoff, Esq.** (`MChristoff@seyfarth.com`)
- **Brooke Gary, Esq.** (`brgary@seyfarth.com`)

*Seyfarth Shaw LLP*

620 Eighth Avenue

New York, NY 10018

/s/ Dr. Gowtham A. Rao

**Dr. Gowtham A. Rao, MD, PhD** (*Defendant Pro Se*)

Email: `gowthamrao.litigation@gmail.com`