# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

---------------------------------------------------------- x

**EPAM SYSTEMS, INC.,**
*Plaintiff / Counterclaim-Defendant,*

*v.*

**GOWTHAM RAO,**
*Defendant / Counterclaim-Plaintiff.*

**Civil Action No. 2:25-cv-06260-WB**

*Hon. Wendy Beetlestone, C.J.*

---------------------------------------------------------- x

**DEFENDANT DR. GOWTHAM RAO'S FIFTH SET OF REQUESTS FOR ADMISSION TO PLAINTIFF EPAM SYSTEMS, INC. (RFAS 187–211)**

***Litigation Hold Issuance, Forensic Telemetry Arithmetic, Clean Room Provenance, Performance Governance & Damages Preclusion***

**PROPOUNDING PARTY:** Defendant / Counterclaim-Plaintiff Dr. Gowtham Rao, MD, PhD (*Pro Se*)
**RESPONDING PARTY:** Plaintiff / Counterclaim-Defendant EPAM Systems, Inc.
**SET NUMBER:** Five (Set 5: Requests Nos. 187 through 211)

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure and Local Civil Rule 26.1 of the United States District Court for the Eastern District of Pennsylvania, Defendant and Counterclaim-Plaintiff Dr. Gowtham Rao ("Dr. Rao"), proceeding *pro se*, hereby requests that Plaintiff and Counterclaim-Defendant EPAM Systems, Inc. ("EPAM") make the following admissions within thirty (30) days after the date of service of this request.

## I. INSTRUCTIONS

1. **Addressee and Scope:** This Fifth Set of Requests for Admission (the "RFAs") is addressed to EPAM Systems, Inc., its subsidiaries, affiliates, divisions, managing agents, officers, directors, employees, forensic investigators, attorneys, or any other persons acting on its behalf.

2. **Separation and Completeness of Responses (Rule 36(a)(4)):** Each matter of which an admission is requested shall be separately stated. Where a numbered request contains lettered subparts (e.g., (a), (b), (c), (d)), each subpart constitutes an independent factual proposition. Responding party may and shall admit, qualify, or deny each lettered subpart separately pursuant to Fed. R. Civ. P. 36(a)(4). A blanket objection that a multi-subpart request is 'compound' is improper where the individual subparts are separately stated and independently answerable.

**3. Good-Faith Qualification Standard:** A denial shall fairly meet the substance of the requested admission, and when good faith requires that a party qualify an answer or deny only a part of the matter of which an admission is requested, the party shall specify so much of it as is true and qualify or deny the remainder, pursuant to Fed. R. Civ. P. 36(a)(4).

**4. Reasonable Inquiry Requirement:** An answering party may not give lack of information or knowledge as a reason for failure to admit or deny unless the party states that the party has made reasonable inquiry and that the information known or readily obtainable by the party is insufficient to enable the party to admit or deny, pursuant to Fed. R. Civ. P. 36(a)(4).

**5. Scope of Reasonable Inquiry:** The reasonable inquiry required by Rule 36(a)(4) encompasses an exhaustive search of all records, communications, electronic mail archives, Slack and Microsoft Teams message histories, Barista and internal chat logs, client pitch presentations, Concur expense records, Bitbucket and Git repositories, CloudTrail and Microsoft 365 Unified Audit Logs, Telescope HR and staffing systems, neutral forensic examiner databases, Relativity workspaces, endpoint telemetry logs, public open-source software repositories, and all information in the possession, custody, or control of EPAM, its officers, directors, managing agents, employees, forensic vendors, and outside litigation counsel.

**6. Litigation-Hold Content Disclaimer:** No Request herein seeks the text or legal analysis of any litigation-hold notice; Requests concerning litigation holds are strictly limited to the factual predicates of existence, date of issuance, and recipient identities.

**7. Restatement of Request:** The full text of the RFA to which the answer is intended to respond is to be restated immediately preceding such answer.

**8. Conclusiveness of Admissions (Rule 36(b)):** Any matter admitted under Rule 36 is conclusively established in this action unless the Court, on motion, permits the admission to be withdrawn or amended pursuant to Fed. R. Civ. P. 36(b).

