**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EPAM SYSTEMS, INC.,<br><br>Plaintiff/Counterclaim-Defendant<br><br>v.<br><br>GOWTHAM RAO,<br><br>Defendant/Counterclaim-Plaintiff | Civil Action No. 2:25-cv-06260 |

**PLAINTIFF/COUNTER-DEFENDANT EPAM SYSTEMS, INC.'S REPLY IN SUPPORT OF MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE**

# TABLE OF CONTENTS

**Page**

ARGUMENT ........ 1

A. The Undisputed Facts Warrant Severe, Dispositive Sanctions ........ 1

B. Rao's Red Herrings and Misstatements Do Not Excuse Spoliation ........ 3

C. Rao's Shifting Explanations Further Support Terminating Sanctions ........ 7

D. Terminating Sanctions Are Warranted Because Rao's Spoliation Is Part of A Pattern of Bad Faith Litigation Conduct ........ 9

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Fletcher v. Experian Info. Sols., Inc.*,
168 F.4th 231 (5th Cir. 2026) ....................................................................................10

*Gutman v. Klein*,
2008 WL 4682208 (E.D.N.Y. 2008).............................................................................8

**Other Authorities**

Fed. R. Civ. P. 37 .................................................................................................................9

# ARGUMENT

Gowtham Rao's opposition supplies no grounds to excuse his spoliation. In fact, his shifting explanations for his conduct cements that he spoliated evidence in bad faith. Further, Rao's recent litigation conduct, including his abusive discovery demands, and the falsities and/or AI-hallucinations in his opposition, only buttresses the bad faith nature of his actions. For these reasons, and as EPAM's opening brief set forth, the Court should award EPAM a default judgment, dismissal of the counterclaims, reimbursement of its forensic costs and attorneys' fees, and injunctive relief.

## A. The Undisputed Facts Warrant Severe, Dispositive Sanctions

Rao's unwieldy opposition papers try their best to muddle the issues—for good reason.

The undisputed facts are these: on November 14, 2025, 14 days after receiving notice of the imminent lawsuit and a preservation notice, 9 days after the TRO hearing and 7 days before the scheduled preliminary injunction hearing, and while the parties were negotiating a forensic inspection, Rao spoliated evidence by conducting a "reset"/"refresh" of his desktop computer. (Oslick Decl. Ex. 4 at 5; ECF #44-2.) The reset eradicated forensic evidence of USB devices, browsing activity, file and folder activity, user activity, and deleted files. (Oslick Decl. Exs. 4, 5, 14, 15; Greenfield Decl. ¶¶ 17, 23-27, 31-33, 37.) This is the exact forensic evidence that would have enabled EPAM to determine if Rao had transferred EPAM data to other sources (such as USB drives or cloud storage accounts), or further misappropriated EPAM data by creating derivative works. (EPAM Br. at 7-9, 22-23.) Indeed, the destroyed evidence would have enabled EPAM to determine not only ***if*** Rao created "new" documents feeding some of the 44,960 EPAM files he pilfered into AI to create derivative works, but ***which*** documents were derivatives. (EPAM Br. at 7-9, 22-23; Greenfield Decl. ¶ 32.) And Rao *knew* EPAM needed this forensic

data. As EPAM explained at the TRO Hearing, it needed "forensic discovery" to learn if EPAM's data had "been misused or potentially transferred elsewhere." (ECF #58-6 at 52.)

The undisputed facts further confirm that Rao had a motive for spoliating this evidence: hiding his misappropriation of EPAM trade secrets and confidential information to aid his competing company. For instance, Exhibit 9, a document that Rao now admits he generated through AI, is a "comprehensive, step-by-step plan" for rebuilding an EPAM software program known as Synapse. (ECF #58-12 at 8; #58-25 ¶¶ 8-14; Opp. at 24.) Rao later bragged to a friend that he planned to take work he did for EPAM, *i.e.*, Synapse, and "rebuild the system from scratch using his own code," which is *exactly* what Exhibit 9 enabled him to do. (Oslick Decl. Ex. 7 at 3, 6.) Then, within 24 hours of EPAM ending his employment, Rao launched a competing company, whose signature product is a Synapse competitor. The fact that EPAM fortuitously discovered *some* of what Rao attempted to hide, and that Rao, after getting caught, *now* partially *admits* what he did, does not erase the prejudice. EPAM has no idea what else Rao misappropriated and has managed to *successfully hide* by destroying the forensics.

