UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EPAM SYSTEMS, INC.,<br><br>Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>GOWTHAM RAO<br><br>Defendant/Counterclaim-Plaintiff. | Civil Action No. 2:25-cv-06260 |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**


**Page**

I. PROCEDURAL BACKGROUND ........ 1

II. EPAM'S PROPOSED AMENDMENTS ........ 3

III. ARGUMENT ........ 9

A. Legal Standard ........ 9

B. Justice Requires Granting EPAM Leave to File A Second Amended Complaint ........ 10

1. First Cause of Action: DTSA (CoReason) ........ 11

2. Second Cause of Action: PUTSA (CoReason) ........ 13

3. Fourth Cause of Action: Breach of Contract: Ownership of Work (Rao) ........ 13

4. Fifth Cause of Action: Breach of Contract: Non-Solicitation of Clients (Rao) ........ 14

5. Sixth Cause of Action: Breach of Fiduciary Duty and Faithless Servant (Rao) ........ 15

6. Seventh Cause of Action: Tortious Interference (CoReason) ........ 15

7. Eighth Cause of Action: Replevin (CoReason) ........ 16

8. Ninth Cause of Action: Conversion (CoReason) ........ 17

9. Tenth Cause of Action: Lanham Act (Rao and CoReason) ........ 17

10. Eleventh Cause of Action: Unfair Competition (Rao and CoReason) ........ 18

11. Twelfth Cause of Action: Declaratory Judgment (Rao and CoReason) ........ 19

12. Thirteenth Cause of Action: Unjust Enrichment (CoReason) ........ 20

C. Leave Should Be Granted Because Rao Cannot Establish Undue Delay, Bad Faith, or Prejudice ........ 20

D. CoReason Lacks Standing to Oppose this Motion ........ 23

CONCLUSION ........ 24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acclaim Sys., Inc. v. Infosys, Ltd.*,
2015 WL 4257463 (E.D. Pa. 2015) ....16

*Adams v. Gould, Inc.*,
739 F.2d 858 (3d Cir. 1984)....9, 10, 22

*Advanced Fluid Sys., Inc. v. Huber*,
28 F. Supp. 3d 306 (M.D. Pa. 2014), *aff'd*, 958 F.3d 168 (3d Cir. 2020)....18

*Advanced Power Sys., Inc. v. Hi-Tech Sys., Inc.*,
801 F. Supp. 1450 (E.D. Pa. 1992) ....16

*Alpha Card Servs., LLC v. Timothy Toombs Paycompass LLC*,
2026 WL 1161448 (E.D. Pa. 2026) ....16

*Alpha Pro Tech, Inc. v. WVR Int'l LLC*,
984 F. Supp. 2d 425 (E.D. Pa. 2013) ....17

*Ames Pub. Co. v. Walker–Davis Pubs., Inc.*,
372 F. Supp. 1 (E.D. Pa. 1974) ....18

*Bechtel v. Robinson*,
886 F.2d 644 (3d Cir. 1989)....10

*Bittner v. Waterford Twp. Sch. Dist.*,
2020 WL 10223599 (D.N.J. 2020) ....23, 24

*Coventry v. U.S. Steel Corp.*,
856 F.2d 514 (3d Cir. 1988)....10, 22

*Cureton v. Nat'l Collegiate Athletic Ass'n*,
252 F.3d 267 (3d Cir. 2001)....9

*Custom Pak Brokerage, LLC v. Dandrea Produce, Inc.*,
2014 WL 988829 (D.N.J. 2014) ....23, 24

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
539 U.S. 23 (2003)....17

*DePuy Synthes Sales, Inc. v. Globus Med., Inc.*,
259 F. Supp. 3d 225 (E.D. Pa. 2017) ....14

*Dole v. Arco Chem. Co.*,
921 F.2d 484 (3d Cir. 1990)....................10

*Harbor Bus. Compliance Corp. v. Firstbase.io, Inc.*,
2023 WL 3095563 (E.D. Pa. 2023) ....................12, 13, 20

*Houser v. Feldman*,
600 F. Supp. 3d 550 (E.D. Pa. 2022) ....................13, 17

*Hydrogen Master Rights, Ltd. v. Weston*,
228 F. Supp. 3d 320 (D. Del. 2017)....................16

*Ilapak, Inc. v. Young*,
No. 5:20-CV-01877, 2020 WL 2787689 (E.D. Pa. 2020) ....................18

*IQVIA, Inc. v. Breskin*,
2023 WL 2588450 (E.D. Pa. 2023) ....................12

*Long v. Wilson*,
393 F.3d 390 (3d Cir. 2004)....................10

*Neopart Transit, LLC v. CBM N.A. Inc.*,
314 F. Supp. 3d 628 (E.D. Pa. 2018) ....................15

*Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC*,
2012 WL 12896257. (E.D. Pa. 2012) ....................13

*Raab Family P'ship v. Borough of Magnolia*,
2009 WL 10689669 (D.N.J. 2009) ....................24

*Rehab. Inst. v. Equitable Life Assurance Soc'y of the U.S.*,
131 F.R.D. 99 (W.D. Pa. 1990) ....................9

*Shane v. Fauver*,
213 F.3d 113 (3d Cir. 2000)....................9

*State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*,
246 F.R.D. 143 (E.D.N.Y. 2007)....................23

*Synthes, Inc. v. Marotta*,
281 F.R.D. 217 (E.D. Pa. 2012).................... *passim*

*Vasquez v. Summit Women's Ctr., Inc.*,
2001 WL 34150397 (D. Conn. Nov. 16, 2001) ....................23

*Yakitori Boy, Inc. v. Starr Indem. & Liab., Co.*,
2019 WL 1259502 (E.D. Pa. 2019) ....................19

**Statutes**

Defend Trade Secrets Act ....................3, 11, 12, 13

Lanham Act....................3, 11, 17, 18

Pennsylvania Uniform Trade Secrets Act....................3, 13, 18, 20

**Other Authorities**

Fed. R. Civ. P.15....................1, 9, 10, 11, 18

F Fed. R. Civ. P. 21....................1, 8, 9

F Fed. R. Civ. P. 12....................19

Pursuant to Rules 15(a)(2) and 21 of the Federal Rules of Civil Procedure, Plaintiff and Counterclaim-Defendant EPAM Systems, Inc. ("EPAM"), respectfully requests leave to file a Second Amended Complaint to add new claims and factual allegations, and to add CoReason, Inc. ("CoReason"), as a defendant, alongside existing Defendant and Counterclaim-Plaintiff Gowtham Rao ("Rao"), (collectively, "Defendants"). As set forth in greater detail below, new facts that EPAM has discovered since the filing of its Amended Complaint support EPAM's proposed amendments. If leave is not granted, EPAM's alternative will be to file a separate, related action against CoReason, which is unnecessary and will be inefficient. Accordingly, EPAM requests leave to file a Second Amended Complaint within one week of the Court granting leave.

