# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EPAM SYSTEMS, INC., Plaintiff, - against - GOWTHAM RAO and COREASON, Inc. Defendants. | Civ. A. No. 2:25-cv-06260 |

## SECOND AMENDED COMPLAINT

Plaintiff EPAM Systems, Inc. ("EPAM" or the "Company"), by and through its undersigned attorneys, Seyfarth Shaw LLP, as and for its Second Amended Complaint against defendants Gowtham Rao ("Rao") and CoReason, Inc. ("CoReason") alleges as follows:

## NATURE OF THE ACTION

1. EPAM, a leading provider of technology solutions with a business unit dedicated to the life sciences industry, originally brought this action for injunctive relief and damages arising from Rao's blatant theft of over 44,000 data files, almost all of which contain confidential and/or trade-secret information relating to EPAM's business, along with proprietary source code developed by EPAM over time at significant expense throughout several software projects (collectively "EPAM Confidential Information and IP").

2. Between September 11 and October 14, 2025, while planning his exit from employment with EPAM, Rao secretly downloaded entire file repositories from EPAM's networks containing source code and other intellectual property, along with EPAM Confidential Information and IP regarding EPAM's clients and historical account information, RFP information and bid proposals, pricing information, project information (including designs and data models), client

contract documents, strategic proposals, business pipelines, and P&L and related financial information. Not only were Rao's actions unauthorized and in violation of Company policy, but there can be no business justification for his actions or his personal possession of this information. Indeed, many of the stolen files relate to historical data, clients, or projects about which Rao had no involvement, or are comprised of information that belongs to EPAM's clients about which EPAM is contractually obligated to these clients to maintain as confidential.

3. Before discovering the unauthorized downloads, Rao was terminated for cause on October 15, 2025 after the Company learned of several actions. First, on or about October 12, 2025, the words "Copyright 2025 Gowtham Rao" appeared in software code developed by the Company. Second, concerns were raised around the same time that Rao had attempted to permanently delete various files from EPAM's SharePoint site. Third, a week earlier, Rao had fraudulently represented to a longstanding Company client that he was a "free agent" in business for himself.

4. Immediately following Rao's termination, the Company launched an investigation into Rao's activities on its network, during which the unauthorized download of over 44,000 data files (the vast majority of which occurred between October 11 through October 13) came to light. In addition, Rao stole not only the source code to certain software tools owned by EPAM, but also source code to tools comprised of intellectual property owned by EPAM's clients that have been entrusted to EPAM and which EPAM is contractually required to maintain as confidential. The investigation also confirmed that Rao had attempted to permanently delete a large number of EPAM files from EPAM's servers.

5. EPAM has since learned that Rao's massive theft of over 44,000 files was only one part of a far larger scheme to misappropriate EPAM Confidential Information and IP, particularly

relating to EPAM's "Synapse"[1] technology, so that Rao could unfairly compete against EPAM through his pre-planned competing enterprise, CoReason.

6. Upon information and belief, Rao's other acts in furtherance of his scheme—most of which he undertook while still an EPAM employee who owed EPAM fiduciary duties—have included the following: (a) feeding Synapse's source code and/or other highly confidential information about Synapse into a generative artificial intelligence platform or model, in order to obtain incredibly detailed step-by-step instructions for re-coding Synapse from scratch; (b) "refactoring" Synapse code to improve the technology, but without sharing these improvements with the EPAM team—and instead keeping them in reserve to use on behalf of CoReason; (c) marketing his version of Synapse (based on stolen EPAM Confidential Information and IP) to investors, in order to raise money for CoReason; (d) contacting at least one high-level EPAM client representative, in order to pitch him on partnering with him on CoReason; (e) encouraging the same high-level EPAM client representative to cease ordering Synapse related services from EPAM and instead to order such services through him and CoReason (f) otherwise preparing to launch CoReason, including by having a domain name registered and incorporating the company in Delaware; (g) purposefully underperforming at EPAM, in order to engineer his own involuntarily termination so that, in Rao's view, he would be free to compete against EPAM; and (h) improperly downloading over 44,000 files from EPAM and *deleting* critical files and folders about Synapse from an EPAM storage account, for his and CoReason's benefit.

7. Rao's theft of EPAM's data files and intellectual property, along with the information that EPAM has learned since the filing of this action, confirms that Rao's plan all

---

[1] "Synapse" was a name that EPAM used internally during the software's development, not a final tradename. Together with MedRag, it forms part of EPAM's AI Accelerator software solution.

along was to compete with EPAM during his employment and after his exit and leverage the stolen information to aid his efforts. Indeed, Rao and/or his business partner registered the domain name for CoReason in September 2025, during his EPAM employment, finalized the company's incorporation in Delaware on October 16, 2025 (*one day* after his termination), and – by his own allegation – had already secured a Statement of Work from Johnson & Johnson ("J&J"), an EPAM client, by October 20, 2025 (just *five days* after his termination).

8. Since Rao's departure from EPAM, Rao and CoReason have been wrongfully competing against EPAM, using stolen EPAM Confidential Information and IP.

9. Indeed, in the morning of October 16, 2025, the same day that Rao incorporated CoReason, and a mere one day after his EPAM employment ended, Rao was already soliciting J&J on CoReason's behalf, representing to J&J that CoReason was "built to solve" problems, through its "transparent 'glass-box' platform." Quite obviously, Rao did not build CoReason's "'glass-box' platform" from scratch in the one-day after his EPAM employment ended. Rather, Rao built CoReason's platform using misappropriated EPAM technology and, within a day of his departure from EPAM, was already using that misappropriated technology to wrongfully compete against EPAM.

10. Rao's and CoReason's actions as described herein are in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1832, *et seq*., the Uniform Pennsylvania Trade Secrets Act, 12 Pa. C.S.A. § 5301, , *et seq*., the Lanham Act, 15 U.S.C.A. § 1125, *et seq*., and also constitute common law unfair competition, tortious inference, and conversion.

11. Additionally, Rao's actions as described herein his Employment Covenants Agreement (the "Covenants Agreement"), the Company's written policies with respect to the use

of the Company's computer equipment and the protection of EPAM Confidential Information and IP, and his fiduciary obligations to EPAM, among other legal obligations.

12. By this action, EPAM seeks, among other things, a return and forensic remediation of all EPAM Confidential Information and IP in Rao's and CoReason's possession and control, an injunction prohibiting him and CoReason from using or disclosing any EPAM Confidential Information and IP, an injunction enforcing his post-termination restrictive covenants, forfeiture of Rao's compensation during his period of his disloyal employment, damages resulting from his and CoReason's wrongful acts, punitive damages, and attorneys' fees.

13. Absent injunctive relief and specific performance of his contractual obligations, EPAM faces irreparable injury, including the loss of proprietary information relating to its business as contained and reflected in the intellectual property and thousands of files purloined by Rao that EPAM developed over the course of many years, at immense cost.

**<u>THE PARTIES</u>**

14. EPAM is a Delaware corporation with its principal place of business located in Newtown, Pennsylvania.

15. Upon information and belief, Rao is a citizen of the State of New Jersey and resides in Princeton, New Jersey.

16. Upon information and belief, CoReason is a Delaware corporation with its principal place of business in New Jersey.

**<u>JURISDICTION AND VENUE</u>**

17. This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 because this action involves a claim arising under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1832, *et seq.* and the Lanham Act, 15 U.S.C.A. § 1125, *et seq.*, and supplemental jurisdiction under 28

U.S.C. § 1367 because all other claims are so related that they form part of the same case or controversy.

18. This Court has personal jurisdiction over Rao and venue is proper in this District by reason of his execution of the Covenants Agreement, a copy of which is attached hereto as Exhibit A, in which he consented to the jurisdiction of the state and federal courts located within the Eastern District of Pennsylvania. *See* Covenants Agreement ¶ 9.

19. Moreover, general and specific jurisdiction exists against Rao based on his contacts with the jurisdiction, the fact that he conducts business in Pennsylvania, committed tortious acts against Plaintiff in Pennsylvania, and/or caused harm to Plaintiff in Pennsylvania.

20. Although the Covenants Agreement also contains an agreement to arbitrate, specifically excluded from the arbitration provision are any claims seeking injunctive relief in a court of law. *See* Covenants Agreement at 7.

21. This Court has personal jurisdiction over CoReason and venue is proper in this District because CoReason has committed tortious acts against EPAM in Pennsylvania, and/or caused harm to Plaintiff in Pennsylvania.

## ALLEGATIONS COMMON TO ALL COUNTS

### I. EPAM's Confidential Information and IP

22. Founded in 1993 as a software engineering company, today EPAM is a leading global provider of digital engineering, cloud and AI-enabled transformation services, and a leading business and experience consulting partner for global enterprises and startups across a broad spectrum of industries. EPAM's clients include businesses engaged in life sciences and healthcare, financial services, media and entertainment, and insurance, among many others.

23. The Real-World Evidence ("RWE") business unit is positioned within EPAM's life

sciences and healthcare group. RWE refers to clinical evidence about the usage and potential benefits or risks of a medical product derived from analysis of real-world data.

24. A core part of EPAM's business is the sale of digital tools and software solutions that EPAM's employees and engineers have continuously developed and refined over many years and via significant investments by the Company. Certain of these products are sold as a commercial license to its pharmaceutical and healthcare clients and are thus considered highly proprietary intellectual property.

25. Among these software tools is what is known as an ETL Conversion Kit. This tool took 10 years to develop by EPAM and the businesses it acquired to Extract, Transform and Load ("ETL") data for medical data standardization. This software is focused on medical data management—cleaning, harmonizing, and preparing patient medical history data for healthcare data analytics purposes, including drug safety, disease, and/or cost and quality of care research. EPAM offers this solution as a core part of the Company's services in the RWE market segment, and it makes the Company uniquely competitive by automating tasks which are often done by others manually. The software can be further customized based on a particular client project or a client's specific need.

26. Another software product developed by EPAM is an AI Cohort Generator. This product was developed by EPAM in 2025 utilizing the latest AI technologies. EPAM offers this innovative solution as part of a larger healthcare analytics platform, allowing customers to automatically generate clinical study designs (patient cohorts, medical codes) from free text, thus significantly boosting research team productivity and saving customers significant time and money.

27. A third software product at issue in this case is AI Accelerator, which includes

Synapse and a solution known as MedRag. This product was also developed by EPAM in 2025 as part of a Company-wide investment and strategy to leverage AI technology. The software is a data and decision support platform that serves as the client's centralized biomedical knowledge layer making it easy for non-technical users. It operates as an AI-powered co-reasoning partner for teams in the pharmaceutical industry, transforming complex text into verifiable, evidence-based insights through an auditable, multi-step process.

28. The underlying code to these tools and products are considered confidential and proprietary, accessible only to EPAM employees who work on the development of these products, are senior executives with broad access needs, or otherwise have business need for access to such information.

29. The life sciences technology industry, including RWE in particular, is highly competitive. EPAM's competitors in this regard include a range of prominent global IT consulting and technology companies with dedicated life sciences practices.

30. To obtain new business, EPAM invests considerable resources cultivating relationships with pharmaceutical companies, healthcare organizations, and other life science consultants to facilitate consideration for RFP invitations on particular projects.

31. Because competitive pricing is integral to a successful bid, pricing of work or services on a particular project is meticulously calculated based upon a number of factors, including EPAM's use of highly proprietary software solutions and engagement of specialized experts, which are incorporated into EPAM's RFP responses and bid proposals.

32. And because EPAM's business is service oriented, the relationships that EPAM has with its clients are highly dependent on the attention and service, as well as EPAM's development of successful technology solutions and results tailored to each client's specific needs, which EPAM

provides to them on an ongoing basis. EPAM's investment in client service enables those who deal with EPAM to develop confidence in the quality of the services offered, and increased recognition of, and familiarity with, EPAM as a provider of quality and reliable services.

33. Furthermore, because clients also entrust the protection of their businesses and their confidential information to EPAM, an essential aspect of EPAM's business model is to protect its reputation and goodwill. Customer goodwill is particularly critical in this industry because any compromise of a client's own data and/or intellectual property (IP) could seriously damage its business operations and EPAM's reputation.

34. Maintaining client relationships and generating repeat business from clients based on its reputation are critical to EPAM's success because long-term business relationships with established clients allow EPAM to maintain its competitive advantage and strategic position in the industry.

35. To effectively service EPAM's clients, the Company also compiles data pertaining to its clients spanning many years. Such client information includes data reflecting prior work done on behalf of particular clients, pricing arrangements, and the identities of individual points of contact among clients to facilitate the development of new leads and opportunities.

36. EPAM's executives and sales representatives, including Rao, who interface directly with existing and potential clients, not only are the face of the Company, but they benefit directly and indirectly from the goodwill, reputation, and name recognition generated by EPAM's investments in client service and proprietary technology. These individuals consequently are able to forge relationships and cultivate accounts and new business on behalf of EPAM.

37. Given that the Company's success and reputation in the market is a function of all of the foregoing considerations, the Company not only treats its software code and developments

in technology as highly proprietary, but also treats its client information, bid proposals, RFP responses, pricing information, client contracts, project data, P&L analysis, sales and growth strategies, employee compensation data, and other similarly sensitive information as confidential, proprietary, and/or trade-secret information.

38. The foregoing compilation of information and software code is treated as highly confidential and trade secret information by the Company because it would provide a competitor with a "playbook" into how to approach each client, replicate EPAM's life sciences business by offering identical solutions, and usurp business from EPAM. Such information could also be used to undercut pricing, outbid competitive proposals, evaluate service opportunities, and target specific clients.

39. In addition, EPAM's client engagements often result in the creation of customized computer code/intellectual property which is delivered to the client. This code sometimes becomes the intellectual property of the client and sometimes is retained as intellectual property of EPAM but is licensed to the client. EPAM treats such code as particularly sensitive and confidential, as it is of significant commercial value to each client and to EPAM. Moreover, EPAM has specific contractual obligations to safeguard its clients' intellectual property. EPAM's reputation as a reliable custodian of client confidential information is essential to its business model.

40. EPAM has spent a substantial amount of time and money in developing EPAM Confidential Information and IP to which the Company's trusted senior executives have access to enable them to cultivate client relationships, engage on projects, develop new solutions, and expand the business on the Company's behalf.

41. The foregoing EPAM Confidential Information and IP is not generally known to the public.

42. The foregoing EPAM Confidential Information and IP would give a competitor who acquired it an unfair competitive advantage by, among other things: (a) not having to invest the time and resources to develop the client relationships, software, or information as the Company has done; and (b) allowing the competitor to unfairly compete by, among other things, leveraging their access to or knowledge of such information, including pricing, software source code, and the aforementioned client information.

43. Given the paramount importance of EPAM Confidential Information and IP to EPAM and its business, EPAM utilizes a number of guardrails to maintain the confidentiality of EPAM Confidential Information and IP. These measures include: (i) making all employees subject to a robust set of IT security policies and work instructions, including the Acceptable Use of IT Resources Policy and EPAM's Code of Conduct; (ii) making employees execute agreements that contain confidentiality and non-disclosure obligations as a condition to obtaining access to EPAM Confidential Information and IP, and in certain instances additional restrictive covenants, such as non-competition and non-solicitation provisions; (iii) limiting access to EPAM Confidential Information and IP to employees on a need-to-know basis; (iv) storing information on secure networks and password protected devices; (v) requiring all employees to periodically complete training lessons regarding confidentiality obligations and data privacy compliance; (vi) monitoring employee access and activity on the Company's computer systems to detect questionable conduct; and (viii) requiring employees to return all EPAM Confidential Information and IP upon termination of employment.

## II. Rao's Employment and Agreements with EPAM

44. Rao was employed by EPAM as Managing Principal, Life Sciences Consulting starting on or about November 18, 2024 until he was terminated for cause on October 15, 2025.

45. In the role for which he was hired, Rao was responsible for heading the data science business unit within EPAM's life sciences group and RWE business unit, including business development, revenue generation, portfolio management, and managing the members of the data science team.

46. Prior to his employment with EPAM, Rao purportedly had significant experience working in the pharmaceutical industry, with an expertise in epidemiology. The Company had believed his connections in the industry might be well-suited for the role.

47. Rao was highly compensated for this position, earning a base salary of $250,000 annually.

48. In consideration for his employment, Rao executed the Covenants Agreement on November 12, 2024. The Covenants Agreement contains various provisions with respect to the protection of EPAM's confidential information and business interests, such as a provision prohibiting the misuse and disclosure of confidential information and restrictive covenants prohibiting the solicitation of certain employees and clients of the Company during employment and for a period of 12 months following termination of employment.

49. With regard to non-disclosure and use restrictions, Section 1(d) of the Covenants Agreement expressly provides, in relevant part, as follows:

> You agree you will: (i) treat all Confidential Information[2] as strictly confidential; (ii) not directly or indirectly disclose Confidential Information, or

[2] Confidential Information is defined in the Covenants Agreement to include, "without limitation, all information not generally known to the public, in spoken, printed, electronic, or any other form, relating to the EPAM Group's business processes, practices, policies, plans, publications, research, operations, services, strategies, techniques, contracts, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, software, applications, design, databases, records, systems, supplier and vendor information, financial information, accounting information, legal information, marketing, pricing, payroll, staffing personnel, internal controls, security, formula, algorithms, ideas, inventions, patent applications, original works of authorship, discoveries, experimental processes/results, specifications, ***and***

> allow it to be disclosed in whole or in part, to any entity or person whatsoever outside of the direct employ of the EPAM Group[3] except as required in the performance of your authorized duties (and then, only within the limits and to the extent of such duties); and (iii) not access, use, or copy Confidential Information or any documents, records, files, media, or other resources containing any Confidential Information, or remove any such items from the premises or control of the EPAM Group, except as required in the performance of your authorized employment (and then, only within the limits and to the extent of such duties or consent).
>
> …
>
> You understand and acknowledge these obligations regarding Confidential Information continue during and after your employment until such time as such Confidential Information becomes public knowledge, except as a result of your breach of this Agreement, or by those acting in concert with you.
>
> If/when your employment terminates, you shall immediately return any and all Confidential Information and other EPAM Group equipment or information in your possession.

50. Separately, the Covenants Agreement makes clear that any work made by Rao in connection with or in the course of his employment with the Company is owned by EPAM. Specifically, Section 2 of the Covenants Agreement provides, in relevant part:

> Ownership of Work Product. Any Confidential Information, design, program, product, invention, package, prototype, model, innovation, data, improvement, new technique, process, discovery, concept, know how, trade secret, work product and original work of authorship, whether or not patentable, copyrightable or otherwise legally protectable (individually and collectively, "Work") made, collected, developed, conceived, discovered, learned, or used by you in connection with or in the course of your employment, whether during or after normal business hours, shall constitute "work made for hire" as that term is defined by the Copyright Act of 1978, as amended from time to time, and shall be deemed to have been made or developed by you solely for the benefit of your employer within the EPAM Group ("Employer") and shall be the sole and exclusive property of Employer. In order to effectuate the terms of this Agreement and in the event any Work created by or on behalf of you would

***client information of the EPAM Group or any existing or prospective client, supplier, investor, or other person or entity that has entrusted information to the EPAM Group in confidence.***" (emphasis added)

[3] "EPAM Group" is defined in the Covenants Agreement to include EPAM's owned affiliates, and successors and assigns.

> not be deemed to be the sole and exclusive property of Employer, you assign and agree to assign to Employer all your rights in and to the Work including, without limitation, any trademarks, copyrights, patents, moral rights, and all other proprietary interest that you may have in any such Work without additional compensation. You shall not during the course of employment or any time after, use or (to the extent that the Work constitutes Confidential Information) disclose to any other person any such Work, except as expressly authorized in writing by Employer.

51. In simpler terms, the Ownership of Work Product provision prohibited Rao from developing a product (such as a software or other technology) during his employment with EPAM, even "after normal business hours," and then claiming ownership of it. By virtue of the Covenants Agreement, anything that Rao developed, during his employment, was EPAM's property.

52. As an employee of EPAM, Rao was also subject to the Company's Code of Conduct, which contains express policies regarding EPAM's culture of confidentiality and treatment of confidential information both with respect to EPAM information and third-party information. A copy of the Code of Conduct is attached hereto as Exhibit B.

53. For example, the Code of Conduct emphasizes "Our confidential and proprietary information is a special kind of company asset. It is the non-public information that brings EPAM value. If such information is disclosed, it might harm our business or benefit our competitors. We protect our customers' and business partners' confidential information the same way." *See* Code of Conduct at 29.

54. Employees are instructed in the Code of Conduct to use Confidential Information only if and as authorized, follow non-disclosure agreements, share it securely with permitted recipients, and to not obtain information that is not needed or that the employee shouldn't have. *Id.*

55. The Code of Conduct further provides examples of EPAM Confidential Information, which includes, among other types of information, business operating strategies and

plans, technical information, pricing information, Company financial data, customer and client lists, and research and development activities, among others. *Id.* at 30.

56. The Code of Conduct also instructs employees regarding the acceptable use of technology, and to not use technology to violate non-disclosure agreements, intellectual property rights, or disclose client names or confidential information. *Id.* at 32.

57. Rao's HR Records show that he completed the Code of Conduct training module on November 18, 2024, and was thus aware of the policies contained therein. He also completed the Company's Confidentiality and Social Media course. Rao was thus well-aware of the Company's policies with respect to the need to safeguard EPAM Confidential Information and IP from misuse.

58. As an employee of EPAM, Rao was also subject to the Corporate Governance Policy with respect to Acceptable Use of IT Resources (the "IT Resources Policy"). A copy of the IT Policy is attached hereto as Exhibit C.

59. As stated therein, the purpose of the IT Resources Policy is to establish standards and obligations for proper use of IT Resources (including, for example, computers, devices, network communications and information systems) in EPAM's business activities. *See* IT Resources Policy at 5.

60. The IT Resources Policy repeats the same confidentiality policies set forth in the Code of Conduct. *Id.* at 7.

61. The IT Resources Policy also provides rules for managing confidential information, including a prohibition against storing confidential data on local workstations or mobile devices. *Id.* at 15.

62. The IT Resources Policy also requires employees to return all work equipment when departing the Company, including any Company-issued laptops. *Id.* at 30.

## III. Rao's Work at EPAM and Pattern of Disloyal Conduct

63. Among the projects that Rao worked on at EPAM was Synapse. EPAM described Synapse as a "co-reasoning" platform – meaning that the technology worked by utilizing multiple artificial intelligence "agents" to analyze a problem simultaneously, using different perspectives. Synapse's principal market was identified from the start as life sciences and, specifically, the pharmaceutical industry.

64. At one point during his work on Synapse, Rao mentioned to another EPAM employee, Dmitrii Ilin, that he was working on "refactoring" (*i.e.*, reorganizing and improving the code without changing what it does) the Synapse source code in order to improve its design and to add features. But, when Mr. Ilin asked Rao to provide his "refactored" code, Rao failed to supply it or share it with his EPAM team members.

65. Instead, upon information and belief, Rao misappropriated this "refactored" code, along with other Synapse code, and incorporated it into a competing Synapse-like software product that he began developing during his EPAM employment.

66. Upon information and belief, on or about August 10, 2025,[4] Rao imputed trade secrets and/or highly Confidential Information (including the source code directly and/or highly sensitive architecture documents used in the development of Synapse), into a generative AI platform or model, in order to obtain incredibly detailed "step-by-step plan" from the generative AI platform or model for how to code a Synapse-like software product from scratch, based on a

[4] The date is based on the metadata associated with this document.

version of Synapse then in development at EPAM.[5] (*See* ECF #58-12 for a heavily redacted copy of this document. The original, unredacted version contains EPAM trade secrets and other confidential information, and cannot be made publicly available).

67. Rao had no legitimate business reason to use an AI platform or model to obtain step-by-step instructions for recoding a Synapse-like software product. EPAM already had the Synapse source code. It did not need AI-generated instructions explaining how it could recreate what it already had. Upon information and belief, Rao's only reason for having an AI platform or model generate a "step-by-step plan" for re-coding Synapse would be if he wanted to create a Synapse competitor, using ostensibly new code. For example, Rao could use the instructions to create a Synapse copy that maintained the same features and functions as Synapse, but with different underlying file names and metadata, so that he could disguise the copy's reliance on misappropriated Synapse data, making it more difficult to determine the origin of his competing product.

68. Upon information and belief, Rao also created other incredibly detailed documents relating to EPAM's Synapse software solution, likely by feeding EPAM Confidential Information into generative AI platforms. These documents described the internal architecture of various versions and/or proposals for its Synapse software solution. Rao had no legitimate business reason to create any of these documents. He created them so that he could better develop his Synapse-competitor, using Confidential Information and IP stolen from EPAM.

[5] The current version of Synapse is somewhat different, as Synapse has continued to undergo development. The specific version of Synapse depicted in this document incorporates some features that Rao sought to include in Synapse, which EPAM ultimately decided not to include (or, at least, have not yet included) as the development proceeded. However, the document would still enable someone with coding expertise to recreate, from scratch, a software solution substantially similar in its foundational architecture, principal components, and core functionality to Synapse as it exists today.

69. By mid-September 2025, *while still an EPAM employee*, Rao was already taking concrete steps to form an EPAM competitor, which would market and license the Synapse competitor technology that Rao developed based on the refactored or otherwise stolen Synapse code.

70. On or about September 16, 2025, Rao attended a business development meeting on EPAM's behalf. During the meeting, Rao represented in his Interrogatory Responses that he was presented with the "question why I was not doing such work independently myself." (*See* Resp. to Interrog. No. 7.) According to Rao, that question formed the "initial seed of what later became CoReason." (*Id.*) In other words, CoReason began as a means of coverting an EPAM business development opportunity into Rao's private, personal business development opportunity.

71. Upon information and belief, as reflected in a document discovered on Rao's personal Google Drive account, dated September 18, 2025, Rao represented, while still employed at EPAM, in sum or substance, the following to a high-level executive ("Executive #1"[6]) at an EPAM client: (a) Rao intended to start a separate company, in order to "seamlessly transition the work he is currently doing" at EPAM "to his own independent company"; (b) Rao "built" technology that was "out of this world" and "best in class," specifically targeting "every pharma company" as potential customers (notably, pharmaceutical companies are the *exact* intended market for Synapse); (c) Rao had already located private investors, whom he was meeting with *that night* to discuss potential investments in his venture; (d) Rao would complete the development

[6] In an abundance of caution, EPAM redacted the names of the non-parties identified in the documents. While the only credible explanation is that these documents are summaries of Rao's conversations with non-parties, EPAM cannot know without further discovery if every word in the summaries are accurate.

of the software by using offshore developers that he knew in India. (A redacted version is available at ECF #58-9.)

72. In response to Rao's proposal, Executive #1 committed to providing Rao's new company with half-a-million in work over the next five to six months.

73. Rao was well-aware that these discussions breached his on-going fiduciary duty of loyalty to EPAM in addition to multiple of the covenants in his Covenants Agreement, including for example IP assignment and non-solicitation restrictions. In fact, Rao and Executive #1 specifically discussed the need for "absolute confidentiality" because Rao was "still employed by EPAM."

74. On September 18, 2025, Rao and/or his CoReason business partner registered the internet domain name coreason.ai, using a private domain registration service to avoid having the public WhoIs database identify the domain name's owner. During his discussion with Executive #1, which happened the same day that this domain name was registered, Rao specifically identified "coreason.ai" as the domain name that his new company would use.

75. On September 21, 2025, during a conversation with a different individual ("Executive #2"), a summary of which was also discovered on Rao's personal Google Drive account, Rao made his plan explicit. (*See* ECF #58-10, for a redacted version of his document.) He would launch an EPAM competitor based on work (*i.e.* Synapse) he originally performed for EPAM. But he would try to "circumvent" intellectual property issues by not using the "specific code" he developed for EPAM, and instead rebuilding the system (*i.e.* Synapse) from scratch. As Rao put it, "I'm not going to use the same code. It's the concept. I'm going to write my own code... it's rebuilt." ***And Rao had the misappropriated means to follow through on this plan: he had***

***already obtained an AI-generated "step-by-step" plan for coding Synapse from scratch, making it easy for him ostensibly to "write [his] own code" in order to create a Synapse-like product.***

76. Upon information and belief, Rao engaged in numerous other acts of disloyalty during his EPAM employment.

**IV. Rao's Exit from EPAM**

77. During his tenure with EPAM, Rao failed to consistently fulfill the expectations of his position. In particular, he failed to build revenue and exhibited poor managerial capabilities; team members cited his lack of leadership and unwillingness to engage in their professional development.

78. Rao's failure to meet EPAM's performance expectations were not because he was unable to perform. It was because he purposefully *chose* to underperform, intending to get fired so that he could evade his non-compete, and begin unfairly competing against EPAM. Rao laid out his strategy during a conversation with another individual ("Executive #3") on or about September 21, 2025, a summary of which was also discovered on Rao's personal Google Drive account. (A redacted version of this document is available at ECF #58-11.) In brief, Rao explained how he would remain an EPAM employee while working "in the shadows" on developing his EPAM competitor. During his EPAM employment, he would be "slowly weaning, being less responsive," until he caused EPAM to "put him on a "performance improvement plan, or some crap like that." He could then negotiate an exit that would "nullify his non-compete clause."

79. Rao alluded to this plan during his conversation with Executive #1 on or about September 18, 2025. As Rao explained, he believed once EPAM involuntarily terminated him, he would be a "free agent," who would be able to "walk with all the intelligence" he developed for EPAM, which he could then immediately use to compete against EPAM.

80. In any event, in light of Rao's significant performance issues, in September 2025, the Company made the decision to transition Rao to a different role in which he would be responsible for developing EPAM's AI capabilities with regard to certain solutions for specific clients. No decision had been made to exit Rao from EPAM employment, and EPAM leadership made this quite clear to him on several occasions.

81. Rao claimed to take offense to both the negative performance evaluations and the change to his role.

82. In late September, Rao floated the concept with EPAM of resignation via a mutually agreeable separation. As part of those discussions, Rao asked EPAM whether it would agree to waive post-employment restrictions in the Covenants Agreement.

83. EPAM responded that it would not waive the restrictive covenants and again reiterated that EPAM was not terminating him, and that his decision to leave was entirely his choice. Rao then appeared to abandon discussions about a resignation.

84. During the week of October 6 through October 9, 2025, Rao attended a professional industry conference in New Jersey as a representative of EPAM. At the conference, an EPAM RWE employee learned that Rao had approached at least one major EPAM client and falsely conveyed that he was no longer working at EPAM. Rao stated that he was a "free agent," suggesting that he was in business for himself.

85. Rao's statements to the client were patently untrue; he was still employed with EPAM and the Company had no plans at that time to terminate his employment.

86. On or about October 14, 2025, the Company found the phrase "Copyright 2025 Gowtham Rao" embedded in the software code for one of EPAM's tools it had been developing and to which Rao had access via GitLab (a software code repository).[7]

87. The project team also raised concerns that Rao had deleted various files from an EPAM SharePoint site (including by attempting to make them permanently unavailable by clearing the recovery folder).

88. The sum total of Rao's conduct and the attendant circumstances compelled EPAM to terminate his employment, effective October 15, 2025. Rao's access to his EPAM email account and the Company's networks were also suspended that same day.

89. Upon information and belief, Rao purposefully orchestrated his termination from the Company in an effort to evade the non-competition restriction in the Covenants Agreement.

90. In fact, when he was advised of his termination, Rao specifically questioned whether the termination was for cause and whether the non-competition provision would be enforced.

91. During that same discussion, Rao was advised to return his Company-issued computer, but the Company did not receive it until October 31, 2025.

## V. Rao's Unauthorized Transmission of EPAM Files and Source Code to His Personal Devices and Other Misconduct

92. Given Rao's misconduct and unethical actions resulting in his termination, the Company took immediate steps to investigate its computer network for evidence of any further misconduct, including other instances of data alteration or exfiltration by Rao.

---

[7] As EPAM later learned, after Rao's termination, the attachment of the phrase "Copyright 2025 Gowtham Rao" may not have been intentional. It nevertheless recounts this incident because it was one of the reasons for Rao's termination.

93. The Company's information security team (the "InfoSec Team") discovered that between September 11, 2025 (around the same time when EPAM advised Rao of a change to his role) through October 14, 2025, Rao downloaded approximately 44,960 documents and data files from the Company's networks to one or more personal external devices, without the Company's authorization.

94. A large volume of these downloads occurred between October 11 and October 13, 2025, after Rao had taken several affirmative steps to start CoReason, and just days before his termination.

