EPAM Systems, Inc. v. Rao, No. 2:25-cv-06260-WB (E.D. Pa.)

Defendant's Motion for Leave to Supplement the Record on Plaintiff's Motion for Sanctions (ECF No. 58) Concerning the August 10, 2025 Document (Oslick Exhibit 9), With Discovery Served After Briefing Closed

# EXHIBIT 5

Excerpts of Rao's served discovery responses concerning the August 10, 2025 document, cited in Exhibit 1 (served August 28, September 5, and September 7, 2026), with caption and signature pages; two nonparty names covered in this public copy

EPAM Systems, Inc. v. Rao, No. 2:25-cv-06260-WB (E.D. Pa.)

# EXHIBIT 5

## Excerpts of Rao's served discovery responses concerning the August 10, 2025 document, cited in Exhibit 1

Each excerpt is copied from the response as served, with the document's caption page and its signature, certification, or verification page. Page numbers below are the served documents' own page numbers. Pages not reproduced are omitted only for length; complete copies were served on EPAM on the dates shown.

In this public copy the names of two individuals who are not parties to this action, which appear in the text of Requests for Admission Nos. 1 and 8 on pages 1 and 4 of Part A, are covered by black boxes. EPAM's motion to seal (ECF No. 60) asks the Court to protect the identities of nonparties it refers to as Executives #1 through #3, and Rao proposed continuing that convention in any exhibit displayed publicly (ECF No. 66 at 1). The copies served on EPAM are unredacted, and an unredacted copy will be provided to the Court on request. Nothing else is altered.

**A. Rao's Responses to EPAM's First Set of Requests for Admission, served August 28, 2026**

caption; Request No. 9 and response (pp. 4-5); signature and Rule 26(g) certification (p. 10) (4 pages)

**B. Rao's Responses to EPAM's First Request for Production, served September 5, 2026**

caption; Request No. 1 response, the six Takeda-Synapse archives (pp. 27-28); Request No. 9 response (p. 77); signature (p. 304) (5 pages)

**C. Rao's First Supplemental Responses to EPAM's First Request for Production, served September 7, 2026**

caption; Requests Nos. 67 (pp. 3-5), 7-8 (pp. 6-8), 9 (p. 10), and 23 (pp. 11-12); signature (p. 16) (11 pages)

**D. Rao's Second Supplemental Answers to EPAM's First Set of Interrogatories, served September 7, 2026**

complete: Interrogatories Nos. 12, 6, and 1 (pp. 1-6); signature and Rule 26(g) certification (p. 7) (7 pages)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **EPAM Systems, Inc.,**<br>*Plaintiff/Counterclaim-Defendant,*<br><br>**v.**<br><br>**GOWTHAM RAO, MD, PhD,**<br>*Defendant/Counterclaim-Plaintiff.* | **CIVIL ACTION**<br><br><br><br><br><br>**NO. 2:25-cv-06260-WB** |

**DEFENDANT AND COUNTERCLAIM-PLAINTIFF GOWTHAM RAO'S RESPONSES AND OBJECTIONS TO PLAINTIFF EPAM SYSTEMS, INC.'S FIRST SET OF REQUESTS FOR ADMISSION (NOS. 1–18)**

Pursuant to Federal Rules of Civil Procedure 26 and 36, I, Defendant and Counterclaim-Plaintiff Gowtham Rao, MD, PhD, proceeding *pro se*, respond and object to Plaintiff and Counterclaim-Defendant EPAM Systems, Inc.'s ("EPAM") First Set of Requests for Admission (Nos. 1–18), served on August 10, 2026, as follows.

## PRELIMINARY STATEMENT

These responses are based on the information known or readily obtainable after reasonable inquiry as of **August 28, 2026**. Each response states its own objection, admission, denial, or qualification. No general objection is incorporated into a numbered response. A qualified response admits what is true and denies or declines to admit only the remainder. I reserve objections to the admissibility of EPAM's exhibits, including objections based on completeness, foundation, authentication, and hearsay; those reservations do not replace the substantive Rule 36 responses below.

## RESPONSES AND SPECIFIC OBJECTIONS

### REQUEST FOR ADMISSION NO. 1

*Admit that you had conversations with* [redacted] *on September 18-19, 2025.*

**Response:** Admitted.

## REQUEST FOR ADMISSION NO. 8

*Admit that Exhibit D is a true and accurate copy of a memorandum prepared by a generative artificial intelligence program, summarizing a conversation you had with [redacted] on September 18, 2025.*

**Response:** Admitted in part and qualified in part. Exhibit D appears to be a copy of a machine-generated memorandum associated with my September 18, 2025 conversation with [redacted]. The memorandum labels him "[redacted] EPAM." Its format and content appear similar to the memorandum I recall. After reasonable inquiry, including review of Exhibit D and the available iDS source information, the information I know or can readily obtain is insufficient to determine whether Exhibit D is a complete and unaltered reproduction of the material collected by iDS. A passive listening application generated the source memorandum. I did not edit, correct, or delete the source memorandum. My admission is limited to the apparent subject and provenance of Exhibit D. It does not admit that the memorandum is a verbatim, complete, or substantively accurate account of the conversation. I do not adopt the model's characterizations, attributions, inferences, or legal conclusions. I also cannot attest whether the memorandum contains an AI-generated hallucination or overstatement, adds content attributable to the model's pretrained weights rather than the underlying conversation, or reflects regression toward the mean or another generic model pattern. Except as expressly admitted, Request No. 8 is denied.

## REQUEST FOR ADMISSION NO. 9

*Admit that Exhibit E is a true and accurate copy of a document that you generated, at least in part, by inputting, into a generative AI program, documents relating to EPAM's Synapse software.*

**Response:** I object because "EPAM's Synapse software" is undefined, and the Request combines copy identity, generation method, and source provenance in a single proposition. During my employment, "Synapse" referred to two different subjects: "Takeda-Synapse," a Takeda client deliverable, and "EPAM Synapse," a theoretical and, to my present knowledge, unbuilt product concept that I proposed EPAM build. I understand this Request to concern the proposed EPAM Synapse concept.

Subject to and without waiving the objection, admitted with qualification. Exhibit E appears to be a copy of an August 10, 2025 conceptual-architecture document that I generated during work I performed for EPAM from approximately July through August 2025, and its format and content appear similar to the document I recall. After reasonable inquiry, including review of Exhibit E and the available iDS source information, the information I know or can readily obtain is insufficient to determine whether Exhibit E is a complete and unaltered reproduction of the material collected by iDS. I performed this work as an EPAM employee and designated Product

Owner. EPAM authorized my use of Google Gemini for this work. I prompted Google Gemini with my own product ideas and publicly available information. My present recollection is that I also used earlier Google Gemini-generated outputs, including research outputs from the same June-August 2025 workflow, as inputs to later Google Gemini prompts, and that those prior outputs and later prompts concerned the proposed, unbuilt EPAM Synapse concept. Based on that present recollection, I admit that documents relating to that proposed concept were input into Google Gemini. I do not admit the Request's characterization of the proposed concept as existing "software." I did not input EPAM trade secrets, EPAM source code, or client source code to generate the output. I did not compose the model-generated text, and I do not adopt the model's characterizations, attributions, inferences, or legal conclusions. I cannot attest whether the model-generated content contains an AI-generated hallucination or overstatement, adds content attributable to the model's pretrained weights rather than to the inputs I supplied, or reflects regression toward the mean or another generic model pattern. Except as expressly admitted, Request No. 9 is denied.

