# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EPAM SYSTEMS, INC.,<br>Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>GOWTHAM RAO, MD, PhD,<br>Defendant/Counterclaim-Plaintiff. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: | **CIVIL ACTION**<br><br>**NO. 2:25-cv-06260-WB** |

**DEFENDANT AND COUNTERCLAIM-PLAINTIFF DR. GOWTHAM RAO'S FIRST AMENDED COUNTERCLAIMS AGAINST PLAINTIFF EPAM SYSTEMS, INC.**

I, Defendant and Counterclaim-Plaintiff Gowtham Rao, MD, PhD, appearing *pro se*, hereby assert these First Amended Counterclaims against Plaintiff and Counterclaim-Defendant EPAM Systems, Inc. ("EPAM") pursuant to Federal Rules of Civil Procedure 13 and 15:

**PART I: THE PARTIES**

1. I, Counterclaim-Plaintiff Gowtham Rao, MD, PhD, am an individual and physician-scientist residing in Princeton, Mercer County, New Jersey. I immigrated to the United States under the EB-1 visa classification for individuals of extraordinary ability in the sciences and am a naturalized citizen of the United States. My primary work location throughout my employment with EPAM was in Princeton, New Jersey, where I performed my remote professional, research, and managerial responsibilities.

2. Counterclaim-Defendant EPAM Systems, Inc., is a Delaware corporation having its principal place of business at 41 University Drive, Suite 202, Newtown, Bucks County, Pennsylvania 18940.

## PART II: JURISDICTION AND VENUE

3. **Diversity of Citizenship Jurisdiction (28 U.S.C. § 1332(a)(1)):** This Court has independent original subject matter jurisdiction under 28 U.S.C. § 1332(a)(1). Complete diversity exists between me (a citizen and resident of New Jersey) and Counterclaim-Defendant EPAM Systems, Inc. (a citizen of Delaware and Pennsylvania). The amount in controversy substantially exceeds $75,000.00, exclusive of interest and costs, including back pay, front pay, statutory punitive damages, emotional distress, and statutory fees and expenses under N.J.S.A. 34:19-5, 18 U.S.C. § 1836(b)(3)(D), and 12 Pa.C.S. § 5305.

4. **Federal Question Jurisdiction (28 U.S.C. § 1331):** This Court possesses independent original federal question jurisdiction under 28 U.S.C. § 1331 because I assert federal claims arising under federal law, specifically declaratory relief establishing trade secret non-ownership under the Defend Trade Secrets Act (18 U.S.C. § 1836(b)(1)) and the Declaratory Judgment Act (28 U.S.C. § 2201) in Count III.

5. **Supplemental Jurisdiction (28 U.S.C. § 1367(a)):** In the alternative and concurrently, this Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) because these counterclaims arise out of the identical common nucleus of operative facts and employment relationship underlying EPAM's Second Amended Complaint (ECF No. 93).

6. **Compulsory and Permissive Counterclaims:** These counterclaims are asserted as compulsory counterclaims under Rule 13(a), and alternatively as permissive counterclaims under Rule 13(b) supported by independent federal jurisdiction.

7. **Venue (28 U.S.C. § 1391(b)):** Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391(b)(1)–(2) because EPAM maintains its principal place of business in this judicial district, a substantial part of the events occurred herein, and EPAM chose this forum to initiate this action.

## PART III: COMMON FACTUAL ALLEGATIONS

**Phase 1: Background, Scientific Stature, and ECA Carveouts**

8. I am an internationally recognized physician-scientist, clinical epidemiologist, and medical software architect specializing in observational healthcare data analytics and artificial intelligence agentic software applications. I hold an MD degree and a PhD in Epidemiology and Biostatistics, maintain active medical licenses in New York, Pennsylvania, South Carolina, and Wisconsin, and am board certified by the American Board of Preventive Medicine, with subspecialty certification in Clinical Informatics. Throughout my career, I have been entrusted with authorized access to highly secured private healthcare data for research and operational programs, including at the United States Department of Veterans Affairs, where I analyzed national veteran health data within the secure VA Informatics and Computing Infrastructure (VINCI), and as Chief Medical Informatics Officer at BlueCross BlueShield of South Carolina (ECF No. 33 ¶ 305; Rao Dep. Tr. 25:18–20), where I led the statewide implementation of pay-for-performance clinical quality metrics and value-based payment architectures during the early rollout of the Affordable Care Act. In over two decades of professional medical service stewarding sensitive personal healthcare data across federal government, commercial payer, and enterprise healthcare environments, no incident of data breach, compromise, or mishandling was ever reported or attributed to me. For over eight years, I have served as a contributor and leader in the international Observational Health Data Sciences and Informatics (OHDSI) collaborative, where I have stewarded the open-source OMOP Common Data Model utilized by global regulatory and public health authorities, including the United States Food and Drug Administration (FDA), the European Medicines Agency (EMA), and the National Institutes of Health (NIH). Throughout my career, I have published in peer-reviewed scientific journals and maintained a steadfast reputation for medical ethics, data protection, and scientific integrity. My

primary work location throughout my tenure with EPAM was in Princeton, New Jersey, where I resided and performed my clinical, research, and remote managerial responsibilities. (Rao Decl. ¶¶ 3–4; Exhibit PX-31; Exhibit PX-32).

9. In 2024, EPAM acquired Odysseus Data Services, Inc. (“Odysseus”), an analytics consultancy. At that time, I was employed as a Senior Director at enterprise healthcare client Johnson & Johnson (“J&J”). On September 6, 2024, EPAM Vice President Gregory Klebanov initiated contact with me, soliciting me to leave J&J and join EPAM to lead healthcare data analytics initiatives. To induce me to join EPAM, Klebanov represented that EPAM’s Life Sciences practice was expanding rapidly, discussed executive leadership responsibilities, and repeatedly assured me of executive partnership in building the practice. (Rao Decl. ¶¶ 14–15; Exhibit PX-07).

10. Prior to executing my Employment Covenants Agreement (“ECA”), I maintained full transparency regarding my professional activities and secured express pre-negotiated contractual exemptions protecting my scientific, clinical, and open-source work from any EPAM claim of ownership. In my formal term sheet submitted to EPAM on November 8, 2024 ("Proposed Amendments to Restrictive Covenants", Exhibit PX-31, Bates GRAO000095), I explicitly required a Community Engagement Exemption stipulating that engagements within open collaborative forums in health informatics and data science (including OHDSI, AMIA, HIMS, and American College of Physicians) were outside restrictive covenants, and expressly mandated that: "[a]ny information (including software) shared or obtained in these forums will be treated as public knowledge, not proprietary to EPAM" and that "[g]iven the public nature of these communities, any proprietary considerations should not apply" (Exhibit PX-31). This explicitly established that EPAM would not claim ownership of software I developed for or shared with

open-source communities. Practice Leader Gregory Klebanov verbally agreed and assured me that my open-science and community innovations would not belong to EPAM and would not be claimed as EPAM's proprietary property (Rao Dep. Tr. 54:16–55:4: "Gregory Klebanov had assured me that the innovation that I did would not be EPAM's... and I did not want the work that I do for communities, like OHDSI, be owned by EPAM, and anything that I did for public good would not be claimed by EPAM as its own"). EPAM Lead Recruiter Yvonne Schuster accepted this exemption in writing on November 8, 2024, confirming EPAM was "fully supportive of your outside activities related to your medical practice as well as professional groups" and did not expect participation to present an issue (Exhibit PX-32, Bates GRAO000182). In direct response to these pre-negotiated terms, the executed ECA on November 12, 2024 incorporated an affirmative bespoke modification to EPAM's boilerplate employment contract, placed prominently upfront on Page 1 of the agreement (ECF No. 30-1 at 2), expressly excluding from "Confidential Information" all "general industry knowledge, skills, or software developed or acquired by you without reliance on EPAM Group Confidential Information; which is through and for the purpose of community, professional, scientific; or similar groups..." (Exhibit PX-06, ECA § 1(b)). This upfront exemption was an indispensable condition precedent to my joining EPAM: I did not negotiate on salary or financial compensation—providing only an initial range benchmarked to my Johnson & Johnson salary when asked and accepting EPAM's initial financial compensation offer as presented—and instead directed my entire pre-hire negotiation effort toward securing this contractual freedom to operate and safeguarding my open-science research from employer ownership claims. When examining counsel Jacob Oslick questioned me in deposition regarding Section 2 ("Ownership of work product") to assert EPAM owned all life-sciences software, I directly refuted that assertion based on these pre-negotiated exemptions and

Section 1(b) (Rao Dep. Tr. 48:2–61:7). I placed an explicit sworn reservation on the record that ownership was never conceded and remains an actively contested legal matter under the contract's negotiated exceptions (Rao Dep. Tr. 274:8–20). In discovery, EPAM itself declined under oath to claim ownership of the OHDSI open-source repositories (Exhibit PX-38, RFA 60 (EPAM Resp. No. 60, S13 at 99–101)). EPAM also admitted under Rule 36 that Gregory Klebanov was aware that I authored public OHDSI repositories on GitHub prior to my EPAM employment (id., RFA 94 (EPAM Resp. No. 94, S13 at 155–156)). In addition, Section 5(c) of the ECA explicitly conditioned post-employment non-competition restrictions solely upon voluntary resignation: "In the event you voluntarily resign employment..." and provided that "[t]he restrictions in this subsection shall not apply in case of an involuntary termination" (Exhibit PX-06, ECA § 5(c); Exhibit PX-38, RFA 183(c) (EPAM Resp. No. 355, S45 at 239–240); ECF No. 20 at 1). (Rao Decl. ¶ 16; Exhibit PX-06; Exhibit PX-31; Exhibit PX-32; Exhibit PX-38, RFAs 60, 94, 183(c); Rao Dep. Tr. 54:16–55:4, 274:8–20).

**Phase 2: Exemplary Delivery Baseline and Commercial Pipeline Generation**

11. Throughout my employment at EPAM, prior to September 2025, my performance as an employee was consistently lauded by EPAM executive leadership and commercial clients. In discovery, EPAM admitted under Rule 36 that its corporate records include a March 31, 2025 "2.2 Meets" project rating and a February 10, 2025 assessment by Project Manager Raman Loseu rating my impact as "High" (Exhibit PX-38, RFA 152(b) (EPAM Resp. No. 229, S45 at 30–32)). EPAM further admitted that Telescope human-resources records do not reflect any specific reprimand or discipline notice, while denying that performance records are limited to Telescope or that no deficiency records exist elsewhere (id.). These corporate admissions corroborate my contemporaneous February 2025 Talent Insights review for the major ALDH analytics

engagement rating my performance as "Meets Expectations" with "High" project impact (Exhibit PX-19). Prior to September 17, 2025, zero written performance criticisms, quota warnings, or client complaints were ever provided to me or entered in my personnel record. (Rao Decl. ¶¶ 18–19, 22; Exhibit PX-19; Exhibit PX-38, RFA 152(b)).

12. Throughout August and early September 2025, I actively drove commercial pipeline and platform partnerships. I coordinated AWS Neptune GraphRAG architecture with VP James Gatch, contributed to technical RFP responses for Bristol Myers Squibb with Anastasia Christianson, advanced commercial client development with J&J VP Dr. Troy Sarich and Head of Global Scientific Affairs Iftekhar Kalsekar, and co-hosted executive strategy sessions with AWS Global Account Manager Emma Segar focused on multi-million-dollar AWS collaborative revenue to help AWS retain J&J as its premier client, while utilizing authorized corporate credit card expenses for AI subscriptions under EPAM's Bring-Your-Own-Device and Bring-Your-Own-Account environment. On September 16, 2025—less than 24 hours before management verbally eliminated my leadership role—Klebanov commended me in writing: "Very nice! FYI I spoke with Sunil the other day and got good positive feedback too. Greg." (Rao Decl. ¶¶ 20–21; Exhibit PX-20; Exhibit PX-22; Exhibit PX-23; Exhibit PX-25; Exhibit PX-33).

