**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

EPAM SYSTEMS, INC.,
Plaintiff/Counterclaim-Defendant,

**CIVIL ACTION**
**NO. 2:25-cv-06260-WB**

v.

GOWTHAM RAO, MD, PhD,
Defendant/Counterclaim-Plaintiff.

# DEFENDANT'S EXHIBIT PX-01

***Declaration of Gregory Klebanov in Support of Plaintiff's Motion for Temporary Restraining Order [Incorporated by Reference from ECF No. 3-2]***

Source / Locator: ECF No. 03-2 (12 pp.) [Incorporated by Reference pursuant to Chambers Policies § J.1]
Date / Timestamp: 2025-11-04
Target Claims: Count II (DJ), Prayer Item D (Bad-Faith Fees), Pretext

Evidentiary Summary & Purpose:
Klebanov swore under oath in ¶ 39 to 'over 40,000 documents and data files' based on an uninspected SharePoint Excel log, while in ¶ 40 alleging theft of software codebases (including Takeda-Synapse); in ¶ 14 swore 4,600 hours; and in ¶ 42 swore Dr. Rao attempted to cover his tracks. Deposition confirmed Klebanov never examined or unzipped the downloaded files before swearing the declaration, and RFA 191 admitted Sklansky never examined them either. Pursuant to Chief Judge Beetlestone Policies § J.1, this document is already an official judicial record at ECF No. 3-2 and is incorporated by reference without duplicative refiling.

*Authentication & Admissibility:*
*Authenticated pursuant to Fed. R. Evid. 901 and 28 U.S.C. § 1746 in Part IX (¶ 51) of the Declaration of Dr. Gowtham Rao, MD, PhD in Support of Motion for Leave to File First Amended Counterclaims.*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EPAM SYSTEMS, INC., | : | Civ. A. No. |
| Plaintiff, | : | |
| - against - | : | |
| GOWTHAM RAO, | : | |
| Defendant. | : | |

**<u>DECLARATION OF GREGORY KLEBANOV</u>**

I, GREGORY KLEBANOV, being duly sworn, declare as follows:

1. I am the Vice President, Global Head of Real-World Evidence at EPAM Systems, Inc. ("EPAM" or the "Company"). I have held this position since June 12, 2024 when EPAM acquired my prior employer, Odysseus Data Services, Inc.

2. My current responsibilities include executive oversight over all aspects of EPAM's RWE business unit. Real-World Evidence or RWE refers to clinical evidence about the usage and potential benefits or risks of a medical product derived from analysis of real-world data. Clients of EPAM's RWE business unit include pharmaceutical companies and healthcare organizations.

3. I submit this declaration in support of EPAM's motion for a temporary restraining order and preliminary injunction against its former employee, Gowtham Rao ("Rao" or "Defendant"): (i) directing Rao, and all parties in active concert with him, to return all of EPAM property, including its confidential information, trade secrets, and intellectual property ("EPAM Confidential Information and IP") in his possession and control; (ii) enjoining Rao, and all parties in active concert with him, from accessing, using or disclosing any EPAM Confidential Information and IP; (iii) directing Rao, and all parties in active concert with him, to preserve and

Case 2:25-cv-06260-AB Document 1-9 Filed 10/15/25 Page 2 of 12

submit to a forensic examination all e-mail accounts, cloud accounts, sharefile accounts and computer or electronic devices in Rao's possession or control, or to which he has access, including, but not limited to, computers, hard disk drives, removable storage devices (e.g., USB drives), smart phones, iPads, tablets, email accounts, cloud accounts, and/or all other similar electronic storage repositories (collectively, "ESI Devices and Accounts"); and (iv) directing Rao to submit for forensic examination any other ESI Devices and Accounts in Rao's possession or control that contain or may have contained EPAM Confidential Information and IP, or were used or may have been used to transmit EPAM Confidential Information and IP.

4. I know the facts testified to in this Declaration to be true based upon my own personal knowledge, discussions with other employees of EPAM, and/or a review of relevant documents.

## I. <u>EPAM's Business and Confidential Information and IP</u>

5. Founded in 1993 as a software engineering company, today EPAM is a leading global provider of digital engineering, cloud and AI-enabled transformation services, and a leading business and experience consulting partner for global enterprises and startups across a broad spectrum of industries. EPAM's clients include businesses engaged in life sciences and healthcare, financial services, media and entertainment, insurance, and life sciences and healthcare, among many others.

