**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

EPAM SYSTEMS, INC.,
Plaintiff/Counterclaim-Defendant,

v.

GOWTHAM RAO, MD, PhD,
Defendant/Counterclaim-Plaintiff.

**CIVIL ACTION**
**NO. 2:25-cv-06260-WB**

# DEFENDANT'S EXHIBIT PX-37

## *EPAM Systems, Inc.'s Responses and Objections to Defendant's First Set of Interrogatories*

Source / Locator: Served Discovery Response (57 pp.)
Date / Timestamp: Served 2026-09-28
Target Claims: Count I (CEPA), Count II (DJ: Client Ownership), Prayer Item D (Fees & Sanctions)

Evidentiary Summary & Purpose:
Formal discovery responses where EPAM stated in response to ROG 3(d) that separating Synapse from Takeda code was 'functionally impossible to answer in narrative format in an interrogatory', admitted in ROG 10 zero lost profits/sales beyond a single $250k commercial dispute while spending $1.12M in legal fees, and stated in response to ROG 14(a) that no internal compliance investigation or corrective action was taken regarding Dr. Rao's Gilead whistleblowing disclosures.

*Authentication & Admissibility:*
*Authenticated pursuant to Fed. R. Evid. 901 and 28 U.S.C. § 1746 in Part IX (¶ 51) of the Declaration of Dr. Gowtham Rao, MD, PhD in Support of Motion for Leave to File First Amended Counterclaims.*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EPAM SYSTEMS, INC.,<br><br>Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>GOWTHAM RAO,<br><br>Defendant/Counterclaim-Plaintiff. | Civil Action No. 2:25-cv-06260 |

**EPAM SYSTEMS, INC.'S RESPONSES AND OBJECTIONS TO DEFENDANT'S FIRST SET OF INTERROGATORIES**

Plaintiff/Counterclaim-Defendant EPAM SYSTEMS, INC. ("EPAM"), by and through its attorneys, Seyfarth Shaw LLP, hereby submits its Responses and Objections to Defendant/Counterclaim-Plaintiff GOWTHAM RAO's First Set of Interrogatories.

**RESERVATION OF RIGHTS**

Any responses to Defendant's Interrogatories will be subject to EPAM's right to object to the admission into evidence of any and all such responses on the grounds that they, or any of them, are not relevant to the issues in this action or are otherwise inadmissible. The responses and objections contained herein are based on EPAM's current knowledge, information and belief. These responses and objections are subject to amendment and supplementation as EPAM acquires additional information and completes its review and analysis of the facts and issues presented by the Complaint.

**PRELIMINARY STATEMENT**

1. The following responses are given without prejudice to EPAM's right to produce evidence of any subsequently discovered fact or facts. EPAM accordingly reserves the right to

change any and all responses herein as additional facts are ascertained, analyses are made, legal research is completed and contentions are made and/or documents are discovered.

2. The responses contained herein are made in a good-faith effort, but should in no way be to the prejudice of EPAM in relation to further discovery, research or analysis.

3. The Interrogatories have been interpreted and answered in accordance with plain English usage. Many of the Interrogatories, however, are vague and ambiguous. EPAM has done its best to interpret these requests as it understands them.

4. EPAM will not provide any information covered by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

**PURPORTED INTERROGATORY NO. 1: (*i.e.* ACTUAL INTERROGATORIES NOS. 1-5) [Identification of each claimed trade secret or confidential item]**

Identify each specific item of information that EPAM contends Rao acquired, accessed, copied, downloaded, synchronized, retained, used, disclosed, or failed to return in violation of a claim pleaded in the First Amended Complaint and that EPAM contends is a trade secret or other protected confidential information. For each item, state: the item's name and the specific repository, site, folder, path, file, or Bates-identified record in which it resides; a description of the information itself — the specific algorithm, architecture, design, method, process, data structure, compilation element, code component, or business content claimed — stated with sufficient particularity to distinguish the item from information generally known in the real-world-evidence or life-sciences software field, from public OHDSI or other open-source or publicly available material, from material owned by a client, and from the general knowledge, skill, and experience of persons who work in that field; whether EPAM claims trade-secret status, contractual confidentiality, or both; the item's authors and creation date; the asserted owner; each secrecy measure EPAM applied to that specific item before October 15, 2025; the persons or classes of persons authorized to access the item; each disclosure of the item outside those persons of which EPAM is aware; and the independent economic value EPAM contends the item derives from not being generally known.

**ANSWER:**

EPAM objects to this purported interrogatory because it asks multiple discrete, independent questions, and thus should not be properly construed as a single interrogatory. *See Straight Arrow Prods., Inc. v. Mane Choice Hair Sol. LLC*, No. CV 20-4722, 2021 WL 4583849, at *3 (E.D. Pa. 2021) ("where the first question can be answered fully and completely without

answering the second question, the questions are distinct," and interrogatory subparts should be counted as multiple interrogatories). EPAM construes the above purported interrogatory as five separate interrogatories:

**Effective 1(a)** – "Identify each specific item of information that EPAM contends Rao acquired, accessed, copied, downloaded, synchronized, retained, used, disclosed, or failed to return in violation of a claim pleaded in the First Amended Complaint and that EPAM contends is a trade secret or other protected confidential information. For each item, state: the item's name and the specific repository, site, folder, path, file, or Bates-identified record in which it resides"

**Effective 1(b)** (*i.e.*, Actual Interrogatory No. 2) – "a description of the information itself — the specific algorithm, architecture, design, method, process, data structure, compilation element, code component, or business content claimed — stated with sufficient particularity to distinguish the item from information generally known in the real-world-evidence or life-sciences software field, from public OHDSI or other open-source or publicly available material, from material owned by a client, and from the general knowledge, skill, and experience of persons who work in that field; whether EPAM claims trade-secret status, contractual confidentiality, or both; . . . and the independent economic value EPAM contends the item derives from not being generally known."

**Effective 1(c)** (*i.e.*, Actual Interrogatory No. 3) – "For each item, state: . . . . the item's authors and creation date; the asserted owner;"

**Effective 1(d)** (*i.e.*, Actual Interrogatory No. 4) – "For each item, state: . . . . each secrecy measure EPAM applied to that specific item before October 15, 2025;"

**Effective 1(e)** (*i.e.*, Actual Interrogatory No. 5) – "For each item, state: . . . . each disclosure of the item outside those persons of which EPAM is aware;"

EPAM further objects to the extent the interrogatories seek confidential information or trade secrets. EPAM will not provide any confidential information without first entering into a reasonable and appropriate protective order or confidentiality agreement. Thus far, Rao has refused such an agreement.

Notwithstanding its objections, EPAM responds as follows:

**1(a)**. EPAM refers Dr. Rao to the following documents: (a) download logs and the InfoSec report, which are being produced and identify the improperly downloaded documents by file name; (b) EPAM's forthcoming production of documents obtained from Dr. Rao's devices and accounts through the forensic protocol (which includes without limitation documents previously filed as Exhibits 9, 10, and 13 to EPAM's motion for sanctions, as well as the CoReason Stakeholder Communication Toolkit), bearing the Bates range prefix "RAODEVICES-ACCOUNTS"; (c) the CoReason source code; and (d) other documents produced by Dr. Rao which originated with EPAM, consist of Work (within the meaning of Dr. Rao's Employment Covenants Agreement) or contain EPAM information, including but not limited to documents whose first page or slip sheet has the Bates-stamps GRAO000453, 454, 455, 456, 463, 464, 467, 468, 469, 470, 471, 474, 475, 1478, 1525, 1528, 1531, 1532, 1533, 1579, 1580, 1581, 1590, 1592, 1594, 1596, 1607, 1643, 1644, 1652, 1655, 1656, 1657, 1666, 1668, 1670, 1673, 1678, 1681, 1707, 1709, 1711, 1727, 1730, 1775, 1781, 1788, 1789, 1790, 1791, 1797, 1800, 1801, 1853, 1856, 1866, 1885, 1888, 1894, 1911, 1913, 1914, 1917, 1966, 2168, 2170, 2188, 2459, 2460, 2472, 2558, 2560, 2564, 2618, 2619, 2620, 2620, 2621, 2622, 2623, 2624, 2625, 2626, 2627, 2628, 2629, 2630, 2707, 2711, 7214, 7400, 7437, 7498, 7535. EPAM's review of Dr. Rao's production is on-going, and EPAM reserves the right to supplement its response to these interrogatories, even after September 30, including but not

limited to the relatively small amount of time between Dr. Rao's production and the September 30, 2026 date.

Upon information and belief, the aforementioned documents represent only a fraction of the total amount of documents that Rao acquired, accessed, copied, downloaded, synchronized, retained, used, disclosed, or failed to return. Rao has improperly withheld or failed to produce numerous other documents. Furthermore, Rao's "refresh" of his computer has spoliated evidence of further documents that would otherwise be responsive to this Interrogatory. EPAM will supplement this response as its production of documents continues.

**1(b).** EPAM objects to this Interrogatory as outrageously disproportionate and unduly burdensome. There are over 44,960 documents on the download log alone. Providing this kind of "description" as to each document, particularly in the form of a narrative interrogatory response, is functionally impossible.

Notwithstanding its objections, as to certain general categories of documents (not "each item identified"), EPAM answers as follows, with the proviso that all trade secrets are also confidential information:

1. EPAM's source code is proprietary and was created by EPAM engineers, for EPAM's sole and exclusive use. It has features, compilations, logic, qualities and utilities not found in opensource programs even if, in certain cases, the source code incorporates portions of open-source information (such as by modifying and/or adding to the open-ource information). It has value by not being known outside of EPAM, enabling EPAM to license its proprietary software to clients. EPAM's source code constitutes trade secrets.

2. EPAM design and architectural documents are proprietary and were created by EPAM employees, for EPAM's sole and exclusive use. These documents discuss and plan

features, compilations, logic, qualities and utilities that are not found in open-source programs even if, in certain cases, the source code incorporates portions of open-source information (by modifying and/or adding to the open-source information). These documents have value by not being known outside of EPAM, enabling EPAM to create, revise, and refactor the software code that forms the basis of the proprietary software it licenses to clients. EPAM design and architectural documents constitute trade secrets.

3. EPAM's pricing documentation, sales strategy, and marketing strategy are proprietary. EPAM's competitors do not know it. EPAM's clients do not know it. Because it is proprietary, it is not generally known or publicly available. EPAM does not know the specific ways in which its pricing documentation, sales strategy, and marketing strategy differs from its competitors because its competitors' pricing documentation, sales strategy, and marketing strategy are also proprietary to its competitors. But EPAM knows that its methods have value. Indeed, EPAM earned approximately $377.7 million net profit in 2025. It did so by offering unique services in unique ways and at unique prices as compared to its competitors. If its competitors had access to EPAM's confidential information (including its pricing documentation, sales strategy, and marketing strategy), EPAM's net profit would have been much less. Keeping this information proprietary and confidential protects EPAM from being undercut in prices and value of services by competitors, and ensures that EPAM is in the best bargaining position when negotiating transactions with EPAM's clients. EPAM's pricing documentation constitutes trade secrets. Its sales and marketing strategy documents constitute trade secrets.

4. EPAM's responses to requests for proposals, bid proposals, and client contracts are confidential insofar as they are known only by EPAM and the applicable client, often protected by confidentiality agreements. These documents have value because they provide key

insight about the services, quality, and prices that EPAM is willing to offer to specific clients. This information is not generally known or publicly available. EPAM does not know the specific ways in which its requests for proposals, bid proposals, and client contracts differ from its competitors because similar documents from its competitors are also proprietary to its competitors. EPAM earned approximately $377.7 million net profit in 2025. It did so by offering unique services in unique ways and at unique prices as compared to its competitors, including as detailed in documents such as responses to requests for proposals and bid proposals. If its competitors had access to such documents, EPAM's net profit would have been much less. EPAM's competitors could use this information to undercut EPAM in future responses to requests for proposals as to pricing and value of services. EPAM's other clients could also use this information to unfairly negotiate prices and services with EPAM. Further, the kinds of services that EPAM was offering to other clients is often confidential to the clients, and there is an immeasurable reputational value to EPAM in keeping its explicit and implicit commitments to clients to maintain this information as confidential. If this information was publicly disclosed, EPAM would lose client confidences and its reputation would be damaged. EPAM's responses to requests for proposals and client contracts, and/or portions thereof, often qualify as trade secrets depending on the specific contents of such proposals and contracts. In other cases where neither the proposals and contracts nor specific terms therein include trade secrets, the compilation of such documents across accounts and time such as found in the immense materials Rao downloaded constitutes a trade secret because it provides invaluable insight into the services and prices that EPAM is willing to offer.

