**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EPAM SYSTEMS, INC.,<br>Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>GOWTHAM RAO, MD, PhD,<br>Defendant/Counterclaim-Plaintiff. | **CIVIL ACTION**<br>**NO. 2:25-cv-06260-WB** |

# DEFENDANT'S EXHIBIT PX-42

***Certified Deposition Transcript of Gregory Klebanov (September 29, 2026)***

Source / Locator: Veritext Job No. 8482063 (389 pp., Lynn Gligor, RMR; Dep. Exs. 1-11)
Date / Timestamp: 2026-09-29
Target Claims: Count I (CEPA), Count II (DJ), Prayer Item D (Fees)

Evidentiary Summary & Purpose:
Certified deposition transcript of Gregory Klebanov establishing sworn admissions of zero inspection, inability to quantify damages, and client work-for-hire ownership under MSA § 12.

*Authentication & Admissibility:*
*Authenticated pursuant to Fed. R. Evid. 901 and 28 U.S.C. § 1746 in Part IX (¶ 51) of the Declaration of Dr. Gowtham Rao, MD, PhD in Support of Motion for Leave to File First Amended Counterclaims.*

UNITED STATES COURT FOR THE

EASTERN DISTRICT OF PENNSYLVANIA

________________________________

EPAM SYSTEMS, INC.,

Plaintiff,

v. Case No.

RAO, 2:25-cv-06260

Defendant.

________________________________

DEPOSITION OF GREGORY KLEBANOV

DATE: Tuesday, September 29, 2026

TIME: 9:49 a.m.

LOCATION: Veritext Legal Solutions
1650 Market Street One Liberty Place,
Suite 5150
Philadelphia, PA 19103

REPORTED BY: Matthew Schenkel

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF EPAM SYSTEMS, INC.:

JACOB F. M. OSLICK, ESQUIRE (by videoconference)
Seyfarth Shaw, LLP
620 8th Avenue
New York, NY 10018
joslick@seyfarth.com
(212) 218-6480

SARAH LUGAR, ESQUIRE (by videoconference)
EPAM Systems, Inc.
41 University Drive, Suite 202
Newtown, PA 18940
sarah_lugar@epam.com
(267) 759-9000

ON BEHALF OF DEFENDANT RAO:

GOWTHAM RAO, PRO SE (by videoconference)

# I N D E X

| EXAMINATION: | PAGE |
|---|---|
| By Mr. Rao | 7 |
| By Mr. Oslick | 292 |

## E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit PX07 | Skype Communication Screenshot | 35 |
| Exhibit 001 | Employment Covenant | 42 |
| Exhibit 002 | Teams Chat Log with Lucy McDermott | 52 |
| Exhibit 003 | Takeda Master Services Agreement | 71 |
| Exhibit 004 | Email Between Gregory and Gowtham | 83 |
| Exhibit 005 | Email Between Gowtham and Katie Barista | 109 |
| Exhibit 006 | Contract | 127 |
| Exhibit 007 | SOW Takeda | 231 |
| Exhibit 008 | Email Between Gregory and Larry Solomon | 243 |
| Exhibit 009 | Email Between Gregory and Evgeny | 245 |
| Exhibit 10 | Email from Evgeny to HR | 250 |
| Exhibit 11 | Screenshot of Desktop | 254 |


## QUESTIONS INSTRUCTED NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 37 | 19 |

QUESTIONS INSTRUCTED NOT TO ANSWER (Cont'd)

| PAGE | LINE |
| --- | --- |
| 100 | 15 |
| 101 | 3 |
| 104 | 4 |
| 123 | 7 |
| 140 | 13 |
| 142 | 9 |
| 152 | 10 |
| 152 | 25 |
| 153 | 13 |

M A R K T H E R E C O R D R E Q U E S T E D

| PAGE | LINE |
| --- | --- |
| 47 | 3 |

P R O C E E D I N G S

THE REPORTER: Good morning. My name is Matthew Schenkel. I'm the reporter assigned by Veritext to take the record of this proceeding. We are now on the record at 9:49 a.m. This is the deposition of Gregory Klebanov taken in the matter of EPAM Systems, Inc. vs. Gowtham Rao on Tuesday, September 29, 2026, in Philadelphia, Pennsylvania. I'm a notary authorized to take acknowledgments and administer oaths in Pennsylvania. Parties agree that I will swear in the witness remotely.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and
- shall constitute written stipulation of such.

At this time, will everyone in attendance please identify themselves for the record

starting with the scheduling attorney?

MR. RAO: This is Gowtham Rao. I am the defendant in this matter. I'm a pro se defendant. I live in Princeton, New Jersey.

MR. OSLICK: Jacob Oslick, Seyfarth Shaw for -- EPAM --

THE REPORTER: Okay.

MR. KLEBANOV: I'm Gregory Klebanov. I'm the Vice President of the EPAM Systems.

MR. OSLICK: And also here is Sarah Lugar who is in-house counsel for EPAM and she is attending in her capacity as a client representative.

THE REPORTER: Okay. Perfect. Thank you. Hearing no objections, I'll swear in the witness.

Mr. Klebanov, if you can please raise your right hand.

WHEREUPON,

GREGORY KLEBANOV,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: Great. Thank you.

We are ready to proceed.

MR. OSLICK: Mr. Rao, just so that it's

on the record, we agreed to two stipulations. The first is that all objections except as to form of the question and privilege are preserved. And the second is that the witness will be given an opportunity -- given a copy of the transcript and opportunity to read and sign and make errata corrections.

MR. RAO: I stipulate --

MS. LUGAR: -- so they have this speaker that may assist with the -- with everything, but we all have to shift down a few, if that's okay with you guys --

MR. RAO: Can you still hear us?

THE REPORTER: Yes.

MR. RAO: Is it better --

THE REPORTER: I do think it will help though. I am going to go off the record real quick. 9:30 -- 9:53.

(Off the record.)

THE REPORTER: We -- it's 10 a.m. We are on the record.

EXAMINATION

BY MR. RAO:

Q Okay. Good morning, Mr. Klebanov. My name is Gowtham Rao. You have just been sworn in under oath by the court reporter. Before we begin, are you

taking any medication or suffering from any medical condition today that would affect your ability to understand my questions or testify fully and accurately?

THE REPORTER: I'm sorry, I did not hear his response.

THE WITNESS: Not to my knowledge, no --

THE REPORTER: Okay.

BY MR. RAO:

Q Okay. Do not know if you are taking any medicines?

A -- understanding what you're asking.

Q Can you state the medicines that you're taking?

THE REPORTER: Mr. Klebanov, I'm going to need you to speak up a little bit. It's very hard to hear you.

BY MR. RAO:

Q Let's put -- let's go off the record, and let's figure out this audio connection.

THE REPORTER: Okay. It's --

MS. LUGAR: The audio is fine --

THE WITNESS: Yeah, so I'm -- I'm taking a -- a medication from high cholesterol --

MR. OSLICK: Greg, can I make a suggestion? Speak slower and louder.

THE WITNESS: Yeah.

MR. OSLICK: I think the court reporter will have an easier time hearing you.

THE WITNESS: Sure, I'll try the best. I'm not a medical doctor, so -- question.

BY MR. RAO:

Q Do you feel like these medicines may affect your judgment or ability to answer questions today?

A No --

Q Do you have any concerns about your ability to answer questions today?

A I have no concerns.

Q So to make sure that the audio is clear that the court reporter is able to transcribe you, please give clear, audible spoken answers as the court reporter cannot record your nonverbal cues, nods, or gestures. If a question seems unclear, please tell me and I will clarify it. Please give your best recollection and do not guess or speculate. If you do not know or recall, simply state that.

Do you understand these ground rules?

A Yes, I do.

Q You're also not allowed to receive any

verbal or non-verbal coaching from your attorneys. Do you understand that?
A I understand.
Q At any point during the day, if you receive any verbal or non-verbal cues, you will -- I can ask you about it and you will have to give me the truthful answer under oath. You understand that?
A I understand.
Q So that means no coaching during breaks, no coaching between questions, and no coaching during questions. Do you understand that?
A Yes.
Q Did you review any documents or notes to refresh your memory for your testimony today?
A Yes, I did.
Q Could you describe them to us?
A Yes, there are several documents that I reviewed, but one that comes to my mind just recently is the -- my written testimony.
Q So you read your written testimony before coming for this deposition?
A Yes, I did.
Q So, Mr. Klebanov, Greg, before we turn to formal questions and the documents today, I want to take a brief moment to acknowledge where we are. You

and I have known each other for many years, since 2017, almost a decade now. I've always respected what you built with the Odysseus Data Services, starting a company from the ground up, dedicating years of your life, building it, achieving commercial success and leading it through acquisition by ELAM. I know this litigation is stressful and difficult for everyone involved. Being on the opposite sides of a federal lawsuit is not where either of us ever expected to be.

My purpose today is to -- not to argue with you, to ambush you or to make you uncomfortable. My purpose is simply to have a direct professional conversation between two colleagues who have a long history together so that the factual record of what actually happened, what was communicated, and what was decided is clear, is complete and truthful. I want to give you every opportunity today to explain your perspective, share your recollection, and tell your side of the story fully and on the record, can we agree to keep this conversation professional, respectful, and direct?

A I agree.

Q Thank you. Let's begin. Please state your full name for the record.

A My name is Gregory Klebanov.

Q You understand that you're testifying under oath today -- to give your answers aloud so the officer can record them?
A To my best ability.
Q Will you allow me to finish each question before answering?
A Yes.
Q Will you tell me if a question is unclear?
A Yes, I will.
Q If you would like any part of the question repeated or the whole question repeated, will you ask for it?
A I will.
Q Will you distinguish what you remember from an estimate?
A Can you repeat it again?
Q Will you distinguish what you remember from an estimate?
A Yes, I will.
Q Will you allow me to finish stating a question before you answer? Will you allow counsel to finish stating an objection before you answer?
A Yes, I will.
Q Is anyone assisting you with your answers while you are on the record?

A No.

Q Do you have any devices -- communication devices, that you're going to use to assist you with your answers when a question is being proposed between questions or during breaks?

THE REPORTER: Was that a no, sir?

THE WITNESS: Sorry?

THE REPORTER: I -- I couldn't quite hear. I can't -- it's hard to hear his answers.

THE WITNESS: No.

THE REPORTER: Okay.

THE WITNESS: I'm sorry.

BY MR. RAO:

Q Can we already -- can we finish a pending question before taking a requested break?

A Yes.

Q You tell us if you need a break. Are you referring to any materials to assist you during this testimony?

MR. OSLICK: Objection to the form.

THE WITNESS: -- restate it.

BY MR. RAO:

Q Do you have with you today any materials that you're going to use to assist you during testimony?

A I do not.
Q Is there anything we should address before you can proceed effectively today?
A No.
Q You are currently the vice president of technology and life sciences at EPAM Systems; correct?
A I'm the vice president in EPAM Systems, yes.
Q Are you a software engineer?
A Not currently, no.
Q Were you a software engineer?
A At some point in my career.
Q Prior to the acquisition, were you the chief technology officer of Odysseus Data Services, Inc.
A At some point, yes.
Q Did you personally develop software during your career?
A Can you restate the question?
Q Have you personally developed software during your career?
A I did.
Q Did you personally architect enterprise software solutions?
A Yes, I did.
Q Are you skilled in database systems?
A Not currently, but at some point, I worked

with database systems.

Q Are you skilled in enterprise software architectures?

A Not currently in my job, but previously, yes, I was.

Q When was the last time you were skilled?

A Cannot tell you a specific date. Sorry.

Q Is it true that you have stated that you can design software architecture with your eyes closed?

MR. OSLICK: Objection to the form.

BY MR. RAO:

Q Mr. Klebanov, state the answer.

A Do not recall.

Q Have you ever known the answer to this question?

A Restate the question.

Q Is it true that you stated that you can design software architecture with your eyes closed?

MR. OSLICK: Objection to the form.

THE WITNESS: -- the next part of the question. You asked me the second part of the question.

BY MR. RAO:

Q There's no second part of the question. That is the question. Is it true that you have stated

that you can design software architecture with your eyes closed?

MR. OSLICK: Objection to the form.

THE WITNESS: I do not recall.

BY MR. RAO:

Q Did you design Prometheus?

A I did not design Prometheus.

Q You did not design Prometheus?

A Involved in discussions related to Prometheus design, yes. I'm not a technical architect. I did not design Prometheus if you're asking me about technical architecture.

Q Did you contribute to the design of Prometheus in any shape or form?

A Yes, I did.

Q Did you design the Arachne system?

A Same answer stands. I am not a technical architect. I did not design the technical architecture, but yes, I contributed to the discussions of the system design.

THE WITNESS: Matthew, can you hear me okay?

THE REPORTER: Yes. Yeah, just try to keep -- speak up, but yeah.

BY MR. RAO:

Q Can you say with certainty that you are an engineer?
A I'm an engineer by background education, yes. Currently, I'm not an engineer. I'm the vice president of -- business --
Q Have you ever understood what source code means?
A Yes, I understand.
Q Do you understand what a code repository means?
A Yes, I do.
Q Do you understand what a data schema means?
A I do.
Q Do you understand what git version control means?
A I'm not experienced with git, but I understand principle.
Q Do you understand what version control means?
A Yes.
Q You understand what software architecture means?
A Yes.
Q Mr. Klebanov, you and I have known each other professionally for approximately five years;

correct?

A -- recall the exact date. Probably more than five years, but --

Q Isn't it true that you first worked with me in 2017 when I gave you and Odysseus your first contract at Blue Cross Blue Shield, South Carolina?

A And I cannot recall a specific date or a year, but we worked together while you were employed at Blue Shield South Carolina, yes.

Q Did you receive your contract from Blue Cross Blue Shield, South Carolina, when I was an employee of Blue Cross Blue Shield, South Carolina?

A We had a contract with Blue Cross Blue Shield, South Carolina, at the time, yes.

THE REPORTER: Could you repeat that, Mr. Klebanov. I'm sorry.

MR. RAO: Was I involved --

THE WITNESS: We received a contract with -- we had a contract with Blue Cross Blue Shield of South Carolina at the time when Gowtham Rao was employed at Blue Cross Blue Shield, yes.

THE REPORTER: Thank you.

BY MR. RAO:

Q You have always wanted to work with me, haven't you?

A I liked working with you, Gowtham, and worked together, yes.
Q And I wanted to work with you; correct?
A Cannot answer this question speaking for yourself.
Q In fact, you tried to and wanted to recruit me in 2019 when I was preparing to leave Blue Cross Blue Shield of South Carolina to join Patrick Ryan at Johnson & Johnson?
A I did not intend to hire you in 20 --
Q '19.
A -- '19 because I actually had no idea that you were leaving Blue Cross Blue Shield at the time.
Q Did you try to recruit me in 2019?
A Do not recall.
Q From 2019 through 2024, you and I stayed in regular contact as respected colleagues in the OHDSI community regularly meeting at open science conferences; correct?
A I would define the regular contact, but yes, we met regularly.
Q After Odysseus was acquired by EPAM in June 2024 when Archie Golidad [ph] left Odysseus, you thought of me, didn't you?
A Can you restate the question?

Q After Odysseus was acquired by EPAM in June 2024 when Archie Golidad [ph] left Odysseus, you thought of recruiting me, didn't you?

MR. OSLICK: Objection to the form.

THE WITNESS: Not immediately. Not at the time, no.

BY MR. RAO:

Q Did you think of recruiting me at one -- some point after Odysseus was acquired by EPAM?

A Yes. And you were recruited by EPAM.

Q When you recruited me in the fall of 2024, you knew full well that my professional profile, methodologies, and tools were rooted in open source OHDSI framework and public real world evidence; correct?

MR. OSLICK: Objection to the form.

THE WITNESS: Please restate the question.

BY MR. RAO:

Q When you recruited me in the fall of 2024, you knew full well that my professional profile, methodologies, and tools were rooted in open source Odyssey framework and public real world evidence; correct?

MR. OSLICK: Objection to form.

THE WITNESS: I do not understand the question, what -- what it means and what relevance as to the question itself.

BY MR. RAO:

Q When you recruited me in the fall of 2024, did you -- were you aware that my professional profile was associated with open source software and OHDSI real world data science?

A I knew at the time that you were involved with OHDSI or Odyssey and you have been involved with Odyssey for multiple years, yes.

Q You specifically recruited me because of the Odyssey expertise and standing; correct?

A Specifically -- I did not specifically recruit you because of the Odyssey expertise. I was interested in recruiting you -- background.

THE REPORTER: I'm sorry, can you -- can you please repeat that?

THE WITNESS: Yes, of course. I did not recruit or was interested in recruiting Gowtham because of his Odyssey involvement specifically, but I was more interested in his medical background in epidemiology, medical and epidemiological background.

THE REPORTER: Okay.

MR. OSLICK: Greg, I might suggest

bring your chair in and again speaking slower and louder.

THE WITNESS: I will speak slower and louder and apologies for my accent.

THE REPORTER: No, it's -- it's definitely an audio issue, not your accent. Appreciate that.

MR. RAO: Take a break and check the audio one more time. I think this is really affecting the quality of the transcription. Sorry.

THE WITNESS: Let's try it again and see if -- let's do some tests.

THE REPORTER: It sounds better -- it sounds much better since whenever you moved -- whatever you moved. I can -- I can tell.

MR. OSLICK: Sorry.

THE WITNESS: Go ahead.

THE REPORTER: Okay. Let me go off the record real quick. It's 10:18. We're off the record.

(Off the record.)

THE REPORTER: It is 10:19. We are on the record.

BY MR. RAO:

Q And during my tenure at EPAM, you were my direct manager; correct?

A You reported to me, yes.
Q When you recruited me from Johnson & Johnson, you understood that I was employed as a director at J&J; correct?
A I did not understand the structure of your question.
Q When you recruited me from Johnson & Johnson, you understood that I was employed by Johnson & Johnson; correct?
A I knew that at some point you were employed at Johnson & Johnson. I believe it was a director role.
Q Did you know the -- did you know when you first contacted me to recruit me to EPAM in September of 2024 that I was actively employed by Johnson & Johnson?
MR. OSLICK: Objection to the form.
THE WITNESS: I disagree because I did not contact you to recruit you when you were employed at J&J. I --
BY MR. RAO:
Q When you contacted me in September, did you talk about anything related to Johnson & Johnson?
MR. OSLICK: Objection to the form.
THE WITNESS: I do not recall what we

were talking about.
BY MR. RAO:
Q When you contacted me to recruit me in October of 2024, did you know that I was actively employed by Johnson & Johnson?
MR. OSLICK: Objection to the form.
THE WITNESS: I do not recall a specific conversation, but I do not believe you were employed by Johnson & Johnson at the time.
BY MR. RAO:
Q You contacted me while I was still employed at Johnson & Johnson to solicit me to leave Johnson & Johnson and join EPAM; correct?
MR. OSLICK: Objection to the form.
THE WITNESS: I disagree, incorrect.
BY MR. RAO:
Q So you're saying under oath that you did not know that I was employed by Johnson & Johnson in September or October 2024; correct?
MR. OSLICK: Objection to the form.
THE WITNESS: That's a very different question from the first question that you asked me.
BY MR. RAO:
Q Can you answer the question as stated right now?

A Can you repeat the question?
Q Are you stating under oath that in September or October 2024, you did not know that I was employed by Johnson & Johnson?
MR. OSLICK: Objection to the form.
THE WITNESS: I knew in September and October that you were employed at some point by Johnson & Johnson.
BY MR. RAO:
Q That is not the question I asked. I asked -- the question I asked is were you -- did you know that in the month of September and October of 2024 when I was talking to you and you were talking to me about potentially joining EPAM, did you know that I was an employee of Johnson & Johnson?
A I do not recall a particular conversation. I do not believe that in September we were talking about you joining EPAM.
Q At that time, Johnson & Johnson was an active client of Odysseus or EPAM; correct?
A That is correct.
Q You knew that EPAM and Odysseus were bound by contractual non-solicitation restrictions regarding Johnson & Johnson employees, didn't you?
MR. OSLICK: Objection to the form.

THE WITNESS: I am not -- I do not recall a specific clause in the MSA for any contractual agreements between EPAM and especially with EPAM and Johnson & Johnson because I was not an EPAM employee at the time, but I do not specifically. I don't.

BY MR. RAO:

Q You were not -- you -- are you saying under oath that you were not an EPAM employee in September or October 2024?

A I was an EPAM employee, but I am not -- I do not know the details of the master services agreement between EPAM and Johnson & Johnson. So I cannot answer this question.

Q So in September and October 2024, you did not know the details of the master service agreement between EPAM and Johnson & Johnson; correct?

A That is correct because this is not an agreement that I ever signed or not ever but signed at the time. It was not in my agreement.

Q Did you specifically tell me during our recruitment discussions that soliciting me might be a violation of the non-solicit agreement between EPAM and Johnson & Johnson?

A Can you restate the question again?

Q Did you specifically tell me during the recruitment discussions that soliciting me might be a violation of the non-solicit agreement between EPAM and Johnson & Johnson?
A As I stated before, I do not recall specific conversation, but it doesn't sound like something that I would say --
Q Yes or no.
A -- if I -- I do not recall a specific conversation, but it doesn't sound like something that I would say.
Q So are you saying on the record that you did not knowingly solicit me in direct disregard of the contractual non-solicitation obligations between EPAM and Johnson & Johnson?
MR. OSLICK: Objection to the form.
THE WITNESS: Can you restate the question again?
BY MR. RAO:
Q Can -- are you stating on the record that you did not knowingly solicit me with direct disregard of contractual non-solicitation obligations between EPAM and Johnson & Johnson?
MR. OSLICK: Objection to the form.
THE WITNESS: I -- it's very difficult

for me to understand the question because it's structured in the way that it's difficult to answer.

BY MR. RAO:

Q Mr. Klebanov, did you receive a nonverbal cue from Mr. Oslick just now?

THE WITNESS: I do not believe I did. I'm just confused by the question --

BY MR. RAO:

Q Did you have a facial expression exchange between Jacob Oslick and Mr. Klebanov?

A I looked at Jacob.

Q Was there an expression on his face that you reacted to?

A There was an expression on his face as always, but I don't know what the expression was supposed to tell me. But it's a question that is difficult for me to answer because I don't understand the conjecture.

Q Got it. In June 2024, Odysseus was acquired by EPAM; correct?

A That is correct.

Q Under your acquisition agreement, you had personal earnout targets tied to post acquisition revenue milestones; correct?

A Can you restate the question?

Q Under your acquisition agreement, you had personal earnout targets tied to post acquisition revenue milestones; correct?
A I don't know what personal means, but we had an acquisition earnout targets, yes.
Q Growing clinical RWE data analytics and data science wasn't part of that acquisition plan, wasn't it?
MR. OSLICK: Objection to the form.
THE WITNESS: State it again.
BY MR. RAO:
Q Growing clinical RWE data analytics and data science was part of that acquisition plan, wasn't it?
MR. OSLICK: Objection to the form.
THE WITNESS: We had a -- financial targets and that included running RWE business effectively and growing obviously.
BY MR. RAO:
Q Prior to recruiting me, Odysseus had recently lost his data science lead Archie Golidad [ph]; correct?
A Archie [ph] had left the company, correct.
Q To replace a Archie Golidad [ph] and to protect your acquisition earnout, you needed a respected physician or an epidemiologist with

credentials in real world evidence; correct?
MR. OSLICK: Objection to the form.
THE WITNESS: To replace Archie [ph], I needed a data science lead of similar character and similar skills, but they had different options.
BY MR. RAO:
Q During the recruitment process, you viewed -- you stated that you viewed me as a partner in leading this business, didn't you?
A Can you repeat the question?
Q During the recruitment process, you stated that you viewed me as a partner in leading this business, didn't you?
A At some point during our discussions about your potential employment at EPAM, you asked me if we going to work closely together and said yes.
Q Was there a word "partner" involved?
A There was a word "partnership," yes.
Q Can you -- okay. During our recruitment discussions, I specifically brought up and I wanted direct profit and loss leadership and we talked about a chief medical officer type of responsibility, didn't we?
MR. OSLICK: Objection to the form.
THE WITNESS: Think you combined

multiple questions and -- split it into multiple questions, if you don't mind.

BY MR. RAO:

Q During our recruitment discussions, I specifically brought up that I wanted direct profit and loss leadership; correct?

A You did.

Q During our recruitment discussions, I specifically brought up that I wanted a chief medical officer type of responsibility; correct?

A Not to me, not to my knowledge.

Q Are you saying on the record that you had not -- to your knowledge that I brought up during the recruitment process to you about a chief medical officer type of role?

A I'm saying to my knowledge, but I never initiated this discussion with the chief medical officer and that's not a discussion that you had with me.

Q Did you specifically tell me that there was a clear trajectory for me to become a chief medical officer for EPAM?

A No, I did not.

Q Did you tell me that you personally help me become the chief medical officer for EPAM?

A Since I did not initiate the conversation about a chief medical officer, I did not make those statements.
Q You represented that EPAM Life Sciences and Healthcare Vertical were generating 400 million to 500 million and aiming to reach 1 billion, didn't you?
A Can you repeat the question?
Q You represented that EPAM's Life Science's and Healthcare Vertical was generating 400 million to 500 million and aiming to reach 1 billion, didn't you?
A I do not recall specific conversation, but we were new to EPAM and I cannot imagine I would give you a very specific number. It was not my agreement at the time. My -- my agreement was running a -- business -- EPAM.
Q You represented that EPAM and Odysseus possessed a mature operational clinical data network ready for deployment, didn't you?
A I did not.
Q You represented that there was an established client pipeline with millions of revenue for Odysseus, didn't you?
A As any business, we had a pipeline, yes.
Q So you represented that there was a pipeline of millions of dollars for Odysseus; right?

A I do not recall specifically saying millions of dollars, but yes, there was a pipeline of projects and I do not recall specifically a conversation where we discussed the pipeline.

Q You do not recall or you do not know?

A Do not recall.

Q Did you ever know?

A Know what?

Q Did you ever know that the revenue of Odysseus?

A Of course I did, yeah, at the time I probably did.

Q You directly set up recruitment meetings for me with Greg Killian and Sergey Yevhkov, didn't you?

A I do not believe that I directly set up recruitment meetings with Greg Killian and Sergey Yevhkov, but I believe that I initiated an HR process. But I do not have a specific memory of what specific steps I've taken at the time, but I would imagine I would go through the HR process.

Q Did you talk to Greg Killian or Sergey Yevhkov or Chris Waller to enable the recruitment of Gowtham Rao to EPAM?

A I discussed all of my possible candidates that I considered for recruitment for this role. You

were one of many multiple, not many, but multiple and yes, I did discuss specifically with Greg Killian who is my line manager.

Q In reality, you never gave me a profit and loss authority, did you?

MR. OSLICK: Objection to the form.

THE WITNESS: What does it mean, authority, in your mind?

BY MR. RAO:

Q Profit and loss authority would be like a decision making or accountability for profit and loss of a division.

MR. OSLICK: Objection to the form.

THE WITNESS: A data science team, A, is not a division. You were hired as a data science team lead. You also told me multiple times that you have no experience with running a P&L. That you would appreciate coaching and mentoring, which I believe I provided to you and you explicitly asked for help. So I don't understand how you could claim that somebody didn't give you a full authority, those conditions.

BY MR. RAO:

Q When did you initiate contract -- sorry, let me restate.

When did you initiate contact with me to

recruit me to EPAM in late 2024?
MR. OSLICK: Objection to the form.
THE WITNESS: I was looking for a data science team lead replacement and then I shared this information with multiple people and I believe you were one of those people that I shared. I did not explicitly attempted to recruit you, but I was looking for any leads to people who might be interested in this position with proper qualifications. So this information I shared was many of my contacts -- professional contacts.
MR. RAO: Court reporter, I have an exhibit that is titled PX07 on my side. I'm going to send you digital copies of it. I'm going to give this to the deponent.
(Exhibit PX07 was marked for identification.)
THE REPORTER: Okay. Do you want it just labeled as Exhibit 1?
MR. RAO: If you could use my -- would be useful because then I can keep track of it. PX07 or if you want me to change it, I could.
THE REPORTER: Okay.
MR. OSLICK: -- for me to look at.
MR. RAO: I do not.

MR. OSLICK: I'm going to put an objection on the record. I'm entitled to look at the exhibits you are showing your witness.

MR. RAO: Are you able to share it? Do you remember what this -- these screenshots are, Mr. Klebanov?

THE WITNESS: Let me read it.

BY MR. RAO:

Q Are you ready, Mr. Klebanov, now? It's been one minute.

A Okay -- I'm --

MR. OSLICK: Gowtham, if I can make a suggestion. When you introduce an exhibit, because we don't have a court reporter physically here, if the exhibit has a Bates number, I'd suggest reading the Bates number so there's no confusion after the deposition about which document is which exhibit.

BY MR. RAO:

Q It's been about two minutes, Mr. Klebanov. Have you finished reading?

A I need -- I need to read it, Gowtham. Just for the record, it's many pages here that I'm reading, probably five or six or seven.

Q On the first page, Mr. Klebanov, on September 6, 2024 --

A Let me finish -- still reading.

THE REPORTER: It -- it sounds like the -- the paper is covering up the -- the -- yeah. Thank you.

BY MR. RAO:

Q Mr. Klebanov, are you intentionally delaying this deposition?

A -- I'm intentionally reading -- that you are sharing with me.

Q -- your attorney -- to take your time -- reading the document?

MR. OSLICK: Objection. That's privileged. You're asking for privileged legal advice between attorney and client.

THE WITNESS: I've been asked carefully --

BY MR. RAO:

Q Are you asking --

MR. OSLICK: I'm instructing him not to answer. You're not -- you should not answer anything about what I or Sarah or any other attorney for EPAM told you about in connection with this deposition.

THE WITNESS: Then I propose I don't answer the question. It's quite a few pages for the record.

//
BY MR. RAO:
Q I think -- let's stick to the first page. Have you read the first page?
A Okay. Let's stick to the first page, right. I did, yep.
Q Okay. So in that first page, do you recognize this communication?
A I -- it's a Skype communication between Gowtham and myself, yes.
Q And the -- can you read the first two lines?
A "September 6, 2024, Hey Gowtham, how are you? We should catch up soon."
Q Who wrote that message?
A I did.
Q What were your thoughts when you wrote that message?
A -- remember what my thoughts were when I wrote this message, but I already mentioned and actually you mentioned that before that we kept in regular contact as part of Odyssey community, so it could've been anything.
Q Can you read the next five lines?
A Next line is an answer from Gowtham Rao. "Hi Greg, hope you are doing well too. Have time" --

and next message from me. "Have time to chat later today, let's say at 4:00 p.m. or next Friday. I'm in Europe next week coming back on Friday."

Q Please go ahead and read the next --

A Maybe you can read it easier but yeah, Gowtham Rao is saying "All is well." And my response "Yes, all is great." Continue? Gowtham Rao "Sure, we can talk today at 4 p.m." My response "Fantastic. Will pin you on Skype."

Q Okay. So do you remember why that communication was initiated?

A I do not remember specifically why.

Q Do you agree that this communication was initiated by you?

A It was initiated by me, yes.

Q On -- excuse -- go further down. There seems to be about a 40-minute call between you -- 2024, is it not?

THE REPORTER: I -- I'm sorry, Mr. Rao, I did not hear your question fully. Can you repeat that?

BY MR. RAO:

Q If you go a little bit down, there seems to be a 40-minute call between you and me, is it not?

A That is correct. Seems to be a call.

Q Do you remember the details of that conversation?
A I do not.
Q Did you attempt to recruit me to EPAM in that conversation?
A I do not remember the details, so I cannot tell you, but I do not believe that was the case.
Q On October 7, 2024, there's a follow-up communication; correct? Could you just read the first two lines just to acknowledge that this communication happened?
A Yes. So on October 7, 2024, Gowtham Rao is reaching out to me. "Hey, Greg, Let's find time to follow up on our discussion." To which I reply "Hey, Gowtham, Sure. Want to catch up with it today?"
Q Perfect, thank you. We can keep the exhibit aside. Thank you. During the recruitment process, did you expect me to be actively involved in open source communities like OHDSI during my employment at EPAM?
MR. OSLICK: Objection to the form.
THE WITNESS: Can you state it again?
BY MR. RAO:
Q When you recruited me, did you expect me to be actively involved with open source communities like

OHDSI during my employment at EPAM?

A All our employees are allowed to contribute a reasonable portion of their time to the open source community called OHDSI up to, again, reasonable limit.

Q Did you promote and encourage OHDSI participation among employees in the Odysseus business unit?

A As I just stated, yes, I consider it a participation in Odyssey as an employee. I encourage people to contribute a reasonable amount of time and the keyword is reasonable up to certain limits and still being compliant with employment contracts, covenants, and the code of conduct --

MR. RAO: Court reporter, do they have a way to address sticky notes so I can make -- label these documents?

THE REPORTER: So when you send them to me, I can have them, like, digitally labeled when they get attached to the transcript.

MR. RAO: Can I write on the back of it so that we know which one is which?

THE REPORTER: Write on the bottom right hand corner, the exhibit numbers. And I assume you're going to scan them in and send me a digital copy; is that right?

MR. RAO: Yes.
THE REPORTER: Okay.
MR. RAO: All right. So I'm going to label this Exhibit 001. Is that okay?
(Exhibit 001 was marked for identification.)
THE REPORTER: Yes. Is this a -- a new exhibit or is that the previous exhibit?
MR. RAO: This is a new exhibit.
THE REPORTER: New exhibit. Okay.
BY MR. RAO:
Q So I'm handing to you an exhibit named Exhibit 001. You don't need to read it in entirety, but by looking at it, do you know -- do you understand what this document is?
MR. OSLICK: I'm objecting to this exhibit. It's not a complete document. Giving him one page of what appears to be a 20-page document.
BY MR. RAO:
Q Do you recognize this document?
A I don't know where it came from. It's hard for me to say I do or I do not.
Q Have you seen documents like this?
A I've seen documents that are called employment covenants, covenant agreements, agreement

and such, but this specific document cannot tell you --

Q Can you look at section 1B of this document? Just 1B. Can you read the last line of section --

A -- because it's --

Q No, I didn't ask you to read it. I just asked you to look at the --

MR. OSLICK: He's entitled to read the document.

BY MR. RAO:

Q Can you read it aloud, please?

A It's hard for me to read that and I'm trying to focus on the content and understanding, so I would prefer if you would like to read it, you can read it.

Q I'm instructing you to read the document. If you're unable to read it, you may state so, but section 1B -- I'm asking you to read the last line of section 1B.

A Can I read the whole paragraph so at least I can understand the meaning of it? And again --

Q I'm not going to ask you about the meaning of it to interpret here. I just want you to read section 1B, last line.

A Section 1B, last line, which one is what?

Q That's for avoidance of doubt.

A "For avoidance of doubt, confidential -- for avoidance of doubt confidential -- does not include general industry knowledge, skills or software developed or acquired by you without reliance on EPAM group confidential information, which is true and for the purpose of community professional, scientific or similar groups and settings that are reasonably available through general industry sources."

Q Thank you, Mr. Klebanov. Were you aware during the recruitment process that I specifically requested carve-outs or changes to the standard EPAM employee confidentiality agreement?

A I am aware that we discussed that you want to continue to work -- and I instructed you to work with HR to make sure the certain changes can be made to the employment covenants. I don't know the details of your discussion on what happened.

Q I requested for these changes to make contributions to the Odyssey community; correct?

A I don't know why you requested those changes. So you can tell me.

Q When I requested those changes I had stated that it was to contribute to the Odyssey community; correct?

A I do not recall you stating that.

Q You may return that. Prior to executing my agreement -- of employment covenant's agreement in November 2024, you were aware that I engaged in detailed contract negotiations regarding the employment covenant agreement with EPAM legal and HR including senior legal counsel Sarah Lugar; correct?

MR. OSLICK: Objection to the form.

THE WITNESS: I knew that you were going through an HR process. I don't -- don't know the details of who you worked with as part of that HR process.

BY MR. RAO:

Q During those negotiations, what was your understanding of Odyssey activities that I would continue to perform?

A I knew that you were involved in leading -- library working group, so would expect that would be one of those activities. I do not recall many other activities that you were specifically involved in. Probably one of them was exposure to Atmos [ph] at some point when you --

Q Do you understand that I would continue to work directly with researchers, with physicians, with academic collaborators across the International Odyssey Network?

A Can you state the question please?
Q Do you understand that I would continue to work directly with researchers, physicians, academic collaborators across the International Odyssey Network?
A As a part of the Odyssey community, you often work directly with a group of people like that, but I would still expect you to be compliant with employment contract -- conduct and ethics per EPAM agreements.
Q Did you participate in any one of these employment negotiations that I had with EPAM?
A Any employment negotiations?
Q Did you participate with these employment negotiations that I had with EPAM?
A What does it mean did I participate in?
Q You -- wait, did you talk to somebody to facilitate my employment negotiations with EPAM?
MR. OSLICK: Greg, you can answer but to the extent that you spoke with EPAM legal counsel, I would ask that you not disclose the substance of those communications.
THE WITNESS: I initiated an HR contact in the process. I did not to my knowledge influence any changes or discussions about specifics of your

contract. But I knew about your salary requirements, about your open source community request.

MR. RAO: Court reporter please note that Jacob Oslick has instructed the witness to not state matters that is legal. This is contested.

BY MR. RAO:

Q During the recruitment process, did you state "We are partners, man."

A I do not recall specific claims for specific sentence or specific statement.

Q During recruitment negotiations, did you tell anybody in EPAM that you fully supported my outside professional and open source activities?

A I do not recall stating specific words including fully supported, but I supported your involvement in Odyssey community up to a reasonable limit and according still being compliant with code of conduct and employment covenants.

Q I want to reintroduce this exhibit -- I'm reintroducing Exhibit 001. In the line that you read, is there any word that states that I need to ask permission from EPAM?

MR. OSLICK: I'm going to object on the record. This is one page of a 20-page document. You can't show a witness a tiny fraction of a document and

ask him to opine about what clauses are in or are not in the document.

BY MR. RAO:

Q Mr. Klebanov, all I'm asking is in that line is there a request for permission -- requirement for permission?

A A specific line that reads "For avoidance of doubt, confidential information expressly does not include general industry knowledge, skills, software developed or acquired by you without reliance on EPAM group confidential information, which is through and for the purpose of community, professional, scientific or similar groups and settings that are reasonably available through general industry sources." So what, what is the question again?

Q Does that sentence require me to ask permission from EPAM?

A This sentence doesn't talk about permission specifically.

Q Did an employee of EPAM called Alexander Aleksiayuk report directly to me within your business unit at EPAM?

A Some point of your employment, yes.

Q Alexander Aleksiayuk was physically located and working in Belarus during my supervision of him;

correct?

A To my knowledge, I believe that's -- that's a correct statement.

Q You have known Alexander Aleksiayuk before I became his supervisor at EPAM; correct?

A Yes, I did.

Q Did you instruct Alexander Aleksiayuk to train or guide other EPAM personnel in OMA and Odyssey data science activities?

A Can you repeat the question?

Q Did you instruct Alexander Aleksiayuk to train or guide other EPAM personnel in OMA and Odyssey data science activities?

A I did not -- do not specifically recall talking to Alex about that, but I always support collaboration within the team. That probably would include Alex.

Q Were there reported issues during 2025 concerning the geographic location of EPAM personnel on Gilead engagement?

MR. OSLICK: Objection to the form.

THE WITNESS: Can you just state it again?

BY MR. RAO:

Q Were there reported issues during 2025

concerning the geographic location of EPAM personnel on the Gilead engagement?

A There were requests, not issues, from Gilead to at some point have employees that -- EPAM employees that work for Gilead in certain geographical locations and at some point Gilead expressed that certain locations are not allowed. I wouldn't call it an issue. It was just a business as usual that our clients request -- raise the request and I believe we satisfy this request.

Q Did Gilead raise concerns about personnel working from unauthorized or geographic locations that were not on their approved list?

A I do not recall that we had an approved list at the time, but when Gilead explicitly called out a certain geographical location and asked us to replace an employee, we complied with it.

Q How many times did Gilead raise this concern?

A I am not engaged in running specific projects at Gilead. It's a responsibility for the delivery manager who is running a specific project. I cannot tell you very specific number of times.

Q More than one, less than one?

A Cannot be less than one, is zero. But

again, I would not call it an issue. It's just a request to have employees from certain geographical locations.

Q Did Gilead raise these concerns more than one time?

A Again, I don't understand what's raised the concern. The concern is just basically a -- a request not to have employees in certain geographic locations and we did comply and replaced employees with different employees in different locations.

Q And did that issue happen more than one time?

A No issue. It was just a business as usual when Gilead -- when we -- the location of an employee during the onboarding process, the Gilead said, "No, this location does not work for us. You need to have an employee in a different location," which we satisfied. But all of the locations for -- of all the employees that work for Gilead were shared with Gilead with full transparency at all times.

Q On about December 2024, were you aware of any issues from Gilead regarding geographic location of EPAM employees?

A I do not remember what happened in December 2024 explicitly or -- issue -- but I do not -- if you

have a specific instance that you're referring to, would appreciate -- because I cannot speculate to which specific conversations or requests you're referring.

MR. RAO: Court reporter, I am handing to the witness Exhibit labeled 002.

(Exhibit 002 was marked for identification.)

THE WITNESS: And what is that? I'm sorry.

BY MR. RAO:

Q Can you read that?

A Can you tell me what this is?

Q This is a chat message that I would like you to read.

A Chat message as in what chat?

Q This is a chat message from an EPAM steam system that I would like you to read.

A Okay.

Q Could you read it aloud for the record, please?

A That's the first --

Q I want you to read the last entry from -- labeled "Lucy McDermott." Could you start from there, please?

A Just the last and this -- just for the record, that's a full page of text that I cannot immediately tell what that is. So I'm reading without actually knowing the full document. Reading just last paragraph. In the message from Lucy McDermott states "Lucy McDermott 12/16/2024, I agree a hundred percent. For a while we split up the Gilead responsibilities but then they had issues with Belarus and listed approved countries per the Optum agreement. Unfortunately, the Czech Republic was not included in that list. So when it came time to take Alex off Gilead, we could only use Jeff as he was in the -- in the approved countries."

Q Thank you, Mr. Klebanov. The Alex taken off Gilead in December 2024, was that Alexander Aleksiayuk?

MR. OSLICK: Objection to the form.

THE WITNESS: As I said, I do not get involved with running a project and that's the responsibility of the delivery manager or a project manager. Lucy McDermott was one of them. Jim Singer was another one. I do not know the context of this conversation and it's very difficult for me to say what that is.

BY MR. RAO:

Q Do you know who Lucy McDermott is, Mr. Klebanov?
A Yes. She's one of the project managers in my business unit in EPAM.
Q Did Lucy McDermott ever report to you?
A She reported to you. She reported to -- she does not report directly to me.
Q Did Lucy McDermott share about a -- potential staffing issues from Gilead -- reported from Gilead?
A She might have shared the text that came from one of the Gilead employees, but I advised Lucy to -- with the -- an appropriate delivery manager who was responsible for this particular project, which was not Lucy at the time, to my knowledge. And she successfully did exactly that. She forwarded this message to Jim Singer who took care of the issue at -- at hand. But again, I do not know what this particular discussion involved because it's a discussion between you and Lucy. I was not a part of the discussion.
Q So going back to the employee Alexander Aleksiayuk who you said was in Belarus, was he in Belarus in December 2024?
A I have no way of telling but probably

according to the employment records he was in Belarus. But at the time specifically, physically, I cannot tell you exactly where he was.

Q I can have that.

A Yeah.

Q Because Mr. Alexander Aleksiayuk was located in Belarus, he could not connect directly to Gilead or other restricted client systems; correct?

MR. OSLICK: Objection to the form.

THE WITNESS: Repeat the question.

BY MR. RAO:

Q I'll restate the question.

A Sure.

Q You said that Mr. Alex was in Belarus at some point in time; correct?

A Belarus, yeah. As an employee of Belarus.

Q As a Belarusian employee, when he is geographically in Belarus, do you agree that he was not allowed to connect to the Gilead systems?

MR. OSLICK: Object --

THE REPORTER: I'm sorry, I didn't quite --

THE WITNESS: Not --

THE REPORTER: Oh sorry.

THE WITNESS: No -- no. My response

was that I'm thinking -- I'm taking time to think through the questions.

THE REPORTER: Okay. Thank you.

THE WITNESS: I'm trying to understand the form of the question. If the employee is not onboard in to Gilead and is in the country where Gilead requested not to have employees, we would remove those employees. Yes, but it's a responsibility of Gilead to remove the accounts on time from Gilead as well. So there are two sides to it. Our -- our responsibility is to remove his access on our side and also Gilead's responsibility to take care of the access on their side.

BY MR. RAO:

Q So on the record, you said that the responsibility of managing the geographic locations, specifically controlled access for certain geographic locations, is the responsibility of both parties, that of EPAM and that of Gilead; correct?

A It -- it is a mutual agreement between two parties.

Q If one of the parties fails to shut down access, will that allow EPAM employees to use that credential for accessing the systems of the client?

A If one of the parties fails to shut --

Q Let me restate the question. If a client does not shut down access to an EPAM employee and that EPAM employee is in a restricted country, can they use that access?
A I would be speculating. I don't know.
Q Asking a question about policy.
A Policy? What policy are you referring to?
Q -- did you instruct Mr. Aleksiayuk to look over the screen of another EPAM employee to service the needs of Gilead?
A As I said, I do not manage this team. I do not manage this project, so I cannot imagine that I would extract Alex -- instruct Alex -- to do that.
Q Are you stating on the record that you did not instruct Alex to look at somebody else's screen -- some other employee's screen for Gilead services?
A As I said previously, I do not recall this conversation with Alex, but I do not manage Alex. I do not manage this project, so I cannot imagine that I would extract -- instruct Alex to --
Q Yes or no, did you instruct or not?
A Just answered my question. I do not recall having a conversation with Alex about that particular request.
Q Have you encouraged an EPAM employee to

share passwords with any other EPAM employee to get access to a client's systems?

A Why would I do that? No, I would not.

Q So you are going on the record to say you have not instructed an -- one EPAM employee to share credentials with another EPAM employee to access to a client's systems.

A Are you referring to specific instance or you referring in general?

Q In general.

A General, I would not recommend or not recommend -- I would not instruct an employee to share passwords.

Q Have you done such instructions?

A I said --

MR. OSLICK: Let the witness finish his answer. You're interrupting him.

THE WITNESS: As I said, in general, you asked me to answer in general, I would not have instructed the people to do this because that would be in violation of a code of conduct and I do not recall ever instructing. I do not recall instructing employees to share their passwords.

BY MR. RAO:

Q Do you personally know of any occasion where

Alexander Aleksiayuk received password of another EPAM employee?

A As I said, I do not manage this team directly and all of my information would be coming from or escalated to me if such thing would happen. I do not know the details of that particular instance.

Q I'll repeat the question because I didn't hear a yes or a no. Do you personally know of an occasion where Alexander Aleksiayuk gave -- sorry, again.

Do you personally know of an occasion when Alexander Aleksiayuk received password from another EPAM employee?

A Received a password from employee? I'm repeating the question so I can understand it. I'm sorry.

Q Do you personally know of an occasion when Alexander Aleksiayuk received password from another EPAM employee?

A As I said, I do not manage Alex -- information would be coming from elsewhere. So do not --

Q So under oath today --

A As I said -- that I do not -- I know there was a -- an -- an instance where he worked with

someone. I believe his name was Jeff, and I believe there was an instance where they worked together where Alex was doing knowledge transfer. I do not know the details of what actually happened.

Q Did Jeff share his passwords to Alexander Aleksiayuk?

A You're testing my memory but do not -- I do not remember those specifics that collaborations and them working together.

Q Did Jeff have access to the Gilead systems?

A Should ask the delivery manager for the -- yes.

Q So you're saying that the delivery manager would know if Jeff had access to Gilead systems?

A Delivery manager was responsible for onboarding people who know if an employee of EPAM would've had -- been onboard into EPAM, yes.

Q You said in your testimony that you had -- you knew that Alexander Aleksiayuk was coaching Jeff. Did you instruct him to do that coaching?

A Again, I do not manage this team. So the instructions would've been coming from a person who was managing the team at the time or a project at the time.

Q And who was managing the team at that time?

A That is -- at what time are you referring to?
Q The time when you said that Alexander Aleksiayuk was instructed by that the person managing the team to coach Jeff.
A Which is when?
Q You are the fact witness. You have to state the answer.
A I'm asking you what time are you referring to? I do not remember when this collaboration or this work happened. So can you please help me remember?
Q You remember the time frame when Jeff was an employee of EPAM?
A Jeff is one of many employees that I have on staff. So I do not recall his specific employment and I did not manage Jeff --
Q Tell me everything that you know about the interaction between Alexander Aleksiayuk and Jeff.
A I told you they had a -- to my knowledge, which I do not have a direct knowledge, but through communication with my delivery managers, Alex was instructed to do knowledge transfer to Jeff and they worked together to perform this knowledge transfer. To my understanding Alex, which actually Alex was liked by Gilead and they liked working with Alex. He

possessed some knowledge. They -- they did knowledge transfer.

So when you are working with someone, like, I'm working with Matthew right now, I'm seeing Matthew on the screen. So they probably did remote communication. They probably shared some information. I do not know the details, what exactly was shared in that collaboration. But many teams these days work with teams and they -- they may be looking at a codebase together, which is not necessarily -- it does not necessarily mean that this codebase is located at some restricted client location. It could be rebound. So -- so I do not know the details of what exactly happened during this collaboration.

Q So it could be a benign peer to peer training, coaching that Alexander Aleksiayuk is coaching Jeff?

A I would assume that could be the case.

Q How well was Jeff's performance?

A I'm not Jeff's line manager. I believe Jeff resigned, and I believe he was not the best performer according to some of the feedback that I've heard.

Q Do you know when Jeff resigned?

A I believe Jeff -- I do not know specifically. Sorry. But approximately during the

time that you mentioned.

Q Can you tell me what year was it? What month was it approximately? What season was it?

A I don't know what season it was. But again, you're testing my memory. Approximately at the time, I think -- again, I might be -- I actually don't know whether it was '24 or '25, but I think it's when you joined the company.

Q So who was the line manager of Jeff at that time when you resigned?

A Do not remember it was before you joined the company or after you joined the company. Honestly don't remember.

Q Do you remember when Jeff joined the company?

A No, because I didn't hire Jeff. He was hired by --

Q Do you remember when Jeff left the company?

A I do not recall a specific date or a specific time. In fact, many employees who joined the company and some of them they leave the company. I cannot recall every single date for every single employee.

Q Is it possible that I was the line manager for Jeff?

A It's possible that you are at the time were line manager for Jeff, yes, but I do not recall specifically when he left the company was prior to you joining or after you joining because you joined approximately in November of '24, would've been yeah.

Q Do you know as a fact that I was the line manager of Jeff?

MR. OSLICK: Objection to the form.

THE WITNESS: I just said I do not remember specifically if you were a line manager. I do not recall a specific timeline around that. I'm sorry.

BY MR. RAO:

Q Do you -- at the time when I was an employee of EPAM, was Jeff an employee of EPAM.

A Again, you're testing my memory. I do not know the specific dates and months when Jeff resigned -- at the company. If you have any documents showing me specifically when he did, then I'll tell you whether you were a line manager at the time or not.

Q Can you state on the record that you are not aware if Alexander Aleksiayuk received password from Jeff to access Gilead Systems? Can you state on the record that Alexander Aleksiayuk did not receive

password from Jeff to access Gilead systems?
A Do not know the details of what happened.
Q Evgeny Sidenko served as a delivery manager for Takeda projects within Odysseus; correct?
A He is an EPAM employee that helps us with managing some of our Odysseus or -- business unit projects.
Q How many years have you known Mr. Sidenko?
A Again, you're testing my specific memory, but probably around two years at this point.
Q Have you known Mr. Sidenko as part of Odysseus prior to being acquired by EPAM?
A Have I -- say it --
Q Have you known Mr. Sidenko prior to being acquired by EPAM?
A We had some employees from EPAM staff and Odysseus prep prior to that position. I do not remember if -- if Evgeny was one of them.
Q Was Evgeny an employee of Odysseus?
A I do not believe that's the case.
Q During my employment, did you and Mr. Sidenko communicate on a regular basis about the Takeda project?
A On occasional basis, not on a regular basis, but Evgeny was responsible for client communication Of

all Takeda projects, yes.
Q Did you communicate with them on phone or on Microsoft Teams?
A Probably on Teams.
Q Are you personally familiar with the client project that Mr. Sidenko was managing?
A I'm not familiar with the details of each particular project, but I'm familiar with the context and contents of many of them, yes.
Q At a functional level, did you have a supervisory role for Mr. Sidenko in the organization?
A He was in our project management office. Was a part of it and the office was created so that we can coordinate project management activities across multiple projects.
Q Did you have some responsibility to assigning work to Mr. Sidenko?
A As a part of the project management office, I had some expectations from all the project managers involved with projects in our portfolio, yes.
Q Specifically, was Mr. Sidenko the project delivery manager for the Takeda phase two project?
A Takeda what phase?
Q Phase two project.
MR. OSLICK: Objection to the form.

THE WITNESS: What's Takeda phase two project? Of what project? What's the name of the project?

BY MR. RAO:

Q Can you describe the project that Mr. Sidenko was delivery manager for Takeda in June of 2025?

MR. OSLICK: Objection to the form.

THE WITNESS: Yeah, I do not remember every single particular -- project we have -- projects. We have many of them.

BY MR. RAO:

Q Was there any other delivery manager for the Takeda client that you are responsible for?

A So we have multiple delivery managers depending on the type of a project. Evgeny to my recollection was responsible for running OMA PTL projects. But he was also responsible for the overall communication of the -- we have a system called RAG -- of all the status of all the projects across Takeda.

I do not know other projects, whether it was led by him or maybe Konstantin was leading one of the projects like Prometheus, for example. Prometheus was probably not led by Evgeny.

Q Do you know about a project called Takeda

Synapse?

A I'm aware of the internal project name called Synapse. Also aware of the Takeda project called -- it is called RWEAI Insight. So that is the project -- with Takeda to deploy solution that we developed internally to Takeda -- customize it for Takeda. And the solution that the project that we developed internally was called Synapse.

Q Was Evgeny Sidenko the delivery manager for that project called Synapse for Takeda?

A Do not remember, sorry.

Q Did Evgeny Sidenko's responsibility include Synapse?

A Internal project -- I believe he was a project manager for the internal project, yes.

Q Did -- was the AI Accelerator also called Synapse?

A Well, the AI Accelerator is the term that we point during this. Receiving internal projects were called at some point MedRAG, Medical RAG and then it evolved into Synapse I think is a name that you probably coined at some point. But again, I don't know for fact what it's called and AI Accelerator is very general term. It's one of the AI accelerators but in -- in our forms proceedings, I think it's

called AI Accelerator if I'm not mistaken.

Q Yeah. When was AI Accelerator name coined?

A I don't know because you were the business leader on the project.

Q Was it coined when I was an EPAM employee?

A Please state which name again.

Q Was AI Accelerator coined when I was an EPAM employee?

A AI Accelerator is a very broad name. We had many accelerators at the time. So I don't think it was coined when you were an employee.

Q On the record, you -- that AI Accelerator was not used when I was an employee?

MR. OSLICK: Objection to the form.

THE WITNESS: Just don't know if it was used or not. It might have been used. Might have been not -- it's a general -- very general name.

BY MR. RAO:

Q In EPAM there were four letter codes to -- for billing, four letter codes to represent clients in billing codes. Yes or no?

A How many letters are in the billing code? I don't manage billing. I don't manage projects. It's the responsibility of the delivery manager. I don't know if it's four letter. If you give me an example,

I'll tell you if it's a project.

Q If I say TKDA, is that a representation of any client?

A I don't know if it's a valid project, but according to EPAM, I do not believe that that's the notation that is being used within EPAM.

Q When I say TKDA, what does that -- what do you relate it to?

A You asking me to imply to -- or decode something that I could probably guess what it means, but I don't know if it's a project code not.

Q Do you recall of any project codes inside EPAM that starts with TKDA?

A Yeah, I don't manage project codes or projects. That's not my responsibility, so I --

Q Okay. But do you recall?

A Don't recall. I do not know. Do not remember.

Q You do not recall if there is a project code inside EPAM that starts with TKDA?

MR. OSLICK: Objection to the form.

THE WITNESS: As I said, I don't manage the delivery of projects and I don't work with project codes and -- on a regular basis. I -- occasionally been exposed to reports, but I don't pay attention to

what the project codes are.

BY MR. RAO:

Q You just stated on the record under oath that you do not recall, you do not know if there is a project code that started with TKDA.

MR. OSLICK: Objection to the form. Is there a question?

THE WITNESS: Difference -- difference between not knowing, not recalling. I do not remember in my head seeing the project codes that starts with an abbreviation that you mentioned, but it doesn't mean that they might not exist.

MR. RAO: Court Reporter, I'm sharing with Mr. Klebanov an exhibit that I have labeled as Exhibit 003.

(Exhibit 003 was marked for identification.)

BY MR. RAO:

Q Mr. Klebanov, I would like you to read -- see the first top icon there. Can you state the company that the icon seems to imply?

A The company name for the record is Takeda, which is -- that's it.

Q Can you tell me what is the three letter -- three words below it?

A Master services agreement.
Q What is the master services agreement, Mr. Klebanov?
A So what the name implies, it's a contract filling out the -- again, I'm not a legal expert, so I can't tell you exactly the definition of master services agreement -- a legal expert. But in my understanding, that's general rules of the contract and engagement between two parties and specifically between the vendor and the -- and the client.
Q Are you -- in your role in EPAM as the vice president, are you able to recognize the master service agreement as a face value?
A Yeah, the face value.
Q Can I show you a document? Would -- are you able to recognize it to be a master service agreement?
A I can see that the document says "A master services agreement." Without actually looking at the whole document, I don't know if it's a master services agreement and where this document came from.
Q Are you aware of a master service agreement that was executed between EPAM and Takeda, also known as Millennium Pharmaceuticals?
A Repeat the question, please.
Q Are you aware of a master service agreement

that was executed between EPAM and Takeda Pharmaceuticals, also known as Millennium Pharmaceuticals?

A No, but the master services agreement between EPAM and Millennium, because -- again, to my knowledge -- EPAM master services agreement.

Q Can you go to the last page of this document, Mr. Klebanov? On the bottom right is a signature; right? Does it -- is it resembling your signature?

A It does look like my signature, yes.

Q Is that your signature, Mr. Klebanov?

A It does, as I said, look like my signature.

Q Is it your signature, Mr. Klevanov?

A I said it twice that is my signature, Mr. Rao.

Q In the first page, this document has Odysseus Data Services; correct?

A On the --

Q I want specifically point to line number three and line number four of the first page of the -- which has the Takeda logo on it.

A Again, without seeing the full document, I will state for the record that line Odysseus Data and four Odysseus Data Services, Inc.

Q Is that the same company that you were the Chief Technology officer for?

A Yes, I was the chief technical officer -- technology officer for Odysseus Data Services.

Q Did you sign an agreement between Takeda Pharmaceuticals Limited Company and Odysseus Data Services on June 1, 2019, that was titled "Master Services Agreement"?

A Again, without seeing a full document -- without seeing a full document, without knowing where it came from, it's hard for me to say that this document that is authentic and it was signed on specific date. But yes, we did sign an agreement between Odysseus Data Services and Takeda. I don't know if that's the document that reflects that.

Q Did you sign an agreement -- a master service agreement between Takeda Pharmaceuticals and Odysseus Data Services on June 1, 2019, as the chief technology officer?

MR. OSLICK: Objection to the form.

THE WITNESS: -- sign many master services agreements and without authenticating this document it's hard for me to say that this document is the valid master services agreement and this date is in fact when I signed it. But as I said for the

record, yes, I did sign -- we did sign. I don't remember it was me or somebody else signed an agreement between Odysseus Data Services and Takeda or Millennium at the time. It's used by different names.

BY MR. RAO:

Q When you sign an agreement, do you read the document in entirety, Mr. Klebanov?

A I do read the documents and yes, but I also consult with the legal counsel, an attorney.

Q When you sign a document, do you take responsibility for the content of the document, Mr. Klebanov?

A If I sign a document, that means that I'm in agreement with the terms and conditions of that particular document, yes.

Q You said that you signed master service agreement. Do you read the terms of that agreement when you sign them?

A I do read the terms when I sign it and I also ask typically my attorney to read the terms as well. Like, I'm not a legal expert in all of the permutations of agreements and I rely on my legal counsel to flag any possible issues before I sign it. So I cannot say that I cannot -- I can -- can understand every single permutation of condition and

determine every single master service agreement. For that, we have experts who are responsible for that.

Q And when you were at Odysseus Data Science Services Company, were you the signatory authority for master services agreement?

A I was one of them, yes.

Q Did the master service agreement that was signed when you were in Odysseus Data Services, it in force when you were -- after you were acquired by EPAM?

A -- clarify your question.

Q Was -- are master services agreement signed by you when you were an officer of Odysseus Data Services still in force after Odysseus got acquired by EPAM?

A When EPAM acquired Odysseus, it inherited master services agreement with a disclaimer that we did not have to use it if we want to or we didn't have to.

Q It was an optional use?

A Don't know the word "optional," but even if the master services agreements were used, there could be an -- amendments or modifications proposed by EPAM legal team to make sure that whatever the terms and conditions that they inherited would be in compliance

with EPAM standards as a public company.

Q Under your understanding of the master service agreements that you have signed, if a master service agreement states that the intellectual property is vested with a client, you believe or have you allowed Odysseus or EPAM to take -- claim ownership of that work?

MR. OSLICK: Objection to the form.

THE WITNESS: Showing me a specific location in the documents or states --

BY MR. RAO:

Q -- recall question. Have you claimed ownership of work done for clients where the document says the intellectual property gets vested to the client?

A I think it's a very convoluted question, but I'll break it up maybe into sub-parts. Very difficult for me to process the question -- will you say it again? Sorry. Recall -- another time, please.

Q I'm going to change the question.

A Change it, yeah.

Q You said you signed a master service agreement between Odysseus Data Sciences -- Data Services and Takeda Pharmaceuticals; correct?

A If that's the case, again, I cannot

authenticate this particular MSA or specific date.

Q And you have read the terms before signing them?

A As I said, I relied on my legal counsel, but in general, I read many terms. Yes, most of them, all of them, I read them.

Q Mr. Klebanov, I'm handing back that exhibit. I want you to read section 12 on page number 6 at the bottom that starts with "Any information" and stop when it reaches the line that has "Work for hire," which is on the beginning of the next line.

MR. OSLICK: Objection -- ask detailed questions about a document, he's entitled to read the entire document, not just the handful of lines you want to ask him questions about.

BY MR. RAO:

Q On the record, repeat what I said.

A Yeah, I cannot indicate what the document is, but I will read what it says. Paragraph 12, "Intellectual property and restrictions on publications." -- I'm sorry. "Any information, data, concepts, reports, discoveries, inventions, innovations or other intellectual property that is conceived, discovered, reduced to practice, made or developed by Company in the course of performing the

services shall be promptly disclosed to Takeda and the title thereto shall immediately vest in Takeda."
Continue?
"Company further agrees that all information and materials prepared in the performance of services (collectively, the "Deliverables") are works for hire, shall be the sole and exclusive property of Takeda and title thereto shall be immediately vest in Takeda."
Q Thank you, Mr. Klebanov. I want you to explain what it means when you read a sentence, "Sole and exclusive property of Takeda."
MR. OSLICK: Objection to the form.
THE WITNESS: Not a legal expert or a lawyer, so it's hard for me to --
BY MR. RAO:
Q What does it mean by sole and exclusive property?
A I said I'm not an attorney to provide a definition.
Q Tell me what you understand.
A My understanding is that if the client hires a vendor to develop something for a client, unless stated explicitly in the statement of work, which is also a contract that is attached to service agreement, unless it is stated explicitly that is a -- something

that is a preexisting property, then whatever is developed for a client comes a property to client is work for hire. As I said in disclaimer, I'm not an attorney so I cannot claim that my definition is legal --

Q Was Synapse developed in performance services under this Takeda engagement?

MR. OSLICK: Object to form.

THE WITNESS: Was Synapse -- can you repeat the question?

BY MR. RAO:

Q Was Synapse developed in performance services under Takeda engagement?

A Synapse was an internal project name that was developed internally, funded in big portion by EPAM and might have been some portion by a TWS [ph]. I cannot recall. But I believe most of it was funded by, if not all of it, by internal funding. Synapse was again an internal project name. Takeda signed a contract where we deployed the -- developed internally and customized it for Takeda -- but when we deployed the service, the statement of work clearly said it is a preexisting intellectual property.

Q Did Takeda pay EPAM to build software on AI Accelerator.

MR. OSLICK: Objection to the form.

THE WITNESS: And we're mixing different names here. Takeda -- again, we've been working with Takeda for many -- many years. Some of the projects that we did for Takeda is work for hire. Some other project was intellectual property developed built by EPAM or Odysseus that we deployed to Takeda customized especially in some cases for Takeda. But the intellectual property belongs to EPAM and was provided to Takeda with a non-exclusive, non-transferable license. Because again, more details you can see in the statement -- of you look at it.

BY MR. RAO:

Q Did Dmitrii Ilin work on the projects for Takeda?

MR. OSLICK: Objection to the form.

THE WITNESS: I do not manage exclusively projects, and I do not remember every single person on staff. But I know that Dmitrii Ilin joined the internal project first working with you and rest of the team. There was many people on the team working on MedRAG and Synapse. Later, I think Synapse came internally. I do not remember if he -- probably, he did work on Takeda once we signed -- Takeda contract and we deployed our internal project to

Takeda for utilization.
BY MR. RAO:
Q What do you recall of the term EPAM Synapse?
A Anything about that term? Could be a project name EPAM Synapse.
Q Have you heard the term EPAM Synapse -- phrase EPAM Synapse, sorry?
A You say it right now. It sounds familiar. Do I recall explicitly what it -- probably was an internal project name. I said Synapse was something called specifically called -- project that you were in charge of internally at EPAM.
Q Have you heard of the phrase "Takeda Synapse?"
A As I said before, Takeda project was called, "RWE" to my best collection, "RWEAI Insights." Specifically, how Synapse was used in this context, I cannot tell you.
Q When you say, "Synapse," do you think about it -- think about it being owned by Takeda or of EPAM?
A Synapse is an internal project name and thus would be property of EPAM.
Q Are you saying on the record that Takeda does not own any part of Synapse?
A Saying on the record that Synapse is a

property of EPAM that we developed prior to deployment to Takeda and we provided Takeda with a non-exclusive, non-transferable license that you can make with full license statement in the contract of the site.

Q So Synapse was not paid for or built for Takeda by EPAM?

A Takeda, similar to any product, paid us to deploy preexisting property and customize it, make it usable for Takeda, and we always had a very collaboration with Takeda.

Q And who was your collaborator in Takeda?

A Specific name of a client?

Q Main client -- the main client representative, yes?

A Main client as of today is Sunil -- Sunil Dravida.

MR. RAO: Court Reporter, I'm handing a document which is -- which are handwritten as Exhibit 004. This is an email that has a conversation between Gowtham Rao and Gregory Klebanov.

(Exhibit 004 was marked for identification.)

BY MR. RAO:

Q Do you recognize this communication, Mr. Klebanov?

A I don't know.
Q Continue to read. It's just been one minute since you started.
A Okay.
Q Do you remember this communication, Mr. Klebanov.
A I can recall this conversation. Again, I cannot explicitly authenticate this particular document or the content of this email.
Q What is the date of this email, Mr. Klebanov?
A Based on -- the date is 6/19/2025.
Q And who are the people in reference in this communication?
A You're referring to Sunil and -- which was another employee, Takeda employee, who left the company to my best knowledge.
Q And are the EPAM employees here, Gowtham Rao and you?
A That's what it seems like.
Q Do you remember having this communication --
A I remember the discussion -- I remember the discussion whether the -- the codebase that were deployed to Takeda will be open source versus an internal intellectual property -- EPAM's license, yes.

To which you wanted to make an open source. And I objected and I said we will make the -- an EPAM commercial license. At the time, EPAM's intellectual property was not debatable, but we're talking about a license because open and public applies to a license -- belongs to property. Belongs to -- to my best knowledge -- you want to ask me any questions, let me know.

Q What do you recall of these communications? What -- tell me the origin of this communication.

A I just described you for some reason wanted to make the -- the codebase as open source and I rejected this idea. The codebase was developed by EPAM. By definition -- by default, it's EPAM's intellectual property and commercial license. And -- and that's what the -- basically the -- the conversation that we were having.

Q So this document appears to be sent to your email. Is this an -- is this a true copy of what you received in an email?

A I don't know where you got this copy from --

Q Can you read that? "You left a comment" and below that, the paragraph, aloud, please?

A Which one? "You left"?

Q "Yes, Gowtham."

A "Yes, Gowtham, we already do it all the time with Takeda and elsewhere unless customer clearly states it is work for hire. Just as with any previous AI and non-AI work with Takeda. But it does not need to be open source. It will be our IP. The EPAM can decide what to do with it open source or commercial IP. There are pros and cons for each."

Q In June 2025, was there a repository inside EPAM that you know of that was called Synapse?

A I'm not a developer, so I don't know what depository existed -- being called, but it was a source code developed by EPAM at the time in the project called Synapse.

Q So there was a -- so just so I understand and to state on the record, you're saying there was a project called Synapse that had source code in a repository on June 19, 2025?

A You were leading the project, so you tell me. But I would expect any project that is internal that has a codebase would have a codebase stored somewhere.

Q And is that the same codebase that you were referring to in the next paragraph as preexisting IP?

A Whenever we were deploying to Takeda specifically, believe the -- the project was called

RWEAT Insight, but I might be mistaken, I came to call the client's project name.

Q And was that RWEAT Insight?

A So I believe that this license was -- sentence was specific to the codebase that was deploying to Takeda.

Q And that -- the codebase that was being deployed to Takeda, that is preexisting IP, was that previously deployed on any other client?

A It was in the beginning of the project, but I don't believe that -- at that time we did not have any other clients who were deploying this particular codebase Synapse.

Q Can you explain what that particular codebase did?

A Again, you were leading the project, so I'm going to tell you my basic understanding, but it's a AI driven decision making -- decision support tool that we were developing at the time. Part of it was based on the open source literature and included -- and I believe this project was called MedRAG. This component was called MedRAG that then built a specific use case called -- for drug launch support and I believe that's what you called Synapse at the time. But there were many use cases we were targeting in our

minds when we developed codebase.
Q Did you see a demo of a working codebase on EPAM systems using this preexisting IP?
A I cannot recall -- so many demos. I cannot recall specific date and when, but at some point I did see a demo use case that were running at the time.
Q Who was the engineer or the software developer that developed the EPAM'S preexisting IP?
A The multiple engineers working on that. One of them was Dimitri Ilin.
Q So did Dimitri Ilin develop the preexisting IP?
A He was one of multiple engineers, but yes, he developed some of the preexisting IP.
Q Did he develop it before June 19, 2025?
A I believe that the project started before June 19, 2025. But again, full disclaimer, you were running the project then. I was a sponsor at the time, but based on some records that I've seen, including the project charter and communications, Evgeny was running the project. Development was -- for June 19th.
Q When you say here "We already do it all the time with Takeda," can you elaborate?
A "We already do it with Takeda" and also

that's what I was -- to making things open source I believe at the time. Again, it's hard for me to tell right now because it's a -- something that I typed -- I guess. But the idea was that we do publish certain projects as open source if we discuss it and negotiate and agree internally, and with the client, that something is open source.

But in this particular case, I clearly declined that is going to be an open source because now we're part of a publicly traded company called EPAM. Anything developed by EPAM is by default EPAM's intellectual property. And I wanted to leave EPAM an ability to decide later to declare something, to publish something --

Q So the engineers that developed this preexisting IP, were they authorized to build this preexisting IP or did they do it on their own time?

A There is -- there is no their own time because if you're an employee of EPAM, by default, you -- anything that you develop during the employment of EPAM is the property of EPAM. But they also had a funded project. They had a project -- we had the project charter. We had a project team who provided infrastructure, who provided funds. So I would say they were given time and I believe to develop during

the employment by -- of this person by EPAM's intellectual property -- so.

Q And the project charter and the funds that they assigned would be represented as a project code that the employee would put in to justify their time; correct?

A Partially correct. Because there's any idea, you might have used some non-billable internal code until the idea is being formulated and then it becomes a project, fully funded project. Then it becomes a billable code that is approved internally, and then you can track your time against this code. So when I say somebody is tracking time against the code, it might spread across multiple products.

Q And you said there was something called MedRAG and then there was something called Synapse. Is that -- are you differentiating between MedRAG and Synapse? Can you tell me the difference?

A That's what you said, but yeah, from my understanding of how you -- broke up those two projects, is that MedRAG -- MedRAG, sorry. Medical RAG was a reusable component. I don't know if it had a UI but itself or not, but I think it was just reusable component that would build a RAG system by indexing literature, whether it's publicly available

literature or licensed literature or internal documents. So build big index that then would be used by an AI system built on the top of it. Which is again, by your definition. So Synapse, that would answer one of multiple use cases.

Q And I understand you're referencing me as in Gowtham Rao as an EPAM employee who provided that distinction between MedRAG and Synapse. Do you agree?

A You were one of the team members at the time, yeah. You were a business lead on the project with the technical team assigned to build those components.

Q Who else would know the difference between MedRAG and Synapse as you just described?

A I don't know the answer to this question. It would be speculation.

Q No problem.

A But I would assume Jim Singer would actually know the difference.

Q So one of the persons in your statement that you recall had the most information on this topic would be me. Is that a fair statement?

A You were leading the projects as a business lead and yes, you had a lot of information about the project. So is different teams on the members on the

project had different roles and each role would have an information that is relevant to their particular roles. So anything relevant to project management would be project manager. Technical architecture would be delivered and designed by technical lead. So you were one of the team members.

Q Who had the most comprehensive information or knowledge?

A You were certainly involved heavily in influencing in -- in discussions of both MedRAG and Synapse would be.

Q Did you see a demo of MedRAG before June 19, 2025?

A Oh, I'm sorry.

Q Did you see a demo?

A -- demo -- you scheduled several -- several demos. It might have been before June 19th, so it might have been. I don't know.

Q Did you see a demo of Synapse before June 19, 2025?

A Seen many demos. I cannot recall specific date.

Q When you say preexisting IP, how sure were you that there was a preexisting IP for EPAM on June 19, 2025?

A Based on my costs that I approved during the development of this project, I am pretty sure that was a piece or a component developed so that would be considered to be in a preexisting IP. But I was looking at the financial side of it --

Q So are you stating on the record that you observed financial investment in something that may have led to a preexisting IP?

MR. OSLICK: Objection to the form.

BY MR. RAO:

Q Prior to June 19, 2025?

MR. OSLICK: Objection to the form.

THE WITNESS: Can you please restate the question?

BY MR. RAO:

Q Can you clarify your statement about incurring costs on the MedRAG and Synapse project prior to June 19, 2025?

A There were costs accrued by the team or different members involved in developing MedRAG and Synapse that were spread across multiple projects. But typically, yes, I mean, I saw costs in my P&L and then there was a -- a different project -- a global P&L.

Q From your recall, based on the master

service agreement signed between Odysseus Data Science -- Odysseus Data Services and Takeda Pharmaceuticals dated June 2019 and the verbatim text that you read, if code was written for Takeda, who owns it?

MR. OSLICK: Objection to the form.

THE WITNESS: That's a very loaded question with many assumptions and presumptions. So the code was clearly developed by EPAM and deployed to Takeda. So as a preexisting IP, there's a proper clause in the contract. And the preexisting IP being preexisting IP, the code belongs to EPAM.

The other projects at Takeda were -- was clearly work for hire when they ask us to develop something that is Takeda specific, which was the only Takeda resources that was -- would belong to Takeda. But in this particular case was a preexisting IP.

BY MR. RAO:

Q What was the name of this project again, Mr. Klebanov?

MR. OSLICK: Objection to the form.

THE WITNESS: What project?

BY MR. RAO:

Q The one that this statement of work is talking about.

MR. OSLICK: Objection to the form.

THE WITNESS: Sorry. What statement of work?

BY MR. RAO:

Q The comments in this email is referencing.

A I -- and I see only a conversation. I don't see a statement of work here, so it's hard for me to --

Q What was the work -- what was the AI project that was done under the -- under a master service agreement by EPAM to Takeda between June 2025 and September/October of '25?

A June. Again, I cannot recall every single SOW and every single date. There was an AI project that we signed an SOW to deploy against preexisting active internal names Synapse to Takeda. I believe in July when the deployment -- when the SOW was signed -- July, I believe, to my best recollections, but I cannot deploy every single SOW. It was called -- again, I cannot recall every single customer name, but I believe it was called RWEAI Insight at Takeda.

Q And was it -- was there a phase name? Was it a called phase one, phase two, phase three for that project?

MR. OSLICK: Objection to the form.

THE WITNESS: The project in Takeda I don't believe it has a phase name, the SOW. Don't remember the -- internally, we used phases I think just to state a new SOW version. I do not, but again, what -- what is the question here?

BY MR. RAO:

Q Why is there a phase two in the subject of this email?

A Because it was a continuation of innovation -- AI innovation work stream that we started at Takeda. The -- I believe the first work stream was focused on proving that AI can work in general, not specific codebase utilizing public infrastructure and in general concept -- experiments -- which is phase one. It was done for Takeda phase one.

Q And this was a continuation of that phase one; correct?

MR. OSLICK: Objection to the form.

THE WITNESS: It was a next step in evolution of what we did for Takeda. It wasn't necessarily the same thing being redone in different phase. Again, that was an investment by Takeda being different AI specific solutions that could work for Takeda. In phase one, we experimented with -- phase

two, we proposed this specific idea and a specific solution.

MR. OSLICK: We've been going on for about two hours now. And its past -- I don't know when you want to break for lunch, but I need to -- certainly need a potty break myself.

MR. RAO: Court Reporter, is it okay if we take a break now?

THE REPORTER: Yeah, that's fine.

MS. LUGAR: Just to follow a line.

MR. RAO: -- take a break.

MS. LUGAR: I think we need to order lunch. So maybe this is a short break and then when lunch arrives we take a real break.

MR. OSLICK: Fair enough.

MS. LUGAR: Is that okay? So we don't have two long breaks.

MR. RAO: All right.

MS. LUGAR: So I'm going to pass -- around.

MR. RAO: Did you stop the time, Mr. Court Reporter?

THE REPORTER: I'm sorry. There's a lot of people. Are we going off the record now; correct?

MR. RAO: Yeah. We took, like, a minute ago.

THE REPORTER: It's 12:13.

(Off the record.)

THE REPORTER: It is 12:24. We are on the record.

BY MR. RAO:

Q Mr. Klebanov, when you introduced this language of preexisting IP into the statement of work, did you consult with EPAM's legal?

A Yes. We --

MR. OSLICK: Mr. Klebanov, you can state whether you consulted with EPAM's legal. I'm going to instruct you not to disclose the substance of any communications you had with EPAM's attorneys.

MR. RAO: For the record, Mr. Oslick has asserted privilege.

THE WITNESS: All SOWs and MSAs in EPAM, they go through a -- a rigorous review process, which includes legal, compliance, delivery managers, and the SOWs are put through a legal review process --

BY MR. RAO:

Q Were these words drafted by you, Mr. Klebanov?

A These words were -- specifically, I don't

remember this particular paragraph, but I believe the words were reviewed and approved by EPAM legal counsel.

Q Is there a reason why you put "preexisting IP" inside parentheses, Mr. Klebanov?

A That I put it into parentheses because there is a -- I guess not. I don't know why, but in this particular case, I guess I meant to separate the license from an intellectual property, meaning that it's a --

Q Can you speak a little loudly, please?

A I'm sorry. Can you hear me?

THE REPORTER: Yeah. Yes, I --

THE WITNESS: Okay. So -- so I -- I do not -- I cannot tell you for a fact two years later or a year later, I guess, a year later why this specific instance I have preexisting IP in parentheses. Again, I submit, it's a proper document as well. But I guess I just wanted to highlight that there's a preexisting intellectual property and there's a license.

BY MR. RAO:

Q Did you receive my objection to that language on June 19, 2025?

MR. OSLICK: Objection to the form.

THE WITNESS: What do you mean by --

BY MR. RAO:

Q Did I object to adding that language in June 19, 2025?

A I do not believe you objected. I -- from my recollection, again, it's been a year since then. You -- and again, that was a chat conversation right here that you wanted to make it an open source product and I declined and proposed to make it a commercial license itself. I don't think there's any debate or existence of any objections on preexisting IP in general.

Q Did you ask EPAM's legal to review section 12 of the master service agreement when you were drafting this --

MR. OSLICK: I'm going to instruct you not to answer. That you -- that is -- that question calls for the disclosure of privileged communications, namely requests for legal advice.

MR. RAO: Mr. Oslick is asserting privilege. He's asserting privilege for a fact, not for an opinion.

BY MR. RAO:

Q Mr. Klebanov, you'll answer the question.

MR. OSLICK: You'll not answer that question.

You are asking him about whether he requested legal advice about a specific language. Requests for legal advice are privileged. I am instructing him not to answer that question.

BY MR. RAO:

Q Mr. Klebanov, can you state on the record that you did ask EPAM's legal before inserting this language in the statement of work?

MR. OSLICK: Objection. Again, I'm going to instruct you not to answer. He is asking you specific questions about what you did or did not -- what kind of advice you did or to not seek from EPAM's legal. That is privileged. Do not answer that question.

THE WITNESS: What was the question again?

BY MR. RAO:

Q On June 19, 2025, you were not concerned about legal clearance, were you?

A We were going through a -- a legal and compliance review process for every SOW. I cannot say that I was concerned or not concerned. It was just a part of normal, regular process.

Q You treated the section 12 of the work for hire ownership clause in the Takeda's master service

agreement as an inconvenience to just brush off, didn't you?

MR. OSLICK: Objection to the form.

THE WITNESS: I cannot tell you what section you just mentioned in SOW what it states unless I'm going to look at the MSA and I can tell you what the section means. And even then, I would consult with my legal advisor, but specifically, I don't know what you're talking about. Sorry.

BY MR. RAO:

Q You said "We already do it all the time with Takeda and elsewhere." You meant that you do it all the time of claiming ownership of a client's property?

MR. OSLICK: Objection to the form.

THE WITNESS: What you are asking is false. You are not claiming the ownership. We are working with Takeda with proper service agreements and contracts in place and if it's work for hire, it's work for hire. If it's a preexisting IP and a commercial license, we have a preexisting IP and commercial license. If it's open source, it's again, that would be an agreement between internal EPAM first of all and the client. So you've taken it out of context. I think you try to use it -- way that probably suits you.

BY MR. RAO:

Q So you simply dismissed my objection on June 19, 2025, on this matter as my manager?

MR. OSLICK: Objection to the form.

THE WITNESS: Did not object. You proposed and to use to put something as an open source code, which I declined and we proceeded with a default, meaning that this property belongs to EPAM, and it's an internal IP and we will proceed with commercial license.

BY MR. RAO:

Q Are you aware of an objection from me to claiming preexisting IP of codebase that does not exist on June 19, 2025?

MR. OSLICK: Objection to the form.

THE WITNESS: When did you object to that?

BY MR. RAO:

Q June 19, 2025.

MR. OSLICK: Objection to the form.

THE WITNESS: Do not recall you objecting to any codebase that did not exist. You simply proposed to treat this code as -- as an open source code.

BY MR. RAO:

Q Did you talk to EPAM legal or Odysseus counsel before inserting the recitals claiming retained preexisting software?

MR. OSLICK: Once again, do not answer that question. I'm instructing you not to answer it. It is seeking requests for legal advice.

BY MR. RAO:

Q How do you define preexisting software?

A I'm not an attorney, so speak with my words. Again, if you need a -- a specific definition, you can consult an attorney. But a preexisting IP, that is anything that was developed for an EPAM that has a value for EPAM, was funded by EPAM, thus belongs to EPAM.

Q Was code written as part of phase one of Takeda's statement of work?

A A developer cannot tell you whether the code was written or maybe some -- were written. I don't know. It's probably a question for -- or anybody who was involved in -- was developing at that time.

Q You were involved with Jim Gatch of EPAM to sell Synapse to Johnson & Johnson; correct?

A I think you were involved with Jim Gatch trying to sell an internal project with name Synapse to Johnson & Johnson, yeah.

Q Can you identify Jim Gatch?
A Jim Gatch is an EPAM employee responsible for business development and I believe at the time he was specifically responsible for Johnson & Johnson as an account.
Q Did you go to Johnson & Johnson with Jim Gatch to -- for -- on behalf of EPAM?
A Yes, I did.
Q Did -- did you meet with Mr. Troy Sarich at Johnson & Johnson when you met with Jim Gatch?
A Yes, I did.
Q Was that meeting with Troy Sarich recorded by EPAM employees?
A I cannot tell you whether it was recorded by employees, but it wasn't recorded by me.
Q There was a recording of that meeting shared with you on a Microsoft Teams chat inside EPAM Systems?
A Cannot recall. I'm sorry.
Q Do you remember discussing about the meeting with Troy Sarich on an internal chat of EPAM?
A Discussing meeting with Troy om internal -- internal chat? We probably use Teams for communications. Possible. Don't remember.
Q Do -- are you aware of any EPAM employee who

was recording client conversations inside client's physical buildings?

A Not -- not to my knowledge. Again, at the time I had no idea. No. Again, I cannot be responsible or know about some other people's activities, so I'm going to tell you that I do not record -- to call -- recording any conversations for a client without client's knowledge.

Q Did you request Mr. Gatch to share the recording or any recording of a client conversation?

A Again, if we have a Teams conference call, which is very common with the client and the client would contest -- consent to recording, meaning saying, "Yes, I -- I allow recording," then recording would be recorded and then share it internally with the client. That's a normal practice in any business -- exception.

Q Have you been a part of any EPAM employee group that has gone inside the premises of a client and recorded the client in a meeting?

A I sometimes would join somebody else, maybe Jim, maybe somebody else. And we'll go inside. But again, unless -- and we have a conversation whether somebody else is recording, I have no knowledge --

Q Is -- are you saying under oath that you do not know of any recording that was shared with you

that was done inside a client's campus?
MR. OSLICK: Objection to the form.
THE WITNESS: I know of the recordings shared with me that were done in general conference calls where clients would consent to the recording. I do not check or validate every single recording that is being shared with me because I simply -- it's not my job and responsibility. I know there were some recordings done that I did not consent to that related to you specifically.
BY MR. RAO:
Q Tell us more about the recording.
A I don't know. Just know that something happened.
Q Do you remember in the meeting with Mr. Sarich whether a consent was obtained to record the conversation?
A I remember that we met in the cafeteria and had a discussion. I was not present at the whole time -- I cannot tell you --
THE REPORTER: Can you -- can you say -- for me. That was -- something -- there was a noise and it kind of overshadowed what you were saying?
THE WITNESS: Yeah. What I was saying

is that since I was in that meeting and I cannot claim to be present at every single minute in the moment of this meeting, I don't know what conversations -- different -- other employees of EPAM might have had a story at the time. And even that something was recorded, I did not -- I do not recall or remember at the time.

BY MR. RAO:

Q September 9, 2025, I sent an email to a person named Katie Barista asking for an opinion on a master service agreement and statement of work for Takeda. Do you remember that email?

MR. OSLICK: Objection to the form.

THE WITNESS: Do not remember that email. Sorry. I get hundreds of emails per month.

BY MR. RAO:

Q Are you part of any such email?

A If you show me the email, I'll tell you if I was part it.

Q Do you remember who -- do you know who Katie Barista is?

A She is a part of a marketing team or I'm not sure how she is relevant for any legal advice or legal conversation. I think she is part of marketing team.

Q Can you describe what you know about her

responsibility?

A I don't know what her responsibilities are. I'm sorry. But we work with Katie to -- I can describe what I work with Katie to -- so we work with Katie on our marketing material and naming conventions and publications that our marketing materials that are shared with clients.

MR. RAO: Court Reporter -- Exhibit 005.

(Exhibit 005 was marked for identification.)

BY MR. RAO:

Q Mr. Klebanov, can you tell me who are listed in this document, the names of the people?

A Just you, Gowtham Rao, and Katie Barista.

Q Can you go to the bottom, please?

A I see an empty message at the bottom. I cannot authenticate this email. I don't know -- if it's valid then the -- Katie Barista --

Q And what date and time was that email?

A Again, if this email is authentic, Tuesday September 9th.

Q Do you recall receiving an email on September 9th at that time?

A I don't recall, especially since it doesn't

have any content, and I don't know what the content of this email -- the message was over.

Q Did you receive an email on that date and time, Mr. Klebanov?

MR. OSLICK: Objection to the form.

THE WITNESS: If I were to believe this email thread that I was on email message that came from Gowtham Rao to Katie Barista on September 9th, which has no message in it -- email. And on the subsequent email, I was removed from the communication, so I have no -- visibility. And so the subsequent email between -- exchange between Katie Barista and Gowtham, I don't know the contents of this email.

BY MR. RAO:

Q Do you remember the day of September 9, 2025? Do you remember what any key events for the day?

MR. OSLICK: Objection.

THE WITNESS: I cannot remember. September 9th. I'm sorry.

BY MR. RAO:

Q Do you remember any planning meeting for -- with Johnson & Johnson September 9, 2025?

A I cannot remember.

Q Did -- do you remember any conversations with me on September 9, 2025?
A Do not remember September 9th in general. Is not a significant date in my head.
Q September 9, 2025, did I have a direct conversation with you regarding an upcoming Johnson & Johnson demonstration?
A I said I cannot remember conversation from September 9th. We -- we did talk about your pursuits, but I cannot recall this particular conversation.
Q On September 9, 2025, did I raise a concern about whether EPAM had a legal right to demonstrate Takeda built software to Johnson & Johnson?
A Did you raise concerns to whom?
Q You.
A I do not recall this conversation.
Q Did I ever inform you that we should not be using Takeda software to demonstrate to EPAM -- to Johnson & Johnson? Sorry.
A That's a loaded question by itself.
MR. OSLICK: Objection to the form.
BY MR. RAO:
Q Let me restate the question.
Did I object to demonstrating what EPAM asserts is a preexisting IP which is identified by

Synapse to Johnson & Johnson because it was owned by Takeda?

MR. OSLICK: Objection.

THE WITNESS: Did you object to whom?

BY MR. RAO:

Q To you.

A You were responsible for the business development and conversations with clients and John -- Jim Gatch and others. I was not involved in your business pursuits except that you listed them as clients. Do not remember you objecting any particular presentation of our internally developed tools because I don't understand why would you object.

By definition, you should not be demonstrating client specific material to somebody who's not -- but that's part of your code of conduct and ethics that you as an employee should know and be aware of.

Q You think it was acceptable to demonstrate Synapse, which is a preexisting IP of EPAM to Johnson & Johnson?

MR. OSLICK: Objection.

BY MR. RAO:

Q Okay. Let me state -- restate.

Did I object to showing EPAM's Synapse to

Johnson & Johnson?
A You -- you asked this question. I do not recall you objecting to me and I do not recall you seeking permission from me to present this to J&J.
Q On September 9, 2025, was there any conversation between you and me that you recall?
A I do not recall. And I do not remember what day of the week it was.
Q What was your reaction when you saw this email that comes -- came from me about the Takeda project?
A Which email are you referring to?
Q Email on September 9th?
A Show me this email. Is this the email? Just an empty message. So what was my reaction to an empty message? I probably did not read it or did not see it, or I could get -- I get thousands of emails. So if I see an empty message, I have no reaction from empty message.
Q So on September 9th when you got this message, which did not have a body but had a subject, an attachment, your reaction was to not read it; is that correct? Is that what you're saying on the record?
MR. OSLICK: Objection to the form.

THE WITNESS: My reaction to an empty message would be I don't know what happened then. I don't recall what happened on September 9th. As I told you before, so I cannot remember how I reacted so an empty message.

BY MR. RAO:

Q Did you ask me to demonstrate Synapse to any client?

A You were in charge of Synapse, and so you were in charge of business development. Since Synapse was the internally funded project that we developed internally, that was initial for me to expect you to sell that product to our clients. Otherwise, it doesn't make sense to invest in it.

Q But the -- but Synapse software, the existing IP different in September 2025 compared to June 2025?

A Preexisting IP is not different but the codebase you mean and was the codebase different? I'm not a developer. I am not involved in this project on a day-to-day basis. I don't -- I cannot answer this question -- but I would assume that would be the case.

Q But it would be different?

A For the developer. I'm not running this project.

Q In September 2025, did you see a demo of EPAM's Synapse?
A Sorry --
Q Have you ever seen EPAM Synapse demo?
A In general -- question, I have seen demo of Synapse product, yes.
Q When was the first time you saw a demo of EPAM's Synapse?
A Specific timeline?
Q When I was an employee of EPAM's Synapse -- of EPAM, did you see a demo of EPAM's Synapse product?
A I don't remember a specific timeline. I'm sorry.
Q Who would do a demo of EPAM's Synapse product?
A Probably would be Dmitri, myself, maybe other people.
Q Do you have any idea of what the inputs for an EPAM Synapse software is?
A The inputs would be you were focusing your specific first use case that you -- focus on. Can you hear me, Matthew?
THE REPORTER: Can -- if you can speak up a little bit, I can hear you and I'm getting everything, but yeah, just try to keep -- keep voice

up.

THE WITNESS: Try to speak up -- I guess. The -- focusing on the first use case that I believe we discussed was the product launch. And the product launch would require, if my memory doesn't betray me, a product name. I don't remember actually specifically, but I think it's a product name and indication and the phase -- and the product -- pharmaceutical product.

BY MR. RAO:

Q What was the input and what was the output?

A The output would be an analysis of potential risks and -- concepts to mitigate those risks.

Q Was that built out on June 2025?

A -- was built out on June 2025, I cannot tell you because I was not directly involved in the project. But you were actually advertising this as one of the internally funded use cases.

Q So in June 2025, we are not seeing it. But it -- but was the description of the functionality or the inputs of this software the same as you described?

A Cannot tell you specifically. It's been a while. I -- I cannot tell you what I saw and I didn't see. Again, I cannot recall a specific timeline.

Q And as the leader of the business unit who's

responsible for the revenue generated by this software, are you saying you do not recall the functionality of the software that you're commercializing?

MR. OSLICK: Objection to the form.

THE WITNESS: Cannot recall every product and the software and the timeline and the date and the demo for the whole year. It's just simply not something that I can hold in my head. As a business owner, I'm ultimately responsible for producing revenue. You were responsible for producing revenue related to the data science, specifically Synapse. But we have other products and, like, even other products I cannot recall a specific date and a specific timeline and specific features that were available or not available and the date.

BY MR. RAO:

Q And you're responsible to know the revenue of these products?

A At that particular moment, I'm responsible for knowing what they generate and what the forecast will generate. And the forecast will come from product --

Q And as of June 2025, how much revenue did EPAM Synapse generate?

A -- a specific --
Q Give me a ballpark.
A -- EPAM Synapse -- brand new funded project by definition, something that is funded internally was going to develop and then you start selling to products --
Q Generate more than $0 revenue on June 2025?
A It was a brand -- developed components that we haven't, to my recollection, deployed to other clients yet. Takeda was the first client who were deploying this client project -- this component.
Q But in September 2025, did EPAM Synapse generate revenue?
A You could not sell it to other clients to my best knowledge and ability.
Q Did EPAM Synapse generate revenue as of October 15, 2025?
A Takeda was one of the clients who if you look at Takeda -- the revenue generation --
Q Are there any other clients where EPAM Synapse generated revenue?
A And you were the business leader responsible for business development. You were, to my knowledge at the time, pitching it to multiple clients. I do not remember revenue being brought to other products,

yet.

Q And as part of the statement of work, the phase two statement of work, EPAM Synapse was deployed at Takeda; correct?

MR. OSLICK: Objection to the form.

THE WITNESS: Takeda was the first client where EPAM internal project name Synapse was deployed to clients to be customized and developed, enhanced for -- specific use.

BY MR. RAO:

Q And when the software was customized and enhanced, was that -- were developers billing for their time using Takeda billable code?

MR. OSLICK: Objection to the form.

THE WITNESS: I'm not a delivery manager. I cannot tell you, but I would assume that there were client specific codes and internal codes.

BY MR. RAO:

Q You've been in this business for quite some time. Do you think that the customization was just integration changes or addition of functionality and features?

A Sure. The business -- can probably tell me, but in this particular case, I think there were many ideas floating around at the time including testing

the -- the actual use case because AI is new and I guess validating the use case actually works. Real clients, real data, fine tuning, that's what customization is all about deploying with our infrastructure, making sure that you commission proper infrastructure to run, index proper documents. So it's a lot -- a lot goes into customization.

Q Was anything that was billed as part of the statement of work owned by Takeda?

A Anything that is billed by statement of work?

MR. OSLICK: Objection to the form.

THE WITNESS: I'm not an attorney per se, but I know that the license clearly stated if I'm not mistaken this particular license was non-exclusive, non-transferable license -- modifications -- EPAM's property.

BY MR. RAO:

Q Is it a routine practice for your business to sell first that does not exist and then build on customer's dime?

MR. OSLICK: Objection to the form.

THE WITNESS: Do not agree with the statement. Can you rephrase your question?

BY MR. RAO:

Q Is it your business practice to sell software that does not exist as licensable assets and after the customer signs the agreement, build it for them as part of their license fee?

MR. OSLICK: Objection to the form.

THE WITNESS: I do not believe we do anything like that.

BY MR. RAO:

Q Are you stating on the record that on June 19, 2025, the software that existed as EPAM's intellectual property was deployed in Takeda as a software license and not a custom built software?

MR. OSLICK: Objection to the form.

THE WITNESS: We --

BY MR. RAO:

Q Under oath, Mr. Klebanov.

MR. OSLICK: Will you stop badgering the witness? Seriously, stop it with the "You're under oath" after he takes two seconds before answering a question. He's entitled to think about his answer without you badgering him.

THE WITNESS: Please repeat the question, Mr. Rao. I lost my train of thought.

BY MR. RAO:

Q Is it your routine business practice to sell

software that does not exist -- to license software that does not exist and after the client purchases or signs a statement of work to sell -- build custom software on their dime and license it back to them?

MR. OSLICK: Objection to the form.

THE WITNESS: That's your statement. I do not --

BY MR. RAO:

Q -- the question.

MR. OSLICK: Objection to the form.

THE WITNESS: -- the question. I think it's a statement that you make and I do not agree with the statement.

BY MR. RAO:

Q Have you ever done this type of action?

A We build software for a client that sometimes work for hire and that property belongs to a client and we sell an existing intellectual property. Typically comes with the non-exclusive, non-transferable license for a client.

Q Why do you think I asked permission to demonstrate Takeda Synapse to EPAM's legal via Katie Barista?

MR. OSLICK: Objection to the form.

THE WITNESS: Tell me why you asked

Katie because Katie is not even the legal. To my knowledge, she's a marketing person. But I cannot tell you why you asked.

BY MR. RAO:

Q Was there a contact made from EPAM's legal department to you regarding IP?

MR. OSLICK: Again, I'm going to instruct you not to answer. He's asking for privileged information. Don't answer.

MR. RAO: Noted for the record.

THE WITNESS: I'm not going to answer this question based on my attorney recommendation.

MR. OSLICK: Be clear, I don't know if there's -- that existed or not, but whether or not specific subjects were discussed with Counsel is privileged. That's not a statement that these communications exist. It's simply a statement that if they exist, they are privileged.

BY MR. RAO:

Q Did anybody in EPAM communicate that Katie Barista was being disloyal by sharing this opinion?

MR. OSLICK: Objection to the form. Communicate to whom?

BY MR. RAO:

Q The teams. Let me restate the question.

Did anybody in EPAM communicate to you that Katie Barista is being disloyal to the company by sharing EPAM's legal opinion about the ownership of the IP?

MR. OSLICK: Objection to the form.

THE WITNESS: I do not remember a communication like that, but I work with Katie even today and I think she's a very good and ethical employee.

BY MR. RAO:

Q Was there any compliance with contract escalations in EPAM on that subject?

MR. OSLICK: Objection to the form.

THE WITNESS: What subject?

BY MR. RAO:

Q Use of client IP for client commercial purposes by EPAM.

A Escalation to whom?

Q Corporate governance.

A Corporate governance. I cannot tell you that.

Q Are you aware of any issues raised inside EPAM in any form about using property that was built for Takeda as a commercial asset that will be licensed for another client?

MR. OSLICK: Objection.
THE WITNESS: I -- well, can you repeat the question? Sorry --
BY MR. RAO:
Q Sorry. Is it true that EPAM demonstrated to Sanofi what it built for Roche or Genetech?
A I do not know. Hearsay is not something that I'm going to speculate on with you.
Q Have you heard that it is possible that EPAM demonstrated to Sanofi what was built for Roche or Genetech?
A I am not going to comment on rumors or something that I have no -- I'm here to answer that.
Q Have you heard a rumor that EPAM demonstrated to Sanofi something that was built by EPAM or Roche or Genetech?
A I'm sorry. I don't remember details -- rumors or speculations.
Q Is it true -- is it possible that EPAM built custom software for a client and then keeps that software and licenses it as its product or accelerated to another client?
MR. OSLICK: Objection to the form.
THE WITNESS: Hypothetical and speculation. Again, EPAM is a very ethical company.

Every employee goes through a code of conduct and ethics -- again, I'm not going to comment on speculations or hypothetical -- I'm here to give you the facts that I know.

BY MR. RAO:

Q Have you authorized licensing of software built for and owned by a client to another client?

MR. OSLICK: Objection.

THE WITNESS: To my best knowledge at the time, the software that I authorized to be sold as a license was the property of EPAM, so --

BY MR. RAO:

Q You said you work with Katie Barista routinely. Does she interface with EPAM's legal?

MR. OSLICK: Objection.

THE WITNESS: Katie, I -- I don't know if she does.

BY MR. RAO:

Q When you interacted with Katie, did she ever say that "I will contact legal on a certain topic"?

A She didn't tell me. Actually, she did say that she might refer a naming convention to someone. I don't who know that is particularly, whether she interacts with legal or not. It's a part of her responsibility, job, so I cannot comment.

Q When was the last time you spoke to Katie Barista?
A I cannot give you a specific date, but probably a week or two weeks ago.
Q Have you talked about this email or matters related to this email with Ms. Barista?
A Talked about our marketing material and naming convention.
Q So you did not talk about this email?
A With Katie Barista? No. I do -- do not know what this email again is. It's an empty body and -- exchanges between you and Katie --
Q -- that email again --
MR. RAO: Court Reporter, I am handing another exhibit to Mr. Klebanov. It's labeled Exhibit 007.
(Exhibit 006 was marked for identification.)
BY MR. RAO:
Q Mr. Klebanov, I do not need you to authenticate this document. I just need you to tell me who Igor Lukash is.
THE REPORTER: Apologies, just as a -- as a bookkeeping thing. I think you're on 006, if I'm not mistaken.

MR. RAO: Okay. 006. Thank you. I'll change it.

THE WITNESS: -- Igor Lukash -- a person -- contractual -- contract signing processes --

BY MR. RAO:

Q Did Igor Lukash help you with the phase two SOW for Takeda on June 19, 2025?

MR. OSLICK: Objection to the form.

THE WITNESS: -- helped me -- he's managing all of our CRM processes.

BY MR. RAO:

Q Did he manage the phase two Takeda SOWs CRM process?

A Looking back at the records, I cannot tell you hundred percent, but I assume if he's managing our processes, he's managing CRM records.

Q Okay. So in the middle in the white box there, could you read what -- read the bottom section?

A Which one? White box?

Q Yes.

MR. OSLICK: Again, if you're asking him questions about a document, he'd like to read the actual document.

A I can read it?

Q Yeah, you can read the centerpiece.

MR. OSLICK: Should be able to read the document for context, not just, like, two lines.

BY MR. RAO:

Q Can you read the center section?

A So I'll read the middle section even though I'm allowed to read the whole document. I don't know what the document is until I read it. So for the record, I'm just reading the middle section, whatever that means. The message -- I cannot understand message from whom. I guess this message from you to Igor Lukash. "Okay. I'm putting hold till we clarify where is the language on intellectual property and confidentiality? Saurin and Sunil have agreed to make it open and public, so let's make it open core. This will help me sell it. I would like EPAM to be able to freely use or sell these ideas, similar or ..." and then you say -- he replies "Okay. I got it." Or he replies "Okay, got it."

Q What is the interpretation of that dialogue?

A I cannot interpret this dialogue because I don't see the -- the whole entire conversation. Also the -- how it aligns with the -- discussions we just had. So I can -- but Igor Lukash is to simply manage the CRM record, meaning that he helps me to submit SOWs for processing --

Q Was I in routine touch with Igor Lukash?
A I do not know how frequently you interacted with Igor, but I know you did interact with Igor occasionally.
Q Did you ever demonstrate or did you -- do you know of any EPAM employee demonstrating Takeda built software to another client?
A Yeah, you were very clear and territorial in owning Synapse in client conversations. I think you let the business develop. So I cannot say if anybody else possibly did it. I cannot tell. You were in charge of the project.
Q So are you aware of anybody else presenting Takeda Synapse software to a client?
A During your employment -- during your --
Q Yes.
A I cannot tell you.
Q Are you aware of any EPAM employee presenting Takeda Synapse software after my employment?
A Synapse software, again the project is not called Synapse anymore, but project continues. We do present the latest products to different clients -- demo.
Q Did EPAM keep a copy of the Takeda's built

Synapse software?
A Not -- DevOps person. Should ask them, but I would assume that -- actually I'm not going to assume anything. I don't know.
Q You reviewed the logs of the files that I downloaded; correct?
A What logs are you referring to?
Q Referring to the logs that EPAM said that I downloaded.
A The InfoSec reports?
Q Correct. And does that have EPAM's Synapse software?
A Based on the input, again, I'm not a -- a developer anymore and don't have an in-depth knowledge of the codebase or the naming convention. So GitLab -- I have to consult with other people based on their feedback I believe the Synapse was used as a name in the lab and Synapse codebase was downloaded.
Q So is your -- in your declaration, you said that I downloaded software. Does that declaration include the EPAM Synapse software?
MR. OSLICK: Objection to the form.
THE WITNESS: Can you repeat the question again?
BY MR. RAO:

Q Your declaration, you said I downloaded software. Does that include EPAM's Synapse software?

A Based on intercept report and the feedback that I provided, I believe Synapse was part of the what piece that was downloaded. Possibly some other documents as well.

Q So you put in a federal litigation on a belief and not objective facts; is that true?

MR. OSLICK: Objection to the form. Stop badgering.

THE WITNESS: When I say I believe, it's based on my best knowledge. It's the language that I use.

BY MR. RAO:

Q It's a reasonable belief that EPAM software was downloaded?

A Based on the feedback that I received from IT support people including IT DevOps people who have access and exposure to GitLab repository to understand the -- the details of the software itself, I believe that I remember them telling me that you downloaded Synapse.

Q What about Takeda Synapse? Did I download Takeda Synapse?

A I cannot tell -- tell you for a fact

that -- whether it was Takeda project Synapse or internal project name. It is to my recollection based on -- again, it's a very large report and I needed help from other people to interpret this report, so based on my recollection, you don't know multiple codebases -- codebase, not only internal but also client specific -- Synapse -- Takeda Synapse was also downloaded. But I cannot tell you for a hundred percent again without looking at this report right now again.

Q And EPAM Synapse belongs to EPAM; correct?

A EPAM developed codebase that is a part of a project. Synapse is an IP, intellectual property of EPAM. Like anything that is developed at EPAM is internal funding that -- internal --

Q And Takeda Synapse belongs to Takeda; correct?

MR. OSLICK: Objection to the form.

THE WITNESS: Already discussed that; right?

BY MR. RAO:

Q So no?

A We deployed an internally developed project or product into a client and we provide a client with a non-exclusive transferable license with a social

property rights for any modifications.

Q And it was maintained as a separate repository called Takeda Synapse; correct?

A I'm not a developer on the project. I cannot tell you.

Q Is it normal and common to keep EPAM's property customized for a client in a separate repository compared to the core software?

A I will -- I will tell you based on my experience, but it is not unusual probably for a company to -- a copy of something that's being deployed to -- but again, it's not something that I can tell you as a practice or it is done in EPAM just my experience.

Q What is the name of the repository that has EPAM?

MR. OSLICK: Objection to the form.

THE WITNESS: -- specific name. I'm not a hands-on developer on the project -- this project could be -- I had to rely on external feedback again --

BY MR. RAO:

Q But there is a soft repository that is distinct from Takeda's custom version of Synapse; correct?

A As I said, I have -- I have to rely on external feedback and external opinion.
Q So you would expect that the external feedback would say that the core EPAM's IP Synapse would be a distinct depository compared to Takeda Synapse; correct?
MR. OSLICK: Objection to the form.
THE WITNESS: Don't expect anything. I expect that anything that is developed internally by EPAM's internal funding -- internal effort be a property of EPAM by default.
BY MR. RAO:
Q If a property was built by EPAM with its own funding, will you give it a client's name, Takeda?
MR. OSLICK: Objection to the form.
THE WITNESS: And it's a hypothetical scenario or speculation. I don't know the specifics of how it was done here in EPAM. But anything that was developed internally with internal funding, internal effort is property of EPAM. Whether it's named one way or the other doesn't change the --
BY MR. RAO:
Q Was Evgeny Sidenko a manager of Synapse or Takeda Synapse?
MR. OSLICK: Objection.

THE WITNESS: The manager is a very general term. He's a delivery manager, meaning that he tasks staff with typically project management, planning, dates, communication with clients. He's not technical --

BY MR. RAO:

Q Was he responsible for both the core Synapse and the Takeda Synapse or only Takeda Synapse?

A Since you managed Evgeny, I do not recall. But you managed Evgeny. I -- I recall he was at some point responsible for internal Synapse. We discussed with Evgeny a project charter, which by the way, list of many -- many potential clients --

Q So yeah, you want to take a break?

A No, it's okay.

MR. OSLICK: Actually, yeah -- take a break -- it's lunchtime --

THE WITNESS: I understand.

BY MR. RAO:

Q Are you okay with just one more question?

A Yeah, just --

Q If there's a repository that was started after the SOW was signed June 2025, would you agree that it's most likely built for Takeda rather than for EPAM?

MR. OSLICK: Objection to the form.
THE WITNESS: Speculation. The repository is being created all the time.
MR. RAO: We can break Court Reporter. We can stop the clock.
THE REPORTER: Okay. The time is 1:24. We are off the record.
(Off the record.)
THE REPORTER: It is 1:50. We are on the record.
BY MR. RAO:
Q Mr. Klebanov, we are -- you are still under oath. So we are back on the record following the break. During the recess, did you speak with Mr. Oslick or Ms. Lugar or any attorney about your testimony or this case?
THE REPORTER: Is that a no?
BY MR. RAO:
Q Did you communicate with --
THE REPORTER: Sorry.
THE WITNESS: That was no.
THE REPORTER: Okay.
THE WITNESS: Sorry.
BY MR. RAO:
Q Did any attorney -- or give you

instructions, suggestions, or advice, impressions, nonverbal cues on matters of this case during the break?

A No.

Q So, Mr. Klebanov, we were talking about the difference between EPAM Synapse and Takeda Synapse. Based on if I would summarize what I -- and you please say yes or no. No code -- custom code was written to -- for Takeda owned by Takeda as part of the statement of work, yes or no?

MR. OSLICK: Objection to the form.

THE WITNESS: It's a very loaded question -- EPAM project called Synapse is a component for deployment to Takeda. That was then customized for Takeda including deployment in Takeda environment.

BY MR. RAO:

Q So no code -- no line of code was owned by Takeda?

A Again, I'm not a -- an attorney, but based on my understanding of the license that we provided, the license clearly states that we grant EPAM the license and it's the property of EPAM.

Q And how many hours did employees spend on this project?

A During what time?

Q As part of phase two --
MR. OSLICK: Objection.
THE WITNESS: On Takeda projects -- I can't answer. I'm sorry.
BY MR. RAO:
Q You report in your declaration that 4,600 hours was spent. Could you give a high level breakdown of those hours?
MR. OSLICK: Objection to the form.
THE WITNESS: I cannot give you a high level breakdown because it required other people to compile those reports for me.
BY MR. RAO:
Q Was the 4,600 hours spent in 2024 or 2025 or 2026? Do you know?
MR. OSLICK: Objection to the form.
THE WITNESS: Similar. It was compiled by other people. It included time definitely in '25. Do not recall --
BY MR. RAO:
Q Was it -- was most of the time -- when I define most, is 50 percent or more, spent when I was employee or after I was an employee?
A And I cannot do a breakdown because I'm not a project manager compiled this report or a person who

compiled this report.

Q As a business lead, you received a report on the hours; correct?

A I receive costs -- costs, P&L costs. So people, projects, but it doesn't break -- break it down. Maybe it does, but I don't -- break down, so --

Q Obviously, you provided a declaration of in hours, not in dollars. So that hours must mean something different. Explain why did you provide hours in the declaration?

MR. OSLICK: Objection to form.

THE WITNESS: Because --

MR. OSLICK: Further, to the extent that your answer depends upon communications with counsel, I'm going to instruct you not to answer.

BY MR. RAO:

Q Mr. Klebanov, you are compelled to answer questions. That is not a privilege.

MR. OSLICK: That is incorrect. You asked him why he made a specific statement in a declaration. I -- sitting -- I don't know what he is going to say, but if his answer involves communications with Counsel, he is not -- he has not -- he is instructed not to answer.

MR. RAO: Mr. Oslick for the record has

instructed Mr. Klebanov from not explaining the 4,600 hours.

MR. OSLICK: That's not what I said. What I said is you asked him -- court reporter, can you repeat Gowtham Rao's last question?

THE REPORTER: Yes.

(The reporter repeated the record as requested.)

MR. OSLICK: Exactly. So --

BY MR. RAO:

Q Did the 4,600 hours include MedRAG?

A Again, the report was compiled by other people. I cannot say -- say yes or no with full confidence.

Q Did you approve any code, billing code for any of these projects in Synapse?

A -- approve typically billing codes. The billing code are given to me by other operations folks I think.

Q In your declaration, you said 4,600 hours. Is that a representation of capital investment by Takeda -- by EPAM?

MR. OSLICK: Objection to the form.

THE WITNESS: It's a capital investment.

BY MR. RAO:

Q You're a business person. You know what capital expenditure is. Is it a representation of capital expenditure?

A I'm not a finance person. I'm not sure how this investment will be considered.

Q What was the purpose of including 4,600 in your declaration?

MR. OSLICK: Again, to the extent that that the answer to that question would involve communications with counsel or if you can answer without disclosing anything that's privileged or work product, you may answer.

THE WITNESS: I'll take your advice.

BY MR. RAO:

Q Is there any information that is not privileged or work product?

A Do not recall what information is considered to be privileged specifically in this context --

Q -- choose not to reply. You're compelled to answer.

A If it's privileged, I don't have to answer; right?

Q If it is privileged, you don't have to. But is there any information about the 4,600 hours that is

not privileged?
A Do not believe that there is information that would not be privileged.
Q So are you saying that all the information about the 4,600 is privileged?
MR. OSLICK: Objection to the form.
THE WITNESS: As to your question, yeah, as it was formed in your question.
BY MR. RAO:
Q Asking you a more broader question. Tell me everything you know about the 4,600 hours that is not privileged.
A Okay. I'll tell you what I already shared with you. The report was compiled by multiple people who looked at the effort that was spent on Synapse project. I do not recall if it includes MedRAG or not. I believe it -- it probably is included. I cannot say for -- for a fact.
Q Did you read the report, Mr. Klebanov, before providing your declaration?
A I read the report but I trust the -- the numbers that are given to me by people who are responsible for that report.
Q Are you stating on the record that you are -- in your sworn declaration you are basing it on

hearsay?
MR. OSLICK: Objection to the form.
THE WITNESS: It's not hearsay. It's a report provided by people who are responsible for tracking time.
BY MR. RAO:
Q Can you personally verify any of this information?
A I trust -- I cannot personally verify this information. I trust that the information that is given to me by professionals has been verified and --
Q In my request for document production, I have requested for details of the 4,600. Should I expect a document that details this from EPAM?
A I do not know -- tell you.
Q Okay. If I request for GitHub or git repositories, logs of git repositories in EPAM for the preexisting IP that does not belong to -- that is -- predates June 19, 2025, will I get something?
A Similar, I don't know. It's not in my mandate to tell you yes or no. It's something that I'm not responsible for, accountable for.
Q The preexisting IP, did you ever see it before June 19, 2025?
A Define seen.

Q Did you see it in a repository of EPAM in any form of electronically stored?

A I'm not a developer. I don't look at GitHub, GitLab repositories or otherwise.

Q What was your basis for saying there was a preexisting IP on June 19, 2025?

A My conversations with lead developers and project team and also reports that I believe were coming from you at the time.

Q What was your basis That there was preexisting IP in September 2025?

A Again, that'd be based at that time on the information that was given to me at that time by the project team.

Q Was the code used by developers to build that preexisting IP considered a billable code or a non-billable code?

A Again, you're testing my memory on billable, non-billable, and as we discussed earlier today that there were multiple project codes used to build an IP. I would expect it's probably something that is internal to EPAM unless we can build -- that EPAM has. So for preexisting IP, it would be an internal project code from EPAM.

Q Do you know anybody inside EPAM who's seen a

demo of the EPAM Synapse software?
A I cannot answer for anybody as someone --
Q Yes or no, did you never know?
A I'm not aware of anybody. But maybe, again, do not recollect it.
Q You provided a declaration of a software that you have never seen a demo. Is that yes or no?
MR. OSLICK: Objection to form.
THE WITNESS: I didn't say that. I said that I don't know what the -- what was the question again?
BY MR. RAO:
Q You have provided a declaration about a software called Synapse, which you have never seen a demo for?
A Never is a misleading keyword. I've seen Synapse. I cannot tell you exactly when the timeline looked like as I previously stated already.
Q When was the first time you saw a demo of EPAM Synapse software?
A Just said that I cannot give you a specific timeline. Just don't remember.
Q Did you see the EPAM Synapse software when I was an employee of EPAM?
A I cannot give you a specific timeline -- in

several presentations.
Q Do you remember if those presentations were a PowerPoint slide or actual demos of software?
A Cannot remember whether it included software demos --
THE REPORTER: Mr. Klebanov, can you -- can you speak -- speak up a little bit? It's a little bit hard to hear you. Sorry.
THE WITNESS: Yeah -- definitely PowerPoint slides and I cannot recall if there were demos at the time, probably, but I cannot recall.
BY MR. RAO:
Q Do you know who made those PowerPoint slides?
A I would -- to my best recollection, they were made by -- well, those PowerPoint slides, which ones? There are many PowerPoint slides.
Q The ones that you're referring to that you saw.
A The ones that I'm referring to were made specifically by you presented to me and other leaders in the team showing us the -- the plans, strategic plans for Synapse.
Q And do you -- would you -- would the word "concept" represent what was presented?

A I don't know.
Q Were there any screenshots of any software on the PowerPoint slide?
A Again, I cannot recall a particular slide. There's so many of them.
Q Has anybody told you that as part of my discovery submission, I have shared some repositories called -- that starts with the Takeda Synapse?
A Can you repeat the question again?
Q Has anybody told you that as part of my discovery production to EPAM as part of this litigation, I have shared names of repositories that is called Takeda Synapse?
A You shared the repository names?
Q The names of repositories called Takeda Synapse?
A I -- there's so much information I cannot recall specific claim.
Q Do you know Mr. Sklansky?
A What's the first name? I might know. The person I might not --
Q He served the declaration as part -- his title is EPAM's global head of IT security.
A Right. So yes but what's the first name? So I do know.

Q He gave you -- did he give you a report on the files that were downloaded?
A The InfoSec report. I do not recall specific person who shared that report with me but was given to me by the in InfoSec team.
Q Mr. -- the EPAM's global head of IT security, he says in his declaration that he gave the report to life sciences leadership for review. Are you one of those life sciences leadership members?
A I guess I would be considered the life science leadership but I cannot recall specifically whether I got this report from Stravo [ph] or somebody else.
Q Do you know who is part of the EPAM's Life Sciences leadership who got this report?
A I cannot speculate on specific names because I simply don't remember who were included. So I'm going to --
Q Did -- can you name a single person in life sciences who opened and read those files before November 3, 2025, the reports that the global head of IT security shared?
A A single person?
Q Name a single person in EPAM's Life Sciences leadership who reviewed -- who opened and read those

files before November 3, 2025?
MR. OSLICK: Objection to the form.
THE WITNESS: Just again, I -- I don't know what other people did. I can just speak for myself and what I did.
BY MR. RAO:
Q Can you give me the names of EPAM's Life Sciences leadership who would have access to this report?
A And I don't know with whom this report was shared, so I'm not going to do it.
Q You provided a declaration for the November 4th or the November 5th temporary restraining order hearing under Judge Wendy Beetlestone as -- did you review that report as -- in -- in preparation for your declaration?
MR. OSLICK: Objection to the form.
THE WITNESS: Can you repeat the question again?
BY MR. RAO:
Q In -- as part of your -- when -- you wrote a declaration for the temporary restraining order hearing under Judge Wendy Beetlestone, yes or no?
A I do not remember the judge's name so I cannot speculate on that. Sorry. I -- I should not,

but I don't. What declaration? What -- did I write a declaration?

Q You wrote a declaration for --

A The declaration -- specifically?

Q Did you write any declaration for this litigation?

A I did.

Q Can you state the declaration that you wrote?

A The name of the declaration, I don't remember.

Q You wrote the declaration, sir. It's your fact. You should state the declaration.

A I do not remember the words or the name of the declaration. If you would provide me with a printed version, I would tell you that yes I wrote this or no I didn't, but I can I hold the names of files or declaration names and -- and details in my head. Sorry.

Q Are you saying under oath that you presented a document to a federal court and you do not recall it right now?

MR. OSLICK: Objection to the form.

THE WITNESS: Say that I will tell you that I presented the declaration. I believe it was

called restraining order in regards to that litigation that is related to downloading software and putting restraining order and I declared several things. Don't remember specific name of this declaration. That's what I'm -- what I'm stating.

BY MR. RAO:

Q And to write the declaration, how did you prepare for the content?

A I --

MR. OSLICK: Again, and, Mr. Klebanov, to the extent that the preparation of your declaration involved work product, namely, you know, materials generated in connection with this litigation or communications with Counsel, I would instruct you not to answer.

THE WITNESS: I will take your advice then not to answer.

BY MR. RAO:

Q Did you review the report from the global head of IT security to prepare for that declaration?

A I did review the reports and I consulted with internal IT support folks to validate certain information.

Q Did you hand type that declaration?

MR. OSLICK: Again, Mr. Klebanov, to

the extent that these questions regarding the exact preparation of your declaration involve communications with Counsel or material prepared in connection with this litigation, i.e. in this case your declaration filed in court, I would instruct you not to answer.

THE WITNESS: Choose that response.

BY MR. RAO:

Q Are you refusing to state that whether you typed the declaration?

A Stating is that it's privileged information?

Q No. The fact of you typing is not privileged information.

MR. OSLICK: That is incorrect. I'm instructing him not to answer.

MR. RAO: For the record, Mr. Oslick has instructed the witness not to answer the question whether the witness typed his own declaration.

BY MR. RAO:

Q Can you tell me the content of the report given by the global head of IT security?

A The report that I remember was given to me included information about files that were downloaded from a SharePoint side in the GitLab repository and different other activities that were performed in those files.

Q Did you go through those files and classify them as trade secrets and not trade secrets?
A I reviewed those files together with my IT help and support and labeled certain repositories that were -- or files that were downloaded as possibly containing an EPAM intellectual property or a client intellectual property.
Q Did those files have software in them?
A Files? Which files? The --
Q The files that the global head of IT security alleged that I downloaded.
A The GitLab by definition the source code software is something that is already built but the source code is --
Q Did it have files that were owned by a client?
A There were certain repositories that we categorize as a client's IP.
Q So they were owned by the client, yes or no?
A Client's IP.
Q So they were owned by the client, yes or no?
A -- an IP is owned by the client.
Q And did those files include Takeda's IP?
MR. OSLICK: Objection to the form.
THE WITNESS: I do not recall specific

repositories, meaning Takeda specific repository and what intellectual property or license was associated with those repositories.
BY MR. RAO:
Q What date did you know about this download?
A I knew about your activities on SharePoint site, I believe, prior to termination. Specific file, I cannot recall a specific date when it was shared. But it was shortly before that that or shortly after.
Q What else did you know that made you decide to terminate me?
A Again, can you repeat your question?
Q What else did you know that made you decide to terminate my employment on October 15 --
MR. OSLICK: Objection to the form.
THE WITNESS: You bundled multiple questions. "What else did you decide?" And also "Terminate me." So what else was -- besides what?
BY MR. RAO:
Q What else did you know that led to your decision to terminate me on October 15, 2025?
MR. OSLICK: Objection to the form.
THE WITNESS: Again, let's separate the termination and decisions was what was -- what factors led into termination? The commit that you did for one

of the -- associated with internal IP where you claimed copyright by Gowtham Rao plus an open source license -- but prior to that was escalated to me that you deleted some files on SharePoint side and tried to double delete to also hide some of the activities.

And one was your -- a month-long behavior and interaction with HR trying to get out of the employment covenants and clearly kind of showing the intent that you're planning to leave EPAM. So many of those factors kind of played a role. But the last one was the -- the license file that you committed.

BY MR. RAO:

Q Were you aware of the downloads before the decision to terminate me?

A I do not recall specific date. I don't believe I was aware at the time. I think it was -- was done after termination.

Q I can't even hear you. Sorry.

A I do not believe it was done -- it -- we knew but downloads prior to your termination. But it was discovered I think shortly after.

Q So somebody knew about my downloads before my termination?

A I cannot speculate to what IT security knew

at the time.

Q Sure. But did anybody tell you that they knew about the downloads before October 15, 2025, and that is outside the IT report?

A Before the termination, I do not recall specific date and time, but I do not believe the downloads were given to me prior to your termination.

Q Okay. So suffice to say, the reason for the termination -- the immediate reasons for the termination was the MIT license, I think?

A There were multiple factors and that was the -- the final drop but also the escalation by one of the team members that you deleted and double deleted and manipulated several files on the SharePoint site related to some of the products that we're developing.

Q Can you elaborate what double deletion is?

A Meaning that you delete it and then went into delete and also tried to delete it again.

Q What does that mean?

A It means that you tried to erase something from a recycle bin to thinking -- probably what it means is the thinking probably that is not going to be recovered.

Q And going back to the license, tell me what

happened in your own words.

A Happened in my words would be speculating because it was your actions.

Q What is your understanding of what happened?

A My interpretation of what happened is you trying to claim what -- a copyright claim on the file that was developed by EPAM and the license. Maybe it was an intent to be terminated. Because I know that you were trying to get out of the non-compete agreements looking to be terminated, but it's my speculation here.

Q Sure.

A -- what your specific motives were at the time.

Q And what repositories was that license applied?

A And I am relying on IT people to share this information with me and specifically I do not manage those repositories but based on what I've been told, those repositories were related to something that was going to be deployed into Takeda.

Q It -- was EPAM Synapse affected by my application of license?

A I don't understand how a single commit can affect the -- what this mean affected by? Sorry, can

you restate your question?
Q So there was -- so there's an act of putting a license on a software repository; right? And that was you stated code that was being deployed for Takeda.
A Based on my understanding of the matter and feedback from people at the time.
Q So the -- I am asking about EPAM Synapse. Did I put a copyright license note on EPAM Synapse repository?
A I wouldn't be able to tell you that.
Q Are you aware of any report that EPAM Synapse code was affected by my commit of a license?
A I'm not aware of any report like that.
Q Did I have access to EPAM Synapse codebase?
A Again, that's -- I'm not an IT support who's managing -- who's managing access and controls access. My understanding based on feedback again from IT support that you did have access to all the relevant code repositories.
Q But I was the lead for the EPAM Synapse?
A You were a business leader.
Q And I had access to the codebase; correct?
A As a part of the -- your role, you had access -- to my understanding based on the feedback

from IT support people, you had the access to the repository.

Q You just swore that I put the license on the Takeda Synapse codebase?

MR. OSLICK: Objection to the form.

THE WITNESS: I -- again, clarification. Based on what you're saying, I stated that -- I'm sorry, say it again, the question.

MR. RAO: Based on -- Court Reporter, could you repeat the question that I --

THE WITNESS: Could you repeat the question?

THE REPORTER: Yeah, give me one second.

(The reporter repeated the record as requested.)

THE WITNESS: I stated that based on the input from IT support folks that --

THE REPORTER: Oh, it's very hard to hear you now. I'm sorry. I don't know what just happened right there.

THE WITNESS: -- I'm going to restate. Based on the feedback that I received from IT support people, the commit in question was related to the codebase that is being deployed into Takeda

repository -- into Takeda environment.
BY MR. RAO:
Q Has that license commit been reversed or is it still an MIT license?
MR. OSLICK: Objection to the form.
THE WITNESS: Again, I'm not responsible for code management.
BY MR. RAO:
Q What do you understand from the word "trade secret," Mr. Klebanov?
A Trade secret is -- again, I'm not a -- full disclaimer, I'm not an attorney. Going to give you my interpretation. But a trade secret is anything that was developed within the company, funded within the company, was a company effort that has a commercial value to the company.
Q What do you understand from confidential information, Mr. Klebanov?
A The different information types according to the information classification in any big publicly traded company like EPAM, so there's public information -- information, strictly confidential information, to my best understanding, again, I'm not a compliance expert, I'm not a information security expert, but to my best understanding, confidential is

anything that is privileged to the company and not exposed to the public and only exposed to people on a need to know basis or clients under a specific -- on a need to know basis or not.

Q Is there a difference between a trade secret and a confidential information?

A Confidential information in my understanding is a broader term which trade secret would fall into.

Q When you reviewed the 44,160 files, the names, did you classify them into trade secrets or confidential information?

A Again, I obtain help with our IT experts. I did not personally review or pull 40-something thousand files. But based on again -- grouping of those files, we assigned an intellectual property tax, whether it's owned by EPAM or client, but also confidential and probably public permission as well.

Q When you reviewed those files -- file list, were you aware that some of these files were from SharePoint and some of those files -- did you know the sources that these files came from?

MR. OSLICK: Objection to the form.

THE WITNESS: Again, the IT InfoSec security report had different tabs with files related to a SharePoint and files related to GitLab. So based

on that information provided to me, I could see, I guess, the source of the -- the type of a file it is.

BY MR. RAO:

Q Did you know that the Federal Defense Trade Secret Act has a statutory definition for a trade secret?

A I'm not an attorney, and I cannot tell you.

Q You made a declaration that those files contain trade secrets. Did you look -- did you -- when you said that trade secrets, were you referring to the statutory definition of trade secrets or your understanding of the word "trade secrets"?

A And as I already answered this question, I'm not an attorney, so I have a certain understanding of the words of the trade secret, which is what I based my decision upon.

Q Does EPAM keep trade secrets on a Microsoft SharePoint site?

A I'm not an EPAM, well, you know, person. I cannot speak for EPAM.

Q Was -- well, did I have access to SharePoint systems inside EPAM that you were not responsible for?

A Based on your specific project's assignment, I would assume that you were given access to SharePoint sites that -- that are not in my

jurisdiction, but I have no specific way of knowing that.

Q Did I report to you when I was working for EPAM, Mr. Klebanov?

A You did report to me.

Q Do your employees have access that you are not aware of?

A My employees do not report the project or file access. I know of the projects they're working on, but I'm not managing the access and files that they have access to.

Q Do your team members put codebases inside Microsoft SharePoint folders?

A I'm not an IT person. I do not know the -- the software development practices for the EPAM.

Q How about in your own -- you have a delivery organization in the EPAM; correct?

A I have a delivery organization specific to -- business unit, but similarly, I'm not a technical person who's -- I'm not responsible for day-to-day code management or repository management or any administrative tasks.

Q The delivery team responsible for code management and day-to-day code-based management?

A The software engineering team or teams or

specific people with specific administrative access. Not everybody but the people who are administrators who are responsible for access controls, who are responsible for code management.

Q Does anybody reporting to you directly or indirectly have these types of privileges?

MR. OSLICK: Objection to the form.

THE WITNESS: Privileges? Define specific privileges.

BY MR. RAO:

Q Just said managing codebases, repositories.

A There are people under my report line directly and indirectly who are managing repositories or have access to codebases.

Q Do they give authorized access to other employees in your team?

A As I mentioned, they provide access on a need to know basis. You have to have a specific reason why you would have access to specific codebase. However, I'm not an administrator and I cannot tell you specific best practice or a specific process within EPAM.

Q Do you -- have you written any policies or stated any policies as the leader of the organizations of how to protect IP?

A As a part of the EPAM?
MR. OSLICK: Objection to the form.
BY MR. RAO:
Q As a part of your unit?
THE WITNESS: Sorry, Jacob, said, "Objection." I'm just clarifying.
MR. RAO: Witness appears to be asking for guidance from attorney.
MR. OSLICK: That is completely false.
THE WITNESS: I asked attorney to repeat his statement. I think he said, "Objection." I did not hear because you were speaking at the same time.
BY MR. RAO:
Q So let's move on. The -- do your team members who have those administrative privileges who are part of the delivery team assign authorization to access on a need to know basis to other members in your team?
A Can you repeat --
Q Does an employee that is in your team who has administrative privileges assign responsibility of access to another employee in your team?
MR. OSLICK: Objection to the form.
THE WITNESS: I should not manage

my -- do not prescribe any particular best practices or processes to the employees who are responsible for repository code management. They follow practices that are established by EPAM, not me.

BY MR. RAO:

Q Do you -- in your organization that you lead, have you provided any instructions to your own team members of how to safeguard codebases?

A The general EPAM policies, code of conduct policies, and different other trainings that only EPAM employees would take. I do not take these or prescribe any particular process because it's not in my agreement. I follow processes as being guided by a broader EFA organization.

Q You are an employee in your organization who's got the administrative privileges?

MR. OSLICK: Objection to the form.

THE WITNESS: Again, this administrative privileges specifically --

BY MR. RAO:

Q Is Konstantin an administrator in your organization?

A Konstantin is our -- for DevOps person who has certain administrative privileges to certain repositories.

Q And Konstantin provides privileges to other employees in your organization?
A Konstantin is being guided by EPAM processes and me being an administrator, I cannot tell you whether he cannot or cannot do that.
Q Do you have administrative privileges yourself?
A I do not. It's not in my job agreement to control access to -- okay.
THE WITNESS: Can you -- can you hear me Matthew?
THE REPORTER: I missed the last word of that actually. "It's not -- it's not in my to job to control access to" --
THE WITNESS: Could you repeat the question?
MR. RAO: The witness asked me to repeat the question.
BY MR. RAO:
Q Do you, Mr. Klebanov, have administrative privileges on code repositories inside your organization?
A Code repositories, again, is not in my job description to manage code repositories.
Q Question was do you have administrative

privileges?
A And I -- as I said, I would not know if I have administrative privileges because it's not in my job requirements, but I would -- would assume that based on my job and responsibilities, I probably do not have administrative privileges.
Q Do the people who have those administrative privileges follow EPAM's policies?
A I would -- every employee at EPAM is responsible to take mandated trainings that include a code of conduct and -- they might take some other trainings. So I would refer them to those trainings and whatever the policies they have to follow.
Q Was I given access based on such EPAM policies?
A Was -- was you --
Q Was I given access to the court repositories based on such EPAM's policies?
A You have to ask the administrator to answer this question, but I would assume that would be -- he would be following the -- the practice but you would have to raise this question with the administrator.
Q Are you aware that I was using my own personal computer during my time as an EPAM employee?
A I was aware that you were using a personal

device, but I would assume again that any personal device that is being utilized by an employee at EPAM would follow EPAM standard practices and policies and again would be specially configured and approved by EPAM administrators who are responsible for that process.

Q What was the first time you were aware that I was using my own personal devices?

A I wasn't specifically aware that you were using your personal device, but I knew that you were -- wanted to use your personal device for some of the open source activities that you were planning for -- I was also aware that you had a corporate laptop and I -- I would assume that any business client, specifically business related activities that will include confidential information, would use a corporate laptop or a corporate Apple device.

Q But you also said that in certain conditions you would be -- you would -- you -- let me reframe the question.

Are employees of EPAM allowed to use their personal computers under certain conditions?

A There is a bring-your-own-device policy that was active at the time. Again, there are certain policies in place to what is considered to be a device

that can be used by an employee for a business which includes specific EPAM-specific software guardrails and things like that. There is a bring-your-own-device policy that was instituted.

Q Does that policy allow access to EPAM's codebase?

A I'm not a developer. I wouldn't know.

Q Do developers use their own devices to access codebase?

A Again, I'm not -- cannot speak for all or any of the developers. I'm not a developer.

Q Are you aware of any developer who's using their own personal devices to write code or access code of EPAM?

A I would expect any employee to follow EPAM's standard processes and I do not ask an employee of what specifically device they use as long as they're compliant with the policy.

Q You aware of any EPAM employee who was accessing EPAM'S codebase using their own personal devices?

A As I said, I do not ask an employee what device they use. I'm assuming that employee as any employee at EPAM would take a specific -- would follow a specific employee code of conduct and -- and

processes set up by EPAM whether it's personal device that's been approved or the corporate laptop that is provided to them.

Q I understand the policy but the question is are you aware? It's a yes or no question?

A I am not aware because I never asked this question.

Q Okay. So you never asked anybody if they're using their personal device to access EPAM's codebase?

A Never, again, is a broad word. I do not --

Q I said never.

A Take it back. Maybe I'll say I do not recall asking this question employees in my development team at EPAM.

Q Does EPAM allow the use of GitHub by its employees?

A And I'm not a date -- how do you say? I'm not up to date on technology and GitHub or GitLab policies within EPAM, so I cannot comment on that.

Q Does EPAM Data Science Unit maintain a public GitHub organization?

A And I'm not responsible for code development, so have no way of saying yes or no. I know that EPAM does maintain some public repositories for some of those --

Q You're responsible for your team; correct, Mr. Klebanov?
A I am responsible for my business unit.
Q You're also responsible for your team members contract?
A I am responsible to make sure that all of my team members are up to date on their trainings and follow the policies. If they are not, it is being escalated to me as necessary and then I would work with appropriate EPAM organizations to mitigate those issues if there are ever --
Q Because of the special status of Odysseus in EPAM, you have both a business unit and a delivery unit; correct?
MR. OSLICK: Objection to the form.
THE WITNESS: In EPAM, EPAM is a publicly traded company and when we got acquired by EPAM, we became a part of the public traded company. We follow EPAM's policies and structure and organization that the compliance -- the processes that we need to be compliant with.
In my business unit, which is a former Odysseus, we do have a delivery organization and a management organization embedded, but we can work part of a -- EPAM.

BY MR. RAO:

Q Do you have a delivery unit, Mr. Klebanov?

A I -- we do not explicitly call it a delivery unit because we're still -- under the former structure. We have no definitions.

Q Do you have people who write code, Mr. Klebanov?

A Yes. People who write code.

Q Do they make EPAM's intellectual property?

A By definition, any employee who develops code or produces any material that is property of EPAM, they -- intellectual property for EPAM.

Q Have you ever instructed them or talked to them about the idea of a secret?

MR. OSLICK: Objection to the form.

THE WITNESS: Again, I'm not a -- an attorney and they just have to follow the standard code of conduct of potential information policies and many other policies for a mandatory and many cases training that they have to take. So that those definitions exist in those trainings.

BY MR. RAO:

Q Have you ever given training or know of any training about the idea of a trade secret among your employees?

A Ever -- again or within EPAM?
Q Within EPAM?
A Again, those definitions -- I'm not an attorney. Those definitions exist -- policies that and trainings that people are required to take? I do not specifically -- being -- not being an attorney, I cannot specifically define what those definitions means. It's not my responsibility.
Q Have you instructed anybody in your team that the EPAM Synapse is a secret?
MR. OSLICK: Objection to the form.
THE WITNESS: Again, by default, any codebase that is developed by EPAM is a confidential information period. And you said EPAM Synapse. Again, there is a codebase -- EPAM project book. It's called Synapse and there is a codebase that was deployed into Takeda. But again, by definition any information should be treated as confidential.
BY MR. RAO:
Q Is an employee -- was an employee -- when I was an employee of EPAM able to go to EPAM's code repository and download it to their personal device?
A Restate the question.
Q As an employee of EPAM, did EPAM's IT security allow an EPAM employee to download codebase

to their personal computers?

MR. OSLICK: Objection to the form.

THE WITNESS: You were given a certain privileged access to certain repositories and based on that access, certain privileges were given to you assuming that you would still comply as an employee with an employee code of conduct confidential information, not -- whether you were downloading it on a personal device or -- or a -- a corporate issued laptop, I have no way of going.

BY MR. RAO:

Q That's true. But was it possible for an employee to download codebase from an EPAM's code repository to their personal computer?

A I'm not going to speculate on possible code repository. It's not my job.

Q Suffice to say you did not write a trade secret policy; correct?

A Correct. The policies within EPAM are produced by, I don't know -- know what specific team, but the people who were hired to produce those policies. It's their job.

Q Did you talk to me ever about the idea of a trade secret?

A I do not recall talking to you about a trade

secret.

Q Did you ever tell me who was leading EPAM Synapse that this is a trade secret?

A We were discussing the license types. We were discussing intellectual property. I -- again, my memory cannot go back and remember every single conversation on every single keyword. I cannot recollect us talking about trade secret.

Q On September 19th, I brought to your notice that Mr. Ram Varma, a Gilead employee, had reported that he -- that Gilead had found out that your business unit had represented two EPAM employees to be in the U.S. when they were in Eastern Europe; is that true?

MR. OSLICK: Objection to the form.

THE WITNESS: Can you show me this communication, sir?

BY MR. RAO:

Q This is by recall. Do you recall?

MR. OSLICK: Objection to the form.

THE WITNESS: Restate it again. I don't remember the question.

BY MR. RAO:

Q Was there a communication from me conveying what I heard from Mr. Ram Varma about employees being

reported to be in the U.S. when they were truly in Eastern Europe?

A I do not remember a specific wording in specific conversation. I remember you escalating a request from Ram to deal with a certain issue related to personal location, which I advised you to -- to -- we already escalated, I believe at the time to a proper delivery manager to take care of. And this proper delivery manager already was taking care of this issue. And I believe we exchanged the message saying that it's already been taken care of when we aware of the request -- the issue.

Q What was the issue?

A Again, I would not classify it as an issue. It -- to my best recollection, there was a mistake that was made by a delivery manager filling out a mandatory onboarding form of our staff into a -- environment where they accidentally by copying and paste, I believe, specified a wrong employee location. Person who was in Serbia was specified as being a U.S., which then would be flagged, and we immediately acknowledged the mistake and error and mitigated that and the person --

Q And when did that happen, Mr. Klebanov?

A I cannot tell you specific dates or I just

can't remember those dates --
Q Who brought it to your attention for the first time?
A For the first time? Again, I believe we already knew -- were aware of this issue. It came from someone. Cannot recall a specific name. Probably -- but I'm not going to speculate.
Q Is that an important instance when a client says that they found a certain form was accidentally mistyped?
A Can you restate your question again?
Q Is this an important event when a client states that a form was mistyped with saying that an employee is in U.S. when they truly are in Serbia?
MR. OSLICK: Objection to the form.
BY MR. RAO:
Q Is it an important event or not important?
A It's an event that happened not frequently by mistake and there are multiple steps to make sure that if it does happen, the information is validated and -- and captured and corrected if needed. So it's an event. It's not -- any -- any communication from a client is important, but I cannot classify this specific event as being extraordinary or something.
Q Do you remember the billing rate of the

employee who was being onboarded? Is there a difference in billing rate for employees who are represented to be in the U.S. versus Serbia?

A Yes, there is a billing rate difference.

Q Was there a change in the billing rate when the form was corrected?

A I do not remember a specific type of a contract. And as I said, I do not believe that this employee was ever -- but in some cases the billing rate doesn't really make any difference because it's a fixed -- contract.

Q You said it doesn't happen frequently. How many times did that -- has this happened?

A I cannot give you a specific number of times -- times or types of mistakes that are being made by -- by people. Everybody makes mistakes occasionally, but there are multiple steps in the process to validate information and make sure that information is valid in compliance policies and -- and take clients requests.

Q Are these "informations" always escalated to you or is it -- but -- is it rare that things are escalated to you?

MR. OSLICK: Objection to the form.

THE WITNESS: Again, these instances

again were always a very broad questions. There was no incident and there was a request from a client asking a question of which we handled. And some cases it's either it can be escalated to me, but in some cases would be handled by an appropriate delivery manager if necessary. I believe in this case a client texted several people at the same time or separately. I don't know if it's the same time.

BY MR. RAO:

Q Do you recall of any other instances that a client like Gilead said a similar pattern of an EPAM employee being told to be in geographic area A when they were truly in geographic area B.

A I know this specific example that you were referring to. I do not recall any other examples.

Q I -- previously, I asked you to read an exhibit that had a conversation in -- that was dated December 2024. Could you recall from memory and tell me what that instance was?

A Sorry, what -- can I see this --

Q Do you remember of any other instance of an EPAM employee being reported to be in a different geographic area by a client?

MR. OSLICK: Objection to the form.

THE WITNESS: If you could refer a

specific communication, I can look at it again -- know what you're referring to, what exhibits. We looked look at several today. I cannot recollect every single one of them or every message that was written. Some of them you did not want me to read.

BY MR. RAO:

Q Okay. On September 19th when I reported this to you, did you think of me as a troublemaker?

MR. OSLICK: Objection to the form.

THE WITNESS: When you sent me -- when there was an email or a text message, I didn't think of you in any specific way. I took the information then before that already were taken care of it by another person, so -- think of you as a troublemaker.

BY MR. RAO:

Q When I emailed Ms. Katie Barista on September 9th about the Takeda MSA, did you think of me as a troublemaker?

A Again, going back to the conversation that I do not recall in the empty email messages. I do not know how to answer this question because it doesn't make sense.

Q On June 17th, you gave me a verbal notice of an organizational change; correct?

MR. OSLICK: Objection to the form.

BY MR. RAO:

Q September 17, 2025.

A And what's the question?

Q Gave me a verbal notification of an organizational change; correct?

A I gave you a notification of you being world changing and being moved into a different organization.

Q And what do you recall of that day -- that meeting?

A I explained the reasons we discussed. You were not drilled and that's a summary of what the conversation was about.

Q What reasons?

A The reasons that I provided to you were multiple and includes you not succeeding in the head of data science role, specifically in revenue generation, specifically in bringing -- studies, selling -- designs primarily focused on AI projects and AI software development. And we also thought that it would be better fit with your ambitions to have a different role that would focus on your strengths, which is AI software development and your ambitions in and transfer the -- the head of data science role to someone else who would lead the team going forward.

Q And was there a direction from EPAM board or board of directors or anybody in leadership to reduce costs?

A Again, that's a very loaded question because to my -- I cannot speak for the board of directors of EPAM. It's a big publicly traded company, so I'm not going to answer that question from a board of directors perspective. There was a -- there was a -- as any organization that has a P&L associated with it, our goal is to increase revenue while decreasing the costs; right? It's the nature for any commercial organization, growing revenue while containing or hopefully minimizing costs since the -- that's it basically. That's the idea.

Q Was there a direction to you to increase the revenue and reduce the cost by eliminating my position?

MR. OSLICK: Objection to the form.

THE WITNESS: Again, it's very loaded question. There's a job that I hold that is responsible for -- for P&L and my job also dictates that I have to -- revenue while managing the costs and different venues to achieve both of them. Again, in your specific situation, the reasons for a role change I clearly stated two minutes ago.

BY MR. RAO:
Q Was the role change related to my performance?
A That's one of the reasons; right? The revenue generation was one of your responsibilities. Building revenue, whether it's related to the data science specific projects or revenue related to broader EPAM, bringing in specific growing data science team was one of your responsibilities and specifically growing an area of protocol driven studies of scientific design material -- unfortunately those things did not materialize and that performance was not what we expect from a data science lead.
Q Was EPAM Synapse part of that data science responsibility?
A Typically projects like that would not fall into a data science lead responsibility. That would fall into software engineering --
Q Was the revenue potential -- what was the revenue potential of EPAM Synapse?
MR. OSLICK: Objection to the form.
THE WITNESS: Revenue potential is what you shared with me; however, those revenue numbers never materialized. I do not recall specific numbers that you shared at the time or multiple times, but

there were millions and unfortunately none of those millions materialized.

BY MR. RAO:

Q What was the revenue of the data science core function?

A As of when in?

Q September 2024 -- as of -- in the 2025 -- in the financial year 2025.

A I cannot tell you specific --

Q In the calendar year 2025.

A I don't know specific numbers. Don't remember specific numbers.

Q Do you have an average -- month-to-month average?

A No, we don't track numbers on a month to month per business unit. Or rather -- restate it, we don't -- I don't pay attention in many cases unless there's a need.

Q What was the baseline month-to-month revenue of the data science business unit before I joined?

A Again, I don't recall specific numbers. It's been many years. And I also will disclaim that -- multiple things. That being a private company versus publicly traded company brings different accounting methods that we use for a different level

cash basis versus accrual basis as a publicly traded company. Plus our fiscal year was different. Our fiscal year started in April, ended in March. And EPAM's calendar year -- fiscal year is a calendar year. So those things complicated reporting when we transitioned into EPAM especially in the year one, which is 2024.

Q Is it accurate to say that you had not finished in a single year before I became an employee of EPAM --

A Sorry, can you restate the question?

Q Is it accurate to say that you had -- it had not been one full year before Odysseus gotten acquired by EPAM when I joined?

A I don't understand the question the way you stated it.

Q When I joined EPAM --

A Right.

Q -- how long was Odysseus part of EPAM?

A Right. Okay. When you joined EPAM in November 24th, we got acquired in June 24th. Yeah, I'll do the math. June, July, August, September, October. Two -- five months.

Q About six months. What was the revenue in that six months of the data science position?

A And I cannot recall the numbers in my head.
Q So even with being a publicly traded company, you did not have good accounting for the five months for the data science position; correct?
MR. OSLICK: Objection to the form.
THE WITNESS: This is not a correctly statement -- stated question because EPAM has been a publicly traded company, follows very strict accounting rules and -- strict accounting rules. Complicated matter is the projects in flight, projects being transitioned, system integration transitioning to EPAM systems transitioning to EPAM projects and but EPAM follows very strict accounting rules being publicly traded company.
BY MR. RAO:
Q When you were recruiting me in October 2024, do you remember our in-person meeting at the Odyssey Symposium?
A I remember us meeting at the Odyssey Symposium.
Q You remember us sitting together in the common area and you describing the different business units under you?
A I do not remember sitting together and I do not remember this particular conversation, but no, I

don't remember much.

Q You remember sitting at the -- where the exhibit booths were when we sat together? Nobody was there at the end of the day, and you describing the different revenue streams?

A Sorry, I do not recall.

Q You remember writing on a piece of paper the different business units?

A I do not recall.

Q You remember giving me an estimate of revenue by business unit?

A Again, I have no recollection. I probably would not give you any precise numbers without actually consulting with the actual numbers.

Q If I present to you an exhibit which has a photo of us sitting together, would that help you with the recall?

A Photos of us sitting together probably would not help me to recall specific conversation on the numbers that according to you I gave you.

Q You described to me the revenue -- expected revenue of the data science business unit at the time of recruitment.

A I cannot recall specific number -- specific conversation. I probably did not give you a specific

number at the time or precise number.

Q When was the first time you gave me some number about the expected revenue of the data science position?

A We started talking about numbers -- again, I cannot recall specific date or a specific time, but we continuously talk about numbers probably in Q1 in 2025.

Q You're aware of any written documentation in Q1 of 2025 about revenue expectations for the data science unit?

A I've seen documents that stated our generated revenue in approximately and the disclaimer of accounting differences and accounting practices and accruing methods and things like that and some of the slides. And what was the question? Please repeat it again if --

Q Are you aware of any documentation of expected revenue for the data science business unit that you shared with me in quarter one of 2025?

A In quarter one of 2025, I do not recall sharing a written number --

Q Remember the first time you shared a written number with me?

A I shared a confirmed number. I believe it

was sometime in Q2 '25 during the -- sometime midyear conversations -- midyear reviews.

Q And what was the number?

A I believe in that role description document that I shared with you, I believe I stated -- again, I could be wrong, but I -- a fiscal year revenue numbers previous was 2 million. I do not recall what I said in the target revenue but probably over 2 million.

Q Was that a verbal discussion or an email?

A It was an email conversation. It was both verbal and then followed up by an email conversation and some numbers at the bottom.

Q Was there an email response from me?

A It do not believe you ever gave me an email response.

Q Was there a verbal response from me?

A Depends. What do you mean by a verbal response? Because you presented projected revenue on a continuous basis ever since the beginning of your employment to several people, including myself and the head of life sciences and healthcare business unit. And I believe in those PowerPoint slides you had a -- a certain target number -- so you knew about the targets that we set up and you also obtained financial information and performance and -- to those reports.

I do not remember the exact dates and times of those reports that you shared with myself and the leadership team.

Q Was that number consistent with prior years?

MR. OSLICK: Objection to the form.

BY MR. RAO:

Q Two million or something that we said was in written form.

A It consistent -- it was about consistent with --

Q Year to year, if you say performance of prior years, the year before. You were in the data science business for some time.

A Yes. So all right. Data science business unit was growing up until, well, it was growing in '23 and previous years. Again, as I said, there are several accounting methods. There are some, sorry, different accounting methods that exist between a privately held company and publicly held companies -- public -- publicly traded companies. It was very difficult to stitch those reports together, but I believe the numbers were set to be achievable and reasonable.

What concerned me is that we were not on a growing trajectory. We were on a losing trajectory.

Our revenue was not growing but decreasing consistently. So it didn't really make any difference what targets you set up if your revenue keeps falling.

Q So the question was, was that number that you shared in email projected based on prior experiences or was that a number that you gave?

MR. OSLICK: Objection to the form.

THE WITNESS: In any organization that is commercial organization, the goals and objectives and targets set up on a regular basis, there is an intent of growing revenue. So any number that is given is based on the idea that the revenue must be growing. The business must be growing, and we as business leaders, including yourself, should be attempting to grow the revenue and grow the business and decrease the costs. So that's how goals and objectives are being set up in any organization.

BY MR. RAO:

Q So would it be fair to say that June 2025 was the first time you ever communicated a number in written form?

MR. OSLICK: Objection to the form.

THE WITNESS: Well, that was not the first time I communicated the numbers. I believe we had numbers discussed verbally and probably some

written material previously.

That was the first time when I restated the number and also restated the -- the job description so to make sure that you focus on certain expected goals and respect objectives within your job, within your specific role.

BY MR. RAO:

Q Are you not sure if there was a written communication before June 2025?

A Cannot recall if there was a written communication, but we had several meetings. Actually, I'm going leadership team meetings where you -- where you of where we continuously on a weekly or biweekly basis put the numbers on the screen and discussed the revenue, discussed the pipeline, discussed the portfolio.

Q You do not recall any affirmation from me in written form to that June 2025 communication?

MR. OSLICK: Objection to the form.

THE WITNESS: Can you restate the question?

BY MR. RAO:

Q Do you remember of any affirmative -- do you remember if I said yes or affirmative -- sorry, let me restate.

Do you remember if I acknowledged or agreed to the number you gave in June 2025?

A You did not object to the number and as a part of your role, I don't know if I was looking for any yes or no statements simply acknowledging your goals as a business -- sub-business unit lead. I think I might have even followed up on my email to you asking for a response. I do not remember if you respond.

MR. OSLICK: Can we take a break after the next question?

BY MR. RAO:

Q And do you -- in this conversation, you did not tell me that the number that you gave me in June was based on prior revenue that Odysseus or EPAM has achieved in data science; correct?

MR. OSLICK: Objection to the form.

BY MR. RAO:

Q Yes or no?

A In this conversation, I shared both estimated previous revenue and estimated target for a new upcoming year. Both of them were, I believe in the same document in the same email.

Q Now, in today's conversation right now here under oath, that numbers that you gave me, were they

based on projections and experience of prior years or was it a number that you said is an ideal target?

MR. OSLICK: Objection to the form.

THE WITNESS: I don't understand the -- the difference. I'm sorry.

BY MR. RAO:

Q Okay. That number that you gave in June 2025, was that based on your commitments to EPAM leadership or was it based on a reasonable target you set based on prior years of experience?

MR. OSLICK: Objection to the form.

THE WITNESS: Again, why do you think that the number is unreasonable?

BY MR. RAO:

Q -- please answer the question.

A -- answer the question. My opinion, numbers that we set would be the target goals and obviously reasonable in my personal opinion achieving.

Q It's your personal opinion that that numbers were reasonable and you gave me a personal opinion in June 2025; correct?

A Is correct.

MR. RAO: We can take a break.

THE REPORTER: Okay. 3:16, we are off the record.

(Off the record.)

THE REPORTER: It's 3:27. We are on the record.

BY MR. RAO:

Q Mr. Klebanov, during the recess, did Mr. Oslick or Sarah or any attorneys coach you, speak to you about this litigation?

A No.

Q Did you communicate with anybody or an attorney on this topic?

A No.

Q So, Mr. Klebanov, I wanted to ask you, you made the decision to terminate me; correct?

A I was a part of the decision to terminate -- terminate your employment.

Q So on October 15th, you made the decision -- you were the primary decision maker for the termination; correct?

A Decision was made by the head of life sciences business unit, which I supported.

Q So -- so the decision was made by Greg Killian, then?

A I supported this decision.

Q You shared the decision with me?

A I shared the decision with you.

Q What was the -- and what -- did you give the recommendation to Mr. Killian to -- to authorize the termination?
A I supported his decision. I shared the facts with Greg Killian.
Q What facts did you share?
A Facts that we previously discussed. I believe at the time, I shared the information about the license commit issue and also your SharePoint activities issue.
Q Now, EPAM in the second amended complaint has stated that the commit issue that you just mentioned may not have been intentional. Where you -- can you explain that?
MR. OSLICK: Objection to the form.
THE WITNESS: -- that information.
BY MR. RAO:
Q When the -- did you investigate the commit issue that you just mentioned before terminating, before making the recommendation to terminate?
A This issue was reported by other employees. I am not in position to personally investigate, but it was not the only reason for termination. It just --
Q Can you -- sorry. Can you describe the commit issue to me?

A Based on how I understand it happened?
Q Yes.
A If -- to my best recollection of this matter, again, I -- was reported by someone else that you committed the file that contained copyright by Gowtham Rao -- as well as the -- the license, open source license type that we -- that were not applicable or not compatible with licenses we previously discussed. That was the issue that was reported to me as well as the activities that you did in SharePoint site with file deletions, double deletions.
Q And the -- and obviously, you already swore under oath that you did not know about the download activities on October 15th before the decision -- before terminating; correct?
A I said testimony I do not recall exactly the date when it happened, but I believe it happened after.
Q And do you remember what time of the day approximately you terminated my employment from EPAM? Was it a morning or afternoon?
A I don't remember a specific time. If -- I would be trying to guess, probably somewhere afternoon.

Q Somewhere in the afternoon.
A I don't know.
Q No? Okay. You came on the call with Larry McKlaine for issuing the termination notice; right? Is that correct?
A Larry McKlaine and myself and you, we -- we had a conference call.
Q Right. So you obviously met with Larry McKlaine to communicate this before you met with me; correct?
A I met with Larry McKlaine. We agreed on the message that I was giving to -- giving to you.
Q Was that on October 14th or October 15th, sir?
A I do not remember on the specific date on when we met with Larry McKlaine.
Q Was it immediately before my termination notice or was it a long time before my termination notice?
A Can you repeat the question?
Q Was it immediately before my termination notice or a long time before my termination notice?
A The meeting with Larry McKlaine on -- on your termination? Your termination was based on the activities that you did related to -- to the license

files.

So me meeting with Larry McKlaine discussing your termination related to that specific activity was before our call on that day. I cannot tell you specifically when.

Q By a few minutes, by an hour, by a day?

A -- speculate. Probably hours.

Q Hours, okay. And your conversation with Greg Killian, was that before Larry McKlaine or after Larry McKlaine?

A Again, I cannot recall specifically in which order or possibly it was together, but I think it was prior to getting Larry McKlaine who is an HR representative --

Q So did -- can you restate your answer because I missed --

A I believe I escalated that issue to Greg Killian prior to Larry McKlaine's conversation.

Q Right on October 15th or October 14th?

A Cannot recall specific --

THE REPORTER: I'm sorry, what was the answer?

THE WITNESS: I cannot recall a specific date or time, but it was approximately on the day or the day before. I think on that day.

BY MR. RAO:
Q Do you have a medical condition that affects your memory, Mr. Klebanov?
A Do I have a medical condition that affects my memory? That's very broad question. If I'm sick occasionally, then yes, it does affect my thinking abilities if I have a headache or anything like that.
Q You sick on that day, Mr. Klebanov?
A Cannot recall if I was sick on that day.
Q Are you known to not remember things, Mr. Klebanov?
MR. OSLICK: Objection to form.
THE WITNESS: Say it again.
BY MR. RAO:
Q Are you known to not remember things, Mr. Klebanov?
A Like any human being, I cannot contain in my head every single date, time, facts, events in brain. As you medical professional knows -- you know that it works in a very selective way. So I remember certain things and like any human being tends to potentially not remember the exact -- and chain of events happening time like anybody else.
Q Certain events are important and certain events are not important; is that correct, Mr.

Klebanov?

A Certain events are more important than other events.

Q Is firing an employee an important event, Mr. Klebanov?

A It's an important event. However, there are many different actions that happen on that day and I cannot remember or recall a specific order or timing or conversation.

Q Are details of terminating an employee, something that is important to remember, Mr. Klebanov?

A It's been a year, and as any human being, I do not remember or recall every single detail of conversation with Larry McKlaine or Greg Killian or -- probably both to the same category.

Q Is the facts of a sworn testimony to a federal court something important to remember, Mr. Klebanov?

A I cannot remember every single fact, but if I -- at the time when I provided this testimony, I verified the facts and I submitted and signed the testimony based on the facts and the information in my memory at that time. However, like any human being, I cannot recall every single sentence, words, date, time, and order of things, because people tend to not

remember everything especially after a year.

Q On September 17th, you gave me a notification. Would it be fair to say that was a discharge from my position as a data science lead?

A Define a discharge.

Q Discharge would be release from the role as a data science lead?

MR. OSLICK: Objection to the form.

THE WITNESS: Release, again. Sorry.

BY MR. RAO:

Q Stopped being the data science lead.

MR. OSLICK: Objection to the form.

THE WITNESS: On September 17th, we gave you a notice of -- you went to different organization -- to different business unit --

THE REPORTER: I'm sorry, can you speak up? That was a little muffled.

THE WITNESS: Sure. I'm sorry, my -- my bad.

THE REPORTER: It's okay.

THE WITNESS: On September 17th, I provided a notification to Gowtham about him moving into a -- a different business unit into a different role and transitioning his head of data science lead role to somebody else.

BY MR. RAO:
Q And subsequently we had several meetings on that topic; correct?
A We discussed that you were not happy with the transition, were not happy with the feedback that was provided. And I believe there was several email exchanges that happened between you and me, Larry McKlaine, who's an HR lead, and Greg Killian --
Q And part of the reasons that you said was due to revenue, profit and loss; correct?
A I believe the reason that I stated was you not achieving a goal set in your role or failing in your role. And it includes achieving certain revenue targets and certain profitability of a business unit, not hitting revenue targets.
Q And before we took the break, you were talking about a revenue for the RWD protocol driven studies at a number of around 2.5 million. You -- the AI projects that I was leading, was that part of the 2.5 million or was it a different bucket?
MR. OSLICK: Objection to the form.
THE WITNESS: I don't believe I ever mentioned the number of 2.5 million.
BY MR. RAO:
Q What was the number?

A I believe I never mentioned any specific number. I believe I said that the previous revenue, if I'm not -- if my memory doesn't betray me or my best recollection was around 2 million fiscal year estimated number. And I believe what I said was the target revenue was higher than that, probably by a certain number. But I didn't specify a certain specific number that you just mentioned.

Q And before taking the break, you said the number that you -- the target number that you gave me was a decision that you made. But the prior number that you said in that notification, was that based on historical experience or also a number that you made up?

MR. OSLICK: Objection to the form.

THE WITNESS: Can you repeat the question again?

BY MR. RAO:

Q So you said in -- you just said there was a prior year's number.

A Estimated.

Q That was an estimated number. That wasn't actual?

A That was estimated based on trying to stitch together different accrual methods and accounting and

based on the information that was known at that time, which we were in transition between being acquired and becoming a part of the full blown process in EPAM.

Q And did I ever say that -- to you in any of the meetings that I did not believe these numbers?

A I do not believe you ever said. I think you were quite optimistic about your ability to sell and achieve millions in revenues as you once -- if I'm not mistaken.

Q And was that for the protocol driven studies and data science project or was it for the AI Synapse project?

MR. OSLICK: Objection to form.

THE WITNESS: I -- again, you had a certain role and certain responsibility and particle driven studies and atypic designs were included into your role as the head of data science business unit. AI software engineering was not included into a data science role. However, when we discussed your financial targets, we talked about multiple numbers, which included the data science business, sub BU or sub business unit number as well as your personal contribution to other non-data science business units.

BY MR. RAO:

Q Did you ever give me any written

instructions as my manager saying that the AI projects was not part of my scope as you just said?

A We had a -- I believe we had a couple of conversations about that but verbal and I believe were flexible to include those AI projects, specifically AI specific to your data sciences --

Q And how do you remember that these are -- these verbal conversations, Mr. Klebanov?

A I do not remember the details of verbal conversations, but I remember substance of the conversation.

Q So this recall may not be true or it could be challenged by your memory recall; is that fair?

A It's -- I'm giving you my memory as far as I can recollect it today.

Q Okay. So the -- on September 9th, I sent this email to Katie Barista. When was the first time you heard about this email?

A When was the first time I've heard about this email?

MR. OSLICK: Mr. Klebanov, if your answer would involve communications with Counsel, don't disclose that. Otherwise, you can answer.

THE WITNESS: Yeah, that -- that's probably the case in this case. I think the -- and

was it the first time I've heard about this email? Maybe not, but the first time I -- I remember this email was in my conversations with legal counsel.

BY MR. RAO:

Q Tell me the first time you were aware of this email that -- from the source that was not privileged.

A Again, I clearly -- well, not clearly, but based on your statement, this email was sent to me and I was CC'd as an empty -- again, it was an empty message but apparently was some email sent to me and Katie Barista. I do not -- since it had no content, I -- obviously, I do not remember seeing this email or even if I would've seen this email -- email with no contents, it has no meaning. And -- but this email again had no contents and I cannot tell you whether I saw it or not. Something that is zero, you can see zero; right?

Q Was there an attachment to that email?

A I do not remember seeing an attachment at that time.

Q Do you typically get emails without any body?

A I do not typically get an email without any body -- I do not typically get an email without any

body.

Q Do you typically ignore emails that you get without a body?

A If email is intended and addressed to me, I read it. If email between somebody else and somebody else, I might not read it. Because it might not be directed to me. It might not be that important. And I assume that people, if they need my input, they would contact me and -- and ask me for my input.

Q On the afternoon of September 9th, did I report to you my reservations of using Takeda's IP for a demonstration as if EPAM owned that software?

MR. OSLICK: Objection to the form.

THE WITNESS: We talked about it and I previously said I do not recall having -- recall the events what happened on September 9th, but I do not remember you stating any objections to demoing the software to whoever you were demoing the software to.

BY MR. RAO:

Q If I -- if between June to September of 2025 when the data science business unit was not achieving the revenue target that you desired, what was your thoughts on the AI Synapse revenue?

A You -- Synapse -- is an internal EPAM project that we invested money into developing. You

produced a set of slides. I believe it was called strategy where you projected some pretty big numbers. I don't exactly remember the numbers, but in my head when I saw numbers associated with AI and projections, they were a little inflated to say the least. However, I trusted you as a business leader and your ability to build revenue and I believe we supported you in -- in enabling you to sell this product and achieve those revenues.

Q You supported me in July of 2025?

A Did I support -- restating question. Sorry.

Q Were you supportive of me in July of 2025?

A I believe I was supportive of you always, Gowtham.

Q And I appreciate that. In August of 2025, were you supportive of me?

A It's -- again, it's a very broad question of supportive of you. If it's in the context of enabling you to build revenue and succeed in your role, then yes. If we had a discussion and disagreement on certain aspects, which is a normal part of any business, then it just happens.

Q If the AI project that I led as a business lead for -- was successful in generating millions and millions of revenue, would that change your

perspective on the data science revenue targets?

A I will restate the -- the intents that were communicated to you on September 17th. We were moving you into a different business unit to better align you your work, your abilities, and your ambitions with the work that you were doing in AI to enable you to better sell -- develop and sell AI-specific software.

However, as a head of the data science business unit, you had certain goals and objectives and certain roles and responsibilities in your roles that you did not achieve as a head of data science business unit. So as the head of data science business unit that did not align with your, with the job that you hired to do, and we wanted to better align you with the -- the work that you were doing in your ambitions in that space.

Q In July, August, and before September, so before this alignment conversation, were you supporting my time in the AI projects on the AI revenue generation strategy?

A Supporting your time has given you an ability to -- again, I don't micromanage people and you were a senior business lead. So I relied on you to achieve your goals and objectives and also be aligned with the role that you've been given to

perform. I cannot supervise you on a daily or weekly or a monthly basis of what you do and how you spend your time.

Q Did EPAM invest in the project that I was working on in July, August and September to build intellectual property?

A As I previously stated, EPAM invested in building different AI accelerators including the project that we internally called Synapse as well as MedRAG.

Q In July, August, and September 2025; is that correct?

A I would say yes.

Q On September 9th after the email and before September 17th when you talked about a change in my position, did you investigate me or if -- with an intent to terminate my employment?

A We did not intend to terminate your employment on September 17th. Our intent was very clear. Intent was to move you into different organization to better align your ambitions and strengths with the role that fitted better.

Q Between September 9th and September 17th, did you investigate my activities as a senior leader with the intent of finding some reasons to reprimand

or punishment?

A We did not investigate. Like, what does it mean investigate? Can you clarify your question, please?

Q What do you mean by -- is the question -- what is -- what do you mean by investigate?

A What do you include into a definition of investigate your activities and how do you see us punishing you?

Q So did you ask anybody about what do you think of Gowtham between September 9th and September 17, 2025?

A I worked with you on a daily basis. We communicated on a daily basis. I have my opinion formed of who Gowtham Rao is, what his strengths and weaknesses are. Say it again, the dates that you stated.

Q September 9th to September 17th of --

A I do not believe we had any conversations about Gowtham Rao explicitly asking an opinion of someone to -- to provide again.

Q Did you ask anybody to keep an eye on Gowtham Rao between September 9th and September 17, 2025?

A Keep an eye on you? You're not a child to

keep an eye on. You're a senior director at --
Q Yes or no? Did you investigate a website created by an EPAM employee between September 9th and September 17th of 2025?
A Personally, did I investigate a website? No.
Q Did you -- were you aware of a website that was created in my name between September 9th and September 17th of 2025?
A At some point, I became aware of this website. I do not remember whether it was between those dates or later or earlier, and it was shared to me by someone.
Q Who shared it to you?
A Do not recall specific person.
Q Why was it shared with you?
A Because you report to me and I'm a -- a leader responsible for this business unit and I believe --
Q What was the reaction when you found out about it -- what was your reaction when you found out about it?
A I typically do not have reaction until I see the facts.
Q And the facts are the website. So what was

your reaction?
A -- the website.
Q What do you recall of a website in my name?
A I remember somebody shared with me that you created a website in your name literally. I think it was -- I think it was called GowthamRao.com or I might be wrong. I don't remember the exact name, which I don't remember looking at it to be honest. But I was told that it outlines the Gowtham Rao skills. Basically marketing messages for Gowtham Rao as an individual.
Q And was that a violation of EPAM's policy, Mr. Klebanov?
A I would probably refer this to an HR person to make a decision whether it's in a violation of HR policy or not, but there could be a violation of HR policy if there's certain -- if this website was created outside of the code of conductor -- out of the code of ethics.
Q Did you or anybody refer to HR regarding that website?
A Do not know if someone referred to HR. It might have been the case. I do not know if that happened. So I'm not going to speculate on that. But do not remember if it happened.

Q Between September 9th and September 17th, did you think of me as a troublemaker that you needed to get rid of because I was bringing up Takeda IP issues?
A I think you loaded this question with multiple.
Q Okay. Would you like me to split it?
A If you could, yes.
Q Between September 9th to September 17th, did you think of me as a troublemaker?
A I did not think of Gowtham Rao as a troublemaker. I -- our intent on September 17th was to realign your new role with your strengths and ambitions.
Q On September 17th, was your actions on September 17th a retaliation for me telling you on September 9th that the project that we worked on was owned by Takeda?
A Just stated that our goal --
Q Yes or no?
MR. OSLICK: Objection to the form.
THE WITNESS: Can you please restate the question again?
BY MR. RAO:
Q Was your action on September 17 a

retaliation for me telling on September 9th that the project that we worked on belonged to Takeda?

MR. OSLICK: Objection to the form.

THE WITNESS: Again, I already told you I do not recollect as discussing the September 9th or having specific discussions on conversations. So I cannot retaliate on something don't recall. So I cannot answer this question.

BY MR. RAO:

Q Have you listened to the recording of the call of the meeting between you and me that was shared with EPAM?

A Which meeting are you referring to?

Q The meeting on September 17.

A I did not listen. I briefly read the transcript. It was -- transcript was readable, but I just briefly read the -- the introduction, but I literally participated in this conversation for a minute. I did not -- the 17th? When -- oh, I'm sorry. I'm thinking about something else on the 17th. I do not remember the details of this transcript. I'm sorry. I do not remember listening to that. There are many recordings apparently that happened, and I was not aware of those recordings being done, but I was given -- I cannot --

MR. OSLICK: Again, if I shared specific documents or other things -- you are entitled to testify about what refreshes your memory for purposes of this deposition. You are not entitled to testify about what documents I shared with you. That is privileged.

THE WITNESS: So I cannot -- so what's the question? And how do I answer this question with sharing privileged information?

BY MR. RAO:

Q I can play the recording or we can move on. Okay. On September -- are you aware that I spoke to Mr. Troy Rask after you gave me the notification of change of position?

A I'm not aware of specific conversations you might have had, but I'm aware that you made several calls to many EPAM and probably not EPAM -- non-EPAM people. And -- but I do not recall specific conversation that you might have made a call to Troy Rask.

Q Has anybody that is an EPAM employee described to you or discussed with you? The content and the nature of the conversation I had with them?

A I do not recall any specific conversations. But in the substance from what I remember hearing that

some -- to some people you stated that you are being moved into a new role. Some people you stated that you're being promoted, that you also, I believe communicate with some of the employees in my business unit you were offering them to take them with you to a new role, which caused the -- the big question mark in my head.

Q Was there any communication that you received that you know of where I said I am going to start my own company?

A And define the time period that you are describing.

Q The period after September 17th to the last date of my employment.

A I believe based on a communication from someone else that you approached one of the clients and you stated the words, "I'm an -- I'm going to be an independent agent or I'm an independent agent" while still being employed by EPAM.

Q Did I say that substance content with anybody inside EPAM other than the client?

A Can you state the question again? I'm sorry.

Q Can I -- what do you know about my plans post operation from EPAM that you heard when I was

still an EPAM employee?
A And I don't know what plans you had and I did not have a specific conversations -- do not recall having a specific conversation with people about your plans you communicated, but I think your messages from what I've heard were quite conflicting at times and erratic.
Q After the September 17th call, we had a call that involved you, me and Greg Killian; correct?
A Cannot recall a specific conversation. Probably yes.
Q In that call, there was more clarification of my role; correct?
A And since I don't recall specific -- we have many calls -- employment or conversations and it's hard to remember all of them.
Q The -- there was a proposal for a different role for me. Can you describe that proposal?
A The initial idea of the proposal as I said before was to move you into a role that is better aligned with your strengths and ambitions and projects that you were passionate about, specifically focused on AI continuation of specific projects. And one of them was AI specific project that you were working on, Synapse.

Q Which business unit would that be on?
A It's -- at that time, the business unit was Scientific Infomatics, I believe it's called. It's under person who left this business unit shortly after.
Q Chris Waller?
A Chris Waller was the -- the person that we're -- were discussing moving you on.
Q So the proposal was to move me from the head of data science unit to under Chris Waller whose department was Scientific Infomatics; correct?
A That was the idea.
Q Was that a -- something that I applied for or was it something that was mandated by EPAM management?
MR. OSLICK: Objection to the form.
THE WITNESS: You did not apply for this role, but it was a decision made by EPAM management to realign your -- to move you into a different role.
BY MR. RAO:
Q Did I accept it?
A You had several reactions to that and I believe you said, "I need to think about it." I don't remember a specific answer that you provided, but you

did not immediately accept it with joy, let's say.

Q What was the plan when I did not accept that with joy?

MR. OSLICK: Objection to the form.

THE WITNESS: The plan was to move you into a different role and we've had different conversations, but the plan was to go ahead with transitioning your head of data science role to a different person.

BY MR. RAO:

Q And what was the -- when I said no, what was the reaction?

A I do not remember an explicit no -- from you. I remember I need -- I think you -- I believe you said I need to think about it, but you had different reactions and different answers, so I don't remember which one of those counter answers, you don't know or I think about it.

Q But was there a performance improvement plan as part of this transition?

A I believe we did eventually discuss a PIP or performance improvement plan.

Q Was there a performance implement plan that was implemented?

A It was not implemented because of the --

obviously this movement into -- never happened.
Q And when was the performance implementation plan proposed? Do you know the date?
A The performance improvement plan is something that you probably should reach out to HR, so --
Q Did you email me about a performance improvement plan?
A I believe we -- you sent us an email with clarifications -- requesting clarifications and correspondence with clarifications in one of the emails and I believe was stated the reasons for your termination. And I believe -- don't remember what we talked about at the performance plan specifically in this email. I'm sorry.
Q And that -- the performance improvement plan was in lieu of the termination; correct?
A Has it been in lieu of the termination?
Q Instead of?
A It is not -- no instead of. There was no termination discussion held period at that time.
Q And when you sent me the performance improvement plan, and I understand you don't remember the details, who helped you with that performance improvement?

MR. OSLICK: Objection to the form.
THE WITNESS: Again, I don't remember sending you a performance improvement plan.
BY MR. RAO:
Q When an email was sent to me about a performance improvement plan by you, was your thinking at that time to manage the performance improvement plan?
A Again, I don't remember sending you an email about the performance improvement plan. We shared a communication with you clarifying the role and -- and reasons for that. And we explicitly specify reasons for why, including your performance that you couldn't achieve. I do not recall specifically details about performance improvement plan.
Q Who gives -- who issues a performance improvement plan? Is it the line manager or some person in the company?
MR. OSLICK: Objection to the form.
BY MR. RAO:
Q Who issues a performance improvement plan in EPAM?
A I'm not an EPAM HR expert as you know. We recently joined EPAM and I'm not particularly knowledgeable about the performance improvement plan

process. So I cannot answer this question.

Q Did Larry McClain coach you about a performance improvement plan?

A Since I don't remember sending you any communication about a performance improvement plan, I do not remember specifically about details in my conversation with Larry McKlaine about the performance improvement plan.

From my recollection, I remember that HR guided me saying that performance improvement plan helps employee to succeed. That is the idea.

Q Did you know that I had a conversation with Mr. Sunil Dravida around that time?

A Sunil Dravida is our client and I have regular conversations with my clients, including Sunil. And you were working with Takeda at the time on the project related to Takeda. So I assume you would've had a -- a reason or a need to have a conversation with the client.

Q Do I know -- do you know if I know Sunil Dravida personally?

A Do I know if you know --

Q Know Sunil personally?

A How would I know that?

Q Who's Guarav Dravida?

A Guarav Dravida is Sunil's son.
Q And was any of the Takeda contracts related to you hiring Guarav Dravida?
A No.
Q Are -- did you -- are you -- have you done any favors to Sunil Dravida to get contracts from Takeda?
A We -- when we hired Sunil, he -- oh, sorry. When we hired Guarav Dravida, he went through a typical HR process and as a junior joining a company right after college, and we, as you know, EPAM is constantly looking for junior talent. He was non-U.S. based and they're welcome to join the company. So when we employed Guarav, he went through a typical interview process. At the time, I believe it was still with Odysseus, and then he became part of the Takeda later.
Q So when Guarav was recruited or he applied and joined Odysseus, did his recruitment have any bearing to making Sunil Dravida happy?
A You need to ask Sunil Dravida about this, but --
Q Except It's your question.
A Cannot speak for Sunil Dravida.
Q Did you want to make him happy?

A I hired the talent after college and we constantly were scanning for talent in people with -- junior people to join our company.

Q When you made a statement in the comment that "We do it all the time with Takeda," did you mean to say that we do it all the time because "I have hired Guarav Davida and Sunil Dravida will agree"?

MR. OSLICK: Objection to the form.

THE WITNESS: You are making a very out of the context statement here.

BY MR. RAO:

Q Yes or no question.

A Could you repeat the question? I don't understand the question.

Q You made a statement that "We do it all the time with Takeda." Was the basis of your statement based on you making a favor to Sunil Dravida by hiring his son?

MR. OSLICK: Objection to the form.

THE WITNESS: Again, this is very convoluted the question that I cannot reply to many --

BY MR. RAO:

Q What is your understanding of the question?

A I don't understand your question.

Q What didn't you understand about it?

A You're saying several out of the context taken statements, bundling it together into a statement which doesn't make sense to me.

Q Did -- was Takeda -- was the relationship with Takeda any different from a relationship with another client like Gilead because you hired Guarav Dravida who is the son of a client representative?

A Any relationship with a client is ethical and dictated by code of conduct and certain ethical behavior. I do not believe that hiring Guarav Dravida, who proven to be actually quite nice, valuable employee, had any bearing on our contractual commitments or contractual work with Takeda.

Q Were you using this relationship to fund the development of your proprietary software?

MR. OSLICK: Objection to the form.

THE WITNESS: Again, bundling multiple questions into a single one. So if you could maybe break it up into two questions or more if you could -- if it's possible.

BY MR. RAO:

Q Are you using the relationship with Takeda to inappropriately fund development of your proprietary software?

A We had a contractual master service

agreement with Takeda and we did many -- many projects over the course of time. By the way, this relationship started before Sunil Dravida took the lead in our relationship. It started well before that. And so that's -- that's the answer to your first question. And we did -- ever used --

THE REPORTER: Sorry, it kind of cut out there. Can you just repeat what you just said? Sorry.

THE WITNESS: Right, I said that the relationship with Takeda started well before Sunil took his position as our primary business stakeholder in Takeda. We did many projects. Some of them, as I mentioned before, were work for hire. Some of them were where we deployed our proprietary software with a commercial license and a specific license in IP to Takeda. And depending on the project, again, the funding would be to cover for that type of license or this type of work.

BY MR. RAO:

Q Are you stating under oath that it did -- you did not inappropriately use a work for hire contract to build proprietary software for Takeda?

MR. OSLICK: Objection to the form.

THE WITNESS: Every contract was very

clear on the intent of this contract. Every contract, to my knowledge, that we conduct with Takeda had a certain type of a construct, whether it was work for hire or a license. In those cases where an intellectual property with EPAM was deployed to Takeda, the licensing would state appropriately what the type of a contract it is and what the license type is.

MR. RAO: Court Reporter, I'm going to give a new exhibit to the deponent. It is Exhibit 007. I believe that's the number.

(Exhibit 007 was marked for identification.)

THE REPORTER: Yes.

BY MR. RAO:

Q Mr. Klebanov, I do not need you to authenticate the document. I just need you to read paragraph -- I want you to read the paragraph that starts with the background as a subheading. Just one paragraph.

MR. OSLICK: You're showing him a document. He's entitled to read the entire document in the context you're asking questions about.

MR. RAO: I'm not asking questions about the document. I'm just asking him to read a

paragraph.

THE WITNESS: Yes, I -- for the record, I cannot authenticate or confirm what this document is. I'm just reading the paragraph as being asked by Gowtham Rao. Which paragraph?

BY MR. RAO:

Q Right on the background -- this background.

A "This -- this effort is building of the successful Takeda RWEAI-enabled Evidence Generation POC developed in Q2 2025. EPAM will continue to help Takeda in evolving the POC into an evidence grade enterprise solution that will use an Agentic AI enabled workflow with medical evidence grade retrieval as finally confirmed by Takeda, augmented generation (RAG) to deliver study concepts (aka study proposals)".

Q Thank you Mr. Klebanov. I do not need you to authenticate this document. Is Synapse mentioned in that paragraph?

MR. OSLICK: You just took the document away from him.

THE WITNESS: Can I -- can I see it?

BY MR. RAO:

Q Yeah, you have the document back.

A I do not see Synapse being mentioned in this

document as a name.

Q Do you recognize that document, Mr. Klebanov?

A I am not seeing a full document. I cannot tell you this, no.

Q Are you -- so if you -- signature on the last page of the document, does that reassemble your signature, Mr. Klebanov?

A Again, just purely a signature at the end of the document that I cannot recognize, it resembles an electronic signature that has my name in it.

Q Have you signed documents like that, Mr. Klebanov, electronically?

A I signed documents like what?

Q Like that.

A I signed SOW statements of work with our clients.

Q Do you remember general content of the statement of work that was done -- assigned by you on June 2019 for Takeda?

A Do not remember general content. Probably in a nutshell to deploy Synapse, which is an internally funded developed -- project developed by EPAM with EPAM funding into Takeda, customized it to address Takeda use case.

Q And did the statement of work describe it in that way?
A The statement of work? I just read one paragraph.
Q No, not this statement of work. The statement of work that you signed, which you read for Takeda in June 2019, did that have that type of content?
MR. OSLICK: Objection to the form.
THE WITNESS: I do not have to describe our internal IP and property and the statement of work. The scope of work could be specific to clients. It's -- that I don't believe I have to mention in any of those statements of work Synapse by name or how we're going to do it.
BY MR. RAO:
Q If that statement of work has words that mean, not the statement of work, that statement of work, if that -- let me reframe the question.
If the statement of work that you signed in June 2019 had descriptions that can be interpreted as building software, would that build software belong to EPAM or Takeda?
MR. OSLICK: Objection to the form.
THE WITNESS: It -- by itself, any

keyword is meaningless. There are certain clauses and contracts, certain statements that would clarify the meaning and the type of work and clarify the type of a license and type of processes being used on the contract. Any keyword itself is meaningless.

BY MR. RAO:

Q So did Mr. Dravida contact you about me in September of 2025?

A You work directly with our clients including Sunil Dravida. We had several calls together with Mr. Dravida. I had separate conversations with Mr. Dravida discussing the contracts that we do, the work that we do, the projects that we do. In several conversations he might mention people, names, would give compliments, would stress certain skills. I believe he considers you to be a -- a knowledgeable medical doctor and project lead.

Q So Mr. Sunil Davida mentioned me in September 2025, yes or no?

A I don't remember whether it was September or August. Whenever you actually -- I don't even remember when you met Sunil for the first time. I cannot speak about that. But we've discussed team members that were deployed on Takeda projects in very constructive and business-like conversations.

Q Did I bring the relationship between Sunil Dravida and EPAM or did you bring in the relationship?
MR. OSLICK: Objection to the form.
BY MR. RAO:
Q Who brought the relationship of Sunil Dravida to EPAM?
A Relationship between EPAM and Takeda, again, it's organizations, so organizations or personal relationship, professional relationships. This particular case, I had a professional relationship with Sunil Dravida that formed over time. Our relationship with Takeda started prior to Sunil joining Takeda. And we had a relationship with Takeda. I don't remember exactly when, but prior to that, Sunil joining the organization.
Q Did Sunil Dravida contact you in September 2025 stating that if Gowtham is not involved or if Gowtham fired from EPAM, he will not renew the Takeda contract?
A I don't remember conversation like that. Was concerned because I believe you shared the information of you changing the role something -- was not in that conversation.
Q Tell me about his concern.
A He shared with me or actually in the

conversation with you when I joined the conference call where you and Sunil were already in the conference call, you were discussing your concerns with the new role, I believe. We continued in that conversation talking about the project. He -- we talked with Sunil Dravida regularly about projects, about success factors, about any risks, and he naturally brought up a concern with risks of key people not being with the company, not being involved with the project. To which I assured Sunil that we have resources with similar skills who would be able to advance if any risk of employees not being involved with the project.

Q Did that conversation change your subsequent follow-up with me in September 2025?

A In what manner? In what way?

Q The role -- position that you were envisioning that I would move to.

A Oh, my hope and the goal was that you will be moved into a new role where you would focus on AI-focused project and one of those projects was focused -- specifically was Synapse -- developing internally Synapse for different -- Takeda. So my goal was not to risk a project with Takeda but rather put you into a role -- in a position where you would

be able to continue this work and succeed.

Q So you would -- so are you saying under oath that you were envisioning moving me to a different role in a different business unit, Scientific Infomatics and take on the project of Takeda in the Scientific Infomatics role?

A One of the projects was -- again, the overall project would be focused on Synapse, developing Synapse for internally. But a specific client relationship and specific deployment would be Takeda, but it's one of I believe one or two projects that we stated you would focus on.

Q Okay. Did Sunil Dravida ever say that the IP was or that the Synapse project was owned by Takeda?

A No. In my several conversations with Sunil, we discussed intellectual property and he was clear in stating that the IP belongs to EPAM.

Q That -- is any of this in writing?

A I do not believe the statement of work is in writing. So if you would believe the statement of work, it clearly states the IP and the copyright -- I'm sorry, IP and license type that is associated to the specific project, so yes, it is in writing. And Sunil obviously being a -- a signer reviewed and

confirmed those SOWs. One of the statement of work we actually reviewed with Takeda legal on a conference call together.

Q Was EPAM legal involved with any of those conversations?

MR. OSLICK: Again --

BY MR. RAO:

Q You don't need to give me privileged information, just want to say yes or no.

A I'll wait for my counsel to --

MR. OSLICK: If there were calls with Sunil in which EPM legal participated, that is not privileged. You can talk about that. If there were discussions you had with EPAM -- the question was very broadly phrased. If a question -- if you -- there are conversations you had just with legal within EPAM and that influenced a subsequent discussion with Sunil in some way that would be privileged and you should not discuss the substance of conversations with Counsel, if that makes sense.

THE WITNESS: Takeda legal requested a call to clarify an SOW in certain clauses and statements. We had a call sometime in December clarifying certain -- the scope of work and type of license and work that we do and including the

intellectual property, I believe statement and the license type. So they were aware of our deployments, the work that we doing. To my best recollection, Sunil and EPAM legal or procurement or a legal person were on the call.

BY MR. RAO:

Q Did my communication about Ram Varma's report of EPAM misrepresenting its employee's geographic location make you want to retaliate against me and introduce a new performance improvement plan?

MR. OSLICK: Objection to the form.

THE WITNESS: You communicated that you had a request from Ram, which we already were handling, so I had no reason to -- I did not. What was the question again? How did you phrase it?

BY MR. RAO:

Q Did my communication to you about Ram's concern make you want to retaliate against me?

A I had no reason to retaliate about anything. That was just a normal communication between two employees and concern was a just, and case was closed.

Q October 15th when you fired me, you had information about the copyright from it. Did you have information about the SharePoint deletions?

A I believe we had information about

SharePoint activity at the time, yes.
Q When you created the ticket for my termination, Mr. Solomon responded, Larry Solomon, the senior vice president of HR in EPAM responded asking for information; correct?
A I do not recall that.
Q Did you communicate with Larry Solomon over email about my termination?
A Do not recall that.
Q Did you contact Evgeny Sidenko to make the justification for my termination after you terminated me?
A Evgeny Sikenko, I believe he raised an issue at first place. I asked him to document this issue and share it with HR, not -- and I believe that Evgeny did exactly that.
Q Did you coach Evgeny to do this?
A I asked Evgeny to raise any concerns to HR as any as per HR processes.
Q Are you swearing -- are you stating under oath that you did not ask Evgeny to make it sound like it was his report?
MR. OSLICK: Objection to the form.
THE WITNESS: He -- I do not understand. I just clearly stated that Evgeny was the

one who raised an issue and I asked him to document it and share it with HR.

BY MR. RAO:

Q Did Evgeny come to you to, with that issue or did you ask Evgeny to search for the issue?

A No, he -- several -- well, people escalate to me any concerns as the head of business unit and you report it to me. So Evgeny escalated his concerns and findings and --

Q Did you ask him to escalate to you after you terminated me too -- give a justification of my termination?

A I cannot answer this question the way it's stated, but --

Q Did you contact Evgeny to create a documentation to justify your termination -- justify my termination?

A The documentation was to document an incident. It was not to justify termination, but to document an incident that an employee reported to us following processes -- HR processes.

Q Larry Solomon sent you an email asking you to describe what happened. Did you get worried or anxious?

A I already told you I don't recollect the

communication between Larry Solomon and me.

Q As -- can you -- do you remember meetings with AWS and Johnson & Johnson and EPAM Synapse in September 2025?

A You were leading this -- so I do not remember.

Q What do you know about that meeting?

A If I don't remember the meeting, I cannot tell you.

Q Were you part of any of those meetings?

A I believe I was a part of a call. I was at the conference. I don't remember which conference, so I dialed remotely, but I did not actively participate in those calls. You were leading this relationship. You were leading this engagement.

MR. RAO: Court reporter, is it Exhibit 008?

THE REPORTER: Yes. You're on eight.

(Exhibit 008 was marked for identification.)

BY MR. RAO:

Q So I'm handing witness Exhibit 008. Mr. Klebanov, can you -- so tell me what you see on this page?

A I see a communication between --

THE REPORTER: I -- I didn't hear any of that. There was ruffling papers.

THE WITNESS: I see a -- an email. If I do believe this print. I cannot verify it. But if I were to believe this printout, that's an email communication between me and Larry Solomon, which is the head of HR at EPAM.

BY MR. RAO:

Q Mr. Klebanov, I want to repeat the question. Was there a communication between you and Larry Solomon on October 15th regarding my termination?

A Let me read the full email --

Q -- question --

A -- I go with this --

THE REPORTER: I -- I can hardly hear you, Mr. Klebanov.

THE WITNESS: I cannot --cannot answer this question until I read the full email and confirm it's related to his termination.

THE REPORTER: Okay.

THE WITNESS: Am I allowed to read it? Okay. What would you like me to answer?

BY MR. RAO:

Q Do you remember an email from Mr. Solomon to you regarding -- on topics related to my termination?

A Well, now I can see this email, it brings back some recollection of this exchange, but I do not remember a specific exchange. Do you believe that is a true copy of that email? I have no reason to -- to deny it. It looks --

Q What time was that email sent by Mr. Solomon?

A So the email from Larry Solomon came at 11:20 a.m. on October 15, 2025.

Q What was the reason for my termination again, Mr. Klebanov?

A The -- one of the reasons for your termination among others was the commit that you did on a GitHub repository stating that copyright by Gowtham Rao and the license side. But it's one of the reasons. There are many others, multiple others.

MR. RAO: Court reporter, I'm going to give Exhibit Number 009 to the witness.

(Exhibit 009 was marked for identification.)

THE REPORTER: Okay.

BY MR. RAO:

Q Mr. Klebanov, what do you see?

THE WITNESS: Again, I'm going to state for the record what I'm seeing and I -- I cannot

authenticate whether it's real or not, but if it's real, it's a communication between me and Evgeny Sidenko, which is the project manager at question on October 15th at 12:06 p.m. Again, I don't know what the time zone was used for this specific communication, so I cannot claim it's Eastern Time zone or a different time zone. I'm just stating what's on paper.

BY MR. RAO:

Q Can you read the messages?

A Yes, I can read the messages. "Greg, could we have a quick talk just afterwards about Gowtham? I am not sure to share -- I'm not sure to share this findings around all our team." That's the message as I quoted. It came from Evgeny Sidenko at 10 -- I'm sorry, 12:06 p.m. on October 15th, '25. My reply -- I'm assuming it's my reply because it doesn't have my name on it, but reply says "Yes" at 12:10.

Q Have you taken a screenshot of your Microsoft Teams' environment that conveys this message?

A Have I taken this screenshot? I do not remember me taking it. There's a bit more. Can I read that? Obviously, there's some other pages that I did not see. Evgeny Sidenko -- should I read it or --

okay. Evgeny Sidenko 10/15 2:25 p.m. "I discussed it with Dimitri - Gowtham took our code for his local modification and refactoring." I put a sad face and I asked the question "When?" The reply was at 10/15 2:23 p.m. from Evgeny saying "Gowtham mentioned it during the call a week or two ago." I'm assuming it's my reply again 10/15/25 at 2:23. "Please send this as a follow-up email to Larry, we need to document all of this. To which Evgeny replies "All right."

Q Mr. Klebanov, do you remember this communication with Mr. Sidenko?

THE REPORTER: I -- I did not hear any of that question. Can you repeat the question?

BY MR. RAO:

Q Mr. Klevanov, do you remember this communication with Mr. Sidenko?

A Again, now when I read it, it sounds -- it looks like communication with Mr. Sidenko. As I said before, I do not remember every particular detail with Mr. Sikenko, what was said, just the content of the conversation. And I think this content is quite consistent with my previous messages.

Q Can you tell me if the timestamp is after -- of the email from Larry Solomon?

A I really said that I cannot guarantee it's

Eastern Time zone or any other time zone and also timestamps. But based on what I see on this paper, the message from Evgeny Sikenko is on 10/15/25 at 12:06 p.m. Based on this email conversation with Larry Solomon, the -- the question from -- from Larry Solomon by email, not Teams, came to me at 11:20 a.m.

Q Do you remember if Larry Solomon's email was before Mr. Sidenko's message to you?

A If I were to believe this email exchange in the records, it is before my message -- it is before Evgeny's messaged me --

Q When Mr. Solomon raised his question, did you contact Evgeny Sidenko and ask him to send a message to you about any issue?

A The -- Larry Solomon is the head of HR for the whole EPAM. I do not believe my exchange and the -- and the direction I gave to Evgeny, which is to document -- contact, document -- document the findings and share with HR would be any different whether I've received this email from Larry Soloman or not.

Q When -- when Sidenko is -- it seems to be asking for a call. Did you talk to Mr. Sidenko?

A There's no record of this in -- in the chat. I'm not going to speculate, but since he is asking for a quick talk -- it is possible that we had a

conversation on Teams.

Q Do you recall a conversation with Mr. Sidenko after this request from him?

A I do not remember a specific details of that conversation, but my recollection still stays the same that I guided Evgeny to document his findings and share it with HR.

Q You terminated an employee in the morning. The head -- head of the HR contacted you and immediately after, there is a employee asking to talk about the terminated employee and you do not meet -- do not remember the substance of that conversation; is that correct?

MR. OSLICK: Objection to the form.

THE WITNESS: I do not remember the details of the conversation since he is asking me to talk about and against this message from Evgeny was incomprehensible if you would. I am not sure -- I'm quoting Evgeny. "I am not sure to share the -- this findings around all our team." I do not understand what it means. Right. So my conversation with Evgeny, I do not remember and recall the details of the conversation. So he might have been asking me of how to communicate that Gowtham is no longer with the company or something else. I cannot speculate on

this.

MR. RAO: Court reporter. I have another exhibit. It's Exhibit 10.

(Exhibit 10 was marked for identification.)

THE REPORTER: Did you say 110?

MR. RAO: Yeah. 10. No, just 10.

BY MR. RAO:

Q So Mr. Evgeny, you said on record that you cannot read his -- understand what he wrote because of the structure of the sentence; correct?

A That's right.

Q Could you go through this document and tell me how -- who are the participants of this conversation?

A Can I read it? The specific document?

Q You want to read it aloud?

A -- you want me to read the whole email?

Q I just want you to answer the questions if you -- if it requires you to read the whole email. First question that came is who's on this email?

A So I'm going to reply to that question. This email, I cannot authenticate this document but the messages are between Larry McKlaine and Evgeny Sidenko with me being CC'd on this message. I do not

believe there's anybody else in this message.

Q Do you remember any email exchanges regarding my termination after I was terminated?

A Do not remember any email messages. I'm sure there were email messages regarding your termination. I do not.

Q Do you remember any email from Evgeny Sidenko that -- in which you are copied that describes some of his findings?

A That's consistent what I previously said. I asked Evgeny to document and share it with HR. Again, I need to read this email in detail but that might be this email. Let me confirm and read.

Q You can read it aloud if you want to so that the court reporter can capture.

A Yeah, I can read but it's a lot to read if --

Q -- absolutely necessary.

A Yeah, I'll read this. Larry McKlaine -- I'm going to start with -- I don't even know where to start. Gowtham, where do you want me to read this. It's, like, five pages.

Q Yeah, I think I just -- so if I were to offer you recommendation, I'd like you to read -- you don't need to read the full thing. You can just tell

me the gist of this if you can and just tell me the metadata, like what date, time, who sent that email, what's it about?

A So I'll read the full email. I'm not going to try to interpret this. The email is from Evgeny Sidenko on Wednesday, October 15, 2025, at 1:09 p.m. to Larry McKlaine who's our HR representative and CCing Gregory Klebanov, myself. The subject of this email is "Unethical Behavior and Data Loss in Agentic AI Insight Project for Takeda." The content -- content of this email as follows.

"Dear Larry, I hope this message finds you well. I'm writing to bring to your attention a serious issue that occurred within the Agentic AI Insight project for Takeda" then the project code (DS-0092 Takeda-RWEAI-enabled Evidence Strategy Generation Phase2). I identified today that our former Account Manager of the project, Gowtham Rao, has deleted project information from the project SharePoint. Unfortunately, he also cleared the contents of the Recovery folder, complicating the restoration process.

I have attached screenshots for your review and have already initiated the support ticket and the ticket number to restore the lost information.

However, given the nature of this incident, I believe it's necessary to start a formal investigation into Gowtham Rao's actions during his work at EPAM Systems. This appears to be a breach of ethical conduct, and I'm concerned about the potential implications for our project and client relationship.

Please let me know if you are available for a discussion to determine the appropriate next steps. Your guidance on how to proceed under these circumstances would be greatly appreciated. Thank you for your attention to this critical matter. Best regards, Evgeny Sidenko, Senior Project Manager."

Q Okay. Thank you.

A I think it's acceptable.

Q -- than this chat message. Did he write that message?

A If I were to believe this email exchange, he did write the message.

Q Did you ghost write the email for him?

A Did I ghost write email? What does it mean ghost write email?

Q Did you write the email and give it to him to send it to you?

A -- believe I would write an email like this. I instructed Evgeny to report an issue to HR, which he

seems to be doing acceptably.

Q So after -- from a timeline sequence, Mr. Solomon sent an -- sent a request of information. There was a communication with Evgeny. His language was difficult for you to interpret, and then there is a very nicely written email that was sent out to HR afterwards. Is that a correct summary?

MR. OSLICK: Objection to the form.

THE WITNESS: You're stating events and timestamps that it might not be connected. I cannot -- in any way, shape, or form and there might be some other events that not documented or missing.

MR. RAO: Okay. Court report. I'm handing Exhibit Number 11 to the witness.

(Exhibit 11 was marked for identification.)

BY MR. RAO:

Q Do you know if -- so you made a statement that the files that were deleted from a SharePoint site by me; correct?

A Based on the information provided to me, they were deleted.

Q And was the information provided to you by Evgeny Sidenko?

A Might have been by other people -- I don't

recall specific person, but probably multiple people.

Q And files were deleted and it said double deleted. What is double deleted?

A In the information that I received from people, I was told that you deleted the file and then deleted the second time from what is called recycle bin.

Q This is a screenshot that EPAM provided to me. On the left-hand side there is a recycled spot. Can you -- and that appears to be selected. Would you -- as a former CTO and who's familiar with technology, d bin?

A I cannot comment on this. As a former CEO, I'm not an expert in SharePoint or recycle bins. I cannot also state for a fact at which point in time this screenshot was taken, what's on the screenshot and where the screenshot even came from. So I cannot comment on this at all.

Q If the files were in the recycle bin, does that mean it is double deleted?

A And as I mentioned before, my understanding of recycle bin is -- delete something in SharePoint, it goes into recycle bin. If you delete the file from a recycle bin, it cannot be easily restored directly from SharePoint itself. You need to contact

administrator to restore a file.
Q Did EPAM report in its complaint that I had permanent and irrevocably deleted files from a SharePoint site?
A Can you repeat the question?
Q Did EPAM report in its complaint that I had permanently and irrevocably deleted files from a SharePoint site?
A I cannot say specifically the -- that -- if that was the phrase that was used by EPAM in the complaint. I just can't remember.
Q Do you know when was the files restored?
A I am not actively involved in restoring files and it's not probably at the top of my mind at the time, but to monitor dates or a time of file restoration, what I was concerned about is losing information and people being able or not being able, so I did not monitor a specific date, time in that process.
Q Do you remember when was those files restored?
A As I said, I do not remember a specific date and time of files.
Q Was any file permanently lost?
A I was about to say that I don't know if all

files were restored and some files were lost. I believe that some files were not restored or were not, but I cannot recollect this to my a hundred percent ability.

Q Okay. Did you take this information of storing into account when you did your sworn declaration?

A Did I --

MR. OSLICK: Objection to the form.

THE WITNESS: Can you please, Jacob, repeat what you just said? I cannot hear it.

MR. OSLICK: Objection to the form.

THE WITNESS: Thank you.

Can you repeat the question again?

MR. RAO: Court reporter, could you repeat?

THE REPORTER: What's that? Oh, you need me to repeat the question for you. All right.

MR. RAO: My question.

THE REPORTER: Yeah -- yeah. One second here.

(The reporter repeated the record as requested.)

THE WITNESS: When I did my sworn

declaration, I do not understand how the information of files state -- were restored or not restored would change my declaration. The fact that you did a certain activity and this activity included deleting and then double deleting files based on the information I received from somebody, that's what they reported.

BY MR. RAO:

Q Was your sworn declarations -- all your sworn declarations based on complete facts that you knew at the time that you give the sworn declaration?

MR. OSLICK: Objection to the form.

THE WITNESS: Can you repeat the question?

BY MR. RAO:

Q Well, you made several sworn declarations to the Court. Were all of those sworn declarations based on the complete facts that you knew at that time that you made that declaration?

A My declarations were based on the information that I provided or knew at the time.

Q So was it a complete representation of the -- all the facts that you knew at that -- when you wrote the sworn declaration?

A I don't understand the -- the meaning of

complete representation -- what complete means in the specific --

Q Were you truthful when you made the declaration to the Court?

A To my best knowledge, I was truthful making the declaration at the time to the Court.

Q So you're swearing today that to your best knowledge you were truthful when you made the declaration.

A As I already just said, to my best knowledge, my declaration was truthful to the Court at the time based on my knowledge.

Q That's your sworn declaration? Mr. Klebanov, did you ever think that my reporting to EPAM about the Takeda intellectual property issue or the Belarus Serbia staffing issue was a threat your business?

MR. OSLICK: Objection to the form.

THE WITNESS: Many questions, again, or assumptions bundled into a question. Let -- let's -- Matthew, can you repeat the question again, please?

THE REPORTER: Yes, sir. One sec.

(The reporter repeated the record as requested.)

THE WITNESS: So -- multiple things. So I -- as I previously stated -- I -- the Gilead incident was not an incident. It was just request from a client to address a certain specific location and this was handled. It was business as usual, so I did not see it as an issue. So that's previously said by me. A second thing you said -- you reported Takeda --

Jacob, I'm sorry, Matthew -- Takeda specific thing, can you please repeat it?

THE REPORTER: Yes. One second.

(The reporter repeated the record as requested.)

THE WITNESS: I do not recall you raising an issue with Takeda intellectual property. We're discussing license or you talked about it today. So I did not see there's an issue. It was just a business as usual. And based on those two facts, I do not understand how you would imagine thinking about it as being a threat to the business. So in general, don't understand what it means threat to the business.

BY MR. RAO:

Q Mr. Klebanov, are you still stating on the record that on September 9th when I sent the email to Katie Barista, you did not notice it?

MR. OSLICK: Objection to the form.
THE WITNESS: I do not recall this email or communication or events that happened on September 9th.
BY MR. RAO:
Q Lucy McDermott was copied on that email; correct?
A I don't know. If you look at this email, it'll tell you.
Q Did Lucy McDermott ever raise that issue?
MR. OSLICK: Objection to the form.
THE WITNESS: I just said that I don't know if Lucy was copied on this email. If she was -- can I see the email again?
BY MR. RAO:
Q I'm handing back Exhibit 05.
A Yes, Lucy -- I'm confirming if this email is real that that empty message that -- where I was CC'd or copied to, Lucy also was in that email thread. But I do not recall having any conversation with Lucy or I do not recall having a conversation with Lucy McDermott related to this email or Takeda.
Q Between September 9th and September 17th, did you ask Lucy McDermott to keep an eye on me?
A Say it again. September?

Q Between September 9th and September 17th, did you ask Lucy McDermott to keep an eye on me?

A I do not believe this phrase would be something that I would say and I do not believe I would ask an employee to keep an eye on somebody. So do not recall conversation like that.

Q Between September 9th and September 17th, did you communicate with Lucy McDermott to report to you anything about me that was inappropriate?

MR. OSLICK: Objection to the form.

THE WITNESS: I received an escalation from employees and Lucy contacted me with several concerns. I do not recall specific date and time, but there were certain concerns that she raised to me. I do not recall me asking Lucy McDermott to keep an eye on you because it doesn't even sound like something that I would say.

BY MR. RAO:

Q Do you try to collect information about me to make a case to terminate?

A We were not terminating you on September 17th. I already shared that we're moving you to a different role. So there was no discussion about terminating Gowtham Rao at the time, just moving Gowtham Rao into role that is better aligned with your

skills, ambitions, and success.

Q Did Lucy McDermott share with you the GowthamRao.com website?

A I do not recall exactly where this information came -- you -- came to me, but it could have been Lucy who shared this information. There are many people who contact me, Gowtham, on a daily basis and it's very hard for me to track specific communication, specific outreaches from people.

Q Of course. Did you have any thoughts of retaliating against me after the September 9th message?

A Again, I do not recall conversations or what happened September 9th in messages. And I do not agree with the statement of retaliation against you in general because there is no one who's trying to retaliate you or anybody.

Q So EPAM alleges that I stole the Synapse software and I am benefiting from it. What benefit do you think I have from the EPAM Synapse software?

A It's a loaded question here. I'm going to answer the question of what benefit you might have from Synapse software. You would be able to quickly able to offer it to your new potential clients in your business that you apparently initiated immediately

after termination from EPAM without spending any time on or investment in creating a software of this type.

Q What type of business am I -- what do you think I'm doing right now that affects EPAM negatively?

A I don't know what you are doing right now. No idea. I know that you started a business called CoReason, and from what I understand you were offering a software that is structurally similar to what Synapse was providing and that would -- again asking -- answering your previous question, if you would've had a Synapse codebase, you would be able to quickly offer it to potential clients without an investment from your side.

Q Has EPAM lost any business because of this alleged downloading and my starting a company?

A Well, EPAM business was impacted by several of your actions including deleting files from SharePoint -- that because obviously client presentations are quite important and some of them were, I believe -- client presentations. We -- I cannot blame a hundred percent whether it was due to actions, but the timing is -- is very relevant in this specific case. From what I understand, you reached out to J&J and you had a contract negotiated with J&J

immediately after leaving EPAM, and J&J was one of the clients you were pursuing as part of your job at EPAM selling Synapse to.

We also did not extend RWEAI Insight projects base, I forget which one, in 2006 [sic] was Takeda, whether it was due to something that you were -- on your side or not, I cannot state for -- but that's -- and I understand that also your actions might have caused confusion with our clients. If you reach out to our clients offering a software similar to what you were developing as part of your role in employment at EPAM, that would definitely create some confusion and questions on the client side as well.

Q How much money do you think I impacted?

A I'm not going to speculate on that.

Q Does EPAM have any estimate of how much money I have impacted?

A Does EPAM have any estimate? I cannot speculate on that because they -- I don't know. But again, there are specific numbers that you were provided -- that you provided to us as part of your strategy and those numbers never materialized, but you could look at those numbers and judge.

Q So the projections that I -- you're talking about the projections that I made in PowerPoint?

A Well, the projections are some numbers that you can refer to, but again, as I said, they were a bit inflated. But I would imagine that because of your actions there were some revenue would've been impacted that is similar to that or --
Q But have you -- do you know of any facts of actual damage caused by my actions?
A Well, the confusion with clients is a clear impact. I think a lot of clients were confused and a specific J&J project that you were pursuing and all of a sudden you started the contract. Can I put a number on it? Not going to speculate -- probably. Not going to do it.
Q Understood. How about ETL conversion? Do you, do you believe I created harm to EPAM based on ETL business?
A Do I believe you created a harm with you downloading an ETL conversion kit?
Q Allegedly, yeah.
A Allegedly. I'm not going to speculate. I don't know what you did with this codebase, but you could have created a harm. Yes.
Q How about Prometheus or AI cohort generator, do you believe that I have created harm to EPAM based on possession of that codebase?

A Again, I'm not going to speculate, but depending on the actions that you've taken on your time -- on -- on your side, you created or could have created harm to us. Specifically talking about AI cohort generator, I think that's something that you downloaded. I don't remember if you downloaded actually permits you -- I don't think you -- you had access to that codebase.

Q And you, so do you know what codebases I have access and I do not have access?

A I -- again, based on the information provided to me from our IT support, I had a list of different components and I remember some core components, not all of them.

Q Does EPAM have any evidence, factual evidence, of me winning EPAM's clients over?

A I -- again, I'm not going to speak for EPAM. I'm not EPAM. So you would probably have to ask EPAM these questions with doing the investigation. I'm just sharing the facts that I'm aware of. This information is not available to me, so I cannot answer.

Q Do you have any facts that you are compelled to share of me winning EPAM's clients?

A I'm not -- again speaking for EPAM, I'm

speaking as a witness representing the information and knowledge that is not in my position. I believe the question that you are asking would be better suited for a discovery team or somebody who is looking at the activities and the conduct that was done -- cannot tell you any answer to this question.

Q What are the products of EPAM that is alleged to be in my possession?

A As I said, I cannot remember every single repository and the product. I'm going to mention some form of -- to my understanding and recollection, you've downloaded Synapse, MedRAG, AI cohort generator, ETL conversion kits. I believe you also downloaded text Tabulate, and some of the other repositories that again, I cannot just recall it specifically, but some of them were EPAM -- some belonged to our clients.

Q Did you speak to Mr. Alex Asiimwe when you were in Gilead about me?

A About you? No. When we spoke with Alex, we spoke about business and --

Q When was that meeting?

A Which meeting?

Q The -- how many meetings have you had with Mr. Alex Asiimwe in Gilead after I left or

terminate -- got terminated from EPAM?

A I do not believe I had meetings with Alex after you left EPAM.

Q So is your statement under oath that after October 15, 2025, you did not meet Alex Asiimwe in Gilead?

MR. OSLICK: Objection to the form.

THE WITNESS: Right. To my best recollection of that, I do not recall meeting Alex after October 15th. I probably exchanged some information -- information emails related to an event, I think, that was planned at Gilead at the time. I -- Alex is a hard to get person. I believe I tried to reach out to Alex and he might have not responded to me to -- but my conduct with Alex was related to a business we're trying to conduct with Gilead.

BY MR. RAO:

Q Did you communicate with him over a meeting, virtual meeting, if not -- or a real -- sorry. Did you meet with him virtually or physically after October 15, 2025?

A I just said that I don't recall meeting Alex virtually or physically. He's hard to get guy. He's pretty senior level director.

Q Did you convey to Alex as you may anything

about the EPAM systems vs. Rao litigation matter?
A I do not believe I had a conversation with Alex about that.
Q Did you tell anybody in -- outside EPAM about the EPAM systems vs. Rao matter?
MR. OSLICK: Objection to the form.
THE WITNESS: I -- anybody outside of EPAM, that includes many people or --
BY MR. RAO:
Q Outside EPAM, EPAM's Counsel, your family.
A Clarify the question because there's so many people at EPAM, which -- with whom we discussed this matter as a part of the proceedings itself.
Q Have you discussed EPAM systems vs. Rao with anybody who's a professional network and not an employee or a contractor of EPAM or your family?
A I had some questions raised to me by clients and one of them is someone who works at J&J who called me I believe in sometime at the end of '25, I don't recall specific date, who clearly already had this information about the -- the matter and started asking me a question, what can we do to mitigate it? To which I, to my best recollection because it was a call -- phone call responded that it is best to have it dealt between EPAM legal and yourself.

Q Did you state to anybody that Gowtham should not be trusted or that he's a thief or that he stole EPAM's code outside the people --

MR. OSLICK: Objection to the form.

THE REPORTER: Outside. I'm sorry, outside what? I missed the end of the question.

BY MR. RAO:

Q Outside the people that said --

THE REPORTER: Okay.

MR. RAO: Let restate the question.

THE WITNESS: I did not state that you are -- it's not even the words I would typically use.

BY MR. RAO:

Q Did you state that I did something wrong at EPAM to anybody in your professional network?

A As a part of the termination when you were terminated, there were a client communication to, I believe, to or three different clients using a pretty standard form informing client that you are not longer with EPAM and introducing a new data science lead.

Q Did you communicate as any of the wrongdoing or alleged wrongdoing to any of these individual?

A I do not recall me sharing this information with those specific clients that were communicated with.

Q Have you made any statements that says, "Do not do business with Gowtham, he's not to be trusted" with any of your professional networks?
A I do not believe I explicitly made those statements to anybody.
Q Did you specifically make that statement?
A People were asking me and I was trying to avoid a conversation about you considering that there is a legal proceedings or ongoing legal proceedings.
Q Okay. So under oath, you're saying that you did not disparage me or make any statements that that prevents me from making -- getting business after I was terminated from EPAM?
A From my -- again, can you repeat the question?
Q Are you stating under oath that you did not discourage me or make any statement that interferes with my ability to gain business after I got terminated from EPAM?
A I think it's a loaded question, but I'm going to answer it differently. I -- after you terminated with EPAM, we had a very professional conversation with clients where you were involved in informing clients that you are no longer with EPAM. I do not recall me -- let me just think about how to

answer this question. I do not -- that's what I'm trying to do.

I do not recall me making any disparaging statements about Gowtham Rao or several, not several, but couple of clients or people that I knew reached out to me asking. I tried to not get involved in the conversation about an ongoing mitigation and your specific conduct.

Q -- client?

A One of the clients, or not even a client or colleague from Odyssey who called me was -- Brian and second was Sunil Dravida who was asking me about you.

Q -- two?

A I do not recall any other people where I discussed your litigation specifically.

Q And affirmatively, you did not tell anybody in Gilead about the alleged wrongdoing that I have done for EPAM?

A We communicated with Ram informing Ram that you are no longer with the company and a replacement with Sara Seeger [ph].

Q Okay. Do you know how much money EPAM has expended in legal fees for this litigation, Mr. Klebanov?

A I cannot disclose this information because I

heard this number from legal team.

MR. OSLICK: The number -- the amount we've expended in fees is not legal advice or request for legal advice. That number is not privileged. If, if you happen to know it, you can testify to it.

THE WITNESS: Again, I cannot tell you a precise number, but I've heard something in the number around 700,000.

BY MR. RAO:

Q When the litigation was brought up, did you go and talk to Arkadiy Dobkin asking for help to -- because you -- your code was stolen?

A So Arkadiy is the chairman of the board for EPAM. I don't think he is involved or wants to be involved with employee matters like that. So no, I did not talk to Arkadiy about this specific matter to my best --

Q Who was the person in your management chain that you went and shared about the alleged stolen code?

A My -- the first line manager in my management would be Greg Killian.

Q So you reported to Greg Killian that the code was stolen; is that correct?

A I did not report to anyone that the code was

stolen just to be clear. Information came to me with an InfoSec report.

Q Okay. What was Greg -- did you report that to Greg Killian, the InfoSec report?

A I -- we talked about this earlier today where Greg was on the list and the report was shared by InfoSec team. I do not know if Greg was on the list. Probably he was on the list with this information being shared.

Q Who made the substantive decision to -- to mitigate this matter, the business decision?

A I'll wait for Jacob to make up his mind then.

MR. OSLICK: I don't believe that's privileged. I think you can answer that.

THE WITNESS: I believe --

BY MR. RAO:

Q A fact statement.

A Yeah, I believe that at the time an initial proposal came from Greg Killian.

Q Did anybody make a statement that "We need to teach him a lesson"?

A EPAM is a professional company with professional employees and statements like teaching lesson, I do not believe any professional would make.

I do not recall statements like that.
Q Did anybody make any statement that "We need to make an example of this"?
A I do not remember the statements like that.
Q Did anybody make a statement that "We want to take action so as to prevent things like this in the future"?
A Again, I -- similar to -- I don't remember statements like that.
Q Did you observe any anger in the room when they discussed this matter?
A Anger? It's a business, professional people. There is no anger. There is no emotions. There's just facts and an employee misconduct, and the process by which the company -- publicly traded company --
Q Is there any communication that you're aware of in written form that talks about teaching me a lesson or making an example of it or something that suggests EPAM wants to take action because I'm a bad actor?
MR. OSLICK: Objection to the form.
THE WITNESS: I just previously said on the record that I don't recall any statements or conversations like that, verbal or written.

BY MR. RAO:

Q Was this lawsuit to punish me for refusing to commercialize Takeda code for EPAM?

MR. OSLICK: Objection to the form.

THE WITNESS: This -- lawsuit was a result of your action in violation of the employee code of conduct and what I stated in my declarations, the -- the download and the illegal download of the source code and the appropriation of the source code that belongs to the -- property that belongs to EPAM is one of the reasons.

BY MR. RAO:

Q And did I know the date of my termination in advance?

A Did you know -- I'm sorry?

Q The date of termination in advance?

A Did I know?

Q Did I know the date of termination in advance?

A You would not have known a date of termination in advance nor did I.

Q And when did I download the files according to the InfoSec report?

A Again, you're testing my memory, so to the best I can tell -- my best memory, my recollection,

but the InfoSec report stated that a -- a big portion of your download occurred between the date when you were informed of your changing roles to the date of your termination. And I believe early October was a lot of downloads happening.

Q Okay. And who knows that, you know, when did Synapse come about, like, the actual codebase of Synapse come about?

MR. OSLICK: Objection to the form.

THE WITNESS: Again, I explain --

BY MR. RAO:

Q Like, when did EPAM actually have physical possession of the Synapse code?

MR. OSLICK: Objection to the form.

THE WITNESS: Any idea starts with some code and eventually forms into a project. So I don't think anybody will be able to tell you the exact date of when something became on a codebase or property of EPAM. But I -- some code might have been produced sometime in March, even in April of 2025.

BY MR. RAO:

Q Is EPAM alleging that I have misappropriated ETL conversion kit code?

A ETL conversion kit was among the projects that you downloaded according --

Q Did I have authorized access to ETL conversion kit?

A If I were to believe the -- that you were able to download, it means you had access. Now, whether it was unauthorized access or access to a group membership because we just migrated into a new system. But you had access to the codebase.

Q Okay. Mr. Klebanov, I want to ask you specifically what is your position on every piece of non-public information that is inside a public company like EPAM? Do you consider all of it trade secrets?

A I'm not a legal expert. I'll provide my opinion on this matter. So if the -- let me just think about the answers. I think by default any information that is located within EPAM and protected by access controls regardless of the actual license should be treated as confidential information.

Q Question is about trade secret.

A Trade secret is a type of a confidential information.

Q So are you stating on the record that not all confidential information is trade secret?

MR. OSLICK: Objection to the form.

THE WITNESS: As I said, trade secret is the type of a confidential information, but there

are other confidential information that would be a different type.

BY MR. RAO:

Q Was all the files that I downloaded trade secrets --

A All the files or certain files that you downloaded a big portion was -- let me just think about the answer. If the files were an intellectual property of EPAM or the files were classified as confidential information and you downloaded those files, then those files would be in the category of confidential information.

Q Asking what trade secrets.

A Trade secrets would be included. So some of the files that you downloaded would be classified as trade secrets.

Q Okay. So not all the files that are downloaded are trade secrets. Is that --

A I don't know the all files and I cannot as a human being classify all 40,000 files as a one category or another category. But I know that files that you downloaded contain trade secrets and confidential information.

Q What are the trade secrets?

A Trade secrets might -- might include

internal battle cards, so pricing information, client information. So that will use pricing, the codebase itself.

Q So just -- you are stating on the record that the trade secrets that you identified in my download are the battle cards, the SOWs, the pricing information and some codebase; correct?

MR. OSLICK: Objection to the form.

THE WITNESS: I'm stating for the record that some type of the information that you downloaded are the trade secrets, might include some other information, which me not being an attorney would not be able to classify properly. But an attorney or somebody who is the legal expert in this matter would tell you specifically which file would be classified as a trade secret or not.

BY MR. RAO:

Q Did -- is the classification that was made on those report by the global information security officer, was that classification done by an attorney or was it done by an employee?

A We were asked to provide a report of files and based on our knowledge of the intellectual property and the license of those files categorize them as A, files that belong to EPAM's intellectual

property and the license of EPAM files that might belong to a client and the files that might contain a confidential information which is client confidential information as well.

Q Mr. Klebanov, under Defense Trade Secret Act, the count one and count two of this litigation, I'm entitled to know what trade secrets you are alleging that I misappropriated, that EPAM is alleging. I want to know specifically, what are the trade secrets? Can you state the trade secrets?

MR. OSLICK: Objection to the form.

THE WITNESS: Gowtham, I'm not a -- Mr. Rao, I'm sorry. I'm not a legal expert. I'm not an attorney. I don't have the details and -- or details or any deep knowledge of this specific act that you're referring to. So I'm not going to be able to answer this information -- this -- this question.

BY MR. RAO:

Q Are all the files that were downloaded -- allegedly downloaded part of your business unit?

A No. Some of the files were not part of my business unit. Some of the files belong to other EPAM projects that we -- I believe you were engaged with at the time.

Q Okay. Is it possible that those files were downloaded to create a analysis of my value to EPAM in a new role as a consultant?

A I cannot tell you the reason why you downloaded such a large number of files in bulk over such a short period of time while the rest of the year activity was pretty slow. So it doesn't align with the statement that you just made, you know, the -- like, based on my guess of the intent, that was not the intent that you had in mind.

Q Okay. And when you looked at the InfoSec report, were they -- did you observe any keep my files synchronization of OneDrive?

A I am not a technical expert, but what also puzzled me is that you also, I believe, had a -- a business issued laptop and I'm not sure why you had to use a personal device for downloading those files if you had a business issued laptop as well. But I'm not an expert. I cannot tell you why the -- and how OneDrive sync works or how it worked in your specific case.

Q Okay. Did Mr. Killian or you, sorry -- did Mr. Killian, who's the head of life sciences business unit suggest that in the new role, my responsibility would be the amount of revenue I touch, not the amount

of revenue I bring in?
MR. OSLICK: Objection to the form.
THE WITNESS: I do not remember that conversation taking place or the specific discussion taking place.
BY MR. RAO:
Q How does the Scientific Infomatics group get valued for what they bring to EPAM?
A I do not run, or I'm not responsible for the Scientific Infomatics group. So I cannot tell you how they've been measured or --
Q Did you ever state to me that the Scientific Infomatics team are counted based -- are valued based on the number of dollars they influence not the number of values they -- number of dollars they bring in?
A But -- is business unit; however, this information, I think is -- is known, but it's one of the ways they're being measured, not the only way. They're also being measured by their billable time, the actual revenue that they bring in.
Q Right.
A So they have certain, to my knowledge, targets for billable time and some certain targets for the revenue that they generate depending on the -- and it's -- more complicated -- depending on the -- level.

There's certain expectations.
Q So if a team is -- or a person in a team is valued based on the revenue that they touch, that means they would have to work with a lot of projects; correct?
A And touch is a very general keyword. I think, again, I'm not running a business unit, so I cannot state specific matrix of how they've been measured. I'm sorry.
Q So if a person is valued by a lot of projects, what is the easiest way to get access to all the files in those projects?
A Again, the access to files is being provided on a need to know basis and being granted by a -- a person who's responsible for access controls for those files, whether it's a project owner or a file owner or administrator.
Q If a person is being transitioned to a Scientific Infomatics role where they have access to a lot of different projects and they want to see their performance, would it be reasonable to say, "Keep my files so that I have all the files local"?
MR. OSLICK: Objection.
BY MR. RAO:
Q Yes or no?

MR. OSLICK: Objection to the form.

THE WITNESS: Can you restate your question again?

BY MR. RAO:

Q If a person is being transitioned to a Scientific Infomatics role and they wanted to have access to all the projects that they touched so that they can calculate the value that they brought in, is the option of keep my files in a SharePoint a reasonable thing to do?

MR. OSLICK: Objection to form.

THE WITNESS: Again, it's a speculation of something that would've happened or would've happened at the time we were not discussing any access controls as a part of your transition.

MR. RAO: Okay.

MR. OSLICK: Okay. Gowtham, just as a reminder, you -- it's 5:40. You agreed at 5:45 that you would end so that I could have a handful of questions before we --

MR. RAO: I said I'll do seven hours and then you can have 15 minutes. That was not agreement.

MS. LUGAR: That is not what you --

MR. RAO: No, Sarah.

MS. LUGAR: No, you appeared late for this deposition and then we started late and then --

MR. RAO: Matthew left --

MS. LUGAR: -- let us know he had to leave a little bit after six. And I specifically asked you, I said, "So then can we reserve you stop at 5:45 so we have our opportunity so the court reporter can leave time?" And you said, "Yes, that's fine." That's what happened.

MR. RAO: I want to keep my seven hours and I have questions to ask. You may ask your questions after my seven hours. The court reporter has time to 6:30 and now it is 5:34.

THE REPORTER: Can I -- all right. So I -- I want to let you know that the on the record time is six hours and 52 minutes and 32 seconds as of right now.

MR. RAO: Oh, we got -- minutes. Come on, we'll be done.

BY MR. RAO:

Q All right. Mr. Klebanov, is it possible that I accessed the file just because I wanted to keep track of all the projects that I worked on when I was an employee of EPAM?

A I cannot speak -- on the intent that you had

in mind. But the bulk downloads of all the files and such quantity and such short period of time unexpectedly, I don't think it aligns with your stated intent.

Q And does EPAM have any evidence of me using those files for my purposes that you are aware of?

A -- question -- if -- please restate the question.

Q Do you have any facts of me reusing the files or the code that was allegedly downloaded for my business purposes?

A According to the information that I saw on your website, I saw that you were at the time offering -- beginning to offer a product was strikingly similar to what we developed at EPAM called Synapse. However, the other files, I have no way of knowing how it was utilized --

Q Mr. Klebanov, did -- you said you had authorized -- Mr. Klebanov, did you authorize my use of Gemini and ChatGPT as -- or during my employment?

A What I allowed in our conversations -- you requested a license to be provisioned for those tools and my direction was yes, you can use it for business related purposes. However, I would expect you as an employee to go through a standard procedure at EPAM to

obtain those licenses and you follow some kind of a process as it's written and was dictated by EPAM. I am not authorized to give you freedom to just buy licenses at work.

Q Did you approve my credit card expenses for Gemini license for several months?

A I approved your credit cards, credit card expenses. I -- so Gemini licenses, I didn't look at the details of which particular expense, but I -- my assumption was that it was being for business related activities.

Q And did any of the account managers or Troy Rask tell you that after your notice on September 17th I informed them that I would like to start my own company and be a consultant for EPAM?

A I do not recall any conversations on that.

Q Why did you not allow me to mutually separate with cancellation of all restrictions on employee covenant agreement?

A Again, that's a question to EPAM. I'm not authorized to answer this question or give this authorization. I believe you worked with EPAM HR for almost a month trying to negotiate an amicable separation.

Q What was your reactions to Katie Barista's

email that -- about EPAM legal's opinion?
A I don't know what email you referring to. If it's an empty email from you to Katie Barista, I had no reaction because I don't recall what this email was or -- happening.
Q At any point, was there any subsequent follow-up on that topic that you received from Katie Barista or any other EPAM employee who's not --
A On the topic that --
Q The Takeda intellectual property and software ownership?
A Again, I do not recall discussing this particular topic with any -- with -- not any, but with EPAM employees outside of a legal consulting.
Q And is any of the software inside EPAM that you're responsible for that is alleged that I downloaded, owned by somebody else?
MR. OSLICK: Objection to the form.
THE WITNESS: I believe, based on my recollection that you downloaded the codebase that was developed as work for hires for some other clients. I cannot recall specific clients and a specific codebase.
BY MR. RAO:
Q Was the hospital system ETL code owned by

EPAM?

A I cannot say from the name hospital.

Q There are several hospital systems codes that EPAM possesses, ETL code. Are those owned by EPAM?

A It's depending on the type of a contractor, depending on the type of a project, depending on the type of a codebase. I cannot say --

Q Do those clients authorize EPAM's possession?

A I am not a legal expert. However, I believe there is certain clauses that if we develop a codebase allowing us to possess the codebase that was then provided to a client. But again, I'm not a legal counsel of how --

Q The master service agreement that you signed with Takeda, does that control the statement of work?

MR. OSLICK: Objection to the form.

THE WITNESS: The master services agreements outline general rules of engagement and the SOW refers to the master services agreement, but the SOW can also contain clauses that state certain clauses and certain legal -- if you have certain legal meanings, for example.

BY MR. RAO:

Q The master service agreement states that it controls, and if there is any disconnect dispute between the SOW and the master service agreement, which one wins?

MR. OSLICK: Objection to the form.

THE WITNESS: It's a very broad question with a lot of assumptions. I'm not a legal expert. However, if something is not stated explicitly in the master services agreement and is stated in the SOW, I believe the SOW --

MR. OSLICK: Court Reporter, are we at seven hours now?

THE REPORTER: We are.

MR. OSLICK: Thank you.

MR. RAO: Okay. All right. This concludes the deposition for my side, but it's your time now.

EXAMINATION

BY MR. OSLICK:

Q All right. Mr. Klebanov, I just have a few questions for you. You had testified during this deposition about an employee named Alex who lived in Belarus. Do you recall that testimony?

A Somewhat, yes.

Q Okay. If you had instructed Alex directly

or indirectly to look at another employee's screen in order to invade a client's access restrictions, is that something you would've remembered?
A It's something I would not do, but I would remember.
Q If Dr. Rao had raised concerns about whether EPAM had legal ownership of software that it was licensing to Takeda, is that something you would've remembered?
A I would've remembered that.
Q If Dr. Rao had raised concerns that EPAM was misappropriating Takeda IP, is that something you would've remembered?
A I would've remembered that.
Q Dr. Rao -- I'm sorry, can you repeat the last answer? I didn't hear it.
A I would've remembered that.
Q Okay. If Dr. Rao had objected to showing Synapse to Johnson & Johnson or to any client, is that something you would've remembered?
A I would've remembered that as well.
Q If you had asked Lucy McDermott to make reports on Dr. Rao or to keep an eye on Dr. Rao, is that something you would've remembered?
A I would not do it, but I would've remembered

that.

Q Fair to say that if you don't remember things happening that you would've remembered, it means they did not happen?

A Would be a fair assumption, yes.

Q Prior to Dr. Rao's termination, had you heard of Dr. Rao representing himself to an EPAM client as a free agent?

A This information came to me through somebody else, yes.

Q Did that factor into the decision to terminate Dr. Rao's employment?

A Yes, because it clearly stated the intent.

Q Okay. At any point during Dr. Rao's employment, did you receive complaints about Dr. Rao's treatment of the employees he was managing?

A I received several complaints from employees directly and some indirect.

Q Did those complaints and reports that you received factor into the decision to move Dr. Rao into a different role?

A Yes.

MR. RAO: Okay. You got ten minutes.

MR. OSLICK: I'm still talking.

//

BY MR. OSLICK:
Q Are you aware one way or another about whether there are written policies that EPAM that define what a trade secret is?
A I -- I'm aware that the certain code of conducts and the information security policy. I do not know the exactly trade secret definition within EPAM.
Q Secret -- you don't know if EPAM has a company definition of trade secrets or not; correct?
A No.
Q All right. You testified earlier about an employee named Evgeny; right?
A Yes.
Q Am I correct that he's physically located in Turkey?
A I believe that's his location.
Q And Dr. Rao showed you a message exchange between yourself and Evgeny that had timestamps; correct?
A That's correct.
Q Do you know whether that -- the timestamps on that message exchange were Turkish time, Eastern U.S. time or some other time?
A I would not be able to tell this from the

message, full confidence, at least.
MR. OSLICK: No further questions.
THE REPORTER: Okay. Are we --
MR. RAO: All right, sir, yeah, I think we are done.
THE REPORTER: Okay. So really quick, I'll try to make the -- the wrap-up here as quick as I can. I believe we have Mr. Oslick's order for the transcript; is that right? You were the -- you're the -- the attorney who submitted the -- the request?
MR. OSLICK: I -- no, I did not submit this. This was scheduled not by me, but by Dr. Rao.
THE REPORTER: Okay.
MR. RAO: So Matt -- so I'm the deponent and -- or Mr. Klebanov is the deponent and -- Mr. Oslick is the attorney for the --
THE REPORTER: Yeah. Yeah, I'm -- I understand that. I'm just saying, like, he -- I guess because he is an attorney and you are not, that's why Veritext put it under your name and not your name.
MR. RAO: -- deposit for it.
THE REPORTER: So I can't -- I can't hear anything right now. I'm sorry.
MR. RAO: Oh, I have paid a deposit for it.

THE REPORTER: Okay.
MR. RAO: It just needs to be sorted out. Maria, I think, is the person in Veritext who's been communicating with me.
THE REPORTER: Okay.
MR. RAO: And the person who works at the front desk in this -- a local office took that information down.
THE REPORTER: Okay. I'll -- I'll figure it out.
MR. OSLICK: I am not sure what Veritext's policies are regarding whether we can send copies of transcripts to each other or whether we each have to buy them. I think what we had agreed, and correct me Gowtham if I'm wrong, is that if we can send free transcripts that I will send you a free copy of your transcript and you will send me a free copy of this transcript. If we're not permitted to do that by Veritext policies, then we each buy copies of the transcript and I would need your contact information.
THE REPORTER: Okay. So for now, I'll put it in just as an order for him and not an order for you, and then we'll see.
MR. OSLICK: Correct.
THE REPORTER: And from there, if you

need to order one, you can contact Veritext and they'll send it to you. Okay. All right. It is 5:55.

(Whereupon, at 5:55 p.m., the proceeding was concluded.)

______________________________

GREGORY KLEBANOV

Subscribed and sworn to before me

this __ day of ____________, 2026.

____________________________________

Notary public

CERTIFICATE OF DEPOSITION OFFICER

I, MATTHEW SCHENKEL, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.



MATTHEW SCHENKEL
Notary Public in and for the
Commonwealth of Pennsylvania

CERTIFICATE OF TRANSCRIBER

I, PATRICIA DENEEN, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Patricia Joy Deneen

PATRICIA DENEEN

ERRATA SHEET

VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: EPAM Systems, Inc. v. Rao
DATE OF DEPOSITION: 9/29/2026
WITNESSES' NAME: Gregory Klebanov

| PAGE | LINE (S) | CHANGE | REASON |
|---|---|---|---|
| ____ | ________ | ____________________________ | __________________________ |
| ____ | ________ | ____________________________ | __________________________ |
| ____ | ________ | ____________________________ | __________________________ |
| ____ | ________ | ____________________________ | __________________________ |
| ____ | ________ | ____________________________ | __________________________ |
| ____ | ________ | ____________________________ | __________________________ |
| ____ | ________ | ____________________________ | __________________________ |
| ____ | ________ | ____________________________ | __________________________ |
| ____ | ________ | ____________________________ | __________________________ |
| ____ | ________ | ____________________________ | __________________________ |
| ____ | ________ | ____________________________ | __________________________ |
| ____ | ________ | ____________________________ | __________________________ |
| ____ | ________ | ____________________________ | __________________________ |
| ____ | ________ | ____________________________ | __________________________ |
| ____ | ________ | ____________________________ | __________________________ |

________________________________
Gregory Klebanov

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF ____________, 20__.

______________________ (NOTARY PUBLIC)

______________________ MY COMMISSION EXPIRES:

**&**

**&** 19:9 23:2,7,9 23:11,15,23 24:5,9,12,12,18 25:4,8,15,19,24 26:4,13,17,24 27:4,15,23 104:22,25 105:4,6,10 110:24 111:6 111:13,19 112:1,21 113:1 243:3 293:19

**0**

**0** 118:7
**001** 3:9 42:4,5 42:13 47:20
**002** 3:10 52:6,7
**003** 3:11 71:15 71:16
**004** 3:12 83:19 83:21
**005** 3:13 109:9 109:10
**006** 3:15 127:17,24 128:1
**007** 3:16 127:16 231:11 231:12
**008** 3:17 243:17,19,22
**009** 3:19 245:18,19
**0092** 252:16
**05** 261:16
**06260** 1:7

**1**

**1** 32:6,10 35:19 74:7,18
**10** 3:20 4:9 7:19 246:15 250:3,4,7,7
**10/15** 247:1,4
**10/15/25** 247:7 248:3
**100** 4:3
**10018** 2:6
**101** 4:4
**104** 4:5
**109** 3:14
**10:18** 22:19
**10:19** 22:21
**11** 3:21 254:14 254:15
**110** 250:6
**11:20** 245:9 248:6
**12** 78:8,19 100:13 101:24
**12/16/2024** 53:6
**123** 4:6
**127** 3:15
**12:06** 246:4,16 248:4
**12:10** 246:18
**12:13** 98:3
**12:24** 98:5
**13** 4:7,11
**140** 4:7
**142** 4:8
**14th** 200:13 201:19
**15** 4:3 118:17 155:14,21 157:3 245:9 252:6 269:5,21 286:22
**152** 4:9,10
**153** 4:11
**15th** 197:16 199:15 200:13 201:19 240:22 244:11 246:4 246:16 269:10
**1650** 1:14
**17** 183:2 214:12,23 217:25 218:14
**17th** 182:23 204:2,13,21 212:3 213:15 213:19,23 214:18 215:4,9 217:1,9,12,15 217:16 218:19 218:20 220:13 221:8 261:23 262:1,7,22 289:13
**18940** 2:13
**19** 3:25 19:11 19:12 86:17 88:15,17 92:12 92:20,25 93:11 93:18 99:23 100:3 101:18 103:3,14,19 121:10 128:7 144:19,24 145:6
**19103** 1:16
**19th** 88:22 92:17 177:9 182:7
**1:09** 252:6
**1:24** 137:6
**1:50** 137:9
**1b** 43:3,4,17,18 43:23,24

**2**

**2** 191:7,8 206:4
**2.5** 205:18,20 205:23
**20** 19:10 42:18 47:24 301:22
**2006** 265:5
**2017** 11:2 18:5
**2019** 19:7,14,16 74:7,18 94:3

233:20 234:7 234:21
**202** 2:12
**2024** 19:16,23 20:2,11,20 21:5 23:15 24:4,19 25:3 25:13 26:10,15 28:19 35:1 36:25 38:12 39:18 40:8,12 45:3 51:21,25 53:15 54:24 139:14 181:18 186:7 187:7 188:16
**2025** 49:18,25 67:7 86:8,17 88:15,17 92:13 92:20,25 93:11 93:18 95:11 99:23 100:3 101:18 103:3 103:14,19 108:9 110:17 110:24 111:2,5 111:11 113:5 114:16,17 115:1 116:14 116:15,19 117:24 118:7 118:12,17 121:10 128:7 136:23 139:14 144:19,24 145:6,11 149:21 150:1 155:21 157:3 183:2 186:7,8 186:10 190:8 190:10,20,21 193:19 194:9 194:18 195:2 196:8,21 210:20 211:10 211:12,15 213:11 214:12 214:24 215:4,9 232:10 235:8 235:19 236:17 237:15 243:4 245:9 252:6 269:5,21 278:20
**2026** 1:11 5:8 139:15 298:12
**212** 2:8
**218-6480** 2:8
**23** 192:15
**231** 3:16
**24** 63:7 64:5
**243** 3:18
**245** 3:19
**24th** 187:21,21
**25** 4:10 63:7 95:12 139:18 191:1 246:16 270:19
**250** 3:20
**254** 3:21
**26373** 300:14
**267** 2:15
**29** 1:11 5:8
**292** 3:4
**2:23** 247:5,7
**2:25** 1:7 247:1

**3**

**3** 4:4,15 149:21 150:1
**32** 287:16
**34651** 299:19
**35** 3:8
**37** 3:25
**3:16** 196:24
**3:27** 197:2

**4**

**4** 4:5 39:8
**4,600** 139:6,14 141:1,11,20 142:7,25 143:5 143:11 144:13
**40** 39:17,24 162:13
**40,000** 280:20
**400** 32:5,9
**41** 2:12
**42** 3:9
**44,160** 162:9
**47** 4:15
**4:00** 39:2
**4th** 150:13

**5**

**50** 139:22
**500** 32:5,10
**5150** 1:15
**52** 3:10 287:16
**5:34** 287:13
**5:40** 286:18
**5:45** 286:18 287:7
**5:55** 298:3,4
**5th** 150:13

**6**

**6** 36:25 38:12 78:8
**6/19/2025** 84:12
**620** 2:5
**6:30** 287:13

**7**

**7** 3:3 4:6 40:8 40:12
**700,000** 274:8
**71** 3:11
**759-9000** 2:15

**8**

**83** 3:12
**8th** 2:5

**9**

**9** 4:8 108:9 110:16,24 111:2,5,11

113:5
**9/29/2026** 301:3
**9:30** 7:17
**9:49** 1:12 5:5
**9:53** 7:17
**9th** 109:22,24 110:8,21 111:3 111:9 113:13 113:20 114:3 182:17 208:16 210:10,16 213:14,23 214:11,18,23 215:3,8 217:1 217:9,17 218:1 218:5 260:24 261:4,23 262:1 262:7 263:11 263:14

**a**

**a.m.** 1:12 5:5 7:19 245:9 248:6
**abbreviation** 71:11
**abilities** 202:7 212:5
**ability** 8:2 9:10 9:12 12:4 89:13 118:15 207:7 211:7 212:22 257:4
272:18 299:10 300:7
**able** 9:16 36:4 72:12,16 129:1 129:15 159:11 175:21 237:11 238:1 256:17 256:17 263:23 263:24 264:12 278:17 279:4 281:13 282:16 295:25
**absent** 5:12
**absolutely** 251:18
**academic** 45:24 46:3
**accelerated** 125:21
**accelerator** 68:16,18,23 69:1,2,7,9,12 80:25
**accelerators** 68:24 69:10 213:8
**accent** 22:4,6
**accept** 222:22 223:1,2
**acceptable** 112:19 253:14
**acceptably** 254:1
**access** 56:11,13 56:17,23 57:2 57:4 58:2,6 60:10,14 64:24 65:1 132:19 150:8 159:15 159:17,17,19 159:23,25 160:1 163:21 163:24 164:6,9 164:10,11 165:1,3,14,15 165:17,19 166:18,23 168:9,14 169:14,17 171:5,9,13 172:9 176:4,5 267:8,10,10 279:1,4,5,5,7 279:16 285:11 285:13,15,19 286:7,14 293:2
**accessed** 287:22
**accessing** 56:24 171:20
**accidentally** 178:18 179:9
**account** 105:5 252:18 257:6 289:12
**accountability** 34:11
**accountable** 144:22
**accounting** 186:25 188:3,9 188:9,13 190:14,14 192:17,18 206:25
**accounts** 56:9
**accrual** 187:1 206:25
**accrued** 93:19
**accruing** 190:15
**accurate** 187:8 187:12 299:9 300:5
**accurately** 8:4
**achievable** 192:22
**achieve** 184:23 207:8 211:9 212:11,24 225:14
**achieved** 195:16
**achieving** 11:5 196:18 205:12 205:13 210:21
**acknowledge** 10:25 40:10
**acknowledged** 178:22 195:1

**acknowledging** 195:5
**acknowledg...** 5:9
**acquired** 19:22 20:1,9 28:19 44:4 48:10 65:12,15 76:9 76:14,16 173:17 187:13 187:21 207:2
**acquisition** 11:6 14:12 28:22,23 29:1 29:2,5,7,13,24
**act** 159:2 163:5 282:6,15
**action** 122:15 217:25 276:6 276:20 277:6 299:12,16 300:8,12
**actions** 158:3 203:7 217:15 253:3 264:18 264:23 265:8 266:4,7 267:2
**active** 25:20 95:16 170:24
**actively** 23:15 24:4 40:18,25 243:13 256:13
**activities** 45:14 45:18,19 47:13 49:9,13 66:14 106:6 153:24 155:6 156:5 170:12,15 198:10 199:10 199:15 200:25 213:24 214:8 268:5 289:11
**activity** 201:3 241:1 258:4,4 283:7
**actor** 276:21
**actual** 120:1 128:23 147:3 189:14 206:23 266:7 278:7 279:16 284:20
**actually** 11:15 19:12 38:20 53:4 60:4 61:24 63:6 72:18 91:18 116:6,17 120:2 126:21 131:3 136:16 168:13 189:14 194:11 229:11 235:21 236:25 239:2 267:7 278:12
**adding** 100:2
**addition** 119:21
**additionally** 5:12
**address** 14:2 41:15 233:25 260:4
**addressed** 210:4
**administer** 5:10
**administrative** 164:22 165:1 166:16,22 167:16,19,24 168:6,20,25 169:3,6,7
**administrator** 165:20 167:21 168:4 169:19 169:22 256:1 285:17
**administrators** 165:2 170:5
**advance** 237:12 277:14,16,19 277:21
**advertising** 116:17
**advice** 37:13 100:18 101:2,3 101:12 104:6 108:23 138:1 142:14 152:16 274:3,4
**advised** 54:12 178:6
**advisor** 102:8
**affect** 8:2 9:9 158:25 202:6
**affected** 158:22 158:25 159:13
**affecting** 22:9
**affects** 202:2,4 264:4
**affirmation** 194:17
**affirmative** 194:23,24
**affirmatively** 273:16
**afternoon** 199:22,25 200:1 210:10
**agent** 220:18 220:18 294:8
**agentic** 232:12 252:9,14
**ago** 98:2 127:4 184:25 247:6
**agree** 5:10 11:20,22 39:13 53:6 55:18 89:6 91:8 120:23 122:12 136:23 228:7 263:15
**agreed** 7:1 129:13 195:1 200:11 286:18 297:14

**agreement** 3:11 26:12,16,19,20 26:23 27:3 28:22 29:1 32:13,14 42:25 44:12 45:2,2,5 53:9 56:20 72:1,2,7,13,16 72:18,20,21,25 73:4,6 74:5,8 74:13,16,17,24 75:3,6,14,17,17 76:1,5,7,12,17 77:4,23 79:24 94:1 95:11 100:13 102:1 102:22 108:11 121:3 167:13 168:8 230:1 286:23 289:19 291:16,21 292:1,3,9
**agreements** 26:3 42:25 46:10 74:22 75:22 76:22 77:3 102:17 158:10 291:20
**agrees** 79:4
**ahead** 22:17 39:4 223:7
**ai** 68:16,18,23 68:24 69:1,2,7 69:9,12 80:24 86:4,4 87:18 91:3 95:9,14 96:10,12,24 120:1 183:19 183:20,23 205:19 207:11 207:18 208:1,5 208:5 210:23 211:4,23 212:6 212:7,19,19 213:8 221:23 221:24 232:12 237:21 252:10 252:14 266:23 267:4 268:12
**aiming** 32:6,10
**aka** 232:15
**aleksiayuk** 48:21,24 49:4 49:7,11 53:16 54:23 55:6 57:8 59:1,9,12 59:18 60:6,19 61:4,18 62:16 64:23,25
**alex** 49:15,17 53:11,14 55:14 57:13,13,15,18 57:18,20,23 59:20 60:3 61:21,24,24,25 268:18,20,25 269:2,5,9,13,14 269:15,22,25 270:3 292:22 292:25
**alexander** 48:20,24 49:4 49:7,11 53:15 54:22 55:6 59:1,9,12,18 60:5,19 61:3 61:18 62:16 64:23,25
**align** 212:4,13 212:15 213:21 283:7
**aligned** 212:25 221:21 262:25
**alignment** 212:18
**aligns** 129:22 288:3
**alleged** 154:11 264:16 268:8 271:22 273:17 274:19 290:16
**allegedly** 266:19,20 282:20 288:10
**alleges** 263:18
**alleging** 278:22 282:8,9
**allow** 12:5,20 12:21 56:23 106:14 171:5 172:15 175:25 289:17
**allowed** 9:25 41:2 50:7 55:19 77:6 129:6 170:21 244:21 288:21
**allowing** 291:13
**aloud** 12:2 43:11 52:20 85:23 250:17 251:14
**ambitions** 183:21,23 212:5,16 213:21 217:14 221:21 263:1
**ambush** 11:11
**amended** 198:11
**amendments** 76:23
**amicable** 289:23
**amount** 41:10 274:2 283:25 283:25
**analysis** 116:12 283:2
**analytics** 29:6 29:12
**anger** 276:10 276:12,13
**answer** 3:23 4:1 9:10,13

10:7 12:21,22 15:12,14 16:17 19:4 24:24 26:14 28:2,17 37:20,20,24 38:24 46:19 58:17,19 61:8 91:5,15 100:16 100:23,24 101:4,10,13 104:4,5 114:21 121:21 123:8,9 123:11 125:13 139:4 140:14 140:15,17,22 140:24 142:10 142:11,13,21 142:22 146:2 152:15,17 153:5,14,16 169:19 182:21 184:7 196:15 196:16 201:15 201:22 208:22 208:23 218:8 219:8 222:25 226:1 230:5 242:13 244:17 244:22 250:19 263:22 267:22 268:6 272:21 273:1 275:15 280:8 282:16 289:21 293:16
**answered** 57:22 163:13
**answering** 12:6 121:20 264:11
**answers** 9:17 12:2,24 13:4,9 223:16,17 279:14
**anxious** 242:24
**anybody** 47:12 104:19 123:20 124:1 130:10 130:13 145:25 146:2,4 148:6 148:10 157:2 165:5 172:8 175:9 184:2 197:9 202:23 214:10,22 216:20 219:21 220:21 251:1 263:17 270:4,7 270:15 271:1 271:15 272:5 273:16 275:21 276:2,5 278:17
**anymore** 130:22 131:14
**apologies** 22:4 127:23
**apparently** 209:11 218:23 263:25
**appeared** 287:1
**appears** 42:18 85:18 166:7 253:4 255:10
**apple** 170:17
**applicable** 5:18 199:8
**application** 158:23
**applied** 158:16 222:13 227:18
**applies** 85:5
**apply** 222:17
**appreciate** 22:7 34:18 52:2 211:15
**appreciated** 253:10
**approached** 220:16
**appropriate** 54:13 173:10 181:5 253:8
**appropriately** 231:6
**appropriation** 277:9
**approve** 141:15 141:17 289:5
**approved** 50:13,14 53:9 53:13 90:11 93:1 99:2 170:4 172:2 289:7
**approximately** 17:25 62:25 63:3,5 64:5 190:13 199:21 201:24
**april** 187:3 278:20
**arachne** 16:16
**archie** 19:23 20:2 29:20,22 29:23 30:3
**architect** 14:21 16:11,18
**architecture** 15:9,18 16:1 16:12,19 17:21 92:4
**architectures** 15:3
**area** 181:12,13 181:23 185:10 188:22
**argue** 11:10
**arkadiy** 274:11 274:13,16
**arrives** 97:14
**aside** 40:17
**asiimwe** 268:18 268:25 269:5
**asked** 15:21 24:22 25:10,11 25:11 30:15 34:19 37:15

43:7 50:16 58:19 113:2 122:21,25 123:3 140:20 141:4 166:10 168:17 172:6,8 181:16 232:4 241:14,18 242:1 247:4 251:11 281:22 287:6 293:22
**asking** 8:13 16:12 37:13,18 43:17 48:4 57:6 61:9 70:9 101:1,10 102:15 108:10 123:8 128:21 143:10 159:8 166:7 172:13 181:3 195:8 214:20 231:23 231:24,25 241:4 242:22 248:22,24 249:10,16,23 262:15 264:11 268:3 270:21 272:7 273:6,12 274:11 280:13
**aspects** 211:21
**asserted** 98:17
**asserting** 100:19,20
**asserts** 111:25
**asset** 124:24
**assets** 121:2
**assign** 166:17 166:22
**assigned** 5:3 90:4 91:11 162:15 233:19
**assigning** 66:17
**assignment** 163:23
**assist** 7:9 13:3 13:18,24
**assisting** 12:24
**associated** 21:7 155:2 156:1 184:9 211:4 238:23
**assume** 41:23 62:18 91:18 114:22 119:16 128:15 131:3,4 163:24 169:4 169:20 170:1 170:14 210:8 226:17
**assuming** 171:23 176:6 246:17 247:6
**assumption** 289:10 294:5
**assumptions** 94:8 259:20 292:7
**assured** 237:10
**atmos** 45:20
**attached** 41:19 79:24 252:23
**attachment** 113:22 209:19 209:20
**attempt** 40:4
**attempted** 35:7
**attempting** 193:15
**attendance** 5:25
**attending** 6:12
**attention** 70:25 179:2 186:17 252:13 253:11
**attorney** 6:1 37:10,14,21 75:9,20 79:18 80:4 104:9,11 120:13 123:12 137:15,25 138:19 161:12 163:7,14 166:8 166:10 174:17 175:4,6 197:10 281:12,14,20 282:14 296:10 296:16,19 299:14 300:10
**attorneys** 10:1 98:15 197:6
**atypic** 207:16
**audible** 9:17
**audio** 8:21,23 9:15 22:6,9 299:8 300:3
**augmented** 232:14
**august** 187:22 211:15 212:17 213:5,11 235:21
**authentic** 74:12 109:21
**authenticate** 78:1 84:8 109:18 127:21 231:17 232:3 232:18 246:1 250:23
**authenticating** 74:22
**authority** 34:5 34:8,10,21 76:4
**authorization** 166:17 289:22
**authorize** 198:2 288:19 291:9
**authorized** 5:9 89:16 126:6,10 165:15 279:1 288:19 289:3 289:21

**available** 44:8 48:14 90:25 117:16,16 253:7 267:21
**avenue** 2:5
**average** 186:13 186:14
**avoid** 272:8
**avoidance** 43:25 44:1,2 48:7
**aware** 21:6 44:9,13 45:3 51:21 64:23 68:2,3 72:21 72:25 103:12 105:25 112:18 124:22 130:13 130:18 146:4 156:14,17 159:12,14 162:19 164:7 169:23,25 170:7,9,13 171:12,19 172:5,6 178:12 179:5 190:9,18 209:5 215:7,10 218:24 219:12 219:15,16 240:2 267:20 276:17 288:6 295:2,5
**aws** 243:3

**b**

**b** 3:6 181:13
**back** 39:3 41:20 54:22 78:7 122:4 128:14 137:13 157:25 172:12 177:6 182:19 232:24 245:2 261:16
**background** 17:3 21:16,22 21:23 231:19 232:7,7
**bad** 204:19 276:20
**badgering** 121:17,21 132:10
**ballpark** 118:2
**barista** 3:14 108:10,21 109:15,19 110:8,13 122:23 123:21 124:2 126:13 127:2,6,10 182:16 208:17 209:12 260:25 290:3,8
**barista's** 289:25
**base** 265:5
**based** 84:12 87:20 88:19 93:1,25 123:12 131:13,16 132:3,12,17 133:2,5 134:9 138:7,19 145:12 158:19 159:6,18,25 160:7,9,17,23 162:14,25 163:15,23 164:24 169:5 169:14,18 176:4 193:5,12 195:15 196:1,8 196:9,10 199:1 200:24 203:22 206:12,24 207:1 209:9 220:15 227:13 228:17 248:2,4 254:21 258:5 258:10,17,20 259:12 260:18 266:15,24 267:11 281:23 283:9 284:13 284:13 285:3 290:19
**baseline** 186:19
**basic** 87:17
**basically** 51:7 85:16 184:14 216:10
**basing** 143:25
**basis** 65:22,24 65:24 70:24 114:21 145:5 145:10 162:3,4 165:18 166:18 187:1,1 191:19 193:10 194:14 213:2 214:13 214:14 228:16 263:7 285:14
**bates** 36:15,16
**battle** 281:1,6
**bearing** 227:20 229:12
**becoming** 207:3
**beetlestone** 150:14,23
**beginning** 78:11 87:10 191:19 288:14
**behalf** 2:2,17 105:7
**behavior** 156:7 229:10 252:9
**belarus** 48:25 53:8 54:23,24 55:1,7,14,16,16 55:18 259:16 292:23

**belarusian** 55:17
**belief** 132:8,15
**believe** 23:11 24:8 25:17 28:6 33:15,17 34:18 35:5 40:7 49:2 50:9 60:1,1 62:20 62:21,24 65:20 68:14 70:5 77:5 80:17 86:25 87:4,11 87:21,24 88:16 89:2,25 95:16 95:18,21 96:2 96:11 99:1 100:4 105:3 110:6 116:4 121:6 131:17 132:4,11,20 143:2,17 145:8 151:25 155:7 156:17,20 157:6 178:7,10 178:19 179:4 180:8 181:6 190:25 191:4,5 191:14,22 192:22 193:24 195:22 198:8 199:18 201:17 205:6,11,22 206:1,2,5 207:5,6 208:3 208:4 211:1,7 211:13 214:19 215:19 220:3 220:15 222:3 222:24 223:14 223:21 224:9 224:12,13 227:15 229:10 231:11 234:13 235:16 236:21 237:4 238:11 238:20,21 240:1,25 241:13,15 243:11 244:4,5 245:3 248:9,16 251:1 253:1,17 253:24 257:2 262:3,4 264:21 266:15,17,24 268:2,13 269:2 269:13 270:2 270:19 271:18 272:4 275:14 275:16,19,25 278:4 279:3 282:24 283:15 289:22 290:19 291:11 292:10 295:17 296:8
**belong** 94:16 144:18 234:22 281:25 282:2 282:23
**belonged** 218:2 268:17
**belongs** 81:9 85:6,6 94:12 103:8 104:13 122:17 133:11 133:16 238:18 277:10,10
**benefit** 263:19 263:22
**benefiting** 263:19
**benign** 62:15
**best** 9:6,20 12:4 62:21 82:16 84:17 85:7 95:18 118:15 126:9 132:12 147:15 161:23 161:25 165:21 167:1 178:15 199:3 206:4 240:3 253:11 259:5,7,10 269:8 270:23 270:24 274:17 277:25,25 299:10 300:6
**betray** 116:6 206:3
**better** 7:14 22:13,14 183:21 212:4,6 212:14 213:21 213:22 221:20 262:25 268:3
**big** 80:15 91:2 161:20 184:6 211:2 220:6 278:1 280:7
**billable** 90:8,11 119:13 145:16 145:17,18,19 284:19,23
**billed** 120:8,10
**billing** 69:20,21 69:22,23 119:12 141:15 141:17,18 179:25 180:2,4 180:5,9
**billion** 32:6,10
**bin** 157:22 255:7,12,19,22 255:23,24
**bins** 255:14
**bit** 8:17 39:23 115:24 147:7,8 246:23 266:3 287:5
**biweekly** 194:13
**blame** 264:22
**blown** 207:3
**blue** 18:6,6,9 18:10,11,12,12 18:13,13,19,19

18:21,21 19:7 19:8,13,13
**board** 184:1,2 184:5,7 274:13
**body** 113:21 127:11 209:23 209:25 210:1,3
**book** 175:15
**bookkeeping** 127:24
**booths** 189:3
**bottom** 41:22 73:8 78:9 109:16,17 128:18 191:12
**bound** 25:22
**box** 128:17,19
**brain** 202:18
**brand** 118:3,8
**breach** 253:4
**break** 13:15,17 22:8 77:17 97:5,6,8,11,13 97:14 136:14 136:17 137:4 137:14 138:3 140:5,5,6 195:10 196:23 205:16 206:9 229:19
**breakdown** 139:8,11,24
**breaks** 10:9 13:5 97:17
**brian** 273:11
**brief** 10:25
**briefly** 218:15 218:17
**bring** 22:1 170:23 171:4 236:1,2 252:13 284:1,8,15,20
**bringing** 183:18 185:8 217:3
**brings** 186:24 245:1
**broad** 69:9 172:10 181:1 202:5 211:17 292:6
**broader** 143:10 162:8 167:14 185:8
**broadly** 239:15
**broke** 90:20
**brought** 30:20 31:5,9,13 118:25 177:9 179:2 236:5 237:8 274:10 286:8
**brush** 102:1
**bu** 207:21
**bucket** 205:20
**build** 80:24 89:16 90:24 91:2,11 120:20 121:3 122:3,16 145:15,20,22 211:7,19 213:5 230:23 234:22
**building** 11:5 185:6 213:8 232:8 234:22
**buildings** 106:2
**built** 11:3 81:7 83:5 87:22 91:3 111:13 116:14,15 121:12 124:23 125:6,10,15,19 126:7 130:7,25 135:13 136:24 154:13
**bulk** 283:5 288:1
**bundled** 155:16 259:20
**bundling** 229:2 229:17
**business** 17:5 29:16 30:9,13 32:15,23 41:6 48:21 50:8 51:13 54:4 65:6 69:3 91:10,23 105:3 106:16 112:7 112:10 114:10 116:25 117:9 118:22,23 119:19,23 120:19 121:1 121:25 130:10 140:2 142:2 159:22 164:19 170:14,15 171:1 173:3,13 173:22 177:12 186:16,20 188:22 189:8 189:11,22 190:19 191:21 192:13,14 193:13,14,15 195:6,6 197:20 204:15,23 205:14 207:17 207:21,22,23 210:21 211:6 211:22,23 212:4,9,12,13 212:23 215:18 220:4 222:1,2 222:4 230:12 235:25 238:4 242:7 259:17 260:5,18,20,21 263:25 264:3,7 264:15,17 266:16 268:21 269:16 272:2 272:12,18 275:11 276:12 282:21,23

283:16,18,23 284:16 285:7 288:11,23 289:10
**buy** 289:3 297:14,19

**c**

**c** 2:1 4:13 5:1
**cafeteria** 107:18
**calculate** 286:8
**calendar** 186:10 187:4,4
**call** 39:17,24,25 50:7 51:1 87:1 106:7,11 174:3 200:3,7 201:4 218:11 219:19 221:8,8,12 237:2,3 239:3 239:22,23 240:5 243:11 247:6 248:22 270:24,24
**called** 6:20 41:4 42:24 48:20 50:15 67:19,25 68:3,4,4,8,10 68:16,20,23 69:1 82:11,11 82:15 86:9,11 86:13,16,25 87:21,22,23,24 89:10 90:15,16 95:19,21,23 130:22 134:3 138:13 146:14 148:8,13,15 152:1 175:16 211:1 213:9 216:6 222:3 255:6 264:7 270:18 273:11 288:15
**calls** 100:17 107:5 219:17 221:15 235:10 239:11 243:14
**campus** 107:1
**cancellation** 289:18
**candidates** 33:24
**capacity** 6:12
**capital** 141:21 141:24 142:3,4
**capture** 251:15
**captured** 179:21
**card** 289:5,7
**cards** 281:1,6 289:7
**care** 54:17 56:13 178:8,9 178:11 182:13
**career** 14:11,16 14:19
**carefully** 37:16
**carolina** 18:6,9 18:11,12,14,20 19:8
**carve** 44:11
**case** 1:6 40:7 62:18 65:20 77:25 87:23 88:6 89:8 94:17 99:8 114:22 115:21 116:3 119:24 120:1,2 137:16 138:2 153:4 181:6 208:25 208:25 216:23 233:25 236:10 240:21 262:20 264:24 283:21 301:2
**cases** 81:8 87:25 91:5 116:18 174:19 180:9 181:3,5 186:17 231:4
**cash** 187:1
**catch** 38:13 40:15
**categorize** 154:18 281:24
**category** 203:15 280:11 280:21,21
**caused** 220:6 265:9 266:7
**cc'd** 209:10 250:25 261:18
**ccing** 252:8
**center** 129:4
**centerpiece** 128:25
**ceo** 255:13
**certain** 41:11 44:15 50:5,6 50:16 51:2,8 56:17 89:4 126:20 152:22 154:4,17 163:14 167:24 167:24 170:18 170:22,24 176:3,4,5 178:5 179:9 191:23 194:4 202:20,24,24 203:2 205:13 205:14 206:7,7 207:15,15 211:21 212:9 212:10 216:17 229:9 231:3 235:1,2,15 239:22,24 258:4 260:4 262:14 280:6 284:22,23 285:1 291:12

291:22,23,23 295:5
**certainly** 92:9 97:6
**certainty** 17:1
**certificate** 299:1 300:1
**certified** 5:14
**certify** 299:4 300:2
**chain** 202:22 274:18
**chair** 22:1
**chairman** 274:13
**challenged** 208:13
**change** 35:22 77:20,21 128:2 135:21 180:5 182:24 183:5 184:24 185:2 211:25 213:15 219:14 237:14 258:3 301:5
**changes** 44:11 44:15,18,21,22 46:25 119:21
**changing** 183:7 236:22 278:3
**character** 30:4
**charge** 82:12 114:9,10 130:12
**charter** 88:20 89:23 90:3 136:12
**chat** 3:10 39:1 52:14,16,16,17 100:6 105:17 105:21,23 248:23 253:15
**chatgpt** 288:20
**check** 22:8 107:6
**chief** 14:12 30:22 31:9,14 31:17,21,25 32:2 74:2,3,18
**child** 214:25
**cholesterol** 8:25
**choose** 142:20 153:6
**chris** 33:22 222:6,7,10
**circumstances** 253:10
**claim** 34:20 77:6 80:4 108:1 148:18 158:6,6 246:6
**claimed** 77:12 156:2
**claiming** 102:13,16 103:13 104:2
**claims** 47:9
**clarification** 160:7 221:12
**clarifications** 224:10,10,11
**clarify** 9:20 76:11 93:16 129:11 214:3 235:2,3 239:22 270:11
**clarifying** 166:6 225:11 239:24
**classification** 161:20 281:18 281:20
**classified** 280:9 280:15 281:16
**classify** 154:1 162:10 178:14 179:23 280:20 281:13
**clause** 26:2 94:11 101:25
**clauses** 48:1 235:1 239:22 291:12,22,23
**clear** 9:15,17 11:16 31:21 123:13 130:8 213:20 231:1 238:17 266:8 275:1
**clearance** 101:19
**cleared** 252:20
**clearly** 80:22 86:2 89:8 94:9 94:14 120:14 138:21 156:8 184:25 209:8,8 238:22 241:25 270:20 294:13
**client** 6:12 25:20 32:21 37:14 55:8 56:24 57:1 62:12 65:25 66:5 67:14 70:3 72:10 77:5,15 79:21 79:22 80:2,2 83:12,13,13,15 87:9 89:6 102:23 106:1,8 106:10,12,12 106:15,18,19 112:15 114:8 118:10,11 119:7,17 122:2 122:16,18,20 124:16,16,25 125:20,22 126:7,7 130:7 130:9,14 133:7 133:24,24 134:7 154:6,16

154:19,21,22 162:16 170:15 179:8,12,23 181:2,6,11,23 220:21 226:14 226:19 229:6,7 229:8 238:10 253:6 260:4 264:19,21 265:13 271:17 271:19 273:9 273:10 281:1 282:2,3 291:14 293:19 294:8
**client's** 58:2,7 87:2 102:13 106:1,8 107:1 135:14 154:18 154:20 293:2
**clients** 50:9 69:20 77:13 87:12 107:5 109:7 112:8,11 114:13 118:10 118:14,18,20 118:24 119:8 120:3 130:23 136:4,13 162:3 180:20 220:16 226:15 233:17 234:12 235:9 263:24 264:13 265:2,9,10 266:8,9 267:16 267:24 268:17 270:17 271:18 271:24 272:23 272:24 273:5 273:10 290:21 290:22 291:9
**clinical** 29:6,12 32:17
**clock** 137:5
**closed** 15:9,18 16:2 240:21
**closely** 30:16
**coach** 61:5 197:6 226:2 241:17
**coaching** 10:1,9 10:10,10 34:18 60:19,20 62:16 62:17
**code** 17:6,9 41:13 47:17 58:21 69:22 70:11,19 71:5 86:12,16 90:4 90:9,11,12,14 94:4,9,12 103:7,23,24 104:15,17 112:16 119:13 126:1 138:8,8 138:17,17 141:15,15,18 145:15,16,17 145:24 154:12 154:14 159:4 159:13,20 161:7 164:21 164:23,24 165:4 167:3,9 168:21,23,24 169:11 171:13 171:14,25 172:22 174:6,8 174:11,18 175:21 176:7 176:13,15 216:18,19 229:9 247:2 252:15 271:3 274:12,20,24 274:25 277:3,7 277:9,9 278:13 278:16,19,23 288:10 290:25 291:4 295:5
**codebase** 62:10 62:11 84:23 85:12,13 86:20 86:20,22 87:5 87:7,13,15 88:1,2 96:13 103:13,22 114:19,19 131:15,18 133:6,12 159:15,23 160:4,25 165:19 171:6,9 171:20 172:9 175:13,15,16 175:25 176:13 264:12 266:21 266:25 267:8 278:7,18 279:7 281:2,7 290:20 290:23 291:8 291:12,13
**codebases** 133:6 164:12 165:11,14 167:8 267:9
**codes** 69:19,20 69:21 70:12,14 70:24 71:1,10 119:17,17 141:17 145:20 291:3
**cohort** 266:23 267:5 268:12
**coined** 68:22 69:2,5,7,11
**collaboration** 49:16 61:10 62:8,14 83:10
**collaborations** 60:8
**collaborator** 83:11
**collaborators** 45:24 46:4
**colleague** 273:11

**colleagues** 11:13 19:17
**collect** 262:19
**collection** 82:16
**collectively** 79:6
**college** 227:11 228:1
**combined** 30:25
**come** 117:22 242:4 278:7,8 287:18
**comes** 10:18 80:2 113:10 122:19
**coming** 10:21 39:3 59:4,21 60:22 145:9
**comment** 85:22 125:12 126:2 126:25 172:19 228:4 255:13 255:18
**comments** 95:5
**commercial** 11:5 85:3,15 86:6 100:8 102:20,21 103:10 124:16 124:24 161:15 184:11 193:9 230:16
**commercialize** 277:3
**commercializ...** 117:4
**commission** 120:5 301:25
**commit** 155:25 158:24 159:13 160:24 161:3 198:9,12,18,25 245:13
**commitments** 196:8 229:13
**committed** 156:12 199:5
**common** 106:12 134:6 188:22
**commonwealth** 299:21
**communicate** 65:22 66:2 123:20,23 124:1 137:19 197:9 200:9 220:4 241:7 249:24 262:8 269:18 271:21
**communicated** 11:15 193:20 193:24 212:3 214:14 221:5 240:12 271:24 273:19
**communicating** 297:4
**communication** 3:8 13:2 38:8,9 39:11,13 40:9 40:10 61:21 62:6 65:25 67:19 83:24 84:5,14,21 85:10 110:11 124:7 136:4 177:17,24 179:22 182:1 194:9,11,18 220:8,15 225:11 226:5 240:7,17,20 243:1,25 244:6 244:10 246:2,6 247:11,16,18 254:4 261:3 263:9 271:17 276:17
**communicati...** 46:22 85:9 88:20 98:15 100:17 105:24 123:17 140:14 140:23 142:11 152:14 153:2 208:22
**communities** 40:19,25
**community** 19:18 38:21 41:4 44:6,19 44:23 46:6 47:2,16 48:12
**companies** 192:20,20
**company** 11:4 29:22 63:8,12 63:12,15,18,21 63:21 64:3,18 71:21,22 74:1 74:6 76:4 77:1 78:25 79:4 84:17 89:10 124:2 125:25 134:11 161:14 161:15,15,16 161:21 162:1 173:17,18 184:6 186:23 186:24 187:2 188:3,8,14 192:19 220:10 225:18 227:10 227:13 228:3 237:9 249:25 264:16 273:20 275:23 276:15 276:16 279:10 289:15 295:10
**compared** 114:16 134:8 135:5

**compatible** 199:8
**compelled** 140:17 142:20 267:23
**compete** 158:9
**compile** 139:12
**compiled** 139:17,25 140:1 141:12 143:14
**complaint** 198:11 256:2,6 256:11
**complaints** 294:15,17,19
**complete** 11:16 42:17 258:10 258:18,22 259:1,1
**completely** 166:9
**compliance** 76:25 98:20 101:21 124:11 161:24 173:20 180:19
**compliant** 41:12 46:8 47:17 171:18 173:21
**complicated** 187:5 188:10 284:25
**complicating** 252:21
**complied** 50:17
**compliments** 235:15
**comply** 51:9 176:6
**component** 87:22 90:22,24 93:3 118:11 138:13
**components** 91:12 118:8 267:13,14
**comprehensive** 92:7
**computer** 169:24 176:14
**computers** 170:22 176:1
**conceived** 78:24
**concept** 96:14 147:25
**concepts** 78:22 116:13 232:15
**concern** 50:19 51:7,7 111:11 236:24 237:8 240:18,21
**concerned** 101:18,22,22 192:24 236:21 253:5 256:16
**concerning** 49:19 50:1
**concerns** 9:12 9:14 50:11 51:4 111:14 237:3 241:18 242:7,8 262:13 262:14 293:6 293:11
**concluded** 298:5
**concludes** 292:16
**condition** 8:2 75:25 202:2,4
**conditions** 34:21 75:14 76:25 170:18 170:22
**conduct** 41:13 46:9 47:18 58:21 112:16 126:1 167:9 169:11 171:25 174:18 176:7 229:9 231:2 253:4 268:5 269:15,16 273:8 277:7
**conductor** 216:18
**conducts** 295:6
**conference** 106:11 107:4 200:7 237:1,3 239:2 243:12 243:12
**conferences** 19:19
**confidence** 141:14 296:1
**confidential** 44:1,2,5 48:8 48:11 161:17 161:22,25 162:6,7,11,17 170:16 175:13 175:18 176:7 279:17,19,22 279:25 280:1 280:10,12,23 282:3,3
**confidentiality** 44:12 129:13
**configured** 170:4
**confirm** 232:3 244:18 251:13
**confirmed** 190:25 232:14 239:1
**confirming** 261:17
**conflicting** 221:6
**confused** 28:7 266:9

**confusion** 36:16 265:9,13 266:8
**conjecture** 28:18
**connect** 55:7,19
**connected** 254:10
**connection** 8:21 37:22 152:13 153:3
**cons** 86:7
**consent** 106:13 107:5,9,16
**consider** 41:8 279:11
**considered** 33:25 93:4 142:6,18 145:16 149:10 170:25
**considering** 272:8
**considers** 235:16
**consistent** 192:4,9,9 247:22 251:10
**consistently** 193:2
**constantly** 227:12 228:2
**constitute** 5:22
**construct** 231:3
**constructive** 235:25
**consult** 75:9 98:10 102:8 104:11 131:16
**consultant** 283:3 289:15
**consulted** 98:13 152:21
**consulting** 189:14 290:14
**cont'd** 4:1
**contact** 19:17 19:20 23:19 34:25 38:21 46:23 123:5 126:20 210:9 235:7 236:16 241:10 242:15 248:13,18 255:25 263:7 297:20 298:1
**contacted** 23:14,22 24:3 24:11 249:9 262:12
**contacts** 35:11 35:11
**contain** 163:9 202:17 280:22 282:2 291:22
**contained** 199:5
**containing** 154:6 184:12
**content** 43:13 75:11 84:9 110:1,1 152:8 153:19 209:12 219:22 220:20 233:18,21 234:8 247:20 247:21 252:10 252:11
**contents** 66:9 110:13 209:15 209:16 252:21
**contest** 106:13
**contested** 47:5
**context** 53:22 66:8 82:17 102:24 129:2 142:19 211:18 228:10 229:1 231:23
**continuation** 96:9,17 221:23
**continue** 39:7 44:14 45:15,22 46:2 79:3 84:2 232:10 238:1
**continued** 237:4
**continues** 130:22
**continuous** 191:19
**continuously** 190:7 194:13
**contract** 3:15 18:6,10,13,18 18:19 34:23 45:4 46:9 47:1 72:4,8 79:24 80:20 81:25 83:4 94:11 124:11 128:4 173:5 180:8,11 230:23,25 231:1,1,7 235:5 236:19 264:25 266:11
**contractor** 270:16 291:6
**contracts** 41:12 102:18 227:2,6 235:2,12
**contractual** 25:23 26:3 27:14,22 128:4 229:12,13,25
**contribute** 16:13 41:2,10 44:23
**contributed** 16:19
**contribution** 207:23
**contributions** 44:19

**control** 17:14 17:18 168:9,14 291:17
**controlled** 56:17
**controls** 159:17 165:3 279:16 285:15 286:15 292:2
**convention** 126:22 127:8 131:15
**conventions** 109:5
**conversation** 11:13,20 24:8 25:16 27:6,10 32:1,11 33:3 40:2,5 53:23 57:18,23 83:19 84:7 85:17 95:6 100:6 106:10,22 107:17 108:24 111:6,8,10,16 113:6 129:21 177:7 178:4 181:17 182:19 183:13 188:25 189:19,25 191:10,11 195:13,20,24 201:8,18 203:9 203:14 208:11 212:18 218:18 219:19,23 221:4,10 226:7 226:12,19 236:20,23 237:1,5,14 247:21 248:4 249:1,2,5,12,16 249:21,23 250:15 261:20 261:21 262:6 270:2 272:8,23 273:7 284:4
**conversations** 52:3 106:1,7 108:3 111:1 112:8 130:9 145:7 191:2 208:4,8,10 209:3 214:19 218:6 219:15 219:24 221:3 221:15 223:7 226:15 235:11 235:14,25 238:16 239:5 239:16,19 263:13 276:25 288:21 289:16
**conversion** 266:14,18 268:13 278:23 278:24 279:2
**convey** 269:25
**conveying** 177:24
**conveys** 246:20
**convoluted** 77:16 228:21
**coordinate** 66:14
**copied** 251:8 261:6,13,19
**copies** 35:14 297:13,19
**copy** 7:5 41:25 85:19,21 130:25 134:11 245:4 297:16 297:17
**copying** 178:18
**copyright** 156:2 158:6 159:9 199:5 238:22 240:23 245:14
**core** 129:14 134:8 135:4 136:7 186:5 267:13
**coreason** 264:8
**corner** 41:23
**corporate** 124:19,20 170:13,17,17 172:2 176:9
**correct** 14:6 18:1 19:3,19 20:15,24 21:13 22:25 23:4,9 24:13,19 25:20 25:21 26:17,18 28:20,21,24 29:3,21,22 30:1 31:6,10 39:25 40:9 44:19,24 45:6 49:1,3,5 55:8 55:15 56:19 65:4 73:18 77:24 90:6,7 96:18 97:25 104:22 113:23 119:4 131:6,11 133:11,17 134:3,25 135:6 140:3 159:23 164:17 173:1 173:14 176:18 176:19 182:24 183:5 188:4 195:16 196:21 196:22 197:13 197:18 199:16 200:5,10 202:25 205:3 205:10 213:12 221:9,13 222:11 224:17 241:5 249:13

250:11 254:7 254:20 261:7 274:24 281:7 285:5 295:10 295:15,20,21 297:15,24
**corrected** 179:21 180:6
**corrections** 7:6
**correctly** 188:6
**corresponden...** 224:11
**cost** 184:16
**costs** 93:1,17 93:19,22 140:4 140:4,4 184:3 184:11,13,22 193:16
**could've** 38:22
**counsel** 6:11 12:21 45:6 46:20 75:9,23 78:4 99:3 104:2 123:15 140:15,23 142:11 152:14 153:3 208:22 209:3 239:10 239:19 270:10 291:15 299:11 299:14 300:7 300:10
**count** 282:6,6
**counted** 284:13
**counter** 223:17
**countries** 53:9 53:13
**country** 56:6 57:3
**couple** 208:3 273:5
**course** 21:19 33:11 78:25 230:2 263:10
**court** 1:1 7:25 9:4,16,17 35:12 36:14 41:14 47:3 52:5 71:13 83:17 97:7,22 109:8 127:14 137:4 141:4 151:21 153:5 160:9 169:17 203:17 231:9 243:16 245:17 250:2 251:15 254:13 257:15 258:17 259:4,6 259:11 287:7 287:12 292:11
**covenant** 3:9 42:25 45:5 289:19
**covenant's** 45:2
**covenants** 41:13 42:25 44:16 47:18 156:8
**cover** 230:18
**covering** 37:3
**create** 242:15 265:12 283:2
**created** 66:13 137:3 215:3,8 216:5,18 241:2 266:15,17,22 266:24 267:3,4
**creating** 264:2
**credential** 56:24
**credentials** 30:1 58:6
**credit** 289:5,7,7
**critical** 253:11
**crm** 128:10,12 128:16 129:24
**cross** 18:6,11 18:12,13,19,21 19:7,13
**cto** 255:11
**cue** 28:5
**cues** 9:18 10:5 138:2
**currently** 14:5 14:9,25 15:4 17:4
**custom** 121:12 122:3 125:20 134:24 138:8
**customer** 86:2 95:20 121:3
**customer's** 120:21
**customization** 119:20 120:4,7
**customize** 68:6 83:8
**customized** 80:21 81:8 119:8,11 134:7 138:14 233:24
**cut** 230:7
**cv** 1:7
**czech** 53:10

**d**

**d** 3:1 4:13,13 5:1 255:12
**daily** 213:1 214:13,14 263:7
**damage** 266:7
**data** 11:3 14:13 17:12 21:8 29:6,6,12,12,20 30:4 32:17 34:14,15 35:3 49:9,13 73:18 73:24,25 74:4 74:6,14,18 75:3 76:3,8,13 77:23,23 78:21 94:1,2 117:12

120:3 172:20 183:17,24 185:6,8,13,14 185:17 186:4 186:20 187:25 188:4 189:22 190:3,10,19 192:12,14 195:16 204:4,7 204:11,24 207:11,17,18 207:21,23 208:6 210:21 212:1,8,11,12 222:10 223:8 252:9 271:20
**database** 14:24 15:1
**date** 1:11 15:7 18:2,7 63:19 63:22 74:13,24 78:1 84:10,12 88:5 92:22 95:14 109:20 110:3 111:4 117:7,14,16 127:3 155:5,8 156:16 157:6 172:17,18 173:7 190:6 199:18 200:15 201:24 202:18 203:24 220:14 224:3 252:2 256:18,22 262:13 270:20 277:13,16,18 277:20 278:2,3 278:17 301:3
**dated** 94:3 181:17
**dates** 64:17 136:4 178:25 179:1 192:1 214:16 215:12 256:15
**davida** 228:7 235:18
**day** 10:4 110:16,18 113:8 114:21 114:21 164:21 164:21,24,24 183:9 189:4 199:20 201:4,6 201:25,25,25 202:8,9 203:7 298:12 301:22
**days** 62:8
**deal** 178:5
**dealt** 270:25
**dear** 252:12
**debatable** 85:4
**debate** 100:9
**decade** 11:2
**december** 51:21,24 53:15 54:24 181:18 239:23
**decide** 86:6 89:13 155:10 155:13,17
**decided** 11:16
**decision** 34:11 87:18,18 155:21 156:15 163:16 197:13 197:14,17,17 197:19,21,23 197:24,25 198:4 199:15 206:11 216:15 222:18 275:10 275:11 294:11 294:20
**decisions** 155:24
**declaration** 131:19,20 132:1 139:6 140:7,10,21 141:20 142:8 143:20,25 146:6,13 148:22 149:7 150:12,16,22 151:1,2,3,4,5,8 151:10,12,13 151:15,18,25 152:4,7,11,20 152:24 153:2,4 153:9,17 163:8 257:7 258:1,3 258:11,19,24 259:4,6,9,11,13
**declarations** 258:9,10,16,17 258:20 277:7
**declare** 89:13
**declared** 152:3
**declined** 89:9 100:8 103:7
**decode** 70:9
**decrease** 193:16
**decreasing** 184:10 193:1
**dedicating** 11:4
**deep** 282:15
**default** 85:14 89:11,19 103:8 135:11 175:12 279:14
**defendant** 1:8 2:17 6:3,3
**defense** 163:4 282:5
**define** 19:20 104:8 139:22 144:25 165:8 175:7 204:5 220:11 295:4
**definitely** 22:6 139:18 147:9 265:12

**definition** 72:6 79:19 80:4 85:14 91:4 104:10 112:14 118:4 154:12 163:5,11 174:10 175:17 214:7 295:7,10
**definitions** 174:5,21 175:3 175:4,7
**delaying** 37:6
**delete** 156:5 157:18,19,19 255:22,23
**deleted** 156:4 157:13,14 252:19 254:19 254:22 255:2,3 255:3,5,6,20 256:3,7
**deleting** 258:4 258:5 264:18
**deletion** 157:17
**deletions** 199:11,12 240:24
**deliver** 232:15
**deliverables** 79:6
**delivered** 92:5
**delivery** 50:22 53:20 54:13 60:11,13,15 61:21 65:3 66:22 67:6,13 67:15 68:9 69:24 70:23 98:20 119:15 136:2 164:16 164:18,23 166:17 173:13 173:23 174:2,3 178:8,9,16 181:5
**demo** 88:2,6 92:12,15,16,19 115:1,4,5,7,11 115:14 117:8 130:24 146:1,7 146:15,19
**demoing** 210:17,18
**demonstrate** 111:12,18 112:19 114:7 122:22 130:5
**demonstrated** 125:5,10,15
**demonstrating** 111:24 112:15 130:6
**demonstration** 111:7 210:12
**demos** 88:4 92:17,21 147:3 147:5,11
**deneen** 300:2 300:15
**deny** 245:5
**department** 123:6 222:11
**depending** 67:16 230:17 267:2 284:24 284:25 291:6,7 291:7
**depends** 140:14 191:17
**deploy** 68:5 83:8 95:15,19 233:22
**deployed** 80:20 80:21 81:7,25 84:24 87:8,9 94:9 118:9 119:3,8 121:11 133:23 134:12 158:21 159:4 160:25 175:17 230:15 231:5 235:24
**deploying** 86:24 87:6,12 118:11 120:4
**deployment** 32:18 83:1 95:17 138:14 138:15 238:10
**deployments** 240:2
**deponent** 35:15 231:10 296:15 296:15
**deposit** 296:21 296:24
**deposition** 1:10 5:6,20 10:21 36:17 37:7,22 219:4 287:2 292:16,22 299:1 301:3
**depository** 86:11 135:5
**depth** 131:14
**describe** 10:16 67:5 108:25 109:4 198:24 221:18 234:1 234:10 242:23
**described** 85:11 91:14 116:21 189:21 219:22
**describes** 251:8
**describing** 188:22 189:4 220:12
**description** 3:7 116:20 168:24 191:4 194:4
**descriptions** 234:21
**design** 15:9,18 16:1,6,7,8,10

16:11,13,16,18 16:20 185:11
**designed** 92:5
**designs** 183:19 207:16
**desired** 210:22
**desk** 297:7
**desktop** 3:21
**detail** 203:13 247:19 251:12
**detailed** 45:4 78:12
**details** 26:12 26:16 40:1,6 44:16 45:10 59:6 60:4 62:7 62:13 65:2 66:7 81:11 125:17 132:20 144:13,14 151:18 203:10 208:9 218:21 224:24 225:14 226:6 249:4,16 249:22 282:14 282:14 289:9
**determine** 76:1 253:8
**develop** 14:15 79:22 88:11,15 89:20,25 94:14 118:5 130:10 212:7 291:12
**developed** 14:18 44:4 48:10 68:6,8 78:25 80:2,6 80:12,15,20 81:6 83:1 85:13 86:12 88:1,8,14 89:11,15 93:3 94:9 104:12 112:12 114:11 118:8 119:8 133:12,14,23 135:9,19 158:7 161:14 175:13 232:10 233:23 233:23 288:15 290:21
**developer** 86:10 88:8 104:17 114:20 114:24 131:14 134:4,19 145:3 171:7,11,12
**developers** 119:12 145:7 145:15 171:8 171:11
**developing** 87:19 93:20 104:20 157:16 210:25 237:22 238:9 265:11
**development** 88:21 93:2 105:3 112:8 114:10 118:23 164:15 172:14 172:23 183:20 183:23 229:15 229:23
**develops** 174:10
**device** 170:1,2 170:10,11,17 170:23,25 171:4,17,23 172:1,9 175:22 176:9 283:17
**devices** 13:2,3 170:8 171:8,13 171:21
**devops** 131:2 132:18 167:23
**dialed** 243:13
**dialogue** 129:19,20
**dictated** 229:9 289:2
**dictates** 184:21
**difference** 71:8 71:8 90:18 91:13,19 138:6 162:5 180:2,4 180:10 193:2 196:5
**differences** 190:14
**different** 24:21 30:5 51:10,10 51:17 75:4 81:3 91:25 92:1 93:20,23 96:22,24 108:4 114:16,18,19 114:23 130:23 140:9 153:24 161:19 162:24 167:10 181:22 183:7,22 184:23 186:24 186:25 187:2 188:22 189:5,8 192:18 203:7 204:14,15,23 204:23 205:20 206:25 212:4 213:8,20 221:17 222:20 223:6,6,9,16,16 229:5 237:23 238:3,4 246:7 248:19 262:23 267:13 271:18 280:2 285:20 294:21
**differentiating** 90:17
**differently** 272:21

**difficult** 11:7 27:25 28:2,17 53:23 77:17 192:21 254:5
**digital** 35:14 41:24 299:8 300:3
**digitally** 41:18
**dime** 120:21 122:4
**dimitri** 88:10 88:11 247:2
**direct** 11:12,21 22:25 27:13,21 30:21 31:5 61:20 111:5
**directed** 210:7
**direction** 184:1 184:15 248:17 288:23
**directly** 33:13 33:15 45:23 46:3,7 48:21 54:7 55:7 59:4 116:16 165:5 165:13 235:9 255:24 292:25 294:18
**director** 23:4 23:11 215:1 269:24
**directors** 184:2 184:5,8
**disagree** 23:18 24:15
**disagreement** 211:20
**discharge** 204:4,5,6
**disclaim** 186:22
**disclaimer** 76:17 80:3 88:17 161:12 190:13
**disclose** 46:21 98:14 208:23 273:25
**disclosed** 79:1
**disclosing** 142:12
**disclosure** 100:17
**disconnect** 292:2
**discourage** 272:17
**discovered** 78:24 156:22
**discoveries** 78:22
**discovery** 148:7,11 268:4
**discuss** 34:2 89:5 223:21 239:19
**discussed** 33:4 33:24 44:13 116:4 123:15 133:19 136:11 145:19 183:11 193:25 194:14 194:15,15 198:7 199:9 205:4 207:19 219:22 235:23 238:17 247:1 270:12,14 273:15 276:11
**discussing** 105:20,22 177:4,5 201:2 218:5 222:8 235:12 237:3 260:16 286:14 290:12
**discussion** 31:17,18 40:14 44:17 54:19,20 54:21 84:22,23 107:19 191:9 211:20 224:21 239:17 253:8 262:23 284:4
**discussions** 16:9,20 26:22 27:2 30:14,20 31:4,8 46:25 92:10 129:22 218:6 239:14
**disloyal** 123:21 124:2
**dismissed** 103:2
**disparage** 272:11
**disparaging** 273:3
**dispute** 292:2
**disregard** 27:13,21
**distinct** 134:24 135:5
**distinction** 91:8
**distinguish** 12:14,17
**district** 1:2
**division** 34:12 34:15
**dmitri** 115:16
**dmitrii** 81:14 81:19
**dobkin** 274:11
**doctor** 9:7 235:17
**document** 36:17 37:11 42:15,17,18,20 43:1,3,9,15 47:24,25 48:2 53:4 72:15,17 72:19,20 73:8 73:17,23 74:9 74:10,12,15,23

74:23 75:7,10 75:11,13,15 77:13 78:13,14 78:18 83:18 84:9 85:18 99:18 109:14 127:21 128:22 128:23 129:2,6 129:7 144:12 144:14 151:21 191:4 195:23 231:17,22,22 231:25 232:3 232:18,20,24 233:1,2,4,7,10 241:14 242:1 242:18,20 247:8 248:18 248:18,18 249:6 250:13 250:16,23 251:11
**documentation** 190:9,18 242:16,18
**documented** 254:12
**documents** 10:13,17,24 41:16 42:23,24 64:18 75:8 77:10 91:2 120:6 132:6 190:12 219:2,5 233:12,14
**doing** 38:25 60:3 212:6,15 240:3 254:1 264:4,6 267:19
**dollars** 32:25 33:2 140:8 284:14,15
**double** 156:5 157:13,17 199:11 255:2,3 255:20 258:5
**doubt** 43:25 44:1,2 48:8
**download** 132:23 155:5 175:22,25 176:13 199:14 277:8,8,22 278:2 279:4 281:6
**downloaded** 131:6,9,18,20 132:1,5,16,21 133:8 149:2 153:22 154:5 154:11 267:6,6 268:12,14 278:25 280:4,7 280:10,15,18 280:22 281:11 282:20,20 283:2,5 288:10 290:17,20
**downloading** 152:2 176:8 264:16 266:18 283:17
**downloads** 156:14,21,23 157:3,7 278:5 288:1
**dr** 293:6,11,15 293:18,23,23 294:6,7,12,14 294:15,20 295:18 296:12
**drafted** 98:23
**drafting** 100:14
**dravida** 83:16 226:13,14,21 226:25 227:1,3 227:6,9,20,21 227:24 228:7 228:17 229:7 229:11 230:3 235:7,10,11,12 236:2,6,11,16 237:6 238:13 273:12
**drilled** 183:12
**drive** 2:12
**driven** 87:18 185:10 205:17 207:10,16
**drop** 157:12
**drug** 87:23
**ds** 252:16
**due** 205:10 264:22 265:6
**duly** 6:20 299:5

**e**

**e** 2:1,1 3:1,6 4:13,13,13,13 4:13 5:1,1
**earlier** 145:19 215:12 275:5 295:12
**early** 278:4
**earnout** 28:23 29:2,5,24
**easier** 9:5 39:5
**easiest** 285:11
**easily** 255:24
**eastern** 1:2 177:13 178:2 246:6 248:1 295:23
**education** 17:3
**efa** 167:14
**effectively** 14:3 29:17
**effort** 135:10 135:20 143:15 161:15 232:8
**eight** 243:18
**either** 11:9 181:4
**elaborate** 88:24 157:17

**elam** 11:6
**electronic** 233:11
**electronically** 145:2 233:13
**eliminating** 184:16
**else's** 57:15
**email** 3:12,13 3:17,19,20 83:19 84:9,10 85:19,20 95:5 96:8 108:9,12 108:15,17,18 109:18,20,21 109:23 110:2,3 110:7,7,9,10,12 110:14 113:10 113:12,13,14 113:14 127:5,6 127:9,11,13 182:11,20 191:9,10,11,13 191:14 193:5 195:7,23 205:6 208:17,18,20 209:1,3,6,9,11 209:13,14,14 209:15,19,24 209:25 210:4,5 213:14 224:7,9 224:15 225:5,9 241:8 242:22 244:3,5,12,18 244:24 245:1,4 245:6,8 247:8 247:24 248:4,6 248:7,9,20 250:18,20,21 250:23 251:2,4 251:5,7,12,13 252:2,4,5,9,11 253:17,19,20 253:21,22,24 254:6 260:24 261:3,6,8,13,14 261:17,19,22 290:1,2,3,4
**emailed** 182:16
**emails** 108:15 113:17 209:22 210:2 224:12 269:11
**embedded** 173:24
**emotions** 276:13
**employed** 18:8 18:21 23:3,8 23:10,15,19 24:5,9,11,18 25:3,7 220:19 227:14 299:11 299:14 300:8 300:11
**employee** 18:12 25:15 26:5,9 26:11 41:9 44:12 48:20 50:17 51:14,17 54:22 55:16,17 56:5 57:2,3,9 57:25 58:1,5,6 58:12 59:2,13 59:14,19 60:16 61:13 63:23 64:14,15 65:5 65:19 69:5,8 69:11,13 84:16 84:16 89:19 90:5 91:7 105:2,25 106:17 112:17 115:10 124:9 126:1 130:6,18 139:23,23 146:24 166:21 166:23 167:15 169:9,24 170:2 171:1,15,16,19 171:22,23,24 171:25 174:10 175:20,20,21 175:24,25 176:6,7,13 177:10 178:19 179:14 180:1,9 181:12,22 187:9 203:4,10 215:3 219:21 221:1 226:11 229:12 242:20 249:8,10,11 262:5 270:16 274:15 276:14 277:6 281:21 287:24 288:25 289:19 290:8 292:22 295:13 299:13 300:10
**employee's** 57:16 240:8 293:1
**employees** 25:24 41:2,6 50:4,4 51:2,8,9 51:10,19,23 54:12 56:7,8 56:23 58:23 61:14 63:20 65:16 84:18 105:13,15 108:4 138:23 164:6,8 165:16 167:2,11 168:2 170:21 172:13 172:16 174:25 177:12,25 180:2 198:21 220:4 237:12 240:21 262:12 275:24 290:14 294:16,17
**employment** 3:9 30:15 40:19 41:1,12

42:25 44:16 45:2,5 46:9,12 46:13,14,18 47:18 48:23 55:1 61:15 65:21 89:20 90:1 130:15,20 155:14 156:8 191:20 197:15 199:21 213:17 213:19 220:14 221:15 265:12 288:20 294:12 294:15
**empty** 109:17 113:15,16,18 113:19 114:1,5 127:11 182:20 209:10,10 261:18 290:3
**enable** 33:22 212:6
**enabled** 232:9 232:13 252:16
**enabling** 211:8 211:18
**encourage** 41:5 41:9
**encouraged** 57:25
**ended** 187:3
**engaged** 45:3 50:20 282:24
**engagement** 49:20 50:2 72:9 80:7,13 243:15 291:20
**engineer** 14:8 14:10 17:2,3,4 88:7
**engineering** 164:25 185:18 207:18
**engineers** 88:9 88:13 89:15
**enhanced** 119:9,12
**enterprise** 14:21 15:2 232:12
**entire** 78:14 129:21 231:22
**entirety** 42:13 75:7
**entitled** 36:2 43:8 78:13 121:20 219:2,4 231:22 282:7
**entry** 52:23
**environment** 138:15 161:1 178:18 246:20
**envisioning** 237:18 238:3
**epam** 1:4 2:2 2:11 5:7 6:6,9 6:11 14:6,7 19:22 20:1,9 20:10 22:24 23:14 24:13 25:14,18,20,22 26:3,4,5,9,11 26:13,17,23 27:3,14,23 28:20 30:15 31:22,25 32:4 32:12,15,16 33:23 35:1 37:21 40:4,20 41:1 44:4,11 45:5 46:9,12 46:15,18,20 47:12,22 48:10 48:17,20,22 49:5,8,12,19 50:1,4 51:23 52:17 54:4 56:19,23 57:2 57:3,9,25 58:1 58:5,6 59:1,13 59:19 60:16,17 61:13 64:15,15 65:5,12,15,16 69:5,7,19 70:5 70:6,13,20 72:11,22 73:1 73:5,6 76:10 76:15,16,23 77:1,6 80:16 80:24 81:7,9 82:3,5,6,7,12 82:20,22 83:1 83:6 84:18 85:2,14 86:5,9 86:12 88:3 89:11,11,12,19 89:21,21 91:7 92:24 94:9,12 95:11 98:19 99:2 102:22 103:8 104:1,12 104:13,13,14 104:21 105:2,7 105:13,17,21 105:25 106:17 108:4 111:12 111:18,24 112:20 115:4 115:11,19 117:25 118:3 118:12,16,20 119:3,7 123:20 124:1,12,17,23 125:5,9,14,16 125:19,25 126:11 129:15 130:6,18,25 131:8,21 132:15 133:11 133:11,12,14 133:14 134:13 134:16 135:11 135:13,18,20 136:25 138:6 138:13,21,22

141:22 144:14
144:17 145:1
145:22,22,24
145:25 146:1
146:20,23,24
148:11 154:6
156:9 158:7,22
159:8,9,12,15
159:21 161:21
162:16 163:17
163:19,20,22
164:4,15,17
165:22 166:1
167:4,9,10
168:3 169:9,14
169:24 170:2,3
170:5,21 171:2
171:14,19,24
172:1,14,15,19
172:20,24
173:10,13,16
173:16,18,25
174:12,12
175:1,2,10,13
175:14,15,21
175:24,25
176:19 177:2
177:12 181:11
181:22 184:1,6
185:8,14,20
187:6,10,14,17
187:19,20
188:7,12,12,13
195:15 196:8
198:11 199:21
207:3 210:12
210:24 213:4,7
215:3 218:12
219:17,17,17
219:21 220:19
220:21,25
221:1 222:14
222:18 225:22
225:23,24
227:11 231:5
232:10 233:24
233:24 234:23
236:2,6,7,18
238:18 239:4
239:14,16
240:4,8 241:4
243:3 244:7
248:16 253:3
255:8 256:2,6
256:10 259:14
263:18,20
264:1,4,15,17
265:1,2,12,16
265:18 266:15
266:24 267:15
267:17,18,18
267:25 268:7
268:16 269:1,3
270:1,4,5,8,10
270:12,14,16
270:25 271:15
271:20 272:13
272:19,22,24
273:18,22
274:14 275:23
276:20 277:3
277:10 278:12
278:19,22
279:11,15
280:9 282:1,8
282:23 283:2
284:8 287:24
288:5,15,25
289:2,15,20,22
290:1,8,14,15
291:1,4,5
293:7,11 294:7
295:3,8,9
301:2
**epam's** 32:8
84:25 85:3,14
88:8 89:11
90:1 98:10,13
98:15 100:12
101:7,12
112:25 115:2,8
115:10,11,14
120:17 121:10
122:22 123:5
124:3 126:14
131:11 132:2
134:6 135:4,10
148:23 149:6
149:14,24
150:7 169:8,18
171:5,15,20
172:9 173:19
174:9 175:21
175:24 176:13
187:4 216:12
267:16,24
270:10 271:3
281:25 291:9
**epam.com** 2:14
**epidemiologi...**
21:23
**epidemiologist**
29:25
**epidemiology**
21:23
**epm** 239:12
**erase** 157:21
**errata** 7:6
301:1
**erratic** 221:7
**error** 178:22
**es** 299:4
**escalate** 242:6
242:10
**escalated** 59:5
156:3 173:9
178:7 180:21
180:23 181:4
201:17 242:8
**escalating**
178:4
**escalation**
124:18 157:12
262:11
**escalations**
124:12

**especially** 26:3 81:8 109:25 187:6 204:1
**esquire** 2:3,10
**established** 32:21 167:4
**estimate** 12:15 12:18 189:10 265:16,18
**estimated** 195:21,21 206:5,21,22,24
**ethical** 124:8 125:25 229:8,9 253:4
**ethics** 46:9 112:17 126:2 216:19
**etl** 266:14,16 266:18 268:13 278:23,24 279:1 290:25 291:4
**europe** 39:3 177:13 178:2
**event** 179:12,17 179:18,22,24 203:4,6 269:11
**events** 110:17 202:18,22,24 202:25 203:2,3 210:16 254:9 254:12 261:3
**eventually** 223:21 278:16
**everybody** 165:2 180:16
**evgeny** 3:19,20 65:3,18,19,25 67:16,24 68:9 68:12 88:21 135:23 136:9 136:10,12 241:10,13,15 241:17,18,21 241:25 242:4,5 242:8,15 246:2 246:15,25 247:1,5,9 248:3,13,17 249:6,17,19,22 250:9,24 251:7 251:11 252:5 253:12,25 254:4,24 295:13,19
**evgeny's** 248:11
**evidence** 20:14 20:23 30:1 232:9,11,13 252:16 267:15 267:16 288:5
**evidentiary** 5:19
**evolution** 96:21
**evolved** 68:21
**evolving** 232:11
**exact** 18:2 153:1 192:1 202:22 216:7 278:17
**exactly** 54:16 55:3 62:7,13 72:6 141:9 146:17 199:17 211:3 236:14 241:16 263:4 295:7
**examination** 3:2 7:21 292:18
**examined** 6:22
**example** 67:23 69:25 181:14 276:3,19 291:24
**examples** 181:15
**except** 7:2 112:10 227:23
**exception** 106:16
**exchange** 28:9 110:12 245:2,3 248:9,16 253:17 295:18 295:23
**exchanged** 178:10 269:10
**exchanges** 127:12 205:7 251:2
**exclusive** 79:7 79:11,16 81:10 83:2 120:16 122:19 133:25
**exclusively** 81:18
**excuse** 39:16
**executed** 72:22 73:1
**executing** 45:1
**exhibit** 3:8,9,10 3:11,12,13,15 3:16,17,19,20 3:21 35:13,16 35:19 36:13,15 36:17 40:16 41:23 42:4,5,8 42:8,9,10,12,13 42:17 47:19,20 52:6,7 71:14 71:15,16 78:7 83:18,21 109:8 109:10 127:15 127:15,17 181:17 189:3 189:15 231:10 231:10,12 243:16,19,22 245:18,19

250:3,3,4
254:14,15
261:16
**exhibits** 36:3
182:2
**exist** 71:12
103:14,22
120:20 121:2
122:1,2 123:17
123:18 174:21
175:4 192:18
**existed** 86:11
121:10 123:14
**existence**
100:10
**existing** 114:16
122:18
**expect** 40:18,24
45:17 46:8
86:19 114:12
135:3,8,9
144:14 145:21
171:15 185:13
288:24
**expectations**
66:19 190:10
285:1
**expected** 11:9
189:21 190:3
190:19 194:5
**expended**
273:23 274:3
**expenditure**
142:3,4
**expense** 289:9
**expenses** 289:5
289:8
**experience**
34:17 134:10
134:14 196:1
196:10 206:13
**experienced**
17:16
**experiences**
193:6
**experimented**
96:25
**experiments**
96:15
**expert** 72:5,7
75:21 79:13
161:24,25
225:23 255:14
279:12 281:14
282:13 283:14
283:19 291:11
292:8
**expertise** 21:13
21:15
**experts** 76:2
162:12
**expires** 301:25
**explain** 11:17
79:10 87:14
140:9 198:14
278:10
**explained**
183:11
**explaining**
141:1
**explicit** 223:13
**explicitly** 34:19
35:7 50:15
51:25 79:23,25
82:9 84:8
174:3 214:20
225:12 272:4
292:9
**exposed** 70:25
162:2,2
**exposure** 45:20
132:19
**expressed** 50:6
**expression** 28:9
28:12,14,15
**expressly** 48:8
**extend** 265:4
**extent** 46:20
140:13 142:9
152:11 153:1
**external** 134:20
135:2,2,3
**extract** 57:13
57:20
**extraordinary**
179:24
**eye** 214:22,25
215:1 261:24
262:2,5,15
293:23
**eyes** 15:9,18
16:2

**f**

**f** 2:3
**face** 28:12,14
72:13,14 247:3
**facial** 28:9
**facilitate** 46:18
**fact** 19:6 61:7
63:20 64:6
68:23 74:25
99:15 100:20
132:25 143:18
151:13 153:11
203:19 255:15
258:3 275:18
**factor** 294:11
294:20
**factors** 155:24
156:10 157:11
237:7
**facts** 126:4
132:8 198:5,6
198:7 202:18
203:16,21,22
215:24,25
258:10,18,23
260:18 266:6
267:20,23
276:14 288:9
**factual** 11:14
267:15
**failing** 205:12
**fails** 56:22,25

**fair** 91:22 97:15 193:19 204:3 208:13 294:2,5
**fall** 20:11,20 21:5 162:8 185:16,18
**falling** 193:3
**false** 102:16 166:9
**familiar** 66:5,7 66:8 82:8 255:11
**family** 270:10 270:16
**fantastic** 39:8
**far** 208:14
**favor** 228:17
**favors** 227:6
**features** 117:15 119:22
**federal** 11:8 132:7 151:21 163:4 203:17
**fee** 121:4
**feedback** 62:22 131:17 132:3 132:17 134:20 135:2,4 159:7 159:18,25 160:23 205:5
**feel** 9:9
**fees** 273:23 274:3
**figure** 8:21 297:10
**file** 155:7 156:11 158:6 162:18 163:2 164:9 199:5,11 255:5,23 256:1 256:15,24 281:15 285:16 287:22
**filed** 153:5
**files** 131:5 149:2,20 150:1 151:18 153:22 153:25 154:1,3 154:5,8,9,9,10 154:15,23 156:4 157:14 162:9,14,15,18 162:19,20,21 162:24,25 163:8 164:10 201:1 254:19 255:2,19 256:3 256:7,12,14,20 256:23 257:1,1 257:2 258:2,5 264:18 277:22 280:4,6,6,8,9 280:11,11,15 280:17,19,20 280:21 281:22 281:24,25 282:1,2,19,22 282:23 283:1,5 283:12,17 285:12,13,16 285:22,22 286:9 288:1,6 288:10,16
**filling** 72:5 178:16
**final** 157:12
**finally** 232:14
**finance** 142:5
**financial** 29:15 93:5,7 186:8 191:24 207:20
**financially** 299:15 300:11
**find** 40:13
**finding** 213:25
**findings** 242:9 246:14 248:18 249:6,20 251:9
**finds** 252:12
**fine** 8:23 97:9 120:3 287:8
**finish** 12:5,20 12:22 13:14 37:1 58:16
**finished** 36:20 187:9
**fired** 236:18 240:22
**firing** 203:4
**first** 6:20 7:2 18:4,5 23:14 24:22 36:24 38:3,4,5,7,11 40:9 52:22 71:20 73:17,21 81:20 96:11 102:22 115:7 115:21 116:3 118:10 119:6 120:20 146:19 148:20,24 170:7 179:3,4 190:2,23 193:20,24 194:2 208:17 208:19 209:1,2 209:5 230:6 235:22 241:14 250:21 274:21
**fiscal** 187:2,3,4 191:6 206:4
**fit** 183:21
**fitted** 213:22
**five** 17:25 18:3 36:23 38:23 187:23 188:3 251:22
**fixed** 180:11
**flag** 75:23
**flagged** 178:21
**flexible** 208:5
**flight** 188:10
**floating** 119:25
**focus** 43:13 115:21 183:22

194:4 237:20 238:12
**focused** 96:12 183:19 221:22 237:21,22 238:8
**focusing** 115:20 116:3
**folder** 252:21
**folders** 164:13
**folks** 141:18 152:22 160:18
**follow** 40:8,14 97:10 167:3,13 169:8,13 170:3 171:15,24 173:8,19 174:17 237:15 247:8 289:1 290:7
**followed** 191:11 195:7
**following** 137:13 169:21 242:21
**follows** 6:22 188:8,13 252:11
**force** 76:9,14
**forecast** 117:21 117:22
**foregoing** 299:3,4 300:4
**forget** 265:5
**form** 7:2 13:20 15:10,19 16:3 16:14 20:4,16 20:25 23:17,24 24:6,14,20 25:5,25 27:16 27:24 29:9,14 30:2,24 34:6 34:13 35:2 40:21 45:7 49:21 53:17 55:9 56:5 64:8 66:25 67:8 69:14 70:21 71:6 74:20 77:8 79:12 80:8 81:1,16 93:9,12 94:6 94:21 95:1,25 96:19 99:24 102:3,14 103:4 103:15,20 107:2 108:13 110:5 111:21 113:25 117:5 119:5,14 120:12,22 121:5,13 122:5 122:10,24 123:22 124:5 124:13,23 125:23 128:8 131:22 132:9 133:18 134:17 135:7,15 137:1 138:11 139:9 139:16 140:11 141:23 143:6 144:2 145:2 146:8 150:2,17 151:23 154:24 155:15,22 160:5 161:5 162:22 165:7 166:2,24 167:17 173:15 174:15 175:11 176:2 177:15 177:20 178:17 179:9,13,15 180:6,24 181:24 182:9 182:25 184:18 185:21 188:5 192:5,8 193:7 193:21,22 194:18,19 195:17 196:3 196:11 198:15 202:12 204:8 204:12 205:21 206:15 207:13 210:13 217:21 218:3 222:16 223:4 225:1,19 228:8,19 229:16 230:24 234:9,24 236:3 240:11 241:23 249:14 254:8 254:11 257:9 257:12 258:12 259:18 261:1 261:11 262:10 268:11 269:7 270:6 271:4,19 276:18,22 277:4 278:9,14 279:23 281:8 282:11 284:2 286:1,11 290:18 291:18 292:5
**formal** 10:24 253:2
**formed** 143:8 214:15 236:11
**former** 173:22 174:4 252:18 255:11,13
**forms** 68:25 278:16
**formulated** 90:9
**forward** 183:25
**forwarded** 54:16
**found** 177:11 179:9 215:20 215:21

**four** 69:19,20 69:25 73:21,25
**fraction** 47:25
**frame** 61:12
**framework** 20:14,23
**free** 294:8 297:16,16,17
**freedom** 289:3
**freely** 129:16
**frequently** 130:2 179:18 180:12
**friday** 39:2,3
**front** 297:7
**full** 11:24 20:12 20:21 34:21 51:20 53:2,4 73:23 74:9,10 83:3 88:17 141:13 161:11 187:13 207:3 233:4 244:12 244:18 251:25 252:4 296:1
**fully** 8:3 11:19 39:20 47:12,15 90:10
**function** 186:5
**functional** 66:10
**functionality** 116:20 117:3 119:21
**fund** 229:14,23
**funded** 80:15 80:17 89:22 90:10 104:13 114:11 116:18 118:3,4 161:14 233:23
**funding** 80:18 133:15 135:10 135:14,19 230:18 233:24
**funds** 89:24 90:3
**further** 39:16 79:4 140:13 296:2 299:13 300:9
**future** 276:7

**g**

**g** 5:1
**gain** 272:18
**gatch** 104:21 104:23 105:1,2 105:7,10 106:9 112:9
**gemini** 288:20 289:6,8
**general** 44:3,8 48:9,14 58:9 58:10,11,18,19 68:24 69:17,17 72:8 78:5 96:13,14 100:11 107:4 111:3 115:5 136:2 167:9 233:18,21 260:20 263:16 285:6 291:20
**generate** 117:21,22,25 118:7,13,16 284:24
**generated** 117:1 118:21 152:13 190:13
**generating** 32:5,9 211:24
**generation** 118:19 183:18 185:5 212:20 232:9,14 252:17
**generator** 266:23 267:5 268:13
**genetech** 125:6 125:11,16
**geographic** 49:19 50:1,12 51:8,22 56:16 56:17 181:12 181:13,23 240:9
**geographical** 50:5,16 51:2
**geographically** 55:18
**gestures** 9:19
**getting** 115:24 201:13 272:12
**ghost** 253:19 253:20,21
**gilead** 49:20 50:2,3,5,6,11 50:15,18,21 51:4,14,15,19 51:19,22 53:7 53:12,15 54:9 54:10,12 55:7 55:19 56:6,7,9 56:10,19 57:10 57:16 60:10,14 61:25 64:24 65:1 177:10,11 181:11 229:6 260:2 268:19 268:25 269:6 269:12,16 273:17
**gilead's** 56:12
**gist** 252:1
**git** 17:14,16 144:16,17
**github** 144:16 145:4 172:15 172:18,21 245:14
**gitlab** 131:16 132:19 145:4

153:23 154:12 162:25 172:18
**give** 9:17,20 10:6 11:17 12:2 32:12 34:21 35:14 69:25 118:2 126:3 127:3 135:14 137:25 139:7,10 146:21,25 149:1 150:7 160:13 161:12 165:15 180:14 189:13,25 198:1 207:25 231:10 235:15 239:8 242:11 245:18 253:22 258:11 289:3 289:21
**given** 7:4,5 89:25 141:18 143:22 144:11 145:13 149:5 153:20,21 157:7 163:24 169:14,17 174:23 176:3,5 193:12 212:21 212:25 218:25 253:1
**gives** 225:16
**giving** 42:17 189:10 200:12 200:12 208:14
**global** 93:23 148:23 149:6 149:21 152:19 153:20 154:10 281:19
**go** 7:16 8:20 22:17,18 33:20 39:4,16,23 73:7 98:19 105:6 106:21 109:16 154:1 175:21 177:6 223:7 244:14 250:13 274:11 288:25
**goal** 184:10 205:12 217:19 237:19,24
**goals** 193:9,16 194:5 195:6 196:17 212:9 212:24
**goes** 120:7 126:1 255:23
**going** 7:16 8:16 13:3,24 30:16 35:13,14 36:1 41:24 42:3 43:21 45:9 47:23 54:22 58:4 77:20
87:17 89:9 97:3,19,24 98:14 100:15 101:10,20 102:6 106:6 118:5 123:7,11 125:8,12 126:2 131:3 140:15 140:22 149:18 150:11 157:23 157:25 158:21 160:22 161:12 176:10,15 179:7 182:19 183:25 184:7 194:12 216:24 220:9,17 231:9 234:15 245:17 245:24 248:24 250:22 251:20 252:4 263:21 265:15 266:12 266:12,20 267:1,17 268:10 272:21 282:16
**golidad** 19:23 20:2 29:20,23
**good** 5:2 7:23 124:8 188:3
**gotten** 187:13
**governance** 124:19,20
**gowtham** 2:18 3:12,13 5:7 6:2 7:24 18:20 19:1 21:20 33:23 36:12,21 38:10,12,24 39:6,7 40:12 40:15 83:20 84:18 85:25 86:1 91:7 109:15 110:8 110:13 141:5 156:2 199:6 204:22 211:14 214:11,15,20 214:23 216:9 216:10 217:11 232:5 236:17 236:18 245:15 246:12 247:2,5 249:24 251:21 252:18 253:3 262:24,25 263:7 271:1 272:2 273:4 282:12 286:17 297:15
**gowthamrao....** 216:6 263:3
**grade** 232:11 232:13
**grant** 138:21
**granted** 285:14

**great** 6:23 39:7
**greatly** 253:10
**greg** 9:1 10:23 21:25 33:14,16 33:21 34:2 38:25 40:13 46:19 197:21 198:5 201:9,17 203:14 205:8 221:9 246:11 274:22,23 275:3,4,6,7,20
**gregory** 1:10 3:12,17,19 5:6 6:8,19 11:25 83:20 252:8 298:8 301:3,21
**ground** 9:23 11:4
**group** 44:5 45:17 46:7 48:11 106:18 279:6 284:7,10
**grouping** 162:14
**groups** 44:7 48:13
**grow** 193:15,15
**growing** 29:6 29:12,17 184:12 185:8 185:10 192:15 192:15,25 193:1,11,13,13
**guarantee** 247:25
**guarav** 226:25 227:1,3,9,14,18 228:7 229:6,10
**guardrails** 171:2
**guess** 9:21 70:10 89:4 99:7,8,16,18 116:3 120:2 129:10 149:10 163:2 199:24 283:9 296:18
**guidance** 166:8 253:9
**guide** 49:8,12
**guided** 167:13 168:3 226:10 249:6
**guy** 269:23
**guys** 7:11

**h**

**h** 3:6 4:13
**hand** 6:17 41:23 54:18 152:24 255:9
**handful** 78:14 286:19
**handing** 42:12 52:5 78:7 83:17 127:14 243:22 254:14
261:16
**handled** 181:3 181:5 260:5
**handling** 240:14
**hands** 134:19
**handwritten** 83:18
**happen** 51:11 59:5 178:24 179:20 180:12 203:7 274:5 294:4
**happened** 11:15 40:11 44:17 51:24 60:4 61:11 62:14 65:2 107:14 114:2,3 158:1,2,4,5 160:21 179:18 180:13 199:1 199:18,18 205:7 210:16 216:24,25 218:23 224:1 242:23 261:3 263:14 286:13 286:14 287:9
**happening** 202:23 278:5 290:5 294:3
**happens** 211:22
**happy** 205:4,5 227:20,25
**hard** 8:17 13:9 42:21 43:12 74:11,23 79:14 89:2 95:7 147:8 160:19 221:16 263:8 269:13,23
**harm** 266:15 266:17,22,24 267:4
**head** 71:10 111:4 117:9 148:23 149:6 149:21 151:19 152:20 153:20 154:10 183:16 183:24 188:1 191:21 197:19 202:18 204:24 207:17 211:3 212:8,11,12 220:7 222:9 223:8 242:7 244:7 248:15 249:9,9 283:23
**headache** 202:7
**healthcare** 32:5 32:9 191:21
**hear** 7:12 8:6 8:18 13:9,9 16:21 39:20 59:8 99:12

115:22,24 147:8 156:19 160:20 166:12 168:10 244:1 244:15 247:12 257:11 293:16 296:23
**heard** 62:22 82:6,13 125:9 125:14 177:25 208:18,19 209:1 220:25 221:6 274:1,7 294:7
**hearing** 6:14 9:5 150:14,23 219:25
**hearsay** 125:7 144:1,3
**heavily** 92:9
**held** 192:19,19 224:21
**help** 7:15 31:24 34:19 61:11 128:6 129:15 133:4 154:4 162:12 189:16 189:19 232:10 274:11
**helped** 128:9 224:24
**helps** 65:5 129:24 226:11
**hereto** 299:15 300:11
**hey** 38:12 40:13,14
**hi** 38:25
**hide** 156:5
**high** 8:25 139:7 139:10
**higher** 206:6
**highlight** 99:19
**hire** 19:10 63:16 78:10 79:6 80:3 81:5 86:3 94:14 101:25 102:18 102:19 122:17 230:14,22 231:4
**hired** 34:15 63:17 176:21 212:14 227:8,9 228:1,7 229:6
**hires** 79:21 290:21
**hiring** 227:3 228:17 229:10
**historical** 206:13
**history** 11:14
**hitting** 205:15
**hold** 117:9 129:11 151:17 184:20
**honest** 216:8
**honestly** 63:12
**hope** 38:25 237:19 252:12
**hopefully** 184:13
**hospital** 290:25 291:2,3
**hour** 201:6
**hours** 97:4 138:23 139:7,8 139:14 140:3,8 140:8,10 141:2 141:11,20 142:25 143:11 201:7,8 286:21 287:10,12,16 292:12
**house** 6:11
**hr** 3:20 33:17 33:20 44:15 45:5,9,10 46:23 156:7 201:13 205:8 216:14,15,16 216:20,22 224:5 225:23 226:9 227:10 241:4,15,18,19 242:2,21 244:7 248:15,19 249:7,9 251:11 252:7 253:25 254:6 289:22
**human** 202:17 202:21 203:12 203:23 280:20
**hundred** 53:6 128:15 133:8 257:3 264:22
**hundreds** 108:15
**hypothetical** 125:24 126:3 135:16

**i**

**i.e.** 153:4
**icon** 71:20,21
**idea** 19:12 85:13 89:4 90:8,9 97:1 106:4 115:18 174:14,24 176:23 184:14 193:12 221:19 222:12 226:11 264:7 278:15
**ideal** 196:2
**ideas** 119:25 129:16
**identification** 35:17 42:6 52:8 71:17 83:22 109:11 127:18 231:13 243:20 245:20 250:5 254:16

**identified** 111:25 252:17 281:5
**identify** 5:25 105:1
**ignore** 210:2
**igor** 127:22 128:3,6 129:11 129:23 130:1,3 130:3
**ilin** 81:14,19 88:10,11
**illegal** 277:8
**imagine** 32:12 33:19 57:12,19 260:19 266:3
**immediate** 157:9
**immediately** 20:5 53:3 79:2 79:8 178:21 200:17,21 223:1 249:10 263:25 265:1
**impact** 266:9
**impacted** 264:17 265:14 265:17 266:5
**implement** 223:23
**implementati...** 224:2
**implemented** 223:24,25
**implications** 253:5
**implies** 72:4
**imply** 70:9 71:21
**important** 179:8,12,17,17 179:23 202:24 202:25 203:2,4 203:6,11,17 210:7 264:20
**impressions** 138:1
**improvement** 223:19,22 224:4,8,16,23 224:25 225:3,6 225:7,10,15,17 225:21,25 226:3,5,8,10 240:10
**inappropriate** 262:9
**inappropriately** 229:23 230:22
**incident** 181:2 242:19,20 253:1 260:3,3
**include** 44:2 48:9 49:17 68:12 131:21 132:2 141:11 154:23 169:10 170:16 208:5 214:7 280:25 281:11
**included** 29:16 53:10 87:20 139:18 143:17 147:4 149:17 153:22 207:16 207:18,21 258:4 280:14
**includes** 98:20 143:16 171:2 183:16 205:13 270:8
**including** 45:6 47:15 88:20 119:25 132:18 138:15 142:7 191:20 193:14 213:8 225:13 226:15 235:9 239:25 264:18
**incomprehen...** 249:18
**inconvenience** 102:1
**incorrect** 24:15 140:19 153:13
**increase** 184:10 184:15
**incurring** 93:17
**independent** 220:18,18
**index** 91:2 120:6
**indexing** 90:25
**indicate** 78:18
**indication** 116:8
**indirect** 294:18
**indirectly** 165:6,13 293:1
**individual** 216:11 271:22
**industry** 44:3,8 48:9,14
**inflated** 211:5 266:3
**influence** 46:24 284:14
**influenced** 239:17
**influencing** 92:10
**infomatics** 222:3,11 238:5 238:6 284:7,10 284:13 285:19 286:6
**inform** 111:17
**information** 35:5,10 44:5 48:8,11 59:4 59:21 62:6 78:9,21 79:4 91:21,24 92:2 92:7 123:9

142:16,18,25 143:2,4 144:8 144:10,10 145:13 148:17 152:23 153:10 153:12,22 158:18 161:18 161:19,20,22 161:22,23,24 162:6,7,11 163:1 170:16 174:18 175:14 175:18 176:8 179:20 180:18 180:19 182:12 191:25 198:8 198:16 203:22 207:1 219:9 236:22 239:9 240:23,24,25 241:5 252:19 252:25 254:3 254:21,23 255:4 256:17 257:5 258:1,6 258:21 262:19 263:5,6 267:11 267:21 268:1 269:11,11 270:21 271:23 273:25 275:1,9 279:10,15,17 279:20,22,25 280:1,10,12,23 281:1,2,7,10,12 281:19 282:3,4 282:17 284:17 288:12 294:9 295:6 297:8,20

**informations** 180:21

**informed** 278:3 289:14

**informing** 271:19 272:24 273:19

**infosec** 131:10 149:3,5 162:23 275:2,4,7 277:23 278:1 283:11

**infrastructure** 89:24 96:14 120:5,6

**inherited** 76:16 76:25

**initial** 114:12 221:19 275:19

**initiate** 32:1 34:23,25

**initiated** 31:17 33:17 39:11,14 39:15 46:23 252:24 263:25

**innovation** 96:10,10

**innovations** 78:23

**input** 116:11 131:13 160:18 210:8,9

**inputs** 115:18 115:20 116:21

**inserting** 101:7 104:2

**inside** 70:12,20 86:8 99:5 105:17 106:1 106:18,21 107:1 124:22 145:25 163:22 164:12 168:21 220:21 279:10 290:15

**insight** 68:4 87:1,3 95:21 252:10,15 265:4

**insights** 82:16

**instance** 52:1 58:8 59:6,25 60:2 99:17 179:8 181:19 181:21

**instances** 180:25 181:10

**instituted** 171:4

**instruct** 49:7 49:11 57:8,13 57:15,20,21 58:12 60:20 98:14 100:15 101:10 123:8 140:15 152:14 153:5

**instructed** 3:23 4:1 44:14 47:4 58:5,20 61:4 61:22 140:24 141:1 153:16 174:13 175:9 253:25 292:25

**instructing** 37:19 43:15 58:22,22 101:4 104:5 153:14

**instructions** 58:14 60:22 138:1 167:7 208:1

**integration** 119:21 188:11

**intellectual** 77:4,14 78:20 78:23 80:23 81:6,9 84:25 85:3,15 89:12 90:2 99:9,20 121:11 122:18 129:12 133:13 154:6,7 155:2 162:15 174:9 174:12 177:5 213:6 231:5 238:17 240:1

259:15 260:15 280:8 281:23 281:25 290:10
**intend** 19:10 213:18
**intended** 5:17 210:4
**intent** 156:9 158:8 193:11 213:17,19,20 213:25 217:12 231:1 283:9,10 287:25 288:4 294:13
**intentional** 198:13
**intentionally** 37:6,8
**intents** 212:2
**interact** 130:3
**interacted** 126:19 130:2
**interaction** 61:18 156:7
**interacts** 126:24
**intercept** 132:3
**interested** 21:16,20,22 35:8 299:15 300:12
**interface** 126:14
**interferes** 272:17
**internal** 68:2 68:14,15,19 80:14,18,19 81:20,25 82:10 82:21 84:25 86:19 90:8 91:1 95:16 102:22 103:9 104:24 105:21 105:23,23 119:7,17 133:2 133:6,15,15 135:10,10,19 135:20 136:11 145:22,23 152:22 156:1 210:24 234:11 281:1
**internally** 68:6 68:8 80:15,20 81:23 82:12 89:6 90:11 96:3 106:15 112:12 114:11 114:12 116:18 118:4 133:23 135:9,19 213:9 233:23 237:23 238:9
**international** 45:24 46:4
**interpret** 43:22 129:20 133:4 252:5 254:5
**interpretation** 129:19 158:5 161:13
**interpreted** 234:21
**interrupting** 58:17
**interview** 227:15
**introduce** 36:13 240:10
**introduced** 98:8
**introducing** 271:20
**introduction** 218:17
**invade** 293:2
**inventions** 78:22
**invest** 114:14 213:4
**invested** 210:25 213:7
**investigate** 198:18,22 213:16,24 214:2,3,6,8 215:2,5
**investigation** 253:2 267:19
**investment** 93:7 96:23 141:21,25 142:6 264:2,14
**involve** 142:10 153:2 208:22
**involved** 11:8 16:9 18:17 21:9,10 30:17 40:18,25 45:16 45:19 53:19 54:19 66:20 92:9 93:20 104:20,21,23 112:9 114:20 116:16 152:12 221:9 236:17 237:9,12 239:4 256:13 272:23 273:6 274:14 274:15
**involvement** 21:21 47:16
**involves** 140:22
**ip** 86:5,7,23 87:8 88:3,8,12 88:14 89:16,17 92:23,24 93:4 93:8 94:10,11 94:12,17 98:9 99:5,17 100:10 102:19,20 103:9,13 104:11 111:25

112:20 114:16 114:18 123:6 124:4,16 133:13 135:4 144:18,23 145:6,11,16,20 145:23 154:18 154:20,22,23 156:1 165:25 210:11 217:3 230:16 234:11 238:14,18,22 238:23 293:12
**irrevocably** 256:3,7
**issue** 22:6 50:8 51:1,11,13,25 54:17 178:5,10 178:12,13,14 179:5 198:9,10 198:12,19,21 198:25 199:9 201:17 241:13 241:14 242:1,4 242:5 248:14 252:14 253:25 259:15,16 260:6,15,17 261:10
**issued** 176:9 283:16,18
**issues** 49:18,25 50:3 51:22 53:8 54:9 75:23 124:22 173:11 217:4 225:16,21
**issuing** 200:4
**it'll** 261:9

**j**

**j&j** 23:4,20 113:4 264:25 264:25 265:1 266:10 270:18
**jacob** 2:3 6:5 28:10,11 47:4 166:5 257:10 260:9 275:12
**jeff** 53:12 60:1 60:5,10,14,19 61:5,12,14,16 61:18,22 62:17 62:20,23,24 63:9,14,16,18 63:25 64:2,7 64:15,17,24 65:1
**jeff's** 62:19,20
**jersey** 6:4
**jim** 53:21 54:17 91:18 104:21 104:23 105:1,2 105:6,10 106:21 112:9
**job** 15:4 107:8 126:25 168:8 168:13,23 169:4,5 176:16 176:22 184:20 184:21 194:3,5 212:14 265:2
**john** 112:9
**johnson** 19:9,9 23:2,3,7,8,8,9 23:11,11,15,16 23:23,23 24:5 24:5,9,9,12,12 24:12,13,18,18 25:4,4,8,8,15 25:15,19,19,24 25:24 26:4,4 26:13,13,17,17 26:24,24 27:4 27:4,15,15,23 27:23 104:22 104:22,25,25 105:4,4,6,6,10 105:10 110:24 110:24 111:6,7 111:13,13,19 111:19 112:1,1 112:20,21 113:1,1 243:3 243:3 293:19 293:19
**join** 19:8 24:13 106:20 227:13 228:3
**joined** 63:8,11 63:12,14,20 64:4 81:20 186:20 187:14 187:17,20 225:24 227:19 237:1
**joining** 25:14 25:18 64:4,4 227:10 236:13 236:15
**joslick** 2:7
**joy** 223:1,3
**judge** 150:14 150:23 265:23
**judge's** 150:24
**judgment** 9:10
**july** 95:17,18 187:22 211:10 211:12 212:17 213:5,11
**june** 19:22 20:1 28:19 67:6 74:7,18 86:8 86:17 88:15,17 88:22 92:12,17 92:19,24 93:11 93:18 94:3 95:11,13 99:23 100:2 101:18 103:2,14,19 114:17 116:14 116:15,19 117:24 118:7 121:9 128:7 136:23 144:19 144:24 145:6

182:23 187:21 187:22 193:19 194:9,18 195:2 195:14 196:7 196:21 210:20 233:20 234:7 234:21
**junior** 227:10 227:12 228:3
**jurisdiction** 164:1
**justification** 241:11 242:11
**justify** 90:5 242:16,16,19

**k**

**k** 4:13
**katie** 3:13 108:10,20 109:3,4,5,15,19 110:8,12 122:22 123:1,1 123:20 124:2,7 126:13,16,19 127:1,10,12 182:16 208:17 209:12 260:25 289:25 290:3,7
**keep** 11:20 16:24 35:21 40:16 115:25 115:25 130:25 134:6 163:17 214:22,25 215:1 261:24 262:2,5,15 283:12 285:21 286:9 287:10 287:22 293:23
**keeps** 125:20 193:3
**kept** 38:20
**key** 110:17 237:8
**keyword** 41:11 146:16 177:7 235:1,5 285:6
**killian** 33:14,16 33:21 34:2 197:22 198:2,5 201:9,18 203:14 205:8 221:9 274:22 274:23 275:4 275:20 283:22 283:23
**kind** 101:12 107:23 156:8 156:10 230:7 289:1
**kit** 266:18 278:23,24 279:2
**kits** 268:13
**klebanov** 1:10 5:6 6:8,8,16,19 7:23 8:16 10:23 11:25 15:12 17:24 18:16 28:4,10 36:6,9,19,24 37:6 44:9 48:4 53:14 54:2 71:14,19 72:3 73:8,12 75:7 75:12 78:7 79:9 83:20,25 84:6,11 94:20 98:8,12,24 99:5 100:23 101:6 109:13 110:4 121:16 127:15,20 137:12 138:5 140:17 141:1 143:19 147:6 152:10,25 161:10,18 164:4 168:20 173:2 174:2,7 178:24 197:5 197:12 202:3,8 202:11,16 203:1,5,11,18 208:8,21 216:13 231:16 232:17 233:3,8 233:13 243:23 244:9,16 245:11,23 247:10 252:8 259:14 260:23 273:24 279:8 282:5 287:21 288:18,19 292:20 296:15 298:8 301:3,21
**klevanov** 73:14 247:15
**knew** 20:12,21 21:9 23:10 25:6,22 45:8 45:16 47:1 60:19 155:6 156:21,23,25 157:3 170:10 179:5 191:23 258:11,18,21 258:23 273:5
**know** 8:11 9:22 11:6 23:13,13 24:4,18 25:3 25:12,14 26:12 26:16 28:15 29:4 33:5,7,8,9 41:21 42:14,21 44:16,20 45:9 53:22 54:1,18 57:5 58:25 59:6,8,11,17,24 60:3,14,16 61:17 62:7,13 62:23,24 63:4 63:6 64:6,17 65:2 67:21,25

68:23 69:3,15 69:25 70:4,11 70:17 71:4 72:19 74:15 76:21 81:19 84:1 85:8,21 86:9,10 90:22 91:13,15,19 92:18 97:4 99:7 102:9 104:19 106:5 106:25 107:3,8 107:13,13 108:3,20,25 109:2,18 110:1 110:13 112:17 114:2 117:18 120:14 123:13 125:7 126:4,16 126:23 127:11 129:6 130:2,3 130:6 131:4 133:5 135:17 139:15 140:21 142:2 143:11 144:15,20 145:25 146:3 146:10 147:13 148:1,19,20,25 149:14 150:4 150:10 152:12 155:5,10,13,20 158:8 160:20 162:3,4,20 163:4,19 164:9 164:14 165:18 166:18 169:2 171:7 172:24 174:23 176:20 176:20 181:8 181:14 182:1 182:21 186:11 195:4 199:14 200:2 202:19 216:22,23 220:9,24 221:2 223:18 224:3 225:23 226:12 226:20,20,20 226:22,22,23 226:24 227:11 243:7 246:4 251:20 253:7 254:18 256:12 256:25 261:8 261:13 264:6,7 265:19 266:6 266:21 267:9 273:22 274:5 275:7 277:13 277:15,17,18 278:6 280:19 280:21 282:7,9 283:8 285:14 287:4,15 290:2 295:7,9,22

**knowing** 53:4 71:9 74:10 117:21 164:1 288:17

**knowingly** 27:13,21

**knowledge** 8:7 31:11,13,16 44:3 46:24 48:9 49:2 54:15 60:3 61:19,20,22,23 62:1,1 73:6 84:17 85:7 92:8 106:3,8 106:23 118:15 118:23 123:2 126:9 131:14 132:12 231:2 259:5,8,11,12 268:2 281:23 282:15 284:22 299:10 300:6

**knowledgeable** 225:25 235:16

**known** 11:1 15:14 17:24 49:4 65:8,11 65:14 72:22 73:2 202:10,15 207:1 277:20 284:17

**knows** 202:19 278:6

**konstantin** 67:22 167:21 167:23 168:1,3

**l**

**lab** 131:18

**label** 41:15 42:4

**labeled** 35:19 41:18 52:6,24 71:14 127:15 154:4

**language** 98:9 99:23 100:2 101:2,8 129:12 132:12 254:4

**laptop** 170:14 170:17 172:2 176:10 283:16 283:18

**large** 133:3 283:5

**larry** 3:17 200:3,6,8,11,16 200:23 201:2,9 201:10,13,18 203:14 205:7 226:2,7 241:3 241:7 242:22 243:1 244:6,10 245:8 247:8,24 248:5,5,7,15,20 250:24 251:19 252:7,12

**late** 35:1 287:1 287:2

**latest** 130:23
**launch** 87:23 116:4,5
**laws** 5:19
**lawsuit** 11:9 277:2,5
**lawyer** 79:14
**lead** 29:20 30:4 34:16 35:4 91:10,24 92:5 140:2 145:7 159:21 167:7 183:25 185:13 185:17 195:6 204:4,7,11,24 205:8 211:24 212:23 230:4 235:17 271:20
**leader** 69:4 116:25 118:22 159:22 165:24 211:6 213:24 215:18
**leaders** 147:21 193:14
**leadership** 30:21 31:6 149:8,9,11,15 149:25 150:8 184:2 192:2 194:12 196:9
**leading** 11:6 30:9,12 45:16 67:22 86:18 87:16 91:23 177:2 205:19 243:5,14,15
**leads** 35:8
**leave** 19:7 24:12 63:21 89:12 156:9 287:5,8
**leaving** 19:13 265:1
**led** 67:22,24 93:8 155:20,25 211:23
**left** 19:23 20:2 29:22 63:18 64:3 84:16 85:22,24 222:4 255:9 268:25 269:3 287:3
**legal** 1:13 37:13 45:5,6 46:20 47:5 72:5,7 75:9,21 75:22 76:24 78:4 79:13 80:5 98:10,13 98:20,21 99:2 100:12,18 101:2,3,7,13,19 101:20 102:8 104:1,6 108:23 108:23 111:12 122:22 123:1,5 124:3 126:14 126:20,24 209:3 239:2,4 239:12,16,21 240:4,4 270:25 272:9,9 273:23 274:1,3,4 279:12 281:14 282:13 290:14 291:11,14,23 291:23 292:7 293:7
**legal's** 290:1
**lesson** 275:22 275:25 276:19
**letter** 69:19,20 69:25 71:24
**letters** 69:22
**level** 66:10 139:7,11 186:25 269:24 284:25
**liberty** 1:14
**library** 45:17
**licensable** 121:2
**license** 81:11 83:3,4 84:25 85:3,5,6,15 87:4 99:9,20 100:9 102:20 102:21 103:10 120:14,15,16 121:4,12 122:1 122:4,20 126:11 133:25 138:20,21,22 155:2 156:3,11 157:10,25 158:7,15,23 159:3,9,13 160:3 161:3,4 177:4 198:9 199:6,7 200:25 230:16,16,18 231:4,7 235:4 238:23 239:25 240:2 245:15 260:16 279:16 281:24 282:1 288:22 289:6
**licensed** 91:1 124:24
**licenses** 125:21 199:8 289:1,4 289:8
**licensing** 126:6 231:6 293:8
**lieu** 224:17,18
**life** 11:5 14:6 32:4,8 149:8,9 149:10,14,19 149:24 150:7 191:21 197:19 283:23
**liked** 19:1 61:25,25
**likely** 136:24

**limit** 41:4 47:17
**limited** 74:6
**limits** 41:11
**line** 3:24 4:2,14 34:3 38:24 43:4,17,23,24 47:20 48:4,7 62:20 63:9,24 64:2,6,10,20 73:20,21,24 78:10,11 97:10 138:17 165:12 225:17 274:21 301:5
**lines** 38:11,23 40:10 78:14 129:2
**list** 50:13,14 53:11 136:12 162:18 267:12 275:6,8,8
**listed** 53:8 109:13 112:10
**listen** 218:15
**listened** 218:10
**listening** 218:22
**literally** 216:5 218:18
**literature** 87:20 90:25 91:1,1
**litigation** 11:7 132:7 148:12 151:6 152:1,13 153:4 197:7 270:1 273:15 273:23 274:10 282:6
**little** 8:17 39:23 99:11 115:24 147:7,8 204:17 211:5 287:5
**live** 6:4
**lived** 292:22
**llc** 301:1
**llp** 2:4
**loaded** 94:7 111:20 138:12 184:4,19 217:5 263:21 272:20
**local** 247:2 285:22 297:7
**located** 48:24 55:6 62:11 279:15 295:15
**location** 1:13 49:19 50:1,16 51:14,16,17,22 62:12 77:10 178:6,19 240:9 260:4 295:17
**locations** 50:5 50:7,12 51:3,8 51:10,18 56:16 56:18
**log** 3:10
**logo** 73:22
**logs** 131:5,7,8 144:17
**long** 11:13 97:17 156:6 171:17 187:19 200:18,22
**longer** 249:24 271:19 272:24 273:20
**look** 35:24 36:2 43:3,7 57:8,15 73:11,13 81:12 102:6 118:19 145:3 163:9 182:1,3 261:8 265:23 289:8 293:1
**looked** 28:11 143:15 146:18 182:2 283:11
**looking** 35:3,7 42:14 62:9 72:18 93:5 128:14 133:9 158:10 195:4 216:8 227:12 268:4
**looks** 245:5 247:18
**losing** 192:25 256:16
**loss** 30:21 31:6 34:5,10,11 205:10 252:9
**lost** 29:20 121:23 252:25 256:24 257:1 264:15
**lot** 91:24 97:24 120:7,7 251:16 266:9 278:5 285:4,10,20 292:7
**louder** 9:2 22:2 22:4
**loudly** 99:11
**lucy** 3:10 52:24 53:5,6,21 54:1 54:5,8,12,15,20 261:6,10,13,17 261:19,20,21 261:24 262:2,8 262:12,15 263:2,6 293:22
**lugar** 2:10,14 6:11 7:8 8:23 45:6 97:10,12 97:16,19 137:15 286:24 287:1,4
**lukash** 127:22 128:3,6 129:11 129:23 130:1
**lunch** 97:5,13 97:14
**lunchtime** 136:17

**m**

**m** 2:3 4:13
**made** 44:15 78:24 123:5 140:20 147:13 147:16,20 155:10,13 163:8 178:16 180:16 197:13 197:16,19,21 206:11,13 219:16,19 222:18 228:4 228:15 254:18 258:16,19 259:3,8 265:25 272:1,4 275:10 281:18 283:8
**main** 83:13,13 83:15
**maintain** 172:20,24
**maintained** 134:2
**make** 7:6 9:1 9:15 11:11 32:2 36:12 41:15 44:15,18 76:24 83:3,8 85:1,2,12 100:7,8 114:14 122:12 129:13 129:14 173:6 174:9 179:19 180:10,18 182:22 193:2 194:4 216:15 227:25 229:3 240:9,18 241:10,21 262:20 272:6 272:11,17 275:12,21,25 276:2,3,5 293:22 296:7
**maker** 197:17
**makes** 180:16 239:20
**making** 34:11 87:18 89:1 120:5 198:20 227:20 228:9 228:17 259:5 272:12 273:3 276:19
**man** 47:8
**manage** 57:11 57:12,18,19 59:3,20 60:21 61:16 69:23,23 70:14,22 81:17 128:12 129:23 158:18 166:25 168:24 225:7
**managed** 136:9 136:10
**management** 66:12,14,18 92:3 136:3 161:7 164:21 164:21,24,24 165:4 167:3 173:24 222:15 222:19 274:18 274:22
**manager** 22:25 34:3 50:22 53:20,21 54:13 60:11,13,15 62:20 63:9,24 64:2,7,10,20 65:3 66:22 67:6,13 68:9 68:15 69:24 92:4 103:3 119:16 135:23 136:1,2 139:25 178:8,9,16 181:6 208:1 225:17 246:3 252:18 253:12 274:21
**managers** 54:3 61:21 66:19 67:15 98:20 289:12
**managing** 56:16 60:23,25 61:4 65:6 66:6 128:10,15,16 159:17,17 164:10 165:11 165:13 184:22 294:16
**mandate** 144:21
**mandated** 169:10 222:14
**mandatory** 174:19 178:17
**manipulated** 157:14
**manner** 5:20 237:16
**march** 187:3 278:20
**maria** 297:3
**mark** 220:6
**marked** 35:16 42:5 52:7 71:16 83:21 109:10 127:17 231:12 243:19 245:19 250:4 254:15
**market** 1:14
**marketing** 108:22,24 109:5,6 123:2 127:7 216:10
**master** 3:11 26:12,16 72:1 72:2,6,12,16,17 72:19,21,25

73:4,6 74:7,16 74:21,24 75:16 76:1,5,7,12,17 76:22 77:2,3 77:22 93:25 95:10 100:13 101:25 108:11 229:25 291:16 291:19,21 292:1,3,9
**material** 109:5 112:15 127:7 153:3 174:11 185:11 194:1
**materialize** 185:12
**materialized** 185:24 186:2 265:22
**materials** 13:18 13:23 79:5 109:6 152:12
**math** 187:22
**matrix** 285:8
**matt** 296:14
**matter** 5:6 6:3 103:3 159:6 188:10 199:4 253:11 270:1,5 270:13,21 274:16 275:11 276:11 279:13 281:15
**matters** 47:5 127:5 138:2 274:15
**matthew** 1:17 5:3 16:21 62:4 62:4 115:22 168:11 259:21 260:9 287:3 299:2,20
**mature** 32:17
**mcclain** 226:2
**mcdermott** 3:10 52:24 53:5,6,21 54:1 54:5,8 261:6 261:10,22,24 262:2,8,15 263:2 293:22
**mcklaine** 200:4 200:6,9,11,16 200:23 201:2,9 201:10,13 203:14 205:8 226:7 250:24 251:19 252:7
**mcklaine's** 201:18
**mean** 34:7 46:16 62:11 71:12 79:16 93:22 99:25 114:19 140:8 157:20 158:25 191:17 214:3,5 214:6 228:5 234:18 253:20 255:20
**meaning** 43:20 43:21 99:9 103:8 106:13 129:24 136:2 155:1 157:18 209:15 235:3 258:25
**meaningless** 235:1,5
**meanings** 291:24
**means** 5:21 10:9 17:7,10 17:12,15,19,22 21:2 29:4 70:10 75:13 79:10 102:7 129:9 157:21 157:23 175:8 249:21 259:1 260:21 279:4 285:4 294:4
**meant** 99:8 102:12
**measured** 284:11,18,19 285:9
**medical** 8:1 9:7 21:22,23 30:22 31:9,14,17,21 31:25 32:2 68:20 90:21 202:2,4,19 232:13 235:17
**medication** 8:1 8:25
**medicines** 8:12 8:14 9:9
**medrag** 68:20 81:22 87:21,22 90:16,17,21,21 91:8,14 92:10 92:12 93:17,20 141:11 143:16 213:10 268:12
**meet** 105:9 249:11 269:5 269:20
**meeting** 19:18 105:12,16,20 105:22 106:19 107:15 108:1,3 110:23 183:10 188:17,19 200:23 201:2 218:11,13,14 243:7,8 268:22 268:23 269:9 269:18,19,22
**meetings** 33:13 33:16 194:11 194:12 205:2 207:5 243:2,10 268:24 269:2

**members** 91:9 91:25 92:6 93:20 149:9 157:13 164:12 166:16,18 167:8 173:5,7 235:24
**membership** 279:6
**memory** 10:14 33:18 60:7 63:5 64:16 65:9 116:5 145:18 177:6 181:18 202:3,5 203:23 206:3 208:13,14 219:3 277:24 277:25
**mention** 234:13 235:14 268:10
**mentioned** 38:19,20 63:1 71:11 102:5 165:17 198:13 198:19 205:23 206:1,8 230:14 232:18,25 235:18 247:5 255:21
**mentoring** 34:18
**message** 38:14 38:17,19 39:1 52:14,16,17 53:5 54:17 109:17 110:2,7 110:9 113:15 113:16,18,19 113:21 114:2,5 129:9,10,10 178:10 182:4 182:11 200:12 209:11 246:14 246:21 248:3,8 248:10,14 249:17 250:25 251:1 252:12 253:15,16,18 261:18 263:12 295:18,23 296:1
**messaged** 248:11
**messages** 182:20 216:10 221:5 246:10 246:11 247:22 250:24 251:4,5 263:14
**met** 19:21 105:10 107:18 200:8,9,11,16 235:22
**metadata** 252:2
**methodologies** 20:13,22
**methods** 186:25 190:15 192:17,18 206:25
**micromanage** 212:22
**microsoft** 66:3 105:17 163:17 164:13 246:20
**middle** 128:17 129:5,8
**midyear** 191:1 191:2
**migrated** 279:6
**milestones** 28:24 29:3
**millennium** 72:23 73:2,5 75:4
**million** 32:5,6,9 32:10 191:7,8 192:7 205:18 205:20,23 206:4
**millions** 32:21 32:25 33:1 186:1,2 207:8 211:24,25
**mind** 10:18 31:2 34:8 256:14 275:12 283:10 288:1
**minds** 88:1
**minimizing** 184:13
**minute** 36:10 39:17,24 84:2 98:2 108:2 218:19
**minutes** 36:19 184:25 201:6 286:22 287:16 287:18 294:23
**misappropria...** 278:22 282:8
**misappropria...** 293:12
**misconduct** 276:14
**misleading** 146:16
**misrepresenti...** 240:8
**missed** 168:12 201:16 271:6
**missing** 254:12
**mistake** 178:15 178:22 179:19
**mistaken** 69:1 87:1 120:15 127:25 207:9
**mistakes** 180:15,16
**mistyped** 179:10,13
**mit** 157:10 161:4

**mitigate** 116:13 173:10 270:22 275:11
**mitigated** 178:22
**mitigation** 273:7
**mixing** 81:2
**modification** 247:3
**modifications** 76:23 120:17 134:1
**moment** 10:25 108:2 117:20
**money** 210:25 265:14,17 273:22
**monitor** 256:15 256:18
**month** 25:12 63:3 108:15 156:6 186:13 186:13,15,16 186:19,19 289:23
**monthly** 213:2
**months** 64:17 187:23,24,25 188:4 289:6
**morning** 5:2 7:23 199:22 249:8
**motives** 158:13
**move** 166:15 213:20 219:11 221:20 222:9 222:19 223:5 237:18 294:20
**moved** 22:14 22:15 183:7 220:2 237:20
**movement** 224:1
**moving** 204:22 212:3 222:8 238:3 262:22 262:24
**msa** 26:2 78:1 102:6 182:17
**msas** 98:18
**muffled** 204:17
**multiple** 21:11 31:1,1 34:1,1 34:16 35:5 66:15 67:15 88:9,13 90:14 91:5 93:21 118:24 133:5 143:14 145:20 155:16 157:11 179:19 180:17 183:16 185:25 186:23 207:20 217:6 229:17 245:16 255:1 260:1
**mutual** 56:20
**mutually** 289:17

**n**

**n** 2:1 3:1 5:1
**name** 5:2 7:23 11:24,25 60:1 67:2 68:2,21 69:2,6,9,17 71:22 72:4 80:14,19 82:5 82:10,21 83:12 87:2 94:19 95:20,22 96:2 104:24 116:6,7 119:7 131:18 133:2 134:15 134:18 135:14 148:20,24 149:19,24 150:24 151:10 151:14 152:4 179:6 215:8 216:3,5,7 233:1,11 234:14 246:18 291:2 296:20 296:20 301:2,3
**named** 42:12 108:10 135:21 292:22 295:13
**names** 75:4 81:3 95:16 109:14 148:12 148:14,15 149:16 150:7 151:17,18 162:10 235:14
**naming** 109:5 126:22 127:8 131:15
**naturally** 237:8
**nature** 184:11 219:23 253:1
**necessarily** 62:10,11 96:22
**necessary** 173:9 181:6 251:18 253:2
**need** 8:17 13:17 36:21,21 42:13 47:21 51:16 86:4 97:5,6,12 104:10 127:20 127:21 162:3,4 165:18 166:18 173:21 186:18 210:8 222:24 223:14,15 226:18 227:21 231:16,17 232:17 239:8 247:8 251:12 251:25 255:25 257:18 275:21 276:2 285:14 297:20 298:1

**needed** 29:24 30:4 133:3 179:21 217:2
**needs** 57:10 297:2
**negatively** 264:5
**negotiate** 89:5 289:23
**negotiated** 264:25
**negotiations** 45:4,13 46:12 46:13,15,18 47:11
**neither** 299:11 300:7
**network** 32:17 45:25 46:5 270:15 271:15
**networks** 272:3
**never** 31:16 34:4 146:3,7 146:14,16 172:6,8,10,11 185:24 206:1 224:1 265:22
**new** 2:6 6:4 32:12 42:7,9 42:10 96:4 118:3 120:1 195:22 217:13 220:2,6 231:10 237:4,20 240:10 263:24 271:20 279:6 283:3,24 301:1
**newtown** 2:13
**nice** 229:11
**nicely** 254:6
**nods** 9:18
**noise** 107:23
**non** 10:1,5 25:23 26:23 27:3,14,22 81:10,11 83:2 83:3 86:4 90:8 120:16,16 122:19,20 133:25 145:17 145:19 158:9 207:23 219:17 227:12 279:10
**nonverbal** 9:18 28:4 138:2
**normal** 101:23 106:16 134:6 211:21 240:20
**notary** 5:9 298:14 299:20 301:25
**notation** 70:6
**note** 47:3 159:9
**noted** 123:10
**notes** 10:13 41:15
**notice** 177:9 182:23 200:4 200:18,19,22 200:22 204:14 260:25 289:13
**notification** 183:4,6 204:3 204:22 206:12 219:13
**november** 45:3 64:5 149:21 150:1,12,13 187:21
**number** 32:13 36:15,16 50:23 73:20,21 78:8 180:14 189:24 190:1,1,3,22,24 190:25 191:3 191:23 192:4 193:4,6,11,20 194:3 195:2,3 195:14 196:2,7 196:13 205:18 205:23,25 206:2,5,7,8,10 206:10,11,13 206:20,22 207:22 231:11 245:18 252:25 254:14 266:11 274:1,2,4,7,8 283:5 284:14 284:14,15
**numbers** 41:23 143:22 185:23 185:24 186:11 186:12,15,21 188:1 189:13 189:14,20 190:5,7 191:6 191:12 192:22 193:24,25 194:14 195:25 196:16,19 207:5,20 211:2 211:3,4 265:20 265:22,23 266:1
**nutshell** 233:22
**ny** 2:6

**o**

**o** 4:13 5:1
**oath** 7:25 10:7 12:2 24:17 25:2 26:9 59:23 71:3 106:24 121:16 121:19 137:13 151:20 195:25 199:14 230:21 238:2 241:21 269:4 272:10 272:16
**oaths** 5:10
**object** 47:23 55:20 80:8 100:2 103:5,16 111:24 112:4

112:13,25 195:3
**objected** 85:2 100:4 293:18
**objecting** 42:16 103:22 112:11 113:3
**objection** 5:12 12:22 13:20 15:10,19 16:3 20:4,16,25 23:17,24 24:6 24:14,20 25:5 25:25 27:16,24 29:9,14 30:2 30:24 34:6,13 35:2 36:2 37:12 40:21 45:7 49:21 53:17 55:9 64:8 66:25 67:8 69:14 70:21 71:6 74:20 77:8 78:12 79:12 81:1,16 93:9 93:12 94:6,21 95:1,25 96:19 99:22,24 101:9 102:3,14 103:2 103:4,12,15,20 107:2 108:13 110:5,19 111:21 112:3 112:22 113:25 117:5 119:5,14 120:12,22 121:5,13 122:5 122:10,24 123:22 124:5 124:13 125:1 125:23 126:8 126:15 128:8 131:22 132:9 133:18 134:17 135:7,15,25 137:1 138:11 139:2,9,16 140:11 141:23 143:6 144:2 146:8 150:2,17 151:23 154:24 155:15,22 160:5 161:5 162:22 165:7 166:2,6,11,24 167:17 173:15 174:15 175:11 176:2 177:15 177:20 179:15 180:24 181:24 182:9,25 184:18 185:21 188:5 192:5 193:7,22 194:19 195:17 196:3,11 198:15 202:12 204:8,12 205:21 206:15 207:13 210:13 217:21 218:3 222:16 223:4 225:1,19 228:8 228:19 229:16 230:24 234:9 234:24 236:3 240:11 241:23 249:14 254:8 257:9,12 258:12 259:18 261:1,11 262:10 269:7 270:6 271:4 276:22 277:4 278:9,14 279:23 281:8 282:11 284:2 285:23 286:1 286:11 290:18 291:18 292:5
**objections** 6:14 7:2 100:10 210:17
**objective** 132:8
**objectives** 193:9,17 194:5 212:9,24
**obligations** 27:14,22
**observe** 276:10 283:12
**observed** 93:7
**obtain** 162:12 289:1
**obtained** 107:16 191:24
**obviously** 29:17 140:7 196:17 199:13 200:8 209:13 224:1 238:25 246:24 264:19
**occasion** 58:25 59:9,11,17
**occasional** 65:24
**occasionally** 70:24 130:4 180:17 202:6
**occurred** 252:14 278:2
**october** 24:4,19 25:3,7,12 26:10,15 40:8 40:12 95:12 118:17 155:14 155:21 157:3 187:23 188:16 197:16 199:15 200:13,13 201:19,19 240:22 244:11 245:9 246:4,16 252:6 269:5,10 269:21 278:4

**odysseus** 11:3 14:13 18:5 19:22,23 20:1 20:2,9 25:20 25:22 28:19 29:19 32:16,22 32:25 33:10 41:6 65:4,6,12 65:17,19 73:18 73:24,25 74:4 74:6,14,18 75:3 76:3,8,13 76:14,16 77:6 77:23 81:7 94:1,2 104:1 173:12,23 187:13,19 195:15 227:16 227:19
**odyssey** 20:23 21:10,11,13,15 21:21 38:21 41:9 44:19,23 45:14,25 46:4 46:6 47:16 49:8,12 188:17 188:19 273:11
**offer** 251:24 263:24 264:13 288:14
**offering** 220:5 264:8 265:10 288:14
**office** 66:12,13 66:18 297:7
**officer** 12:3 14:13 30:22 31:10,15,18,22 31:25 32:2 74:2,3,4,19 76:13 281:20 299:1,2
**oh** 55:24 92:14 160:19 218:19 227:8 237:19 257:17 287:18 296:24
**ohdsi** 19:17 20:14 21:7,10 40:19 41:1,4,5
**okay** 6:7,13 7:10,23 8:9,11 8:22 13:11 16:22 21:24 22:18 30:19 35:18,23 36:11 38:5,7 39:10 42:2,4,10 52:19 56:3 70:16 84:4 97:7,16 99:14 112:24 128:1 128:17 129:11 129:17,18 136:15,20 137:6,22 143:13 144:16 157:8 168:9 172:8 182:7 187:20 196:7 196:24 200:3 201:8 204:20 208:16 217:7 219:12 238:13 244:20,22 245:21 247:1 253:13 254:13 257:5 271:9 272:10 273:22 275:3 278:6 279:8 280:17 283:1,11,22 286:16,17 292:15,25 293:18 294:14 294:23 296:3,6 296:13 297:1,5 297:9,21 298:2
**om** 105:22
**oma** 49:8,12 67:17
**onboard** 56:6 60:17
**onboarded** 180:1
**onboarding** 51:15 60:16 178:17
**once** 81:24 104:4 207:8
**onedrive** 283:13,20
**ones** 147:17,18 147:20
**ongoing** 272:9 273:7
**open** 19:18 20:13,22 21:7 40:18,25 41:3 47:2,13 84:24 85:1,5,12 86:5 86:6 87:20 89:1,5,7,9 100:7 102:21 103:6,23 129:14,14 156:2 170:12 199:6
**opened** 149:20 149:25
**operation** 220:25
**operational** 32:17
**operations** 141:18
**opine** 48:1
**opinion** 100:21 108:10 123:21 124:3 135:2 196:16,18,19 196:20 214:14 214:20 279:13 290:1

**opportunity** 7:4,5 11:17 287:7
**opposite** 11:8
**optimistic** 207:7
**option** 286:9
**optional** 76:20 76:21
**options** 30:5
**optum** 53:9
**order** 97:12 150:13,22 152:1,3 201:12 203:8,25 293:2 296:8 297:22 297:22 298:1
**organization** 66:11 164:17 164:18 167:6 167:14,15,22 168:2,22 172:21 173:20 173:23,24 183:8 184:9,12 193:8,9,17 204:15 213:21 236:15
**organizational** 182:24 183:5
**organizations** 165:24 173:10 236:8,8
**origin** 85:10
**oslick** 2:3 3:4 6:5,5,10,25 9:1 9:4 13:20 15:10,19 16:3 20:4,16,25 21:25 22:16 23:17,24 24:6 24:14,20 25:5 25:25 27:16,24 28:5,10 29:9 29:14 30:2,24 34:6,13 35:2 35:24 36:1,12 37:12,19 40:21 42:16 43:8 45:7 46:19 47:4,23 49:21 53:17 55:9,20 58:16 64:8 66:25 67:8 69:14 70:21 71:6 74:20 77:8 78:12 79:12 80:8 81:1,16 93:9 93:12 94:6,21 95:1,25 96:19 97:3,15 98:12 98:16 99:24 100:15,19,24 101:9 102:3,14 103:4,15,20 104:4 107:2 108:13 110:5 110:19 111:21 112:3,22 113:25 117:5 119:5,14 120:12,22 121:5,13,17 122:5,10,24 123:7,13,22 124:5,13 125:1 125:23 126:8 126:15 128:8 128:21 129:1 131:22 132:9 133:18 134:17 135:7,15,25 136:16 137:1 137:15 138:11 139:2,9,16 140:11,13,19 140:25 141:3,9 141:23 142:9 143:6 144:2 146:8 150:2,17 151:23 152:10 152:25 153:13 153:15 154:24 155:15,22 160:5 161:5 162:22 165:7 166:2,9,24 167:17 173:15 174:15 175:11 176:2 177:15 177:20 179:15 180:24 181:24 182:9,25 184:18 185:21 188:5 192:5 193:7,22 194:19 195:10 195:17 196:3 196:11 197:6 198:15 202:12 204:8,12 205:21 206:15 207:13 208:21 210:13 217:21 218:3 219:1 222:16 223:4 225:1,19 228:8 228:19 229:16 230:24 231:21 232:20 234:9 234:24 236:3 239:6,11 240:11 241:23 249:14 254:8 257:9,12 258:12 259:18 261:1,11 262:10 269:7 270:6 271:4 274:2 275:14 276:22 277:4 278:9,14 279:23 281:8 282:11 284:2

285:23 286:1 286:11,17 290:18 291:18 292:5,11,14,19 294:24 295:1 296:2,11,16 297:11,24
**oslick's** 296:8
**outcome** 299:16 300:12
**outline** 291:20
**outlines** 216:9
**output** 116:11 116:12
**outreaches** 263:9
**outs** 44:11
**outside** 47:13 157:4 216:18 270:4,7,10 271:3,5,6,8 290:14
**overall** 67:18 238:8
**overshadowed** 107:23
**own** 82:24 89:17,18 135:13 153:17 158:1 164:16 167:7 169:23 170:8,23 171:4 171:8,13,20 220:10 289:14
**owned** 82:20 112:1 120:9 126:7 138:9,17 154:15,19,21 154:22 162:16 210:12 217:18 238:14 290:17 290:25 291:4
**owner** 117:10 285:16,16
**ownership** 77:7 77:13 101:25 102:13,16 124:3 290:11 293:7
**owning** 130:9
**owns** 94:5

**p**

**p** 2:1,1 5:1
**p&l** 34:17 93:22,24 140:4 184:9,21
**p.m.** 39:2,8 246:4,16 247:1 247:5 248:4 252:6 298:4
**pa** 1:16 2:13
**page** 3:2,7,24 4:2,14 36:24 38:3,4,5,7 42:18,18 47:24 47:24 53:2 73:7,17,21 78:8 233:7 243:24 301:5
**pages** 36:22 37:24 246:24 251:22
**paid** 83:5,7 296:24
**paper** 37:3 189:7 246:8 248:2
**papers** 244:2
**paragraph** 43:19 53:5 78:19 85:23 86:23 99:1 231:18,18,20 232:1,4,5,19 234:4
**parentheses** 99:5,6,17
**part** 12:10 15:20,21,24 29:7,13 38:21 45:10 46:6 54:20 65:11 66:13,18 82:24 87:19 89:10 101:23 104:15 106:17 108:17 108:19,22,24 112:16 119:2 120:8 121:4 126:24 132:4 133:12 138:9 139:1 148:6,10 148:11,22 149:14 150:21 159:24 166:1,4 166:17 173:18 173:24 185:14 187:19 195:4 197:14 205:9 205:19 207:3 208:2 211:21 223:20 227:16 243:10,11 265:2,11,21 270:13 271:16 282:20,22 286:15
**partially** 90:7
**participants** 250:14
**participate** 46:11,14,16 243:13
**participated** 218:18 239:12
**participation** 41:6,9
**particle** 207:15
**particular** 25:16 54:14,19 57:23 59:6 66:8 67:10 75:15 78:1 84:8 87:12,14 89:8 92:2

94:17 99:1,8 111:10 112:11 117:20 119:24 120:15 148:4 167:1,12 188:25 236:10 247:19 289:9 290:13
**particularly** 126:23 225:24
**parties** 5:10,13 56:18,21,22,25 72:9 299:12,14 300:8,11
**partner** 30:8,12 30:17
**partners** 47:8
**partnership** 30:18
**parts** 77:17
**pass** 97:19
**passionate** 221:22
**password** 59:1 59:12,14,18 64:23 65:1
**passwords** 58:1 58:13,23 60:5
**past** 97:4
**paste** 178:19
**patricia** 300:2 300:15
**patrick** 19:8
**pattern** 181:11
**pay** 70:25 80:24 186:17
**peer** 62:15,15
**pending** 13:14
**pennsylvania** 1:2 5:8,10 299:21
**people** 35:5,6,8 41:10 46:7 58:20 60:16 81:21 84:13 97:24 109:14 115:17 131:16 132:18,18 133:4 139:11 139:18 140:5 141:13 143:14 143:22 144:4 150:4 158:17 159:7 160:1,24 162:2 165:1,2 165:12 169:7 174:6,8 175:5 176:21 180:16 181:7 191:20 203:25 210:8 212:22 219:18 220:1,2 221:4 228:2,3 235:14 237:9 242:6 254:25 255:1,5 256:17 263:7,9 270:8,12 271:3 271:8 272:7 273:5,14 276:13
**people's** 106:5
**percent** 53:6 128:15 133:9 139:22 257:3 264:22
**perfect** 6:13 40:16
**perform** 45:15 61:23 213:1
**performance** 62:19 79:5 80:6,12 185:3 185:12 191:25 192:11 223:19 223:22,23 224:2,4,7,14,16 224:22,24 225:3,6,7,10,13 225:15,16,21 225:25 226:3,5 226:7,10 240:10 285:21
**performed** 153:24
**performer** 62:21
**performing** 78:25
**period** 175:14 220:11,13 224:21 283:6 288:2
**permanent** 256:3
**permanently** 256:7,24
**permission** 47:22 48:5,6 48:17,18 113:4 122:21 162:17
**permits** 267:7
**permitted** 5:17 297:18
**permutation** 75:25
**permutations** 75:22
**person** 60:22 61:4 81:19 90:1 108:10 123:2 128:4 131:2 139:25 142:2,5 148:21 149:4,19,23,24 163:19 164:14 164:20 167:23 178:20,23 182:14 188:17 215:15 216:14 222:4,7 223:9 225:18 240:4 255:1 269:13 274:18 285:2 285:10,15,18 286:5 297:3,6

**personal** 28:23 29:2,4 169:24 169:25 170:1,8 170:10,11,22 171:13,20 172:1,9 175:22 176:1,9,14 178:6 196:18 196:19,20 207:22 236:8 283:17
**personally** 14:15,18,21 31:24 58:25 59:8,11,17 66:5 144:7,9 162:13 198:22 215:5 226:21 226:23
**personnel** 49:8 49:12,19 50:1 50:11
**persons** 91:20
**perspective** 11:18 184:8 212:1
**ph** 19:23 20:2 29:21,22,23 30:3 45:20 80:16 149:12 273:21
**pharmaceutical** 116:9
**pharmaceutic...** 72:23 73:2,3 74:6,17 77:24 94:3
**phase** 66:22,23 66:24 67:1 95:22,23,23,23 96:2,7,15,16,17 96:23,25,25 104:15 116:8 119:3 128:6,12 139:1
**phase2** 252:17
**phases** 96:3
**philadelphia** 1:16 5:8
**phone** 66:2 270:24
**photo** 189:16
**photos** 189:18
**phrase** 82:7,13 240:15 256:10 262:3
**phrased** 239:15
**physical** 106:2 278:12
**physically** 36:14 48:24 55:2 269:20,23 295:15
**physician** 29:25
**physicians** 45:23 46:3
**piece** 93:3 132:5 189:7 279:9
**pin** 39:9
**pip** 223:21
**pipeline** 32:21 32:23,24 33:2 33:4 194:15
**pitching** 118:24
**place** 1:14 102:18 170:25 241:14 284:4,5
**plaintiff** 1:5 2:2
**plan** 29:7,13 223:2,5,7,19,22 223:23 224:3,4 224:8,14,16,23 225:3,6,8,10,15 225:17,21,25 226:3,5,8,10 240:10
**planned** 269:12
**planning** 110:23 136:4 156:9 170:12
**plans** 147:22 147:23 220:24 221:2,5
**play** 219:11
**played** 156:10
**please** 5:25 6:16 9:16,19 9:20 11:23 20:17 21:18 39:4 43:11 46:1 47:3 52:21,25 61:11 69:6 72:24 77:19 85:23 93:13 99:11 109:16 121:22 138:7 190:16 196:15 214:4 217:22 247:7 253:7 257:10 259:22 260:10 288:7
**plus** 156:2 187:2
**poc** 232:10,11
**point** 10:4 14:11,14,25 20:9 23:10 25:7 30:14 45:21 48:23 50:4,6 55:15 65:10 68:19,20 68:22 73:20 88:5 136:11 215:10 255:15 290:6 294:14
**policies** 165:23 165:24 167:9 167:10 169:8 169:13,15,18 170:3,25 172:19 173:8 173:19 174:18

174:19 175:4 176:19,22 180:19 295:3 297:12,19
**policy** 57:6,7,7 170:23 171:4,5 171:18 172:4 176:18 216:12 216:16,17 295:6
**portfolio** 66:20 194:16
**portion** 41:3 80:15,16 278:1 280:7
**position** 35:9 65:17 184:17 187:25 188:4 190:4 198:22 204:4 213:16 219:14 230:12 237:17,25 268:2 279:9
**possess** 291:13
**possessed** 32:17 62:1
**possesses** 291:4
**possession** 266:25 268:8 278:13 291:10
**possible** 33:24 63:24 64:1 75:23 105:24 125:9,19 176:12,15 229:20 248:25 283:1 287:21
**possibly** 130:11 132:5 154:5 201:12
**post** 28:23 29:2 220:25
**potential** 30:15 54:9 116:12 136:13 174:18 185:19,20,22 253:5 263:24 264:13
**potentially** 25:14 202:21
**potty** 97:6
**powerpoint** 147:3,10,13,16 147:17 148:3 191:22 265:25
**practice** 78:24 106:16 120:19 121:1,25 134:13 165:21 169:21
**practices** 164:15 167:1,3 170:3 190:14
**precise** 189:13 190:1 274:7
**predates** 144:19
**preexisting** 80:1,23 83:8 86:23 87:8 88:3,8,11,14 89:16,17 92:23 92:24 93:4,8 94:10,11,12,17 95:15 98:9 99:4,17,19 100:10 102:19 102:20 103:13 104:3,8,11 111:25 112:20 114:18 144:18 144:23 145:6 145:11,16,23
**prefer** 43:14
**premises** 106:18
**prep** 65:17
**preparation** 150:15 152:11 153:2
**prepare** 152:8 152:20
**prepared** 79:5 153:3 300:3
**preparing** 19:7
**prescribe** 167:1 167:12
**present** 107:19 108:2 113:4 130:23 189:15
**presentation** 112:12
**presentations** 147:1,2 264:20 264:21
**presented** 147:21,25 151:20,25 191:18
**presenting** 130:13,19
**preserved** 7:3
**president** 6:9 14:5,7 17:5 72:12 241:4
**presumptions** 94:8
**pretty** 93:2 211:2 269:24 271:18 283:7
**prevent** 276:6
**prevents** 272:12
**previous** 42:8 86:3 191:7 192:16 195:21 206:2 247:22 264:11
**previously** 15:4 57:17 87:9 146:18 181:16 194:1 198:7 199:9 210:15 213:7 251:10

260:2,6 276:23
**pricing** 281:1,2 281:6
**primarily** 183:19
**primary** 197:17 230:12
**princeton** 6:4
**principle** 17:17
**print** 244:4
**printed** 151:16
**printout** 244:5
**prior** 14:12 29:19 45:1 64:3 65:12,14 65:17 83:1 93:11,18 155:7 156:3,21 157:7 192:4,12 193:5 195:15 196:1 196:10 201:13 201:18 206:11 206:20 236:12 236:14 294:6 299:5
**private** 186:23
**privately** 192:19
**privilege** 7:3 98:17 100:20 100:20 140:18
**privileged** 37:13,13 100:17 101:3 101:13 123:9 123:16,18 142:12,17,19 142:22,24 143:1,3,5,12 153:10,12 162:1 176:4 209:7 219:6,9 239:8,13,18 274:4 275:15
**privileges** 165:6,8,9 166:16,22 167:16,19,24 168:1,6,21 169:1,3,6,8 176:5
**pro** 2:18 6:3
**probably** 18:2 33:12 36:23 45:20 49:16 54:25 62:5,6 65:10 66:4 67:24 68:22 70:10 81:23 82:9 102:25 104:19 105:23 113:16 115:16 119:23 127:4 134:10 143:17 145:21 147:11 157:22,23 162:17 169:5 179:7 189:12 189:18,25 190:7 191:8 193:25 199:24 201:7 203:15 206:6 208:25 216:14 219:17 221:11 224:5 233:21 255:1 256:14 266:12 267:18 269:10 275:8
**problem** 91:17
**procedural** 5:18
**procedure** 288:25
**proceed** 6:24 14:3 103:9 253:9
**proceeded** 103:7
**proceeding** 5:4 5:16 298:5 300:4
**proceedings** 68:25 270:13 272:9,9 299:3 299:5,6,9 300:6
**process** 30:7,11 31:14 33:17,20 40:17 44:10 45:9,11 46:24 47:7 51:15 77:18 98:19,21 101:21,23 128:13 165:21 167:12 170:6 180:18 207:3 226:1 227:10 227:15 252:22 256:19 276:15 289:2
**processes** 128:4 128:10,16 167:2,13 168:3 171:16 172:1 173:20 235:4 241:19 242:21 242:21
**processing** 129:25
**procurement** 240:4
**produce** 176:21
**produced** 5:15 176:20 211:1 278:19
**produces** 174:11
**producing** 117:10,11
**product** 83:7 100:7 114:13 115:6,11,15 116:4,5,6,7,8,9 117:7,23 125:21 133:24

142:13,17 152:12 211:8 268:10 288:14
**production** 144:12 148:11
**products** 90:14 117:13,14,19 118:6,25 130:23 157:15 268:7
**professional** 11:12,20 20:12 20:21 21:6 35:11 44:6 47:13 48:12 202:19 236:9 236:10 270:15 271:15 272:3 272:22 275:23 275:24,25 276:12
**professionally** 17:25
**professionals** 144:11
**profile** 20:12 20:21 21:6
**profit** 30:21 31:5 34:4,10 34:11 205:10
**profitability** 205:14
**project** 50:22 53:19,20 54:3 54:14 57:12,19 60:23 65:23 66:6,8,12,14,18 66:19,21,22,24 67:2,2,3,5,10 67:16,25 68:2 68:3,5,7,10,14 68:15,15 69:4 70:1,4,11,12,14 70:19,23 71:1 71:5,10 80:14 80:19 81:6,20 81:25 82:5,10 82:11,15,21 86:13,16,18,19 86:25 87:2,10 87:16,21 88:16 88:18,20,21 89:22,22,23,23 90:3,4,10,10 91:10,25 92:1 92:3,4 93:2,17 93:23 94:19,22 95:9,14,24 96:1 104:24 113:11 114:11 114:20,25 116:17 118:3 118:11 119:7 130:12,21,22 133:1,2,13,23 134:4,19,20 136:3,12 138:13,24 139:25 143:16 145:8,14,20,23 164:8 175:15 207:11,12 210:25 211:23 213:4,9 217:17 218:2 221:24 226:17 230:17 233:23 235:17 237:5,10,13,21 237:24 238:5,8 238:14,24 246:3 252:10 252:15,15,18 252:19,19 253:6,12 266:10 278:16 285:16 291:7
**project's** 163:23
**projected** 191:18 193:5 211:2
**projections** 196:1 211:4 265:24,25 266:1
**projects** 33:2 50:21 65:4,7 66:1,15,20 67:11,18,20,21 67:23 68:19 69:23 70:15,23 81:5,14,18 89:5 90:21 91:23 93:21 94:13 139:3 140:5 141:16 164:9 183:19 185:7,16 188:10,10,12 205:19 208:1,5 212:19 221:21 221:23 230:1 230:13 235:13 235:24 237:6 237:21 238:7 238:11 265:5 278:24 282:24 285:4,11,12,20 286:7 287:23
**prometheus** 16:6,7,8,10,11 16:14 67:23,23 266:23
**promote** 41:5
**promoted** 220:3
**promptly** 79:1
**proper** 35:9 94:10 99:18 102:17 120:5,6 178:8,9
**properly** 281:13
**property** 77:5 77:14 78:20,23 79:7,11,17

80:1,2,23 81:6 81:9 82:22 83:1,8 84:25 85:4,6,15 89:12,21 90:2 99:9,20 102:13 103:8 120:17 121:11 122:17 122:18 124:23 126:11 129:12 133:13 134:1,7 135:11,13,20 138:22 154:6,7 155:2 162:15 174:9,11,12 177:5 213:6 231:5 234:11 238:17 240:1 259:15 260:15 277:10 278:18 280:9 281:24 282:1 290:10
**proposal** 221:17,18,19 222:9 275:20
**proposals** 232:16
**propose** 37:23
**proposed** 13:4 76:23 97:1 100:8 103:6,23 224:3
**proprietary** 229:15,24
230:15,23
**pros** 86:7
**protect** 29:24 165:25
**protected** 279:15
**protocol** 185:10 205:17 207:10
**proven** 229:11
**provide** 79:18 133:24 140:9 151:15 165:17 214:21 279:12 281:22
**provided** 34:19 81:10 83:2 89:23,24 91:7 132:4 138:20 140:7 144:4 146:6,13 150:12 163:1 167:7 172:3 183:15 203:20 204:22 205:6 222:25 254:21 254:23 255:8 258:21 265:21 265:21 267:12 285:13 291:14
**provides** 168:1
**providing** 143:20 264:10
**proving** 96:12
**provisioned** 288:22
**ptl** 67:17
**public** 20:14,23 77:1 85:5 96:13 129:14 161:21 162:2 162:17 172:21 172:24 173:18 192:20 279:10 279:10 298:14 299:20 301:25
**publications** 78:21 109:6
**publicly** 89:10 90:25 161:20 173:17 184:6 186:24 187:1 188:2,8,14 192:19,20 276:15
**publish** 89:4,14
**pull** 162:13
**punish** 277:2
**punishing** 214:9
**punishment** 214:1
**purchases** 122:2
**purely** 233:9
**purpose** 11:10 11:12 44:6
48:12 142:7
**purposes** 124:17 219:4 288:6,11,24
**pursuing** 265:2 266:10
**pursuits** 111:9 112:10
**put** 8:20 36:1 90:5 98:21 99:4,6 103:6 132:7 159:9 160:3 164:12 194:14 237:25 247:3 266:11 296:20 297:22
**putting** 129:11 152:2 159:2
**puzzled** 283:15
**px07** 3:8 35:13 35:16,21

**q**

**q1** 190:7,10
**q2** 191:1 232:10
**qualifications** 35:9
**qualified** 299:7
**quality** 22:10
**quantity** 288:2
**quarter** 190:20 190:21

**question** 7:3 9:7,19 12:5,8 12:10,11,21 13:4,15 14:17 15:15,16,21,22 15:24,25 19:4 19:25 20:18 21:2,3 23:6 24:22,22,24 25:1,10,11 26:14,25 27:18 28:1,7,16,25 30:10 32:7 37:24 39:20 46:1 48:15 49:10 55:10,12 56:5 57:1,6,22 59:7,15 71:7 72:24 76:11 77:12,16,18,20 80:10 91:15 93:14 94:8 96:5 100:16,23 100:25 101:4 101:14,15 104:5,19 111:20,23 113:2 114:22 115:5 120:24 121:20,23 122:9,11 123:12,25 125:3 131:24 136:20 138:13 141:5 142:10 143:7,8,10 146:11 148:9 150:19 153:16 155:12 159:1 160:8,10,12,24 163:13 168:16 168:18,25 169:20,22 170:20 172:4,5 172:7,13 175:23 177:22 179:11 181:3 182:21 183:3 184:4,7,20 187:11,15 188:7 190:16 193:4 194:21 195:11 196:15 196:16 200:20 202:5 206:17 211:11,17 214:3,5 217:5 217:23 218:8 219:8,8 220:6 220:22 226:1 227:23 228:12 228:13,14,21 228:23,24 230:6 234:19 239:14,15 240:15 242:13 244:9,13,18 246:3 247:4,13 247:13 248:5 248:12 250:21 250:22 256:5 257:14,18,19 258:14 259:20 259:21 263:21 263:22 264:11 268:3,6 270:11 270:22 271:6 271:10 272:15 272:20 273:1 279:18 282:17 286:3 288:7,8 289:20,21 292:7

**questions** 3:23 4:1 8:3 9:10,13 10:10,11,24 13:5 31:1,2 56:2 78:13,15 85:7 101:11 128:22 140:18 153:1 155:17 181:1 229:18 229:19 231:23 231:24 250:19 259:19 265:13 267:19 270:17 286:20 287:11 287:12 292:21 296:2

**quick** 7:16 22:19 246:12 248:25 296:6,7

**quickly** 263:23 264:13

**quite** 13:8 37:24 55:22 119:19 207:7 221:6 229:11 247:21 264:20

**quoted** 246:15

**quoting** 249:19

**r**

**r** 2:1 4:13,13,13 4:13 5:1

**rag** 67:19 68:20 90:22,24 232:15

**raise** 6:16 50:9 50:11,18 51:4 111:11,14 169:22 241:18 261:10

**raised** 51:6 124:22 241:13 242:1 248:12 262:14 270:17 293:6,11

**raising** 260:15

**ram** 177:10,25 178:5 240:7,13 273:19,19

**ram's** 240:17

**rao** 1:7 2:17,18 3:3 5:7 6:2,2 6:25 7:7,12,14

| | | | |
|---|---|---|---|
| 7:22,24 8:10 | 94:23 95:4 | 142:15 143:9 | 225:4,20 |
| 8:19 9:8 13:13 | 96:6 97:7,11 | 144:6 146:12 | 228:11,22 |
| 13:22 15:11,23 | 97:18,21 98:1 | 147:12 150:6 | 229:21 230:20 |
| 16:5,25 18:17 | 98:7,16,22 | 150:20 152:6 | 231:9,15,24 |
| 18:20,23 20:7 | 99:21 100:1,19 | 152:18 153:7 | 232:5,6,23 |
| 20:19 21:4 | 100:22 101:5 | 153:15,18 | 234:16 235:6 |
| 22:8,23 23:21 | 101:17 102:10 | 155:4,19 156:2 | 236:4 239:7 |
| 24:2,10,16,23 | 103:1,11,18,25 | 156:13 160:9 | 240:6,16 242:3 |
| 25:9 26:7 | 104:7 107:11 | 161:2,8 163:3 | 243:16,21 |
| 27:19 28:3,8 | 108:8,16 109:8 | 165:10 166:3,7 | 244:8,23 |
| 29:11,18 30:6 | 109:12,15 | 166:14 167:5 | 245:15,17,22 |
| 31:3 33:23 | 110:8,15,22 | 167:20 168:17 | 246:9 247:14 |
| 34:9,22 35:12 | 111:22 112:5 | 168:19 174:1 | 250:2,7,8 |
| 35:20,25 36:4 | 112:23 114:6 | 174:22 175:19 | 252:18 254:13 |
| 36:8,18 37:5 | 116:10 117:17 | 176:11 177:18 | 254:17 257:15 |
| 37:17 38:2,24 | 119:10,18 | 177:23 179:16 | 257:19 258:8 |
| 39:6,7,19,22 | 120:18,25 | 181:9 182:6,15 | 258:15 260:22 |
| 40:12,23 41:14 | 121:8,15,23,24 | 183:1 185:1 | 261:5,15 |
| 41:20 42:1,3,9 | 122:8,14 123:4 | 186:3 188:15 | 262:18,24,25 |
| 42:11,19 43:10 | 123:10,19,24 | 192:6 193:18 | 269:17 270:1,5 |
| 45:12 47:3,6 | 124:10,15 | 194:7,22 | 270:9,14 271:7 |
| 48:3 49:24 | 125:4 126:5,12 | 195:12,18 | 271:10,13 |
| 52:5,11 53:25 | 126:18 127:14 | 196:6,14,23 | 273:4 274:9 |
| 55:11 56:14 | 127:19 128:1,5 | 197:4 198:17 | 275:17 277:1 |
| 58:24 64:13 | 128:11 129:3 | 199:6 202:1,14 | 277:12 278:11 |
| 67:4,12 69:18 | 131:25 132:14 | 204:10 205:1 | 278:21 280:3 |
| 71:2,13,18 | 133:21 134:22 | 205:24 206:18 | 281:17 282:13 |
| 73:16 75:5 | 135:12,22 | 207:24 209:4 | 282:18 284:6 |
| 77:11 78:16 | 136:6,19 137:4 | 210:19 214:15 | 285:24 286:4 |
| 79:15 80:11 | 137:11,18,24 | 214:20,23 | 286:16,21,25 |
| 81:13 82:2 | 138:16 139:5 | 216:9,10 | 287:3,10,18,20 |
| 83:17,20,23 | 139:13,20 | 217:11,24 | 290:24 291:25 |
| 84:18 91:7 | 140:16,25 | 218:9 219:10 | 292:15 293:6 |
| 93:10,15 94:18 | 141:10 142:1 | 222:21 223:10 | 293:11,15,18 |

293:23,23 294:7,20,23 295:18 296:4 296:12,14,21 296:24 297:2,6 301:2
**rao's** 141:5 253:3 294:6,12 294:14,15
**rare** 180:22
**rask** 219:13,20 289:13
**rate** 179:25 180:2,4,5,10
**rather** 136:24 186:16 237:24
**reach** 32:6,10 224:5 265:10 269:14
**reached** 264:24 273:5
**reaches** 78:10
**reaching** 40:13
**reacted** 28:13 114:4
**reaction** 113:9 113:15,18,22 114:1 215:20 215:21,23 216:1 223:12 290:4
**reactions** 222:23 223:16 289:25
**read** 7:5 10:20 36:7,21 38:4 38:11,23 39:4 39:5 40:9 42:13 43:4,6,8 43:11,12,14,14 43:15,16,17,19 43:22 47:20 52:12,15,18,20 52:23 71:19 75:6,8,17,19,20 78:2,5,6,8,13 78:19 79:10 84:2 85:22 94:4 113:16,22 128:18,18,22 128:24,25 129:1,4,5,6,7 143:19,21 149:20,25 181:16 182:5 210:5,6 218:15 218:17 231:17 231:18,22,25 234:3,6 244:12 244:18,21 246:10,11,24 246:25 247:17 250:10,16,17 250:18,20 251:12,13,14 251:16,16,19 251:21,24,25 252:4
**readable** 218:16
**reading** 36:15 36:20,22 37:1 37:8,11 53:3,4 129:8 232:4
**reads** 48:7
**ready** 6:24 32:18 36:9
**real** 7:16 20:14 20:23 21:8 22:19 30:1 97:14 120:2,3 246:1,2 261:18 269:19
**realign** 217:13 222:19
**reality** 34:4
**really** 22:9 180:10 193:2 247:25 296:6
**reason** 85:11 99:4 157:8 165:19 198:23 205:11 226:18 240:14,19 245:4,10 283:4 301:5
**reasonable** 41:3,4,10,11 47:16 132:15 192:23 196:9 196:18,20 285:21 286:10
**reasonably** 44:7 48:13
**reasons** 157:9 183:11,14,15 184:24 185:4 205:9 213:25 224:12 225:12 225:12 245:12 245:16 277:11
**reassemble** 233:7
**rebound** 62:12
**recall** 9:22 15:13 16:4 18:2,7 19:15 23:25 24:7 25:16 26:2 27:5,9 32:11 33:1,3,5,6 44:25 45:18 47:9,14 49:14 50:14 57:17,22 58:21,22 61:15 63:19,22 64:2 64:11 70:12,16 70:17,19 71:4 77:12,19 80:17 82:3,9 84:7 85:9 88:4,5 91:21 92:21 93:25 95:13,20 103:21 105:19 108:6 109:23 109:25 111:10

111:16 113:3,3 113:6,7 114:3 116:24 117:2,6 117:14 136:9 136:10 139:19 142:18 143:16 147:10,11 148:4,18 149:3 149:11 151:21 154:25 155:8 156:16 157:5 172:13 176:25 177:19,19 179:6 181:10 181:15,18 182:20 183:9 185:24 186:21 188:1 189:6,9 189:17,19,24 190:6,21 191:7 194:10,17 199:17 201:11 201:20,23 202:9 203:8,13 203:24 208:12 208:13 210:15 210:15 215:15 216:3 218:7 219:18,24 221:3,10,14 225:14 241:6,9 249:2,22 255:1 260:14 261:2 261:20,21 262:6,13,15 263:4,13 268:15 269:9 269:22 270:20 271:23 272:25 273:3,14 276:1 276:24 289:16 290:4,12,22 292:23

**recalling** 71:9

**receive** 9:25 10:4 18:10 28:4 64:25 99:22 110:3 140:4 294:15

**received** 18:18 59:1,12,14,18 64:23 85:20 132:17 140:2 160:23 220:9 248:20 255:4 258:6 262:11 290:7 294:17 294:20

**receiving** 68:19 109:23

**recently** 10:18 29:20 225:24

**recess** 137:14 197:5

**recitals** 104:2

**recognize** 38:8 42:20 72:12,16 83:24 233:2,10

**recollect** 146:5 177:8 182:3 208:15 218:5 242:25 257:3

**recollection** 9:21 11:18 67:17 100:5 118:9 133:2,5 147:15 178:15 189:12 199:3 206:4 226:9 240:3 245:2 249:5 268:11 269:9 270:23 277:25 290:20

**recollections** 95:18

**recommend** 58:11,12

**recommendat...** 123:12 198:2 198:20 251:24

**record** 5:4,5,13 5:25 7:1,16,18 7:20 8:20 9:18 11:14,19,24 12:3,25 22:19 22:19,20,22 27:12,20 31:12 36:2,22 37:25 47:24 52:20 53:2 56:15 57:14 58:4 64:22,25 69:12 71:3,22 73:24 75:1 78:17 82:23,25 86:15 93:6 97:24 98:4,6,16 101:6 106:7 107:16 113:24 121:9 123:10 129:8,24 137:7 137:8,10,13 140:25 141:7 143:24 153:15 160:15 196:25 197:1,3 232:2 245:25 248:23 250:9 257:23 259:24 260:12 260:24 276:24 279:21 281:4 281:10 287:15 299:9 300:5

**recorded** 5:20 105:12,14,15 106:15,19 108:6 299:6

**recording** 5:15 105:16 106:1,7 106:10,10,13 106:14,14,23 106:25 107:5,6 107:12 218:10 219:11 299:8 300:4

**recordings** 107:3,9 218:23 218:24
**records** 55:1 88:19 128:14 128:16 248:10
**recovered** 157:24
**recovery** 252:21
**recruit** 19:6,14 21:15,20 23:14 23:19 24:3 35:1,7 40:4
**recruited** 20:10 20:11,20 21:5 21:12 23:2,7 40:24 227:18
**recruiting** 20:3 20:8 21:16,20 29:19 188:16
**recruitment** 26:22 27:2 30:7,11,19 31:4,8,14 33:13,16,22,25 40:17 44:10 47:7,11 189:23 227:19
**recycle** 157:22 255:6,14,19,22 255:23,24
**recycled** 255:9
**redone** 96:22
**reduce** 184:2 184:16
**reduced** 78:24 299:7
**refactoring** 247:3
**refer** 126:22 169:12 181:25 216:14,20 266:2
**reference** 84:13
**referencing** 91:6 95:5
**referred** 216:22
**referring** 13:18 52:1,4 57:7 58:8,9 61:1,9 84:15 86:23 113:12 131:7,8 147:18,20 163:10 181:15 182:2 218:13 282:16 290:2
**refers** 291:21
**reflects** 74:15
**reframe** 170:19 234:19
**refresh** 10:14
**refreshes** 219:3
**refusing** 153:8 277:2
**regarding** 25:23 45:4 51:22 111:6 123:6 153:1 216:20 244:11 244:25 251:3,5 297:12
**regardless** 279:16
**regards** 152:1 253:12
**regular** 19:17 19:20 38:21 65:22,24 70:24 101:23 193:10 226:15
**regularly** 19:18 19:21 237:6
**reintroduce** 47:19
**reintroducing** 47:20
**rejected** 85:13
**relate** 70:8
**related** 16:9 23:23 107:9 117:12 127:6 152:2 157:15 158:20 160:24 162:24,25 170:15 178:5 185:2,6,7 200:25 201:3 226:17 227:2 244:19,25 261:22 269:11 269:15 288:24 289:10 299:11 300:7
**relationship** 229:4,5,8,14,22 230:3,4,11 236:1,2,5,7,9 236:10,12,13 238:10 243:14 253:6
**relationships** 236:9
**relative** 299:13 300:10
**release** 204:6,9
**relevance** 21:2
**relevant** 92:2,3 108:23 159:19 264:23
**reliance** 44:4 48:10
**relied** 78:4 212:23
**rely** 75:22 134:20 135:1
**relying** 158:17
**remember** 12:14,17 36:5 38:18 39:10,12 40:1,6 51:24 60:8 61:10,11 61:12 63:11,13 63:14,18 64:10 65:18 67:9

68:11 70:18 71:9 75:2 81:18,23 84:5 84:21,22,22 96:3 99:1 105:20,24 107:15,18 108:6,12,14,20 110:16,17,20 110:23,25 111:1,3,8 112:11 113:7 114:4 115:12 116:6 118:25 124:6 125:17 132:21 146:22 147:2,4 149:17 150:24 151:11 151:14 152:4 153:21 177:6 177:22 178:3,4 179:1,25 180:7 181:21 186:12 188:17,19,21 188:24,25 189:1,2,7,10 190:23 192:1 194:23,24 195:1,8 199:20 199:23 200:15 202:10,15,20 202:22 203:8 203:11,13,17 203:19 204:1 208:7,9,10 209:2,13,20 210:17 211:3 215:11 216:4,7 216:8,25 218:21,22 219:25 221:16 222:25 223:13 223:14,17 224:13,23 225:2,9 226:4 226:6,9 233:18 233:21 235:20 235:22 236:14 236:20 243:2,6 243:8,12 244:24 245:3 246:23 247:10 247:15,19 248:7 249:4,12 249:15,22 251:2,4,7 256:11,20,22 267:6,13 268:9 276:4,8 284:3 293:5 294:2

**remembered** 293:3,9,10,13 293:14,17,20 293:21,24,25 294:3

**reminder** 286:18

**remote** 62:5

**remotely** 5:11 243:13

**remove** 56:8,9 56:11

**removed** 110:10

**renew** 236:18

**repeat** 12:16 18:15 21:18 25:1 30:10 32:7 39:20 49:10 55:10 59:7 72:24 78:17 80:10 121:22 125:2 131:23 141:5 148:9 150:18 155:12 160:10 160:11 166:11 166:20 168:15 168:18 190:16 200:20 206:16 228:13 230:8 244:9 247:13 256:5 257:11 257:14,16,18 258:13 259:21 260:10 272:14 293:15

**repeated** 12:11 12:11 141:7 160:15 257:23 259:24 260:12

**repeating** 59:15

**rephrase** 120:24

**replace** 29:23 30:3 50:16

**replaced** 51:9

**replacement** 35:4 273:20

**replies** 129:17 129:18 247:9

**reply** 40:14 142:20 228:21 246:16,17,18 247:4,7 250:22

**report** 48:21 54:5,7 132:3 133:3,4,9 139:6,25 140:1 140:2 141:12 143:14,19,21 143:23 144:4 149:1,3,4,8,12 149:15 150:9 150:10,15 152:19 153:19 153:21 157:4 159:12,14 162:24 164:3,5 164:8 165:12 210:11 215:17 240:8 241:22 242:8 253:25 254:13 256:2,6

262:8 274:25 275:2,3,4,6 277:23 278:1 281:19,22 283:12
**reported** 1:17 23:1 49:18,25 54:6,6,9 177:10 178:1 181:22 182:7 198:21 199:4 199:10 242:20 258:7 260:7 274:23
**reporter** 5:2,3 6:7,13,23 7:13 7:15,19,25 8:5 8:9,16,22 9:4 9:16,18 13:6,8 13:11 16:23 18:15,22 21:17 21:24 22:5,13 22:18,21 35:12 35:18,23 36:14 37:2 39:19 41:14,17,22 42:2,7,10 47:3 52:5 55:21,24 56:3 71:13 83:17 97:7,9 97:22,23 98:3 98:5 99:13 107:21 109:8 115:23 127:14 127:23 137:4,6 137:9,17,20,22 141:4,6,7 147:6 160:9,13 160:15,19 168:12 196:24 197:2 201:21 204:16,20 230:7 231:9,14 243:16,18 244:1,15,20 245:17,21 247:12 250:2,6 251:15 257:15 257:17,20,23 259:23,24 260:11,12 271:5,9 287:7 287:12,14 292:11,13 296:3,6,13,17 296:22 297:1,5 297:9,21,25
**reporting** 165:5 187:5 259:14 301:1
**reports** 70:25 78:22 131:10 139:12 145:8 149:21 152:21 191:25 192:2 192:21 293:23 294:19
**repositories** 144:17,17 145:4 148:7,12 148:15 154:4 154:17 155:1,3 158:15,19,20 159:20 165:11 165:13 167:25 168:21,23,24 169:17 172:24 176:4 268:15
**repository** 17:9 86:8,17 132:19 134:3,8,15,23 136:22 137:3 145:1 148:14 153:23 155:1 159:3,10 160:2 161:1 164:21 167:3 175:22 176:14,16 245:14 268:10
**represent** 69:20 147:25
**representation** 70:2 141:21 142:3 258:22 259:1
**representative** 6:12 83:14 201:14 229:7 252:7
**represented** 32:4,8,16,20,24 90:4 177:12 180:3
**representing** 268:1 294:7
**reprimand** 213:25
**republic** 53:10
**request** 47:2 48:5 50:9,9,10 51:2,7 57:24 106:9 144:12 144:16 178:5 178:12 181:2 240:13 249:3 254:3 260:3 274:3 296:10
**requested** 13:15 44:11,18 44:20,22 56:7 101:2 141:8 144:13 160:16 239:21 257:24 259:25 260:13 288:22
**requesting** 224:10
**requests** 50:3 52:3 100:18 101:3 104:6 180:20
**require** 48:16 116:5
**required** 139:11 175:5

**requirement** 48:5
**requirements** 47:1 169:4
**requires** 250:20
**researchers** 45:23 46:3
**resembles** 233:10
**resembling** 73:9
**reservations** 210:11
**reserve** 287:6
**resigned** 62:21 62:23 63:10 64:18
**resources** 94:16 237:11
**respect** 194:5
**respected** 11:2 19:17 29:25
**respectful** 11:21
**respond** 195:9
**responded** 241:3,4 269:14 270:24
**response** 8:6 39:6,8 55:25 153:6 191:13 191:15,16,18 195:8
**responsibilities** 53:7 109:2 169:5 185:5,9 212:10
**responsibility** 30:22 31:10 50:21 53:20 56:9,11,12,16 56:18 66:16 68:12 69:24 70:15 75:11 107:8 109:1 126:25 166:22 175:8 185:15 185:17 207:15 283:24
**responsible** 54:14 60:15 65:25 67:14,17 67:18 76:2 105:2,4 106:5 112:7 117:1,10 117:11,18,20 118:22 136:7 136:11 143:23 144:4,22 161:7 163:22 164:20 164:23 165:3,4 167:2 169:10 170:5 172:22 173:1,3,4,6 184:21 215:18 284:9 285:15 290:16
**rest** 81:21 283:6
**restate** 13:21 14:17 15:16 19:25 20:17 26:25 27:17 28:25 34:24 55:12 57:1 93:13 111:23 112:24 123:25 159:1 160:22 175:23 177:21 179:11 186:16 187:11 194:20 194:25 201:15 212:2 217:22 271:10 286:2 288:7
**restated** 194:2 194:3
**restating** 211:11
**restoration** 252:22 256:16
**restore** 252:25 256:1
**restored** 255:24 256:12 256:21 257:1,2 258:2,2
**restoring** 256:13
**restraining** 150:13,22 152:1,3
**restricted** 55:8 57:3 62:12
**restrictions** 25:23 78:20 289:18 293:2
**result** 277:6
**retained** 104:3
**retaliate** 218:7 240:9,18,19 263:17
**retaliating** 263:11
**retaliation** 217:16 218:1 263:15
**retrieval** 232:13
**return** 45:1
**reusable** 90:22 90:24
**reusing** 288:9
**revenue** 28:24 29:3 32:21 33:9 117:1,11 117:11,18,24 118:7,13,16,19 118:21,25 183:17 184:10 184:12,16,22 185:5,6,7,19,20 185:22,23 186:4,19 187:24 189:5

189:11,21,22 190:3,10,13,19 191:6,8,18 193:1,3,11,12 193:15 194:15 195:15,21 205:10,13,15 205:17 206:2,6 210:22,23 211:7,19,25 212:1,20 266:4 283:25 284:1 284:20,24 285:3
**revenues** 207:8 211:9
**reversed** 161:3
**review** 10:13 98:19,21 100:12 101:21 149:8 150:15 152:19,21 162:13 252:23
**reviewed** 10:18 99:2 131:5 149:25 154:3 162:9,18 238:25 239:2
**reviews** 191:2
**rid** 217:3
**right** 6:17 24:24 32:25 38:5 41:23,25 42:3 62:4 73:8 73:9 82:8 89:3 97:18 100:6 111:12 133:9 133:20 142:23 148:24 151:22 159:3 160:21 184:11 185:4 187:18,20 192:14 195:24 200:4,8 201:19 209:18 227:11 230:10 232:7 247:9 249:21 250:12 257:18 264:4,6 269:8 284:21 287:14 287:17,21 292:15,20 295:12,13 296:4,9,23 298:2
**rights** 134:1
**rigorous** 98:19
**risk** 237:12,24
**risks** 116:13,13 237:7,8
**roche** 125:6,10 125:16
**role** 23:12 31:15 33:25 66:11 72:11 92:1 156:10 159:24 183:17 183:22,24 184:24 185:2 191:4 194:6 195:4 204:6,24 204:25 205:12 205:13 207:15 207:17,19 211:19 212:25 213:22 217:13 220:2,6 221:13 221:18,20 222:18,20 223:6,8 225:11 236:22 237:4 237:17,20,25 238:4,6 262:23 262:25 265:11 283:3,24 285:19 286:6 294:21
**roles** 92:1,3 212:10,10 278:3
**room** 276:10
**rooted** 20:13,22
**routine** 120:19 121:25 130:1
**routinely** 126:14
**ruffling** 244:2
**rules** 5:19 9:23 72:8 188:9,9 188:13 291:20
**rumor** 125:14
**rumors** 125:12 125:18
**run** 120:6 284:9
**running** 29:16 32:14 34:17 50:20,22 53:19 67:17 88:6,18 88:21 114:24 285:7
**rwd** 205:17
**rwe** 29:6,12,16 82:16
**rweai** 68:4 82:16 95:21 232:9 252:16 265:4
**rweat** 87:1,3
**ryan** 19:8

**s**

**s** 2:1 3:6 4:13 5:1 301:5
**sad** 247:3
**safeguard** 167:8
**salary** 47:1
**sanofi** 125:6,10 125:15
**sara** 273:21
**sarah** 2:10,14 6:10 37:21 45:6 197:6 286:25

**sarich** 105:9,12 105:21 107:16
**sat** 189:3
**satisfied** 51:18
**satisfy** 50:10
**saurin** 129:13
**saw** 93:22 113:9 115:7 116:23 146:19 147:19 209:17 211:4 288:12 288:13
**saying** 24:17 26:8 27:12 31:12,16 33:1 39:6 60:13 82:23,25 86:15 106:13,24 107:24,25 113:23 117:2 143:4 145:5 151:20 160:7 172:23 178:11 179:13 208:1 226:10 229:1 238:2 247:5 272:10 296:18
**says** 72:17 77:14 78:19 149:7 179:9 246:18 272:1
**scan** 41:24
**scanning** 228:2
**scenario** 135:17
**scheduled** 92:16 296:12
**scheduling** 6:1
**schema** 17:12
**schenkel** 1:17 5:3 299:2,20
**science** 19:18 21:8 29:7,13 29:20 30:4 34:14,15 35:4 49:9,13 76:3 94:2 117:12 149:11 172:20 183:17,24 185:7,9,13,14 185:17 186:4 186:20 187:25 188:4 189:22 190:3,11,19 192:13,14 195:16 204:4,7 204:11,24 207:11,17,19 207:21,23 210:21 212:1,8 212:11,12 222:10 223:8 271:20
**science's** 32:8
**sciences** 14:6 32:4 77:23 149:8,9,15,20 149:24 150:8 191:21 197:20 208:6 283:23
**scientific** 44:6 48:12 185:11 222:3,11 238:4 238:6 284:7,10 284:12 285:19 286:6
**scope** 208:2 234:12 239:24
**screen** 57:9,15 57:16 62:5 194:14 293:1
**screenshot** 3:8 3:21 246:19,22 255:8,16,16,17
**screenshots** 36:5 148:2 252:23
**se** 2:18 6:3 120:14
**search** 242:5
**season** 63:3,4
**sec** 259:23
**second** 7:3 15:21,24 160:14 198:11 255:6 257:21 260:7,11 273:12
**seconds** 121:19 287:16
**secret** 161:10 161:11,13 162:5,8 163:5 163:6,15 174:14,24 175:10 176:18 176:24 177:1,3 177:8 279:18 279:19,22,24 281:16 282:5 295:4,7,9
**secrets** 154:2,2 162:10 163:9 163:10,11,12 163:17 279:11 280:5,13,14,16 280:18,22,24 280:25 281:5 281:11 282:7 282:10,10 295:10
**section** 43:3,4 43:17,18,23,24 78:8 100:12 101:24 102:5,7 128:18 129:4,5 129:8
**security** 148:23 149:7,22 152:20 153:20 154:11 156:25 161:24 162:24 175:25 281:19 295:6

**see** 22:12 71:20 72:17 81:12 88:2,6 92:12 92:15,19 95:6 95:7 109:17 113:17,18 115:1,11 116:24 129:21 144:23 145:1 146:23 163:1 181:20 209:17 214:8 215:23 232:22,25 243:23,25 244:3 245:1,23 246:25 248:2 260:6,17 261:14 285:20 297:23
**seeger** 273:21
**seeing** 62:4 71:10 73:23 74:9,10 116:19 209:13,20 233:4 245:25
**seek** 101:12
**seeking** 104:6 113:4
**seems** 9:19 39:17,23,25 71:21 84:20 248:21 254:1
**seen** 42:23,24 88:19 92:21 115:4,5 144:25 145:25 146:7 146:14,16 190:12 209:14
**selected** 255:10
**selective** 202:20
**sell** 104:22,24 114:13 118:14 120:20 121:1 121:25 122:3 122:18 129:15 129:16 207:7 211:8 212:7,7
**selling** 118:5 183:19 265:3
**send** 35:14 41:17,24 247:7 248:13 253:23 297:12,16,16 297:17 298:2
**sending** 225:3 225:9 226:4
**senior** 45:6 212:23 213:24 215:1 241:4 253:12 269:24
**sense** 114:14 182:22 229:3 239:20
**sent** 85:18 108:9 182:10 208:16 209:9 209:11 224:9 224:22 225:5 242:22 245:6 252:2 254:3,3 254:6 260:24
**sentence** 47:10 48:16,18 79:10 87:5 203:24 250:11
**separate** 99:8 134:2,7 155:23 235:11 289:18
**separately** 181:7
**separation** 289:24
**september** 1:11 5:8 23:14,22 24:19 25:2,6 25:12,17 26:9 26:15 36:25 38:12 95:12 108:9 109:22 109:24 110:8 110:16,21,24 111:2,3,5,9,11 113:5,13,20 114:3,16 115:1 118:12 145:11 177:9 182:7,17 183:2 186:7 187:22 204:2 204:13,21 208:16 210:10 210:16,20 212:3,17 213:5 213:11,14,15 213:19,23,23 214:11,11,18 214:18,23,23 215:3,4,8,9 217:1,1,9,9,12 217:15,16,17 217:25 218:1,5 218:14 219:12 220:13 221:8 235:8,19,20 236:16 237:15 243:4 260:24 261:4,23,23,25 262:1,1,7,7,21 263:11,14 289:13
**sequence** 254:2
**serbia** 178:20 179:14 180:3 259:16
**sergey** 33:14,16 33:21
**serious** 252:14
**seriously** 121:18
**served** 65:3 148:22
**service** 26:16 57:9 72:13,16 72:21,25 74:17 75:16 76:1,7 77:3,4,22

79:24 80:22 94:1 95:10 100:13 101:25 102:17 108:11 229:25 291:16 292:1,3
**services** 3:11 11:3 14:13 26:12 57:16 72:1,2,7,18,19 73:4,6,18,25 74:4,7,8,14,18 74:22,24 75:3 76:4,5,8,12,14 76:17,22 77:24 79:1,5 80:7,13 94:2 291:19,21 292:9
**set** 33:13,15 172:1 191:24 192:22 193:3 193:10,17 196:10,17 205:12 211:1
**settings** 44:7 48:13
**seven** 36:23 286:21 287:10 287:12 292:12
**several** 10:17 92:16,16 147:1 152:3 157:14 181:7 182:3 191:20 192:17 194:11 205:2,6 219:16 222:23 229:1 235:10 235:13 238:16 242:6 258:16 262:12 264:17 273:4,4 289:6 291:3 294:17
**seyfarth** 2:4 6:5
**seyfarth.com** 2:7
**shape** 16:14 254:11
**share** 11:18 36:4 54:8 58:1 58:5,12,23 60:5 106:9,15 158:17 198:6 241:15 242:2 246:13,13 248:19 249:7 249:19 251:11 263:2 267:24
**shared** 35:4,6 35:10 51:19 54:11 62:6,7 105:16 106:25 107:4,7 109:7 143:13 148:7 148:12,14 149:4,22 150:11 155:8 185:23,25 190:20,23,25 191:5 192:2 193:5 195:20 197:24,25 198:4,8 215:12 215:14,16 216:4 218:11 219:1,5 225:10 236:21,25 262:22 263:6 274:19 275:6,9
**sharepoint** 153:23 155:6 156:4 157:15 162:20,25 163:18,21,25 164:13 198:9 199:11 240:24 241:1 252:20 254:19 255:14 255:22,25 256:4,8 264:19 286:9
**sharing** 37:9 71:13 123:21 124:3 190:22 219:9 267:20 271:23
**shaw** 2:4 6:6
**sheet** 301:1
**shield** 18:6,9,11 18:12,14,19,21 19:8,13
**shift** 7:10
**short** 97:13 283:6 288:2
**shortly** 155:9,9 156:22 222:4
**show** 47:25 72:15 108:18 113:14 177:16
**showed** 295:18
**showing** 36:3 64:19 77:9 112:25 147:22 156:8 231:21 293:18
**shut** 56:22,25 57:2
**sic** 265:5
**sick** 202:5,8,9
**side** 11:19 35:13 56:12,13 93:5 153:23 156:4 245:15 255:9 264:14 265:7,13 267:3 292:16
**sidenko** 65:3,8 65:11,14,22 66:6,11,17,21 67:6 68:9 135:23 241:10 246:3,15,25 247:1,11,16,18 248:13,21,22 249:3 250:25 251:8 252:6

253:12 254:24
**sidenko's** 68:12 248:8
**sides** 11:8 56:10
**sign** 7:6 74:5,13 74:16,21 75:1 75:1,6,10,13,18 75:19,23
**signatory** 76:4
**signature** 73:9 73:10,11,12,13 73:14,15 233:6 233:8,9,11 299:19 300:14
**signed** 26:19,19 74:12,25 75:2 75:16 76:8,12 77:3,22 80:19 81:24 94:1 95:15,17 136:23 203:21 233:12,14,16 234:6,20 291:16
**signer** 238:25
**significant** 111:4
**signing** 78:2 128:4
**signs** 121:3 122:3
**sikenko** 241:13 247:20 248:3
**similar** 30:4,5 44:7 48:13 83:7 129:16 139:17 144:20 181:11 237:11 264:9 265:10 266:5 276:8 288:15
**similarly** 164:19
**simply** 9:22 11:12 103:2,23 107:7 117:8 123:17 129:23 149:17 195:5
**singer** 53:21 54:17 91:18
**single** 63:22,22 67:10 75:25 76:1 81:19 95:13,14,19,20 107:6 108:2 149:19,23,24 158:24 177:6,7 182:4 187:9 202:18 203:13 203:19,24 229:18 268:9
**sir** 13:6 151:12 177:17 200:14 259:23 296:4
**site** 83:4 155:7 157:15 163:18 199:11 254:20 256:4,8
**sites** 163:25
**sitting** 140:21 188:21,24 189:2,16,18
**situation** 184:24
**six** 36:23 187:24,25 287:5,16
**skilled** 14:24 15:2,6
**skills** 30:5 44:3 48:9 216:9 235:15 237:11 263:1 299:10 300:6
**sklansky** 148:19
**skype** 3:8 38:9 39:9
**slide** 147:3 148:3,4
**slides** 147:10 147:14,16,17 190:16 191:22 211:1
**slow** 283:7
**slower** 9:2 22:1 22:3
**social** 133:25
**soft** 134:23
**software** 14:8 14:10,15,18,22 15:2,9,18 16:1 17:21 21:7 44:3 48:9 80:24 88:7 104:3,8 111:13 111:18 114:15 115:19 116:21 117:2,3,7 119:11 121:2 121:10,12,12 122:1,1,4,16 125:20,21 126:6,10 130:7 130:14,19,21 131:1,12,20,21 132:2,2,15,20 134:8 146:1,6 146:14,20,23 147:3,4 148:2 152:2 154:8,13 159:3 164:15 164:25 171:2 183:20,23 185:18 207:18 210:12,18,18 212:7 229:15 229:24 230:15 230:23 234:22 234:22 263:19 263:20,23 264:2,9 265:10 290:11,15 293:7

**sold** 126:10
**sole** 79:7,10,16
**solicit** 24:12 26:23 27:3,13 27:21
**solicitation** 25:23 27:14,22
**soliciting** 26:22 27:2
**soloman** 248:20
**solomon** 3:18 241:3,3,7 242:22 243:1 244:6,11,24 245:7,8 247:24 248:5,6,12,15 254:3
**solomon's** 248:7
**solution** 68:5,7 97:2 232:12
**solutions** 1:13 14:22 96:24
**somebody** 34:20 46:17 57:15 75:2 90:13 106:20 106:21,23 112:15 149:12 156:23 204:25 210:5,5 216:4 258:6 262:5 268:4 281:14 290:17 294:9
**somewhat** 292:24
**son** 227:1 228:18 229:7
**soon** 38:13
**sorry** 8:5 13:7 13:12 15:7 18:16 21:17 22:10,16 34:23 39:19 52:10 55:21,24 59:9 59:16 62:25 64:12 68:11 77:19 78:21 82:7 90:21 92:14 95:2 97:23 99:12 102:9 105:19 108:15 109:3 110:21 111:19 115:3,13 125:3 125:5,17 137:20,23 139:4 147:8 150:25 151:19 156:19 158:25 160:8,20 166:5 181:20 187:11 189:6 192:17 194:24 196:5 198:24 201:21 204:9,16,18 211:11 218:20 218:22 220:23 224:15 227:8 230:7,9 238:23 246:16 260:9 269:19 271:5 277:15 282:13 283:22 285:9 293:15 296:23
**sorted** 297:2
**sound** 27:6,10 241:21 262:16
**sounds** 22:13 22:14 37:2 82:8 247:17
**source** 17:6 20:13,22 21:7 40:19,25 41:3 47:2,13 84:24 85:1,12 86:5,6 86:12,16 87:20 89:1,5,7,9 100:7 102:21 103:6,24 154:12,14 156:2 163:2 170:12 199:7 209:6 277:9,9
**sources** 44:8 48:14 162:21
**south** 18:6,9,11 18:12,14,20 19:8
**sow** 3:16 95:14 95:15,17,19 96:2,4 101:21 102:5 128:7 136:23 233:16 239:22 291:21 291:22 292:3 292:10,10
**sows** 98:18,21 128:12 129:25 239:1 281:6
**space** 212:16
**speak** 8:17 9:2 16:24 22:3 99:11 104:9 115:23 116:2 137:14 147:7,7 150:4 163:20 171:10 184:5 197:6 204:16 227:24 235:23 267:17 268:18 287:25
**speaker** 7:9
**speaking** 19:4 22:1 166:12 267:25 268:1
**special** 173:12
**specially** 170:4
**specific** 15:7 18:7 24:8 26:2 27:5,9 32:11 32:13 33:18,18 43:1 47:9,9,10 47:14 48:7 50:20,22,23

52:1,3 58:8 61:15 63:19,20 64:11,17 65:9 74:13 77:9 78:1 83:12 87:5,22 88:5 92:21 94:15 96:13,24 97:1 97:1 99:16 101:2,11 104:10 112:15 115:9,12,21 116:24 117:14 117:15,15 118:1 119:9,17 123:15 127:3 133:7 134:18 140:20 146:21 146:25 148:18 149:4,16 152:4 154:25 155:1,7 155:8 156:16 157:6 158:13 162:3 163:23 164:1,18 165:1 165:1,9,18,19 165:21,21 171:2,2,24,25 176:20 178:3,4 178:25 179:6 179:24 180:7 180:14 181:14 182:1,12 184:24 185:7,8 185:24 186:9 186:11,12,21 189:19,24,24 189:25 190:6,6 194:6 199:23 200:15 201:3 201:20,24 203:8 206:1,8 208:6 212:7 215:15 218:6 219:2,15,18,24 221:3,4,10,14 221:23,24 222:25 230:16 234:12 238:9 238:10,24 245:3 246:5 249:4 250:16 255:1 256:18 256:22 259:2 260:4,10 262:13 263:8,9 264:24 265:20 266:10 270:20 271:24 273:8 274:16 282:15 283:20 284:4 285:8 290:22 290:22

**specifically** 21:12,14,14,21 26:5,21 27:1 30:20 31:5,9 31:20 33:1,3 34:2 39:12 44:10 45:19 48:19 49:14 55:2 56:17 62:25 64:3,10 64:19 66:21 72:9 73:20 82:11,17 86:25 98:25 102:8 105:4 107:10 116:7,22 117:12 142:19 147:21 149:11 151:4 158:18 167:19 170:9 170:15 171:17 175:6,7 183:17 183:18 185:10 201:5,11 208:5 221:22 224:14 225:14 226:6 237:22 256:9 267:4 268:16 272:6 273:15 279:9 281:15 282:9 287:5

**specifics** 46:25 60:8 135:17

**specified** 178:19,20

**specify** 206:7 225:12

**speculate** 9:21 52:2 125:8 149:16 150:25 156:25 176:15 179:7 201:7 216:24 248:24 249:25 265:15 265:19 266:12 266:20 267:1

**speculating** 57:5 158:2

**speculation** 91:16 125:25 135:17 137:2 158:11 286:12

**speculations** 125:18 126:3

**spend** 138:23 213:2

**spending** 264:1

**spent** 139:7,14 139:22 143:15

**split** 31:1 53:7 217:7

**spoke** 46:20 127:1 219:12 268:20,21

**spoken** 9:17

**sponsor** 88:18

**spot** 255:9

**spread** 90:14 93:21

**staff** 61:15 65:16 81:19 136:3 178:17

**staffing** 54:9 259:16
**stakeholder** 230:12
**standard** 44:11 170:3 171:16 174:17 271:19 288:25
**standards** 77:1
**standing** 21:13
**stands** 16:17
**start** 52:24 118:5 220:10 251:20,21 253:2 289:14
**started** 71:5 84:3 88:16 96:11 136:22 187:3 190:5 230:3,4,11 236:12 264:7 266:11 270:21 287:2
**starting** 6:1 11:3 264:16
**starts** 70:13,20 71:10 78:9 148:8 231:19 278:15
**state** 8:14 9:22 11:23 15:12 29:10 40:22 43:16 46:1 47:5,8 49:22 61:7 64:22,24 69:6 71:20 73:24 86:15 96:4 98:13 101:6 112:24 151:8,13 153:8 220:22 231:6 245:24 255:15 258:2 265:7 271:1,11,14 282:10 284:12 285:8 291:22
**stated** 15:8,17 15:25 24:24 27:5 30:8,11 41:8 44:22 71:3 79:23,25 120:14 146:18 159:4 160:7,17 165:24 184:25 187:16 188:7 190:12 191:5 198:12 205:11 213:7 214:17 217:19 220:1,2 220:17 224:12 238:12 241:25 242:14 260:2 277:7 278:1 288:3 292:8,10 294:13
**statement** 47:10 49:3 79:23 80:22 81:12 83:4 91:20,22 93:16 94:24 95:2,7 98:9 101:8 104:16 108:11 119:2,3 120:9 120:10,24 122:3,6,12,13 123:16,17 138:10 140:20 166:11 188:7 209:9 228:4,10 228:15,16 229:3 233:19 234:1,3,5,6,11 234:17,18,18 234:20 238:20 238:21 239:1 240:1 254:18 263:15 269:4 272:6,17 275:18,21 276:2,5 283:8 291:17
**statements** 32:3 195:5 229:2 233:16 234:14 235:2 239:23 272:1,5 272:11 273:4 275:24 276:1,4 276:9,24
**states** 1:1 47:21 53:5 77:4,10 86:3 102:5 138:21 179:13 238:22 292:1
**stating** 12:20 12:22 25:2 27:20 44:25 47:14 57:14 93:6 121:9 143:24 152:5 153:10 210:17 230:21 236:17 238:18 241:20 245:14 246:7 254:9 260:23 272:16 279:21 281:4,9
**status** 67:20 173:12
**statutory** 163:5 163:11
**stayed** 19:16
**stays** 249:5
**steam** 52:17
**stenographic** 5:21
**step** 96:20
**steps** 33:19 179:19 180:17 253:8
**stick** 38:3,5
**sticky** 41:15
**stipulate** 7:7
**stipulation** 5:22

**stipulations** 7:1
**stitch** 192:21 206:24
**stole** 263:18 271:2
**stolen** 274:12 274:19,24 275:1
**stop** 78:9 97:21 121:17,18 132:10 137:5 287:6
**stopped** 204:11
**stored** 86:20 145:2
**storing** 257:6
**story** 11:19 108:5
**strategic** 147:22
**strategy** 211:2 212:20 252:16 265:22
**stravo** 149:12
**stream** 96:10 96:12
**streams** 189:5
**street** 1:14
**strengths** 183:22 213:22 214:15 217:13 221:21
**stress** 235:15
**stressful** 11:7
**strict** 188:8,9 188:13
**strictly** 161:22
**strikingly** 288:15
**structurally** 264:9
**structure** 23:5 173:19 174:5 250:11
**structured** 28:2
**studies** 183:18 185:11 205:18 207:10,16
**study** 232:15 232:15
**sub** 77:17 195:6 207:21 207:22
**subheading** 231:19
**subject** 96:7 113:21 124:12 124:14 252:8
**subjects** 123:15
**submission** 148:7
**submit** 99:18 129:24 296:11
**submitted** 203:21 296:10
**subscribed** 298:10 301:22
**subsequent** 110:10,12 237:14 239:17 290:6
**subsequently** 205:2
**substance** 46:21 98:14 208:10 219:25 220:20 239:19 249:12
**substantive** 275:10
**succeed** 211:19 226:11 238:1
**succeeding** 183:16
**success** 11:5 237:7 263:1
**successful** 211:24 232:9
**successfully** 54:16
**sudden** 266:11
**suffering** 8:1
**suffice** 157:8 176:17
**suggest** 21:25 36:15 283:24
**suggestion** 9:2 36:13
**suggestions** 138:1
**suggests** 276:20
**suite** 1:15 2:12
**suited** 268:3
**suits** 102:25
**summarize** 138:7
**summary** 183:12 254:7
**sunil** 83:15,15 84:15 129:13 226:13,14,16 226:20,23 227:6,8,20,21 227:24 228:7 228:17 230:3 230:11 235:10 235:18,22 236:1,5,11,12 236:15,16 237:2,6,10 238:13,16,25 239:12,17 240:4 273:12
**sunil's** 227:1
**supervise** 213:1
**supervision** 48:25
**supervisor** 49:5
**supervisory** 66:11
**support** 49:15 87:18,23 132:18 152:22 154:4 159:16

159:19 160:1 160:18,23 211:11 252:24 267:12
**supported** 47:12,15,15 197:20,23 198:4 211:7,10
**supporting** 212:19,21
**supportive** 211:12,13,16 211:18
**supposed** 28:16
**sure** 9:6,15 39:7 40:15 44:15 55:13 76:24 92:23 93:2 108:23 119:23 120:5 142:5 157:2 158:12 173:6 179:19 180:18 194:4,8 204:18 246:13,13 249:18,19 251:5 283:16 297:11
**swear** 5:11 6:14
**swearing** 241:20 259:7
**swore** 160:3 199:13
**sworn** 5:13 6:20 7:24 143:25 203:16 257:6,25 258:9 258:10,11,16 258:17,24 259:13 298:10 299:5 301:22
**symposium** 188:18,20
**synapse** 68:1,3 68:8,10,13,17 68:21 80:6,9 80:12,14,18 81:22,22 82:3 82:5,6,7,10,14 82:17,19,21,24 82:25 83:5 86:9,13,16 87:13,24 90:16 90:18 91:4,8 91:14 92:11,19 93:17,21 95:16 104:22,24 112:1,20,25 114:7,9,10,15 115:2,4,6,8,10 115:11,14,19 117:12,25 118:3,12,16,21 119:3,7 122:22 130:9,14,19,21 130:22 131:1 131:11,17,18 131:21 132:2,4 132:22,23,24 133:1,7,7,11,13 133:16 134:3 134:24 135:4,6 135:23,24 136:7,8,8,11 138:6,6,13 141:16 143:15 146:1,14,17,20 146:23 147:23 148:8,13,16 158:22 159:8,9 159:13,15,21 160:4 175:10 175:14,16 177:3 185:14 185:20 207:11 210:23,24 213:9 221:25 232:18,25 233:22 234:14 237:22,23 238:8,9,14 243:3 263:18 263:20,23 264:10,12 265:3 268:12 278:7,8,13 288:16 293:19
**sync** 283:20
**synchronizati...** 283:13
**system** 16:16 16:20 52:18 67:19 90:24 91:3 188:11 279:7 290:25
**systems** 1:4 2:2 2:11 5:7 6:9 14:6,7,24 15:1 55:8,19 56:24 58:2,7 60:10 60:14 64:24 65:1 88:3 105:18 163:22 188:12 253:3 270:1,5,14 291:3 301:2

**t**

**t** 3:6 4:13,13
**tabs** 162:24
**tabulate** 268:14
**take** 5:4,9 10:25 22:8 37:10 53:11 56:12 75:10 77:6 97:8,11 97:14 136:14 136:16 142:14 152:16 167:11 167:11 169:10 169:11 171:24 172:12 174:20 175:5 178:8 180:20 195:10

196:23 220:5 238:5 257:5 276:6,20
**takeda** 3:11,16 65:4,23 66:1 66:22,23 67:1 67:6,14,20,25 68:3,5,6,7,10 71:22 72:22 73:1,22 74:5 74:14,17 75:3 77:24 79:1,2,7 79:8,11 80:7 80:13,19,21,24 81:3,4,5,7,8,10 81:15,24,24 82:1,13,15,20 82:23 83:2,2,6 83:7,9,10,11 84:16,24 86:2 86:4,24 87:6,8 88:24,25 94:2 94:4,10,13,15 94:16,16 95:11 95:16,21 96:1 96:11,16,21,23 96:25 102:12 102:17 108:12 111:13,18 112:2 113:10 118:10,18,19 119:4,6,13 120:9 121:11 122:22 124:24 128:7,12 130:6 130:14,19 132:23,24 133:1,7,16,16 134:3 135:5,14 135:24 136:8,8 136:24 138:6,9 138:9,14,15,15 138:18 139:3 141:22 148:8 148:13,15 155:1 158:21 159:5 160:4,25 161:1 175:17 182:17 217:3 217:18 218:2 226:16,17 227:2,7,17 228:5,16 229:4 229:5,13,22 230:1,11,13,17 230:23 231:2,6 232:9,11,14 233:20,24,25 234:7,23 235:24 236:7 236:12,13,14 236:18 237:23 237:24 238:5 238:11,15 239:2,21 252:10,15,16 259:15 260:8,9 260:15 261:22 265:6 277:3 290:10 291:17 293:8,12
**takeda's** 101:25 104:16 130:25 134:24 154:23 210:11
**taken** 5:6 33:19 53:14 102:23 178:11 182:13 229:2 246:19 246:22 255:16 267:2 299:3,12 300:9
**takes** 121:19
**talent** 227:12 228:1,2
**talk** 23:23 33:21 39:8 46:17 48:18 104:1 111:9 127:9 176:23 190:7 239:13 246:12 248:22 248:25 249:10 249:17 274:11 274:16
**talked** 30:21 127:5,7 174:13 207:20 210:14 213:15 224:14 237:6 260:16 275:5
**talking** 24:1 25:13,13,17 49:15 85:4 94:25 102:9 138:5 176:25 177:8 190:5 205:17 237:5 265:24 267:4 294:24
**talks** 276:18
**target** 191:8,23 195:21 196:2,9 196:17 206:6 206:10 210:22
**targeting** 87:25
**targets** 28:23 29:2,5,16 191:24 193:3 193:10 205:14 205:15 207:20 212:1 284:23 284:23
**tasks** 136:3 164:22
**tax** 162:15
**teach** 275:22
**teaching** 275:24 276:18
**team** 34:14,16 35:4 49:16 57:11 59:3 60:21,23,25 61:5 76:24 81:21,21 89:23

91:9,11 92:6 93:19 108:22 108:24 145:8 145:14 147:22 149:5 157:13 164:12,23,25 165:16 166:15 166:17,19,21 166:23 167:8 172:14 173:1,4 173:7 175:9 176:20 183:25 185:9 192:3 194:12 235:23 246:14 249:20 268:4 274:1 275:7 284:13 285:2,2
**teams** 3:10 62:8 62:9 66:3,4 91:25 105:17 105:23 106:11 123:25 164:25 246:20 248:6 249:1
**technical** 16:10 16:12,17,18 74:3 91:11 92:4,5 136:5 164:20 283:14
**technology** 14:6,13 74:2,4 74:19 172:18 255:12
**tell** 6:21 9:19 11:18 12:8 13:17 15:7 22:15 26:21 27:1 28:16 31:20,24 40:7 43:1 44:21 47:12 50:23 52:13 53:3 55:3 61:17 63:2 64:19 70:1 71:24 72:6 79:20 82:18 85:10 86:18 87:17 89:2 90:18 99:15 102:4,6 104:17 105:14 106:6 107:12 107:20 108:18 109:13 116:15 116:22,23 119:16,23 122:25 123:3 124:20 126:21 127:21 128:14 130:11,17 132:25,25 133:8 134:5,9 134:13 143:10 143:13 144:15 144:21 146:17 151:16,24 153:19 157:2 157:25 159:11 163:7 165:20 168:4 177:2 178:25 181:18 186:9 195:14 201:4 209:5,16 233:5 236:24 243:9,23 247:23 250:13 251:25 252:1 261:9 268:6 270:4 273:16 274:6 277:25 278:17 281:15 283:4,19 284:10 289:13 295:25
**telling** 54:25 132:21 217:16 218:1
**temporary** 150:13,22
**ten** 294:23
**tend** 203:25
**tends** 202:21
**tenure** 22:24
**term** 68:18,24 82:3,4,6 136:2 162:8
**terminate** 155:11,14,18 155:21 156:15 197:13,15,15 198:20 213:17 213:18 262:20 269:1 294:12
**terminated** 158:8,10 199:21 241:11 242:11 249:8 249:11 251:3 269:1 271:17 272:13,19,22
**terminating** 198:19 199:16 203:10 262:21 262:24
**termination** 155:7,24,25 156:18,21,24 157:5,7,9,10 197:18 198:3 198:23 200:4 200:17,18,21 200:22,24,24 201:3 224:13 224:17,18,21 241:3,8,11 242:12,16,17 242:19 244:11 244:19,25 245:10,13 251:3,6 264:1 271:16 277:13 277:16,18,21 278:4 294:6
**terms** 75:14,17 75:19,20 76:24

78:2,5
**territorial** 130:8
**testified** 6:22 292:21 295:12
**testify** 8:3 219:3,5 274:5
**testifying** 12:1 299:5
**testimony** 10:14,19,20 13:19,25 60:18 137:16 199:17 203:16,20,22 292:23
**testing** 60:7 63:5 64:16 65:9 119:25 145:18 277:24
**tests** 22:12
**text** 53:2 54:11 94:3 182:11 268:14
**texted** 181:7
**thank** 6:13,23 11:23 18:22 37:4 40:16,17 44:9 53:14 56:3 79:9 128:1 232:17 253:10,13 257:13 292:14
**that'd** 145:12
**thereto** 79:2,8
**thief** 271:2
**thing** 59:5 96:22 127:24 251:25 260:7 260:10 286:10
**things** 89:1 152:3 171:3 180:22 185:12 186:23 187:5 190:15 202:10 202:15,21 203:25 219:2 260:1 276:6 294:3
**think** 7:15 9:4 20:8 22:9 30:25 38:3 56:1 63:6,7 68:21,25 69:10 77:16 81:22 82:19,20 90:23 96:3 97:12 100:9 102:24 104:23 108:24 112:19 116:7 119:20,24 121:20 122:11 122:21 124:8 127:24 130:9 141:19 156:17 156:22 157:10 166:11 182:8 182:11,14,17 195:7 196:12 201:12,25 207:6 208:25 214:11 216:5,6 217:2,5,10,11 221:5 222:24 223:14,15,18 247:21 251:23 253:14 259:14 263:20 264:4 265:14 266:9 267:5,7 269:12 272:20,25 274:14 275:15 278:17 279:14 279:14 280:7 284:17 285:7 288:3 296:4 297:3,14
**thinking** 56:1 157:22,23 202:6 218:20 225:6 260:19
**thought** 19:24 20:3 121:23 183:20
**thoughts** 38:16 38:18 210:23 263:10
**thousand** 162:14
**thousands** 113:17
**thread** 110:7 261:19
**threat** 259:16 260:20,21
**three** 71:24,25 73:21 95:23 271:18
**ticket** 241:2 252:24,25
**tied** 28:23 29:2
**till** 129:11
**time** 1:12 5:24 9:5 15:6 18:14 18:20 19:13 20:6 21:9 22:9 24:9 25:19 26:5,20 32:14 33:11,19 37:10 38:25 39:1 40:13 41:3,10 50:15 51:5,12 53:11 54:15 55:2,15 56:1 56:10 60:23,24 60:25 61:1,3,9 61:12 63:1,5 63:10,20 64:1 64:14,20 69:10 75:4 77:19 85:3 86:1,12 87:11,19,24 88:6,19,24 89:2,17,18,25 90:5,12,13

91:10 97:21 102:11,13 104:20 105:3 106:4 107:20 108:5,7 109:20 109:24 110:4 115:7 118:24 119:13,20,25 126:10 127:1 137:3,6 138:25 139:18,21 144:5 145:9,12 145:13 146:19 147:11 156:17 157:1,6 158:14 159:7 166:13 169:24 170:7 170:24 178:7 179:3,4 181:7 181:8 185:25 189:22 190:1,2 190:6,23 192:13 193:20 193:24 194:2 198:8 199:20 199:23 200:18 200:22 201:24 202:18,23 203:20,23,25 207:1 208:17 208:19 209:1,2 209:5,21 212:19,21 213:3 220:11 222:2 224:21 225:7 226:13 226:16 227:15 228:5,6,16 230:2 235:22 236:11 241:1 245:6 246:5,6 246:7 248:1,1 252:2 255:6,15 256:15,15,18 256:23 258:11 258:18,21 259:6,12 262:13,24 264:1 267:3 269:12 275:19 282:25 283:6 284:19,23 286:14 287:8 287:13,16 288:2,13 292:17 295:23 295:24,24

**timeline** 64:11 115:9,12 116:24 117:7 117:15 146:17 146:22,25 254:2

**times** 34:16 50:18,23 51:20 180:13,15,15 185:25 192:1 221:6

**timestamp** 247:23

**timestamps** 248:2 254:10 295:19,22

**timing** 203:8 264:23

**tiny** 47:25

**title** 79:2,8 148:23

**titled** 35:13 74:7

**tkda** 70:2,7,13 70:20 71:5

**today** 8:2 9:10 9:13 10:14,24 11:10,17 12:2 13:23 14:3 39:2,8 40:15 59:23 83:15 124:8 145:19 182:3 208:15 252:17 259:7 260:16 275:5

**today's** 195:24

**together** 11:14 18:8 19:2 30:16 60:2,9 61:23 62:10 154:3 188:21 188:24 189:3 189:16,18 192:21 201:12 206:25 229:2 235:10 239:3

**told** 34:16 37:22 61:19 114:4 148:6,10 158:19 181:12 216:9 218:4 242:25 255:5

**took** 54:17 98:1 182:12 205:16 230:3,12 232:20 247:2 297:7

**tool** 87:18

**tools** 20:13,22 112:12 288:22

**top** 71:20 91:3 256:14

**topic** 91:21 126:20 197:10 205:3 290:7,9 290:13

**topics** 244:25

**touch** 130:1 283:25 285:3,6

**touched** 286:7

**track** 35:21 90:12 186:15 263:8 287:23

**tracking** 90:13 144:5

**trade** 154:2,2 161:9,11,13 162:5,8,10 163:4,5,9,10,11

163:12,15,17 174:24 176:17 176:24,25 177:3,8 279:11 279:18,19,22 279:24 280:4 280:13,14,16 280:18,22,24 280:25 281:5 281:11,16 282:5,7,10,10 295:4,7,10
**traded** 89:10 161:21 173:17 173:18 184:6 186:24 187:1 188:2,8,14 192:20 276:15
**train** 49:8,12 121:23
**training** 62:16 174:20,23,24
**trainings** 167:10 169:10 169:12,12 173:7 174:21 175:5
**trajectory** 31:21 192:25 192:25
**transcribe** 9:16
**transcriber** 300:1
**transcript** 5:15 7:5 41:19 218:16,16,21 296:9 297:17 297:18,20 300:3,5
**transcription** 22:10
**transcriptionist** 299:8
**transcripts** 297:13,16
**transfer** 60:3 61:22,23 62:2 183:24
**transferable** 81:11 83:3 120:16 122:20 133:25
**transition** 205:5 207:2 223:20 286:15
**transitioned** 187:6 188:11 285:18 286:5
**transitioning** 188:11,12 204:24 223:8
**transparency** 51:20
**treat** 103:23
**treated** 101:24 175:18 279:17
**treatment** 294:16
**tried** 19:6 156:4 157:19 157:21 269:13 273:6
**troublemaker** 182:8,14,18 217:2,10,12
**troy** 105:9,12 105:21,22 219:13,19 289:12
**true** 15:8,17,25 18:4 44:5 85:19 125:5,19 132:8 176:12 177:14 208:12 245:4 299:9 300:5
**truly** 178:1 179:14 181:13
**trust** 143:21 144:9,10
**trusted** 211:6 271:2 272:2
**truth** 6:21,21 6:22
**truthful** 10:6 11:16 259:3,5 259:8,11
**try** 9:6 16:23 19:14 22:11 102:24 115:25 116:2 252:5 262:19 296:7
**trying** 43:12 56:4 104:24 156:7 158:6,9 199:24 206:24 263:16 269:16 272:7 273:2 289:23
**tuesday** 1:11 5:7 109:21
**tuning** 120:3
**turkey** 295:16
**turkish** 295:23
**turn** 10:23
**twice** 73:15
**two** 7:1 11:13 36:19 38:11 40:10 56:10,20 65:10 66:22,24 67:1 72:9 90:20 95:23 96:7 97:1,4,17 99:15 119:3 121:19 127:4 128:6,12 129:2 139:1 177:12 184:25 187:23 192:7 229:19 238:11 240:20 247:6 260:18 273:13 282:6
**tws** 80:16

**type** 30:22 31:10,15 67:16 122:15 152:24 163:2 180:7 199:7 230:18 230:19 231:3,7 231:7 234:7 235:3,3,4 238:23 239:24 240:2 264:2,3 279:19,25 280:2 281:10 291:6,7,8
**typed** 89:3 153:9,17
**types** 161:19 165:6 177:4 180:15
**typewriting** 299:7
**typical** 227:10 227:14
**typically** 75:20 93:22 122:19 136:3 141:17 185:16 209:22 209:24,25 210:2 215:23 271:12
**typing** 153:11

**u**

**u** 4:13
**u.s.** 177:13 178:1,21 179:14 180:3 227:12 295:24
**ui** 90:23
**ultimately** 117:10
**unable** 43:16
**unauthorized** 50:12 279:5
**unclear** 9:19 12:8
**uncomfortable** 11:11
**under** 5:18 7:24 10:7 12:1 24:17 25:2 26:8 28:22 29:1 59:23 71:3 77:2 80:7 80:13 95:10,10 106:24 121:16 121:19 137:12 150:14,23 151:20 162:3 165:12 170:22 174:4 188:23 195:25 199:14 222:4,10 230:21 238:2 241:20 253:9 269:4 272:10 272:16 282:5 296:20
**understand** 5:14 8:3 9:23 10:2,3,7,8,11 12:1 17:8,9,12 17:14,17,18,21 21:1 23:5 28:1 28:17 34:20 42:14 43:20 45:22 46:2 51:6 56:4 59:15 75:25 79:20 86:14 91:6 112:13 129:9 132:19 136:18 158:24 161:9,17 172:4 187:15 196:4 199:1 224:23 228:14,24,25 241:25 249:20 250:10 258:1 258:25 260:19 260:21 264:8 264:24 265:8 296:18
**understanding** 8:13 43:13 45:14 61:24 72:8 77:2 79:21 87:17 90:20 138:20 158:4 159:6,18 159:25 161:23 161:25 162:7 163:12,14 228:23 255:21 268:11
**understood** 17:6 23:3,8 266:14
**unethical** 252:9
**unexpectedly** 288:3
**unfortunately** 53:10 185:11 186:1 252:20
**unit** 41:7 48:22 54:4 65:6 116:25 164:19 166:4 172:20 173:3,13,14,22 174:2,4 177:12 186:16,20 189:11,22 190:11,19 191:21 192:15 195:6 197:20 204:15,23 205:14 207:17 207:22 210:21 212:4,9,12,13 215:18 220:5 222:1,2,4,10 238:4 242:7 282:21,23 283:24 284:16 285:7

**united** 1:1
**units** 188:23 189:8 207:23
**university** 2:12
**unreasonable** 196:13
**unusual** 134:10
**upcoming** 111:6 195:22
**usable** 83:9
**use** 13:3,24 35:20 53:12 56:23 57:3 76:18,20 87:23 87:25 88:6 91:5 102:24 103:6 105:23 115:21 116:3 116:18 119:9 120:1,2 124:16 129:16 132:13 170:11,16,21 171:8,17,23 172:15 186:25 230:22 232:12 233:25 271:12 281:2 283:17 288:19,23
**used** 69:13,16 69:16 70:6 75:4 76:22 82:17 90:8 91:2 96:3 131:17 145:15 145:20 171:1 230:6 235:4 246:5 256:10
**useful** 35:21
**uses** 5:17
**using** 88:3 111:18 119:13 124:23 169:23 169:25 170:8 170:10 171:12 171:20 172:9 210:11 229:14 229:22 271:18 288:5
**usual** 50:8 51:13 260:5,18
**utilization** 82:1
**utilized** 170:2 288:17
**utilizing** 96:13

**v**

**v** 1:6 301:2
**valid** 70:4 74:24 109:19 180:19
**validate** 107:6 152:22 180:18
**validated** 179:20
**validating** 120:2
**valuable** 229:12
**value** 72:13,14 104:13 161:16 283:2 286:8
**valued** 284:8 284:13 285:3 285:10
**values** 284:15
**varma** 177:10 177:25
**varma's** 240:7
**vendor** 72:10 79:22
**venues** 184:23
**verbal** 10:1,1,5 10:5 182:23 183:4 191:9,11 191:16,17 208:4,8,9 276:25
**verbally** 193:25
**verbatim** 94:3
**verified** 144:11 203:21
**verify** 144:7,9 244:4
**veritext** 1:13 5:4 296:20 297:3,19 298:1 301:1
**veritext's** 297:12
**version** 17:14 17:18 96:4 134:24 151:16
**versus** 84:24 180:3 186:24 187:1
**vertical** 32:5,9
**vest** 79:2,8
**vested** 77:5,14
**vice** 6:9 14:5,7 17:4 72:11 241:4
**videoconfere...** 2:3,10,18
**viewed** 30:8,8 30:12
**violation** 26:23 27:3 58:21 216:12,15,16 277:6
**virtual** 269:19
**virtually** 269:20,23
**visibility** 110:11
**voice** 115:25
**vs** 5:7 270:1,5 270:14

**w**

**wait** 46:17 239:10 275:12
**waller** 33:22 222:6,7,10
**want** 10:24 11:16 35:18,22 40:15 43:22

44:13 47:19 52:23 73:20 76:18 78:8,15 79:9 85:7 97:5 136:14 182:5 227:25 231:18 239:9 240:9,18 244:9 250:17 250:18,19 251:14,21 276:5 279:8 282:9 285:20 287:10,15
**wanted** 18:24 19:3,6 30:20 31:5,9 85:1,11 89:12 99:19 100:7 170:11 197:12 212:14 286:6 287:22
**wants** 274:14 276:20
**way** 28:2 41:15 54:25 102:24 135:21 136:12 164:1 172:23 176:10 182:12 187:15 202:20 230:2 234:2 237:16 239:18 242:13 254:11 284:18 285:11 288:16 295:2
**ways** 284:18
**we've** 81:3 97:3 223:6 235:23 274:3
**weaknesses** 214:16
**website** 215:2,5 215:7,11,25 216:2,3,5,17,21 263:3 288:13
**wednesday** 252:6
**week** 39:3 113:8 127:4 247:6
**weekly** 194:13 213:1
**weeks** 127:4
**welcome** 227:13
**wendy** 150:14 150:23
**went** 157:18 204:14 227:9 227:14 274:19
**white** 128:17 128:19
**winning** 267:16 267:24
**wins** 292:4
**witness** 5:11,13 5:14 6:15,20 7:4 8:7,24 9:3 9:6 13:7,10,12 13:21 15:20 16:4,21 18:18 20:5,17 21:1 21:19 22:3,11 22:17 23:18,25 24:7,15,21 25:6 26:1 27:17,25 28:6 29:10,15 30:3 30:25 34:7,14 35:3 36:3,7 37:15,23 40:22 45:8 46:23 47:4,25 49:22 52:6,9 53:18 55:10,23,25 56:4 58:16,18 61:7 64:9 67:1 67:9 69:15 70:22 71:8 74:21 77:9 79:13 80:9 81:2,17 93:13 94:7,22 95:2 96:1,20 98:18 99:14,25 101:15 102:4 102:15 103:5 103:16,21 107:3,25 108:14 110:6 110:20 112:4 114:1 116:2 117:6 119:6,15 120:13,23 121:6,14,18,22 122:6,11,25 123:11 124:6 124:14 125:2 125:24 126:9 126:16 128:3,9 131:23 132:11 133:19 134:18 135:8,16 136:1 136:18 137:2 137:21,23 138:12 139:3 139:10,17 140:12 141:24 142:14 143:7 144:3 146:9 147:9 150:3,18 151:24 152:16 153:6,16,17 154:25 155:16 155:23 160:6 160:11,17,22 161:6 162:23 165:8 166:5,7 166:10,25 167:18 168:10 168:15,17 173:16 174:16 175:12 176:3 177:16,21 180:25 181:25 182:10 184:19 185:22 188:6

193:8,23 194:20 196:4 196:12 198:16 201:23 202:13 204:9,13,18,21 205:22 206:16 207:14 208:24 210:14 217:22 218:4 219:7 222:17 223:5 225:2 228:9,20 229:17 230:10 230:25 232:2 232:22 234:10 234:25 239:21 240:12 241:24 243:22 244:3 244:17,21 245:18,24 249:15 254:9 254:14 257:10 257:13,25 258:13 259:19 260:1,14 261:2 261:12 262:11 268:1 269:8 270:7 271:11 274:6 275:16 276:23 277:5 278:10,15 279:24 281:9 282:12 284:3 286:2,12 290:19 291:19 292:6 299:4

**witnesses'** 301:3

**word** 30:17,18 47:21 76:21 147:24 161:9 163:12 168:12 172:10

**wording** 178:3

**words** 47:14 71:25 98:23,25 99:2 104:9 151:14 158:1,2 163:15 203:24 220:17 234:17 271:12

**work** 18:24 19:3 30:16 44:14,14 45:23 46:3,7 50:5 51:16,19 61:11 62:8 66:17 70:23 77:7,13 78:10 79:23 80:3,22 81:5 81:14,24 86:3 86:4 94:14,24 95:3,7,9 96:10 96:11,12,24 98:9 101:8,24 102:18,19 104:16 108:11 109:3,4,4 119:2,3 120:9 120:11 122:3 122:17 124:7 126:13 138:10 142:12,17 152:12 173:9 173:24 212:5,6 212:15 229:13 230:14,19,22 231:3 233:16 233:19 234:1,3 234:5,6,12,12 234:14,17,18 234:19,20 235:3,9,12 238:1,20,22 239:1,24,25 240:3 253:3 285:4 289:4 290:21 291:17

**worked** 14:25 18:4,8 19:2 45:10 59:25 60:2 61:23 214:13 217:17 218:2 283:20 287:23 289:22

**workflow** 232:13

**working** 19:1 45:17 48:25 50:12 60:9 61:25 62:3,4 81:4,20,22 88:2,9 102:17 164:3,9 213:5 221:24 226:16

**works** 79:6 120:2 202:20 270:18 283:20 297:6

**world** 20:14,23 21:8 30:1 183:6

**worried** 242:23

**would've** 60:17 60:22 64:5 209:14 226:18 264:12 266:4 286:13,13 293:3,8,10,13 293:14,17,20 293:21,24,25 294:3

**wrap** 296:7

**write** 41:20,22 151:1,5 152:7 171:13 174:6,8 176:17 253:15 253:18,19,20 253:21,22,24

**writing** 189:7 238:19,21,24 252:13

**written** 5:22 10:19,20 94:4 104:15,18,18 138:8 165:23 182:4 190:9,22

190:23 192:8 193:21 194:1,8 194:10,18 207:25 254:6 276:18,25 289:2 295:3
**wrong** 178:19 191:6 216:7 271:14 297:15
**wrongdoing** 271:21,22 273:17
**wrote** 38:14,16 38:19 150:21 151:3,9,12,16 250:10 258:24

**x**

**x** 3:1,6

**y**

**yeah** 8:24 9:3 16:23,24 33:11 37:3 39:5 55:5 55:16 64:5 67:9 69:2 70:14 72:14 77:21 78:18 90:19 91:10 97:9 98:1 99:13 104:25 107:25 115:25 128:25 130:8 136:14,16,21 143:8 147:9 160:13 187:21 208:24 232:24 250:7 251:16 251:19,23 257:20,20 266:19 275:19 296:4,17,17
**year** 18:8 63:2 99:16,16 100:5 117:8 186:8,10 187:2,3,4,4,5,6 187:9,13 191:6 192:11,11,12 195:22 203:12 204:1 206:4 283:6
**year's** 206:20
**years** 11:1,4 17:25 18:3 21:11 65:8,10 81:4 99:15 186:22 192:4 192:12,16 196:1,10
**yep** 38:6
**yevhkov** 33:14 33:17,22
**york** 2:6 301:1

**z**

**zero** 50:25 209:17,18
**zone** 246:5,7,7 248:1,1

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.