**9. Expense-Shifting Sanctions (Rule 37(c)(2)):** If Plaintiff fails to admit what is requested under Rule 36, and Defendant later proves a document to be genuine or the matter true, Defendant will apply to the Court under Fed. R. Civ. P. 37(c)(2) for an order requiring Plaintiff to pay the reasonable expenses, including reasonable expert fees and costs, incurred in making that proof.

**10. Duty to Supplement (Rule 26(e)(1)):** Pursuant to Fed. R. Civ. P. 26(e)(1), Plaintiff is under a continuing duty to supplement or correct its disclosures and responses in a timely manner if Plaintiff learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to Defendant during the discovery process or in writing.

**11. Sufficiency of Answers or Objections (Rule 36(a)(6)):** Pursuant to Fed. R. Civ. P. 36(a)(6), Defendant reserves the right to move the Court to determine the sufficiency of an answer or objection. Unless the Court determines that an objection is justified, it will order that an answer be served. On finding that an answer does not comply with Rule 36, the Court may order either that the matter is admitted or that an amended answer be served.

## II. DEFINITIONS

The following definitions apply to each Request for Admission herein:

1. **"EPAM"**, **"Plaintiff"**, or **"Company"** means Plaintiff EPAM Systems, Inc., including its subsidiaries, affiliates, predecessors, successors, parents, divisions, and its current and former officers, directors, employees, agents, representatives, and attorneys.

2. **"Dr. Rao"** or **"Defendant"** means Defendant Dr. Gowtham Rao, MD, PhD, in his individual and professional capacity as a physician, biomedical researcher, data scientist, author, keynote speaker, and independent consultant, as well as in his capacity as a founder, officer, or contractor of CoReason, Inc. or Scientific Informatics, LLC.

3. **"Employment Covenants Agreement"** or **"ECA"** means the Employment Covenants Agreement dated November 12, 2024, attached as Exhibit A to EPAM's Complaint (ECF No. 1-1) and First Amended Complaint (ECF No. 30-1).

4. **"Corporate User Account"** or **"Dual-Lock Account"** means any EPAM-issued digital credential, username, or account assigned to Dr. Rao, including but not limited to `gowtham_rao@epam.com`, Git handle `grao`, and associated Active Directory domain accounts.

5. **"Workstation A0001"** or **"Device A0001"** means Dr. Rao's personally owned desktop workstation designated by neutral forensic examiner iDS as Device A0001 (Make: MSI, Serial Number: MSB0Y2O7S0104130).

6. **"Software Assets at Issue"** or **"Variously Known Assets"** means the software developments referenced in EPAM's pleadings, declarations, and briefs, including developments variously known within EPAM as 'Prometheus,' 'Prometheus Platform,' 'Prometheus Federated Data Analytics Platform,' 'ETL Kit,' 'cdmkit,' 'EPAM Synapse,' 'Synapse,' 'Takeda-Synapse,' 'takeda-synapse-infra,' and 'MedRAG.'

7. **"Pharmaceutical Client Accounts"** or **"Multi-Pharma Listing"** means commercial life sciences client engagements of EPAM, including but not limited to Gilead Sciences, Inc., Takeda Pharmaceuticals, Eli Lilly and Company, Johnson & Johnson / Janssen, and Amgen Inc.

8. **"Forensic Protocol Exhibit B"** means the Microsoft 365 download audit log spreadsheet produced by EPAM under the Forensic Inspection Protocol titled `EPAM Search Terms - Rao SP Download322329263.1.xlsx`.

9. **"Clean Room Protocol P-IP-001"** means the document titled 'CoReason Clean Room Protocol & Trade Secret Protection Standard (P-IP-001),' Version 1.0, dated November 20, 2025.

10. **"Telescope"** or **"Telescope HR"** means EPAM's enterprise human resources, staffing, and project performance tracking system.

11. **"Performance Improvement Plan"** or **"PIP"** means the performance conditions, goals, or expectations proposed, discussed, or communicated to Dr. Rao in September or October 2025.

12. **"Forensic Inspection Protocol"** or **"Protocol"** means the Stipulated Forensic Inspection Protocol Agreement executed by the parties on December 12, 2025.

13. **"First Amended Complaint"** or **"FAC"** means Plaintiff's First Amended Complaint filed on March 27, 2026 (ECF No. 30).