Finally, even before his recent bad acts (*see infra* 4-5, 7, 9), the undisputed facts confirm Rao's spoliation was not a "one off." It was part of a pattern of bad faith conduct. After all, he falsely stated in his Anwer that the "evidentiary baseline is completely preserved" (ECF #33 ¶ 231), and that the forensics not only "yielded no evidence" of his wrongdoing but provided "definitive forensic clearance" of his conduct, and were "exculpatory." (*See id.* ¶¶ 231, 255, 256, 386, 389, 453, 454.) His latest misrepresentations, some of which may be AI- hallucinations, fit the same pattern. Bad faith litigation conduct warrants the most severe sanctions.

For these reasons, EPAM is entitled to case ending sanctions and its other requested relief –due to the prejudice it suffered, and the need to affirm litigation integrity. (EPAM Br. 23-29.)

### B. Rao's Red Herrings and Misstatements Do Not Excuse Spoliation

Faced with the indisputable evidence, Rao resorts to red herrings and misstatements:

1. Rao proffers that Windows "does not record the copying of files to a USB drive." (Opp. at 11.) EPAM never argued otherwise. But, as Dr. Greenfield explained and Rao cannot dispute, Windows generates forensic artifacts which provide strong forensic evidence of copying to USB devices, and his reset destroyed that evidence. (ECF #58-26 ¶¶ 23-26.)

2. Rao posits that he didn't destroy evidence of USB connections, because the only two entries on the USB report are "the computer's internal drive and the neutral examiner's imaging drive." (Opp. at 11.) He ignores that this report describes the *computer's own hard drive* as being "First Connected" on November 14, the date of the reset. (ECF #58-18.) That "First Connected" date shows spoliation. (*See* Greenfield Supp. Decl. ¶ 2.)

3. Rao contends that his browsing history was not destroyed, but "restored." (Opp. at 7.) In fact, the "restored" data goes back only to November 3, eleven days before the reset. (Opp. at 7.) Once again, that data is not exculpatory, but instead reflects that Rao destroyed many months' worth of browsing history which may have shown him copying EPAM files to cloud storage accounts, or inputting EPAM data into AI programs. (*See* Greenfield Supp. Decl. ¶ 3.)

4. Rao remarks that "EPAM has not identified a single search, a single site, or a single upload that it says is missing," "one derivative work it says it cannot prove," or "one file it says went to a USB device." (Opp. at 13, 15, 20.) He similarly notes that EPAM can't prove what the destroyed forensic evidence would have shown. (Opp. at 13, 16, 20.) ***But EPAM's inability to identify precisely what was destroyed is not a defense to spoliation. It is part of the prejudice caused by spoliation.*** (*See* EPAM Br. at 22, citing cases).

5. Rao theorizes that EPAM is not prejudiced because he "released" files, falsely claiming that he "released" 84,000 files to EPAM, and insisting that EPAM supposedly refused

to review 79,000 of them. (Opp. at 8, 14, 20.) Rao also insists forensic evidence is unnecessary because derivative works can be proved by comparing side-by-side content. (Opp. at 14.) Yet Rao ignores that he destroyed invaluable data that would have told EPAM *what files* to review. (ECF #58-26 at ¶¶ 32, 33, 37.) Rao's suggested content searches are no substitute for forensic evidence. They would require incredibly burdensome ESI searches, and can be defeated through simple find-and-replace tricks. (*See* Greenfield Supp. Decl. ¶ 4). For instance, if Rao replaced every instance of "Synapse" in a document with "Spiderman," a word search for "Synapse" would reveal nothing. (*Id.*) Even if possible derivates were located based on a manual search of the 84,000 documents, EPAM witnesses would need to opine document-by-document about why they believed the content indicated a derivate work, and would face cross-examination on their credibility without forensic evidence to back up their assertions. ***Put simply, asking EPAM to "go fish" in an ocean of 84,000 files (even if Rao "released" them—and he did not) is no substitute for destroying data that would have told EPAM where the fish are swimming***, *i.e.*, what "specific files, not originally downloaded from EPAM, it should review" because they likely contain EPAM confidential information. (ECF #58-26 ¶ 32.) ***Further, the destroyed data would also forensically confirm if documents that EPAM found were, in fact, "fish."***

Beyond the above, Rao destroyed forensic evidence of his admitted file deletions. (*Id.* ¶ 33.) Thus, EPAM cannot know how many "fish" Rao removed from the ocean – by deleting documents, or transferring them to unknown USB devices and cloud storage accounts.