## I. PROCEDURAL BACKGROUND

EPAM commenced this action on November 4, 2025 by filing a complaint primarily related to misappropriation of trade secrets. (ECF #1.) On November 4, 2025, EPAM filed a motion for a temporary restraining order, preliminary injunction, and expedited discovery. (ECF #3.) The Court denied EPAM's motion for a temporary restraining order and scheduled a hearing for the preliminary injunction motion. (ECF #10.) The parties conferred and stipulated to resolve the motion. (ECF #20.) Subsequently, the parties entered into the Stipulated Forensic Protocol Agreement ("Forensic Protocol"), which granted EPAM limited access to certain documents within Rao's possession. (ECF #55.) A key purpose of the Forensic Protocol was to identify EPAM's "Confidential Information" and/or "Work" within Rao's possession, to confirm that Rao had not used or disclosed any of the EPAM Confidential Information or Work for non-EPAM purposes, and to then remediate the EPAM Confidential Information or Work. A professed goal of successful completion of the aforementioned steps was to enable resolution of the dispute altogether. This was exemplified by the Parties requests/consent to extending time for Rao to Answer the Complaint in hopes that successful completion of the aforementioned steps would

negate the need for Rao to Answer altogether. On April 20, 2026, in the hopes of narrowing the issues and leading the case towards resolution, EPAM filed an Amended Complaint to remove certain claims. (ECF #37.)

Unfortunately, the case did not resolve. To the contrary, the progression of the Forensic Protocol has had the opposite effect. Instead of providing evidence that Rao did not use or disclose EPAM Confidential Information or Work for non-EPAM purposes, EPAM discovered evidence that Rao engaged in a far broader and more egregious scheme to misappropriate EPAM's intellectual property than EPAM previously believed, including through his company CoReason. *See* Proposed Second Amended Complaint, ("SAC"), attached as **Exhibit 1**, ¶ 5. These documents also reflected that Rao began acting as a faithless servant in breach of his fiduciary duties to EPAM for a far longer period of time than EPAM originally believed. SAC ¶¶ 63-74. While EPAM uncovered some of this information by May 2026, it was unable (due to the parties' disagreements about the Forensic Protocol) to obtain confirmation from its relevant technical employees regarding the nature of the documents until late-July 2026, thus not being able to truly understand the extent of Rao's misappropriation and related damages to EPAM.

In addition, Rao also provided new information in his Answer and Counterclaims, through materials that he has posted on CoReason's website, and through initial discovery responses, which further support that Rao and CoReason misappropriated trade secrets and other confidential information, engaged in tortious inference and conversion, wrongfully solicited EPAM's clients, and committed other improper acts. *See* SAC ¶¶ 111-114; 177; 191-192; 204-205.

The current posture of the case is that the parties are litigating a dispute over Rao's spoliation of evidence, with EPAM's motion fully briefed, and an evidentiary hearing upcoming on September 16. This case otherwise is in its infancy. The pleadings have not closed. Neither

party has served an Answer to each other's claims/counterclaims, and both plan to re-file their motions to dismiss after a decision on the spoliation motion. (ECF #49.) EPAM served its first set of discovery requests on August 10, 2026. Rao began serving discovery requests on August 15. Rao began responding to discovery on or about August 28, and provided additional discovery (including a large document production) over Labor Day Weekend. EPAM is currently seeking a protective order quashing certain of those requests, and has begun the process of drafting responses and objections concerning other requests. No depositions have taken place. The discovery deadline is currently September 30, 2026, but the Court indicated at the May 20, 2026 hearing that this deadline would likely be extended in due time, and EPAM is in the process of seeking an extension.

## II. EPAM'S PROPOSED AMENDMENTS

The factual allegations set forth below form the basis of the new claims asserted in the Second Amended Complaint. *See generally*, SAC. The SAC includes additional or revised claims against Rao under the Lanham Act, for breach of contract, breach of fiduciary duty, unfair competition, and for declaratory judgment. *Id.* The SAC also includes claims against an additional defendant, CoReason, under the Defend Trade Secrets Act ("DTSA"), the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), the Lanham Act, for the torts of tortious interference, conversion, unfair competition, and unjust enrichment, for replevin, and for declaratory judgment. *Id.*

Indeed, only after filing the Amended Complaint, did EPAM learn that Rao's massive theft of 44,960 EPAM files was only one part of an even more brazen scheme to misappropriate EPAM's confidential information and intellectual property ("IP"). The scheme further involved Rao using EPAM's confidential information and IP to unfairly compete against EPAM through his competing enterprise, CoReason. *Id.*

In brief, among the projects that Rao worked on at EPAM was Synapse, a "co-reasoning" platform, meaning that the technology worked by utilizing multiple artificial intelligence "agents" to analyze a problem simultaneously, using different perspectives. SAC ¶ 63. Since filing its Amended Complaint, EPAM has discovered that, while Rao was still an EPAM employee, Rao fed Synapse's source code and/or other highly confidential information about Synapse into a generative artificial intelligence ("AI") platform or model, in order to obtain (i) a document which provided step-by-step instructions for re-coding Synapse from scratch, and (ii) detailed notes on Synapse's internal architecture, and that Rao has retained this information following his employment. Rao had no legitimate business reason to use an AI platform to model or obtain step-by-step instructions for recoding a Synapse-like software product or to produce details of its internal architecture. *Id.* ¶ 66. The information would allow Rao to create a Synapse copy that maintained the same core features and functions as Synapse, but with different underlying file names and metadata, to disguise the copy's reliance on misappropriated Synapse data and make it more difficult to determine the origin of his competing product. *Id.*

The answer to "why" Rao would generate, and furthermore retain, these documents, is that Rao planned to and indeed did launch a copycat of Synapse through his company, CoReason.