95. Among the documents accessed and downloaded by Rao were software code bases for a number of EPAM's digital tools and products, including proprietary source code to EPAM's ETL Conversion Kit, AI Cohort Generator, and Synapse/AI Accelerator. Some of the downloaded source code also included custom built or customized software built by EPAM for clients.

96. In addition to purloining EPAM's proprietary intellectual property, Rao also downloaded entire data folders relating to EPAM's clients, client account information, RFP responses and bid proposals, pricing documentation, client facing project information, including designs and data models, contract documents, CRM data, and P&L data, among other highly confidential and sensitive information.

97. Not only were Rao's actions unauthorized and in violation of Company policy, but there could be no business justification for his personal possession of this information or use of this information on a personal device given that many of the stolen files relate to historical data, clients, or projects about which Rao was not involved or had no need for in his work with EPAM, or are comprised of information that belong to EPAM's clients.

98. Separate from the data exfiltration, the InfoSec team also confirmed earlier reports from the relevant project team that on October 13, 2025, Rao had deleted (and attempted to permanently delete) over 60 EPAM folders and files from EPAM's SharePoint network, several of which related to Synapse.

99. The InfoSec team also identified over a dozen outbound emails from Rao's EPAM email account to a personal email account between September 20, 2025 through October 3, 2025, either forwarding or attaching various documents that appear to be related to Rao's obligations to the Company.

100. As EPAM has now learned, Rao was also using his personal accounts to move EPAM documents. For instance, on September 21, 2025, Raosent EPAM's "Sales Battle Card" for Synapse (and the related MedRag program) to a nondescript personal email address—subscriptionrao@gmail.com. (A redacted version of this document is available at ECF #58-16.) The "Sales Battle Card" set forth a marketing strategy for Synapse. (*Id.*)

101. In addition to investigating its computer networks, the Company also investigated Rao's misuse of resources during his employment at EPAM. For example, Rao had improperly staffed an employee to work on a personal website for Rao and had requested that another employee ghost write a blog for Rao's personal website on Rao's behalf.

## VI. Irreparable Harm to EPAM Without Injunctive Relief

102. Rao immediately began using the EPAM Confidential Information and IP that he pilfered to compete with EPAM. Indeed, given the timing of Rao's admitted competitive activities, it appears likely that Rao was already actively marking his Synapse competitor to clients even before his termination.

103. As noted above, Rao registered the domain name "coreason.ai" on September 18, 2025.

104. On October 16, 2025, the day after his termination, Rao declared on an external communication platform, "In full disclosure I am now a competitor for EPAM."

105. Also on October 16, 2025, the *day after his termination*, Rao incorporated CoReason in Delaware, apparently through Ammar Shalall, who became his colleague at CoReason. It is utterly implausible that Rao managed to create and finalize corporate incorporation documents in a single day.

106. Further on October 16, 2025, again, *just one day after his termination*, Rao was *already* soliciting J&J, an EPAM client, on CoReason's behalf. During this solicitation, Rao represented to J&J that CoReason possessed a "transparent 'glass-box' platform" that could solve J&J's problems. Quite obviously, Rao did not build CoReason's "'glass-box' platform" from scratch in the one-day after his EPAM employment ended. Rather, Rao built CoReason's platform using misappropriated EPAM technology and, within a day of his departure from EPAM, was already using that misappropriated technology to wrongfully compete against EPAM.

107. By October 17, 2025, *two days after his termination*, Rao and Shallal were meeting with Johnson & Johnson, in an effort to secure business for CoReason. (*See* ECF #33-9 at 3-5.)

108. By October 20, 2025, *five days after his termination*, Rao had prepared a Statement of Work with CoReason's "Standard Terms and Conditions." Once again, it is implausible that Rao managed to perform all these functions in the mere few days after his EPAM employment ended. Further, Rao's solicitation to Johnson & Johnson was in direct violation of his non-solicitation obligations contained in his Covenants Agreement, regardless of whether the conduct was during or after employment.

109. Rao's ability to actively market products and services on CoReason's behalf, just days after his EPAM employment ended, only further augments that Rao and CoReason were relying on EPAM Confidential Information and IP that Rao pilfered from EPAM, and/or work that Rao created or contributed to during his EPAM employment (and which belongs to EPAM as a result of the Ownership of Work Product provisions in Rao's Covenants Agreement). That includes software code that Rao ostensibly coded from "scratch," using the step-by-step instructions for recording Synapse that he obtained by feeding EPAM Confidential Information and IP into a generative AI program.

110. Rao also created a professional website for CoReason. (*See* ECF #58-23; *see also* www.coreason.ai) The CoReason website reflects that it is not a one-man shop, but a sophisticated and extremely well-funded company – which had and/or has two "Senior Strategic Advisor[s]," a "Data Officer," a "Legal Advisor," a "Founding Investor" (Shallal), and a "Clinical Advisor."

111. The CoReason website explains what CoReason's product does, including its function and capabilities. CoReason's own description on the prior version of its website, including the use of "[p]arallel agents" to analyze a problem (*See* ECF #58-23 at 7),[8] reflects that CoReason is essentially a copycat of EPAM's Synapse. Further, upon information and belief, to the extent that CoReason's specific features are different, those different features reflect proposals that Rao made, as an EPAM employee, to EPAM's Synapse team. Regardless of whether EPAM elected to include all of these proposals in the current version of EPAM's Synapse, Rao's work on those proposals, by virtue of the Ownership of Work Product provision, is EPAM property.

[8] In the midst of this litigation, CoReason recently revised its website, but still appears to be marketing the same software solution.

112. Upon information and belief, Rao has also misappropriated other EPAM Confidential Information and IP, and, together with CoReason, is misusing them on CoReason's behalf.

113. For example, through the parties' forensic protocol, EPAM identified a "CoReason Stakeholder Communication Toolkit" on Rao's personal Google Drive. The 274 page document appears to set out CoReason's comprehensive business plan. Included within this business plan are six "Strategic Recipes" that appear to be misappropriated, in large part, from six EPAM "Recipes" that existed on an EPAM Sharepoint folder during Rao's employment. All six of CoReason's "Strategic Recipes" contain the same names and, with some differences in wording, the same material information as the EPAM "Recipies."

114. Indeed, even CoReason's corporate name appears to have been taken from EPAM, as EPAM materials from July 2025 specifically describe Synapse as "Your AI Co-Reasoning Partner," and one of EPAM's Recipies sets forth the "ingredients" for "Protocol Co-Reasoning."

## VII. Irreparable Harm to EPAM Without Injunctive Relief

115. EPAM Confidential Information and IP is the lifeblood of EPAM's business.

116. Anyone with unauthorized access to EPAM Confidential Information and IP could exploit such information to replicate EPAM's business and intellectual property, usurp business opportunities, or leverage such information to destroy EPAM's competitive advantage or reputation in the marketplace.

117. Due to Rao's misconduct, EPAM stands to lose an incalculable amount of dollars in business and the loss of value of its trade secrets, and confidential and proprietary information, as well as its reputation with its clients.

118. Rao's misconduct is particularly willful and egregious in that he was a senior employee of EPAM's life science business who understands the importance of protecting Company property and its data.

119. All told, Rao is causing, threatening, and/or will continue to cause or threaten significant irreparable harm to EPAM, including the loss of value of confidential and/or trade secret information, the loss of long-standing client relationships, damage to reputation, and loss of goodwill, unless injunctive relief is obtained.

120. Indeed, Rao and CoReason are now directly competing against EPAM, using Confidential Information and IP that Rao misappropriated from EPAM.

**AS AND FOR A FIRST CAUSE OF ACTION (AGAINST RAO AND COREASON)**
**(Actual and/or Threatened Misappropriation of Trade Secrets, 18 U.S.C. § 1832)**

121. EPAM repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

122. By virtue of his employment at EPAM and performance of responsibilities for EPAM, Rao was given access to and possessed trade secrets and confidential and proprietary information of EPAM, to wit, the EPAM Confidential Information and IP.

123. Rao also developed EPAM Confidential Information and IP by virtue of his employment with EPAM, and EPAM owned all property rights to what Rao developed during his employment, pursuant to the Ownership of Work Product provision in Rao's Covenants Agreement.

124. The EPAM Confidential Information and IP was developed by EPAM at great time and expense to EPAM, and is maintained on password-protected computer networks accessible only by EPAM authorized personnel at an executive level, or otherwise with need to use information on EPAM's behalf or in furtherance of EPAM's business interests.

125. EPAM derives independent economic value from the EPAM Confidential Information and IP entrusted to Rao by EPAM; such information is not generally known or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure and use, and the information is the subject of significant efforts to maintain its secrecy.

126. Such information is considered a trade secret under the federal Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1832 et seq., because EPAM derives independent economic value from this information not being generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy. 18 U.S.C. § 1839.

127. Rao acquired EPAM's trade secrets by improper means, including by surreptitiously downloading without authorization thousands of data files—including the software code to its ETL Conversion Kit, AI Cohort Generator, Synapse/AI Accelerator, and other EPAM Confidential Information and IP—to a personal external device outside of EPAM's network and control, in the days leading up to his planned termination from EPAM, and furthermore by not returning or disclosing to EPAM his possession of the Confidential Information and IP after his termination.

128. At the time Rao transmitted EPAM Confidential Information and IP to his personal device, Rao knew, or had reason to know, that he had a duty to maintain its secrecy or limit its use.

129. By his actions, Rao has used and disclosed, intends to use and disclose and/or threatens to use or disclose EPAM's trade secrets without express or implied consent.

130. Rao knew or should have known that such information, including the EPAM Confidential Information and IP: (1) is confidential; (2) was acquired under circumstances giving

rise to a duty to maintain its secrecy or limit its use; (3) was developed or acquired by EPAM at great expense and effort; (4) was maintained as confidential and is not generally available to the public and EPAM's competitors; (5) would provide significant benefit to a competitor competing or seeking to compete with EPAM; and (6) is critical to EPAM's ability to conduct its business successfully.

131. Rao has misappropriated, exploited, misused, and/or disclosed or threatened to disclose EPAM's trade secrets for his own self-interest and benefit, and without EPAM's express or implied consent.

132. Among the ways that Rao has misappropriated EPAM Confidential Information and IP, including trade secrets, has been by disclosing such materials to CoReason. Because Rao owns and controls CoReason, Rao's knowledge must be imputed to CoReason. Thus, CoReason knew or should have known that the materials contained EPAM Confidential Information and IP, including trade secrets.

133. Rao and CoReason are now actively marking and seeking to sell, including to current and potential EPAM clients, a competitor to EPAM's Synapse product. This Synapse competitor is built on EPAM Confidential Information and IP, including trade secrets, that Rao misappropriated from EPAM, and then disclosed to CoReason.

134. Indeed, as reflected in the documents that EPAM has discovered, Rao created his Synapse competitor by taking EPAM's trade secrets (*i.e.*, highly confidential Synapse files, including the Synapse source code and/or highly sensitive architectural documents used in the creation of Synapse), and feeding these materials into a generative AI platform or model which, in turn, then created a "step-by-step" plan that Rao followed for recoding Synapse from scratch. Thus, CoReason's product depends on, and derives from, EPAM's trade secrets.

135. Rao and CoReason will be or are being unjustly enriched by the misappropriation of EPAM Confidential Information and IP and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate EPAM Confidential Information and IP.

136. As a result of Rao's and CoReason's wrongdoing, EPAM has suffered and continues to suffer the substantial and irreparable loss of its trade secrets, goodwill, and business expectancies in amounts which may be impossible to determine unless Rao is enjoined and restrained by order of the Court.

137. In addition, EPAM seeks actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

**AS AND FOR A SECOND CAUSE OF ACTION (AGAINST RAO AND COREASON)**
**(Actual and/or Threatened Misappropriation of Trade Secrets in Violation of the Uniform Pennsylvania Trade Secrets Act, 12 Pa. C.S.A. § 5301, *et seq.*)**

138. EPAM repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

139. By virtue of his employment at EPAM and performance of responsibilities for EPAM, Rao was given access to and possessed trade secrets and confidential and proprietary information of EPAM, to wit, the EPAM Confidential Information and IP.

140. Rao also developed EPAM Confidential Information and IP by virtue of his employment with EPAM, and EPAM owned all property rights to what Rao developed during his employment, pursuant to the Ownership of Work Product provision in Rao's Covenants Agreement.

141. The EPAM Confidential Information and IP was developed by EPAM at great time and expense to EPAM, and is maintained on password-protected computer networks accessible only by EPAM authorized personnel at an executive level, or otherwise with need to use information on EPAM's behalf or in furtherance of EPAM's business interests.

142. EPAM derives independent economic value from the EPAM Confidential Information and IP entrusted to Rao by EPAM; such information is not generally known or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure and use, and the information is the subject of significant efforts to maintain its secrecy.

143. Such information is considered a trade secret under the Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S.A. §§ 5301-5308 (the "PUTSA"), because EPAM derives independent economic value from this information not being generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy. 12 Pa. C.S.A. § 5302.

144. Rao acquired EPAM's trade secrets by improper means, including by surreptitiously downloading without authorization thousands of data files—including the software code to its ETL Conversion Kit, AI Cohort Generator, Synapse/AI Accelerator, and other EPAM Confidential Information and IP—to a personal external device outside of EPAM's network and control, in the days leading up to his planned termination from EPAM, and furthermore by not returning or disclosing to EPAM his possession of the Confidential Information and IP after his termination.

145. At the time Rao transmitted EPAM Confidential Information and IP to his personal device, Rao knew, or had reason to know, that he had a duty to maintain its secrecy or limit its use.

146. By his actions, Rao has used and disclosed, intends to use and disclose and/or threatens to use or disclose EPAM's trade secrets without express or implied consent.

147. Rao knew or should have known that such information, including the EPAM Confidential Information and IP: (1) is confidential; (2) was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) was developed or acquired by EPAM at great expense and effort; (4) was maintained as confidential and is not generally available to the public and EPAM's competitors; (5) would provide significant benefit to a competitor competing or seeking to compete with EPAM; and (6) is critical to EPAM's ability to conduct its business successfully.

148. Rao has misappropriated, exploited, misused, and/or disclosed or threatened to disclose EPAM's trade secrets for his own self-interest and benefit, and without EPAM's express or implied consent.

149. Among the ways that Rao has misappropriated EPAM Confidential Information and IP, including trade secrets, has been by disclosing such materials to CoReason. Because CoReason is owned and controlled by Rao, CoReason knew or should have known that the materials contained EPAM Confidential Information and IP, including trade secrets.

150. Rao and CoReason are now actively marking and seeking to license, including to current and potential EPAM clients, a competitor to EPAM's Synapse product. This Synapse competitor is built on EPAM Confidential Information and IP, including trade secrets, that Rao misappropriated from EPAM, and then disclosed to CoReason.

151. Indeed, as reflected in the documents that EPAM has discovered, Rao created his Synapse competitor by taking EPAM's trade secrets (*i.e.*, highly confidential Synapse files, including the Synapse source code and/or highly sensitive architectural documents used in the

creation of Synapse), and feeding these materials into a generative AI platform or model which, in turn, then created a "step-by-step" plan that Rao followed for recoding Synapse from scratch. Thus, CoReason's product depends on, and derives from, EPAM's trade secrets.

152. Rao and CoReason will be or are being unjustly enriched by the misappropriation of EPAM Confidential Information and IP and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate EPAM Confidential Information and IP.

153. As a result of Rao's and CoReason's wrongdoing, EPAM has suffered and continues to suffer the substantial and irreparable loss of its trade secrets, goodwill, and business expectancies in amounts which may be impossible to determine unless Rao is enjoined and restrained by order of the Court.

**AS AND FOR A THIRD CAUSE OF ACTION (AGAINST RAO)**
**(Breach of Contract: Non-Disclosure of Confidential Information)**

154. EPAM repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

155. On or about November 12, 2024, Rao entered into the Covenants Agreement in connection with his employment with EPAM.

156. The Covenants Agreement explicitly prohibits him from, *inter alia*, accessing, using, disclosing or copying any EPAM Confidential Information and IP, or removing any EPAM Confidential Information and IP from the premises or control EPAM, other than in the performance of duties for and authorized by EPAM.

157. The Covenants Agreement also explicitly obligates Rao to return any and all EPAM Confidential Information and IP and EPAM equipment or information in his possession, upon termination of employment.

158. The Covenants Agreement is a duly executed and enforceable contract.

159. The confidentiality and non-disclosure obligations contained in the Covenants Agreement remain in full force and effect, and Rao, for good and valuable consideration, remains obligated to comply with those provisions.

160. Rao breached the Covenants Agreement by secretly accessing, transmitting, copying or downloading, without EPAM's knowledge or authorization, thousands of data files—including the software code to its ETL Conversion Kit, AI Cohort Generator, and AI Accelerator and other EPAM Confidential Information and IP—to a personal external device outside of EPAM's network and control, in the days leading up to his anticipated termination from EPAM.

161. Rao also breached the Covenants Agreement by continuing to maintain possession of and failing to return EPAM Confidential Information and IP, and disclosing the EPAM Confidential Information and IP to CoReason and other third-parties.

162. Rao's actions have damaged EPAM's legitimate business interests, and have denied EPAM the benefit of its bargain in respect to the Covenants Agreement.

163. As a result of Rao's breach, EPAM has suffered and continues to suffer irreparable injury, including loss of its confidential and trade secret information, and damage to its business, for which a remedy at law is inadequate. Accordingly, EPAM is entitled to injunctive and equitable relief.

164. In addition, EPAM seeks actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(Breach of Contract: Ownership of Work)**

165. EPAM repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

166. On or about November 12, 2024, Rao entered into the Covenants Agreement in connection with his employment with EPAM.

167. The Covenants Agreement states that any "Confidential Information, design, program, product, invention, package, prototype, model, innovation, data, improvement, new technique, process, discovery, concept, know how, trade secret, work product and original work of authorship, whether or not patentable, copyrightable or otherwise legally protectable (individually and collectively, "Work") made, collected, developed, conceived, discovered, learned, or used by [Rao] in connection with or in the course of [Rao's] employment, whether during or after normal business hours, shall constitute "work made for hire" as that term is defined by the Copyright Act of 1978, as amended from time to time, and shall be deemed to have been made or developed by you solely for the benefit of your employer within the EPAM Group ('Employer') and shall be the sole and exclusive property of Employer."

168. In simpler terms, the Covenants Agreement states that any work product that Rao creates or develops during his EPAM employment is the "sole and exclusive property" of EPAM.

169. Rao has breached the Covenants Agreement by claiming ownership of work product (such as by "refactoring," drafting, or editing computer code) developed during his EPAM employment, which is the "sole and exclusive property" of EPAM. Indeed, Rao is now seeking to profit from this work product, through CoReason.

170. As a result of Rao's breach, EPAM has suffered and continues to suffer irreparable injury, including loss of its property, and damage to its business, for which a remedy at law is inadequate. Accordingly, EPAM is entitled to injunctive and equitable relief.

171. EPAM is further entitled to declaratory relief, in the form of a declaration that it – not Rao or CoReason – owns all work product developed by Rao during Rao's employment, as well as derivatives of that work product that continued to be developed after Rao's employment.

172. In addition, EPAM seeks actual, incidental, compensatory, and consequential damages, in an amount to be determined at trial.

**AS AND FOR A FIFTH CAUSE OF ACTION (AGAINST RAO)**
**(Breach of Contract: Non-Solicitation of Clients)**

173. EPAM repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

174. The Covenants Agreement is a duly executed and enforceable contract giving rise to legal obligations between EPAM and Rao, including the non-solicitation covenants contained in Section 6.

175. The non-solicitation covenant remains in full force and effect and is supported by good consideration.

176. The non-solicitation covenant is necessary and tailored to protect EPAM's legitimate business interests, including but not limited to EPAM Confidential Information and IP, goodwill and business relationships.

177. Rao has breached the non-solicitation covenant by soliciting and/or contacting EPAM clients on behalf of himself for the purpose of offering services similar or competitive to those offered by EPAM both during employment and within the 12-month period following the termination of his employment. Indeed, as set forth in Rao's Answer, he has admitted to soliciting EPAM clients.

178. Upon information and belief, Rao's breach of the non-solicitation covenant will continue unless and until he is ordered to abide by the obligations to which he agreed when he executed the Covenants Agreement.

179. As a direct result of EPAM's breach of the non-solicitation covenant, EPAM has suffered and continues to suffer irreparable injury, including loss of its confidential and trade secret information, and damage to its business, for which a remedy at law is inadequate. Accordingly, EPAM is entitled to injunctive and equitable relief.

180. In addition, EPAM seeks actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to determined at trial.

**AS AND FOR A SIXTH CAUSE OF ACTION (AGAINST RAO)**
**(Breach of Fiduciary Duty And Faithless Servant)**

181. EPAM repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

182. In his role as Managing Principal, Life Sciences Consulting, Rao was placed in a position of trust and confidence, and was expected to devote his full time to the management and promotion of the company's business interests.

183. As a result of this special relationship, Rao owed certain fiduciary duties to EPAM, including a duty of loyalty and honesty, and a duty not to act in any way contrary to the interests of EPAM, including, but not limited to, a duty, while still employed with EPAM and being compensated by the Company: (a) not to make fraudulent representations to EPAM clients with respect to the status of his employment with EPAM; (b) not to misuse or misappropriate the Company's confidential or trade secret information, including EPAM Confidential Information and IP; (c) not to attempt to destroy Company property, including data files on its networks; (d)

not to engage in conduct for the purpose of compelling a termination for cause; and (e) not to be deceitful to the Company.

184. Notwithstanding these obligations and duties, and in violation thereof, Rao breached his fiduciary duty of loyalty and honesty to EPAM by, among other willful acts of misconduct during his employment: (a) fraudulently representing to third persons, including at least one EPAM client, that he is no longer associated with the Company; (b) stealing data belonging to EPAM, including EPAM Confidential Information and IP, out of EPAM's control and into his own possession for his own personal benefit; (c) planning a competing enterprise, using misappropriated EPAM Confidential Information and IP, including by reaching out to at least one executive at a key EPAM client to solicit business for his competing enterprise, and seeking funding from investors for his competing enterprise; (d) "refactoring," or otherwise drafting computer code, but not sharing this code with EPAM, because he wanted to use it for his competing enterprise; (e) feeding EPAM Confidential Information and IP into generative AI platforms or models, in order to obtain instructions on how to duplicate EPAM's Synapse product from scratch, in order to unfairly compete against EPAM; (f) attempting to permanently delete (and succeeding to delete) data files on the Company network; and (g) intentionally underperforming in order to engineer his termination for the purpose of evading the non-competition restrictive covenant in the Covenants Agreement.

185. As a consequence of Rao's breach of his fiduciary duty of loyalty to EPAM, EPAM has been injured and faces irreparable injury. EPAM is threatened with loss and misuse of its confidential and trade secret information, including the EPAM Confidential Information and IP in amounts which may be impossible to determine, unless Rao is enjoined and restrained by order of this court.

186. In addition, as a consequence of Rao's breach of his fiduciary duty, EPAM seeks actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

187. Further, because Rao breached his fiduciary duty of loyalty and/or acted as a faithless servant to EPAM, he must be required to disgorge and/or forfeit any compensation that he received during his period of disloyalty and/or faithless service. EPAM is entitled to the remedy of disgorgement/forfeiture, in addition to damages, in an amount to be determined at trial.

**AS AND FOR A SEVENTH CAUSE OF ACTION (AGAINST COREASON)**
**(Tortious Interference)**

188. EPAM repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

189. EPAM and Rao had a valid and enforceable contract, the Covenants Agreement, under which Rao owed contractual obligations to EPAM, including as to Non-Disclosure of Confidential Information, Ownership of Work, and Non-Solicitation of Clients.

190. EPAM had the reasonable expectation that Rao would honor his contractual obligations, and that his contractual obligations would not be unjustifiably disrupted.

191. CoReason knew that Rao owed EPAM the above-mentioned contractual obligations, through the Covenants Agreement. Indeed, given the substantial overlap between Rao and CoReason, with Rao serving as CoReason's Chief Executive Officer and Founder, Rao's knowledge of his own contractual obligations is imputed to CoReason.

192. CoReason intentionally interfered with Rao's contractual obligations to EPAM, and induced him to breach those obligations, with malice. Indeed, as set forth herein, CoReason's core business model appears to depend on Rao's breaches. CoReason is selling and marketing a product (including by having Rao wrongfully solicit EPAM's clients and prospective clients in violation of

his obligations to EPAM) and that is based on, derives from, and/or incorporates EPAM Confidenital Information and IP. And CoReason is also using EPAM Confidential Information and IP as part of its sales, marketing, and business strategies.

193. CoReason's actions were without privilege or justification.

194. As a result of CoReason's intentional interference, EPAM has suffered monetary damages and has suffered substantial and irreparable harm and is threatened with further substantial and irreparable harm due to the loss of trade secrets, Confidential Information and IP, and customer goodwill, for which there is no adequate remedy at law to compensate.

195. In addition, EPAM seeks actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

**AS AND FOR AN EIGHTH CAUSE OF ACTION (AGAINST RAO AND COREASON)**
**(Replevin)**

196. EPAM repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

197. As set forth above, Rao and CoReason are currently in possession or control of EPAM property, including EPAM Confidential Information.

198. Upon information and belief, the EPAM Confidential Information and IP currently resides on a personal computer and/or other devices and/or accounts owned by Rao as well as devices and accounts controlled by CoReason.

199. Despite his duties and obligations under the Covenants Agreement and the IT Resources Policy to return all Confidential Information and other EPAM equipment or information in his possession, Rao has not returned and continues to remain in possession of the stolen EPAM Confidential Information and IP.

200. Rao and CoReason have no right to possession of EPAM Confidential Information and IP, and, accordingly, EPAM has a possessory right superior to that of Rao and CoReason.

201. Given that Rao is no longer employed by EPAM, EPAM is entitled to immediate possession of the EPAM Confidential Information and IP.

202. In addition, EPAM is entitled to recover its attorneys' fees and expenses incurred as a result of Rao's theft and wrongful detention of EPAM Confidential Information and IP.

**AS AND FOR A NINTH CAUSE OF ACTION (AGAINST RAO AND COREASON)**
**(Conversion)**

203. EPAM repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

204. Rao has intentionally and wrongfully misappropriated EPAM's property, including, among other things, EPAM Confidential Information and IP.

205. Rao downloaded the EPAM Confidential Information and IP onto his personal device without EPAM's consent and without legal justification.

206. Further, Rao created EPAM Confidential Information and IP during his EPAM employment, some of which Rao may always have been stored on his personal devices. This EPAM Confidential Information and IP is the sole and exclusive property of EPAM.

207. Rao has disclosed EPAM Confidential Information and IP to CoReason. Rao and CoReason have and are marketing EPAM Confidential Information and IP as the property of Rao and/or CoReason.

208. Rao continues to be in possession of EPAM Confidential Information and IP despite his obligation to return such property upon the cessation of his employment. Further, CoReason is now in possession of EPAM Confidential Information and IP, despite never having any right to possess it.

209. By engaging in the conduct set forth above, Rao and CoReason have acted with the intent to exercise dominion and control over EPAM Confidential Information and IP, thus depriving EPAM's exclusive rights to such property and which will result in the dilution of its value to EPAM.

210. As a result of Rao's and CoReason's intentional and wrongful conduct, EPAM has been and will continue to be injured, for which it is entitled to recover actual, incidental, compensatory, punitive and consequential damages in an amount to be determined at trial.

211. EPAM is further entitled to recover all monies expended to recover converted property as special damages, including attorneys' fees.

**AS AND FOR A TENTH CAUSE OF ACTION (AGAINST RAO AND COREASON)**
**(False Advertisement in Violation of the Lanham Act, 15 U.S.C.A. § 1125)**

212. EPAM repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

213. Rao and CoReason have marketed and continue to market CoReason's product to investors and prospective clients, including EPAM clients and prospective clients, as CoReason's own original product. (*See* ECF #58-23; *see also* www.coreason.ai)

214. In or about late-2025 or early 2026, Rao, on behalf of CoReason, published a professional website for CoReason that described CoReason's product, its function, and its capabilities, including its use of "[p]arallel agents"" to analyze a problem, and identifies CoReason's personnel. (*See* ECF #58-23 at 7.) In a modified form, the website continues to exist today, and appears to be marketing the same product. *See* www.coreason.ai.

215. The website does not include any reference to EPAM's product Synapse in either its original version or its current version. *Id.*

216. The only reference to EPAM on CoReason's website is the brief credentials section for Rao. *See* www.coreason.ai, 'Our Team'.

217. Rao's credential section on the CoReason website also indicates that "the reasoning frameworks and data models in CoReason are deeply informed by" Rao's personal experience building infrastructure for how the pharmaceutical industry generates and evaluates clinical evidence. *Id.*

218. In fact, Rao created the software advertised on the CoReason website by: (a) feeding EPAM's trade secrets and/or other Confidential Information and IP, including the Synapse source code and/or highly sensitive architectural documents used in the development of Synapse, into a generative AI platform or model which produced a "step-by-step" plan to recode Synapse from scratch; (b) developing the code and/or features during his EPAM employment, rendering those materials EPAM's property under the Covenants Agreement's Ownership of Work provision; or (c) some combination of both.

219. Rao executed an employment agreement, the Covenants Agreement, with EPAM that includes an Ownership of Work provision assigning all rights to Rao's intellectual property developed in the course of his employment to EPAM.

220. To the extent CoReason's product contains features that differ from Synapse, those differing features reflect at least in part proposals that Rao made as an EPAM employee to EPAM's Synapse team, which EPAM's Synapse team decided not to include in the current version of Synapse.

221. Rao used this work product related to modifying Synapse to create CoReason, despite actual knowledge that this work product is EPAM's property.

222. Rao and CoReason are marketing CoReason's product expressly or implicitly, as an original product that is owned by CoReason. This marketing includes the CoReason website. However, Rao and CoReason have actual knowledge that its product was developed with EPAM's proprietary software, code, trade secrets, and/or with code and ideas that constitute EPAM's property under the Ownership of Work Product provision.

223. By marketing CoReason's product, expressly or implicitly, as an original product that is owned by CoReason, Rao and CoReason are engaging in material misrepresentations. Further, by not disclosing on the website or other marketing materials that EPAM actually owns the intellectual property that forms the basis of CoReason's product, and that CoReason is essentially a copycat of Synapse generated by misappropriating EPAM's Confidential Information and/or other EPAM property, Rao and CoReason have engaged in material omissions.

224. Rao's and CoReason's misrepresentations and material omissions regarding the origin and ownership of CoReason's product were made in connection with his commercial marketing and promotion of CoReason on CoReason's website. *See* www.coreason.ai.

225. Nowhere in CoReason's website description, or in any other public-facing statement by Rao or CoReason, do Rao or CoReason disclose that: (a) CoReason's product is functionally identical to EPAM's Synapse product; (b) Rao created the CoReason product by taking highly confidential EPAM Synapse files, including the Synapse source code and/or highly sensitive architectural documents used in the development of Synapse, and feeding those materials into a generative AI platform or model; (c) the generative AI platform or model, in turn, produced a "step-by-step" plan that Rao followed to recode Synapse from scratch; or (d) to the extent CoReason product contains features that differ from Synapse, those differing features are

proposals and/or code Rao developed as an EPAM employee, and remain EPAM's property under the Ownership of Work Product provision of Rao's Covenants Agreement.

226. The omitted information concerns the origin, ownership, and legitimacy of CoReason's technology, information that bears directly on whether a purchaser or investor is acquiring rights to non-infringing, properly owned technology or is instead exposing itself to a competing ownership claim and potential injunctive action by a third party.

227. CoReason's failure to indicate in any way that its product was developed with EPAM's Confidential Information or property has the capacity to deceive consumers.

228. As a result of Rao's and CoReason's wrongdoing, including the false and misleading representations described above, EPAM has suffered and continues to suffer substantial and irreparable loss of its trade secrets, goodwill, and business expectancies in amounts which may be impossible to determine unless Rao and CoReason are enjoined and restrained by order of the Court.

**AS AND FOR AN ELEVENTH CAUSE OF ACTION (AGAINST RAO AND COREASON)**
**(Common Law Unfair Competition)**

229. EPAM repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

230. Rao and CoReason have marketed and continue to market CoReason's product to investors and prospective clients, including EPAM clients and prospective clients, as CoReason's own original product. (*See* ECF #58-23; *see also* www.coreason.ai)

231. In or about late-2025 or early 2026, Rao, on behalf of CoReason, published a professional website for CoReason that described CoReason's product, its function, and its capabilities, including its use of "[p]arallel agents"" to analyze a problem, and identifies

CoReason's personnel. (*See* ECF #58-23 at 7.) In a modified form, the website continues to exist today, and appears to be marketing the same product. *See* www.coreason.ai.