## REQUEST FOR ADMISSION NO. 10

*Admit that Exhibit F is a true and accurate copy of a document that you generated, at least in part, by inputting, into a generative AI program, documents relating to EPAM's Synapse software.*

**Response:** I object because "EPAM's Synapse software" is undefined, and the Request combines copy identity, generation method, and source provenance in a single proposition. During my employment, "Synapse" referred to two different subjects: "Takeda-Synapse," a Takeda client deliverable, and "EPAM Synapse," a theoretical and, to my present knowledge, unbuilt product concept that I proposed EPAM build. I understand this Request to concern the proposed EPAM Synapse concept.

Subject to and without waiving the objection, admitted with qualification. Exhibit F appears to be a copy of an August 16, 2025 NotebookLM comparison derived from the architectural work I performed for EPAM from approximately July through August 2025, and its format and content appear similar to the document I recall. After reasonable inquiry, including review of Exhibit F and the available iDS source information, the information I know or can readily obtain is insufficient to determine whether Exhibit F is a complete and unaltered reproduction of the material collected by iDS. I performed this work as an EPAM employee and designated Product Owner. EPAM authorized my use of Google Gemini for this work. My present recollection is that I imported into Google NotebookLM as an input source a Google Doc containing Google Gemini-generated output from an iterative workflow using my own product ideas, publicly available information, and earlier Gemini-generated outputs, including research outputs. My present recollection is also that the Google Doc concerned the proposed, unbuilt EPAM Synapse

## SIGNATURE AND RULE 26(G) CERTIFICATION

By signing below, I certify under Federal Rule of Civil Procedure 26(g)(1) that, to the best of my knowledge, information, and belief formed after a reasonable inquiry, these responses and objections are consistent with the Federal Rules of Civil Procedure and warranted by existing law; are not interposed for an improper purpose; and are neither unreasonable nor unduly burdensome.

Dated: **August 28, 2026**

Princeton, New Jersey

Respectfully submitted,

/s/ Gowtham Rao

**Gowtham Rao, MD, PhD**

*Defendant and Counterclaim-Plaintiff, pro se*

184 Mansgrove Rd.

Princeton, NJ 08540

Telephone: (803) 386-7890 | `gowthamrao.litigation@gmail.com`

## CERTIFICATE OF SERVICE

I certify that on **August 28, 2026**, I served a true and correct copy of the foregoing by electronic mail, pursuant to Federal Rule of Civil Procedure 5(b)(2)(E) and the parties' written consent to electronic service, on counsel of record for EPAM Systems, Inc.

/s/ Gowtham Rao

**Gowtham Rao, MD, PhD**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **EPAM SYSTEMS, INC.,** | **CIVIL ACTION** |
| *Plaintiff/Counterclaim-Defendant,* | |
| **v.** | **NO. 2:25-cv-06260-WB** |
| **GOWTHAM RAO, MD, PhD,** | |
| *Defendant/Counterclaim-Plaintiff.* | |

**DEFENDANT AND COUNTERCLAIM-PLAINTIFF GOWTHAM RAO'S RESPONSES AND OBJECTIONS TO PLAINTIFF EPAM SYSTEMS, INC.'S FIRST REQUEST FOR THE PRODUCTION OF DOCUMENTS (NOS. 1–70)**

Pursuant to Federal Rules of Civil Procedure 26 and 34, I, Defendant and Counterclaim-Plaintiff Gowtham Rao, MD, PhD, proceeding *pro se*, respond and object to Plaintiff and Counterclaim-Defendant EPAM Systems, Inc.'s ("EPAM") First Request for the Production of Documents (Nos. 1–70), served on August 10, 2026 (the "Requests"), as follows.

**Preliminary Statement**

- These responses are based on information known or reasonably available to me after reasonable inquiry as of **September 5, 2026**.
- Each numbered response states its own objections and states whether responsive material is being withheld on the basis of an objection, as Rule 34(b)(2)(C) requires.
- The objections to EPAM's Definitions and Instructions in Part I apply only where a numbered response invokes them by number, except Objections I-14 and I-16, which state the form of production and the sources I have not searched and apply to every Request.
- I assert the same protections stated in my September 1, 2026 answers to EPAM's First Set of Interrogatories:
  - the attorney-client privilege for qualifying confidential legal-advice communications
  - work-product protection under Rule 26(b)(3) for material prepared in anticipation of litigation or for trial by or for me
  - and the confidential-marital-communications privilege.
- I do not assert a "pro se privilege" or a "family privilege," and I do not treat confidentiality, privacy, or commercial sensitivity as privilege.

`\OneDrive\Documents\ss\` folder on Device Source A0001 identified in EPAM's counsel's April 22, 2026 email, produced as exact-byte natives as they exist in that folder on Device Source A0001 on September 3, 2026, with hash values in the load file; the copies that existed on December 12, 2025 are in the December 12 image, which controls on any difference.

- Six of the thirty-four carry names matching the Takeda-Synapse project: `takeda-synapse-backend-main.zip`, `takeda-synapse-embedding-main.zip`, `takeda-synapse-etl-main.zip`, `takeda-synapse-infra-main.zip`, `takeda-synapse-vector-mcp-server-main.zip`, and `takeda-synapse-webapp-main.zip`.
- Together those six are 23,175 bytes, between 3,023 and 7,932 bytes each and averaging 3,862 bytes, and 48,462 bytes when extracted.
- Five of the six contain one file each, a `README.md` of about six kilobytes. The sixth, `takeda-synapse-infra-main.zip`, contains a `README.md` and eight Terraform configuration files under `iac/dev`, the largest of which is 6,512 bytes. Nothing else is in them.
- The six `README.md` files are the default text GitLab writes when a repository is created, identical to one another except for the project name on the first line. The file in `takeda-synapse-etl-main.zip` begins: "# takeda-synapse-etl ... ## Getting started ... To make it easy for you to get started with GitLab, here's a list of recommended next steps. Already a pro? Just edit this README.md and make it your own." The remainder is GitLab's checklist for adding files, integrating tools, and setting up continuous integration, followed by the generic section headings from makeareadme.com. Each file carries the repository's address on EPAM's GitLab server.
- The Terraform files in `takeda-synapse-infra-main.zip` are deployment configuration for a development environment. They reference a client's Terraform Cloud organization and workspace and describe instance, network, and access settings; credentials are read from a vault at run time, and no credential, key, or password appears in any of the six files. I do not quote them here, because they concern a nonparty client's infrastructure; they are produced in full, and I ask that they be treated accordingly.
- The contents of these archives are also in the iDS review workspace as separate documents with control numbers, where I reviewed and coded them under Protocol § III(b). The `README.md` from `takeda-synapse-embedding-main.zip` is control number `RAO0012666`, and the Terraform backend configuration appears at control numbers `RAO0002017` and `RAO0012673`. The same content carries more than one control number because

the workspace holds a document for each place the file was found, which is the same reason iDS's hash workbooks report 4,406 hit rows for 405 distinct files. What I state about their contents is what those documents show.