**Phase 3: The Takeda Commercialization Whistleblowing**

13. On June 19, 2025, I reviewed the draft Takeda Statement of Work (SOW 9) line-by-line with EPAM technical lead Igor Lukash on Microsoft Teams, pasted Section 12 of Governing Client Master Services Agreement CW2719230 (vesting custom deliverables in Takeda as works made for hire) into Teams, and halted SOW submission for legal review to seek open-core carveouts (Exhibit PX-04 Tab A, Bates EPAM002003–2008; Klebanov Dep. Tr. 127:14–130:25). On SOW margin comments, Klebanov recorded EPAM policy: *"Yes, Gowtham - we already do it*

*all the time with Takeda and elsewhere unless customer clearly states it is work for hire. Just as with any previous AI and non-AI work in Takeda. But it is does not need to be open source etc.. - it will be our IP. I will explain why"* (Exhibit PX-04 Tab B, Bates EPAM002083–2084; Klebanov Dep. Tr. 86:1–7). On September 9, 2025, I engaged in protected whistleblowing activity under N.J.S.A. 34:19-3 by objecting to executive leadership regarding commercial practices I reasonably believed involved deception of and misrepresentation to commercial clients concerning intellectual property ownership. Following an afternoon commercial strategy meeting with AWS regarding commercializing Synapse, I verbally objected to direct supervisor Gregory Klebanov regarding EPAM's strategy of marketing and commercializing software developed under client Takeda Pharmaceuticals' funding as EPAM proprietary software, asserting directly: "No, EPAM does not have preexisting IP because everything was built for Takeda." I held an objectively reasonable belief that pitching and reselling client-funded software without consent constituted deception under N.J.S.A. 34:19-3(a)(1) and copyright infringement. This belief was informed by practice knowledge of prior client IP disputes, wherein EPAM admitted that "prior to September 23, 2025, EPAM or Odysseus Data Services, Inc. lost business of Roche, Genentech, or an affiliated Roche entity in connection with a dispute concerning deliverables or intellectual property developed for that client" (Exhibit PX-38, RFA 148(a) (EPAM Resp. No. 211, S45 at 2–3); ECF No. 43-7 at 4). (Rao Decl. ¶¶ 23–26; Exhibit PX-02; Exhibit PX-03; Exhibit PX-04 Tabs A & B; Exhibit PX-23; Rao Dep. Tr. 89:24–90:25, 118:11–15).

14. The software was developed under Takeda funding pursuant to Governing Client Master Services Agreement CW2719230 and SOW Phase 2 between Millennium Pharmaceuticals, Inc. ("Takeda") and Odysseus, which EPAM acquired. Under MSA § 12, all Deliverables are defined as works made for hire whose copyright immediately vests in Takeda

(and otherwise assigned to Takeda); under MSA § 13, Odysseus is prohibited from making presentations referring to Deliverables without written consent; and under MSA § 25, MSA terms expressly control over conflicting SOWs. At 4:30 PM EDT on September 9, 2025, immediately following my oral objection, I emailed Katie Barista (cc'ing my manager Gregory Klebanov and Lucy McDermott) with subject "Subject: Takeda AI contract - SOW - for legal review?", explicitly demanding formal legal review of EPAM's authority to commercialize Takeda-funded software. (Rao Decl. ¶¶ 25, 27; Exhibit PX-02 §§ 12, 13, 25; Exhibit PX-29). In a sworn deposition on the record (Exhibit PX-42), Klebanov admitted that he was on the email thread (Tr. 110:6–9) and confirmed Lucy McDermott was copied (Tr. 261:17–19). However, he attempted to disclaim notice by testifying that an email with only a subject line and no body "has no meaning" and is "zero" (Tr. 209:12–18), that he did not recall seeing this email, and that while he reads emails addressed to him, he "might not read" emails between others where he is only CC'd because "it might not be directed to me" and "[i]t might not be that important" (Tr. 210:4–9), yet conceded that he had discussed the email with legal counsel (Tr. 209:1–3). Under N.J.S.A. 34:19-4, delivering this written demand for legal review to his corporate inbox provided immediate supervisory notice, which cannot be defeated by asserting an email without body content has no meaning or that CC'd emails might not be read.

15. On September 19, 2025, J&J Head of Global Scientific Affairs Iftekhar Kalsekar requested a formal meeting and demonstration of Synapse. Conscientious about client IP boundaries, I emailed Katie Barista on September 20, 2025, stating that "everything was built on Takeda's dime," and proposing to seek Takeda's permission. On September 23, 2025, I messaged Barista on Microsoft Teams asking if I could demo what we built for Takeda, cautioning that I did not want to show unowned software. Barista replied in separate messages relaying advice

directly from corporate legal counsel confirming my objection: at 4:16 PM, Barista wrote that "legal said nope-- you were right SOW said cool, but MSA is not" (ECF No. 43-7 at 2–3); at 4:22 PM, Barista wrote that "the MSA makes no allowance for pre-existing IP - everything we build belongs to Takeda and the MSA controls over the SOW in the event of a conflict between the terms of the two documents" (id. at 3); and at 4:31 PM, Barista wrote that "Odysseus should not demo this for anyone else unless the MSA has been amended to provide for background intellectual property ownership being retained by Odysseus or Takeda gives express permission to share it" (id. at 4). (Rao Decl. ¶¶ 26, 33; Exhibit PX-05; ECF No. 33-2; ECF No. 43-7; Exhibit PX-38, RFA 164(b) (EPAM Resp. No. 277, S45 at 109–111)).

**Phase 4: The Gilead Offshore Staffing Whistleblowing and Manager Reliance**

16. On September 19, 2025 at 00:36 AM EDT, I engaged in a second protected whistleblowing disclosure under N.J.S.A. 34:19-3 by transmitting a written compliance report to supervisor Gregory Klebanov regarding unauthorized offshore personnel placement on the Gilead account. This marked at least the third time this staffing issue had arisen on Gilead: (a) on December 16, 2024, Senior Program Manager Lucy McDermott notified me in writing that Gilead barred Belarus and restricted staffing to approved countries under its Optum agreement, requiring removal of developer Alexander Aleksiayuk (Exhibit PX-09); (b) in February 2025, Gilead Director Ram Varma documented that an assigned contractor appeared to be working from an unapproved country, which matter was addressed and resolved (Exhibit PX-43, Varma Decl. ¶ 6); and (c) in September 2025, Ram Varma telephoned me reporting that Gilead discovered an EPAM contractor identified as U.S.-based was actually offshore in an unapproved European/Serbian jurisdiction, stating that this had happened multiple times (Exhibit PX-43, Varma Decl. ¶ 7; Rao Dep. Tr. 176:5–184:25). Following that call, I reported the issue in writing

to Klebanov on Microsoft Teams: "Ram called. Gilead is alleging that we claimed we placed two US based employees when they were in offshore and banned country (Serbia). This has been escalated to Gilead legal. do you know about this - is this true. i said i will verify" (Exhibit PX-08). (Rao Decl. ¶¶ 28–32; Exhibit PX-08; Exhibit PX-09; Exhibit PX-43; Rao Dep. Tr. 176:5–184:25).

17. At 07:14 AM EDT on September 19, 2025, Klebanov replied in writing on Teams: "well apparently Lucy already talked to Ram and clarified, including who - by mistake - was said States. She is based in Europe but not in one of the 'approved' countries. They will replace this person - all good. btw, the only way to know what countries are allowed is to either see the TPA (which I have not seen for Gilead DeSC) or if they tell us... Lucy will find out from Ram the allowed locations." At 07:53 AM EDT, I replied: "ok - good." Nine months earlier, on December 16, 2024, Senior Program Manager Lucy McDermott had reported to me in writing that Gilead had named restricted countries—specifically barring Belarus—and maintained an "approved countries" list under its agreement, which required removing developer Alexander Aleksiayuk from Gilead work (Exhibit PX-09, Bates EPAM000117). The September 2025 placement involved a contractor in Serbia; I did not know whether EPAM knew in December 2024 from Gilead if Serbia was banned too, or whether EPAM intentionally refused to acknowledge it. Based on the December 16, 2024 notice from Lucy McDermott and Ram Varma's statements that this was not the first time this had happened, I reasonably understood that deploying unapproved personnel contrary to client commitments was part of a recurring pattern rather than an isolated clerical mistake, and that misrepresenting personnel locations constituted unlawful client deception under N.J.S.A. 34:19-3(a)(1)–(2) and (c)(2). Under EPAM's "Speak Up Policy" (Exhibit PX-35, § 3.4 at EPAM000218), employees are encouraged to report compliance

concerns, backed by EPAM's guarantee that "EPAM does not tolerate retaliation against someone because they raised a good faith question or concern." In discovery, EPAM admitted under Rule 36 that Gilead processed patient claims data (Exhibit PX-38, RFAs 154(a)–(b) (EPAM Resp. Nos. 236–237, S45 at 41–44)). EPAM also admitted that an offshore Belarus developer worked on Gilead with disclosure during onboarding (id., RFA 155(a) (EPAM Resp. No. 240, S45 at 47–49)). Furthermore, EPAM admitted that it did not complete any documented internal compliance investigation into the reported Belarus worker issue as of November 4, 2025 (while denying that the alleged escalations occurred) (id., RFA 173(d) (EPAM Resp. No. 315, S45 at 170–172)), and confirmed under Rule 34 that it possessed zero records of compliance investigations into my protected report (Exhibit PX-41, RFP 20). My reply ("ok - good") reflected reasonable reliance on supervisor assurances that management was actively replacing the individual ("They will replace this person - all good..."). (Rao Decl. ¶ 30, ¶ 33; Exhibit PX-08; Exhibit PX-09; Exhibit PX-35; Exhibit PX-38, RFAs 154(a)–(b), 155(a), 173(d); Exhibit PX-41, RFP 20).

**Phase 5: The Immediate Retaliatory Cascade**

18. Within three days of my September 9 whistleblowing complaint, on September 12, 2025, a message was sent to Klebanov reporting my personal website (gowthamrao.com). Klebanov reviewed the website—which had been registered and hosted by an EPAM engineer under EPAM's Star Magnet talent program—identified no policy violations, found no conflicts of interest, and issued no warnings. On September 17, 2025—eight days after my September 9 complaint—Klebanov verbally informed me during a video conference that my practice leadership role was being eliminated for cost reasons pursuant to board-mandated cost cutting. During that same conversation, he affirmed my performance was outstanding, suggesting I was safe and might transition to another role. I understood and experienced this unannounced

stripping of my executive role and direct reports as an immediate notice of separation and an adverse employment action under New Jersey law, terminating my leadership role and materially altering the terms, conditions, and privileges of my employment. (Rao Decl. ¶¶ 34–35; Exhibit PX-24; Exhibit PX-26; Rao Dep. Tr. 190:14–196:16).

19. Following my September 19 Gilead escalation, on September 23, 2025, practice leadership unilaterally revoked assigned operational support from employee Lana Shubinsky for my OHDSI open-source community coordination and symposium preparations without prior notice to me (Exhibit PX-30), directly impeding my external professional and collaborative commitments. On September 25, 2025 (six days after Gilead), People Partner Larry McKlaine transmitted a confidential PIP template to Klebanov ("As requested") (Exhibit PX-10 Tab A, Bates EPAM002147 & EPAM002012–2015). When I sent an email confirming a discussion in which management indicated my performance was fine and no PIP was in place, McKlaine noted his disagreement with my account. McKlaine advised leadership in writing to refrain from responding in writing (Exhibit PX-34). Management thereby withheld written confirmation that my performance was fine while actively holding the secret PIP template, leaving it uncertain how much of crucial management deliberations and decision-making was conducted verbally or remained undocumented. (Rao Decl. ¶¶ 37.a, 38; Exhibit PX-10 Tab A; Exhibit PX-30; Exhibit PX-34).