6. The RWE business unit that I manage is positioned within EPAM's life sciences and healthcare group.

7. A core part of EPAM's business is the sale of digital tools and software solutions that EPAM's employees and engineers have continuously developed and refined over many years and via significant investments by the Company. Certain of these products are sold as a commercial

license to its pharmaceutical and healthcare clients and are thus considered highly proprietary intellectual property.

8. Among these software tools is what is known as an ETL Conversion Kit. This tool has been developed by EPAM over 10 years to Extract, Transform and Load (“ETL”) data for medical data standardization. This software is focused on medical data management—cleaning, harmonizing, and preparing patient medical history data for healthcare data analytics purposes, including drug safety, disease, and/or cost and quality of care research. EPAM offers this solution as a core part of the Company’s services in the RWE market segment, and it makes the Company uniquely competitive by automating tasks which are often done by others manually. The software can be further customized based on a particular client project or a client’s specific need.

9. Another software product developed by EPAM is a AI Cohort Generator. This product was developed by EPAM in 2025 utilizing the latest AI technologies. EPAM offers this innovative solution as part of a larger healthcare analytics platform, allowing customers to automatically generate clinical study designs (patient cohorts, medical codes) from free text, thus significantly boosting research team productivity and saving customers significant time and money.

10. A third software product at issue in this case is an AI Accelerator. This product was also developed by EPAM in 2025 as part of a Company-wide investment and strategy to leverage AI technology. The software is a data and decision support platform that serves as the client’s centralized biomedical knowledge layer making it easy for non-technical users.

11. The underlying code to these tools and products are considered confidential and proprietary, accessible only to EPAM employees who work on the development of those products, or otherwise have a business need for access to such information.

12. The life sciences technology industry, including RWE in particular, is highly competitive. EPAM's competitors in this regard include a range of prominent global IT consulting and technology companies with dedicated life sciences practices.

13. To obtain new business, EPAM invests considerable resources cultivating relationships with pharmaceutical companies, healthcare organizations, and other life science consultants to facilitate consideration for RFP invitations on particular projects.

14. Because competitive pricing is integral to a successful bid, pricing of work or services on a particular project is meticulously calculated based upon a number of factors, including EPAM's use of its highly proprietary software solutions, and engagement of specialized experts, which are incorporated into EPAM's RFP responses and bid proposals.

15. And because EPAM's business is service oriented, the relationships that EPAM has with its clients are highly dependent on the attention and service, as well as EPAM's development of successful technology solutions and results tailored to each client's specific needs, which EPAM provides to them on an ongoing basis. EPAM's investment in client service enables those who deal with EPAM to develop confidence in the quality of the services offered, and increased recognition of, and familiarity with, EPAM as a provider of quality and reliable services.

16. Furthermore, because clients also entrust the protection of their businesses and their confidential information to EPAM, an essential aspect of EPAM's business model is to protect its reputation and goodwill. Customer goodwill is particularly critical in this industry because any compromise of a client's own data and/or intellectual property (IP) could seriously damage its business operations and EPAM's reputation.

17. Maintaining client relationships and generating repeat business from clients based on its reputation are critical to EPAM's success because long-term business relationships with

established clients allow EPAM to maintain its competitive advantage and strategic position in the industry.

18. To effectively service EPAM's clients, the Company also compiles data pertaining to its clients spanning many years. Such client information includes data reflecting prior work done on behalf of particular clients, pricing arrangements, and the identities of individual points of contact among clients to facilitate the development of new leads and opportunities.

19. EPAM's executives and sales representatives, including Rao, who interface directly with existing and potential clients, not only are the face of the Company, but they benefit directly and indirectly from the goodwill, reputation, and name recognition generated by EPAM's investments in client service and proprietary technology. These individuals consequently are able to forge relationships and cultivate accounts and new business on behalf of EPAM.

20. Given that the Company's success and reputation in the market is a function of all of the foregoing considerations, the Company not only treats its software code and developments in technology as highly proprietary, but also treats its client information, bid proposals, RFP responses, pricing information, client contracts, project data, P&L analysis, , sales and growth strategies, employee compensation data, and other similarly sensitive information as confidential, proprietary, and/or trade-secret information.

21. The foregoing compilation of information and software code is treated as highly confidential and trade secret information by the Company because it would provide a competitor with a "playbook" into how to approach each client, replicate EPAM's life sciences business by offering identical solutions, and usurp business from EPAM. Such information could also be used to undercut pricing, out-bid competitive proposals, evaluate service opportunities, and target specific clients.