5. EPAM's client-facing project information and project data has value to both EPAM and its clients. The solutions that EPAM devises for its clients have value because, if

known, EPAM's competitors (and its client's competitors) could copy them, depriving EPAM and its clients of value. These solutions are not generally known or publicly available. Further, the kinds of services that EPAM was offering to other clients is often confidential to the clients, and there is an immeasurable reputational value to EPAM in keeping its explicit and implicit commitments to clients to maintain this information as confidential. If this information was publicly disclosed, EPAM would lose client confidences and its reputation would be damaged. Depending on the nature of the client-facing project information and project data, it may be trade secrets or confidential. Further, the compilation of such documents across accounts and time such as found in the immense materials Rao downloaded constitutes a trade secret

6. The derivative documents that Rao improperly created based on EPAM Confidential Information and IP have value, and are not generally known or publicly available insofar as they incorporate EPAM trade secrets and other confidential information. For example, the document that served as Exhibit 9 to EPAM's motion for sanctions has value because it incorporates EPAM source code and/or sensitive architectural documents.

Further, all of the above, along with other confidential information (such as EPAM's internal financial data) is confidential and has value because EPAM is a publicly traded company which is obligated to disclose certain information in public filings. Any information that EPAM does *not* publicly disclose is, by definition, *not* generally known or publicly available. And any such information could give investors unfair insight into EPAM's business, allowing them to manipulate the market by trading EPAM securities based on nonpublic information.

Additionally, as reflected in the download logs, Dr. Rao also improperly downloaded significant intellectual and other property that belonged to EPAM's clients, and that constitutes "Confidential Information" within the meaning of Dr. Rao's Employment Covenants Agreement.

The client information downloaded included the following:

- IQVIA: OMOP ETL (multiple)
- J&J: OMOP ETL (multiple)
- Bayer: Studies (multiple)
- Cerner: OMOP ETL
- Lurie Hospital: OMOP ETL
- Providence Health: OMOP ETL
- Mayo Clinic: OMOP ETL
- Takeda: Signals project (business intelligence/BI)
- Takeda: AI Insights
- MSK Terminologist
- Bayer Data Science project

There is an immeasurable reputational value to EPAM in keeping its explicit and implicit commitments to clients to maintain this kind of information as confidential. If this kind of information was publicly disclosed, EPAM would lose client confidences and its reputation would be damaged.

EPAM further refers Dr. Rao to the Declaration of Gregory Klebanov, filed on November 5, 2025.

**1(c).** EPAM objects to this Interrogatory as outrageously disproportionate and unduly burdensome. There are over 44,960 documents on the download log alone. Providing this kind of information as to each document, particularly in the form of a narrative interrogatory response, is functionally impossible.

**1(d).** EPAM objects to this Interrogatory as outrageously disproportionate and unduly burdensome. There are over 44,960 documents on the download log alone. Providing this kind of information as to each document, particularly in the form of a narrative interrogatory response, is functionally impossible.

**1(e)**. EPAM objects to this Interrogatory as outrageously disproportionate and unduly burdensome. There are over 44,960 documents on the download log alone. Providing this kind

of information as to each document, particularly in the form of a narrative interrogatory response, is functionally impossible.

**ACTUAL INTERROGATORY NO. 2**: **(*i.e.* PURPORTED INTERROGATORY NOS. 6-9) [EPAM's ownership, chain of title, and asserted exclusion rights]**

For each item identified in response to Interrogatory No. 1, state the complete chain of title or other right by which EPAM claims to own the item or to exclude Rao or any other person or entity from possessing, using, demonstrating, licensing, or commercializing it, including: each contract, work-for-hire provision, assignment, acquisition instrument, license, client permission, or other instrument on which the claimed right rests, with the parties, the effective date, and the rights conveyed, retained, or reserved under each; the date on which EPAM contends its claimed right in the item began; each prior owner of the item and the date and instrument by which the item or any right in it passed to EPAM, including any transfer from Odysseus Data Services, Inc. in connection with EPAM's June 12, 2024 acquisition of Odysseus; if EPAM's claimed right ended, lapsed, or was transferred at any time, the date on which it ended and the successor holder; each person or entity that EPAM contends holds or has held a co-ownership interest, joint-development right, license, or other shared right in the item — including any right of Takeda or Millennium under the Takeda Agreement or the Takeda SOW and any open-source license applicable to a component of the item — and the distribution of rights between EPAM and each such holder; whether the item was conceived, prepared, or developed, in whole or in part, in the course of performing services under the Takeda Agreement or the Takeda SOW, and, if it was, the application of Sections 12, 20, and 25 of the Takeda Agreement to the claimed right and each Takeda consent, permission, amendment, assignment, or waiver on which EPAM relies; and the specific right that EPAM contends permits it to assert a claim concerning the item in EPAM's own name.

**ANSWER:**

EPAM objects to this purported interrogatory because it asks multiple discrete, independent questions, and thus should not be properly construed as a single interrogatory. *See Straight Arrow Prods.*, 2021 WL 4583849, at *3. EPAM construes the above purported interrogatory as four separate interrogatories:

**Effective 2(a)** (*i.e.*, Actual Interrogatory No. 6) – "For each item identified in response to Interrogatory No. 1, state the complete chain of title or other right by which EPAM claims to own the item or to exclude Rao or any other person or entity from possessing, using, demonstrating, licensing, or commercializing it, including: each contract, work-for-hire provision, assignment, acquisition instrument, license, client permission, or other instrument on

which the claimed right rests, with the parties, the effective date, and the rights conveyed, retained, or reserved under each;"

**Effective 2(b)** (*i.e.*, Actual Interrogatory No. 7) – "For each item identified in response to Interrogatory No. 1, state . . . the date on which EPAM contends its claimed right in the item began; each prior owner of the item and the date and instrument by which the item or any right in it passed to EPAM, including any transfer from Odysseus Data Services, Inc. in connection with EPAM's June 12, 2024 acquisition of Odysseus;"

**Effective 2(c)** (*i.e.*, Actual Interrogatory No. 8) – "For each item identified in response to Interrogatory No. 1, state . . . if EPAM's claimed right ended, lapsed, or was transferred at any time, the date on which it ended and the successor holder; each person or entity that EPAM contends holds or has held a co-ownership interest, joint-development right, license, or other shared right in the item — including any right of Takeda or Millennium under the Takeda Agreement or the Takeda SOW and any open-source license applicable to a component of the item — and the distribution of rights between EPAM and each such holder; whether the item was conceived, prepared, or developed, in whole or in part, in the course of performing services under the Takeda Agreement or the Takeda SOW, and, if it was, the application of Sections 12, 20, and 25 of the Takeda Agreement to the claimed right and each Takeda consent, permission, amendment, assignment, or waiver on which EPAM relies;"

**Effective 2(d)** (*i.e.*, Actual Interrogatory No. 9) – "For each item identified in response to Interrogatory No. 1, state . . . the specific right that EPAM contends permits it to assert a claim concerning the item in EPAM's own name."

EPAM further objects to the extent the interrogatories seek confidential information or trade secrets. EPAM will not provide any confidential information without first entering into a

reasonable and appropriate protective order or confidentiality agreement. Thus far, Rao has refused such an agreement.

Notwithstanding its objections, EPAM responds as follows:

**2(a)**. EPAM objects to this Interrogatory because it is based on a flawed factual and legal premise. The law does not require a "complete chain of title," whatever that means (EPAM further objects because that term is vague and ambiguous), nor does EPAM need to show a "contract, work-for-hire provision, assignment, acquisition instrument, license, client permission, or other instrument" or other document, in order to establish that it owns documents and materials that it created in the course of its ordinary business.

EPAM further objects to this Interrogatory as outrageously disproportionate and unduly burdensome. There are over 44,960 documents on the download log alone. Providing the information requested in the above Interrogatory of every item listed on that log would take an absurd amount of time, and is not proportional to the needs of the case. EPAM further objects because some of the documents identified above consist of documents that Dr. Rao created in violation of EPAM policies.

Notwithstanding its objections, EPAM has a common law right of ownership in the intellectual property, work, and other documents and materials that it created in the ordinary course of business ("IP and Work"). Additionally, EPAM buttresses its common law right of ownership by requiring relevant employees to sign Employment Covenants Agreements or similar agreements, which contain Ownership of Work Product or similar provisions setting forth that EPAM owns the right to any work created by the employee in connection with the employees' employment. EPAM additionally publishes policies, including its Code of Ethical Conduct, which further explain its ownership rights in the in the IP and Work and its employees'

obligations as to same. As to Dr. Rao specifically, EPAM refers to his Employment Covenants Agreement and the Ownership of Work Product provisions contained herein, to its Code of Ethical Conduct, and to other relevant policies.

From time-to-time, EPAM's rights to its IP and Work may be reiterated in documents such as Statements of Work. However, these documents do not *create* a chain of tile or other right to EPAM's own property. Rather, they clarify that other persons or entities do *not* own such property.

EPAM does not claim ownership rights in client-owned intellectual property within its possession. However, it maintains a legal right, under the Employment Covenants Agreement, to sue Dr. Rao for his breach of his contractual obligations as to the protection of this information.

**2(b)**. EPAM objects to this Interrogatory as outrageously disproportionate and unduly burdensome. There are over 44,960 documents on the download log alone. Providing this kind of information as to each document, particularly in the form of a narrative interrogatory response, is functionally impossible.

EPAM further objects to this Interrogatory because it is based on a flawed factual and legal premise. The law does not require an instrument to pass or transfer a title or right to EPAM.

Notwithstanding its objections, under the common law, EPAM's right to its IP and Work begins when the IP and Work is created. From time-to-time, EPAM may also purchase or acquire IP and Work that previously belonged to other entities (such as through its acquisition of Odysseus).

**2(c).** Notwithstanding its objections, EPAM does not seek relief in this action for any IP and Work where its ownership rights have ended, lapsed, or was transferred.

**2(d)**. EPAM objects to this Interrogatory as outrageously disproportionate and unduly burdensome. There are over 44,960 documents on the download log alone. Providing this kind of information as to each document, particularly in the form of a narrative interrogatory response, is functionally impossible. Notwithstanding its objections, EPAM refers to its Second Amended Complaint for the legal bases upon which it seeks relief based on the documents at issue.

**PURPORTED INTERROGATORY NO. 3: (*i.e.* ACTUAL INTERROGATORIES NOS. 10-14) [The identity and development history of the pleaded "AI Accelerator"]**

State what the "AI Accelerator" identified in paragraph 23 of the First Amended Complaint is, by separately identifying each software development EPAM includes within that term — including each development variously known within EPAM as "EPAM Synapse," "Synapse," "Takeda-Synapse," or "MedRag" (ECF No. 58-28 ¶ 3; ECF No. 58-2 at 3 n.2) — and stating for each such development: each source-code repository, project, group, package, module, or namespace that contained its source code, infrastructure configuration, or architecture documentation at any time from June 1, 2019 through October 15, 2025, with the hosting platform and creation date of each, including whether the development included the repository takeda-synapse-infra shown in EPAM's exhibit at ECF No. 3-6 and whether it included any repository, package, module, or namespace named epam-synapse-backend, synapse-core, or synapse-connectors, the names that ECF No. 58-25 ¶ 10 attributes to the document at ECF No. 58-12; the date development began and the development status as of October 15, 2025; each project, billing, time, or investment code to which development time for it was charged, including any of TKDA, TKDA-DSFX, TKDA-SYNPS, TAKEDA, TAKEDA-SYNAPSE, SYNP, and EPMC-SYNP; the cost center, business unit, and sponsor that funded or approved each such code; each budget or funding allocation approved for the development, with the amount and period; each person who contributed to the development and the code under which that person's time was charged; each contract, statement of work, or work order under which any part of it was developed, funded, or delivered; each testing of the development and each test environment or server used; each deployment of the development, internal or client-facing, with the date, the hosting environment, and, for a client deployment, the client; each item of feedback that a client or prospective client communicated about the development; all income or revenue EPAM has received from the development, stated by client and period; the name EPAM now uses for it (ECF No. 60-3 ¶ 5); each act by which EPAM contends the development was separated, in code, repository, funding, or contract, from work performed under the Takeda Agreement, with the date of each such act; and each file that EPAM contends Rao downloaded (ECF No. 3-2 ¶ 40, as explained by ECF No. 58-28 ¶ 3) that belonged to that development.