## III. REQUESTS FOR ADMISSION

**Request for Admission No. 187:**

Admit that:

**(a)** on or before October 15, 2025 (the date Dr. Rao's employment with EPAM was terminated), EPAM issued a written litigation hold notice concerning disputes involving Dr. Rao (including disputes concerning EPAM trade secrets, ownership of client products, and the geographic location of employees);

**(b)** on or before October 31, 2025 (the date EPAM served its cease-and-desist letter and preservation demand, filed as ECF No. 58-4), EPAM issued a written litigation hold notice concerning disputes involving Dr. Rao (including disputes concerning EPAM trade secrets, ownership of client products, and the geographic location of employees);

**(c)** on or before November 4, 2025 (the date EPAM filed its initial Complaint and ex parte TRO application, ECF Nos. 1 and 3), EPAM issued a written litigation hold notice concerning this litigation; and

**(d)** as of the date of these responses, EPAM has not released, suspended, or narrowed the scope of any litigation hold issued concerning this dispute.

**Request for Admission No. 188:**

Admit that:

**(a)** EPAM issued or transmitted a written litigation hold notice concerning disputes involving Dr. Rao to current or former executive leadership, Practice Leaders, and business unit heads with managerial or supervisory responsibility for EPAM's Healthcare and Life Sciences practice or the Odysseus business unit;

**(b)** EPAM issued or transmitted a written litigation hold notice concerning disputes involving Dr. Rao to current or former Human Resources, People Operations, Employee Relations, and In-House Legal personnel involved in Dr. Rao's hiring, performance management, compliance escalations, or separation;

**(c)** EPAM issued or transmitted a written litigation hold notice concerning disputes involving Dr. Rao to current or former Delivery Managers, Project Managers, and technical leads responsible for client engagements or software projects in which Dr. Rao participated or provided technical input; and

**(d)** EPAM issued or transmitted a written litigation hold notice concerning disputes involving Dr. Rao to current or former IT Security, Systems Engineering, and Microsoft 365 Tenant Administration personnel responsible for endpoint security, user account telemetry, and data retention policies.

**Request for Admission No. 189:**

Admit that:

**(a)** on or before November 4, 2025 (the date EPAM filed its initial Complaint and ex parte TRO application, ECF Nos. 1 and 3), EPAM suspended automatic deletion and data-purge policies for Microsoft Teams messages, Exchange Online mailboxes (including inactive or departed employee mailboxes), and cloud storage accounts for current and former personnel within the functional categories identified in RFA No. 188;

**(b)** on or before November 4, 2025, EPAM issued instructions to preserve, or implemented technical measures to preserve, all local ESI stored on or generated through interactions with EPAM computers, EPAM agents' computers, mobile devices, or other computing devices assigned to those same current and former personnel;

**(c)** EPAM maintains written administrative change logs or audit records documenting the date and execution of each suspension described in subparts (a) and (b); and

**(d)** as of the date of these responses, EPAM has not produced in this action any administrative change log or audit record documenting the suspension of automatic deletion policies or the forensic preservation of local device storage for those current and former personnel.

**Request for Admission No. 190:**

Admit that:

**(a)** EPAM has preserved the complete Microsoft Entra ID interactive and non-interactive sign-in and audit logs (including source IP addresses, client application identifiers, and device compliance telemetry) for any EPAM-issued corporate user account or credential assigned to Dr. Rao (including, but not limited to, `gowtham_rao@epam.com`) covering November 18, 2024 through October 15, 2025;

**(b)** EPAM has preserved the GlobalProtect VPN connection logs, ingress/egress gateway telemetry, and concurrent multi-account sign-in records that record, or permit determination of, the physical geographic locations of personnel assigned to pharmaceutical client accounts (including, but not limited to, [redacted]) for the years 2024 and 2025;

**(c)** EPAM has preserved the compliance, posture-verification, and network telemetry logs generated by the OPSWAT MetaAccess agent required under Section 3.21 of EPAM's 'Acceptable Use of IT Resources' policy (ECF No. 30-3) for a personally owned desktop workstation (designated by neutral forensic examiner iDS as Device A0001, Make: MSI, S/N: MSB0Y2O7S0104130); and

**(d)** after anticipating litigation against Dr. Rao, EPAM took affirmative administrative steps to extend retention of its Microsoft 365 Unified Audit Log (UAL) beyond the tenant's default retention period for the user accounts and software repositories identified in its Amended Complaint (ECF No. 30).