Further, ***Rao's claim that he released 84,000 files to EPAM is false.*** In fact, when EPAM – relying on Rao's representation under penalty of perjury that he "released" these files – asked the parties' forensic neutral to make them available to EPAM, Rao instructed "Hold." (*See* Oslick Supp. Decl. Exs. 1, 2; Opp. at 8; Rao Decl. ¶ 65.) Then, in retaliation for EPAM's request to

make the files available, Rao began stripping EPAM attorneys and employees of the right to view the tiny subset of documents EPAM actually had access to. (Oslick Supp. Decl. Exs. 2, 3.)[1]

6. Rao also insists that EPAM can run its desired forensic comparison, because metadata with "creation and modification timestamps" is preserved. (Opp. at 14.) He is wrong. Opening a document and copying text from it, or feeding it to an AI program to create a new document, does not affect a document's creation or modified date. (Greenfield Supp. Decl. ¶ 5.) While those actions create other forensic artifacts, those artifacts are what Rao destroyed. (*Id.*)

7. Rao additionally argues that EPAM's need for additional forensic examinations is somehow an "admission" that the lost ESI is replaceable. (Opp. at 16.) This is nonsense. EPAM needs further forensic examinations because Rao *destroyed evidence* of where he transferred files, so EPAM does not even *know which ocean to fish in*. That is why it needs forensic examinations of CoReason, because it now *cannot know* where Rao transferred EPAM data.

8. Rao bizarrely contends that he had no duty to preserve forensic evidence because EPAM's preservation notice did not specifically mention "registry hives" or "LNK files," and the Court refused to compel a forensic inspection at the TRO hearing. (Opp. at 17-18.) In fact, EPAM told him to preserve "electronically stored information," and expressly sought a forensic inspection at the TRO hearing. (ECF #58-4, #58-6.) If Rao spoliated evidence because the Court didn't immediately order a forensic inspection, that is further evidence of bad faith.

---

[1] Rao otherwise asks the Court to infer that EPAM acted with ill motive based on his interpretation of the parties' forensic protocol. (Opp. at 29-31.) While the Court already concluded that it lacked jurisdiction over interpreting the forensic protocol, Rao's contentions are factually frivolous. The forensic protocol permits EPAM to use the data for any litigation purpose. (ECF #55 § VI(c).) Further, Rao admits that "No protective order has been entered in this case, and no attorneys'-eyes-only designation governs these materials." (Oslick Supp. Decl. Ex. 4.) And Rao contends that the documents at issue are *EPAM documents that he generated for EPAM*. Rao's insistence that EPAM was somehow prohibited from sharing such documents with EPAM employees is a further example of his bad faith, obstructive litigation activity.

9. In an act of pure gall, Rao praises his supposed "voluntary disclosure" of the spoliation. (Opp. at 5.) But Rao admitted to the reset only after iDS discovered it. Rao fessing up after he got caught is not a "voluntary disclosure," and does not mitigate against a bad faith finding.

10. Outrageously, Rao even implies that EPAM is somehow at fault for him spoliating evidence, because it did not resolve the case in exchange for him wiping his computer. (Opp. at 6, 19.) He ignores that any such remediation would have been worthless if Rao had already copied EPAM data to other sources, such as USB devices or cloud storage accounts. As EPAM explained at the TRO hearing, that is *why* it needed a forensic examination: to "get sufficient comfort that data hasn't been misused or potentially transferred elsewhere." (ECF #58-6 at 52.) Then, nine days later, *knowing* precisely *why* EPAM needed forensic evidence that would indicate file transfers, Rao destroyed that very forensic evidence.

As for Rao's remaining arguments, many bear the hallmarks of senseless AI "staccato" style-writing,[2], or are otherwise factually baseless.

Most egregiously, Rao claims that EPAM "authorize[d] a curative analysis five days before calling the loss incurable." (Opp. at 21.) ***This claim is false.*** Tellingly, Rao identifies no "curative analysis" that he discussed with Seyfarth or asked iDS to perform. ***His claims about a "curative analysis" are pure fiction – and, quite possibly, an AI-generated hallucination***. All the documents show, and all that actually happened, is that Rao asked for Seyfarth's permission to contract with iDS for additional work, and Seyfarth agreed to this possibility. (*See* Ex. P.) Rao's descriptions to Seyfarth of the iDS work he wanted would not address, let alone "cure,"