Rao marketed his version of Synapse, based on stolen EPAM confidential information and IP, to investors, in order to raise money for CoReason. According to Rao, on September 16, 2025, Rao was pitching business development on behalf of EPAM, which was attended by Ammar Shallal and Dr. David Youmans (both of whom would later join him at CoReason) when he first contemplated creating his own competing venture. According to Rao, what began as a business development discussion for EPAM culminated in the "question why I was not doing such work

independently myself," and that question was the "initial seed of what later became CoReason." (Resp. to Interrog. No. 7.)

Two days later, on September 18, 2025, Rao contacted a high-level EPAM client representative ("Executive #1"), in order to pitch him on partnering with him on CoReason. *See* ECF No. 58-9; SAC ¶ 69. In response, Executive #1 committed to providing Rao's new company with $500,000 in work over the next six months. *See* ECF No. 58-9 at 13; SAC ¶ 70. Rao and Executive #1 specifically discussed the need for "absolute confidentiality" because Rao was "still employed by EPAM." SAC ¶ 71. On the same day, Rao and/or his CoReason business partner, Ammar Shallal, registered a domain name, www.coreason.ai. *Id.* ¶ 72. The next day, September 19, 2025, according to an AI-generated summary of a conversation between Rao and Executive #1, he and Executive #1 finalized a plan to spin out an AI project, currently at EPAM, into a new independent venture. SAC ¶¶ 71-74.

On September 21, 2025, Rao outlined his plan to unfairly compete with EPAM by launching an EPAM competitor based on work he performed for EPAM (*i.e.*, Synapse) to another individual, ("Executive #2"). *See* ECF No. 58-10; SAC ¶ 75. According to an AI-generated summary of the conversation, Rao told Executive #2 he would try to "circumvent" IP issues by rebuilding the system (*i.e.*, Synapse) himself. SAC ¶ 75. At this point, Rao had the misappropriated means to follow through with this plan. He had already obtained an AI-generated "step-by-step" plan for coding Synapse from scratch, making it easy for him to ostensibly "write [his] own code" to create a Synapse-like product. *See* ECF No. 58-10; SAC ¶ 75. That same day, Rao sent EPAM's "Sales Battle Card" for Synapse, which set forth a marketing strategy for Synapse, to a nondescript personal email address. *See* ECF No. 58-16; SAC ¶ 100.

While undertaking this effort, Rao purposefully underperformed at EPAM, in order to engineer his own involuntary termination. SAC ¶¶ 6, 78, 184. In Rao's view, if he succeeded in getting EPAM to involuntarily terminate him, he would be free to compete against it. *Id.* On or about September 21, 2025, Rao had a conversation with another individual, ("Executive #2"), about his plan to purposefully underperform. *See* ECF No. 58-11; SAC ¶ 75. According to his own summary of the conversation, Rao explained to Executive #3 that he would remain an EPAM employee while working "in the shadows" to develop his EPAM competitor. *Id.* During his EPAM employment, he would be "slowly weaning, being less responsive," until EPAM terminated him for cause, which would "nullify his non-compete clause." *Id.* ¶ 78. Rao also alluded to this plan to Executive #1 on or about September 18, 2025. *Id.* ¶ 79. In late September, Rao proposed to EPAM that he resign via a mutually agreeable separation, but only if EPAM would waive his post-employment restrictive covenants. EPAM declined to waive the covenants and Rao rescinded his proposal. *Id.* ¶ 83.

From at least September 18, 2026 through his eventual termination, Rao continued planning discussions with his now-parter in CoReason, and took steps to solicit investors.

Shortly before his termination, and while he had taken significant steps to start his competing company, Rao downloaded massive amounts of EPAM Confidential Information and Work to his personal computer, and also deleted critical files and folders about Synapse from an EPAM storage account, - all of this for his and CoReason's benefit. SAC ¶ 93, 96.

Rao was terminated by EPAM on October 15, 2025 based on suspicious conduct. Rao incorporated CoReason in Delaware the next day, on October 16, 2025. SAC ¶ 105. That same day, Rao declared on an external communication platform that he was now competing with EPAM. *Id.* ¶ 104.

Two days after his termination, on October 17, 2025, Rao and his partner at CoReason, Ammar Shallal, were already meeting with an EPAM client, Johnson & Johnson ("J&J"), in an effort to secure business for CoReason. *See* ECF No. 33-9 at 5; SAC ¶ 107. According to his own allegation, Rao had already secured a Statement of Work from J&J by October 20, 2025. SAC ¶ 108.

The CoReason website reflects that it is not a one-man shop, but a sophisticated and extremely well-funded company, which at one point had two "Senior Strategic Advisor[s]", a "Data Officer", a "Legal Advisor", a "Founding Investor" (Shallal), and a "Clinical Advisor." SAC ¶ 110. The website also explains what CoReason's product does, including its function and capabilities. CoReason's own description on the prior version of its website, including the use of "[p]arralel agents" to analyze a problem (*see* ECF No. 58-23 at 7), reflects that CoReason is a copycat of EPAM's Synapse. SAC ¶ 111. To the extent that CoReason's specific features are different, those different features appear to reflect proposals that Rao made as an EPAM employee. *Id.* Rao's work on those proposals, by virtue of the Ownership of Work Product provision of Rao's Covenant Agreement, is EPAM property. *Id.* Separately, EPAM discovered that CoReason also has a subsidiary in India, and has been hiring and recruiting employees in India, including at least one person then-employed by EPAM.

Via the parties' forensic protocol, EPAM identified a "CoReason Stakeholder Communication Toolkit" on Rao's personal Google Drive. SAC ¶ 113. The 274-page document appears to set out CoReason's comprehensive business plan. *Id.* Included with this business plan are six "Strategic Recipes" that appear to be misappropriated, in large part, from six EPAM "Recipes" that existed on an EPAM Sharepoint folder during Rao's employment. *Id.* All six of

CoReason's "Strategic Recipes" contain the same names and, with some differences in wording, similar substance as the EPAM "Recipes." *Id.*

Even CoReason's corporate name appears to have been taken from EPAM, as EPAM materials from July 2025 specifically describe Synapse as "Your AI Co-reasoning Partner," and one of EPAM's Recipes sets forth the "ingredients" for "Protocol Co-Reasoning." SAC ¶ 114.