232. The website does not include any reference to EPAM's product Synapse in either its original version or its current version. *Id.*

233. The only reference to EPAM on CoReason's website is the brief credentials section for Rao. *See* www.coreason.ai, 'Our Team'.

234. Rao's credential section on the CoReason website also indicates that "the reasoning frameworks and data models in CoReason are deeply informed by" Rao's personal experience building infrastructure for how the pharmaceutical industry generates and evaluates clinical evidence. *Id.*

235. In fact, Rao created the software advertised on the CoReason website by: (a) feeding EPAM's trade secrets and/or other Confidential Information and IP, including the Synapse source code and/or highly sensitive architectural documents used in the development of Synapse, into a generative AI platform or model which produced a "step-by-step" plan to recode Synapse from scratch; (b) developing the code and/or features during his EPAM employment, rendering those materials EPAM's property under the Covenants Agreement's Ownership of Work provision; or (c) some combination of both.

236. Rao executed an employment agreement, the Covenants Agreement, with EPAM that includes an Ownership of Work provision assigning all rights to Rao's intellectual property developed in the course of his employment to EPAM.

237. To the extent CoReason's product contains features that differ from Synapse, those differing features reflect proposals that Rao made as an EPAM employee to EPAM's Synapse team, which EPAM's Synapse team decided not to include in the current version of Synapse.

238. Rao used this work product related to modifying Synapse to create CoReason, despite actual knowledge that this work product is EPAM's property.

239. Rao and CoReason are marketing CoReason's product expressly or implicitly, as an original product that is owned by CoReason. This marketing includes the CoReason website. However, Rao and CoReason have actual knowledge that its product was developed with EPAM's proprietary software, code, trade secrets, and/or with code and ideas that constitute EPAM's property under the Ownership of Work Product provision.

240. By marketing CoReason's product, expressly or implicitly, as an original product that is owned by CoReason, Rao and CoReason are engaging in material misrepresentations. Further, by not disclosing on the website or other marketing materials that EPAM actually owns the intellectual property that forms the basis of CoReason's product, and that CoReason is essentially a copycat of Synapse generated by misappropriating EPAM's Confidential Information and/or other EPAM property, Rao and CoReason have engaged in material omissions.

241. Rao's and CoReason's misrepresentations and material omissions regarding the origin and ownership of CoReason's product were made in connection with his commercial marketing and promotion of CoReason on CoReason's website. *See* www.coreason.ai.

242. Nowhere in CoReason's website description, or in any other public-facing statement by Rao or CoReason, do Rao or CoReason disclose that: (a) CoReason's product is functionally identical to EPAM's Synapse product; (b) Rao created the CoReason product by taking highly confidential EPAM Synapse files, including the Synapse source code and/or highly sensitive architectural documents used in the development of Synapse, and feeding those materials into a generative AI platform or model; (c) the generative AI platform or model, in turn, produced a "step-by-step" plan that Rao followed to recode Synapse from scratch; or (d) to the extent

CoReason product contains features that differ from Synapse, those differing features are proposals and/or code Rao developed as an EPAM employee, and remain EPAM's property under the Ownership of Work Product provision of Rao's Covenants Agreement.

243. The omitted information concerns the origin, ownership, and legitimacy of CoReason's technology, information that bears directly on whether a purchaser or investor is acquiring rights to non-infringing, properly owned technology or is instead exposing itself to a competing ownership claim and potential injunctive action by a third party.

244. CoReason's failure to indicate in any way that its product was developed with EPAM's Confidential Information or property has the capacity to deceive consumers.

245. In addition to using EPAM Confidential Information and IP to create CoReason's product, Rao and CoReason have also misappropriated and repurposed other EPAM-owned materials (including Confidential Information and IP) to benefit CoReason, including business plans. Further, upon information and belief, Rao is using EPAM Confidential Information and IP, such as bid proposals, pricing information, and the Synapse marketing "Sales Battle Card," to gain an unfair advantage in competing against EPAM.

246. As a result of Rao's and CoReason's wrongdoing, including the false and misleading representations described above, and its misuse and misappropriation of EPAM Confidential Information and IP, Rao and CoReason are unfairly competing against EPAM.

247. EPAM has suffered and continues to suffer substantial and irreparable loss of its trade secrets, goodwill, and business expectancies in amounts which may be impossible to determine unless Rao and CoReason are enjoined and restrained by order of the Court.

**AS AND FOR A TWELTH CAUSE OF ACTION (AGAINST RAO AND COREASON)**
**(Declaratory Judgment Pursuant to the Declaratory Judgment Act, 28 U.S. Code § 2201, *et seq*)**

248. EPAM repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

249. An actual and justiciable controversy exists between EPAM, Rao, and CoReason concerning the ownership of CoReason's technology.

250. Rao and CoReason claim ownership of intellectual property that was developed by misappropriating EPAM's Confidential Information and/or trade secrets.

251. Rao and CoReason also claim ownership of work product Rao developed during his EPAM employment, which is subject to an Ownership of Work provision.

252. Rao and CoReason are marketing and profiting from intellectual property that EPAM owns.

253. EPAM is entitled to a declaration that owns all work product and/or intellectual property developed by misappropriating its Confidential Information and/or trade secrets, such as by feeding Synapse information into generative artificial intelligence platforms or models.

254. EPAM is also entitled to a declaration that it owns all work product and/or intellectual property developed by Rao during his EPAM employment, as well as all derivatives of that work product that continued to be developed after Rao's employment ended.

255. Because CoReason's claimed intellectual property and technology is based on misappropriated EPAM Confidential Information, trade secrets, and/or other EPAM intellectual property, EPAM is further entitled to a declaration that it owns all of CoReason's intellectual property and technology.

256. A judicial declaration is necessary and appropriate at this time for EPAM to ascertain its respective rights and obligations with respect to the ownership of the above, including as to CoReason's claimed intellectual property and technology.

**AS AND FOR A THIRTEENTH CAUSE OF ACTION (AGAINST RAO AND COREASON)**
**(Unjust Enrichment)**

257. EPAM repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

258. Rao obtained the EPAM Confidential Information and IP that in equity and good conscience he should not have obtained, and then provided this material to CoReason.

259. Rao's theft of EPAM Confidential Information and IP has unjustly enriched Rao and CoReason at EPAM's expense.

260. Rao was further unjustly enriched with compensation and other benefits while engaging in acts of disloyalty during his employment with EPAM.

261. As a consequence of Rao's unjust enrichment, EPAM has been and will continue to be injured, for which it is entitled to recover actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

**WHEREFORE**, EPAM seeks judgment in its favor and an Order against Rao that grants the following relief:

1. A preliminary injunction and after trial, a permanent injunction that:

(a) Preliminarily and permanently enjoins Rao from breaching his confidentiality and non-disclosure obligations to EPAM;

(b) Preliminarily and permanently enjoins Rao, and all persons and/or entities acting on his behalf, for his benefit, or in active concert or participation with him, from directly or indirectly accessing, disclosing, reproducing, transmitting or using any confidential, proprietary, or trade secret information of any kind, nature or description belonging to EPAM, including EPAM Confidential Information and IP;

(a) Preliminarily and permanently enjoins Rao, and all persons and/or entities acting on his behalf, for his benefit, or in active concert or participation with him, from directly or indirectly accessing disclosing, reproducing,

transmitting or using any intellectual property of any kind belonging to EPAM or any EPAM client, including software code;

(b) Preliminarily and prospectively enjoins Rao from directly or indirectly soliciting, contacting, or attempting to solicit or contact, or meet with any EPAM client, former, or prospective client, for purposes of offering services similar to or competitive with those offered by EPAM;

(c) Preliminarily and prospectively enjoins Rao from breaching his contractual obligations to EPAM;

2. An Order that Rao, and all parties in active concert or participation with him, to return to EPAM all EPAM property, including all originals and copies of all files, devices and/or documents that contain or relate to EPAM's proprietary software source code, confidential, proprietary and trade secret information, including EPAM Confidential Information and IP;

3. An Order that Rao, and all parties in active concert or participation with him, to return to EPAM all intellectual property belonging to EPAM or its clients, including any and all source code and data relating to software tools owned by EPAM or any EPAM client;

4. An Order that Rao and CoReason produce for inspection, imaging, and remediation all computers and other electronic storage devices or storage accounts, including any cloud accounts, sharefile accounts, USB devices, email accounts, and smartphones belonging to, under the control of, accessible to, or operated by Rao or CoReason or any employee or agent of each, at Rao's and CoReason's expense;

5. An Order declaring that the software and other intellectual property currently marketed as "CoReason" was developed by and is the proprietary software of EPAM;

5. Actual, incidental, compensatory, and consequential damages in excess of $150,000, in an amount to be proven at trial;

6. Disgorgement/forfeiture of Rao's EPAM compensation during the period of his disloyalty;

8. Disgorgement/forfeiture of CoReason's sales and/or earnings of products and services are based on, derive from, or contain misappropriated EPAM Confidential Information and IP.

9. Exemplary damages pursuant to the DTSA and PUTSA, in an amount to be proven at trial;

10. Punitive damages in an amount to be proven at trial due to Rao's willful and malicious conduct;

11. Costs and expenses incurred herein, including reasonable attorneys' fees and interest, including pursuant to the Covenants Agreement;

12. Pre-judgment interest; and

13. All other relief as the Court may deem just, equitable and proper.

Dated: September 11, 2026

Respectfully submitted,

EPAM SYSTEMS, INC.,

By its attorneys,

*/s/ Jacob Oslick*

Jacob Oslick (Pa. Attorney No. 311028)
joslick@seyfarth.com
James S. Yu (admitted *pro hac vice*)
jyu@seyfarth.com
Brooke Gary (admitted *pro hac vice*)
brgary@seyfarth.com
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, NY 10018-1405
(212) 218-5500

# EXHIBIT A

## Employment Covenants Agreement (Confidentiality/Assignment/Non-Compete/Non-Solicitation/Arbitration)

This Employee Agreement ("**Agreement**") is entered into by and between EPAM Systems, Inc., with its principal place of business located at 41 University Drive, Suite 202, Newtown PA ("EPAM") on behalf of itself and its owned affiliates, and successors and assigns (each individually, and all collectively, the "**EPAM Group**"), and Gowtham Rao ("**you** or **your**"), residing at 184 Mansgrove Rd, Princeton, NJ, as of Nov 12th, 2024 (the "**Effective Date**"), as a condition of your employment with EPAM or an entity within the EPAM Group.

*WHEREAS,* all entities in the EPAM Group work globally and collectively on a day to day basis on EPAM Group initiatives and in the provision of services including by sharing information, working on joint-objectives and work product, and cross-sourcing personnel from entities within the EPAM Group. The business model of the EPAM Group further involves staffing from on-shore and off-shore entities within the EPAM Group.

*IT IS AGREED*, in light of the above, and in consideration of your employment by an entity within the EPAM Group, and all other promises made hereunder including without limitation EPAM Group's sharing of proprietary information with you, which you acknowledge to be good and valuable consideration for your obligations hereunder, EPAM Group and you hereby agree as follows:

**1. Confidential Information**. You understand and acknowledge that during the course of employment you will have access to and learn about Confidential Information.

(a) Confidential Information Defined. "Confidential Information" includes, without limitation, all information not generally known to the public, in spoken, printed, electronic, or any other form, relating to the EPAM Group's: business processes, practices, policies, plans, publications, research, operations, services, strategies, techniques, contracts, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, software, applications, design, databases, records, systems, supplier and vendor information, financial information, accounting information, legal information, marketing, pricing, payroll, staffing, personnel, internal controls, security, formulae, algorithms, ideas, inventions, patent applications, original works of authorship, discoveries, experimental processes/results, specifications, and client information of the EPAM Group or any existing or prospective client, supplier, investor, or other person or entity that has entrusted information to the EPAM Group in confidence.

(b) You understand this list is not exhaustive and also includes other information treated as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary. It is also understood and agreed that Confidential Information includes information developed by you in the course of employment. Confidential Information shall not include information generally available and known by the public at the time of disclosure to you, provided the disclosure is through no direct or indirect fault of you in whole or part, information known to you prior to your employment with the EPAM Group, or information regarding your pay, benefits, and other employment terms and conditions. For avoidance of doubt, Confidential Information expressly does not include general industry knowledge, skills, or software developed or acquired by you without reliance on EPAM Group Confidential Information, which is through and for the purpose of community, professional, scientific, or similar groups and settings that are reasonably available through general industry sources.

(c) EPAM Group Creation and Use of Confidential Information. You understand and acknowledge that the EPAM Group has and continues to invest substantial time, money, and specialized knowledge into developing its offerings and resources, creating a client base, generating potential client lists, training its employees, and improving its offerings. You understand and acknowledge that as a result, EPAM Group has created, and continues to use and create Confidential Information that

provides a competitive advantage in the marketplace.

(d) Disclosure and Use Restrictions. You agree you will: (i) treat all Confidential Information as strictly confidential; (ii) not directly or indirectly disclose Confidential Information, or allow it to be disclosed in whole or part, to any entity or person whatsoever outside of the direct employ of the EPAM Group except as required in the performance of your authorized employment duties (and then, only within the limits and to the extent of such duties); and (iii) not access, use, or copy Confidential Information or any documents, records, files, media, or other resources containing any Confidential Information, or remove any such items from the premises or control of the EPAM Group, except as required in the performance of your authorized employment (and then, only within the limits and to the extent of such duties or consent).

Nothing herein shall prevent disclosure of Confidential Information as required by applicable law or regulation, or pursuant to a valid court order of competent jurisdiction or an authorized government agency, provided the disclosure does not exceed that required by such law, regulation, or order. You shall promptly provide written notice of any such order to EPAM Systems, Inc.'s General Counsel.

You understand and acknowledge these obligations regarding Confidential Information continue during and after your employment until such time as such Confidential Information becomes public knowledge, except as a result of your breach of this Agreement, or by those acting in concert with you.

If/when your employment terminates, you shall immediately return any and all Confidential Information and other EPAM Group equipment or information in your possession.

(e) Immunity Under the Economic Espionage Act of 1996, amended by the Defend Trade Secrets Act of 2016. Notwithstanding any other provision of this Agreement, you will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that (a) is made: (ii) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding. If you file a lawsuit for retaliation by EPAM Group for reporting a suspected violation of law, you may disclose EPAM Group's trade secrets to your attorney and use the trade secret information in the court proceeding if you: (i) file any document containing the trade secret under seal; and (ii) do not disclose the trade secret, except pursuant to court order.

(f) Other Permitted Disclosures. Nothing in this Agreement prohibits or restricts you (or your attorney) from filing a charge or complaint or communicating with the Securities and Exchange Commission (SEC), the Financial Industry Regulatory Authority (FINRA), any other securities regulatory agency or authority, the Occupational Safety and Health Administration (OSHA), the National Labor Relations Board (NLRB), the Equal Employment Opportunity Commission (EEOC), or any other federal, state, or local governmental organization or authority, legislative body, or official (or staff member to the foregoing) ("The Agencies"). You further understand this Agreement does not limit your ability to participate in any investigation or proceeding conducted by The Agencies in connection with reporting a possible violation of law without notice to the EPAM Group. This Agreement does not limit your right to receive an award for information provided to any Agencies/to the SEC staff, or any other securities regulatory agency or authority. Additionally, nothing in this Agreement prohibits or restricts you from exercising any rights under Section 7 of the National Labor Relations Act (NLRA), and any rule or regulation promulgated by The Agencies. Additionally, nothing in this Agreement limits you from good faith disclosure of information about alleged unlawful acts in the workplace including but not limited to discrimination, harassment, assault, retaliation, wage and hour violations, violations of public policy, or any other conduct that you have reason to believe is unlawful.

**2. Ownership of Work Product.** Any Confidential Information, design, program, product, invention, package, prototype, model, innovation, data, improvement, new technique, process, discovery, concept, know how, trade secret, work product and original work of authorship, whether or not patentable, copyrightable or otherwise legally protectable, (individually and collectively "Work") made, collected, developed, conceived, discovered, learned, or used by you in connection with or in the course of your employment, whether during or after normal business hours, shall constitute "work made for hire" as that term is defined by the Copyright Act of 1978, as amended from time to time, and shall be deemed to have been made or developed by you solely for the benefit of your employer within the EPAM Group ("Employer") and shall be the

sole and exclusive property of Employer. In order to effectuate the terms of this Agreement and in the event any Work created by or on behalf of you would not be deemed to be the sole and exclusive property of Employer, you assign and agree to assign to Employer all your rights in and to the Work including, without limitation, any trademarks, copyrights, patents, moral rights, and all other proprietary interest that you may have in any such Work without additional compensation. You shall not during the course of employment or at any time after, use or (to the extent that the Work constitutes Confidential Information) disclose to any other person any such Work, except as expressly authorized in writing by Employer. You hereby irrevocably and unconditionally appoint Employer as your attorney-in-fact to execute and deliver any documents necessary or desirable by Employer to protect Employer's ownership in the Work in furtherance of this Section. This power of attorney is coupled with an interest and shall survive any incapacity. You shall assist Employer or its designee, at Employer's expense, in every proper way to secure Employer's or its designee's rights in the Works and all intellectual property rights relating thereto throughout the world requested by Employer or its designee in order to apply for, obtain, maintain and transfer rights (or if not transferable, then waive such rights). You represent that at the time of signing this Agreement, you possess no intellectual property rights, solely or jointly with others, that relate in any way to any of EPAM Group's business, products, services, assets (tangible or intangible) or research and development.

(a) For those working within California, Delaware, Illinois, Kansas, Minnesota, New Jersey, North Carolina, Utah, or Washington. In the event your primary work location is within or changes in the course of employment to within California, Delaware, Illinois, Kansas, Minnesota, New Jersey, North Carolina, Utah, or Washington, then pursuant to the applicable state law, this section shall supplement the language above and apply solely with respect to the time period while working in that state. In such case, you understand and acknowledge that the provisions in this Agreement requiring you to assign (or otherwise providing for ownership by Employer of) rights to Work does not apply to, any invention that you develop entirely on your own time without using EPAM Groups' equipment, supplies, facilities, or trade secret information, except for those inventions that either (i) relate at the time of conception or reduction to practice of the invention directly to Employer's business or actual or demonstrably anticipated research or development of Employer; or (ii) result from any work performed by you for Employer. Notwithstanding, you agree to provide Employer advance written notice in the event you anticipate engaging in activities which would produce Work while employed but that would not be for the benefit of and owned by Employer so that a discussion can be made to ensure such activity would be appropriate under the Code of Conduct and this Agreement.

3. **Warranty Regarding Past Employer/Client Obligations**. You represent and warrant you are not a party to any non-compete restrictive covenant or other contractual limitation that would interfere with or hinder your ability to undertake the obligations and expectations of employment. You furthermore shall not disclose to the EPAM Group or use any intellectual property, confidential or non-public proprietary information or materials belonging to any of your previous client(s) or employer(s).

4. **Processing of Employee Information**. You acknowledge and agree that during the term of your employment, the EPAM Group has your permission to process and transfer data relating to you for legal, personnel, administrative, and business management purposes, including as examples, but without limitation: personal information (i) required to monitor sick time or other leave of absence eligibility; (ii) required to monitor compliance with equal opportunity policies and related government legislation; and (iii) relating to fitness for duty, including regarding background check criteria and results, to comply with policies, legal requirements, and contractual obligations to third parties. The EPAM Group may make such information available to those who provide products or services to it (such as advisors, payroll and benefits administrators), regulatory authorities, government or quasi-governmental organizations, clients to whom EPAM Group has contractual obligations, and any other cases where EPAM Group considers it reasonably necessary for legitimate business purposes, including within the U.S. or across country borders, to the extent permitted by law.

5. **Restrictive Covenants**. You understand the nature of your position gives you access to and knowledge of Confidential Information and places you in a position of trust and confidence with the EPAM Group. You acknowledge and agree that: (i) your services to be rendered to the EPAM Group are of a special and unique character; (ii) that you will obtain knowledge and skill relevant to the EPAM Group's industry, methods of doing business, inventions, marketing strategies and/or other Confidential Information by virtue of your employment; and (iii) that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interests of the EPAM Group. As a result, and in return for employment and access to Confidential Information you will be provided in

your role, you agree to the following restrictive covenants, regardless of the reason for any future employment termination:

(a) Non-Solicitation of Employees. You agree that for the term of your employment plus 12 months following termination of employment, you will not directly or indirectly solicit, hire, engage, recruit, or attempt such acts, with respect to any employee or contractor of the EPAM Group who is or has been employed/engaged by the EPAM Group in the 3 months preceding your termination of employment (collectively, "Covered Employee/Contractor"), or induce the termination of employment or services of any Covered Employee/Contractor.

(b) Non-Solicitation of Clients. You understand and acknowledge that because of your relationship to the EPAM Group, you will have access to and learn about the EPAM Group's client information, such as for example: names, phone numbers, addresses, email addresses, service history, structure, pricing, and other information specific to the client and relevant to the provision of services by EPAM Group. You further understand and acknowledge that loss of any client relationship or goodwill will cause significant and irreparable harm to the EPAM Group.

You agree that for the term of your employment plus 12 months following termination of employment, you will not directly or indirectly solicit, contact, or attempt to solicit or contact, using any form of oral, written, or electronic communication, including, but not limited to, electronic or other mail, phone, fax, instant message, or social media, or meet with the EPAM Group's current, former, or prospective clients, for purposes of offering services similar to or competitive with those offered by the EPAM Group. Following termination of employment, this restriction shall only apply to: (i) any clients or prospective clients you had any contact with during the 12 months preceding termination of employment; and separately, (ii) any clients about whom you possess trade secret or confidential information gained during the 12 months preceding termination of your employment. The restriction applies broadly, without the limitations in (i) and (ii), while you remain employed.

(c) Non-Competition.

1. In the event you voluntarily resign employment, then you agree that for the term of your employment plus 12 months following termination of employment not to become (whether directly or indirectly) an employee, contractor or fiduciary, of any EPAM Group client who you were actively engaged with in the last 6 months prior to the termination of your employment, to perform work of a similar nature as compared to work you performed for the client in the last 6 months of your EPAM employment, without first securing the written consent of your Employer, which may be given or denied at the sole discretion of your Employer. The restrictions in this subsection shall not apply in case of an involuntary termination.; and

2. In the event you voluntarily resign employment, then you agree that for 12 months following termination of your employment, not to engage in activity in which you contribute directly or indirectly in a senior management role as an employee, employer, owner, contractor, fiduciary, or in any other capacity, to a direct competitor of the EPAM Group for purposes of performing similar duties as compared to your EPAM position during the last 12 months preceding your termination. A direct competitor for purpose of this provision is an individual or entity that sells (or seeks to sell) any of the same or similar nature services as compared to the services you were involved with by providing support for, having management oversight over, or possessing confidential information about, during your last 12 months of employment. A senior management role is defined for purpose of this provision as any role that: is involved in setting strategic direction, oversees a functional area that performs any activities competitive with the EPAM Group, supports mergers and acquisition activity, manages client accounts or relationships from a business or delivery perspective, or is involved in new business or new client generation. This prohibition also includes any activity that requires or inevitably requires disclosure of trade secrets, proprietary information, or Confidential Information. The geographic scope of the restriction applies to any country in which you had any contact with clients or potential clients of the EPAM Group or performed any services for the EPAM Group within the last 12 months preceding your termination. The restrictions in this subsection shall not apply in case of an involuntary termination.

Nothing herein shall prohibit you from purchasing or owning less than five percent (5%) of the publicly traded securities of any company, provided such ownership represents a passive investment and you are not a controlling person of, or a member of a group that controls, such Company.

Additionally, nothing in this Section 5(c) shall restrict you from engaging in the practice of medicine that is not in competition with the EPAM Group and which does not otherwise present a conflict of interest, such as for example your providing volunteer physician services at the Ann Silverman Clinic or providing physician services at the Veterans Health Administration. These nature activities will be performed independent of your EPAM Group employment. You agree that in case your outside activities might increase in scope or become in any way competitive with the services of the EPAM Group or involve working directly with EPAM Group clients, you will disclose such expanded scope of activities in order for a conflicts of interest review to be completed.

(d) Tolling: If you violate any of the terms of the restrictive covenant obligations in this Agreement, the term for all such restrictions shall automatically be extended by the period you were in violation of them.

(e) Transfer Outside of State. In the event your primary work location changes in the course of employment to within California, Colorado, Hawaii, Illinois, Massachusetts, Minnesota, Nevada, North Dakota, Oklahoma, Washington, D.C., or Washington State, then Section 5 above, in its entirety, shall become void and will be replaced with the relevant provision in Exhibit A solely with respect to the time period following the transfer. If you subsequently return to working in a state outside California, Colorado, Hawaii, Illinois, Massachusetts, Minnesota, Nevada, North Dakota, Oklahoma, Washington, D.C., or Washington State, then the above Section 5 shall be reinstated and applicable following that move.

6. **Non-Disparagement**. You agree that you will not make, publish, or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments, or statements concerning the EPAM Group or its businesses, or any of its employees, officers, and existing and prospective clients, suppliers, investors, and other associated third parties. Notwithstanding the foregoing, this provision is limited by the same exceptions outlined in Sections 1(d)-(e), and any other legally required exclusions, including that nothing in this Agreement prohibits you from (a) disclosing information in good faith to any federal, state, or local governmental agency, legislative body, or official (or staff member to the foregoing) regarding an alleged violation of law or regulation; (b) from discussing or disclosing information about unlawful acts in the workplace, such as harassment, discrimination, retaliation, wage and hour violations, sexual assault, violations of public policy, or any other conduct that you have reason to believe is unlawful; or (c) otherwise making disclosures that are protected under applicable law, including, without limitation, the National Labor Relations Act, the Defend Trade Secrets Act, and any rule or regulation promulgated by the Securities and Exchange Commission (SEC), the National Labor Relations Board (NLRB), the Equal Employment Opportunity Commission (EEOC), or any other federal, state, or local government agency.

7. **Remedies, Arbitration, and Class Waiver.** You understand and acknowledge that any breach of any covenant or agreement in this Agreement by you will cause irreparable harm to the EPAM Group, and that such harm will usually be difficult if not impossible to ascertain.

Any claim, dispute, or controversy between you and the EPAM Group (including its officers, directors, supervisors, managers, employees, or agents ), arising out of or relating to your employment, the termination of your employment, or this Agreement, shall be resolved by final and binding arbitration before a single arbitrator under the rules of the American Arbitration Association ("AAA") pertaining to employment matters ("AAA Rules"). The claims covered by this arbitration provision include, but are not limited to, claims relative to alleged breach of contract (express or implied), tort, wrongful termination, discrimination or harassment, wages or other compensation, and any other federal, state, or other governmental law, statute, regulation, or ordinance.

EPAM Group is engaged in interstate commerce; thus, interpretation and enforcement of this arbitration provision shall be governed by the substantive provisions of the Federal Arbitration Act (FAA). If for any reason the substantive provisions of the FAA do not apply, interpretation and enforcement of this arbitration provision shall be governed by the law of the state where you worked for EPAM Group. The arbitrator shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, or enforceability of this arbitration provision, except for any claim that the class or collective action waiver below is unenforceable, which will be determined only by a court of competent jurisdiction, and not an arbitrator. If any portion of this arbitration provision is held to be invalid or unenforceable, in whole or in part, the

remaining portions shall continue to be valid and any unenforceable or conflicting provision shall be automatically severed. If the waiver of class and collective claims is found to be unenforceable despite this severability provision, then any claim brought on a class or collective action basis must be filed in a court of competent jurisdiction, and such court shall be the exclusive forum for such claims, but the portion of the waiver of class and collective claims that is enforceable shall be enforced in arbitration. The AAA Rules may be found as of the Effective Date at https://www.adr.org/Rules. AAA contact information for other questions about the process can be found as of the Effective Date at https://www.adr.org/Rules. The arbitrator shall be a retired judge or attorney with experience in the general area of the dispute. The arbitrator shall be selected by mutual agreement of the parties to the arbitration or, if the parties cannot agree, then by striking from a list of 11 arbitrators supplied by AAA. Each party shall have 10 calendar days from the postmark date on the list to strike all names on it deemed unacceptable. If only one common name remains on the list of all parties, the individual shall be designated as the arbitrator. If more than one common name remains, the parties shall strike names alternatively with the party striking first to be determined by coin toss, until only one common name remains. If no common names remain, then AAA shall furnish an additional list of eleven (11) arbitrators from which the parties shall strike alternately, with the party striking first to be determined by a coin toss, until only one name remains. That person shall be designated as the Arbitrator.

The arbitrator will have the power to decide dispositive motions prior to any arbitration hearing.

You and EPAM Group furthermore agree that to the maximum effect permitted by law, all claims covered by this provision may only be brought in the party's individual capacity, and you and EPAM Group waive any right to bring, maintain, or to participate in any class or collective action(or any action involving class or collective certification procedures). Claims asserted under the Private Attorneys General Act (PAGA) involving any violations suffered by a party individually shall be arbitrated on an individual basis only. The parties agree that any non-individual claim asserted under PAGA involving any violations suffered by other individuals will be stayed pending the outcome of the arbitration involving any violations suffered by a party individually.

The decision of the arbitrator will be in writing and contain findings of fact and conclusions of law.

The obligation to arbitrate is mutual, and binding on you and the EPAM Group. The venue for such arbitration shall be the county and state of your employment at the time the alleged cause of action arose. Any arbitral award determination shall be final and binding. **It is understood and agreed that by agreeing to arbitration, the right to a jury trial, as well as normal-course appeal rights in court, are waived.** The EPAM Group will pay the arbitrator's fees and arbitration expenses and any other costs unique to the arbitration hearing except for the filing fee if a claim is initiated by you, in which case you will be responsible to pay the filing fee up to a maximum of the amount you would have paid if you filed a complaint the court of general jurisdiction in the state in which you are/were employed. Each side bears its own deposition, witness, expert and attorney's fees and other expenses to the same extent as if the matter were being heard in court. If, however, any party prevails on a statutory claim that affords the prevailing party attorneys' fees and costs, then the arbitrator may award reasonable attorneys' fees and costs to the prevailing party. Any dispute as to who is a prevailing party and/or the reasonableness of any fee or costs shall be resolved by the arbitrator.

Additionally, in the event of any breach of this Agreement, the prevailing party shall be entitled to recovery of damages arising under this Agreement including, without limitation, reasonable attorneys' fees and all other costs and expenses incurred in securing a judgement for breach aside from the arbitrator's fees and arbitration expenses unique to arbitration; however, nothing in this Agreement shall be construed to permit a party to recover any damages, fees, or other costs or expenses in connection with court proceedings to initiate, compel, or oppose arbitration.

This arbitration provision does not preclude you from filing a charge with any state or federal agency such as for example with any federal, state or local equal employment opportunity or fair employment practices agency, or any other federal, state or local government official or office – this arbitration provision applies solely to the waiver of a court filing by you in favor of an arbitration filing. Also excluded are claims under any employee benefit plan that specifies a different arbitration procedure, claims for workers' compensation, claims for unemployment compensation benefits, or any other claims that, as a matter of law, cannot be compelled to arbitration. In addition, to the extent permitted by applicable law, this arbitration provision does not preclude either you or EPAM Group from seeking injunctive relief in a court of law.

**8. Successors and Assigns**. To the extent permitted by law, the EPAM Group may assign this Agreement to any subsidiary or corporate affiliate in the EPAM Group, or to any successor or assign (whether direct or indirect, by purchase, merger, consolidation, or otherwise) to all or substantially all of the business or assets of the EPAM Group, and you hereby consent to any such assignment. This Agreement shall inure to the benefit of the EPAM Group and permitted successors and assigns and is enforceable by any member of the EPAM GROUP and permitted successors and assigns. You however may not assign this Agreement or any part hereof given the personal nature of the obligations. Any purported assignment by you shall be null and void.

**9. Choice of Law and Forum Selection**. Except as specifically provided in Section 7, this Agreement and all matters arising out of or relating to this Agreement, whether sounding in contract, tort, or statute, are governed by, and construed in accordance with, the laws of the State of Delaware without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the laws of any jurisdiction other than the State of Delaware to apply. Subject to Section 7, to the extent that any lawsuit is nonetheless permitted under this Agreement, any action or proceeding shall be brought in the court closest in proximity to and with jurisdiction over Bucks County, Pennsylvania. The parties to this Agreement hereby irrevocably submit to the exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue. Only in the event that at the time a cause of action arose,(i) your primary work location is within California, Hawaii, Massachusetts, Nevada, North Dakota, Oklahoma or Washington, or (ii) your primary work location is in another state in which the choice of law or forum selection requirements in this section 9 is unlawful and/or unenforceable, then in either case the choice of law and/or forum selection requirements, as applicable, will be replaced with the state of your work at the time the cause of action arose. Nothing in this section shall restrict a party from filing in, or removal to, federal court.