- Three of the 405 Exhibit C hash values match content inside these six archives, and each of the three is a `README.md`, in `takeda-synapse-etl-main.zip`, `takeda-synapse-vector-mcp-server-main.zip`, and `takeda-synapse-webapp-main.zip`, at one hit row each. No Exhibit C value matches any other file in the six, and none matches the archives themselves.
- What I state here is what I observed when I retrieved the six archives from the `ss` folder on September 3, 2026: the archives bearing the project's name hold documentation and deployment configuration, not an application.
- Because these are Contested Materials, and because what I retrieved appears to show that the archives hold no substantive file, I will work with EPAM to retrieve the six from iDS, at EPAM's cost under Protocol § V(a), so that the copies as they stood on December 12, 2025 are the copies before the parties. I authorize that release under paragraph 2 for these six archives.

- **GRAO001478**: a capture of the AWS Pricing Calculator estimate dated October 6, 2025 for a Johnson & Johnson Innovative Research deployment of MedRAG Knowledge Fabric, which I prepared for EPAM's MedRAG work during my employment and which shows the EPAM work for which I was using Takeda-Synapse and MedRAG materials at the end of September and in early October 2025.
- Of the 354 residual values, 278 files are on Device Source A0001 today with matching hash values and are produced at **GRAO001522–GRAO002585** as they exist there. Two hundred seventy-seven of the 278 sit in the `Altera copy` folder of my OneDrive, which holds the EPAM Altera Health Modernization and Transformation document library that EPAM shared with me when I joined and that synchronized to the device: the library's data-warehouse, reporting, CMS quality-measure, document-scan, and Elitea proof-of-concept working files, in the form of presentations, spreadsheets, PDFs, Word documents, notebooks, scripts, diagrams, and logs; the remaining one is `Odysseus RM onboarding.pdf`. Seventeen are recordings, which I produce at **GRAO002614–GRAO002630** as exact-byte natives with their hash values in the load file, about 1.54 gigabytes in all; sixteen of them are in the EPAM Altera Health Modernization and Transformation document library, under its `DW`, `Reporting`, `Docu Scan`, and `Elitea POC` folders. EPAM shared that library with me when I joined, and it synchronized to Device Source A0001, which is why it holds recordings whose file

- (18) Existing documents only: I produce existing documents; I create none and execute no authorization or release.

- **Definitions and instructions incorporated.**
  - (19) Objections I-3, I-17, and I-18 apply to this Request as stated in Part I, and I respond under the constructions they state.
  - (20) Part I objections applied: I-3, I-17, I-18.

- **Grounds incorporated from another Request.**
  - (21) The grounds stated in response to Request No. 8 apply to the extent this Request overlaps them.
  - (22) Related: Request No. 8; documents produced under them are not re-produced here.

**Response [RFP-9]**

- **Produced with these responses.**
  - **GRAO000448–GRAO000452**: Google Docs version-history and share-settings captures for the Exhibit E document and the Exhibit F comparison content.
  - Exhibit G reflects a concept I developed in December 2025, after my employment ended (Request for Admission No. 11); its development materials are addressed in Request No. 8.

- **Identified and not re-produced.**
  - The application data that existed on a collected source is in the December 12 image (paragraph 2).

- **Not located or not in existence.**
  - The recordings from which the Exhibit A through D summaries were generated were made with my telephone's voice-recorder application or with the Otter application while I subscribed to it. My general practice at the time was to delete a recording once its summary had been generated, and I hold no recording or transcript of the conversations those Exhibits summarize. I departed from that practice for ten recordings, and I state why rather than leave the exception unexplained: I kept the recordings of my September 17 through October 1, 2025 meetings with EPAM management because they are material to the end of my employment. I produce them under Request No. 29. The Otter application and its data are not on my current devices or accounts.
  - Exhibits E and F were created in Google accounts collected by iDS (Requests for Admission Nos. 9 and 10).

| | | |
|---|---|---|
| No. 62 | 230 | GRAO000001–GRAO000252; GRAO000316–GRAO000363; GRAO000375–GRAO000436; GRAO000438–GRAO000447; GRAO000477–GRAO000736; GRAO000790–GRAO000975; GRAO000987–GRAO000988; GRAO000993–GRAO001089; GRAO001094–GRAO001129; GRAO001140–GRAO001290; GRAO001293–GRAO001296; GRAO001298–GRAO001521; and 1 further ranges |
| No. 63 | 1240 | GRAO000976–GRAO000992; GRAO001333–GRAO001405; GRAO002848–GRAO007203 |
| No. 64 | 2 | GRAO001140–GRAO001290 |
| No. 65 | 26 | GRAO000001–GRAO000008; GRAO000453–GRAO000476 |
| No. 66 | 0 | none |
| No. 67 | 4 | GRAO001437–GRAO001439; GRAO002682–GRAO002697 |
| No. 68 | 111 | GRAO001437–GRAO001439; GRAO001464; GRAO002740–GRAO002847 |
| No. 69 | 0 | none |
| No. 70 | 0 | none |

## Signature and Rule 26(g) Certification

I certify under Rule 26(g)(1) that, to the best of my knowledge, information, and belief formed after a reasonable inquiry, these responses and objections are consistent with the Federal Rules of Civil Procedure and warranted by existing law or a nonfrivolous argument for its extension, are not interposed for any improper purpose, and are neither unreasonable nor unduly burdensome or expensive considering the needs of the case.

Dated: September 5, 2026 Princeton, New Jersey

Respectfully submitted,

/s/ Gowtham Rao **Gowtham Rao, MD, PhD** *Defendant and Counterclaim-Plaintiff, pro se* 184 Mansgrove Rd., Princeton, NJ 08540 Telephone: (803) 386-7890 gowthamrao.litigation@gmail.com

## Certificate of Service

I certify that on September 5, 2026, I served a true and correct copy of the foregoing Responses and Objections, together with production volume GRAO_PROD_000 (transmitted through EPAM's Kiteworks folder with a manifest of file names and hash values), by electronic mail pursuant to the parties' agreement on electronic service, upon counsel for Plaintiff/Counterclaim-Defendant EPAM Systems, Inc.:

Jacob Oslick, Esq. (joslick@seyfarth.com) James S. Yu, Esq. (jyu@seyfarth.com) Brooke Gary, Esq. (brgary@seyfarth.com) Seyfarth Shaw LLP, 620 Eighth Avenue, New York, New York 10018-1405

/s/ Gowtham Rao **Gowtham Rao, MD, PhD**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**EPAM SYSTEMS, INC.,**

*Plaintiff/Counterclaim-Defendant,*

**v.**

**GOWTHAM RAO, MD, PhD,**

*Defendant/Counterclaim-Plaintiff.*

**CIVIL ACTION**

**NO. 2:25-cv-06260-WB**

**DEFENDANT AND COUNTERCLAIM-PLAINTIFF GOWTHAM RAO'S FIRST SUPPLEMENTAL RESPONSES TO PLAINTIFF EPAM SYSTEMS, INC.'S FIRST REQUEST FOR THE PRODUCTION OF DOCUMENTS (NOS. 6, 7, 8, 9, 23, 29, AND 67)**

Pursuant to Federal Rule of Civil Procedure 26(e)(1)(A), I, Defendant and Counterclaim-Plaintiff Gowtham Rao, MD, PhD, proceeding *pro se*, supplement my Responses and Objections of September 5, 2026 to Plaintiff and Counterclaim-Defendant EPAM Systems, Inc.'s ("EPAM") First Request for the Production of Documents as follows.