20. On September 26, 2025 (seven days after Gilead), management issued a written communication asserting that critical goals such as achieving target revenue and maintaining profit margins had not been met. In that same communication, management threatened that a Performance Improvement Plan ("PIP") would be implemented if I continued in a revised role (Exhibit PX-11, Bates EPAM000085–088). Contemporaneously, management verbally

communicated individual sales expectations that I reasonably understood and experienced as an unattainable demand to produce approximately $2.5 million within 30 days. This was an impossible requirement for an R&D practice leader without sales staff. It directly violated EPAM's mandatory corporate HR standards ("PIP DOs and DON'Ts", Exhibit PX-10 Tab B, Bates EPAM002149–2154) requiring achievable objectives and remediation, prompting my immediate written protest. As a direct consequence of management's unilateral role redefinition into an individual contributor role—which I accepted out of necessity after conferring with Larry McKlaine because EPAM left me no other option to continue my employment (detailed in Paragraph 21)—management processed an internal ticket on October 2, 2025 (thirteen days after Gilead) reassigning all eleven (11) of my direct reports to Sarah Seager (Exhibit PX-12 Tab A, Bates EPAM000138–0139). Management communicated this transfer to me. Under the practical reality of the role change, I responded affirmatively because EPAM left me no other choice to continue my employment, while preserving my objection to the underlying retaliatory role elimination. (Rao Decl. ¶¶ 39–40; Exhibit PX-10 Tab B; Exhibit PX-11; Exhibit PX-12 Tab A).

**Phase 6: Affirmative Rebuttal of Pretextual "Engineered Exit"**

21. Following the September 17 role elimination notice, I conferred transparently with SVP Troy Rask on September 26, 2025. We discussed an amicable post-layoff transition to support key client accounts such as Takeda under an independent B2B consulting model through an LLC without employee overhead, while confirming that an involuntary layoff relieved me of post-employment non-competition restrictions under ECA § 5(c). On September 30, 2025, I submitted a written separation proposal to HR, and on October 1, 2025 emailed HR People Partners June Dinitz and Larry McKlaine attaching my ECA to seek formal clarification of post-employment restrictions (Exhibit PX-36 Tab A, Bates EPAM000009–010). On October 2, 2025, I

served formal written notice E04 communicating my position on ECA §§ 1(b) and 2(a) and preserving my pre-existing open-source and community health data science work (Exhibit PX-36 Tab C, Bates EPAM000114–0116). June Dinitz responded in writing on October 3, 2025, confirming HR would review the requests and agreement terms (Exhibit PX-36 Tab B, Bates EPAM000033–0036). When discussions yielded no agreement, I formally withdrew my separation request in writing on October 2, 2025 (Notice E01). I confirmed I was not resigning, intended to perform my duties diligently, and accepted continuing in the redefined role. I made this acceptance out of practical necessity because EPAM left me no other choice to remain employed, while preserving all objections that the unilateral stripping of my leadership role was retaliatory. Larry McKlaine acknowledged this withdrawal and acceptance in writing at 16:43 EDT (Exhibit PX-12 Tab B, Bates EPAM000031–0032), merely 23 minutes after EPAM processed the internal ticket reassigning all eleven of my direct reports to Sarah Seager pursuant to the redefined role (Exhibit PX-12 Tab A). This contemporaneous record conclusively refutes EPAM's post-hoc "engineered exit" theory under SAC ¶ 6(g). It proves my good-faith, diligent commitment to perform assigned deliverables under the redefined role, and demonstrates that the organizational stripping of my direct reports was an adverse retaliatory action implemented by EPAM rather than an employee abandonment. (Rao Decl. ¶ 50(a)–(b); Exhibit PX-12 Tabs A & B; Exhibit PX-27; Exhibit PX-36 Tabs A–C; Bates GRAO002698; Rao Dep. Tr. 234:19–235:15).

22. During this period, I continued active commercial work, originating and advancing an authorized $1.5 Million AWS partner-funded co-selling initiative for Johnson & Johnson with SVP Greg Killian and Santanu Sen on September 22, 2025 (Exhibit PX-23 Tab B, Bates EPAM000102–0107)—merely three days before Klebanov secretly solicited a PIP template—and advancing co-selling strategy through September 30, 2025 (Exhibit PX-23 Tab A, Bates

EPAM000071–0073). EPAM admitted under Rule 36 that I never submitted a resignation and was terminated involuntarily (Exhibit PX-38, RFAs 169(a), 169(c) (EPAM Resp. Nos. 296, 298, S45 at 139–144)). EPAM also admitted that Section 5(c) conditions post-employment non-compete covenants exclusively on voluntary resignation (id., RFA 183(c) (EPAM Resp. No. 355, S45 at 239–240)). Furthermore, EPAM admitted that it did not contest or appeal my New Jersey Unemployment Insurance benefits following discharge (id., RFA 169(d) (EPAM Resp. No. 299, S45 at 144–145), qualifying that non-contest was the HR team's regular practice). (Rao Decl. ¶ 36, ¶ 50(c); Exhibit PX-13 Tabs A & B; Exhibit PX-21; Exhibit PX-23 Tabs A & B; Exhibit PX-38, RFAs 169(a), 169(c), 169(d), 183(c)).

**Phase 7: The October 15 Discharge and Contemporaneous Cloud Restoration Records**

23. On October 15, 2025 at 11:19 AM EDT, EPAM submitted the internal HR ticket to terminate my employment (Ticket UR0001412586, Exhibit PX-13 Tab A, Bates EPAM000141–0143), accompanied by comprehensive electronic HRMS exit approvals and companion Service Desk Ticket UR0001412685 (Exhibit PX-13 Tab B, Bates EPAM002106–2146). The ticket designated the separation as involuntary, cited "misconduct/disciplinary," and noted: "Was terminated due to the violation of the employee covenants." This locked in my termination well before any file activity was reported. At 11:27 AM EDT, Klebanov emailed Chief People Officer Larry Solomon justifying discharge over open-source copyright tagging ("he decided to put Copyright by Gowtham and open source on the code base... Ahhh :("), with zero mention of file deletions. This primary rationale communicated to corporate HR leadership was completely uninvestigated and unvalidated at the time of termination: EPAM conducted zero technical review, never inquired into the file context, and never ascertained whether any proprietary code was affected. Although EPAM aggressively maintained this uninvestigated accusation on the

public court record for nearly one full year across its Complaint (ECF No. 1 ¶ 69), emergency TRO motion (ECF No. 3-1 at 9, 13), and First Amended Complaint (ECF No. 30 ¶ 67) as an intentional, fraudulent assertion of copyright ownership, EPAM finally conceded in a footnote to its Second Amended Complaint (ECF No. 93 at 22, ¶ 86 n.7) that the attachment of the phrase "may not have been intentional," completely undermining the primary rationale given to Solomon. EPAM has never officially communicated to me that the accusation it cited to justify my discharge was baseless. It has never corrected my official personnel file from a "misconduct/disciplinary" termination. Instead, it has continued to perpetuate this false public stigma in ongoing litigation, demonstrating that the stated ground was an uninvestigated pretext from inception, maintained in bad faith to justify a retaliatory discharge and perpetuate ongoing post-employment retaliation. (Rao Decl. ¶¶ 41.a–b, 42; Exhibit PX-13 Tabs A & B; Exhibit PX-14 Tab A; ECF No. 1 ¶ 69; ECF No. 3-1 at 9, 13; ECF No. 30 ¶ 67; ECF No. 93 ¶ 86 n.7).

24. The internal email from Evgeny Sidenko reporting SharePoint file deletions was sent at 1:09 PM EDT—nearly two hours after the 11:19 AM termination ticket was submitted. Merely four minutes later, at 1:13 PM EDT, Klebanov forwarded this unverified alert to SVP Greg Killian (Exhibit PX-14 Tab B, Bates EPAM002166). This disseminated an unverified alert to executive leadership before technical verification or restoration occurred. In IT Support Ticket UR0001412851, opened at 1:05 PM EDT, Sidenko reported at 2:37 PM EDT (88 minutes after his 1:09 PM email) that "we have successfully restored the deleted folders and have started our internal investigation on any further damage." At 2:23 PM EDT, Klebanov directed Sidenko on Teams: "please send this as a follow up email to Larry, we need to document all of this," creating a post-hoc paper trail for Solomon. In his September 29, 2026 deposition, Klebanov testified under oath that my discharge was motivated because *"prior to that was escalated to me that you*

*deleted some files on SharePoint side and tried to double delete to also hide some of the activities"* (Klebanov Dep. Tr. 156:3–5). This sworn deposition explanation is demonstrably false and an objective chronological impossibility directly refuted by EPAM's own contemporaneous digital timestamps and records: (a) at 11:19 AM EDT, the HR exit ticket cited exclusively "violation of the employee covenants" with zero mention of deletions (Exhibit PX-13 Tab A); (b) at 11:27 AM EDT, Klebanov's email to Solomon stated termination was over open-source copyright tagging with zero mention of deletions (Exhibit PX-14 Tab A); (c) IT Support Ticket UR0001412851 was not created until 1:05 PM EDT; (d) Sidenko's initial alert email was sent at 1:09 PM EDT; (e) Klebanov directed Sidenko at 2:23 PM EDT to *"send this as a follow up email to Larry, we need to document all of this"* (Exhibit PX-15) to engineer an after-the-fact rationale; and (f) Sidenko confirmed at 2:37 PM EDT that "we have successfully restored the deleted folders" (Exhibit PX-16 Tab A). Klebanov's sworn assertion that deletions were escalated prior to termination and motivated the discharge is a demonstrably false post-hoc contrivance refuted by EPAM's own system records, establishing bad-faith contrivance of cause and pretext under *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000). (Rao Decl. ¶ 41.c–f; Exhibit PX-14 Tabs A & B; Exhibit PX-15; Exhibit PX-16 Tab A; Klebanov Dep. Tr. 156:3–5, 247:1–248:20).

25. Standard Microsoft 365 cloud architecture maintains multi-stage Recycle Bins and 93-day retention policies preserving files against permanent deletion by ordinary users. As established by the contemporaneous SharePoint Online Recycle Bin and activity pane screenshot marked as Deposition Exhibit 11 (Exhibit PX-16 Tab B, Bates EPAM002167–2168), the affected files remained intact in the first-stage Recycle Bin, completely restorable via a single administrative click. In deposition, Klebanov testified he believed some files were not restored,

and I testified that I had cleaned up working files during transition. Crucially, EPAM held contemporaneous written confirmation in Ticket UR0001412851 that IT had successfully restored the deleted folders at 2:37 PM on October 15 (Exhibit PX-16 Tab A). On October 16, 2025, EPAM's Information Security team generated an internal SOC Post Incident Review Report (INC0000588192, Exhibit PX-18), recording identified deleted items and selected outbound messages. When moving for emergency injunctive relief in November 2025, EPAM omitted both its contemporaneous restoration confirmation in Ticket UR0001412851 and its internal technical review. Instead, EPAM alleged irreparable permanent data destruction to justify retaliatory termination and support its emergency claims. (Rao Decl. ¶¶ 41.d, 42; Exhibit PX-16 Tabs A & B; Exhibit PX-18; ECF Nos. 3, 3-1, 3-2; Rao Dep. Tr. 215:14–20; Klebanov Dep. Tr. 256:25–257:4).

**Phase 8: Post-Discharge Inbound Inquiries, Commercial Interference, and Unpunished Peer Comparators**

26. On October 16, 2025—the day after my discharge—EPAM employee Gaurav Dravida sent an unsolicited Teams inquiry regarding a Boehringer Ingelheim demonstration; I offered to communicate via the public OHDSI community. At the November 5, 2025 TRO hearing, I told the Court I had never talked to, emailed, texted, or called Katie (ECF No. 43-3 at 42:16–43:1), and Chief Judge Beetlestone stated: "Okay. So, Mr. Yu, we have -- he just said he hadn't -- he hadn't contacted Katie" (id. at 43:2–3). (Rao Decl. ¶ 50(d); ECF No. 33-5; ECF No. 43-3 at 42:16–43:4).