22. In addition, EPAM's client engagements often result in the creation of customized computer code/intellectual property which is delivered to the client. This code becomes the intellectual property of the client. EPAM treats client code as particularly sensitive and confidential, as it is of significant commercial value to each client. Moreover, EPAM has specific contractual obligations to safeguard its clients' intellectual property. EPAM's reputation as a reliable custodian of client confidential information is essential its business model.

23. EPAM has spent a substantial amount of time and money in developing EPAM Confidential Information and IP to which the Company's trusted senior executives have access to enable them to cultivate client relationships, engage on projects, develop new solutions, and expand the business on the Company's behalf.

24. The foregoing EPAM Confidential Information and IP is not generally known to the public.

25. The foregoing EPAM Confidential Information and IP would give a competitor who acquired it an unfair competitive advantage by, among other things: (a) not having to invest the time and resources to develop the client relationships, software, or information as the Company has done; and (b) allowing the competitor to unfairly compete by, among other things, leveraging their access to or knowledge of such information, including pricing, software source code, and the aforementioned client information.

26. Given the paramount importance of EPAM Confidential Information and IP to EPAM and its business, EPAM utilizes a number of guardrails to maintain the confidentiality of EPAM Confidential Information and IP. These measures include: (i) making all employees subject to a robust set of IT security policies and work instructions, including the Acceptable Use of IT Resources Policy and EPAM's Code of Conduct; (ii) making employees execute agreements that

contain confidentiality and non-disclosure obligations as a condition to obtaining access to EPAM Confidential Information and IP, and in certain instances additional restrictive covenants, such as non-competition and non-solicitation provisions; (iii) limiting access to EPAM Confidential Information and IP to employees on a need-to-know basis; (iv) storing information on secure networks and password protected devices; (v) requiring all employees to periodically complete training lessons regarding confidentiality obligations and data privacy compliance; (vi) monitoring employee access and activity on the Company's computer systems to detect questionable conduct; and (viii) requiring employees to return all EPAM Confidential Information and IP upon termination of employment.

## II. <u>Rao's Employment with EPAM and Eventual Termination for Cause</u>

27. Rao was employed by EPAM as Managing Principal, Life Sciences Consulting starting on or about November 18, 2024 until he was terminated for cause on October 15, 2025.

28. In the role for which he was hired, Rao was responsible for heading the data science business unit within EPAM's life sciences group and RWE business unit, including business development, revenue generation, portfolio management, and managing the members of the data science team.

29. Prior to his employment with EPAM, Rao had significant experience working in the pharmaceutical industry, with an expertise in epidemiology. I had believed his connections in the industry might be well-suited for the role.

30. In consideration for his employment, I understand that Rao signed an employment agreement, which includes confidentiality and non-disclosure obligations, as well as non-competition and non-solicitation restrictive covenants befitting his position in the Company and access to EPAM Confidential Information and IP.

31. During his tenure with EPAM, Rao failed to consistently fulfill the expectations of his position. In particular, he failed to build revenue, and exhibited poor managerial capabilities; team members often cited his lack of leadership and unwillingness to engage in their professional development.

32. In light of these performance issues, in September 2025, the Company made the decision to transition Rao to a different role in which he would be responsible for developing EPAM's AI capabilities with regard to certain solutions for specific clients. No decision had been made to exit Rao from EPAM, and I and others within EPAM made this quite clear to him on several occasions.

33. Rao appeared to take offense to both the negative performance evaluations and the change to his role. In late September 2025, Rao began exploring with EPAM his resignation via a mutually agreeable separation. As part of those discussions, Rao asked me and my direct manager, Greg Killian, SVP/GM – Global Life Sciences and Healthcare, whether EPAM would agree to waive the post-employment non-solicitation and non-competition restrictions in his employment agreement. We responded that we would not waive the restrictive covenants, and again reiterated that we were not terminating him, and that his decision to leave was entirely his choice.

34. Around the same time, the week of October 6 through October 9, Rao attended a professional industry conference in New Jersey as a representative of EPAM. At the conference, Lucy McDermott, an EPAM employee of the RWE business unit, learned that Rao had approached at least one major EPAM client and conveyed that he was no longer working at EPAM and that he was a "free agent," suggesting that he was in business for himself. Rao's statements to the client were patently false; he was still employed with EPAM at the time and the Company had no plans to terminate his employment.

35. On or about October 14, 2025, the Company learned that Rao engaged in far more nefarious conduct. Specifically, the RWE team discovered that Rao embedded the phrase "Copyright 2025 Gowtham Rao" in connection with the software code for one of EPAM's tools it had been developing and in an apparent attempt to assert ownership over the code. The project team also raised concerns that Rao had attempted to delete various files from an EPAM SharePoint site (including by attempting to make them permanently unavailable by clearing the recovery folder).