**ANSWER:**

EPAM objects to this purported interrogatory because it asks multiple discrete, independent questions, and thus should not be properly construed as a single interrogatory. *See Straight Arrow Prods.*, 2021 WL 4583849, at *3. EPAM construes the above purported interrogatory as five separate interrogatories:

**Effective 3(a)** (*i.e.*, Actual Interrogatory No. 10) – "State what the "AI Accelerator" identified in paragraph 23 of the First Amended Complaint is, by separately identifying each software development EPAM includes within that term — including each development variously known within EPAM as "EPAM Synapse," "Synapse," "Takeda-Synapse," or "MedRag" (ECF No. 58-28 ¶ 3; ECF No. 58-2 at 3 n.2) – and stating for each such development: each source-code repository, project, group, package, module, or namespace that contained its source code, infrastructure configuration, or architecture documentation at any time from June 1, 2019 through October 15, 2025, with the hosting platform and creation date of each, including whether the development included the repository takeda-synapse-infra shown in EPAM's exhibit at ECF No. 3-6 and whether it included any repository, package, module, or namespace named epam-synapse-backend, synapse-core, or synapse-connectors, the names that ECF No. 58-25 ¶ 10 attributes to the document at ECF No. 58-12; the date development began and the development status as of October 15, 2025[;]"

**Effective 3(b)** (*i.e.*, Actual Interrogatory No. 11) – "stating for each such development: . . . each project, billing, time, or investment code to which development time for it was charged, including any of TKDA, TKDA-DSFX, TKDA-SYNPS, TAKEDA, TAKEDA-SYNAPSE, SYNP, and EPMC-SYNP; the cost center, business unit, and sponsor that funded or approved each such code; each budget or funding allocation approved for the development, with the amount and period; each person who contributed to the development and the code under which

that person's time was charged; each contract, statement of work, or work order under which any part of it was developed, funded, or delivered;"

**Effective 3(c)** (*i.e.*, Actual Interrogatory No. 12) – "stating for each such development: . . . each testing of the development and each test environment or server used; each deployment of the development, internal or client-facing, with the date, the hosting environment, and, for a client deployment, the client; each item of feedback that a client or prospective client communicated about the development; all income or revenue EPAM has received from the development, stated by client and period; the name EPAM now uses for it (ECF No. 60-3 ¶ 5);"

**Effective 3(d)** (*i.e.*, Actual Interrogatory No. 13) – "stating for each such development: . . . each act by which EPAM contends the development was separated, in code, repository, funding, or contract, from work performed under the Takeda Agreement, with the date of each such act;"

**Effective 3(e)** (*i.e.*, Actual Interrogatory No. 14) – "stating for each such development: . . . each file that EPAM contends Rao downloaded (ECF No. 3-2 ¶ 40, as explained by ECF No. 58-28 ¶ 3) that belonged to that development."

EPAM further objects to the extent the interrogatories seek confidential information or trade secrets. EPAM will not provide any confidential information without first entering into a reasonable and appropriate protective order or confidentiality agreement. Thus far, Rao has refused such an agreement.

Notwithstanding its objections, EPAM responds as follows:

**3(a)**. The components of AI Accelerator are MedRAG and the software previously referred to as Synapse.

Development of MedRAG began in approximately March-April 2025. Synapse grew out of MedRAG; there is no fixed date in which Synapse "began" (in much the same way that there is no fixed date in which people in Italy stopped speaking Latin and began speaking Italian). Rather, EPAM organically continued the development of MedRAG by adding and/or discussing additional features and capabilities, to the point where what it was developing was no longer just "MedRAG." Eventually, these additional features and capabilities became known, internally, as Synapse.

EPAM objects to the phrase "development status" as ambiguous, as it does not know what this phrase means. Notwithstanding its objections, EPAM states that it has working software programs, but that – as with its other products – it continues to look for ways to develop and improve these programs.

EPAM will produce documentation sufficient to identify which of Rao's downloads related to the source code for AI Accelerator, and refers Rao to such information once produced.

EPAM objects to the remainder of this Interrogatory which seeks "for each such development: each source-code repository, project, group, package, module, or namespace that contained its source code, infrastructure configuration, or architecture documentation at any time from June 1, 2019 through October 15, 2025, with the hosting platform and creation date of each, including whether the development included the repository takeda-synapse-infra shown in EPAM's exhibit at ECF No. 3-6 and whether it included any repository, package, module, or namespace named epam-synapse-backend, synapse-core, or synapse-connectors, the names that ECF No. 58-25 ¶ 10 attributes to the document at ECF No. 58-12." This is an egregiously large amount of information. It is disproportionate, unduly burdensome, and functionally impossible

to answer in narrative format in an interrogatory. Further, the information sought appears to be of negligible or no relevance to this action.

**3(b).** EPAM is currently collecting business records which set forth project and billing time in connection with AI Accelerator and, once collected, will produce such records upon entry of a protective order or mutually-acceptable confidentiality agreement. EPAM refers Dr. Rao to those records.

**3(c):** EPAM objects to this Interrogatory, which seeks "for each such development: . . . each testing of the development and each test environment or server used; each deployment of the development, internal or client-facing, with the date, the hosting environment, and, for a client deployment, the client; each item of feedback that a client or prospective client communicated about the development; all income or revenue EPAM has received from the development, stated by client and period; the name EPAM now uses for it." This is an egregiously large amount of information. It is disproportionate, unduly burdensome, and functionally impossible to answer in narrative format in an interrogatory. Further, nearly all of the information sought appears to be of negligible or no relevance to this action (*e.g.*, the "hosting environment," the "test environment").

**3(d).** EPAM objects to this Interrogatory, which seeks, "for each such development: . . . each act by which EPAM contends the development was separated, in code, repository, funding, or contract, from work performed under the Takeda Agreement, with the date of each such act." This is an egregiously large amount of information. It is disproportionate, unduly burdensome, and functionally impossible to answer in narrative format in an interrogatory.

**3(e).** EPAM will produce documentation sufficient to identify which of Rao's downloads related to the source code for AI Accelerator, and refers Rao to such information once produced.

**PURPORTED INTERROGATORY NO. 4: (*i.e.* ACTUAL INTERROGATORIES NO. 15-19) [Whether the alleged downloads contain the three pleaded products, and EPAM's proof of access and acquisition for each]**

State the complete factual basis for the allegation that "[a]mong the documents accessed and downloaded by Rao were software code bases for a number of EPAM's digital tools and products, including proprietary source code to EPAM's ETL Conversion Kit, AI Cohort Generator, and AI Accelerator" (ECF No. 37 ¶ 76), separately as to each of the three products that allegation names — the ETL Conversion Kit (ECF No. 37 ¶ 21); the AI Cohort Generator (ECF No. 37 ¶ 22), including the developments variously known within EPAM as "Prometheus," "Prometheus Platform," or "Prometheus Federated Data Analytics Platform"; and the AI Accelerator (ECF No. 37 ¶ 23), including the developments identified in response to Interrogatory No. 3 — stating for each product: each repository, project, namespace, or storage location in which that product's source code resided from September 1 through October 15, 2025; whether any EPAM-issued corporate user account or credential assigned to Rao held an entitlement to each such repository or location, with the permission level, the grant date, the approver, and any revocation date for each entitlement; each recorded access, clone, fetch, pull, download, export, or synchronization event by which EPAM contends Rao in fact acquired that product's source code, with the date, source system, account, and event identifier; each specific file among the files EPAM attributes to Rao — including the approximately 44,960 files (ECF No. 37 ¶ 74) and the files inventoried under the Stipulated Forensic Inspection Protocol, ECF No. 55 — that EPAM contends is or contains that product's source code, identified by file name, path, hash, or Bates or iDS identifier; the portion of the product's code base that the identified files comprise; and the item identified in response to Interrogatory No. 1, and the ownership answer for that item under Interrogatory No. 2, to which each identified file corresponds.

**ANSWER:**

EPAM objects to this purported interrogatory because it asks multiple discrete, independent questions, and thus should not be properly construed as a single interrogatory. *See Straight Arrow Prods.*, 2021 WL 4583849, at *3. EPAM construes the above purported interrogatory as five separate interrogatories:

**Effective 4(a)** (*i.e.*, Actual Interrogatory No. 15) – "State the complete factual basis for the allegation that "[a]mong the documents accessed and downloaded by Rao were software code bases for a number of EPAM's digital tools and products, including proprietary source code to

EPAM's ETL Conversion Kit, AI Cohort Generator, and AI Accelerator" (ECF No. 37 ¶ 76), separately as to each of the three products that allegation names — the ETL Conversion Kit (ECF No. 37 ¶ 21); the AI Cohort Generator (ECF No. 37 ¶ 22), including the developments variously known within EPAM as "Prometheus," "Prometheus Platform," or "Prometheus Federated Data Analytics Platform"; and the AI Accelerator (ECF No. 37 ¶ 23), including the developments identified in response to Interrogatory No. 3;"

**Effective 4(b)** (*i.e.*, Actual Interrogatory No. 16) – "stating for each product: each repository, project, namespace, or storage location in which that product's source code resided from September 1 through October 15, 2025;"

**Effective 4(c)** (*i.e.*, Actual Interrogatory No. 17) – "stating for each product: . . . whether any EPAM-issued corporate user account or credential assigned to Rao held an entitlement to each such repository or location, with the permission level, the grant date, the approver, and any revocation date for each entitlement;"

**Effective 4(d)** (*i.e.*, Actual Interrogatory No. 18) – "stating for each product: . . . each recorded access, clone, fetch, pull, download, export, or synchronization event by which EPAM contends Rao in fact acquired that product's source code, with the date, source system, account, and event identifier;

**Effective 4(e)** (*i.e.*, Actual Interrogatory No. 19) – "stating for each product: . . . each specific file among the files EPAM attributes to Rao — including the approximately 44,960 files (ECF No. 37 ¶ 74) and the files inventoried under the Stipulated Forensic Inspection Protocol, ECF No. 55 — that EPAM contends is or contains that product's source code, identified by file name, path, hash, or Bates or iDS identifier; the portion of the product's code base that the identified files comprise; and the item identified in response to Interrogatory No. 1, and the

ownership answer for that item under Interrogatory No. 2, to which each identified file corresponds."

EPAM further objects to the extent the interrogatories seek confidential information or trade secrets. EPAM will not provide any confidential information without first entering into a reasonable and appropriate protective order or confidentiality agreement. Thus far, Rao has refused such an agreement.

Notwithstanding its objections, EPAM responds as follows:

**4(a)**. EPAM refers Dr. Rao to the download logs and the InfoSec report, which are being produced in a Bates-stamped form. The download logs reflect that Dr. Rao downloaded, to a personal device, the software code bases for a number of EPAM's digital tools and products, including proprietary source code to EPAM's ETL Conversion Kit, AI Cohort Generator, and AI Accelerator. To the extent the Interrogatory seeks information not found in these documents, EPAM objects on the grounds that the Interrogatory is vague and ambiguous (*i.e.*, EPAM does not know what additional information is sought), and, particularly if sought on a file-by-file basis, would be disproportionate, unduly burdensome, and functionally impossible to answer in narrative form.

**4(b)**. EPAM refers Dr. Rao to the download logs and the InfoSec report, which contains information about where the specific files that Dr. Rao downloaded were stored. To the extent the Interrogatory seeks information not found in these documents, EPAM objects on the grounds that the Interrogatory is vague and ambiguous (*i.e.*, EPAM does not know what additional information is sought), and, particularly if sought on a file-by-file basis, would be disproportionate, unduly burdensome, and functionally impossible to answer in narrative form.