**Request for Admission No. 191:**

Admit that:

**(a)** EPAM has preserved the server-side GitLab and Bitbucket access, clone, and administrative audit logs for the software repositories associated with the AI Cohort Generator (including developments variously known within EPAM as 'Prometheus,' 'Prometheus Platform,' or 'Prometheus Federated Data Analytics Platform'), ETL Kit (including 'cdmkit'), and AI Accelerator (including developments variously known within EPAM as 'EPAM Synapse,' 'Synapse,' or 'Takeda-Synapse') as they existed on October 15, 2025;

**(b)** EPAM has preserved the complete corporate Microsoft Exchange mailbox and Microsoft Teams message archive for any EPAM-issued corporate user account or credential assigned to Dr. Rao (including, but not limited to, `gowtham_rao@epam.com`) in its native state as it existed on October 15, 2025;

**(c)** EPAM has preserved all electronic files and forensic artifacts resulting from any interaction by Dr. Rao with EPAM computers, EPAM agents' computers, server instances, or other devices that store ESI; and

**(d)** prior to reassigning, reimaging, wiping, or disposing of the EPAM-issued laptop computer hardware (or any other computing device provisioned to Dr. Rao during his employment), EPAM created a bit-stream forensic disk image of that hardware.

**Request for Admission No. 192:**

Admit that:

**(a)** EPAM has preserved the software repositories and infrastructure configuration files associated with the AI Accelerator (including developments variously known within EPAM as 'EPAM Synapse,' 'Synapse,' 'Takeda-Synapse,' or 'takeda-synapse-infra'), including their full Git commit histories, in native format as they existed on October 15, 2025;

**(b)** EPAM has preserved the software repositories associated with the AI Cohort Generator (including developments variously known within EPAM as 'Prometheus,' 'Prometheus Platform,' or 'Prometheus Federated Data Analytics Platform'), ETL Kit (including 'cdmkit'), and MedRAG, including their full Git commit histories, in native format as they existed on October 15, 2025;

**(c)** EPAM has preserved the October 12, 2025 commit `3d8b15ac` referenced in EPAM's own Exhibit A (ECF No. 3-6) and its surrounding repository history in native form; and

**(d)** since November 4, 2025, no commit that was reachable in the history of those repositories as of October 15, 2025 has been deleted, force-pushed over, rebased, squashed, or otherwise rewritten.

**Request for Admission No. 193:**

Admit that:

**(a)** EPAM has preserved the staffing rosters, assignment schedules, and Telescope work-location records for all personnel assigned to pharmaceutical client accounts (including, but not limited to, [redacted]) for the years 2024 and 2025;

**(b)** EPAM has preserved any Telescope work-location history and any relocation-program records for Anna Tauetekova, Alexander Alexeuk, and the personnel identified in Dr. Rao's Answer and Counterclaims (ECF No. 33 ¶¶ 320–327) reflecting any approved or pending work-country changes during 2024 and 2025;

**(c)** EPAM has preserved all source IP address records, VPN session logs, and multi-account access histories that record, or permit determination of, the actual physical work locations of personnel assigned to those same pharmaceutical client accounts; and

**(d)** EPAM has not destroyed, deleted, or failed to preserve any internal record documenting a discrepancy between the recorded Telescope work locations of developers assigned to pharmaceutical client accounts and their physical network connection locations.

**Request for Admission No. 194:**

Admit that:

**(a)** EPAM has preserved the VPN gateway and network-egress infrastructure located in the Republic of Serbia, including IP routing tables and network configuration records, for the years 2024 and 2025;

**(b)** the records described in subpart (a) record, or permit determination of, the external IP addresses, routing paths, and multi-account proxy sign-in configurations used for connections to client environments from Serbia;

**(c)** EPAM has preserved all written communications between EPAM IT infrastructure personnel and life sciences account leadership concerning the physical hosting, proxy routing, and egress locations of remote developers assigned to pharmaceutical client accounts (including, but not limited to, [redacted]); and

**(d)** as of the date of these responses, EPAM has not produced in this litigation the network routing tables, external IP logs, or VPN gateway records reflecting remote developer connections into pharmaceutical client environments during 2024–2025.