[2] *See* Te-Ping Chen, *Writers Are Going to Extremes to Prove They Didn't Use AI*, Wall St. J. (May 6, 2026) (noting that AI writes in a "distinctive staccato sentence cadence").

spoliation issues such as derivative documents. (Oslick Supp. Decl. ¶ 4.) And Rao never copied Seyfarth on any follow ups with iDS. (*Id.* ¶ 6.) ***Further, while Rao claims that "EPAM has not consented to any specific request under that supplemental-analysis mechanism," Rao, in fact, never made any such requests.*** (Rao Decl. ¶ 71; Oslick Suppl. Decl. ¶ 6.) Rao's misstatements in his opposition papers are further evidence of bad faith, and, in any event, are not justifications for spoliation.

Rao's other nonsensical "staccato"-like statements go nowhere:

1. Rao argues that "EPAM calls unreasonable the very step it told the Court I could have taken." (Opp. at 19.) He does not explain what he means, and EPAM is baffled.

2. Rao argues that "EPAM cannot fault the action for an objective it endorses." (Opp. at 19.) That proposition is frivolous. The "action" that EPAM faults is Rao's destruction of forensic evidence. That action must be "faulted" regardless of Rao's motive (hiding evidence).

3. Rao, referring to Exhibit 9, insists that "Work performed for EPAM does not supply a motive to destroy evidence." (Opp. at 24, describing Ex. 9.) But Ilin confirmed that Rao had *no legitimate reason* to create this document, a self-described "step-by-step" guide for rebuilding Synapse. (ECF #58-25 ¶ 13.) And nowhere in Rao's brief, or his 30 page declaration, or his 11 page "Scope Appendix" does Rao supply such a reason. Clearly, Rao had a motive for destroying evidence that he created a document which, as he plotted to do, would enable him to "rebuild" Synapse from "scratch," and then launch a competing company. (ECF #58-10 at 6.)

**C. Rao's Shifting Explanations Further Support Terminating Sanctions**

Rao originally claimed he spoliated evidence because he lost his passwords twice, and needed to "refresh" his computer (*i.e.*, reinstall the Windows operating system) to recover them. (*See* ECF #44-3.) This explanation was incredulous. He did not search the web for how to reset a password (a Google search would have told him), but for how to "reset" his computer due to

purported "corrupt[ion]." (*See* ECF #44 at 1.) While Rao is a computer-savvy CEO of an AI technology company, even "a novice computer user" would not reinstall an operating system to recover a password. *Gutman v. Klein*, 2008 WL 4682208, at *9-10 (E.D.N.Y. 2008). Further, Rao had ample alternatives to destroying evidence, such as buying a new hard drive (for about $200), buying a new computer for his new company (to avoid comingling EPAM data), using one of his other computers, or alerting EPAM so EPAM could ensure preservation. (EPAM Br. at 2, 16-17.)

Aware of these flaws, Rao now amplifies his story with an extended discussion of how his sign-on screen supposedly didn't display all of his accounts. (Rao Decl. ¶¶ 37-43.) But if that was the issue, Rao doesn't explain why he searched for "how to reset" a "corrupted" Windows, instead of seeking help about signing into the account he wanted. Had he done the latter, a Microsoft webpage would have given him easy solutions. (Greenfield Supp. Decl. ¶ 6.)[3]

Next, Rao feigns ignorance, portraying himself as unsophisticated with computers. (*See* Opp. at 19-24.) This is incredulous. While Rao is also a physician, he's made his living in data science, and serves as the CEO of an AI technology company. He's savvy enough to know how to reset a password, and that a "refresh"/"reset" is not the right way. And the fact that Rao did not destroy even more evidence—such as by wiping his hard drive—does not show "sophistication and incompetence . . . in the same act." (Opp. at 24.) It proves only that Rao had forethought enough not to make his spoliation blindingly obvious. Further, while Rao is computer savvy, he is not litigation savvy. He may not have grasped that this litigation would enable EPAM to locate documents he stored elsewhere, such as his personal Google drive.

---

[3] (*See also* https://support.microsoft.com/en-us/windows/security/identity-signin/troubleshoot-problems-signing-in-to-windows ; last visited August 26, 2026.)