Rao misappropriated EPAM's confidential information and IP, including trade secrets, by disclosing such materials to CoReason. SAC ¶ 128-129. Rao owns and controls CoReason, so Rao's knowledge must be imputed to CoReason. *Id.* CoReason knew or should have known that the materials Rao used to create the CoReason software product contained EPAM's confidential information and IP, including trade secrets. *Id.*

Rao and CoReason are now actively marketing and seeking to sell, including to current and potential EPAM clients, a competitor to EPAM's Synapse product. SAC ¶ 133. This Synapse competitor is built on EPAM confidential information and IP, including trade secrets, that Rao misappropriated from EPAM and then disclosed to CoReason. *Id.*

On August 10, 2026, EPAM notified Rao of its intent to file a Second Amended Complaint. *See* Parties' Correspondence regarding Second Amended Complaint, attached herewith as **Exhibit 2**. In his August 14, 2026 response, Rao indicated that he would not consent to the filing of the proposed Second Amended Complaint on the following grounds: (1) consent is not sufficient to join an additional party under Rule 21; (2) the Court has already sequenced the case; (3) the current discovery schedule would prejudice CoReason; (4) the new claims are futile. *Id.* As a result, EPAM brings the present motion. Then, as EPAM was preparing this motion, Rao responded to discovery. EPAM waited to file this motion until after not only the initial wave of Rao's discovery responses and document production appeared complete, but also until EPAM had an opportunity to conduct

at least an initial review of these materials. Rao produced documents a large quantity of documents over Labor Day Weekend, and EPAM finalized its proposed Second Amended Complaint and this motion within a week after receiving that production.

## III. ARGUMENT

### A. Legal Standard

Read together, Rules 15 and 21 of the Federal Rules of Civil Procedure permit the amendment of a complaint to add a party either by agreement of the parties or upon leave of court, which "[t]he court should freely give . . . when justice so requires." Fed. R. Civ. P. 15(a)(2).

A district court may deny leave to amend a complaint if the defendant has demonstrated undue delay or bad faith, if the amendment would be futile, or if the amendment would prejudice the other party. *Synthes, Inc. v. Marotta*, 281 F.R.D. 217, 224 (E.D. Pa. 2012). In the absence of these factors, leave to amend should be freely given. Futility means that the amended complaint "would fail to state a claim upon which relief could be granted. *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000). "Complication of the issues alone does not justify denying plaintiffs' motion for leave to amend." *Synthes*, 281 F.R.D at 227 (internal quotation marks and citations omitted).

"The touchstone of whether the amendment should be allowed is the issue of prejudice. Only where 'the amendment substantially changes the theory on which the case has been proceeding and is proposed late enough so that the opponent would be required to engage in significant new preparation,' may the court deem it prejudicial." *Id.*, 281 F.R.D. at 227 (quoting *Rehab. Inst. v. Equitable Life Assurance Soc'y of the U.S.*, 131 F.R.D. 99, 102 (W.D. Pa. 1990)).

In the Third Circuit, delay alone does not justify denying a motion to amend. *See Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001) ("The mere passage of time does not require that a motion to amend a complaint be denied on grounds of delay"); *Adams v. Gould, Inc.*, 739 F.2d 858, 868 (3d Cir. 1984). Rather, it is only where delay becomes "'undue,'

placing an unwarranted burden on the court, or . . . 'prejudicial,' placing an unfair burden on the opposing party" that denial of a motion to amend is appropriate. *Adams*, 739 F.2d at 868.

Prejudice arises where a new complaint would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Long v. Wilson*, 393 F.3d 390, 400 (3d Cir. 2004). Even when a proposed amended complaint adds substantive allegations against a defendant, where the evidence required to meet these new allegations is substantially similar to that which was originally required, prejudice does not exist. *Coventry v. U.S. Steel Corp.*, 856 F.2d 514, 520 (3d Cir. 1988).

### B. Justice Requires Granting EPAM Leave to File A Second Amended Complaint

Justice requires granting EPAM leave to file a Second Amended Complaint. Rule 15 embodies a liberal policy favoring amendment so that claims may be resolved on their merits rather than on technical pleading limitations. *Dole v. Arco Chem. Co.,* 921 F.2d 484, 487 (3d Cir. 1990); *Bechtel v. Robinson*, 886 F.2d 644, 652-53 (3d Cir. 1989) (holding justice required leave to amend to add defendant where plaintiffs learned new information during the litigation, promptly sought amendment upon discovering the proper party, and the case remained in the early stages of discovery). The proposed Second Amended Complaint is based upon significant evidence uncovered during the Forensic Protocol process, factual allegations contained in Rao's Answer and Counterclaims, materials discovered on CoReason's website, and facts learned in initial discovery that has just been received.

The Forensic Protocol process revealed misconduct substantially beyond what EPAM knew when it filed the Amended Complaint. The review revealed that Rao fed EPAM confidential information and IP into an artificial intelligence program, which generated a "step-by-step" guide

on how to rebuild the Synapse code from scratch. SAC ¶ 66. Rao then took this guide, along with 44,960 stolen EPAM files, and created his own, similar product known as CoReason. *Id.* ¶¶ 69, 73. Rao also solicited EPAM's clients for business for his competing product. *Id.* ¶ 106. Rao attempted to willfully evade his non-compete agreement with EPAM by purposefully underperforming until EPAM terminated him for cause. *Id.* ¶ 76. Now, Rao and CoReason are actively marketing a competitor product which contains EPAM's confidential information and IP. *Id.* ¶¶ 133-134.

These factual allegations form the basis of the new claims asserted in the SAC, including additional or revised claims against Rao under the Lanham Act, for breach of contract, breach of fiduciary duty, the tort of unfair competition, and for declaratory judgment. The SAC also includes claims against CoReason under the DTSA, PUTSA, Lanham Act, for the torts of tortious interference, conversion, unfair competition, and unjust enrichment, for replevin, and for declaratory judgment.