**10. Modification and Waiver**. No provision of this Agreement may be amended or modified unless agreed to in writing and signed by you and an Officer of EPAM. No waiver of any breach shall be deemed a waiver of any similar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay in exercising any right, power, or privilege under this Agreement operate as a waiver to preclude any other or further exercise of any right, power, or privilege. Additionally, if you believe any future conduct by you could even arguably be in violation of any of the covenants and agreements in this Agreement, you commit to providing written notice to EPAM Systems, Inc's General Counsel before engaging in such conduct, with a description of the anticipated conduct and any request for a modification of the term(s) you believe could be offended, at which time the EPAM Group may decide in its sole discretion whether or not to agree to a modification of any provision of this Agreement.

**11. Severability**. If any provision of this Agreement is held by a court or arbitral authority of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held unenforceable and thus stricken, that holding shall not affect the validity of the remainder of this Agreement, with the balance being binding with any modification to become a part of and treated as though originally set forth in this Agreement. It is further agreed that any such court or arbitral authority is expressly authorized to modify any unenforceable provision of this Agreement instead of severing it from this Agreement, whether by rewriting the offending provision, deleting any or all of the provision, adding additional language to this Agreement, or by making any other modifications it deems warranted to carry out the intent and agreement as embodied in this Agreement to the maximum extent permitted by law. The parties to this Agreement agree that this Agreement as so modified shall be binding upon and enforceable against each of them.

**12. Counterparts**. This Agreement may be executed in counterparts. Delivery of an executed signature page by facsimile, pdf attached to email, or any other electronic means intended to preserve the original graphic and appearance of the document has the same effect as delivery of an executed original.

**13. Notice to Third Parties/Subsequent Employers**. If/when your employment within the EPAM Group terminates, whether voluntarily or involuntarily, you agree that for twelve months following termination of your employment, you will provide to any subsequent employer a copy of this Agreement. In addition, you authorize EPAM Group to provide a copy of this Agreement to third parties, including but not limited to, any subsequent, anticipated, or possible future employer.

**14. At-Will Employment and Status.** Nothing in this Agreement shall be construed to in any way terminate, supersede, undermine, or otherwise modify the "at-will" status of the employment relationship, pursuant to which you or your

Employer may terminate the employment relationship at any time, with or without cause, and with or without notice. Furthermore, nothing in this Agreement implies or creates an employment relationship between you and any other entity in the EPAM Group, except between you and your Employer.

BY SIGNING BELOW YOU ACKNOWLEDGE YOU HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND HAVE READ AND UNDERSTOOD ALL PROVISIONS OF THIS AGREEMENT AND THE ATTACHED EXHIBIT. THIS AGREEMENT SHALL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION THEREOF.

**IN WITNESS WHEREOF**, this Agreement, including Exhibit A, has been executed as of the Effective Date above.

EPAM SYSTEMS, INC.:

Signature: [signature]

Print Name: Larry Solomon

Title: SVP, Chief People Officer

EMPLOYEE:

Signature: [signature]

Print Name: Gowtham Rao

## EXHIBIT A

In the event your primary work location changes to California, Colorado, Hawaii, Illinois, Massachusetts, Minnesota, Nevada, North Dakota, Oklahoma, Washington D.C., or Washington State during your employment, then Section 5 of the Agreement in its entirety shall become void and will be replaced with the relevant provision below with respect to the time period spent in such state.

**In the event your primary work location changes to California**:

5. **Restrictive Covenants**. You understand the nature of your position gives you access to and knowledge of Confidential Information and places you in a position of trust and confidence with the EPAM Group. You acknowledge and agree that: (i) your services to be rendered to the EPAM Group are of a special and unique character; (ii) that you will obtain skills and non-public knowledge relevant to the EPAM Group's industry, methods of doing business, inventions, marketing strategies and/or other Confidential Information by virtue of your employment; and (iii) that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interests of the EPAM Group. As a result, and in return for employment and access to Confidential Information you will be provided in your role, you agree to the following restrictive covenants, regardless of the reason for any future employment termination:

(a) Non-Solicitation of Employees. You agree that for the term of your employment plus 12 months following termination of employment, you will not use the EPAM Group's trade secrets to directly or indirectly solicit or recruit, or attempt such acts, with respect to any employee or contractor of the EPAM Group who is or has been employed/engaged by the EPAM Group in the 3 months preceding your termination of employment.

(b) Non-Solicitation of Clients. You understand and acknowledge that because of your relationship to the EPAM Group, you will have access to and learn about the EPAM Group's client information (much of which is non-public), such as for example: names, phone numbers, addresses, email addresses, service history, structure, pricing, and other information specific to the client and relevant to the provision of services by EPAM Group. You further understand and acknowledge that loss of any client relationship or goodwill will cause significant and irreparable harm to the EPAM Group.

You agree that for the term of your employment plus 12 months following termination of employment, you will not use EPAM Group trade secrets to directly or indirectly solicit, contact, or attempt to solicit or contact, using any form of oral, written, or electronic communication, including, but not limited to, electronic or other mail, phone, fax, instant message, or social media, or meet with the EPAM Group's current, former, or prospective clients, for purposes of offering services similar to or competitive with those offered by the EPAM Group. Following termination of employment, this restriction shall only apply to: (i) any clients or prospective clients you had any contact with during the 12 months preceding termination of employment; and separately, (ii) any clients about whom you possess trade secret or confidential information gained during the 12 months preceding termination of your employment. The restriction applies broadly, without the limitations in (i) and (ii), while you remain employed.

(c) Tolling: If you violate any of the terms of the restrictive covenant obligations in this Agreement, the term for all such restrictions shall automatically be extended by the period you were in violation of them.

(d) Transfer Outside of State. In the event your primary work location changes in the course of employment to outside California, then Section 5 above, in its entirety, shall become void and will be replaced with the relevant provision in Exhibit A solely with respect to the time period following the transfer. If you subsequently return to working in California, then the above Section 5 shall be reinstated and applicable following that move.

**In the event your primary work location changes to Colorado:**

5. **Restrictive Covenants**. You understand the nature of your position gives you access to and knowledge of Confidential Information and places you in a position of trust and confidence with the EPAM Group. You acknowledge and agree that:

(i) your services to be rendered to the EPAM Group are of a special and unique character; (ii) that you will obtain knowledge and skill relevant to the EPAM Group's industry, methods of doing business, inventions, marketing strategies and/or other Confidential Information by virtue of your employment; and (iii) that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interests of the EPAM Group. As a result, and in return for employment and access to Confidential Information you will be provided in your role, you agree to the following restrictive covenants, regardless of the reason for any future employment termination:

(a) Scope and Coverage. You and the EPAM Group agree that Section 5(d) will not be enforceable against you unless you earn annualized cash compensation equivalent to or greater than the threshold amount for highly compensated workers (as determined by the division of labor standards and statistics in the Colorado department of labor and employment), both at the time this Agreement is executed by you and at the time it is enforced. For purposes of this section, "annualized cash compensation" shall mean: (i) the amount of gross salary or wage amount, the fee amount, or other compensation amount for a full year of work; or (ii) if you were not employed for a full year, the annual compensation you would have earned, based on your gross salary, wage amount, fee amount, or other compensation. You and the EPAM Group further agree that Section 5(c) (Non-Solicitation of Clients) will not be enforceable against you unless you earn annualized cash compensation equivalent to or greater than sixty (60) percent of the threshold amount for highly compensated workers, both at the time this Agreement is executed by you and at the time it is enforced.

(b) Non-Solicitation of Employees. You agree that for the term of your employment plus 12 months following termination of employment, you will not directly or indirectly solicit, hire, engage, recruit, or attempt such acts, with respect to any employee or contractor of the EPAM Group who is or has been employed/engaged by the EPAM Group in the 3 months preceding your termination of employment (collectively, "Covered Employee/Contractor"), or induce the termination of employment or services of any Covered Employee/Contractor.

(c) Non-Solicitation of Clients. You understand and acknowledge that because of your relationship to the EPAM Group, you will have access to and learn about the EPAM Group's confidential client information and trade secrets, such as for example: names, phone numbers, addresses, email addresses, service history, structure, pricing, and other information specific to the client and relevant to the provision of services by EPAM Group. You further understand and acknowledge that loss of any client relationship or goodwill will cause significant and irreparable harm to the EPAM Group.

You agree that for the term of your employment plus 12 months following termination of employment, you will not directly or indirectly solicit, contact, or attempt to solicit or contact, using any form of oral, written, or electronic communication, including, but not limited to, electronic or other mail, phone, fax, instant message, or social media, or meet with the EPAM Group's current, former, or prospective clients, for purposes of offering services similar to or competitive with those offered by the EPAM Group. Following termination of employment, this restriction shall only apply to clients about whom you possess trade secret or confidential information gained during the last 12 months of your employment. The restriction applies broadly, without this limitation, while you remain employed.

(d) Non-Competition.

1. In the event you voluntarily resign employment, then you agree that for the term of your employment plus 12 months following termination of employment not to become (whether directly or indirectly) an employee, contractor or fiduciary, of any EPAM Group client who you were actively engaged with in the last 6 months prior to the termination of your employment, to perform work of a similar nature as compared to work you performed for the client in the last 6 months of your EPAM employment, without first securing the written consent of your Employer, which may be given or denied at the sole discretion of your Employer. The restrictions in this subsection shall not apply in case of an involuntary termination.; and

2. In the event you voluntarily resign employment, then you agree that for 12 months following termination of your employment, not to engage in activity in which you contribute directly or indirectly in a senior management role as an employee, employer, owner, contractor, fiduciary, or in any other capacity, to a direct competitor of the EPAM Group for purposes of performing similar duties as compared to your EPAM position during the last 12 months preceding your termination. A direct competitor for purpose of this provision is an individual or entity that sells (or seeks to sell)

any of the same or similar nature services as compared to the services you were involved with by providing support for, having management oversight over, or possessing confidential information about, during your last 12 months of employment. A senior management role is defined for purpose of this provision as any role that: is involved in setting strategic direction, oversees a functional area that performs any activities competitive with the EPAM Group, supports mergers and acquisition activity, manages client accounts or relationships from a business or delivery perspective, or is involved in new business or new client generation. This prohibition also includes any activity that requires or inevitably requires disclosure of trade secrets, proprietary information, or Confidential Information. The geographic scope of the restriction applies to any country in which you had any contact with clients or potential clients of the EPAM Group or performed any services for the EPAM Group within the last 12 months preceding your termination. The restrictions in this subsection shall not apply in case of an involuntary termination.

Nothing herein shall prohibit you from purchasing or owning less than five percent (5%) of the publicly traded securities of any company, provided such ownership represents a passive investment and you are not a controlling person of, or a member of a group that controls, such Company.

Additionally, nothing in this Section shall restrict you from engaging in the practice of medicine that is not in competition with the EPAM Group and which does not otherwise present a conflict of interest, such as for example your providing volunteer physician services at the Ann Silverman Clinic or providing physician services at the Veterans Health Administration. These nature activities will be performed independent of your EPAM Group employment. You agree that in case your outside activities might increase in scope or become in any way competitive with the services of the EPAM Group or involve working directly with EPAM Group clients, you will disclose such expanded scope of activities in order for a conflicts of interest review to be completed.

(e) Tolling: If you violate any of the terms of the restrictive covenant obligations in this Agreement, the term for all such restrictions shall automatically be extended by the period you were in violation of them.

**In the event your primary work location changes to Hawaii, North Dakota, or Oklahoma:**

5. **Restrictive Covenants**. You understand the nature of your position gives you access to and knowledge of Confidential Information and places you in a position of trust and confidence with the EPAM Group. You acknowledge and agree that: (i) your services to be rendered to the EPAM Group are of a special and unique character; (ii) that you will obtain knowledge and skill relevant to the EPAM Group's industry, methods of doing business, inventions, marketing strategies and/or other Confidential Information by virtue of your employment; and (iii) that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interests of the EPAM Group. As a result, and in return for employment and access to Confidential Information you will be provided in your role, you agree to the following restrictive covenants, regardless of the reason for any future employment termination:

(a) Non-Solicitation of Employees. Unless employed within Hawaii, in which case you are exempt from this Section (a) restriction for such period of employment, you agree that for the term of your employment plus 12 months following termination of employment, you will not directly or indirectly solicit, hire, engage, recruit, or attempt such acts, with respect to any employee or contractor of the EPAM Group who is or has been employed/engaged by the EPAM Group in the 3 months preceding your termination of employment (collectively, "Covered Employee/Contractor"), or induce the termination of employment or services of any Covered Employee/Contractor.

(b) Non-Solicitation of Clients. You understand and acknowledge that because of your relationship to the EPAM Group, you will have access to and learn about the EPAM Group's client information, such as for example: names, phone numbers, addresses, email addresses, service history, structure, pricing, and other information specific to the client and relevant to the provision of services by EPAM Group. You further understand and acknowledge that loss of any client relationship or goodwill will cause significant and irreparable harm to the EPAM Group.

You agree that for the term of your employment plus 12 months following termination of employment, you will not directly or indirectly solicit, contact, or attempt to solicit or contact, using any form of oral, written, or electronic communication, including, but not limited to, electronic or other mail, phone, fax, instant message, or social media, or meet with the EPAM

Group's current, former, or prospective clients, for purposes of offering services similar to or competitive with those offered by the EPAM Group. Following termination of employment, this restriction shall only apply to: (i) any clients or prospective clients you had any contact with during the 12 months preceding termination of employment; and separately, (ii) any clients about whom you possess trade secret or confidential information gained during the 12 months preceding termination of your employment. The restriction applies broadly, without the limitations in (i) and (ii), while you remain employed.

The restriction applies broadly, without the limitations in (i) and (ii), while you remain employed.

(c) Tolling: If you violate any of the terms of the restrictive covenant obligations in this Agreement, the term for all such restrictions shall automatically be extended by the period you were in violation of them.

**In the event your primary work location changes to Illinois**:

5. **Restrictive Covenants**. You understand the nature of your position gives you access to and knowledge of Confidential Information and places you in a position of trust and confidence with the EPAM Group. You acknowledge and agree that: (i) your services to be rendered to the EPAM Group are of a special and unique character; (ii) that you will obtain knowledge and skill relevant to the EPAM Group's industry, methods of doing business, inventions, marketing strategies and/or other Confidential Information by virtue of your employment; and (iii) that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interests of the EPAM Group. As a result, and in return for employment and access to Confidential Information you will be provided in your role, you agree to the following restrictive covenants, regardless of the reason for any future employment termination:

(a) Notice of Employer Election of Non-Competition and Non-Solicitation Provisions. You and the EPAM Group agree that if your employment by your Employer within the EPAM Group is terminated for any reason, the EPAM Group will notify you whether it will (A) not enforce Sections 5(c), (d), and (e) against you or (B) if it will enforce Sections 5(c), (d) and/or (e) against you and will pay you compensation equivalent to: (i) 50% of your final annualized base pay at the time of termination minus the amount of any compensation you earn from other sources after termination, which you agree to disclose to the EPAM Group in full, provided that in no event shall your compensation be less than 30% of your final annualized base pay at the time of termination; or, if your Employer terminates your employment as the result of business circumstances or governmental orders related to the COVID-19 pandemic or under circumstances that are similar to the COVID-19 pandemic, (ii) 110% of your final annualized base pay at the time of termination minus the amount of any compensation you earn from other sources after termination, which you agree to disclose to the EPAM Group in full, provided that in no event shall your compensation be less than 70% of your final annualized base pay at the time of termination. If EPAM does not make the designation as between (A) and (B) to you in writing within 14 days of your employment termination date, then (A) shall apply by default. Payments made under this Section shall be monthly, with 1/12th of the applicable pay rate due on or before the final day of the month.

(b) Scope and Coverage. You and the EPAM Group agree that Sections 5(c) & (d) will not be enforceable against you unless your earnings from your Employer within the EPAM Group exceed the following annual compensation thresholds, reflected as wages, tips, and any other form of taxable compensation on your IRS Form W-2: (i) $45,000 for agreements entered into on or after January 1, 2022 and prior to January 1, 2027; (ii) $47,500 for agreements entered into on or after January 1, 2027 and prior to January 1, 2032; (iii) $50,000 for agreements entered into on or after January 1, 2032 and prior to January 1, 2037; and (iv) $52,500 for agreements entered into on or after January 1, 2037. You and the EPAM Group further agree that Section 5(e) will not be enforceable against you unless your earnings from your Employer within the EPAM Group exceed the following annual compensation thresholds, reflected as wages, tips, and any other form of taxable compensation on your IRS Form W-2: (i) $75,000 for agreements entered into on or after January 1, 2022 and prior to January 1, 2027; (ii) $80,000 for agreements entered into on or after January 1, 2027 and prior to January 1, 2032; (iii) $85,000 for agreements entered into on or after January 1, 2032 and prior to January 1, 2037; and (iv) $90,000 for agreements entered into on or after January 1, 2037.

(c) Non-Solicitation of Employees. You agree that for the term of your employment plus 12 months following termination of employment, you will not directly or indirectly solicit, hire, engage, recruit, or attempt such acts, with respect to any employee or contractor of the EPAM Group who is or has been employed/engaged by the EPAM Group in the 3 months

preceding your termination of employment (collectively, "Covered Employee/Contractor"), or induce the termination of employment or services of any Covered Employee/Contractor.

(d) Non-Solicitation of Clients. You understand and acknowledge that because of your relationship to the EPAM Group, you will have access to and learn about the EPAM Group's client information, such as for example: names, phone numbers, addresses, email addresses, service history, structure, pricing, and other information specific to the client and relevant to the provision of services by EPAM Group. You further understand and acknowledge that loss of any client relationship or goodwill will cause significant and irreparable harm to the EPAM Group.

You agree that for the term of your employment plus 12 months following termination of employment, you will not directly or indirectly solicit, contact, or attempt to solicit or contact, using any form of oral, written, or electronic communication, including, but not limited to, electronic or other mail, phone, fax, instant message, or social media, or meet with the EPAM Group's current, former, or prospective clients, for purposes of offering services similar to or competitive with those offered by the EPAM Group. Following termination of employment, this restriction shall only apply to: (i) any clients or prospective clients you had any contact with during the 12 months preceding termination of employment; and separately, (ii) any clients about whom you possess trade secret or confidential information gained during the 12 months preceding termination of your employment. The restriction applies broadly, without the limitations in (i) and (ii), while you remain employed.

(e) Non-Competition.

1. In the event you voluntarily resign employment, then you agree that for the term of your employment plus 12 months following termination of employment not to become (whether directly or indirectly) an employee, contractor or fiduciary, of any EPAM Group client who you were actively engaged with in the last 6 months prior to the termination of your employment, to perform work of a similar nature as compared to work you performed for the client in the last 6 months of your EPAM employment, without first securing the written consent of your Employer, which may be given or denied at the sole discretion of your Employer. The restrictions in this subsection shall not apply in case of an involuntary termination.; and

2. In the event you voluntarily resign employment, then you agree that for 12 months following termination of your employment, not to engage in activity in which you contribute directly or indirectly in a senior management role as an employee, employer, owner, contractor, fiduciary, or in any other capacity, to a direct competitor of the EPAM Group for purposes of performing similar duties as compared to your EPAM position during the last 12 months preceding your termination. A direct competitor for purpose of this provision is an individual or entity that sells (or seeks to sell) any of the same or similar nature services as compared to the services you were involved with by providing support for, having management oversight over, or possessing confidential information about, during your last 12 months of employment. A senior management role is defined for purpose of this provision as any role that: is involved in setting strategic direction, oversees a functional area that performs any activities competitive with the EPAM Group, supports mergers and acquisition activity, manages client accounts or relationships from a business or delivery perspective, or is involved in new business or new client generation. This prohibition also includes any activity that requires or inevitably requires disclosure of trade secrets, proprietary information, or Confidential Information. The geographic scope of the restriction applies to any country in which you had any contact with clients or potential clients of the EPAM Group or performed any services for the EPAM Group within the last 12 months preceding your termination. The restrictions in this subsection shall not apply in case of an involuntary termination.

Nothing herein shall prohibit you from purchasing or owning less than five percent (5%) of the publicly traded securities of any company, provided such ownership represents a passive investment and you are not a controlling person of, or a member of a group that controls, such Company.

Additionally, nothing in this Section shall restrict you from engaging in the practice of medicine that is not in competition with the EPAM Group and which does not otherwise present a conflict of interest, such as for example your providing volunteer physician services at the Ann Silverman Clinic or providing physician services at the Veterans Health Administration. These nature activities will be performed independent of your EPAM Group employment. You agree that in case your outside activities might increase in scope or become in any way competitive with the services of the EPAM

Group or involve working directly with EPAM Group clients, you will disclose such expanded scope of activities in order for a conflicts of interest review to be completed.

(f) Tolling: If you violate any of the terms of the restrictive covenant obligations in this Agreement, the term for all such restrictions shall automatically be extended by the period you were in violation of them.

**In the event your primary work location changes to Massachusetts**:

5. **Restrictive Covenants**. You understand the nature of your position gives you access to and knowledge of Confidential Information and places you in a position of trust and confidence with the EPAM Group. You acknowledge and agree that: (i) your services to be rendered to the EPAM Group are of a special and unique character; (ii) that you will obtain knowledge and skill relevant to the EPAM Group's industry, methods of doing business, inventions, marketing strategies and/or other Confidential Information by virtue of your employment; and (iii) that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interests of the EPAM Group. As a result, and in return for employment and access to Confidential Information you will be provided in your role, you agree to the following restrictive covenants, regardless of the reason for any future employment termination:

(a) Non-Solicitation of Employees. You agree that for the term of your employment plus 12 months following termination of employment, you will not directly or indirectly solicit, hire, engage, recruit, or attempt such acts, with respect to any employee or contractor of the EPAM Group who is or has been employed/engaged by the EPAM Group in the 3 months preceding your termination of employment (collectively, "Covered Employee/Contractor"), or induce the termination of employment or services of any Covered Employee/Contractor.

(b) Non-Solicitation of Clients. You understand and acknowledge that because of your relationship to the EPAM Group, you will have access to and learn about the EPAM Group's client information, such as for example: names, phone numbers, addresses, email addresses, service history, structure, pricing, and other information specific to the client and relevant to the provision of services by EPAM Group. You further understand and acknowledge that loss of any client relationship or goodwill will cause significant and irreparable harm to the EPAM Group.

You agree that for the term of your employment plus 12 months following termination of employment, you will not directly or indirectly solicit, contact, or attempt to solicit or contact, using any form of oral, written, or electronic communication, including, but not limited to, electronic or other mail, phone, fax, instant message, or social media, or meet with the EPAM Group's current, former, or prospective clients, for purposes of offering services similar to or competitive with those offered by the EPAM Group. Following termination of employment, this restriction shall only apply to: (i) any clients or prospective clients you had any contact with during the 12 months preceding termination of employment; and separately, (ii) any clients about whom you possess trade secret or confidential information gained during the 12 months preceding termination of your employment. The restriction applies broadly, without the limitations in (i) and (ii), while you remain employed.

(c) Tolling: If you violate any of the terms of the restrictive covenant obligations in this Agreement, the term for all such restrictions shall automatically be extended by the period you were in violation of them.

**In the event your primary work location changes to Minnesota:**

5. **Restrictive Covenants**. You understand the nature of your position gives you access to and knowledge of Confidential Information and places you in a position of trust and confidence with the EPAM Group. You acknowledge and agree that: (i) your services to be rendered to the EPAM Group are of a special and unique character; (ii) that you will obtain knowledge and skill relevant to the EPAM Group's industry, methods of doing business, inventions, marketing strategies and/or other Confidential Information by virtue of your employment; and (iii) that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interests of the EPAM Group. As a result, and in return for employment and access to Confidential Information you will be provided in your role, you agree to the following restrictive covenants, regardless of the reason for any future employment termination:

(a) Non-Solicitation of Employees. You agree that for the term of your employment plus 12 months following termination of employment, you will not directly or indirectly solicit, hire, engage, recruit, or attempt such acts, with respect to any employee or contractor of the EPAM Group who is or has been employed/engaged by the EPAM Group in the 3 months preceding your termination of employment (collectively, "Covered Employee/Contractor"), or induce the termination of employment or services of any Covered Employee/Contractor.

(b) Non-Solicitation of Clients. You understand and acknowledge that because of your relationship to the EPAM Group, you will have access to and learn about the EPAM Group's client information, such as for example: names, phone numbers, addresses, email addresses, service history, structure, pricing, and other information specific to the client and relevant to the provision of services by EPAM Group. You further understand and acknowledge that loss of any client relationship or goodwill will cause significant and irreparable harm to the EPAM Group.

You agree that for the term of your employment plus 12 months following termination of employment, you will not directly or indirectly solicit, contact, or attempt to solicit or contact, using any form of oral, written, or electronic communication, including, but not limited to, electronic or other mail, phone, fax, instant message, or social media, or meet with the EPAM Group's current, former, or prospective clients, for purposes of offering services similar to or competitive with those offered by the EPAM Group. Following termination of employment, this restriction shall only apply to: (i) any clients or prospective clients you had any contact with during the 12 months preceding termination of employment; and separately, (ii) any clients about whom you possess trade secret or confidential information gained during the 12 months preceding termination of your employment. The restriction applies broadly, without the limitations in (i) and (ii), while you remain employed.

(c) Tolling: If you violate any of the terms of the restrictive covenant obligations in this Agreement, the term for all such restrictions shall automatically be extended by the period you were in violation of them.

**In the event your primary work location changes to Nevada:**

**5. Restrictive Covenants**. You understand the nature of your position gives you access to and knowledge of Confidential Information and places you in a position of trust and confidence with the EPAM Group. You acknowledge and agree that: (i) your services to be rendered to the EPAM Group are of a special and unique character; (ii) that you will obtain knowledge and skill relevant to the EPAM Group's industry, methods of doing business, inventions, marketing strategies and/or other Confidential Information by virtue of your employment; and (iii) that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interests of the EPAM Group. As a result, and in return for employment and access to Confidential Information you will be provided in your role, you agree to the following restrictive covenants, regardless of the reason for any future employment termination:

(a) Non-Solicitation of Employees. You agree that for the term of your employment plus 12 months following termination of employment, you will not directly or indirectly solicit, hire, engage, recruit, or attempt such acts, with respect to any employee or contractor of the EPAM Group who is or has been employed/engaged by the EPAM Group in the 3 months preceding your termination of employment (collectively, "Covered Employee/Contractor"), or induce the termination of employment or services of any Covered Employee/Contractor.

(b) Non-Solicitation of Clients. You understand and acknowledge that because of your relationship to the EPAM Group, you will have access to and learn about the EPAM Group's client information, such as for example: names, phone numbers, addresses, email addresses, service history, structure, pricing, and other information specific to the client and relevant to the provision of services by EPAM Group. You further understand and acknowledge that loss of any client relationship or goodwill will cause significant and irreparable harm to the EPAM Group.

You agree that for the term of your employment plus 12 months following termination of employment, you will not directly or indirectly solicit, contact, or attempt to solicit or contact, using any form of oral, written, or electronic communication, including, but not limited to, electronic or other mail, phone, fax, instant message, or social media, or meet with the EPAM Group's current, former, or prospective clients, for purposes of offering services similar to or competitive with those offered by the EPAM Group. Following termination of employment, this restriction shall only apply to: (i) any clients or

prospective clients you had any contact with during the 12 months preceding termination of employment; and separately, (ii) any clients about whom you possess trade secret or confidential information gained during the 12 months preceding termination of your employment. The restriction applies broadly, without the limitations in (i) and (ii), while you remain employed.

c. Non-Competition. In the event you voluntarily resign employment, then you agree that for 12 months following termination of your employment, not to engage in activity in which you contribute directly or indirectly in a senior management role as an employee, employer, owner, contractor, fiduciary, or in any other capacity, to a direct competitor of the EPAM Group for purposes of performing similar duties as compared to your EPAM position during the last 12 months preceding your termination. A direct competitor for purpose of this provision is an individual or entity that sells (or seeks to sell) any of the same or similar nature services as compared to the services you were involved with by providing support for, having management oversight over, or possessing confidential information about, during your last 12 months of employment. A senior management role is defined for purpose of this provision as any role that: is involved in setting strategic direction, oversees a functional area that performs any activities competitive with the EPAM Group, supports mergers and acquisition activity, manages client accounts or relationships from a business or delivery perspective, or is involved in new business or new client generation. This prohibition also includes any activity that requires or inevitably requires disclosure of trade secrets, proprietary information, or Confidential Information. The geographic scope of the restriction applies to any country in which you had any contact with clients or potential clients of the EPAM Group or performed any services for the EPAM Group within the last 12 months preceding your termination. The restrictions in this subsection shall not apply in case of an involuntary termination.

Nothing herein shall prohibit you from purchasing or owning less than five percent (5%) of the publicly traded securities of any company, provided such ownership represents a passive investment and you are not a controlling person of, or a member of a group that controls, such Company.

Additionally, nothing in this Section shall restrict you from engaging in the practice of medicine that is not in competition with the EPAM Group and which does not otherwise present a conflict of interest, such as for example your providing volunteer physician services at the Ann Silverman Clinic or providing physician services at the Veterans Health Administration. These nature activities will be performed independent of your EPAM Group employment. You agree that in case your outside activities might increase in scope or become in any way competitive with the services of the EPAM Group or involve working directly with EPAM Group clients, you will disclose such expanded scope of activities in order for a conflicts of interest review to be completed.

(c) Tolling: If you violate any of the terms of the restrictive covenant obligations in this Agreement, the term for all such restrictions shall automatically be extended by the period you were in violation of them.

**In the event your primary work location changes to Washington, D.C.:**

**5. Restrictive Covenants.** You understand the nature of your position gives you access to and knowledge of Confidential Information and places you in a position of trust and confidence with the EPAM Group. You acknowledge and agree that: (i)your services to be rendered to the EPAM Group are of a special and unique character; (ii) that you will obtain knowledge and skill relevant to the EPAM Group's industry, methods of doing business, inventions, marketing strategies and/or other Confidential Information by virtue of your employment; and (iii) that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interests of the EPAM Group. As a result, and in return for employment and access to Confidential Information you will be provided in your role, you agree to the following restrictive covenants, regardless of the reason for any future employment termination:

(a) Scope and Coverage. You and the EPAM Group agree that Section 5(d) will not be enforceable against you unless you earn minimum qualifying annual compensation equivalent to or greater than the threshold amount for highly compensated employees. For purposes of this section, "minimum qualifying annual compensation" shall mean: (i) prior to January 1, 2024, $150,000; and (ii) on and after January 1, 2024, an amount equal to the previous calendar year's minimum qualifying annual compensation, increased in proportion to the annual average increase, if any, in the Consumer Price Index for All

Urban Consumers in the Washington Metropolitan Statistical Area published by the Bureau of Labor Statistics of the United States Department of Labor for the previous calendar year adjusted to the nearest whole dollar.

(b) Non-Solicitation of Employees. You agree that for the term of your employment plus 12 months following termination of employment, you will not directly or indirectly solicit, hire, engage, recruit, or attempt such acts, with respect to any employee or contractor of the EPAM Group who is or has been employed/engaged by the EPAM Group in the 3 months preceding your termination of employment (collectively, "Covered Employee/Contractor"), or induce the termination of employment or services of any Covered Employee/Contractor.

(c) Non-Solicitation of Clients. You understand and acknowledge that because of your relationship to the EPAM Group, you will have access to and learn about the EPAM Group's client information, such as for example: names, phone numbers, addresses, email addresses, service history, structure, pricing, and other information specific to the client and relevant to the provision of services by EPAM Group. You further understand and acknowledge that loss of any client relationship or goodwill will cause significant and irreparable harm to the EPAM Group.

You agree that for the term of your employment plus 12 months following termination of employment, you will not directly or indirectly solicit, contact, or attempt to solicit or contact, using any form of oral, written, or electronic communication, including, but not limited to, electronic or other mail, phone, fax, instant message, or social media, or meet with the EPAM Group's current, former, or prospective clients, for purposes of offering services similar to or competitive with those offered by the EPAM Group. Following termination of employment, this restriction shall only apply to: (i) any clients or prospective clients you had any contact with during the 12 months preceding termination of employment; and separately, (ii) any clients about whom you possess trade secret or confidential information gained during the 12 months preceding termination of your employment. The restriction applies broadly, without the limitations in (i) and (ii), while you remain employed.