**Preliminary statement**

- These supplemental responses are based on information known or reasonably available to me after reasonable inquiry as of **September 7, 2026**.
- The objections stated in my September 5, 2026 Responses to Requests Nos. 6, 7, 8, 9, 23, 29, and 67, and the objections in Part I of that document, are preserved and are not restated. Nothing here waives an objection, a privilege, or a protection asserted there. The definitions and conventions of the September 5, 2026 Responses apply, including the December 12 image rule in paragraph 2 of its Preliminary Statement.
- Each supplemental response states only what is added. The Response as served on September 5, 2026 otherwise stands.
- The documents identified below are produced in volume **GRAO_PROD_001**, Bates **GRAO007204 through GRAO007587 (384 pages; 28 documents)**, served with these supplemental responses and described in its load file and request-to-Bates map. Paragraph 4 of the Preliminary Statement of my September 5, 2026 Responses said that the items listed there would follow as GRAO_PROD_001 on or before September 9, 2026; because this volume is served first it takes that name, and those items will follow as **GRAO_PROD_002** on or before September 9, 2026.
- The occasion for this supplement. In preparing for the September 16, 2026 hearing I re-read the August 10, 2025 document EPAM filed as Exhibit 9 to the Declaration of

## Request for Production No. 67 [RFP-67]

*All documents and information associated with your personal cloud-based accounts whose primary purpose is to host source code, such as https://github.com/gowthamrao … (text as served)*

**Supplemental response.** My September 5, 2026 Response states that my personal GitHub account as it stood on December 12, 2025 is in the December 12 image, from which repositories can be released as git bundles. I now produce three of those repositories myself, as git bundles carrying every branch, tag, and pull-request reference, each verified with `git bundle verify`, at **GRAO007204 through GRAO007206**:

- `gowthamrao/synapse-core`, created August 10, 2025 at 8:15 PM Eastern; five commits on five branches (`main`, `vibe`, `vibeJules`, `feat/build-synapse-core-package`, `codex/implement-synapse-core-orchestrator`) and two pull requests; 28 KB;
- `gowthamrao/synapse-mcp-client`, created August 10, 2025 at 8:24 PM Eastern; two commits; 47 KB; and
- `gowthamrao/synapse-retrievers`, created August 10, 2025 at 9:10 PM Eastern; one commit, the Apache-2.0 license file; 5 KB.

I created the three repositories on the evening of Sunday, August 10, 2025 to test whether the concept the architecture document describes could be built quickly with an AI coding assistant, and to show EPAM the result. As far as I know and remember, EPAM Synapse was never built. What I did that evening was a first attempt at building it from scratch, independent of the Takeda deliverable that was also called Synapse, as a proof of concept done in a few hours on a Sunday. Generating a codebase by prompting an AI coding agent with a written specification, instead of writing the code, was a new practice in the summer of 2025. The term then used for it was "vibe coding," and the architecture document has a tab headed "Jules based vibe coding." Google had released Jules to the public shortly before, and I was experimenting with it. This was an experiment with a new tool. I am not a Python developer. I did not test the code the agent generated, I could not tell whether it was working code or something the model had invented, and to the best of my knowledge it has never been used. I was waiting for Dr. Sudeep Ghate to test it: he reported to me, the three repositories were public at the time, and he had access to them. The code in them was not written by me. Google's Jules coding agent generated it in a single session (session `8031755035392793862`) from the step-by-step build plan and package designs in that document: its commits, by `google-labs-jules[bot]`, are dated 8:38 PM (`synapse-mcp-client`) and 8:39 PM (`synapse-core`) Eastern, and I merged the `synapse-core` pull request (No. 2) into the branch `vibeJules` at 9:04 PM. OpenAI Codex generated one

further branch of synapse-core (codex/implement-synapse-core-orchestrator; pull request No. 1, opened 8:41 PM), which I never merged; that pull request remains open. The generated code is package scaffolding: a Pydantic state model, a LangGraph state machine with stub nodes, a FastAPI entry point, custom exceptions, and tests — 318 added lines in the Jules pull request. I searched every file of every commit in the three repositories: none contains EPAM source code, client material, or any reference to Takeda, MedRAG, or Johnson & Johnson; "EPAM" appears once, in the package description "The central orchestrator for the EPAM Synapse backend." The default branch of each repository holds only the license file; the generated code is on the other branches. No commit has been made to any of the three since August 10, 2025. Captures of the repository list, of pull request No. 2, of the branch list of synapse-core, and of that repository's Apache License 2.0 file are produced at **GRAO007210 through GRAO007213**. The commits I made carry the author address rao@ohdsi.org. My personal GitHub account is registered with more than one email address, including gowthamrao@gmail.com and rao@ohdsi.org, and both receive that account's notifications. I used rao@ohdsi.org to identify myself on contributions to the OHDSI open-science community and gowthamrao@gmail.com for other work, and GitHub records on each commit whichever of the account's addresses is configured when the commit is made. The address on these commits does not mean that this work was affiliated with, performed for, or part of OHDSI. No OHDSI system was used for it, and my September 1, 2026 answer to Interrogatory No. 12 stands: I did not use the OHDSI-issued account for EPAM work or EPAM Confidential Information.

The three repositories were public when I created them and while Dr. Ghate had them to review, and each carried an Apache License 2.0 file from its first commit. Dr. Ghate was an EPAM employee who reported to me, so giving him the document and the repositories to review was giving them to EPAM. My recollection is that I also sent links to the repositories inside EPAM over Microsoft Teams from my EPAM account gowtham_rao@epam.com. I do not recall when I did so or to whom. My employment ended and I have no access to that account or to those messages; EPAM controls that system and holds its own records of what was sent, when, and to whom. I state this rather than leave it unstated, and I will supplement under Rule 26(e) if I recall more.

Each of the three repositories is private today, and they became private on two different days.

I made synapse-core private on September 21, 2025. I do not recall my reason for doing it that day, and I do not offer one. I made my other personal GitHub repositories private in mid or late November 2025, after this action was filed, on the advice of the counsel then representing me. GitHub does not record when a repository's visibility changed, and its account security log covers only the last ninety days, so I also state what its records do show: a settings change to synapse-core at 6:40 AM Eastern on September 21, 2025, and

a settings change to 122 of my repositories, including `synapse-mcp-client` and `synapse-retrievers`, between 7:34 and 7:38 AM Eastern on November 19, 2025. There was no push to any of the three after August 10, 2025. I have not developed, run, or built on any of them since that evening, and I have not used any of them in any business since my employment ended; the account changes described above and my retrieval of the bundles produced here are the only things I have done with them. If I recall more about the September 21 change, I will supplement under Rule 26(e).

The three repositories were collected by iDiscovery Solutions on December 12, 2025 as part of my personal GitHub account (source A0011) and are in the December 12 image; the bundles produced here are taken from GitHub on September 6, 2026 and carry the same commits.