27. Following my separation, J&J Head of Global Scientific Affairs Iftekhar Kalsekar confirmed that a $50,000 Proof of Concept SOW for medical indication decks "is aligned with our scope and expectation" and instructed his team to "proceed to next steps" (Oct. 20, 2025 email, J&J Thread), and J&J activated CoReason Inc. in its enterprise supplier portal under

vendor number 0430139026 (VR ID 400228) (Oct. 31, 2025 email). On October 31, 2025, EPAM sent me a cease-and-desist letter asserting that I had "announced yourself as a competitor of EPAM, in violation of the restrictive covenants contained in your agreement". On November 3, 2025, J&J suspended contracting discussions citing "a change in business priorities", following EPAM's cease-and-desist letter to me and immediately preceding EPAM's initiation of this lawsuit the next day on November 4, 2025. CoReason's consulting involved zero EPAM software or trade secrets, relying entirely on public scientific literature, off-the-shelf commercial AI (Google Gemini), and clinician prompting. (Rao Decl. ¶ 50(f); J&J Thread; Rao Dep. Tr. 269:3–272:4).

28. While EPAM disciplined and sued me over alleged data transfers, EPAM employees shared corporate and client files to personal Gmail accounts during normal business under EPAM's Bring-Your-Own-Device and Bring-Your-Own-Account environment. In discovery, EPAM admitted under Rule 36 that Section 3.21 of EPAM's Acceptable Use Policy lists requirements for use of a personally owned computing device (BYOD) (Exhibit PX-38, RFA 1 (EPAM Resp. No. 1, S13 at 2–4)). EPAM admitted that employees have accessed corporate services from personal devices under that Policy (id., RFA 3 (EPAM Resp. No. 3, S13 at 5–7)). EPAM also admitted that access permissions to SharePoint sites and repositories were configured and granted by EPAM IT administrators or repository owners (id., RFA 10 (EPAM Resp. No. 10, S13 at 16–18)), and that desktop computer A0001 reflected recurring authentications and access in Entra ID logs (id., RFA 23 (EPAM Resp. No. 23, S13 at 38–40)). I rely on this workplace practice and access history as support for my account of ordinary employment-related use of my workstation. For example, on September 24, 2025, an engineering colleague shared AWS pricing estimates to my personal Gmail with edit rights, copying another employee's personal Gmail

(ECF No. 33-10). When asked in Request for Admission No. 48 whether colleagues Konstantin Iaroshovets, Santanu Sen, or Naaz Fatima Butt were ever subjected to disciplinary or legal action for utilizing personal email accounts to conduct company business, EPAM asserted objections and declined to admit or deny (Exhibit PX-38, RFA 48 (EPAM Resp. No. 48, S13 at 79–81); Rao Decl. ¶ 50(e); Rao Dep. Tr. 225:2–15). (Rao Decl. ¶ 50(e); Exhibit PX-38, RFAs 1, 3, 10, 23, 48; Rao Dep. Tr. 225:2–15).

**Phase 9: Forensic Reality of Trade Secret Claims: The 23 KB Boilerplate Scaffolding**

29. In emergency TRO papers, EPAM relied on an IT download log listing 44,960 synchronization events to swear that I downloaded over 40,000 files (ECF No. 3-2 ¶ 39). In its briefs, EPAM characterized this telemetry as tens of thousands of files. In reality, these entries followed my selecting "keep my files" on OneDrive for a legitimate work review for SVP Greg Killian and represented automated background synchronizations. In formal discovery, EPAM admitted under Rule 36 that the export log contained 44,741 records with an "O365_Operation (custom)" value of "FileSyncDownloadedFull" (Exhibit PX-38, RFA 198(c) (EPAM Resp. No. 416, S45 at 355–357)). EPAM also admitted that 44,702 records reflected user-agent strings identifying versions of "Microsoft SkyDriveSync" (id., RFA 199(a) (EPAM Resp. No. 418, S45 at 359–361)). Microsoft Purview defines FileSyncDownloadedFull as: 'User downloaded a file to their computer from a SharePoint document library or OneDrive using OneDrive sync app (OneDrive.exe),' which EPAM admitted was accurately quoted by its counsel on the record (Exhibit PX-38, RFA 34 (EPAM Resp. No. 34, S13 at 57–58); ECF No. 43-2 at 2 n.3). The quoted definition describes a download through the OneDrive sync app. I rely on the recorded operation and user-agent values to support my account that the events included synchronization activity. The software repositories found in my OneDrive Documents\ss folder consisted of six

ZIP archives relating to Takeda-Synapse, totaling merely 23,175 bytes (~23 KB) compressed (48,462 bytes uncompressed) (Exhibit PX-17; ECF No. 81-1 at 5–6; ECF No. 81-2 ¶¶ 8–9). EPAM's own GitLab server access logs record these archives as downloaded on September 30, 2025 at 3:31 PM EDT during my active employment (EPAM002184 at lines 56791–56801). I downloaded these files in the ordinary course of performing my routine employment responsibilities as EPAM's designated Product Owner for Synapse (Exhibit PX-38, RFAs 110–112 (EPAM Resp. Nos. 110–112, S13 at 179–183); Klebanov Dep. Tr. 182:13–17). I acted under authorized access pursuant to EPAM IT Acceptable Use Policy § 3.14 (authorizing local storage synced to OneDrive for productivity) and Employment Agreement § 1(d)—simply doing my job during my employment period. As reflected in the native file manifest, five of these archives contained generic GitLab README files autogenerated during repository creation, while the sixth contained Terraform configuration stubs, with zero proprietary application source code, zero executable logic, and zero client deliverables—rendering them effectively empty scaffolding. Crucially, despite nine (9) months of gruelling private forensic inspection pursuant to the Court's inspection protocol (ECF No. 55)—imaging and searching five (5) personal devices and eleven (11) accounts encompassing over 85,000 files—EPAM has produced zero evidence that I have in my possession any EPAM proprietary Synapse software or source code on my computer. EPAM admitted under Rule 36 that Global Head of IT Security Miroslav Sklansky did not examine the contents of the 44,960 files before executing his emergency declaration (Exhibit PX-38, RFA 142(c) (EPAM Resp. No. 191, S13 at 305–306)). (Rao Decl. ¶¶ 44–46, 49, 50(g); Exhibit PX-01; Exhibit PX-17; Exhibit PX-38, RFAs 34, 110–112, 142(c), 198(c), 199(a); ECF No. 55).

30. Following my October 15, 2025 termination, EPAM pursued an extensive legal and forensic investigation against me:

a. **Klebanov Admissions on Client Ownership and Failure of Damages:** In deposition (Exhibit PX-42), Klebanov acknowledged both that some Takeda work was work for hire and some repositories "belonged to our clients" (Klebanov Dep. Tr. 268:16–17; id. 154:17–22), while also asserting that Synapse is EPAM property (id. 82:25–83:4) and that Takeda modifications belong to EPAM under the license (id. 120:13–17). Klebanov could not identify any Synapse repository separate from the Takeda deployment (id. 86, 134), could not define trade secret (id. 295:2–11), could not quantify any financial damages resulting from my actions, stated he would not speculate on a number, and could not attribute lost business to my actions with certainty (id. 264:15–268:25). In formal discovery responses (Exhibit PX-37, ROG 10(a)), EPAM admitted under corporate oath that "[t]here is no firm computation of these damages available" for alleged lost sales, yet revealed in Item 7 that it has incurred approximately $1,120,822.00 in attorneys' fees, $75,717 in forensic expenses, $31,268 in expert witness costs, and $10,711 in other litigation expenses—surpassing $1.23 Million in total litigation spend to pursue an employee over 23 KB of autogenerated templates and an 88-minute restorable deletion. EPAM produced zero ordinary-course timesheets or project ledgers supporting Klebanov's claim of 4,600 development hours (Rao Decl. ¶¶ 46–48; Exhibit PX-37, ROGs 5, 10(a); Exhibit PX-42; Klebanov Dep. Tr. 82:25–83:4, 86, 120:13–17, 134, 154, 264–268, 290, 295).

b. **Depletion of Personal Savings:** Defending against EPAM's claims, emergency motions, and sweeping forensic demands, I depleted my personal savings paying retained defense counsel (ND Galli Law LLC) prior to proceeding pro se.

c. **The March 2026 Pro Se Transition and Economic Asymmetry:** EPAM deployed the full financial and operational resources of its outside litigation counsel Seyfarth Shaw LLP—marshaling four litigation attorneys (Jacob Oslick, James Yu, Brooke Gary, and Madeline Comer) and forensic eDiscovery partner Matthew Christoff, supported by In-House Deputy General Counsel Sarah Lugar—incurring over $1.12 million in legal fees to litigate against an individual former employee. Having depleted my personal savings paying retained defense counsel (ND Galli Law LLC), I was confronted in March 2026 with counsel's advice that because EPAM possessed the financial resources to prolong the litigation indefinitely, the only practical resolution was to accept fault in a civil settlement. Because I had engaged in no wrongdoing and refused to sign an untrue confession or accept unearned fault to yield to economic pressure, an irreconcilable division arose with retained counsel regarding settlement posture, leading to counsel's withdrawal (ECF Nos. 28, 29). I was forced to proceed *pro se* against a large publicly traded corporation and its national law firm. From that point forward, while managing clinically diagnosed Major Depressive Disorder and Generalized Anxiety Disorder (Exhibit PX-40), I personally drafted all court filings, reviewed extensive technical productions, and defended this action without legal representation.

d. **Forensic Protocol Inducement, Coercive Meetings, and Operational Dragnet:** In November and December 2025, EPAM induced my consent to enter a private Forensic Inspection Protocol (ECF No. 55; ECF No. 20 ¶ 3) by representing that the inspection would be a straightforward, objective clearance scan: promising that if I participated in the forensic search, EPAM simply sought to confirm whether I retained any EPAM files, and that if I had deleted company files upon separation then I would clear the scan and EPAM would dismiss the action. Relying upon that representation, I surrendered five personal computing devices and eleven

personal accounts—conceptually encompassing all my personal computers, my mobile phone, and my personal Google accounts, which contained my family photographs, personal communications, and more than a decade of personal life history—to neutral examiner iDS. Following entry of the protocol, EPAM altered its approach: rather than conducting an objective scan for trade secrets, EPAM introduced broad, indiscriminate search strings—including "J&J", "license", "__init__.py", "OHDSI", "cohort definition", and common disease names—designed to capture tens of thousands of unrelated files. Over nine months of forensic proceedings, EPAM generated an immense operational burden: 5,004 litigation emails (>2,200 unique messages), including 1,679 emails involving Seyfarth eDiscovery Lead Matthew Christoff, 1,081 emails involving neutral vendor iDS, and 1,590 emails involving lead counsel Jacob Oslick; 64 meet-and-confer conferences and telephone calls; and 198 direct technical exchanges with iDS. When I temporarily paused the ingestion of unreviewed personal files lacking protective safeguards, counsel accused me of "perjury" (August 20, 2026), while retaining approximately 79,000 files in review limbo after admitting in writing that reviewing them would take over 1,300 hours yet declining to confirm that no trade secrets were found (ECF No. 54 at 3; July 9, 2026 email thread).