36. Rao's aforementioned misconduct compelled EPAM to terminate his employment, effective October 15, 2025.

37. I believe that Rao purposefully orchestrated a for cause termination from the Company. This is because I am told that the non-competition provision in his employment agreement is triggered by a voluntary resignation. In fact, when he was advised of his termination, I understand that Rao's first question was whether the termination was for cause and non-competition provision would be enforced.

## III. <u>EPAM's Discovery of Additional Misconduct by Rao</u>

38. Given Rao's misconduct and unethical actions resulting in his termination, the Company took immediate steps to investigate its computer network for evidence of any further misconduct, including other instances of data alteration or exfiltration by Rao.

39. I understand that during the investigation, the Company's information security team (the "InfoSec Team") discovered that between September 11, 2025 (around the same time when EPAM advised Rao of a change to his role) through October 14, 2025, Rao downloaded over 40,000 documents and data files from the Company's networks to one or more personal external

devices, without the Company's authorization. The vast majority of these downloads occurred between October 11 and October 13, 2025, just days before his termination.

40. Among the data files accessed and downloaded by Rao were software code bases for a number of EPAM's digital tools and products, including proprietary source code to EPAM's ETL Conversion Kit, AI Cohort Generator, and AI Accelerator. Some of the downloaded source code also included custom built or customized software owned by EPAM's clients.

41. In addition to purloining EPAM's proprietary intellectual property, Rao also downloaded entire data folders relating to EPAM's clients, client account information, RFP responses and bid proposals, pricing documentation, client facing project information, including designs and data models, contract documents, CRM data, and P&L data, among other highly confidential and sensitive information.

42. Not only were Rao's actions unauthorized and in violation of Company policy, but there could be no business justification for his personal possession of this information given that many of the stolen files relate to historical data, clients, or projects about which Rao was not involved or had no need for his work with EPAM, or are comprised of information that belong to EPAM's clients. It is my belief Rao intends to leverage the information contained in all of the foregoing purloined documents and other EPAM Confidential Information and IP to compete with EPAM.

43. Separate from the data exfiltration, the InfoSec team also confirmed earlier reports from the relevant project team that on October 13, 2025, Rao had attempted to permanently delete dozens of EPAM client and project files from EPAM's servers.

44. In addition to investigating its computer networks, the Company also investigated Rao's misuse of resources during his employment at EPAM. For example, I learned that Rao had

improperly staffed an employee to work on a personal website for Rao, and had requested that another employee ghost write a blog for Rao's personal website on Rao's behalf.

**IV. Rao's Breach of His Post-Employment Restrictive Covenants**

45. Since his termination, EPAM has obtained evidence that Rao has continued to breach the non-solicitation covenant in his employment agreement with EPAM.

46. Specifically on October 16, 2025, in an external Teams message outside of the EPAM Teams environment, an employee of EPAM, unaware that Rao had been terminated, reached out with an inquiry concerning work for an EPAM client. Rao responded to that message, suggesting a meeting with the client, noting his new work email as Gowtham.rao@coreaaon.ai. He further wrote, "In full disclosure I am now a competitor for EPAM."

47. I was also made aware that he sent text messages to a number of EPAM clients on the day of his termination.

48. Rao's representation that he is now competing directly with EPAM immediately after his exit from the Company supports my belief that Rao purposefully orchestrated his termination from EPAM in an attempt to circumvent the non-competition restriction and that he intends to use the stolen data files to undermine EPAM's business.

**V. Irreparable Harm**

49. EPAM Confidential Information and IP is the lifeblood of EPAM's business.

50. Anyone with unauthorized access to EPAM Confidential Information and IP could exploit such information to replicate EPAM's business and intellectual property, usurp business opportunities, or leverage such information to destroy EPAM's competitive advantage or reputation in the marketplace.

51. Due to Rao's misconduct, EPAM stands to lose an incalculable amount of dollars

in business and the loss of value of its trade secrets, and confidential and proprietary information, as well as its reputation with its clients.

52. Rao's misconduct is particularly willful and egregious in that he was a senior employee of EPAM's life science business who understands the importance of protecting Company property and its data.

53. All told, Rao is causing, threatening, and/or will continue to cause or threaten significant irreparable harm to EPAM, including the loss of value of confidential and/or trade secret information, the loss of long-standing client relationships, damage to reputation, and loss of goodwill, unless injunctive relief is obtained.

I declare, under penalty of perjury, that the foregoing is true and correct.

Gregory Klebanov

Dated: November 3, 2025