**4(c).** EPAM objects to this Interrogatory as vague and ambiguous. EPAM does not understand what this interrogatory seeks. Further, to the extent this Interrogatory seeks information on a specific file-by-file basis (*e.g.*, the references to "such repository or location") it is disproportionate, unduly burdensome, and functionally impossible to answer as a narrative interrogatory response.

**4(d).** EPAM refers Dr. Rao to the download logs and the InfoSec report, which contains information about the specific timing of each download. To the extent the Interrogatory seeks information not found in these documents, EPAM objects on the grounds that the Interrogatory is vague and ambiguous (*i.e.*, EPAM does not know what additional information is sought), and, particularly if sought on a file-by-file basis, would be disproportionate, unduly burdensome, and functionally impossible to answer in narrative form.

**4(e).** EPAM refers Dr. Rao to the download logs and the InfoSec report, which are being produced in a Bates-stamped form today. EPAM will prepare an annotated copy of the download logs which identify which files that were downloaded reflect the source code for each of the above programs, and will produce those annotated logs as part of its document production. EPAM will supplement this interrogatory to identify the specific Bates range of this annotated log, when available. To the extent the Interrogatory seeks information that would not be found in such an annotated log, EPAM objects on the grounds that the Interrogatory is vague and ambiguous (*i.e.*, EPAM does not know what additional information is sought), and, particularly if sought on a file-by-file basis, would be disproportionate, unduly burdensome, and functionally impossible to answer in narrative form.

**PURPORTED INTERROGATORY NO. 5: (*i.e.* ACTUAL INTERROGATORY NO. 20) [The claimed development investment in Synapse]**

State the complete derivation of EPAM's statement that "[t]hrough the end of 2025 alone, EPAM recorded over 4,600 employee hours logged to the project that included Synapse" (ECF

No. 60-3 ¶ 2), including: the system of record from which the figure was drawn; each project, billing, or investment code included in the count; the date range of the counted entries; each person whose hours are included, with that person's employer, role, and included hours; the portion of the counted hours billed to, reimbursed by, or performed under a contract with Takeda or another client, including under the Takeda SOW; each category of time excluded from the figure, including the excluded time of Rao and other "high-salaried management personnel"; the person who first computed the figure and the date it was first computed; and, if EPAM relies on any corrected, updated, or superseding figure in place of the 4,600-hour figure, the same information for that figure.

**ANSWER:**

EPAM derived this information from business records kept in the ordinary course of business. EPAM is in the process of collecting these records, and will produce them as part of its ESI production. EPAM will supplement this interrogatory to identify the specific Bates range of these records, when available.

EPAM objects to this Interrogatory to the extent it seeks information *beyond* the information required for a derivation of the 4,600 hour employee figure. By way of example, if not used in the derivation of the above figure, EPAM will not produce information such as "investment codes" or each employee's "role." EPAM further objects to producing the information sought in this Interrogatory insofar as much of the above information appears to be of negligible or no relevance, and it would be unduly burdensome and disproportionate to collect it, and even more burdensome to list it in narrative form.

**PURPORTED INTERROGATORY NO. 6: (*i.e.* ACTUAL INTERROGATORIES NOS. 21-23) [The authorization history and asserted boundary for Rao and his corporate identities]**

For each EPAM system, repository, folder, project, cloud location, or corporate account that EPAM contends Rao accessed, used, or synchronized without authorization or in excess of authorization, state the complete authorization history for Rao and for each EPAM-issued corporate user account or credential assigned to him, including: each access, role, or entitlement that was assigned, with the date it was granted, the person or process that granted or approved it, and the business purpose for which it was assigned; each change to or revocation of that access, with the date, the person or system that made it, and the record in which it is stated; the person, policy, notice, entitlement change, access-control event, or credential action that EPAM contends made any access, use, or synchronization unauthorized or in excess of authorization, with the

date of each asserted boundary and the record in which it is stated; and, where EPAM relies on a purpose-based or policy-based limit rather than a technical revocation, the exact provision relied on and the date and manner in which that provision was communicated to Rao.

**ANSWER:**

EPAM objects to this purported interrogatory because it asks multiple discrete, independent questions, and thus should not be properly construed as a single interrogatory. *See Straight Arrow Prods.*, 2021 WL 4583849, at *3. EPAM construes the above purported interrogatory as three separate interrogatories:

**Effective 6(a)** (*i.e.*, Actual Interrogatory No. 21) – "For each EPAM system, repository, folder, project, cloud location, or corporate account that EPAM contends Rao accessed, used, or synchronized without authorization or in excess of authorization, state the complete authorization history for Rao and for each EPAM-issued corporate user account or credential assigned to him, including: each access, role, or entitlement that was assigned, with the date it was granted, the person or process that granted or approved it, and the business purpose for which it was assigned;"

**Effective 6(b)** (*i.e.*, Actual Interrogatory No. 22) – "For each EPAM system, repository, folder, project, cloud location, or corporate account that EPAM contends Rao accessed, used, or synchronized without authorization or in excess of authorization, state. . . each change to or revocation of that access, with the date, the person or system that made it, and the record in which it is stated; the person, policy, notice, entitlement change, access-control event, or credential action that EPAM contends made any access, use, or synchronization unauthorized or in excess of authorization, with the date of each asserted boundary and the record in which it is stated;"

**Effective 6(c)** (*i.e.*, Actual Interrogatory No. 23) – "For each EPAM system, repository, folder, project, cloud location, or corporate account that EPAM contends Rao accessed, used, or

synchronized without authorization or in excess of authorization, state. . . where EPAM relies on a purpose-based or policy-based limit rather than a technical revocation, the exact provision relied on and the date and manner in which that provision was communicated to Rao."

EPAM objects to each of the above interrogatories on the following grounds: (1) they appear to seek file-by-file information regarding the approximately 44,960 downloads, demands which are egregiously unduly burdensome, disproportionate, and functionally impossible to answer in narrative form; (2) they are vague and ambiguous, such that EPAM cannot understand what is being asked (*e.g.*, "the person, policy, notice, entitlement change, access-control event, or credential action that EPAM contends made any access, use, or synchronization unauthorized or in excess of authorization," "the date of each asserted boundary and the record in which it is stated"); (3) of the portions of the interrogatories that EPAM can understand, they seek substantial data that appears to have negligible or no relevance to this matter.

**PURPORTED INTERROGATORY NO. 7: (*i.e.* ACTUAL INTERROGATORY NO. 24) [Each alleged unauthorized access, acquisition, copying, or transmission event]**

Identify each act by which EPAM contends Rao accessed, acquired, copied, downloaded, synchronized, transmitted, retained, or failed to return an item identified in response to Interrogatory No. 1 without authorization or in excess of authorization, in any period and not limited to the September 11 through October 14, 2025 period alleged in ECF No. 37 ¶ 74, including each act before September 11, 2025 on which EPAM relies for its contention that Rao took EPAM information about Synapse and provided it to a generative AI program on or about August 10, 2025 (ECF No. 58-2). For each act, state: the item; the date and time; the source system and path; the account or credential used; the device, including whether the act involved Device A0001; the recorded event type; the authorization defect asserted for that act, by reference to the boundary identified in response to Interrogatory No. 6; and the evidence on which EPAM relies.

**ANSWER:**

EPAM refers Dr. Rao to the download logs and the InfoSec report, which are being produced in a Bates-stamped form today. EPAM further refers Dr. Rao to its forthcoming production of document obtained through the forensic protocol, bearing the Bates-stamp prefix

"RAODEVICES-ACCOUNTS," which consists in large measure of EPAM documents and materials (or documents and materials derived from EPAM Confidential Information, IP, and Work within the meaning of Rao's Employment Covenants Agreement) that Rao improperly created, kept, or maintained on non-EPAM devices and accounts. The metadata on those documents will reflect when those documents were created and/or last modified, but may not reflect every instance of Rao engaging in an act such as "access[ing], acquir[ing], copy[ing], download[ing], synchroniz[ing], [or] transmit[ing]" these documents. EPAM additionally objects because what it currently knows is limited. Due to Dr. Rao's use of personal devices and accounts, CoReason devices and accounts, spoliation of evidence, and withholding of documents, EPAM does not know what it does not know. Upon information and belief, there could be many additional instances of Dr. Rao engaging in an act in which he "accessed, acquired, copied, downloaded, synchronized, transmitted, retained, or failed to return an item" as described above.

EPAM objects to this Interrogatory to the extent that it seeks the following information, and that information cannot be located in the referenced documents: "For each act, state: the item; the date and time; the source system and path; the account or credential used; the device, including whether the act involved Device A0001; the recorded event type; the authorization defect asserted for that act, by reference to the boundary identified in response to Interrogatory No. 6; and the evidence on which EPAM relies." To the extent that such information is not located within the referenced document, it would be egregiously unduly burdensome and disproportionate "[f]or each act" to search for, produce, and list such information (particularly in a narrative format).

**PURPORTED INTERROGATORY NO. 8: (*i.e.* ACTUAL INTERROGATORIES NOS. 25-27) [The numerical download and file counts]**

Explain how EPAM calculated each numerical count of files, documents, downloads, or events that it attributes to Rao in this action, including "over 40,000 documents and data files" (ECF No. 3-2 ¶ 39) and "approximately 44,960 documents and data files" (ECF No. 37 ¶ 74; ECF No. 71). For each count, state: the source records and event universe; the date range; whether the count includes any event outside the September 11 through October 14, 2025 period alleged in ECF No. 37 ¶ 74, including any event from July or August 2025; the method for identifying unique files; the deduplication method; the treatment of automated OneDrive or other synchronization events, server-side events, and browser events; each category of event or file excluded; the person who performed and the person who validated the calculation; and the relationship between each count and the 54,900-row Microsoft 365 download audit export that EPAM produced as Forensic Protocol Exhibit B (EPAM Search Terms - Rao SPDownload322329263.1.xlsx).

**ANSWER:**

EPAM objects to this purported interrogatory because it asks multiple discrete, independent questions, and thus should not be properly construed as a single interrogatory. *See Straight Arrow Prods.*, 2021 WL 4583849, at *3. EPAM construes the above purported interrogatory as three separate interrogatories:

**Effective 8(a)** (*i.e.*, Actual Interrogatory No. 25) – "Explain how EPAM calculated each numerical count of files, documents, downloads, or events that it attributes to Rao in this action, including "over 40,000 documents and data files" (ECF No. 3-2 ¶ 39) and "approximately 44,960 documents and data files" (ECF No. 37 ¶ 74; ECF No. 71). . . . For each count, state . . . each category of event or file excluded; the person who performed and the person who validated the calculation;"

**Effective 8(b)** (*i.e.*, Actual Interrogatory No. 26) – "For each count, state: the source records and event universe; the date range; whether the count includes any event outside the September 11 through October 14, 2025 period alleged in ECF No. 37 ¶ 74, including any event from July or August 2025; the method for identifying unique files; the deduplication method; the treatment of automated OneDrive or other synchronization events, server-side events, and browser events;"

**Effective 8(c)** (*i.e.*, Actual Interrogatory No. 27) – "For each count, state: . . . the relationship between each count and the 54,900-row Microsoft 365 download audit export that EPAM produced as Forensic Protocol Exhibit B (EPAM Search Terms - Rao SPDownload322329263.1.xlsx)."

EPAM objects because these interrogatories are unduly burdensome and require EPAM to conduct a disproportionate search of its records to identify the process, which is likely not substantively reflected in such records, by which it calculated how many of EPAM's files Rao impermissibly downloaded. The download logs are equally available to Dr. Rao. He can contest any figure. EPAM relatedly objects because these interrogatories are improper contention interrogatories. EPAM also objects to the extent that the interrogatories seek information protected by the work product doctrine and attorney-client privilege.

EPAM further objects because effective Interrogatory 8(b), and all interrogatories after it, exceed the 25 interrogatory limit set forth in the federal rules, which count each discrete subpart as a separate interrogatory.