**Request for Admission No. 195:**

Admit that:

**(a)** EPAM has preserved all email, Microsoft Teams, and messaging communications between Gregory Klebanov and Greg Killian concerning Dr. Rao for the period September 1, 2025 through December 31, 2025;

**(b)** EPAM has preserved all communications between Gregory Klebanov and either Arkadiy Dobkin or Balázs Fejes, or any other member of EPAM executive leadership or the Board of Directors, concerning Dr. Rao's separation;

**(c)** EPAM has preserved all communications among its human resources and legal personnel (including at least June Dinitz, Larry McKlaine, Larry Solomon, and Sarah Lugar) concerning Dr. Rao's separation, irrespective of the country in which those personnel are employed; and

**(d)** EPAM has preserved all written communications, across all global subsidiaries, among EPAM personnel concerning client contractual commitments, developer physical work locations, and location-masking practices on pharmaceutical client accounts (including, but not limited to, [redacted]).

**Request for Admission No. 196:**

Admit that:

**(a)** EPAM has not identified any instance in which an EPAM officer, employee, or agent deleted, purged, wiped, or destroyed any internal communication in Microsoft Exchange, Microsoft Teams, or Slack concerning Dr. Rao since October 15, 2025 (the date Dr. Rao's employment with EPAM was terminated, Amended Complaint, ECF No. 30 ¶ 7);

**(b)** EPAM has not identified any instance in which an EPAM officer, employee, or agent deleted, purged, wiped, or destroyed any internal communication in Microsoft Exchange, Microsoft Teams, or Slack concerning this litigation since November 4, 2025 (the date EPAM filed its initial Complaint, ECF No. 1);

**(c)** EPAM has not received any report or notification from its IT security or compliance personnel indicating that communications or ESI on computers or devices of custodians of this dispute (including, but not limited to, the custodians referenced in RFA No. 188) were deleted, wiped, or auto-purged after October 15, 2025; and

**(d)** EPAM maintains an immutable administrative audit log capable of discovery forensics to independently verify whether any custodian communication, email, chat message, or device-stored ESI was deleted, purged, or wiped after October 15, 2025.

**Request for Admission No. 197:**

Admit that:

**(a)** EPAM has preserved all client contracts, Master Services Agreements, Statements of Work, and written communications representing EPAM's commitments to clients regarding the physical geographic work locations of assigned personnel (including, but not limited to, [redacted]);

**(b)** EPAM has preserved all client communications received during 2023 through 2025 raising questions, objections, compliance audits, or disputes regarding the physical geographic locations or staffing representations of EPAM personnel across pharmaceutical client accounts;

**(c)** EPAM has preserved all internal and external records concerning any formal or informal accommodations, exceptions, side-letters, or waivers negotiated or arrived at with clients regarding employee physical locations;

**(d)** EPAM has preserved the complete file of any internal ethics, compliance, or whistleblower investigation concerning Dr. Rao or concerning the staffing practices he reported; and

**(e)** EPAM has preserved the complete, native Microsoft Teams chat thread involving Katie Barista referenced in ECF No. 33-2 and ECF No. 43-7 containing the statement: 'everything we build belongs to Takeda and the MSA controls over the SOW'.

**Request for Admission No. 198:**

Admit that:

**(a)** the Microsoft 365 download audit log produced by EPAM as Forensic Protocol Exhibit B (`EPAM Search Terms - Rao SP Download322329263.1.xlsx`) contains exactly 54,900 total rows of event records;

**(b)** every single event record in the 54,900-row export bears a timestamp falling exclusively within the 14-day calendar window from September 30, 2025 through October 13, 2025;

**(c)** of the 54,900 event records in the export, exactly 44,742 records (81.50%) designate the operation type as `FileSyncDownloadedFull`; and

**(d)** of the 54,900 event records in the export, exactly 10,158 records (18.50%) designate the operation type as `FileDownloaded`.

**Request for Admission No. 199:**

Admit that:

**(a)** of the 54,900 event records in Forensic Protocol Exhibit B (`EPAM Search Terms - Rao SP Download322329263.1.xlsx`), exactly 44,702 records (81.42%) designate the client user-agent as `Microsoft SkyDriveSync` (versions 25.170, 25.174, or 25.179);

**(b)** across the entire 54,900-row dataset in Exhibit B, exactly 53 records (0.097%) designate a standard interactive web browser user-agent (i.e., a user-agent string identifying a consumer web browser such as Chrome, Edge, Firefox, or Safari);

**(c)** exactly 8,745 records in Exhibit B record no user-agent string (`N/A`) representing automated server-side events; and

**(d)** exactly 1,393 records in Exhibit B designate the server-side transformation user-agent `OneDriveMpc-Transform_Zip/1.0`.