Rao implies that he lacked the money to purchase a new hard drive or new computer. (*See* Opp. at 19.) This contention is also false. Rao was highly compensated at EPAM (earning $250,000 a year) and *already* secured funding for CoReason, which was incorporated on October 16 by its "Founding Investor," Ammar Shallal. (ECF #58-15; https://www.coreason.ai/) And not long after his spoliation, Rao began advertising to hire a "Lead Systems & Infrastructure Engineer" in India. (*See* Oslick Supp. Decl. Ex. 5.) He plainly had a few hundred dollars to buy a new hard drive, or a few thousand dollars for a new computer, to use for CoReason so he didn't comingle EPAM data. In fact, given these readily available alternatives, the most plausible explanation for Rao's use of his EPAM computer is that he *intended* to use EPAM data on CoReason's behalf.

### D. Terminating Sanctions Are Warranted Because Rao's Spoliation Is Part of A Pattern of Bad Faith Litigation Conduct

Turning to Rao's legal argument, he contends that the Court must rely on Fed. R. Civ. P. 37, rather than its inherent power, because his conduct was not "much more serious" than "a preservation failure." (Opp. at 26.) While terminating sanctions are warranted under both Rule 37 and the Court's inherent authority, his belief that this dispute involves *just* a "preservation failure" is mistaken. Already, before EPAM filed this motion, Rao sought to affirmatively use his spoliation *against* EPAM, and even accused *EPAM* of litigating in "bad faith," by asserting defenses and counterclaims based upon his own false contentions that the "evidentiary baseline is completely preserved" and the forensics were "exculpatory." (*See* ECF #33 ¶¶ 231, 255, 256, 386, 389, 453, 454.) Further, Rao publicly filed EPAM attorney-client privilege information with his Answer, without even giving EPAM prior notice or seeking to seal the information, thereby breaching his duty to EPAM to keep this information confidential. (*See* ECF #33-2; *see also* ECF

#33 ¶¶ 219-221.) And since EPAM filed its spoliation motion, Rao has only doubled-down on his bad faith litigation conduct.

As noted above, Rao peppers his opposition with falsehoods (some of which may be AI-generated hallucinations), and groundless "staccato" arguments, including ***false*** claims about a "curative analysis" and about supposedly "releas[ing]" 84,000 documents to EPAM. *See supra* 4-5, 6-7; *Fletcher v. Experian Info. Sols., Inc.*, 168 F.4th 231, 238-40 (5th Cir. 2026) (sanctioning attorney for AI-hallucinated case citations and factual assertions). He also makes frivolous arguments about how it was somehow improper for EPAM to share what he contends are EPAM documents with EPAM witnesses. *See supra* at 5 n.1. Aside from his opposition, Rao has served abusive, bad faith discovery—flooding EPAM with 471 separate requests for admission (disguised as 211 requests, but with numerous independent subparts), seemingly issued them without any good faith thought into proportionality or relevance, and timed so that responses would fall due on September 14-16, the days before and the day of the spoliation hearing (in order to swamp EPAM with paperwork during critical hearing preparation time). (*See* ECF #70.)

If Rao's spoliation did not itself warrant the most severe sanctions (and it did), his false statements in his pleadings, false statements in his opposition, and other continuing bad faith litigation conduct confirms the need for such sanctions now. The alternative is that EPAM will have to continue incurring the costs of Rao's burdensome and vexatious abuses of the litigation process, while Rao continues to use EPAM's trade secrets and confidential information to compete against it. For these reasons, and as set forth in EPAM's original papers, the Court should award EPAM a default judgment, dismiss Rao's counterclaims, award EPAM its forensic costs and attorneys' fees, and enjoin Rao from competing against EPAM pending a hearing on damages and final relief.

Dated: August 26, 2026

Respectfully submitted,

*/s/ Jacob Oslick*

Jacob Oslick (Pa. Bar No. 311028)
joslick@seyfarth.com
James S. Yu (admitted *pro hac vice*)
jyu@seyfarth.com
Brooke K. Gary (admitted *pro hac vice*)
brgary@seyfarth.com
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018
(212) 218-5500

Matthew Christoff (admitted *pro hac vice*)
mchristoff@seyfarth.com
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, IL 60606
(312) 460-5000

*Attorneys for Plaintiff/Counterclaim-Defendant EPAM Systems, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 26, 2026, I electronically filed the foregoing Reply together with the Supplement Declaration of Jacob Oslick with Exhibits thereto with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to all counsel of record, and a courtesy copy sent via electronic mail to the following:

GOWTHAM ADAMANE ROA
184 Mansgrove Rd.
Princeton, NJ 08540
gowthamrao.litigation@gmail.com
gowthamrao@gmail.com

/s/ Jacob Oslick
Jacob Oslick