As discussed further below, the proposed amendment serves the core purpose of Rule 15 by allowing EPAM to present claims based on facts that were discovered during the course of this litigation. Denying leave would not eliminate those claims, but would merely force EPAM to file a separate action asserting substantially identical facts against substantially identical parties based on substantially identical evidence, which is unnecessary and inefficient. Justice is best served by resolving all related disputes in a single proceeding. Thus, justice requires granting EPAM leave to amend its complaint to address Defendant Rao and CoReason's willful tortious conduct and unfair business practices.

1. **<u>First Cause of Action: DTSA (CoReason)</u>**

Justice requires granting EPAM leave to amend its complaint to include CoReason in its claim for misappropriation of trade secrets under the DTSA. Such an amendment is not futile

because the SAC articulates sufficient facts to set out a claim under the DTSA against CoReason. *Synthes, Inc.*, 281 F.R.D. at 233 ("Because the proposed Amended Complaint, as pled, clearly states claims against [co-Defendant] upon which relief may be granted, the Court cannot deem the amendment to add him as a defendant to be futile"); *Harbor Bus. Compliance Corp. v. Firstbase.io, Inc.*, 2023 WL 3095563, at *5 (E.D. Pa. 2023) (denying motion to dismiss DTSA claim because "the Complaint's allegations that the Firstbase Agent service on its website in November 2022 looked "remarkably similar" to the one [Plaintiff] provided are sufficient to plead [Defendant's] misappropriation of [Plaintiff's] trade secrets"); *IQVIA, Inc. v. Breskin*, 2023 WL 2588450 at *7 (E.D. Pa. 2023) (granting leave to amend complaint in trade secrets litigation where employee downloaded employer files shortly before leaving to work for competitor).

In brief, Rao is now actively competing against EPAM through his company CoReason. It is more than plausible that Rao has shared some of the trade secrets he improperly downloaded from EPAM with CoReason. Further, as CoReason's founder and CEO, Rao's knowledge regarding EPAM's trade secrets, including what he misappropriated from EPAM, should be imputed to CoReason. SAC ¶ 132.

Those inferences aside, since filing the Amended Complaint, EPAM has uncovered strong evidence to support CoReason's misappropriation of EPAM trade secrets. Specifically, it has learned that Rao likely misappropriated EPAM's trade secrets by feeding EPAM materials that it considers trade secrets (*i.e.*, the source code and/or sensitive architectural documents) into a generative AI platform, which produced a step-by-step guide to recode its Synapse technology. *Id.* ¶¶ 109, 134, . Rao also bragged to a friend about how he intended to take technology he developed while at EPAM, and recode it from scratch in order to compete with EPAM. Then, shortly after Rao's EPAM employment ended, Rao and CoReason began actively marketing and seeking to sell

a competitor to EPAM's Synapse product. *Id.* ¶¶ 129, 133. The most logical inference from these facts is that CoReason is marketing a product that was developed based upon stolen EPAM trade secrets.

These facts warrant amending the complaint to include CoReason in EPAM's claim under the DTSA.

2. **Second Cause of Action: PUTSA (CoReason)**

For similar reasons, justice requires allowing EPAM to amend the complaint to include CoReason in its claim under the PUTSA. The amendment would not be futile because the SAC alleges sufficient facts to establish that both Rao and CoReason misappropriated EPAM's trade secrets, including by using EPAM's trade secrets to build an competing product based upon misappropriated EPAM's Synapse technology. *Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC*, 2012 WL 12896257. *2-3 (E.D. Pa. 2012) (finding amendment to add PUTSA claim where defendants allegedly misappropriated a customer list would not be futile); *Harbor Bus. Compliance Corp.*, 2023 WL 3095563, at *5 (denying motion to dismiss PUTSA claim); *Synthes*, 281 F.R.D. at 233. Because CoReason is owned and controlled by Rao, CoReason knew or should have known the materials used to build the core product advertised on CoReason's website was based off of EPAM's trade secrets. SAC ¶¶ 145, 255. The Court should grant EPAM leave to amend the complaint to include CoReason in its PUTSA claim.

3. **Fourth Cause of Action: Breach of Contract: Ownership of Work (Rao)**

An amendment to include a breach of the Ownership of Work provision of Rao's Covenants Agreement would not be futile because the SAC alleges each element of a breach of contract claim. *Houser v. Feldman*, 600 F. Supp. 3d 550, 561-62 (E.D. Pa. 2022) (denying motion to dismiss contract claim based on employment agreement inventions policy). Rao entered into a

valid contract with EPAM, the Covenants Agreement, in connection with his employment. SAC ¶¶ 155-158. The Ownership of Work provision of the Covenants Agreement states that any "trade secret, work product and original work of authorship" made in connection with or in the course of Rao's employment with EPAM is the exclusive property of EPAM. *Id*. ¶¶ 50-53; 167. Rao breached this provision of the Covenants Agreement by claiming ownership of work product developed during his EPAM employment and by seeking to profit from this work product through CoReason. *Id.* ¶ 165. The Court should grant EPAM leave to amend the complaint to include the breach of the Ownership of Work provision.

#### 4. **Fifth Cause of Action: Breach of Contract: Non-Solicitation of Clients (Rao)**

Justice requires granting EPAM leave to amend the complaint to include an additional breach of contract claim against Rao because EPAM has alleged direct solicitation of EPAM's clients by Rao. *DePuy Synthes Sales, Inc. v. Globus Med., Inc.*, 259 F. Supp. 3d 225, 232, 249 (E.D. Pa. 2017) (denying motion to dismiss breach of contract claim where the complaint alleged facts to support an interference that the consultants had solicited plaintiff's customers). The Covenants Agreement includes an enforceable non-solicitation covenant. SAC ¶¶ 48; 173-79. Rao breached the non-solicitation covenant by soliciting and/or contacting EPAM clients on behalf of himself for the purpose of offering services similar or competitive to those offered by EPAM. *Id.* ¶ 173. Rao breached this covenant both during his employment with EPAM and in the 12-month period following the termination of his employment. *Id.* For example, during employment Rao solicited a client executive to join his new competing venture he was planning, and shortly after Rao's termination he secured a Statement of Work agreement from an EPAM client, J&J. *Id.* ¶¶ 71-73; 108. The Court should allow EPAM to amend its complaint to include the breach of the non-solicitation covenant.