(d) Non-Competition.

1. In the event you voluntarily resign employment, then you agree that for the term of your employment plus 12 months following termination of employment not to become (whether directly or indirectly) an employee, contractor or fiduciary, of any EPAM Group client who you were actively engaged with in the last 6 months prior to the termination of your employment, to perform work of a similar nature as compared to work you performed for the client in the last 6 months of your EPAM employment, without first securing the written consent of your Employer, which may be given or denied at the sole discretion of your Employer. The restrictions in this subsection shall not apply in case of an involuntary termination; and

2. In the event you voluntarily resign employment, then you agree that for 12 months following termination of your employment, not to engage in activity in which you contribute directly or indirectly in a senior management role as an employee, employer, owner, contractor, fiduciary, or in any other capacity, to a direct competitor of the EPAM Group for purposes of performing similar duties as compared to your EPAM position during the last 12 months preceding your termination. A direct competitor for purpose of this provision is an individual or entity that sells (or seeks to sell) any of the same or similar nature services as compared to the services you were involved with by providing support for, having management oversight over, or possessing confidential information about, during your last 12 months of employment. A senior management role is defined for purpose of this provision as any role that: is involved in setting strategic direction, oversees a functional area that performs any activities competitive with the EPAM Group, supports mergers and acquisition activity, manages client accounts or relationships from a business or delivery perspective, or is involved in new business or new client generation. This prohibition also includes any activity that requires or inevitably requires disclosure of trade secrets, proprietary information, or Confidential Information. The geographic scope of the restriction applies to any country in which you had any contact with clients or potential clients of the EPAM Group or performed any services for the EPAM Group within the last 12 months preceding your termination. The restrictions in this subsection shall not apply in case of an involuntary termination.

Nothing herein shall prohibit you from purchasing or owning less than five percent (5%) of the publicly traded securities of

any company, provided such ownership represents a passive investment and you are not a controlling person of, or a member of a group that controls, such Company.

Additionally, nothing in this Section shall restrict you from engaging in the practice of medicine that is not in competition with the EPAM Group and which does not otherwise present a conflict of interest, such as for example your providing volunteer physician services at the Ann Silverman Clinic or providing physician services at the Veterans Health Administration. These nature activities will be performed independent of your EPAM Group employment. You agree that in case your outside activities might increase in scope or become in any way competitive with the services of the EPAM Group or involve working directly with EPAM Group clients, you will disclose such expanded scope of activities in order for a conflicts of interest review to be completed.

(e) Tolling: If you violate any of the terms of the restrictive covenant obligations in this Agreement, the term for all such restrictions shall automatically be extended by the period you were in violation of them.

**In the event your primary work location changes to Washington State:**

5. **Restrictive Covenants**. You understand the nature of your position gives you access to and knowledge of Confidential Information and places you in a position of trust and confidence with the EPAM Group. You acknowledge and agree that: (i) your services to be rendered to the EPAM Group are of a special and unique character; (ii) that you will obtain knowledge and skill relevant to the EPAM Group's industry, methods of doing business, inventions, marketing strategies and/or other Confidential Information by virtue of your employment; and (iii) that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interests of the EPAM Group. As a result, and in return for employment and access to Confidential Information you will be provided in your role, you agree to the following restrictive covenants, regardless of the reason for any future employment termination:

(a) Scope and Coverage. You and the EPAM Group agree that Section 5(b), (c) and (d) will not be enforceable against you unless you earn from your Employer within the EPAM Group at least $100,000 annually in W-2 Box 1 compensation, as adjusted annually for inflation after January 1, 2020, by the Washington State Department of Labor & Industries. You further agree (and acknowledge that you have received notice from the EPAM Group through this Agreement) that if, at the time you sign this Agreement, you do not earn from your Employer within the EPAM Group at least $100,000 annually in total W-2 Box 1 compensation (adjusted for inflation), then Section 5(b), (c), and (d) will automatically become enforceable against you if and when you begin earning from your Employer within the EPAM Group at least $100,000 annually in total W-2 Box 1 compensation (adjusted for inflation).

(b) Non-Solicitation of Employees. You agree that for the term of your employment plus 12 months following termination of employment, you will not directly or indirectly solicit, hire, engage, recruit, or attempt such acts, with respect to any employee or contractor of the EPAM Group or any employee who has been employed by the EPAM Group in the 3 months preceding your termination of employment (collectively, "Covered Employee/Contractor"), or induce the termination of employment or services of any Covered Employee/Contractor.

(c) Non-Solicitation of Clients. You understand and acknowledge that because of your relationship to the EPAM Group, you will have access to and learn about the EPAM Group's client information, such as for example: names, phone numbers, addresses, email addresses, service history, structure, pricing, and other information specific to the client and relevant to the provision of services by EPAM Group. You further understand and acknowledge that loss of any client relationship or goodwill will cause significant and irreparable harm to the EPAM Group.

You agree that for the term of your employment plus 12 months following termination of employment, you will not directly or indirectly solicit, contact, or attempt to solicit or contact, using any form of oral, written, or electronic communication, including, but not limited to, electronic or other mail, phone, fax, instant message, or social media, or meet with the EPAM Group's current, former, or prospective clients, for purposes of offering services similar to or competitive with those offered by the EPAM Group. Following termination of employment, this restriction shall only apply to: (i) any clients or

prospective clients you had any contact with during the 12 months preceding termination of employment; and separately, (ii) any clients about whom you possess trade secret or confidential information gained during the 12 months preceding termination of your employment. The restriction applies broadly, without the limitations in (i) and (ii), while you remain employed.

(d) Non-Competition.

1. In the event you voluntarily resign employment, then you agree that for the term of your employment plus 12 months following termination of employment not to become (whether directly or indirectly) an employee, contractor or fiduciary, of any EPAM Group client who you were actively engaged with in the last 6 months prior to the termination of your employment, to perform work of a similar nature as compared to work you performed for the client in the last 6 months of your EPAM employment, without first securing the written consent of your Employer, which may be given or denied at the sole discretion of your Employer. The restrictions in this subsection shall not apply in case of an involuntary termination.; and

2. In the event you voluntarily resign employment, then you agree that for 12 months following termination of your employment, not to engage in activity in which you contribute directly or indirectly in a senior management role as an employee, employer, owner, contractor, fiduciary, or in any other capacity, to a direct competitor of the EPAM Group for purposes of performing similar duties as compared to your EPAM position during the last 12 months preceding your termination. A direct competitor for purpose of this provision is an individual or entity that sells (or seeks to sell) any of the same or similar nature services as compared to the services you were involved with by providing support for, having management oversight over, or possessing confidential information about, during your last 12 months of employment. A senior management role is defined for purpose of this provision as any role that: is involved in setting strategic direction, oversees a functional area that performs any activities competitive with the EPAM Group, supports mergers and acquisition activity, manages client accounts or relationships from a business or delivery perspective, or is involved in new business or new client generation. This prohibition also includes any activity that requires or inevitably requires disclosure of trade secrets, proprietary information, or Confidential Information. The geographic scope of the restriction applies to any country in which you had any contact with clients or potential clients of the EPAM Group or performed any services for the EPAM Group within the last 12 months preceding your termination. The restrictions in this subsection shall not apply in case of an involuntary termination.

Nothing herein shall prohibit you from purchasing or owning less than five percent (5%) of the publicly traded securities of any company, provided such ownership represents a passive investment and you are not a controlling person of, or a member of a group that controls, such Company.

Additionally, nothing in this Section shall restrict you from engaging in the practice of medicine that is not in competition with the EPAM Group and which does not otherwise present a conflict of interest, such as for example your providing volunteer physician services at the Ann Silverman Clinic or providing physician services at the Veterans Health Administration. These nature activities will be performed independent of your EPAM Group employment. You agree that in case your outside activities might increase in scope or become in any way competitive with the services of the EPAM Group or involve working directly with EPAM Group clients, you will disclose such expanded scope of activities in order for a conflicts of interest review to be completed.

(e) Tolling: If you violate any of the terms of the restrictive covenant obligations in Section 5(b), (c), or (d), the term for all such restrictions shall automatically be extended by the period you were in violation of them.

(f) Layoff; Garden Leave Payments. You and the EPAM Group agree that if your employment by your Employer within the EPAM Group is terminated as the result of a layoff, the EPAM Group will notify you whether it will (i) not enforce Section 5(b), (c), and (d) against you and instead you will be subject to the restrictions outlined under Section 5(g), or (ii) if it will enforce Sections 5(b), (c) and (d) against you and will pay you compensation equivalent to your final base pay at the time of termination minus the amount of any compensation you earn from other sources after termination, which you agree to disclose to the EPAM Group in full. If EPAM does not make this designation as between (i) or (ii) to you in writing within 14 days of your employment termination date then (i) shall apply by default. You understand and agree that for purposes of this Section 5, "layoff" means termination of employment by your Employer for reasons of the EPAM

Group's insolvency or other purely economic factors, and specifically excludes termination of your employment for any other reason, either with or without cause.

(g) <u>Non-solicitation of Employees and Clients – Lower-Compensated Employees, and Layoff.</u> If you are not covered by Section 5(b), (c), and (d) above because you do not earn the required compensation as described in Section 5(a), or because you were subject to a Layoff as defined by Section 5(f) and the Company has waived Section 5(b), (c) and (d) pursuant to 5(f), you nonetheless agree that for the term of your employment plus 12 months following termination of employment, you will not directly or indirectly solicit any employee of the EPAM Group to leave employment with the EPAM Group, or solicit any client of the EPAM Group with whom you had contact or confidential information about in the last 12 months to cease or reduce the extent to which it is doing business with the EPAM Group.

# EXHIBIT B

# CODE OF

# ETHICAL CONDUCT

# Table of Contents

**MESSAGE FROM EPAM'S EXECUTIVE CHAIRMAN, CEO AND CHIEF COMPLIANCE OFFICER** ........ 3
**EPAM'S CODE OF ETHICAL CONDUCT - GUIDING PRINCIPLES** ........ 4

**QUESTIONS AND CONCERNS** ........ 5
- What is the Code? ........ 6
- Why Does EPAM Have A Code of Ethical Conduct, Who Must Follow It, and How to Use It ........ 7
- Where Do I Ask Questions Or Report Concerns? ........ 8
- Company's Response / Manager Responsibility ........ 9

**RESPECT, VALUE AND SUPPORT PEOPLE** ........ 10
- No Discrimination ........ 11
- No Harassment ........ 12
- No Retaliation ........ 13
- Evaluating Performance and Health & Safety ........ 14
- Using Social Media ........ 15
- Personal Conflicts of Interest ........ 16
- Respecting, Representing and Speaking for EPAM ........ 17

**BEHAVE WITH INTEGRITY** ........ 18
- Integrity in Communications, Audits, Investigations and Records ........ 19
- Expenses ........ 20
- Maintaining and Preserving Business Records ........ 20
- Transactions in Writing ........ 20
- Financial Conflicts – Definition ........ 21
- Financial Conflicts – Examples ........ 22
- Gifts and Entertainment ........ 23-24
- Respect Third Party Rights ........ 25
- Engage Responsible Suppliers ........ 25

**PROTECT & ENHANCE ASSETS** ........ 26
- Safeguarding Company Assets ........ 27
- Company Rights to Access, Monitor, Review ........ 28
- Confidential Information – Definition and Protective Measures ........ 29
- Confidential Information – Examples ........ 30
- Data Safeguards ........ 31
- Acceptable Use of Technology ........ 32
- Personally Identifiable Information ........ 33

**COMPLY WITH LAWS** ........ 34
- Anti-bribery – Definition ........ 35
- Anti-bribery – Anything of Value / Business Advantages ........ 36
- Anti-bribery – Red Flags ........ 37
- Securities and Insider Trading ........ 38
- Insider Trading – Material / Non-public Information ........ 39
- Trade Compliance ........ 40
- Anti-"Money Laundering" ........ 41
- Antitrust and Fair Competition ........ 42
- Immigration ........ 43
- Understand, Reach Out, Team ........ 44

**EPAM ETHICSLINE - PHONE NUMBERS** ........ 45

# Message from EPAM's Executive Chairman, CEO, and Chief Compliance Officer

**EPAM TRANSFORMS AND IMPROVES THE WAY OUR CUSTOMERS DO BUSINESS.**

At EPAM we use our creative minds and talents to invent, develop and deliver technologically advanced, intelligent solutions. Just as important as what we achieve is how we get there. Simply put, at EPAM we personally hold ourselves to the highest ethical and legal standards, in all our business activities. This means we do the right things in the right way by:

- *Respecting, valuing and supporting people*
- *Showing integrity in our communications, records, and business activities*
- *Protecting and enhancing EPAM's information and assets*
- *Complying with laws*

This sounds logical and simple, but EPAM's global presence can make routine business questions complex. As a result, we all benefit when we know and understand the rules and best practices that apply to us. No matter how quickly things change, how fast we move, or how much we grow, our Code of Ethical Conduct is our educational guide to ethical and lawful action.

Think of our Code not just as a collection of words, but a set of foundational principles and a learning tool that drives proper behavior. Use it when you don't know the answers. Use it when something seems wrong. And use it even when the answers seem obvious.

For matters that may violate our Code, we encourage you to use our official guidance and reporting channels. They are there because EPAM is better and stronger when we help fix small challenges before they become larger.

At EPAM, we can achieve excellence and maintain our unparalleled reputation by turning the Code's principles into action every day. We can't do it without you.

**THANK YOU,**



Arkadiy **DOBKIN**
***Executive Chairman***



Balazs **FEJES**
***Chief Executive Officer***



Philip **STORM**
***Chief Compliance Officer***

# EPAM's Code of Ethical Conduct - Guiding Principles

Understand and Follow the Fundamentals in Our Code, Our Core Values, and the Law

1. Respect, Value and Support People
2. Behave with Integrity
3. Protect and Enhance EPAM's Information and Assets
4. Comply with Laws

## EPAM'S CORE VALUES

- VALUE THE INDIVIDUAL
- ACT AS A TEAM
- STRIVE FOR EXCELLENCE
- FOCUS ON THE CUSTOMER
- ACT WITH INTEGRITY

# QUESTIONS
## AND CONCERNS

# What Is The Code of Ethical Conduct?

**THE CODE IS A STATEMENT OF CONCISE PRINCIPLES OF PROPER BUSINESS CONDUCT TO FOLLOW AND TURN INTO ACTION.**



# Asking Questions and Raising Concerns

## Why Does EPAM Have A Code of Ethical Conduct?

**EDUCATION** - Educates us about ethical, lawful and professional conduct

**GUIDANCE** - Guides us to live our core values

**EXCELLENCE** - Maintains EPAM's reputation for excellence

## Who Must Follow It?

**EACH OF US** - All employees, officers, and board members

**OUR BUSINESS PARTNERS** - Anyone we do business with (contractors, suppliers, customers)

## How Should I Use It?

**READ IT** - Understand EPAM's Code of Ethical Conduct

**USE IT** - To guide your decisions

**RAISE IT** - Raise good faith questions and concerns when needed

**COMPLY WITH IT** - Take annual mandatory certification training on Onboarding Portal



# Asking Questions and Raising Concerns



## Where Do I Ask Questions Or Report Concerns?

EPAM encourages you to ask questions and report concerns about proper conduct, so we can maintain our reputation and improve where needed.

**TO ASK QUESTIONS OR REPORT CONCERNS UNDER OUR CODE, EPAM OFFERS MANY CHANNELS:**

**IN PERSON**

- Your manager
- EPAM's Compliance Sponsors and Compliance Managers **(see https://info.epam.com/ethics.html)**
- HR
- Legal
- EPAM Leadership **(see http://investors.epam.com/investors/leadership-and-governance)**
- EPAM'S Chief Compliance Officer

**EPAM'S ETHICSLINE**

*EPAM provides a confidential hotline to report concerns, which allows you to report anonymously if you prefer where law permits.*

*Our EthicsLine allows you to report online t hrough a dedicated web portal or by calling a toll-free phone number at any time.*

- EthicsLine Webpage — Submit a written question or concern online at **ethics.epam.com**
- Find our toll free phone number **here** or at **ethics.epam.com**

# Asking Questions and Raising Concerns

## What will the company do in response?

**WHEN YOU REPORT A CONCERN, EPAM WILL:**

- Promptly and carefully review your concern
- Conduct a proper investigation
- Treat your report and its investigations as confidentially as it can, consistent with relevant laws and EPAM's need to conduct a fair, complete and compliant review
- Never tolerate retaliation because someone raises good faith questions or concerns or participates in an investigation
- Take appropriate corrective and/or disciplinary action

Please see EPAM's Speak Up Policy

## Managers have expanded responsibility

**IF YOU MANAGE EMPLOYEES, EPAM EXPECTS YOU WILL:**

- Set the right tone and model best behavior for those you manage
- Welcome questions and concerns, take them seriously, and escalate them when needed
- Recognize and reward ethical behavior
- Support our investigation process
- Help EPAM implement necessary remedial actions

### PROVIDING TRUTHFUL AND COMPLETE DETAILS ABOUT YOUR CONCERNS

Whether you identify yourself or raise concerns anonymously, EPAM always expects that you will supply truthful information and be as complete and detailed as possible.

EPAM is better able to understand and respond effectively to concerns if you provide sufficient, factual details, such as relevant background, names, dates, places, people with knowledge, and why the situation is cause for concern.

# RESPECT, VALUE AND SUPPORT PEOPLE

# EPAM People are Professional, Supportive and Fair

## Respect and Support People

Our people maintain a culture where we respect and support our work colleagues, build productive relationships, and value inclusion and diversity.

**NO DISCRIMINATION**

We do not treat people less favorably because of "protected characteristics," which include*:

| | | | |
|---|---|---|---|
| RACE | GENDER | AGE | MEDICAL CONDITION |
| COLOR | SEX | RELIGION | MEDICAL TESTS |
| NATIONAL ORIGIN OR ANCESTRY | SEXUAL ORIENTATION | MARITAL STATUS | PREGNANCY |
| ETHNICITY | GENDER IDENTITY OR EXPRESSION | VETERAN/ MILITARY STATUS | PHYSICAL OR MENTAL DISABILITY |
| GENETIC INFORMATION | PERSONAL APPEARANCE** | CITIZENSHIP STATUS | POLITICAL OR UNION AFFILIATION |
| | | CASTE | |

* and any other legally protected basis
** where not inconsistent with lawful EPAM or customer policy

**NO DISCRIMINATION**

Q: I am hiring for a new project and know that EPAM values diversity. Should I select candidates based on the fact that they exhibit "protected characteristics"?

A: *EPAM values diversity and we are made stronger by employees with different backgrounds, perspectives, and ideas. However, our hiring decisions are not driven by protected characteristics. Rather, we properly follow applicable anti-discrimination laws, and our hiring decisions are always based on our fair and objective assessment of who best meets our job qualifications for the role.*

Case 2:25-cv-06260-WB Document 80-2 Filed 09/11/26 Page 88 of 156

# EPAM People are Professional, Supportive and Fair

**NO HARASSMENT**

We do not participate in offensive comments, offensive actions or harassment.

Harassment is unwelcome conduct based on protected characteristics, whether in words or in actions, that unreasonably interferes with work performance or job benefits or produces an intimidating, hostile or offensive work environment.

Harassment may take many forms, such as:

- offensive or disparaging remarks
- jokes
- slurs
- gestures
- negative stereotypes
- intimidating acts

as well as other verbal, non-verbal, visual, audio, electronic or physical conduct.

Q

**NO HARASSMENT**

My manager sometimes makes sexual comments to me and suggests we should try to start a relationship. The remarks make me uncomfortable, I don't like them, and I've asked him to stop several times but he has not. I don't want him to learn I reported him, but I want it to stop. What should I do?

A

*EPAM does not expect anyone to tolerate unwelcome sexual remarks or propositions as part of the workplace environment, and there are alternative reporting channels outside of your manager. You should promptly raise your concerns through one of the reporting channels in our Code, and we will treat the matter with appropriate confidentiality and discretion.*

# EPAM People are Professional, Supportive and Fair

**NO RETALIATION OR DELIBERATE HARM**

EPAM does not tolerate retaliation, which is conduct that punishes someone for or is likely to discourage or prevent someone from raising concerns, reporting misconduct, or participating in an investigation.

At no time does EPAM tolerate intimidation, bullying, threats of violence, or deliberate mental or physical harm.

**LIKE HARASSMENT, RETALIATION MAY TAKE MANY FORMS, IN WORDS, WRITTEN OR SPOKEN, OR IN ACTIONS, AND INCLUDES:**

- actual or implied threats or intimidating acts
- adverse employment action affecting an employee's compensation, job assignment, opportunities for advancement or other features of employment
- demotion, suspension or termination of employment
- deliberately rude or hostile behaviors or speech
- creating or permitting a work atmosphere hostile to an employee who reports a concern
- deliberate exclusionary behaviors
- harassing behaviors

**ENCOURAGE RAISING QUESTIONS AND CONCERNS**

Q: What should I do if I think my colleague may have violated our Code, but I'm not sure?

A: *It is always easier to ignore things that seem wrong, but to build a better company, we must all take affirmative steps to get there. So in this case, take action. Because we always respect our co-workers, a first step may be speaking directly with him/her to see if you can resolve the issue informally. But for matters that do violate our Code and can't be solved informally, escalate the question. EPAM welcomes good faith questions and concerns, will act on them, and does not tolerate retaliation for raising them.*

# EPAM People are Professional, Supportive and Fair

### FAIRLY, OBJECTIVELY AND REGULARLY RECOGNIZE EMPLOYMENT CONTRIBUTIONS

At EPAM, we make employment decisions fairly and objectively based on capabilities and performance.

We also foster a satisfying and productive work experience by regularly recognizing our individual and collective contributions.

### IMPROVE OUR PERSONAL WELL-BEING - BE SAFE, HEALTHY AND SECURE

Always behave in ways that keep EPAM's working environment safe, healthy and secure and that promote environmental sustainability.

Dangerous practices, hazards, violence, threats, aggression or substance-related impairment are unacceptable.

### REQUIRED HEALTH AND SAFETY BEHAVIORS

- PRIORITIZE HEALTH AND SAFETY
- KEEP WORKSPACES SECURE
- DON'T USE ALCOHOL OR UNLAWFUL DRUGS AT WORK
- BE MINDFUL OF THOSE AROUND YOU
- NEVER ENGAGE IN THREATENING OR AGGRESSIVE ACTS
- NEVER BRING WEAPONS INTO ANY EPAM OR CLIENT WORKPLACE
- REPORT UNSAFE OR UNHEALTHY SITUATIONS
- NEVER RETALIATE AGAINST SOMEONE WHO RAISES A CONCERN

# EPAM People are Professional, Supportive and Fair

## Use Social Media Communications Responsibly

Social media is a powerful tool for communicating about many things, both personal and professional.

**Together we create and build EPAM's positive image in what we do and say.** Therefore, EPAM expects that whenever we communicate using Social Media we will be responsible, professional, and truthful, treat others respectfully and considerately, and never use language that is violent, harassing, hostile, inflammatory, or similarly provocative.

In addition, our Social Media communications must not disclose EPAM's or its clients' confidential information or disclose any material, nonpublic information. And when we receive inquiries from the media and investment communities, we must take proper steps to refer these to appropriate personnel.

EPAM's **Policy on Public Media Statements and Social Media** and our **Social Media Guidelines** describe these principles.

**BE THOUGHTFUL ABOUT WHAT YOU COMMUNICATE AND NEVER USE SOCIAL MEDIA TO:**

- **LIE**
- **PROMOTE VIOLENCE, HOSTILITY, PHYSICAL HARM OR HARASSMENT OF OTHERS**
- **VIOLATE ANYONE'S PRIVACY RIGHTS**
- **VIOLATE TRADEMARKS, COPYRIGHTS, TRADE SECRETS OR PATENTS**
- **REVEAL EPAM'S, ITS CLIENT'S (OR ANYONE'S) CONFIDENTIAL OR "MATERIAL" INFORMATION**
- **VIOLATE EPAM'S CONTRACTUAL AND CLIENT RELATIONSHIP OBLIGATIONS**
- **VIOLATE EPAM'S CODE, ITS POLICIES, OR THE LAW**

Case 2:25-cv-06260-WB Document 80-2 Filed 09/11/26 Page 92 of 156

# EPAM People are Professional, Supportive and Fair

## Personal Relationships That Cause Business Conflicts Must Be Resolved

When business conflicts arise from our close, personal relationships, we address and resolve them so that our duties to EPAM, our business judgment, and our decision-making are not improperly influenced.

**PERSONAL RELATIONSHIPS THAT MAY REQUIRE SUCH ACTION INCLUDE:**

| | |
|---|---|
| MARITAL | FAMILY |
| ROMANTIC | SIMILARLY CLOSE PERSONAL RELATIONSHIPS |

**YOU HAVE AN OBLIGATION TO RAISE, ADDRESS, AND REMOVE YOURSELF FROM BUSINESS CONFLICTS WHERE:**

- You exercise managerial influence over a person with whom you have a close, personal relationship, or you are in a direct managerial or reporting relationship with such a person.
- You make business decisions about a company where a decision-maker and you have a close, personal relationship.

Q

**PERSONAL RELATIONSHIPS THAT CAUSE BUSINESS CONFLICTS**

I am going to be promoted to a managerial position on the Java Solutions team. My cousin will be reporting to me in that new role. Do I need to take any action?

A

*Yes. Many potential conflicts of interest can be resolved if we act on them promptly and with transparency. You need to disclose your relationship to management in advance of the decision, so EPAM can implement a solution to eliminate the personal conflict. We resolve personal conflicts of interest that could improperly influence key aspects of our business decisions with other companies or our hiring and performance review processes.*

Case 2:25-cv-06260-WB Document 80-2 Filed 09/11/26 Page 93 of 156

# EPAM People are Professional, Supportive and Fair

## Respect the Company in your Own Actions

You represent our company, every day, wherever you are. For that reason, your behavior is one of the best ways to build and enhance EPAM's positive reputation.

By behaving in ways consistent with our Code, you show respect for your colleagues and EPAM as a company.

## Respect the Company's Right to Speak for Itself

EPAM only speaks about its business and financial plans and activities through official and authorized communications and communication channels. Only specifically authorized personnel may speak on behalf of EPAM. And only authorized personnel with specialized knowledge speak on behalf of EPAM to the news media and to securities professionals, such as analysts, investors, broker dealers, investment advisors and investment companies (direct all such questions to Investor Relations and Legal).

**SOCIAL MEDIA COMMUNICATIONS – RESPONSIBLE USE**

Q

I have a personal blog that only my close friends follow. Tonight, after work, I was planning to post a short cartoon poking fun at one of my teammates who would rather complain about the customer than come up with effective software solutions. It's just a joke and I doubt the teammate would ever know about it, and anyway it's my personal blog. Is this a problem?

A

*Yes. The conduct you describe would conflict with our Social Media policy. Remember, your social media activity, even on a personal blog, may affect EPAM's legitimate business interests, especially if you were to mention EPAM employees or customers. Such activities require the same care you use in all your EPAM communications. Things on the internet last forever, and you have no way of knowing who may read your blog, including our customers. Take a moment to read what our* ***Code*** *and our* ***social media policy*** *say about proper use of social media, and follow those rules.*

# BEHAVE WITH **INTEGRITY**

# Act with Integrity in EPAM Communications, Records and Business Activities

## Be Honest and Professional in Company Communications

| | | |
|---|---|---|
| NEVER LIE IN ANY WRITTEN OR ORAL COMMUNICATIONS | USE PROFESSIONAL LANGUAGE | THINK OF HOW YOUR WORDS WOULD LOOK IF PUBLISHED IN A NEWS ARTICLE OR TO AN ATTORNEY |

## Integrity during Audits and Investigations

Cooperate fully with EPAM reviews by providing complete and honest information and documents.

EPAM may review, access, preserve or delete any information stored on EPAM-owned or supplied equipment and networks.

## Integrity in Company Financial and Business Records

Whether large or small, fraud harms our Company, our employees, our customers and our business partners.

Always be truthful and accurate in EPAM's financial and business records.

Q

**INTEGRITY IN COMPANY FINANCIAL AND BUSINESS RECORDS**

My team manager adjusted some numbers in our financial software so certain transactions that won't occur until next month were recorded in this month. This is good for our project financials, but it overstates company revenue for this month. What should I do?

A

*Each of us has a duty to make sure our company financial records are accurate and do not violate accounting rules. Regardless of how this may help your current project, you must raise or report the conduct promptly to leadership, or through our various Code channels, so EPAM may review it and take necessary corrective action. We simply do not create false or misleading financial documentation of any kind, as inaccurate entries in our books and records jeopardize the accuracy of EPAM's overall financials and may violate law.*

Case 2:25-cv-06260-WB Document 80-2 Filed 09/11/26 Page 96 of 156

# Act with Integrity in EPAM Communications, Records and Business Activities

## Expenses and Reimbursement

In all business you conduct for EPAM, always:

- Submit only legitimate business expenses
- Request only proper reimbursements

## Maintain Business Records Properly

Always create, retain, modify and discard business records lawfully and under the guidelines for our business.

## Special Preservation Obligations - Hold Notices

At times you must follow additional EPAM instructions to preserve data:

- Important to an investigation (internal or external)
- Required in or related to legal proceedings
- Requested by a government authority

## Company Transactions Are Written and Authorized

Only commit EPAM to a business transaction if you have the authority to do so, if you are authorized to sign on EPAM's behalf, and using a proper, written agreement.

**EXPENSES AND REIMBURSEMENT ARE LEGITIMATE**

Q

A colleague told me she submitted receipts for some personal expenses to compensate her for business expenses she forgot to submit on time. She says the value she submitted for personal expenses equaled what she was owed for the missing business expenses. Is that okay?

A

*No. Submitting false or misleading receipts for ANY reason or secretly causing our company to pay for personal expenses is never okay. You might first try to address the situation directly with your colleague, but if she refuses to correct the error, we ask that you promptly raise it through one of EPAM's reporting channels.*

# Financial Conflicts of Interest - Raise and Address Promptly

A financial conflict of interest exists when our private interests influence — or even appear to influence —our ability to act in EPAM's best financial interests when carrying out our job responsibilities



# Act with Integrity in EPAM Communications, Records and Business Activities

## Avoid Conflicts of Interest

You are required to disclose through **EPAM's Conflicts of Interest review process** any outside activity, financial interest or relationship that poses a real, potential, or perceived conflict of interest.

It is not possible to identify every potential conflict of interest, but the following situations provide examples.

- Taking EPAM's opportunities for your personal advantage or benefit
- Directing EPAM business to companies owned or managed by related parties or close friends
- Holding a significant financial interest in an entity that does business with or seeks to do business with EPAM
- Serving on the board of an entity that has a current or anticipated business relationship with EPAM
- Performing any outside work related to EPAM's business activities
- Any activities that directly compete with EPAM or oppose EPAM's business interests
- Activities that compromise your ability to exercise unbiased judgment or make decisions on behalf of EPAM and for its best interest, or that personally benefit you, your friends, or family at EPAM's expense

## Respect the Legal Rights of Competitors and Third Parties

We respect and abide by the laws that protect the rights of our competitors and others.

We do not take others' confidential information, violate their rights with their employees or customers, or violate the lawful rights of any others with whom we interact.

# Act with Integrity in EPAM Communications, Records and Business Activities

## Gifts and Entertainment Must Not Improperly Influence Decisions

Gifts and entertainment -- whether offered, promised, given or received -- must not improperly influence our business decisions, our standard processes, or the decisions or processes *of those with whom we do business.*

They may never be made to: (a) influence official or government acts or decisions; (b) influence someone to violate a lawful duty; or (c) influence someone to provide EPAM an improper or unfair business advantage.



**GIFTS AND ENTERTAINMENT MUST NOT IMPROPERLY INFLUENCE DECISIONS**

Q

An outside vendor who helped remodel our office space recently sent me two tickets to a professional sporting event as a thank you. They are great seats, and I know the total face value for both tickets is high. But I don't want to offend the vendor because we will want to use them again. May I keep these?