Nothing else in this supplemental response changes the Withholding paragraph of the September 5, 2026 Response.

## Request for Production No. 7 [RFP-7]

*All documents concerning your Use of an AI Platform … where your Use of the AI Platform was paid for or reimbursed by EPAM. (text as served)*

**Supplemental response.** The Google Jules use described in my supplemental response to Request No. 8 was on my personal Google account `gowthamrao@gmail.com`, which EPAM neither paid for nor reimbursed.

The OpenAI Codex use described there was through an OpenAI ChatGPT account of mine. I do not presently recall which one, and the only record of the task I hold is the link recorded in pull request No. 1 of `gowthamrao/synapse-core`. It was one of two personal accounts, as my supplemental answer to Interrogatory No. 12 states. Whichever it was, EPAM did not pay for or reimburse any OpenAI subscription of mine in August 2025: the only OpenAI charge EPAM ever paid for me was one month of a ChatGPT Pro subscription in the spring of 2025, and its receipt, dated March 1, 2025, is produced at GRAO001406 in volume GRAO_PROD_000. I identify the August 10, 2025 use here rather than withhold it while the account question is open; I produce the records of it, which are described in my supplemental response to Request No. 8; and I will supplement under Rule 26(e) if I identify the account.

## Request for Production No. 8 [RFP-8]

*All documents concerning your Use of an AI Platform that relate to: (a) Real World Evidence, or to the life sciences; (b) any product or service offered by EPAM; … (text as served)*

**Supplemental response.** I add two uses of an AI Platform during my employment concerning the proposed EPAM Synapse concept, and one Gemini output that preceded them, and I produce their records.

Both coding agents worked from the same input: the step-by-step build plan in the August 10, 2025 architecture document. That document was itself written by Google Gemini and exported into Google Docs earlier the same day, as was the research document described below. To the best of my knowledge and recollection, I did not give EPAM source code, client material, or any part of the Takeda deliverable to either coding agent.

- **Google Jules**, Google's asynchronous coding agent (`jules.google.com`), on my personal Google account `gowthamrao@gmail.com`, which EPAM neither paid for nor reimbursed. In one session on August 10, 2025 (session `8031755035392793862`), prompted with the step-by-step build plan and package designs set out in the August 10, 2025 architecture document, Jules generated the code described in my supplemental response to Request No. 67. The session's downloadable archive, as downloaded from Jules on September 6, 2026, is produced at **GRAO007207**; its ten source files are the same code as the commit: six are byte-for-byte identical, and the other four (`main.py` and the three test files) differ only in trailing whitespace on blank lines, with the same content on every line; the committed versions are in the `synapse-core` bundle. Captures of the session page and of the Jules repository overview are produced at **GRAO007208 through GRAO007209**. The session remains on Google's service, locked to further edits because of its age.
- **OpenAI Codex**, through one of my personal OpenAI ChatGPT accounts, which my supplemental answer to Interrogatory No. 12 identifies and which I cannot presently narrow further: one task on August 10, 2025 (the task link recorded in pull request No. 1 of `synapse-core`), which produced the `codex/implement-synapse-core-orchestrator` branch. The task's output is in the `synapse-core` bundle. I hold no other record of the task: I opened the task link on September 7, 2026 and the task record is no longer viewable, and I do not know when or how it ceased to be available.
- **"Research - Agents"**, a Google Doc in my personal Google Drive (`gowthamrao@gmail.com`) holding Google Gemini Deep Research reports on publicly documented agent frameworks (LangChain, LangGraph, LangServe, AutoGen, CrewAI, the Model Context Protocol, and the A2A protocol) and a proposed

"Universal Agent Definition Framework," created on the morning of August 10, 2025: its Google Docs version history begins with a version at 5:54 AM Eastern that day, continues at 5:55, 5:56, 5:57, 7:43 and 8:29 AM, and its current version is timestamped 9:39 AM, all before the August 10, 2025 architecture document was created at 7:50 PM that evening. The 5:57 AM version holds a single tab, the "Standardization and reuse" research analysis; by 7:43 AM the framework tabs (LangChain, LangGraph, AutoGen, Universal Agent Definition) had been added. It is one of the earlier Gemini research outputs that my August 28, 2026 response to Request for Admission No. 9 describes as inputs to the later Gemini prompts that produced the August 10, 2025 document. I searched it before producing it and found no Synapse, Takeda, MedRAG, or client content and no EPAM source code; one of its reports contains a section on opportunities the protocols offered EPAM. The document is general research. Its reports are machine-generated summaries of publicly available material about those frameworks and protocols, produced by Google Gemini's Deep Research feature from public content. I did not compose their text and I do not adopt the model's characterizations, and, as my August 28, 2026 response to Request for Admission No. 9 states of this workflow, I did not input EPAM trade secrets, EPAM source code, or client source code to generate it. It is produced at **GRAO007214 through GRAO007386** as a native Google Docs export in `.docx` form, with its pages rendered; captures of its version history are produced at **GRAO007392 through GRAO007393**, and captures of the document as it appears in Google Docs, including the tab that mandates the technology stack the architecture document adopts (LangGraph for macro-orchestration, AutoGen or CrewAI for micro-orchestration, OHDSI LlmPromptBuilders for prompt standardization, and Pydantic for state), at **GRAO007387 through GRAO007390** and **GRAO007394 through GRAO007399**.

- **Four Google Docs of June and July 2025 on the proposed EPAM Synapse platform**, produced under Request No. 6 at **GRAO007498 through GRAO007583** with captures of their version histories at **GRAO007584 through GRAO007587**. Each is generative-AI output that entered Google Docs as an imported HTML file in a single edit: a critical review of an EPAM Synapse design document (June 23, 2025), a playbook on turning the Takeda pilot into a product (July 11), and two naming exercises (July 14 and 17). Their subject is a product EPAM proposed to offer and the life-sciences work it would do, so they fall within subparts (a) and (b) of this Request.
- **The Star Magnet planning records**, four documents I prepared in my personal Google Drive on and before August 5, 2025 and produce under Request No. 6 at **GRAO007400 through GRAO007494**. Three of them are generative-AI research outputs, and one is the research prompt that produced such an output; their subject is real-world evidence, health economics, and the marketing of EPAM's services, so they fall within subparts (a) and (b) of this Request. I reviewed them before producing them

## Request for Production No. 9 [RFP-9]

*All audio or video recordings, transcripts, or other documents, data, or materials which were used to generate the documents attached hereto as Exhibits A–G, or which otherwise relate to the documents attached hereto as Exhibits A–G. (text as served)*

**Supplemental response.** As to Exhibit E, I add: the "Research - Agents" document, produced under Request No. 8, which was among the materials used to generate Exhibit E; the three repositories and the Jules session archive, produced under Requests Nos. 67 and 8, which were generated from Exhibit E; and a capture of the Google Drive activity record for the Exhibit E document, produced at **GRAO007391**, showing its creation and sharing at 7:50 PM Eastern on August 10, 2025 (shared with Dr. Sudeep Ghate, then an employee of EPAM Systems India Private Limited who reported to me, to whom I gave editor access as his manager for EPAM-approved work; he is in India, and my recollection is that I shared it on the Sunday night Eastern so that he could look at it on the Monday morning India time, and by link), its last edit on August 13, 2025, and the restriction of access on November 2, 2025. I restricted access two days after EPAM's October 31, 2025 letter. My recollection, and I give it as recollection, is that I did so to preserve the document as it then stood and to stop it from being edited, and that the access I removed was that of EPAM employees. The Google Docs version-history and share-settings captures at GRAO000448–GRAO000452 stand.