e. **Analysis of Forensic Hit Population, Common Open-Source Filenames, and Docket Accusations:** In court filings and proceedings, EPAM seized upon the raw keyword hit tally from neutral examiner iDS's January 10, 2026 report (ECF No. 58-7 at 3)—reporting 1,265 hash hits and 81,696 non-hash hits on desktop A0001 (and 4,406 hash matches vs. 93,859 non-hash hits across all devices)—to publicly assert on the court docket that I retained "over 80,000 files" belonging to EPAM. EPAM utilized this inflated total to advance a public campaign of accusations, repeatedly labeling me a "thief" and asserting "perjury" across filings to inflict

severe emotional distress and exacerbate my mental health conditions. An objective technical evaluation of this hit population (work_product/study/02_results.json and 04_name_matches.csv) confirms that these hits were not EPAM trade secrets, but ubiquitous open-source developer boilerplate, build configurations, and operating system dependencies matched purely by filename regardless of directory: (1) **__init__.py:** 1,763 target entries in iDS's master search list, representing 131,857 local file occurrences across the machine—the standard Python package initializer file present in every Python library, conda environment, and virtual environment; (2) **pom.xml:** 698 target entries—the standard Project Object Model XML build descriptor for Apache Maven utilized throughout Java software projects; (3) **index.js:** 516 target entries (10,250 local occurrences)—the standard root entrypoint for Node.js packages and npm JavaScript libraries; (4) **LICENSE / LICENSE.txt / LICENSE.md:** 717 target entries (22,591 local occurrences)—standard open-source license text files (Apache-2.0, MIT, BSD) required in public software distributions; (5) **package.json:** 426 target entries (7,897 local occurrences)—the universal Node.js package dependency and metadata configuration file; (6) **README.md / README:** 541 target entries (6,695 local occurrences)—the universal documentation file found in open-source GitHub repositories; (7) **changelog.Debian / changelog.Debian.gz:** 758 target entries—standard Linux operating system package changelog files residing within container and system layers; (8) **license.rtf:** 257 target entries—standard Microsoft Windows operating system and Office license files; (9) **utils.py / util.py:** 117 target entries (10,432 local occurrences)—generic utility Python scripts common to scientific computing; and (10) **config.hpp**, **index.html**, **version.py**, **exceptions.py**, **index.ts**, and **manifest.json**: hundreds of standard configuration and template files. Out of 82,961 total search hits on desktop A0001, actual cryptographic hash matches totaled only 1,265 files (barely 1.5%), and secondary analysis established that over 99%

of all hits were operating system dependencies and public open source. The only code archives downloaded during active employment were the six GitLab archives totaling ~23 KB of autogenerated templates downloaded under IT Policy § 3.14 (ECF No. 81-2 ¶ 8; Exhibit PX-17). By characterizing standard software boilerplate (__init__.py, pom.xml, LICENSE) as evidence of data theft, EPAM advanced an artificial 80,000-file accusation on the public docket to inflict maximum distress upon me.

f. **Escalating Spoliation Theories and Denial of Sanctions With Prejudice:** Instead of accepting my sworn explanation that I deleted EPAM files upon my October 15, 2025 termination in adherence to EPAM IT Acceptable Use Policy §§ 3.14 & 3.21 (mandating that departing employees delete company data from BYOD devices) prior to any litigation hold, EPAM pursued escalating spoliation theories. When neutral examiner iDS found zero EPAM source code on my devices, EPAM shifted theories, speculating that I had created "derived files" of EPAM IP and deleted the EPAM files, demanding interrogation of AI prompts and outputs (ECF No. 58 at 2–3; July 9, 2026 email thread). When the forensic dragnet still yielded no derived files, EPAM escalated in its July 29, 2026 motion for spoliation sanctions (ECF No. 58), alleging that I copied derived files to an external USB storage device, deleted them from my desktop, and performed a Windows system reset on November 14, 2025 specifically to destroy USB connection artifacts. In opposition, I presented evidence that consumer Windows systems do not maintain direct USB file copy logs, citing concessions by EPAM's forensic expert Michael Greenfield (ECF No. 58-26 ¶ 23). I showed that the only two USB devices iDS recorded after September 1, 2025 were the computer's own internal drive and iDS's own imaging drive (ECF No. 58-18 at 2; ECF No. 58-7 at 6). I argued that the system reset was routine user profile troubleshooting selecting "Keep my files," preserving all user files in C:\Users\ and C:\files\

(ECF No. 58-17). Following an evidentiary hearing on September 16, 2026, the Court entered an Order denying EPAM's motion for sanctions with prejudice (Exhibit PX-28, ECF No. 86), after counsel conceded that EPAM's expert had not tried to restore the information and had not been asked to do so (Sept. 16, 2026 Hr'g Tr. 78:11–79:10). Even after the Court entered its Order denying sanctions with prejudice on September 16, 2026 (Exhibit PX-28, ECF No. 86), EPAM sought to prolong forensic scrutiny against my personal workstation. On September 17, 2026 at 2:22 AM EDT, outside counsel Matthew Christoff emailed neutral examiner iDS, copying me, requesting descriptions, timeline, and cost estimates for potential additional workflows to re-examine workstation A0001 for spoliation. I initially objected in writing that morning, asking iDS not to proceed without conferral. Neutral examiner James Vaughn of iDS clarified that he understood the email as an inquiry regarding technical capability and estimates for a potentially agreeable supplemental request rather than an instruction to proceed outside conferral, an interpretation I accepted as reasonable while maintaining that communications should remain transparent. On September 21, 2026, iDS provided an estimate of $6,500 to $7,900 for possible unallocated carving. Following subsequent conferral, EPAM did not pursue the supplemental analysis. Facing the prospect of renewed spoliation demands against my personal computer following a denial with prejudice caused me significant renewed distress and anxiety.

**Phase 10: Involuntary Termination, Restrictive Covenant Nullity, and Corporate Claim Reservation**

31. Section 5(c) of the ECA explicitly conditions post-employment non-competition restrictions solely upon voluntary resignation: "In the event you voluntarily resign employment..." and specifies: "The restrictions in this subsection shall not apply in case of an involuntary termination." EPAM terminated my employment involuntarily on October 15, 2025. In discovery, EPAM admitted under Rule 36 that I never submitted a resignation and was

terminated involuntarily (Exhibit PX-38, RFAs 169(a), 169(c) (EPAM Resp. Nos. 296, 298, S45 at 139–144)). EPAM also admitted that it did not contest or appeal my New Jersey Unemployment Insurance benefits (id., RFA 169(d) (EPAM Resp. No. 299, S45 at 144–145), qualifying that non-contest was the HR team's regular practice; id., RFA 183(c) (EPAM Resp. No. 355, S45 at 239–240)). In the December 10, 2025 Stipulated Consent Order (ECF No. 20 at 1), the parties recorded the joint recital that Sections 5(a) (employee non-solicitation) and 5(b) (client non-solicitation) remain in effect and that "because Defendant's employment was involuntarily terminated, Section 5(c) of the [ECA] regarding Noncompetition is not at issue in the Motion," while preserving positions without waiver. The nominal 12-month post-employment period in § 5(c) concludes on October 15, 2026. However, Section 5(d) contains a tolling provision extending restrictions for a period equal to any violation. In its live Second Amended Complaint (ECF No. 93 ¶ 6(g)), EPAM continues to assert that I engineered my termination to compete. EPAM previously asserted in its October 31, 2025 notice that I was acting in violation of restrictive covenants. Together, these adverse assertions create an ongoing justiciable controversy regarding covenant nullity. (Rao Decl. ¶¶ 16, 43, 50(b); Exhibit PX-06 § 5(c), (d); Exhibit PX-13; Exhibit PX-21; Exhibit PX-38, RFAs 169(a), 169(c), 169(d), 183(c); ECF No. 20 at 1; ECF No. 93 ¶ 6(g)).

32. Under *Rowland v. California Men's Colony*, 506 U.S. 194, 201–02 (1993) and 28 U.S.C. § 1654, a corporation cannot appear pro se in federal court. Accordingly, all affirmative claims for commercial disruption and business torts belonging to CoReason, Inc. are expressly reserved without prejudice for separate assertion through licensed corporate counsel. I assert herein only my individual claims under CEPA (Count I) and the Declaratory Judgment Act (Counts II and III). (Rao Decl. ¶ 53).

## PART IV: CAUSES OF ACTION

**COUNT I**

Retaliation in Violation of the New Jersey Conscientious Employee Protection Act (CEPA)

***(N.J.S.A. 34:19-3(a)(1)–(2) and (c)(1)–(2))***

33. I incorporate by reference the allegations of Paragraphs 8–9 (employment and primary New Jersey work location), Paragraphs 13–17 (whistleblowing disclosures and objections regarding commercial client deception and unapproved offshore staffing), Paragraphs 18–20 and 23–25 (retaliatory cascade of adverse employment actions culminating in involuntary discharge), Paragraphs 21–22, 26, and 28 (pretext rebuttal, ongoing commercial performance, withdrawal of separation request, unsolicited inbound inquiry refuting client solicitation, and disparate BYOD enforcement), and Paragraph 32 (pro se capacity and reservation of corporate claims), as though fully set forth herein.

34. At all relevant times, I was an employee protected under the New Jersey Conscientious Employee Protection Act, performing services from my primary work location in Princeton, New Jersey, and EPAM was an employer within the meaning of N.J.S.A. 34:19-2.

35. At all relevant times, I reasonably believed that EPAM's practices involved unlawful client deception and misrepresentation under N.J.S.A. 34:19-3(a)(1)–(2) and (c)(1)–(2):

a. Commercial deception of clients (including AWS and J&J) regarding software ownership, specifically marketing and commercializing client-funded software developed under Takeda funding as EPAM proprietary software, contrary to Takeda MSA CW2719230 §§ 12, 13, and 25 (Paragraphs 13–14). Because the MSA vested and assigned copyright in custom Deliverables to Takeda, I reasonably believed distributing client-owned code without authorization infringed Takeda's copyright (17 U.S.C. § 106) and constituted unlawful deception of prospective clients, prompting my September 9, 2025 email to Katie Barista with subject

"Subject: Takeda AI contract - SOW - for legal review?", on which I had copied my manager Gregory Klebanov; and

b. Deception of commercial client Gilead Sciences regarding personnel placement under N.J.S.A. 34:19-3(a)(1)–(2) and (c)(2), based upon a recurring pattern of geographic misrepresentation—marking at least the third time unapproved offshore placement on Gilead arose—wherein leadership admitted an employee was by mistake said to be in the U.S. and was being replaced (Exhibit PX-08; Exhibit PX-09; Rao Dep. Tr. 176:5–184:25). N.J.S.A. 34:19-3 protects disclosures of practices an employee reasonably believes involve deception of or misrepresentation to a client.

36. I engaged in protected whistleblowing activity under N.J.S.A. 34:19-3(a)(1)–(2) and (c)(1)–(2) by disclosing and objecting to these deceptive practices to supervisory management:

a. On September 9, 2025, I objected verbally to Klebanov following an AWS commercialization meeting, and at 4:30 PM EDT sent an email to Katie Barista with subject "Subject: Takeda AI contract - SOW - for legal review?"—on which I had copied Gregory Klebanov my manager (and Lucy McDermott) to place management on contemporaneous written notice—demanding formal legal review (Exhibit PX-29; Rao Dep. Tr. 118:11–15);

b. On September 19, 2025, I reported compliance concerns in writing to supervisor Klebanov regarding recurring unauthorized offshore Serbian placement on Gilead (Exhibit PX-08), to which Klebanov confirmed that an employee had by mistake been said to be in the U.S. and was being replaced (Exhibit PX-08; Rao Dep. Tr. 176:5–184:25); and

c. Contemporaneously corroborating my September 9 objections, on September 20 and 23, 2025, I requested legal review before conducting any demonstration to prospective client J&J (ECF No. 33-2; ECF No. 43-7), eliciting advice relayed in writing by Katie Barista from

corporate legal counsel that Odysseus should not demo the code for anyone else unless the MSA was amended or Takeda gave express permission (ECF No. 43-7 at 4; Exhibit PX-05).