**PURPORTED INTERROGATORY NO. 9: (*i.e.* ACTUAL INTERROGATORIES NOS. 28-31) [Each alleged use, disclosure, commercialization, derivative work, or threat]**

Identify each event on which EPAM relies to contend that Rao, CoReason, Inc., or Scientific Informatics, LLC used, disclosed, commercialized, incorporated into a derivative work, or specifically threatened or intended to use or disclose an item identified in response to Interrogatory No. 1 outside Rao's authorized EPAM duties or after his employment. For each event, state: the item; the actor; the date; the words or conduct; where EPAM contends the item was provided to an AI Platform, the platform, the specific input EPAM contends came from the item, and the resulting output — including for the documents at ECF Nos. 58-12 and 58-13 and for each CoReason "Strategic Recipe" or other CoReason material EPAM contends is derivative; how and when the content used or input came to be located in the account, device, or platform from which it was used or input, identifying each download, transfer, synchronization, or other acquisition event on which EPAM relies for that content; the recipient or system; the client or business opportunity involved; the evidence on which EPAM relies to connect the identified item to the identified output, act, or threat, stating whether the contention rests on an identified record or witness or instead on inference or belief, and, for any inference, the facts from which it is drawn; and, where EPAM contends that a product or material of Rao, CoReason, Inc., or Scientific Informatics, LLC is similar to or derived from an item, each comparison EPAM

performed, the person who performed it, the materials compared, and each specific similarity identified.

**ANSWER:**

EPAM objects to this purported interrogatory because it asks multiple discrete, independent questions, and thus should not be properly construed as a single interrogatory. *See Straight Arrow Prods.*, 2021 WL 4583849, at *3. EPAM construes the above purported interrogatory as four separate interrogatories:

**Effective 9(a)** (*i.e.*, Actual Interrogatory No. 28) – "Identify each event on which EPAM relies to contend that Rao, CoReason, Inc., or Scientific Informatics, LLC used, disclosed, commercialized, incorporated into a derivative work, or specifically threatened or intended to use or disclose an item identified in response to Interrogatory No. 1 outside Rao's authorized EPAM duties or after his employment. For each event, state: the item; the actor; the date; the words or conduct; where EPAM contends the item was provided to an AI Platform, the platform, the specific input EPAM contends came from the item, and the resulting output — including for the documents at ECF Nos. 58-12 and 58-13 and for each CoReason "Strategic Recipe" or other CoReason material EPAM contends is derivative;"

**Effective 9(b)** (*i.e.*, Actual Interrogatory No. 29) – "For each event, state: . . . how and when the content used or input came to be located in the account, device, or platform from which it was used or input, identifying each download, transfer, synchronization, or other acquisition event on which EPAM relies for that content; the recipient or system;"

**Effective 9(c)** (*i.e.*, Actual Interrogatory No. 30) – "For each event, state: . . . the client or business opportunity involved;"

**Effective 9(d)** (*i.e.*, Actual Interrogatory No. 31) – "For each event, state: . . . the evidence on which EPAM relies to connect the identified item to the identified output, act, or

threat, stating whether the contention rests on an identified record or witness or instead on inference or belief, and, for any inference, the facts from which it is drawn; and, where EPAM contends that a product or material of Rao, CoReason, Inc., or Scientific Informatics, LLC is similar to or derived from an item, each comparison EPAM performed, the person who performed it, the materials compared, and each specific similarity identified."

EPAM further objects because these interrogatories, and all interrogatories after them, exceed the 25 interrogatory limit set forth in the federal rules, which count each discrete subpart as a separate interrogatory.

EPAM further objects because these interrogatories are vague, cumulative, overly broad, and unduly burdensome. Substantive responses would require document-by-document analysis of tens of thousands of files, which is disproportionate to the needs of the litigation. Similarly, the burden of reconstructing every transmission path, input, output similarity, and associated business opportunity would substantially outweigh the minimal benefit, particularly where EPAM has already produced or identified forensic records, download logs, and device/account materials.

EPAM additionally objects because these interrogatories are improper contention interrogatories. EPAM further objects because the interrogatories seek information that is in Rao's sole possession. Indeed, due to Dr. Rao's use of personal devices and accounts, CoReason devices and accounts, spoliation of evidence, and withholding of documents, EPAM does not know what it does not know.

EPAM further objects to the extent these interrogatories seek information protected by the attorney-client communication and attorney work product privileges.

**PURPORTED INTERROGATORY NO. 10: (*i.e.* ACTUAL INTERROGATORIES NOS. 32-35) [EPAM's damages computation]**

State EPAM's current computation of each category of damages or monetary relief that EPAM seeks in this action. For each category, state: the amount; the calculation method and its assumptions; the date the loss was incurred; the count of the First Amended Complaint and any contractual provision for which the amount is sought; the conduct by Rao alleged to have caused it; the item identified in response to Interrogatory No. 1 involved; the benefit EPAM contends Rao, CoReason, Inc., or Scientific Informatics, LLC received; and each customer, contract, license, sale, revenue stream, development cost, forensic cost, remediation cost, or litigation expense included in the amount.

**ANSWER:**

EPAM objects to this purported interrogatory because it asks multiple discrete, independent questions, and thus should not be properly construed as a single interrogatory. *See Straight Arrow Prods.*, 2021 WL 4583849, at *3. EPAM construes the above purported interrogatory as four separate interrogatories:

**Effective 10(a)** (*i.e.*, Actual Interrogatory No. 32) – "State EPAM's current computation of each category of damages or monetary relief that EPAM seeks in this action. For each category, state: the amount; the calculation method and its assumptions; the date the loss was incurred;"

**Effective 10(b)** (*i.e.*, Actual Interrogatory No. 33) – "For each category, state . . . the count of the First Amended Complaint and any contractual provision for which the amount is sought; the conduct by Rao alleged to have caused it; the item identified in response to Interrogatory No. 1 involved

**Effective 10(c)** (*i.e.*, Actual Interrogatory No. 34) -- "For each category, state: . . . the benefit EPAM contends Rao, CoReason, Inc., or Scientific Informatics, LLC received;"

**Effective 10(d)** (*i.e.*, Actual Interrogatory No. 35) – "For each category, state: . . . each customer, contract, license, sale, revenue stream, development cost, forensic cost, remediation cost, or litigation expense included in the amount."

EPAM further objects because these interrogatories, and all interrogatories after them, exceed the 25 interrogatory limit set forth in the federal rules, which count each discrete subpart as a separate interrogatory.

EPAM further objects to the extent this interrogatory seeks information protected by the attorney-client communications or attorney work product privileges.

**10(a):** Notwithstanding its objections, EPAM responds as follows:

EPAM currently seeks the following forms of damages and monetary relief:

1. Actual/compensatory/consequential damages of approximately $250,000 in lost revenue in connection with Takeda's decision to not proceed with an additional phase of the Synapse-related project.

2. Additional actual/compensatory/consequential damages in an amount to be proven and awarded at trial, in connection with anticipated sales and license revenue associated with Synapse that did not materialize. There is no firm computation of these damages available.

3. Unjust enrichment damages /disgorgement of the $100,000 investment in CoReason that Dr. Rao obtained, which he obtained due to his misappropriation of trade secrets and other confidential information.

4. Exemplary damages in the amount equal to two times EPAM's proven loss and unjust enrichment (*i.e.*, $350,000 in combined lost Takeda revenue and unjust enrichment damages, if no additional damages are proven).

5. Disgorgement/forfeiture of Dr. Rao's compensation during the period of his disloyalty; currently estimated as beginning from at least August 1, 2025 onward. This amount from August totals approximately $52,083.33.

6. Punitive damages in an amount to be proven at trial; there is no computation of punitive damages available.

7. EPAM's attorneys' fees and litigation costs, including its forensic expenses. To date, EPAM's attorneys' fees are approximately $1,120,822, its forensic expenses are approximately $75,717, expert witness costs are approximately $31,268, and its other litigation expenses are approximately $10,711.

The above is in addition to EPAM's requests for various forms of non-monetary relief, including injunctive and declaratory relief.

**10(b):** EPAM refers Dr. Rao to its Second Amended Complaint which sets forth the bases for the damages sought, including but not limited to the Second Amended Complaint's breach of contract claims in connection with Dr. Rao's Employment Covenants Agreement. EPAM otherwise objects to answering this interrogatory (which is beyond the 25 interrogatory limit).

**10(c)**: EPAM seeks disgorgement of the $100,000 investment in CoReason that Dr. Rao obtained. It reserves the right to seek relief for any benefit proven at trial.

**10(d):** EPAM refers Dr. Rao to its answer to effective interrogatory 10(a) and to its Second Amended Complaint.

**PURPORTED INTERROGATORY NO. 11: (*i.e.* ACTUAL INTERROGATORIES NOS. 36-37) [The Takeda and Gilead Reports and EPAM's Responses]**

Describe EPAM's response to each concern, report, objection, refusal, question, or request for legal or compliance review, however phrased and whether communicated orally or in writing, that Rao communicated from July 1 through October 15, 2025 concerning ownership, licensing, reuse, demonstration, or commercialization of work developed or funded under the Takeda Agreement, including each oral discussion of such a concern between Rao and Gregory Klebanov, Greg Killian, Chris Waller, or Jonathan Rioux; the September 9, 2025 4:30 PM email from Rao to Katie Barista, Lucy McDermott, and Gregory Klebanov with the subject "Takeda AI contract - SOW - for legal review?" (reproduced in ECF No. 33-2); the September 20, 2025 email and September 23, 2025 messages reproduced in ECF No. 33-2; and each other email on that subject that Rao sent to or copied to Katie Barista, Lucy McDermott, or Gregory Klebanov —stating for each such concern: each EPAM recipient or discussion participant and the date that person received, discussed, or learned of it; the substance of each oral discussion as EPAM's personnel or records recall or reflect it; each nonprivileged discussion of the concern or its subject among EPAM or Odysseus personnel in any medium — including email, Microsoft

Teams or other chat, and meetings — with the participants, date, medium, substance, and business considerations exchanged, whether the discussion occurred before or after October 15, 2025, through the date of EPAM's answers; each nonprivileged factual inquiry undertaken; each factual conclusion reached; each business, compliance, employment, or no-action decision that followed; and the person who made each decision.

**ANSWER:**

EPAM objects to this purported interrogatory because it asks multiple discrete, independent questions, and thus should not be properly construed as a single interrogatory. *See Straight Arrow Prods.*, 2021 WL 4583849, at *3. EPAM construes the above purported interrogatory as two separate interrogatories:

**Effective 11(a)** (*i.e.*, Actual Interrogatory No. 36) – "Describe EPAM's response to each concern, report, objection, refusal, question, or request for legal or compliance review, however phrased and whether communicated orally or in writing, that Rao communicated from July 1 through October 15, 2025 concerning ownership, licensing, reuse, demonstration, or commercialization of work developed or funded under the Takeda Agreement, including each oral discussion of such a concern between Rao and Gregory Klebanov, Greg Killian, Chris Waller, or Jonathan Rioux; the September 9, 2025 4:30 PM email from Rao to Katie Barista, Lucy McDermott, and Gregory Klebanov with the subject "Takeda AI contract - SOW - for legal review?" (reproduced in ECF No. 33-2); the September 20, 2025 email and September 23, 2025 messages reproduced in ECF No. 33-2; and each other email on that subject that Rao sent to or copied to Katie Barista, Lucy McDermott, or Gregory Klebanov —stating for each such concern: each EPAM recipient or discussion participant and the date that person received, discussed, or learned of it; the substance of each oral discussion as EPAM's personnel or records recall or reflect it; each nonprivileged discussion of the concern or its subject among EPAM or Odysseus personnel in any medium — including email, Microsoft Teams or other chat, and meetings —

with the participants, date, medium, substance, and business considerations exchanged, whether the discussion occurred before or after October 15, 2025, through the date of EPAM's answers;"

**Effective 11(b)** (*i.e.*, Actual Interrogatory No. 37) – "Describe . . . . each nonprivileged factual inquiry undertaken; each factual conclusion reached; each business, compliance, employment, or no-action decision that followed; and the person who made each decision."

EPAM further objects because these interrogatories, and all interrogatories after it, exceed the 25 interrogatory limit set forth in the federal rules, which count each discrete subpart as a separate interrogatory.