**Request for Admission No. 200:**

Admit that:

**(a)** EPAM received in discovery the document titled 'CoReason Clean Room Protocol & Trade Secret Protection Standard (P-IP-001),' Version 1.0, dated November 20, 2025;

**(b)** Section 1.1 of P-IP-001 defines a 'Temporal Firewall Date' and establishes Standard P-102 requiring a Genesis Commit for all new repositories;

**(c)** Section 1.3 of P-IP-001 establishes the 'Human Assumption of Transformative Authorship' protocol requiring human review, substantive modification, and contamination checks before merging code; and

**(d)** as of the date of these responses, EPAM has not identified to Dr. Rao any written technical critique asserting that the provisions of P-IP-001 are inadequate to prevent IP contamination.

**Request for Admission No. 201:**

Admit that:

**(a)** during the period between December 12, 2025 and the date of these responses, Plaintiff and its designated forensic experts have had electronic access, or the contractual opportunity under the Forensic Protocol to obtain access via file promotion and release, to inspect all files on the Relativity workspace hosted by neutral forensic examiner iDS;

**(b)** as of the date of these responses, EPAM has not identified by file name or path any specific file in the collected CoReason repositories that it contends contains EPAM proprietary source code;

**(c)** as of the date of these responses, EPAM has not identified any specific line, block, or routine of source code in the collected CoReason repositories that was copied from any EPAM repository; and

**(d)** the sworn Declaration of Dmitrii Ilin (ECF No. 58-25) does not identify any CoReason source code file or directory path by name.

**Request for Admission No. 202:**

Admit that:

**(a)** EPAM has not identified any document, repository README, or source code header file in existence prior to October 15, 2025 that designated the ETL Conversion Kit (including `cdmkit`) source code as a 'trade secret' on its face;

**(b)** EPAM has not identified any document, repository README, or source code header file in existence prior to October 15, 2025 that designated the AI Cohort Generator (including developments variously known within EPAM as 'Prometheus,' 'Prometheus Platform,' or 'Prometheus Federated Data Analytics Platform') source code as a 'trade secret' on its face;

**(c)** EPAM has not identified any presentation slide deck produced or filed in this action in existence prior to October 15, 2025 for the AI Accelerator (including developments variously known within EPAM as 'EPAM Synapse,' 'Synapse,' or 'Takeda-Synapse') that bore the word 'Trade Secret' on its title slide or body pages; and

**(d)** Dr. Rao's offboarding from EPAM on October 15, 2025 (Amended Complaint, ECF No. 30 ¶ 7) did not include an exit interview in which EPAM identified any specific repository, file, or document for return.

**Request for Admission No. 203:**

Admit that:

**(a)** during 2024 and 2025, EPAM publicly marketed commercial services offering automated software modernization, code conversion, and rapid application rebuilding using Generative AI and LLM tooling;

**(b)** during the July/August 2025 executive meeting introducing incoming CEO Balázs Fejes, Balázs Fejes commended Dr. Rao's Generative AI presentation and workflows, stating, in words or in substance: 'I really loved what Gautam and Sara was presenting, this is really helpful to the industry, and it's not just chat GPT prompts which others are selling';

**(c)** the July/August 2025 executive meeting referenced in subpart (b) was electronically recorded by EPAM;

**(d)** EPAM has preserved the complete audio/video recording and any transcript thereof of the meeting described in subpart (b); and

**(e)** EPAM does not contend that utilizing a commercial LLM to generate original source code from functional requirements constitutes, in itself, the misappropriation of a trade secret.