5. **Sixth Cause of Action: Breach of Fiduciary Duty and Faithless Servant (Rao)**

An amendment to include further factual allegations to EPAM's existing breach of fiduciary duty is not futile because the claim will survive a motion to dismiss and EPAM has since learned of further breaches of Rao's fiduciary duties. *Neopart Transit, LLC v. CBM N.A. Inc.*, 314 F. Supp. 3d 628, 637-38 (E.D. Pa. 2018) (rejecting gist of the action argument and denying motion to dismiss because "as long as the fiduciary duties at issue extend beyond the limits of a contract due to the parties' relative positions, the gist of the action doctrine will not bar a claim for breach of loyalty") (internal quotations and citation omitted)). In addition to the fraudulent representations and data theft allegations that currently support EPAM's breach of fiduciary duty claim against Rao, Rao—while still employed by EPAM—began planning a competing enterprise using misappropriated EPAM confidential information and IP. SAC ¶¶ 65-75; 184. Rao's planning of this competitor company involved further breaches, including refactoring EPAM's software code, but withholding these revisions from EPAM, and feeding EPAM's confidential information and IP into a generative AI platform to obtain instructions on how to duplicate EPAM's Synapse product. *Id.* Rao also attempted to permanently delete EPAM's files on the company network and intentionally underperformed to induce EPAM to terminate his employment, in an attempt to evade his non-competition restrictive covenant. *Id.*

6. **Seventh Cause of Action: Tortious Interference (CoReason)**

The tortious interference claim is not futile. CoReason knowingly accepted, utilized, and benefited from EPAM confidential information and intellectual property, work product belonging to EPAM, and client solicitations undertaken in violation of Rao's contractual obligations to EPAM. CoReason's business operations, commercial offerings, and efforts to compete against EPAM were advanced through Rao's breaches of his contractual obligations concerning

confidentiality, ownership of work product, and client non-solicitation. Further, CoReason necessarily encouraged Rao to engage in this conduct, as its very business model depended upon Rao's breaches of his contractual confidentiality and non-solicitation obligations to EPAM. *See* SAC ¶¶ 188-195*; Acclaim Sys., Inc. v. Infosys, Ltd.*, 2015 WL 4257463, at *3-4 (E.D. Pa. 2015) (sustaining tortious interference claim where defendant knowingly induced violations of restrictive covenants); *Alpha Card Servs., LLC v. Timothy Toombs Paycompass LLC*, 2026 WL 1161448, at *7 (E.D. Pa. 2026) (holding that allegations that a competing company knowingly encouraged conduct in violation of contractual restrictions stated a tortious interference claim); *Synthes*, 281 F.R.D. at 233. At a minimum, these allegations plausibly support the conclusion that CoReason participated in conduct that interfered with EPAM's contractual rights. Any challenge to the ultimate merits of that claim is not a basis to deny amendment at the pleading stage.

7. **Eighth Cause of Action: Replevin (CoReason)**

Justice requires adding CoReason to EPAM's existing claim for replevin. *Synthes*, 281 F.R.D. at 233; *Advanced Power Sys., Inc. v. Hi-Tech Sys., Inc.*, 801 F. Supp. 1450, 1457-58 (E.D. Pa. 1992) (denying motion to dismiss replevin claim where complaint "alleged surreptitious taking from an employer by a former employee"); *Hydrogen Master Rights, Ltd. v. Weston*, 228 F. Supp. 3d 320, 335 (D. Del. 2017) (finding "documents or other physical objects containing confidential information, as well as computer disks or tapes containing software are tangible and thus able to be replevied") (internal citation omitted). Both Rao and CoReason are currently in possession and control of EPAM's property, including EPAM's confidential information. SAC ¶ 197. Rao and CoReason are actively marketing and selling a software product that was built using the source code of EPAM's Synapse product. *Id.* ¶¶ 133-134; 150-151. Rao and CoReason have no right to possess EPAM's confidential information and IP, but nevertheless are claiming ownership of the competitor product that is nearly identical to Synapse. *Id.* ¶ 196. EPAM's possessory right in its

own confidential information and IP, and products derived from such information, is superior to that of Rao and CoReason. *Id.*

8. **Ninth Cause of Action: Conversion (CoReason)**

EPAM's SAC alleges sufficient facts to establish both CoReason and Rao misappropriated EPAM's property. SAC ¶ 203-211. Rao disclosed EPAM's confidential information and IP to CoReason. *Id.* ¶ 203. Both Rao and CoReason continue to market EPAM confidential information and IP as the property of Rao and CoReason. *Id.* ¶ 204. Rao and CoReason misrepresented the origins of CoReason's product in its marketing materials. *Id.* ¶¶ 207-209. Justice thus requires allowing EPAM to amend its complaint to include CoReason in its claim for conversion. *See Synthes*, 281 F.R.D. at 233; *Houser*, 600 F. Supp. 3d at 567-68 (denying motion to dismiss conversion claim because "a properly pled claim of conversion therefore must include an allegation that a defendant acquired the information through misconduct. . . [m]isconduct can include misrepresentations").

9. **Tenth Cause of Action: Lanham Act (Rao and CoReason)**

The claims against Rao and CoReason under the Lanham Act are not futile because they are distinct from EPAM's claims of trade secret misappropriation. *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 29-30 (2003). EPAM's Lanham Act claim is based on Rao's and CoReason's alleged commercial representations and omissions that create a misleading impression regarding the origin, ownership, and legitimacy of the technology being marketed through CoReason. This claim is distinct from the trade secrets claim, and does not depend on it. Indeed, even if the trier of fact somehow finds that Rao's misappropriation did not involve trade secrets, but rather other EPAM confidential information and property that does not rise to the level of trade secrets, the claim would remain equally viable. Defendants who intentionally create false impressions are liable under the Lanham Act. *Alpha Pro Tech, Inc. v. WVR Int'l LLC,* 984 F. Supp.

2d 425, 451 (E.D. Pa. 2013) (noting that the Lanham Act does not require that statements be "literally false" and that liability "arises if the commercial message or statement is either (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers") (internal citations omitted); *Ames Pub. Co. v. Walker–Davis Pubs., Inc.*, 372 F. Supp. 1, 11 (E.D. Pa. 1974) (liability is not limited to descriptions, "but extends to instances where the defendant creates a false impression").