A

*No. What you describe is a single gift above "modest and reasonable value." Accepting these tickets would give the appearance that our decision to select a vendor is based on favoritism or influenced by gifts, not based on merit and our standard procurement process. You should explain to the vendor that our Code does not permit you to accept such gifts, and politely decline and return the tickets.*

# Act with Integrity in EPAM Communications, Records and Business Activities

## Important Rules for Gifts and Entertainment Expenses

**GIFTS AND ENTERTAINMENT MUST:**

- be lawful
- be of modest and reasonable value
- be infrequent
- not violate the recipient's policies
- not violate EPAM's Code or values
- not harm EPAM's reputation
- not appear to be or actually be done to improperly influence a business decision
- be properly approved
- be properly recorded in EPAM's records with accurate supporting documentation

**GIFTS AND ENTERTAINMENT MUST NOT IMPROPERLY INFLUENCE DECISIONS**

Q: My team has just completed a large implementation for a customer. The customer's CIO invited me and the other members of our team to a restaurant to celebrate and will pay for the dinner. Can we accept the invite?

A: *The dinner is related directly to your work for the customer, so as long as the customer is not a government authority (where stricter rules apply) It is okay for you to accept the invite and attend the dinner.*

# Act with Integrity in EPAM Communications, Records and Business Activities

## Championing Human Rights

EPAM believes in and upholds the human rights of our workers, and we treat our people and others in our business operations with care, dignity, and respect.

Our commitment includes maintaining a work environment where we:

- Promote equal opportunity and prohibit discrimination, harassment, and retaliation
- Prohibit child labor
- Prohibit all forms of forced labor
- Provide safe and healthy working conditions
- Respect the rights of workers to associate freely and communicate openly with management

## Engage Responsible Suppliers and Business Partners

We do business only with suppliers and business partners who pass our due diligence checks, uphold the principles outlined in our Code of Ethical Conduct and our Supplier Code of Conduct, and respect our commitment to human rights.

### CORPORATE RESPONSIBILITY

At EPAM, we believe responsible company actions create a more equal and sustainable world.

Because of that, we:

- Invest in, educate, and empower students and our people to effect real, individual, and socially responsible change in technology and technology-related careers
- Foster good through personal and economic contributions
- Preserve and protect our environment
- Embrace understanding and inclusion in the workplace

# PROTECT & ENHANCE ASSETS

Case 2:25-cv-06260-WB Document 80-2 Filed 09/11/26 Page 103 of 156

# Safeguard And Develop EPAM's Company Assets

Each of us shares responsibility to protect and enhance the value of company assets and to use them properly and as authorized —the same way you would treat your own property.

EPAM's Company assets include our facilities, equipment, materials, technology, money, information, physical property and intellectual property. They bring value to EPAM when used for EPAM's legitimate business purposes.

## HOW TO SAFEGUARD AND DEVELOP EPAM'S ASSETS

| | | |
|---|---|---|
| PROTECT THEM TO AVOID WASTE, LOSS, OR THEFT | USE THEM TO ENHANCE THE VALUE OF OUR BUSINESS | NEVER USE THEM FOR PERSONAL FINANCIAL GAIN |
| NEVER MISUSE OR STEAL THEM | NEVER USE THEM TO VIOLATE LAW | REPORT LOST OR STOLEN ASSETS TO SUPPORT.EPAM.COM |

Case 2:25-cv-06260-WB Document 80-2 Filed 09/11/26 Page 104 of 156

# Company Property Requires Special Care

## EPAM Retains Rights to Monitor, Access and Review Its Assets

Although EPAM permits occasional personal use of its equipment, networks, and other assets, you should have no expectation of privacy for any information, personal or otherwise, that is transmitted, received or stored using EPAM assets.

EPAM retains the right in accordance with law to access, monitor and/or intercept such information at any time either with or without your or any third party's knowledge, consent or approval.

By using EPAM assets you are deemed to consent to such rights.

**EPAM RETAINS RIGHTS TO MONITOR, ACCESS AND REVIEW ITS ASSETS**

Q: One of my colleagues often works in the office after hours, and uses his work computer to access sites with sexually explicit videos and sends sexually improper emails from his personal email account to his colleagues. Is there a problem?

A: *Yes. It's never okay to use EPAM computers, electronic equipment, applications, or network systems to store, view or distribute pornographic, sexually explicit or any other improper material in violation of our Code. Our Code and policies prohibit the misuse of our systems and assets, and you are agreeing that you understand and will abide by those principles whenever you use them. Employees that become aware of such conduct should report it.*



# Company Property Requires Special Care

## Confidential Information is Private and Valuable

Our confidential and proprietary information is a special kind of company asset

It is the non-public information that brings EPAM value. If such information is disclosed, it might harm our business or benefit our competitors.

Keep it private, only share it with authorized people and safeguard it from loss or disclosure.

We protect our customers' and business partners' confidential information the same way.

**STANDARD PROTECTIVE MEASURES WHEN HANDLING CONFIDENTIAL INFORMATION**

| | | |
|---|---|---|
| PROTECT IT FROM LOSS, DISCLOSURE OR UNAUTHORIZED ACCESS | USE IT ONLY IF AUTHORIZED | USE IT ONLY AS AUTHORIZED |
| FOLLOW "NON-DISCLOSURE AGREEMENTS" | SHARE IT SECURELY WITH PERMITTED RECIPIENTS | DO NOT OBTAIN INFORMATION YOU DON'T NEED OR SHOULDN'T HAVE |

**CONFIDENTIAL INFORMATION IS PRIVATE AND VALUABLE**

Q: To get some better ideas about how to solve a difficult coding issue on my current project, I posted some of the customer's code on an internet developer's site, and I asked the developer community a few simple questions about how to improve it. Is that okay?

A: *No. The customer's code, whether existing or code we develop, is confidential information. We have non-disclosure agreements in place with our customers that limit when and how we may share information that may be confidential. Confidential information, like source code, is one of EPAM's most important assets, and it brings value and a competitive advantage to our business and our customers. We must protect it carefully. If you are uncertain of the best coding solution, you should raise your question internally.*

# Company Property Requires Special Care

## Examples of EPAM Confidential Information

| | | | |
|---|---|---|---|
| BUSINESS OPERATING STRATEGIES AND PLANS | TECHNICAL INFORMATION | PRICING INFORMATION | COMPANY FINANCIAL DATA |
| INTERNAL LEGAL INFORMATION | CUSTOMER AND CLIENT LISTS | PRIVATE EMPLOYEE INFORMATION | RESEARCH AND DEVELOPMENT ACTIVITIES |



Case 2:25-cv-06260-WB Document 80-2 Filed 09/11/26 Page 107 of 156

# Company Property Requires Special Care

## Data Moves and Vanishes Instantly – So We Are Careful With It

When you "handle" company and personal employee data —in electronic or hard-copy form — always take steps to properly protect its privacy and security.

"Handling" data is collecting, storing, accessing, processing, using, transmitting, communicating or discarding.

## Simple Steps to Safeguard Our Data

- **TRANSMIT DATA CAREFULLY AND SECURELY TO AUTHORIZED PEOPLE**
- **DO NOT USE UNENCRYPTED STORAGE DEVICES (E.G. UNENCRYPTED USB STICKS)**
- **DON'T SEND BUSINESS DATA THROUGH PERSONAL EMAILS, PERSONAL CHAT OR CONFERENCING, OR SIMILAR PERSONAL TECHNOLOGY TOOLS**
- **DON'T SHARE PASSWORDS**
- **ACCESS BUSINESS DATA AND SYSTEMS VIA SECURE NETWORKS**
- **USE OUR SECURITY SOFTWARE**
- **PASSWORD PROTECT AND SAFEGUARD YOUR MOBILE DEVICES**
- **SHIELD AND LOCK DEVICE SCREENS**
- **DISPOSE OF DATA SECURELY**
- **FOLLOW EPAM'S RULES FOR ACCEPTABLE USE OF IT RESOURCES**
- **PROMPTLY REPORT ANY DATA LOSS OR DISCLOSURE**

# Creating Value through the Acceptable Use of Technology

## Our Approach

EPAM uses, designs, implements, and optimizes the benefits of innovative technology for our clients and as an integral part of EPAM's internal business operations.

## Our Actions

**AT EPAM WE:**

- Use technology responsibly
- Leverage AI and Generative AI technology to:
  - improve EPAM's internal business systems;
  - drive delivery efficiencies and enhance technology capabilities;
  - create and deliver custom, innovative, and valuable solutions for our clients
- Take proper precautions to facilitate acceptable use of the technology in compliance with our **Acceptable Use** and **Generative AI** policies and the law, which protects EPAM's and our Clients' information and interests

## Using Technology Responsibly

Whenever we use AI, Generative AI, or similar technologies, we are careful and responsible about:

| WHAT WE INPUT | HOW WE USE OUTPUTS |
|---|---|

**AS RESPONSIBLE STEWARDS OF TECHNOLOGY, WE ARE CAREFUL NOT TO:**

- Disclose Sensitive Personal Information
- Disclose Financial Data or Material Non-public Information
- Disclose Client Names or Confidential Information without Client Authorization
- Violate Non-Disclosure Agreements
- Violate Intellectual Property Rights of anyone
- Share EPAM Legal Communications or Advice
- Distribute Legal Advice generated by the models
- Engage in other conduct or communications that violate our Code or the Law

Case 2:25-cv-06260-WB Document 80-2 Filed 09/11/26 Page 109 of 156

# Company Property Requires Special Care

## Personal Data - Personally Identifiable Information (PII) Requires Additional Precautions

Personally identifiable information (personal information and sensitive personal information) presents heightened risks to EPAM, as many countries have strict laws about protecting, handling, transferring and processing such data.

Review and consult EPAM's data privacy policy to be sure you are handling PII and any other data properly.

**SOME EXAMPLES OF PII — DATA THAT ON ITS OWN OR WITH OTHER INFORMATION IDENTIFIES AN INDIVIDUAL.**

- NAME
- NATIONAL IDENTIFICATION NUMBER OR PASSPORT NUMBER
- EMPLOYMENT INFORMATION SUCH AS EMPLOYER'S NAME, POSITION, SALARY
- IMAGE (E.G., PHOTOGRAPH)
- PERSONAL ADDRESS
- IP ADDRESS

# COMPLY
## WITH LAWS

# Special Government Laws and Rules

## Anti-Bribery Laws

We never offer, promise, provide (or receive) bribes or engage in corrupt business activities with anyone, especially government or public officials.



Bribery may be thought of as gaining a business benefit by:

1. Paying, offering, giving, or promising "anything of value" to a recipient
2. Intending that the recipient will do something improper, like violating official obligations, violating the law, or granting any unfair or improper advantage

# Pay Close Attention to Government Laws and Rules

"Anything of value" includes cash but is a broad term that may encompass anything that has value.

**THE FOLLOWING IS AN ILLUSTRATIVE LIST:**

| | | |
|---|---|---|
| CASH | COMMISSIONS | SERVICES |
| EMPLOYMENT (JOBS OR JOB OFFERS) | CHARITABLE OR POLITICAL CONTRIBUTIONS | MEALS THAT ARE TOO EXTRAVAGANT, TOO FREQUENT OR OCCUR DURING A BID OR NEGOTIATION |
| ENTERTAINMENT AND TRAVEL EXPENSES | EDUCATIONAL BENEFITS | BUSINESS OPPORTUNITIES |

Any business advantage produced through bribery is forbidden. This includes any of the following potential business benefits:

- Obtaining or keeping any customer, project, contract or work
- Circumventing or avoiding government rules
- Avoiding duties, taxes or penalties
- Influencing the procurement process
- Influencing lawsuits or enforcement actions
- Obtaining tax benefits
- Obtaining licensing benefits
- Obtaining contract or bidding approvals or extensions
- Obtaining any other financial or business benefit

# Pay Close Attention to Government Laws and Rules

Additional due diligence, caution and approvals may be necessary in transactions when red flags are apparent

**EXAMPLES OF RED FLAGS INCLUDE REQUESTING:**

- PAYMENTS IN CASH (OR CASH EQUIVALENTS, SUCH AS GIFT CARDS, BANK CARDS)
- PAYMENTS "IN KIND" (PAYMENTS IN GOODS AND SERVICES FOR OTHER GOODS AND SERVICES)
- PAYMENTS BE MADE TO OFFSHORE ACCOUNTS
- PAYMENTS BE MADE TO THIRD PARTIES NOT PERFORMING THE SERVICES
- THAT EPAM AGREE TO EMPLOY A GOVERNMENT OFFICIAL OR RELATIVE OR THAT EPAM CONSENT TO A GOVERNMENT OFFICIAL'S REQUEST TO EMPLOY A SPECIFIC PERSON
- TO PAY FOR ENTERTAINMENT, TRAVEL, OR LODGING OF GOVERNMENT OFFICIALS
- TO CONTRIBUTE TO A PARTICULAR CHARITY OR POLITICAL PARTY
- PAYMENTS TO THIRD PARTIES FOR VAGUELY DESCRIBED SERVICES
- UNUSUAL OR EXCESSIVE PAYMENT OR EXCESSIVE OR NON-MARKET COMMISSIONS OR DISCOUNTS TO ANYONE, ESPECIALLY TO THIRD PARTIES
- THAT A CONSULTANT, SUPPLIER OR A THIRD PARTY BECOMES PART OF A TRANSACTION
- TO NOT INCLUDE ANTI-BRIBERY COMMITMENTS OR OTHER DUE DILIGENCE MEASURES IN A WRITTEN CONTRACT

# Pay Close Attention to Government Laws and Rules

## Securities Laws

Buying or selling stock ("trading"), or telling others to buy or sell stock ("tipping"), on the basis of "material," "non-public" information is called "insider trading" and is illegal.

**INSIDER TRADING – BUYING OR SELLING**

No EPAM personnel may buy or sell any stock or securities of EPAM (or of any other company) when he or she has "material" and "non-public" information about that company.

**INSIDER TRADING – TIPPING**

No EPAM personnel may "tip" others. "Tipping" is providing material, nonpublic information that you possess to other individuals or companies, who use the information to buy, hold or sell securities.

**SECURITIES LAWS**

Q: Is it okay to tell my sister some internal information about a company where she owns stock? I learned the information while doing a recent project with that company.

A:

*No. Information from one of our business partners is covered by confidentiality agreements, and sharing information with your sister would violate those rules.*

*In addition, if the information is something a reasonable investor would consider important, by sharing the information you could be "tipping" your sister to inside information, which violates insider trading laws. Tipping someone to material, inside information that they use to trade securities is as improper as trading on that information yourself. Remember, insider trading is a crime.*

# Pay Close Attention to Government Laws and Rules

Material information is information a reasonable investor would consider important before deciding whether to buy, sell or hold a company's securities.

## Examples of Material Information

**INFORMATION ABOUT:**

- financial results
- new products
- actual or threatened litigation
- senior leadership changes
- acquisition plans or strategies
- significant cybersecurity or other data protection or privacy incidents
- other significant confidential corporate developments not yet made public

## Non-public information is:

- Information not generally known or available to the general public
- Information that has been publicly disclosed but has not had adequate time to be absorbed by the marketplace.



# Pay Close Attention to Government Laws and Rules

## Trade Compliance

Import, export and trade laws govern the worldwide transfer of goods, technology and services, and restrict where and with whom we do business. How they apply depends on the nature of the activities, the countries and the parties involved.

Economic sanctions prohibit entirely or restrict direct and indirect business relationships or transactions with targeted countries, regions, legal entities, or individuals. EPAM reviews and conducts due diligence to comply with applicable sanctions affecting its relationships with clients, vendors, and employees.

## Important Trade Compliance Steps

- Follow our standard procurement process so that third parties are screened against watch lists (contractors and vendors)
- Comply with economic sanctions and embargoes adopted by countries where we do business
- Promptly report any requests to perform services touching sanctioned countries or any requests to participate in restrictive trade practices (e.g., boycotts) to our General Counsel or Chief Compliance Officer
- Obtain an export control license or other required government authorizations where needed
- Use accurate and complete trade documentation.



Case 2:25-cv-06260-WB Document 80-2 Filed 09/11/26 Page 117 of 156

# Pay Close Attention to Government Laws and Rules

## Anti-“Money Laundering” Compliance

Money laundering is concealment by criminals of the true origin and ownership of money obtained from their criminal activities by passing it through legitimate businesses. If successful, it allows them to maintain control over such money and ultimately to provide a legitimate cover for it.

EPAM does business only with reputable clients and third parties engaged in legitimate business activities with funds derived from legitimate sources.

Questions about the legitimacy of funds or sources of funds should be raised to Legal or the Chief Compliance Officer.



# Pay Close Attention to Government Laws and Rules

## Antitrust and Fair Competition Laws

Antitrust and competition laws encourage fair and free competition and protect consumers from unfair business practices or agreements that unreasonably limit competition.

We comply with the spirit and letter of such laws in our interactions with customers, suppliers, competitors and other third parties.

- Do not discuss or enter into prohibited agreements with competitors that restrict competition.
- Do not make misleading or untrue statements about our products or services or those of our competitors.
- Procure materials, supplies and services at fair and reasonable prices.

## Prohibited Agreements or Discussions

**EXAMPLES OF PROHIBITED AGREEMENTS OR DISCUSSIONS:**

- Fixing prices or pricing levels or other terms of sale
- Allocating, dividing or sharing territories or customers
- Bidding or not bidding on contracts
- Refraining from selling or buying from particular parties

# Pay Close Attention to Government Laws and Rules

## Immigration Laws

EPAM's and our clients' ability to conduct business on a global scale may involve cross-border travel or relocations, which can raise immigration, payroll and tax requirements and obligations. Valid work authorizations and documentation, such as work permits or work visas, are usually required if you are going to perform productive work in a country other than your home country.

When you are involved in foreign travel for yourself or for others, first consult EPAM's Global Immigration Policy to be sure you take all necessary steps to comply with applicable Immigration Laws, including determining what type of visa or other work authorization may be needed, and to comply with our rules for remote work and permanent relocations.



Case 2:25-cv-06260-WB Document 80-2 Filed 09/11/26 Page 120 of 156

## What Else?

### Understand

Take a moment to really understand the Code. While no document could ever provide examples of every scenario you may encounter, our Code is the foundation for proper action at EPAM. Refer to our Code often and always abide by it.

### Reach out and Speak Up

When you need more guidance, do not hesitate to reach out and speak up. EPAM respects and values such conduct because it helps us build and maintain the best working environment.

### Act as a Team

If we act as one EPAM team, we will benefit from our shared, good judgment. That will keep EPAM a company that is trusted and valued by our employees, our customers, our shareholders and all of our business partners.



# EPAM EthicsLine – Phone Number

## Contact us

If you would prefer to speak to someone confidentially,
call us and one of our representatives would be happy to assist you.

**For English: +1-866-786-9137**
*Call anytime on our Toll-Free Number*

<epam>

# THANK YOU

ISSUED - **MARCH 2018** REVISED - **SEPTEMBER 2025**

# EXHIBIT C

## Corporate Governance Policy

# ACCEPTABLE USE OF IT RESOURCES

## Quality Management System

**Legal Notice:** This document contains privileged and/or confidential information and may not be disclosed, distributed or reproduced without the prior written permission of EPAM®.

The document can be shared according to EPAM Regulations Sharing Rules.

| Related Artefacts | |
|---|---|
| **Ref.** | **Name** |
| CEC | Code of Ethical Conduct |
| WIMTP | Work Instruction: Mandatory Training Program |
| PISP | Physical and Infrastructural Security Policy |
| WICSCD | Work Instruction: Clear Screen and Clear Desk |
| WIC | Work Instruction: Communications |
| WIASA | Work Instruction: Access to Systems and Applications |
| RGACNR | Work Instruction: Remote and Guest Access to Corporate Network Resources |
| WIAES | Work Instruction: Access to E-mail Services |
| WIAFTP | Work Instruction: Access to FTP |
| GIAM | Guideline: Information Asset Management |
| WIWRA | Work Instruction: Web Resources Access |
| GSLM | Guideline: Software License Management |
| WISPC | Work Instruction: Software Package Control |
| WIAP | Work Instruction: Antivirus Protection |
| DEDS | Work Instruction: Data Encryption and Digital Signing |
| WIBD | Work Instruction: Backup Description |
| WIDP | Work Instruction: Data Privacy |
| PDIM | Process Description: Universal Request Management |
| WIISIH | Work Instruction: Information Security Incident Handling |
| WISTSU | Work Instruction: Support Team Service Usage |
| GPM | Guideline: Project Management |
| WIMDH | Work Instruction: Mobile Device Handling |
| WIWHS | Work Instruction: EPAM Workstation Hardening Standards |
| WIWOO | Work Instruction: Work Outside the Office |
| WIRDMH | Work Instruction: Removable Digital Media Handling |
| PRUPSD | Work Instruction: Protection Rules for Units Processing Sensitive Personal Data |
| WIVAPT | Work Instruction: Vulnerability Assessment and Penetration Testing |
| GPCCR | Guideline: Processing of Client Compliance Requirements |
| AUGAIP | Acceptable Use of Generative AI Policy |
| PMSSMP | Public Media Statements and Social Media Policy |
| OFFEP | Offboarding / Exit Policy |
| LDRWI | Local Disaster Recovery WI (when it is available) |
| LEH | Local Employee Handbook (when it is available) |

| Abbreviations and Acronyms | |
|---|---|
| AM | Account Manager |
| BSS | Business Systems and Services |

| Abbreviations and Acronyms | |
|---|---|
| CCTV | Closed-circuit Television |
| DL | Distribution list |
| DM | Delivery Manager |
| MSA | Master Service Agreement |
| NDA | Non-disclosure agreement |
| ODC | Offshore Development (Delivery) Center |
| PII | Personally Identifiable Information |
| PM | Project Manager |
| QMS | Quality Management System |
| RDM | Removable Digital Media |
| SLA | Service Level Agreement |
| SOW | Statement of Work |
| WIGLO | Work Instruction Global |

# CONTENTS

1 INTRODUCTION AND PURPOSE ........ 5
1.1 SCOPE ........ 5
2 RESPONSIBILITIES AND AUTHORITIES ........ 5
2.1 VIOLATIONS OF THIS POLICY ........ 5
2.2 DISCLAIMER ........ 6
3 EPAM GLOBAL REQUIREMENTS AND RECOMMENDATIONS ........ 6
3.1 CODE OF ETHICAL CONDUCT ........ 6
3.2 MANDATORY TRAINING ........ 7
3.3 PHYSICAL AND INFRASTRUCTUAL SECURITY POLICY ........ 8
3.4 CLEAR SCREEN AND CLEAR DESK ........ 8
3.5 COMMUNICATIONS AND ACCESS TO E-MAIL SERVICES ........ 9
3.6 ACCESS TO SYSTEMS AND APPLICATIONS ........ 11
3.7 REMOTE AND GUEST ACCESS TO CORPORATE NETWORK RESOURCES ........ 12
3.8 ACCESS TO FTP ........ 13
3.9 WEB RESOURCES ACCESS ........ 13
3.10 SOFTWARE ........ 13
3.11 ANTIVIRUS ........ 14
3.12 DATA ENCRYPTION AND DIGITAL SIGNING, COMPUTER PROTECTION ........ 14
3.13 BACKUP ........ 15
3.14 INFORMATION ASSET MANAGEMENT ........ 15
3.15 DATA PRIVACY ........ 21
3.16 VULNERABILITY ASSESSMENT AND PENETRATION TESTING ........ 22
3.17 INCIDENT HANDLING ........ 23
3.18 SUPPORT TEAM SERVICE ........ 23
3.19 CLIENT'S SPECIFIC REQUIREMENTS AND REQUESTS ........ 24
3.20 PROTECTION RULES FOR UNITS PROCESSING SENSITIVE PERSONAL DATA ........ 24
3.21 MOBILE DEVICE HANDLING ........ 25
3.22 WORKSTATION HARDENING STANDARDS ........ 27
3.23 WORK OUTSIDE THE OFFICE ........ 27
3.24 REMOVABLE DIGITAL MEDIA HANDLING ........ 28
3.25 ACCEPTABLE USE OF GENERATIVE AI ........ 29
3.26 PUBLIC MEDIA STATEMENTS AND SOCIAL MEDIA ........ 29
3.27 BUSINESS CONTINUITY AND DISASTER RECOVERY ........ 30
3.28 OFFBOARDING ........ 30
4 COUNTRY / CITY LEVEL REQUIREMENTS ........ 30
4.1 COUNTRY / CITY SPECIFIC REQUIREMENTS AND RECOMMENDATIONS ........ 30
5 ACCESS TO AND MONITORING OF IT RESOURCES ........ 31
5.1 MONITORING ACTIVITIES ........ 31
POLICY GOVERNANCE ........ 32

# 1 INTRODUCTION AND PURPOSE

EPAM's Acceptable Use of IT Resources Policy:

a. establishes standards and obligations for proper use of IT Resources in EPAM's business activities; and

b. describes and links to related Work Instructions that further explain these obligations.

The term "IT Resources" includes but is not limited to information assets, computers, devices, network communications, and information systems used in EPAM's business activities, all information accessed, transmitted, or stored on such resources, and non-EPAM owned Resources used on behalf of EPAM or in any EPAM-related activities.

## 1.1 SCOPE

This Policy applies to:

- **People** – People includes all EPAM employees, contractors, temporary employees, or outside consultants working on behalf of an EPAM entity **whenever handling IT Resources** (collectively "EPAM People," "People" or "Person").
- **Locations -** Locations includes the use of IT Resources at all EPAM locations, as well as at remote locations including, but not limited to, homes, Client workspaces, Supplier workspaces, hotels, and airports.
- **IT Devices and Activities -** IT Devices and Activities includes the use by EPAM People of servers, desktop computers, laptops, mobile and hand-held devices, networks, information systems, and any other IT-related devices or systems, whether provided by EPAM or a third party, whenever EPAM People:
  - access or maintain any EPAM data or information on such devices (including Client data);
  - use such devices to perform any EPAM-related services, or
  - access EPAM's network or any other IT system or network to perform EPAM services.

# 2 RESPONSIBILITIES AND AUTHORITIES

All EPAM People are expected to understand and comply with this Policy and its associated work instructions and procedures.

As part of this responsibility, EPAM People must use EPAM's IT Resources in a manner that relates to and enhances EPAM's business, strategy, and positive reputation, protects the confidentiality and security of EPAM's and its clients' confidential information, trade secrets, intellectual property, and assets, and complies with applicable laws.

EPAM provides its People with IT Resources to assist them in conducting EPAM business. EPAM owns and retains all rights of ownership consistent with applicable law in such IT Resources. EPAM also retains all rights to access, monitor, review, delete, or otherwise use EPAM-related data and records created on or through the use of our IT Resources. While EPAM People may make reasonable, occasional, and incidental personal use of IT Resources provided such use otherwise complies with EPAM's Code and policies, EPAM retains ownership of and rights to use and access such IT Resources and their contents to the fullest extent of applicable law.

EPAM retains the right at all times to discontinue any Person's use of or access to the IT Resources.

## 2.1 VIOLATIONS OF THIS POLICY

Any violation of this Policy or its underlying Work Instructions and/or any damage to or unauthorized access or use of IT Resources, including the misuse of any information contained in or on any IT Resources, may result in disciplinary action, up to and including dismissal and related legal proceedings, termination of contracts, and in some instances, criminal prosecution by applicable governmental authorities and agencies.

## 2.2 DISCLAIMER

EPAM makes no warranties of any kind, whether express or implied, regarding IT Resources that it is providing. By using IT Resources for any personal activities, EPAM People agree to do so in compliance with EPAM's Code of Ethical Conduct and policies, and agree to assume all risk and any liability that may arise from such activities. EPAM is not responsible for any damage or liability caused by or related to such personal use.

# 3 EPAM GLOBAL REQUIREMENTS AND RECOMMENDATIONS

## 3.1 CODE OF ETHICAL CONDUCT

Source: Code of Ethical Conduct

**Use Social Media Communications Responsibly**

Social media is a powerful tool for communicating about many things, both personal and professional.

Before making any statement, post, link or other communication or expression on EPAM-Sponsored or Personal Social Media, you must read and follow EPAM's Public Media Statements and Social Media Policy and EPAM's Social Media Guidelines.

Whether you use Social Media on behalf of EPAM or for personal reasons, EPAM expects that in all cases you will be responsible, professional, and abide by the principles of proper use found in our Code of Ethical Conduct.

NEVER USE COMMUNICATIONS TO:

- LIE;
- PROMOTE VIOLENCE, HOSTILITY, PHYSICAL HARM OR HARASSMENT OF OTHERS;
- VIOLATE ANYONE'S PRIVACY RIGHTS;
- VIOLATE TRADEMARKS, COPYRIGHTS, TRADE SECRETS OR PATENTS;
- REVEAL EPAM'S, ITS CLIENT'S (OR ANYONE'S) CONFIDENTIAL OR "MATERIAL" INFORMATION;
- VIOLATE EPAM'S CONTRACTUAL AND CLIENT RELATIONSHIP OBLIGATIONS;
- VIOLATE EPAM'S CODE, ITS POLICIES, OR THE LAW.

**Safeguard and Develop EPAM's Company Assets**

Each of us shares responsibility to protect and enhance the value of Company assets and to use them properly and as authorized —the same way you would treat your own property.

EPAM's Company assets include our facilities, equipment, materials, technology, money, information, physical property, and intellectual property. They bring value to EPAM when used for EPAM's legitimate business purposes.

HOW TO SAFEGUARD AND DEVELOP EPAM'S ASSETS:

- PROTECT THEM TO AVOID WASTE, LOSS, OR THEFT;
- USE THEM TO ENHANCE THE VALUE OF OUR BUSINESS;
- NEVER USE THEM FOR PERSONAL FINANCIAL GAIN;
- NEVER MISUSE OR STEAL THEM;
- NEVER USE THEM TO VIOLATE LAW;
- REPORT LOST OR STOLEN ASSETS TO SUPPORT.EPAM.COM.

**EPAM Retains Rights to Monitor, Access and Review Its Assets**

Although EPAM permits occasional personal use of its equipment, networks, and other assets, you should have no expectation of privacy for any information, personal or otherwise, that is transmitted, received, or stored using EPAM assets.

EPAM retains the right in accordance with law to access, monitor and/or intercept such information at any time either with or without your or any third party's knowledge, consent, or approval.

By using EPAM assets you are deemed to consent to such rights.

**Confidential Information is Private and Valuable**

Our confidential and proprietary information is a special kind of Company asset.It is the non-public information that brings EPAM value. If such information is disclosed, it might harm our business or benefit our competitors.

Keep it private, only share it with authorized people and safeguard it from loss or disclosure.

We protect our Clients' and business partners' confidential information the same way.

STANDARD PROTECTIVE MEASURES WHEN HANDLING CONFIDENTIAL INFORMATION:

- PROTECT IT FROM LOSS, DISCLOSURE OR UNAUTHORIZED ACCESS;
- USE IT ONLY IF AUTHORIZED;
- USE IT ONLY AS AUTHORIZED;
- FOLLOW "NON-DISCLOSURE AGREEMENTS";
- SHARE IT SECURELY WITH PERMITTED RECIPIENTS;
- DO NOT OBTAIN INFORMATION YOU DON'T NEED OR SHOULDN'T HAVE.

**Data Moves and Vanishes Instantly - So We Are Careful with It**

When you "handle" Company and personal employee data —in electronic or hard-copy form — always take steps to properly protect its privacy and security.

"Handling" data is collecting, storing, accessing, processing, using, transmitting, communicating, or discarding.

Simple Steps to Safeguard Our Data:

- TRANSMIT DATA CAREFULLY AND SECURELY TO AUTHORIZED PEOPLE;
- DO NOT USE UNENCRYPTED STORAGE DEVICES (E.G. UNENCRYPTED USB STICKS);
- DON'T SEND BUSINESS DATA THROUGH PERSONAL EMAILS, PERSONAL CHAT OR CONFERENCING, OR SIMILAR PERSONAL TECHNOLOGY TOOLS;
- DON'T SHARE PASSWORDS;
- ACCESS BUSINESS DATA AND SYSTEMS VIA SECURE NETWORKS;
- USE OUR SECURITY SOFTWARE;
- PASSWORD PROTECT AND SAFEGUARD YOUR MOBILE DEVICES;
- SHIELD AND LOCK DEVICE SCREENS;
- DISPOSE OF DATA SECURELY;
- PROMPTLY REPORT ANY DATA LOSS OR DISCLOSURE.

**Personal Data - Personally Identifiable Information (PII) Requires Additional Precautions**

Personally identifiable information (personal information and sensitive personal information) presents heightened risks to EPAM, as many countries have strict laws about protecting, handling, transferring, and processing such data.

Review and consult EPAM's data privacy policy to be sure you are handling PII and any other data properly.