## Request for Production No. 23 [RFP-23]

*All documents concerning any refactoring (or other editing/revisions) of Synapse code, or representations that you were refactoring Synapse code (or otherwise editing/revising Synapse code). (text as served)*

**Supplemental response.** I add the three repositories produced under Request No. 67 at **GRAO007204 through GRAO007206** and the coding-agent session archive produced under Request No. 8 at **GRAO007207**, and I state what they are, because the declaration of Dmitrii Ilin says that I mentioned having started "refactoring" the Synapse code (ECF No. 58-25 ¶ 15) and EPAM's brief describes what I now sell as "a refactored version of EPAM's Synapse software."

The code in those repositories was not refactored from anything of EPAM's. AI coding agents generated it on the evening of August 10, 2025 from the step-by-step build plan in the architecture document, as my supplemental responses to Requests Nos. 8 and 67 describe, and no commit has been made to any of the three since that evening. I searched every file of every commit on every branch before producing them: none contains EPAM source code, none contains any part of the Takeda deliverable that was also called Synapse, and none refers to Takeda, to MedRAG, or to Johnson & Johnson. The words "EPAM" and "Synapse" appear only in package names and descriptions. The bundles carry every commit on every branch, tag, and pull-request reference each repository holds today, so EPAM can verify each of those statements for itself rather than take mine. Each repository was created with an Apache License 2.0 file, committed in its initial commit before the agent generated anything, and that file is the only file on each repository's default branch; a capture of it in `synapse-core` is produced at **GRAO007213**.

The document EPAM filed as Exhibit 9 is itself a plan for generating this code with an AI coding agent, which is what happened. Its "Backend Build Guide" tab says it "provides a comprehensive, step-by-step plan for building the modular backend of the EPAM Synapse platform" (ECF No. 58-12 at 9) and sets out a "Step-by-Step Package Build Guide" (id. at 10). The tab that follows is headed "Jules based vibe coding" (id. at 14) and holds an "AI-Assisted Build Guide for EPAM Synapse" describing "a strategic workflow for developing the EPAM Synapse backend by pairing a mid-level Python developer with an advanced, context-aware AI coding assistant like Google's Jules," beginning with "Phase 0: Context Priming and Environment Setup" (id. at 15). Seven further tabs each specify one Python package. The three repositories I created that evening carry the names of the first three of those packages, and what is in them is what Jules and Codex produced when given that plan. The text of that document is Gemini's output, generated earlier the same day; I did not compose it and I do not adopt its wording.

I do not adopt the characterization in paragraph 15 of Mr. Ilin's declaration. That paragraph gives no date, no repository, and no other identifier for the conversation it describes, so I cannot say which conversation it is, and I do not concede that it is about the August 10, 2025 work. The same paragraph states, of that conversation, "I asked Rao to see the code that he was drafting for the Synapse project, but he never shared it with me." That is consistent with my account: I described this work to people at EPAM, and I did not give the code to Mr. Ilin. To the extent EPAM reads paragraph 15 as a statement that I was editing or reorganizing EPAM's Synapse code, that is not what the August 10, 2025 work was. It was a first attempt to build the proposed concept from scratch, and what came of it is produced in full.

EPAM has not identified in this litigation what it means by "Synapse" apart from the deliverable built for Takeda. If EPAM's claim rests on something else of that name, or on what it describes as an AI accelerator, and if that thing is not the Takeda deliverable, then to the best of my present knowledge the three repositories produced here are what it is describing, because they are the only thing answering that description that I ever made. I state that so EPAM has it. It is not a concession: I do not concede that these repositories are EPAM's, that anything in them is EPAM's, or that anything in them is a trade secret. They are produced in full, with every commit on every branch each repository holds today, so EPAM can compare them against whatever it contends was taken. If EPAM means something else by "Synapse," it should identify it, and I will respond to that identification.

## Request for Production No. 29 [RFP-29]

*To the extent you claim that your termination of employment from EPAM was unlawful, all documents concerning such claim. (text as served)*

**Supplemental response.** I add the Star Magnet planning document at **GRAO007400 through GRAO007436** and the Google Drive activity captures at **GRAO007495 through GRAO007497**, produced under Request No. 6 and described there. They concern my claim because EPAM authorized, sponsored, and supported a program built on my public scientific profile as a means of attracting business to EPAM, in the same months in which EPAM later said my role was being eliminated. My Verified Counterclaims plead that program at paragraphs 343 through 346 (ECF No. 33). The materials produced with my September 5, 2026 Responses under this Request, including the ten audio recordings at GRAO002631 through GRAO002640, are not re-produced here.

### Signature and Rule 26(g) Certification

I certify under Federal Rule of Civil Procedure 26(g)(1) that, to the best of my knowledge, information, and belief formed after a reasonable inquiry, these supplemental responses are consistent with the Federal Rules of Civil Procedure and warranted by existing law or a nonfrivolous argument for its extension, are not interposed for any improper purpose, and are neither unreasonable nor unduly burdensome or expensive considering the needs of the case. The objections stated in my September 5, 2026 Responses and Objections are preserved and are not restated here.

Dated: **September 7, 2026** Princeton, New Jersey

Respectfully submitted,

/s/ Gowtham Rao MD, PhD **Gowtham Rao, MD, PhD** *Defendant and Counterclaim-Plaintiff, pro se* 184 Mansgrove Rd. Princeton, NJ 08540 Telephone: (803) 386-7890 | `gowthamrao.litigation@gmail.com`

### Certificate of Service

I certify that on **September 7, 2026**, I served a true and correct copy of the foregoing supplemental responses, together with production volume GRAO_PROD_001 (transmitted through EPAM's Kiteworks folder with a manifest of file names and hash values), by electronic mail pursuant to Federal Rule of Civil Procedure 5(b)(2)(E) and the parties' written consent to electronic service, on counsel of record for Plaintiff and Counterclaim-Defendant EPAM Systems, Inc.

/s/ Gowtham Rao MD, PhD **Gowtham Rao, MD, PhD**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **EPAM SYSTEMS, INC.,** | **CIVIL ACTION** |
| *Plaintiff/Counterclaim-Defendant,* | |
| **v.** | **NO. 2:25-cv-06260-WB** |
| **GOWTHAM RAO, MD, PhD,** | |
| *Defendant/Counterclaim-Plaintiff.* | |

**DEFENDANT AND COUNTERCLAIM-PLAINTIFF GOWTHAM RAO'S SECOND SUPPLEMENTAL ANSWERS TO PLAINTIFF EPAM SYSTEMS, INC.'S FIRST SET OF INTERROGATORIES (NOS. 1, 6, AND 12)**

Pursuant to Federal Rule of Civil Procedure 26(e), I, Defendant and Counterclaim-Plaintiff Gowtham Rao, MD, PhD, proceeding *pro se*, further supplement my answers of September 1, 2026, as supplemented on September 5, 2026, to Plaintiff and Counterclaim-Defendant EPAM Systems, Inc.'s ("EPAM") First Set of Interrogatories as follows.