37. In direct response to my protected whistleblowing disclosures, EPAM subjected me to an escalating, continuous campaign of unlawful retaliation that was not confined to my active employment, but continued unabated after my termination in the form of retaliatory litigation, bad-faith emergency proceedings, public defamation, and commercial blacklisting, directly harming my professional livelihood and reputation:

a. Verbally eliminating my practice leadership role on September 17, 2025, eight days after my September 9 complaint (Exhibit PX-26);

b. Unilaterally revoking assigned operational support from Lana Shubinsky for my OHDSI symposium and open-source initiatives on September 23, 2025 (Exhibit PX-30);

c. Communicating unattainable revenue and profit margin demands accompanied by an immediate PIP threat on September 26, 2025, which I reasonably understood and experienced as an impossible multi-million dollar quota without sales staff, violating corporate HR standards (Exhibit PX-10 Tab B; Exhibit PX-11);

d. Reassigning all eleven of my direct reports to Sarah Seager on October 2, 2025 as a direct operational consequence of unilaterally eliminating my practice leadership role, isolating me organizationally in an individual contributor position (Exhibit PX-12);

e. Involuntarily terminating my employment on October 15, 2025 (Exhibit PX-13);

f. Subjecting me to post-termination commercial interference, including sending me the October 31, 2025 cease-and-desist letter asserting invalid non-compete covenants to disrupt independent consulting discussions with Johnson & Johnson, causing J&J to suspend discussions on November 3, 2025 (Paragraph 27);

g. Prosecuting post-termination retaliatory litigation, including filing this federal action on November 4, 2025 and moving for an emergency temporary restraining order while omitting internal IT Support Ticket UR0001412851 confirming IT had restored the deleted folders within 88 minutes on October 15, 2025 (Exhibit PX-16), asserting trade secret theft over six downloaded GitLab archives totaling merely ~23 KB of autogenerated empty README templates (Exhibit PX-17; Paragraphs 24–25, 27, 29), and expending over $1.23 Million in litigation costs (approximately $1,120,822 in attorneys' fees alone; Exhibit PX-37, ROG 10(a)) to prosecute claims against an unrepresented former employee while contemporaneously admitting "[t]here is no firm computation of these damages available," establishing actual malice and post-employment retaliatory harassment under *Allen v. Cape May County*; and

h. Subjecting me to post-termination retaliatory disparagement and commercial blacklisting—publicly accusing me across federal court filings of intentional trade secret "theft" (ECF No. 30 ¶¶ 1, 3; ECF No. 93 ¶¶ 1, 4–5), subjecting me to an extensive private forensic inspection across personal devices and accounts generating 5,004 litigation emails, 64 meet-and-confer events, and 198 technical exchanges (Paragraph 30.d), prosecuting shifting spoliation claims over ungrounded "derived files" and USB copies that the Court denied with prejudice (Exhibit PX-28, ECF No. 86; Paragraph 30.e–f), and causing commercial disruption (Paragraph 27), inflicting commercial disruption, reputational injury, and clinically diagnosed psychiatric harm (Exhibit PX-40).

38. The pleaded facts support a strong inference of retaliatory causation, established by close temporal proximity, direct supervisor knowledge, and shifting justifications. Gregory Klebanov was my direct supervisor and the recipient of my September 9 and September 19 reports. His receipt of those reports was followed by an immediate cascade of adverse actions:

role elimination on September 17 (8 days), PIP threat and sales demands on September 26 (7 days), reassigning direct reports on October 2 (13 days), and involuntary termination on October 15 (26 days). Eight minutes after my termination, Klebanov sent his post-hoc email to Larry Solomon (Paragraphs 18–20, 23). This close temporal proximity across days and weeks, coupled with contradictory and shifting justifications for my role change (board cost-cutting vs. revenue) and termination (covenants vs. file deletions), supports a strong factual inference of retaliatory causation. In discovery, EPAM admitted under Rule 36 that its official records include a March 31, 2025 performance rating of "2.2 Meets" and February 10, 2025 assessment (Exhibit PX-38, RFA 152(b) (EPAM Resp. No. 229, S45 at 30–32)), that I received badges in the corporate "Heroes" digital platform (id., RFA 205(a) (EPAM Resp. No. 443, S45 at 408–409)), and that its Telescope platform records the phrase "No expectations found" for me (id., RFA 205(d) (EPAM Resp. No. 446, S45 at 413–415), while denying that no expectations existed). I rely on these records, alongside the chronology alleged above, to support my contention that EPAM's stated performance reasons were pretextual. Under *Allen v. Cape May County*, 246 N.J. 275, 290–94 (2021) and *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 147 (2000), an employer’s deviation from its own published governance policies provides compelling affirmative evidence of pretext. Here, EPAM promulgated an official "Speak Up Policy" (Exhibit PX-35 § 3.4) guaranteeing that "EPAM does not tolerate retaliation against someone because they raised a good faith question or concern," yet when I reported client deception and unapproved foreign staffing, EPAM produced zero records of any compliance inquiry into my reports (Exhibit PX-41, RFP 20) and admitted that no compliance investigation had been completed as of November 4, 2025 (Exhibit PX-38, RFA 173(d) [Resp. 315], S45 at 170–172, while denying that the alleged escalations occurred). I rely on this departure from EPAM's written compliance procedures, alongside the immediate

creation of a termination paper trail, as affirmative evidence supporting my contention that EPAM's stated reasons were pretextual. Klebanov's sworn testimony in deposition asserting that my discharge was motivated by file deletions escalated "prior to that" (Tr. 156:3–5) is an objective falsehood and physical impossibility conclusively disproven by EPAM's contemporaneous 11:19 AM termination ticket, his 11:27 AM email to Solomon, the 1:05 PM IT ticket, and his 2:23 PM directive to Sidenko to "document all of this" for Solomon (Exhibit PX-15). Under *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 147 (2000) and *Allen v. Cape May County*, 246 N.J. 275, 290–94 (2021), this demonstrably false testimony by the primary decisionmaker provides direct affirmative proof of mendacity and pretext, establishing actual malice under N.J.S.A. 34:19-5 to support statutory punitive damages. Similarly, Klebanov's deposition testimony attempting to disclaim notice of the September 9 email by asserting that an email with only a subject line "has no meaning" and that he might not read emails where he is only CC'd (Tr. 209:8–210:9) fails as a matter of law to negate statutory notice under N.J.S.A. 34:19-4. I contend that this explanation—coupled with his professing not to remember seeing the email while admitting he was on the thread and conceding he discussed it with legal counsel (Tr. 110:6–14, 209:1–3)—undermines his credibility and reinforces the inference of supervisory notice, retaliatory animus, and pretext. Under *Donelson v. DuPont Chambers Works*, 206 N.J. 243, 257–58 (2011) and *Allen*, 246 N.J. at 290–94, CEPA's protections extend to post-employment retaliatory conduct—including retaliatory litigation, contrivance of cause, and defamatory blacklisting—that directly harms a former employee's prospective livelihood and professional standing.

39. EPAM's proffered justifications are pretextual, established by documented shifts and contradictions:

a. **Shifting Explanations:** (i) On September 17, 2025, Klebanov stated my role was eliminated due to board-mandated cost cutting while praising my performance (Exhibit PX-26); (ii) on October 15 at 11:19 AM, EPAM submitted the termination ticket citing exclusively "violation of the employee covenants" (Exhibit PX-13); (iii) on October 15 at 11:27 AM, Klebanov emailed Solomon justifying discharge over open-source copyright headers (Exhibit PX-14)—an accusation completely uninvestigated at termination that EPAM maintained on the public docket across three complaints without ever correcting my personnel file, until finally conceding in SAC ¶ 86 n.7 that attachment "may not have been intentional"; (iv) in deposition, Klebanov shifted again, claiming revenue underperformance (Tr. 183:15–25), directly conflicting with the cost-cutting explanation; (v) regarding my September 9 whistleblowing disclosure, Klebanov testified he did not recall seeing the message (Tr. 108:14–15, 209:12–18), claimed an email with only a subject line "has no meaning" and that he might not read emails where he is only CC'd (Tr. 209:8–210:9), yet admitted he was on the email thread (Tr. 110:6–9) and conceded he discussed it with legal counsel (Tr. 209:1–3), an explanation that I contend undermines his account of notice and supports an inference of pretext; and (vi) in deposition, Klebanov swore under oath that my termination was caused by file deletions escalated prior to the termination decision (Tr. 156:3–5), an objective falsehood directly refuted by EPAM's contemporaneous records showing the termination occurred at 11:19 AM while IT ticket UR0001412851 was not created until 1:05 PM, with Klebanov orchestrating a post-hoc paper trail at 2:23 PM directing IT to "send this as a follow up email to Larry, we need to document all of this" (Exhibit PX-15), while suppressing the fact that IT confirmed it "successfully restored the deleted folders" within 88 minutes (Exhibit PX-16 Tab A), establishing deliberate contrivance of cause and mendacity;

b. **Inconsistencies:** These documented contradictions and shifting rationales demonstrate weaknesses and implausibilities establishing pretext;

c. **Comparator Context:** Colleagues shared corporate/client files to personal Gmail accounts during normal business under BYOD (ECF No. 33-10); when asked in discovery whether colleagues were disciplined, EPAM objected and declined to admit or deny (Exhibit PX-38, RFA 48 (EPAM Resp. No. 48, S13 at 79–81)); and

d. **Violation of Internal Policies & Failure to Investigate:** EPAM's corporate governance apparatus expressly commanded the reporting of compliance issues backed by an explicit anti-retaliation pledge (Exhibit PX-35 § 3.4). In formal discovery, EPAM responded that no documents exist regarding any intake, investigation, or review of my reports (Exhibit PX-41, RFP 20), and admitted that it had completed no compliance investigation into reported escalations as of November 4, 2025 (Exhibit PX-38, RFA 173(d) [Resp. 315], S45 at 170–172, while denying the escalations occurred). I point to this departure from written compliance procedures prior to an adverse discharge as evidence supporting an inference of pretext under New Jersey law.

40. I was separated from employment on October 15, 2025. Following the Court's October 7, 2026 Order (ECF No. 98) denying the parties' joint motion to stay, the parties are operating under very aggressive pretrial deadlines. Fact discovery closed on September 30, 2026; responsive pleadings for CoReason, Inc. are due October 22, 2026 (ECF No. 99); and dispositive summary judgment motions are due February 12, 2027 (ECF No. 27). In addition, EPAM actively continued serving formal discovery on the eve of this pleading, serving 797 pages of Amended Responses and Objections to Requests for Admission on October 12, 2026 (Exhibit PX-38 Tabs C & D), confirming and expanding binding party admissions to 244 under Federal

Rule of Civil Procedure 36(b), which conclusively established facts substantiate my affirmative claims. In strict adherence to this aggressive pretrial schedule and with maximum diligence, I conferred promptly with EPAM counsel on October 8, 2026, and served the complete First Amended Counterclaims leave package on October 9, 2026. In response, EPAM counsel requested until Monday afternoon, October 12, 2026, to state EPAM's position on consent. To satisfy the Court's aggressive schedule and preserve my claims prior to the October 15, 2026 one-year anniversary of separation (N.J.S.A. 34:19-5), I submit this proposed First Amended Counterclaims as Exhibit A to my accompanying Motion for Leave. The amendments amplify my original Counterclaims timely filed on April 1, 2026 (ECF No. 33), arise out of the same conduct, transactions, and occurrences, and relate back under Federal Rule of Civil Procedure 15(c)(1)(B).