EPAM further objects to the extent the interrogatories seek confidential information or trade secrets. EPAM will not provide any confidential information without first entering into a reasonable and appropriate protective order or confidentiality agreement. Thus far, Rao has refused such an agreement.

EPAM further objects because the interrogatories are overly broad and unduly burdensome. The burden posed exceeds the minimal benefit of each specific piece of information sought, responding would require a broad collection and review of emails, chats, meeting records, and witness recollections across numerous custodians – regarding documents and conversations that may not even exist. Similarly, the interrogatory requests substantive records of oral communications, many of which Rao was a part of, which may not even exist.

EPAM further objects to the extent the interrogatories seek cumulative or duplicative information.

EPAM further objects to the extent the interrogatories seek information subject to the attorney-client communication or attorney work product privileges.

**PURPORTED INTERROGATORY NO. 12: (*i.e.* ACTUAL INTERROGATORIES NOS. 38-40) [EPAM's contemporaneous basis to reuse or commercialize Takeda-funded work]**

Explain the nonprivileged factual and contractual basis on which EPAM or Odysseus believed, at any time from June 1, 2019 through October 15, 2025, that it could own, reuse, demonstrate, market, sell, license, or commercialize work developed or funded under the Takeda Agreement — in whole or in part, and whether in full or as modules, components, code, architecture, or documentation used to extend or enhance another EPAM product or offering, including, without limitation, work relating to the developments variously known within EPAM as "Prometheus," "Prometheus Platform," the "AI Cohort Generator," the "AI Accelerator," "EPAM Synapse," "Synapse," "Takeda-Synapse," "MedRag," and the "ETL Conversion Kit" — without additional Takeda permission, including: any reliance on the "pre-existing intellectual property" license provision of the Takeda SOW notwithstanding Sections 12 and 25 of the Takeda Agreement; for each listed development EPAM contends was not developed or funded in whole or in part under the Takeda Agreement, the basis for that contention; and each request that EPAM or Odysseus made to Takeda or Millennium for permission, consent under Section 13, 14, or 20 of the Takeda Agreement, license, assignment, or amendment concerning that work, with the date, the participants, the substance, and whether Takeda granted, denied, limited, withdrew, or left each request unresolved.

**ANSWER:**

EPAM objects to this purported interrogatory because it asks multiple discrete, independent questions, and thus should not be properly construed as a single interrogatory. *See Straight Arrow Prods.*, 2021 WL 4583849, at *3. EPAM construes the above purported interrogatory as three separate interrogatories:

**Effective 12(a)** (*i.e.*, Actual Interrogatory No. 38) – "Explain the nonprivileged factual and contractual basis on which EPAM or Odysseus believed, at any time from June 1, 2019 through October 15, 2025, that it could own, reuse, demonstrate, market, sell, license, or commercialize work developed or funded under the Takeda Agreement — in whole or in part, and whether in full or as modules, components, code, architecture, or documentation used to extend or enhance another EPAM product or offering, including, without limitation, work relating to the developments variously known within EPAM as "Prometheus," "Prometheus Platform," the "AI Cohort Generator," the "AI Accelerator," "EPAM Synapse," "Synapse," "Takeda-Synapse," "MedRag," and the "ETL Conversion Kit" — without additional Takeda

permission, including: any reliance on the "pre-existing intellectual property" license provision of the Takeda SOW notwithstanding Sections 12 and 25 of the Takeda Agreement;"

**Effective 12(b)** (*i.e.*, Actual Interrogatory No. 39) – **"**for each listed development EPAM contends was not developed or funded in whole or in part under the Takeda Agreement, the basis for that contention;"

**Effective 12(c)** (*i.e.*, Actual Interrogatory No. 40) – "each request that EPAM or Odysseus made to Takeda or Millennium for permission, consent under Section 13, 14, or 20 of the Takeda Agreement, license, assignment, or amendment concerning that work, with the date, the participants, the substance, and whether Takeda granted, denied, limited, withdrew, or left each request unresolved."

EPAM further objects because these interrogatories, and all interrogatories after them, exceed the 25 interrogatory limit set forth in the federal rules, which count each discrete subpart as a separate interrogatory.

EPAM further objects to the extent the interrogatories seek confidential information or trade secrets. EPAM will not provide any confidential information without first entering into a reasonable and appropriate protective order or confidentiality agreement. Thus far, Rao has refused such an agreement.

EPAM further objects because the interrogatories are both overly broad in time (*e.g.*, over six years) and subject matter. The request does not identify whose "belief" is at issue and effectively attributes a single state of mind to EPAM and Odysseus as entities over a lengthy period. EPAM further objects to the extent the interrogatories seek information about the mental impressions of an undefined universe of current and former employees.

EPAM additionally objections because the discovery sought is wildly overbroad and of negligible or no relevance. Rao's CEPA claim concerns whether he engaged in protected activity in connection with whether Takeda or EPAM owned certain intellectual property associated with a Synapse-related project. The documents relevant to that inquiry concern whether Rao engaged in protected activity, and whether EPAM retaliated against Rao due to any such alleged protected activity. None of these inquiries require an exhaustive six-year investigation (or narrative interrogatory response) regarding EPAM's and/or Odysseus' relationship with Takeda, or scores of other products/services.

EPAM further objects to the extent the interrogatories assumes a disputed fact or calls for a legal conclusion.

EPAM further objects to the extent the interrogatories seek cumulative or duplicative information.

EPAM further objects to the extent the interrogatories seek information subject to the attorney-client communication and attorney work product privileges.

**PURPORTED INTERROGATORY NO. 13: (*i.e.* ACTUAL INTERROGATORIES NOS. 41-42) [EPAM's understanding of Gilead's staffing and access requirements]**

Explain EPAM's understanding, during the period January 1, 2024 through October 15, 2025, of the Gilead requirements that governed the country from which Gilead Personnel could access United States healthcare data or a Gilead system, the use of assigned credentials, screen access by another worker, and staffing or onboarding approval, including: how EPAM acquired that understanding, whether through written terms, oral instructions, course of dealing, prior onboarding decisions, client rejections or removals, or later client confirmation; for each Access-Event Gilead Personnel, the requirement that applied, the staffing or access decision made, and the reason that EPAM or Gilead communicated or recorded for it; and, for each person who performed, supported, or was made available to perform extract-transform-load or data-engineering work, data or statistical analysis, or software development, engineering, or management work involving Gilead healthcare data, United States healthcare data licensed by Gilead, or a Gilead system during that period — whether or not Gilead requested, approved, onboarded, billed for, or was informed of the person's involvement — the person's identity, the function or functions among those categories the person performed, the person's physical work location by country during the involvement, and whether EPAM classified each such country as restricted or approved under the requirements described in this answer.

**ANSWER:**

EPAM objects to this purported interrogatory because it asks multiple discrete, independent questions, and thus should not be properly construed as a single interrogatory. *See Straight Arrow Prods.*, 2021 WL 4583849, at *3. EPAM construes the above purported interrogatory as two separate interrogatories:

**Effective 13(a)** (*i.e.*, Actual Interrogatory No. 41) – "Explain EPAM's understanding, during the period January 1, 2024 through October 15, 2025, of the Gilead requirements that governed the country from which Gilead Personnel could access United States healthcare data or a Gilead system, the use of assigned credentials, screen access by another worker, and staffing or onboarding approval, including: how EPAM acquired that understanding, whether through written terms, oral instructions, course of dealing, prior onboarding decisions, client rejections or removals, or later client confirmation for each Access-Event Gilead Personnel, the requirement that applied, the staffing or access decision made, and the reason that EPAM or Gilead communicated or recorded for it;"

**Effective 13(b)** (*i.e.*, Actual Interrogatory No. 42) – "[F]or each person who performed, supported, or was made available to perform extract-transform-load or data-engineering work, data or statistical analysis, or software development, engineering, or management work involving Gilead healthcare data, United States healthcare data licensed by Gilead, or a Gilead system during that period — whether or not Gilead requested, approved, onboarded, billed for, or was informed of the person's involvement — [state:] the person's identity, the function or functions among those categories the person performed, the person's physical work location by country during the involvement, and whether EPAM classified each such country as restricted or approved under the requirements described in this answer."

EPAM further objects because these interrogatories, and all interrogatories after them, exceed the 25 interrogatory limit set forth in the federal rules, which count each discrete subpart as a separate interrogatory.

EPAM further objects to the extent the interrogatories seek confidential information or trade secrets, including sensitive personal and employment information. EPAM will not provide any confidential information without first entering into a reasonable and appropriate protective order or confidentiality agreement. Thus far, Rao has refused such an agreement.

EPAM further objects because the interrogatories lack relevance, are overly broad, and unduly burdensome. Reconstructing the identity, functions, physical location, access status, and country classification of every person who performed, supported, or was potentially available to perform broadly defined Gilead-related work imposes a substantial burden disproportionate to any issues concerning Rao's specific report or conduct.

EPAM further objects to the extent the interrogatories assumes a disputed fact or improperly attributes a single state of mind to EPAM. The request asks for "EPAM's understanding" without identifying the relevant personnel, business unit, project, contract, system, or time.

EPAM further objects to the extent the interrogatories seek cumulative or duplicative information.

EPAM additionally objects because the discovery sought in these interrogatories is wildly overbroad and of negligible or no relevance. Rao's CEPA claim concerns whether he engaged in protected activity in connection with a single isolated Gilead staffing issue. At deposition, Rao clarified that his purported protected activity consisted of a single message exchange. The documents relevant to that inquiry concern whether Rao engaged in protected activity (*e.g.*, the

message exchange, which has already been produced), and whether EPAM retaliated against Rao due to any such alleged protected activity. None of these inquiries require an exhaustive investigation (or narrative interrogatory response) regarding EPAM's staffing on Gilead projects, much less the incredible amount of data sought by the above interrogatories.

EPAM further objects to the extent the interrogatories call for speculation. To the extent Gilead did not communicate the reason for a staffing or access decision, EPAM cannot state Gilead's rationale without speculating. Similarly, EPAM may not be able to determine a person's precise physical work location throughout an extended period absent reliable contemporaneous records.

**PURPORTED INTERROGATORY NO. 14: (*i.e.* ACTUAL INTERROGATORIES NOS. 43-46) [EPAM's response to Rao's Gilead report]**

Describe EPAM's response to each concern, report, objection, or refusal that Rao communicated concerning the location, staffing, billing, credential use, screen access, or data access of Gilead Personnel, stating for each such concern: each recipient and the date the recipient learned of it; each nonprivileged discussion of the concern or its subject among EPAM or Odysseus personnel in any medium — including email, Microsoft Teams or other chat, and meetings — with the participants, date, medium, substance, and business considerations exchanged, whether the discussion occurred before or after October 15, 2025, through the date of EPAM's answers; each factual inquiry or client contact undertaken, at any time through the date of EPAM's answers; each finding; each corrective or no-action decision and the person responsible for it; and each investigation, finding, or closure concerning those subjects that occurred after October 15, 2025.

**ANSWER:**

EPAM objects to this purported interrogatory because it asks multiple discrete, independent questions, and thus should not be properly construed as a single interrogatory. *See Straight Arrow Prods.*, 2021 WL 4583849, at *3. EPAM construes the above purported interrogatory as four separate interrogatories:

**Effective 14(a)** (*i.e.*, Actual Interrogatory No. 43) – "Describe EPAM's response to each concern, report, objection, or refusal that Rao communicated concerning the location, staffing, billing, credential use, screen access, or data access of Gilead Personnel, stating for each such concern: each recipient and the date the recipient learned of it; each nonprivileged discussion of the concern or its subject among EPAM or Odysseus personnel in any medium — including email, Microsoft Teams or other chat, and meetings — with the participants, date, medium, substance, and business considerations exchanged, whether the discussion occurred before or after October 15, 2025, through the date of EPAM's answers;"

**Effective 14(b)** (*i.e.*, Actual Interrogatory No. 44) – "Describe . . . each factual inquiry or client contact undertaken, at any time through the date of EPAM's answers;"

**Effective 14(c)** (*i.e.*, Actual Interrogatory No. 45) – "Describe . . . each finding; each corrective or no-action decision and the person responsible for it;"

**Effective 14(d)** (*i.e.*, Actual Interrogatory No. 46) – "Describe . . . each investigation, finding, or closure concerning those subjects that occurred after October 15, 2025."