**Request for Admission No. 204:**

Admit that:

**(a)** at the November 5, 2025 preliminary injunction hearing, neither EPAM's counsel nor any EPAM witness disputed Dr. Rao's statement on the record that 'all EPAM employees use OneDrive and those files gets downloaded to our local machines' (Hearing Tr., ECF No. 58-6, at 19:9–10);

**(b)** the transcript of the November 5, 2025 hearing (ECF No. 58-6) contains no statement by EPAM's counsel, and no testimony or exhibit offered by EPAM, contradicting the statement quoted in subpart (a);

**(c)** EPAM did not present any witness, declaration, or testimonial evidence at the November 5, 2025 hearing establishing that Dr. Rao disabled or bypassed any security telemetry agent (including OPSWAT MetaAccess or GlobalProtect VPN) on a personally owned desktop workstation (designated by neutral forensic examiner iDS as Device A0001, Make: MSI, S/N: MSB0Y2O7S0104130); and

**(d)** the transcript of the November 5, 2025 hearing (ECF No. 58-6) contains no statement or exhibit by EPAM's counsel identifying any specific trade secret formula, algorithm, or customer record alleged to have been disclosed to any third party.

**Request for Admission No. 205:**

Admit that:

**(a)** in 2025, Dr. Rao was awarded the corporate 'EPAM HEROES 2025' award recognizing his professional contributions to the company (Answer & Counterclaims, ECF No. 33 ¶ 359);

**(b)** on September 17, 2025, Gregory Klebanov informed Dr. Rao that his role would be backfilled by Sarah Seager (ECF No. 33 ¶ 352);

**(c)** Dr. Rao's role was backfilled by Sarah Seager following his separation (ECF No. 33 ¶ 352); and

**(d)** Dr. Rao's official profile in EPAM's Telescope performance portal, as reflected in Exhibit F (ECF No. 33-6), stated 'No expectations found'.

**Request for Admission No. 206:**

Admit that:

**(a)** on September 25, 2025 at 3:54 PM, Dr. Rao transmitted an email to Greg Killian and Gregory Klebanov, copying Larry McKlaine (Exhibit G, ECF No. 33-7), stating: 'We confirmed there are no organizational changes impacting my position and no change in role. No layoffs. It was explicitly stated that there is no performance improvement plan (PIP) in place.';

**(b)** on September 26, 2025, Gregory Klebanov responded in writing stating: 'Should you choose to continue in this revised role, a Performance Improvement Plan (PIP) will be implemented to ensure that clear goals and expectations are established for future success' (ECF No. 33-7);

**(c)** in or around mid-September 2025, Gregory Klebanov stated to Dr. Rao that the legacy data science pipeline was 'close to zero' (ECF No. 33 ¶ 361); and

**(d)** in September or October 2025, EPAM executive Alvin Ow stated internally that EPAM was 'abusing' Dr. Rao in connection with the sudden performance demands and role changes (ECF No. 33 ¶ 357).

**Request for Admission No. 207:**

Admit that:

**(a)** EPAM's official 'Performance Management process at EPAM' policy directs that employee expectations and goals be recorded in the Expectations section of the Performance tab of the employee's Telescope profile;

**(b)** the same policy directs that project performance evaluations focus on how well the employee met the project expectations and goals so recorded;

**(c)** prior to September 17, 2025, EPAM management never entered any specific numeric revenue target for Dr. Rao into the Telescope system (ECF No. 33 ¶ 354, Exhibit F; ECF No. 33-6); and

**(d)** prior to September 26, 2025, EPAM management never delivered to Dr. Rao a written PIP setting forth structured performance targets, criteria, or review periods.

**Request for Admission No. 208:**

Admit that:

**(a)** after October 15, 2025, EPAM personnel or representatives communicated with Takeda Pharmaceuticals personnel (including Sunil Dravida) regarding Dr. Rao's departure and this litigation;

**(b)** in one or more such communications, EPAM stated, in words or in substance, that Dr. Rao had engaged in unlawful data exfiltration or trade secret theft;

**(c)** EPAM has never transmitted any written retraction, clarification, or correction to Takeda Pharmaceuticals regarding the statements described in subpart (b); and

**(d)** EPAM has not identified any written or oral statement by Dr. Rao to any commercial client of EPAM (including, but not limited to, [redacted]) disparaging EPAM's technical capabilities or business integrity.