Advertising a product, without attribution to the product's designer, has a tendency to deceive consumers because the "ambiguity[] invites the logical inference that Defendants [] designed [the product]." *Advanced Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 352 (M.D. Pa. 2014), *aff'd*, 958 F.3d 168 (3d Cir. 2020). The description of CoReason's product on its website does not include any attribution to the origins of the product, or mention EPAM in any capacity. SAC ¶ 211. The lack of attribution invites the logical inference that Rao, as CoReason's Founder and CEO, developed the product. *See id.* ¶¶ 222-225. CoReason's and Rao's failure to indicate that its product was developed with EPAM's confidential information has the capacity to deceive consumers. *Id.* ¶ 223. These allegations are more than sufficient to state a plausible Lanham Act claim and therefore cannot be deemed futile at the Rule 15 stage.

10. **<u>Eleventh Cause of Action: Unfair Competition (Rao and CoReason)</u>**

The unfair competition claims against both Rao and CoReason are not preempted by the Pennsylvania Uniform Trade Secrets Act (PUTSA) because the claims, pled in the alternative if necessary, arise from confidential information that does not rise to the level of trade secrets. Moreover, the possibility of preemption later in the proceedings does not deem an amendment futile. *Ilapak, Inc. v. Young*, No. 5:20-CV-01877, 2020 WL 2787689, at *5 (E.D. Pa. 2020) (Tort claims that may or may not be preempted by PUTSA are not dismissed at the motion to dismiss stage). Further, the unfair competition claim also depends on material misrepresentations in the

marketing of CoReason. Rao, on behalf of CoReason, published a professional website that described CoReason's product. SAC ¶ 231. Using this website, Rao and CoReason have marketed and continue to market CoReason's product to investors and prospective clients, including EPAM's clients and prospective clients, as CoReason's original product. *Id.* ¶ 230. There is no reference to EPAM or Synapse anywhere on CoReason's website. *Id.* ¶ 242. In reality, Rao created the software advertised on the CoReason website by feeding EPAM's trade secrets and confidential information into an AI model to create a guide to recreate the Synapse code from scratch. *Id.* ¶ 235. Both Rao and CoReason have actual knowledge that its product was developed with EPAM's proprietary software, code, and trade secrets. *Id.* ¶ 239. Rao and CoReason have also misappropriated business plans and marketing materials such as bid proposals, pricing information, and the Synapse "Sales Battle Card" in its efforts to market and sell CoReason's product. *Id.* ¶ 245. EPAM's SAC has alleged sufficient facts for the unfair competition claims to survive a Rule 12(b)(6) motion. The proposed amendment is not futile.

11. **Twelfth Cause of Action: Declaratory Judgment (Rao and CoReason)**

In regard to Plaintiff's claim for declaratory judgment, CoReason's core product appears to be a misappropriated version of Synapse according to its website. SAC ¶¶ 250-55. There is no indication that CoReason has any other intellectual property. *Id.* If Plaintiff takes the position CoReason has intellectual property that was developed independent of EPAM's Confidential Information and IP, the proper venue for such a dispute is discovery followed by motion practice and/or trial. There is no basis to deny leave to amend the Amended Complaint on these grounds. *Yakitori Boy, Inc. v. Starr Indem. & Liab., Co.*, 2019 WL 1259502, at *3 (E.D. Pa. 2019) (granting motion to amend in declaratory judgment action to add additional plaintiffs). Justice requires permitting EPAM to amend the complaint to add a claim for declaratory judgment against both Rao and CoReason.

12. **<u>Thirteenth Cause of Action: Unjust Enrichment (CoReason)</u>**

The unjust enrichment claim is not preempted by the Pennsylvania Uniform Trade Secrets Act (PUTSA) because the claim, pled in the alternative if necessary, arises from confidential information that does not rise to the level of trade secrets. *Harbor*, 2023 WL 3095563, at *5. The SAC alleges sufficient facts to establish that both Rao and CoReason are unjustly enriching themselves by misrepresenting CoReason's product as their own. SAC ¶ 250-252, 258-260. Rao and CoReason have also solicited EPAM's clients despite actual knowledge that such solicitation violates Rao's Covenants Agreement with EPAM. SAC ¶¶ 174-178. The Court is well within its authority to grant EPAM leave to amend the complaint to add CoReason to its existing unjust enrichment claim.

**C. Leave Should Be Granted Because Rao Cannot Establish Undue Delay, Bad Faith, or Prejudice**

Here, there has been no undue delay, nor can Rao offer evidence of bad faith or prejudice. And the proposed amendment certainly is not futile, in particular as to Rao.[1] There has been no undue delay. Plaintiff filed the Amended Complaint on April 20, 2026. ECF No. 37. Since then, the parties continued to engage in the Forensic Protocol process, and EPAM was eventually able to share certain of these documents with its technical employees. As a result, EPAM discovered additional claims against both Defendant Rao and CoReason beyond what it knew when it filed the Amended Complaint. The evidence obtained through those documents, along with statements that Rao made in his Answer and Counterclaims, in response to initial discovery, and on

[1] Indeed, even if CoReason had standing to oppose this motion, or if Rao had standing to do so on its behalf, CoReason has been aware that it may be added to this case. CoReason's CEO and Founder is the sole Defendant in this litigation and its own product is now the central issue. Plaintiff has sufficient evidence to assert claims against CoReason based upon the documents produced by Defendant and Defendant's statements in his Answer and Counterclaims. Nothing in the document productions, or Defendant's own admissions, should come as any surprise to CoReason.

CoReason's website, indicates that Rao, through his company CoReason, has engaged in a scheme to misappropriate EPAM's intellectual property (including its Synapse software), is currently marketing competing software that is based on misappropriated trade secrets and confidential information, has solicited EPAM's clients, and is seeking to profit from this product.