## 3.2 MANDATORY TRAINING

Source: EPAM_MandatoryTrainingProgramWIGLO

The mandatory training, which may be amended from time to time, includes the following training courses:

- EPAM Code of Ethical Conduct 'Foundation';
- EPAM Code of Ethical Conduct (Refresher);
- Avoiding Discrimination;
- Avoiding Insider Trading;
- Avoiding Fraud;
- Conflicts of Interest;

- Confidentiality and Social Media;
- Mandatory Guidance – Traveling and Performing EPAM Services Abroad;
- Acceptable Use of Generative AI;
- Anti-Bribery and Anti-Corruption Policy;
- QMS Induction Training;
- QMS Awareness Training;
- Training for Managers: QMS Overview;
- QMS for LSH Overview Training;
- Introduction to ESG: Environmental, Social, Governance;
- Cyber Security Success;
- IT Security and Awareness Basic Training;
- IT Security and Awareness Refresher Training;
- Health and Safety and Emergency Response Basic Training;
- Health and Safety and Emergency Response Refresher Training
- Data Privacy and Awareness Basic Training;
- Data Privacy and Awareness Refresher Training;
- BCP: Employee Awareness Training;
- Physical Product design and development: Overview.

Out of scope of this work instruction: project, units and locations specific trainings considered as mandatory for members of project, unit, or location.

## 3.3 PHYSICAL AND INFRASTRUCTURAL SECURITY POLICY

Source: EPAM_PhysicalAndInfrastructuralSecurityPolicy

The purpose of this policy is to protect EPAM premises, protected areas, and EPAM physical assets.

**PHYSICAL SECURITY FRAMEWORK**

EPAM defines three levels of physical security:

| Level | Requirements |
|---|---|
| Global | • Global Policies and Work Instructions |
| Location | • Local instructions (e.g., Physical Security WI for location (if any), Local Business Continuity and Disaster Recovery Plan (if any)) |
| Account/project | • Account/project level instructions and/or Client requirements (e.g., Account security plan, MSA) |

**ASSET PROTECTION**

EPAM assets shall be protected from unauthorized access, theft, damage, and other risks.

**VISITORS**

Each external visitor shall be informed about key security requirements and recommended behaviour.

## 3.4 CLEAR SCREEN AND CLEAR DESK

Source: EPAM_ClearScreenandClearDeskWIGLO

The purpose of this work instruction is to reduce the risks of unauthorized access, loss of and damage to information during and outside normal working hours.

CLEAR DESK

- Hard (printed) copies of documents containing confidential or internal EPAM information (including personal data) must not be left in shared desk space, and must be properly removed, stored, or disposed of using a paper shredder or secure disposal receptacle;
- If a large volume of documents needs to be locked, the owner of paper documents must designate a secure place for them;
- Dispose of flipchart sheets and clean off white boards at the end of each meeting except cases when sheets or white board are located in ODC;

CLEAR SCREEN

- Terminals and workstations must be protected by time-out software which is activated after a predetermined time period, generally 10 minutes of inactivity;
- The user must terminate (log-off) active sessions when finished or secure it with a password protected screen saver;
- Laptops must be additionally secured with disk encryption;
- Equipment, where information is stored and used by several users in parallel, (like version control systems, file or application servers) must be installed in locked and safely protected facilities (e.g. server rooms).

CLEAN PRINTERS, SCANNERS AND COPY MACHINES

- EPAM People using the printer must check the printer's availability prior to sending the print job to the printer, and must collect all the printed documents immediately.

CAMERAS AND SOUND RECORDING

- On EPAM premises, any form of information capture, e.g., photo taking, video or sound recording, using any equipment (digital or analog) including cameras found in portable devices (i.e. mobile phone, tablet PC, notebook, webcam, etc.) and targeting any content is prohibited unless prior written consent is received from the Management. Such permissions must contain the necessary details about the area, purpose, recording format and device; the retention time of the original record and the method of destruction after the retention interval has expired;
- Documents containing EPAM confidential or EPAM strictly confidential (sensitive) data (including personal data) must not be captured without prior written consent from the Management;
- EPAM People must not disclose the captured confidential or strictly confidential information or make copies of it without prior written consent from the Management.

## 3.5 COMMUNICATIONS AND ACCESS TO E-MAIL SERVICES

Source: EPAM_CommunicationsWIGLO

EPAM_AccesstoE-mailServicesWIGLO

The purpose of these documents is to clarify Communication methods and describe basic rules of courtesy and proper use of communications within EPAM.

VERBAL, PERSONAL, AND TELECOMMUNICATIONS

- Use correct phrasing - be sensitive to individuals or groups in language, tone, and approach;
- Comply with EPAM's rules relating to confidential and internal EPAM information and do not reveal it in any form to an external audience;
- Always document (via meeting follow-up) the decisions made during such a conversation and provide this documentation to the other participants;
- Be sensitive of other peoples' time and commitments when approaching them with ad-hoc topics or in "on-the-go" conversations.

DOS AND DON'TS

DOS:

- Set up your communication space carefully; haphazard or careless rules and settings can cause you to miss important messages;

- Use common sense while choosing communication channels and vehicles for your purposes;
- Treat other people and their opinions with respect.

DON'TS:

- Do not share EPAM internal information outside the Company;
- Don't forget about IT security. EPAM People receive many emails and messages every day, and some of them may be phishing attempts.

**E-MAIL COMMUNICATION**

- EPAM People must use their corporate email address – FirstName_LastName@epam.com – for work-related correspondence;
- Messages must contain a completed subject line with a brief description of the message subject matter and a standard polite complimentary close and signature block;
- In the line "To," include the direct recipients of the message and/or those from whom a reply is required. Never leave a message unanswered if you are in the "To" list;
- In the line "Cc," include those who are to be informed but who are not expected to answer;
- Courtesy generally dictates waiting for direct recipients to answer first;
- For informational messages, the recipients are to be indicated in the "Cc" line, and the "Subject" line is to contain the abbreviation FYI (For Your Information);
- Preserve message history by using the menu tabs Reply, Reply to All, and Forward when appropriate;
- Do not inadvertently mix addressees from different companies or organizations (outside of EPAM) in the lines "To" and "Cc" to avoid leakage of information;
- If the reply is inserted into the body of the original message, clearly mark the insertions;
- For request or instruction messages with a deadline, be sure to reply;
- We strongly advise writing the message body in English;
- Before replying to an email thread (chain of messages with the same subject), make sure to read all messages in the chain and reply to the latest one;
- If someone is in an email thread they no longer need to be in, move that person to BCC in your next reply, and say so in the first line of the email;
- If you have not clearly understood a message, contact the sender directly by phone or IM instead of starting a long round of clarifications or reacting in a way that could cause unwanted tension;
- Email messages are not project documents. Use them for transmitting information and for providing concise descriptions and summaries. Detailed descriptions should be given in project documentation, where it can have underlying versions, storage control, shared access, and traceability;
- Carefully choose who to address in an email. Analyze and respect organizational responsibilities and rules before sending out the information. Not informing interested parties is miscommunication; informing uninterested personnel can lead to information leaks and possibly escalations;
- To find EPAM People contact information, use the Office 365 global address book and the Contacts folders for external addresses.

**Mail System Restrictions**

- The size of an outgoing message should not exceed 100 MB. Use corporate OneDrive or SharePoint to transfer larger files;
- Using the Company mail system for personal correspondence is prohibited;
- EPAM People must not use their corporate accounts for registration purposes, unless this is driven by the nature of their work;
- If your mailbox size exceeds its limit, you will receive a system notification with a request to reduce its size to meet mail system requirements. The warning message is generated when your mailbox exceeds 90% of the limit. When the limit is reached (100%), you will not be able to send new messages until you reduce your mailbox size. If your mailbox size is twice the limit (200%), you will not be able to send or receive messages;
- Auto forwarding messages is prohibited;

- Some attachment file types are blocked: bat, bmp, com, exe, js, jsp, pif, scr, url, vb, vbs. If you need to send such files the correct method for distributing these kinds of files is via cloud file sharing tools as agreed with the Client, supplier, 3rd party.

**Signatures**

- EPAM People are required to use the standard corporate complimentary closing and signature block in their business correspondence. Using this closing and signature block is obligatory for external correspondence. For replies and forwarded messages, the corporate complimentary closing and signature block are optional and a matter of personal preference;
- Configure your signature using this guide.

**MICROSOFT TEAMS**

- Microsoft Teams should be used for work-related communication and collaboration with colleagues and teams. Set up meetings to virtually connect with your teammates, brainstorm ideas, work on tasks together on a call and use private or group chats for instant communication. You can share files and work on documents right from MS Teams. You can also create your own Team to have a space for a project group to share updates, raise questions and maintain transparency. You can add a planner to conveniently organize your work inside the team and upload files for quick access, write a wiki with the most helpful information for the Team or channels inside it, or create FAQs for your members;
- MS Teams can also be used as an online community space. We generally advise Teams as a channel only for small groups of people – otherwise it may be too noisy and intrusive for community members (Viva Engage is better for big groups).

**PROJECT-RELATED COMMUNICATION**

- In email communication, all technical messages related to a project (both to Clients and from Clients) should be forwarded to the Project Manager/Delivery Manager (if they are not among the recipients of the original message) and to the Project Folder;
- Messages directly related to business issues (e.g. the discussion of a business trip or of a new task on the project) are to be forwarded to the Project Folder, to the Project Manager/Delivery Manager, and to the Resource Manager (if they are not among the recipients of the original message);
- All messages (technical and business) may be forwarded if necessary;
- Upon receipt of the forwarded message, the Project Manager/Delivery Manager may decide to forward it to the next management level;
- After phone calls with the Client, in compliance with the rules set out above, it is required to send a subsequent message informing of the conversation subject and the decisions taken during the conversation.

See Access to E-mail Services WIGLO for more details about the following:

- USING OUTLOOK WEB ACCESS;
- USING MICROSOFT OUTLOOK;
- USING MICROSOFT OUTLOOK ON APPLE MAC OS;
- USING A MOBILE DEVICE.

## 3.6 ACCESS TO SYSTEMS AND APPLICATIONS

Source: EPAM_AccesstoSystemsandApplicationsWIGLO

This work instruction provides detailed information on policies established for ensuring suitable access to systems and applications within EPAM Systems

**GENERAL RULES OF PASSWORD USAGE**

- EPAM People must treat all authentication factors (passwords, OTP, etc.) as private and strictly confidential. Authentication factors must not be shared with any other person, including other Company staff, for any reason;
- Passwords must never be stored on computer systems in an unprotected form;
- Keeping a record (e.g. paper, software file or hand-held device) of passwords must be avoided, unless this can be stored securely and the method of storing has been approved;
- Passwords must not be included in any automated log-on process, e.g. stored insecurely in a macro or function key. Password managers use is recommended. Approved freeware includes KeePass:

- Care must be taken to prevent the compromise of one password from compromising the security of multiple systems or resources. A password used to secure one account must never be used for any other accounts or services;
- Passwords must not be displayed on the screen when being entered;
- Password files must be stored separately from application system data;
- Passwords must always be changed immediately whenever there is any indication of possible system or password compromise.

See the cross-referenced instruction for more details about the following:

- ACCESS TO SYSTEMS AND APPLICATIONS;
- SECOND FACTOR OF AUTHENTICATION;
- GRANTING, REVOKING, CHANGING ACCESS TO SYSTEMS.

## 3.7 REMOTE AND GUEST ACCESS TO CORPORATE NETWORK RESOURCES

Source: EPAM_RemoteandGuestAccessToCorporateNetworkResourcesWIGLO

Only EPAM People are authorized to access the internal EPAM network from the Internet over VPN in case they need services that cannot be accessed from the Internet.

Computing devices accessing the Company's network must meet the following requirements:

- Properly licensed and up-to-date software;
- For devices with mobile operating system the device OS should not be rooted/jail-broken;
- Up-to-date antivirus:
  - For devices with computer operating system;
  - For devices with mobile operating system: when possible.
- Password protection and auto-locking:
  - For devices with computer operating system: locked automatically after 10 minutes;
  - For devices with mobile operating system: locked automatically after 2 minutes.
- Firewall must be enabled for personally owned devices with computer OS;
- Encryption for system drive must be enabled for personally owned devices with computer OS;
- Encryption for internal storage must be enabled for personally owned devices with mobile OS;
- Up to date 3rd party software.

The following restrictions and recommendations must be observed and strictly adhered to:

- It is strictly prohibited to pass any details of connection information to any third party, or to allow any third party (including friends and family members) to access Company's network or resources;
- It is forbidden to allow the computer device accessing the Company's network to act as a gateway between the Company's network and another network.
- Do not use VPN and Guest connections for Internet navigation not related to work activities;
- Do not use VPN connections for generally browsing the Internet and mass downloads, even if it is work related.

See the instruction for more details about the following:

- CONNECTING TO EPAM NETWORK VIA GLOBALPROTECT VPN;
- CONNECTING TO EPAM NETWORK VIA TERMINAL SERVICES GATEWAYS (TSG);
- WI-FI ACCESS.

## 3.8 ACCESS TO FTP

Source: EPAM_AccessToFTPWIGLO

See the instruction for more details about the following:

- FTP USAGE;
- FTP SERVER ACCESS;
- FILE SHARING VIA FTP;
- FTP CLIENT APPLICATIONS AND SETTINGS.

## 3.9 WEB RESOURCES ACCESS

Source: EPAM_WebResourcesAccessWIGLO

**OVERVIEW**

The following web resources are restricted (this is an inexhaustive list) at EPAM and should be blocked:

- Peer-to-peer (P2P) sites including torrents;
- Websites that distribute copyright objects (music, movie, etc.) without the consent of the copyright holders;
- Pornography websites;
- Key generator and cracking websites;
- Anonymizing sites that avoid any monitoring/tracking network system;
- Unsupported vulnerable sites added to the deny list by the IT Services Security group;
- Cryptocurrency mining websites for personal profit;
- Hacking sites used for infrastructure/application attacks.

It is not allowed to share EPAM provided internet services with 3rd parties, by Wi-Fi, VPN, EPAM cloud, or other means.

Company owned devices and personal devices connected to EPAM network may access the Internet via the corporate networks with restrictions according to this policy.

WEB CONTENT CATEGORIES UNDER BLOCKING

Web resources related to the prohibited categories are blocked by default for all EPAM-owned devices and any other device accessing the Internet through EPAM infrastructure.

In exceptional cases, a resource categorized as prohibited can be allowed if the following conditions were met:

- Clearly articulated project needs;
- The decision to allow such use is made by the IT Services Security team after risk assessment procedure.

Prohibited categories and full list of categories you may found on KB page: https://kb.epam.com/x/pN9ARg.

## 3.10 SOFTWARE

Source: EPAM_SoftwareLicenseManagementGuideline
EPAM_SoftwarePackageControlWIGLO

**SOFTWARE CODE OF ETHICS**

The illegal use and copying of computer software protected by the Copyright and other Intellectual Property Acts are unlawful acts that may entail criminal prosecution and are contrary to EPAM System's policy and internal regulations. EPAM Systems disapproves and condemns such use of software; therefore, in order to prevent it, EPAM has adopted the following basic principles:

- Under no circumstances will EPAM Systems encourage or tolerate the preparation or use of illegally copied software;
- To satisfy any valid software need, EPAM Systems will ensure licensed software for all computers at the right time and in sufficient quantity;

- EPAM Systems will at all times fulfill any license or purchase conditions regulating the use of the software obtained or used by it;
- In order to prevent the preparation and/or use of illegal software copies, EPAM Systems will implement stringent internal checks and take any necessary action against persons breaching the norms.

**TRIAL SOFTWARE**

Trial software installation is not allowed by default and should be approved by SAM team, the User should get the confirmation by submitting a request in SUPPORT.EPAM.COM before installing any trial/evaluation software.

**ZERO TOLERANCE**

It is strictly forbidden to operate, use, store, or transmit any of the following, using EPAM resources, including using own personal workstations, laptops during connection to EPAM infrastructure by Wi-Fi, VPN or other channels:

- peer-to-peer software (P2P) including torrent Clients/files except authorized software;
- software created for distribution of copyright objects (music, movie, etc.) without the consent of the copyright holders;
- pornography software including watching pornography sites;
- key generator and cracking software (including Wi-Fi access cracking applications);
- anonymizers and software that avoids any monitoring/tracking network systems;
- unsupported vulnerable software added to the block list by IT Security team (full list: https://kb.epam.com/x/45CdF);
- not enterprise/not corporate standard encryption tools;
- cryptocurrency mining software including usage of corporate resources (hardware, network, etc.) for personal commercial profit;
- hacking software used for infrastructure/application attacks.

## 3.11 ANTIVIRUS

Source: EPAM_AntivirusProtectionWIGLO

**General Principles**

- All Company's Endpoints (workstations, servers, virtual machines, laptops, registered personal devices which are used to process Company's data) must be protected with endpoint protection service which include set of security software with enabled features, firewall, anti-malware features.

**Exception Principles**

- The installation of a critical update is impossible due to business requirement. The responsible person must obtain written permission from the Project Manager and notify the Support Team. Compensating controls should be implemented;
- The sample of malware is used as part the development, testing security tools by appropriate EPAM units according to their business needs;
- Hardware or software configuration do not meet the minimum system requirements, according to vendor's specifications.

**Responsibilities**

Users must notify Support Team immediately if:

- the security software is not (or seems to be not) working properly;
- the security tool detects any threat on the endpoint device.

## 3.12 DATA ENCRYPTION AND DIGITAL SIGNING, COMPUTER PROTECTION

Source: EPAM_DataEncryptionandDigitalSigningWIGLO

This work instruction describes the encryption technologies used within EPAM to protect confidential data.

**MAIL ENCRYPTION**

EPAM uses Microsoft Office 365 as primary mail services for end users. Microsoft Outlook supports two encryption options:

- Microsoft 365 Message Encryption (Microsoft Purview Message Encryption). For usage Microsoft 365 Message Encryption the sender must have Microsoft 365 E3 or Microsoft 365 E5 license assigned. No certificates need to be stored on user workstation.
- S/MIME encryption. For usage S/MIME encryption the sender and recipient must have valid personal certificates installed locally. Mail application must support S/MIME standard (for example, Outlook, Thunderbird, etc.) and configured properly.

**ENDPOINT ENCRYPTION**

Endpoint encryption for Windows is implemented on user workstations and laptops using the Microsoft BitLocker software as part of a centralized EPAM enterprise solution.

Endpoint encryption for MacOS is implemented on user workstations and laptops using the FileVault software as part of a centralized EPAM enterprise solution.

For endpoint encryption on Ubuntu, it is recommended to use the ECryptfs utility. For additional information, refer to https://wiki.archlinux.org/title/ECryptfs.

To enable endpoint encryption on Debian:

- Create a small, unencrypted partition for /boot.
- Create a large partition for encrypted data and mark it for use as ‘physical volume for encryption’.
- Activate encryption with the Configure encrypted volumes item in the Debian installer.
- Create LVM on top of the encrypted physical volume.
- Inside LVM, create LV and VGs for /root, the swap, etc.

## 3.13 BACKUP

Source: EPAM_BackupDescriptionWIGLO

**GENERAL BACKUP PROCEDURES**

- All production servers, databases, project and personal shared network folders are under backup;
- The test servers, development servers, and user machines are not under backup. Users can store project files in a project folder and their own files in a personal folder on a file server.

**GENERAL RESTORING PROCEDURES**

- A user can request files to be restored via EPAM Service Portal, which must include the path and filename, and the date or version number of the file(s).

## 3.14 INFORMATION ASSET MANAGEMENT

Source: EPAM_InformationAssetManagementGuideline

This document defines the EPAM Data Classification scheme and establishes key principles and rules for Information asset handling based on the classification.

**KEY INFORMATION ASSET HANDLING REQUIREMENTS**

| Handling phase | Strictly confidential (sensitive) Data | Confidential Data | Public Data |
|---|---|---|---|
| **Labelling with confidentiality class** | Labelling must be applied to all documents based on EPAM approved templates.<br>Labelling must be applied to other cases. | | |
| **Data storage on local workstation or mobile device** | Strictly confidential or Confidential data **must not be** stored on local workstations.<br>When possible, strictly confidential or confidential data must be processed in online tools or storage without downloading it to a local workstation. | | No special precautions are required. |

| | | | |
|---|---|---|---|
| | When storage of strictly confidential or confidential data is required for productivity/convenience purposes, the data must be automatically synced up to EPAM online storage (SharePoint, OneDrive). | | |
| **Encryption** (electronic documents) | Encryption must be applied for:<br>• End point encryption for all Company-owned workstations and laptops<br>• End point encryption for personally owned devices used for processing EPAM data. Otherwise, personally owned devices must not be used for processing EPAM Strictly confidential data.<br>See Work Instruction: Data Encryption and Digital Signing and Work Instruction: Mobile Device Handling | Encryption must be applied for:<br>• End point encryption for all Company-owned workstations and laptops.<br>• End point encryption for personally owned devices used for processing EPAM data. Otherwise, personally owned devices must not be used for processing of EPAM confidential data.<br>See Work Instruction: Data Encryption and Digital Signing and Work Instruction: Mobile Device Handling | No special precautions are required. |
| **Access control**<br>a) Key principle;<br>b) Access to Systems and Applications;<br>c) Remote and Guest Access to Corporate Network;<br>d) Access to EPAM E-mail services;<br>e) Access to FTP. | a) A business needs to know the information, and approval from the data owner must be provided. Access is limited to as few persons as possible on a need to know basis. Information access and change is closely monitored using auditing tools. Information is controlled from creation to destruction. Release is only permitted by appropriate policies and procedures;<br>b) According to Work Instruction: Access to Systems and Applications;<br>c) According to Work Instruction: Remote and Guest Access to Corporate Network Resources;<br>d) According to Work Instruction: Access to E-mail Services;<br>e) According to Work Instruction: Access to FTP | a) Access is limited to as few persons as possible on a need to know basis. Information is controlled from creation to destruction. Release is only permitted by appropriate policies and procedures;<br>b) According to Work Instruction: Access to Systems and Applications;<br>c) According to Work Instruction: Remote and Guest Access to Corporate Network Resources;<br>d) According to Work Instruction: Access to E-mail Services;<br>e) According to Work Instruction: Access to FTP. | Available to the general public and for distribution outside of EPAM. |
| **Usage of personal mobile devices** | According to Work Instruction: Mobile Device Handling. | | |
| **Plugging a personal hardware**<br>(video cards, hard drives, other appliances) into corporate equipment (such as workstations) | Not allowed:<br>• Modifying a device by connecting to internal interfaces of the device. Plugging video cards, hard drives, other appliances into corporate equipment (such as workstation) unless it is approved by IT Security.<br>Allowed:<br>• External peripherals connected via USB and other external interfaces. | | |
| **Connecting personal devices** | 1. Connection to "EPAM Guests" access points (only Internet access) is allowed without extra steps. | | |

| | | | |
|---|---|---|---|
| (network enabled devices and equipment such as personal computers, smartphones, appliances, and gadgets) to EPAM data networks, by wire, wireless, VPN, EPAM cloud, or other channels) | 2. Any other type of connection must comply with Work Instruction: Mobile Device Handling. | | |
| **Storage of printed materials** | Store in a lockable enclosure only. See Work Instruction: Clear Screen and Clear Desk. | Storage in a lockable enclosure is recommended. See Work Instruction: Clear Screen and Clear Desk. | No special precautions are required. |
| **Delivery by Post within EPAM** | Sealed inter-office envelope marked and labelled "Strictly confidential" must be delivered directly to the addressee by someone who has access rights to the information or by someone trusted by the sender. The addressee must be notified of the delivery in advance. | Sealed inter-office envelope marked and labelled "Confidential". Notify the recipient in advance. | Available to the general public and for distribution outside of EPAM. |
| **Delivery by Post outside of EPAM** | 1st class USPS or equivalent mail service when it is possible as a minimum. Case by case analysis must be done to determine whether courier or other service is suitable.<br>Must be sent by registered and tracked post. | Must be sent by registered and tracked post. | No special handling is required. |
| **Transmission by E-mail within EPAM** | Apply label "Strictly confidential" to the e-mail.<br>For more information, please go to Knowledge base: https://kb.epam.com/x/w0wUXg .<br>Encryption should be applied when the data must be visible for recipient only. See Work Instruction: Data Encryption and Digital Signing. | No special handling is required. | No special handling is required. |
| **Transmission by E-mail outside of EPAM** | Apply label "Strictly confidential" to the e-mail For more information, please go to Knowledge base: https://kb.epam.com/x/w0wUXg .<br>Encryption must be applied when it is possible. Any attachments containing Strictly confidential (sensitive) personal data should be password protected. See Work Instruction: Data Encryption and Digital Signing | Encryption and digital signature must be applied when possible. See Work Instruction: Data Encryption and Digital Signing. | No special handling is required. |
| **Transmission by FAX**<br>1. Location of FAX machine; | 1. In an area not accessible to the general public and unauthorized persons; | 1. In area not accessible to the general public; | 1. No special handling is required; |

| | | | |
|---|---|---|---|
| 2. Use of FAX cover sheet;<br>3. Transmission safeguards. | 2. Coversheet must be labelled as "Strictly confidential";<br>3. Telephone notification prior to transmission and subsequent telephone confirmation of receipt must be obtained. | 2. Coversheet must be labelled as "Confidential";<br>3. Telephone notification prior to transmission and subsequent telephone confirmation of receipt must be obtained. | 2. Not required;<br>3. Reasonable care in dialing. |
| **Transmission via FTP** | Secure transmission protocol must be used (sftp). See Work Instruction: Access to FTP. | Secure transmission protocol must be used (sftp). See Work Instruction: Access to FTP. | No special handling is required. |
| **Sharing information**<br>a) Between projects belonging to the same Client;<br>b) Between projects belonging to different Clients;<br>c) With auditing companies, partners, existing or potential Clients, governmental agencies, or authorities. | a) Allowed when a consent from the Client is obtained;<br>b) Prohibited;<br>c) Prohibited by default. Exception: cases defined by legislation and particular agreements. Each exceptional case must be processed separately and specific security measures must be agreed and applied.<br>In case of concern about information sharing, seek approval from Chief Compliance Officer. | a) Allowed when a consent from the Client is obtained;<br>b) Prohibited;<br>c) Allowed if the following conditions are met:<br>1. There is no Strictly confidential data (If strictly confidential data is in place, the data must be obfuscated).<br>2. NDA is signed (not applied for government agencies or authorities where data sharing is required by law).<br>3. One of the following approvals is obtained:<br>• Option A - From Information Asset Owner;<br>• Option B - From Chief Compliance Officer or one of the following EPAM team heads within their areas of responsibilities: Enterprise Services, Contract review office, Security & Compliance, Compliance Assurance Office, Data Privacy Office, Legal. | No special precautions are required. |

| | | | |
|---|---|---|---|
| | | In case of concern about information sharing, seek approval from Chief Compliance Officer. | |
| **Communication channels and types** | According to Work Instruction: Communications. | | |
| **Spoken word**<br>(Conversation/meeting, telephone, mobile) | Close control and active measures to limit information to as few persons as possible must be taken.<br>1. Closed rooms must be used. Public areas are prohibited;<br>2. Avoid proximity to unauthorized listeners;<br>3. Speakerphone in a closed room is acceptable but should not be used;<br>4. No lobby announcements. | Close control and active measures to limit information to as few persons as possible must be taken.<br>1. Closed rooms must be used;<br>2. Avoid proximity to unauthorized listeners is recommended;<br>3. Speakerphone in a closed room is acceptable;<br>4. No lobby announcements. | No special handling is required. |
| **Monitors / computer screens** | Close control and active measures to limit information to as few persons as possible must be taken.<br>Position or shield to prevent viewing by unauthorized parties must be used. Possible security measures include: placement in an area without direct view by others; repositioning computer monitor; password protected screen saver; etc.<br>See Work Instruction: Clear Screen and Clear Desk. | Reasonable precautions to prevent inadvertent disclosure must be taken.<br>Position or shield to prevent viewing by non-employees, and password protected screen saver must be used.<br>See Work Instruction: Clear Screen and Clear Desk. | No special handling is required. |
| **Backup**<br>a) Procedure;<br>b) Retention region. | a) According to Work Instruction: Backup Description;<br>b) Offsite with respect to law requirements and EPAM internal regulation. | a) According to Work Instruction: Backup Description;<br>b) Offsite with respect to law requirements and EPAM internal regulation. | a) According to Work Instruction: Backup Description;<br>b) No special handling is required. |
| **Retention** | According to law requirements and EPAM Data Retention Policy. | | |
| **Destruction**<br>a) Method of destruction;<br>b) Electronic files;<br>c) Storage device / Removable media;<br>d) Paper recycling. | a) Destroy in a manner that protects Strictly confidential information;<br>b) Information must be securely deleted to make the original information non-retrievable (see details below);<br>c) Information must be overwritten or physically destroyed to make the original information non-retrievable (see details below); | a) Destroy in a manner that protects confidential information;<br>b) Information must be deleted to make the original information non-retrievable (see details below);<br>c) Information must be deleted or physically destroyed to make the original information non- | a) No special precautions are required;<br>b) No special precautions are required;<br>c) No special precautions are required; |

| | | | |
|---|---|---|---|
| | d) Destruction or shredding must be applied. | retrievable (see details below);<br>d) Destruction or shredding must be applied. | d) No special precautions are required. |
| **Secure disposal of electronic data** | All items of equipment containing storage media must be verified to ensure that any Strictly confidential or confidential data and licensed software has been removed or securely overwritten prior to disposal or re-use.<br>Storage devices containing strictly confidential or confidential information must be physically destroyed or securely disposed to make the original information non-retrievable.<br>Damaged storage devices containing strictly confidential data may require a risk assessment to determine if the items should be destroyed, repaired or discarded. The EUS Country Head should define the suitable process.<br>For more information, see the following documents:<br>• For mobile and personally owned devices - Work Instruction: Mobile Device Handling;<br>• For removable media - Work Instruction: Removable Digital Media Handling;<br>• EPAM standard procedure for the EPAM-owned hardware data erasure - Data Erasure Procedure (accessible for EUS team);<br>• The secure backup tape disposal process is described in Work Instruction: Backup Description. | | No special handling is required. |
| **Physical security**<br>a) Computer /workstation;<br>b) Mobile device (laptop, smartphone);<br>c) Printing documents;<br>d) Office access. | a) The following rules must be followed:<br>• Never leave unattended unless it is encrypted and password protected;<br>• Do not provide your device with EPAM data to unauthorized individuals;<br>• Keep away from magnetic fields;<br>• Prevent viewing screen in public places;<br>• Sign-off or power-off workstation or terminals not in use or when leaving work area.<br>b) Follow Work Instruction: Mobile Device Handling (when the document is published);<br>c) Follow Work Instruction: Clear Screen and Clear Desk;<br>d) Physical access to areas where Strictly confidential information is stored must be restricted. Strictly confidential information must be locked when left in an unattended room. See Physical and Infrastructural Security Policy | a) The following rules must be followed:<br>• Never leave unattended unless it is encrypted and password protected;<br>• Do not provide your device with EPAM data to unauthorized individuals;<br>• Keep away from magnetic fields;<br>• Prevent viewing screen in public places;<br>• Sign-off or power-off workstation or terminals not in use or when leaving work area.<br>b) Follow Work Instruction: Mobile Device Handling (when the document is published);<br>c) Follow Work Instruction: Clear Screen and Clear Desk;<br>d) Physical access to areas where confidential information is stored must be restricted. Confidential information must be locked when left in an unattended | No special precautions are required. |

| | | | |
|---|---|---|---|
| | | room. See Physical and Infrastructural Security Policy | |
| **Work Outside the Office** | According to Work Instruction: Work Outside the Office. | | |
| **Environmental controls** | According to Physical and Infrastructural Security Policy | | |
| **Removal of property** | During the removal of property data security must be assured.<br>For more information, see the following documents:<br>• Removing EPAM-owned equipment from office locations for Work outside the office purpose - Work Instruction: Work Outside the Office;<br>• EPAM standard procedure for the EPAM-owned hardware data erasure - Data Erasure Procedure (accessible for EUS team);<br>• For mobile and personally owned devices - Work Instruction: Mobile Device Handling;<br>• For removable media - Work Instruction: Removable Digital Media Handling;<br>• The secure backup tape disposal process is described in Work Instruction: Backup Description. | | |
| **Generative AI usage** | According to:<br>• Acceptable Use of Generative AI Policy<br>• Guideline: Generative AI Security and Privacy | | |

For more information about classes of sensitive information, and particular handling requirements please see document itself

## 3.15 DATA PRIVACY

Source: EPAM_DataPrivacyWIGLO
This work instruction specifies the rules, protection objectives and methods to be maintained at EPAM in accordance with EPAM Global Privacy Policy, Guideline: Data Privacy Framework and to promote compliance with these protection objectives.