**Preliminary statement**

- These supplemental answers are based on information known or reasonably available to me after reasonable inquiry as of **September 7, 2026**.
- Rule 26(e)(1)(A) requires supplementation where an answer is incomplete in a material respect and the additional information has not otherwise been made known to EPAM. I supplement Interrogatories Nos. 1, 6, and 12 for that reason.
- The objections stated in my September 1, 2026 answers are preserved and are not restated. The definitions and conventions of the Preliminary Statement to those answers apply. Each answer below states only what is added; the answers as served on September 1 and supplemented on September 5, 2026 otherwise stand.
- The documents identified below are produced in volume **GRAO_PROD_001** (GRAO007204 through GRAO007587 (384 pages; 28 documents)), served with my First Supplemental Responses to EPAM's First Request for the Production of Documents, which describe them.

**Interrogatory No. 12**

*(text as served)*

**Supplemental answer.** I add two AI Platform accounts to paragraph 4 of my September 1, 2026 answer, and I supplement paragraph 3.

- **Google Jules** (jules.google.com), Google's asynchronous coding agent, used through my personal Google account gowthamrao@gmail.com, which EPAM neither paid for nor reimbursed. I used it on August 10, 2025 in one session (session 8031755035392793862) to generate package scaffolding from the step-by-step build plan in the August 10, 2025 architecture document that EPAM filed as Exhibit 9 to the Declaration of Jacob Oslick, as my supplemental responses to Requests Nos. 8 and 67 of EPAM's First Request for the Production of Documents describe. I do not disclose credentials or security configuration.
- **OpenAI Codex**, OpenAI's coding agent, which runs through an OpenAI ChatGPT account, used for one task on August 10, 2025 on the repository gowthamrao/synapse-core, as those supplemental responses describe. I do not presently recall which of my accounts ran the task, and the only record of it I hold is the task link recorded in pull request No. 1 of that repository. It was one of two: the OpenAI ChatGPT account on my personal Google account subscriptionrao@gmail.com that my September 5, 2026 supplemental answer identifies, or an OpenAI ChatGPT account on my personal Google account gowthamrao@gmail.com, which I identify here to the extent one existed then. EPAM paid for one month of a ChatGPT Pro subscription on subscriptionrao@gmail.com in the spring of 2025, and the March 1, 2025 receipt for it is produced at GRAO001406 in volume GRAO_PROD_000; that month is the only OpenAI charge EPAM paid or reimbursed for me, and EPAM did not pay for or reimburse any OpenAI subscription of mine in August 2025. I will supplement under Rule 26(e) if I identify the account.

Paragraph 3 of my September 1, 2026 answer identifies my personal GitHub account gowthamrao, and my September 5, 2026 supplement adds the ten public forks. I add three repositories in that account, created on August 10, 2025, whose contents are unchanged since that evening although their visibility settings later changed as described below: gowthamrao/synapse-core, gowthamrao/synapse-mcp-client, and gowthamrao/synapse-retrievers. They hold code generated by Jules and by Codex from the August 10, 2025 architecture document, as my supplemental response to Request No. 67 describes; they are private today, and they became private on two different days. I made synapse-core private on September 21, 2025; I do not recall my reason for doing it that day, and I do not offer one. I made my other personal GitHub repositories, including synapse-mcp-client and synapse-retrievers, private in mid or late November 2025, after this action was filed, on the advice of the counsel then representing me. GitHub does not record when a repository's visibility changed; its records show a settings change to synapse-core at 6:40 AM Eastern on September 21, 2025 and to the other two between 7:34 and 7:38 AM Eastern on November 19, 2025, and GitHub does not record what a settings change was. They were among the repositories iDiscovery Solutions collected from that account on December 12, 2025 (source A0011). They are produced as git bundles at GRAO007204

through GRAO007206 in volume GRAO_PROD_001. The commits I made in them carry the author address `rao@ohdsi.org`, because my personal GitHub account is registered with more than one email address, including `gowthamrao@gmail.com` and `rao@ohdsi.org`, and GitHub records on each commit whichever of them is configured at the time. That address does not make this work OHDSI work: no OHDSI system was used, and paragraph 5 of my September 1, 2026 answer to this Interrogatory stands.

I also identify, as to paragraph 4 of my September 1, 2026 answer, the Google Gemini use that preceded that work. The Google Doc "Research - Agents" in my personal Google Drive (`gowthamrao@gmail.com`) holds Google Gemini Deep Research reports on publicly documented agent frameworks and a proposed "Universal Agent Definition Framework." Its version history runs from 5:54 AM to 9:39 AM Eastern on August 10, 2025, before the August 10, 2025 architecture document was created at 7:50 PM that day, and those reports were among the earlier Gemini outputs that, as my August 28, 2026 response to Request for Admission No. 9 states, were inputs to the later Gemini prompts that produced the architecture document. Both documents are Google Gemini output of August 10, 2025 exported into Google Docs: the research reports in the morning, and the architecture document that evening. The Gemini use that produced the reports was on one of the two Google accounts that paragraph 4 of my September 1, 2026 answer already identifies, the Google Gemini subscription associated with `subscriptionrao@gmail.com` or the Google services associated with `gowthamrao@gmail.com`. I used the two alternately and I do not recall which of them produced these reports. The document is general research: its reports are machine-generated summaries of publicly available material about those frameworks, produced by Gemini's Deep Research feature from public content, and I did not compose their text. The document is produced at GRAO007214 through GRAO007386, captures of its version history at GRAO007392 through GRAO007393, and captures of its tabs at GRAO007387 through GRAO007390 and GRAO007394 through GRAO007399, all in volume GRAO_PROD_001.

The same Gemini use produced four further Google Docs about the proposed EPAM Synapse platform, in June and July 2025, each of which entered Google Docs as an imported HTML file in a single edit: a critical review of an EPAM Synapse design document of June 23, 2025, a playbook of July 11, 2025 on turning the Takeda pilot into a product, and naming exercises of July 14 and July 17, 2025. They are produced at GRAO007498 through GRAO007587 and are described in my First Supplemental Responses to Requests Nos. 6 and 8 of EPAM's First Request for the Production of Documents.

**Interrogatory No. 6**

*(text as served)*

**Supplemental answer.** I add three locations of electronically stored information to my September 1, 2026 answer.

- **Google Jules session `8031755035392793862`**, held on Google's Jules service under my personal Google account `gowthamrao@gmail.com`. Jules is one of the Google services associated with that account. That account is an Email and Cloud Source within the December 2025 Forensic Protocol: I identified my Google accounts and their services to iDiscovery Solutions, and iDS collected the account on December 12, 2025. The session records the prompt, the agent's steps, and the generated code for the August 10, 2025 work described there. Google marks it locked to further edits because of its age; it remains viewable, and its downloadable archive is produced at GRAO007207. Its output was also pushed to the GitHub repositories identified in my supplemental answer to Interrogatory No. 12, which iDS collected as part of source A0011.
- **Microsoft Teams messages on EPAM's system sent from my EPAM account `gowtham_rao@epam.com`.** My recollection is that I sent links to the three GitHub repositories, and discussed the August 10, 2025 work, in Microsoft Teams chats on EPAM's system. I do not recall when I did so or to whom. My employment ended and I have no access to that account or to those messages. EPAM controls that system and holds those records; I do not. I identify the location rather than leave it unstated, and I will supplement under Rule 26(e) if I recall more.
- **The OpenAI Codex task record** for the task recorded in pull request No. 1 of `gowthamrao/synapse-core`, on whichever of the two OpenAI ChatGPT accounts described in my supplemental answer to Interrogatory No. 12 ran it. I opened that link on September 7, 2026 and the task record is no longer viewable, and I do not know when or how it ceased to be available. The output of the task survives as the `codex/implement-synapse-core-orchestrator` branch of that repository, which is produced in its git bundle.