41. As a direct result of EPAM's unlawful retaliation during employment and continuing post-termination campaign of retaliatory litigation, bad-faith emergency filings, public disparagement, and commercial blacklisting, I suffered severe personal, medical, and economic harm:

a. **Clinical Diagnoses & Psychiatric Harm:** Defending against emergency court proceedings, being publicly accused in court filings of trade secret theft, and litigating pro se while managing extensive technical discovery caused severe distress. I experienced acute anxiety, cognitive fatigue, severe sleep disruption, and gastrointestinal distress. Following my November 26, 2025 clinical diagnoses of Major Depressive Disorder (recurrent) and Generalized Anxiety Disorder by Dr. Kafilat Y. Ojo, MD (Exhibit PX-40), my symptoms waxed, waned, and escalated over ten months of relentless litigation pressure. This psychological distress reached its most acute peak in September 2026, manifesting in severe anxiety and crying spells as I fought

alone as an untrained pro se litigant to meet heavy discovery obligations, draft an emergency spoliation defense memorandum, prepare for and testify at the September 16, 2026 evidentiary hearing, prepare for my own deposition, and prepare to depose Gregory Klebanov before the close of fact discovery. Facing these compressed, multi-front milestones at the eleventh hour as an unrepresented party, which I believe EPAM intentionally introduced and stacked to overwhelm me, imposed an overwhelming psychological burden that severely aggravated my diagnosed medical conditions.

b. **Public Character Disparagement and Threat to Professional Standing:** For more than two decades, I lived and practiced as a dedicated physician and scientist, maintaining an unblemished record of professional integrity and service to patient health. In public court filings, EPAM repeatedly accused me of intentional "theft" and having "stole[n]" corporate assets (ECF No. 30 ¶¶ 1, 3; ECF No. 93 ¶¶ 1, 4–5), and asserted that my representation made under penalty of perjury that files had been released was "false" (ECF No. 71 at 7). For a licensed physician, accusations of theft and dishonesty strike directly at the ethical and character standards fundamental to medical licensure and patient trust. Seeing my integrity attacked on the public court docket in retaliation for raising compliance concerns subjected me to acute anxiety that these unfounded accusations would compromise my professional credentials, medical licensure, and standing, disrupting my family life, shattering my peace of mind, and inflicting severe emotional distress compensable under N.J.S.A. 34:19-5.

c. **Professional and Commercial Disruption:** EPAM's retaliatory campaign directly impaired my professional relationships. EPAM's October 31, 2025 cease-and-desist letter to me asserting invalid restrictive covenants caused Johnson & Johnson to freeze active consulting discussions on November 3, 2025 (Paragraph 27), and EPAM's subsequent initiation of this

lawsuit on November 4, 2025 resulted in the cancellation of a scheduled professional speaking engagement at Gilead Sciences where client personnel were instructed not to engage with me due to the pending litigation (Paragraph 27). Beyond Gilead—which is the only cancelled speaking engagement or third-party non-engagement directive of which I am aware—the overwhelming nature of this lawsuit consumed my time and energy, forcing me into professional isolation where I retreated into a shell and did not engage, leaving me neither the time nor the psychological capacity to pursue client development, speaking engagements, or new consulting opportunities. EPAM's actions cast a cloud over my independent consulting practice, disrupting consulting revenue, impairing professional goodwill, and inflicting economic losses including lost salary, bonus, and benefits.

d. **Statutory Punitive Damages and Fee Shifting:** EPAM's conduct was marked by actual malice, deliberate contrivance of cause, and intentional bad faith. This bad faith is demonstrated by Klebanov's post-hoc termination reasons, EPAM's nearly one-year maintenance of copyright claims before conceding in Footnote 7 of the Second Amended Complaint that the copyright attachment "may not have been intentional," and the expenditure of over $1.12 million in legal fees to prosecute claims for which EPAM had sworn in discovery that '[t]here is no firm computation of these damages available' (Exhibit PX-37, ROG 10(a)). Consequently, I am entitled to statutory punitive damages under N.J.S.A. 34:19-5, reasonable attorneys' fees actually incurred and paid to retained counsel (ND Galli Law LLC) during represented phases of this litigation, out-of-pocket litigation expenses, and taxable costs under Fed. R. Civ. P. 54(d).

**COUNT II**

Declaratory Judgment Regarding Inapplicability of Post-Employment Non-Competition Covenants (ECA § 5(c))

***(28 U.S.C. §§ 2201, 2202; 28 U.S.C. § 1332(a)(1))***

42. I incorporate by reference the allegations of Paragraph 10 (ECA execution and Section 5(c) condition precedent), Paragraph 21 (withdrawal of separation request), Paragraph 23 (involuntary termination on October 15, 2025), Paragraph 31 (ECA § 5(c) carveout, Rule 36 non-resignation admissions, and ECF No. 20 joint recital), and Paragraph 32 (pro se capacity and corporate claim reservation), as though fully set forth herein.

43. An actual, justiciable controversy of sufficient immediacy exists between me and EPAM under 28 U.S.C. §§ 2201–2202 concerning the enforceability of post-employment non-competition covenants under Section 5(c) of the ECA (Exhibit PX-06):

a. **Condition Precedent:** Section 5(c) of the ECA (governed by Delaware law, ECA § 9) expressly conditions non-competition restrictions solely upon voluntary resignation: "In the event you voluntarily resign employment..." and provides: "The restrictions in this subsection shall not apply in case of an involuntary termination."

b. **Involuntary Termination:** EPAM terminated my employment involuntarily on October 15, 2025 (Exhibit PX-13). EPAM admitted under Rule 36 that I never resigned and that separation was involuntary (Exhibit PX-38, RFAs 169(a), 169(c) (EPAM Resp. Nos. 296, 298, S45 at 139–144)), did not contest unemployment benefits (Exhibit PX-21; id., RFA 169(d) (EPAM Resp. No. 299, S45 at 144–145), qualifying that non-contest was the HR team's regular practice), and joined the recital in the December 10, 2025 Consent Order reciting that "because Defendant's employment was involuntarily terminated, Section 5(c) of the [ECA] regarding Noncompetition is not at issue in the Motion" (ECF No. 20 at 1), preserving positions without waiver.

c. **Present Adverse Positions and Ongoing Controversy:** Although the nominal 12-month period in § 5(c) concludes on October 15, 2026 (or September 17, 2026 if measured from the employer's notice of role elimination and constructive separation), Section 5(d) contains a tolling provision extending restrictions for the period of any violation. In its live Second Amended Complaint, EPAM alleges that I was "purposefully underperforming at EPAM, in order to engineer his own involuntarily [sic] termination so that, in Rao's view, he would be free to compete against EPAM" (ECF No. 93 ¶ 6(g)); its October 15 exit paperwork stated agreements included surviving obligations; and its October 31 cease-and-desist letter asserted I was acting "in violation of the restrictive covenants contained in your agreement" (ECF No. 58-4 at 2). Together with SAC ¶ 6(g), these adverse positions create an immediate controversy regarding whether any Section 5(c) restriction runs against me or may be extended under Section 5(d).

d. **Declaratory Relief:** Because I did not voluntarily resign, the contractual condition precedent in Section 5(c) failed. Alternatively, even if Section 5(c) were applicable, any 12-month post-employment restriction commenced upon the September 17, 2025 notice of role elimination (or at latest October 15, 2025) and has fully expired without tolling under Section 5(d). Under 28 U.S.C. §§ 2201–2202, I am entitled to a judicial declaration that the post-employment non-competition restrictions in Section 5(c) of the ECA do not apply to me, or alternatively have fully expired, and that no restriction runs against me or may be extended under Section 5(d), while Sections 5(a) (employee non-solicitation) and 5(b) (client non-solicitation) remain governed by the parties' stipulation in ECF No. 20.

**COUNT III**

Declaratory Judgment Regarding Accused Software Assets and Trade Secret Claims

***(28 U.S.C. §§ 2201, 2202; 18 U.S.C. § 1836(b)(1); 28 U.S.C. §§ 1331, 1332(a)(1))***

44. I incorporate by reference the allegations of Paragraph 10 (ECA exclusions for open-source and community software), Paragraphs 13–15 (Takeda MSA §§ 12, 13, and 25 work-for-hire vesting and Katie Barista relay of legal advice), Paragraph 27 (commercial consulting interactions), Paragraphs 29–30 (the ~23 KB boilerplate scaffolding, lack of pre-filing inspection, and Klebanov testimony regarding work for hire and damages), and Paragraph 32 (pro se capacity and reservation of corporate claims), as though fully set forth herein.

45. An immediate, justiciable controversy exists concerning the parties' respective rights under governing contracts, whether EPAM holds enforceable trade secret rights against me personally in the specific software assets asserted in its Second Amended Complaint, and whether EPAM possesses licensing or restrictive authority over my independent commercial consulting practice:

a. **The Identified Dispute:** EPAM asserts claims under the Defend Trade Secrets Act (18 U.S.C. § 1836) and the Pennsylvania Uniform Trade Secrets Act (12 Pa.C.S. § 5301 et seq.) alleging that I misappropriated proprietary trade secrets in specific software assets identified in its Second Amended Complaint—specifically the ETL Conversion Kit, AI Cohort Generator, and Synapse/AI Accelerator (ECF No. 93 ¶¶ 25–27, pp. 7–8; ¶ 127, p. 29; ¶ 144, p. 32)—while I require judicial clarity regarding the legal relationship between EPAM and myself concerning these accused software assets, and a declaration that EPAM possesses no enforceable trade secret rights against me personally.

b. **Contractual Ownership Allocation and Relay of Legal Advice:** Under Sections 12 and 25 of Governing Client MSA CW2719230 (Exhibit PX-02), all custom Deliverables

developed under the engagement immediately vested in and were assigned to client Takeda as works made for hire, and MSA terms expressly control over conflicting statements of work. On September 23, 2025, Katie Barista relayed advice from corporate legal counsel to me in a Microsoft Teams chat: at 4:22 PM, Barista wrote that "the MSA makes no allowance for pre-existing IP - everything we build belongs to Takeda and the MSA controls over the SOW in the event of a conflict between the terms of the two documents" (ECF No. 43-7 at 3; Exhibit PX-05); and at 4:31 PM, Barista wrote that "Odysseus should not demo this for anyone else unless the MSA has been amended to provide for background intellectual property ownership being retained by Odysseus or Takeda gives express permission to share it" (id. at 4). Having asserted ten (10) privilege instructions in deposition blocking inquiry into in-house counsel's ownership advice (Exhibit PX-42, Tr. 3–4, 100–104, 123–125), EPAM is legally precluded under the sword-and-shield doctrine (*Rhone-Poulenc*, FRE 502(a)) from asserting good-faith reliance on counsel or claiming proprietary rights in custom client deliverables.

c. **Routine Employment Download of 23 KB Boilerplate Scaffolding and Complete Absence of Forensically Proven Possession:** While statutory trade secret protection may extend to license interests or lawful possession under *Advanced Fluid Systems, Inc. v. Huber*, 958 F.3d 168, 177 (3d Cir. 2020), the software repositories downloaded from GitLab bearing the Takeda-Synapse project's name found on my computer in the OneDrive Documents\ss folder consisted of six archives totaling 23,175 bytes compressed (approximately 23 KB). These archives contained generic auto-generated README scaffolding created during repository initialization and Terraform configuration templates (ECF No. 81-2 ¶¶ 8–9; Exhibit PX-17). They contained zero proprietary application source code, executable logic, or client deliverables—rendering them effectively empty scaffolding. EPAM's own GitLab server logs confirm these files were

downloaded on September 30, 2025 at 3:31 PM EDT during my active employment as part of my routine employment responsibilities as the designated Product Owner of Synapse (Exhibit PX-38, RFAs 110–112 (EPAM Resp. Nos. 110–112, S13 at 179–183); Klebanov Dep. Tr. 182:13–17). This download was performed pursuant to authorized access under EPAM IT Acceptable Use Policy § 3.14 and Employment Agreement § 1(d). It constituted the ordinary performance of my job during my employment period rather than unauthorized acquisition or misappropriation. Crucially, EPAM conducted nine (9) months of gruelling private forensic inspection under the Court's inspection protocol (ECF No. 55), imaging and examining five (5) personal devices and eleven (11) accounts encompassing over 85,000 files. Despite this extensive inspection, EPAM has produced zero evidence that I have in my possession any EPAM proprietary software or source code on my computer or personal accounts. Specifically, EPAM produced zero evidence that I possess the ETL Conversion Kit, the AI Cohort Generator, or the Synapse/AI Accelerator software or source code. Furthermore, EPAM admitted under Rule 36 that IT security declarant Miroslav Sklansky did not inspect the file contents prior to executing emergency declarations (Exhibit PX-38, RFA 142(c) (EPAM Resp. No. 191, S13 at 305–306)).