EPAM further objects because these interrogatories, and all interrogatories after them, exceed the 25 interrogatory limit set forth in the federal rules, which count each discrete subpart as a separate interrogatory.

EPAM further objects to the extent the interrogatories seek confidential information or trade secrets. EPAM will not provide any confidential information without first entering into a reasonable and appropriate protective order or confidentiality agreement. Thus far, Rao has refused such an agreement.

EPAM further objects because the interrogatories are vague, overly broad, and unduly burdensome. Requiring EPAM to catalogue every internal discussion and investigative step

concerning location, staffing, billing, credential use, screen access, or data access substantially exceeds what is necessary to determine how EPAM responded to Rao's specific communication—particularly where EPAM understands Rao's sole communication to be the document produced as EPAM000283.

EPAM further objects because the interrogatories assume disputed facts.

EPAM further objects to the extent the interrogatories seek cumulative and duplicative information.

EPAM further objects to the extent the interrogatories seek information subject to the attorney-client communications and attorney work product privileges.

Notwithstanding its objections, EPAM responds as follows:

**14(a).** To the best of EPAM's knowledge, Dr. Rao's sole communication regarding the location, staffing, billing, credential use, screen access, or data access of Gilead Personnel consists of the document produced as EPAM000283. EPAM did not further respond because the issue had already been reported by Lucy McDermott and appropriately addressed.

**14(b).** EPAM's response to Dr. Rao's communication is also reflected in the document produced as EPAM000283.

**14(c).** None, as to any "concern, report, objection, or refusal" by Dr. Rao.

**14(d).** None, as to any "concern, report, objection, or refusal" by Dr. Rao.

**PURPORTED INTERROGATORY NO. 15: (*i.e.* ACTUAL INTERROGATORIES NOS. 47-50) [The adverse-employment-action chronology and EPAM's reasons]**

Describe EPAM's decision process that culminated in Rao's October 15, 2025 termination, including how the reduction or reassignment of his duties, the elimination or replacement of his role, his selection for a financial layoff, the proposed revised role, the proposed performance-improvement plan, and the conversion of the layoff into an immediate termination formed part of that process. For each stage, identify: the proposer, reviewer, and decision-maker; the decision date; the reason stated at the time; the reasons actually considered or exchanged among the participants, as EPAM's personnel or records recall or reflect them; each nonprivileged discussion of the stage in any medium — including email, Microsoft Teams

or other chat, and meetings — with the participants, date, medium, and substance; each budget, cost-reduction, headcount, revenue, or other financial model, analysis, or projection relied on for the stage, with the person who prepared it and its date; each approval or authorization obtained for the stage, including any approval by executive leadership or the Board of Directors; the information and criteria relied on; the alternatives considered; the person who communicated the decision to Rao; and each later change in the stated reason.

**ANSWER:**

EPAM objects to this purported interrogatory because it asks multiple discrete, independent questions, and thus should not be properly construed as a single interrogatory. *See Straight Arrow Prods.*, 2021 WL 4583849, at *3. EPAM construes the above purported interrogatory as four separate interrogatories:

**Effective 15(a)** (*i.e.*, Actual Interrogatory No. 47) – "Describe EPAM's decision process that culminated in Rao's October 15, 2025 termination, including how the reduction or reassignment of his duties, the elimination or replacement of his role, his selection for a financial layoff, the proposed revised role, the proposed performance-improvement plan, and the conversion of the layoff into an immediate termination formed part of that process. For each stage, identify: the proposer, reviewer, and decision-maker; the decision date; . . . the person who communicated the decision to Rao; For each stage, identify: . . . the reason stated at the time; the reasons actually considered or exchanged among the participants, as EPAM's personnel or records recall or reflect them; . . . and each later change in the stated reason[;]"

**Effective 15(b)** (*i.e.*, Actual Interrogatory No. 48) – "For each stage, identify: . . . each nonprivileged discussion of the stage in any medium — including email, Microsoft Teams or other chat, and meetings — with the participants, date, medium, and substance;"

**Effective 15(c)** (*i.e.*, Actual Interrogatory No. 49) – "For each stage, identify: . . . each budget, cost-reduction, headcount, revenue, or other financial model, analysis, or projection relied on for the stage, with the person who prepared it and its date;"

**Effective 15(d)** (*i.e.*, Actual Interrogatory No. 50) – "For each stage, identify: . . . each approval or authorization obtained for the stage, including any approval by executive leadership or the Board of Directors; the information and criteria relied on; the alternatives considered;"

EPAM further objects because these interrogatories, and all interrogatories after them, exceed the 25 interrogatory limit set forth in the federal rules, which count each discrete subpart as a separate interrogatory.

EPAM further objects because the interrogatories are vague, overly broad, and unduly burdensome. Requiring EPAM to catalogue every communication, analysis, approval, and alternative associated with multiple preliminary or abandoned employment options substantially exceeds what is necessary to identify the material decision-makers and reasons for Rao's termination. Rule 33 does not necessarily require EPAM to catalogue every email, chat, meeting, and oral discussion where it can provide a reasonable narrative identifying the principal decision-makers, material chronology, and reasons for the employment decision.

EPAM further objects to the extent the interrogatories assume disputed facts (*e.g.*, the false assertion that Rao was subjected to a financial layoff, the false assertion regarding a puported "conversion of the layoff into an immediate termination").

EPAM further objects to the extent the interrogatories seek information subject to the attorney-client communications or attorney work product privileges.

EPAM further objects to the extent the interrogatories call for speculation. A request for all reasons "actually considered" may require EPAM to speculate about the unexpressed mental processes of multiple individuals. EPAM can identify reasons reflected in its records or recalled by relevant witnesses but should not be required to characterize undisclosed subjective thoughts.

EPAM further objects to the extent the interrogatories seek information that is cumulative or duplicative.

**PURPORTED INTERROGATORY NO. 16: (*i.e.* ACTUAL INTERROGATORIES NOS. 51-58) [The Odysseus acquisition economics, financial modeling, and performance goals behind Rao's recruitment and role]**

Describe the financial and acquisition arrangements that formed the context for EPAM's recruitment of Rao and the definition of his role, including: each earn-out, milestone, or performance-linked payment arrangement arising from EPAM's acquisition of Odysseus Data Services, with each person entitled to payment, the metrics, thresholds, and measurement periods, and the amounts accrued or paid through December 31, 2025, including the separate profit-and-loss statement identified within EPAM as "THE EARN OUT"; each financial model, valuation, revenue baseline, or forecast that EPAM or Odysseus prepared or relied on in deciding to recruit Rao, defining the role offered to him, or setting the role's revenue expectations, with the author, the date, and the historical and projected revenue figures it stated; the actual revenue of the Odysseus or Life Sciences practice for 2023 through 2025 as EPAM's records state it, and each revenue baseline or growth figure represented to Rao during recruitment, with the speaker and date of each representation; each performance goal, revenue target, or margin target assigned to or associated with Rao's role from his hire through October 15, 2025, when and by whom it was set, and its relationship to any earn-out metric; the contribution that EPAM or any person entitled to an earn-out payment expected Rao or his role to make toward any earn-out metric when he was recruited, as reflected in any nonprivileged plan, model, or discussion; the actual status of each earn-out metric for each 2025 measurement period, and each nonprivileged communication in which a person entitled to an earn-out payment discussed the risk of missing, or the pressure to achieve, a metric; the contribution of Rao and of each project on which he worked — including the Synapse, MedRAG, Takeda, Boehringer Ingelheim, and Bayer engagements — to the earn-out metrics and the Odysseus profit-and-loss results, including how revenue and billed or logged time from those projects was allocated between an EPAM delivery division and the Odysseus profit-and-loss statement or earn-out calculation; each nonprivileged discussion in which the actual or potential effect of Rao's Takeda ownership concern, the Johnson & Johnson demonstration he declined, or the Gilead staffing and access practices on revenue, client opportunities, or an earn-out metric was raised or considered, with the participants, date, and substance; and whether, when, and by whom any of the foregoing arrangements, models, or targets was disclosed to Rao before he executed the Employment Covenants Agreement on November 12, 2024.

**ANSWER:**

EPAM objects to this purported interrogatory because it asks multiple discrete, independent questions, and thus should not be properly construed as a single interrogatory. *See Straight Arrow Prods.*, 2021 WL 4583849, at *3. EPAM construes the above purported interrogatory as eight separate interrogatories:

**Effective 16(a)** (*i.e.*, Actual Interrogatory No. 51) – "Describe the financial and acquisition arrangements that formed the context for EPAM's recruitment of Rao and the definition of his role, including: each earn-out, milestone, or performance-linked payment arrangement arising from EPAM's acquisition of Odysseus Data Services, with each person entitled to payment, the metrics, thresholds, and measurement periods, and the amounts accrued or paid through December 31, 2025, including the separate profit-and-loss statement identified within EPAM as "THE EARN OUT";"

**Effective 16(b)** (*i.e.*, Actual Interrogatory No. 52) – "Describe . . . each financial model, valuation, revenue baseline, or forecast that EPAM or Odysseus prepared or relied on in deciding to recruit Rao, defining the role offered to him, or setting the role's revenue expectations, with the author, the date, and the historical and projected revenue figures it stated;"

**Effective 16(c)** (*i.e.*, Actual Interrogatory No. 53) – "Describe . . . the actual revenue of the Odysseus or Life Sciences practice for 2023 through 2025 as EPAM's records state it, and each revenue baseline or growth figure represented to Rao during recruitment, with the speaker and date of each representation;"

**Effective 16(d)** (*i.e.*, Actual Interrogatory No. 54) – "Describe . . . each performance goal, revenue target, or margin target assigned to or associated with Rao's role from his hire through October 15, 2025, when and by whom it was set, and its relationship to any earn-out metric;"

**Effective 16(e)** (*i.e.*, Actual Interrogatory No. 55) – "Describe . . . the contribution that EPAM or any person entitled to an earn-out payment expected Rao or his role to make toward any earn-out metric when he was recruited, as reflected in any nonprivileged plan, model, or discussion;"

**Effective 16(f)** (*i.e.*, Actual Interrogatory No. 56) – "Describe . . . the actual status of each earn-out metric for each 2025 measurement period, and each nonprivileged communication in which a person entitled to an earn-out payment discussed the risk of missing, or the pressure to achieve, a metric;"

**Effective 16(g)** (*i.e.*, Actual Interrogatory No. 57) – "Describe . . . the contribution of Rao and of each project on which he worked — including the Synapse, MedRAG, Takeda, Boehringer Ingelheim, and Bayer engagements — to the earn-out metrics and the Odysseus profit-and-loss results, including how revenue and billed or logged time from those projects was allocated between an EPAM delivery division and the Odysseus profit-and-loss statement or earn-out calculation;"

**Effective 16(h)** (*i.e.*, Actual Interrogatory No. 58) – "Describe . . . each nonprivileged discussion in which the actual or potential effect of Rao's Takeda ownership concern, the Johnson & Johnson demonstration he declined, or the Gilead staffing and access practices on revenue, client opportunities, or an earn-out metric was raised or considered, with the participants, date, and substance; and whether, when, and by whom any of the foregoing arrangements, models, or targets was disclosed to Rao before he executed the Employment Covenants Agreement on November 12, 2024."

EPAM further objects because these interrogatories, and all interrogatories after them, exceed the 25 interrogatory limit set forth in the federal rules, which count each discrete subpart as a separate interrogatory.

EPAM further objects to the extent the interrogatories seek confidential information or trade secrets. EPAM will not provide any confidential information without first entering into a

reasonable and appropriate protective order or confidentiality agreement. Thus far, Rao has refused such an agreement.

EPAM further objects because the interrogatories lack relevance, are overly broad, and unduly burdensome. Reconstructing the complete economics of EPAM's acquisition of Odysseus substantially exceeds what is necessary to determine the reasons for Rao's recruitment, role, or termination.