**Request for Admission No. 209:**

Admit that:

**(a)** the complete October 2025 Microsoft Teams thread filed as Exhibit E (ECF No. 33-5) shows that Gaurav Dravida transmitted messages to Dr. Rao on October 14, 2025 and at 10:49 AM on October 16, 2025, before any responsive message from Dr. Rao shown in ECF No. 3-7;

**(b)** the 10:49 AM October 16, 2025 message from Gaurav Dravida requested Dr. Rao's technical assistance concerning ETL processing of STD_COST_YR and type-of-service cost fields (ECF No. 33-5);

**(c)** the screenshot filed by EPAM as Exhibit B to the Declaration of Gregory Klebanov (ECF No. 3-7) does not display the text of any inbound message from Gaurav Dravida transmitted before Dr. Rao's first reply, including the substance of the 10:49 AM October 16, 2025 message shown in ECF No. 33-5;

**(d)** EPAM's emergency motion for a temporary restraining order and preliminary injunction filed on November 4, 2025 (ECF No. 3) did not attach or disclose the October 2–3, 2025 'E01–E04' email thread between Dr. Rao and HR leadership (Exhibit C, ECF No. 33-3); and

**(e)** EPAM transmitted its proposed Second Amended Complaint to Dr. Rao on August 11, 2026, while its Motion for Terminating Sanctions (ECF No. 58) remained pending and undecided before the Court.

**Request for Admission No. 210:**

Admit that:

**(a)** during the approximately six-month period preceding Dr. Rao's November 2024 hire, the Odysseus unit's rolling six-month revenue was approximately [redacted] (Answer & Counterclaims, ECF No. 33 ¶¶ 347, 471);

**(b)** within his first four months of employment at EPAM, Dr. Rao originated and delivered a commercial contract with [redacted] generating approximately [redacted] in revenue (ECF No. 33 ¶ 351);

**(c)** Dr. Rao joined EPAM from Johnson & Johnson, an established enterprise in the healthcare and life sciences industry; and

**(d)** during recruitment discussions, EPAM was informed that Dr. Rao would forfeit unvested compensation and benefits at Johnson & Johnson by accepting EPAM's employment offer.

**Request for Admission No. 211:**

Admit that:

**(a)** as of the date of these responses, EPAM has not produced any economic model, expert calculation, or document computing a claimed reasonable royalty under 18 U.S.C. § 1836(b)(3)(B) or 12 Pa. C.S. § 5304 for the software assets identified in its pleadings;

**(b)** as of the date of these responses, EPAM has not produced any financial ledger, customer loss statement, or document calculating actual lost profits resulting from Dr. Rao's alleged conduct;

**(c)** as of the date of these responses, EPAM has not produced any expert computation or document quantifying alleged head-start or unjust enrichment damages; and

**(d)** the consolidated financial statements and accompanying notes in Item 8 of EPAM Systems, Inc.'s Annual Report on Form 10-K for the fiscal year ended December 31, 2025 (filed February 26, 2026) do not recognize any impairment charge, loss contingency accrual, or material loss attributable to the alleged misappropriation of the software at issue in this action.

Dated: August 17, 2026

Respectfully submitted,

/s/ Dr. Gowtham A. Rao
**Dr. Gowtham A. Rao, MD, PhD**
*Defendant and Counterclaim-Plaintiff Pro Se*
184 Mansgrove Rd
Princeton, NJ 08540
Phone: (803) 386-7890
Email: `gowthamrao.litigation@gmail.com`

## CERTIFICATE OF SERVICE

I hereby certify that on **August 17, 2026**, a true and correct copy of the foregoing **Defendant Dr. Gowtham Rao's Fifth Set of Requests for Admission to Plaintiff EPAM Systems, Inc. (RFAs 187–211)** was served via electronic mail pursuant to Fed. R. Civ. P. 5(b)(2)(E) and the parties' established course of electronic service upon Plaintiff's counsel of record:


- **Jacob Oslick, Esq.** (`joslick@seyfarth.com`)
- **James S. Yu, Esq.** (`jyu@seyfarth.com`)
- **Matthew Christoff, Esq.** (`MChristoff@seyfarth.com`)
- **Brooke Gary, Esq.** (`brgary@seyfarth.com`)

*Seyfarth Shaw LLP*

620 Eighth Avenue

New York, NY 10018


/s/ Dr. Gowtham A. Rao

**Dr. Gowtham A. Rao, MD, PhD** (*Defendant Pro Se*)

Email: `gowthamrao.litigation@gmail.com`