Upon discovering certain of this evidence, EPAM immediately took steps to confirm the nature and significance of the recovered materials. EPAM's efforts were impeded, however, by Rao's insistence that these documents could not be shared with non-attorneys (notably, Rao now admits that "no attorneys'-eyes-only designation governs these materials"). Indeed, before filing the present Motion, EPAM advised the Court that documents recovered through the forensic review presented "a compelling case for EPAM to seek to amend its complaint to assert new claims, potentially against additional parties," but that EPAM was unable to complete the necessary factual investigation because Rao insisted that the materials could be reviewed only by attorneys and not by EPAM's technical personnel. *See* **Exhibit 3** (July 17, 2026 Letter Regarding Forensic Protocol Dispute) at 3; **Exhibit 4** (July 20, 2026 Reply Letter Regarding Forensic Protocol Dispute (exhibits to this letter are not included here)). Once EPAM was able to obtain the necessary technical review and confirm the significance of the recovered materials, it promptly began preparing the proposed Second Amended Complaint, followed by a meet-and-confer process with Rao. In short, EPAM began efforts to prepare the Second Amended Complaint as soon as it established that it had sufficient grounds to bring additional, related claims against Rao and CoReason. Further, while EPAM was in the midst of preparing this motion, Rao began responding to discovery. It was prudent, not improper, for EPAM to wait a little while more until Rao completed at least the first wave of his discovery responses, and EPAM had the opportunity

to conduct an initial review of the discovery produced. There was no delay. To the contrary, the record demonstrates diligence.

Moreover, any delay was not undue and neither Rao nor CoReason will be prejudiced if the amendment is permitted. *Adams*, 739 F.2d at 868 (holding that delay is only "undue," where it places "an unwarranted burden on the court," and is only "prejudicial," where it places "an unfair burden on the opposing party"). To establish prejudice, Rao must do more than merely allege it; he must identify a specific way in which the proposed amendment would impair his ability to defend the case. *Coventry*, 856 F.2d at 520. Rao cannot make that showing here. Indeed, the factual allegations underlying the proposed Second Amended Complaint arise from the very same course of conduct already at issue in this litigation, namely Rao's alleged misappropriation and misuse of EPAM's confidential information, intellectual property, and client relationships. The proposed amendment does not introduce an unrelated dispute; rather, it expands upon facts uncovered through formal and informal discovery and other litigation activity, and seeks to add CoReason, the entity through which Rao allegedly carried out much of the misconduct described in the proposed pleading.

From the outset of this litigation, both Rao and CoReason should have reasonably anticipated that CoReason could be brought into the case as a co-defendant. The sole Defendant currently in the lawsuit is CoReason's Founder and CEO. Moreover, CoReason's principal technology and business activities are already central to EPAM's existing claims and to the parties' ongoing discovery efforts. The Court has already indicated that the discovery deadline would likely be extended. As a practical matter, formal discovery remains in its early stages. EPAM served its first set of discovery requests on August 10, 2026, Rao did not begin serving discovery requests until August 15, 2026, did not begin responding to discovery until August 28, and did not

begin producing documents until Labor Day Weekend. EPAM has not yet responded to discovery or produced documents, and no depositions have been taken. No party will be required to duplicate completed discovery, or revisit prior depositions. Rao (and CoReason) are not being unfairly disadvantaged or deprived of the opportunity to present facts or allegations. Rao has had, and will have, ample opportunity to do so (as will CoReason).

Nor will permitting amendment meaningfully delay resolution of this action. To the contrary, resolving EPAM's related claims against Rao and CoReason in a single proceeding promotes efficiency and avoids the need for a separate lawsuit based on substantially the same facts, witnesses, and evidence. Requiring EPAM to pursue its claims against CoReason in a separate action would create duplicative litigation, risk inconsistent rulings, and result in the unnecessary expenditure of party and judicial resources. Under these circumstances, amendment promotes efficiency rather than delay. Indeed, compared to the prospective of a second, duplicative litigation, permitting EPAM's proposed amendment would, if anything, benefit Rao and CoReason by ensuring the final resolution of potential claims in this case.

**D. CoReason Lacks Standing to Oppose this Motion**

As other courts in this circuit (and others) have held, CoReason does not have standing to oppose this motion because it is not yet a party to the lawsuit. *See Bittner v. Waterford Twp. Sch. Dist.*, 2020 WL 10223599, at *2 (D.N.J. 2020) (citing *Custom Pak Brokerage, LLC v. Dandrea Produce, Inc.*, 2014 WL 988829, at *2-3 (D.N.J. 2014)) (finding that proposed new defendants lack standing to oppose a motion to amend the pleadings); *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, 246 F.R.D. 143, 146 n.1 (E.D.N.Y. 2007) (finding that the proposed new defendants do not have standing to oppose the proposed amendments because they are not yet named parties in the action); *Vasquez v. Summit Women's Ctr., Inc.*, 2001 WL 34150397, at *1 n.1

(D. Conn. Nov. 16, 2001) ("the standing of nonparties to challenge a motion for leave to file an amended complaint that seeks to add them is, at best, dubious").

Thus, the only party that has standing to argue undue delay, bad faith, or prejudice is Rao. While he may oppose this Motion on the grounds that CoReason will be unduly delayed or prejudiced, he "may not raise a futility argument as to proposed claims against proposed new parties." *Raab Family P'ship v. Borough of Magnolia*, 2009 WL 10689669, at *4 (D.N.J. 2009); *see also Custom Pak Brokerage*, 2014 WL 988829, at *2 (same). Rather, upon service of the Second Amended Complaint, CoReason "may, of course, challenge the sufficiency of the pleadings by way of dispositive motion practice." *Bittner*, 2020 WL 10223599, at *2.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant leave for EPAM to file a Second Amended Complaint.

Dated: September 11, 2026

Respectfully submitted,

*<u>/s/ Brooke K. Gary</u>*
Brooke K. Gary (admitted *pro hac vice*)
brgary@seyfarth.com
Jacob Oslick (Pa. Attorney No. 311028)
joslick@seyfarth.com
James S. Yu (admitted *pro hac vice*)
jyu@seyfarth.com
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018
(212) 218-5500

Matthew Christoff (admitted *pro hac vice*)
mchristoff@seyfarth.com
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, IL 60606
(312) 460-5000

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on September 11, 2026 and copy via email as follows:

GOWTHAM ADAMANE ROA
184 Mansgrove Rd
Princeton, NJ 08540
gowthamrao@gmail.com
gowthamrao.litigation@gmail.com

*/s/ Brooke K. Gary*
Brooke K. Gary