**Avoiding Access to Production Data and PII by Default**

- EPAM prefers not to have access to production data (including personal information) and should seek alternatives to accessing, handling or processing such data;
- Client production data (either complete sets or masked parts) must not be used for testing on EPAM's premises;
- If any data that seems to be personal information is received from the Client, the Project Manager or Account Manager must seek written confirmation from the Client that the data is fictitious test data and not personal information / production data. Until such written confirmation is received from the Client, such data must be handled as if it were personal information and their usage for testing purposes must be suspended;
- Any EPAM application or service that is being developed for EPAM's own purposes should strictly follow the General Principles of protection by Confidentiality levels defined in: https://kb.epam.com/x/1Cxglg.

**Access and Processing Production Data and PII - Only under special conditions**

Personal information provided or made available by Clients must remain under the relevant Client's control and should preferably not be processed, stored, or saved on EPAM's internal systems.

- If EPAM is required to process, save or store such Client personal information on internal systems then EPAM must act as explicitly contracted with the Client and in accordance with the applicable laws and regulations and the agreed security requirements;
- Personal information must never be posted onto publicly available websites (no matter how secure) or stored on cloud-based service as we do not know where the actual information may be located.

**EPAM People General Duty**

- EPAM requires all EPAM People to handle personal information as prescribed in Data Privacy Work Instruction, to keep the personal information to which they have access strictly confidential, to access it only on a need to know basis, and not to use it, disclose it, transfer it, or disclose it to third parties other than as permitted under Data Privacy Work Instruction, or as permitted or required by the applicable law.

**EPAM People Confidentiality Agreement**

- Before starting work, each EPAM Person must agree to keep certain information confidential.

**Important Contact**

Data Privacy Management Office (Privacy@epam.com)

- Contact via e-mail at: "Privacy@epam.com" (Data Privacy Office).

**Reporting Obligations**

- Any suspected violation of the policies and principles set forth in the Data Privacy WIGLO must be immediately reported to the EPAM Data Protection Lead;
- Any suspected breach of security of the personal information must be immediately reported to the EPAM Security Operations Center and Data Privacy Office.

**Disclosing of Personal Information within EPAM**

- In general, EPAM People are not permitted to disclose any personal information to which they have access unless they have been specifically permitted to do so.

**Sharing of Sensitive Personal Information**

- EPAM does not disclose or share sensitive personal information with anyone within or across national boundaries without appropriate agreement, protection measures and activities required by Law.

**No Expectation of Privacy at the Workplace**

- EPAM People do not have a right of privacy or property interest in any part of the EPAM systems or facilities, including but not limited to any EPAM Person's work area, equipment, filing cabinets, desk drawers, purses, briefcases, bags, packages, suitcases, disks, storage media, personal computer, thumb drive, trash can (physical or electronic), email box, voicemail box, physical or electronic files, emails, written electronic message, telephone communications that are sent, received, forwarded, deleted, stored or transmitted using the EPAM systems or facilities (collectively "Employee Files");

Information or possessions that EPAM People wish to remain private must be maintained off premises;

EPAM may, with or without notice, in its discretion, subject to the relevant local policies and the Employee Privacy Notices, exercise the right to monitor, access, retrieve, inspect, delete, destroy any property situated on the EPAM premises and/or owned by EPAM, including but not limited to all such Employee Files, and any matter stored in, created, received, or sent over the EPAM systems (including, e-mail system, instant messaging systems used by any EPAM Person via EPAM's network or servers, telephone system), for any reason, at any time and without the permission of EPAM Person.

## 3.16 VULNERABILITY ASSESSMENT AND PENETRATION TESTING

Source: EPAM_VulnerabilityAssessmentAndPenetrationTestingWIGLO

This document defines the Vulnerability Assessment and Penetration Testing Work Instruction in order to secure EPAM's information assets and report the inherent vulnerabilities of a given system or a component.

**Vulnerability management agent**

Asset owners are responsible for ensuring that the vulnerability management agent is installed on their assets.

Generally the agent is deployed on assets automatically by the Vulnerability Management Team.
If agent has not been installed on the asset automatically, the asset owner must deploy the agent within reasonable timeframe following the instructions: https://kb.epam.com/x/xeJMb.

Asset owners are responsible for maintenance agents on their assets. They must ensure the agent is up-to-date and runs correctly.

**Container security**

Every container host must be equipped with a vulnerability management sensor provided by the Vulnerability Management team.

**Public cloud account compliance**

Public cloud accounts are constantly monitored for compliance with standards and best practices.
For more information go to https://kb.epam.com/x/YV5cPQ.

Each detected non-compliance must be fixed within SLA.

When detected issues cannot be fixed within SLAs, the Asset Owner must request an exception via support.epam.com. The Vulnerability Management Team analyzes the exception request and sets an expiration date (standard 180 days). Once the approved exception period has passed, the vulnerability may be solved.

**Asset exposure to the Internet**

Each asset to be exposed to the Internet must pass additional security checks by the Vulnerability Management team. Security check consists of manual penetration testing and automated vulnerability scanning for OS-level vulnerabilities and web application vulnerabilities.

All issues detected within security check and reported to the Asset owner must be fixed before the Asset is exposed to the Internet.

Assets that require EPAM domain authorization must use two-factor authentication by default.

Exposed assets are subject to be moved to DMZ.

BSS assets must be exposed through CloudFlare.

**Finding closure guideline**

The timelines for fixing a reported vulnerability are listed in the table below. Asset Owners of respective Business Units are responsible for closing/fixing the open vulnerabilities as per the below timelines in all systems (Development, Testing, Staging, Production). Asset Owners must fix the vulnerabilities themselves (in case of inability to fix them, they can ask the Service Desk for assistance).

| # | Priority | Severity Level | SLA (Remediation Time Frame) | AMBER STATUS on DC | RED STATUS on DC |
|---|---|---|---|---|---|
| 1 | Fix Now | Level 0 | 0 Days | | |
| 2 | Urgent | Level 5 | 5 Days | >=0 Days | >=31 Days |
| 3 | Critical/Very High | Level 4 | 30 Days | >=0 Days | >=31 Days |
| 4 | Major/High | Level 3 | 60 Days | N/A | N/A |
| 5 | Medium | Level 2 | 90 Days | N/A | N/A |

## 3.17 INCIDENT HANDLING

Sources: EPAM_UniversalRequestManagementProcessDescription
EPAM_InformationSecurityIncidentHandlingWIGLO

**Responsibilities**

- All EPAM People are responsible for reporting known or suspected information or security incidents;
- All individuals involved in investigation of a security incident must maintain confidentiality unless the Head of Global Operations authorizes information disclosure in advance.

**Detection by EPAM People**

- All EPAM People are responsible for reporting about any suspicious events, IS breaches and weaknesses, possible fraudulent activities, and other anomalies during their daily work to the SUPPORT.EPAM.COM.

**Specific requirements for Data privacy incidents**

- Data privacy incidents are considered a subtype of security incidents. Additional requirements are established for data privacy incidents in the EPAM_InformationSecurityIncidentHandlingWIGLO.

## 3.18 SUPPORT TEAM SERVICE

Source: EPAM_SupportTeamServiceUsageWIGLO

A user can raise a request through the communication channels mentioned below in the order of preference:

- SUPPORT.EPAM.COM;

- E-mail sent to support@epam.com;
- Phone call to the nearest to you EPAM office and ext. 50911, MS Teams call to ext. 50911 or "Help Desk" user.

## 3.19 CLIENT'S SPECIFIC REQUIREMENTS AND REQUESTS

Source: EPAM_ProjectManagementGuideline,
EPAM_ProcessingOfClientComplianceRequirementsGD

**Information security management**

The AM is responsible for the following:

- Identification and agreement of Client specific security requirements;
- Provision of resources for implementation and maintenance of Client specific security requirements.

The DM or PM is responsible for the following:

- Implementation of security requirements defined by Client and EPAM rules.

**Support with compliance questions from Clients and third parties**

EPAM compliance teams provides necessary information and support with respect to the nature of requests, Client or third-party needs. It can be a compliance information about EPAM, EPAM services, processes, environments, controls. The request must be sent to Compliance Contract Review Office via email: WFT Client Compliance Assurance.

## 3.20 PROTECTION RULES FOR UNITS PROCESSING SENSITIVE PERSONAL DATA

Source: EPAM_ProtectionRulesForUnitsProcessingSensitivePII

**Verify if the requirements are applicable for you**

- If you are a member one of the following group, then the rules from Protection Rules for Units Processing Sensitive PII WIGLO are applicable for you: "WFT Data Security Controlled"; "WFT Data Security Controlled Group 1"; "WFT Data Security Controlled Group 2"; "WFT Data Security Controlled Group 3"; "WFT Data Security Controlled Group 4"; "WFT Data Security Controlled Group 5";
- To determine if you are a member of this group, please see Appendix A in Protection Rules for Units Processing Sensitive PII WIGLO.

SECURITY REQUIREMENTS

1. ADMINISTRATIVE AND LEGAL CONTROLS

Agreements with each member of the unit:

- Non-Disclosure Agreement must be signed.

Participation of each member of the unit in training courses:

- EPAM Global Data privacy training;
- EPAM training for units processing strictly confidential (sensitive) personal data.

Background check for each member of the unit.

2. PHYSICAL SECURITY CONTROLS

- SECURITY PERIMETER
  - Unit/team members with access to Sensitive personal data must be physically segregated or isolated work area should be implemented;
  - The room must be equipped with physical or electronic locker;
  - Rooms must be closed when no one is in the room;
  - Room entrance can be covered with CCTV (Closed-circuit television, also known as video surveillance).
- PRINTING EQUIPMENT

- Printer is not shared with other units/teams;
- Shredder must be installed and used in each room, where printer is in place.

- SECURITY MEASURES FOR PAPER DOCUMENTS
  - Enough space, accuracy and documents identification in storage;
  - Lockable enclosure for storages must be used;
  - Fire protection controls must be in place.
- TRANSMISSION OF MEDIA WITH SENSITIVE PERSONAL DATA in electronic format:
  - Within EPAM: office envelope marked and labelled as "Confidential/Strictly confidential";
  - Outside of EPAM:
    - 1st class USPS (US Postal Service) or equivalent mail service;
    - Must be sent by registered or tracked post.
  - For exceptional cases, obtain approval from unit head.

3. LOGICAL SECURITY CONTROLS

- CONFIGURATION OF USER EQUIPMENT
  - Any device used for access PII, must be configured according to the following EPAM rules:
    - Work Instruction: EPAM Workstation Hardening Standards and
    - Work Instruction: Mobile Device Handling.
- FILE SHARING OF PERSONAL DATA
  - It is prohibited to use non-corporate tools for sharing PII except cases defined in the Work Instruction: Access to Company and Customer Data. It is recommended to use the following tools:
    - EPAM SharePoint;
    - EPAM OneDrive.
- TRANSMISSION OF INFORMATION/DOCUMENTS WITH STRICTLY CONFIDENTIAL PERSONAL DATA IN EMAIL COMMUNICATION
  - Apply label "Strictly confidential" to the e-mail. For more information, please go to Knowledge base: https://kb.epam.com/x/w0wUXg;
  - Encryption should be applied when the data must be visible for recipient only. Details are defined in: Work Instruction: Data Encryption and Digital Signing.

## 3.21 MOBILE DEVICE HANDLING

Source: EPAM_MobileDeviceHandlingWIGLO

**CRITERIA FOR ELIGIBLE USE OF COMPANY OWNED MOBILE DEVICE OR PERSONALLY OWNED COMPUTING DEVICE**

- The criteria for usage of Company owned mobile device or personally owned computing device must be met before processing or accessing EPAM or Client confidential or strictly confidential (sensitive) data;
- See the instruction to verify if you are eligible to use Company owned mobile device or personally owned computing device.

**SECURITY REQUIREMENTS**

The defined requirements must be implemented for Company owned mobile device or personally owned computing device before processing or accessing EPAM or Client confidential or strictly confidential data.

ADMINISTRATIVE CONTROLS

- Ensure that eligibility criteria for device usage are met;
- Storage of EPAM/Client credentials on device is prohibited;

- Strictly confidential or confidential data must not be stored on any type of mobile device. When possible, strictly confidential or confidential data must be processed in online tools or storage without downloading it to a local workstation;
- If your device was lost or stolen, inform EPAM Support team immediately.

PHYSICAL SECURITY CONTROLS

- Controls are defined in Work Outside the Office section.

LOGICAL SECURITY CONTROLS

- Company owned mobile device - CONFIGURATION OF Mobile devices with **computer** operating system
  - Device must be configured according to the Company rules (defined in Workstation Hardening Standards section).
- Company owned mobile device - CONFIGURATION OF Mobile devices with **mobile** operating system
  - OPSWAT must be used:
    - OPSWAT must be installed;
    - Verification with OPSWAT of the device must confirm compliance of the device with EPAM's security policy.
  - Mobile devices with mobile operating system must be protected by password. The following settings must be set:
    - Password protection;
    - Automatic lockout after 2 minutes;
    - Internal storage should be encrypted;
  - OS version should be supported by the vendor (no end-of-life operating systems).
- Personally owned computing device - CONFIGURATION OF devices with any operating system (devices without EPAM image)
  - OPSWAT must be used:
    - OPSWAT must be installed;
    - Verification with OPSWAT of the device must confirm compliance of the device with EPAM's security policy.
  - Properly licensed and up to date software;
  - For devices with mobile operating system the device OS should not be rooted/jail-broken;
  - OS version should be supported by the vendor (no end of life operating systems);
  - Up-to-date antivirus:
    - For devices with computer operating system: mandatory requirement;
    - For devices with mobile operating system: when possible.
  - Password protection and auto-locking:
    - For devices with computer operating system: locked automatically after 10 minutes;
    - For devices with mobile operating system: locked automatically after 2 minutes.
  - Firewall must be enabled for personal owned devices with computer OS;
  - Encryption for system drive must be enabled for personal owned devices with computer OS;
  - Encryption for internal storage must be enabled for owned devices with mobile OS;
  - Properly up to date 3rd party software.
- Special requirements for devices with computer operating system for members of units with access to strictly confidential (sensitive) personal data:
  - By default, personally owned devices without EPAM image with computer operating system are prohibited to access strictly confidential data.

## 3.22 WORKSTATION HARDENING STANDARDS

Source: EPAM_WorkstationHardeningStandardsWIGLO

**COMPANY MANAGED COMPUTING DEVICES**

- Company managed computing devices are configured by EPAM teams according to EPAM_WorkstationHardeningStandardsWIGLO.

**RESPONSIBILITY OF EACH USER**

- Each user must monitor and verify on regular basis that OPSWAT meta-access agent is running, and its status confirms compliance with EPAM's security policy.

**CONFIGURATION OF CLIENT'S DEVICES WITH CLIENT MANAGED SYSTEM**

- Client device must be configured according to the Client's requirements;
- Users must use the device according to Client's requirements communicated directly or during project specific training.

## 3.23 WORK OUTSIDE THE OFFICE

Source: EPAM_WorkOutsideTheOfficeWIGLO

**CRITERIA FOR ELIGIBLE WORK FROM OUTSIDE EPAM PREMISES AND APPROVAL REQUIREMENTS**

By default, the following types of work from outside EPAM premises are allowed and do not require approvals:

- EPAM Anywhere unless it is specifically forbidden by particular Client;
- Working at the Client premises;
- Any person during business trip;
- Any person with Permanent approach to work from outside EPAM premises when it is already approved.

The table below defines the eligibility criteria for typical cases:

| Type of EPAM unit or project | Restrictions | Eligibility to work / Required approval |
|---|---|---|
| EPAM non-production units and projects | There are no documented restrictions to work from outside the office. | • Allowed after approval from Unit manager. |
| | By default, work from outside the office is not allowed for the following cases unless special exception is approved:<br>• Unit works in protected area;<br>• Unit works with sensitive personal data;<br>• The remote worker's job requires physical presence at an office location;<br>• There are country-specific legal constraints, or additional constraints imposed by the Company (e.g., requirement for accounting team to work from protected area). | • Cases defined in Restrictions column can be allowed as exception only (e.g., pandemic, etc.). Exception can be approved by Unit manager. |
| EPAM production units and projects | There are no documented restrictions to work from outside the office. | • Allowed. Approval from Account or Delivery manager is needed. |
| | By default, work from outside the office is not allowed for the following cases unless special exception is approved:<br>• Directly prohibited by the Client (in MSA/SOW etc.); | • Allowed for project works onsite, at the Client premise;<br>• Cases defined in Restrictions column can be allowed as exception only (e.g., pandemic, etc.):<br>– Case 1 - There are no project specific secure environment: |

| | | |
|---|---|---|
| | • Project works in clean room/closed perimeter environment;<br>• There are country-specific legal constraints, or additional constraints imposed by the Company. | • Approval from Client;<br>• Approval from Account or Delivery manager.<br>– Case 2 - There is project specific secure environment (ODC, specific logical controls):<br>• Approval from Client;<br>• Approval from Account or Delivery manager;<br>• Account or Delivery manager must notify Global Security and Resiliency team (WFT Secured Perimeter Request). |

**Securing devices and data outside the office**

Physical Security Controls

- EPAM's confidential documents or materials taken from Company offices must be kept in a designated work area and handled with the same level of security as within the Company office;
- If documents or materials are required to be in a locked drawer in the Company office, then the same is required at the remote worker's designated work area;
- The same level of Company policies regarding disposal of sensitive printed documents applies to a remote worker's workspace;
- Equipment must be protected from damage during transportation. Please ensure all devices are properly secured in transit;
- Equipment which contains or provides access to EPAM or Client's data and/or networks must not be provided to non-authorized individuals including family members;
- Personally owned or Company owned computing devices used for work with EPAM or Client's data must not be left unattended in a vehicle, public places, etc.;
- Lock screen must be activated whenever the user leaves their workplace, password must be required for unlocking;
- Eavesdropping must be prevented in public places and other non-EPAM premises;
- The remote worker must take precautions to ensure that monitor screens and/or printed materials with confidential or sensitive data are not visible to others;
- When possible, laptops must be secured with a security cable.

Logical Security Controls

Primary responsibility of user is to monitor and verify on regular basis that OPSWAT meta-access agent is running and confirm compliance with EPAM's security policy.

See the instruction for more details about the following:

- WORKPLACE SETUP
- EQUIPMENT HANDLING
  – Removing EPAM-owned equipment from office locations
  – Obtaining an EPAM laptop to working from home
  – Usage of personally owned equipment (desktops, laptops)
  – Usage of Client computing equipment to work from home
- REQUIREMENTS FOR WORK AT CLIENT PREMISES
- REQUIREMENTS FOR PROJECTS WITH SPECIFIC SECURE SETUP WORKING OUTSIDE THE OFFICE (HOME ODC)

## 3.24 REMOVABLE DIGITAL MEDIA HANDLING

Source: EPAM_RemovableDigitalMediaHandlingWIGLO

COMPANY OWNED OR PERSONNALY OWNED RDM DEVICE

| Type of EPAM unit or project | Criteria of eligibility |
|---|---|
| EPAM non-production units and projects | **Prohibited** under the following conditions:<br>• There are additional constraints imposed by the Company.<br>**Permitted** under the following conditions:<br>• There are no additional constraints imposed by the Company and;<br>• Security requirements defined in Section REQUIREMENTS FOR RDM DEVICE HANDLING are met. |
| EPAM production units and projects | **Prohibited** under the following conditions:<br>• Directly prohibited by the Client (in MSA/SOW etc.);<br>• Project works in clean room / closed perimeter environment (unless explicitly approved by the Client);<br>• Project works onsite, at the Client premise (unless explicitly approved by the Client);<br>• There are country-specific legal constraints, or additional constraints imposed by the Company;<br>• Project has access to production data.<br>**Permitted** under the following conditions:<br>• There are no additional constraints imposed by the Company and;<br>• Security requirements defined in Section REQUIREMENTS FOR RDM DEVICE HANDLING are met. |

See Removable Digital Media Handling WIGLO for more details about the following:

- REQUIREMENTS FOR RDM DEVICE HANDLING;
- REQUIREMENTS FOR DATA REMOVAL;
- RECOMMENDATIONS.

## 3.25 ACCEPTABLE USE OF GENERATIVE AI

Source: EPAM_AcceptableUseOfGenerativeAIPolicy

See the Policy for more details about the following:

- Approval Steps for Acceptable Use of Generative AI;
- Prohibited Uses of Generative AI;
- Generative AI Compliance Assessment;
- Generative AI Input and Output Content Types.

## 3.26 PUBLIC MEDIA STATEMENTS AND SOCIAL MEDIA

Source: EPAM_PublicMediaStatementsAndSocialMediaPolicy

MEDIA STATEMENTS - ONLY MAY BE MADE BY SPECIFICALLY AUTHORIZED PEOPLE

- Media statements about EPAM or on behalf of EPAM must be made only by the authorized person EPAM designates to make the statement.

PUBLIC SPEAKING OPPORTUNITIES, CONFERENCES, AND EVENTS

- Only properly authorized executives/managers are permitted to speak on behalf of EPAM at public events. Similarly, only authorized and EPAM media-trained executives may speak to the media on behalf of EPAM or provide EPAM-authorized media statements.

STATEMENTS, POSTS AND LINKS ON PERSONAL SOCIAL MEDIA

- Before making any statement, post or link on Personal Social Media, you must read and follow the rules below and EPAM's Social Media Guidelines [Social Media Guidelines].

APPROVED SOCIAL MEDIA LINKS

- Only EPAM-approved Social Media content may be used or linked to your Social Media account. Official EPAM global social media accounts can be found in: EPAM_PublicMediaStatementsAndSocialMediaPolicy.

## 3.27 BUSINESS CONTINUITY AND DISASTER RECOVERY

Source: Business Continuity Section in ECL

SAFETY OF HUMAN RESOURCES

- When a disaster occurs, the first thing is to ensure that everyone is safe, then IT facilities and resources must be recovered, and operation must be restored.

DISASTER NOTIFICATION LIST

- Be aware about Emergency contacts and Key EPAM contacts.

ACTIONS DURING A DISASTER

- Follow the instructions from the Business Continuity Team.

## 3.28 OFFBOARDING

Source: EPAM_OffBoardingExitPolicy

In circumstances where an employee chooses to pursue other opportunities outside of EPAM or where the Company chooses to end their employment or other covered relationship, it is important to ensure the employee's departure is handled in an organized manner.

Actions required for the correct handling of equipment and data of EPAM and EPAM Clients:

- **Return work equipment** to the IT Service Department: laptops, headphones, adaptors, chargers, etc. Reporting any lost, stolen or damaged property immediately to your Line/Resource Manager. In case of any question - please contact WFA IT Service Department team in your office location or WFT IT Services [Location] team;
- **Properly handle Company and Client data**. Check any Company/Client data (pdf/word/excel documents, notes, etc.) on all personal devices and personal cloud storages (iCloud/Google Drive, etc.):
  - Place/return Company data into Company storages;
  - Remove Company/Client data from all personal devices and personal cloud storages (iCloud/Google Drive, etc.).
- **Return any Client property issued (laptops, monitors, etc.).** It can be returned to your Line/Resource Manager.

# 4 COUNTRY / CITY LEVEL REQUIREMENTS

## 4.1 COUNTRY / CITY SPECIFIC REQUIREMENTS AND RECOMMENDATIONS

Source: Employee Handbook (when it is available)

The Handbook will help you navigate Company's policies and procedures related to topics like equal employment opportunity and accommodations, onboarding and offboarding, working schedule, time off from work and leaves of absence, workplace arrangements, and compensation and benefits.

- Review and follow the requirements and recommendations from local Employee Handbook when it is available for your Country/City.

# 5 ACCESS TO AND MONITORING OF IT RESOURCES

To the greatest extent permitted under applicable law, EPAM reserves the right to monitor IT Resources for all or any of the purposes described in Introduction section and in the manner described in Global level and Country/City level requirements.

Data Privacy Management Office must oversee the use of Data Protection Impact Assessments to confirm that any monitoring is necessary to achieve the purposes described in Introduction section and that such monitoring is performed in a reasonable and proportionate manner. The Data Privacy Management Office must be responsible for overseeing that the assessments are updated periodically as circumstances warrant and must obtain the approval of EPAM's Data Privacy Lead for any new monitoring activities.

## 5.1 MONITORING ACTIVITIES

EPAM monitors the use of IT Resources to protect the security of such IT Resources and to preserve EPAM's interests. EPAM may conduct monitoring activities for the following reasons:

- Protecting EPAM assets including the security of IT Resources, by conducting routine and non-routine monitoring of EPAM's networks and databases for viruses, spam, intrusion detection, malware or other malicious code, or for other security purposes;
- Preventing or detecting conduct that may violate EPAM policies or procedures, other EPAM rules, or other inappropriate or unlawful conduct (where EPAM has a reasonable suspicion that such conduct may have occurred);
- Preventing theft or unauthorized disclosure of EPAM's property or data;
- Conducting internal investigations or audits.

This may include monitoring of inbound and outbound emails through an automated process that filters the content of emails for these legitimate purposes. As part of this filtering process, email (and attachments) containing certain pre-selected words or material or of a particular file size may be automatically blocked and potentially reviewed by appropriate people.

In addition, in the event EPAM has a reasonable suspicion of unlawful or inappropriate activity on the part of a Person , including a violation of EPAM policies and procedures, or in connection with complying with legal obligations in connection with pending or threatened litigation, EPAM may engage in an internal investigation concerning the identified Person. Such investigation may include monitoring of email, including the content of such emails or other communications, as well as a more thorough search of the Person's computer workstation and other activities on IT Resources to the extent permitted by and in accordance with applicable law.

Automated monitoring of IT Resources for spam, viruses, and other computer threats, to protect EPAM's data or systems and/or prevent other conditions that might jeopardize EPAM's data or systems or for blocking and statistical purposes is necessary on a systematic and continuous basis for the proper management and maintenance of IT Resources. Additionally, EPAM blocks access to certain Internet sites considered as offensive or for productivity and security reasons. In the event of abusive usage of Internet, EPAM may conduct further monitoring of Internet usage to prevent such abuse.

# POLICY GOVERNANCE

The owner of this Policy is the Head of Compliance Assurance Office.

The approver of this Policy is Head of Enterprise Compliance.

The Head of Compliance Assurance has a right to re-approve the document if changes are related to copying information from other published QMS documents.

Compliance Assurance Office is responsible for its regular review/update.

| REVISION HISTORY | | | | | |
|---|---|---|---|---|---|
| Ver. | Description of Change | Author | Date | Approved | |
| | | | | Name | Date |
| 0.1 | Draft created | Oleksandr Dmytriyev | 26-Feb-2018 | | |
| 0.2 | Reviewed | Leyla Razavi | 03-Apr-2018 | | |
| 0.3 | Reviewed and updated | Nandor Gurovits | 03-Apr-2018 | | |
| 0.4 | Updated | Oleksandr Dmytriyev | 27-Apr-2018 | | |
| 1.0 | QA review done with technical corrections | Aliaksandra Valozhynskaya | 28-Apr-2018 | Sergey Sinkevich | 30-Apr-2018 |
| 2.0 | Document name was updated | Oleksandr Dmytriyev | 04-May-2018 | Sergey Sinkevich | 04-May-2018 |
| 2.1 | Updated pp.4.6, 4.18, 4.19 | Aliaksandra Valozhynskaya | 02-Aug-2018 | | |
| 3.0 | QA review | Oleksandr Dmytriyev | 02-Aug-2018 | Andrei Zemliakou | 02-Aug-2018 |
| 3.1 | Updated with p.4.14 | Aliaksandra Valozhynskaya | 20-Aug-2018 | | |
| 3.2 | QA review | Oleksandr Dmytriyev | 20-Aug-2018 | Andrei Zemliakou | 21-Aug-2018 |
| 3.3 | Updated | Ivanna Zaritska | 20-Nov-2018 | | |
| 4.0 | QA review | Oleksandr Dmytriyev | 26-Nov-2018 | Andrei Zemliakou | 03-Dec-2018 |
| 4.1 | Updated | Ivanna Zaritska | 18-Mar-2019 | | |
| 5.0 | QA review | Oleksandr Dmytriyev | 20-Mar-2019 | Andrei Zemliakou | 20-Mar-2019 |
| 5.1 | Updated | Ivanna Zaritska | 18-Nov-2019 | | |
| 6.0 | QA review | Vitalii Denysov | 18-Nov-2019 | Andrei Zemliakou | 18-Nov-2019 |
| 6.1 | Updated | Oleksandr Dembytskyi | 18-Mar-2020 | | |
| 7.0 | QA review | Ivanna Zaritska | 20-Mar-2020 | Andrei Zemliakou | 24-Mar-2020 |
| 7.1 | Updated p.4.20, added p.4.21 and p.4.22. | Oleksandr Dembytskyi | 16-Apr-2020 | | |
| 7.2 | Sections 4.20, 4.21, 4.22 reviewed | Oleksandr Dmytriyev | 16-Apr-2020 | | |
| 8.0 | QA review | Vitalii Denysov | 21-Apr-2020 | Andrei Zemliakou | 21-Apr-2020 |
| 8.1 | Updated | Oleksandr Dembytskyi | 01-Dec-2020 | | |
| 9.0 | QA review | Valeriy Neumoin | 01-Dec-2020 | Andrei Zemliakou | 03-Dec-2020 |
| 9.1 | Updated | Oleksandr Dembytskyi | 19-Apr-2021 | | |
| 10.0 | QA review | Aliaksandra Valozhynskaya | 20-Apr-2021 | Andrei Zemliakou | 22-Apr-2021 |
| 10.1 | Technical changes | Viktoryia Shtukar | 03-Nov-2021 | | |
| 10.2 | Updated in according to the latest changes in EPAM ISMS policies | Oleksandr Dembytskyi | 21-Dec-2021 | | |
| 11.0 | QA Review | Alena Siakeryna | 22-Dec-2021 | Andrei | 22-Dec-2021 |

| REVISION HISTORY | | | | | |
|---|---|---|---|---|---|
| Ver. | Description of Change | Author | Date | Approved | |
| | | | | Name | Date |
| | | | | Zemliakou | |
| 11.1 | Updated in accordance with the latest changes in EPAM ISMS policies | Oleksandr Dembytskyi | 10-Jun-2022 | | |
| 12.0 | QA review | Nadiia Romanova | 11-Aug-2022 | Sergey Sinkevich | 22-Aug-2022 |
| 12.1 | Updated in accordance with the latest changes in EPAM ISMS policies. Reference and summary of Work Instruction: Vulnerability Assessment and Penetration Testing were added. | Oleksandr Dembytskyi | 09-Aug-2023 | | |
| 13.0 | QA Review | Alena Siakeryna | 11-Aug-2023 | Sergey Sinkevich | 11-Aug-2023 |
| 13.1 | Technical change: the title of Code of Ethical Conduct was corrected | Iryna Bulat | 09-Nov-2023 | | |
| 13.2 | QA Review | Oleksandr Dembytskyi | 13-Nov-2023 | Andrei Zemliakou | 13-Nov-2023 |
| 13.3 | Technical change: link to the Interaction Management Process Description has been changed to the Universal Request Management Process Description | Iryna Bulat | 22-Nov-2023 | | |
| 13.4 | QA Review | Oleksandr Dembytskyi | 22-Nov-2023 | Andrei Zemliakou | 22-Nov-2023 |
| 13.5 | Updated in accordance with the latest changes in EPAM ISMS policies. Reference and summary of the Acceptable Use Of Generative AI Policy has been added. | Oleksandr Dembytskyi | 31-Oct-2024 | | |
| 13.6 | New sections added: Public media statements and social media, Offboarding. Section updated: Customer's specific requirements and requests | Oleksandr Dmytriyev | 08-Nov-2024 | | |
| 14.0 | QA Review | Irakli Gagoshidze | 12-Nov-2024 | Sergey Sinkevich | 12-Nov-2024 |
| 14.1 | Work Instruction has been promoted to the Policy. | Philip Storm | 09-Jul-2025 | | |
| 14.2 | Formatting according to the Policy Template | Oleksandr Dembytskyi | 09-Jul-2025 | | |
| 14.3 | Updated | Oleksandr Dembytskyi | 14-Jul-2025 | | |
| 14.4 | Reviewed | Philip Storm | 17-Jul-2025 | | |
| 15.0 | QA Review | Iryna Bulat | 18-Jul-2025 | Sergey Sinkevich | 18-Jul-2025 |