**Interrogatory No. 1**

*(text as served)*

**Supplemental answer.** I supplement the subjects stated in paragraph 48 of my September 1, 2026 answer for **Dr. Sudeep Ghate**: the August 10, 2025 "Synapse architecture" document (Oslick Exhibit 9) and the work I did that evening.

Dr. Ghate was then an employee of EPAM Systems India Private Limited and reported to me. I gave him editor access to the document when I created it on August 10, 2025, as his manager and for EPAM-approved work, so that he could review it; he is in India, and my recollection is that I shared it on the Sunday night Eastern so that he could look at it on the Monday morning India time. The document's version history shows no edit to it by him, and

I do not know whether he read it or used it. It remained shared with him until November 2, 2025, when I restricted access. The three repositories were public while he had them to review, and he had access to them. His knowledge of that document, of the repositories, and of any discussion of either.

The purpose of that work bears on the subjects for several of the individuals identified in my September 1, 2026 answer, so I state it here. As far as I know and remember, EPAM Synapse was never built. What I did on August 10, 2025 was a first attempt at building it from scratch, independent of the Takeda deliverable that was also called Synapse: a proof of concept, done in a few hours on a Sunday, to show EPAM that the concept could be built quickly with an AI coding assistant. Generating a codebase by prompting an AI coding agent with a written specification, instead of writing the code, was a new practice in the summer of 2025. The term then used for it was "vibe coding," and the architecture document itself has a tab headed "Jules based vibe coding" (ECF No. 58-12 at 14). Google had released Jules to the public shortly before, and I was experimenting with it. This was an experiment with a new tool. I am not a Python developer. I did not test the code the agent generated, I could not tell whether it was working code or something the model had invented, and to the best of my knowledge it has never been used.

I was waiting for Dr. Ghate to test it. He reported to me, so I could ask him to do that; the three repositories were public at the time and he had access to them. Dr. Ghate was an EPAM employee, and giving him the document and the work to review was giving them to EPAM. My recollection is that I also sent links to the repositories inside EPAM over Microsoft Teams from my EPAM account `gowtham_rao@epam.com`, though I do not recall when or to whom; EPAM holds those records and I no longer have access to that account. Mr. Ilin did not report to me and I could not direct him to test anything. My recollection is that on the Monday I showed or described the work to him and to others at EPAM, and that I described the code as having been "vibe coded," by which I meant that an AI coding agent had generated it rather than that I had written or verified it.

I further supplement the subjects stated in my September 1, 2026 answer as to EPAM's **Star Magnet** program. Star Magnet was an EPAM thought-leadership and business-development program directed at using my public scientific profile to attract enterprise clients to EPAM; my Verified Counterclaims describe it at paragraphs 343 through 346 (ECF No. 33), and paragraphs 19 and 20 of my September 1, 2026 answer already identify James Gatch and Gabby Semon by reference to "the Star Magnet and CIO.com work." The planning records I prepared for the program are produced at GRAO007400 through GRAO007497 in volume GRAO_PROD_001 and are described in my First Supplemental Responses to Requests Nos. 6 and 29 of EPAM's First Request for the Production of Documents.

- **James Gatch** (paragraph 19) — in addition to the subjects stated: my Microsoft Teams messages with him on EPAM's system, from my EPAM account

gowtham_rao@epam.com, concerning the program; and a meeting about the program at which he told Gabby Semon and others present that it was an important priority. My contemporaneous note of a July 16, 2025 meeting on the program records him, Ms. Semon and me as its participants. EPAM holds the Teams messages and its own records of the meeting.

- **Gabby Semon** (paragraph 20) — in addition to the subjects stated: her presence at that meeting and the marketing work for the program.
- **Gregory Klebanov** (paragraph 2), **Greg Killian** (paragraph 3), and **Chris Waller** (paragraph 5) — in addition to the subjects stated: the Star Magnet program, according to their participation in it. My Verified Counterclaims identify Mr. Gatch, Mr. Killian and Mr. Klebanov as the executives who authorized and supported the program (ECF No. 33 ¶ 344). I do not state here what any of them said to me about it, and I will supplement under Rule 26(e) if I recall a particular conversation.

I also supplement the subjects stated for **Dmitrii Ilin** (paragraph 36): the manner in which the August 10, 2025 document was generated and what it was used for on that date, as the records produced with my First Supplemental Responses to EPAM's First Request for the Production of Documents show, as against the characterization in paragraphs 8 through 14 of his declaration (ECF No. 58-25); what I showed or described to him about that work on or about Monday, August 11, 2025, including my use of the words "vibe coded" to mean that an AI coding agent had generated the code from the plan in that document; and the conversation described in paragraph 15 of his declaration, in which he says I mentioned having started "refactoring" the Synapse code. I do not adopt that characterization. That paragraph gives no date, no repository, and no other identifier, so I cannot say which conversation it describes, and I do not concede that it is about the August 10, 2025 work. It also states that he asked to see the code and that I never shared it with him, which is consistent with my account that I described this work at EPAM rather than gave it to him. The code generated that evening is produced in full, it was generated from the step-by-step build plan in the architecture document, and my search of every file of every commit in the three repositories found no EPAM source code, no client material, and no part of the Takeda deliverable that was also called Synapse.

**Verification**

I declare under penalty of perjury under the laws of the United States that the foregoing supplemental answers are true and correct.

Executed on: **September 7, 2026** Princeton, New Jersey

/s/ Gowtham Rao MD, PhD **Gowtham Rao, MD, PhD**

**Signature and Rule 26(g) Certification**

By signing below, I certify under Federal Rule of Civil Procedure 26(g)(1) that, to the best of my knowledge, information, and belief formed after a reasonable inquiry, these supplemental answers are complete and correct as of the time they are made.

Dated: **September 7, 2026**

Respectfully submitted,

/s/ Gowtham Rao MD, PhD **Gowtham Rao, MD, PhD** *Defendant and Counterclaim-Plaintiff, pro se* 184 Mansgrove Rd. Princeton, NJ 08540 Telephone: (803) 386-7890 | gowthamrao.litigation@gmail.com

**Certificate of Service**

I certify that on **September 7, 2026**, I served a true and correct copy of the foregoing by electronic mail, pursuant to Federal Rule of Civil Procedure 5(b)(2)(E) and the parties' written consent to electronic service, on counsel of record for EPAM Systems, Inc.

/s/ Gowtham Rao MD, PhD **Gowtham Rao, MD, PhD**