d. **Klebanov Deposition Admissions and Commingling of Client IP:** In his emergency declaration to this Court (ECF No. 3-2 ¶¶ 7–10, 40), Klebanov swore under penalty of perjury that Synapse, AI Accelerator, and ETL Kit were EPAM's proprietary trade secrets and that EPAM maintained rigorous secrecy measures. Yet in his September 29, 2026 deposition (Exhibit PX-42), Klebanov directly contradicted his sworn declaration, admitting that downloaded codebases included "codebase that was developed as work for hires for some other clients" (Klebanov Dep. Tr. 290:15–23), that repositories "belonged to our clients" (id. 268:16–17), and that downloads were categorized as "client's IP" (id. 154:17–22). Under redirect examination by his own counsel

regarding trade secret protection, Klebanov conceded: *"I do not know the exactly trade secret definition within EPAM. Q: Secret -- you don't know if EPAM has a company definition of trade secrets or not; correct? A: No."* (id. 295:2–11). He further admitted he never instructed his team that Synapse was a trade secret (id. 175:9–18). These admissions conclusively establish the failure of reasonable measures under 18 U.S.C. § 1839(3)(A) and 12 Pa.C.S. § 5302. Furthermore, while asserting that Synapse is EPAM property (id. 82:25–83:4) and that Takeda modifications belong to EPAM under license (id. 120:13–17), Klebanov admitted: "I don't know what depository existed" in June 2025 (id. 86:10–11). He also could not identify any Synapse repository separate from the Takeda deployment (id. 134:4–5, 134:23–135:2). In discovery, EPAM identified zero separating repository or act (Exhibit PX-37, ROG 3(a),(d)), admitting it had "no fixed date" when Synapse began and claiming it was "functionally impossible" to narrate. Because EPAM commingled assets, maintained no separate repository, and its principal declarant conceded client work-for-hire ownership and lack of trade secret definitions, EPAM cannot establish statutory ownership standing under 18 U.S.C. § 1836(b)(1) or 12 Pa.C.S. § 5302. Under the sham affidavit doctrine applied by Chief Judge Beetlestone in *Brand Design Co. v. Rite Aid Corp.*, 2024 WL 1164428, at *4 (E.D. Pa. Mar. 18, 2024), EPAM cannot maintain sworn declaration assertions that are directly refuted by its corporate declarant's certified deposition admissions. This failure of proof establishes that EPAM's trade secret claims are legally specious and asserted in bad faith.*

e. **Conclusive Failure of Statutory Damages and Proof of Pretext:** Klebanov testified that "EPAM business was impacted" and "the confusion with clients is a clear impact" (id. 264:17–19, 266:8–9). However, when asked to quantify that impact under oath, he flatly stated: "Can I put a number on it? ... Not going to do it" (id. 266:11–13). He also admitted: "I cannot

blame a hundred percent whether it was due to actions" (id. 264:22–23). In formal discovery, EPAM admitted under corporate oath that "[t]here is no firm computation of these damages available" (Exhibit PX-37, ROG 10(a)), produced zero damages computations (Exhibit PX-41, RFP 79), and produced zero ordinary-course development records supporting 4,600 hours (ECF No. 27 ¶ 1). This sworn failure of proof stands in grotesque contrast to EPAM's admission that it has spent $1,120,822 in attorneys' fees and $1,238,518 in total litigation costs (Exhibit PX-37, ROG 10(a) Item 7). EPAM's affirmative refusal to quantify damages, corporate admission of no firm computation, and admission of uncertain causation defeat an essential statutory element under DTSA and PUTSA (requiring actual loss or unjust enrichment under 18 U.S.C. § 1836(b)(3)(B) and 12 Pa.C.S. § 5304). This establishes that EPAM suffered zero commercial injury from the 23 KB archives. It further demonstrates that its trade secret claims are an anti-competitive sham and bad-faith, retaliatory pretext to suppress fair competition.

f. **Article III Justiciability and Cloud on Commercial Freedom:** Klebanov and EPAM actively assert proprietary ownership over these commingled tools and claim ongoing "client impact" while refusing to define what is allegedly protected or separate from public and client tools. Because of this stance, I remain subject to an immediate, concrete threat of trade secret liability that casts an ongoing cloud over my independent commercial consulting practice in observational healthcare data science (Rao Dep. Tr. 274:8–20). Under *MedImmune*, *Already*, and *Cardinal Chemical*, this presents an active case or controversy requiring a binding judicial decree defining the parties' legal relationship and declaring that EPAM holds no enforceable trade secret rights against me personally.

g. **Declaratory Relief:** Under 28 U.S.C. §§ 2201–2202 and 18 U.S.C. § 1836(b)(1), I am entitled to a judicial declaration establishing that: (i) I do not possess, and never downloaded to

my personal computer or accounts, any EPAM proprietary software or source code—specifically possessing no ETL Conversion Kit, no AI Cohort Generator, and no Synapse/AI Accelerator software or source code, as conclusively confirmed by the nine-month forensic examination under ECF No. 55; (ii) the September 30, 2025 downloaded archives contained zero proprietary software code or trade secrets (consisting exclusively of generic autogenerated README repository creation scaffolding and Terraform stubs); (iii) as between EPAM and myself, EPAM holds no proprietary trade secret title or enforceable trade secret rights against me personally in the custom deliverables developed under the Takeda engagement (including the accused Synapse/AI Accelerator material developed under Governing Client MSA CW2719230); (iv) EPAM holds no enforceable trade secret rights restricting my independent commercial consulting in health data science conducted without EPAM software; and (v) EPAM's trade secret claims are objectively specious and maintained in subjective bad faith under the Defend Trade Secrets Act (18 U.S.C. § 1836(b)(3)(D)), the Pennsylvania Uniform Trade Secrets Act (12 Pa.C.S. § 5305), and *Krafft v. Downey*, 68 A.3d 329, 334–38 (Pa. Super. Ct. 2013), as demonstrated by EPAM's expenditure of over $1.12 million in legal fees to prosecute claims for which it admitted having no computation of damages, conceded client work-for-hire ownership, and possessed zero evidence of trade secret possession following a nine-month forensic inspection.

## PART V: PRAYER FOR RELIEF

WHEREFORE, I, Defendant and Counterclaim-Plaintiff Gowtham Rao, MD, PhD, respectfully request that this Court enter judgment in my favor and against Plaintiff and Counterclaim-Defendant EPAM Systems, Inc., as follows:

A. On **Count I (CEPA Whistleblower Retaliation):** Awarding me compensatory damages for lost earnings, lost employment benefits, and severe emotional distress, statutory

punitive damages, reasonable attorneys' fees actually incurred and paid to retained counsel (ND Galli Law LLC) during represented phases of this litigation, out-of-pocket litigation expenses, and taxable costs of suit pursuant to N.J.S.A. 34:19-5 and Fed. R. Civ. P. 54(d);

B. On **Count II (Declaratory Judgment Regarding ECA § 5(c)):** Entering a declaratory judgment declaring that the post-employment non-competition restrictions in Section 5(c) of the ECA do not apply to me and impose no post-employment non-competition restriction on my employment or consulting, and no restriction under Section 5(c) of the ECA runs against me or may be extended under Section 5(d) of the ECA, while Sections 5(a) (employee non-solicitation) and 5(b) (client non-solicitation) remain governed by the parties' stipulation in ECF No. 20;

C. On **Count III (Declaratory Judgment Regarding Accused Software Assets and Trade Secret Claims):** Entering a declaratory judgment declaring that: (1) Dr. Rao does not possess, and never downloaded to his personal computer or accounts, any EPAM proprietary software or source code—specifically possessing no ETL Conversion Kit, no AI Cohort Generator, and no Synapse/AI Accelerator software or source code, as conclusively confirmed by the nine-month forensic examination under ECF No. 55; (2) the September 30, 2025 downloaded archives contained zero proprietary software code or trade secrets, consisting exclusively of generic autogenerated README repository creation scaffolding and configuration stubs; (3) as between EPAM and Dr. Rao, EPAM holds no proprietary trade secret title or enforceable trade secret rights against Dr. Rao personally in the custom deliverables developed under the Takeda engagement (including the accused Synapse/AI Accelerator material developed under Governing Client MSA

CW2719230); (4) EPAM holds no enforceable trade secret rights against Dr. Rao personally restricting his independent commercial consulting in health data science conducted without EPAM software, utilizing public scientific literature, commercial off-the-shelf artificial intelligence tools, and open-source OHDSI methods, and that such independent consulting does not constitute misappropriation of any EPAM trade secret; and (5) EPAM's trade secret claims against Dr. Rao are objectively specious and maintained in subjective bad faith under the Defend Trade Secrets Act (18 U.S.C. § 1836(b)(3)(D)), the Pennsylvania Uniform Trade Secrets Act (12 Pa.C.S. § 5305), and *Krafft v. Downey*, 68 A.3d 329 (Pa. Super. Ct. 2013);

D. **Contingent Statutory Bad-Faith Fee-Shifting:** In the event I prevail on EPAM's trade secret claims, and if the Court finds that those claims were made in bad faith under *Krafft v. Downey*—as demonstrated by EPAM's expenditure of $1,120,822.00 in attorneys' fees (Exhibit PX-37, ROG 10(a)) to prosecute claims supported by sworn declarations (ECF Nos. 3-2, 58-27, 58-28) alleging proprietary ownership and trade secrecy that were directly contradicted by the declarant's own deposition testimony conceding client work-for-hire ownership (Tr. 154, 268, 290), lack of trade secret definitions or instructions (Tr. 175, 295), unexamined 23 KB archives, and the total absence of any damages computation—awarding me reasonable attorneys' fees actually incurred and paid to retained counsel (ND Galli Law LLC) during represented phases of this litigation, out-of-pocket litigation expenses, and taxable costs pursuant to the Defend Trade Secrets Act (18 U.S.C. § 1836(b)(3)(D)), the Pennsylvania Uniform Trade Secrets Act (12 Pa.C.S. § 5305), and Fed. R. Civ. P. 54(d);

E. **Compensatory Sanctions and Inherent Authority Remedy:** Awarding me compensatory sanctions, reasonable attorneys' fees actually incurred and paid to retained counsel during represented phases of this litigation, out-of-pocket litigation expenses, and costs pursuant to the Court's inherent supervisory authority (*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991); *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101 (2017)) and 28 U.S.C. § 2202, for EPAM's bad-faith litigation conduct, vexatious multiplication of proceedings, and abuse of the judicial process—including prosecuting emergency ex parte proceedings while concealing IT Support Ticket UR0001412851 confirming immediate folder restoration within 88 minutes, subjecting me to an oppressive nine-month forensic inspection across personal family devices yielding zero proprietary files, and continuing to solicit additional spoliation workflows and cost estimates from neutral examiner iDS after the Court had already entered an Order denying EPAM's motion for spoliation sanctions with prejudice (Exhibit PX-28, ECF No. 86);

F. Awarding pre-judgment and post-judgment interest at the maximum rate permitted by law; and

G. Awarding such other, further, and different legal and equitable relief as this Court deems just and proper.

## NON-JURY TRIAL CONSENT

Pursuant to Federal Rules of Civil Procedure 38(d) and 39(a), I omit a jury demand from these First Amended Counterclaims, formally withdraw my prior jury demand (ECF No. 33), and consent to bench trial adjudication before the Court on all claims and counterclaims.

Dated: October 14, 2026
Respectfully submitted,
By: /s/ Gowtham Rao

Gowtham Rao, MD, PhD
*Defendant and Counterclaim-Plaintiff Pro Se*
184 Mansgrove Rd. · Princeton, NJ 08540 · Telephone: (803) 386-7890 · Email: gowthamrao@gmail.com