EPAM additionally objects because these interrogatories appear to seek information about "THE EARN OUT," which is of negligible or no relevance, with an unclear connection to the claims and defenses asserted.

EPAM additionally objects because these interrogatories appear to seek information that, while perhaps tangentially related to Rao's recruitment, has negligible or no relevance to the claims of fraudulent inducement actually asserted in Rao's Counterclaims (*e.g.*, "each financial model, valuation, revenue baseline, or forecast that EPAM or Odysseus prepared or relied on in deciding to recruit Rao, defining the role offered to him, or setting the role's revenue expectations").

EPAM further objects to the extent the interrogatories assumes a disputed fact or improperly attributes a single state of mind to EPAM. The request asks what EPAM "expected" of Rao, without identifying the relevant recruiter, acquisition team member, business leader, financial officer, or employment decision-maker.

**PURPORTED INTERROGATORY NO. 17: (*i.e.* ACTUAL INTERROGATORY NO. 59) [EPAM's statements about Rao and CoReason to persons outside EPAM]**

Identify each communication from September 17, 2025 through the date of EPAM's answers in which an EPAM officer, employee, agent, or authorized representative — including Gregory Klebanov, Greg Killian, Jim Gatch (also appearing in EPAM records as James Gatch), and any EPAM account manager, client partner, or sales personnel — stated or implied to a person outside EPAM that Rao or CoReason, Inc. committed theft, misappropriation, unauthorized downloading or retention, evidence destruction, sabotage, dishonesty, or

professional misconduct, including communications with Gilead personnel (including Alex Asiimwe, also identified in the record as Alex Cash, and Ram Varma), Takeda personnel (including Sunil Dravida), Boehringer Ingelheim personnel (including Ajit Londhe), Pfizer personnel (including Josh Ide), Johnson & Johnson personnel, and any other client or prospective client. For each communication, state: the date; the speaker; the recipient; the medium; the exact words or substance; the factual basis on which the speaker relied at the time; the EPAM authorization for the communication; each known republication; and any correction or retraction.

**ANSWER:**

EPAM objects because this interrogatory, and all interrogatories after it, exceed the 25 interrogatory limit set forth in the federal rules, which count each discrete subpart as a separate interrogatory.

EPAM further objects because the interrogatory calls for speculation. EPAM cannot identify every republication of a purported communication merely because the original recipient may have repeated it. EPAM should be required to identify only republications actually known to EPAM after a reasonable inquiry, without speculating about communications among third parties.

EPAM further objects to the extent the interrogatory seeks information outside of EPAM's possession, custody, control, or knowledge. EPAM will not investigate third-party communications beyond its own records and personnel.

EPAM additionally objects because the interrogatory is overbroad. EPAM cannot possibly know what every single "officer, employee, agent, or authorized representative" within the company, including "any EPAM account manager, client partner, or sales personnel" may have stated in communications (including but not limited to oral communications that EPAM would have no record of). EPAM relatedly objects because EPAM cannot know the "the exact words or substance" of communications not recorded in its systems (such as oral communications), and because it would need to conduct an egregiously exhaustive and disproportionate ESI review to locate such written communications. EPAM will not do so,

particularly because it is not aware of any evidence that *any* such communications even happened – EPAM will not expend enormous resources hunting for communications that may not exist.

EPAM further objects because the interrogatory asks EPAM to improperly investigate and opine on the state of mind of every single "officer, employee, agent, or authorized representative" within the company, including "any EPAM account manager, client partner, or sales personnel," asking not only what such persons "stated" but what such persons "implied."

EPAM further objects to the extent the interrogatory seeks information subject to the attorney-client communications or attorney work product privileges.

**PURPORTED INTERROGATORY NO. 18: (*i.e.* ACTUAL INTERROGATORY NO. 60) [EPAM's acts affecting Rao's and CoReason's business Relationships]**

Describe each action EPAM took after September 17, 2025 that was directed to or reasonably expected to affect an actual or prospective business, client, employment, research, speaking, contracting, or investment relationship involving Rao, CoReason, Inc., or Scientific Informatics, LLC of which EPAM became aware, identifying for each action: the relationship affected; how and when EPAM learned of that relationship; the EPAM actor; the act or communication; the business reason EPAM stated at the time; the outcome EPAM intended; the response EPAM received; and the outcome EPAM understands occurred.

**ANSWER:**

EPAM objects because this interrogatory, and the numerous interrogatories preceding it, exceed the limit imposed by Rule 33(a)(1). Defendant's First Set contains scores of discrete interrogatories masquerading as subparts. Numerous requests seek independent categories of information, different subjects, different time periods, different repositories, different products, different ownership theories, different agreements, and different acts of alleged misconduct. When properly counted, Defendant's interrogatories substantially exceed the twenty-five interrogatories permitted by Rule 33(a)(1). EPAM therefore objects and declines to provide a response. EPAM further objects because the interrogatory is unduly burdensome,

disproportionate, cumulative of other discovery requests, and seeks premature contention discovery.

EPAM further objects to the extent the interrogatories seek confidential information or trade secrets. EPAM will not provide any confidential information without first entering into a reasonable and appropriate protective order or confidentiality agreement. Thus far, Rao has refused such an agreement.

EPAM further objects because the interrogatory is overly broad and unduly burdensome.

EPAM further objects to the extent the interrogatory assumes a disputed fact.

EPAM further objects to the extent the interrogatory improperly attributes a single state of mind to EPAM. The request assumes that EPAM, as an entity, had a particular intent or expectation concerning each action without identifying the relevant actor or decision-maker.

EPAM additionally objects to the extent that this interrogatory seeks information protected by the attorney-client privilege and work product doctrine (such as whether its attorneys may have "reasonably expected" that EPAM's pursuit of its legitimate legal rights may adversely affect CoReason).

**PURPORTED INTERROGATORY NO. 19: (*i.e.* ACTUAL INTERROGATORIES NOS. 61-63) [The sequence from EPAM's initial internal alarm to its authorization of legal action]**

Describe the complete sequence of nonprivileged events from the first moment on or after October 1, 2025 when any EPAM or Odysseus employee raised, monitored, or discussed a concern, alarm, or report about Rao's status, conduct, files, repositories, or deletions, through EPAM's engagement of outside counsel and its authorization of legal action against Rao, and the nonprivileged course of internal communications thereafter, including: each escalation, discussion, or communication in that sequence in any medium — including email, Microsoft Teams or other chat, meetings, and calls — with the participants, date, medium, and substance; each conversation with or within EPAM's security, information-security, or investigations function, with the trigger, the participants, and each factual finding; each conversation involving executive leadership, the Board of Directors, Human Resources, or a member of Gregory Klebanov's organization — including Arkadiy Dobkin, Larry Solomon, Sergey Yezhkov, Greg Killian, Gregory Klebanov, Larry McKlaine, Lucy McDermott, and any other employee reporting directly or indirectly to Gregory Klebanov — concerning Rao, his status or

termination, or potential legal action; each statement in that sequence by Gregory Klebanov or any other EPAM or Odysseus person expressing anger toward Rao, or a purpose of punishing him, making an example of him, teaching him or others a lesson, sending a message to other employees, or impairing his ability to compete or find work, with the speaker, date, and words or substance; the person who first proposed involving legal counsel and the person who authorized litigation against Rao, with the date and the stated business purpose of each authorization; for the period after EPAM engaged outside counsel, through the date of EPAM's answers, each communication between or among EPAM or Odysseus employees concerning Rao or CoReason, Inc. that EPAM does not contend is privileged — including routine business, security, human-resources, client-facing, and marketing communications that were not made to, from, or at the direction of counsel for this litigation — with the participants, date, medium, and substance; and each access to or use of material generated under the Stipulated Forensic Inspection Protocol, ECF No. 55, by or for any EPAM or Odysseus employee other than outside counsel of record — including Gregory Klebanov, Lucy McDermott, Sarah Lugar, and Dmitrii Ilin — for any business, client, marketing, personnel, or other purpose other than the conduct of this litigation, with the person, the date, the material, the location and country from which access occurred, and the use made.

**ANSWER:**

EPAM objects to this purported interrogatory because it asks multiple discrete, independent questions, and thus should not be properly construed as a single interrogatory. *See Straight Arrow Prods.*, 2021 WL 4583849, at *3. EPAM construes the above purported interrogatory as three separate interrogatories:

**Effective 19(a)** (*i.e.*, Actual Interrogatory No. 61) – "Describe the complete sequence of nonprivileged events from the first moment on or after October 1, 2025 when any EPAM or Odysseus employee raised, monitored, or discussed a concern, alarm, or report about Rao's status, conduct, files, repositories, or deletions, through EPAM's engagement of outside counsel and its authorization of legal action against Rao, and the nonprivileged course of internal communications thereafter, including: each escalation, discussion, or communication in that sequence in any medium — including email, Microsoft Teams or other chat, meetings, and calls — with the participants, date, medium, and substance; each conversation with or within EPAM's security, information-security, or investigations function, with the trigger, the participants, and each factual finding; each conversation involving executive leadership, the Board of Directors,

Human Resources, or a member of Gregory Klebanov's organization — including Arkadiy Dobkin, Larry Solomon, Sergey Yezhkov, Greg Killian, Gregory Klebanov, Larry McKlaine, Lucy McDermott, and any other employee reporting directly or indirectly to Gregory Klebanov — concerning Rao, his status or termination, or potential legal action;"

**Effective 19(b)** (*i.e.*, Actual Interrogatory No. 62) – "Describe . . . each statement in that sequence by Gregory Klebanov or any other EPAM or Odysseus person expressing anger toward Rao, or a purpose of punishing him, making an example of him, teaching him or others a lesson, sending a message to other employees, or impairing his ability to compete or find work, with the speaker, date, and words or substance; the person who first proposed involving legal counsel and the person who authorized litigation against Rao, with the date and the stated business purpose of each authorization; for the period after EPAM engaged outside counsel, through the date of EPAM's answers, each communication between or among EPAM or Odysseus employees concerning Rao or CoReason, Inc. that EPAM does not contend is privileged — including routine business, security, human-resources, client-facing, and marketing communications that were not made to, from, or at the direction of counsel for this litigation — with the participants, date, medium, and substance;"

**Effective 19(c)** (*i.e.*, Actual Interrogatory No. 63) – "Describe . . . each access to or use of material generated under the Stipulated Forensic Inspection Protocol, ECF No. 55, by or for any EPAM or Odysseus employee other than outside counsel of record — including Gregory Klebanov, Lucy McDermott, Sarah Lugar, and Dmitrii Ilin — for any business, client, marketing, personnel, or other purpose other than the conduct of this litigation, with the person, the date, the material, the location and country from which access occurred, and the use made."

EPAM further objects because these interrogatories, and all interrogatories after them, exceed the 25 interrogatory limit set forth in the federal rules, which count each discrete subpart as a separate interrogatory.

EPAM further objects to the extent the interrogatories seek confidential information or trade secrets. EPAM will not provide any confidential information without first entering into a reasonable and appropriate protective order or confidentiality agreement. Thus far, Rao has refused such an agreement.

EPAM further objects because the interrogatories are overly broad and unduly burdensome.

EPAM further objects to the extent the interrogatories improperly attribute a single state of mind to EPAM.

EPAM further objects to the extent the interrogatories seek information subject to the attorney-client communication or attorney work product privileges.

EPAM further objects to the extent the interrogatories seek information that is cumulative or duplicative.

Dated: September 28, 2026

SEYFARTH SHAW LLP

By: /s/ Jacob Oslick

Jacob Oslick (Pa. Bar No. 311028)
joslick@seyfarth.com
James S. Yu (admitted *pro hac vice*)
jyu@seyfarth.com
Brooke K. Gary (admitted *pro hac vice*)
brgary@seyfarth.com
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018
(212) 218-5500

Matthew Christoff (admitted *pro hac vice*)
mchristoff@seyfarth.com
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, IL 60606
(312) 460-5000

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of September 2026, a copy of PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANT'S FIRST SET OF INTERROGATORIES was sent via electronic mail to:

GOWTHAM ADAMANE RAO
gowthamrao@gmail.com
gowthamrao.litigation@gmail.com

*/s/ Brooke Gary*